TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Lara R. Sheikh
Lauren L. Peacock

Proposed Counsel to the
 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
In re:                                                      :        Chapter 11
                                                            :
FL 6801 SPIRITS LLC, *et al.*,                              :        Case Nos. [     ] through [     ]
                                                            :
                              Debtors.                      :        (Motion for Joint Administration
                                                            :        Pending)
------------------------------------------------------------X

## DECLARATION OF ANTHONY BARSANTI PURSUANT TO
## LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1746, I, Anthony Barsanti, declare as follows under penalty of

perjury:

1.      I am a Vice President of Lehman Ali Inc., the sole member of PAMI

ALI LLC, which in turn is the sole member and manager of FL 6801 Spirits LLC

("Spirits"), a limited liability company organized under the laws of Delaware, a debtor

and debtor in possession herein, and the managing (and sole) member of the following

affiliated debtors and debtors in possession, each of which are limited liability

companies organized under the laws of Delaware:  FL 6801 Collins North LLC ("6801

North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC

("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries,"

and collectively with Spirits, "Collins" or the "Debtors").  In that capacity, I am familiar

with the operations, business, and financial affairs of the Debtors, which share a

principal place of business at 1271 Avenue of the Americas, New York, New York

10020.

2.      The Debtors are indirect, wholly-owned subsidiaries of Lehman

Brothers Holdings, Inc., which together with certain of its subsidiaries (collectively,

"LBHI") are currently the subjects of pending cases in the United States Bankruptcy

Court for the Southern District of New York (the "Court") under jointly administered

Chapter 11 Case No. 08-13555 (the "LBHI Chapter 11 Case").  On December 6, 2011, the

Court entered an order in the LBHI Chapter 11 Case confirming the Modified Third

Amended Joint Chapter 11 Plan of LBHI (ECF No. 23023) (the "Plan").  The Plan

became effective on March 6, 2012 (the "Plan Effective Date").  The Plan provides for

the appointment of LBHI, as Plan Administrator, to liquidate LBHI's assets, including

the assets of LBHI's non-debtor subsidiaries, within three years of the Plan Effective

Date.

3.      I submit this declaration (the "Declaration") pursuant to Rule 1007-

2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local

Bankruptcy Rules"):  (i) in support of the voluntary petitions for relief filed by each of

the Debtors under Chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code");  (ii) to explain to the Court and other interested parties the circumstances that

compelled the Debtors to seek relief under Chapter 11;  and (iii) in support of the

motions and applications for related relief filed concurrently herewith and discussed

herein (collectively, the "First Day Motions").

4.      I have reviewed the First Day Motions or have otherwise had their

contents explained to me and, to the best of my knowledge as I have been able to

2

ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to permit an effective transition into Chapter 11, to minimize disruption to the Debtors' operations and to implement the sale of the Debtors' property in order to preserve and maximize the value of the Debtors' estates.

5.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge and information concerning the Debtors' operations and financials.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

6.     I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

7.     The Collins Subsidiaries own property commonly known as the "Canyon Ranch Hotel & Spa, Miami Beach," a luxury full-service, ocean front condominium hotel located at the site of the old Carillon Hotel in Miami Beach, Florida (the "Property").  As described in more detail below, the Property is governed by certain recorded Declarations (defined below) and managed by Canyon Ranch under a management agreement and related licensing agreements with certain Canyon Ranch entities (the "CR Agreements") that predated the Debtors' acquisition of the Property, pursuant to which the Debtors are entitled to net operating income after payment of certain fees and expenses to Canyon Ranch.  When the Debtors acquired the Property by deed in lieu of foreclosure ("DIL"), dated November 17, 2009, the Property was still under construction and many of the condominium units remained unfinished and

3

unsold.  While the Property's hotel has operated at a loss in each year of its operation, the Collins Subsidiaries successfully finished and sold all but 13 of the condominium units at the Property that were acquired by DIL.  Notwithstanding the successful sale of all of the condominium units, the net proceeds from such sales were substantially less than the outstanding balance of the loans made by LBHI.

8.      In furtherance of the liquidation of LBHI's assets and to stem the cost to the Collins Subsidiaries of further operating losses, in August 2013, the Collins Subsidiaries hired CBRE, Inc. as their broker to sell the Property.  After several rounds of bids from numerous parties, the Collins Subsidiaries awarded the sale to SMGW Hotel and Spa, LLC ("Shamrock") and on January 30, 2014, the Collins Subsidiaries and Shamrock entered into a Purchase and Sale Agreement for the Property to Shamrock. In addition, a development site located adjacent to the Property and known as the "Golden Sands" and which, at the time, was also indirectly owned by LBHI, was to be simultaneously purchased by a Shamrock affiliate.  Each of the purchase and sale agreements (each a "PSA," together, the "PSAs") required that the closing under such PSA was a condition of the closing under the other PSA.  Additionally, each PSA provided for a period of due diligence and allowed the purchaser thereunder to terminate prior to the expiration of such due diligence period, provided that the purchaser could not elect to terminate one PSA and close under the other PSA.

9.      During the due diligence period afforded to it by the PSA, Shamrock met with various unit owners and representatives of Canyon Ranch.  Certain of the unit owners expressed concern that Shamrock would impose changes to the operations of the Property and indicated that certain unit owners wanted to acquire the Property themselves.

4

10.     On February 14, 2014, the North Tower Association (defined below) brought an action in Florida State Court (defined below) against all three of the Collins Subsidiaries and a principal of the purchaser seeking a declaratory judgment that the purchaser's business plan in connection with the prospective sale of the Property and the alleged intention of the purchaser with respect to future governance and operations would violate the Declarations that govern the Property (the "North Tower Litigation").

11.     Shortly thereafter on February 28, 2014, the South and Central Tower Associations (defined below) brought a separate action against Collins Central in Florida State Court (and the Master and North Tower Associations as nominal defendants) seeking $8.7 million in damages for fees that were allegedly wrongfully assessed for the spa facilities, fitness centers, other recreational facilities, and valet services and the "improper" allocation of certain utility fees (the "South Tower Litigation," together with the North Tower Litigation, the "Association Litigations"). Additionally, the South Tower Litigation seeks a declaratory judgment that the costs to which they object shall not be assessed prospectively and that certain guest access to the spa and recreational facilities not be limited.

