**BID PROCEDURES HEARING**
**DATE AND TIME:**                    _____, 2014 at [__:00] a.m. (New York Time)

**BID PROCEDURES OBJECTION**
**DEADLINE DATE AND TIME:**          _____, 2014 at at 4:00 p.m. (New York Time)

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Lara R. Sheikh
Lauren L. Peacock

Proposed Counsel to the
  Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                 :
In re:                                           :      Chapter 11
                                                 :
FL 6801 SPIRITS LLC, *et al.*,                   :      Case Nos. [      ] through [      ]
                                                 :
                              Debtors.           :      (Motion for Joint Administration
                                                 :      Pending)
-------------------------------------------------------------x

**DEBTORS' (I) *EX PARTE* APPLICATION FOR AN ORDER
SCHEDULING A HEARING TO CONSIDER, AMONG OTHER
THINGS, BIDDING PROCEDURES AND (II) MOTION FOR
(A) AN ORDER APPROVING, AMONG OTHER THINGS,
(i) BIDDING PROCEDURES REGARDING THE DEBTORS'
SALE OF PROPERTY, SUBJECT TO HIGHER OR BETTER
OFFERS AND BANKRUPTCY COURT APPROVAL, (ii) THE TIME,
DATE, PLACE AND FORM OF NOTICE FOR THE AUCTION
AND SALE HEARING, AND (iii) A BREAK-UP FEE, (B) AN
ORDER (i) APPROVING THE SALE FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND
(ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS, AND (C) RELATED RELIEF**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

# TABLE OF CONTENTS

Page(s)

JURISDICTION AND VENUE ...............................................................................2

SUMMARY OF RELIEF REQUESTED ...............................................................3

BACKGROUND ......................................................................................................5

I.     OVERVIEW OF THE PROPERTY AND RIGHTS
GRANTED IN THE DECLARATIONS ......................................................5

II.    THE MARKETING PROCESS FOR THE PROPERTY ...............................8

III.   THE ASSOCIATION LITIGATIONS .......................................................10

     A.     North Tower Association Litigation –
Attempt to Stop the Sale to Shamrock ............................................10

     B.     South Tower Litigation – Attempt to Limit Hotel Lot
Owner From Levying Assessments and Imposing Rules ...........................11

IV.   THE PROPOSED SALE .............................................................................12

     A.     Further Negotiations Lead to Proposed Sale ...................................12

     B.     Selection of the Purchaser as Stalking Horse Bidder .....................16

     C.     The Purchase Agreement ..................................................................17

           1.     Terms Summary ....................................................................17

           2.     Termination Expense Reimbursement and Break-Up Fee ...............19

THE PROPOSED BIDDING PROCEDURES AND AUCTION, THE SALE
HEARING, THE BIDDING PROCEDURES AND SALE ORDERS .......................20

V.    EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE .............................23

VI.   NOTICE OF BIDDING PROCEDURES, AUCTION AND SALE HEARING ........24

VII.  OBJECTIONS TO BIDDING PROCEDURES AND SALE .......................................26

i

**Page(s)**

VIII.    THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED.........................28

    A.    The Bidding Procedures Should be Approved...............................................28

    B.    The Break-Up Fee Should Be Approved .......................................................28

    C.    The Time, Place, and Notice Proposed for the Auction and
the Sale Hearing are Reasonable and Should be Approved........................32

    D.    The Assigned Contracts Should Be Assigned to the
Purchaser or Successful Purchaser in Accordance with
the Assignment Procedures..............................................................................34

IX.    THE SALE ORDER SHOULD BE ENTERED ..........................................................36

    A.    The Sale of the Assets is an Exercise of the Debtors'
Sound Business Judgment ................................................................................36

    B.    The Court Should Include Findings In the Sale Order Confirming
the Debtors' Broad Property Rights Under the Declarations ....................38

        1.    Findings Necessary to Dispose of the North Tower
Association's Attempt to Limit the Debtors' Rights
to the Property ......................................................................................39

        2.    Findings Necessary to Dispose of the South and
Central Tower Associations' Attempt to Limit the
Debtors' Rights to the Property ..........................................................43

    C.    The Assets Should be Sold Free and Clear of Liens, Claims,
and / or Interests Other than Permitted Encumbrances...............................49

    D.    The Purchaser Should be Afforded All Protections
Under Section 363(m) as a Good Faith Purchaser .........................................56

    E.    Assumption of the Assigned Contracts and Assignment
Procedures Should be Approved......................................................................58

CONCLUSION ......................................................................................................................61

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994) ........................................................ 54

*Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*,
94 B.R. 343 (E.D. Pa. 1988) .......................................................................................... 49

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ........................................................................................ 35

*Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002) ............................................ 49

*Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855
(Bankr. D.N.J. 1994)...................................................................................................... 49

*In re 523 E. Fifth Street Hous. Pres. Dev. Fund Corp.*, 79 B.R. 568
(Bankr. S.D.N.Y. 1987) ............................................................................................ 36, 37

*In re Adelphia Bus. Solutions, Inc.*, No. 02-11389 (REG)
(Bankr. S.D.N.Y. Dec. 16, 2002) .................................................................................. 30

*In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM),
97 Civ. 2241 (MBM), 1997 WL 283412 (S.D.N.Y. 1997) ..................................................... 54

*In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) ................................................................. 54

*In re BearingPoint, Inc.*, Case No. 09-10691 (REG)
(Bankr. S.D.N.Y. Apr. 7, 2009) ..................................................................................... 30

*In re Borders Grp., Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011) ............................................... 49

*In re Boston Generating, LLC*, 440 B.R. 330 (Bankr. S.D.N.Y. 2010)..................................... 53

*In re Cabrini Med. Ctr.*, Case No. 09-14398 (AJG)
(Bankr. S.D.N.Y. Dec. 30, 2009) ................................................................................. 30

*In re Child World, Inc.*, 142 B.R. 87 (Bankr. S.D.N.Y. 1992)................................................... 55

*In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009) ...................................................................... 35

*In re Daufuskie Island Properties, LLC*, 431 B.R. 626 (Bankr. S.C. 2010)............................... 52

*In re Downtown Athletic Club of New York City, Inc. ("DAC")*,
No. M-47, 2000 WL 744126 (S.D.N.Y. June 9, 2000)............................................ 50, 51, 52

*In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743
(Bankr. S.D.N.Y. Mar. 6, 1992)..................................................................................... 47

**Page(s)**

*In re Enron Corp.*, No 01-16034, 2004 WL 5361245 (Bankr. S.D.N.Y. 2004)........................ 50

*In re Enron Corp.*, No. 01-16034, 2003 WL 21755006 (Bankr. S.D.N.Y. 2003)..................... 50

*In re Flores*, 291 B.R. 44 (Bankr. S.D.N.Y. 2003)........................................................ 36

*In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009)................................................. 35

*In re GSC, Inc.*, 453 B.R. 132 (Bankr. S.D.N.Y. 2011) ................................................................ 49

*In re HMX Acquisition Corp.*, Case No. 12-14300 (ALG)
(Bankr. S.D.N.Y. Nov. 29, 2012) ................................................................................. 29, 30

*In re Inwood Heights Hous. Dev. Fund Corp.*, No. 11-13322,
2011 WL 3793324 (Bankr. S.D.N.Y. Aug. 25, 2011)........................................................... 36

*In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr.S.D.N.Y. 1989) ..................................... 55, 56

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) ........................................................ 35

*In re Old Carco LLC (f/k/a Chrysler LLC)*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009)................... 55

*In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005).................................................... 47

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990)................................................... 54

*Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs.*
*(In re Colony Hill Assocs.)*, 111 F.3d 269 (2d Cir. 1997)..................................................... 54

*Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc.*
*(In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992),
*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) .................................................................. 28, 29

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*,
4 F.3d 1095 (2d Cir. 1993) ............................................................................................... 55

*Richmond Leasing Co v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985).......................... 55

*Royal Oak Landing Homeowners Ass'n v. Pelletier*, 620 So.2d 786
(Fla. 4th DCA 1993)........................................................................................................... 38

*Sharon Steel Corp v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*,
872 F.2d 36 (3d Cir. 1989) ............................................................................................... 56

*Shields v. Andros Isle Prop. Owners Ass'n, Inc.*, 872 So.2d 1003
(Fla. Dist. Ct. App. 4th Dist. 2004) ................................................................................. 38

**Page(s)**

**Statutes**

11 U.S.C. § 101(5) ................................................................................................ 47

11 U.S.C. § 105 ...................................................................................................... 2

11 U.S.C. § 105(a) ................................................................................................ 36

11 U.S.C. § 363 ............................................................................................... passim

11 U.S.C. § 363(b) ........................................................................ 31, 35, 47, 53

11 U.S.C. § 363(f) ........................................................................................... passim

11 U.S.C. § 363(f)(1) ............................................................................................ 37

11 U.S.C. § 363(f)(2) ..................................................................................... 49, 50

11 U.S.C. § 363(f)(3) ............................................................................................ 50

11 U.S.C. § 363(f)(4) ................................................................................ 50, 51, 53

11 U.S.C. § 363(f)(5) ............................................................................................ 53

11 U.S.C. § 363(m) ..................................................................................... 53, 54, 55

11 U.S.C. § 364(c)(1) ............................................................................................ 19

11 U.S.C. § 365 ............................................................................... 2, 15, 33, 34

11 U.S.C. § 365(a) ......................................................................................... 33, 55

11 U.S.C. § 365(b) ................................................................................................ 56

11 U.S.C. § 501(b)(1)(A) ...................................................................................... 23

11 U.S.C. § 503(b)(1) ............................................................................................ 19

28 U.S.C. § 1334 .................................................................................................... 2

28 U.S.C. § 1408 .................................................................................................... 2

28 U.S.C. § 1409 .................................................................................................... 2

28 U.S.C. § 157 ...................................................................................................... 2

28 U.S.C. § 157(b) ................................................................................................. 2

Page(s)

**Other Authorities**

2 COLLIER ON BANKRUPTCY, ¶ 105 (15th ed. rev. rel. 2000)...........................................36

Adoption of Amended Guidelines for the Conduct of Asset Sales,
   Bankr. S.D.N.Y. General Order M-383 (Nov. 18, 2009)..........................................2, 23, 37


**Rules**

Fed. R. Bankr. P. 2002(a)....................................................................................................31, 32

Fed. R. Bankr. P. 2002(a)(2).....................................................................................................31

Fed. R. Bankr. P. 2002(c).........................................................................................................32

Fed. R. Bankr. P. 2002(c)(1).....................................................................................................31

Fed. R. Bankr. P. 2002(l)..........................................................................................................32

Fed. R. Bankr. P. 6004.....................................................................................................2, 31, 33

Fed. R. Bankr. P. 6004(a)..........................................................................................................31

Fed. R. Bankr. P. 6004(c)..........................................................................................................32

Fed. R. Bankr. P. 6006................................................................................................................2

Fed. R. Bankr. P. 6006(c)..........................................................................................................56

Fed. R. Bankr. P. 9024................................................................................................................2

Rule 1007-2 of the Local Rules for the United States Bankruptcy Court
   for the Southern District of New York...................................................................................1

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] hereby move this Court (the "Motion") seeking the entry of: (a) an *ex parte* Scheduling Order (defined below), (b) an order approving Bidding Procedures (defined below) regarding the Sale (defined below) of the Debtors' Assets (defined below), subject to higher or better offers, (c) an order approving the Sale, free and clear of Liens, Claims and/or Interests (defined below), (d) approving certain procedures related to the assumption and assignment of certain executory contracts and unexpired leases (the "Assignment Procedures"), and fixing the Cure Amounts (as hereinafter defined), and (e) related relief. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Anthony Barsanti[2] submitted in accordance with Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York in support of the Debtors' Chapter 11 petitions (the "Barsanti Declaration") and filed with the Court concurrently herewith [Docket No. 2], and the Declaration of Lara R. Sheikh in Support of this Motion (the "Sale Declaration"). The Debtors reserve the right to file additional documents and present such further information or evidence to the Court as may be appropriate in support of the relief requested in this Motion. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully state:

---

[1]    The Debtors consist of the following entities: FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries").

