TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Lara R. Sheikh

*Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                            :
In re:                                      :        Chapter 11
                                            :        Case No.
FL 6801 SPIRITS  LLC, et al.,               :
                                            :
                          Debtors.          :
                                            :
-------------------------------------------------------------x

## ORDER (I) APPROVING SALE OF DEBTORS' PROPERTY; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon that portion (the "Sale Motion") of the motion (the "Motion"), dated

[                    ], 2014 of FL 6801 Spirits LLC, et al. (collectively, the "Debtors"),[1]

wherein the Debtors moved for entry of an order pursuant to sections 105(a) and 363 of

title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2), 6004

and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

approving the sale (the "Sale") of the Assets to 360 Miami Hotel & Spa LLC (the

"Purchaser"), as defined and described in the Motion and the Purchase and Sale

Agreement attached to the Motion as Exhibit A (the "Purchase Agreement");[2] and this

Court having reviewed the Sale Motion and the Purchase Agreement;  and upon this

---

[1]    The Debtors consist of the following entities:  FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries").

[2]    Unless otherwise defined in this Order, capitalized terms used herein shall have the meanings ascribed to such terms in the Motion or the Purchase Agreement, as applicable.

Court's prior order, dated _____ __, 2014 approving the Bidding

Procedures [Docket No. __] (the "Bidding Procedures Order"); and due notice of the

Sale Motion, the Bidding Procedures Order and the auction conducted in connection

therewith (the "Auction") having been given to all parties entitled thereto; and the

Auction having been held on _____ __, 2014;

       **NOW, THEREFORE**, upon the entire record of the Procedures Hearing,

the Sale Hearing (each as defined in the Bidding Procedures Order) and this case, and

after due deliberation thereon and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

       A.     This Court has jurisdiction over the Sale Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.), and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the

Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

       B.     The statutory predicates for the relief sought in the Sale Motion are

sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and

6006.

       C.     Proper, timely, adequate and sufficient notice of the Sale Motion

and the relief requested therein, the Auction, the Sale Hearing, the Sale, and the

transactions described in the Purchase Agreement, including, without limitation,

payment of the Break-Up Fee contained in the Purchase Agreement (all such

transactions being collectively referred to as the "Sale Transaction"), and the

assumption and assignment of each Assigned Contract, has been provided in

accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy

2

Rules 2002, 6004, 6006 and 9014 and in compliance with the Bidding Procedures Order

to all interested persons and entities, including:  (i) counsel for the Purchaser, Fulbright

& Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn:  Jane

Snoddy Smith, Esq., and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:

Kristian W. Gluck, Esq.; (ii) all applicable federal, state, and local taxing and regulatory

authorities of the Debtors or recording offices or any other governmental authorities

that, as a result of the sale of the Assets, are reasonably expected by the Debtors to have

claims, contingent or otherwise, in connection with the Debtors' ownership of the

Assets or have any known interest in the relief requested by the Motion, including (a)

the Internal Revenue Service, P.O. Box 21126, Philadelphia, Pennsylvania 19114, (b) the

Florida Licensing Authorities, and (c) the City of Miami Beach, City Hall, 1700

Convention Center Drive, Miami Beach, Florida 33139; (iii) the Debtors' known secured

creditors and lien holders, including all creditors or their counsel known to the Debtors

to assert a lien (including any security interest), claim, right, interest, or encumbrance of

record against all or any portion of the Assets; (iv) the United States Attorney for the

Southern District of New York; (v) the Office of the United States Trustee for Region 2,

Attn: William K. Harrington, Esq. and Susan D. Golden, Esq., U.S. Federal Office

Building, 201 Varick Street, Suite 1006, New York, New York 10014; (vi) the Debtors'

Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline

Marcus, Esq., 767 Fifth Avenue, New York, New York 10153; (vii) CR Miami, LLC, Attn:

Jerry Cohen and Gary Milner, 8600 East Rockcliff Road, Tucson, Arizona 85750; W.

James Harrison, Esq., W.J. Harrison & Associates, P.C., 3561 East Sunrise, Suite 201,

Tucson, Arizona 85718 (counsel to CR Miami, LLC); (viii) parties to executory contracts

and unexpired leases proposed to be assumed and assigned, or rejected as part of the

Proposed Sale; (ix) counsel to the North Tower Association; (x) counsel to the Central

3

and South Tower Associations; (xi) all owners of units at the Assets; (xii) the creditors listed as holding the 20 largest unsecured claims against the Debtors' estates (on a consolidated basis); (xiii) all entities that have expressed an interest to the Debtors' or their advisors in purchasing the assets subject to this Order; (xiv) all parties listed on Schedule 6 to the Purchase Agreement;  and (xv) all other parties that filed notices of appearance in the Chapter 11 cases, ((i)-(xv) shall be collectively referred to herein as the "Notice Parties").  Notice of the Auction and Sale Hearing was published in the New York Times on _____, 2014.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice is required.

D.      The disclosures made by the Debtors concerning the Purchase Agreement, the Auction, the Sale contemplated by the Purchase Agreement, and the Sale Hearing were good, complete, and adequate.

E.      The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive and proposed and executed in good faith as a result of arm's-length negotiations between the Debtors and the Purchaser, and were substantively and procedurally fair to all entities.

F.      The Debtors conducted the sale and auction process in accordance, and have otherwise complied in all respects, with the Bidding Procedures Order.  The sale and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for all creditors, parties-in-interest and other entities to make a higher or otherwise better offer to purchase the Assets.

G.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

H.      The Debtors have full corporate power and authority to consummate the Sale Transaction pursuant to the Purchase Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Sale Transaction.

