TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Brian F. Moore

Proposed Counsel to the
Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                           :

In re:                                                                          :          Chapter 11
                                           :

FL 6801 SPIRITS LLC, *et al.*,                              :          Case Nos. [     ] through [     ]
                                           :

                       Debtors.              :          (Motion for Joint Administration
                                           :          Pending)
------------------------------------------------------------X

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SECURED SUPER-PRIORITY FINANCING, AND (B) UTILIZE CASH COLLATERAL OF PREPETITION LENDER; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

           FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"),

FL 6801 Collins Central LLC ("6801 Central"), and FL 6801 Collins South LLC ("6801

South," together with 6801 North and 6801 Central, the "Collins Subsidiaries" and

collectively with Spirits, the "Debtors"), as debtors and debtors in possession in the

above-captioned cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"), respectfully represent:

## I.    RELIEF REQUESTED

1.      The Collins Subsidiaries own property commonly known as the "Canyon Ranch Hotel & Spa, Miami Beach," a luxury full-service, ocean front condominium hotel located at the site of the old Carillon Hotel in Miami Beach, Florida (the "Property").  As set forth in the Declaration of Anthony Barsanti (the "Barsanti Declaration"), attached hereto as Exhibit A, the Debtors have been actively marketing their interests in the Property for approximately nine months.  As a result of that effort, they have identified a potential purchaser and, concurrently herewith, are seeking approval of an auction process that they expect will allow them to monetize their interests in the Property for the benefit of their creditors and other interested parties (the "Proposed Sale").  See Barsanti Declaration, ¶5.

2.      In connection with the Proposed Sale and pursuant to the related purchase and sale agreement, dated as of May 28, 2014 (the "PSA"), the Debtors have agreed to initiate certain repairs to the Property.  However, the cost of such repairs exceeds the Debtors' available liquid assets.  Similarly, the Debtors anticipate the need for additional financing to fund the administration of their bankruptcy cases—at least until the closing of the Proposed Sale.  Accordingly, the Debtors have an immediate need for post-petition financing and believe that the financing available under the DIP Facility (as defined below) is superior to any financing that they would be able to obtain from a third party lender. See Barsanti Declaration, ¶6.

3.      By this motion (the "Motion"), the Debtors seek entry of interim (the "Interim Order")[1] and final (the "Final Order," together with the Interim Order, the "DIP Orders") orders (a) authorizing the Debtors to (i) obtain postpetition secured

---

[1] A copy of the Debtors' proposed Interim Order is attached hereto as Exhibit B.

2

super-priority financing, and (ii) utilize the cash collateral of their prepetition lender; (b)

scheduling a final hearing; and (c) granting certain related relief.

4.      More specifically, the Debtors seek authority, pursuant to sections

105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001, 6003 and 6004 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2

of the Local Rules for the United States Bankruptcy Court for the Southern District of

New York (the "Local Rules"), to

(i)     obtain secured postpetition financing on a superiority basis (the "DIP
        Facility") in an aggregate principal amount of up to $5 million, of which
        up to $500,000 shall be available upon entry of the Interim Order,
        pursuant to the terms and conditions of that certain Subordinate
        Mortgage, Loan and Security Agreement, dated as of  June [], 2014 (as
        amended, supplemented, restated or otherwise modified from time to
        time, the "DIP Agreement"),[2] by and among the Debtors and PAMI ALI
        LLC ("Lender").[3]

(ii)    execute and enter into the DIP Agreement and any related documents or
        instruments, including but not limited to that certain Promissory Note,
        dated as of May [], 2014, among the Debtors and Lender (collectively, the
        "DIP Documents"), and to perform such other and further acts as may be
        required under or in connection therewith;

(iii)   grant Lender security interests, liens, and superiority claims (including
        superiority administrative claims pursuant to section 364(c)(1) of the
        Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of
        the Bankruptcy Code), and related protections to secure all obligations of
        the Debtors under and with respect to the DIP Facility and as provided in
        the DIP Orders (as applicable), the DIP Agreement, and the DIP
        Documents;

(iv)    use cash collateral, as such term is defined in section 361(a) of the
        Bankruptcy Code ("Cash Collateral") on the terms and conditions set forth
        in the DIP Orders (as applicable), the DIP Agreement, and the DIP
        Documents;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in
the DIP Agreement.

[3] A copy of the DIP Agreement is attached hereto as Exhibit C.

     (v)    use the proceeds from the DIP Facility, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for the following purposes:

        a.  to assess options with respect to certain repairs to the Property, including the repair and remediation of the exterior of the residential condominium building on the north portion of the Property (the "<u>North Tower</u>"); and, following such assessment, to commence such repairs in accordance with the budget annexed to the Interim Order as <u>Exhibit 1</u> (as the same may be modified from time to time with the consent of Lender) (the "<u>Budget</u>"),

        b.  to reimburse Lender for its reasonable costs and expenses incurred in connection with the discussion, negotiation, preparation, execution and delivery of any documents in connection with the DIP Facility and the Chapter 11 Cases,

        c.  to pay professional fees and expenses incurred in connection with the Chapter 11 Cases in accordance with the Budget, and

        d.  for general corporate purposes and working capital during the Chapter 11 Cases in accordance with the Budget;

     (vi)   modify the automatic stay extant under section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>") to the extent necessary to permit the Debtors and Lender to implement the terms of the DIP Orders (as applicable), the DIP Agreement, and the DIP Documents;

     (vii)  waive any stay otherwise applicable pursuant to the Bankruptcy Rules and provides for the immediate effectiveness of the DIP Orders, as applicable; and

     (viii)  schedule a final hearing (the "<u>Final Hearing</u>") on the Motion no later than thirty calendar days' after the entry of this Interim Order to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Agreement and the DIP Documents on a final basis and approve notice procedures with respect thereto.