12.     The Association Litigations were intended to place a cloud on title and create an obstacle to a conveyance of the Property to Shamrock.  Indeed, just prior to the expiration of the due diligence period under the PSAs, the two Shamrock affiliates exercised their respective rights to terminate the PSAs by a written notice, which notice provided that the North Tower Litigation and then threatened South Tower Litigation was the reason for terminating.  In order to salvage part of the transaction, on March 10, 2014, Shamrock's affiliate entered into an Amended and Restated Purchase and Sale Agreement for the Golden Sands development site, which was wholly independent of and without reference to the Property.  The Golden Sands

sale closed in April 2014 and Shamrock announced its plans to construct a boutique, luxury 20-story tower comprised of 14 full floor exclusive residences on the Golden Sands site – a far cry from the 1,000 member beach club and the concern that an annexation of the Golden Sands site would devalue the existing unit owners' properties, as alleged in the North Tower Litigation.

13.    In light of the Hotel Lot's continuing operating losses and liquidity constraints, on or about March 12, 2014, the Debtors were required to borrow $2 million from PAMI ALI on a secured basis to pay the annual insurance premiums for the Property, which were due in March.

14.    Anticipating continued operating deficiencies as the Property enters its slow summer season, and consistent with its obligations under the Plan, the Debtors approached Shamrock regarding a potential sale transaction under section 363 of the Bankruptcy Code and reengaged with CBRE to identify other potential purchasers. At the same time, the Debtors entered into a "stand-still" agreement with the plaintiffs in the Association Litigations to permit the Associations (defined below) to conduct diligence, meet with Canyon Ranch, and potentially enter into a contract to purchase the Property which would provide for the dismissal of the Association Litigations. The standstill specifically permitted the Debtors to engage in negotiations with other parties while the Associations conducted diligence and negotiated with the Debtors.

15.    The Debtors received an offer of $12 million for the Property from 360 Miami Hotel and Spa LLC ("360 Miami" or the "Purchaser"), free and clear of liens and encumbrances pursuant to section 363 of the Bankruptcy Code, subject to higher or better offers and Bankruptcy Court approval (the "Proposed Sale"). 360 Miami is an affiliate of 360 Vox LLC, the owner and manager of a portfolio of award-winning hotels

6

and spas, including the Enchantment Resort in Sedona, Arizona. The terms of the Proposed Sale are set forth in a Purchase and Sale Agreement, dated May 28, 2014, (the "Purchase Agreement") between the Collins Subsidiaries and 360 Miami, which is being filed contemporaneously with the First Day Motions. I have been informed by counsel that a motion to approve the Proposed Sale and bidding procedures (the "Sale Motion") will also be filed.

16.     The Purchase Agreement contemplates that pending receipt of Bankruptcy Court approval of the Proposed Sale the Property will be operated in the ordinary course as to not cause disruption to the unit owners and guests and that certain necessary repairs to the North Tower stucco may be commenced. In order to provide the necessary funds for the foregoing and subject to the Court's approval, LBHI non-debtor subsidiary, PAMI ALI, has agreed to provide post-petition financing solely to permit the Debtors to pay certain operating and capital expenses and consummate the Proposed Sale.

17.     Significantly, the Proposed Sale is contingent upon a favorable resolution of the non-monetary claims asserted in the Association Litigations. A resolution incorporated into the approval of the Proposed Sale is necessary because the Association Litigations seek to encumber, define and limit the rights afforded to the Debtor 6801 Central, as owner of the "Hotel Lot" and any prospective purchaser as successor owner of the Hotel Lot such as the right to control access to the spa and shared facilities and to assess charges for the use of certain shared and spa facilities.

18.     However, in asserting their claims, the Associations ignore that the Declarations[1] that are recorded against and govern the Property afford Debtor 6801

---

[1] I understand that true and correct copies of the Declarations will be filed with the Sale Motion.

Central, as owner of the Hotel Lot, broad control over the Property.  The  owners of units in the condominium towers are only afforded "limited rights to use, benefit from and enjoy" the Property's shared facilities in exchange for the payment of certain assessments, fees and charges under the Master Declaration (defined below).  Under the Master Declaration**,** the Hotel Lot Owner has expansive rights:

- "to adopt at any time… and enforce … rules and regulations governing" the shared facilities' use;

- to determine who may access those shared facilities, including granting access to "members of the public generally[;]"

- to "grant . . . general . . . and specific easements under and through" the shared facilities;  and

- the "right and duty" to levy assessments and fees on the unit owners "for the purpose of maintaining and operating" the shared facilities.

Additionally, as the owner of the spa facilities, "the Hotel Lot Owner has the exclusive right to determine . . . in its sole discretion and without notice or approval of any change, how and by whom" those facilities shall be used.

19.    In fact, each of the unit owner members of the Associations have been living under this regime and construct from the time they purchased their units at the Property.  The meritless issues raised by the Associations at this time is a thinly veiled attempt to prevent the Debtors from selling the Property by proposing to curtail the Debtors' and any prospective purchaser's property rights expressly granted under the Declarations.

20.    In the Sale Motion, the Debtors will ask the Court to include findings in the Order approving the Proposed Sale that clearly delineate the Debtors' broad rights under the Declarations to (i) impose regulations and restrictions in order to manage and operate the Property, (ii) determine who may have access to the Property, and (iii) levy assessments and fees on the unit owners for their use of the spa and

shared facilities.  These findings will satisfy the conditions to closing that are contained

in the Purchase Agreement by affirming the Debtors' property rights under the

governing Declarations and disposing of the Associations' baseless non-monetary

claims, thereby allowing the Proposed Sale to close in accordance with the provisions of

the Purchase Agreement.