[2]    Capitalized terms, used herein but not otherwise defined, shall have the meanings ascribed to them in the Barsanti Declaration.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider the Motion and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The predicate for the relief requested is based upon sections 105, 363 and 365 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 6004, 6006 and 9024, and General Order M-383.

3.      The Debtors are indirect, wholly-owned subsidiaries of Lehman Brothers Holdings, Inc., which together with certain of its subsidiaries (collectively, "LBHI") are currently the subjects of pending cases in the United States Bankruptcy Court for the Southern District of New York (the "Court") under jointly administered Chapter 11 Case No. 08-13555 (the "LBHI Chapter 11 Case").  On December 6, 2011, the Court entered an order in the LBHI Chapter 11 Case confirming the Modified Third Amended Joint Chapter 11 Plan of LBHI (ECF No. 23023) (the "Plan").  The Plan became effective on March 6, 2012 (the "Plan Effective Date").  The Plan provides for the appointment of LBHI, as Plan Administrator, to liquidate LBHI's assets, including the assets of LBHI's non-debtor subsidiaries, within three years of the Plan Effective Date.

## SUMMARY OF RELIEF REQUESTED

4.      The Collins Subsidiaries own interests in property commonly known as the "Canyon Ranch Hotel & Spa, Miami Beach," a luxury full-service, ocean front condominium hotel located at the site of the old Carillon Hotel in Miami Beach, Florida (the "Property").

2

5.      The Collins Subsidiaries and 360 Miami Hotel and Spa LLC ("360 Miami" or the "Purchaser"), an affiliate of 360 VOX LLC ("360 VOX"), have entered into a Purchase and Sale Agreement (the "Purchase Agreement"), annexed hereto as Exhibit "1", that provides for the sale of the Debtors' Assets (as defined in the Purchase Agreement), including the Property, for a purchase price of $12,000,000 in cash ("Purchase Price"), subject to higher or better offers and Bankruptcy Court approval.

6.      By this Motion, the Debtors request the following:

- Entry of the pre-fixed order (the "Scheduling Order") scheduling a hearing to consider the bidding procedures and shortening and limiting notice thereon;

- Entry of a bidding procedures order (the "Bidding Procedures Order"), in substantially the form attached hereto as Exhibit "2", among other things, (i) establishing bidding procedures for the Assets (the "Bidding Procedures"), in substantially the form attached to the proposed Bidding Procedures Order as Exhibit "A," (ii) setting the time, date and place for an auction for the Assets in the event a higher or better offer(s) is received by the Bid Deadline (the "Auction") and the hearing promptly thereafter to consider the sale (the "Sale Hearing") to the offeror having made the highest or best offer at the Auction if one is held (the "Successful Purchaser"), (iii) approving procedures for the assignment of certain executory contracts and leases to the Purchaser or the Successful Purchaser, (iv) fixing the notice of the Auction and the Sale Hearing (the "Notice of Auction and Sale Hearing") in substantially the form attached to the proposed Bidding Procedures Order as Exhibit "B," and (v) authorizing the Debtors to pay a termination expense reimbursement and break-up fee to the Purchaser under certain conditions set forth in the Purchase Agreement;  and

- Entry of an order approving the sale of the Debtors' interest in the Assets (the "Sale Order"), in substantially the form attached to this Motion as Exhibit "3," approving, among other things, at the conclusion of the Sale Hearing, the sale of the Assets to the Successful Purchaser free and clear of all Liens, Claims and/or Interests except for permitted

3

encumbrances expressly set forth in the Purchase Agreement.

7.      By this Motion, the Debtors also ask this Court to include findings in the Sale Order that clearly confirm the Debtors' broad rights under the Declarations that govern the Property.  As described in the Barsanti Declaration and below, affirming the Debtors' property rights under the governing Declarations will dispose of the Associations' meritless non-monetary claims, which is a condition to closing under the Purchase Agreement.  To the extent there are any, the Associations' monetary damages will attach to the Sale proceeds, and can be resolved in the claim resolution process, as any other disputed pre-petition claim.

8.      This Court is uniquely suited to facilitate a prompt and successful sale of the Assets, consistent with the mandate under the LBHI Plan.  An expeditious sale of the Assets to a financially sound third-party, such as the Purchaser, with the means to purchase the Debtors' remaining unsold residential and hotel units and profitably operate the Property's hotel and spa will eliminate the Debtors' incurring further losses and will maximize recoveries to the estates of the Debtors and, ultimately, LBHI.  Further, the unit owner members of the Associations and the Property will benefit from the expertise of a well-positioned hotel and spa operator.

9.      Any further delay in the Sale of the Assets, with the concurrent costs to maintain same (including the payment of real estate taxes, property management fees and insurance premiums), will only diminish the ultimate return to creditors, and, ultimately to the LBHI estate.  Accordingly, the Debtors seek this Court's prompt approval of the Proposed Sale (defined below).

## BACKGROUND

10.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

11.     No committee of unsecured creditors has been appointed in this case.

12.     As described in more detail below, the Property is governed by certain recorded declarations of covenants, restrictions and easements that run with the land and managed by Canyon Ranch under a management agreement and related licensing agreements (the "Canyon Ranch Agreements") with certain Canyon Ranch entities pursuant to which the Debtors are entitled to net operating income after payment of certain fees and expenses to Canyon Ranch.  When the Debtors acquired the Property by deed in lieu of foreclosure ("DIL"), dated November 17, 2009, the Property was still under construction and many of the condominium units remained unfinished and unsold.  While the Property's hotel has operated at a loss in each year of its operation, the Collins Subsidiaries successfully finished the Property and sold all but 13 of the condominium units at the Property that were acquired by DIL.

## I.     OVERVIEW OF THE PROPERTY AND RIGHTS GRANTED IN THE DECLARATIONS

13.     The Property is a mixed-use project comprised of condominium units, located in three towers, with hotel and spa amenities and facilities.  The entire Property is governed by a recorded "Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa" (the "Master Declaration").  Each of the South, Central, and North Lots (as defined in the Master Declaration) are also further governed by its own, recorded declaration of covenants, restrictions and easements (each, a "Tower Declaration," together with the Master Declaration, the "Declarations").  The

Declarations are attached as exhibits to the Sale Declaration. Each Tower Declaration incorporates and is subordinated to the Master Declaration.

14.     The Master Declaration, among other things, vests the "Hotel Lot Owner," currently Debtor 6801 Central, with broad control over all of the facilities necessary to operate, maintain, and manage the Property's hotel, common areas and operations, including services in the spa, the private health and wellness facilities, the salon, parking facilities and retail space;  provides for the sharing of certain costs for shared Property components among the condominium unit owners with a cost sharing mechanism based upon applicable use and benefits;  and subdivides the Property into separate lots. Sale Declaration Ex. A (Master Declaration, at Articles 1.1(dd), 4.3, 4.4, 16.2, 16.3).

15.     The Master Declaration divides the Property into five lots (the "Lots"):  (a) the Condominium Central Lot;  (b) the Condominium South Lot;  (c) the Retail Lot;  (d) the Condominium North Lot;  and (e) the Hotel Lot. *Id.* at Article 1.1. The fee-based portion of the spa, which consists of a health and treatment rooms, is part of the Hotel Lot (as defined in the Master Declaration as the "Spa"). *Id.* at Article 1.1(oo). The Shared Facilities (as defined in the Master Declaration) are generally part of and contained in the Hotel Lot, which the condominium unit owners have "limited rights to use, benefit from, and enjoy." *Id.* at Article 4.3. Those limited rights "may be reasonably regulated by the Hotel Lot Owner." *Id.*

16.     The Shared Facilities are further subdivided by the Master Declaration into:  (a) the Condominium South Shared Facilities;  (b) the Condominium North Shared Facilities;  (c) the Condominium Central Shared Facilities;  (d) the Non-Retail Shared Facilities;  and (e) the General Shared Facilities. *Id.* at Article 1.1(dd). The Non-Retail Shared Facilities include the condominium unit owners' limited rights to use

6

certain exercise, pool, and other commonly available recreational facilities and
amenities (defined in the Master Declaration as the "Limited Spa Rights").  *Id.* at
Articles 4.4, 1.1(oo), 1.1(dd)(iv)(d).

17.     As the owner of the Shared Facilities under the Master Declaration,
the owner of the Hotel Lot (currently Debtor 6801 Central) may impose regulations and
restrictions on all of the Shared Facilities, and the condominium unit owners' use of
those facilities shall be so limited.  *Id.* at Article 4.3 (c).  Additionally, the Hotel Lot
Owner may "grant and use general . . . and specific easements over, under, and
through" the Shared Facilities at its sole discretion to whomever it so chooses, *id.* at
Article 4.3(e);  determine who may access the Shared Facilities, including granting
access to "members of the public generally," *id.* at Article 4.3(c);  and withdraw certain
portions of the Shared Facilities.  *Id.* at Articles 2.3, 4.3(f).  Further, as the owner of the
Spa and spa facilities, the Hotel Lot Owner has the exclusive right to determine "in its
sole discretion and without notice or approval of any change" how and by whom the
Spa and spa facilities may be used, including establishing hours of use and guest
policies, granting access to the general public, and setting other prohibitions and
restrictions.  *Id.* at Article 4.4.

18.     The Master Declaration also provides for the periodic payment of
assessments and charges to the Hotel Lot Owner by the unit owners in order to pay for,
among other things, the maintenance, repair, replacement, and operation of the Shared
Facilities (as defined in the Master Declaration) in exchange for their use.  *Id.* at Articles
4.3(a)-(b), 16.3.

19.     The Collins Subsidiaries' interest in the Property includes
ownership of certain condominium units and the Hotel and the Retail Lots (as defined

in the Master Declaration), including the rights vested in the Declarations to assess fees

and charges and to fashion regulations and restrictions.

## II.    THE MARKETING PROCESS FOR THE PROPERTY

20.    As noted, to stem further losses and in furtherance of LBHI's

mandate to liquidate its estate within three years of the Plan Effective Date, the Debtors

determined to take steps to sell the Property to a third party purchaser.  Accordingly, as

noted, on August 2, 2013, the Collins Subsidiaries entered into an Exclusive Sale Listing

Agreement (as amended, the "Listing Agreement")[3] with CBRE, Inc. (the "Broker" or

"CBRE") for the Property and the adjacent Golden Sands development site.

21.    CBRE implemented a robust process to market the Property,

including the preparation of an offering memorandum (the "Offering

Memorandum") for the Property.  The Offering Memorandum also offered the Golden

Sands development site, which is approved for the development of 40 residential

condominium units, as well as retail and parking spaces in a 20-story building with

frontage along Collins Avenue and the Atlantic Ocean adjacent to the Property.  CBRE

also created a proprietary website and electronic diligence room for the Property and

the Golden Sands development site.

22.    As part of its efforts, CBRE sent property "teasers" to

approximately 4,500 parties in CBRE's data base of real estate and hotel professionals,

which resulted in 253 executed confidentiality agreements.  The parties that executed

confidentiality agreements were provided with additional property information.  CBRE

arranged property tours, inspections and meetings with 31 parties who expressed

interest after reviewing the property information.  These meetings and tours resulted in

---

[3]    The Listing Agreement was amended and extended through September 30, 2014 on April 28, 2014.

8

indications of interest from 18 parties, who requested and received additional due diligence materials. In response to a call for offers, bids were received from 12 proposed purchasers; however, only 4 expressed interest in purchasing both the Property and Golden Sands. After three rounds of bids, a $15 million offer from SMGW Hotel and Spa, LLC ("Shamrock") was determined to be the best offer for the Property.

23.    In addition, a development site located adjacent to the Property and known as the "Golden Sands" and which, at the time was, also indirectly owned by LBHI, was to be simultaneously purchased by a Shamrock affiliate.