I.      Approval of the Purchase Agreement and consummation of the Sale Transaction are in the best interests of the Debtors' estates, their creditors, and other parties-in-interest.

J.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code.  Such business reasons include, without limitation, the following: (i) the Purchase Agreement constitutes the highest or otherwise best offer for the Assets; (ii) the Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets; and (iii) any other transaction, including, without limitation, pursuant to a chapter 11 plan, would not have yielded as favorable an economic result.

K.      The Purchase Agreement was negotiated, proposed and entered into by and among the Debtors and the Purchaser, without collusion, in good faith, and from arm's- length bargaining positions.  The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the avoidance of the Purchase Agreement or the consummation of the Sale Transaction, or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.  The

aggregate price paid by the Purchaser for the Assets was not controlled by any

agreement among the bidders.

        L.    The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in

that: (a) the Purchaser recognized that the Debtors were free to deal with any other

party interested in a transaction regarding the Sale; (b) the Purchaser complied in all

respects with the Bidding Procedures Order; (c) the Purchaser agreed to provisions in

the Purchase Agreement that would enable the Debtors to accept a higher or better offer

in respect of the Sale; (d) the Purchaser made the highest or best bid in respect of the

Sale; (e) all payments to be made by or to the Purchaser and other agreements or

arrangements entered into by the Purchaser in connection with the transactions have

been disclosed; (f) the Purchaser neither induced nor caused the Debtors' chapter 11

filings; (g) the negotiation and execution of the Purchase Agreement and any other

agreements or instruments related thereto was in good faith and an arm's-length

transaction between the Purchaser and the Debtors; and (h) the Purchaser has not

violated section 363(n) of the Bankruptcy Code by any action or inaction.  The

Purchaser has at all times acted in good faith and will continue to be acting in good

faith within the meaning of section 363(m) of the Bankruptcy Code in closing the

transactions contemplated by the Purchase Agreement.

        M.    The Sale Transaction and the sale of the Assets is in furtherance of,

and a conveyance pursuant to, the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc., Chapter 11 Case No. 08-13555 [ECF No. 23023] (the

"Plan"), which provides that the Plan Administrator (as defined in the Plan) shall wind-

down, sell and otherwise liquidate assets of the Debtor-Controlled Entities (as defined

in the Plan) in accordance with Section 6.1(b)(iii) of the Plan. The Debtors are Debtor-Controlled Entities within the meaning of the Plan.

N.      The terms and conditions of the Purchase Agreement are fair and reasonable. The consideration of $12,000,000 provided by the Purchaser for the Assets pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or best offer for the Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. No other entity or group of entities has offered to purchase the Assets for greater economic value to the Debtors' estates than the Purchaser. The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

O.      The Purchaser is not a mere continuation of any of the Debtors or their estates and there is no continuity of enterprise between the Purchaser and any of the Debtors. The Purchaser is not holding itself out to the public as a continuation of any of the Debtors. The Purchaser is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation, merger or de facto merger of Purchaser and any of the Debtors.

P.      The Sale of the Assets outside a chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtors. The Sale does not constitute a sub rosa plan.

Q.    The Purchaser has not agreed to assume and shall have no obligations with respect to any liabilities of the Debtors or their subsidiaries or Affiliates other than the Assumed Liabilities and Permitted Encumbrances as specifically provided in the Purchase Agreement.

R.    The Purchaser is not and will not be liable to any agent, broker, person or firm acting or purporting to act on behalf of either the Debtors or the Purchaser for any commission, broker's fee or finder's fee respecting the Sale Transaction.

S.    The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Purchaser are fraudulently entering in the transaction contemplated by the Purchase Agreement.

T.    The Assets constitute property of the Debtors' estates and the Debtors are the sole and lawful owner of the Assets, and hold good title thereto (subject to the Permitted Encumbrances).[3]  The transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets free and clear of all liens, claims, interests, obligations, rights, charges and encumbrances, except for Permitted Encumbrances as specifically provided in the Purchase Agreement.  The Purchaser shall have no liability for any claims against or liabilities of the Debtors or their estates.

U.    The Debtors have good marketable title to the Assets and are lawful owners of the Assets.  The Debtors may sell the Assets free and clear of all, liens,

---

[3]    A Legal Description of the real property components of the Assets is contained on Exhibit B to this Order.

interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security

interests, claims (including, any "claim" as defined in Section 101(5) of the Bankruptcy

Code), leases, possessory leasehold interests, charges, options, rights of first refusal or

option to purchase any real property, easements, servitudes, transfer restrictions under

any agreement, judgments, hypothecations, demands, licenses, sublicenses,

assignments, debts, obligations, guaranties, options, contractual commitments,

restrictions, environmental liabilities, options to purchase, and options, in each case of

whatever kind, nature, or description in, against or with respect to any of the Assets,

having arisen, existed or accrued prior to and through the Closing, whether direct or

indirect, absolute or contingent, choate or inchoate, fixed or contingent, matured or

unmatured, liquidated or unliquidated, arising or imposed by agreement,

understanding, law, equity, statute or otherwise and whether arising prior to, on or

after the Petition Date, including those liens, claims and/or encumbrances listed on

Exhibit A to this Order (collectively, "Liens, Claims and/or Interests"), except for

Permitted Encumbrances as expressly provided in the Purchase Agreement, because

one or more of the standards set forth in section 363(f)(1) – (5) has been satisfied with

regard to each such Lien, Claim and/or Interest.  Those non-debtor parties with Liens,

Claims and/or Interests in or with respect to the Assets who did not object, or who

withdrew their objections to the Sale Transaction or the Sale Motion are deemed to have

consented to the sale of the Assets free and clear of those non-debtor parties' Liens,