## II.    <u>CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001</u>

     5.    The Debtors submit this concise statement listing certain material terms set forth in the DIP Agreement, the DIP Documents and the proposed Interim Order. Specifically, the Debtors believe that the following financing terms are required to be identified pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2

4

and, as discussed in detail herein, are necessary and justified in the context of, and

under the circumstances relating to, these Chapter 11 Cases.[4]

    (a)    <u>Cash Collateral</u>:  The Debtors seek authority to use Lender's Cash Collateral, to the extent that any accrues during the Chapter 11 Cases, subject to the granting of Replacement Liens (as defined below).  Interim Order at ¶3.

    (b)    <u>Borrowing</u>:  The DIP Facility shall be in the maximum amount of $5,000,000, of which up to $500,000 will be available during the Interim Period.  Interim Order at ¶2; DIP Agreement at ¶¶1,2.  Absent special circumstances, the DIP Facility matures on May 30, 2015.  DIP Agreement, ¶6.

    (c)    <u>Conditions to Closing and Borrowing</u>:  The most significant conditions to borrowing under the DIP Facility are the entry and effectiveness of the DIP Orders, as applicable.  DIP Agreement at ¶¶2, 18.

    (d)    <u>Pricing, Economic Terms and Fees</u>:  The DIP Agreement and the Interim DIP Order provide for the payment of Lender's reasonable costs and expenses incurred in connection with the discussion, negotiation, preparation, execution and delivery of any documents in connection with the DIP Facility and these Chapter 11 Cases.  Interim Order at ¶3; DIP Agreement at ¶F.  Interest accrues on amounts borrowed under the DIP Facility at a per annum rate equal to the Prime Rate plus 0.5%.  DIP Agreement at ¶4.

    (e)    <u>Liens, Superpriority Claims</u>:  Subject to the Carve Out, Lender will receive valid, enforceable, unavoidable, and fully perfected security interests in and liens and mortgages upon all of the Debtors' assets, provided that such liens and security interest shall be subordinate to Lender's preexisting liens and security interests.  DIP Agreement, ¶ F; Interim DIP Order, ¶8.  Subject to the Carve-Out, Lender will also receive superpriority administrative expense claims in connection with all of the Debtors' obligations under the DIP Facility.  Interim DIP Order, ¶11.

---

[4]   The terms and conditions set forth in this Motion are qualified in their entirety by reference to the provisions of the DIP Agreement, the DIP Documents, and the DIP Orders.  The descriptions of the terms of the DIP Agreement, the DIP Documents, and the DIP Orders set forth in this Motion are provided for the convenience of the Court and the parties in interest.  In the event of any inconsistency between the description of the terms of the DIP Agreement, the DIP Documents and the DIP Orders contained in this Motion and the actual DIP Agreement, DIP Documents or DIP Orders, the terms of the DIP Agreement, the DIP Documents or the DIP Orders, as applicable, shall govern.

(f)    <u>Automatic Effectiveness of Liens</u>.  All liens and security interests provided for in the DIP Agreement, the DIP Documents and the DIP Orders, as applicable, shall immediately attach and become valid, perfected, enforceable, non-avoidable and effective without any further action by the Debtors or the Lender, and without the necessity of execution by any Debtor, or the filing or recordation of any financing statements, security agreements, vehicle lien applications, mortgages, or other documents or the taking of any other actions.  Interim DIP Order, ¶10.

(g)    <u>Carve-Out</u>:  The Carve-Out applies to (i) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee; (ii) reasonable fees and expenses incurred by a trustee appointed under section 726(b) of the Bankruptcy Code (if applicable), not to exceed $50,000; and (iii) subject to certain limitations, approved fees and expenses of retained professionals accrued prior to the delivery of a Carve-Out Trigger Notice (as defined in the Initial DIP Order) plus $100,000 of unpaid fees and expenses of such professionals incurred on or after the date of delivery of such Carve-Out Trigger Notice.  Interim Order at ¶13.

(h)    <u>Waivers and Limitations</u>.  The time period within which the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Creditors' Committee</u>"), if any, may bring an adversary proceeding or contested matter challenging the amount, validity, or enforceability of the Prepetition Note (as defined below), the perfection or priority of the Prepetition Security Documents (as defined below), or otherwise asserting any claims or causes of action on behalf of the Debtors' estates relating to the Prepetition Secured Obligations (as defined below) is limited to the 60-day period following entry of the Final Order.  Such period, however, may be extended by an order of the Court.  Interim Order at ¶ 15.

(i)    <u>Events of Default</u>:  The DIP Facility sets forth a number of Events of Default, including, but not limited to (i) the failure to pay principal or interest when due; (ii) the occurrence of various breaches of the DIP Agreement, the DIP Documents or the DIP Orders, as applicable; (iii) challenges to the effectiveness of the DIP Orders, as applicable; and (iv) challenges to the enforceability or priority of Lender's claims or interests.  DIP Agreement, ¶ 18; Interim DIP Order, ¶21.