21.     I believe that an expeditious sale of the Property to a financially

sound third-party, such as the Purchaser, with the means and expertise to purchase the

Debtors' remaining unsold residential and hotel units and profitably operate the

Property's hotel and spa will prevent the Debtors' from incurring further losses and will

maximize recoveries to the estates of the Debtors and, ultimately, LBHI.  Further, the

unit owner members of the Associations and the Property will benefit from the

expertise of a well positioned hotel and spa operator.  Accordingly, the Debtors will

seek to pursue and consummate the Proposed Sale through an expedited and

streamlined process.

## I.    SDNY LBR 1007-2(A)(1) NATURE OF DEBTORS' BUSINESS AND CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

### A.    Organizational Structure

22.     As described more fully below, the Collins Subsidiaries own the

Property, including the Hotel Lot, the Retail Lot and the Debtors' Units (each, defined

below).  Spirits holds the liquor license for the Property and is the sole member and

manager for each of the Debtors.  As reflected in the corporate organization chart

annexed hereto as Exhibit "A," PAMI ALI is the sole member of Spirits.  PAMI ALI is

wholly owned by Lehman ALI, Inc., a direct subsidiary of LBHI.

23.     It should be noted at the outset that substantially all operations of

the Property (except for the Debtors' Units in the North and South Towers) are

managed by and through the Canyon Ranch Entities (defined below) pursuant to the

Canyon Ranch Agreements (defined below).  The Debtors' limited operations that are

not covered by the Canyon Ranch Agreements are handled under common financial

and operational systems through Spirits.  Spirits is operated under LBHI's centralized

general ledger and cash management system.

### B.    Overview of Assets and Liabilities

24.    The Debtors' assets consist of the Property, which as described

below are comprised of:  (a) the Hotel Lot;  (b) the Retail Lot;  and (c) the Debtors' Units,

as well as cash held in working capital and other reserve accounts used in the ordinary

course operation and management of the Property by Canyon Ranch under the terms of

the Management Agreement.

25.    As of the Petition Date, the Debtors' liabilities consist primarily of

approximately $1.7 million in obligations under a secured loan extended to the Debtors

by PAMI ALI, as evidenced by a Promissory Note, dated March 12, 2014.  The loan was

utilized to pay an annual $2 million insurance premium that came due in March 2014,

and is believed to be the only secured debt against the Debtors' estates.  The Debtors

also have outstanding potential unsecured obligations, which are asserted in the

amount of approximately $15.5 million, comprised of:  (a) approximately $5 million in

obligations to the Canyon Ranch Entities under the Canyon Ranch Agreements, which

are largely disputed;  (b) approximately $370,000, as of April 30, 2014, in net rental

income obligations to participating unit owners pursuant to the RMAs (defined below);

(c) approximately $7,000 on account of association dues, utility payments and

marketing costs relating to the Debtors' Units (defined below); and (d) approximately

$10 million in disputed litigation claims.  As described more fully below, obligations

pursuant to the RMAs and substantially all of the costs of operating the Property's

Shared Facilities (defined below) are paid by and through the Canyon Ranch Entities pursuant to the Canyon Ranch Agreements, including, but not limited to, all property and sales and use taxes, utilities, hotel operating expenses and employee related costs.

### C.   The Debtors' Property and The Governing Declarations

26.     The Property was developed as a mixed-use project comprised of 580 condominium units, located in three towers, with hotel and spa amenities and facilities, as follows:  (a) a combination hotel, residential condominium building and spa in the central portion of the Property (the "Central Tower");  (b) a residential condominium building on the south portion of the property (the "South Tower");  and (c) an additional residential condominium building on the north portion of the property (the "North Tower").  Of the 580 total condominium units on the Property, 150 units are "hotel units" and 430 units are standard "residential units."

27.     The entire Property is governed by a Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration"), which is recorded in Official Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida.  Each of the South, Central, and North Lots (as defined in the Master Declaration) are also further governed by its own recorded declaration of covenants, restrictions and easements (each, a "Tower Declaration," together with the Master Declaration, the "Declarations.")  Each Tower Declaration incorporates and is subordinated to the Master Declaration.

28.     The Master Declaration, among other things:  (a) vests the "Hotel Lot Owner" (currently Debtor 6801 Central) with broad control over all of the facilities necessary to operate, maintain, and manage the Property's hotel, common areas and operations, including services in the spa, the private health and wellness facilities, the salon, parking facilities and retail space;  (b) provides for the sharing of certain costs for

11

shared Property components among the condominium unit owners with a cost sharing mechanism based upon applicable use and benefits; and (c) subdivides the Property into separate lots.

29.     The Master Declaration divides the Property into five lots (the "Lots"): (a) the Condominium Central Lot; (b) the Condominium South Lot; (c) the Retail Lot; (d) the Condominium North Lot; and (e) the Hotel Lot. The fee-based portion of the spa, which consists of health and treatment rooms, is part of the Hotel Lot (as defined in the Master Declaration as the "Spa"). The Shared Facilities (as defined in the Master Declaration) are generally part of and contained in the Hotel Lot, which the condominium unit owners have "limited rights to use, benefit from, and enjoy." Those limited rights "may be reasonably regulated by the Hotel Lot Owner."

30.     The Shared Facilities are further subdivided by the Master Declaration into: (a) the Condominium South Shared Facilities; (b) the Condominium North Shared Facilities; (c) the Condominium Central Shared Facilities; (d) the Non-Retail Shared Facilities; and (e) the General Shared Facilities. The Non-Retail Shared Facilities include the condominium unit owners' limited rights to use certain exercise, pool, and other commonly available recreational facilities and amenities (defined in the Master Declaration as the "Limited Spa Rights").

31.     As the owner of the Shared Facilities under the Master Declaration, the owner of the Hotel Lot (currently Debtor 6801 Central) may impose regulations and restrictions on all of the Shared Facilities and the condominium unit owners' use of those facilities shall be so limited. Additionally, the Hotel Lot Owner may "grant and use general . . . and specific easements over, under, and through" the Shared Facilities at its sole discretion to whomever it so chooses, and may withdraw portions of the Shared Facilities.

12

32.     As the owner of the Spa and the spa facilities, the Hotel Lot Owner has the exclusive right to determine "in its sole discretion and without notice or approval of any change" how and by whom the Spa and spa facilities may be used, including establishing hours of use and guest policies, granting access to the general public, and setting other prohibitions and restrictions.