24.    On January 30, 2014, the Collins Subsidiaries entered into a purchase and sale agreement with Shamrock to purchase the Property, and a separate purchase and sale agreement was executed for the Golden Sands property. Each of the purchase and sale agreements (each a "PSA," together, the "PSAs") required that the closing under such PSA was a condition of the closing under the other PSA. Additionally, each PSA provided for a period of due diligence and allowed the purchaser thereunder to terminate prior to the expiration of such due diligence period, provided that the purchaser could not elect to terminate one PSA and close under the other PSA.

25.    During the due diligence period afforded to it by the PSA, Shamrock met with various unit owners and representatives of Canyon Ranch. Certain of the unit owners expressed concern that Shamrock would impose changes to the operations of the Property and indicated that certain unit owners wanted to acquire the Property themselves.

26.    In February 2014, Shamrock and its affiliate each terminated its PSA based on the North Tower Litigation (as defined below) and the threat of the South Tower Litigation (as defined below). An Amended and Restated Purchase and Sale

9

Agreement that did not contain any contingencies or references to the Property was executed for the Golden Sands site but Shamrock abandoned buying the Property in light of the Association Litigations described below.

### III.   THE ASSOCIATION LITIGATIONS

**A.   North Tower Association Litigation –
Attempt to Stop the Sale to Shamrock**

27.   On February 14, 2014, the North Carillon Beach Condominium Association, Inc. (the "North Tower Association"), on behalf of its 207 unit owners, filed a complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida ("Florida State Court") against the Collins Subsidiaries seeking to bar the Collins Subsidiaries or any successor from exercising their rights of ownership in the Property "in such a way that will fundamentally change the character of the exclusive Canyon Ranch lifestyle within the community" (the "North Tower Litigation").

28.   In essence, the North Tower Association seeks a declaratory judgment that the business plan of the prospective purchaser of the Hotel Lot, as allegedly contemplated at that time, is not permitted under the Declarations that govern the Property and violates Florida statutory and decisional law.  In particular, the North Tower Association objects to any sale or subsequent business plan that would fundamentally and adversely change the character of the Property, including but not limited to, the alleged plan to (i) "annex" the adjacent Golden Sands hotel into the Canyon Ranch Miami Beach property, (ii) create a 1,000-member beach club whose members and guests could access the Shared Facilities, the Spa, and commonly available spa and recreational facilities, (iii) reduce the North Tower Association's

number of "permitted occupants" from eight to six, or (iv) otherwise "overburden" the facilities currently used by condominium residents and hotel guests.

29.     The North Tower Litigation lacks merit and has been mooted.  As explained in detail below, directly contrary to the North Tower Association allegations, the Declarations that govern the Property empower the Collins Subsidiaries (and any future successor in interest):

- to regulate and restrict access to the Shared Facilities, including the unit owners' limited rights to use the spa facilities,

- to permit any other persons, including members of the general public, to use these facilities, and

- to add future development property to the jurisdiction of the Master Declaration.

Sale Decl. Ex. A (Master Declaration, at Articles 1.1(x), 2.2., 4.3-4.4).  Further, the allegations of the North Tower Association regarding an annexation of the Golden Sands site and the creation of a thousand member beach club was mere speculation of the then purchaser's proposed business plan.  Accordingly, the North Tower Litigation was not ripe when filed and has now been further mooted by the subsequent termination of the Shamrock PSA for the Property.

**B.     South Tower Litigation – Attempt to Limit Hotel Lot
         Owner From Levying Assessments and Imposing Rules**

30.     On February 28, 2014, the Central Carillon Beach Condominium Association, Inc. (the "Central Tower Association") and the South Carillion Beach Condominium Associations (the "South Tower Association," together, the "South and Central Associations") filed a complaint in the Florida State Court against 6801 Central, the subsidiary that owns the Hotel and Retail Lots on the Property, seeking

approximately $8.7 million in damages (the "South Tower Litigation," together with the North Tower Litigation, the "Association Litigations").

31.     The South Tower Litigation asserts, among other things, that the South and Central Associations were wrongly assessed for fees associated with the spa facilities, fitness centers, and valet services;  that certain utility fees were incorrectly allocated;  and that each South and Central Tower unit owner is entitled to eight guests to the Shared Facilities, including the spa facilities, on any one-calendar day without paying an access fee.  In addition to damages, the South and Central Tower Associations seek a declaratory judgment that the costs and rules to which they object shall not be assessed or imposed prospectively.

32.     The South Tower Litigation's attempt to restrict the Hotel Lot Owner's rights with respect to the Property has no basis.  Contrary to the South and Central Associations' allegations, the Master Declaration provides that 6801 Central, as the Hotel Lot Owner, has broad discretion to assess fees based upon the unit owners' use and benefit of the Property and to regulate and restrict the unit owners' use of the Shared Facilities, including the spa and recreational facilities portions of the Property by establishing hours of use, guest policies, and setting other prohibitions.  Sale Decl. Ex. A (Master Declaration, at Articles 4.3, 4.4, 16.3).

## IV.   THE PROPOSED SALE

### A.   Further Negotiations Lead to Proposed Sale

33.     Although meritless, because the Association Litigations attempt to restrict the assessments and charges that the Hotel Lot Owner may impose on the unit owners for project amenities and to mandate who may access certain shared and spa and recreational facilities in the future, the Associations have succeeded in chilling the sale of the Property.  The Associations' claims were the direct cause of the termination

of the Shamrock PSA and the loss to the Debtors of a $15 million purchase price.  The Proposed Sale at a reduced purchase price of $12 million is expressly conditioned upon a resolution of the Associations' non-monetary claims in a manner favorable to the Debtors.

34.      As noted, just prior to the expiration of the due diligence period under the Shamrock PSAs, the two Shamrock affiliates exercised their respective rights to terminate those PSAs by a written notice, which notice provided that the North Tower Litigation and the then threatened South Tower Litigation was the reason for terminating.

35.      On March 10, 2014, Shamrock's affiliate entered into an Amended and Restated Purchase and Sale Agreement for the adjacent Golden Sands development site, which was wholly independent of and without reference to the Property.  The Golden Sands sale closed in April 2014 and Shamrock publicly announced its plans to construct a boutique, luxury 20-story tower comprised of 14 full floor exclusive residences on the Golden Sands site—a far cry from the thousand member beach club and the concern that an annexation of the Golden Sands site would devalue the existing unit owners' properties, as alleged in the North Tower Litigation.

36.      In light of the Hotel Lot's continuing operating losses and liquidity constraints, on or about March 12, 2014, the Debtors were required to borrow $2 million from PAMI ALI on a secured basis to pay the annual insurance premiums for the Property, which were due in March.

37.      Anticipating continued operating deficiencies as the Property enters its slow summer season and consistent with its obligations under the Plan, the Debtors inquired to determine whether Shamrock—a bidder in the earlier sale process who continued to express interest in the Property through CBRE—would consider a

13

potential sale transaction under section 363 of the Bankruptcy Code.  The Debtors also reengaged with CBRE to identify other potential purchasers.

38.    At the same time, the Debtors entered into a "stand-still" agreement with the plaintiffs in the Association Litigations to permit the Associations to conduct diligence, meet with Canyon Ranch, and potentially enter into a contract to purchase the Property, which would provide for the dismissal of the Association Litigations.  The standstill specifically permitted the Debtors to engage in negotiations with other parties while the Associations conducted diligence and negotiated with the Debtors.  In connection therewith, the Debtors made a request that the Associations' representatives provide evidence of their authority to negotiate and purchase the Property on the Associations' behalf.  The Associations did not respond to this request and the Debtors are unsure whether they will ultimately be able to raise the necessary funds, achieve the required unit owner approval and votes, and deliver certain required releases that would enable them to purchase the Property.  The proposed bid of the Associations has been significantly less than the bids of all of the other interested potential purchasers.  The standstill expired by its terms on May 11, 2014.

39.    Concurrently, the Debtors engaged in communications with Canyon Ranch, including by letter, dated April 17, 2014, in which the Debtors reminded Canyon Ranch of the Debtors' right to unilaterally terminate the Management Agreement based on Canyon Ranch's failure to generate net operating income by 2013, and of Canyon Ranch's obligation under the Omnibus Amendment to mitigate loss by reducing costs.  The Debtors also made a demand that Canyon Ranch present a full and detailed budget and forecast that reflects positive net operating income by the end of 2014.  Canyon Ranch has not met the Debtors' demand and, to the Debtors' knowledge, has not taken significant steps to reduce costs.

14

40.    The Debtors also further engaged in negotiations with Shamrock to purchase the Property and contacted numerous other potentially interested parties, including 360 Miami.  These negotiations led to the Purchase Agreement between the Collins Subsidiaries and 360 Miami, which sets forth the terms of a proposed sale pursuant to sections 363 and 365 of the Bankruptcy Code, subject to higher and better offers (the "Proposed Sale").  As noted, the Proposed Sale is conditioned on the favorable resolution of the non-monetary claims asserted in the Association Litigations. This is necessary because the Associations attempt to significantly alter and infringe upon the rights that the Debtors as owner of the Hotel Lot—and the rights of any prospective purchaser as successor owner—have in the Property (including the rights to impose future regulations and levy future assessments on the unit owners).

41.    As explained further below, in this Motion the Debtors respectfully request that this Court make factual findings in the Sale Order confirming the Hotel Lot Owner's broad rights under the recorded Declarations to (i) impose regulations and restrictions in order to manage and operate the Property, (ii) determine who may have access to the Property, and (iii) levy assessments and fees on the unit owners for their use of the Property, including use of the spa and shared facilities.  Such findings will dispose of the Associations' baseless non-monetary claims and facilitate the Proposed Sale for the benefit of the Debtors' creditors.  Without such findings, the Proposed Sale to 360 Miami will be unable to close and the Debtors would likely see a significant reduction in purchase price if another buyer can be found.

**B.    Selection of the Purchaser as Stalking Horse Bidder**

42.    The Debtors determined that the Purchaser's offer should be accepted as a "stalking horse offer," and so the parties negotiated the Purchase Agreement attached hereto as Exhibit "1."  The Purchase Price, $12,000,000, is to be paid

in cash at closing.  Based on the extensive marketing efforts by CBRE, the Debtors have concluded that the Purchase Agreement is fair and reasonable and in the best interests of the Debtors, their creditors and other parties in interest.  Notwithstanding, the Proposed Sale and Purchase Price will be tested by an additional solicitation process and auction at which higher or better offers will be considered.

43.     The Purchaser's affiliate, 360 VOX, owns and manages a portfolio of hotels and spas that have earned international awards and widespread industry acclaim.  Most significantly, 360 VOX's Enchantment Resort in Sedona, Arizona has won multiple accolades including recognition as one of the "Best Hotels in the USA" by U.S. News & World Report, "Top 100 Resorts in the U.S." and "500 World's Best Hotels" by Travel + Leisure.  Enchantment Resort also earned a spot on Condé Nast Traveler's "Gold List of top resorts" and a TripAdvisor Certificate of Excellence. Enchantment's Mii amo Spa was recognized as the "#1 Destination Spa in North America" by Condé Nast Traveler in 2013 and as #5 in Travel + Leisure's "Top 10 Spas Overall - World's Best Awards" in 2012.  More information about 360 VOX and its properties may be obtained on the website:  www.360VOX.com.

44.     The Purchaser has provided the Debtors with a 10% deposit and evidence of its ability to pay the balance of the Purchase Price at closing, in cash.

45.     The Purchase Agreement is conditioned on approval of the Court, and is subject to higher or better Qualified Bids, as defined in the Bidding Procedures. The Purchase Agreement is also subject to several other conditions, including but not

limited to a favorable resolution of the Association Litigations within 120 days of the entry of the Bidding Procedures Order.[4]

46.     To ensure that the Debtors' estates receive the maximum purchase price for the Assets, the Debtors seek approval of Bidding Procedures, which will enable them to solicit higher or better offers for the Assets and conduct an auction if a higher or better offer(s) is received.  The Bidding Procedures, in conjunction with the Purchase Agreement, will provide the Debtors with the greatest opportunity to maximize the purchase price for the benefit of their estates.  In light of the interest expressed by multiple parties for the Assets, it is hoped that by selecting a stalking horse offer, a greater return can be achieved at an auction.  In all events, however, a sale of the Assets will benefit the Debtors' estates and that of LBHI.