Claims and/or Interests in the Assets pursuant to section 363(f)(2) of the Bankruptcy

Code.  Those non-debtor parties with Liens, Claims and/or Interests in or with respect

to the Assets who objected to the Motion, but who did not withdraw any such objection,

can be compelled to accept a monetary satisfaction of their liens, claims or interests

within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      Certain of the Assets are sold subject to: (i) the Declaration of
Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded on
December 3, 2007 in OR Book 26080 on Pages 4905 – 5008 in the public records for
Miami-Dade County, FL, including all recorded amendments to same (collectively, the
"Master Declaration"); (ii) the Declaration of Central Carillon Beach, a Condominium
recorded on October 15, 2008 in OR Book 26610, Pages 0735 – 882 in the public records
for Miami-Dade County, FL, including all recorded amendments to same (collectively,
the "Central Tower Declaration");  (iii) the Declaration of South  Carillon Beach, a
Condominium recorded on December 3, 2007 in OR Book 26080 at page 4764 in the
public records for Miami-Dade County, FL, including all recorded amendments to same
(collectively, the "South Tower Declaration"), and (iv) the Declaration of North
Carillon Beach, a Condominium recorded on  August 27, 2008 in OR Book 26542 at page
15 in the public records for Miami-Dade County, FL, including all recorded
amendments to same (collectively, the "North Tower Declaration") (the "North Tower
Declaration," "South Tower Declaration" and "Central Tower Declaration" are
collectively referred to hereinafter as the "Tower Declarations" unless otherwise
specified, and the Master Declaration and Tower Declarations are hereinafter referred to
as the "Declarations," unless otherwise specified) which grant the owner of those Assets
certain rights pursuant thereto.  The North Carillon Beach Condominium Association
Inc., South Carillon Beach Condominium Association Inc., and Central Carillon Beach
Condominium Association, Inc. (collectively referred to hereinafter as the
"Associations" unless otherwise specified) dispute and have sought to impinge upon
and define those rights.  To facilitate the Sale, this Court makes the following findings
confirming the rights granted to the Debtors pursuant to the Declarations:

- The "Hotel Lot Owner" (as defined in the Master Declaration) (or any successor Hotel Lot Owner) has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa (as defined in the Master Declaration) and spa facilities shall be used, if at all, including, without limitation, the right to approve users, determine eligibility for use, establish hours or use and guest policies, restrictions and/or prohibitions, and to allow use of the Spa and spa facilities by persons other than the Unit Owners (as defined in the Declarations).

- Each Unit Owner's right to use the Shared Facilities (as defined in the Master Declaration), including his or her "Limited Spa Rights," as that term is defined in Article 1.1(dd)(iv)(d) of the Master Declaration, are subject to the Hotel Lot Owner's right to permit other persons to use such facilities as the Hotel Lot Owner (or any successor Hotel Lot Owner) may designate in its sole discretion. This includes without limitation persons who are not members of the Associations or who are not owners of any portion of the Properties (as defined in the Master Declaration) and may include members of the public generally.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) of the Future Development Property as defined by Article 1.1(x) of the Master Declaration has the right to "annex" or add Future Development Property to the jurisdiction of the Master Declaration, provided that a Supplemental Declaration is duly executed and recorded in the Public Records of Miami-Dade County, as provided in Article 2.2 of the Master Declaration.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration.  Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit

11

the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may institute reasonable rules and regulations to operate and manage the Shared Facilities, including limiting maximum daily users to comport with legal occupancy limits.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may include the expense of Valet Parking Services (as defined in the Sale Motion) in the Condominium Tower' Shared Facilities Assessments (as defined in the Sale Motion).

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may assess utility costs based upon square footage rather than actual usage.

Nothing herein shall constitute an amendment of the Declarations.

W.    If the above findings regarding the rights granted by the Master Declaration and Declarations were not entered, the Purchaser would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors.

X.    If the Sale were not free and clear of all Liens, Claims and/or Interests, or if the Purchaser would, or in the future could, be liable for any of the Liens, Claims and/or Interests, the Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors.

Y.    The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

Z.      The Debtors and Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including, without limitation, sections 365(b)(l)(A) and (B) and 365(f) of the Bankruptcy Code, in connection with the Sale and the assumption and assignment of the Assigned Contracts to the extent provided under the Purchase Agreement. The Purchaser is able to demonstrate adequate assurance of future performance with respect to any Assigned Contracts in accordance with section 365(b)(l)(C) of the Bankruptcy Code. Except as expressly provided by the Purchase Agreement, the Assigned Contracts are assumable and assignable notwithstanding any provisions contained therein to the contrary.

AA.    The transfer of the Assets to the Purchaser (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtors' business prior to the closing of the Sale Transaction (the "Closing").

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Sale Motion is hereby granted and approved as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

13

3.       Any and all objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case, are enjoined from taking any action against the Purchaser or any purchaser of the Assets, his affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against the Debtors, or their estates.   Those parties who did not object or who withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Approval of the Purchase Agreement**

4.       The Purchasers' offer for the Assets, as embodied in the Purchase Agreement, is the highest or otherwise best offer for the Assets.

5.       The Sale Transaction, and all of the terms and conditions and transactions contemplated by the Purchase Agreement, including, without limitation, the obligations respecting the Break-Up Fee contained therein, are hereby authorized and approved pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

6.       Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale Transaction or pay the Break-Up Fee, as the case may be, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Debtors shall at all times act in accordance with the terms thereof.