(j)    <u>Termination</u>:  Lender's obligations under the DIP Facility terminate and all amounts owing under the DIP Facility become due and payable, on the earliest to occur of:  (i) May 30, 2015, (ii) the effective date of a chapter 11 plan confirmed in any of the Chapter 11 Cases, (iii) the Debtors' receipt of written notice of an Event of Default; (iv) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, and (v) the

Court's dismissal of any of the Chapter 11 Cases.  *See* Interim Order ¶12.

(k)  <u>Modification of the Automatic Stay</u>:  The DIP Orders provide for the modification of the Automatic Stay to permit Lender to file such documents as are appropriate to evidence its security interests and to take such other action as may be required or permitted by the DIP Orders, the DIP Agreement, and the DIP Documents.  Interim Order ¶23.

(l)  <u>Indemnification</u>:  The Debtors are obligated to indemnify Lender against any liability arising in connection with the DIP Agreement or the DIP Documents.  Interim Order ¶4.

### III.    BACKGROUND

6.    On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for appointment of a trustee or examiner has been made in any of the Chapter 11 Cases.  No committees have been appointed or designated.

7.    Additional information regarding the background of the Debtors' businesses and the commencement of the Chapter 11 Cases is set forth in the Declaration of Anthony Barsanti (the "<u>Rule 1007-2 Declaration</u>") (ECF No. 2), submitted pursuant to Local Rule 1007-2.

### IV.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. §157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003 and 6004.

## V.       THE DEBTORS' CAPITAL STRUCTURE

### A.     Prepetition Capitalization

9.     As set forth in the Barsanti Declaration, the Debtors' secured liabilities as of the Petition Date consist primarily of $1,666,666.67 due to Lender under a promissory note, dated March 12, 2014 (the "Prepetition Note"). *See* Barsanti Declaration, ¶7. The Debtors' obligations under the Prepetition Note, which included the payment of principal, interest and certain costs, fees and expenses of Lender, are secured by liens on substantially all of the Debtors' assets (collectively, the "Prepetition Collateral"). *See* Barsanti Declaration, ¶7. These liens are evidenced by a Collateral Agreement, and a Mortgage Security Agreement, Assignment of Leases and Rents, and Fixture Filing, each dated as of March 12, 2014 (together, the "Prepetition Security Documents," and collectively with the Prepetition Note, the "Prepetition Secured Obligations"). Based on the purchase price negotiated in connection with the Proposed Sale, the Debtors believe that the value of the Prepetition Collateral exceeds the amount of the Prepetition Secured Obligations. *See* Barsanti Declaration, ¶7.

10.     The Debtors incurred the Prepetition Secured Obligations, for which they are jointly and severally liable, in order to obtain the funds required to pay their annual insurance premiums—expenses which are essential to the operation of the Debtors' businesses. *See* Barsanti Declaration, ¶8. Lender duly perfected the Prepetition Security Obligations by, among other things, recording mortgages and fixture filings and, where necessary, by possession of relevant instruments, certificates, or other property. *See* Barsanti Declaration, ¶8. All such mortgages and fixture filings were validly executed by authorized representatives of the Debtors. *See* Barsanti Declaration, ¶8. The Prepetition Secured Obligations constitute valid, binding,

8

enforceable and perfected liens and security interests and are not subject to avoidance, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

**B.    Proposed DIP Facility**

   **a.    The Need for Postpetition Financing**

   11.    Access to the DIP Facility and the use of Cash Collateral is essential to the success of the Proposed Sale and the administration of the Chapter 11 Cases.  As set forth in the Barsanti Declaration, portions of the Property, particularly the exterior of the North Tower, are deficient and must be repaired.  *See* Barsanti Declaration, ¶9.  The expense attendant to completing these repairs is incorporated into the Proposed Sale and, to the extent that the Debtors are able to commence the repair process (including the assessment of the scope of such repairs) and control the related expenses in the time period leading up to the closing, they may be able to retain a larger portion of the sale price for the benefit of their estates.  *See* Barsanti Declaration, ¶9.  As set forth in Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(A), 345, 363, 364 and 503(B)(1) Authorizing: (I) Continued Maintenance of Existing Bank Accounts;  (II) Continued Use of Existing Business Forms;  (III) Continued Use of Existing Cash Management System; and (IV) Waiver of Certain Guidelines Relating to Bank Accounts (the "Cash Management Motion"), virtually all of the revenues generated by the Debtors' businesses flow into the Bank Accounts (as defined in the Cash Management Motion).  The Bank Accounts are subject to management by the Canyon Ranch Entities pursuant to the Canyon Ranch Agreements (as defined in the Cash Management Motion) and funds in the Bank Accounts are generally exhausted in connection with the operating expenses of the Debtors' businesses.  See Barsanti

9

Declaration, ¶9.  Accordingly, while all such funds are property of the Debtors' estates

and Cash Collateral of the Lender, they are likely to be insufficient to fund the repairs.

12.    Consequently, obtaining additional financing is crucial to the

success of the Chapter 11 Cases.  The Debtors believe that the DIP Facility will allow

them to meet their liquidity needs for the duration of the Chapter 11 Cases and enable

them to maximize the return to their estates from the Proposed Sale.  The Budget

reflects the Debtors' reasonable judgment and projections as to the cash needs of their

businesses over the next four months.  The Debtors believe that the level of

expenditures reflected in the Budget is prudent for the preservation and maximization

of the value of their estates.  *See* Barsanti Declaration, ¶10.