33.     The Master Declaration also provides for the periodic payment of assessments and charges to the Hotel Lot Owner by the unit owners in order to pay for, among other things, the maintenance, repair, replacement, and operation of the Shared Facilities (as defined in the Master Declaration) in exchange for their use.  Certain of the percentages of the Shared Facilities assessments to be paid by each entity are set forth in the Master Declaration.

34.     As noted, Debtor 6801 Central currently owns the Hotel Lot. Debtor 6801 Central also owns the Retail Lot and the "Shared Component Unit" (as defined in the Central Tower Declaration) located within the Central Tower.  Debtor 6801 North owns three unsold residential units in the North Tower.  Debtor 6801 South owns one residential unit in the South Tower and nine residential units in the Central Tower (together, with the units owned by 6801 North and 6801 Central, the "Debtors' Units").  The Proposed Sale contemplates that the Debtors will transfer their interests in the Property (*i.e.*, the Hotel Lot, the Retail Lot and the Debtors' Units) free and clear of liens, claims and encumbrances to the Purchaser, subject to higher or better offers.

**D.     The Canyon Ranch Agreements**

35.     The entire Property is also subject to:  (a) a Development Agreement, dated as of May 9, 2003 between North Carillon LLC, Carillon South Joint Venture LLC, as owners (collectively, the "Developers") and CR Miami LLC, CR License LLC and Spa Project Advisors (collectively, the "Canyon Ranch Entities" or

13

"Canyon Ranch") (the "Development Agreement");  (b) a Carillon Management Agreement, dated as of May 9, 2003, between the Developers, as owners, and CR Miami, LLC, as manager (the "Manager") (the "Management Agreement");  and (c) a Sublicense Agreement between the Developers and CR License LLC, dated May 9, 2003 (together with the Development Agreement and the Management Agreement, as amended by the Omnibus Amendment (defined below), collectively,  the "Canyon Ranch Agreements").

36.     Under the Management Agreement, an annual operating budget for the Shared Facilities is prepared by the Manager for the Hotel Lot Owner's approval.  The budget provides for all of the operating expenses necessary for the Manager's operation of the Hotel Lot and Shared Facilities.  The budget also designates which Shared Facility category is applicable for a particular expense.  Then, based upon the provisions of the Master Declaration, that expense is shared in predesignated percentages by the various stakeholders.  The Debtors have disputed various aspects of the proposed annual operating budgets and such disputes are not fully resolved.

37.     As noted, the Hotel Lot has been maintained and operated on the Debtors' behalf by Canyon Ranch, as Manager under the Canyon Ranch Agreements. While the Debtors have the right to terminate the Canyon Ranch Agreements based on existing defaults, the Debtors intend that Canyon Ranch will continue as Manager during the Chapter 11 case, at least in the near term pending completion of the Proposed Sale to insure that any disruption to the unit owners and guests is minimized and to transition the operations as contemplated by the Management Agreement.

E.     **The Rental Program**

38.     Pursuant to Rental Management Agreements ("RMAs") previously executed between the Hotel Lot Owner and various hotel condominium unit owners,

14

certain hotel condominium units participate in a Rental Management Program ("RMP").

39.     Under the RMP, the Hotel Lot Owner contracts with participating owners of individual Central Tower condominium units to allow the Manager to rent the rooms to the public as hotel rooms.  The Hotel Lot Owner adopted the RMP created by the original Hotel Lot Owner and entered into RMAs with various owners of hotel condominium units pursuant to which the owners agreed to allow their units to be utilized, operated and managed by the Manager in exchange for a share of the revenues generated by the rentals of their units (net of certain costs, expenses, and fees set forth in the RMAs).  Owners are not required to put their units into the RMP.  As of the Petition Date, 98 of the 150 Central Tower units participate in the RMP.  Net rental proceeds are paid to unit owners on a quarterly basis.  In addition, the Hotel Lot Owner owns nine hotel units that are rented to the public as hotel rooms.  Under the Proposed Sale, the Debtors will assume and assign the RMAs to the Purchaser.

### F.     LBHI 2009 Acquisition of Property

40.     On or about July 29, 2005, the Developers, the Canyon Ranch Entities and Hypo Real Estate Capital Corporation ("Hypo"), as agent for the original project lender, entered into Consent, Subordination and Recognition Agreements (the "Recognition Agreements"), which permitted Hypo to terminate the Canyon Ranch Agreements in the event that Hypo, the lender, or an affiliate took title to the Property by foreclosure or deed in lieu of foreclosure.  Subsequently, LBHI became the successor lender, and in a Certificate dated September 6, 2006, the Developers, the Canyon Ranch Entities, and LBHI agreed that LBHI had been assigned the rights of Hypo under the Recognition Agreements.

41.    On or about November 17, 2009, the Collins Subsidiaries (which had been newly formed for the purpose) became the owners of the Property pursuant to the DIL.  In lieu of exercising the option to terminate the Canyon Ranch Agreements, the Collins Subsidiaries and the Canyon Ranch Entities agreed to certain amendments to the Canyon Ranch Agreements (the "Omnibus Amendment").  By the Omnibus Amendment, the Collins Subsidiaries assumed and agreed to perform under the respective Canyon Ranch Agreements, as amended by the Omnibus Amendment.

42.    Significantly, the Omnibus Amendment provided the Collins Subsidiaries with a right to terminate the Canyon Ranch Agreements, among other things, for "failure to achieve positive NOI by year five (2013)."  The Omnibus Amendment also provides for transition procedures and obligates the Collins Subsidiaries and the Canyon Ranch Entities to "cooperate with one another so as to effect an orderly transition of the Hotel and Spa" upon termination.

43.    Based on the Canyon Ranch Entities' failure to generate a positive NOI, on November 19, 2013, the Collins Subsidiaries provided the Canyon Ranch Entities with a written Notice of Intent to Terminate Canyon Ranch Agreement and Transition Property Operations to New Management (the "Notice of Intent").  In response, the Canyon Ranch Entities asserted its claim for various fees and commissions aggregating approximately $3.8 million, certain of which the Debtors dispute and other of which have been paid.  By the Notice of Intent, the Collins Subsidiaries reserved the right to terminate the Canyon Ranch Agreements, although they have not yet done so. The Proposed Sale to the Purchaser contemplates that the Debtors will terminate or reject the Canyon Ranch Agreements at or before closing.