### C.     The Purchase Agreement[5]

#### 1.     Terms Summary

47.     The following is a summary of the material terms of the Purchase Agreement.[6]

- Purchase Price.  $12,000,000, all cash.

- Deposit.  $1,200,000 paid within two (2) business days of execution of the Purchase Agreement ("Deposit").

---

[4]     The Purchase Agreement defines "Favorable Resolution" of the Association Litigations as "entry of an order by the Bankruptcy Court which denies, dismisses or otherwise disposes of the declaratory relief sought by Plaintiff(s) named therein, including the entry of (i) the Sale Order containing findings of fact and conclusions of law effectuating such relief, (ii) an order of dismissal, or (iii) other similar resolution that is favorable to the Defendant(s) named therein."  Purchase Agreement, Section 10(d)(vi)(C).

[5]     Capitalized terms not defined herein are ascribed the meanings of such terms as set forth in the Purchase Agreement.

[6]     The summary of the Purchase Agreement is provided for the convenience of the Court and parties in interest.  In the event of any inconsistency between the summary in this Motion and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern.

- <u>Assets</u>.  The Assets to be transferred under the Purchase Agreement include:  (a) the Real Property (comprised of (i) the Hotel Lot owned by Debtor 6801 Central;  (ii) the Retail Lot owned by Debtor 6801 Central;  (iii) a Shared Component Unit in the Central Tower owned by Debtor 6801 Central;  (iv) nine residential units in the Central Tower owned by Debtor 6801 Central;  (v) three unsold residential units in the North Tower owned by Debtor 6801 North;  and (vi) one residential unit in the South Tower owned by Debtor 6801 South);  (b) the Intellectual Property;  (c) the Rental Program Agreements;  (d) the Licenses;  (e) the Personal Property;  (f) the Developer Rights;  (g) the Software;  (h) the Construction Contract;  (i) Assumed Leases and Contracts;  (j) the Property Books and Records;  and (k) specifically excluding the Excluded Assets.

- <u>Closing Conditions Required by the Purchaser</u>.  The Purchaser's obligation to close is conditioned on the fulfillment of each of the following conditions:  (a) the Bankruptcy Court entering the Bidding Procedures Order; (b) the Bankruptcy Court entering the Sale Order, and such Sale Order being a Final Order (which condition may be waived by the Purchaser in its sole discretion);  (c) a Favorable Resolution of the Association Litigations (which condition may be waived by the Purchaser in its sole discretion);  and (d) the Purchase Agreement and transactions contemplated shall not have been declared invalid, unenforceable or prohibited.

- <u>Purchaser Termination Rights</u>.  The Purchase Agreement may be terminated prior to closing by the Purchaser if: (a) the Sale Motion is not filed within five business days after the date of the Purchase Agreement;  (b) the Bidding Procedures Order is not entered within 30 days of filing the Sale Motion;  (c) the Auction is not held within fifty (50) days following the entry of the Bidding Procedures Order;  or (d) the Sale Order is not entered by the Bankruptcy Court within the later of (x) two (2) Business Days following the completion of the Auction and (y) a date that is no later than five (5) Business Days after a resolution of the Association Litigations;  (e) the Purchaser is not the successful bidder;  or (f) the Purchase Agreement is declared invalid, unenforceable, or prohibited.

- <u>Termination of Canyon Ranch Agreements</u>.  The Purchase Agreement provides for termination and/or rejection of the Canyon Ranch Agreements at the Purchaser's request, at or prior to closing.

18

- <u>Assumption of Rental Management Program and Construction Contracts</u>. The Purchase Agreement contemplates the assumption and assignment of the Rental Management Program and certain Construction Contracts to the Purchaser.

### 2.  **Termination Expense Reimbursement and Break-Up Fee**

48.     The Purchase Agreement provides that upon the Purchaser's termination of the Purchase Agreement in accordance with the Purchase Agreement, the Deposit will be returned to the Purchaser and the Debtors will pay Purchaser any third-party costs incurred by Purchaser up to $120,000 (the "Termination Expenses"). The Purchase Agreement also provides that upon consummation of an Alternative Transaction, the Debtors will pay the Purchaser a break-up fee in an amount equal to $320,000, plus the Termination Expenses (collectively, the "Break-Up Fee"). The Break-Up Fee of up to $440,000 would be payable within one (1) business day of a closing of the sale of the Assets to the Successful Purchaser, and until paid will be allowed as a superpriority administrative expense of preserving the Debtors' estates under sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code. The Break-Up Fee (i) is reasonable and appropriate, particularly in light of the size and nature of the sale and the efforts that have been or will be expended by the Purchaser notwithstanding that the proposed sale is subject to higher or otherwise better offers for the Assets, (ii) was negotiated by the parties at arm's length and in good faith, (iii) is necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Assets contemplated by the Purchase Agreement, and (iv) is commensurate with the real and substantial post-petition benefits conferred upon the Debtors' estates by the Purchaser and constitutes an actual and necessary cost and expense incurred by the Debtors in preserving the value of their estates.

19

### THE PROPOSED BIDDING PROCEDURES AND AUCTION, THE SALE
### HEARING, THE BIDDING PROCEDURES AND SALE ORDERS

49.     The Debtors propose to hold the Auction, on a date that is no later

than 50 days after entry of the Bidding Procedures Order.  The Bidding Procedures

contain the terms and procedures that will govern the submission of bids for the Assets.

The Auction will only be held if one or more Qualified Bids is received pursuant to the

Bidding Procedures before the proposed deadline for submitting such bids—45 days

following entry of the Bidding Procedures Order (the "Bid Deadline").

50.     At the Auction, and subject to the Bidding Procedures, all Qualified

Bidders (as defined in the Bidding Procedures) will be allowed to bid on the Assets.

The Debtors, in their sole discretion, will determine the highest or best bid or bids for

the Assets with the goal of maximizing the net value to the Debtors' estates.  In

evaluating competing bids, the Debtors intend to consider positively the following

factors, among others and without limitation:  (i) the amount of consideration offered;

(ii) the changes to the Purchase Agreement, if any, required by the competing bid;  and

(iii) the bidder's ability to timely consummate the Sale.

51.     At the Sale Hearing, the Debtors will seek approval of the Sale to

the Successful Purchaser.

52.     The Bidding Procedures provide in pertinent part:[7]

- Qualified Bidders.  To participate in the bidding process, a bidder must first deliver to the Debtors a Qualified Bid.

- Qualified Bid.  A Qualified Bid for the Assets must (i) be irrevocable through the Closing Date or such earlier date as the Purchase Agreement may be terminated in accordance with its terms and, in the case of the Second Highest Bid

---

[7]     To the extent that there are any inconsistencies between the description of the Bidding Procedures contained herein and the Bidding Procedures, the terms of the Bidding Procedures control.

(defined below), such bid shall remain irrevocable through the closing of the sale of the Assets to the Successful Bidder, unless the Successful Bidder fails to close and the Debtors shall have given notice to the Second Highest Bidder that it has decided to consummate the transaction contemplated by the Second Highest Bid in which case the Second Highest Bid shall remain open through the closing with such Second Highest Bidder;  (ii) be submitted to the proper parties, as described in the Bidding Procedures, prior to the Bid Deadline;  and (iii) satisfy the requirements set forth in the Bidding Procedures, including the following:

~   the bid must be based on the Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "Modified Purchase Agreement").  The bid must also include a copy of the Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder (a Word document of the Purchase Agreement will be made available for this purpose);

~   the bid must offer to purchase all of the Assets;

~   the bid must be on the same (or better) terms and conditions as those set forth in the Purchase Agreement, including without limitation, with respect to certainty of closing;

~   the bid must include a bid for a price and under terms which the Debtors believe to be higher or better than the Proposed Purchaser's bid in cash without any financing conditions, the value of which is determined by the Debtors to be equal to or greater than the sum of: (a) the purchase price set forth in the stalking horse Purchase Agreement;  (b) the Break-Up Fee;  and (c) $100,000 (the sum of which shall be the incremental bid amount);

~   be accompanied by a deposit (the "Bid Deposit") in an amount equal to at least 10% of the purchase price proposed by the Potential Bidder, in the form of a certified check or cash deposit;

~   be accompanied by sufficient information, including to demonstrate, in the Debtors' sole discretion, that the Potential Bidder has the financial ability to timely consummate the Alternative Transaction, including, but not limited to, current bank account statements, current audited financial statements, commitments or other proof of available financing, and such other forms of financial

disclosure and credit quality in support of such Potential Bidder (including financial information from any entities that will finance or guarantee the obligations of such Potential Bidder);

~   be firm and unconditional and not subject to any contingencies that are not also applicable to the Purchase Agreement including, without limitation, further due diligence review or financing contingencies.

~   The Purchase Agreement is deemed a Qualifying Bid, and the Purchaser is deemed a Qualifying Bidder.

•   <u>Bid Deadline</u>.  All bids for the Assets must be received by the Debtors by the deadline stated in the Bidding Procedures and Scheduling Order, which is proposed to be 45 days following entry of the Bidding Procedures Order.

•   <u>The Auction</u>.  If a Qualified Bid or Bids, other than the Purchase Agreement, is received by the Bid Deadline, the Auction will be held commencing at the date and time set forth in the Bidding Procedures Order and to be continued, if necessary from time to time, to such date(s) and time(s) as the Debtors shall determine.  Only Qualified Bidders will be eligible to participate at the Auction.  The Debtors will determine the highest or best Qualifying Bid(s) received prior to the Bid Deadline, and such Qualifying Bid(s) will be the starting bid(s) at the Auction (the "Starting Auction Bid(s)").

•   <u>Auction Rules</u>.  At the Auction, the minimum initial overbid must be, in the aggregate, at least $100,000 greater than the Starting Auction Bid(s), and subsequent bids must be, in the aggregate, at least $100,000 greater than the prior bid unless otherwise determined by the Debtors in their sole discretion. The Debtors will, from time to time, advise all participants in the Auction as to their determination of the highest or best bid or bids currently offered.  Subject to the Purchase Agreement, the Debtors, in their discretion, may adopt other rules for the Auction that, in his reasonable judgment, will promote the goals of the Auction.  All such rules will provide that:  (i) the Auction procedures must be fair and open, and (ii) all bids shall be made known to all other participating Qualified Bidders.

•   <u>Successful Bid(s)</u>.  At the conclusion of the Auction, the Debtors will select, in their sole discretion, subject to Court approval, a bid as the highest or best for the Assets.  The Qualified Bidder(s) submitting the Successful Bid(s) will be

the "Successful Bidder(s)." The Debtors will also select an alternate bid or bids, which will become the Successful Bid(s) should the Successful Bidder(s) fail to close the transaction contemplated by the Successful Bid(s). If no Auction is held, the Purchase Agreement will be considered the Successful Bid. In determining whether a bid is the Successful Bid, the Debtors shall consider the impact of the Break-Up Fee and the potential costs of satisfying the conditions of any bid.

- <u>Sale Hearing</u>. The Sale Hearing will be held shortly following the Auction at a date and time established by the Court and set forth in the Bidding Procedures Order. At the Sale Hearing, the Debtors seek entry of the Sale Order in substantially the form annexed hereto as Exhibit "3."

## V. **EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE**

53. Pursuant to this Court's Guidelines for the Conduct of Asset Sales, adopted by General Order No. M-383, dated as of November 18, 2009, the Debtors are required to highlight any "extraordinary provisions." The extraordinary provisions are as follows:

- "Use of Proceeds." Under the Sale Order, proceeds from the Sale will be used, first, to pay the Brokers' fee and the other costs of Sale and second, to PAMI, the Debtors' post-petition lender and the holder of a first priority senior lien on the Property. The net proceeds will be retained by the Debtors for the benefit of the estates. Sale Order ¶ 15.