7.       The Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient or desirable to implement the Purchase Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by the

14

Purchaser for the purpose of assigning, transferring, granting, conveying and

conferring to the Purchaser or reducing to possession, the Assets, or as may be

necessary or appropriate to the performance of the obligations as contemplated by the

Purchase Agreement.

8.    The consideration provided by the Purchaser to the Debtors

pursuant to the Purchase Agreement for the Assets constitutes reasonably equivalent

value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer

Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any

state, territory, possession or the District of Columbia.

9.    This Order shall be binding in all respects upon (a) the Debtors, (b)

their estates, (c) all creditors, (d) all holders of Liens, Claims and/or Interests whether

known or unknown (including, but not limited to those identified on Exhibit A to this

Order) against or on all or any portion of the Assets, (d) the Purchaser and all

successors and assigns of the Purchaser (e) the Assets, (f) any trustees, if any,

subsequently appointed in the Debtors' chapter 11 cases or upon a dismissal or

conversion of these cases under chapter 7 of the Bankruptcy Code.  This Order and the

Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors,

the Purchaser and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets**

10.    The conditions of section 363(f) of the Bankruptcy Code have been

satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Liens,

Claims and/or  Interests in the Assets.

11.    Except for Permitted Encumbrances only as expressly provided in

the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code,

upon the Closing, the Assets (and good and marketable title to such Assets) and all of

15

the Debtors' rights, title and interest therein shall be transferred to the Purchaser free and clear of all Liens, Claims and/or Interests (including, but not limited to those listed on Exhibit A to this Order) with all such Liens, Claims and/or Interests to attach to the net cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect which they now have as against the Assets, subject to any claims and defenses, setoffs or rights of recoupment the Debtors may possess with respect thereto.

12.    Pursuant to section 363(f) of the Bankruptcy Code, applicable Florida law, the Declarations, and this Court's Guidelines for the Conduct of Asset Sales, adopted by General Order No. M-383, dated as of November 18, 2009, the Debtors have set forth the legal authority necessary to support this Court's findings regarding the future conduct that may or will take place with respect to certain of the Assets after the date of the Sale Order.

13.    Except for Permitted Encumbrances, as expressly provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns) including, but not limited to, all equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Liens, Claims and/or Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in or with respect to the Debtors and/or the Assets arising or accruing under or out of, in connection with, or in any way relating to, the Debtor, the Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' Liens, Claims and/or Interests against the Assets or the Purchaser or any of the Purchaser's successors or assigns.  Following the Closing Date, no holder of a Lien, Claim and/or

16

Interest shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to such Lien, Claim and/or Interest or any actions that the Debtors have taken or may take in this Chapter 11 case. Effective upon the Closing, the Purchaser shall have no liability for any claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors or their estates.

14.     The Debtors may sell the Assets free and clear of all Liens, Claims and/or Interests whatsoever against the Debtors, their estates or any of the Assets (except the Assumed Liabilities or as otherwise provided in this Order) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens, Claims and/or Interests against the Debtors, their estates or any of the Assets who did not object, or who withdrew their objections to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to 363(f)(2) of the Bankruptcy Code.

15.     The transfer of the Assets to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets.

**Sale Proceeds**

16.     The proceeds of the Sale Transaction (including the amount of the Deposit) shall be distributed as follows: first, to pay the costs and expenses incurred by the Debtors in connection with the Sale Transaction (excluding legal fees), including, without limitation, the commission owing to the Debtors' broker, CBRE in the amount of [ X ], all taxes and/or assessments levied and assessed against the land, which are due and payable, estoppel fees, survey costs, escrow fees, title costs, stamp taxes, transfer taxes, and property prorations due from the Debtors; and second, to PAMI ALI, LLC, the Debtors' post-petition lender and the holder of a first priority senior lien

17

on the Assets.  Any and all valid and perfected Liens, Claims and/or Interests in the

Assets shall attach to the proceeds of such Assets immediately upon receipt of such

proceeds by the Debtors (or any party acting on any Debtor's behalf) in order of

priority, and with the same validity, force and effect which they now have against such

Assets, except to the extent modified by the immediately preceding sentence, subject to

any rights, claims and defenses the Debtors, the Debtors' estates or any trustee for any

Debtor, as applicable, may possess with respect thereto, in addition to any limitations

on the use of such proceeds pursuant to any provision of this Sale Order.

**No Successor Liability**

17.    Except for the Assumed Liabilities, the transfer of the Assets to

Purchaser shall not result in (i) the Purchaser or the Assets having any liability or

responsibility for any Liens, Claims and/or Interests against the Debtors or against an

insider of the Debtors, (ii) the Purchaser or the Assets having any liability whatsoever

with respect to or be required to satisfy in any manner, whether at law or in equity,

whether by payment, setoff or otherwise, directly or indirectly, any Liens, Claims

and/or Interests or [Excluded Assets], or (iii) the Purchaser or the Assets, having any

liability or responsibility to the Debtors except as is expressly set forth in the Purchase

Agreement.

18.    Without limiting the generality of the foregoing, and except as

otherwise specifically provided herein or in the Agreement, the Purchaser shall not be

liable for any claims (as defined in section 101(5) of the Bankruptcy Code) against any of

the Debtors or any of their respective predecessors or affiliates, and the Purchaser shall

have no successor or vicarious liabilities of any kind of character, including, but not

limited to, under any theory of antitrust, environmental, successor or transferee

liability, labor law, successor or successor employer liability, de facto merger or joint

venture, mere continuation or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between any of the Debtors and any non-debtor subsidiary, liabilities relating to or arising from any environmental laws, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to Closing.