### b.    Efforts to Obtain Postpetition Financing

13.    Given the Debtors' financial condition, existing debt, and lack of

unencumbered assets, the Debtors do not believe that they would be able to obtain

financing on an unsecured basis pursuant to sections 364(b) and 503(b)(1) of the

Bankruptcy Code, or even on a superpriority basis under section 364(c)(1) of the

Bankruptcy Code, on terms more favorable than those of the DIP Facility.  *See* Barsanti

Declaration, ¶11.  Similarly, if the Debtors were to solicit offers for financing secured by

liens on their unencumbered assets (which are virtually nonexistent) pursuant to

section 364(c)(2) of the Bankruptcy Code, or junior liens on their encumbered assets,

pursuant to section 364(c)(3) of the Bankruptcy Code, the Debtors believe that such

financing would provide for terms that are far more onerous than those of the DIP

Facility, including a significantly higher interest rate, liens on Avoidance Action

Proceeds (as defined in the Interim DIP Order), more punitive default provisions,

adequate protection payments, and countless other fees (*i.e.*, commitment fees, exit fees,

monitoring fees, etc.). *See* Barsanti Declaration, ¶11.  Further, even if the Debtors were

to solicit offers for financing secured by priming liens pursuant to section 364(d) of the

Bankruptcy Code, such financing, if it were even available, is unlikely to be on terms

materially superior to those of the DIP Facility and the expense and delay attendant to

obtaining Court approval of such priming liens over Lender's objection would quickly

erode any incremental advantage.  *See* Barsanti Declaration, ¶11.  Finally, Lender, as the

ultimate parent of the Debtors and the holder of Prepetition Secured Obligations, has a

substantial interest in the success of both the Proposed Sale and the Chapter 11 Cases

and, therefore, is willing to provide the DIP Facility on terms that are favorable to the

Debtors.  Accordingly, the Debtors determined to pursue financing options from their

affiliate, the Lender. *See* Barsanti Declaration, ¶11.

15. These factors, the Debtors' review of debtor in possession financing

that has been approved in other recent cases, and the Debtors' substantial experience

with real estate financing generally, have informed the Debtors' conclusion that the DIP

Facility is fair and reasonable and represents the best financing currently available to

the Debtors.  *See* Barsanti Declaration, ¶12.

   **c.    The Proposed DIP Facility**

15. As set forth in the Barsanti Declaration, the Debtors and Lender

were represented by separate counsel in connection with the negotiation of the DIP

Facility.  After good faith negotiations, the terms set forth in the DIP Agreement and the

DIP Documents were agreed upon.  *See* Barsanti Declaration, ¶13. As set forth in the

DIP Agreement, the Lender has agreed to extend the DIP Facility in an aggregate

amount of $5 million, with $500,000 available immediately upon entry of the Interim

Order and the remaining $4,500,000 available upon entry of the Final Order.

16.     During the Interim Period and subject to the Budget, the proceeds of the DIP Facility will be used to assess and/or commence the repair process and fund administrative expenses.  Subject to entry of the Final Order, the remaining proceeds of the DIP Facility will be used (i) to pay any remaining expenses incurred in connection with the repair and remediation of the Property, (ii) to reimburse Lender for its reasonable costs and expenses incurred in connection with the discussion, negotiation, preparation, execution and delivery of any documents in connection with the DIP Facility and these Chapter 11 Cases, (iii) to pay professional fees and expenses incurred in connection with the Chapter 11 Cases in accordance with the Budget, and (iv) for general corporate purposes and working capital during the Chapter 11 Cases in accordance with the Budget.  *See* Barsanti Declaration, ¶14.

| Overview of the Postpetition Financing | |
|---|---|
| DIP Agreement Parties | **Borrowers**:<br>FL 6801 Spirits LLC<br>FL 6801 Collins North LLC<br>FL 6801 Collins Central LLC<br>FL 6801 Collins South LLC<br><br>**Lender:**<br>PAMI ALI LLC |
| Maturity | The full outstanding Principal Amount (or Advanced portion thereof), together with all accrued and unpaid interest, are due and payable on May 30, 2015.<br>**DIP Agreement, ¶6.** |
| Purpose | **DIP Facility and Cash Collateral**: The proceeds of the DIP Facility and Cash Collateral may be used (i) to complete certain capital repairs and improvements to the Property, (ii) to pay professional fees and expenses incurred in connection with the Chapter 11 Cases, (iii) to pay for the reasonable costs and expenses of Lender incurred in connection with the discussion, negotiation, preparation, execution and delivery of any documents relating to the DIP Facility, the DIP Orders, or the Chapter 11 Cases, and (iv) for general corporate purposes and working capital during the Chapter 11 Cases in |