G.        **Pre-petition Marketing and Negotiations to Sell Property**

44.        As noted, to stem further losses and in furtherance of LBHI's

mandate to liquidate its estate within three years of the Plan Effective Date, the Debtors

determined to take steps to sell the Property to a third party purchaser.  Accordingly, as

noted, on August 2, 2013, the Collins Subsidiaries entered into an Exclusive Sale Listing

Agreement (as amended, the "Listing Agreement")[2] with CBRE, Inc. (the "Broker" or

"CBRE") for the Property and the adjacent Golden Sands development site.

45.        CBRE implemented a robust process to market the Property,

including the preparation of an offering memorandum (the "Offering Memorandum")

for the Property.  The Offering Memorandum also offered the Golden Sands

development site, which is approved for the development of 40 residential

condominium units, as well as retail and parking spaces in a 20-story building with

frontage along Collins Avenue and the Atlantic Ocean adjacent to the Property.  CBRE

also created a proprietary website and electronic diligence room for the Property and

the Golden Sands development site.

46.        As part of its efforts, CBRE sent property "teasers" to

approximately 4,500 parties in CBRE's data base of real estate and hotel professionals,

which resulted in 253 executed confidentiality agreements.  The parties that executed

confidentiality agreements were provided with additional property information.  CBRE

arranged property tours, inspections and meetings with 31 parties who expressed

interest after reviewing the property information.  These meetings and tours resulted in

indications of interest from 18 parties, who requested and received additional due

diligence materials.  In response to a call for offers bids were received from 18 proposed

---

[2]     The Listing Agreement was amended and extended through September 30, 2014 on April 28, 2014.

purchasers however only four (4) expressed interest in purchasing both the Property and Golden Sands and only Shamrock was amenable to retaining Canyon Ranch as Manager for the hotel and spa.  After three rounds of bids, a $15 million offer from Shamrock was determined to be the best offer for the Property in large part because their proposal allowed for the retention of Canyon Ranch (albeit subject to modifications to the Management Agreement) which the Collins Subsidiaries believed would allow for a smooth transition of the Property and the support of the unit owners.

47.    On January 30, 2014, the Collins Subsidiaries entered into a PSA with Shamrock to purchase the Property.  The PSA provided that as a condition to closing, the Shamrock affiliate that executed the PSA for the Golden Sands was obligated to close simultaneously with the closing for the Property.  Both PSAs contained a due diligence period.  In February 2014, Shamrock and its affiliate each terminated its PSA based on the North Tower Litigation and the threat of the South Tower Litigation.  An Amended and Restated Purchase and Sale Agreement that did not contain any contingencies or references to the Property was executed for the Golden Sands site but Shamrock abandoned buying the Property in light of the Association Litigations described below.

### H.    North Tower Litigation

48.    On February 14, 2014, the North Carillon Beach Condominium Association, Inc. (the "North Tower Association"), on behalf of its 207 unit owners, filed a complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida ("Florida State Court") against the Collins Subsidiaries seeking declaratory relief barring the Collins Subsidiaries or any successor from exercising their rights of ownership in the Property "in such a way that will fundamentally change the character of the exclusive Canyon Ranch lifestyle within the community."  In essence,

18

the North Tower Association seeks a declaratory judgment that the business plan of the then prospective purchaser of the Hotel Lot (and associated rights as defined in the Declarations), as allegedly contemplated at that time, is not permitted under the Declarations that govern the Canyon Ranch Miami Beach property and violates Florida statutory and decisional law.  In particular, the North Tower Association objects to any sale or subsequent business plan that would fundamentally and adversely change the character of the exclusive Canyon Ranch Miami Beach property, including but not limited to the alleged plan to (i) "annex" the adjacent Golden Sands hotel into the Canyon Ranch Miami Beach property, (ii) create a 1,000-member beach club whose members and guests could access the Canyon Ranch shared facilities, spa facilities, and Spa, (iii) reduce the North Tower Association's number of "permitted occupants" from eight to six;  or (iv) otherwise "overburden" the facilities currently used by condominium residents and hotel guests.

49.    Directly contrary to the North Tower Association allegations, the Declarations that govern the Property empower the Collins Subsidiaries (and any future successor in interest) to regulate and restrict access to the Shared Facilities, including the unit owners' limited rights to use the spa facilities.  In particular, the Master Declaration permits the Hotel Lot Owner to permit any other persons, including members of the general public, to use the Shared Facilities, including the spa facilities, and the Spa.

50.    Additionally, the allegations of the North Tower Litigation regarding an annexation of the Golden Sands site and the creation of a thousand member beach club were mere speculation by the North Tower Association of the then purchaser's proposed business plan and as such they were not ripe for determination

19

and further have been mooted by the subsequent termination of the Shamrock PSA for the Property.

**I.**     **South Tower Litigation**

51.     On February 28, 2014, the Central Carillon Beach Condominium Association, Inc. (the "Central Tower Association") and the South Carillion Beach Condominium Associations (the "South Tower Association," together, the "South and Central Associations") filed a complaint in the Florida State Court against 6801 Central, the subsidiary that owns the Hotel and Retail Lots within the Canyon Ranch Miami Beach community, seeking approximately $8.7 million in damages (the "South Tower Litigation," together with the North Tower Litigation, the "Association Litigations").

52.     The South Tower Litigation asserts, among other things, that the South and Central Associations were wrongly assessed for fees associated with the spa facilities, fitness centers, and valet services; that certain utility fees were incorrectly allocated; and that each South and Central Tower unit owner is entitled to eight guests to the Shared Facilities, including the spa facilities, on any one-calendar day without paying an access fee. In addition to damages, the South and Central Tower Associations seek a declaratory judgment that the costs and rules to which they object shall not be assessed prospectively.