- "Break-Up Fee." As described above, the Purchaser will be entitled to the return of the Deposit and a Break-Up Fee of up to $440,000 under certain conditions. The Break-Up Fee would be payable within one (1) business day of the sale of the Assets to the Successful Bidder, and until paid will be allowed as an administrative claim pursuant to Bankruptcy Code section 501(b)(1)(A). Purchase Agreement § 40(a).

- "Successor Liability." Under the Sale Order, the Purchaser shall not be liable for any Claims against any of the Debtors or any of their respective predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind of character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, de facto merger or joint venture, mere

continuation or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to , liabilities on account of warranties, intercompany loans and receivables between any of the Debtors and any non-debtor subsidiary, liabilities relating to or arising from any environmental laws, any successor liability as a "developer" of the Property and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Property prior to Closing.  Sale Order ¶ 17.

- "Future Conduct."  The Sale Order provides for the Court to make certain determinations regarding the Debtors' property rights under the governing Declarations that will effect the Purchaser's conduct and actions taken after the date of the Sale Order.  These determinations will dispose of the Associations' non-monetary claims, which the Debtors view as meritless on their face due to provisions of the Master Declaration, and satisfy the Favorable Resolution requirement.  Sale Order, Finding V, ¶ 12.

## VI.   NOTICE OF BIDDING PROCEDURES, AUCTION AND SALE HEARING

54.   The Debtors seek entry of the pre-fixed Scheduling Order limiting the time and notice requirements for the hearing on the Bidding Procedures and Break-Up Fee.  Specifically, the Debtors request that notice of the hearing on the Bidding Procedures, Break-Up Fee and related relief be sufficient if the Scheduling Order and the Motion are served via (a) overnight mail or (b) electronic transmission followed by regular first class mail, within one (1) business day of entry of the Scheduling Order on (i) counsel for the Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn:  Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:  Kristian W. Gluck, Esq.;  (ii) all applicable federal, state, and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Assets, are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the

Debtors' ownership of the Assets or have any known interest in the relief requested by the Motion, including (a) the Internal Revenue Service, P.O. Box 21126, Philadelphia, PA 19114, (b) the Florida Licensing Authorities, and (c) the City of Miami Beach, City Hall, 1700 Convention Center Drive, Miami Beach, FL 33139;  (iii) the Debtors' known secured creditors and lien holders, including all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Assets;  (iv) the United States Attorney for the Southern District of New York;  (v) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq., 201 Varick Street, Suite 1006, New York, New York 10014; (vi) the Debtors' Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline Marcus, Esq., 767 Fifth Avenue New York, New York 10153;  (vii) CR Miami, LLC, Attn:  Jerry Cohen and Gary Milner, 8600 East Rockcliff Road, Tucson, Arizona 85750;  and W. James Harrison Esq., W.J. Harrison & Associates, P.C., 3561 East Sunrise, Suite 201, Tucson, AZ 85718 (counsel to CR Miami, LLC);  (viii) parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected as part of the Proposed Sale;  (ix) counsel to the North Tower Association; (x) counsel to the Central and South Tower Associations;  (xi) all owners of units at the Property;  (xii) the creditors listed as holding the twenty (20) largest unsecured claims against the Debtors' estates (on a consolidated basis);  (xiii) all entities that have expressed an interest to the Debtors' or their advisors in purchasing the Assets;  (xiv) all parties listed on Schedule 6 to the Purchase Agreement;  and (xv) all other parties that filed notices of appearance in the Chapter 11 cases, ((i)-(xv) shall be collectively referred to herein as the "Notice Parties").  This shortened notice is necessary because the Debtors are continuing to incur losses to maintain and preserve the Assets.

25

55.    Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures, the Bidding Procedures Order, and the Notice of Auction and Sale Hearing on the Notice Parties as well as to each of the parties that toured and/or made an offer for the Property.

56.    Further, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will submit the Notice of Auction and Sale Hearing in form annexed as Exhibit "B" to the Bidding Procedures Order to be published once in the New York Times and such other publications as deemed appropriate by the Debtors, if any.

## VII.    OBJECTIONS TO BIDDING PROCEDURES AND SALE

57.    Responses and objections, if any, to the Bidding Procedures Motion be made in writing, state with particularity the reasons for the objection or response, and be filed with the Clerk of the Bankruptcy Court, with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Room 621, New York, New York 10004-1408, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and be served upon: (a) Togut, Segal & Segal LLP, attorneys for the Debtors, One Penn Plaza, Suite 3335, New York, New York 10119, Attention: Frank A. Oswald, Esq.;  (b) the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq.;  (c) the Debtors' Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline Marcus, Esq., 767 Fifth Avenue New York, New York 10153;  and (d) counsel for

Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn: Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:  Kristian W. Gluck, Esq., so as to be actually received no later than seven (7) days before the hearing on the Bidding Procedures.

58.    The Debtors propose that objections, if any, to the Sale, shall be filed with this Court and served so as to be received by:  (a) Togut, Segal & Segal LLP, attorneys for the Debtors, One Penn Plaza, Suite 3335, New York, New York 10119, Attention:  Frank A. Oswald, Esq.;  (b) the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq.; (c) the Debtors' Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline Marcus, Esq., 767 Fifth Avenue New York, New York 10153;  and (d) counsel for Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn: Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:  Kristian W. Gluck, Esq., so as to be actually received no later than seven (7) days before the Sale Hearing (the "Objection Deadline").

59.    The Debtors further request that the Bidding Procedures Order provide that the failure of any objecting person or entity to timely file an objection to the Sale shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or the consummation of the Sale contemplated by the Purchase Agreement, or the agreement with the Successful Bidder(s), if any, including the transfer of the Assets free and clear of any and all Liens, Claims and/or Interests, including leasehold possessory interests, other than permitted exception as expressly set forth in the Purchase Agreement.

27

## VIII.   THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED

### A.   The Bidding Procedures Should be Approved

60.     The Bidding Procedures, which are standard for the sale of assets in such cases, will ensure that the Debtors' estates receive the greatest benefit available from the Sale of the Assets.  Further, the Bidding Procedures are fair and open, and do not unfairly favor the Purchaser or any other potential purchaser.  Finally, in light of the Debtors' extensive marketing efforts pre petition, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence and submit informed competing bids, while still providing for the expeditious sale of the Assets.

61.     The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors' estates receive the maximum purchase price for the Assets, and therefore warrant Court approval.

### B.   The Break-Up Fee Should Be Approved

62.     Bankruptcy courts have approved bidding incentives similar to the break-up fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the trustee's or debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable.  *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3* F.3d 49 (2d Cir. 1993).  A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  Specifically, such provisions (i) attract or retain a potentially successful bid,

28

(ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. *Id.* at 661-62.

63.     First, there is no self-dealing or manipulation between the Purchaser and the Debtors.  Indeed, the Debtors have had ample time to explore every other opportunity to sell the Assets and, even now that the Debtors have agreed to the terms of the Purchase Agreement, the Purchaser has agreed to give the Debtors 45 days from the entry of the Bidding Procedures Order to solicit additional bids for the Assets. Moreover, the Debtors negotiated at arm's-length with the Purchaser.

64.     Second, it is the Debtors' business judgment that the Break-Up Fee will not hamper bidding.  Moreover, without agreeing to the Break-Up Fee, the Debtors would be unable to secure a proposal as favorable as the Purchase Agreement, and would lack the security of the minimum bid that they now enjoy.  Indeed, because it is by virtue of the Break-Up Fee that the Debtors can rely on a bidding floor, the Debtors believe the Break-Up Fee and the related Purchase Agreement will actually encourage constructive bidding.  On account of this bidding floor, the Debtors expect the Purchase Agreement to encourage other interested parties to submit competitive bids at or before the Auction.  Moreover, and importantly, the Debtors do not want to lose the highest and best committed bid received.  Accordingly, the Debtors believe that agreeing to pay the Break-Up Fee has opened the door to a path that will encourage further bidding on the Assets at greater, value-maximizing prices.

65.     Further, at 2.67% percent of the Purchase Price (excluding the expense reimbursement of up to $120,000), the amount of the Break-Up Fee is well within the range of reasonableness, particularly with respect to the proposed purchase price, and is comparable with respect to break-up fees or expense reimbursements approved in other chapter 11 cases.  *See, e.g.*, *In re HMX Acquisition Corp.*, Case No. 12-

14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving breakup fee of approximately

3.0% of the $75 million purchase price); *In re Cabrini Med. Ctr.,* Case No. 09-14398

(AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% for an

$80 million sale); *In re BearingPoint, Inc.,* Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr.

7, 2009) (approving a break-up fee of 3% on a $350 million sale and expense

reimbursement up to $1,500,000); *In re Adelphia Bus. Solutions, Inc.,* No. 02-11389

(REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving break-up fee of 2.5%

of the purchase price and expense reimbursement).

66.    Finally, the Break-Up Fee does not hamper any other party's ability

to offer a higher or better bid for the Assets.  Given the size of the Break-Up Fee relative

to the total amount of consideration provided for the Assets pursuant to the Purchase

Agreement, and relative to the "overbid" requirements set forth in the Bidding

Procedures, the fee is not so large as to have a "chilling effect" on other prospective

bidders' interest in the Assets.

67.    Furthermore, because the timely sale of the Assets is required and

the auction process is the most beneficial means to the Debtors' estates of maximizing

the value of the Assets, the Break-Up Fee constitutes actual and necessary costs and

expenses of preserving the Debtors' estates.  In addition, because the Purchase

Agreement has created a floor for any additional bids, the Purchaser has provided

significant value to the Debtors' estates.  The Debtors submit that the Break-Up Fee is

appropriate.

68.    Likewise, the Purchaser should be entitled to the expense

reimbursement, which is capped at $120,000.  Approval of an expense reimbursement

as a superpriority claim in connection with a sale of assets pursuant to Bankruptcy

Code section 363 is appropriate and has become a recognized bidder protection practice

30

in chapter 11 cases.  Expense reimbursements, such as the one being sought here, enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

69.     The expense reimbursement (which would be a superpriority administrative expense) was a material inducement for, and condition of, the Purchaser's entry into the Purchase Agreement.  The Purchaser is unwilling to commit to hold open the offer to purchase the Assets under the terms of the Purchase Agreement unless the Purchaser is assured payment of the expense reimbursement. The Purchaser has provided value to the Debtors' estates by, among other things, conducting the legal and financial diligence necessary to submit an offer that will serve as the baseline for all other bids, and negotiating the form of Purchase Agreement that all other bidders will use as a template in the sale process.  As such, the Purchaser is entitled to be compensated for its efforts, and the expense reimbursement should be authorized.

### C.   The Time, Place, and Notice Proposed for the Auction and the Sale Hearing are Reasonable and Should be Approved

70.     Bankruptcy Rule 6004 prescribes the notice that must be given of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code.  Pursuant to Bankruptcy Rule 6004(a), notice must be given of a proposed use, sale or lease of property, not in the ordinary course of business, which satisfies the requirements of Bankruptcy Rule 2002(a)(2) and (c)(1), among others.

71.     Bankruptcy Rule 2002(a) requires that "the clerk, or some other person as the court may direct," give "the debtor, the trustee, all creditors and indenture trustees at least 21 days notice by mail of:  (2) a proposed use, sale, or lease of

31

property of the estate other than in the ordinary course of business[.]" Fed. R. Bankr. P. 2002(a). Bankruptcy Rule 2002(c) requires that this notice include "the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c).

72.     Bankruptcy Rule 6004(c) requires that a motion pursuant to section 363(f) of the Bankruptcy Code for authority to sell property free and clear of liens or other interests "shall be served on the parties who have liens or other interest in the property to be sold." Fed. R. Bankr. P. 6004(c).

73.     Bankruptcy Rule 2002(l) provides that the Court "may order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice." Fed. R. Bankr. P. 2002(l).