19.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of any of the Debtors to sell and transfer the Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

20.    The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the Debtors, their estates and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Liens, Claims and/or Interests pursuant to the Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of all Liens, Claims and/or Interests against any of the Debtors or any of the Assets.  The consideration provided by the Purchaser for the Assets under the Agreement is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

**Assigned Contracts**

21.    (a)    **Authorization**.  Subject to the terms of this Section 20, the Debtors are authorized to execute and deliver to the Purchaser such documents or other instruments and to take such other actions as may be necessary to assume and assign

the Assigned Contracts to the Purchaser at Closing. In addition, the Debtors shall, at or

prior to Closing, assign the Rental Program Agreements to the Purchaser. The

foregoing assignment of the Rental Program Agreements to the Purchaser shall

constitute an "Assigned Contract" for all purposes hereunder, including, without

limitation, Section 20(c) of this Sale Order.

(b)      **Cure Amounts; Adequate Assurances**. Except as may

otherwise be agreed to by the parties to an Assigned Contract, at the Closing, the

Debtors shall cure those defaults under the Assigned Contracts that need to be cured in

accordance with the Purchase Agreement and section 365(b) of the Bankruptcy Code,

by payment of (i) the undisputed Cure Amounts in the amounts listed in the Sale Notice

as "Cure Amounts," (ii) the amount agreed to by any party to an Assigned Contract and

the Debtors, or (iii) the amount ordered by this Court to constitute the Cure Amount for

any Assigned Contract after a hearing to consider the objection by a counterparty to an

Assigned Contract to the Cure Amount for such Assigned Contract. The payment of

the applicable Cure Amounts (if any) by the Debtors will (a) effect a cure of all defaults

existing thereunder as of the date that such executory contracts or unexpired leases are

assumed and assigned within the meaning of section 365(b)(l)(A) of the Bankruptcy

Code or otherwise and (b) compensate for any actual pecuniary loss to such non-Debtor

party resulting from such default within the meaning of section 365(b)(l)(B) of the

Bankruptcy Code or otherwise, at which time the Purchasers shall then have taken

assignment of the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy

Code, the assignment by the Debtors of such Assigned Contracts shall not be a default

thereunder. Since the Purchaser has sufficient assets to continue performance under the

Assigned Contracts, the Purchaser's promise to perform under the Assigned Contracts

is hereby deemed to constitute adequate assurance of future performance under the

Assigned Contracts and any other proposed assignments.

(c)     **Assignment Free and Clear of Liens, Claims and/or**

**Interests**.  The Assigned Contracts shall be assigned to the Purchaser upon the Closing,

free and clear of all Liens, Claims and/or Interests of any kind or nature whatsoever

(including, without limitation, any Liens, Claims and/or Interests arising under or

related to any of the Canyon Ranch Agreements) other than the Assumed Liabilities,

and shall remain in full force and effect for the benefit of the Purchaser and/or its

affiliates, as applicable, in accordance with their respective terms, notwithstanding any

provision in any such Assigned Contracts (including those of the type described in

sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions

any assignment, transfer or sublease.

(d)     **Good Faith**.  The assignments of each of the Assigned

Contracts are made in good faith under sections 363(b) and 363(m) of the Bankruptcy

Code.

(e)     **Effect of Assumption and Assignment**.  Upon the Closing

(or, if later, upon the assignment of such Assigned Contract to Purchaser) and the

payment of the relevant Cure Amounts by the Debtors, Purchaser shall be deemed to be

substituted for the Debtors, as applicable, as a party to the applicable Assigned

Contracts and the Debtors shall be released, pursuant to section 365(k) of the

Bankruptcy code, to the extent allowable under applicable law, from any liability under

the Assigned Contracts but only to the extent any such liability first accrues after the

Closing Date;  provided, however, that any default, claim, liability or obligation of any

kind arising from an event that occurs prior to the Closing that gives rise to a default,

claim, liability or obligation or any kind after Closing (e.g., any event that gives rise to

21

liability after lapse of an applicable cure period) shall be deemed to have accrued prior to Closing for all purposes hereunder); and, provided, further, that the foregoing release of the Debtors by the Purchaser shall apply only with respect to liabilities that are assumed by the Purchaser.  There shall be no rent accelerations, assignment fees, increases or any other fees or loss of rights or increase of liabilities under the Assigned Contracts charged to Purchaser solely as a result of the assumption and assignment of the Assigned Contracts.  Each counterparty to an Assigned Contract will be forever barred, estopped and permanently enjoined from (i) asserting against the Debtors or the Purchaser, or their respective affiliates, or the property of any of them, any default existing as of Closing; or, against the Purchaser or its affiliates, any counterclaim, defense, setoff or any other Lien, Claim and/or Interest asserted or assertable against the Debtors;  and (ii) imposing or charging against Purchaser or its affiliates any accelerations, assignment fees, increases or any other fees or asserting any loss of rights or increase of liabilities under the Assigned Contract solely as a result of the Debtors' assumption and assignment to Purchaser of the Assigned Contract.  No counterparty under any Assigned Contract may terminate any such contract, nor shall the Purchaser's rights and obligations under such Assigned Contracts be adversely affected in any way, by reason of any default under such Assigned Contract prior to Closing.  To the extent that any counterparty to an Assigned Contract failed to object to any notice of assumption and assignment or to the Cure Amount with respect to such Assigned Contract, such counterparty is deemed to have consented to such Cure Amount and the assignment of such contract to the Purchaser.

(f)    **Possible Covenants Attached to the Assets**.  The assumption of that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration"), which is recorded in Official

Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida, is

without prejudice to any party's argument over whether such contract is an "executory

contract" subject to assumption or rejection.