| **Overview of the Postpetition Financing** | |
|---|---|
| | accordance with the Budget. **DIP Agreement, ¶F; Interim DIP Order, ¶3.** |
| Interest Rate | **Interest Rate**: From the Closing Date until all obligations under the DIP Facility are paid in full, on each of March 31, June 30, September 30 and December 31 of each calendar year commencing with the first of such dates following the Closing Date, interest shall accrue on the outstanding Principal Amount (or Advanced portion thereof) at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin during the immediately following calendar quarter. **DIP Agreement, ¶4.** |
| | **Prime Rate**: The prime rate as of the most recent January 1, April 1, July 1 or October 1, as applicable (as reported in The Wall Street Journal). **DIP Agreement, ¶1.** |
| | **Applicable Margin**: 0.5% per annum. **DIP Agreement, ¶1.** |
| | **Default Rate:** 2.0% per annum in excess of the interest rate otherwise payable under the DIP Facility. **DIP Agreement, ¶4.** |
| DIP Commitments | **DIP Agreement**: Total aggregate term loan commitment of $5 million to be disbursed as follows: <br> ▪ Initial Amount: $500,000 following entry of the Interim Order, <br> ▪ Final DIP Loan: $5 million (less the Initial Amount). <br> **DIP Agreement, ¶¶1,5; Interim DIP Order, ¶2.** |
| Fees | **Fees:** Reasonable costs and expenses of Lender incurred in connection with the discussion, negotiation, preparation, execution and delivery of any documents relating to the DIP Facility, the DIP Orders, or the Chapter 11 Cases. **DIP Agreement, ¶F; Interim DIP Order, ¶4.** |
| Liens and Priorities of DIP Obligations | **Liens**: Subject to the Carve Out, the DIP Obligations (as defined in the Interim Order) will be secured by valid, enforceable, unavoidable, and fully perfected security interests in and liens and mortgages (collectively, the "<u>DIP Liens</u>") upon all existing and after-acquired tangible and intangible personal and real property and assets of all of the Debtors whether existing prior to or acquired after the Petition Date (collectively, the "<u>DIP Collateral</u>"); <u>provided</u> that the DIP Liens are subordinate to any security interest of Lender in the Prepetition Collateral; <u>provided, further</u>, that the DIP Liens will not attach to any Avoidance Action Proceeds. Subject to the Carve-Out, the DIP Liens will be |

| Overview of the Postpetition Financing | |
|---|---|
| | prior and senior to all liens and encumbrances of all other secured creditors and in and to the DIP Collateral granted or arising after the Petition Date. **DIP Agreement, ¶¶ F; Interim DIP Order, ¶8.** <br><br> **Superiority Claims**: Subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code. The DIP Superpriority Claims shall be payable from and have recourse to all prepetition unencumbered property and all postpetition property of the Debtors, other than the Avoidance Action Proceeds. **Interim DIP Order, ¶11.** |
| Carve Out | **Carve-Out**: The Carve-Out applies to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee, (ii) reasonable fees and expenses incurred by a chapter 7 trustee (if applicable) up to $50,000; and (iii) approved fees and expenses incurred by the Debtors' and the Creditors' Committee's professionals, provided that Carve-Out applicable to any approved fees and expenses of such professionals incurred after delivery of a Carve Out Trigger Notice is capped at $100,000. <br><br> The Carve Out is not available to pay fees and expenses incurred in connection with the initiation or prosecution of (i) any challenge to the validity, perfection, priority, extent or enforceability of the DIP Obligations or the DIP Superpriority Claims under the DIP Agreement or the DIP Documents, or the DIP Liens or any collateral or security interests securing the DIP Obligations, or (ii) any claims, causes of action, adversary proceedings or other litigation against Lender or its affiliates in respect of the Prepetition Secured Obligations, or the Replacement Liens, provided that the limitation in this clause (ii) shall not apply to any fees and expenses incurred by the Creditors' Committee in connection with any investigation of or claims against Lender in respect of the Prepetition Secured Obligations or the Replacement Liens in an aggregate amount not to exceed $20,000. **Interim DIP Order, ¶13.** |
| Adequate Protection | To the extent of any postpetition diminution in the value of |

| Overview of the Postpetition Financing | |
|---|---|
| | Lender's interest in the Prepetition Collateral on account of the Debtors' use of Cash Collateral, and any decline in value from the Automatic Stay or the Debtors' use, sale, depreciation, pledge or disposition of the Prepetition Collateral, and subject to the Carve-Out, Lender, in its capacity as lender under the Prepetition Secured Obligations, will be granted valid, enforceable, unavoidable, and fully perfected security liens in and replacement liens upon the DIP Collateral with rank and priority superior to that of the DIP Liens (the "<u>Replacement Liens</u>"). **Interim DIP Order, ¶9.** |
| Events of Default | The DIP Agreement contains certain customary Events of Default, including the following: <ul><li>failure to pay principal or interest when due;</li><li>failure by the Debtors to perform under, or comply with, any term of the DIP Agreement, the DIP Documents, or the DIP Orders, which failure continues unremedied for a period of 5 business days after notice from Lender;</li><li>any breach or default under the DIP Agreement, the DIP Documents, or the DIP Orders, or written repudiation or assertion of the invalidity of the liens granted therein;</li><li>any order shall have been entered by the Bankruptcy Court granting relief from or modifying the Automatic Stay to allow any creditor to execute upon or enforce a lien on any asset of any Debtor;</li><li>a reversal, vacatur, stay, amendment, supplementation or other modification of the Final Order shall have occurred and be in effect for a period in excess of 5 business days, or an order providing for a change in venue with respect to the Chapter 11 Cases shall have been entered and not reversed or vacated within 5 business days;</li><li>the Final Order shall not have been entered by the Bankruptcy Court within 45 days after entry of the Interim Order;</li><li>the DIP Orders (as applicable) shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the DIP Orders (as applicable), (ii) amending or modifying the DIP Orders (as applicable) in a manner that is adverse to the Lender without the consent of Lender, or (iii) staying the DIP Orders (as applicable) for a period in excess of 7 business days;</li><li>the Debtors' exclusive period within which to file a</li></ul> |