53.     The South Tower Litigation's attempt to restrict the Hotel Lot Owner's rights with respect to the Property has no basis in the language of the Declarations. Contrary to the South and Central Associations' allegations, the Master Declaration provides that 6801 Central, as the Hotel Lot Owner, has broad discretion to assess fees based upon the unit owners' use and benefit of the Property and to regulate and restrict the unit owners' use of the Shared Facilities, including the spa and

recreational facilities portions of the Property by establishing hours of use, guest policies, and setting other prohibitions.

**J.     Further Negotiations Lead to Proposed Sale and Financing**

54.     Although meritless, because the Association Litigations attempt to limit the assessments and charges that the Hotel Lot Owner may impose on the unit owners for project amenities and to mandate who may access certain shared and Spa and recreational facilities in the future, the assertions by the Associations have succeeded in chilling the sale of the Property.  The claims were the direct cause of the termination of the Shamrock PSA and the loss to the Debtors of a $15 million purchase price.  The Proposed Sale at a reduced purchase price of $12 million is expressly conditioned upon a resolution of the claims in a manner favorable to the Debtors.

55.     As noted, in April 2014, the Debtors entered into a "stand-still" agreement with the plaintiffs in the Association Litigations to permit the North, Central, and South Tower Associations (together, the "Associations") to conduct due diligence and potentially submit an offer to purchase the Property.  In connection therewith, the Debtors made a request that the Associations' representatives provide evidence of their authority to negotiate and purchase the Property on the Associations' behalf.  The Associations did not respond to this request and the Debtors are unsure whether they will ultimately be able to raise the necessary funds, achieve the required unit owner approval and votes and deliver certain required releases that would enable them to purchase the Property.

56.     Concurrently, the Debtors engaged in further communications with Canyon Ranch, including by letter, dated April 17, 2014, in which the Debtors reminded Canyon Ranch of the Debtors' right to terminate the Management Agreement based on a failure to generate net operating income by 2013, and of Canyon Ranch's obligation

21

under the Omnibus Amendment to mitigate loss by reducing costs. The Debtors also made a demand that Canyon Ranch present a full and detailed budget and forecast that reflects positive net operating income by the end of 2014. Canyon Ranch has not met the Debtors' demand and, to the Debtors' knowledge, has not taken significant steps to reduce costs.

57.     The Debtors also further engaged in negotiations with Shamrock to purchase the Property and contacted numerous other potentially interested parties, including 360 Vox. These negotiations led to the Purchase Agreement between the Collins Subsidiaries and 360 Miami, as stalking horse purchaser, which sets forth the terms of the Proposed Sale pursuant to sections 363 and 365 of the Bankruptcy Code, subject to higher and better offers.

58.     As noted, the Purchase Agreement provides for an all cash purchase price of $12 million, and a combined break-up fee and termination expense reimbursement not to exceed $440,000. Under the Purchase Agreement, the Debtors are required to file a motion to approve a bidding procedures order (the "Bidding Procedures Order") and for approval of the Proposed Sale order (the "Sale Order") with the Court within five (5) business days from the date of the Purchase Agreement (*i.e.*, May [X], 2014). The Debtors intend to file the Sale Motion contemporaneously with the First Day Motions.

59.     The Purchase Agreement may be terminated by the Purchaser prior to closing if any of the following milestones fail to be met:

- Entry of the Bidding Procedures Order within 30 days of the Sale Motion;

- An auction is held not 50 days following entry of the Bidding Procedures Order; and

- Entry of the Sale Order within the later of (x) two (2) business days of the auction and (y) a date that is no later than five (5) business days after resolution of the Association Litigations, provided that such date is not later than 120 days following entry of the Bidding Procedures Order.

60.     As noted, the Purchase Agreement requires the resolution of the non-monetary relief sought in the Association Litigations.  This condition to closing is required because the Associations' claims propose to significantly alter the property rights granted to the Debtors, as the Hotel Lot Owner, under the recorded Declarations that run with the land in a manner that will prevent any Hotel Lot owner from ever operating the Property in a manner that is profitable.  By the Sale Motion, the Debtors will request that this Court enter findings confirming the Debtors' rights under the Declarations to impose regulations and restrictions to manage and operate the Property, determine who may access the Property, and levy assessments and fees on the unit owners for their use.  I have been informed by counsel that these findings are necessary to facilitate the Proposed Sale, and that the legal and factual support for these findings will be set forth in detail in the Sale Motion.[3]

61.     PAMI ALI has agreed to provide financing to the Debtors solely to effectuate the Proposed Sale and to administer these cases for the benefit of the Debtors' and, ultimately, the LBHI estates.  Absent an expeditious sale of the Debtors' interests in the Property to a financially sound third-party, such as 360 Miami, free and clear of the claims and interests asserted in the Association Litigations, it is unlikely that the Property will result in any significant value to the Debtors' estates.  As a result, PAMI

---

[3]     As noted above, the South and Central Tower Associations also seek approximately $8.7 million in damages for these allegedly wrongly assessed fees and charges.  Because their claim for money damages does not seek to limit or impinge upon a sucessor's rights with respect to the Property, that portion of the South Tower Litigation will not be addressed as part of the Proposed Sale.  For the avoidance of doubt, however, the Debtors deny all liablity and damages in the South Tower Litigation, and will object to such claims, to the extent they are pursued by the Associations, as they would to any other disputed claim.

ALI's post-petition financing is conditioned on an expeditious schedule to approve the Proposed Sale, as described more fully in a First Day Motion to approve debtor-in-possession financing that will be filed with the Court.

## II.    FIRST DAY MOTIONS

62.    Contemporaneously with the filing of this Declaration, the Debtors filed First Day Motions seeking orders granting various forms of relief.

63.    I have reviewed each of the First Day Motions or have otherwise had their contents explained to me, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motion is narrowly tailored to meet the goals described above and, ultimately, will be critical to each Debtors' ability to maximize the value of its assets for its creditors.

### A.    Administrative Motions

#### i.    Debtors' Motion Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure for Joint Administration and Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1055 and 2002(n) (the "Joint Administration Motion")

64.    The Debtors request entry of an order directing joint administration of their Chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the case of parent company FL 6801 Spirits LLC.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 cases of the Debtors other than FL 6801 Spirits LLC to indicate the joint administration of the Chapter 11 cases.