74.     As set forth above, the Debtors seek entry of the pre-fixed Scheduling Order limiting the time and notice requirements for the hearing on the Bidding Procedures and the Break-Up Fee. Specifically, the Debtors request that notice of the hearing on the Bidding Procedures, the Break-Up Fee, and related relief be sufficient if served by overnight mail or electronic transmission within one business day of entry of the Scheduling Order on the Notice Parties.

75.     As also stated above, the Debtors propose that the Auction be held approximately 50 days following the date the entry and service of the Bidding Procedures Order with the Sale Hearing to be held shortly after the Auction.

76.     The Notice of Auction and Sale Hearing sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the

32

time, date, and location of the Auction;  and the time, date, and location of the Sale

Hearing.

77.     The Debtors submit that these notice procedures satisfy the

requirements of Bankruptcy Rule 6004 and request that the Court approve the same.

**D.     The Assigned Contracts Should Be Assigned to the Purchaser or
Successful Purchaser in Accordance with the Assignment Procedures**

78.     Section 365 of the Bankruptcy Code provides in relevant part, that

"the trustee, subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the Debtors."  11 U.S.C. § 365(a).

79.     In connection with the Proposed Sale, the Debtors may seek to

assume and assign to the Purchaser, and may if provided by the Successful Bid, assume

and assign to the Successful Purchaser(s) if different from the Purchaser, certain

executory contracts and/or leases (each a "Contract or Lease" and, collectively, the

"Contracts and Leases") designated by the Purchaser or another Successful Purchaser

(the "Assigned Contracts") pursuant to section 365 of the Bankruptcy Code and in

accordance with the procedures set forth herein (the "Assignment Procedures").

80.     The Debtors will file a schedule of the potential Assigned Contracts

(the "Assumption Schedule") no later than ten (10) business days following entry of the

Bidding Procedures Order, and concurrently serve notice of such potential assumption

and assignment of the Assigned Contracts, substantially in the form attached to the

proposed Bidding Procedures Order as Exhibit C (the "Cure Notice").  The Cure Notice

shall identify each of the Contracts and Leases and provide the corresponding cure

amounts that the Debtors believe must be paid to cure all defaults under the Contracts

and Leases to the extent required by section 365 of the Bankruptcy Code (the "'Cure

Amounts").  The Cure Notice that the Debtors shall file with the Bankruptcy Court will

include a comprehensive list of the Contracts and Leases with the corresponding Cure
Amounts and the Cure Notice that the Debtors shall serve on Contract Parties shall be
personalized.

81.     Unless the Contract Party to any Contract or Lease files an objection
to its scheduled Cure Amount or to the assumption and assignment of a Contract or
Lease, and serves a copy of the such objection so as to be actually received by the Notice
Parties no later than the Objection Deadline, such Contract Party shall be forever
barred, estopped, and enjoined from objecting (a) to the Cure Amount and from
asserting that any additional amounts are due or defaults exist, (b) that any conditions
to assumption and assignment must be satisfied under such Contract or Lease before it
can be assumed and assigned or that any required consent to assumption or assignment
has not been given, or (c) that the Successful Bidder(s) (including the Purchaser) has not
provided adequate assurance of future performance.

82.     In the event of a timely filed objection and dispute regarding:
(a) any Cure Amount with respect to any of the Contracts and Leases;  (b) the ability of
the Successful Bidder(s) (including the Purchaser) to provide adequate assurance of
future performance as required by section 365 of the Bankruptcy Code, if applicable,
under any of the Contracts and Leases;  or (c) any other matter pertaining to
assumption or assignment of any of the Contracts and Leases, the Cure Amount shall be
paid by the Debtors as soon as reasonably practicable after the Closing, in accordance
with the applicable asset purchase agreement following the entry of a final order
resolving the dispute and approving the assumption and assignment of such Contract
or Lease;  provided, however, that the Debtors are authorized to consensually resolve
with an applicable counterparty any dispute regarding the amount of any Cure

Amount or assignment to the Successful Bidder(s) (including the Purchaser), without any further notice to or action, order, or approval of the Bankruptcy Court.

83.     No later than five (5) business days after the Closing Date, the Debtors will file a complete list of the Contracts and Leases that were assumed and assigned as Assigned Contracts as of the Closing Date in connection with the sale of the Assets.

## IX.     THE SALE ORDER SHOULD BE ENTERED

### A.     The Sale of the Assets is an Exercise of the Debtors' Sound Business Judgment

84.     Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of the debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…."  11 U.S.C. § 363(b).

85.     The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction.  *See In re Chrysler LLC*, 576 F.3d 108, 117-18 (2d Cir. 2009), *citing In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (*citing Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983);  *In re Gen. Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009).

86.     In addition, Bankruptcy Code section 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a).  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." *In re Flores*, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003) (quoting 2 COLLIER ON BANKRUPTCY, ¶ 105 at 105-5, 15th ed. rev. rel. 2000)).

87.     The Debtors submit that the Purchase Price is fair and reasonable in light of the extensive marketing of the Property by CBRE, the current real estate market and the offers received for the Assets to date.  Finally, any concern that the Debtors may be able to sell the Assets on better overall terms than those provided for in the Purchase Agreement should be allayed by the fact that the Purchase Agreement will be tested through the Bidding Procedures, and at the Auction if a competing bid is submitted.

88.     As such, the Debtors submit that the Sale of the Assets offers the greatest benefit to the Debtors' estates, and is an exercise of the Debtors' sound business judgment.

**B.     The Court Should Include Findings In the Sale Order Confirming the Debtors' Broad Property Rights Under the Declarations**

89.     Pursuant to the Purchase Agreement, applicable state law, and section 363(f) of the Bankruptcy Code, the rights granted under the Declarations run with the land and remain in place after the Proposed Sale.  *See* Sale Declaration Ex. A (Master Declaration, at Article 19.17 ("[I]t is the intention of all parties . . . that these covenants and restrictions shall run with the Property and with title to [the Property]."); *In re Inwood Heights Hous. Dev. Fund Corp.*, No. 11-13322, 2011 WL 3793324, at *7 (Bankr. S.D.N.Y. Aug. 25, 2011) (holding that section 363(f) cannot obviate state law restrictions in property deed that runs with the land); *In re 523 E. Fifth Street Hous. Pres. Dev. Fund*

36

*Corp.*, 79 B.R. 568, 574-75 (Bankr. S.D.N.Y. 1987) (denying motion to sell real property free and clear of covenant running with the land under 363(f)(1)).  The Associations have sought to define, limit, and encumber those rights under the Declarations that the Debtors, and any future owner, has in the Property (for instance, seeking to limit future access and restrict future rules and assessments that the owner may impose).  But in asserting their claims, the Associations ignore that the Declarations that govern the Property unambiguously afford the Hotel Lot Owner, currently Debtor 6801 Central, broad control over the Property.  As a result, a "Favorable Resolution" of the non-monetary relief sought by the Associations is a condition to closing of the Proposed Sale.  Accordingly, the Debtors submit that it is necessary for this Court to make findings in the Sale Order confirming the Debtors' rights under the Declarations—thereby nullifying the Associations' attempts to limit a Hotel Lot Owner's rights with respect to the Property—in order to maximize the value of the Property and to successfully facilitate the Proposed Sale.

90.    Per General Order No. M-383, the findings set forth in the Sale Order are supported by applicable Florida law and the Declarations as explained further below.

**1.    Findings Necessary to Dispose of the
North Tower Association's Attempt to
<u>Limit the Debtors' Rights to the Property</u>**

91.    The North Tower Association seeks a declaration that the Hotel Lot Owner, including any successor owner, is precluded from exercising its rights under the Master Declaration "in such a way that would fundamentally change or alter the character of the exclusive lifestyle at the Canyon Ranch community, particularly as it affects the Association and the North Tower unit owners."  In particular, the North Tower seeks to prohibit the Hotel Lot Owner from "somehow" (i) "annexing" the

37

adjacent Golden Sands hotel into the Canyon Ranch Miami Beach property, (ii) creating a 1,000-member beach club whose members and guests could access the Shared Facilities, the Spa, and commonly available spa and recreational facilities, (iii) reducing their number of "permitted occupants" from eight to six, and (iv) otherwise overburdening the facilities used by condominium residents and hotel guests. As set forth below, apart from reducing the number of "permitted occupants," the recorded Master Declaration expressly empowers the Debtors (and any successor owner) to take these actions with respect to the Property in the future. This Court should thus include findings in the Sale Order confirming the property rights under the Declaration that will be conveyed.

92.    As a preliminary matter, Florida courts interpret declarations of covenants based on the plain language of the declaration itself. *See, e.g., Shields v. Andros Isle Prop. Owners Ass'n, Inc.,* 872 So.2.d 1003 (Fla. Dist. Ct. App. 4th Dist. 2004) (interpreting declaration of covenants according to the ordinary and obvious meaning of the words used); *Royal Oak Landing Homeowners Ass'n v. Pelletier,* 620 So.2d 786, 788 (Fla. 4th DCA 1993) (in interpreting a declaration of protective covenants and restrictions, "the best evidence is the plain language of the contract"). Here, the Master Declaration specifically provides that the Hotel Lot Owner, currently Debtor 6801 Central, has the right to "annex" or add Future Development Property as defined by the Article 1.1(x) of the Master Declaration. Sale Declaration Ex. A (Master Declaration, at Articles 1.1(x), 2.2). To that end, Article 2.2 specifically provides the Debtors and any successor owner of the Hotel Lot with the right to "annex" Future Development Property in the Canyon Ranch Miami Beach property provided that a Supplemental Declaration is duly executed and recorded in the Public Records of Miami-Dade County. *Id.* at Article 2.2.

93.     Second, the Master Declaration plainly provides that the Hotel Lot Owner has the right to use, and regulate use of, the Hotel Lot, including the Shared Facilities, the Spa, and the spa facilities in its sole discretion.  *Id.* at Articles 4.3-4.4. Article 4.4 of the Master Declaration states:

> the Hotel Lot Owner has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa Facilities shall be used, if at all (which shall include the right to establish from time to time reasonable non-discriminatory rules and regulation governing the Limited Spa Rights, including, without limitation, establishing hour of use and guest policies, restrictions and/or prohibitions).  By way of example, but not limitation, the Hotel Lot Owner has the right to approve users and determine eligibility for use, to allow use of the Spa by persons other than owners of Lots[.]

*Id.* at Article 4.4.  Further, Article 4.3 of the Master Declaration provides that each unit owner's "limited rights to use, benefit from and enjoy" the Shared Facilities, including their limited rights to use the Spa and spa facilities, are subject to the Hotel Lot Owner's right to "permit such [other] persons as the Hotel Lot Owner may designate . . . includ[ing] persons who are not members of the Association or owners of any portion of the properties (***and may include members of the public generally***)" to use the Shared Facilities, *id.* at Article 4.3(d) (emphasis added), and that the Hotel Lot Owner may "grant and use general . . . and specific easements over, under and through" the Shared Facilities to whomever it so chooses.  *Id.* at Article 4.3(e).  The Hotel Lot Owner may even withdraw certain portions of the Shared Facilities "unilaterally at any time, without prior notice and without the consent" of the Associations or the unit owners. *Id.* at Articles 2.3, 4.3(f).

94.     As a result, although not the intention of either the Debtors or the Purchaser, the Hotel Lot Owner (including the Purchaser after the closing of the Proposed Sale) has the sole and exclusive right, if it shall so desire, to (i) add or "annex"

new and additional property into the Property, (ii) create a 1,000 member beach club

whose members and guests may use of the Shared Facilities, the Spa, and commonly

available spa and recreational facilities;  and (iii) generally allow members of the public

to use the Shared Facilities and the Spa and spa facilities as it sees fit.