## Rejected Contracts

22.     This Sale Order shall operate as a permanent injunction prohibiting

any party to a contract that has been rejected by any of the Debtors (each a "Rejected

Party") that in any way relates to the Assets from taking any action against the

Purchaser in connection with the Sale Transaction, whether pursuant to the Bankruptcy

Code or any other statutory or non-statutory federal, state or local law.

## Ipso Facto Clauses Ineffective

23.     Upon the Debtors' assignment of the Assigned Contracts to the

Purchaser under the provisions of this Sale Order and any additional order

contemplated by this Sale Order or the Purchase Agreement, and subject to the timely

payment by the Debtors of the applicable Cure Amount or such other amount as may

be agreed to in writing by the parties to an Assigned Contract (provided, however, that

the failure of the Debtors to cure any default under an Assigned Contract shall not

result in any liability to or obligation of the Purchaser), no default shall exist under any

Assigned Contract, and no counterparty to any Assigned Contract shall be permitted to

declare a default thereunder, or otherwise take action against the Purchaser, as a result

of any Debtor's financial condition, bankruptcy or failure of the Debtor to perform or

observe any of its obligations under the relevant Assigned Contract.  Any provision in

an Assigned Contract that prohibits or conditions an assignment or sublease of such

Assigned Contract (including, without limitation, the granting of a lien therein) or

allows the counterparty thereto to terminate, recapture, impose any penalty, condition

on renewal or extension, or modify any term or condition on account of such

23

assignment or sublease, constitutes an unenforceable anti-assignment provision in connection with the Sale Transaction that is void and of no force and effect. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or the Debtors' and Purchaser's rights to enforce every term and condition of the Assigned Contract.

**No Stay of Order**

24.      Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Bankruptcy Rules, this Sale Order shall not be stayed for 14 days after the entry hereof, but shall be effective and enforceable immediately upon entry. Time is of the essence in approving the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.

**Additional Provisions**

25.      Without limiting the other terms of this Sale Order, prior to or upon the Closing of the Sale Transaction, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens, Claims and/or Interests, if any, in the Assets as such Liens, Claims and/or Interests may have been recorded or may otherwise exist.

26.      Except for Permitted Encumbrances, only as expressly provided in the Purchase Agreement, this Sale Order (a) shall be effective as a determination that, upon the Closing, all Liens, Claims and/or Interests existing with respect to the Assets prior to the Closing (including, but not limited to those listed on Exhibit A to this Sale Order) have been unconditionally released, discharged and terminated as to the Purchaser and the Assets, and that the conveyances described herein have been

24

effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state,

and local officials, and all other persons and entities who may be required by operation

of law, the duties of their office, or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure

any title or state of title in or to any of the Assets.

27.     Each and every federal, state, and local governmental agency or

department or office is hereby directed to accept this Sale Order and any and all

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Purchase Agreement.

28.     Without limiting the other provisions of this Sale Order, if any

person or entity that has filed financing statements, mortgages, mechanic's liens, lis

pendens or other documents or agreements evidencing interests with respect to the

Debtors and/or the Assets shall not have delivered to the Debtors or their designee

prior to the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all Liens, Claims and/or

Interests which the person or entity has with respect to the Debtors, the Assets or

otherwise, then (a) the Debtors are hereby authorized and directed to execute and file

such statements, instruments, releases and other documents on behalf of the person or

entity with respect to the Assets and (b) the Purchaser and/or the Debtors are hereby

authorized to file, register, or otherwise record a certified copy of this Sale Order,

which, once filed, registered, or otherwise recorded, shall constitute conclusive

evidence of the release of all Liens, Claims and/or Interests in, against or with respect to

the Debtors and/or the Assets.  This Sale Order is deemed to be in recordable form

sufficient to be placed in the filing or recording system of each and every federal, state,

and local governmental agency, department, or office.

29.    From and after the date hereof, no creditor of the Debtors or other

party in interest shall take or cause to be taken any action that would interfere with the

transfer of the Assets to the Purchaser in accordance with the terms of this Sale Order.

30.    This Court hereby retains exclusive jurisdiction, regardless of

whether a chapter 11 plan has been confirmed and consummated and irrespective of the

provisions of any such plan or order confirming such plan, to enforce and implement

the terms and provisions of the Purchase Agreement, all amendments thereto, any

waivers and consents thereunder, and of each of the agreements executed in connection

therewith in all respects including, but not limited to, retaining jurisdiction to (a)

compel delivery of the Assets to the Purchaser in accordance with the terms of the

Purchase Agreement, (b) resolve any dispute, controversy or claim arising under or

related to the Purchase Agreement, or the breach thereof and (c) interpret, implement,

and enforce the provisions of this Sale Order and resolve any disputes related thereto.

31.    Nothing contained in any plan confirmed in this Chapter 11 case or

any order of this Court confirming such plan shall conflict with or derogate from the

provisions of the Purchase Agreement or the terms of this Sale Order.

32.    The transactions contemplated by the Purchase Agreement are

undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the

Bankruptcy Code.  The Purchaser is a purchaser in good faith of the Assets and is

entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

Accordingly, any reversal or modification on appeal of the authorization provided

herein to consummate the Sale Transaction shall not affect the validity of the Sale

Transaction to the Purchaser.

26

33.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Purchaser, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtors' creditors, all prospective and actual bidders for some or all of the Assets, and all persons and entities receiving notice of the Sale Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any examiner(s) or receiver(s) under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their members or any examiner(s) or receiver(s).