| Overview of the Postpetition Financing | |
|---|---|
| | plan of reorganization in any of the Chapter 11 Cases terminates or is otherwise lifted and remains terminated or otherwise lifted for a period of 5 business days; <br>▪ an order shall have been entered in any of the Chapter 11 Cases granting any other superpriority administrative claim or lien equal or superior to that granted to Lender, or the Debtors file any pleading requesting such relief unless such pleading is in respect of a transaction that would indefeasibly repay all obligations owed to Lender under the DIP Agreement and the DIP Documents in full in cash on or prior to the date of incurrence of any such claim or lien; or <br>▪ the Debtors file a chapter 11 plan that is not an Acceptable Plan. <br>**DIP Agreement, ¶18; Interim DIP Order, ¶21.** |
| Automatic Stay | The Automatic Stay will be modified to the extent necessary to permit Lender to enforce its rights under the DIP Agreement and the DIP Documents and to take any or all of the following actions without further authorization from the Court: <br>▪ terminate the Debtors' use of Cash Collateral and cease making any Advances to the Debtors; <br>▪ declare all DIP Obligations to be immediately due and payable; and <br>▪ take any other actions or exercise any other rights or remedies permitted under the DIP Orders (as applicable), the DIP Agreement, the DIP Documents or applicable law to effect the repayment of the DIP Obligations. <br>Lender is required to provide 7 calendar days' written notice to the Debtors, the Creditors' Committee, and the U.S. Trustee prior to exercising any lien enforcement rights or remedies with respect to the DIP Collateral. <br>**Interim DIP Order, ¶23.** |
| Debtors' Stipulations | **DIP Facility**: The Debtors shall be deemed to (i) release and discharge Lender from any and all claims, causes of action and remedies arising out of, based upon or related to the DIP Agreement, the DIP Documents, the DIP Obligations, the DIP Collateral, the DIP Liens, or the Replacement Liens; and (ii) waive any and all defenses as to the validity, perfection, priority, enforceability, amount, and nonavoidability of the DIP Agreement, the DIP Documents, DIP Obligations, the DIP Liens, the DIP Collateral, or the Replacement Liens. |

| Overview of the Postpetition Financing | |
|---|---|
| | **Prepetition Secured Obligations**: The Debtors waive any and all defenses as to the validity, perfection, priority, enforceability, amount, and nonavoidability of the Prepetition Secured Obligations. The stipulations and admissions contained in the Interim Order pertaining to the Prepetition Secured Obligations will be binding on all parties in interest, including, without limitation, the Creditors' Committee, unless, and solely to the extent that, (i) the Creditors' Committee has timely commenced an appropriate contested matter or adversary proceeding (a "<u>Challenge</u>") challenging the amount, validity, or enforceability of the Prepetition Note, the perfection or priority of the Prepetition Security Documents, or otherwise asserting any claims or causes of action on behalf of a Debtor's estate relating to the Prepetition Secured Obligations no later than the earlier of (a) 60 days after the entry of the Final Order, or (b) such later date as has been ordered by the Bankruptcy Court, and (ii) the Bankruptcy Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  If no such Challenge is timely commenced or approved by Bankruptcy Court by final order, then, without further order of the Bankruptcy Court, the Prepetition Secured Obligations will be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case or cases and will not be subject to challenge by any party in interest as to validity, priority or otherwise. <br> **Interim DIP Order, ¶¶ 14, 15.** |
| Section 506(c) | Upon entry of the Final Order, subject to the Carve-Out, no expenses of administration of the Debtors' cases or any future proceedings shall be recovered from the Prepetition Collateral or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code without prior written consent of the Lender. <br> **Interim DIP Order, ¶30.** |

## VI.        BASIS FOR RELIEF REQUESTED

17.     The Debtors' ability to preserve the value of their estates and to maximize their returns from the Proposed Sale depends on immediate access to Cash Collateral and the DIP Facility.  Absent access to Cash Collateral and the DIP Facility, the Debtors lack sufficient liquidity to make the necessary repairs to the North Tower or to fund the administration of the Chapter 11 Cases.  Accordingly, the Debtors request

authorization to use Cash Collateral and borrow up to an aggregate of $5 million, with $500,000 available on an interim basis.

18.     As set forth above and in the Barsanti Declaration, the Debtors believe that the DIP Facility is the best financing available to the Debtors at this time. The Debtors do not believe that they would be able to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code, or (b) solely as an administrative expense under section 364(a) or (b) of the Bankruptcy Code on terms superior to those of the DIP Facility.  Moreover, the other financing alternatives reasonably available to the Debtors would likely have terms that are far more onerous than those of the DIP Facility.  Therefore, for the reasons stated herein, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

19.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections.  11 U.S.C. § 364(c).

**a.     The DIP Facility Should be Approved
       Under Section 364 of the Bankruptcy Code**

20.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession

is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the

Bankruptcy Code as an administrative expense."  11 U.S.C. § 364(c); see also In re Ames

Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990);  Sapir v. CPQ Colorchrome

Corp. (In re Photo Promotion Assocs.), 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (Section

364(c) financing is appropriate when the debtor in possession is unable to obtain

unsecured credit allowable as an ordinary administrative claim).  Courts have

articulated a three-part test to determine whether a debtor may obtain financing under

section 364(c) of the Bankruptcy Code:

> (i)    The debtor is unable to obtain unsecure credit under section 364(b)
>        (i.e., by granting a lender administrative expense priority);
>
> (ii)   the credit transaction is necessary to preserve the assets of the
>        estate; and
>
> (iii)  the terms of the transaction are fair, reasonable and adequate, given
>        the circumstances of the debtor-borrower and the proposed lender.