65.    Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of

the motions, hearings and orders that will be filed in the Chapter 11 cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor the Chapter 11 cases with greater ease and efficiency.  I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

66.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

ii.     **Debtors' Motion for Order Extending Deadline to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules Extension Motion")**

67.     The Debtors request that the Court enter an order extending the time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively the "Schedules and Statements"), for an additional 30 days without prejudice to the Debtors' ability to request additional time, should it become necessary. The requested extension would give the Debtors a total of 44 days from the Petition Date to file their Schedules and Statements.

68.     The Debtors have begun compiling the information that will be required to complete the Schedules and Statements, but as a consequence of the Debtors' reliance on their Property Manager, Canyon Ranch, for information relating to their books and records, the Debtors have not yet finished this process.  Given the numerous matters that the Debtors must address in the initial phase of the Chapter 11

cases, the volume of information that must be included in the Schedules and Statements, and the fact that the Debtors do not have any employees and rely heavily on the Canyon Ranch Entities for substantially all of their operations, the Debtors anticipate that they will be unable to complete their Schedules and Statements within the 14 days provided by the Bankruptcy Rules.

69.     I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estate, their creditors, and all other parties in interest and will enable the Debtors to administer their Chapter 11 cases efficiently and expeditiously.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be approved.

      **iii.**    **Debtors' Motion for Order Pursuant to Bankruptcy Code Section 521, Bankruptcy Rule 1007 and Local Bankruptcy Rule 1007-1 Authorizing the Debtors to: (i) Prepare a List of Creditors in Lieu of Mailing Matrix; (ii) File List of 20 Largest Unsecured Creditors;  and <u>Mail Notices to Creditors (the "Creditor List Motion")</u>**

70.     The Debtors propose to retain Prime Clerk, LLC as notice and claims agent in connection with the Chapter 11 cases to assist the Debtors in preparing creditor lists and mailing notices.  With such assistance, the Debtors will be prepared to file a computer-readable list of creditors upon request and will be capable of undertaking all necessary mailings without the need of a creditor mailing matrix.

71.     On behalf of the Debtors, I submit that the Creditor List Motion should be approved.

B.      **Operating Motions**

    i.      **Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 Authorizing Debtors to Obtain Post-petition Secured Super-Priority Financing and Utilize Cash Collateral of Pre-petition Lender (the "DIP Financing Motion")**

72.     The Debtors have reached an agreement with PAMI ALI to obtain post-petition financing and for the use of cash collateral to pay various expenses to facilitate the Chapter 11 Cases, including obtaining approval of the Proposed Sale, in accordance with an agreed upon Budget.  Paying these expenses is critical for the Debtors to pursue the Proposed Sale and maximize the value of the Debtors' assets for all creditors.

73.     The ability of the Debtors to finance the Chapter 11 Cases to consummate the Proposed Sale requires such financing, absent which immediate and irreparable harm will result to the Debtors, their estates and creditors.  Absent the proposed financing and use of cash collateral, the Debtors do not have available sources of working capital or financing to conduct the Chapter 11 cases.  The relief requested in the DIP Financing Motion is therefore necessary, essential, and appropriate to liquidate the Debtors' property pursuant to the Proposed Sale, and the management and preservation of its assets.  The Debtors have negotiated in good faith with PAMI ALI regarding the terms of the proposed financing, which terms and conditions are fair and reasonable and have been agreed to by the Debtors in the exercise of their sound business judgment.

74.     For these and the other reasons discussed in the DIP Financing Motion and my separate declaration in support of the DIP Financing Motion, entry of the proposed Interim Order is in the best interests of the Debtors and the estates.

      **ii.**    **Debtors' Motion Pursuant to Section 105
of the Bankruptcy Code, for an Order Confirming
the Protections of Sections 362 and 365 of
the Bankruptcy Code (the "Automatic Stay Motion")**

75.     To aid in the administration of the Debtors' Chapter 11 cases and to provide the Debtors with breathing space to focus on pursuing and consummating the Proposed Sale, the Debtors have filed a motion seeking an order, pursuant to section 105(a) of the Bankruptcy Code, that confirms the application of two key protections afforded to the Debtors under the Bankruptcy Code: (a) the automatic stay provisions of section 362 of the Bankruptcy Code; and (b) the anti- termination and anti-modification provisions of section 365 of the Bankruptcy Code, to ensure continued performance by the Canyon Ranch Entities under the Canyon Ranch Agreements, as well as performance of other parties in interests during the Chapter 11 cases. Pursuant to Bankruptcy Code sections 362 and 365, a party to an executory contract with a debtor in possession must continue to perform under the contract during the pendency of the bankruptcy case until the debtor in possession assumes or rejects the contract. Such an order is particularly appropriate in the Debtors' Chapter 11 cases because the Debtors' business cannot operate without the services provided by the Canyon Ranch Entities. Accordingly, the Debtors seek an order implementing the protections of sections 362 and 365 to assure that the Canyon Ranch Entities and other parties in interest continue to perform pursuant to the terms of the Canyon Ranch Agreements following commencement of these Chapter 11 cases.

76.     I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to pursue and seek to consummate the Proposed Sale

without any interruption in Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Automatic Stay Motion should be approved.

  **ii. Debtors' Motion for the Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Rental Program Participants and Otherwise Continue the Rental Program and Certain Practices with Canyon Ranch in the <u>Ordinary Course of Business ("RMP and Canyon Ranch Motion")</u>**

  77. By the RMP and Canyon Ranch Motion, the Debtors seek authority to honor certain pre-petition obligations and otherwise continue practices under the Canyon Ranch Agreements, including with respect to the RMP, in the ordinary course of business.  I am familiar with the Canyon Ranch Agreements and the RMP, which are integral to the Debtors' ability to operate the Property pending completion of the Proposed Sale.  In order to ensure continuing guest loyalty and a successful sale process, it is essential that the Debtors be permitted to honor, without interruption, obligations relating to the RMP and that the Canyon Ranch Entities be permitted to honor their obligations under the Canyon Ranch Agreements in accordance with their prepetition practice and hotel guest and unit owner expectations.  Any interruption of the RMP or Canyon Ranch Entities' obligations under the Canyon Ranch Agreements risks the permanent loss of guests, which would cause a dramatic reduction in revenue and immediate and irreparable harm to the Debtors' business.