95.     Accordingly, the Debtors respectfully request that the Court enter

the following findings in the Order approving the Proposed Sale to clearly affirm the

Debtors' rights under the Declarations:

- The Hotel Lot Owner (or any successor owner) of the Future Development Property as defined by Article 1.1(x) of the Master Declaration has the right to "annex" or add Future Development Property to the jurisdiction of the Master Declaration, provided that a Supplemental Declaration is duly executed and recorded in the Public Records of Miami-Dade County, as provided in Article 2.2 of the Master Declaration.

- The Hotel Lot Owner (and any successor owner) has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa and spa facilities shall be used, if at all, including, without limitation, the right to approve users, determine eligibility for use, establish hours or use and guest policies, restrictions and/or prohibitions, and to allow use of the Spa and spa facilities by persons other than the Unit Owners (as defined in the Declarations).

- Each Unit Owner's right to use the Shared Facilities, including his or her Limited Spa Rights, are subject to the Hotel Lot Owner's right to permit other persons to use such facilities as the Hotel Lot Owner (or any successor Hotel Lot Owner) may designate in its sole discretion.  This includes without limitation persons who are not members of the Associations or who are not owners of any portion of the Property and may include members of the public generally.

- The Hotel Lot Owner (and any successor) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses.

These findings will effectively dispose of the North Tower Association's meritless attempts to restrict the Debtors' (and any successor owner's) rights to the Property, paving the way for the Proposed Sale to close.

96.     No finding is required as to the North Tower Association's number of "permitted occupants" to the spa facilities.  The North Tower Association also asserts that their number of "permitted occupants" to the spa facilities may not be reduced from eight to six.  The concept of "permitted occupants" is defined and addressed in the North Tower Declaration.  The North Tower Declaration indeed provides that each North Tower unit owner may designate up to eight "Permitted Occupants" to the Hotel Lot Owner, Sale Decl. Ex. B (North Declaration, at Article 15.3), and any attempt to amend or revise the North Tower Declaration requires a vote by the unit owners and is not an action that can be unilaterally exercised by the Debtors, either individually or collectively.  *Id.* at Article 6.1.  Because this is not an action that the Debtors assert that they or any successor owner may do unilaterally (or that the Debtors have attempted), no finding is required as to this assertion.

**2.    Findings Necessary to Dispose of the
South and Central Tower Associations' Attempt
to Limit the Debtors' Rights to the Property**

97.     The South and Central Tower Associations also seek to significantly alter the Debtors' (and any successor's) rights to the Property.  In particular, the South and Central Tower Associations assert that they were wrongly assessed certain fees associated with the Shared Facilities, Spa and spa facilities, fitness centers, and valet services, and that the South and Central Tower unit owners are entitled to allow eight guests to use the Shared Facilities, including the spa facilities, on any one-calendar day without paying an access fee.  The South and Central Tower Associations seek to enjoin the Debtors and any successor from charging the "improperly" assessed charges or to

enforce the rules to which they object going forward.[8]  As explained below, because the

Master Declaration expressly empowers 6801 Central as the Hotel Lot Owner, and any

successor owner, to take these actions, the Debtors respectfully request that this Court

make findings in the Sale Order confirming the Debtors' rights under the Declarations

to assess such fees and enact such rules.

98.     <u>The Hotel Lot Owner (and any successor owner) may assess fees
for the unit owners' use of the Limited Spa Rights.</u>  The South and Central Tower

Associations assert that they were improperly assessed for charges related to the spa

facilities, which is part of the Hotel Lot.  The South and Central Tower Associations

claim that this is because the "only" fee or charge they are required to pay for their use

of the spa facilities is a monthly "fixed charge" as set forth in Article 16.3 of the Master

Declaration.  These allegations are directly contrary to the plain language of the Master

Declaration.

99.     The Master Declaration affords the Hotel Lot Owner broad

discretion to levy assessments for the "repair, replacement, improvement, maintenance,

management, operation, alteration, relocation, and or insurance of . . . the Non-Retail

Shared Facilities."  Sale Declaration Ex. A (Master Declaration, at Article 16.3).  The

Non-Retail Shared Facilities include the unit owner's "Limited Spa Rights," which are

defined as the right of "access to and use of, Cardio/Weight Room, Exercise Studio, Spa

Reception Lobby, Men's & Women's Locker Room, Men's & Women's Wet

Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio,

---

[8]     The South and Central Tower Associations also seek approximately $8.7 million in damages for these
allegedly wrongly assessed fees and charges.  Because their claim for money damages does not seek
to limit or impinge a sucessor's rights with respect to the Property, that portion of the South Tower
Litigation is not addressed in this Motion.  For the avoidance of doubt, however, the Debtors deny all
liablity and damages in the South Tower Litigation, and will object to such claims to the extent they
are pursued by the Associations, as it would any other disputed claim.

South Tower Lobby, South Tower Beach Pool and Jacuzzi and Central Tower Lobby and Reception." *Id*. at Article 4.4. *See also* Articles 1.1(oo), 1.1(dd)(iv)(d). The Master Declaration also clearly states that these assessments are "[*i]n addition to*" the fixed charge that each owner agrees to pay on a monthly basis for use of the spa facilities. *See id.* at Article 16.3 (emphasis added). Thus, the Master Declaration provides the Hotel Lot Owner the express right to levy assessments for the Non-Retail Shared Facilities, which include the unit owners' Limited Spa Rights, ***in addition to*** the express right to require payment by the unit owners of the "fixed charge" for use of the spa facilities. Accordingly, the Hotel Lot Owner may assess the unit owners for "spa-related" costs for their use of those facilities within the Non-Retail Shared Facilities assessment.

100.    The Hotel Lot Owner (and any successor owner) may include the expense of valet parking services in each individual Condominium Tower's Shared Facilities assessments. The South and Central Associations seek to prohibit the Hotel Lot Owner from including costs for valet parking services ("Valet Parking Services") in the Shared Facilities assessments for each of the three Condominium Towers (each, a "Condominium Tower Shared Facilities Assessment"). Nothing in the Master Declaration requires this.

101.    The South and Central Associations assert that the costs for Valet Parking Services must be captured in the Non-Retail Shared Facilities assessment because they claim that Valet Parking Services fall within the definition of "Garage Costs" in Article 1.1(z) of the Master Declaration. But Article 1.1(z) of the Master Declaration defines Garage Costs as "the operation, maintenance, repair, replacement, insurance and/or alteration of the parking ***structures and/or facilities located within the Hotel Lot***." Sale Declaration Ex. A (Master Declaration, at Article 1.1(z)) (emphasis added). Valet Parking Services expenses are for personnel, not for structures or

43

facilities.  Additionally, neither Article 1.1(z) nor any other Article of the Master

Declaration requires that the cost of providing Valet Parking Services to the individual

Condominium Towers—which necessarily differ by Tower based upon staffing and

usage—be included in the overall Non-Retail Shared Facilities assessment.  Because no

provision of the Master Declaration expressly requires that Valet Parking Services be

included in the Non-Retail Shared Facilities assessment (and because the need for and

intensity of use of the valet services usage varies by Tower), the Hotel Lot Owner is

entitled to assess Valet Parking Services costs to unit owners through each individual

Tower's Shared Facilities Assessment so that the charge for these services is borne by

the applicable unit owners in accordance with their particular use and benefit.

> 102.   <u>The Hotel Lot Owner (and any successor owner) may assess utility</u>
<u>costs based upon square footage rather than actual usage.</u>  The South and Central

Associations seek to force the Hotel Lot Owner and any successor owner to assess

utility fees based upon actual usage rather than square footage.  The Master Declaration

provides that "to the extent that any utility consumption charges are part of the cost

attributable to the Shared Facilities and those charges ***can reasonably be allocated to***

***the particular Lots based upon actual consumption***" then they shall be so charged.  Sale

Declaration Ex. A (Master Declaration, at Article 16.3) (emphasis added).  The

Property's utility lines are not separately metered.  Thus, it would not be reasonable to

allocate utility costs based upon actual consumption and therefore, per the Master

Declaration, the Hotel Lot Owner is entitled to charge for utility consumption based

upon square footage.

> 103.   <u>The Hotel Lot Owner (and any successor owner) may limit the</u>
<u>number of "Permitted Occupants" to a daily maximum based upon daily legal</u>
<u>occupancy of a condominium unit.</u>  The South and Central Tower Associations seek to

require that the Hotel Lot Owner and any purchaser allow the South and Central Tower

unit owners eight guests per day to use the Shared Facilities, including the spa facilities,

without paying an access fee.  Nowhere in Declarations are the unit owners entitled to

eight guests on any given calendar day.

104.    Rather, the South and Central Tower Declarations merely state that

the unit owner can submit the names of eight individuals who are then deemed

"permitted occupants" of the unit and do not have to pay an access fee to enter and use

the spa facilities;  not that eight guests can use the facilities at *the same time* such that

legal occupancy limits for the units and the facilities would be violated.  Sale

Declaration Exs. C, D (South Tower Declaration, at Article 15.3, Central Tower

Declaration, at Article 16.3).  Moreover, the Master Declaration, which trumps the

Tower Declarations, affords the Hotel Lot Owner broad authority to issue reasonable

rules and restrictions over the unit owners' Limited Spa Rights, and the spa facilities are

entirely Hotel Lot property subject to the sole discretion of the Hotel Lot Owner.  Sale

Declaration Ex. A (Master Declaration, at Article 4.4).  A daily limit is an obvious and

reasonable restriction that is consistent with the terms of the Declarations and

applicable legal occupancy limits.  The South and Central Tower Associations' attempt

to force the Debtors and any purchaser to allow eight guests to the spa facilities a day

thus has no basis in the Declarations.

105.    For the foregoing reasons, the South and Central Associations'

attempt to limit the Debtors' rights to levy assessments and enforce certain rules—

thereby also potentially diminishing the value of the purchase price by attempting to

limit the Purchaser's rights—are wholly invalid.  The Debtors therefore respectfully

request that the Court include findings in the Order approving the Proposed Sale to

confirm the Debtors' rights under the Declarations as follows:

45

- The Hotel Lot Owner (or any successor owner) may levy assessments for, among other things, the maintenance, repair, management, replacement and operation of the Shared Facilities. Included in the Shared Facilities are the United Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration.

- The Hotel Lot Owner (or any successor owner) may include the expense of Valet Parking Services in the individual Condominium Tower's Shared Facilities Assessments.

- The Hotel Lot Owner (or any successor owner) may assess utility costs based upon square footage rather than actual usage.

- The Hotel Lot Owner (or any successor owner) may institute reasonable rules and regulations to operate and manage the Shared Facilities, including limiting maximum daily users to comport with legal occupancy limits.

- The Hotel Lot Owner (or any successor owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit the availability of unit owners' use privileges, (ii) to change, eliminate or cease operation of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities.

These findings will effectively dispose of the South and Central Towers' meritless non-monetary claims.

106.    In sum, because the Associations have sought to infringe upon the Debtors' property rights (and the future rights of any prospective purchaser) under the Declarations, the Debtors respectfully request that this Court make these factual findings in the Sale Order, which shall set forth the Debtors' and any successor owner's broad rights under the Declarations to (i) impose regulations and restrictions in order to

manage and operate the Property, (ii) determine who may access the Property, and (iii) levy assessments and fees on the unit owners for their use of the Property.  These findings are necessary in order to enable the success of the Proposed Sale and to maximize recoveries to the estates of the Debtors and, ultimately, LBHI.