34.     The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

35.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**[continued on the following page]**

27

36.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

DATED:    New York, New York
          _____, 2014

                                    _____
                                    HONORABLE SHELLEY C. CHAPMAN
                                    UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

1.   The Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo
     Real Estate Capital Corporation, a Delaware corporation, dated April 21, 2004, recorded April 22. 2004 in
     Official Records Book 22234, Page 2688, as amended by First Amendment to Mortgage. Security
     Agreement, Assignment of Rents and Leases and Fixture Filing recorded March 4, 2005 in Official
     Records Book 23139, Page 1936, as re-recorded April 4, 2005 in Official Records Book 23233, Page 1997.
     and modified by Notice of Future Advance and Second Amendment to Mortgage, Security Agreement,
     Assignment of Rents and Leases and Fixture Filing recorded August 2, 2005 in Official Records Book
     23633. Page 4123, as assigned to Lehman Brothers Holdings, Inc., by Assignment of Notes and Mortgages
     recorded July 5, 2006 in Official Records Book 24689, Page 864, and further modified by that certain
     Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents
     and Leases and Fixture Filing recorded September 12, 2006 in Official Records Book 24901, Page 2262, as
     assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and
     Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May
     1, 2008 in Official Records Book 26355, Page 4533, and further assigned to Fortress Credit Corp, by
     Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded May 1, 2008 in
     Official Records Book 26355, Page 4587, and as affected by that certain Termination and Release of
     Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded July 7, 2009 in
     Official Records Book 26930, Page 559, as affected by Partial Release of Mortgages and Security
     Documents recorded August 5, 2009 in Official Records Book 26967, Page 3163, Partial Release of
     Mortgage and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3 167,
     Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records
     Book 27074, Page 2925, Partial Release of Mortgages and Security Documents recorded November 5,
     2009 in Official Records Book 27074, Page 2933, Partial Release of Mortgages and Security Documents
     recorded November 16, 2009 in Official Records Book 27084, Page 22, Partial Release of Mortgages and
     Security Documents recorded November 16, 2009 in Official Records Book 27084, Page 148, Partial
     Release of Mortgage recorded May 1, 2008 in Official Records Book 26355, Page 4529, Partial Release of
     Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page
     1450, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records
     Book 26722, Page 4506, Partial Release of Mortgages and Security Documents recorded January 20, 2009
     in Official Records Book 26722, Page 4512, Partial Release of Mortgages and Security Documents
     recorded May 19, 2009 in Official Records Book 26872, Page 85, Partial Release of Mortgages and
     Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 100, Partial Release of
     Mortgages and Security Documents recorded July 7, 201 0 in Official Records Book 27343, Page 4986,
     Partial Release of Mortgages and Security Documents recorded July 7, 20 10 in Official Records Book
     27344, Page 94, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official
     Records Book 27714, Page 1656, Partial Release of Mortgages and Security Documents recorded June 8,
     2011 in Official Records Book 27714, Page 1664 Partial Release of Mortgages and Security Documents
     recorded December 9, 2011 in Official Records Book 27921, Page 4251, Partial Release of Mortgages and
     Security Documents recorded December 21, 2011 in Official Records Book 27935, Page 4658, Partial
     Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 2826
     t, Page 8, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official
     Records Book 28261, Page 16, and Partial Release of Mortgages and Security Documents recorded
     December 3, 2012 in Official Records Book 28381, Page 2543, all of the Public Records of Miami-Dade
     County, Florida.

2.   UCC-1 Financing Statement recorded April 22, 2004 in Official Records Book 22234, Page 2742, Of the
     Public Records of Miami-Dade County, Florida, as amended by UCC-3 Financing Statement Amendment
     recorded July 5, 2006 in Official Records Book 24689, Page 869, and further amended by UCC-3
     Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1293,
     UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page
     4602, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355,

Page 4603, and further amended by UCC-3 Financing Statement Amendment recorded December 26, 2008 in Official Records Book 26699, Page 4 186, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3988, all of the Public Records of Miami-Dade County, Florida.

3.    UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23633, Page 4169, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3567, UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3568, all of the Public Records of Miami-Dade County, Florida.

4.    Assignment of Leases, Rents and Revenues recorded September 12, 2006 in Official Records Book 24901, Page 2304, of the Public Records of Miami-Dade County. Florida.

5.    Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc., recorded May 1, 2008 in Official Records Book 26355, Page 4546, of the Public Records of Miami-Dade County, Florida.

6.    UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4608, of the Public Records of Miami-Dade County, Florida; as amended by UCC-3 Financing Statement Amendment recorded May 5, 2008 in Official Records Book 26360, Page 4190, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 563, all of the Public Records of Miami-Dade County, Florida.

7.    Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo Real Estate Capital Corporation, a Delaware corporation dated July 29, 2005 recorded August 2, 2005 in Official Records Book 23631, Page 2746, as modified by Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded September 1 3, 2006 in Official Records Book 24903, Page 3644, and as assigned to Lehman Brothers Holdings, Inc., a Delaware corporation by Assignment of Notes and Mortgages recorded July 5, 2006 in Official Records Book 24689, Page 864, and further assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May 1, 2008 in Official Records Book 26355, Page 4540, as affected by Partial Release of Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page 1456, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4518, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 110, Partial Release of Mortgages and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3159, Partial Re lease of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2929, Partial Release of Mortgages and Security Documents recorded July 7, 2010 in Official Records Book 27344, Page 47, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1660, Partial Release of Mortgages and Security Documents recorded August 3, 2011 in Official Records Book 27778, Page 3179, Partial Release of Mortgages and Security Documents recorded December 9, 2011 in Official Records Book 27921, Page 4242, Partial Release of Mortgages and Security Documents recorded January 18, 2012 in Official Records Book 27964, Page 2631, Partial Release of Mortgages and Security Documents recorded February 10, 2012 in Official Records Book 27994, Page 1233, Partial Release of Mortgages and Security Documents recorded May 2, 2012 in Official Records Book 2809-L Page 4599, Partial Release of Mortgages and Security Documents recorded May 4, 2012 in Official Records Book 28098, Page 2916, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 12, Partial Release of Mortgages and Security Documents recorded October 1, 2012 in Official Records Book 28294, Page 2404, Partial Release of Mortgages and Security Documents recorded December 3, 2012 in Official Records Book 28381, Page 2547, Partial Release of Mortgages and Security Documents recorded September 4, 2013 in Official Records Book 28803, Page 2919, Partial Release of Mortgages and Security Documents recorded November 15, 2013 in Official Records Book 28912, Page 3203, Partial Release of Mortgages and Security Documents recorded November 25, 2013 in Official Records Book 28925, Page 3937, all of the Public Records of Miami-Dade County, Florida.