See In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above

test and finding that "[o]btaining credit should be permitted not only because it is not

available elsewhere, which could suggest the unsoundness of the basis for use of the

funds generated by credit, but also because the credit acquired is of significant benefit

to the debtor's estate and that the terms of the proposed loan are within the bounds of

reason, irrespective of the inability of the debtor to obtain comparable credit

elsewhere").  In these circumstances, "[t]he statute imposes no duty to seek credit from

every possible lender before concluding that such credit is unavailable."  Bray v.

Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir.

1986); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).

A debtor need only demonstrate "a good faith effort that credit was not available

without" the protections of section 364(c).  In re Snowshoe, 789 F.2d. at 1088.  When

there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom.; Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

> **b.    The DIP Facility is Necessary
> to Preserve the Assets of the Debtors' Estates**

21.    As described above, postpetition credit is necessary in order for the Debtors to maximize the returns they are able to obtain in connection with the Proposed Sale.  Additionally, such credit is essential to the administration of the Chapter 11 Cases and, therefore, will benefit all creditors, secured and unsecured, as well as other parties in interest.

> **c.    The Terms of the DIP Facility Are Fair, Reasonable, and
> Appropriate and Represent the Sound Exercise of Business Judgment**

22.    As described in the Barsanti Declaration and herein, the Debtors have concluded that Lender's proposal is the best alternative available for post-petition financing and that credit cannot be obtained from a third party on more favorable terms.  Specifically, the terms of the DIP Facility are more than reasonable in that the applicable interest rate is below market and Lender has not (i) sought additional fees (*i.e.*, commitment fees, exit fees, monitoring fees, etc.) that are customary in such financings, (ii) insisted on a priming lien to subordinate Lender's interest in the Prepetition Collateral, or (iii) sought to obtain liens on the Avoidance Action Proceeds. As such, the DIP Facility is the best financing option available under the circumstances of the Chapter 11 Cases.  *See* Barsanti Declaration, ¶11.

23.     The proposed terms of the DIP Facility are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers on the Debtors for the benefit of all parties in interest.  As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Facility is to enable the Debtors to maximize the value of their estates while providing them with the resources necessary to formulate a confirmable plan.  See generally In re First S. Sav. Ass'n, 820 F.2d 700, 710-15 (5th Cir. 1987).

24.     Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("business judgments should be left to the boardroom and not to this Court"); see also In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (holding that, in general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

25.     The Debtors submit that they have exercised sound and prudent business judgment in determining the merits and necessity of the DIP Facility and have further satisfied the legal prerequisites for incurring debt.  The Debtors additionally submit that they have aptly demonstrated that the terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates.  See Barsanti Declaration, ¶15.  Accordingly, the Debtors should be granted the requested relief to borrow funds

from the Lender on a secured and superpriority basis, pursuant to sections 364(c) of the Bankruptcy Code.

**d.**     <u>**Use of Cash Collateral and Proposed Adequate Protection**</u>

26.     Sections 363(c)(2) and 363(e) of the Bankruptcy Code provide that a debtor is not authorized to use Cash Collateral without the consent of the pre-petition secured lender unless such lender is provided adequate protection of its interest in such Cash Collateral.   The Debtors propose to provide Lender with the Replacement Liens as adequate protection of the Lender's interest in the Cash Collateral.   Subject to the Court's approval of the Replacement Liens, Lender has consented to use of Cash Collateral by the Debtors and their agents, including the Canyon Ranch Entities (as defined in the Rule 1007-2 Declaration), in the ordinary course of the Debtors' businesses pursuant to section 363 of the Bankruptcy Code.   The Debtors anticipate that Cash Collateral will be used to, among other things, (i) pay (either directly or by reimbursement of the Canyon Ranch Entities) Necessary Expenses;[1] (ii) honor rental program obligations and rental program deposits; and (iii) pay the base management fee owed to the Manager under the Management Agreement (each as defined in the Rule 1007-2 Declaration).   In accordance with the Debtors' motions for:  (a) an Order pursuant to Section 105 of the Bankruptcy Code for an Order Confirming the Protections of Sections 362 And 365 of the Bankruptcy Code;  (b) Interim and Final Orders pursuant to Bankruptcy Code Sections 105(A), 345, 363, 364 and 503(B)(1) Authorizing:  (I) Continued Maintenance of Existing Bank Accounts;  (II) Continued Use of Existing Business Forms;  (III) Continued Use of Existing Cash Management

---

[1]     "Necessary Expenses" are expenses that are appropriate to be paid, such as employees, vendors, service providers, utilities, insurance, tax obligations and reimbursement for operational costs (e.g., reservation systems).

System;  and (IV) Waiver of Certain Guidelines Relating to Bank Accounts;  and (c) an

Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Rental

Program Participants and Otherwise Continue the Rental Program and Certain

Practices with Canyon Ranch in the Ordinary Course of Business, such uses of Cash

Collateral may be on account of claims for Necessary Expenses that arose prior to the

Petition Date.  Accordingly, the Debtors' use of the Lender's Cash Collateral satisfies

sections 361 and 363(c)(2) of the Bankruptcy Code.

> **e.**   **The DIP Facility Was Negotiated in Good Faith and Should
> Be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

27.   Pursuant to section 364(e) of the Bankruptcy Code, any reversal or

modification on appeal of an authorization to obtain credit or incur debt or a grant of

priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity

of the debt incurred or priority of the lien granted as long as the entity that extended

credit "extended such credit in good faith." See 11 U.S.C. § 364(e).