  78. I believe that the relief requested in the RMP and Canyon Ranch Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the RMP and Canyon Ranch Motion should be approved.

### iii. Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 345, 363, 364 and 503(b)(1) Authorizing (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Continued Use of Existing Cash Management Systems and (D) Waiver of Certain Guidelines Relating to Bank Accounts (the "Cash Management Motion")

79.     Under the Cash Management Motion, the Debtors request the entry of interim and final orders: (a) authorizing the maintenance and continued use of its existing bank accounts and business forms;  and (b) authorizing the continued use of the Debtors' existing cash management system.

80.     In the ordinary course of business, the Debtors maintain a cash management system (the "Cash Management System") under the management of Canyon Ranch Entities who have access and control over the accounts in accordance with the Canyon Ranch Agreements.  This system provides the mechanism for the collection, concentration, management and disbursement of funds used in the Debtors' operations and maintains current and accurate accounting records of the transactions within the Cash Management System by Canyon Ranch.

81.     I believe that given the complexity of the Cash Management System, if the Debtors were required to comply with the guidelines of the U.S. Trustee, the burden of opening new bank accounts, revising cash management procedures, and the immediate ordering of new checks and business forms with a "Debtor in Possession" legend, would disrupt and cause irreparable harm to the Debtors' prospects to pursue and complete the Proposed Sale transaction in an orderly fashion by causing additional confusion, delay and cost at this critical time.  It is my opinion that the relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.

82.     Authorizing the Debtors to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of the Chapter 11 cases.

83.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates creditors, and all other parties in interest, and will enable the Debtors to conduct a sale process in an efficient, effective and expeditious manner in Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

### C.     Retention Related Motions

#### i.     Debtors' Application to Employ Prime Clerk, LLC as Claims and Noticing Agent (the "Prime Clerk Retention Application")

84.     The Debtors seeks to retain Prime Clerk, LLC ("Prime Clerk") as notice, claims and administrative agent.  I believe that by retaining Prime Clerk in the Chapter 11 cases, the Debtors' estate, and particularly its creditors, will benefit from Prime Clerk's service.  Prime Clerk has developed efficient and cost-effective methods in its area of expertise.  I am of the opinion that Prime Clerk is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the Chapter 11 cases and, therefore, respectfully submit that the Prime Clerk Retention Application should be approved.

#### ii.     Other Retention Motions

85.     The Debtors will be filing additional motions seeking to, *inter alia*, retain Togut, Segal & Segal LLP, as its bankruptcy counsel, Shutts & Bowen LLP, as its special real estate counsel and CBRE, as real estate broker.

86.     The Debtors will also be filing a motion to retain professionals in the ordinary course of business whose services are not directly related to the Chapter 11 case, but whose services are required during the case and through conclusion of the sale process.

## III.     ADDITIONAL DISCLOSURES REQUIRED UNDER LOCAL RULE 1007-2

### A.     SDNY LBR 1007-2(a)(2)

87.     These cases were not originally commenced as a Chapter 7, Chapter 12 or Chapter 13 case.

### B.     SDNY LBR 1007-2(a)(3)

88.     To the best of my knowledge, no unofficial creditor or other committees were formed prior to the filing of the Debtors' Chapter 11 cases.

### C.     SDNY LBR 1007-2(a)(4)

89.     A list containing the names, addresses and the amounts of the claims of the consolidated Debtors' twenty (20) largest known non-insider unsecured creditors is annexed hereto as Exhibit "B."  The Debtors reserve their rights to dispute the amount or validity of such claims.

### D.     SDNY LBR 1007-2(a)(5)

90.     A list containing the name and address of the Debtors' secured creditor, with amount of its claim and a brief description and estimate of the value of the collateral securing the claim, indicating whether such claim is disputed, is annexed hereto as Exhibit "C."

E.    **SDNY LBR 1007-2(a)(6)**

91.    A summary of the Debtors' assets and liabilities on an unaudited basis as of April 30, 2014 is annexed hereto as Exhibit "D."

F.    **SDNY LBR 1007-2(a)(8)**

92.    Other than property in the possession or custody of Canyon Ranch, none of the Debtors' property is not in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

G.    **SDNY LBR 1007-2(a)(9)**

93.    A schedule setting forth the premises that the Debtors currently own, lease, or otherwise hold from which they operate their businesses is annexed hereto as Exhibit "E."

H.    **SDNY LBR 1007-2(a)(10)**

94.    A schedule setting forth the location of the Debtors assets, books and records is annexed hereto as Exhibit "F."

I.    **SDNY LBR 1007-2(a)(11)**

95.    A schedule of actions against the Debtors is annexed hereto as Exhibit "G."

J.    **SDNY LBR 1007-2(a)(12)**

96.    The names of the individuals who comprise the Debtors' existing officers and senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience is attached hereto as Exhibit "H."

K.     **SDNY LBR 1007-2(b)(1) and (2)**

97.     The Debtors do not have any employees.  Thus, the amount paid or proposed to be paid in payroll for the 30-day period following the filing of the Chapter 11 cases is $0.

L.     **SDNY LBR 1007-2(b)(3)**

98.     A schedule setting forth, for the 30-day period following the filing of the Chapter 11 petitions, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing, is attached hereto as Exhibit "I."

99.     Copies of the resolutions authorizing the filing of the Debtors' Chapter 11 petitions are annexed thereto.

*[concluded on the following page]*

IV.    **CONCLUSION**

100.    The Debtors will continue in possession of their assets and management of their affairs in accordance with sections 1107(a) and 1108 of the Bankruptcy Code.

I declare under the penalty of perjury that the foregoing is true and correct.


Executed on May 29, 2014 in New York, New York


/s/ *Anthony Barsanti*
Anthony Barsanti
Vice President, Lehman Ali Inc.