### C.    The Assets Should be Sold Free and Clear of Liens, Claims, and/or Interests Other than Permitted Encumbrances

107.    Pursuant to section 363(f) of the Bankruptcy Code, a trustee or debtor in possession may sell property under Bankruptcy Code section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interest;  (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;  (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f).  *See In re Smart World Techs., LLC*, 423 F.3d 166, 169 n.3 (2d Cir. 2005) (Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers … to acquire assets [from a debtor] without any accompanying liabilities."); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

108.    Pursuant to the Purchase Agreement, the Debtors request that the Court authorize the sale of the Assets free and clear of all liens, interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security interests, claims (including, any "claim" as defined in Section 101(5) of the Bankruptcy Code), leases,

possessory leasehold interests, charges, options, rights of first refusal or option to

purchase any real property, easements, servitudes, transfer restrictions under any

agreement, judgments, hypothecations, demands, licenses, sublicenses, assignments,

debts, obligations, guaranties, options, contractual commitments, restrictions,

environmental liabilities, options to purchase, and options, in each case of whatever

kind, nature, or description in, against or with respect to any of the Assets, having

arisen, existed or accrued prior to and through the Closing, whether direct or indirect,

absolute or contingent, choate or inchoate, fixed or contingent, matured or unmatured,

liquidated or unliquidated, arising or imposed by agreement, understanding, law

equity, statute or otherwise and whether arising prior to, on or after the Petition Date,

including those liens, claims and/or encumbrances listed on Exhibit A to the Sale Order

(collectively, "Liens", Claims and/or Interests"), other than "Permitted Encumbrances"

described in the Purchase Agreement.

109.    Additionally, under the Sale Order, the Purchaser shall not be liable

for any claims against any of the Debtors or any of their respective predecessors or

affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind

of character, including, but not limited to, under any theory of antitrust, environmental,

successor or transferee liability, labor law, successor or successor employer liability, de

facto merger or joint venture, mere continuation or substantial continuity, whether

known or unknown as of the Closing, now existing or hereafter arising, whether fixed

or contingent, whether asserted or unasserted, whether legal or equitable, whether

liquidated or unliquidated, including, but not limited to, liabilities on account of

warranties, intercompany loans and receivables between any of the Debtors and any

non-debtor subsidiary, liabilities relating to or arising from any environmental laws,

any successor liability as a "developer" of the Property and any taxes arising, accruing

or payable under, out of, in connection with, or in any way relating to the operation of any of the Property prior to Closing. *Sale Order* ¶ 17.

110.    The sale of the Assets pursuant to the Bidding Procedures will satisfy section 363(f) because, as described below, any entities holding liens on the Assets will have received notice of this Motion and the Notice of Auction and Sale Hearing, the purchase price exceeds the value of all liens against the Assets, which may be satisfied by monetary relief, and the claims and interests asserted in the Association Litigations are subject to *bona fide* dispute.

111.    Section 363(f)(2) is satisfied as to those parties that consent or do not object to the Proposed Sale.  All parties in interest will be given sufficient opportunity to object to the relief requested by the Debtors, and any such entity that does not object to the Sale should be deemed to have consented.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted);  *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2));  *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (same).  Courts in this district have applied the same principle.  *See also In re GSC, Inc.*, 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2));  *In re Borders Grp., Inc.*, 453 B.R. 459, 484 (Bankr. S.D.N.Y. 2011) (failure to

49

object to free and clear sale satisfies section 363(f)(2)); *In re Enron Corp.,* No 01-16034, 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. 2004)*; In re Enron Corp.,* No. 01-16034, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

112.    Section 363(f)(3) is satisfied.  A sale can be made free and clear of any liens pursuant to section 363(f)(3) so long as the purchase price exceeds "the aggregate value of all liens on such property."  Section 363(f)(3) is satisfied because the price at which the Assets is to be sold is greater than the value of the known liens on the Assets which the Debtors believe aggregate less than $1.7 million.

113.    Section 363(f)(4) is satisfied with respect to claims and interests raised in the Association Litigations.  Furthermore, as described above and in the Barsanti Declaration, the Sale will be free and clear of all disputed claims and interests asserted in the Association Litigations.  The Proposed Sale of the interests in, and transfer of title to, the Assets resolves a bona fide dispute between the Debtors, on the one hand, and the Associations, on the other hand.

114.    Pursuant to section 363(f)(4) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any such interest if such interest is in "bona fide dispute."  11 U.S.C. § 363(f)(4).  An interest is in bona fide dispute within the meaning of section 365(f)(4) where the debtor can demonstrate "an objective basis for either a factual or legal dispute as to the validity of the debt."  *See In re Downtown Athletic Club of New York City, Inc. ("DAC"),* No. M-47, 2000 WL 744126, at *4 (S.D.N.Y. June 9, 2000).  In this case, as more fully described above, there is no question that certain interests in the Assets are the subject of bona fide dispute.  Specifically, the Associations seek to encumber, define, and limit the Debtors' rights to the Property under the Declarations.  Because the rights granted under the Declarations go to the

heart of the Hotel Lot's profitability, which is critical to the Property's value in the eyes

of any purchaser, the Association Litigations have rendered the Property virtually

unsellable (or sellable at a significantly reduced purchase price) pending a full and final

resolution of those disputed claims.

115.    Courts, including this Court, have utilized section 363(f)(4) to

extinguish disputed claims and interests against purchasers and property that is sold

under Bankruptcy Code section 363 free and clear of all liens, claims, encumbrances,

and other interests of any kind.

116.    For instance, in the Downtown Athletic Club ("DAC") case,

pursuant to its Chapter 11 plan, DAC sold a thirty-five story building where it had been

located for 71 years. *In re Downtown Athletic Club of New York City, Inc. ("DAC"),* No.

M-47, 2000 WL 744126 (S.D.N.Y. June 9, 2000).  The top 15 floors consisted of hotel

rooms and the rest of the building was DAC's health club, restaurant, retail and social

facilities.  Two long-time members (the "Members") of DAC that occupied hotel suites

on the hotel floors refused to vacate.  Post-petition but before plan confirmation, the

Members each filed a complaint with the New York State Division of Housing alleging

that the building was subject to rent stabilization laws ("RSL") and that DAC violated

the RSL by overcharging the Members rent for their rooms.  DAC responded to the

complaints and denied that the RSL applied.

117.    Pursuant to a confirmed Chapter 11 plan, the building was sold.

DAC then filed a complaint against the Members in the bankruptcy case seeking to

enjoin them from obtaining any interest in the building, for an order declaring that they

had no interest in the building and enjoining the Members from using their rooms.  On

appeal, the District Court held that the purchaser had obtained title to the building "free

and clear" of the Members' asserted interests, which were the subject of a bona fide

51

dispute.  The District Court found that the sale extinguished any ongoing interest of the

Members in the building that could be enforced against the purchaser.  *Id.* at *4 ("Under

the Code, a debtor 'may sell property . . . free and clear of *any interest* in such property

of an entity other than the estate' if, . . . such interest is in bona fide dispute.") (*citing*

§ 363(f)).

118.    Another instructive decision is *In re Daufuskie Island Properties, LLC,*

431 B.R. 626 (Bankr. S.C. 2010).  There, the Bankruptcy Court for the District of South

Carolina permitted the sale of a resort property free and clear of "interests" in a

disputed restrictive covenant running with the land.  The Court found that the history

of significant litigation between the parties regarding the validity of rights with respect

to the restrictive covenant demonstrated that the sale "free and clear" was authorized

on the theory that the rights in question were subject to "bona fide" dispute.  The

restrictive covenant at issue provided a former owner with the right to repurchase the

property if certain improvements were not completed for the benefit of the resort's

members or if certain other requirements intended for the members' protection were

not met.  The Court found that the refusal to grant the sale free and clear of the

purported rights would significantly impact the trustee's ability to complete the sale.

The Court held that to authorize a sale free and clear of interests, it is not necessary for

the Court to resolve the underlying dispute;  it need only determine that such a dispute

exists.

119.    Here, as described above, a "bona fide dispute" exists between the

Debtors and the Associations with respect to the Hotel Lot Owner's rights to Property,

such that the Property may be sold free and clear of such bona fide disputed claims and

interests.   Therefore, even without the consent of all parties in interest or a favorable

resolution of the issues raised in the Association Litigations, the sale of the Assets free

and clear of all of Liens, Claims and/or Interests is reasonable and authorized under

section 363(f)(4).  Notwithstanding, as noted, the Purchaser has required as a closing

condition that the non-monetary relief sought by the Associations be resolved

favorably, including findings of fact and conclusions of law in the Sale Order (as set

forth above).

120.    Section 363(f)(5) is satisfied.  Further, the Debtors' submit that

section 363(f)(5) is satisfied by the Purchase Agreement, as (i) any entity holding a lien

on the Assets, not included in the Permitted Encumbrances, could be compelled to

accept a monetary satisfaction of its lien, and (ii) the Debtors propose that any lien on

the Assets sold pursuant to the Bidding Procedures, which is not a Permitted

Encumbrance, shall attach to the net proceeds of the sale of the Assets, subject to any

claims and defenses the Debtors may possess with respect thereto, in the priority they

had before the Sale (except as otherwise set forth herein).  Additionally, as this Court

has recognized, section 363(f)(5) does not require that such lien holders receive full

payment of their underlying debt.  *See e.g., In re Boston Generating, LLC*, 440 B.R. 330, 332

(Bankr. S.D.N.Y. 2010).  As such, the sale of the Assets free and clear of all Liens, Claims

and/or Interests (other than Permitted Encumbrances), including any monetary

damages owing to the Associations, if any, satisfies section 363(f)(5) of the Bankruptcy

Code.

**D.    The Purchaser Should be Afforded All
Protections Under Section 363(m) as a Good Faith Purchaser**

121.    Section 363(m) of the Bankruptcy Code protects a good faith

purchaser's interest in property purchased from the debtor notwithstanding that the

sale conducted under section 363(b) was later reversed or modified on appeal.

Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) … provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal[.]");  *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal[.]").

122.    The Second Circuit has indicated that a party would have to show fraud or collusion between a buyer and the debtor in possession or trustee in order to demonstrate a lack of good faith.  *See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.*), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders[.]");  *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997);  *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

123.    Here, the Purchaser and Debtors have satisfied the requirements of Section 363(m).  The Purchase Agreement is the result of extended arm's-length, good-faith negotiations between the Debtors and the Purchaser, each represented by their respective professionals.  The Debtors submit that the Purchaser is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Accordingly, the Debtors request that the Court make a

finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

124.    To the extent that the Purchaser is not the Successful Bidder at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### E.    Assumption of the Assigned Contracts and Assignment Procedures Should be Approved

125.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor".

126.    The business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed. *See, e.g., In re Old Carco LLC (f/k/a Chrysler LLC)*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993*); Richmond Leasing Co v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially[.]").  A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. *See, e.g., Old Carco*, 406 B.R. at 196-97; *In re Child World, Inc.*, 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 673 (Bankr. S.D.N.Y.

1989); *see also Sharon Steel Corp v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989).

127.    When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

128.    Assuming and assigning the Assigned Contracts to the Purchaser (or the Successful Bidder) pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment.  As the Debtors are selling the Property, the Assigned Contracts will no longer have any value to the Debtors.  By assuming and assigning the Assigned Contracts to the Purchaser (or the Successful Bidder) the Debtors' estates will benefit from avoiding the damage claims that would arise from rejecting the Assigned Contracts.

129.    In addition, the Purchaser has sufficient capital to provide adequate assurance of future performance on all of the Assigned Contracts and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

130.    The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the counterparties to the Assigned Contracts notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfies the notice requirements of Bankruptcy Rule 6006(c).

131.    Therefore, because assuming and assigning the Assigned Contracts to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and

unexpired leases and increases the value to be realized from the Sale of the Acquired

Assets, assumption and assignment to the Successful Bidder(s) of the Assigned

Contracts is clearly an exercise of the Debtors' sound business judgment which

warrants approval by this Court.

## **CONCLUSION**

132.   No prior motion for the relief requested herein has been made to

this or any other Court.

WHEREFORE, the Debtors respectfully request entry of the orders

authorizing the relief requested herein and such other and further relief as is just.

DATED:  New York, New York
          June 1, 2014

                      FL 6801 SPIRITS LLC, *ET AL.*,
                      Debtors and Debtors in Possession,
                      By their Proposed Counsel,
                      TOGUT, SEGAL & SEGAL LLP
                      By:

                      /s/ Frank A. Oswald
                      ALBERT TOGUT
                      FRANK A. OSWALD
                      Members of the Firm
                      One Penn Plaza, Suite 3335
                      New York, New York  10119
                      (212) 594-5000