8.   UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2836, as assigned by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 870, and UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24 716, Page 1292, as terminated by UCC-3 Financing Statement recorded October 11, 2006 in Official Records Book 24991, Page 1301, as assigned by UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4604, and assigned by UCC-3 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4605, and July 24, 2009 in Official Records Book 26953, Page 3987, all of the Public Records of Miami-Dade County, Florida.

9.   UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2844, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3566, and further amended by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 871, and further amended by UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1291, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4606, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4607, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3986, all of the Public Records of Miami-Dade County, Florida.

10.  Assignment of Leases, Rents and Revenues recorded September 13, 2006 in Official Records Book 24903, Page 3684, of the Public Records of Miami-Dade County, Florida.

11.  Collateral Assignment of Recorded Mortgage Collateral Security Documents in favor of Fortress Credit Corp, recorded May 1, 2008 in Official Records Book 26355, Page 4595, of the Public Records of Miami-Dade County, Florida.

12.  Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc. recorded May 1, 2008 in Official Records Book 26355, Page 4567, of the Public Records of Miami-Dade County, Florida.

13.  UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4616, as amended by UCC-3 Financing Statement Amendment recorded May 6, 2008 in Official Records Book 26364, Page 148, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3985, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 562, all of the Public Records of Miami-Dade County, Florida.

14.  Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in favor of PAMI ALI LLC, a Delaware limited liability company dated March 12, 2014, recorded March 18, 20 14 in Official Records Book 29072, Page 1855, of the Public Records of Miami-Dade County, Florida.

15.  [Notice of Commencement recorded June 19, 2013 in Official Records Book 28685, Page 3570, of the Public Records of Miami-Dade County, Florida.]

16.  [Notice of Commencement recorded March 5, 2014 in Official Records Book 29055, Page 1441, of the Public Records of Miami-Dade County, Florida.]

17.  Any and all claims in North Carillon Beach Condominium Association, Inc. Complaint for Declaratory Relief against FL 6801 COLLINS NORTH LLC, FL 6801 COLLINS SOUTH LLC and FL 6801 Collins Central dated February 19, 2014.

18.  Any and all claims in Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, Inc., Complaint against FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc., and North Carillon Beach Condominium Association, Inc., dated, March 11, 2014.

19.     Any and all claims covered by the Broad and Cassel letter addressed to Carillon Hotel and Spa Master Association, Inc. regarding "Request for Records" dated December 27, 2013.

20.     Any and all claims covered by the Broad and Cassel letter addressed to FL6801 Collins Central, LLC c/o FL 6801 Spirits LLC regarding "Request for Records" dated December 27, 2013.

21.     Any and all claims covered by the Siegfried Rivera Hyman Lerner De La Torre Mars Sobel ("SRHL") letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated November 19, 2013.

22.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Certificate of Occupancy dated September 26, 2013.

23.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated September 25, 2013.

24.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Vibration and Noise from Hydraulic Elevator Pumps  dated September 27, 2013.

25.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated April 26, 2013.

26.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated May 3, 2013.

27.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated June 3, 2013.

28.     Any and all claims covered by the GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Building Records dated February 5, 2013.

29.     Any and all claims covered by the GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Request for Records dated January 21, 2013.

30.     Any and all claims covered by the Notice of Claim by South Carillon Beach Condominium Association, Inc. pursuant to Chapter 558 Florida Statues dated May 22, 2012.

31.     Any and all claims covered by the RUMBERGER KIRK & CALDWELL letter addressed to GURSKY & RAGAN PA regarding South Carillon Beach Condominium Association, Inc. 558 Notice dated May 29, 2013.

32.     Any and all claims covered by the Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 507 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010

33.     Any and all claims covered by the Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 508 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010.

**Exhibit B**

**NORTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Units 610, 204 and 205 of North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**SOUTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Unit 109 of South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**CENTRAL TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019 of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**HOTEL PROPERTY LEGAL DESCRIPTION**

**Parcel 1:**

Lots 1 through 6, inclusive, in Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, at Page 14, of the Public records of Miami-Dade County, Florida.

**Parcel 2:**

A PARCEL OF LAND LYING East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.

**Parcel 3:**

The North 25.00 feet of Lot 48, all Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

**Parcel 4:**

A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62 of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 1 and 2 ABOVE:**

North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded on August 27, 2008 in Official Records Book 26542, Pages 0015 through 158, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

The Retail Lot, described as follows:

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet; thence N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 3 and 4 ABOVE:**

Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26610, Pages 735 through 822, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26080, Pages 4764 through 4904, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto.

## RETAIL PROPERTY LEGAL DESCRIPTION

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet thence; N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

## SHARED COMPONENT UNIT LEGAL DESCRIPTION

Unit Shared Component Unit of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.