28.   Courts generally hold that "good faith" in the context of

postpetition financing means, consistent with the Uniform Commercial Code, honesty

in fact in the conduct or transaction concerned.  See Unsecured Creditors' Comm. v.

First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th

Cir. 1987) (citing U.C.C. § 1-201(19)).  Additionally, "[g]ood faith is measured with

respect to the good faith of the lender as contrasted to that of the borrower." Transcript

of Record (Court Decision) at 736:24-25, In re Lyondell Chem. Co., No. 09-10023 (Bankr.

S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to make

money on interest and fees, and to protect prepetition positions are understandable and

acceptable motivations for a postpetition lender in negotiating a deal.  Id. at 737:6-14.

29.     As described above and in the Barsanti Declaration, Lender and the Debtors were each represented by separate Lehman employees and reflect the most advantageous terms (including availability, pricing, and fees) available to the Debtors in light of their financial circumstances and need to move quickly in connection with the Proposed Sale.  *See* Barsanti Declaration, ¶13.

30.     All of the Postpetition Obligations will be extended by Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as set forth herein, in the DIP Agreement, the DIP Documents, and in the Interim Order.  Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code and Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders (as applicable) or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**f.      Interim Relief Is Necessary to Prevent Immediate and Irreparable Harm**

31.     Bankruptcy Rule 4001 governs the procedures for obtaining authorization to use cash collateral and incur postpetition debt and provides, in relevant part:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).  And:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day

> period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(c)(2).

32.     Similarly, to the extent the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid immediate and irreparable harm.  FED. R. BANKR. P. 6003(b).

33.     Generally, courts find "immediate and irreparable harm" exists where loss of business threatens a debtor's ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990).  Approval of a DIP facility and the use of cash collateral on an interim basis under Rule 4001 is left to the discretion of the court as informed by the facts of each case.  See In re Pan Am Corp., No. 91-8319, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992).

34.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in the Barsanti Declaration, the Debtors need to obtain immediate access to the Cash Collateral and the DIP Facility in order to fund the administration of the Chapter 11 Cases and to begin the repairs to the North Tower that are provided for in the PSA and that are essential to the success of the Proposed Sale.  See Barsanti Declaration, ¶16.  If the Debtors are unable to access Cash Collateral and the DIP Facility until entry of the Final Order, the repairs to the North Tower will be delayed, which could jeopardize the transaction, or consume a greater portion of the consideration that the Debtors receive from the Proposed Sale than would otherwise have been the case.  Providing the Debtors with

immediate access to Cash Collateral and the first tranche of the DIP Facility is, therefore, necessary to avoid immediate and irreparable harm to the Debtors' estates.

35.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district.  See, e.g., In re Hostess Brands, No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (order approving postpetition financing on an interim basis); In re Chemtura Corp., No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009) (same); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (same); In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., No. 08-14679 (Bankr. S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., No. 08-10595 (Bankr. S.D.N.Y. Feb. 27, 2008) (same).

36.     Accordingly, the Debtors believe that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to their estates and, therefore, that the requirements of Bankruptcy Rule 4001 are satisfied.

**g.     Modification of the Automatic Stay is Appropriate Under the Circumstances.**

37.     Paragraph 23 of the proposed Interim Order provides that the Automatic Stay will be lifted to the extent contemplated by the provisions of the DIP Agreement and the DIP Documents, as described above.  Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Agreement, the DIP Documents, and the proposed DIP Orders.

**h.     Request for a Final Hearing**

38.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to the relief requested in the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

### i.     **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

39.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a), and the 14-day stay under Bankruptcy Rule 6004(h).  As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtors' prospects for maximizing the returns they are able to obtain from the Property.  *See* Barsanti Declaration, ¶16.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h).

### VII.     **NOTICE**

40.     Notice of this Motion has been provided either by facsimile, electronic transmission, overnight delivery, or hand delivery to: (i) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, Attn: William K. Harrington, Esq., Susan D. Golden, Esq., 201 Varick Street, Suite 1006, New York, NY 10014;  (ii) the parties set forth on the Debtors' Consolidated List of Creditors Holding

the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d);

(iii) Lender, c/o Lehman Brothers Holdings Inc., Attn: James Pomeranz, 1271 Avenue of the Americas, New York, NY 10020;  Weil, Gotshal & Manges LLP, Attn: Jacqueline Marcus, Esq., 767 Fifth Avenue New York, New York 10153 (attorneys for Lender);

(iv) CR Miami, LLC, Attn:  Jerry Cohen and Gary Milner, 8600 East Rockcliff Road, Tucson, AZ 85750; W. James Harrison Esq., W.J. Harrison & Associates, P.C., 3561 East Sunrise, Suite 201, Tucson, AZ 85718 (counsel to CR Miami, LLC); (v) the Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-102 (vi) the Internal Revenue Service, Special Procedures Branch, Attn: District Director, 290 Broadway, New York, NY 10007;  (vii) the United States Attorney for the Southern District of New York, Claims Unit - Room 417, One St. Andrew's Plaza, New York NY 10007; and (viii) any parties required to be served under any applicable Bankruptcy Rule or Local Rule.

       41.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with the Chapter 11 Cases.

## VIII.         <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as is just.

Dated:    June 1, 2014
           New York, New York

                                        TOGUT, SEGAL & SEGAL LLP
                                        Proposed Attorneys for the
                                        Debtors and Debtors in Possession
                                        By:


                                        /s/ Frank A. Oswald
                                        FRANK A. OSWALD
                                        A Member of the Firm
                                        One Penn Plaza, Suite 3335
                                        New York, New York 10119