# Exhibit "A"



CFN 2007R1144863
OR Bk 26080 Pgs 4905 - 5008; (104pgs)

RECORDED 12/03/2007 10:54:05
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

)

This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg, Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

(Reserved for Clerk of Court)

DECLARATION OF COVENANTS,
RESTRICTIONS AND EASEMENTS
FOR
CARILLON HOTEL AND SPA

THIS DECLARATION is made as of the _2nd_ day of _November_, 2007, by **Carillon South Joint Venture, L.L.C., a Florida limited liability company,** which declares hereby that "The Properties" described in Article **2** of this Declaration are and shall be held, transferred, sold, conveyed and occupied subject to the covenants, restrictions, easements, charges and liens hereinafter set forth.

ARTICLE 1

DEFINITIONS AND INTERPRETATION

1.1     <u>Definitions</u>.      The following words when used in this Declaration (unless the context shall prohibit) shall have the following meanings:

(a)     "Administrative Agent" shall have the meaning given in paragraph 1.1(s) below.

(b)     "Allocated Interests" shall have the meaning given in paragraph 13.7(c) below.

(c)     "Articles" or "Articles of Incorporation" mean the Articles of Incorporation of the Association, as amended from time to time. A copy of the initial Articles of Incorporation of the Association is attached hereto as **Exhibit "A"**.

(d)     "Assessments" shall mean and refer to the various forms of payment to the Association which are required to be made by Owners, as more particularly described in Section 7.1 of this Declaration.

(e)     "Association" or "Master Association" shall mean and refer to the CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC., a Florida corporation not for profit, which is (or is to be) incorporated.

(f)     "Board" or "Board of Directors" shall mean and refer to the duly constituted Board of Directors of the Association, from time to time.

(g)     "By-Laws" mean the By-Laws of the Association, as amended from time to time. A copy of the initial By-Laws of the Association is attached hereto as **Exhibit "B"**.

(h)     "City" shall mean and refer to the City of Miami Beach, located within the County (as hereinafter defined).

(i)     "Common Properties" shall mean and refer to the property, if any, legally described in **Exhibit "C"** attached hereto and made a part hereof, together with the landscaping and any improvements thereon, including, without limitation all of the following if located thereon, all private roadways and pedestrian walkway areas, structures, recreational facilities, open space, walkways, sprinkler systems and street lights, if any, but excluding any public utility installations thereon, and any other property of Declarant not intended to be made Common Properties. The Common Properties shall also include any drainage facilities and/or the surface water management system serving the Common Properties or more than one Lot. Declarant will endeavor to specifically identify (by recorded legal description, signage, physical boundaries, site plans or other means) the Common Properties of The Properties, but such identification shall not be required in order for a portion of The Properties to be Common Properties hereunder. Without limiting the generality of Section 1.2, in the event that Declarant determines that a particular portion of The Properties is or is not Common Properties hereunder (in the manner provided in said Section 1.2), and except only as to those portions of the Common Properties supplemented by the Future Development Property Owner (as to which Declarant shall not be permitted to make a determination), in the event that Declarant determines that a particular portion of The Properties is or is not Common Properties hereunder (in the manner provided in said Section 1.2), such determination shall be binding and conclusive. In the event that the Association accepts an easement or similar grant over, under or through any portion of The Properties or any property adjacent thereto or in the vicinity thereof, the area

subject to such easement may be, at the election of Declarant, deemed Common Properties for the purposes of, but only for the purposes of, the Association performing whatever duties or obligations are stated in, or implied by law with respect to such easement or other grant. **Notwithstanding the foregoing, The Properties have been developed and structured in such a manner to minimize the Common Properties. Most components which are typical "common properties" of a development of this nature have instead been designated herein as part of the Shared Facilities.**

(j) "Condominium Central Lot" shall have the meaning given in paragraph 1.1(dd) below. Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict the permitted uses thereof.

(k) "Condominium Central Shared Facilities" shall have the meaning given in paragraph 1.1(dd) below.

(l) "Condominium North Lot" shall have the meaning given in paragraph 1.1(dd) below. Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict the permitted uses thereof.

(m) "Condominium North Shared Facilities" shall have the meaning given in paragraph 1.1(dd) below.

(n) "Condominium South Lot" shall have the meaning given in paragraph 1.1(dd) below. Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict the permitted uses thereof.

(o) "Condominium South Shared Facilities" shall have the meaning given in paragraph 1.1(dd) below.

(p) "Condominium Unit" shall have the meaning given in paragraph 1.1(qq) below.

(q) "County" shall mean and refer to Miami-Dade County, Florida.

(r) "Declarant" shall mean and refer to **Carillon South Joint Venture, L.L.C., a Florida limited liability company,** its successors and such of its assigns as to which the rights of Declarant hereunder are specifically assigned. Declarant may assign all or a portion of its rights hereunder, or all or a portion of such rights in connection with appropriate portions of The Properties or the Future Development Property (as hereinafter defined). In the event of such a partial assignment, the assignee shall not be deemed the Declarant, but may exercise such rights of Declarant specifically assigned to it. Any such assignment may be made on a nonexclusive basis. The rights of Declarant under this Declaration are independent of the Declarant's rights to control the Board of Directors of the Association, and, accordingly, shall not be deemed waived, transferred or assigned to the Owners, the Board or the Association upon the transfer of control of the Association.

(s) "Declarant's Mortgagee" shall mean and refer to the mortgagee advancing construction funds for the development of The Properties (or portions thereof), and if more than one, the lead lender or administrative agent for any syndication or participation loan, or the construction lender loaning [based on the initial size of the loan (regardless of what has been advanced)] the greatest amount of indebtedness ("Administrative Agent").

(t) "Declaration" or "Master Covenants" means this instrument and all exhibits attached hereto, as same may be amended from time to time.

(u) "Easement Agreement" means that certain Easement Agreement by and between Declarant and the City of Miami Beach, a municipal corporation, dated _____ to be recorded in the Public Records of the County, for ingress and egress and the installation and maintenance of utilities over portions of the Condominium Property.

(v) "Facilities Records" shall have the meaning given in paragraph 16.8 below.

(w) "Fixed Charge" shall have the meaning given in paragraph 16.3 above.

(x) "Future Development Property " shall mean and refer to the property described on **Exhibit "D"** attached hereto and made a part hereof, any or all of which may, but none of which shall be, be brought within The Properties. **NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THE FUTURE DEVELOPMENT PROPERTY SHALL NOT BE DEEMED BURDENED BY THE TERMS AND CONDITIONS OF THIS DECLARATION UNLESS AND UNTIL SAME (OR ANY PORTION THEREOF) IS BROUGHT HEREUNDER BY A SUPPLEMENTAL DECLARATION DULY EXECUTED AND RECORDED IN THE PUBLIC RECORDS OF THE COUNTY.**

(y) "Future Development Property Owner" shall mean and refer to the owner from time to time of the Future Development Property.

(z) "Garage Costs" shall mean and refer to a portion of the expenses incurred by, or on behalf of, the Hotel Lot Owner for the operation, maintenance, repair, replacement, insurance and/or alteration of the parking structures and/or facilities located within the Hotel Lot, said portion to be equal to a fraction, the numerator of which is the number of Condominium Units then located within The Properties, and the denominator of which shall be equal to total number of parking spaces then located within the parking structures and/or facilities located within the Hotel Lot.

(aa) "General Shared Facilities" shall have the meaning given in paragraph 1.1(dd) below.

(bb)    "Hotel Lot" shall have the meaning given in paragraph 1.1(dd) below. Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict the permitted uses thereof.

(cc)    "Hotel Lot Owner" shall have the meaning given in paragraph 1.1(dd) below.

(dd)    "Lot" shall mean and refer to a portion of The Properties (as hereinafter defined) legally described in **Exhibit "E"** attached hereto and made a part hereof, which is designated as such in this Declaration or in a Supplemental Declaration executed and recorded by the Declarant (and joined into by the Owner of such parcel, if different from the Declarant). In the event that any Lot is submitted to the condominium or cooperative form of ownership, it shall nevertheless be deemed a single Lot hereunder, as more particularly described in Article 18 of this Declaration. It is contemplated (but without imposing any obligation) that ultimately, The Properties shall contain five (5) Lots:

(1)    the "Condominium Central Lot", which is legally described on **Exhibit "1" of Exhibit "E"** attached hereto;

(2)    the "Condominium South Lot", which is legally described on **Exhibit "2" of Exhibit "E"** attached hereto;

(3)    the "Retail Lot", which is legally described on **Exhibit "3" of Exhibit "E"** attached hereto;

(4)    the "Condominium North Lot", which is legally described on **Exhibit "4" of Exhibit "E"** attached hereto; and

(5)    the "Hotel Lot", which is legally described on **Exhibit "5" of Exhibit "E"** attached hereto;

Together, the improvements on the Retail Lot, Hotel Lot, Condominium South Lot, Condominium North Lot and Condominium Central Lot have been, or shall be, developed as a unified resort project and in some instances, with a unified structure. Given the integration of the project and structure of the improvements (and/or proposed improvements), and notwithstanding the legal descriptions contained on Exhibit "1" of Exhibit "E" through Exhibit "5" of Exhibit "E", inclusive, there is a necessity to share certain components of The Properties. Those shared components shall be identified as follows:

(i)    The "Condominium South Shared Facilities" shall be deemed to be the following components of the Properties, which are hereby deemed to be part of the Hotel Lot (whether or not contained within the legal description of any other Lot now or hereafter submitted to this Declaration), which serve either the Condominium South Lot exclusively, or the Condominium South Lot and the Hotel Lot, but not the Condominium Central Lot, Retail Lot or the Condominium North Lot:

(a)    all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving the Condominium South Lot exclusively (or the Condominium South Lot and Hotel Lot, but not the Condominium Central Lot, Retail Lot, or the Condominium North Lot), including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services;

(b)    all heating, ventilating and air conditioning systems serving the Condominium South Lot exclusively (or the Condominium South Lot and Hotel Lot, but not the Condominium Central Lot, Retail Lot or the Condominium North Lot), including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(c)    all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving the Condominium South Lot exclusively (or the Condominium South Lot and Hotel Lot, but not the Retail Lot, Condominium Central Lot or the Condominium North Lot);

(d)    any and all structural components of the improvements or air space comprising the Condominium South Lot and/or Hotel Lot, including, without limitation, all exterior walls and all finishes and balconies, terraces and/or facades attached or affixed thereto, provided that same do not affect the structural integrity of either the Retail Lot, Condominium Central Lot or the Condominium North Lot; and

(e)    the roof; all roof trusses, roof support elements and roofing insulation serving the Condominium South Lot exclusively (or the Condominium South Lot and Hotel Lot, but not the Retail Lot, Condominium Central Lot or the Condominium North Lot);

all subject to such regulation and restrictions as may be imposed from time to time by the owner from time to time of the Hotel Lot (the "Hotel Lot Owner").

(ii)    The "Condominium Central Shared Facilities" shall be deemed to be the following components of the Properties, which are hereby deemed to be part of the Hotel Lot (whether or not contained within the legal description of any other Lot now or hereafter submitted to this Declaration), which

serve either the Condominium Central Lot exclusively, or the Condominium Central Lot and the Hotel Lot, but not the Condominium South Lot, Retail Lot or the Condominium North Lot:

(a) all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving the Condominium Central Lot exclusively (or the Condominium Central Lot and Hotel Lot, but not the Condominium South Lot, Retail Lot, or the Condominium North Lot), including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services;

(b) all heating, ventilating and air conditioning systems serving the Condominium Central Lot exclusively (or the Condominium Central Lot and Hotel Lot, but not the Condominium South Lot, Retail Lot or the Condominium North Lot), including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(c) all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving the Condominium Central Lot exclusively (or the Condominium Central Lot and Hotel Lot, but not the Retail Lot, Condominium South Lot or the Condominium North Lot);

(d) any and all structural components of the improvements or air space comprising the Condominium Central Lot and/or Hotel Lot, including, without limitation, all exterior walls and all finishes and balconies, terraces and/or facades attached or affixed thereto, provided that same do not affect the structural integrity of either the Retail Lot, Condominium South Lot or the Condominium North Lot; and

(e) the roof; all roof trusses, roof support elements and roofing insulation serving the Condominium Central Lot exclusively (or the Condominium Central Lot and Hotel Lot, but not the Retail Lot, Condominium South Lot or the Condominium North Lot); and

all subject to such regulation and restrictions as may be imposed from time to time by the Hotel Lot Owner.

(iii) The "Condominium North Shared Facilities" shall be deemed to be the following components of the Properties, which are hereby deemed to be part of the Hotel Lot (whether or not contained within the legal description of any other Lot now or hereafter submitted to this Declaration), which serve either the Condominium North Lot exclusively, or the Condominium North Lot and the Hotel Lot, but not the Condominium Central Lot, Retail Lot or the Condominium South Lot:

(a) all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving the Condominium North Lot exclusively (or the Condominium North Lot and Hotel Lot, but not the Condominium Central Lot, Retail Lot, or the Condominium South Lot), including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services;

(b) all heating, ventilating and air conditioning systems serving the Condominium North Lot exclusively (or the Condominium North Lot and Hotel Lot, but not the Condominium Central Lot, Retail Lot or the Condominium South Lot), including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(c) all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving the Condominium North Lot exclusively (or the Condominium North Lot and Hotel Lot, but not the Retail Lot, Condominium Central Lot or the Condominium South Lot);

(d) any and all structural components of the improvements or air space comprising the Condominium North Lot and/or Hotel Lot, including, without limitation, all exterior walls and all finishes and balconies, terraces and/or facades attached or affixed thereto, provided that same do not affect the structural integrity of either the Retail Lot, Condominium Central Lot or the Condominium South Lot; and

(e) the roof; all roof trusses, roof support elements and roofing insulation serving the Condominium North Lot exclusively (or the Condominium North Lot and Hotel Lot, but not the Retail Lot, Condominium Central Lot or the Condominium South Lot);

all subject to such regulation and restrictions as may be imposed from time to time by the Hotel Lot Owner.

(iv) The "Non-Retail Shared Facilities" shall be deemed to be the following components of the Properties, which are hereby deemed to be part of the Hotel Lot (whether or not contained within the legal description of any other Lot now or hereafter submitted to this Declaration), which serve either the Condominium Central Lot, Condominium North Lot and the Condominium South Lot,

exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail Lot:

(a) all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving either the Condominium Central Lot, Condominium North Lot and the Condominium Central Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail Lot, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services;

(b) all heating, ventilating and air conditioning systems serving either the Condominium Central Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail Lot, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(c) all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving either the Condominium Central Lot, Condominium North Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail Lot;

(d) the Limited Spa Rights (as defined in Section 4.4 below), including, access to the Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi, Central Tower Lobby and Reception,

all subject to such regulation and restrictions as may be imposed from time to time by Hotel Lot Owner.

**Notwithstanding anything herein contained to the contrary, the Hotel Lot Owner shall not eliminate the following amenities: Cardio/Weight Room, Fitness Studios, 5th Floor Fitness Pool, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, South Tower Lobby, South Tower Beach Pool and Central Tower Lobby and Reception, without the prior written consent of a majority of the members of the Board of the condominium association established to govern the Condominium Central Lot, a majority of the members of the Board of the condominium association established to govern the Condominium South Lot and a majority of the members of the Board of the condominium association established to govern the Condominium North Lot.**

(v) The Hotel Lot also contains the following other areas and/or facilities (together with a license for reasonable pedestrian access thereto, the "General Shared Facilities") intended for use by and/or enjoyment of all of the Lot Owners (and their guests, tenants and invitees), all subject to such regulation and restrictions as may be imposed from time to time by the Hotel Lot Owner: Notwithstanding the foregoing, unless and until the Retail Lot is submitted to The Properties in accordance with the terms of this Declaration, the following shall be deemed to be included with the Non-Retail Shared Facilities:

(a) all sidewalks,

(b) any perimeter landscaping,

(c) all drives, paths and other areas (serving all Lots), including without limitation, any and all rights, obligations and/or liabilities which may arise pursuant to the Easement Agreement,

(d) except only as may be included in either the Condominium Central Shared Facilities, Condominium South Shared Facilities or the Condominium North Shared Facilities, any remaining structural components of the improvements or air space comprising any portion of the improvements, which may include, without limitation, all exterior walls, exterior glass surfaces and all finishes and balconies, terraces and/or facades attached or affixed thereto,

(e) except only as may be included in either the Condominium Central Shared Facilities, Condominium South Shared Facilities or the Condominium North Shared Facilities, any remaining roofs and/or roof trusses, roof support elements and roofing insulation,

(f) all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving all of the Lots, including, without limitation, all wires, conduits, pipes,

Book26080/Page4909     CFN#20071144863     Page 5 of 104

ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services,

(g) all heating, ventilating and air conditioning systems serving all of the Lots, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(h) any elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators serving all of the Lots,

(i) all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving all of the Lots,

(j) [the central loading dock area];

(k) the Master Life Safety Systems; and

Collectively, the Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, Non-Retail Shared Facilities and General Shared Facilities are sometimes hereinafter referred to as the "Shared Facilities". The Hotel Lot Owner shall have the right (but not the obligation), by Supplemental Declaration executed by the Hotel Lot Owner and Declarant's Mortgagee to supplement the Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities Non-Retail Shared Facilities and/or General Shared Facilities by adding additional facilities or to designate additional portions of the Project as Shared Facilities hereunder (or redesignate any portion of same). Notwithstanding the designation of the Shared Facilities, the Hotel Lot Owner shall have the right, from time to time, to expand, alter, relocate and or eliminate the Shared Facilities, or any portion thereof, without requiring the consent or approval of the Association, any other Owner, any Neighborhood Association or any member thereof (including, without limitation, any and all owners or mortgagees of the condominium units established within the Condominium South Lot, Condominium North Lot and/or Condominium Central Lot), provided, however, that no such alteration, relocation or elimination shall deny any Owner or any Condominium Unit Owner legal pedestrian access to and from the Owner's Lot and/or Condominium Unit, as applicable, nor terminate any utility and/or mechanical, electrical, HVAC, plumbing, life safety, monitoring, information and/or other systems located in the Hotel Lot and serving said Owner's Lot and/or Condominium Unit, as applicable, nor compromise the structural integrity of the Structures or otherwise impair the easements of support granted herein (without otherwise providing equivalent substitutions for same). The foregoing shall not, however, preclude the temporary cessation of services as reasonably necessary to effect repairs to any such systems.

Declarant also reserves the absolute right at any time, and from time to time, to construct additional facilities upon or adjacent thereto and to determine whether same shall be deemed Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, Non-Retail Shared Facilities and/or General Shared Facilities. Without limiting the generality of the foregoing, any and all food and beverage operations, meeting rooms, conference rooms, business center(s) and ballrooms, located within the Hotel Lot shall expressly be excluded from the Shared Facilities and shall be deemed the exclusive property, and for the exclusive use, of the Hotel Lot Owner.

Without limiting the generality of Section 1.2, in the event that the Hotel Lot Owner determines that a particular portion of The Properties is or is not Shared Facilities (or a particular type of Shared Facilities, i.e., Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, Non-Retail Shared Facilities or General Shared Facilities), such determination shall be binding and conclusive, provided Declarant's Mortgagee consents thereto.

(ee) "Master Association" shall have the meaning given in paragraph 1.1(e) above.

(ff) "Master Life Safety Systems" mean and refer to any and all emergency lighting, audio and visual signals, safety systems, sprinklers and smoke detection systems, which are now or hereafter installed within any portion of The Properties and which serve more than one Lot, whether or not within the Condominium Units. All such Master Life Safety Systems, together with all conduits, wiring, electrical connections and systems related thereto, regardless of where located, shall be deemed part of the General Shared Facilities of the Hotel Lot. Without limiting the generality of the foregoing, when the context shall so allow, the Master Life Safety Systems shall also be deemed to include all means of emergency ingress and egress, which shall include all Stairways and stair landings.

(gg) "Member" shall mean and refer to all those Owners and others who are Members of the Master Association as hereinafter provided (including, without limitation, the Declarant).

(hh) "Neighborhood Association" shall mean any association created or to be created to administer specific portions of The Properties and common areas or common elements lying within such portions pursuant to a declaration of condominium or declaration of covenants and restrictions affecting such portions. The condominium associations established to govern the Condominium South Lot, the Condominium North Lot and the Condominium Central Lot shall be deemed a Neighborhood Association hereunder.

(ii) "Non-Retail Shared Facilities" shall have the meaning given in paragraph 1.1(dd)(iv) above.

(jj) "Owner" shall mean and refer to the record owner, whether one or more persons or entities, of the fee simple title to any Lot situated upon or within The Properties. For the purposes of this Declaration, an "Owner" shall also mean a condominium or cooperative association administering a condominium or cooperative constituting a Lot/Structure as more particularly described in Article 18 of this Declaration.

(kk) "The Properties" or "CARILLON HOTEL AND SPA PROJECT" shall mean and refer to all properties described in **Exhibit "F"** attached hereto and made a part hereof, and all additions thereto, now or hereafter made subject to this Declaration, except such as are withdrawn from the provisions hereof in accordance with the procedures set forth in this Declaration.

(ll) "Retail Lot" shall have the meaning given in paragraph 1.1(dd) above. Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict the permitted uses thereof.

(mm) "Retail Lot Owner" shall mean the owner from time to time of the Retail Lot.

(nn) "Shared Facilities" shall have the meaning given in paragraph 1.1(dd) above.

(oo) "Spa" shall mean that portion of the Hotel Lot consisting of a health and fitness center, treatment rooms, medical offices and examination rooms, private fitness studios and labs, pilates room, rock climbing wall, treatment area relaxation lounges, cardio/weight room, men's locker room, women's locker room, men's wet lounge/sauna/steam, women's wet lounge/sauna/steam, south tower lobby, south tower beach pool and central tower lobby and reception, retail store and display areas. The Spa is not a part of the Shared Facilities, and except only as provided in Section 4.4 below, Owners (other than the Hotel Lot Owner) shall not be entitled to use of, or access to, the Spa.

(pp) "Stairways" mean any flight of steps, fire corridors, elevators and/or escalators which are at some point located in, or directly accessible from, more than one Lot.

(qq) "Structure" shall mean and refer to the structure or structures constructed on a Lot and all appurtenant improvements. A "Structure" shall be deemed a single Structure hereunder even if including multiple Lots (or portions thereof) or if divided into separate condominium or cooperative parcels (said separate condominium or cooperative parcels, for purposes of this Declaration being herein referred to, regardless of whether condominium or cooperative, as "Condominium Units").

(rr) "Supplemental Declaration" shall mean and refer to an instrument executed by the Declarant, and/or the Future Development Property Owner, (or the Master Association, if permitted by Section 2.4 hereof) and recorded in the Public Records of the County, for the purpose of adding to The Properties, withdrawing any portion(s) thereof from the effect of this Declaration, designating (or removing the designation of a portion of The Properties as Common Properties and/or Shared Facilities hereunder (or designating or redesignating any portion of the Shared Facilities as either Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, Non-Retail Shared Facilities or General Shared Facilities) or a common area/element of a Neighborhood Association or for such other purposes as are provided in this Declaration.

1.2 <u>Interpretation</u>. The provisions of this Declaration as well as those of the Articles, By-Laws and any rules and regulations of the Association shall be interpreted by the Hotel Lot Owner. Any such interpretation of the Hotel Lot Owner which is rendered in good faith shall be final, binding and conclusive if the Hotel Lot Owner receives the confirming consent of Declarant and a written opinion of legal counsel to the Association, or the counsel having drafted this Declaration or other applicable document, that the interpretation is not unreasonable, which opinion may be rendered before or after the interpretation is adopted. Notwithstanding any rule of law to the contrary, the provisions of this Declaration and the Articles, By-Laws and the Rules and Regulations of the Association shall be liberally construed so as to effectuate the purposes herein expressed with respect to the efficient operation of the Association and The Properties, the preservation of the values of the Lots and Structures and the protection of Declarant's and Hotel Lot Owner's rights, benefits and privileges herein contemplated.

## ARTICLE 2.

### PROPERTY SUBJECT TO THIS DECLARATION; ADDITIONS THERETO

2.1 <u>Legal Description</u>. The initial real property which is and shall be held, transferred, sold, conveyed and occupied subject to this Declaration is located in the County, and is more particularly described in **Exhibit "F"** attached hereto and made a part hereof, all of which real property (and all improvements thereto), together with additions thereto, but less any withdrawals therefrom, is herein referred to collectively as "The Properties".

2.2 <u>Supplements</u>. The Future Development Property Owner, may from time to time subject other land within the Future Development Property under the provisions of this Declaration by Supplemental Declarations, which shall not require the consent of the Declarant (if other than the Future Development Property Owner), the Hotel Lot Owner (if other than the Future Development Property Owner) existing Owners, the Association or any mortgagee other than that, if any, of the land intended to be added to The Properties) and thereby add to The Properties. To the extent that such additional real property shall be made a part of The Properties, reference herein to The Properties shall be deemed to be reference to all of such additional property where such reference is intended to include property other than that legally described above. Nothing herein, however, shall obligate the Future Development Property Owner or the Hotel Lot Owner (if other than the Future Development Property Owner) to add to the initial portion of The Properties, to develop any such future portions under a common scheme, nor to prohibit the Future Development Property Owner from rezoning and changing plans with respect to such future portions. All Owners, by acceptance of a deed to or other conveyance of their Lots, shall be deemed to have automatically consented to any such rezoning, replatting, covenant in lieu of unity of title, change, addition or deletion thereafter made by the Future Development Property Owner, and shall evidence such consent in writing if requested to do so by the Future Development Property Owner at any time (provided, however, that the refusal to give such written consent shall not obviate the general and automatic effect of this provision). A Supplemental Declaration may vary the terms of this Declaration by addition, deletion or modification so as to reflect any unique characteristics of a particular portion of The Properties identified therein; provided, however, that no such variance shall be directly contrary to the uniform scheme of development of The Properties. Notwithstanding the foregoing, no Supplemental Declaration may change the common elements of a condominium or the Shared Facilities (nor make any interpretation as to whether a particular portion of The Properties or Future Development Property, is, or is to become, part of the Shared Facilities).

2.3 <u>Withdrawal</u>. Declarant reserves the right to amend this Declaration unilaterally at any time, without prior notice and without the consent of any person or entity (other than Declarant's Mortgagee and the Owner(s) of the property being removed if other than Declarant), for the purpose of removing certain portions of The Properties (including, without limitation, Lots, Common Properties, and/or Shared Facilities) then owned by the Declarant or its affiliates or the Association from the provisions of this Declaration to the extent included originally in error or as a result of any changes whatsoever in the plans for The Properties desired to be effected by the Declarant; provided, however, that such withdrawal is not unequivocally contrary to the overall, uniform scheme of development for The Properties. Notwithstanding the foregoing, Declarant shall not remove any portion of The Properties to the extent that same will result in the denial to any Owner or any Condominium Unit Owner of legal pedestrian access to and from the Owner's Lot and/or Condominium Unit, as applicable, or shall result in the termination of any utility and/or mechanical, electrical, HVAC, plumbing, life safety, monitoring, information and/or other systems located in the Hotel Lot and serving said Owner's Lot and/or Condominium Unit, as applicable, or shall compromise the structural integrity of the Structure or otherwise impair the easements of support granted herein (without otherwise providing equivalent substitutions for same).

2.4 <u>Common Properties</u>. In the event of any doubt, conflict or dispute as to whether any portion of The Properties is or is not Common Properties under this Declaration or a common area/element of a Neighborhood Association, the Declarant may, without the consent of the Master Association or then existing Owners, record in the public records of the County, a Supplemental Declaration resolving such issue and such Supplemental Declaration shall be dispositive and binding (except only that the foregoing shall not be dispositive as to any property brought within The Properties by a Future Development Property Owner other than the Declarant). After the Declarant no longer owns any portion of The Properties, the Master Association may, without the consent of then existing Owners, record the aforesaid Supplemental Declaration, which shall have the same dispositive and binding effect (but shall also be of no effect with respect to property brought within The Properties by a Future Development Property Owner other than the Declarant). Notwithstanding the foregoing, no Supplemental Declaration may change the common elements of a condominium or the Shared Facilities (nor make any interpretation as to whether a particular portion of The Properties is part of the Shared Facilities). In making any such determination, it must be understood and agreed that The Properties have been structured in a manner that minimizes the Common Properties and instead has most if not all typical "common properties" included as part of the Hotel Lot.

2.5 <u>Shared Facilities</u>. In the event of any doubt, conflict or dispute as to whether any portion of The Properties is or is not part of the Shared Facilities (and if so, which of the Shared Facilities) under this Declaration, the Hotel Lot Owner may, without the consent of the Master Association or then existing Owners or mortgagees, record in the public records of the County, a Supplemental Declaration resolving such issue and such Supplemental Declaration shall be dispositive and binding.


### ARTICLE 3

### MEMBERSHIP AND VOTING RIGHTS IN THE ASSOCIATION

3.1 <u>Membership</u>. Every person or entity who is a record Owner of a fee interest in any Lot shall be a Member of the Association, subject, however, to the provisions of Article 18 hereof. Notwithstanding anything else to the contrary set forth in this Article, any such person or entity who holds such interest merely as security for the performance of an obligation shall not be a Member of the Association.

3.2 <u>Voting Rights</u>. The Association shall have such classes of Voting Members, who shall cast such votes, as are provided in the Articles of Incorporation of the Association.

3.3 <u>General Matters</u>. When reference is made herein, or in the Articles, By-Laws, Rules and Regulations, management contracts or otherwise, to a majority or specific percentage of Members, such reference shall be deemed to be reference to a majority or specific percentage of the total voting interests of all Members (and not just those present at a duly constituted meeting) as cast through their Voting Members.

## ARTICLE 4

### COMMON PROPERTIES; CERTAIN EASEMENTS;
### SHARED FACILITIES

4.1    <u>Members' Easements in Common Properties</u>. Each Member, and each Member's guests, tenants and invitees, shall have a non-exclusive permanent and perpetual easement over and upon the Common Properties for the intended use and enjoyment thereof in common with all other such Members, guests, tenants and invitees, their agents and invitees, but in such manner as may be regulated by the Association. Without limiting the generality of the foregoing, such rights of use and enjoyment are hereby made subject to the following:

        (a)    The right and duty of the Association to levy assessments against each Lot for the purpose of maintaining the Common Properties and any facilities located thereon in compliance with the provisions of this Declaration and with the restrictions on the plats of portions of The Properties from time to time recorded.

        (b)    The right of the Association to suspend the Member's (and his guests, tenants and/or invitees') right to use the Common Properties recreational facilities (if any) for any period during which any assessment against the Owner's Lot remains unpaid for more than thirty (30) days; and for a period not to exceed sixty (60) days for any infraction of this Declaration or the Association's lawfully adopted rules and regulations.

        (c)    The right of the Association to charge reasonable admission and other fees for the use of recreational facilities (if any) situated on the Common Properties.

        (d)    The right of the Association to adopt at any time and from time to time and enforce rules and regulations governing the use of the Common Properties and all facilities at any time situated thereon, including the right to fine Members as hereinafter provided. Any rule and/or regulation so adopted by the Association shall apply until rescinded or modified as if originally set forth at length in this Declaration.

        (e)    The right of Declarant to permit such persons as Declarant shall designate to use the Common Properties and all recreational facilities located thereon (if any).

        (f)    The right of Declarant and the Association to have, grant and use general ("blanket") and specific easements over, under and through the Common Properties.

        (g)    The right of the Association, by a 2/3rds affirmative vote of all voting interests of the membership, voting through their Voting Members, to dedicate or convey portions of the Common Properties to any other association having similar functions, or any public or quasi-public agency, community development district or similar entity under such terms as the Association deems appropriate and to create or contract with the other association, community development and special taxing districts for lighting, roads, recreational or other services, monitoring, or communications and other similar purposes deemed appropriate by the Association (to which such dedication or contract all Owners, by the acceptance of the deeds to their Lots, shall be deemed to have consented, no consent of any other party, except Declarant, being necessary).

        (h)    The rights of the Declarant to withdraw portions of the Common Properties as provided in Section 2.3 above.

WITH RESPECT TO THE USE OF THE COMMON PROPERTIES AND THE PROPERTIES GENERALLY, ALL PERSONS ARE REFERRED TO ARTICLE 20 HEREOF, WHICH SHALL AT ALL TIMES APPLY THERETO. The Properties have been developed and structured in such a manner to minimize the Common Properties. Most components which are typical "common properties" of a development of this nature have instead been designated herein as part of the Shared Facilities.

4.2    <u>Easements Appurtenant</u>. The easements provided in Section 4.1 shall be appurtenant to and shall pass with the title to each Lot, but shall not be deemed to grant or convey any ownership interest in the Common Properties subject thereto.

4.3    <u>Members' Rights in Shared Facilities</u>. Subject to all of the other provisions of the Declaration, each Member, shall have limited rights to use, benefit from and enjoy the General Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with all other such Members, guests and tenants, and their agents and invitees, but in such manner as may be reasonably regulated by the Hotel Lot Owner.

Similarly, subject to all of the other provisions of the Declaration, each owner of a Condominium Unit in the Condominium South Lot, shall have limited rights to use, benefit from and enjoy: (i) the Condominium South Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner (and its guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner from time to time, and (ii) the Non-Retail Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner, the Condominium Central Lot Owner (and its and their members guests, tenants, invitees and designees), and the Condominium North Lot Owner (and its and their members guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner from time to time.

Subject to all of the other provisions of the Declaration, each owner of a Condominium Unit in the Condominium Central Lot, shall have limited rights to use, benefit from and enjoy: (i) the Condominium Central Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner (and its guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner

from time to time, and (ii) the Non-Retail Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner, the Condominium South Lot Owner (and its and their members, guests, tenants, invitees and designees) and the Condominium North Lot Owner (and its and their members guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner from time to time.

Subject to all of the other provisions of the Declaration, each owner of a Condominium Unit in the Condominium North Lot, shall have limited rights to use, benefit from and enjoy: (i) the Condominium North Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner (and its guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner from time to time, and (ii) the Non-Retail Shared Facilities (as same may exist from time to time) for their intended purposes (as determined by the Hotel Lot Owner) in common with the Hotel Lot Owner, the Condominium South Lot Owner (and its and their members, guests, tenants, invitees and designees) and the Condominium Central Lot Owner (and its and their members guests, tenants, invitees and designees), but in such manner as may be reasonably regulated by the Hotel Lot Owner from time to time.

Without limiting the generality of the foregoing, such rights of use and enjoyment are hereby made subject to the following:

      (a)     The right and duty of: (1) the Hotel Lot Owner to levy assessments against each Lot for the purpose of maintaining and operating the General Shared Facilities and any facilities located thereon, all as hereinafter provided; (2) the Hotel Lot Owner to levy assessments against the Condominium South Lot for the purpose of maintaining and operating the Condominium South Shared Facilities and any facilities located thereon, all as hereinafter provided, (3) the Hotel Lot Owner to levy assessments against the Condominium Central Lot for the purpose of maintaining and operating the Condominium Central Shared Facilities and any facilities located thereon, all as hereinafter provided, (4) the Hotel Lot Owner to levy assessments against the Condominium North Lot for the purpose of maintaining and operating the Condominium North Shared Facilities and any facilities located thereon, all as hereinafter provided, and (5) the Hotel Lot Owner to levy assessments against the Condominium South Lot, Condominium North Lot and the Condominium Central Lot for the purpose of maintaining and operating the Non-Retail Shared Facilities and any facilities located thereon, all as hereinafter provided.

      (b)     The right of the Hotel Lot Owner to suspend the Member's and/or owner's (and his guests, tenants and/or invitees') right to use the General Shared Facilities, Condominium South Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, and/or Non-Retail Shared Facilities for any period during which any assessment against such member's Lot remains unpaid for more than thirty (30) days; and for a period not to exceed sixty (60) days for any infraction of this Declaration or the Hotel Lot Owner's rules and regulations regarding the General Shared Facilities, the Condominium South Shared Facilities, the Condominium Central Shared Facilities, Condominium North Shared Facilities, and/or the Non-Retail Shared Facilities, as applicable.

      (c)     The right of the Hotel Lot Owner to adopt at any time and from time to time and enforce reasonable, non-discriminatory rules and regulations governing the use of the General Shared Facilities, Non-Retail Shared Facilities, Condominium Central Shared Facilities, Condominium North Shared Facilities, and/or Condominium South Shared Facilities and all facilities at any time situated thereon, including the right to fine Members as hereinafter provided. Any rule and/or regulation so adopted by the Hotel Lot Owner shall apply until rescinded or modified as if originally set forth at length in this Declaration.

      (d)     The right of the Hotel Lot Owner to permit such persons as the Hotel Lot Owner shall designate to use the General, Non-Retail, Condominium Central, Condominium North and/or Condominium South Shared Facilities and all recreational facilities located thereon (if any), which may include persons who are not members of the Association or owners of any portion of The Properties (and may include members of the public generally). Additionally, the Hotel Lot Owner reserves the right from time to time, on a non-discriminatory basis, to limit the right to use Non-Retail Shared Facilities to Condominium Unit Owners only, and not their tenants, guests and/or invitees.

      (e)     The right of the Hotel Lot Owner to have, grant and use general ("blanket") and specific easements over, under and through the General, Non-Retail, Condominium Central, Condominium North and/or Condominium South Shared Facilities.

      (f)     The rights to withdraw portions of the Shared Facilities as provided in Section 2.3 above.

WITH RESPECT TO THE USE OF THE SHARED FACILITIES AND THE PROPERTIES GENERALLY, ALL PERSONS ARE REFERRED TO ARTICLE 20 HEREOF, WHICH SHALL AT ALL TIMES APPLY THERETO.

      4.4     Spa. The Spa shall be operated by the owner from time to time of the Hotel Lot. Only the following limited rights shall be included as part of the Non-Retail Shared Facilities (the "Limited Spa Rights"): access to, and use of, Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi and Central Tower Lobby and Reception. In all other respects, the Spa shall be deemed part of the private portions of the Hotel Lot and same shall not be included within the Common Properties or the Shared Facilities. The Spa (including all features and services offered from the Spa from time to time) shall be developed and provided at the discretion of the Hotel Lot Owner and the Hotel Lot Owner has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa Facilities shall be used, if at all (which shall include the right to establish from time to time reasonable non-discriminatory rules and regulation governing the Limited Spa Rights, including, without limitation, establishing hours of use and guest policies, restrictions and/or prohibitions). By way of example, but not limitation, the Hotel Lot Owner has the right to approve users and determine eligibility for use, to allow use of the Spa by persons other than owners of Lots, to terminate any or all use rights, to change, eliminate or cease operation of any or all of the Spa features and/or services, to limit the availability of use privileges, and to require the payment of a

Book26080/Page4914    CFN#20071144863    Page 10 of 104

purchase price, membership contribution, initiation fee, membership deposit, dues and other charges for use privileges. Ownership of a Lot and membership in the Association do not give any vested right or easement, prescriptive or otherwise, to use the Spa, and do not grant any ownership or membership interest in the Spa (except only for the Limited Spa Rights). Use of the Spa by a Lot Owner to any extent greater than provided by the Limited Spa Rights shall be governed solely by separate agreement entered into by and between such Lot Owner and the Hotel Lot Owner. All fees collected by the Hotel Lot Owner for use of the Spa, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association or any other Lot Owner.

4.5    Maintenance.  The Association shall at all times maintain in good repair and manage, operate and insure, and shall replace as often as necessary, the Common Properties and, to the extent not otherwise provided for, the paving, drainage structures, landscaping, improvements and other structures (except public utilities) situated on the Common Properties, if any, all such work to be done as ordered by the Board of Directors of the Association. Nothing herein, however, shall obligate, authorize or otherwise empower the Association to perform any such maintenance functions with respect to the Shared Facilities or any of the Lots. No Owner may waive or otherwise escape liability for assessments by non-use (whether voluntary or involuntary) of the Common Properties or abandonment of the right to use the Common Properties.

The maintenance obligations of the Association shall include, without limitation, the duty and obligation to (i) operate and maintain any portion of the surface water management system (regardless of where located with The Properties) serving the Common Properties and/or more than one Lot in accordance with the permit issued by the South Florida Water Management District (the "SFWMD" or "District"), (ii) carry out, maintain, and monitor any required wetland mitigation tasks and (iii) maintain copies (by the Association's registered agent for the Association's benefit) of all permitting actions with regard to the SFWMD.

Notwithstanding anything herein contained to the contrary, any and all maintenance obligations of either the Association or an Owner must be undertaken in such a manner to assure that the portions being maintained by the Association and/or Owner are consistent with the high standards of any hotel operated from within the Hotel Lot (the "Hotel") and the other hotels and resorts owned or managed and operated by the operator of the Hotel, or its affiliates.

4.6    Street Lights.  The Hotel Lot Owner shall be responsible for the operation, maintenance, repair and replacement of all street lighting fixtures, installations and equipment located within The Properties, even if same are located within the common properties/elements owned or administered by a Neighborhood Association (and said fixtures, installations and equipment shall be deemed General Shared Facilities for the aforesaid purposes).  Charges for electricity used by street lights shall be initially billed to the Hotel Lot, but a portion of such charges shall be assessed against the Lots in accordance with the provisions of Article 16 below.

4.7    Easements for Vehicular Traffic.  In addition to the general easements for use of the Common Properties reserved herein, there shall be, and Declarant for itself and as the initial Hotel Lot Owner, hereby reserves and covenants for itself and all future Owners of Lots/Structures within The Properties [as well as the owners of the Condominium Units (the "Unit Owners")], that each and every Owner, Unit Owner and Declarant, shall have a non-exclusive easement appurtenant for vehicular traffic over all private streets within the Common Properties and/or Shared Facilities, subject to the provisions set forth in Section 17 herein.

4.8    Utility Easements.  Use of the Common Properties and/or Shared Facilities for utilities, as well as use of the other utility easements as shown on relevant plats, shall be in accordance with the applicable provisions of this Declaration and said plats. Declarant and its affiliates and its and their designees shall have a perpetual easement over, upon and under the Common Properties and the Lots for the installation, operation, maintenance, repair, replacement, alteration and expansion of utilities.

4.9    Public Easements.  Fire, police, health and sanitation and other public service personnel and vehicles shall have a permanent and perpetual easement for ingress and egress over and across the Common Properties in the performance of their respective duties.  Additionally, easements are hereby reserved in favor of all Owners (and their guests, tenants and invitees) for emergency ingress and egress over, through and across all Stairways.

4.10    Ownership.  The Common Properties are hereby dedicated non-exclusively to the joint and several use, in common, of Declarant, and the Owners of all Lots that may from time to time constitute part of The Properties, such Owners' guests, tenants and invitees and Declarant's tenants, guests and invitees, all as provided and regulated herein or otherwise by the Association, subject to Section 2.3 hereof.  The Common Properties, other than any portion of the Common Properties which is not owned by Declarant, as contemplated by Subsection 1.1(i) above) shall, upon the later of completion of the improvements thereon or the date when the last Lot within The Properties (and the Future Development Property if then contemplated to be added to The Properties by Declarant, in Declarant's sole and absolute opinion) has been conveyed to a purchaser (or at any time and from time to time sooner at the sole election of Declarant), be conveyed by quit claim deed to the Association, which shall be deemed to have automatically accepted such conveyance. Beginning from the date this Declaration is recorded, the Association shall be responsible for the maintenance, insurance and administration of such Common Properties (whether or not then conveyed or to be conveyed to the Association), all of which shall be performed in a continuous and satisfactory manner without cost to the general taxpayers of the County or the City. It is intended that any and all real estate taxes and assessments assessed against the Common Properties shall be (or have been, because the purchase prices of the Lots and Structures have already taken into account their proportionate shares of the values of the Common Properties), proportionally assessed against and payable as part of the taxes of the applicable Lots within The Properties. However, in the event that, notwithstanding the foregoing, any such taxes are assessed directly against the Common Properties, the Association shall be responsible for the payment (subject to protest or appeal before or after payment) of same, including taxes on any improvements and any personal property located thereon, which taxes accrue from and after the date these Master Covenants are recorded, and such taxes shall be prorated between Declarant and the Association as of the date of such recordation.

Declarant and its affiliates shall have the right from time to time to enter upon the Common Properties and other portions of The Properties (including, without limitation, Lots) for the purpose of the installation, construction, reconstruction,

repair, replacement, operation, expansion and/or alteration of any improvements or facilities on the Common Properties or elsewhere on The Properties that Declarant and its affiliates or designees elect to effect, and to use, without charge, the Common Properties and other portions of The Properties for sales, displays and signs or for any other purpose during the period of construction and sale of any portion thereof or of other portions of adjacent or nearby property. Without limiting the generality of the foregoing, Declarant and its affiliates shall have the specific right to maintain upon any portion of The Properties sales, administrative, construction or other offices and appropriate exclusive and non-exclusive easements of access and use are expressly reserved unto Declarant and its affiliates, and its and their successors, assigns, employees and contractors, for this purpose. Any obligation (which shall not be deemed to be created hereby) to complete portions of the Common Properties shall, at all times, be subject and subordinate to these rights and easements and to the above-referenced activities. Accordingly, Declarant shall not be liable for delays in such completion to the extent resulting from the need to complete any of the above-referenced activities prior to such completion.

# ARTICLE 5

## MAINTENANCE OF STRUCTURES AND LOTS

5.1     Exteriors of Structures.  Inasmuch as all exterior surfaces are part of the Hotel Lot, the Hotel Lot Owner shall maintain all exterior surfaces and roofs, facias and soffits of the structures (including the Structure) and other improvements located on the Lot (including driveway and sidewalk surfaces) in a neat, orderly and attractive manner.  The aforesaid maintenance shall include maintaining windows and doors (including the wood and hardware sliding glass doors).  The minimum (though not sole) standard for the foregoing shall be consistency with the general appearance of The Properties as initially constructed and otherwise improved (taking into account, however, normal weathering and fading of exterior finishes, but not to the point of unsightliness).  The Hotel Lot Owner shall clean, repaint or restain, as appropriate, the exterior portions of each Structure, as often as is necessary to comply with the foregoing standards.  To the extent that the exterior portions of Structures are deemed General Shared Facilities, a proportionate share of the costs thereof shall be assessed against the Retail, Condominium North, Condominium South and Condominium Central Lots as more particularly described in Article 16 below. Similarly, to the extent that any portion of same is deemed part of the Non-Retail Shared Facilities, a proportionate share of the costs thereof shall be assessed against the Condominium Central, Condominium North and Condominium South Lots as more particularly described in Article 16 below; to the extent that any portion of same is deemed part of the Condominium South Shared Facilities, a proportionate share of the costs thereof shall be assessed against the Condominium South Lot as more particularly described in Article 16 below; and to the extent that any portion of same is deemed part of the Condominium North Shared Facilities, a proportionate share of the costs thereof shall be assessed against the Condominium North Lot as more particularly described in Article 16 below; and lastly, to the extent that any portion of same is deemed part of the Condominium Central Shared Facilities, a proportionate share of the costs thereof shall be assessed against the Condominium Central Lot as more particularly described in Article 16 below.  Notwithstanding the foregoing, as to any terrace or balcony as to which a Condominium Unit Owner has exclusive access from his or her Condominium Unit, the applicable Condominium Unit Owner is hereby granted exclusive use of same (subject to the rights of the Hotel Lot Owner as elsewhere provided herein), but shall be liable for the maintenance, repair (other than any necessary structural repairs) and upkeep of same.

5.2     Lots.  The Hotel Lot Owner shall maintain and irrigate the trees, shrubbery, grass and other landscaping on each Lot, if any, in a neat, orderly and attractive manner and consistent with the general appearance of The Properties as a whole.  The minimum (though not sole) standard for the foregoing shall be the general appearance of The Properties as initially landscaped (such standard being subject to being raised by virtue of the natural and orderly growth and maturation of applicable landscaping, as properly trimmed and maintained).  To the extent that any trees, shrubbery, grass and other landscaping are deemed part of the Shared Facilities, a proportionate share of the costs thereof shall be assessed against each Lot as more particularly described in Article 16 below.

5.3     Condominium Mechanical Equipment.  Notwithstanding the location of "Condominium Mechanical Equipment" (as hereinafter defined) within portions of the Hotel Lot, the Condominium Mechanical Equipment shall be solely maintained, repaired and replaced by the Lot Owner served by the Condominium Mechanical Equipment (and the Hotel Lot Owner shall have no obligation for the maintenance, repair or replacement of same).  In order to accommodate the foregoing, Declarant, as the initial Hotel Lot Owner, hereby grants, in favor of the applicable Lot Owner, and its applicable designees, an easement over and across such portions of the Hotel Lot as are reasonably necessary for the purpose of accessing the Condominium Mechanical Equipment, and repairing, replacing and/or maintaining same.  For purposes hereof, the "Condominium Mechanical Equipment" shall mean and refer to the air conditioning systems serving individual Units within any Lot.

5.4     Master Life Safety Systems.  No Owner shall make any additions, alterations or improvements to the Master Life Safety Systems, and/or to any other portion of The Properties which may impair the Master Life Safety Systems or access to the Master Life Safety Systems, without first receiving the prior written approval of the Hotel Lot Owner.  In that regard, no lock, chain or other device or combination thereof shall be installed or maintained at any time on or in connection with any door on which panic hardware or fire exit hardware is required.  Stairwell identification and emergency signage shall not be altered or removed by any Owner whatsoever.  No barrier including, but not limited to personalty, shall impede the free movement of ingress and egress to and from all emergency ingress and egress passageways.

5.5     Right of Entry.  In addition to such other remedies as may be available under this Declaration, in the event that an Owner fails to maintain a Structure or Lot as required hereby, the Association shall have the right to enter upon the Lot in question and perform such duties; provided, however, that such entry shall be during reasonable hours and only after fifteen (15) business days' prior written notice (or such longer time as may reasonably be required to effect such repair to the extent that said curative activity can not reasonably be completed within such fifteen (15) business day period).  The Owner having failed to perform its maintenance duties shall be liable to the Association for the costs of performing such remedial work and shall pay a surcharge of not more than thirty-five percent (35%) of the cost of the applicable remedial work, all such sums being payable upon demand and to be secured by the lien provided for in Article 7 hereof.  No bids need be obtained for any of the work

performed pursuant to this Article and the person(s) or company performing such work may be selected by the Association in its sole discretion. There is hereby created an easement in favor of the Association, and its applicable designees over each Lot for the purpose of entering onto the Lot in the performance of the work herein described, provided that the notice requirements of this Article are complied with.

## ARTICLE 6.

## CERTAIN USE RESTRICTIONS

6.1     Applicability.  The provisions of this Article 6 shall be applicable to all of The Properties but shall not be applicable to Declarant or any of its designees or Lots or other property owned by Declarant or its designees.

6.2     Uses of Lots and Structures.  All Lots and Structures (and appurtenant Common Properties) shall be used for the general purposes for which they are designed and intended and at all times used, operated and maintained in accordance with applicable zoning and other requirements, conditions and restrictions applicable to same (including, without limitation, any contained in a deed or lease of the Lot/Structure from the Declarant, as same may be amended from time to time). Notwithstanding anything herein contained to the contrary, the name of the Lot is assigned only for convenience of reference, and is not intended, nor shall it be deemed to limit or otherwise restrict, the permitted uses thereof.

6.3     Easements.  Easements for the installation and maintenance of utilities are reserved as shown on the recorded plats covering The Properties and/or as provided herein.  The area of each Lot covered by an easement and all improvements in such area shall be maintained continuously by the Association (if located on Common Properties) or the applicable Lot Owner (if within a Lot), except for installations for which a public authority or utility company is responsible.  The appropriate water and sewer authority, electric utility company, telephone company, the Association, the applicable Lot Owner liable for the maintenance thereof, and Declarant and its affiliates, and their respective successors and assigns, shall have a perpetual easement for the installation and maintenance, of water lines, sanitary sewers, storm drains, and electric and telephone lines, cables and conduits, under and through the utility easements as shown on the plats.

6.4     Nuisances.  Nothing shall be done or maintained on any Lot which may be or become an annoyance or nuisance to the occupants of other Lots.  Any activity on a Lot which interferes with television, cable or radio reception on another Lot shall be deemed a nuisance and a prohibited activity.  In the event of a dispute or question as to what may be or become a nuisance, such dispute or question shall be submitted to the Hotel Lot Owner , which shall render a decision in writing, which decision shall be dispositive of such dispute or question.  Notwithstanding anything herein contained to the contrary, it is intended (without creating any obligation) that the Hotel Lot shall be operated as a hotel, with transient guests and scheduled functions.  It is hereby confirmed that any and all activities in any way related to such operation shall not be deemed a nuisance hereunder.  The Hotel Lot Owner shall have the right to establish non-discriminatory restrictions on any and all persons performing work in The Properties, including, without limitation, by (a) restricting the hours during which work may be performed and restricting access of contractors to certain areas, (b) requiring that all persons performing any work have all necessary licenses and permits to perform the work, (c) requiring that all persons performing any work have adequate insurance coverage and that the Hotel Owner is a named additional insured on such policy(ies), and (d) requiring a security deposit or other collateral to protect against damage that may be caused during such work.

6.5     Signs.  No sign, poster, display, billboard or other advertising device of any kind shall be displayed to the public view on any portion of the Common Properties and/or Shared Facilities without the prior written consent of the Association (if on the Common Properties) or Hotel Lot Owner (if on the Shared Facilities), except signs, regardless of size, used by Declarant, its successors or assigns, for advertising during the construction, sale and leasing period.

6.6     Animal Restriction.  The maintenance, keeping, boarding and/or raising of dogs, cats, pot belly pigs, reptiles, rodents (i.e., mice, gerbils, hamsters) and/or any other animals, livestock, or poultry of any kind, regardless of number, is expressly prohibited in the Retail Lot and the Condominium Central Lot.  With respect to the Condominium South Lot and the Condominium North Lot, a Condominium Unit Owner may maintain in his Condominium Unit aquarium fish and not more than two (2) orderly domesticated pets (which shall be limited to any combination of dog, cat or caged bird), provided that any pets permitted shall only be allowed to remain in the Condominium Unit if such pet is (i) permitted to be so kept by applicable laws and regulations, (ii) not left unattended on balconies or in lanai areas, (iii) not kept or maintained for commercial purposes or breeding, and (iii) generally, not a nuisance to residents of other Condominium Units and/or Lots.  Pets shall not be permitted outside of their owner's Unit unless attended by an adult and on a leash not more than six (6) feet long.  Pets shall only be walked or taken upon those portions of The Properties designated by the Hotel Lot Owner from time to time for such purposes, if any.  Condominium Unit Owners shall pick up all solid wastes from their pets and dispose of same appropriately.  Each Owner shall be responsible for all damage caused by his/her pet.  The maintenance, keeping, boarding and/or raising of pot belly pigs, reptiles, rodents (i.e., mice, gerbils, hamsters) and any other animals, livestock, or poultry of any kind, regardless of number, is expressly prohibited within the Condominium South Lot, Condominium North Lot and Condominium Central Lot.  Any Owner who keeps or maintains a pet within The Properties shall indemnify and hold harmless the Declarant, the Master Association and all Lot Owners from and against any loss, claim or liability of any kind or character whatsoever arising by reason of keeping or maintaining such pet within The Properties.  The Hotel Lot Owner may require registration of all pets and may establish reasonable fees in connection with same and/or may require pet owners to place with the Hotel Lot Owner a reasonable security deposit.  Without limiting the generality of the other provisions hereof, a violation of the provisions of this paragraph shall entitle the Hotel Lot Owner to all of its rights and remedies, including, but not limited to, the right to fine Unit Owners and/or to require any pet to be permanently removed from The Properties.

6.7     Trash.  No rubbish, trash, garbage or other waste material shall be kept or permitted on Common Properties and/or the Shared Facilities, except in those areas expressly designed for same or as otherwise approved by the Hotel Lot Owner, and no odor shall be permitted to arise therefrom so as to render Common Properties, the Shared Facilities or any portion thereof unsanitary, unsightly, offensive or detrimental to any other property in the vicinity thereof or to its occupants.  No

Book26080/Page4917     CFN#20071144863     Page 13 of 104

lumber, grass, shrub or tree clippings or plant waste, metals, bulk material or scrap or refuse or trash shall be kept, except within an enclosed structure appropriately screened from view erected for that purpose, if any, and otherwise in accordance with the approval of the Hotel Lot Owner.

6.8     Temporary Structures. Except as may be used or permitted by the Declarant during periods of construction or renovation, no structure of a temporary nature (including, without limitation, trailers, tents, shacks or mobile offices) shall be located or used within The Properties.

6.9     Limitations on Alterations. No Owner, Neighborhood Association or any other party shall make any alteration to their Lot, or any other portion of The Properties which shall alter, modify and/or otherwise affect the coordinated exterior of the structures constructed upon The Properties (including, without limitation, any windows and/or exterior lighting schemes), without the prior written approval of the Hotel Lot Owner, which approval may be withheld for any reason or for no reason whatsoever in the sole and absolute discretion of the Hotel Lot Owner. Any approval granted by the Hotel Lot Owner may be conditioned in any manner, including, without limitation, by (a) restricting the hours during which work may be performed and restricting access of contractors to certain areas, (b) requiring that all persons performing any alterations have all necessary licenses and permits to perform the work, (c) requiring that all persons performing any alterations have adequate insurance coverage and that the Hotel Owner is a named additional insured on such policy(ies), and (d) requiring a security deposit or other collateral to protect against damage that may be caused during such alteration.

6.10     Hurricane Evacuation Procedures. Upon notice of approaching hurricanes, all furniture, plants, objects, and plants must be removed from any balconies or terraces. IN THE EVENT THAT AN EVACUATION ORDER IS ISSUED BY ANY APPLICABLE GOVERNMENTAL AGENCY, ALL OWNERS MUST PROMPTLY COMPLY WITH SAID ORDER. The Hotel Lot Owner shall have the right from time to time to establish hurricane preparedness and evacuation policies, and each Owner shall fully comply with same.

6.11     Variances. The Board of Directors of the Association shall have the right and power to grant variances from the provisions of this Article 6 (as they may relate to the Common Properties) and from the Association's rules and regulations (as they may relate to the Common Properties) for good cause shown, as determined in the reasonable discretion of the Board. Similarly, the Hotel Lot Owner shall have the right and power to grant variances from the provisions of this Article 6 (as they may relate to the Shared Facilities) and from the Hotel Lot Owner's rules and regulations (as they may relate to the Shared Facilities) for good cause shown, as determined in the reasonable discretion of the Hotel Lot Owner. No variance granted as aforesaid shall alter, waive or impair the operation or effect of the provisions of this Article 6 in any instance in which such variance is not granted.

6.12     Declarant Exemption. In order that the development of The Properties may be undertaken and The Properties established as a fully occupied community, no Owner, nor the Master Association, nor any Neighborhood Association shall do anything to interfere with Declarant's activities. Without limiting the generality of the foregoing, nothing in this Declaration shall be understood or construed to:

(a)     Prevent Declarant, its successors or assigns, or its or their contractors or subcontractors, from doing on any property owned by them whatever they determine to be necessary or advisable in connection with the completion of the development of The Properties and the Future Development Property, including without limitation, the alteration of its construction plans and designs as Declarant deems advisable in the course of development and/or enlargement of any; or

(b)     Prevent Declarant, its successors or assigns, or its or their contractors, subcontractors or representatives, from erecting, constructing and maintaining on any property owned or controlled by Declarant, or its successors or assigns or its or their contractors or subcontractors, such structures as may be reasonably necessary for the conduct of its or their business of completing said development and establishing The Properties as a community and disposing of the same by sale, lease or otherwise; or

(c)     Prevent Declarant, its successors or assigns, or its or their contractors or subcontractors, from conducting on any property owned or controlled by Declarant, or its successors or assigns, its or their business of developing, subdividing, grading and constructing improvements in The Properties and the Future Development Property and of disposing of Lots and/or Structures therein by sale, lease or otherwise; or

(d)     Prevent Declarant, its successors or assigns, from determining in its sole discretion the nature of any type of improvements to be initially constructed as part of The Properties; or

(e)     Prevent Declarant, its successors or assigns or its or their contractors or subcontractors, from maintaining such sign or signs on any property owned or controlled by any of them as may be necessary in connection with the operation of any Lots owned by Declarant (its successors or assigns) or the sale, lease or other marketing of Lots and/or Structures, or otherwise from taking such other actions deemed appropriate; or

(f)     Prevent Declarant, or its successors or assigns from filing Supplemental Declarations which modify or amend this Declaration, or which add or withdraw additional property as otherwise provided in this Declaration; or

(g)     Prevent Declarant from modifying, changing, re-configuring, removing or otherwise altering any improvements located on the Common Properties.

In general, the Declarant shall be exempt from all restrictions set forth in this Declaration to the extent such restrictions interfere in any matter with Declarant's plans for construction, development, use, sale or other disposition of The Properties and the Future Development Property, or any part thereof.

## ARTICLE 7.

## COVENANT FOR MAINTENANCE ASSESSMENTS

7.1 <u>Creation of the Lien and Personal Obligation for Assessments</u>. Except as provided elsewhere herein, Declarant (and each party joining in any supplemental declaration), for all Lots now or hereafter located within The Properties, hereby covenants and agrees, and each Owner of any Lot by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to covenant and agree, to pay to the Association annual assessments and charges for the operation of, and for payment of expenses allocated or assessed to or through the Association, of and for the maintenance, management, operation and insurance of the Common Properties and the Association as provided elsewhere herein, including such reasonable reserves as the Association may (if it determines in its sole discretion) deem necessary (it being understood and agreed that the Board may determine not to establish reserves, or if established, to establish only in nominal amounts to provide some emergency funds), capital improvement assessments, as provided in Section 7.5 hereof, special assessments as provided in Section 7.4 hereof and all other charges and assessments hereinafter referred to or lawfully imposed by or on the Association, the costs and expenses of installing, maintaining, repairing, restoring and/or replacing landscaped setbacks upon or adjacent to (even if beyond the legal boundaries of) The Properties; all such assessments to be fixed, established and collected from time to time as herein provided. In addition, special assessments may be levied against particular Owners and Lots for fines, expenses incurred against particular Lots and/or Owners to the exclusion of others and other charges against specific Lots or Owners as contemplated in this Declaration. The annual, special and other assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the Lot against which each such assessment is made. Each such assessment, together with such interest thereon and costs of collection thereof as hereinafter provided, shall also be the personal obligation of the person who is the Owner of such property at the time when the assessment fell due and all subsequent Owners until paid, except as provided in Section 7.9 below. Reference herein to assessments shall be understood to include reference to any and all of said charges whether or not specifically mentioned.

7.2 <u>Rates of Assessments</u>. Assessments shall be made against each Lot at the same percentages allocated to each Lot for the sharing of the General Shared Facilities (as set forth in Section 16.3 below), provided, however, prior to the time that the Retail Lot is added to The Properties, the percentages shall be the same as those set forth for the allocation of the Non-Retail Shared Facilities (as set forth in Section 16.3 below).

In the event of any dispute as to the allocation of assessments by the Association (as opposed to the assessments and charges to made by the Hotel Lot Owner), the determination of the Board of the Association in accordance with this Declaration shall be binding and dispositive. The Board of Directors shall budget and adopt assessments for the Association's general expenses.

7.3 <u>Purpose of Assessments</u>. The regular assessments levied by the Association shall be used for the purposes expressed in Section 7.1 above and for such other purposes as the Association shall have within its powers and from time to time elect to undertake.

7.4 <u>Special Assessments</u>. In addition to the regular and capital improvement assessments which are or may be levied hereunder, the Association (through the Board of Directors) shall have the right to levy special assessments against an Owner(s) to the exclusion of other Owners (a) for the repair or replacement of damage to any portion of the Common Properties (including, without limitation, improvements and landscaping thereon) caused by the misuse, negligence or other action or inaction of an Owner or his guests, tenants or invitees, (b) for the costs of work performed by the Association in accordance with Article 5 of this Declaration (together with any surcharges collectible thereunder), (c) to obtain funds for a specific purpose(s) which is of a non-recurring nature, for which no reserve funds (or inadequate reserve funds) have been collected or allocated, and which is not the appropriate subject of a capital improvement assessment. Any such special assessment shall be subject to all of the applicable provisions of this Article including, without limitation, lien filing and foreclosure procedures and late charges and interest. Any special assessment levied hereunder shall be due within the time specified by the Board of Directors in the action imposing such assessment or may be of an ongoing nature, as provided in Article 5 hereof.

7.5 <u>Capital Improvements</u>. Funds which, in the aggregate, exceed the lesser of $150,000.00 or 10% of the total amount of the current operating budget of the Association in any one fiscal year which are necessary for the addition of capital improvements (as distinguished from repairs and maintenance, including repairs and replacement per Article 10 hereof) relating to the Common Properties and which have not previously been collected as reserves or are not otherwise available to the Association (other than by borrowing) shall be levied by the Association as assessments only upon approval of a majority of the Board of Directors of the Association and upon approval by two-thirds (2/3) favorable vote of the Members of the Association. The costs of any of the aforesaid work which are less than the above-specified threshold amount shall be collected as general or special assessments upon approval of a majority of the Association's Board of Directors.

7.6 <u>Date of Commencement of Annual Assessments; Due Dates</u>. The annual regular assessments provided for in this Article shall commence on the first day of the month next following the recordation of these covenants and shall be applicable through December 31 of such year. Each subsequent annual assessment shall be imposed for the year beginning January 1 and ending December 31. The annual assessments shall be payable in advance in monthly installments, or in annual, semi- or quarter-annual installments if so determined by the Board of Directors of the Association (absent which determination they shall be payable monthly). The assessment amount (and applicable installments) may be changed at any time by said Board from that originally stipulated or from any other assessment that is in the future adopted. The original assessment for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary, at any appropriate time during the year), but the amount of any revised assessment to be levied during any period shorter than a full calendar year shall be in proportion to the number of months (or other appropriate installments) remaining in such calendar year. The due date of any special assessment or capital improvement assessment shall be fixed in the Board resolution authorizing such assessment.

Book26080/Page4919    CFN#20071144863    Page 15 of 104

7.7    Duties of the Board of Directors. The Board of Directors of the Association shall fix the date of commencement and the amount of the assessment against the Lots subject to the Association's jurisdiction for each assessment period, to the extent practicable, at least thirty (30) days in advance of such date or period, and shall, at that time, prepare a roster of the Lots and assessments applicable thereto which shall be kept in the office of the Association and shall be open to inspection by any Owner. Written notice of the assessment shall thereupon be sent to every Owner subject thereto twenty (20) days prior to payment of the first installment thereof, except as to special assessments. In the event no such notice of the assessments for a new assessment period is given, the amount payable shall continue to be the same as the amount payable for the previous period, until changed in the manner provided for herein. The Association, through the action of its Board of Directors, shall have the power, but not the obligation, to enter into an agreement or agreements from time to time with one or more persons, firms or corporations (including affiliates of Declarant) for management services, including the administration of budgets and assessments as herein provided. The Association shall have all other powers provided in its Articles of Incorporation and By-Laws.

7.8    Effect of Non-Payment of Assessment; the Personal Obligation; the Lien; Remedies of the Association. If the assessments (or installments) provided for herein are not paid on the date(s) when due (being the date(s) specified herein or pursuant hereto), then such assessments (or installments) shall become delinquent and shall, together with late charges, interest and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Lot which shall bind such property in the hands of the then Owner, his heirs, personal representatives, successors and assigns. Except as provided in Section 7.9 to the contrary, the personal obligation of an Owner to pay such assessment shall pass to his successors in title and recourse may be had against either or both. If any installment of an assessment is not paid within fifteen (15) days after the due date, at the option of the Association, a late charge not greater than the amount of such unpaid installment may be imposed (provided that only one late charge may be imposed on any one unpaid installment and if such installment is not paid thereafter, it and the late charge shall accrue interest as provided herein but shall not be subject to additional late charges; provided further, however, that each other installment thereafter coming due shall be subject to one late charge each as aforesaid) or the next twelve (12) months' worth of installments may be accelerated and become immediately due and payable in full and all such sums shall bear interest from the dates when due until paid at the highest lawful rate (or, if there is no highest lawful rate, 18% per annum) and the Association may bring an action at law against the Owner(s) personally obligated to pay the same, may record a claim of lien (as evidence of its lien rights as hereinabove provided for) against the Lot on which the assessments and late charges are unpaid, may foreclose the lien against the Lot on which the assessments and late charges are unpaid, or may pursue one or more of such remedies at the same time or successively, and attorneys' fees and costs actually incurred in preparing and filing the claim of lien and the complaint, if any, and prosecuting same, in such action shall be added to the amount of such assessments, late charges and interest secured by the lien, and in the event a judgment is obtained, such judgment shall include all such sums as above provided and attorneys' fees actually incurred together with the costs of the action, through all applicable appellate levels. In the case of an acceleration of the next twelve (12) months' of installments, each installment so accelerated shall be deemed, initially, equal to the amount of the then most current delinquent installment, provided that if any such installment so accelerated would have been greater in amount by reason of a subsequent increase in the applicable budget, the Owner of the Lot whose installments were so accelerated shall continue to be liable for the balance due by reason of such increase and special assessments against such Lot shall be levied by the Association for such purpose. In addition to the rights of collection of assessments stated in this Section, any and all persons acquiring title to or an interest in a Lot as to which the assessment is delinquent, including without limitation persons acquiring title by operation of law and by judicial sales, shall not be entitled to the occupancy of such Lot or the enjoyment of the Common Properties until such time as all unpaid and delinquent assessments due and owing from the selling Owner have been fully paid; provided, however, that the provisions of this sentence shall not be applicable to the mortgagees and purchasers contemplated by Section 7.9 below. All assessments, late charges, interest, penalties, fines, attorney's fees and other sums provided for herein shall accrue to the benefit of the Association.

Unless delegated to a Neighborhood Association by the Master Association, it shall be the legal duty and responsibility of the Master Association to enforce payment of the assessments hereunder. Failure of a collecting entity to send or deliver bills or notices of assessments shall not, however, relieve Owners from their obligations hereunder.

The Master Association shall have such other remedies for collection and enforcement of assessments as may be permitted by applicable law. All remedies are intended to be, and shall be, cumulative.

7.9    Subordination of the Lien. The lien of the assessments provided for in this Article shall be subordinate to real property tax liens and the lien of any first mortgage; provided, however, that any such mortgage lender when in possession or any receiver, and in the event of a foreclosure, any purchaser at a foreclosure sale, and any such mortgage lender acquiring a deed in lieu of foreclosure, and all persons claiming by, through or under such purchaser or mortgage lender, shall hold title subject to the liability and lien of any assessment coming due after such foreclosure (or conveyance in lieu of foreclosure). Any unpaid assessment which cannot be collected as a lien against any Lot by reason of the provisions of this Section shall be deemed to be an assessment divided equally among, payable by and a lien against all Lots subject to assessment by the Association, including the Lots as to which the foreclosure (or conveyance in lieu of foreclosure) took place.

7.10    Collection of Assessments. Assessments levied pursuant hereto shall be collected in the manner established pursuant to Section 8.3 of this Declaration. In the event that at any time said manner provides for collection of assessments levied pursuant hereto by an entity other than the Master Association, all references herein to collection (but not necessarily enforcement) by the Master Association shall be deemed to refer to the other entity performing such collection duties and the obligations of Owners to pay assessments shall be satisfied by making such payments to the applicable collecting entity.

7.11    Declarant's Assessments. Notwithstanding anything herein to the contrary, Declarant shall have the option, in its sole discretion, to (a) pay assessments on the Lots owned by it, (b) pay assessments only on certain designated Lots (e.g., those under construction or those containing a Structure for which a certificate of occupancy has been issued) or (c) not pay assessments on any Lots and in lieu thereof fund any resulting deficit in the Association's operating expenses not produced by assessments receivable from Owners other than Declarant and any other income receivable by the Association. The deficit to be paid under option (c), above, shall be the difference between (i) actual operating expenses of the Association (exclusive of

capital improvement costs and reserves) and (ii) the sum of all monies receivable by the Association (including, without limitation, assessments, interest, late charges, fines and incidental income) and any surplus carried forward from the preceding year(s). Declarant may from time to time change the option under which Declarant is making payments to the Association by written notice to such effect to the Association. If Declarant at any time elects option (b), above, it shall not be deemed to have necessarily elected option (a)or (c) as to the Lots which are not designated under option (b). When all Lots within The Properties are sold and conveyed to purchasers, neither Declarant nor its affiliates shall have further liability of any kind to the Association for the payment of assessments, deficits or contributions.

   7.12 <u>Association Funds</u>. The portion of all regular assessments collected by the Association for reserves for future expenses, and the entire amount of all special and capital assessments, shall be held by the Association and may be invested in interest bearing accounts or in certificates of deposit or other like instruments or accounts available at banks or savings and loan institutions, the deposits of which are insured by an agency of the United States.

ARTICLE 8.

MASTER ASSOCIATION AND NEIGHBORHOOD ASSOCIATIONS

   8.1 <u>Preamble</u>. In order to ensure the orderly development, operation and maintenance of The Properties, including the properties subject to the administration of the Neighborhood Associations as integrated parts of The Properties, this Article has been promulgated for the purposes of (a) giving the Master Association certain powers to effectuate such goal, (b) providing for intended (but not guaranteed) economies of scale and (c) establishing the framework of the mechanism through which the foregoing may be accomplished. The provisions of this Article are specifically subject, however, to Section 19.13 of this Declaration.

   8.2 <u>Cumulative Effect; Conflict</u>. The covenants, restrictions and provisions of this Declaration shall be cumulative with those of the Neighborhood Associations and the Master Association may, but shall not be required to, enforce the latter; provided, however, that in the event of conflict between or among such covenants, restrictions and provisions, or any articles of incorporation, by-laws, rules and regulations, policies or practices adopted or carried out pursuant thereto, those of the Neighborhood Associations shall be subject and subordinate to this Declaration. The foregoing priorities shall apply, but not be limited to, the liens for assessments created in favor of the Hotel Lot Owner, the Association and the Neighborhood Associations as provided for herein. As to any Neighborhood Association which is a condominium association, no duties of same hereunder shall be performed or assumed by the Master Association if same are required by law to be performed by the Neighborhood Association or if the performance or assumption of such duties would be contrary to the purpose and intent of Section 19.13 of this Declaration.

   8.3 <u>Collection of Assessments</u>. The Neighborhood Associations shall, initially, collect all assessments and other sums due the Master Association, the Hotel Lot Owner and the applicable Neighborhood Association from the members thereof. The Neighborhood Association will remit the assessments so collected to the respective payees pursuant to such procedures as may be adopted by the Master Association and/or the Hotel Lot Owner, as applicable. The sums so collected shall be applied first to the assessments of the Hotel Lot Owner, then to the assessments of the Master Association and then to those of the collecting Neighborhood Association.

   Notwithstanding the priority of disbursements of collected lump sums as provided above, all regular and special assessments, interest, late charges, recovered costs of collection and other extraordinary impositions shall be remitted to the respective entity imposing same separate and apart from the priorities established above. All fidelity bonds and insurance maintained by a Neighborhood Association shall reflect any duties performed by it pursuant hereto and the amounts to be received and disbursed by it and shall name the Association and the Hotel Lot Owner as an obligee/insured party for so long as its assessments are being collected and remitted by the Neighborhood Association. The Association and/or the Hotel Lot Owner may, from time to time by sixty (60) days' prior written notice to the affected Neighborhood Association(s), change the procedures set forth in this Section 8.3 in whole or in part. In the event of any change in assessment collection procedures elected to be made by either the Hotel Lot Owner and/or the Association, the relative priorities of assessment remittances and liens (i.e., the Hotel Lot Owner first, the Master Association second and the applicable Neighborhood Association third) shall nevertheless still remain in effect, as shall the Hotel Lot Owner's and/or the Association's ability to modify or revoke its or their elections from time to time.

   8.4 <u>Expense Allocations</u>. The Master Association may, by written notice given to the affected Neighborhood Association at least sixty (60) days prior to the end of the Neighborhood Association's fiscal year, allocate and assess to the Neighborhood Association a share of the expenses incurred by the Master Association which are reasonably allocable to the Neighborhood Association and/or the portion of The Properties within its jurisdiction (e.g., for utilities which are billed to the Master Association, but serve in certain instances, only a Neighborhood Association, and street lighting systems). In such event, the expenses so allocated shall thereafter be deemed common expenses of the Neighborhood Association payable by it (with assessments collected from its members) to the Master Association.

   In the event of a failure of a Neighborhood Association to budget or assess its members for expenses allocated as aforesaid, the Master Association shall be entitled to pursue all available legal and equitable remedies against the Neighborhood Association or, without waiving its right to the foregoing, specially assess the members of the Neighborhood Association and their Lots for the sums due (such special assessments, as all others, to be secured by the lien provided for in this Declaration).

   8.5 <u>Non-Performance of Neighborhood Association Duties</u>. In addition to the specific rights of the Master Association provided in Section 8.4 above, and subject to the limitations set forth in Section 8.2 of this Declaration, in the event that a Neighborhood Association fails to perform any duties delegated to, or required of, it under this Declaration or to otherwise be performed by it pursuant to its own declaration, articles of incorporation, by-laws or related documents, which failure continues for a period in excess of thirty (30) days after the Master Association's giving notice thereof, then the Master

Declaration of Covenants
- 17 -

Association may, but shall not be required to, assume such duties. In such event, the Neighborhood Association shall not perform such duties unless and until such time as the Master Association directs it to once again do so.

8.6    Conflict. In the event of conflict between this Article 8, as amended from time to time, and any of the other covenants, restrictions or provisions of this Declaration or the Articles of Incorporation, By-Laws or rules and regulations of the Master Association all as amended from time to time, the provisions of this Article shall supersede and control.

ARTICLE 9.

RULES; ENFORCEMENT

9.1    Compliance by Owners. Every Owner and its guests, tenants and invitees shall comply with the restrictions and covenants set forth herein and any and all rules and regulations which from time to time may be adopted by the Board of Directors of the Association (as to Common Properties) and/or the Hotel Lot Owner (as to the Shared Facilities).

9.2    Enforcement. Failure of an Owner or his guests, tenants or invitees to comply with such restrictions, covenants or rules and regulations shall be grounds for immediate action which may include, without limitation, an action to recover sums due for damages, injunctive relief, or any combination thereof. The Association and/or the Hotel Lot Owner, as applicable, shall have the right to suspend the rights of use of Common Properties and/or General, Non-Retail, Condominium South, Condominium Central or Condominium North Shared Facilities, as applicable, provided, however, that no Owner shall be denied (i) legal pedestrian access to and from the Owner's Lot and/or Condominium Unit, as applicable, or (ii) use of any utility and/or mechanical, electrical, HVAC, plumbing, life safety, monitoring, information and/or other systems located in the Hotel Lot and serving said Owner's Lot and/or Condominium Unit, as applicable, or (iii) the use and benefit of the easements of support granted herein (without the Association and/or Hotel Lot Owner, as applicable, otherwise providing equivalent substitutions for same). The offending Owner shall be responsible for all costs of enforcement including attorneys' fees actually incurred and court costs.

9.3    Fines. In addition to all other remedies, and to the maximum extent lawful, in the sole discretion of the Board of Directors of the Association, a fine or fines may be imposed upon an Owner for failure of an Owner or his guests, tenants or invitees to comply with any covenant, restriction, rule or regulation, provided the following procedures are adhered to:

(a)    Notice: The Association shall notify the Owner of the alleged infraction or infractions. Included in the notice shall be the date and time of a special meeting of the Board of Directors at which time the Owner shall present reasons why a fine(s) should not be imposed. At least fourteen (14) days' notice of such meeting shall be given.

(b)    Hearing: The alleged non-compliance shall be presented to an independent committee appointed by the Board of Directors (which committee shall not include officers, directors, or employees of the Association, or the spouse, parent, child, brother, or sister of an officer, director, or employee of the Association) at which the committee shall hear reasons why a fine(s) should not be imposed. A written decision of the committee shall be submitted to the Board and the Owner by not later than twenty-one (21) days after the committee meeting. The Owner shall have a right to be represented by counsel and to cross examine witnesses.

(c)    Amounts: The Board of Directors (if its or such panel's findings are made against the Owner) may impose special assessments against the Lot owned by the Owner in an amount not to exceed the lesser of: (i) the maximum amounts permitted by law, or (ii) $500.00, provided, however, that with respect to an infraction of a continuing nature, the fine may, with only the initial notice and opportunity for a hearing, be in an amount equal to $250.00 for each day that the infraction continues, except that no such fine shall exceed $10,000.00 in the aggregate. The foregoing amounts shall increase from time to time by application of a nationally recognized consumer price index chosen by the Board of Directors, using the date this Declaration is recorded as the base year. In the event no such consumer price index is available, the Board shall choose a reasonable alternative to compute such increases.

(d)    Payment of Fines: Fines shall be paid not later than five (5) days after notice of the imposition or assessment of the penalties.

(e)    Collection of Fines: Fines shall be treated as an assessment subject to the provisions for the collection of assessments, and the lien securing same, as set forth herein.

(f)    Application of Proceeds: All monies received from fines shall be allocated as directed by the Board of Directors.

(g)    Non-exclusive Remedy: These fines shall not be construed to be exclusive, and shall exist in addition to all other rights and remedies to which the Association may be otherwise legally entitled; provided, however, any penalty paid by the offending Owner shall be deducted from or offset against any damages which the Association may otherwise be entitled to recover by law from such Owner.

Similarly, the Hotel Lot Owner shall have the right to fine an Owner for failure of an Owner or his guests, tenants or invitees to comply with any covenant, restriction, rule or regulation applicable to the General, Non-Retail, Condominium South, Condominium North and/or Condominium Central Shared Facilities, said fine to be implemented in accordance with the procedure set forth above, but substituting in each instance the Hotel Lot Owner for the Association or the Board of the Association.

Book26080/Page4922     CFN#20071144863     Page 18 of 104

# ARTICLE 10.

## DAMAGE OR DESTRUCTION TO COMMON PROPERTIES

10.1    Damage or Destruction.  Damage to or destruction of all or any portion of the Common Properties shall be addressed in the following manner, notwithstanding any provision in this Declaration to the contrary:

(a)    In the event of damage to or destruction of the Common Properties, if the insurance proceeds are sufficient to effect total restoration, then the Association shall cause such portions of the Common Properties to be repaired and reconstructed substantially as it previously existed.

(b)    If the insurance proceeds are within Five Hundred Thousand Dollars ($500,000.00) or less of being sufficient to effect total restoration of the Common Properties, then the Association shall cause such portions of the Common Properties to be repaired and reconstructed substantially as it previously existed and the difference between the insurance proceeds and the actual cost shall be levied as a capital special (and not capital improvement) assessment against each of the Owners in equal shares in accordance with the provisions of Article 7 of this Declaration.

(c)    If the insurance proceeds are insufficient by more than Five Hundred Thousand Dollars ($500,000.00) to effect total restoration of the Common Properties, then by written consent or vote of a majority of each class of the Members, they shall determine, subject to Article 12 hereof, whether (1) to rebuild and restore the Common Properties in substantially the same manner as they existed prior to damage and to raise the necessary funds over the insurance proceeds by levying capital improvement assessments against all Members, (2) to rebuild and restore in a way which is less expensive than replacing the Common Properties in substantially the same manner as they existed prior to being damaged, or (3) subject to the approval of the Board, to not rebuild and to retain the available insurance proceeds.

(d)    Each Member shall be liable to the Association for any damage to the Common Properties not fully covered by collected insurance which may be sustained by reason of the negligence or willful misconduct of any Member or his guests, tenants or invitees.  Notwithstanding the foregoing, the Association reserves the right to charge such Member an assessment equal to the increase, if any, in the insurance premium directly attributable to the damage caused by such Member.  In the case of joint ownership of a Structure, the liability of such Member shall be joint and several.  The cost of correcting such damage shall be an assessment against the Member and may be collected as provided herein for the collection of assessments.

# ARTICLE 11.

## INSURANCE ON COMMON PROPERTIES

11.1    Common Properties.  The Association shall keep all improvements, facilities and fixtures located within the Common Properties insured against loss or damage by fire or other casualty in amounts not less than may be required from time to time by the Administrative Agent, or after such time as the Administrative Agent no longer holds a mortgage encumbering any portion of The Properties, in such amounts as are commercially reasonable (with reasonable deductibles and normal exclusions for land, foundations, excavation costs and similar matters), and may obtain insurance against such other hazards and casualties as the Association may deem desirable.  The Association may also insure any other property, whether real or personal, owned by the Association, against loss or damage by all risks and such other hazards as the Association may deem desirable, with the Association as the owner and beneficiary of such insurance for and on behalf of itself and all Members.  The insurance coverage with respect to the Common Properties shall be written in the name of, and the proceeds thereof shall be payable to, the Association.  Insurance proceeds shall be used by the Association for the repair or replacement of the property for which the insurance was carried.  Premiums for all insurance carried by the Association are common expenses included in the assessments made by the Association.

To the extent obtainable at reasonable rates, the insurance policy(ies) maintained by the Association shall contain provisions, or be accompanied by endorsements, for:  replacement costs, demolition costs, contingent liability from operation of building laws and increased costs of construction.

All insurance policies shall contain standard mortgagee clauses, if applicable.

The Association shall also maintain flood insurance on the insurable improvements on the Common Properties in an amount equal to the lesser of 100% of the replacement costs of all insurable improvements (if any) within the Common Properties or the maximum amount of coverage available under the National Flood Insurance Program, in either case if the insured improvements are located within an "A" flood zone.

11.2    Replacement or Repair of Property.  In the event of damage to or destruction of any portion of the Common Properties, the Association shall repair or replace the same from the insurance proceeds available, subject to the provisions of Article 10 of this Declaration.

11.3    Waiver of Subrogation.  As to each policy of insurance maintained by the Association which will not be voided or impaired thereby, the Association hereby waives and releases all claims against the Board, the Members, Declarant and the agents and employees of each of the foregoing, with respect to any loss covered by such insurance, whether or not caused by negligence of or breach of any agreement by said persons, but only to the extent that insurance proceeds are received in compensation for such loss.

Book26080/Page4923    CFN#20071144863                    Page 19 of 104

11.4    <u>Liability and Other Insurance</u>. The Association shall have the power to and shall obtain comprehensive public liability insurance, including medical payments and malicious mischief, with coverage of at least $1,000,000.00 (if available at reasonable rates and upon reasonable terms) for any single occurrence, insuring against liability for bodily injury, death and property damage arising from the activities of the Association or with respect to property under its jurisdiction, including, if obtainable, a cross liability endorsement insuring each Member against liability to each other Member and to the Association and vice versa and coverage for legal liability resulting from lawsuits related to employment contracts shall also be maintained. The Association may also obtain Worker's Compensation insurance and other liability insurance as it may deem desirable, insuring each Member and the Association and its Board of Directors and officers, from liability in connection with the Common Properties, the premiums for which shall be Common Expenses and included in the assessments made against the Members. The Association may also obtain such other insurance as the Board deems appropriate. All insurance policies shall be reviewed at least annually by the Board of Directors and the limits increased in its discretion. The Board may also obtain such errors and omissions insurance, indemnity bonds, fidelity bonds and other insurance as it deems advisable, insuring the Board or any management company engaged by the Association against any liability for any act or omission in carrying out their obligations hereunder, or resulting from their membership on the Board or any committee thereof. At a minimum, however, there shall be blanket fidelity bonding of anyone (compensated or not) who handles or is responsible for funds held or administered by the Association, with the Association to be an obligee thereunder. Such bonding shall cover the maximum funds to be in the hands of the Association or management company during the time the bond is in force.

11.5    <u>"Blanket" Insurance</u>. The requirements of this Article may be met by way of the Association being an insured party under any coverage carried by the Declarant, any Owner, the Master Association or any Neighborhood Association as long as such coverage is in accordance with the amounts and other standards stated in this Article.

## ARTICLE 12.

### MORTGAGEE PROTECTION

12.1    <u>Mortgagee Protection</u>. The following provisions are added hereto (and to the extent these added provisions conflict with any other provisions of the Declaration, these added provisions shall control):

     (a)    The Association shall be required to make available to all Owners and Mortgagees, and to insurers and guarantors of any first Mortgage, for inspection, upon request, during normal business hours or under other reasonable circumstances, current copies of this Declaration (with all amendments) and the Articles, By-Laws and rules and regulations and the books and records of the Association. Furthermore, such persons shall be entitled, upon written request (which request is hereby deemed given by Declarant's Mortgagee), to (i) receive a copy of the Association's financial statement for the immediately preceding fiscal year, (ii) receive notices of and attend the Association meetings, (iii) receive notice from the Association of an alleged default by an Owner in the performance of such Owner's obligations under this Declaration, the Articles of Incorporation or the By-Laws of the Association, which default is not cured within thirty (30) days after the Association learns of such default, and (iv) receive notice of any substantial damage or loss to the Common Properties.

     (b)    Any holder, insurer or guarantor of a Mortgage on a Structure shall have, if first requested in writing (which request is hereby deemed given by Declarant's Mortgagee), the right to timely written notice of (i) any condemnation or casualty loss affecting a material portion of the Common Properties, (ii) a sixty (60) day delinquency in the payment of the Assessments on a mortgaged Lot, (iii) the occurrence of a lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association, and (iv) any proposed action which requires the consent of a specified number of Mortgage holders.

     (c)    Any holder, insurer or guarantor of a Mortgage on a Structure shall have the right to pay, singly or jointly, taxes or other charges that are delinquent and have resulted or may result in a lien against any portion of the Common Properties and receive immediate reimbursement from the Association.

     (d)    Any holder, insurer or guarantor of a Mortgage on a Structure shall have the right to pay, singly or jointly, any overdue premiums on any hazard insurance policy covering the Common Properties or obtain, singly or jointly, new hazard insurance coverage on the Common Properties upon the lapse of a policy and, in either case, receive immediate reimbursement from the Association.

     (e)    Notwithstanding anything to the contrary contained herein, no portion of The Properties may be withdrawn from the effect of this Declaration without the prior written consent of Declarant's Mortgagee.

## ARTICLE 13.

### INSURANCE ON SHARED FACILITIES

13.1    <u>Insurance</u>. Insurance obtained pursuant to the requirements of this Article 13 shall be governed by the following provisions:

13.2    <u>Purchase, Custody and Payment</u>.

     (a)    <u>Purchase</u>. All insurance policies required to be obtained by the Hotel Lot Owner hereunder shall be issued by an insurance company authorized to do business in Florida or by surplus lines

carriers offering policies for properties in Florida and said policies must otherwise satisfy the requirements of the mortgage held by Declarant's Mortgagee on the date hereof.

(b) <u>Named Insured</u>. The named insured under policies to be maintained by the Hotel Lot Owner shall be the Hotel Lot Owner, individually, or such designee as may be designated by the Hotel Lot Owner, and as agent for the Association and the Owners of all Lots, without naming them, and as agent for the holders of any mortgage on a Lot, without naming them. The Association, Owners and the holders of any mortgage on a Lot shall be deemed additional insureds. Notwithstanding anything to the contrary contained herein, Declarant's Mortgagee shall be named an additional insured on all such policies and a loss payee on all such property insure policies.

The Insuring Owner (as hereinafter defined) shall have the option in its discretion of appointing an Insurance Trustee hereunder. If the Insuring Owner fails or elects not to appoint such Trustee, the Insuring Owner will perform directly all obligations imposed upon such Trustee by this Declaration. To the extent that Administrative Agent holds a mortgage on any Unit owned by Declarant, Administrative Agent shall be deemed to be the appointed Insurance Trustee of the Association, unless it declines to act as such.

(c) <u>Custody of Policies and Payment of Proceeds</u>. All policies obtained by the Hotel Lot Owner pursuant to this Article 13 shall provide that payments for losses made by the insurer shall be paid to the Hotel Lot Owner and Declarant's Mortgagee, as their interests may appear.

(d) <u>Copies to Mortgagees</u>. One copy of each insurance policy, or a certificate evidencing such policy, and all endorsements thereto, shall be furnished by the policy holder upon request to the holders of any mortgage on a Lot or a Condominium Unit. Copies or certificates shall be furnished not less than ten (10) days prior to the beginning of the term of the policy, or not less than ten (10) days prior to the expiration of each preceding policy that is being renewed or replaced, as appropriate.

(e) <u>Personal Property and Liability</u>. Except as specifically provided herein, the Hotel Lot Owner shall not be responsible for Owners to obtain insurance coverage upon the property lying within the boundaries of their Lot, including, but not limited to, Owner's personal property, nor insurance for the Owners' personal liability and expenses, nor for any other risks not otherwise required to be insured in accordance herewith.

13.3 <u>Coverage</u>. The Hotel Lot Owner (the "Insuring Owner") shall maintain insurance covering the following:

(a) <u>Casualty</u>. The applicable Shared Facilities, together with all fixtures, building service equipment, personal property and supplies constituting the applicable Shared Facilities (collectively the "Insured Property"), shall be insured in an amount not less than 100% of the full insurable replacement value thereof, excluding foundation and excavation costs. Notwithstanding the foregoing, the Insured Property shall not include, and shall specifically exclude, any portions of The Properties which are not part of the Shared Facilities, and all furniture, furnishings, floor coverings, wall coverings and ceiling coverings, other personal property owned, supplied or installed by Owners or tenants of Owners, and all electrical fixtures, appliances, air conditioner and heating equipment and water heaters to the extent not part of the Shared Facilities. Such policies may contain reasonable deductible provisions as determined by the applicable Owner obligated to obtain such policies and approved by Declarant's Mortgagee. Such coverage shall afford protection against loss or damage by fire and other hazards covered by "all risks" coverage, and such other risks as from time to time are customarily covered with respect to buildings and improvements similar to the Insured Property in construction, location and use.

(b) <u>Liability</u>. Comprehensive general public liability and automobile liability insurance covering loss or damage resulting from accidents or occurrences on or about or in connection with the Insured Property or adjoining driveways and walkways, or any work, matters or things related to the Insured Property, with such coverage as shall be required by the Insuring Owner, and with a cross liability endorsement to cover liabilities of the Owners as a group to any Owner, and vice versa.

(c) <u>Worker's Compensation</u>. Worker's Compensation and other mandatory insurance, when applicable, to the extent applicable to the maintenance, operation, repair or replacement of the Shared Facilities.

(d) <u>Windstorm and Flood Insurance.</u> Windstorm and Flood Insurance covering the Insured Property, if so determined by the Insuring Owner, in such amounts (and containing such deductibles) as the Insuring Owner may determine from time to time.

(e) <u>Other Insurance</u>. Such other or greater insurance as is required by the mortgage held by Declarant's Mortgagee as of the date hereof, as well as such other insurance as the Insuring Owner shall determine from time to time to be desirable in connection with the Shared Facilities.

When appropriate and obtainable, each of the foregoing policies shall waive the insurer's right to: (i) as to property insurance policies, subrogation against the Association and against the Owners individually and as a group, (ii) to pay only a fraction of any loss in the event of coinsurance or if other insurance carriers have issued coverage upon the same risk, and (iii) avoid liability for a loss that is caused by an act of the Insuring Owner (or any of its employees, contractors and/or agents), one or more Owners or as a result of contractual

Book26080/Page4925    CFN#20071144863    Page 21 of 104

undertakings. Additionally, and each policy shall provide that the insurance provided shall not be prejudiced by any act or omissions of individual Owners that are not under the control of the Insuring Owner.

13.4     <u>Additional Provisions</u>. All policies of insurance shall provide that such policies may not be canceled or substantially modified without at least thirty (30) days' prior written notice to all of the named insureds, including all mortgagees. Prior to obtaining any policy of casualty insurance or any renewal thereof, the Insuring Owner may obtain an appraisal from a fire insurance company, or other competent appraiser, of the full insurable replacement value of the applicable Insured Property (exclusive of foundations), without deduction for depreciation, for the purpose of determining the amount of insurance to be effected pursuant to this Section.

13.5     <u>Premiums</u>. Premiums upon insurance policies purchased by the Insuring Owner pursuant to this Article 13 shall be among the costs assessed against the Owners in accordance with the provisions of Article 16. Premiums may be financed in such manner as the Insuring Owner deems appropriate.

13.6     <u>Share of Proceeds</u>. All insurance policies obtained by or on behalf of the Insuring Owner pursuant to this Article 13 shall be for the benefit of the Insuring Owner, the Association, the Owners and the holders of any mortgage on a Lot, as their respective interests may appear. The duty of the Insuring Owner shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein, and for the benefit of the Owners and the holders of any mortgage on the subject Lot(s) (or any leasehold interest therein).

13.7     <u>Distribution of Proceeds</u>. Proceeds of insurance policies required to be maintained by the Insuring Owner pursuant to this Article 13 shall be distributed to or for the benefit of the beneficial owners thereof in the following manner:

    (a)     <u>Reconstruction or Repair</u>. If the damaged property for which the proceeds are paid is to be repaired or reconstructed, the proceeds shall be paid to defray the cost thereof as elsewhere provided herein. Any proceeds remaining after defraying such costs shall be distributed to the Owners, remittances to Lot Owners and their mortgagees being payable jointly to them.

    (b)     <u>Disbursement of Reconstruction Funds</u>. The proceeds of insurance collected on account of a casualty, and the sums collected from Lot Owners on account of such casualty, shall constitute a construction fund which shall be disbursed by the Insuring Owner or Insurance Trustee, as applicable, in payment of the costs of reconstruction and repair only with the approval of a construction consultant, architect, contractor or engineer qualified to practice in Florida and employed by the Insuring Owner or Insurance Trustee, as applicable, to supervise the work and disbursements. Disbursement of proceeds or other funds for the repair or restoration shall only be made in accordance with safeguards normally associated with construction loan disbursements, which shall include, without limitation, that the construction consultant, architect, contractor or engineer certify prior to any disbursement substantially the following: (i) that all of the work completed as of the date of such request for disbursement has been done substantially in accordance with the approved plans and specifications; (ii) that such disbursement request represents monies which either have been paid by or on behalf of the construction consultant, architect, contractor or engineer and/or are justly due to contractors, subcontractors, materialmen, engineers or other persons who have rendered or furnished certain services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the respective amounts paid or due to each of said persons in respect thereof and stating the progress of the work up to the date of said certificate; (iii) that the sum then requested to be disbursed plus all sums previously disbursed does not exceed the cost of the work in relation to what has actually been completed through the date of the certificate; (iv) that no sums being requested to be disbursed have been the subject of any previous disbursement or any pending application for disbursement; (v) confirming receipt of all applicable lien waivers; and (vi) that the amount remaining for disbursement after the pending disbursement will be sufficient to complete the necessary repair or restoration.

    (c)     <u>Failure to Reconstruct or Repair</u>. If it is determined in the manner elsewhere provided that the damaged property for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be allocated among the Owners in accordance with their percentage shares of Assessment Points as set forth in Section 7.2 hereof (provided, however, if the damage suffered affects fewer than all Owners, the percentage shares shall be prorata allocated over only those Owners suffering damage from the applicable policies and proceeds in proportion to the amount of loss suffered by each affected Lot Owner) (the "Allocated Interests"), and distributed first to the holders of any mortgage on an insured Lot in amounts sufficient to pay off their mortgages, as their interests may appear, and the balance, if any, to the applicable Owner(s).

13.8     <u>Insuring Owner as Agent</u>. The Insuring Owner is hereby irrevocably appointed as agent and attorney-in-fact for the Association and each Owner and for each owner of a mortgage or other lien upon a Lot and for each owner of any other interest in The Properties, subject to the terms of any mortgage held by Declarant's Mortgagee, to adjust all claims arising under insurance policies purchased by the Insuring Owner and to execute and deliver releases upon the payment of claims.

13.9     <u>Owners' Personal Coverage</u>. The insurance required to be purchased by the Insuring Owners pursuant to this Article 13 shall not cover claims against an Owner due to accidents occurring within his Lot, nor casualty

Book26080/Page4926      CFN#20071144863      Page 22 of 104

or theft loss to the contents of an Owner's Lot. It shall be the obligation of the individual Owner, if such Owner so desires, to purchase and pay for insurance as to all such and other risks not covered by insurance required to be carried by the Insuring Owner hereunder.

13.10    Benefit of Mortgagees. Certain provisions in this Article 13 are for the benefit of mortgagees of Lots and may be enforced by such mortgagees.

## ARTICLE 14.

### RECONSTRUCTION OR REPAIR OF SHARED FACILITIES

14.1    Determination to Reconstruct or Repair. Subject to the immediately following paragraph, in the event of damage to or destruction of the Insured Property as a result of fire or other casualty, the Insuring Owner shall determine whether or not to repair and/or restore the Insured Property, and if a determination is made to effect restoration, the Insuring Owner shall disburse the proceeds of all insurance policies required to maintained by it under Article 13 to the contractors engaged in such repair and restoration in appropriate progress payments. Notwithstanding the above, in the event insurance proceeds are "sufficient" to repair or restore any Insured Property damaged or destroyed, the Insuring Owner shall be required to effect such repair or restoration. For purposes of the preceding sentence, such proceeds shall be deemed "sufficient" if either (i) the proceeds, together with the amount of any deductible, are within $500,000.00 of the total amount needed to effect such repairs or restoration, or (ii) if the total amount needed to effect the repairs or restoration is more than $500,000.00 above the insurance proceeds and any deductibles under any applicable policies, and a Lot Owner (or combination of Lot Owners) elects to contribute the deficit in the repair funds for the use of the Insuring Owner to effect the repair or restoration.

Subject to the preceding paragraph, in the event the Insuring Owner determines not to effect restoration to the Shared Facilities, the net proceeds of insurance resulting from such damage or destruction shall be divided among all the Owners benefited by the insurance maintained by the Insuring Owner as set in Section 13.7(c) above; provided, however, that no payment shall be made to an Owner until there has first been paid off out of his share of such fund all mortgages and liens on the Owner's Lot in the order of priority of such mortgages and liens.

14.2    Plans and Specifications. Any reconstruction or repair must be made substantially in accordance with the plans and specifications for the original Improvements and then applicable building and other codes; or if not, then in accordance with the plans and specifications approved by the Insuring Owner.

14.3    Assessments. If the proceeds of the insurance are not sufficient to defray the estimated costs of reconstruction and repair to be effected by the Insuring Owner, or if at any time during reconstruction and repair, or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, Assessments shall be made against the Owners benefited by the insurance policy providing the proceeds for reconstruction by the applicable Insuring Owner (which shall be deemed to be assessments made in accordance with, and secured by the lien rights contained in, Article 16 below) in sufficient amounts to provide funds for the payment of such costs. Such Assessments on account of damage to the Insured Property shall be in proportion to all of the Owners' respective Allocated Interests.

14.4    Benefit of Mortgagees. Certain provisions in this Article 14 are for the benefit of mortgagees of Lots and may be enforced by any of them.

## ARTICLE 15.

### ENCROACHMENTS; EASEMENTS

15.1    Encroachment. If (a) any portion of the Common Properties (or improvements constructed thereon) encroaches upon any other portion of a Lot or upon any Structure; (b) any portion of a Lot (or improvements constructed thereon) encroaches upon the Common Properties or any other Lot; or (c) any encroachment shall hereafter occur as the result of (i) construction of any improvement; (ii) settling or shifting of any improvement; (iii) any alteration or repair to any improvement after damage by fire or other casualty or any taking by condemnation or eminent domain proceedings of all or any portion of any improvement or portion of the Common Properties or any Lot, then, in any such event, a valid easement is granted and shall exist for such encroachment and for the maintenance of the same so long as the structure causing said encroachment shall stand.

15.2    Pipes, Wires, Ducts, Cables, Conduits, Public Utility Lines, Etc. Each portion of any Lot and the Common Properties shall have an easement in common with all other portions thereof to use, maintain, repair, alter and replace all pipes, wires, ducts, vents, cables, conduits, utility lines, and similar or related facilities located in the Lots and Common Properties and serving such portion thereof. Each portion of the Lots and Common Properties shall be subject to an easement in favor of all other portions thereof to install, use, maintain, repair, alter and replace the pipes, wires, ducts, vents, cables, conduits, utility lines and other similar or related facilities located in such portion of the Lots and Common Properties and serving other portions thereof.

Without limiting the generality of the foregoing, each portion of the Hotel Lot and the Common Properties shall have an easement in common with all other portions thereof to use, maintain, repair, alter and replace all pipes, wires, ducts, vents, cables, conduits, utility lines, and similar or related facilities located in any other Lot and/or included within the Common Properties and/or the Shared Facilities and serving either of same. Each portion of the Retail, Condominium North, Condominium South and Condominium Central Lots and the Common Properties shall be subject to an easement in favor of the Hotel Lot and all other portions of the Common Properties to use, maintain, repair, alter and replace the pipes, wires, ducts, vents, cables, conduits, utility lines and other similar or related facilities located in such portion of, or integrated with, the Retail,

Condominium North, Condominium South and Condominium Central Lots and Common Properties and serving other portions of The Properties.

15.3 <u>Easements of Support</u>. Whenever any structure on any Lot or included in the Common Properties adjoins any structure included in any other portion of The Properties, each said structure shall have and be subject to an easement of support and necessity in favor of the other structure.

15.4 <u>Construction and Sales</u>. The Declarant (and its agents, employees, contractors, subcontractors and suppliers) shall have an easement of ingress and egress over and across the Hotel Lot and the Common Properties for construction purposes and to erect, maintain, repair and replace, from time to time, one or more signs on the Common Properties for the purposes of advertising the sale or lease of Structures.

## ARTICLE 16

## PROVISIONS REGARDING SHARED FACILITIES

16.1 <u>Easements</u>. Given the integration of the improvements on the Hotel Lot and the Retail, Condominium North, Condominium South and Condominium Central Lots, the following easements are hereby reserved and granted over under and upon the Lots as follows, subject to all of the other provisions of this Article 16:

(a) <u>Support</u>. In the event that any Structure(s) is constructed so as to transverse Lot lines and/or to be connected in any manner to any Structure on any other Lot, then there shall be (and there is hereby declared and created) a perpetual easement of support for such Structure(s) as well as for the installation, maintenance, repair and replacement of all utility lines and equipment and any other technological services (whether or not now existing) serving said Structure(s) which are necessarily or conveniently located within The Properties.

(b) <u>Construction and Installation and Maintenance of General Shared Facilities</u>. A perpetual exclusive easement is hereby reserved (and declared and created) over, under and upon the Retail, Condominium North, Condominium South and Condominium Central Lots for the construction and installation of the Shared Facilities, and the operation repair, replacement, maintenance, alteration and relocation of same, said easement to be appurtenant to the Hotel Lot and run in favor of the Hotel Lot Owner, and such owner's contractors, subcontractors, agents, employees and designees. A perpetual exclusive easement is hereby reserved (and declared and created) over, under and upon the Condominium South Lot for the construction and installation of the Condominium South Shared Facilities, and the operation repair, replacement, maintenance, alteration and relocation of same, said easement to be appurtenant to the Hotel Lot and run in favor of the Hotel Lot Owner, and such owner's contractors, subcontractors, agents, employees and designees. A perpetual exclusive easement is hereby reserved (and declared and created) over, under and upon the Condominium Central Lot for the construction and installation of the Condominium Central Shared Facilities, and the operation repair, replacement, maintenance, alteration and relocation of same, said easement to be appurtenant to the Hotel Lot and run in favor of the Hotel Lot Owner, and such owner's contractors, subcontractors, agents, employees and designees. A perpetual exclusive easement is hereby reserved (and declared and created) over, under and upon the Condominium North Lot for the construction and installation of the Condominium North Shared Facilities, and the operation repair, replacement, maintenance, alteration and relocation of same, said easement to be appurtenant to the Hotel Lot and run in favor of the Hotel Lot Owner, and such owner's contractors, subcontractors, agents, employees and designees. A perpetual exclusive easement is hereby reserved (and declared and created) over, under and upon the Condominium South, Condominium North and Condominium Central Lots for the construction and installation of the Non-Retail Shared Facilities, and the operation repair, replacement, maintenance, alteration and relocation of same, said easement to be appurtenant to the Hotel Lot and run in favor of the Hotel Lot Owner, and such owner's contractors, subcontractors, agents, employees and designees. In exercising the easements contained in this subsection 16.1(b), the Hotel Lot Owner shall use reasonable efforts to minimize interference with the other proper uses of the Retail, Condominium North, Condominium South and Condominium Central Lots and Structures.

(c) <u>Use</u>. Subject to such rules and regulations as may be established from time to time by the Hotel Lot Owner, a non-exclusive easement is hereby reserved (and declared and created) over, under and upon such portions of the Hotel Lot as may be designated, in writing, from time to time by the Owner thereof for the use, benefit and enjoyment of any General Shared Facilities that may be constructed thereon from time to time in favor of the Retail, Condominium North, Condominium South and Condominium Central Lots, including Condominium Unit Owners, and such Condominium Unit Owner's tenants and invitees. Similarly, a non-exclusive easement is hereby reserved (and declared and created) over, under and upon such portions of the Hotel Lot as may be designated, in writing, from time to time by the Owner thereof for the use, benefit and enjoyment of any Condominium South Shared Facilities that may be constructed thereon from time to time in favor of the Condominium South Lot, including Condominium Unit Owners in the Condominium South Lot, and such Condominium Unit Owner's tenants and invitees. A non-exclusive easement is hereby reserved (and declared and created) over, under and upon such portions of the Hotel Lot as may be designated, in writing, from time to time by the Owner thereof for the use, benefit and enjoyment of any Condominium Central Shared Facilities that may be constructed thereon from time to time in favor of the Condominium Central Lot, including Condominium Unit Owners in the Condominium Central Lot, and such Condominium Unit Owner's tenants and invitees. A non-exclusive easement is hereby reserved (and declared and created) over, under and upon such portions of the Hotel Lot as may be designated, in writing, from time to time by the Owner thereof for the use, benefit and enjoyment of any Condominium North Shared Facilities that may be constructed thereon from time to time in favor of the Condominium North Lot, including Condominium Unit Owners in the Condominium North Lot, and such Condominium Unit Owner's tenants and invitees. Further, a non-exclusive easement is hereby reserved (and declared and created) over, under and upon such portions of the Hotel Lot as may

be designated, in writing, from time to time by the Owner thereof for the use, benefit and enjoyment of the any Non-Retail Shared Facilities that may be constructed thereon from time to time in favor of the Condominium South, Condominium North and Condominium Central Lots (their guests, tenants and invitees), including Condominium Unit Owners in the Condominium South Lot, Condominium North Lot and/or the Condominium Central Lot, and such Condominium Unit Owner's tenants and invitees. The Hotel Lot Owner shall have the right to establish, from time to time, rules and regulations regarding the use of the General, Non-Retail, Condominium South, Condominium Central and Condominium North Shared Facilities, including, without limitation, the right to close off portions of the General Shared Facilities or Non-Retail Shared Facilities from time to time for private parties and/or functions as desired in the sole discretion of the Hotel Lot Owner and the right to charge reasonable use fees for use of the General and/or Non-Retail Shared Facilities and/or for services offered from the General Shared Facilities and/or Non-Retail Shared Facilities [provided, however, that, except only through the maintenance assessments described in Section 16, and any applicable Access Fee, Administrative Fee and/or Fixed Charge, no Condominium Unit Owner shall be charged a use or membership fee for access to any of the Non-Retail, Condominium South, Condominium Central and/or Condominium North Shared Facilities and/or for the Limited Spa Rights (as distinguished from fees for items purchased at, or services provided from, the Non-Retail, Condominium South, Condominium Central and/or Condominium North Shared Facilities, for which a Condominium Unit Owner shall be charged and/or guest fees established from time to time by the Hotel Lot Owner pursuant to a non-discriminatory policies)]. Notwithstanding anything herein contained, the Hotel Lot Owner, for itself and its successors and assigns, hereby reserves the exclusive use of the roof surfaces and/or structures located on any and all roofs within The Properties for purposes of placing, installing and/or otherwise allowing, whether or not for consideration (and if for consideration, all such consideration shall be the sole property of the Hotel Lot Owner) antennas, dishes, receiving, transmitting, monitoring and/or other equipment thereon, all as the Hotel Lot Owner may desire from time to time, without requiring approval from the Association, the Board or any other Owner.

16.2     Maintenance. The Hotel Lot Owner shall maintain in good repair, and shall replace as often as necessary, the General, Non-Retail, Condominium South, Condominium Central and Condominium North Shared Facilities, all such work to be done as determined and ordered by the Hotel Lot Owner. All work pursuant to this Section related to the foregoing shall be paid for through assessments (either general or special) imposed in accordance herewith. In the event that any Lot Owner requests the Hotel Lot Owner to repair or replace any portions of that Owner's Lot other than the General, Non-Retail, Condominium South, Condominium Central and Condominium North Shared Facilities which would not otherwise fall under the Hotel Lot Owner's responsibilities, then the Hotel Lot Owner may do so as long as all costs and expenses thereof are paid by the applicable Lot Owner.  No Owner may waive or otherwise escape liability for assessments to the Hotel Lot Owner by non-use (whether voluntary or involuntary) of the applicable Shared Facilities or abandonment of the right to use same. Notwithstanding anything herein contained to the contrary, the Hotel Lot Owner shall be excused and relieved from any and all maintenance, repair and/or replacement obligations under this Section to the extent that the funds necessary to perform same are not available through the assessments imposed and actually collected. The Hotel Lot Owner shall have no obligation to fund and/or advance any deficit or shortfall in funds needed by the Hotel Lot Owner in order to properly perform the maintenance, repair and/or replacement obligations described herein.

Without limiting the generality of the foregoing, the Hotel Lot Owner shall assume all of Declarant's and its affiliates' responsibilities to the County, the City, and its and their governmental and quasi-governmental subdivisions and similar entities of any kind with respect to The Properties as a whole and shall indemnify and hold Declarant and its affiliates harmless with respect thereto in the event of the Hotel Lot Owner's failure to fulfill those responsibilities.

16.3     Assessment to Hotel Lot Owner; Lien. Declarant (and each party joining in any Supplemental Declaration), as the initial owner of all of the Lots, hereby covenants and agrees, and each owner of a Lot (including, without limitation, a Unit Owner) or any portion thereof, by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to covenant and agree, to pay to the Hotel Lot Owner annual assessments and charges for the operation and insurance of, and for payment of expenses (and real estate and personal property taxes and/or governmental assessments and/or impositions) allocated or assessed to or through the Hotel Lot Owner, of and/or for the maintenance, management, operation and insurance of the Shared Facilities, the establishment of reasonable reserves for the replacement of same (if same are established in the sole discretion of the Hotel Lot Owner), capital improvement assessments, special assessments and all other charges and assessments hereinafter referred to or imposed by the Hotel Lot Owner in connection with the repair, replacement, improvement, maintenance, management, operation and insurance of, and taxes on, the Shared Facilities, all such assessments to be fixed, established and collected from time to time as herein provided. The annual assessment, capital improvement assessment and special assessment, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the Retail, Condominium North, Condominium South and Condominium Central Lots and shall be a continuing lien upon the Retail, Condominium North, Condominium South and Condominium Central Lots and upon all improvements thereon, from time to time existing. Each such assessment, together with such interest thereon and costs of collection thereof as hereinafter provided, shall also be the personal obligation of all persons who own any fee interest in the Retail, Condominium North, Condominium South and Condominium Central Lots, or any portions thereof at the time when the assessment fell due and all subsequent Owners and fee owners and Unit Owners thereof until paid, except as provided in Section 16.5 below.

Reference herein to assessments shall be understood to include reference to any and all of said charges whether or not specifically mentioned.

With respect to the Non-Retail Shared Facilities, upon submission of the Condominium South Lot, Condominium Central Lot and Condominium North Lot to this Declaration, and otherwise as set forth below, the Condominium South Lot shall be assessed 25%, the Condominium Central Lot shall be assessed 29% and the Condominium North Lot shall be assessed 46% of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner) for, and taxes on, the Non-Retail Shared Facilities.  For purposes hereof, the following shall be deemed part of the expenses attributable to the Non-Retail Shared Facilities: (1) the costs and expenses of maintaining, repairing and/or replacing as

Book26080/Page4929     CFN#20071144863     Page 25 of 104

necessary the seawall located upon or adjacent to (even if beyond the legal boundaries of) the Hotel Lot; (2) the costs and expenses of installing, maintaining, repairing, restoring, renourishing and/or replacing of the beach/dune systems, and any crosswalk or crossover structures to and from the beach located upon or adjacent to (even if beyond the legal boundaries of) the Hotel Lot; (3) the costs and expenses of providing services to Owners (and their guests, tenants and invitees) on the beach located upon or adjacent to (even if beyond the legal boundaries of) the Hotel Lot (without imposing any obligation on the Hotel Lot Owner to provide such services) and (4) the Garage Costs.

Notwithstanding the foregoing, only then Completed Lots (as hereinafter defined) shall be obligated for payment of its allocable share of the Non-Retail Shared Facilities, said allocable share to be determined as follows: The allocable share of the Non-Retail Shared Facilities attributable to each Completed Lot shall be equal to a fraction, the numerator of which shall be the percentage attributable to the applicable Completed Lot and the denominator of which shall be the percentage attributable to all the Completed Lots then submitted to The Properties (said percentages as set forth in the previous paragraph). For purposes hereof, a "Completed Lot" shall be deemed to be only those Lots which are then submitted to The Properties, and for which a certificate of occupancy and/or completion (whether temporary, partial or otherwise) has been issued by the appropriate governmental authority. Each Condominium Unit located within an applicable Completed Lot shall be responsible for its share of that portion of such Completed Lot's allocable share of the Non-Retail Shared Facilities in an amount equal to the Condominium Unit's proportionate share of the common elements of the applicable condominium in which the Unit is located.

With respect to the Condominium South Shared Facilities, the Condominium South Lot shall be assessed **one hundred percent (100%)** of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner) for, and taxes on, the Condominium South Shared Facilities.

With respect to the Condominium Central Shared Facilities, the Condominium Central Lot shall be assessed **one hundred percent (100%)** of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner) for, and taxes on, the Condominium Central Shared Facilities.

With respect to the Condominium North Shared Facilities, the Condominium North Lot shall be assessed **one hundred percent (100%)** of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner), for, and taxes on , the Condominium North Shared Facilities.

Inasmuch as the Retail Lot has not initially been submitted as part of The Properties, at such time there are no initial General Shared Facilities (with many items which are intended to be part of the General Shared Facilities, instead being initially classified as Non-Retail Shared Facilities). To the extent that the Declarant elects to add the Retail Lot to The Properties, the Hotel Lot Owner may, without requiring the consent of any party, reclassify certain of the Non-Retail Shared Facilities as General Shared Facilities, to the extent applicable. With respect to the General Shared Facilities, each Lot shall be assessed a percentage of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner) for, and taxes on, the General Shared Facilities, with the exact allocations to be established in the sole discretion of the Hotel Lot Owner and to be set forth in the Supplemental Declaration adding the Retail Lot to The Properties, provided, however, that in no event shall the percentage assessed against either the Condominium Central Lot or Condominium South Lot exceed the initial allocations to those Lots set forth in this Declaration of the Non-Retail Shared Facilities expenses.

Notwithstanding the allocations set forth above, to the extent that any utility consumption charges are part of the costs attributable to the Shared Facilities and those charges can reasonably be allocated to the particular Lots based upon actual consumption, then in such event, the utility consumption charges shall be allocated based upon actual consumption, rather than by the percentage allocations described above.

In addition to the assessments described in the foregoing paragraphs, each fee owner of a unit within a Condominium Lot (a "Unit Owner") agrees to pay, on a monthly basis, a fixed charge for use of the spa facilities contained within the Non-Retail Shared Facilities (the "Fixed Charge"), which shall be assessed by the Hotel Lot Owner against each Unit. The initial Fixed Charge for each Unit shall be equal to the aggregate of the following per month (i) two hundred fifty and No/100 Dollars ($250.00) for Units within the Condominium Central Lot and/or Condominium South Lot, or three hundred fifty and No/100 Dollars ($350.00) for Units within the Condominium North Lot, plus (ii) additional amount equal to fifty and No/100 Dollars ($50.00) multiplied by the Occupancy Limits (as defined in the applicable Declaration) for the Unit. By way of example only, for a 3-bedroom Unit having an Occupancy Limit of four (4) persons, the Fixed Charge shall be equal to a total of $550.00 (i.e., $350.00 plus $50.00 x 4). The Fixed Charge amount shall remain fixed through the last day of the calendar year following the year in which this Declaration is recorded. Effective on January 1 of the following year and on every anniversary thereafter, the Fixed Charge shall be increased by an amount to be determined by the Hotel Lot Owner in its sole discretion, provided, however, that no single increase shall be more than ten percent (10%) greater than the immediately previous Fixed Charge charged. From each payment of a Fixed Charge, the applicable Unit Owner shall initially be entitled to a $100.00 credit against spa and/or treatment services obtained during that calendar month (or any of the following two (2) calendar months) and a $100.00 credit against food and beverage expenses incurred during that calendar month (or any of the following two (2) calendar months). No unused credits shall rollover beyond the two (2) month period described in the previous sentence and under no circumstances may a credit be utilized unless all Fixed Charges against the applicable Unit have been paid current. By way of example only, provided that all Fixed Charges are then paid and provided further that that are no accrued but unused credits at the time, upon making payment of the January Fixed Charge paid current: (i) if the Unit Owner then spends $400.00 on food and beverage services in January, the credit shall offset $100.00 of those charges and the Unit Owner shall be obligated for payment of the balance directly, and (ii) if the Unit Owner does not use any spa and treatment services during that January, February or March, but in April of that calendar year spends $500.00 for spa or treatment services (and assuming that the February, March and April installments of the Fixed Charges were paid), then, the potential $100 credit toward spa and treatment services from January would not be available (since it was only available for the month due – January – and the following two months), but the $100.00

spa and treatment credits for February, March and April could be applied against the $500.00, and with the Unit Owner responsible for payment of the $200.00 balance. Credits (whether for food and beverage service or spa or treatment services) may never be applied to a period prior to the period during which it is paid (and for which it is due). As such, with respect to the $500.00 example above, the Unit Owner would not be permitted to leave its $200.00 balance unpaid with the thought of applying the subsequent May or June credits. Notwithstanding the foregoing, the Hotel Lot Owner may, at any time, but with not less than ninety (90) days notice, alter the allocation of credits from the Fixed Charge (i.e., provide that all credits may only be applied to spa and/or treatments services, or all only to food and beverage services, or to any other allocation it may desire).

The Hotel Lot Owner shall budget and adopt assessments for the Hotel Lot Owner's general expenses for repair, operation, maintenance, improvement, replacement, insurance, alteration or relocation of, and taxes on, the applicable Shared Facilities (and the establishment of reserves therefore at the election of the Hotel Lot Owner) based, in part, upon the Hotel Lot Owner's reasonable projections of the intensity of use of the applicable Shared Facilities for the period subject to the budget. In addition to the regular and capital improvement assessments which are or may be levied hereunder, the Hotel Lot Owner shall have the right to collect reasonable reserves for the replacement of the applicable Shared Facilities (or any components thereof) and to levy special assessments against an Owner(s) to the exclusion of other Owners for the repair or replacement of damage to any portion of the applicable Shared Facilities (including, without limitation, improvements and landscaping thereon) caused by the misuse, negligence or other action or inaction of an Owner or his guests, tenants or invitees. Any such special assessment shall be subject to all of the applicable provisions of this Article including, without limitation, lien filing and foreclosure procedures and late charges and interest. Any special assessment levied hereunder shall be due within the time specified by the Hotel Lot Owner in the action imposing such assessment. Further, funds which, in the aggregate, exceed ten percent (10%) of the estimated operating budget for the applicable Shared Facilities for repair, maintenance and improvement of the applicable Shared Facilities in any one fiscal year which are necessary or desired by the Hotel Lot Owner for the addition of capital improvements (as distinguished from repairs, maintenance, replacement and/or relocation) relating to the applicable Shared Facilities and which have not previously been collected as reserves or are not otherwise available to the Hotel Lot Owner (other than by borrowing) shall be levied by the Hotel Lot Owner as assessments against the applicable Lot Owners entitled to use of (or benefiting from) the particular component of the applicable Shared Facilities. The annual regular assessments provided for in this Article shall commence on the first day of the month next following the recordation of these covenants and shall be applicable through December 31 of such year. Each subsequent annual assessment shall be imposed for the year beginning January 1 and ending December 31. The annual assessments shall be payable in advance in monthly installments, or in annual, semi- or quarter-annual installments if so determined by the Hotel Lot Owner (absent which determination they shall be payable monthly). The assessment amount (and applicable installments) may be changed at any time by the Hotel Lot Owner from that originally stipulated or from any other assessment that is in the future adopted by the Hotel Lot Owner. The original assessment for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary, at any appropriate time during the year), but the amount of any revised assessment to be levied during any period shorter than a full calendar year shall be in proportion to the number of months (or other appropriate installments) remaining in such calendar year. The Hotel Lot Owner shall fix the date of commencement and the amount of the assessment against the Lots for each assessment period, to the extent practicable, at least thirty (30) days in advance of such date or period, and shall, at that time, prepare a roster of the Lots and assessments applicable thereto which shall be kept in the Condominium North of the Hotel Lot Owner and shall be open to inspection by any Owner. Written notice of the assessment shall thereupon be sent to every Owner subject thereto twenty (20) days prior to payment of the first installment thereof, except as to special assessments. In the event no such notice of the assessments for a new assessment period is given, the amount payable shall continue to be the same as the amount payable for the previous period, until changed in the manner provided for herein.

16.4    **Effect of Non-Payment of Assessment; the Personal Obligation; the Lien; Remedies of the Hotel Lot Owner.** If the assessments (or installments) provided for herein are not paid on the date(s) when due (being the date(s) specified herein or pursuant hereto), then such assessments (or installments) shall become delinquent and shall, together with late charges, interest and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Lot and all improvements thereon which shall bind such property in the hands of the then Owner, his heirs, personal representatives, successors and assigns. Except as provided in Section 16.5 to the contrary, the personal obligation of an Owner to pay such assessment shall pass to his successors in title and recourse may be had against either or both. If any installment of an assessment is not paid within fifteen (15) days after the due date, at the option of the Hotel Lot Owner a late charge not greater than fifty percent (50%) of the amount of such unpaid installment may be imposed (provided that only one late charge may be imposed on any one unpaid installment and if such installment is not paid thereafter, it and the late charge shall accrue interest as provided herein but shall not be subject to additional late charges; provided further, however, that each other installment thereafter coming due shall be subject to one late charge each as aforesaid) and the Hotel Lot Owner may bring an action at law against the Owner(s) personally obligated to pay the same, may record a claim of lien (as evidence of its lien rights as hereinabove provided for) against the Lot on which the assessments and late charges are unpaid and all improvements thereon, may foreclose the lien against the applicable portion of the Lot and all improvements thereon on which the assessments and late charges are unpaid, or may pursue one or more of such remedies at the same time or successively, and attorneys' fees and costs actually incurred in preparing and filing the claim of lien and the complaint, if any, and prosecuting same, in such action shall be added to the amount of such assessments, late charges and interest secured by the lien, and in the event a judgment is obtained, such judgment shall include all such sums as above provided and attorneys' fees actually incurred together with the costs of the action, through all applicable appellate levels. In addition to the rights of collection of assessments stated in this Section, any and all persons acquiring title to or an interest in a Lot as to which the assessment is delinquent, including without limitation persons acquiring title by operation of law and by judicial sales, shall not be entitled to the occupancy of such Lot or the enjoyment of the applicable portion of the Shared Facilities until such time as all unpaid and delinquent assessments due and owing from the selling Owner have been fully paid; provided, however, that the provisions of this sentence shall not be applicable to the mortgagees and purchasers contemplated by Section 16.5 below. Failure of the Hotel Lot Owner (or any collecting entity) to send or deliver bills or notices of assessments shall not relieve Owners from their obligations hereunder. The Hotel Lot Owner shall have such other remedies for collection and enforcement of assessments as may be permitted by applicable law. All remedies are intended to be, and shall be, cumulative.

16.5    **Subordination of the Lien.** The lien of the assessments provided for in this Article shall be subordinate to real property tax liens and the lien of any first mortgage; provided, however, that any such mortgage lender when in possession, and

in the event of a foreclosure, any purchaser at a foreclosure sale, and any such mortgage lender acquiring a deed in lieu of foreclosure, and all persons claiming by, through or under such purchaser or mortgage lender, shall hold title subject to the liability and lien of any assessment coming due after such foreclosure (or conveyance in lieu of foreclosure). Any unpaid assessment which cannot be collected as a lien against any Lot by reason of the provisions of this Section shall be deemed to be an assessment divided equally among, payable by and a lien against all Lots subject to assessment by the Hotel Lot Owner, including the Lots as to which the foreclosure (or conveyance in lieu of foreclosure) took place.

16.6  Curative Right.  Declarant, for all Lots now or hereafter located within The Properties, hereby acknowledges and agrees, and each Owner of any Lot by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to acknowledge and agree, that it shall be the obligation of the Hotel Lot Owner to maintain, repair and replace the General, Non-Retail, Condominium North, Condominium Central and Condominium South Shared Facilities in accordance with the provisions of this Declaration. Notwithstanding anything herein contained to the contrary, in the event (and only in the event) that the Hotel Lot Owner fails to maintain the applicable Shared Facilities as required under this Declaration, any affected Lot Owner shall have the right to perform such duties; provided, however, that, except in the case of an emergency (in which case such notice as is reasonable under the circumstances shall be required) same may only occur after thirty (30) business days' prior written notice to the Hotel Lot Owner and provided that the Hotel Lot Owner has not effected curative action within said thirty (30) business day period (or if the curative action cannot reasonably be completed within said thirty (30) business day period, provided only that the Hotel Lot Owner has not commenced curative actions within said thirty (30) business day period and thereafter diligently pursued same to completion). To the extent that a Lot Owner must undertake maintenance responsibilities as a result of the Hotel Lot Owner's failure to perform same, then in such event, but only for such remedial actions as may be necessary, the Lot Owner shall be deemed vested with the Assessment rights of the Hotel Lot Owner hereunder for the limited purpose of obtaining reimbursement from the Owners for the costs of performing such remedial work.

16.7  Priority of Liens.  Notwithstanding anything herein contained to the contrary, any assessment sums collected shall be applied first to the assessments of the Hotel Lot Owner, then to the assessments of the Master Association and then to those of the collecting Neighborhood Association. Further, the lien of the Association provided in Article 7.1 hereof shall be junior and subordinate to the lien hereby created in favor of the Hotel Lot Owner.

16.8  Financial Records.  The Hotel Lot Owner shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and relocation of the General, Non-Retail, Condominium North, Condominium Central and Condominium South Shared Facilities, including the then current budget and any then proposed budget (the "Facilities Records"). The Facilities Records need not be audited or reviewed by a Certified Public Accountant. The Facilities Records shall at all times, during reasonable business hours, be subject to the inspection and audit of any Member of the Association.

16.9  Hotel Lot Owner Consent; Conflict.  The provisions of this Article 16 shall not be amended, modified or in any manner impaired and/or diminished, directly or indirectly, without the prior written consent of the Hotel Lot Owner. In the event of any conflict between the provisions of this Article 16, and the provisions of any other Article of this Declaration, the provisions of this Article 16 shall prevail and govern.

## ARTICLE 17

### PROVISIONS REGARDING PARKING

17.1  General.  All of the parking areas for the use of the Hotel, Retail, Condominium North, Condominium South and Condominium Central Lots are located within the Hotel Lot. Declarant, as the initial Hotel Lot Owner (and thereafter the Hotel Lot Owner, if different from Declarant), shall have, and hereby reserves unto the Hotel Lot Owner, the exclusive right at any time, and from time to time, to grant to specific Structures, Condominium Units, Lots, the Master Association or any Neighborhood Association the exclusive right to use one or more of such parking spaces. A grant with respect to parking spaces shall be made by the Hotel Lot Owner by written assignment (which shall not be recorded). Any such grant vests in the Owner of the applicable Structure, Condominium Unit, Lot, Master Association or such Neighborhood Association, as appropriate, the exclusive right to use (and not title to) such space(s), and, if to a Lot, Structure or a Condominium Unit, as an appurtenance to such Lot, Structure or Condominium Unit, as applicable. Unless otherwise noted on the form of assignment with respect to certain parking spaces, such exclusive right to use shall pass with title to such Lot, Structure or Condominium Unit, whether or not specifically assigned. All fees collected by the Hotel Lot Owner for assigning spaces, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association. Temporary guest or recreational parking shall be permitted only as determined by the Hotel Lot Owner, and only within spaces and areas, if any, clearly designated for this purpose. The Hotel Lot Owner is hereby empowered to establish parking regulations in all of the parking areas of the Hotel Lot and may make provision for the involuntary removal of any violating vehicle. It is initially intended that all parking shall be by valet only and that there shall be no self-parking permitted within the parking facilities at any time. The Declarant, as the initial owner of the Hotel Lot, agrees that at no additional charge, it shall provide the non-exclusive use of one parking space for each Unit within the Condominium South Lot and the Condominium North Lot and for each Traditional Unit within the Condominium Central Lot. Each Transient Unit, however, shall have, at no additional charge, the non-exclusive use of one parking space to be used solely by a Permitted Occupant (as defined in the applicable Declaration) of the Transient Unit when in residence, and that said space shall not be utilized by a Permitted Occupant when such Permitted Occupant is not in residence on The Properties.

17.2  Easements for Use.  Subject to such rules and regulations as may be established from time to time by the Hotel Lot Owner, a non-exclusive easement for vehicular ingress and egress is hereby reserved (and declared and created) over, under and upon the driveways, accessways, ramps and other portions of the Hotel Lot as are necessary to access any portion of the Hotel Lot to which the owner of a Lot has use rights, if any, in favor of the applicable Retail, Condominium North, Condominium South and/or Condominium Central Lot, including Condominium Unit Owners. The Hotel Lot Owner shall have the right to establish, from time to time, rules and regulations regarding the use of the Hotel Lot, including, without limitation, the right

Book26080/Page4932    CFN#20071144863                    Page 28 of 104

to charge reasonable use fees for use of the Hotel Lot, or portions thereof, and/or for services offered from the Hotel Lot and to specifically limit the scope of the easements herein granted. The Hotel Lot Owner shall further have the right to permit persons other than owners of Lots to use the Hotel Lot, or portions thereof, and to establish rules and regulations related thereto.

17.3 <u>Maintenance</u>. The Hotel Lot Owner shall maintain in good repair, and shall replace as often as necessary, the parking garage portion of the Hotel Lot, all such work to be done as determined and ordered by the Hotel Lot Owner.

## ARTICLE 18.

## SPECIAL COVENANTS

18.1 <u>Preamble</u>. In recognition of the fact that certain special types of platting and/or construction require special types of covenants to accurately reflect the maintenance and use of the affected Lots and Structures, the following provisions of this Article 18 shall apply in those cases where the below-described types of improvements are constructed within The Properties. However, nothing herein shall necessarily suggest that Declarant will or will not, in fact, construct such types of improvements nor shall anything herein contained be deemed an obligation to do so.

18.2 <u>Condominiums, Timeshare and Cooperatives</u>. In the event that any portion of The Properties is submitted to the condominium, timeshare or cooperative form of ownership, then the following special provisions shall apply:

(a) As provided in Article 1.1 of this Declaration, a single Lot or Structure shall not lose its character as such for the purposes of this Declaration by virtue of being subdivided into condominium, timeshare or cooperative parcels by a declaration of condominium, timeshare or vacation plan, or cooperative or similar instrument. As also provided in Article I, an Owner shall be deemed, for purposes of this Declaration, to be the association for a Lot/Structure submitted to such form of ownership (a "Condominium Lot"), even though same is not actually the owner of the Lot/Structure.

(b) The condominium or cooperative association (acting through its board of directors) shall constitute the Neighborhood Association for such condominium or cooperative.

(c) For the purposes of complying with and enforcing the standards of maintenance contained herein, the condominium/ cooperative building and any appurtenant facilities shall be treated as a Structure and any other portion of the condominium/ cooperative shall be treated as an unimproved portion of the Lot, with the condominium/cooperative association to have the maintenance duties of an Owner as set forth herein. The condominium/cooperative association shall also be jointly and severally liable with its members for any violation of the use restrictions set forth in this Declaration or of rules and regulations of the Association.

(d) Assessments levied hereunder against a single Condominium Lot shall be but a single lien on the entirety of such Lot and shall be payable by the Owner thereof (i.e., the association therefor). Accordingly, each applicable declaration of condominium or cooperative shall provide (or in the absence of such provision, shall be deemed to provide) that all assessments levied hereunder shall be a common expense (within the meaning of Fla. Stat. 718.103(8) (1993) or Fla. Stat. 719.103(7) (1993), as applicable). The foregoing is not intended to obviate the effect of Fla. Stat. 718.121(3), but inasmuch as this Declaration and the lien created hereby shall be recorded prior to the recording of any relevant declaration of condominium or cooperative, it is intended that Fla. Stat. 718.121(1) shall not be operative as to such lien and each applicable condominium parcel owner shall be deemed to have ratified and confirmed same by the acceptance of the deed to such parcel.

(e) Each association for a Condominium Lot shall be liable and responsible to the Association hereunder for its and its constituents' compliance with the covenants, restrictions and requirements of this Declaration and the Articles of Incorporation, By-Laws, and rules and regulations of the Association. Accordingly, while the Association shall have the right (exercisable at its sole option) to proceed against such a constituent for a violation of this Declaration, it shall have a direct right to do so against the condominium/cooperative association (even if the violation is not caused by such association or all of its constituents).

(f) Each association for a Condominium Lot shall be a Member of the Association, but its constituents shall not be deemed to be Members for voting purposes. Such association shall cast its votes as would any corporate Owner, as provided in the articles of incorporation and/or by-laws of the association.

18.3 <u>Commercial Property</u>. In the event that any portion of The Properties is developed for commercial uses, then the supplemental declaration submitting same to this Declaration shall provide for such voting rights, assessment obligations, use restrictions, maintenance standards and architectural control requirements as the Declarant with the consent of Declarant's Mortgagee shall determine and declare in the supplemental declaration.

## GENERAL PROVISIONS

19.1    _Duration._ The covenants and restrictions of this Declaration shall run with and bind The Properties, and shall inure to the benefit of and be enforceable by the Association, the Hotel Lot Owner, Declarant (at all times) and the Owner of any land subject to this Declaration, and their respective legal representatives, heirs, successors and assigns, for a term of ninety-nine (99) years from the date this Declaration is recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years each unless an instrument signed by all of the then Owners of the Lots subject hereto and of 100% of the mortgagees thereof has been recorded, agreeing to revoke said covenants and restrictions; provided, however, that no such agreement to revoke shall be effective unless made and recorded three (3) years in advance of the effective date of such revocation, and unless written notice of the proposed agreement is sent to every Owner at least ninety (90) days in advance of any signatures being obtained.

19.2    _Notice._ Except only as may be provided to the contrary in the By-Laws, any notice required to be sent to any Member or Owner under the provisions of this Declaration shall be deemed to have been properly sent when personally delivered or mailed, postpaid, to the last known address of the person who appears as Member or Owner on the records of the Association at the time of such mailing.

19.3    _Enforcement._ Without limiting the generality of Article 9, enforcement of these covenants and restrictions shall be accomplished by any proceeding at law or in equity against any person or persons violating or attempting to violate any covenant or restriction, either to restrain violation or to recover damages, and against the Lots to enforce any lien created by these covenants; and failure to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter. The SFWMD shall have the right to take enforcement action, including a civil action or an injunction and the right to seek penalties against the Association to compel it to correct any outstanding problems with the surface water management systems facilities or in mitigation or conservation areas under the responsibility or control of the Association.

19.4    _Interpretation._ The Article and Section headings have been inserted for convenience only, and shall not be considered or referred to in resolving questions and interpretation or construction. Unless the context requires a contrary construction, the singular shall include the plural and the plural the singular, and the masculine, feminine and neuter genders shall each include the others.

19.5    _Severability._ Invalidation of any one of these covenants or restrictions or any part, clause or word hereof, or the application thereof in specific circumstances, by judgment or court order shall not affect any other provisions or applications in other circumstances, all of which shall remain in full force and effect.

19.6    _Effective Date._ This Declaration shall become effective upon its recordation in the Public Records of the County.

19.7    _Condominium North Lot and Retail Lot._ Any and all rights, benefits and burdens imposed upon the Condominium North Lot, the Condominium North Lot Owner(s) from time to time, the Retail Lot and/or the Retail Lot Owner(s) from time to time shall be disregarded and of no force or effect unless and until the Condominium North Lot and/or Retail Lot, as applicable, is/are added to The Properties by recordation of a supplemental declaration. Prior to the time that the Condominium North Lot and/or Retail Lot, as applicable, is/are submitted to The Properties, and notwithstanding any provisions contained herein to the contrary, no approval, joinder or consent of the Condominium North Lot and/or Retail Lot shall be required.

19.8    _Amendment._ In addition, but subject, to any other manner herein provided for the amendment of this Declaration, the covenants, restrictions, easements, charges and liens of this Declaration may be amended, changed or added to at any time and from time to time upon the execution and recordation of an instrument executed by Declarant and Declarant's Mortgagee, for so long as it or its affiliate holds title to any Lot or Structure affected by this Declaration; or alternatively, by an instrument signed by the President of the Master Association, attested to by its Secretary and certifying that the amendment set forth in the instrument was adopted by a vote of at least 66-2/3% of the votes to be cast by all Members, at a duly called meeting thereof, provided that so long as Declarant or its affiliates is the Owner of any Lot affected by this Declaration, Declarant's consent must be obtained if such amendment, in the sole opinion of Declarant, affects its interest. No amendment may be adopted which would affect the surface water management system, including environmental conservation areas, without the consent of the SFWMD. The SFWMD shall determine whether the amendment necessitates a modification of the current surface water management permit. If a modification is necessary, the District will advise the Association.

19.9    _Conflict._ This Declaration shall take precedence over conflicting provisions in the Articles of Incorporation and By-Laws of the Association and said Articles shall take precedence over the By-Laws.

19.10    _Cooperation._ Each Owner, by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to covenant and agree, to cooperate in, and support, any and all zoning, administrative, governmental and/or quasi-governmental filings, applications, requests, submissions and other actions necessary or desired for development and/or improvement of The Properties, including, without limitation, signing any required applications, plats, etc. as the owner of any portion of The Properties owned or controlled thereby when necessary or requested.

19.11    _Standards for Consent, Approval and Other Actions._ Whenever this Declaration shall require the consent, approval, completion, substantial completion, or other action by the Declarant or its affiliates, the Association or the Hotel Lot Owner, such consent, approval or action may be withheld in the sole and unfettered discretion of the party requested to give such consent or approval or take such action, and all matters required to be completed or substantially completed by the Declarant or its affiliates or the Association shall be deemed so completed or substantially completed when such matters have been completed or substantially completed in the reasonable opinion of the Declarant or Association, as appropriate.

19.12    <u>Easements</u>. Should the intended creation of any easement provided for in this Declaration fail by reason of the fact that at the time of creation there may be no grantee in being having the capacity to take and hold such easement, then any such grant of easement deemed not to have been so created shall nevertheless be considered as having been granted directly to the Association as agent for such intended grantees for the purpose of allowing the original party or parties to whom the easements were originally intended to have been granted the benefit of such easement and the Owners designate hereby the Declarant and the Association (or either of them) as their lawful attorney-in-fact to execute any instrument on such Owners' behalf as may hereafter be required or deemed necessary for the purpose of later creating such easement as it was intended to have been created herein. Formal language of grant or reservation with respect to such easements, as appropriate, is hereby incorporated in the easement provisions hereof to the extent not so recited in some or all of such provisions.

19.13    <u>Limitation on Master Association</u>. Anything in this Declaration to the contrary notwithstanding, the existence or exercise of any easement, right, power, authority, privilege or duty of the Master Association as same pertains to any condominium located within The Properties which would cause the Master Association to be subject to Chapter 718, Florida Statutes, or any related administrative rules or regulations, shall be null, void and of no effect to the extent, but only to the extent, that such existence or exercise is finally determined by a court or administrative hearing officer of competent jurisdiction (after all appellate rights have been exercised or waived) to subject the Master Association to said Chapter 718. It is the intent of this provision that the Master Association not be deemed to be a condominium association, nor the Common Properties be deemed to be common elements of any such condominium.

19.14    <u>No Public Right or Dedication</u>. Nothing contained in this Declaration shall be deemed to be a gift or dedication of all or any part of the Common Properties to the public, or for any public use.

19.15    <u>Constructive Notice and Acceptance</u>. Every person who owns, occupies or acquires any right, title, estate or interest in or to any Lot and/or Unit or other property located on or within The Properties, shall be conclusively deemed to have consented and agreed to every limitation, restriction, easement, reservation, condition, lien and covenant contained herein, whether or not any reference hereto is contained in the instrument by which such person acquired an interest in such Lot, Structure or other property.

19.16    <u>NO REPRESENTATIONS OR WARRANTIES</u>. NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, HAVE BEEN GIVEN OR MADE BY DECLARANT, HOTEL LOT OWNER OR ITS OR THEIR AGENTS OR EMPLOYEES IN CONNECTION WITH ANY PORTION OF THE COMMON PROPERTIES, THE SHARED FACILITIES, THEIR PHYSICAL CONDITION, ZONING, COMPLIANCE WITH APPLICABLE LAWS, MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR IN CONNECTION WITH THE SUBDIVISION, SALE, OPERATION, MAINTENANCE, COST OF MAINTENANCE, TAXES OR REGULATION THEREOF, EXCEPT (A) AS SPECIFICALLY AND EXPRESSLY SET FORTH IN THIS DECLARATION OR IN DOCUMENTS WHICH MAY BE FILED BY DECLARANT FROM TIME TO TIME WITH APPLICABLE REGULATORY AGENCIES, AND (B) AS OTHERWISE REQUIRED BY LAW. AMONG OTHER ACTS OF GOD AND UNCONTROLLABLE EVENTS, HURRICANES AND FLOODING HAVE OCCURRED IN SOUTH FLORIDA AND, GIVEN THE PROXIMITY OF THE PROPERTIES TO THE WATER, THE PROPERTIES ARE EXPOSED TO THE POTENTIAL DAMAGES FROM FLOODING AND FROM HURRICANES, INCLUDING, BUT NOT LIMITED TO, DAMAGES FROM STORM SURGES AND WIND-DRIVEN RAIN. WATER OR OTHER DAMAGES FROM THIS OR OTHER EXTRAORDINARY CAUSES SHALL NOT BE THE RESPONSIBILITY OF THE DECLARANT, HOTEL LOT OWNER OR ANY OTHER PARTY. TO THE MAXIMUM EXTENT LAWFUL DECLARANT, FOR ITSELF AND AS THE INITIAL HOTEL LOT OWNER, HEREBY DISCLAIMS ANY AND ALL AND EACH AND EVERY EXPRESS OR IMPLIED WARRANTIES, WHETHER ESTABLISHED BY STATUTORY, COMMON, CASE LAW OR OTHERWISE, AS TO THE DESIGN, CONSTRUCTION, SOUND AND/OR ODOR TRANSMISSION, EXISTENCE AND/OR DEVELOPMENT OF MOLDS, MILDEW, TOXINS OR FUNGI, FURNISHING AND EQUIPPING OF THE PROPERTIES AND/OR SHARED FACILITIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY, COMPLIANCE WITH PLANS, ALL WARRANTIES IMPOSED BY STATUTE AND ALL OTHER EXPRESS AND IMPLIED WARRANTIES OF ANY KIND OR CHARACTER.

AS TO SUCH WARRANTIES WHICH CANNOT BE DISCLAIMED, AND TO OTHER CLAIMS, IF ANY, WHICH CAN BE MADE AS TO THE AFORESAID MATTERS, ALL INCIDENTAL AND CONSEQUENTIAL DAMAGES ARISING THEREFROM ARE HEREBY DISCLAIMED. ALL OWNERS, BY VIRTUE OF ACCEPTANCE OF TITLE TO THEIR RESPECTIVE LOTS AND/OR STRUCTURES (WHETHER FROM THE DECLARANT OR ANOTHER PARTY) SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ALL OF THE AFORESAID DISCLAIMED WARRANTIES AND INCIDENTAL AND CONSEQUENTIAL DAMAGES.

FURTHER, GIVEN THE CLIMATE AND HUMID CONDITIONS IN SOUTH FLORIDA, MOLDS, MILDEW, TOXINS AND FUNGI MAY EXIST AND/OR DEVELOP WITHIN THE LOTS, UNITS AND/OR OTHER PORTIONS OF THE PROPERTIES. EACH OWNER IS HEREBY ADVISED THAT CERTAIN MOLDS, MILDEW, TOXINS AND/OR FUNGI MAY BE, OR IF ALLOWED TO REMAIN FOR A SUFFICIENT PERIOD MAY BECOME, TOXIC AND POTENTIALLY POSE A HEALTH RISK. BY ACQUIRING TITLE TO A LOT OR UNIT, EACH OWNER, INCLUDING WITHOUT LIMITATION, EACH CONDOMINIUM UNIT OWNER, SHALL BE DEEMED TO HAVE ASSUMED THE RISKS ASSOCIATED WITH MOLDS, MILDEW, TOXINS AND/OR FUNGI AND TO HAVE RELEASED THE DEVELOPER, DECLARANT AND HOTEL LOT OWNER FROM ANY AND ALL LIABILITY RESULTING FROM SAME.

19.17    <u>Covenants Running With The Land</u>. Anything to the contrary herein notwithstanding and without limiting the generality (and subject to the limitations) of Section 19.1 hereof, it is the intention of all parties affected hereby (and their respective heirs, personal representatives, successors and assigns) that these covenants and restrictions shall run with The Properties and with title to The Properties. Without limiting the generality of Section 19.5 hereof, if any provision or application of this Declaration would prevent this Declaration from running with The Properties as aforesaid, such provision and/or application shall be judicially modified, if at all possible, to come as close as possible to the intent of such provision or application and then be enforced in a manner which will allow these covenants and restrictions to so run with The Properties; but if such provision and/or application cannot be so modified, such provision and/or application shall be unenforceable and considered null and void

Book26080/Page4935     CFN#20071144863     Page 31 of 104

in order that the paramount goal of the parties (that these covenants and restrictions run with The Properties as aforesaid) be achieved.

## ARTICLE 20.

### DISCLAIMER OF LIABILITY

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE ARTICLES OF INCORPORATION, BY-LAWS, ANY RULES OR REGULATIONS OF THE ASSOCIATION OR ANY OTHER DOCUMENT GOVERNING OR BINDING THE ASSOCIATION (COLLECTIVELY, THE "ASSOCIATION DOCUMENTS"), NEITHER THE ASSOCIATION, DECLARANT OR HOTEL LOT OWNER SHALL BE LIABLE OR RESPONSIBLE FOR, OR IN ANY MANNER A GUARANTOR OR INSURER OF, THE HEALTH, SAFETY OR WELFARE OF ANY OWNER, OCCUPANT OR USER OF ANY PORTION OF THE PROPERTIES INCLUDING, WITHOUT LIMITATION, RESIDENTS AND THEIR FAMILIES, GUESTS, INVITEES, AGENTS, SERVANTS, CONTRACTORS OR SUBCONTRACTORS OR FOR ANY PROPERTY OF ANY SUCH PERSONS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING:

(a)     IT IS THE EXPRESS INTENT OF THE ASSOCIATION DOCUMENTS THAT THE VARIOUS PROVISIONS THEREOF WHICH GOVERN OR REGULATE THE USES OF THE PROPERTIES HAVE BEEN WRITTEN, AND ARE TO BE INTERPRETED AND ENFORCED, FOR THE SOLE PURPOSE OF ENHANCING AND MAINTAINING THE ENJOYMENT OF THE PROPERTIES AND THE VALUE THEREOF;

(b)     NEITHER THE ASSOCIATION, DECLARANT NOR HOTEL LOT OWNER IS EMPOWERED NOR ESTABLISHED TO ACT AS AN ENTITY WHICH ENFORCES OR ENSURES THE COMPLIANCE WITH THE LAWS OF THE UNITED STATES, STATE OF FLORIDA, THE COUNTY, THE CITY AND/OR ANY OTHER JURISDICTION OR THE PREVENTION OF TORTIOUS ACTIVITIES; AND

(c)     ANY PROVISIONS OF THE ASSOCIATION DOCUMENTS SETTING FORTH THE USES OF ASSESSMENTS WHICH RELATE TO HEALTH, SAFETY AND/OR WELFARE SHALL BE INTERPRETED AND APPLIED ONLY AS LIMITATIONS ON THE USES OF ASSESSMENT FUNDS AND NOT AS CREATING A DUTY OF THE RECIPIENT OF SUCH ASSESSMENT FUNDS TO PROTECT OR FURTHER THE HEALTH, SAFETY OR WELFARE OF ANY PERSON(S), EVEN IF ASSESSMENT FUNDS ARE CHOSEN TO BE USED FOR ANY SUCH REASON.

EACH OWNER (BY VIRTUE OF HIS ACCEPTANCE OF TITLE TO HIS LOT) AND EACH OTHER PERSON HAVING AN INTEREST IN OR LIEN UPON, OR MAKING ANY USE OF, ANY PORTION OF THE PROPERTIES (BY VIRTUE OF ACCEPTING SUCH INTEREST OR LIEN OR MAKING SUCH USES) SHALL BE BOUND BY THIS ARTICLE AND SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ANY AND ALL RIGHTS, CLAIMS, DEMANDS AND CAUSES OF ACTION AGAINST THE ASSOCIATION ARISING FROM OR CONNECTED WITH ANY MATTER FOR WHICH THE LIABILITY OF THE AFOREMENTIONED PARTIES HAS BEEN DISCLAIMED IN THIS ARTICLE.

AS USED IN THIS ARTICLE, "ASSOCIATION" SHALL INCLUDE WITHIN ITS MEANING ALL OF THE ASSOCIATION'S DIRECTORS, OFFICERS, COMMITTEE AND BOARD MEMBERS, EMPLOYEES, AGENTS, CONTRACTORS (INCLUDING MANAGEMENT COMPANIES), SUBCONTRACTORS, SUCCESSORS AND ASSIGNS. REFERENCES HEREIN TO DECLARANT OR HOTEL LOT OWNER SHALL INCLUDE EACH OF THE NAMED PARTIES, THEIR PARTNERS, AND ITS AND THEIR SHAREHOLDERS, DIRECTORS, OFFICERS, COMMITTEE AND BOARD MEMBERS, EMPLOYEES, AGENTS, CONTRACTORS, SUBCONTRACTORS, AND ITS AND THEIR SUCCESSORS AND ASSIGNS.

*** Signatures are contained on the following page***

EXECUTED as of the date first above written.

Witnessed by:

Name: _Joanne Hurley_

Name: _DENISE P. SORIANO_

Carillon South Joint Venture, L.L.C., a Florida limited liability company

By: _____
Name: _Phil Wolman_
Title: _Managing Member_

(Corporate Seal)

Address: _400 Arthur Godfrey Rd_
_Miami Beach, FL 33140_

STATE OF FLORIDA )
) ss:
COUNTY OF _MIAMI-DADE_

The foregoing instrument was acknowledged before me this ___ day of _November_, 200__ by _PHILIP WOLMAN_ as _Mgr_ of _CARILLON SOUTH JV, LLC_, on behalf of said _____. He/she is personally known to me or produced _____ as identification.

Name: _DENISE P SORIANO_

Notary Public, State of Florida
Commission No. _DD 416499_

My commission expires:

DENISE P SORIANO
Notary Public - State of Florida
My Commission Expires Jun 25, 2009
Commission # DD 416499
Bonded By National Notary Assn.

Declaration of Covenants
- 33 -

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the 2nd day of November, 2007, on behalf of LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Mortgagee"), being the owner and holder of a mortgage (as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") on all or portions of The Properties (as defined in the Master Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of the Declaration of Covenants, Restrictions and Easements for Carillon Hotel And Spa (the "Master Declaration").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Master Declaration and the recordation thereof and agrees that the lien and effect of the Mortgage shall be subject and subordinate to the terms of the Master Declaration.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Master Declaration, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of the Carillon Hotel and Spa Project (as defined in the Master Declaration), and does not assume and shall not be responsible for any of the obligations or liabilities of the Declarant contained in the Master Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of any portion of the Carillon Hotel and Spa Project. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Master Declaration.

Made as of the day and year first above written.

Witnessed by:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation

Name: RONNIE BAPTISTE

By: _____
Name: Abbey B. Kosakowski
Title: AUTHORIZED SIGNATORY

Name: Nancy Sharperson

STATE OF New York )
                              ) SS:
COUNTY OF New York )

The foregoing instrument was acknowledged before me this 2 day of November, 2007, by Abbey B. Kosakowski as AUTHORIZED SIGNATORY of LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation on behalf of said corporation. He/she is personally known to me or has produced _____ as identification.

DEANNA EMILIO
Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011

Name: DEANNA EMILIO

Notary Public, State of _____
Commission No. _____

My Commission Expires:

*MIA 179748883v1 9/21/2007*



*Exhibit*
*"A"*

September 26, 2007

FLORIDA DEPARTMENT OF STATE
Division of Corporations

CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.
400 ARTHUR GODFREY BOULEVARD, SUITE 200
MIAMI BEACH, FL 33140

The Articles of Incorporation for CARILLON HOTEL AND SPA MASTER
ASSOCIATION, INC. were filed on September 25, 2007, and assigned document
number N07000009484. Please refer to this number whenever corresponding
with this office.

This document was electronically received and filed under FAX audit number
H07000239215.

A corporation annual report/uniform business report will be due this
office between January 1 and May 1 of the year following the calendar year
of the file/effective date. A Federal Employer Identification (FEI)
number will be required before this report can be filed. Please apply NOW
with the Internal Revenue Service by calling 1-800-829-3676 and requesting
form SS-4 or by going to their website at www.irs.ustreas.gov.

Please be aware if the corporate address changes, it is the responsibility
of the corporation to notify this office.

Should you have any questions regarding corporations, please contact this
office at the address given below.

Sincerely,
Valerie Herring
Document Specialist
New Filings Section
Division of Corporations          Letter Number: 307A00056545

## ARTICLES OF INCORPORATION
## OF
## CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.

The undersigned incorporator, desiring to form a corporation not for profit under Chapter 617, Florida Statutes, as amended, hereby adopts the following Articles of Incorporation:

### ARTICLE I
### NAME

The name of the corporation shall be **CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.,** which is hereinafter referred to as the "Association".

### ARTICLE II
### OFFICE

The principal office and mailing address of the Association shall be at 400 Arthur Godfrey Boulevard, Suite 200, Miami Beach, Florida 33140, or at such other place as may be subsequently designated by the Board of Directors. All books and records of the Association shall be kept at its principal office.

### ARTICLE III
### PURPOSES AND POWERS

The objects and purposes of the Association are those objects and purposes as are authorized by the **Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa** recorded (or to be recorded) in the Public Records of the County, as hereafter amended and/or supplemented from time to time (the "Declaration"). The further objects and purposes of the Association are to preserve the values and amenities in The Properties (as defined in the Declaration) and to maintain the Common Properties thereof for the benefit of the Members of the Association.

The Association is organized not for profit and no part of the net earnings, if any, shall inure to the benefit of any Member or individual person, firm or corporation.

The Association shall have the power to contract for the management of the Association and to delegate to the party with whom such contract has been entered into (which may be an affiliate of the Declarant) the powers and duties of the Association, except those which require specific approval of the Board of Directors or Members.

The Association shall have all of the common law and statutory powers of a corporation not for profit which are not in conflict with the terms of these Articles and the Declaration above identified. The Association shall also have all of the powers necessary to implement the purposes of the Association as set forth in the Declaration and to provide for the general health and welfare of its membership. Notwithstanding anything contained in the Declaration, the By-Laws or these Articles to the contrary, before commencing litigation against any party in the name of the Association involving amounts in controversy in excess of One Hundred Thousand and No/100 Dollars ($100,000.00), the Association must obtain the affirmative approval of a majority of the voting interests at a meeting of the membership at which a quorum has been attained. The powers of the Association shall be subject to and shall be exercised in accordance with the provisions hereof and of the Master Covenants, the By-Laws and applicable law, provided that in the event of conflict, the provisions of applicable law shall control over those of the Master Covenants and By-Laws.

Definitions set forth in the Declaration are incorporated herein by this reference.

### ARTICLE IV
### MEMBERS

Section 1.    Membership.  The Owner of each Lot shall be a Member of the Association, provided that any such person or entity who holds an ownership interest merely as security for the performance of an obligation shall not be a Member. All votes permitted or required to be cast by Members shall be cast only by their respective Voting Members.

Section 2.    Voting Rights.  The Association shall have two (2) classes of voting membership:

Class A.  Class A Members shall be all those Owners as defined in Section 1 above with the exception of the Declarant (as long as the Class

B Membership shall exist, and thereafter the Declarant shall be a Class A Member to the extent it would otherwise qualify). The Lot Owner shall be deemed the Voting Member, provided, however, that when the Lot Owner is a Neighborhood Association, the Voting Member shall be the President of the Neighborhood Association, and the Voting Member shall be entitled to cast the following number of votes, as applicable:

- The Voting Member for the Condominium South Lot - one (1) vote

- The Voting Member for the Condominium Central Lot - one (1) vote

- The Voting Member for the Condominium North Lot - one (1) vote

- The Voting Member for the Retail Lot - one (1) vote

- The Voting Member for the Hotel Lot - five (5) votes

Class B. The Class B Member shall be the Declarant (or the assignee of Declarant, which may include without limitation, Declarant's Mortgagee, as defined in the Declaration), or a representative thereof, who shall have and cast one (1) vote in all Association matters, plus two (2) votes for each vote which may be cast, in the aggregate, by the Class A Voting Members. Such Class B Voting Member may be removed and replaced only by the Declarant in its sole discretion. The Class B membership shall cease and terminate three (3) months after ninety percent (90%) of all Condominium Units (as to any Lot that has been submitted to the condominium form f ownership) and Lots (as to those which have not been submitted to the condominium form of ownership) within The Properties have been sold and conveyed by the Declarant (or its affiliates) to an Owner other than Declarant or a builder, contractor or other who purchases the Lot for the purpose of constructing improvements thereon for resale, or sooner at the election of the Declarant (the "Transition Date"), whereupon the Class A Members shall be obligated to appoint the Board in the manner herein provided and assume control of the Association.

Section 3. Meetings of Voting Members. The By-Laws of the Association shall provide for an annual meeting of Voting Members, and may make provisions for regular and special meetings of Voting Members other than the annual meeting. A quorum for the transaction of business at any meeting of the Voting Members

shall exist if a majority of the votes which may be cast by Voting Members shall be present or represented at the meeting.

Section 4. General Matters. When reference is made herein, or in the Declaration, By-Laws, Rules and Regulations, management contracts or otherwise, to a majority or specific percentage of Members or Voting Members, such reference shall be deemed to be reference to a majority or specific percentage of the votes of the Members eligible to be cast by their respective Voting Members present at a duly constituted meeting thereof (i.e., one for which proper notice has been given and at which quorum exists) and not of the Members themselves (or their Lots) or of the individual Voting Members themselves.

## ARTICLE V
## CORPORATE EXISTENCE

The Association shall have perpetual existence.

## ARTICLE VI
## BOARD OF DIRECTORS

Section 1. Management by Directors. The property, business and affairs of the Association shall be managed by a Board of Directors, which shall consist of nine (9) persons. A majority of the directors in office shall constitute a quorum for the transaction of business. The By-Laws shall provide for meetings of directors, including an annual meeting.

Section 2. Appointment of Members of Board of Directors. The Owner of the Hotel Lot shall be entitled to appoint five (5) members of the Board; the Owner of the Condominium South Lot shall be entitled to appoint one (1) member of the Board; the Owner of the Condominium Central Lot shall be entitled to appoint one (1) member of the Board; the Owner of the Condominium North Lot shall be entitled to appoint one (1) member of the Board; and the Owner of the Retail Lot shall be entitled to appoint one (1) member of the Board. Directors may be removed only by the Lot Owner that appointed the Director and vacancies on the Board of Directors shall be filled by the appointment of another Director by the Lot Owner who originally appointed the Director being replaced.

Section 3. Original Board of Directors. The names and addresses of the first Board of Directors of the Association, each of whom shall hold office until removed by the Member who appointed such Director, shall be as follows:

| Name | Address | Appointed by: |
|------|---------|---------------|
| Eric Sheppard | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Hotel |
| Phil Wolman | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Hotel |
| Mark Burgin | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Hotel |
| Jeff Graff | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Hotel |
| Adam Wolman | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Hotel |
| Eric Sheppard | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Condominium South |
| Phil Wolman | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Condominium Central |
| Mark Burgin | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Condominium North |
| Eric Sheppard | 400 Arthur Godfrey Boulevard Suite 200, Miami Beach, Florida 33140 | Retail |

Section 4. Duration of Office. Except as provided herein or in the Bylaws to the contrary, the term of each Director's service shall extend until the next annual meeting of the Members and subsequently until his or her successor is duly appointed and has taken office, or until he or she is removed in the manner

elsewhere provided. Notwithstanding the foregoing, any Director shall serve at the pleasure of the Member who appointed such Director and may be removed and replaced by such Member at any time.

Section 5. <u>Vacancies and Removal</u>. Vacancies in the Board of Directors shall be filled by the appointment of another Director by the Member who originally appointed the Director being replaced. Directors shall serve at the pleasure of the Member who appointed such Director and may be removed and replaced by such Member at any time.

## ARTICLE VII
## OFFICERS

Section 1. <u>Officers Provided For</u>. The Association shall have a President, a Vice President, a Secretary and a Treasurer, and such other officers as the Board of Directors may from time to time elect.

Section 2. <u>Election and Appointment of Officers</u>. The officers of the Association, in accordance with any applicable provision of the By-Laws, shall be elected by the Board of Directors for terms of one (1) year and thereafter until qualified successors are duly elected and have taken office. The By-Laws may provide for the method of voting in the election, for the removal from office of officers, for filling vacancies and for the duties of the officers. The officers may or may not be directors of the Association. If the office of President shall become vacant for any reason, or if the President shall be unable or unavailable to act, the Vice President shall automatically succeed to the office or perform its duties and exercise its powers. If any office shall become vacant for any reason, the Board of Directors may elect or appoint an individual to fill such vacancy.

Section 3. <u>First Officers</u>. The names and addresses of the first officers of the Association, who shall hold office until the first annual meeting of directors and thereafter until successors are duly elected and have taken office, shall be as follows:

| Name | Address |
|------|---------|
| **President:** | |
| Eric Sheppard | 400 Arthur Godfrey Boulevard<br>Suite 200<br>Miami Beach, Florida 33140 |
| **Vice President:** | |
| Phil Wolman | 400 Arthur Godfrey Boulevard<br>Suite 200<br>Miami Beach, Florida 33140 |
| **Secretary/Treasurer:** | |
| Mark Burgin | 400 Arthur Godfrey Boulevard<br>Suite 200<br>Miami Beach, Florida 33140 |

## ARTICLE VIII
## BY-LAWS

The Board of Directors shall adopt By-Laws consistent with these Articles of Incorporation. Such By-Laws may be altered, amended or repealed in the manner set forth in the By-Laws.

## ARTICLE IX
## AMENDMENTS AND PRIORITIES

Section 1. Amendments to these Articles of Incorporation shall be proposed and approved by the Board of Directors and thereafter submitted to a meeting of the membership of the Association for adoption or rejection (by affirmative vote of 80% of the votes entitled to be cast by all Voting Members), all in the manner provided, and in accordance with the notice provisions of, Section 617.017, Florida Statutes.

Section 2. In case of any conflict between these Articles of Incorporation and the By-Laws, these Articles shall control; and in case of any conflict between these Articles of Incorporation and the Declaration, the Declaration shall control.

Master Articles
-7-

## ARTICLE X
## INCORPORATOR

The name and address of the incorporator of this Corporation is:

| Name | Address |
|------|---------|
| Eric Sheppard | 400 Arthur Godfrey Boulevard<br>Suite 200<br>Miami Beach, Florida 33140 |

## ARTICLE XI
## INDEMNIFICATION

Section 1. The Association shall indemnify any person who was or is a party to any proceeding (other than an action by, or in the right of, the Association) by reason of the fact that he is or was a director, officer, employee or agent (each, an "Indemnitee") of the Association, against liability incurred in connection with such proceeding, including any appeal thereof, if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Association and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any proceeding by judgment, order, settlement, or conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Association or, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 2. The Association shall indemnify any person, who was or is a party to any proceeding by or in the right of the Association to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee, or agent of the Association against expenses and amounts paid in settlement not exceeding, in the judgment of the board of directors, the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof. Such indemnification shall be authorized if such person acted in good

faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Association, except that no indemnification shall be made under this subsection in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable unless, and only to the extent that, the court in which such proceeding was brought, or any other court of competent jurisdiction, shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

Section 3.   To the extent that a director, officer, employee, or agent of the Association has been successful on the merits or otherwise in defense of any proceeding referred to in sections 1 or 2 above, or in defense of any claim, issue, or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith.

Section 4.   Any indemnification under sections 1 or 2, unless pursuant to a determination by a court, shall be made by the Association only as authorized in the specific case upon a determination that indemnification of the director, officer, employee, or agent is proper under the circumstances because he has met the applicable standard of conduct set forth in sections 1 or 2.  Such determination shall be made:

(a)   By the board of directors by a majority vote of a quorum consisting of directors who were not parties to such proceeding;

(b)   If such a quorum is not obtainable or, even if obtainable, by majority vote of a Committee duly designated by the Board of Directors (in which directors who are parties may participate) consisting solely of two or more Directors not at the time parties to the proceeding;

(c)   By independent legal counsel:

(i)   selected by the Board of Directors prescribed in paragraph (a) or the committee prescribed in paragraph (b); or

(ii)    if a quorum of the Directors cannot be obtained for paragraph (a) and the Committee cannot be designated under paragraph (b), selected by majority vote of the full Board of Directors (in which Directors who are parties may participate); or

(iii)    By a majority of the voting interests of the members of the Association who were not parties to such proceeding.

Section 5.   Evaluation of the reasonableness of expenses and authorization of indemnification shall be made in the same manner as the determination that indemnification is permissible.  However, if the determination of permissibility is made by independent legal counsel, persons specified by section 4(c) shall evaluate the reasonableness of expenses and may authorize indemnification.

Section 6.   Expenses incurred by an officer or director in defending a civil or criminal proceeding may be paid by the Association in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if he is ultimately found not to be entitled to indemnification by the Association pursuant to this section.  Expenses incurred by other employees and agents may be paid in advance upon such terms or conditions that the Board of Directors deems appropriate.

Section 7.   The indemnification and advancement of expenses provided pursuant to this section are not exclusive, and the Association may make any other or further indemnification or advancement of expenses of any of its directors, officers, employees, or agents, under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  However, indemnification or advancement of expenses shall not be made to or on behalf of any director, officer, employee, or agent if a judgment or other final adjudication establishes that his actions, or omissions to act, were material to the cause of action so adjudicated and constitute:

(a)    A violation of the criminal law, unless the director, officer, employee, or agent had reasonable cause to believe his conduct was lawful or had no reasonable cause to believe his conduct was unlawful;

(b)      A transaction from which the director, officer, employee, or agent derived an improper personal benefit; or

(c)      Willful misconduct or a conscious disregard for the best interests of the Association in a proceeding by or in the right of the Association to procure a judgment in its favor or in a proceeding by or in the right of the members of the Association.

Section 8.   Indemnification and advancement of expenses as provided in this section shall continue as, unless otherwise provided when authorized or ratified, to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of such a person, unless otherwise provided when authorized or ratified.

Section 9.   Notwithstanding the failure of a Association to provide indemnification, and despite any contrary determination of the Board or of the members in the specific case, a director, officer, employee, or agent of the Association who is or was a party to a proceeding may apply for indemnification or advancement of expenses, or both, to the court conducting the proceeding, to the circuit court, or to another court of competent jurisdiction. On receipt of an application, the court, after giving any notice that it considers necessary, may order indemnification and advancement of expenses, including expenses incurred in seeking court-ordered indemnification or advancement of expenses, if it determines that:

(a)      The director, officer, employee, or agent is entitled to mandatory indemnification under section 3, in which case the court shall also order the Association to pay the director reasonable expenses incurred in obtaining court-ordered indemnification or advancement of expenses;

(b)      The director, officer, employee, or agent is entitled to indemnification or advancement of expenses, or both, by virtue of the exercise by the Association of its power pursuant to section 7; or

(c)      The director, officer, employee, or agent is fairly and reasonably entitled to indemnification or advancement of expenses, or both, in view of all the relevant circumstances, regardless of whether

such person met the standard of conduct set forth in section 1, section 2, or section 11.7. unless (i) a court of competent jurisdiction determines, after all available appeals have been exhausted or not pursued by the proposed indemnitee, that he did not act in good faith or acted in a manner he reasonably believed to be not in, or opposed to, the best interest of the Association, and, with respect to any criminal action or proceeding, that he had reasonable cause to believe his conduct was unlawful, and (ii) such court further specifically determines that indemnification should be denied. The termination of any proceeding by judgment, order, settlement, conviction or upon a plea of <u>nolo contendere</u> or its equivalent shall not, of itself, create a presumption that the person did not act in good faith or did act in a manner which he reasonably believed to be not in, or opposed to, the best interest of the Association, and, with respect to any criminal action or proceeding, that he had reasonable cause to believe that his conduct was unlawful.

<u>Section 10</u>. For purposes of this Article XI, the term "expenses" shall be deemed to include attorneys' fees, including those for any appeals; the term "liability" shall be deemed to include obligations to pay a judgment, settlement, penalty, fine, and expenses actually and reasonably incurred with respect to a proceeding; the term "proceeding" shall be deemed to include any threatened, pending, or completed action, suit, or other type of proceeding, whether civil, criminal, administrative or investigative, and whether formal or informal; and the term "agent" shall be deemed to include a volunteer; the term "serving at the request of the Association" shall be deemed to include any service as a director, officer, employee or agent of the Association that imposes duties on such persons.

<u>Section 11</u>. Anything to the contrary herein notwithstanding, no amendment to the provisions of this Article XI shall be applicable as to any party eligible for indemnification hereunder who has not given his prior written consent to such amendment.

<u>Section 12</u>. The provisions of this Article **XI** shall not be amended.

## ARTICLE XII
### REGISTERED AGENT

Until changed, Eric Sheppard shall be the registered agent of the Association and the registered office shall be at 400 Arthur Godfrey Boulevard, Suite 200, Miami Beach, Florida 33140.

IN WITNESS WHEREOF, the aforesaid incorporator has hereunto set his hand this 8th day of September, 2007.

_____
Eric Sheppard, Incorporator

CERTIFICATE DESIGNATING PLACE OF BUSINESS OR DOMICILE FOR THE SERVICE OF PROCESS WITHIN THIS STATE, NAMING AGENT UPON WHOM PROCESS MAY BE SERVED.

In compliance with the laws of Florida, the following is submitted:

First -- That desiring to organize under the laws of the State of Florida with its principal office, as indicated in the foregoing articles of incorporation, in the County of Miami-Dade, State of Florida, the Association named in the said articles has named Eric Sheppard, located at 400 Arthur Godfrey boulevard, Suite 200, Miami Beach, Florida 33140, as its statutory registered agent.

Having been named the statutory agent of said Association at the place designated in this certificate, I am familiar with the obligations of that position, and hereby accept the same and agree to act in this capacity, and agree to comply with the provisions of Florida law relative to keeping the registered office open.

_____
Eric Sheppard, Registered Agent

DATED this 25th day of September, 2007.

Exhibit "B"

BY-LAWS
OF
CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.

*A Corporation Not for Profit*
*Under the Laws of the State of Florida*

## ARTICLE 1
## DEFINITIONS

Section 1.1    "Association" shall mean and refer to CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC., a nonprofit corporation organized and existing under the laws of the State of Florida.

Section 1.2    "Electronic Transmission" means any form of communication, not directly involving the physical transmission or transfer of paper, which creates a record that may be retained, retrieved, and reviewed by a recipient thereof and which may be directly reproduced in a comprehensible and legible paper form by such recipient through an automated process. Examples of electronic transmission include, but are not limited to, telegrams, facsimile transmissions of images, and text that is sent via electronic mail between computers. Notwithstanding the provision for electronic transmission of notices by the Association, same may be only be sent to Owners and/or Members that consent to receipt of Association notices by electronic transmission (and only for long as such consent remains in effect).

Section 1.3    "Member" shall mean and refer to all those Owners who are Members of the Association as provided in Article IV of the Articles of Incorporation of the Association.

Section 1.4    "The Properties" shall mean and refer to The Properties as defined in the Declaration (the "Declaration") described in the Articles of Incorporation of the Association.

Section 1.5    All other definitions from the Declaration are incorporated herein by this reference.

## ARTICLE 2

## BOOKS AND PAPERS

Section 2.1    The books, records and papers of the Association shall at all times, during reasonable business hours, be subject to the inspection of any Member of the Association.

## ARTICLE 3

## MEMBERSHIP

Section 3.1    Membership of the Association is as set forth in Article IV of the Articles of Incorporation of the Association.

Section 3.2    The rights of membership are subject to the payment of annual and special assessments levied by the Association, the obligation of which assessments is imposed against each Owner of, and becomes a lien upon, that portion of The Properties against which such assessments are made as provided in the Declaration.

## ARTICLE 4

## BOARD OF DIRECTORS

Section 4.1    The Directors of the Association shall be appointed as specified in the Articles of Incorporation.

Section 4.2    Directors shall serve at the pleasure of the Member who appointed such Director and may be removed and replaced only by such Member at any time.

Section 4.3    The first meeting of the duly elected Board of Directors, for the purposes of organization, shall be held immediately after the annual meeting of Members, provided that a quorum of the Board be present. Any action taken at such meeting shall be by a majority of the whole Board. If a quorum of the Board shall not be present at that time, or if the directors shall fail to elect officers, the meeting of the Board to elect officers shall then

be held within thirty (30) days after the annual meeting of Members upon three (3) days notice in writing to each member of the Board, stating the time, place and object of such meeting.

Section 4.4    Subject to the provisions of Section 4.6 below, regular meetings of the Board of Directors may be held at any place or places within Miami-Dade County, Florida, on such days and at such hours as the Board of Directors may, by resolution, designate.

Section 4.5    Subject to the provisions of Section 4.6 below, special meetings of the Board of Directors may be called at any time by the President or by any two (2) members of the Board and may be held any place or places within Miami-Dade County, Florida, and at any time.

Section 4.6    Except only for meetings between the Board and its attorney with respect to proposed or pending litigation where the contents of the discussion would otherwise be protected by the attorney-client privilege, regular and/or special meetings of the Board of Directors shall be open to all Owners, and notices of Board meetings shall be posted in a conspicuous place on the property governed by the Association at least forty eight (48) hours prior to the meeting, except in the event of an emergency. In the alternative, if notice is not conspicuously posted, notice of the Board meeting must be mailed or delivered to each Member at least seven (7) days before the meeting, except in an emergency. Notice of any meeting in which assessments against Lots are to be considered shall specifically contain a statement to that effect as well as a statement of the nature of such assessments. As an alternative to posting of notices, the Board may elect to broadcast the notice on a closed circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on The Properties, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda. In addition to the means of giving notice described in these By-Laws, the Association may give notice by electronic transmission, however, a member must consent in writing to receiving notice by electronic transmission.

Section 4.7    Directors (including affiliates of the Declarant) shall have the absolute right to resign at any time and the Member who appointed such Director shall then fill the vacancy.

Section 4.8    Directors may not vote by proxy or secret ballot, provided, however, that secret ballots may be used for the election of officers.

Section 4.9    The Directors of the Association have a fiduciary duty to the Owners of Lots governed by the Association.

## ARTICLE 5

### OFFICERS

Section 5.1    Any officer may be removed at any time by the affirmative vote of a majority of the Board of Directors at any duly called regular or special meeting of the Board.

Section 5.2    The President shall be the chief executive officer of the Association. The President shall preside at all meetings of the Members of the Association and of the Board of Directors. He shall have the general powers and duties of supervision and management of the Association which usually pertain to his office, and shall perform all such duties as are properly required of him by the Board of Directors. The Board of Directors shall elect at least one (1) Vice President, who shall have such powers and perform such duties as usually pertain to such office or as are properly required of him by the Board of Directors. In the absence or disability of the President, any Vice President shall perform the duties and exercise the powers of the President. If more than one (1) Vice President is appointed, the Board shall designate which Vice President is to perform which duties. The Secretary shall issue notices of all meetings of the membership of the Association and the directors where notices of such meetings are required by law or in these By-Laws. He shall keep the minutes of the meetings of the membership and of the Board of Directors. The Treasurer shall have the care and custody of all the monies and securities of the Association. He shall enter on the books of the Association, to be kept by him for that purpose, full and accurate accounts of all monies received by him and paid by him on account of the Association. He shall sign such instruments as require his signature and shall perform all such duties as usually pertain to his office or as are properly required of him by the Board of Directors.

Section 5.3    Vacancies in any office arising from any cause may be filled by the Board of Directors at any regular or special meeting.

Section 5.4    The officers of the Association have a fiduciary duty to the Owners of Lots governed by the Association.

# ARTICLE 6

## MEETINGS OF MEMBERS

Section 6.1     The regular annual meeting of the Members shall be held in the month of November in each year at such time and place as shall be determined by the Board of Directors. The appointment of directors shall be held at, or in conjunction with, the annual meeting.

Section 6.2     Special meetings of the Members for any purpose may be called at any time by the President, the Vice President, the Secretary or Treasurer, or by any two (2) or more members of the Board of Directors, or upon written request of the Members who have a right to vote one-third (1/3) of all the votes of the entire membership, or who have a right to vote one-third (1/3) of the votes of the Class A membership. Business conducted at a special meeting shall be limited to the purposes set forth in the notice of meeting.

Section 6.3     Notice may be given to the Members either personally, or by sending a copy of the notice through the mail, postage thereon fully paid, to the addresses appearing on the records of the Association. Each Member shall register his address with the Secretary, and notices of meetings shall be mailed to him at such address. Notice of any meeting, regular or special, shall be mailed or personally delivered at least six (6) days' in advance of the meeting and shall set forth the general nature of the business to be transacted, provided, however, that if any business of any meeting shall involve any action governed by the Articles of Incorporation, notice of such meeting shall be given or sent as therein provided. Notice of an annual meeting need not set forth the nature of the business to be transacted. Notice of a special meeting, however, must include a description of the purpose or purposes for which the meeting is called. In addition to the means of giving notice described in these By-Laws, the Association may give notice by electronic transmission, however, a member must consent in writing to receiving notice by electronic transmission.

Section 6.4     The presence in person or by proxy at the meeting of Members entitled to cast a majority of the votes of the membership shall constitute a quorum for any action governed by these By-Laws. Unless a greater percentage is expressly required, decisions of the members shall be made by a majority of the voting interests represented at a meeting at which a quorum is present.

Section 6.5     Members have the right to vote in person or by proxy. To be valid, a proxy must be in writing and be signed by the Member or the person designated in a voting certificate signed by the Member as the person authorized to cast the vote attributable to such Lot, and the proxy must state the date, time and place of the meeting for which it was given. A proxy is effective only for the meeting for which it was given, as the meeting may be legally adjourned and reconvened from time to time, and automatically expires ninety (90) days following the date of the meeting for which it was originally given. A proxy is revocable at any time at the pleasure of the person who executes it. If the proxy form so provides, the proxyholder may appoint, in writing, a substitute to act in the proxyholder's place. No person other than a designee of the Declarant is permitted to cast more than five (5) votes by proxy.

Section 6.6     Any Owner may tape record or videotape meetings of the Members, subject however to the rules established from time to time by the Board regarding such tapings.

Section 6.7     Except when specifically or impliedly waived by the chairman of a meeting (either of Members or Directors) Roberts' Rules of Order (latest edition) shall govern the conduct of Association meetings when not in conflict with the Declaration, the Articles or these By-Laws; provided, however, that a strict or technical reading of said Roberts' Rules shall not be made so as to frustrate the will of the persons participating in said meeting.

# ARTICLE 7

## AMENDMENTS

Section 7.1     These By-Laws may be amended, at a regular or special meeting of the Members, by a vote of 80% of the total voting interests of all Members, provided that the notice to the Members of the meeting discloses the information that the amendment of the By-Laws is to be considered, provided, however, the provisions which are governed by the Articles of Incorporation of this Association may not be amended except as provided in the Articles of Incorporation or applicable law; and provided further that any matters stated herein to be or which are in fact governed by the Declaration may not be amended except as provided in such Declaration. Anything to the contrary herein notwithstanding, the Declarant shall have the absolute right to amend these By-Laws and the Articles of Incorporation as long as the Declarant or its affiliates owns any Lot governed by the Association without the consent of the Members or the Board.

Book26080/Page4956     CFN#20071144863     Page 52 of 104

Section 7.2    In case of any conflict between the Articles of Incorporation and these By-Laws, the Articles shall control; and in case of any conflict between the Declaration and these By-Laws, the Declaration shall control.

## ARTICLE 8

## OFFICIAL RECORDS

From the inception of the Association, the Association shall maintain each of the following, where applicable, which shall constitute the official records of the Association:

(a)    A photocopy of any plans, specifications, permits and warranties related to improvements constructed on the Common Properties or other property that the Association is obligated to maintain, repair or replace;

(b)    A photocopy of the By-Laws of the Association and all amendments thereto;

(c)    A certified copy of the Articles of Incorporation of the Association or other documents creating the Association and all amendments thereto;

(d)    A photocopy of the Declaration and all amendments thereto;

(e)    A copy of the current Rules and Regulations of the Association;

(f)    The minutes of all meetings of the Association, of the Board of Directors, and of Members, which minutes shall be retained for a period of not less than 7 years;

(g)    A current roster of all Owners, their mailing addresses and Lot identifications. The Association shall also maintain the electronic mailing addresses and the numbers designated by Members for receiving notices sent by electronic transmission of those Members consenting to receive notice by electronic transmission. The electronic mailing addresses and numbers provided by Owners to receive notice by electronic transmission shall be removed from Association records when consent to receive notice by electronic transmission is revoked. However, the Association shall not be liable for an erroneous disclosure of the electronic mail address or the number for receiving electronic transmission of notices;

(h)    All current insurance policies of the Association or a copy of each such policy, which policies shall be retained for a period of not less than 7 years;;

(i)    A current copy of all contracts to which the Association is a party, including, without limitation, any management agreement, lease, or other contract under which the Association has an obligation or responsibility;

(j)    Bids received by the Association for any work to be performed on behalf of the Association, which bids shall be retained for a period of not less than 1 year;

(k)    Financial and accounting records for the Association maintained in accordance with good accounting practices. All financial and accounting records shall be maintained for a period of not less than 7 years. The financial and accounting records shall include, but not be limited to:

(i)    Accurate, itemized, and detailed records for all receipts and expenditures.

(ii)    A current account and a periodic statement of the account for each member of the Association, designating the name and current address of each Member, the due date and amount of each Assessment, the date and amount of each payment on the account, and the balance due.

(iii)    All tax returns, financial statements and financial records of the Association; and

(iv)    Any other records that identify, measure, record or communicate financial information.

Book26080/Page4957    CFN#20071144863    Page 53 of 104

# ARTICLE 9

## BOOKS AND PAPERS; FISCAL YEAR; MINUTES; BUDGETS; FINANCIAL REPORTS

Section 9.1    The official records shall be maintained within the State of Florida and must be open to inspection and available for photocopying by any Association Member or the authorized agent(s) of such Member at all reasonable times and places within (10) business days after receipt of a written request for access. The Association may adopt reasonable written rules regarding the frequency, time, location, notice and manner of inspections and may impose fees to cover the costs of providing copies of the official records, including, without limitation, the costs of copying. The Association shall maintain an adequate number of copies of the recorded Declaration, Articles, By-Laws and any rules to ensure their availability to Members and prospective Members, and may charge only its actual costs for reproducing and furnishing these documents.

Section 9.2    The fiscal year of the Association shall be the calendar year.

Section 9.3    Minutes of all meetings of the Members and of the Board must be maintained in written form or in another form that can be converted into written form within a reasonable time. The vote or abstention from voting on each matter voted upon for each director present at a Board meeting must be recorded in the minutes.

Section 9.4    The Association shall prepare an annual budget reflecting, among other things, the estimated revenues and expenses for the budgeted year and the estimated surplus or deficit for the end of the current year. The budget must separately set out all fees or charges for recreational amenities, whether owned by the Association or another person. The Association shall provide each Member with a copy of the annual budget or a written notice advising that a copy of the budget is available upon request to the Member. The copy must be provided to the Member in accordance with the time limits set forth in Section 9.1 above.

Section 9.5    The Association shall prepare an annual financial report within sixty (60) days following the close of each fiscal year of the Association. The financial report must consist of either, at the determination of the Board, (a) financial statements presented in conformity with generally accepted accounting principles, or (b) a financial report of actual receipts and expenditures, cash basis, showing, the amount of receipts and expenditures by classification and the beginning and ending cash balances of the Association. The Association shall provide each Member with a copy of the annual financial report or a written notice advising that a copy of the report is available upon request at no charge to the Member. The copy must be provided to the Member in accordance with the time limits set forth in Section 9.1 above.

**WE HEREBY CERTIFY** that the foregoing By-Laws of the above-named corporation were duly adopted by the Board of Directors of said Association on the _25_ day of _September_, 200_7_

_____
Eric Sheppard, President

_____
Mark Purgin, Secretary

Book26080/Page4958    CFN#20071144863    Page 54 of 104

**<u>Exhibit "C"</u>**


*<u>Legal Description of Common Properties</u>*


THERE ARE NO INITIAL COMMON PROPERTIES

**Exhibit "D"**

*Legal Description of the Future Development Property*

## LEGAL DESCRIPTION: (NORTH TOWER)

A portion of lots 1, thru 6, Block B CORRECTED PLAT OF ATLANTIC HEIGHTS, Plat Book 9, Page 14, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami-Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N00°00'00"W along the East right-of-way line of Collins Avenue (State Road A-1-A) for 404.45 feet; thence S88°23'16"E for 1.00 foot; thence N00°46'05"W for 40.16 feet; thence S90°00'00"E at right angles to the aforementioned course for 140.95 feet to the POINT OF BEGINNING. thence N00°00'00"E for 223.83 feet: thence S90°00'00"E for 85.00 feet: thence S00°00'00"W for 223.83 feet: thence N90°00'00"W for 85.00 feet to the POINT OF EGINNING.

## LESS:

All (HOTEL LOT) areas as graphically depicted in sheets 6 thru 17 of 56 of this document.

The above described perimetrical boundary lies between elevation +2.9 feet and elevation +375.5 feet relative to the National Geodetic Vertical Datum of 1929.

NORTH TOWER     1-10-05    RJM

# LEGAL DESCRIPTION, NOTES AND CERTIFICATION
*Exhibit "D"*

/



BLOW-UP DETAIL
NORTH TOWER BOUNDARY

NOT TO SCALE

COLLINS AVENUE

POINT OF
COMMENCEMENT

POINT OF
BEGINNING

PROPOSED STORY
MULTI-TOWER

N00°00'00"E 273.85'

S00°00'00"E 273.85'

S90°00'00"E 85.00'

N90°00'00"W 85.00'

NOTE: LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT
OF EXTERNAL FLOOR PLATE AT ITS PROPER
ELEVATION LESS ALL UNITS AND BALCONIES.
UNLESS OTHERWISE NOTED.

Book26080/Page4962    CFN#20071144863         Page 58 of 104

Retail Lot

*(to be supplemented)*

MIA 179567736v1 3/15/2007

## Exhibit "E"

*Legal Description for the Lots*

"Condominium Central Lot" is legally described on the attached **Exhibit "1" of this Exhibit "E"**

"Condominium South Lot" is legally described on the attached **Exhibit "2" of this Exhibit "E"**

"Hotel Lot" is legally described on the attached **Exhibit "5" of this Exhibit "E"**

## LEGAL DESCRIPTION: (CENTRAL TOWER)-SECOND LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N01°41'29"W along the East right–of–way line of Collins Avenue (State Road A–1–A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING.

thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 78.27 feet; thence N01°50'54"W for 27.92 feet; thence N88°09'06"E for 52.67 feet; thence N01°50'54"W for 14.00 feet; thence S88°09'06"W for 13.50 feet; thence N01°50'54"W for 19.20 feet; thence N88°09'06"E for 91.83 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet

to the POINT OF EGINNING.


### LESS:

All (HOTEL LOT) areas as graphically depicted in sheet 12 of this document.


**The above described perimetrical boundary lies between elevation +29.8 feet and elevation +40.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED,

## SURVEYOR'S NOTES:

– This site lies in between Section 14, Township 53 South, Range 42 East and Section 14, Township 52 South, Range 42 East, Miami Beach, Miami–Dade County, Florida.

– Bearings hereon are referred to an assumed value of N01°41'29"W for the easterly right–of–way line of COLLINS AVENUE.

– Lands shown hereon were not abstracted for easements and/or rights–of–way of records.

– This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.


## SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Description" was made under my responsible charge on June 5, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17–6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.

"Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

Cad No.030811CT–B Drawn By: RJM

NOTE:
LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT OF EXTERNAL FLOOR PLATE AT ITS PROPER ELEVATION. LESS ALL (UNITS AND BALCONIES) AND (HOTEL LOT) AS DEPICTED IN GRAPHICS UNLESS OTHERWISE NOTED.

# CENTRAL TOWER
# LEGAL DESCRIPTION, NOTES AND CERTIFICATION
## EXHIBIT "1" OF EXHIBIT "E"     SHEET 1



NOT TO SCALE



SECOND LEVEL FLOOR PLAN

COLLINS AVENUE
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

POINT OF
BEGINNING

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

SOUTH LINE LOT 49
Plat Book 28, Page 28

EASTERLY RIGHT-OF-WAY
LINE OF COLLINS AVENUE

Cad No.030811CT-B Drawn By: RJM

## BLOW-UP DETAIL
## CENTRAL TOWER BOUNDARY
EXHIBIT "1" OF EXHIBIT "E"

SHEET 2

## LEGAL DESCRIPTION: (CENTRAL TOWER)-THIRD AND FOURTH LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami—Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N01°41'29"W along the East right—of—way line of Collins Avenue (State Road A—1—A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING.

thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 77.94 feet; thence N01°50'54"W for 27.98 feet; thence S88°09'06"W for 59.17 feet; thence S01°50'54"E for 3.25 feet; thence S88°09'06"W for 4.92 feet; thence N01°50'54"W for 3.25 feet; thence S88°09'06"W for 27.08 feet; thence S01°50'54"E for 27.08 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 77.99 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 143.84 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet

to the POINT OF EGINNING.

## LESS:

All (HOTEL LOT) areas as graphically depicted in sheets 13 and 14 of this document.

**The above described perimetrical boundary lies between elevation +40.8 feet and elevation +58.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED,

## SURVEYOR'S NOTES:

— This site lies in between Section 14, Township 53 South, Range 42 East and Section 14, Township 52 South, Range 42 East, Miami Beach, Miami—Dade County, Florida.

— Bearings hereon are referred to an assumed value of N01°41'29"W for the easterly right—of—way line of COLLINS AVENUE.

— Lands shown hereon were not abstracted for easements and/or rights—of—way of records.

— This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

## SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Description" was made under my responsible charge on June 5, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17—6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.

"Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By:
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

NOTE:
LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT OF EXTERNAL FLOOR PLATE AT ITS PROPER ELEVATION. LESS ALL (UNITS AND BALCONIES) AND (HOTEL LOT) AS DEPICTED IN GRAPHICS UNLESS OTHERWISE NOTED.

Cod No.03081 1GT—B Drawn By: RJM

# CENTRAL TOWER
## LEGAL DESCRIPTION, NOTES AND CERTIFICATION
### EXHIBIT "1" OF EXHIBIT "E"
# SHEET 3



NOT TO SCALE



THIRD AND FOURTH LEVEL FLOOR PLAN

COLLINS AVENUE
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

EASTERLY RIGHT-OF-WAY
LINE OF COLLINS AVENUE

N01°41'29"W 314.84'

POINT OF COMMENCEMENT
SOUTHWEST CORNER OF LOT 49

SOUTH LINE LOT 49
Plat Book 28, Page 28

POINT OF BEGINNING

N88°18'31"E 218.61'

Cad No.030811CT-B Drawn By: RJM

## BLOW-UP DETAIL
## CENTRAL TOWER BOUNDARY
EXHIBIT "1" OF EXHIBIT "E"

**SHEET 4**

Page 64 of 104

Book26080/Page4968    CFN#20071144863

## LEGAL DESCRIPTION: (CENTRAL TOWER)-FIFTH LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami-Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A-1-A) for 314.64 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING.

thence N01°50'54"W for 4.55 feet; thence S 88°09'06" W for 77.94 feet; thence N01°50'54"W for 27.98 feet; thence S88°09'06"W for 91.17 feet; thence S01°50'54"E for 27.08 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79

to the POINT OF EGINNING.

### LESS:

All (HOTEL LOT) areas as graphically depicted in sheet 15 of this document.

**The above described perimetrical boundary lies between elevation +58.8 feet and elevation +67.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED,
### SURVEYOR'S NOTES:

– This site lies in between Section 14, Township 53 South, Range 42 East and Section 14, Township 52 South, Range 42 East, Miami Beach, Miami-Dade County, Florida.

– Bearings hereon are referred to an assumed value of N01°41'29"W for the easterly right-of-way line of COLLINS AVENUE.

– Lands shown hereon were not abstracted for easements and/or rights-of-way of records.

– This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

### SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Description" was made under my responsible charge on June 5, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17-6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.

"Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

NOTE:
LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT OF EXTERNAL FLOOR PLATE AT ITS PROPER ELEVATION. LESS ALL (UNITS AND BALCONIES) AND (HOTEL LOT) AS DEPICTED IN GRAPHICS UNLESS OTHERWISE NOTED.

Cad No.030811CT-B Drawn By: RJM

# CENTRAL TOWER
## LEGAL DESCRIPTION, NOTES AND CERTIFICATION
### EXHIBIT "1" OF EXHIBIT "E"

# SHEET 5



NOT TO SCALE



**FIFTH LEVEL FLOOR PLAN**

POINT OF
BEGINNING

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

SOUTH LINE LOT 49
Plat Book 28, Page 28

COLLINS AVENUE
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

EASTERLY RIGHT-OF-WAY
LINE OF COLLINS AVENUE

Ccd No.030811CT-B Drawn By; RJM

**BLOW-UP DETAIL**
**CENTRAL TOWER BOUNDARY**
EXHIBIT "1" OF EXHIBIT "E"
Book26080/Page4970   CFN#20071144863
**SHEET 6**
Page 66 of 104

## LEGAL DESCRIPTION: (CENTRAL TOWER)-SIXTH LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami—Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N01°41'29"W along the East right—of—way line of Collins Avenue (State Road A—1—A) for 314.44 feet; thence N88°18'31"E at right angles to the aforementioned course for 49.51 feet to the POINT OF BEGINNING.

thence N01°50'54"W for 5.38 feet; thence S 88°09'06" W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 90.27 feet; thence S01°50'54"E for 4.49 feet; thence S88°09'06"W for 52.67 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 12.50 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 13.67 feet

to the POINT OF EGINNING.

### LESS:

All (HOTEL LOT) areas as graphically depicted in sheet 16 of this document.

**The above described perimetrical boundary lies between elevation +67.8 feet and elevation +76.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED,
## SURVEYOR'S NOTES:

- This site lies in between Section 14, Township 53 South, Range 42 East and Section 14, Township 52 South, Range 42 East, Miami Beach, Miami—Dade County, Florida.

- Bearings hereon are referred to an assumed value of N01°41'29"W for the easterly right—of—way line of COLLINS AVENUE.

- Lands shown hereon were not abstracted for easements and/or rights—of—way of records.

- This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

### SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Description" was made under my responsible charge on June 5, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17—6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.

"Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

NOTE:
LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT OF EXTERNAL FLOOR PLATE AT ITS PROPER ELEVATION. LESS ALL (UNITS AND BALCONIES) AND (HOTEL LOT) AS DEPICTED IN GRAPHICS UNLESS OTHERWISE NOTED.

Cad No.03081CT-B Drawn By; RJM



SIXTH LEVEL FLOOR PLAN

N88°09'06"E
208.17'

N88°09'06"E
35.00

N88°09'06"E
13.67'

N88°09'06"E
30.55'

N88°09'06"E
4.45'

N88°09'06"E
4.67'

S01°50'54"E
9.78'

S01°50'54"E
18.42'

S01°50'54"E
22.75

N01°50'54"W
28.13

N01°50'54"W
54.83'

N01°50'54"W
28.20

S01°50'54"E
12.88

S01°50'54"E
39.94

S88°09'06"W
4.39

S01°50'54"E
12.90'

S88°09'06"W
35.00

S88°09'06"W
52.67'

S88°09'06"W
90.27'

S88°09'06"W
52.79'

S88°09'06"W
25.04'

S88°09'06"W
31.68'

S88°09'06"W
21.50'

S01°50'54"E
4.55

S01°50'54"E
4.55

N01°50'54"W
4.55"

N01°50'54"W
4.55"

N01°50'54"W
4.61"

N88°18'31"E
49.51'

POINT OF
BEGINNING

SEE
DETAIL "A"
BELOW

NOT TO SCALE

COLLINS AVENUE
(STATE ROAD A—1—A)
(PUBLIC RIGHT OF WAY)

EASTERLY RIGHT-OF-WAY
LINE OF COLLINS AVENUE

N01°41'29"W
314.44'

SOUTH LINE LOT 49
Plat Book 28, Page 28

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

N01°50'54"W
5.38'

S88°09'06"W
13.67'

S01°50'54"E
4.55'

S88°09'06"W
12.50'

S01°50'54"E
4.49'

DETAIL "A"
NOT TO SCALE:

BLOW-UP DETAIL
CENTRAL TOWER BOUNDARY
EXHIBIT "1" OF EXHIBIT "E"

SHEET 8
Page 68 of 104

Cad No.030811GT-B Drawn By, RJM

## LEGAL DESCRIPTION: (CENTRAL TOWER)-SEVENTH THRU SIXTEENTH LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami—Dade County, Florida.

being more particularly described as follows:

Commence at the Southwest corner of lot 49 thence N01°41'29"W along the East right—of—way line of Collins Avenue (State Road A—1—A) for 314.51 feet; thence N88°18'31"E at right angles to the aforementioned course for 75.67 feet to the POINT OF BEGINNING.

thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 26.17 feet; thence N01°50'54"W for 0.83 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; then ce N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 90.27 feet; thence S01°50'54"E for 4.49 feet; thence S88°09'06"W for 52.67

to the POINT OF EGINNING.

### LESS:

All (HOTEL LOT) areas as graphically depicted in sheets 17 through 20 of this document.

**The above described perimetrical boundary lies between elevation +76.8 feet and elevation +148.8 feet relative to the National Geodetic Vertical Datum of 1929.**

### SURVEYOR'S NOTES:

- This site lies in between Section 14, Township 53 South, Range 42 East and Section 14, Township 52 South, Range 42 East, Miami Beach, Miami—Dade County, Florida.

- Bearings hereon are referred to an assumed value of N01°41'29"W for the easterly right—of—way line of COLLINS AVENUE.

- Lands shown hereon were not abstracted for easements and/or rights—of—way of records.

- This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

### SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Description" was made under my responsible charge on June 5, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17—6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.

"Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By: _____
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

NOTE:
LEGAL DESCRIPTION DESCRIBES THE ENTIRE LIMIT OF EXTERNAL FLOOR PLATE AT ITS PROPER ELEVATION. LESS ALL (UNITS AND BALCONIES) AND (HOTEL LOT) AS DEPICTED IN GRAPHICS UNLESS OTHERWISE NOTED.

*(NOTE: THERE IS NO 13th LEVEL)*

# CENTRAL TOWER
## LEGAL DESCRIPTION, NOTES AND CERTIFICATION
### EXHIBIT "1" OF EXHIBIT "E"

### SHEET 9

Cod No 0308110T—B Drawn By, RJM





NOT TO SCALE

SEVENTH THRU SIXTEENTH LEVEL
FLOOR PLAN

POINT OF
BEGINNING

Collins Avenue
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

SOUTH LINE LOT 49
Plat Book 28, Page 28

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

*(NOTE: THERE IS NO 13th LEVEL)*

**BLOW-UP DETAIL**
**CENTRAL TOWER BOUNDARY**

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 10**



GRAPHIC SCALE

0    15    30              60

( IN FEET )
1 inch = 30 ft.

**LEGEND:**

—— CONDOMINIUM
BOUNDARY

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

**(GROUND) FIRST LEVEL FLOOR PLAN**

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 11**

Book26080/Page4975    CFN#20071144863    Page 71 of 104

Cad No. 030811F    Drawn By. RJM



GRAPHIC SCALE

0    15    30                    60

( IN FEET )
1 inch = 30 ft.

**SHARED COMPONENT UNIT**

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|----------|
| UNIT #201 | (CR-209) |
| UNIT #202 | (CR-211) |
| UNIT #203 | (CR-215) |
| UNIT #204 | (CR-217) |
| UNIT #205 | (CR-222) |
| UNIT #206 | (CR-220) |
| UNIT #207 | (CR-218) |
| UNIT #208 | (CR-216) |
| UNIT #209 | (CR-214) |
| UNIT #210 | (CR-212) |
| UNIT #211 | (CR-210) |

BALCONY          BALCONY

TYPE "CR-L" UNIT #204
TYPE "CR-K" UNIT #205
TYPE "CR-J" UNIT #206
TYPE "CR-M" UNIT #203
TYPE "CR-I_ADA" UNIT #207
TYPE "CR-N" UNIT #202
TYPE "CR-H" UNIT #208
TYPE "CR-O" UNIT #201
TYPE "CR-G" UNIT #209
TYPE "CR-F" UNIT #210
TYPE "CR-E" UNIT #211

BALCONY

ROOF

LINE OF WALL BELOW

MANAGING DIRECTOR
HOTEL EXECUTIVE OFFICES
BOARDROOM
**(HOTEL LOT)**
MECH.
BOARDROOM
OPEN TO LOBBY BELOW
LECTURE ROOM
ELEC.

PORTE COCHERE
C O V E R E D   D R I V E

LEGEND:
———— CONDOMINIUM BOUNDARY
▨ (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cod No. 030811F    Drawn By: RJM

# SECOND LEVEL FLOOR PLAN

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 12**

Page 72 of 104



GRAPHIC SCALE

0   15   30                      60

( IN FEET )
1 inch = 30  ft.

**SHARED
COMPONENT
UNIT**

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # | |
|--------|------|--|
| UNIT #301 | (CR-309) | |
| UNIT #302 | (CR-311) | |
| UNIT #303 | (CR-315) | |
| UNIT #304 | (CR-317) | |
| UNIT #305 | (CR-322) | |
| UNIT #306 | (CR-320) | |
| UNIT #307 | (CR-318) | |
| UNIT #308 | (CR-316) | |
| UNIT #309 | (CR-314) | |
| UNIT #310 | (CR-312) | |
| UNIT #311 | (CR-310) | |
| UNIT #319 | (CR-307) | |
| UNIT #315 | (CR-315) | (CR-302) |
| UNIT #316 | (CR-316) | (CR-305) |

**SHARED
COMPONENT
UNIT**

BALCONY          BALCONY

TYPE
"CR-L"
UNIT #304

TYPE
"CR-K"
UNIT #305

TYPE
"CR-J"
UNIT #306

BALCONY

TYPE
"CR-M"
UNIT #303

TYPE
"CR-I_ADA"
UNIT #307

TYPE
"CR-N"
UNIT #302

TYPE
"CR-H"
UNIT #308

TYPE
"CR-O_ADA"
UNIT #301

TYPE
"CR-G"
UNIT #309

BALCONY

TYPE
"CR-F"
UNIT #310

BALCONY

TYPE "CR-P_ADA"
UNIT #319

TYPE
"CR-E"
UNIT #311

BALCONY

NUTRITION
OFFICE

NUTRITION
OFFICE          SECRETARY

SECRETARIAL
OFFICE          CR & DIRECTOR

RECEPTION
WAITING AREA

BLOOD
DRAW

**(HOTEL LOT)**

LEGEND:

CONDOMINIUM
BOUNDARY

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

TYPE
"CR-S"
UNIT #316

TYPE
"CR-A"
UNIT #315

Drawn By RJM

Cod No 030811F

## THIRD LEVEL FLOOR PLAN

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 13**



GRAPHIC SCALE

0  15  30    60

( IN FEET )
1 inch = 30 ft.

SHARED COMPONENT UNIT

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # | |
|---|---|---|
| UNIT #401 | (CR-409) | |
| UNIT #402 | (CR-411) | |
| UNIT #403 | (CR-415) | |
| UNIT #404 | (CR-417) | |
| UNIT #405 | (CR-422) | |
| UNIT #406 | (CR-420) | |
| UNIT #407 | (CR-418) | |
| UNIT #408 | (CR-416) | |
| UNIT #409 | (CR-414) | |
| UNIT #410 | (CR-412) | |
| UNIT #411 | (CR-410) | |
| UNIT #419 | (CR-407) | |
| UNIT #415 | (CR-415) | (CR-402) |
| UNIT #416 | (CR-413) | (CR-401) |

SHARED COMPONENT UNIT

TYPE "CR-L" UNIT #404
TYPE "CR-K" UNIT #405
TYPE "CR-J" UNIT #406
TYPE "CR-M" UNIT #403
TYPE "CR-I ADA" UNIT #407
TYPE "CR-N" UNIT #402
TYPE "CR-H" UNIT #408
TYPE "CR-O" UNIT #401
TYPE "CR-G" UNIT #409
TYPE "CR-P ADA" UNIT #419
TYPE "CR-F" UNIT #410
TYPE "CR-E" UNIT #411

BALCONY  BALCONY

(HOTEL LOT)

TYPE "CR-S" UNIT #416
TYPE "CR-A" UNIT #415

LEGEND:
———— CONDOMINIUM BOUNDARY

///// (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cod. No. 030811F    Drawn By, RJM

**FOURTH LEVEL FLOOR PLAN**

EXHIBIT "1" OF EXHIBIT "E"



GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30 ft.

**SHARED COMPONENT UNIT**

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| UNIT #501 | (CR-509) |
| UNIT #502 | (CR-511) |
| UNIT #503 | (CR-515) |
| UNIT #504 | (CR-517) |
| UNIT #505 | (CR-522) |
| UNIT #506 | (CR-520) |
| UNIT #507 | (CR-518) |
| UNIT #508 | (CR-516) |
| UNIT #509 | (CR-514) |
| UNIT #510 | (CR-512) |
| UNIT #511 | (CR-510) |
| UNIT #515 | (CR-502) |
| UNIT #516 | (CR-501) |
| UNIT #517 | (CR-503) |
| UNIT #518 | (CR-505) |
| UNIT #519 | (CR-507) |

**SHARED COMPONENT UNIT**

(HOTEL LOT)

BALCONY     BALCONY

TYPE "CR-L" UNIT #504
TYPE "CR-K" UNIT #505
TYPE "CR-J" UNIT #506
TYPE "CR-M" UNIT #503
TYPE "CR-I" UNIT #507
TYPE "CR-N" UNIT #502
TYPE "CR-H" UNIT #508
TYPE "CR-O" UNIT #501
TYPE "CR-G" UNIT #509
TYPE "CR-F" UNIT #510
TYPE "CR-P_ADA" UNIT #519
TYPE "CR-E" UNIT #511
TYPE "CR-Q" UNIT #518
MECHANICAL ROOM
TYPE "CR-R" UNIT #517
TYPE "CR-S" UNIT #516
TYPE "CR-A" UNIT #515

STAIR
BALCONY

LEGEND:

———— CONDOMINIUM BOUNDARY

▨ (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cod No 030811F    Drown By, RJM

**FIFTH LEVEL FLOOR PLAN**

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 15**

Page 75 of 104

Book26080/Page4979    CFN#20071144863



GRAPHIC SCALE

0    15    30                60

( IN FEET )
1 inch = 30 ft.

**SHARED
COMPONENT
UNIT**

BALCONY        BALCONY

TYPE
"CR-L"
UNIT #604

TYPE
"CR-K"
UNIT #605

TYPE
"CR-J"
UNIT #606

TYPE
"CR-M"
UNIT #603

TYPE
"CR-I"
UNIT #607

TYPE
"CR-N"
UNIT #602

TYPE
"CR-H"
UNIT #608

TYPE
"CR-O"
UNIT #601

TYPE
"CR-G"
UNIT #609

TYPE
"CR-F"
UNIT #610

TYPE "CR-P ADA"
UNIT #619

TYPE
"CR-E"
UNIT #611

TYPE
"CR-D"
UNIT #612
(CR-608)

TYPE
"CR-Q"
UNIT #618

TYPE
"CR-C_06"
UNIT #613

TYPE
"CR-R"
UNIT #617

TYPE
"CR-B2"
UNIT #614

TYPE
"CR-S"
UNIT #616
(CR-601)

TYPE
"CR-A"
UNIT #615
(CR-602)

**SHARED
COMPONENT
UNIT**

BALCONY (repeated along right side)

**UNIT ADDRESS LEGEND:**
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| UNIT #601 | (CR-609) |
| UNIT #602 | (CR-611) |
| UNIT #603 | (CR-615) |
| UNIT #604 | (CR-617) |
| UNIT #605 | (CR-622) |
| UNIT #606 | (CR-620) |
| UNIT #607 | (CR-618) |
| UNIT #608 | (CR-616) |
| UNIT #609 | (CR-614) |
| UNIT #610 | (CR-612) |
| UNIT #611 | (CR-610) |
| UNIT #612 | (CR-608) |
| UNIT #613 | (CR-606) |
| UNIT #614 | (CR-604) |
| UNIT #615 | (CR-602) |
| UNIT #616 | (CR-601) |
| UNIT #617 | (CR-603) |
| UNIT #618 | (CR-605) |
| UNIT #619 | (CR-607) |

**LEGEND:**

———— CONDOMINIUM
BOUNDARY

▨ (HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Drawn By: RJM

Cod No. 030811F

# SIXTH LEVEL FLOOR PLAN

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 16**



GRAPHIC SCALE

0    15    30    60

( IN FEET )
1 inch = 30 ft.

**SHARED COMPONENT UNIT**

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|---|---|
| #701 AND #801 | (CR-709 AND CR-809) |
| #702 AND #802 | (CR-711 AND CR-811) |
| #703 AND #803 | (CR-715 AND CR-815) |
| #704 AND #804 | (CR-717 AND CR-817) |
| #705 AND #805 | (CR-722 AND CR-822) |
| #706 AND #806 | (CR-720 AND CR-820) |
| #707 AND #807 | (CR-718 AND CR-818) |
| #708 AND #808 | (CR-716 AND CR-816) |
| #709 AND #809 | (CR-714 AND CR-814) |
| #710 AND #810 | (CR-712 AND CR-812) |
| #711 AND #811 | (CR-710 AND CR-810) |
| #712 AND #812 | (CR-708 AND CR-808) |
| #713 AND #813 | (CR-706 AND CR-806) |
| #714 AND #814 | (CR-704 AND CR-804) |
| #715 AND #815 | (CR-702 AND CR-802) |
| #716 AND #816 | (CR-701 AND CR-801) |
| #717 AND #817 | (CR-703 AND CR-803) |
| #718 AND #818 | (CR-705 AND CR-805) |
| #719 AND #819 | (CR-707 AND CR-807) |

**SHARED COMPONENT UNIT**

LEGEND:
——— CONDOMINIUM BOUNDARY
▨ (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cod No. 030811F    Drawn By: RJM

BALCONY    BALCONY

TYPE "CR-L"
UNITS
#704 AND #804

TYPE "CR-K"
UNITS
#705 AND #805

TYPE "CR-J"
UNITS
#706 AND #806

STAIR    ELEC.

TYPE "CR-M"
UNITS
#703 AND #803

TYPE "CR-I"
UNITS
#707 AND #807

TYPE "CR-N"
UNITS
#702 AND #802

TYPE "CR-H"
UNITS
#708 AND #808

TYPE "CR-O"
UNITS
#701 AND #801

TYPE "CR-G"
UNITS
#709 AND #809

TYPE "CR-P"
UNITS #719 AND #819

TYPE "CR-F"
UNITS
#710 AND #810

TYPE "CR-E"
UNITS
#711 AND #811

TYPE "CR-D"
UNITS
#712 AND #812

TYPE "CR-Q"
UNITS
#718 AND #818

TYPE "CR-C"
UNITS
#713 AND #813

TYPE "CR-R"
UNITS
#717 AND #817

TYPE "CR-B"
UNITS
#714 AND #814

TYPE "CR-S"
UNITS
#716 AND #816

TYPE "CR-A"
UNITS
#715 AND #815

BALCONY    BALCONY    BALCONY    BALCONY

# SEVENTH AND EIGHTH LEVEL FLOOR PLAN

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 17**



GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30 ft.

**SHARED COMPONENT UNIT**

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| #901 AND #1001 | (CR-909 AND CR-1009) |
| #902 AND #1002 | (CR-911 AND CR-1011) |
| #903 AND #1003 | (CR-915 AND CR-1015) |
| #904 AND #1004 | (CR-917 AND CR-1017) |
| #905 AND #1005 | (CR-922 AND CR-1022) |
| #906 AND #1006 | (CR-920 AND CR-1020) |
| #907 AND #1007 | (CR-918 AND CR-1018) |
| #908 AND #1008 | (CR-916 AND CR-1016) |
| #909 AND #1009 | (CR-914 AND CR-1014) |
| #910 AND #1010 | (CR-912 AND CR-1012) |
| #911 AND #1011 | (CR-910 AND CR-1010) |
| #912 AND #1012 | (CR-908 AND CR-1008) |
| #913 AND #1013 | (CR-906 AND CR-1006) |
| #914 AND #1014 | (CR-904 AND CR-1004) |
| #915 AND #1015 | (CR-902 AND CR-1002) |
| #916 AND #1016 | (CR-901 AND CR-1001) |
| #917 AND #1017 | (CR-903 AND CR-1003) |
| #918 AND #1018 | (CR-905 AND CR-1005) |
| #919 AND #1019 | (CR-907 AND CR-1007) |

**SHARED COMPONENT UNIT**

LEGEND:
——— CONDOMINIUM BOUNDARY
▨ (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cad No 030811F    Drawn By, RJM

BALCONY        BALCONY

TYPE "CR-L" UNITS #904 AND #1004
TYPE "CR-K" UNITS #905 AND #1005
STAIR
TYPE "CR-J" UNITS #906 AND #1006
TYPE "CR-M" UNITS #903 AND #1003
TYPE "CR-I" UNITS #907 AND #1007
TYPE "CR-N" UNITS #902 AND #1002
TYPE "CR-H" UNITS #908 AND #1008
TYPE "CR-O" UNITS #901 AND #1001
TYPE "CR-G" UNITS #909 AND #1009
TYPE "CR-P" UNITS #919 AND #1019
TYPE "CR-F" UNITS #910 AND #1010
TYPE "CR-E" UNITS #911 AND #1011
TYPE "CR-D" UNITS #912 AND #1012
TYPE "CR-Q" UNITS #918 AND #1018
TYPE "CR-C" UNITS #913 AND #1013
TYPE "CR-R" UNITS #917 AND #1017
TYPE "CR-B" UNITS #914 AND #1014
TYPE "CR-S" UNITS #916 AND #1016
TYPE "CR-A" UNITS #915 AND #1015

BALCONY

**NINETH AND TENTH LEVEL FLOOR PLAN**

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 18**

Book26080/Page4982    CFN#20071144863    Page 78 of 104



**GRAPHIC SCALE**

0   15   30   60

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|---|---|
| #1101 THRU #1401 | (CR-1109 THRU CR-1409) |
| #1102 THRU #1402 | (CR-1111 THRU CR-1411) |
| #1103 THRU #1403 | (CR-1115 THRU CR-1415) |
| #1104 THRU #1404 | (CR-1117 THRU CR-1417) |
| #1105 THRU #1405 | (CR-1116 THRU CR-1416) |
| #1106 THRU #1406 | (CR-1114 THRU CR-1414) |
| #1107 THRU #1407 | (CR-1112 THRU CR-1412) |
| #1108 THRU #1408 | (CR-1110 THRU CR-1410) |
| #1109 THRU #1409 | (CR-1108 THRU CR-1408) |
| #1110 THRU #1410 | (CR-1106 THRU CR-1406) |
| #1111 THRU #1411 | (CR-1104 THRU CR-1404) |
| #1112 THRU #1412 | (CR-1102 THRU CR-1402) |
| #1113 THRU #1413 | (CR-1101 THRU CR-1401) |
| #1114 THRU #1414 | (CR-1103 THRU CR-1403) |
| #1115 THRU #1415 | (CR-1105 THRU CR-1405) |
| #1116 THRU #1416 | (CR-1107 THRU CR-1407) |

LEGEND:

——————  CONDOMINIUM BOUNDARY

**C.E.**  COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Drawn By: RJM

Cod No. 030811F

*(NOTE: THERE IS NO 13th LEVEL)*

# ELEVENTH THRU FOURTEENTH LEVEL
## FLOOR PLAN

EXHIBIT "1" OF EXHIBIT "E"

**SHEET 19**

Book26080/Page4983    CFN#20071144863



GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30 ft.

**BALCONY**          **BALCONY**

TYPE "B4_17"
UNITS #LP04 #PH04

TYPE "B5_16"
UNITS #LP05 #PH05

STAIR    ELEC

**BALCONY**

TYPE "B3_14"
UNITS #LP06 #PH06

TYPE "C3_15"
UNITS #LP03 #PH03

TYPE "C3_11"
UNITS #LP02 #PH02

TYPE "B3_12"
UNITS #LP07 #PH07

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| #LP01 AND #PH01 | (CR-LP09 AND CR-PH09) |
| #LP02 AND #PH02 | (CR-LP11 AND CR-PH11) |
| #LP03 AND #PH03 | (CR-LP15 AND CR-PH15) |
| #LP04 AND #PH04 | (CR-LP17 AND CR-PH17) |
| #LP05 AND #PH05 | (CR-LP16 AND CR-PH16) |
| #LP06 AND #PH06 | (CR-LP14 AND CR-PH14) |
| #LP07 AND #PH07 | (CR-LP12 AND CR-PH12) |
| #LP08 AND #PH08 | (CR-LP10 AND CR-PH10) |
| #LP09 AND #PH09 | (CR-LP08 AND CR-PH08) |
| #LP10 AND #PH10 | (CR-LP06 AND CR-PH06) |
| #LP11 AND #PH11 | (CR-LP04 AND CR-PH04) |
| #LP12 AND #PH12 | (CR-LP02 AND CR-PH02) |
| #LP13 AND #PH13 | (CR-LP01 AND CR-PH01) |
| #LP14 AND #PH14 | (CR-LP03 AND CR-PH03) |
| #LP15 AND #PH15 | (CR-LP05 AND CR-PH05) |
| #LP16 AND #PH16 | (CR-LP07 AND CR-PH07) |

TYPE "B1_09"
UNITS #LP01 #PH01

TYPE "B1_10"
UNITS #LP08 #PH08

**BALCONY**

TYPE "C4_07"
UNITS #LP16 #PH16

TYPE "C1"
UNITS #LP09 #PH09

**BALCONY**

TYPE "B3_06"
UNITS #LP10 #PH10

TYPE "B1_05"
UNITS #LP15 #PH15

**BALCONY**

TYPE "B3_04"
UNITS #LP11 #PH11

TYPE "C3_03"
UNITS #LP14 #PH14

**BALCONY**

LEGEND:

———  CONDOMINIUM BOUNDARY

**C.E.**  COMMON ELEMENT

▨ (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

TYPE "C5_01"
UNITS #LP13 #PH13

TYPE "B2_02"
UNITS #LP12 #PH12

Drawn By. RJM

Cad No. 030811F

**LPH AND PH LEVEL
FLOOR PLAN**

EXHIBIT "1" OF EXHIBIT "E"

Book26080/Page4984    CFN#20071144863

**SHEET 20**
Page 80 of 104



GRAPHIC SCALE

```
 0      15      30              60
```

( IN FEET )
1 inch = 30  ft.



**(HOTEL LOT)**

LEGEND:

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

**MAIN ROOF PLAN**

Cad No  030811F    Drawn By. RJM



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

**(HOTEL LOT)**

**(HOTEL LOT)**

**(HOTEL LOT)**

LEGEND:

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Cod No. 030811F    Drawn By: RJM

## MECHANICAL LEVEL 1

EXHIBIT "1" OF EXHIBIT "E"

## SHEET 22

Book26080/Page4986    CFN#20071144863

## LEGAL DESCRIPTION: (SOUTH TOWER)-(GROUND) FIRST LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami-Dade County, Florida, and a parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said lot 49 thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A-1-A) as shown on right-of-way map no. 87060-misc-4, for 32.44 feet; thence N88°18'31"E at right angles to the aforementioned course for 206.07 feet to the POINT OF BEGINNING; thence N01°50'54"W for 7.01 feet; thence S88°09'06"W for 78.73 feet; thence N01°50'54"W for 35.42 feet; thence S88°09'06"W for 30.40 feet; thence N01°50'54"W for 5.92 feet; thence N88°09'06"E for 3.29 feet; thence N01°50'54"W for 6.03 feet; thence S88°09'06"W for 2.15 feet; thence N01°50'54"W for 12.00 feet; thence N88°09'06"E for 2.65 feet; thence N01°50'54"W for 5.88 feet; thence N88°09'06"E for 26.67 feet; thence N01°50'54"W for 44.75 feet; thence N88°09'06"E for 3.09 feet; thence N43°09'06"E for 5.06 feet; thence N01°50'54"W for 2.74 feet; thence N88°09'06"E for 125.67 feet; thence S01°50'54"E for 123.34 feet; thence S88°09'06"W for 53.67 feet to the POINT OF BEGINNING.

### LESS:

All (HOTEL LOT) areas as graphically depicted in sheet 7 of this document.

**The above described perimetrical boundary lies between elevation +15.3 feet and elevation +29.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED,

## SURVEYOR'S NOTES:

- This site lies in Government Lot 2, of Section 11, Township 53 South, Range 42 East, City of Miami Beach, Miami-Dade County, Florida.

- Bearings hereon are referred to an assumed value of N01°41'29"W for the Easterly right-of-way line of COLLINS AVENUE.

- Lands shown hereon were not abstracted for easements and/or rights-of-way of records.

- Elevations shown hereon are relative to the North American Vertical Datum of 1988, based on Department of Natural Resources Monument R-42 (1974), Elevation +10.84 (+12.39 N.G.V.D.), Located by found brass disk in parking deck.

- Dimensions indicated hereon are field measured by electronic measurement, unless otherwise noted.

- Dimensions shown hereon are based on F.L.S. sketch #2005-062S.

- Legal description describes the entire limit of external floor plate at its proper elevation. less all (units and balconies) and (hotel lot) as depicted in graphics unless otherwise noted.

## SURVEYOR'S CERTIFICATION:

I hereby certify that this "Sketch of Survey" for the subject property as described below in

### LEGAL DESCRIPTION: (SEE PAGE 4 OF 48)
The North 25.00 feet of Lot 48, all of Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

was made under my responsible charge on June 13, 2005, and last updated on May 18, 2007 and meets the Minimum Technical Standards as set forth by the Florida Board of Professional Surveyors and Mappers in Chapter 61G17-6, Florida Administrative Code, pursuant to Section 472.027, Florida Statutes.
"

Not valid without the signature and the original raised seal of a Florida Licensed Surveyor and Mapper"

FORTIN, LEAVY, SKILES, INC., LB3653

By:
Daniel C. Fortin, For The Firm
Surveyor and Mapper, LS2853
State of Florida.

Cad No. 030184SN-B Drawn By, RJM

**SOUTH TOWER**
**LEGAL DESCRIPTION, NOTES AND CERTIFICATION**
**EXHIBIT "2" OF EXHIBIT "E"**
**SHEET 1**
Book26080/Page4987    CFN#20071144863
Page 83 of 104



**(GROUND)**
**FIRST LEVEL FLOOR PLAN**

LOT 51

LOT 50

LOT 49

N88°09'06"E  125.67'

N01°50'54"W 2.74'

N88°09'06"E 3.09'

5.06' N88°09'06"E

N01°50'54"W 44.76'

N88°09'06"E 26.67'

SEE DETAIL "A" BELOW

30.40' S88°09'06"W

N01°50'54"W 35.42'

S88°09'06"W 78.73'

N01°50'54"W 7.70'

S88°09'06"W 53.67'

HIGH WATER LINE OF THE ATLANTIC OCEAN AS SHOWN ON PLAT BOOK 28, PAGE 28

S01°50'54"E 123.34'

N NOT TO SCALE

POINT OF BEGINNING

N88°18'31"E 205.07'

COLLINS AVENUE
(STATE ROAD RIGHT-OF-WAY MAP NO. 87060-MISC.-4)
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

N01°41'29"W 32.44'

EASTERLY RIGHT-OF-WAY LINE OF COLLINS AVENUE

SOUTH LINE LOT 49
Plat Book 28, Page 28

**POINT OF COMMENCEMENT**
SOUTHWEST CORNER OF LOT 49

Cad No.03018451-B Drawn By: RJM

N01°50'54"W 5.88'

N88°09'06"E 2.65'

N01°50'54"W 12.00'

N01°50'54"W 6.03'

S88°09'06"W 2.15'

N88°09'06"E 3.29'

N01°50'54"W 5.92'

DETAIL "A"
NOT TO SCALE:

**BLOW-UP DETAIL**
**SOUTH TOWER BOUNDARY**
EXHIBIT "2" OF EXHIBIT "E"

**SHEET 2**

## LEGAL DESCRIPTION: (SOUTH TOWER)-SECOND THRU FIFTH LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida, and a parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said lot 49 thence N01°41'29"W along the East right–of–way line of Collins Avenue (State Road A–1–A) as shown on right–of–way map no. 87060–misc–4, for 32.44 feet; thence N88°18'31"E at right angles to the aforementioned course for 55.75 feet to the POINT OF BEGINNING; thence N01°50'54"W for 55.33 feet; thence N88°09'06"E for 13.42 feet; thence S01°50'54"E for 7.71 feet; thence N88°09'06"E for 16.58 feet; thence N01°50'54"W for 6.24 feet; thence N88°09'06"E for 12.25 feet; thence N01°50'54"W for 12.01 feet; thence N88°09'06"E for 2.65 feet; feet; thence N01°50'54"W for 5.88 feet; thence N88°09'06"E for 26.67 feet; thence N01°50'54"W for 51.07 feet; thence N88°09'06"E for 132.33 feet; thence S01°50'54"E for 123.34 feet; thence S88°09'06"W for 53.67 feet; thence N01°50'54"W for 7.01 feet; thence S88°09'06"W for 103.33 feet; thence S01°50'54"E for 6.51 feet; thence S88°09'06"W for 46.90 feet to the POINT OF BEGINNING.

## LESS:

All (HOTEL LOT) areas as graphically depicted in sheets 8 through 11 of this document.

**The above described perimetrical boundary lies between elevation +29.8 feet and elevation +62.8 feet relative to the National Geodetic Vertical Datum of 1929.**

CONTINUED
CONTINUED,

## SURVEYOR'S NOTES:

– This site lies in Government Lot 2, of Section 11, Township 53 South, Range 42 East, City of Miami Beach, Miami–Dade County, Florida.

– Bearings hereon are referred to an assumed value of N01°41'29"W for the Easterly right–of–way line of COLLINS AVENUE.

– Lands shown hereon were not abstracted for easements and/or rights–of–way of records.

– This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

– Dimensions shown hereon are based on F.L.S. sketch #2005–062S.

– Legal description describes the entire limit of external floor plate at its proper elevation. less all (units and balconies) and (hotel lot) as depicted in graphics unless otherwise noted.

Cod No.03018457–B Drawn By; RJM

## SOUTH TOWER
## LEGAL DESCRIPTION. NOTES AND CERTIFICATION
EXHIBIT "2" OF EXHIBIT "E"
Book26080/Page4989    CFN#20071144863
SHEET 3
Page 85 of 104



NOT TO SCALE

LOT 51

LOT 50

SECOND THRU FIFTH LEVEL FLOOR PLAN

LOT 49

COLLINS AVENUE

POINT OF BEGINNING

POINT OF COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

DETAIL "A"
NOT TO SCALE

SEE DETAIL "A" BELOW

EXHIBIT "2" OF EXHIBIT "E"

BLOW-UP DETAIL
SOUTH TOWER BOUNDARY

SHEET 4

## LEGAL DESCRIPTION: (SOUTH TOWER)-SIXTH THRU TWENTY FIRST LEVEL FLOOR PLAN

A portion of lots 49, 50 and 51, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami-Dade County, Florida, and a parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot said 49 thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A-1-A) as shown on right-of-way map no. 87060-misc-4, for 32.44 feet; thence N88°18'31"E at right angles to the aforementioned course for 55.75 feet to the POINT OF BEGINNING; thence N01°50'54"W for 7.01 feet; thence S88°09'06"W for 78.73 feet; thence N01°50'54"W for 35.42 feet; thence S88°09'06"W for 30.40 feet; thence N01°50'54"W for 5.92 feet; thence N88°09'06"E for 3.29 feet; thence N01°50'54"W for 6.03 feet; thence S88°09'06"W for 2.15 feet; thence N01°50'54"W for 12.00 feet; thence N88°09'06"E for 2.65 feet; thence N01°50'54"W for 5.88 feet; thence N88°09'06"E for 26.67 feet; thence N01°50'54"W for 44.75 feet; thence N88°09'06"E for 3.09 feet; thence N43°09'06"E for 5.06 feet; thence N01°50'54"W for 2.74 feet; thence N88°09'06"E for 125.67 feet; thence S01°50'54"E for 123.34 feet; thence S88°09'06"W for 53.67 feet to the POINT OF BEGINNING.

### LESS:

All (HOTEL LOT) areas as graphically depicted in sheets 12 thru 17 of this document.

**The above described perimetrical boundary lies between elevation +62.80 feet and elevation +209.11 feet relative to the National Geodetic Vertical Datum of 1929.**

### SURVEYOR'S NOTES:

- This site lies in Government Lot 2, of Section 11, Township 53 South, Range 42 East, City of Miami Beach, Miami-Dade County, Florida.

- Bearings hereon are referred to an assumed value of N01°41'29"W for the Easterly right-of-way line of COLLINS AVENUE.

- Lands shown hereon were not abstracted for easements and/or rights-of-way of records.

- This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

- Dimensions shown hereon are based on F.L.S. sketch #2005-062S.

- Legal description describes the entire limit of external floor plate at its proper elevation. less all (units and balconies) and (hotel lot) as depicted in graphics unless otherwise noted.

Cod No.030184ST-B Drawn By: RJM

# SOUTH TOWER
# LEGAL DESCRIPTION, NOTES AND CERTIFICATION
## EXHIBIT "2" OF EXHIBIT "E"  SHEET 5



LOT 51

N88°09'06"E 66.50'

SIXTH THRU TWENTY FIRST LEVEL FLOOR PLAN

N01°50'54"W 40.75'

S01°50'54"E 122.83'

24.84'
S88°09'06"W

SEE DETAIL "A" BELOW

LOT 50

N88°09'06"E
13.42'

N01°50'54"W 54.00'

N88°18'31"E 55.75'

S88°09'06"W 66.50'

LOT 49

POINT OF BEGINNING

HIGH WATER LINE OF THE ATLANTIC OCEAN AS SHOWN ON PLAT BOOK 28 PAGE 28

N01°41'29"W 32.44'

COLLINS AVENUE
(STATE ROAD A—1—A)
(PUBLIC RIGHT OF WAY)
(STATE ROAD RIGHT-OF-WAY MAP NO. 87060-MISC—4)

EASTERLY RIGHT-OF-WAY LINE OF COLLINS AVENUE

N
NOT TO SCALE

SOUTH LINE LOT 49
Plat Book 28, Page 28

POINT OF COMMENCEMENT
SOUTHWEST CORNER OF LOT 49

Cad No. 03018AST-B Drawn By: RJM

S88°09'06"W 5.17'
S01°50'54"E 5.75'
N01°50'54"W 15.92'

N88°09'06"E 28.29'
N01°50'54"W 7.13'
S88°09'06"W 28.29'

N01°50'54"W 23.70'
S01°50'54"E 2.87'
6.38'
S01°50'54"E
N88°09'06"E 11.67'
S01°50'54"E 3.67'
N88°09'06"E 3.41'
N88°09'06"E 1.51'

DETAIL "A"
NOT TO SCALE:

BLOW-UP DETAIL
SOUTH TOWER BOUNDARY
(NOTE: THERE IS NO 13th LEVEL)

EXHIBIT "2" OF
EXHIBIT "E"

SHEET 6

Page 88 of 104



GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30 ft.



BALCONY          BALCONY          BALCONY

BALCONY

TYPE "A1"
UNIT #104

TYPE "B1"
UNIT #105

TYPE "A1a"
UNIT #106

TYPE "B2a"
UNIT #103

COURTYARD
OPEN TO SKY

ELEC.

TYPE "C1"
UNIT #107

TYPE "B2"
Rev.
UNIT #102

TYPE "C1"
Rev.
UNIT #108

C.E.

TYPE "B2"
UNIT #101

TYPE "C1"
UNIT #109

COURTYARD
OPEN TO SKY

(HOTEL LOT)
NOT A PART

LEGEND:

——————   CONDOMINIUM
         BOUNDARY

**C.E.**   COMMON ELEMENT

▨▨▨   (HOTEL LOT)
      NOT A PART OF
      CONDOMINIUM PROPERTY

Cod No. 030184F    Drawn By: RJM

# (GROUND) FIRST LEVEL FLOOR PLAN

ALL (HOTEL) UNLESS OTHERWISE NOTED.

**EXHIBIT "2" OF EXHIBIT "E"**

**SHEET 7**



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.



BALCONY     BALCONY     BALCONY

TYPE "A1"
UNIT #204

TYPE "B1"
UNIT #205

TYPE "A1a"
UNIT #206

TYPE "B2a"
UNIT #203

TYPE "C1"
UNIT #207

FEATURE WALL
ELEC.

TYPE "B2"
Rev.
UNIT #202

COURTYARD
OPEN TO SKY

TYPE "C1"
Rev.
UNIT #208

C.E.

TYPE "B2"
UNIT #201

COURTYARD
OPEN TO SKY

TYPE "C1"
UNIT #209

TYPE "C2"
UNIT #210

TYPE "C3"
UNIT #211

(HOTEL LOT)
NOT A PART

TYPE "B5"
UNIT #212

BALCONY     BALCONY

LEGEND:

———  CONDOMINIUM
      BOUNDARY

**C.E.**  COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Cod No 030184F    Drawn By: RJM

EXHIBIT "2"  **SECOND LEVEL FLOOR PLAN**
OF EXHIBIT "E"   ALL (HOTEL) UNLESS OTHERWISE NOTED.

**SHEET 8**



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

BALCONY    BALCONY    BALCONY

**TYPE "A1"**
UNIT #304

**TYPE "B1"**
UNIT #305

**TYPE "A1a"**
UNIT #306

**TYPE "B2a"**
UNIT #303

COURTYARD
OPEN TO SKY

**TYPE "C1"**
UNIT #307

**TYPE "B2"
Rev.**
UNIT #302

**TYPE "C1"
Rev.**
UNIT #308

**C.E.**

**TYPE "B2"**
UNIT #301

**TYPE "C1"**
UNIT #309

COURTYARD
OPEN TO SKY

**TYPE "C2"**
UNIT #310

**TYPE "C3"**
UNIT #311

**(HOTEL LOT)**

NOT A PART

**TYPE "B5"**
UNIT #312

BALCONY    BALCONY

LEGEND:
—— CONDOMINIUM
BOUNDARY

**C.E.** COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Cod No 030184F    Drawn By, RJM

**THIRD LEVEL FLOOR PLAN**
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2"
OF EXHIBIT "E"

**SHEET 9**

Book26080/Page4995    CFN#20071144863



GRAPHIC SCALE

0    15    30    60

( IN FEET )
1 inch = 30 ft.



BALCONY    BALCONY    BALCONY

TYPE "A1"
UNIT #404

TYPE "B1"
UNIT #405

TYPE "A1a"
UNIT #406

UNDER CONSTRUCTION
10-1-07

NO DOORS

ELEC.

TYPE "B2a"
UNIT #403

COURTYARD
OPEN TO SKY

TYPE "C1"
UNIT #407

TYPE "B2"
Rev.
UNIT #402

TYPE "C1"
Rev.
UNIT #408

TYPE "B2"
UNIT #401

C.E.

TYPE "C1"
UNIT #409

COURTYARD
OPEN TO SKY

TYPE "C2"
UNIT #410

TYPE "C3"
UNIT #411

(HOTEL LOT)
NOT A PART

TYPE "B5"
UNIT #412

BALCONY    BALCONY

LEGEND:

———  CONDOMINIUM
      BOUNDARY

C.E.  COMMON ELEMENT

▨  (HOTEL LOT)
    NOT A PART OF
    CONDOMINIUM PROPERTY

Cod No. 030184F    Drawn By: RJM

EXHIBIT "2"  **FOURTH LEVEL FLOOR PLAN**
OF EXHIBIT "E"  ALL (HOTEL) UNLESS OTHERWISE NOTED.

**SHEET 10**

Book26080/Page4996    CFN#20071144863



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

BALCONY   BALCONY   BALCONY

TYPE "A1"
UNIT #504

TYPE "B1"
UNIT #505

TYPE "A1a"
UNIT #506

TYPE "B2a"
UNIT #503

TYPE "C1"
UNIT #507

COURTYARD
OPEN TO SKY

TYPE "B2"
Rev.
UNIT #502

TYPE "C1"
Rev.
UNIT #508

C.E.

TYPE "B2"
UNIT #501

TYPE "C1"
UNIT #509

COURTYARD
OPEN TO SKY

TYPE "C2"
UNIT #510

TYPE "C3"
UNIT #511

(HOTEL LOT)
NOT A PART

TYPE "B5"
UNIT #512

BALCONY   BALCONY

LEGEND:

———— CONDOMINIUM BOUNDARY

**C.E.** COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Pod No 030184F   Drawn By. RJM

EXHIBIT "2"
OF EXHIBIT "E"

# FIFTH LEVEL FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

**SHEET 11**



GRAPHIC SCALE

0    15    30              60

( IN FEET )
1 inch = 30 ft.



(HOTEL LOT)
NOT A PART

UNIT #504

PRIVATE ROOF UNIT #505

PRIVATE ROOF UNIT #506

PRIVATE ROOF UNIT #507

PRIVATE ROOF UNIT #508

RF HATCH

OPEN TO COURTYARD BELOW

OPEN TO COURTYARD BELOW

BALCONY    BALCONY    BALCONY    BALCONY

TYPE "B3b"
UNIT #602

TYPE "C4a"
UNIT #603

TYPE "C6"
UNIT #604

TYPE "B3a"
UNIT #605

C.E.

MACHINE ROOM

SPA ELEVATOR OVERRUN

TYPE "C5a"
UNIT #601

TYPE "B5"
UNIT #606

BALCONY    BALCONY            BALCONY    BALCONY

Cod No. 030184F    Drawn By; RJM

LEGEND:

——————  CONDOMINIUM BOUNDARY

**C.E.**  COMMON ELEMENT

///////  (HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY
NOT BUILT 10-1-07

⌒⌒⌒  SPIRAL STAIRS SHOWN PER
ARCHITECTURAL DESIGN

EXHIBIT "2"
OF EXHIBIT "E"

# SIXTH LEVEL FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

SHEET 12



GRAPHIC SCALE

0      15      30          60

( IN FEET )
1 inch = 30 ft.



Cod No. 0301184F   Drawn By: RJM

LEGEND:

——— CONDOMINIUM BOUNDARY

**C.E.** COMMON ELEMENT

/////// (HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY (NOTE: THERE IS NO 13th LEVEL)

# SEVENTH THRU SIXTEENTH LEVEL
## FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2"
OF EXHIBIT "E"

**SHEET 13**

Book26080/Page4999   CFN#20071144863



GRAPHIC SCALE

```
0    15    30              60
```

( IN FEET )
1 inch = 30 ft.



BALCONY BALCONY BALCONY BALCONY

TYPE "B3b"
UNIT #1702

TYPE "C4"
UNIT #1703

TYPE "B4"
UNIT #1704

TYPE "B3a"
UNIT #1705

C.E.

TYPE "C5"
UNIT #1701

TYPE "B5"
UNIT #1706

BALCONY BALCONY BALCONY BALCONY

LEGEND:

———— CONDOMINIUM BOUNDARY

**C.E.** COMMON ELEMENT

 (HOTEL LOT) NOT A PART OF CONDOMINIUM PROPERTY

Cad No 030184F    Drawn By RJM

# SEVENTEENTH LEVEL
# FLOOR PLAN

ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2" OF EXHIBIT "E"

**SHEET 14**



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.



BALCONY   BALCONY      BALCONY      BALCONY

TYPE "A2"
UNIT #1802

TYPE "B4"
UNIT #1804

TYPE "B3a"
UNIT #1805

C.E.

TYPE "C5"
UNIT #1801

TYPE "B5"
UNIT #1806

BALCONY           BALCONY        BALCONY      BALCONY

LEGEND:

——— CONDOMINIUM BOUNDARY

**C.E.** COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

# EIGHTEENTH LEVEL
# FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

Cod No 030184F   Drawn By. RJM

EXHIBIT "2"
OF EXHIBIT "E"

SHEET 15



GRAPHIC SCALE

0    15    30              60

( IN FEET )
1 inch = 30   ft.



BALCONY    BALCONY         BALCONY         BALCONY

**TYPE "A2"**
UNIT #CPH02

**TYPE "B4"**
UNIT #CPH04

**TYPE "B3a"**
UNIT #CPH05

C.E.

STAIR

**TYPE "C5"**

UNIT #CPH01

STAIR

**TYPE "B5"**

UNIT #CPH06

BALCONY    BALCONY         BALCONY         BALCONY

LEGEND:

——— CONDOMINIUM
     BOUNDARY

**C.E.** COMMON ELEMENT

 (HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

# CPH LEVEL
# FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

**EXHIBIT "2" OF EXHIBIT "E"**

**SHEET 16**

Page 98 of 104

Cod No. 030184F   Drawn By. RJM



GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30 ft.



LIMITED COMMON
ELEMENT ON LPH
LEVEL ONLY
LPH01 AND LPH02

BALCONY    BALCONY    BALCONY    BALCONY

TYPE "A2"
UNITS
#LPH02 #PH02

TYPE "B4"
UNITS
#LPH04 #PH04

TYPE "B3a"
UNITS
#LPH05 #PH05

C.E.

STAIR

TYPE "C5"
UNITS
#LPH01 #PH01

TYPE "B5"
UNITS
#LPH06 #PH06

BALCONY    BALCONY    BALCONY    BALCONY

LEGEND:

———— CONDOMINIUM
        BOUNDARY

**C.E.** COMMON ELEMENT

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

LIMITED COMMON
ELEMENT ON
LPH LEVEL ONLY

# LPH AND PH LEVEL
# FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2" OF EXHIBIT "E"

**SHEET 17**

Page 99 of 104

Cod No. 0301B4F   Drawn By: RJM



GRAPHIC SCALE

```
0        15       30              60
```

( IN FEET )
1 inch = 30  ft.





LEGEND:

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Cad No. 030184F    Drawn By: RJM

# 22 ROOF PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2" OF EXHIBIT "E"

**SHEET 18**



GRAPHIC SCALE

0    15    30    60

( IN FEET )
1 inch = 30 ft.



TOP OF
SUPERGRID

**(HOTEL LOT)**

PUMP
ROOM
BELOW

BOILER
ROOM
BELOW

ELEVATOR
MACHINE
ROOM

COOLING
TOWER
BELOW



LEGEND:

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

Cod No 030184F          Drawn By: RJM

# 23 ROOF PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2" OF EXHIBIT "E"

**SHEET 19**



GRAPHIC SCALE

```
0      15      30                60
```

( IN FEET )
1 inch = 30 ft.



(HOTEL LOT)

TOP OF BOILER ROOM ROOF

TOP OF PUMP ROOM ROOF

TOP OF ELEV. MACHINE ROOM ROOF

COOLING TOWER (BELOW)

TOP OF AMOEBA PARAPET



Drown By: RJM

Cad No. 030184F

LEGEND:

(HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

# ROOF
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT "2" OF EXHIBIT "E"

Book26080/Page5006     CFN#20071144863

**Exhibit "5" of Exhibit "E"**

*Legal Description of Hotel Lot*

"Hotel Lot" is legally described as The Properties, which are legally described on Exhibit "F" to this Declaration, LESS the Condominium Central Lot as legally described on Exhibit "1" of this Exhibit "E" and the Condominium South Lot as legally described on Exhibit "2" of this Exhibit "E"

## Exhibit "F"

### *The Properties*

The Properties shall initially consist of the aggregate of the following:

(i)      the initial Common Properties, as described on Exhibit "C" to this Declaration; and

(ii)     the initial portion of the Hotel Lot, as described on Exhibit "5" of Exhibit "E" to this Declaration

(iii)    the Condominium Central Lot, as described on Exhibit "1" of Exhibit "E" to this Declaration, and

(iv)    the Condominium South Lot, as described on Exhibit "2" of Exhibit "E" to this Declaration.

# **Amendments**



CFN 2008R0701130
OR Bk 26542 Pss 0001 - 14; (14pss)
RECORDED 08/27/2008 15:11:49
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This instrument prepared by, or under the supervision of
(and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

(Reserved for Clerk of Court)

**AMENDMENT AND SUPPLEMENTAL DECLARATION**
**TO**
**DECLARATION OF COVENANTS,**
**RESTRICTIONS AND EASEMENTS**
**FOR**
**CARILLON HOTEL AND SPA**

**THIS AMENDMENT AND SUPPLEMENTAL DECLARATION** is made as of the ⸺ day of August, 2008, to that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded December 3, 2007 in Official Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida (as amended from time to time, the "Declaration"). Unless the context otherwise requires, any capitalized term not defined but used herein shall have the meaning given to such word or words in the Declaration.

**RECITALS**

A.      **Carillon South Joint Venture, L.L.C., a Florida limited liability company** (the "Company") is the "Declarant" under the Declaration and is the sole Class B Voting Member of the Master Association.

B.      Pursuant to Section 2.2 of the Declaration, the Declarant, alone may from time to time subject other land to the provisions of the Declaration by execution and recordation of a Supplemental Declaration, and the Declarant may designate such added land as Lots and supplement the existing Properties.

C.      Pursuant to Section 19.8 of the Declaration, the Declaration may be amended, changed or added to at any time and from time to time upon the execution and recordation of an instrument executed by Declarant and Declarant's Mortgagee, for so long as it or its affiliate holds title to any Lot or Structure affected by the Declaration.

D.      Declarant is the owner of Lots affected by the Declaration.

E.      The undersigned now desires to amend the Declaration and to supplement The Properties in the manner set forth below.

**NOW, THEREFORE,** in consideration of the premises and by virtue of the authority as hereinabove set forth, the Declaration is hereby amended and supplemented as follows:

1.      The Properties are hereby supplemented to include (if not previously included), all of the property described on **Exhibit "A"** attached hereto and made a part hereof (the "Added Property"). All of the Added Property shall be subject to the terms, conditions, liens and provisions of the Declaration.

2.      From and after the recordation hereof, the Future Development Property shall be deemed to be that property legally described on **Exhibit "B"** attached hereto and made a part hereof.

3.      From and after the recordation hereof, the portion of the Added Property described on **Exhibit "C"** attached hereto and made a part hereof shall be deemed to be the Condominium North Lot.

4.      From and after the recordation hereof, the legal description of the Hotel Lot, which is described on Exhibit "5" of Exhibit "E" of the Declaration as originally recorded shall hereby be amended and replaced in its entirety with the following:

"Hotel Lot" is legally described as The Properties (as supplemented hereby), LESS: (i) the Condominium Central Lot, as legally described on Exhibit "1" of Exhibit "E" to the Declaration as originally recorded, (ii) the Condominium South Lot, as legally described on Exhibit "2" of Exhibit "E" to the Declaration as originally recorded, and the Condominium North Lot, as legally described on Exhibit "C" attached hereto."

5. The Hotel Lot Owner shall be the Declarant and its successors and assigns.

Except as specifically modified hereby, the Declaration shall remain in full force and effect in accordance with its terms.

***Signatures are contained on the following page***

**IN WITNESS WHEREOF,** Developer has executed this Supplemental Declaration as of the day and year first above written.

Witnessed by:

Name: ~~GREG STEP~~

Name: DAVIE MARTINEZ

Carillon South Joint Venture, L.L.C., a Florida limited liability company

By: _____

Eric Sheppard
Title: MANAGER

(Corporate Seal)

Address: 400 ARTHUR GODFREY RD
#200
MIAMI BEACH, FL 33140

STATE OF FLORIDA )
) ss:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me this 20th day of August, 2008 by Eric Sheppard, as MANAGER of Carillon South Joint Venture, L.L.C., a Florida limited liability company, on behalf of said company. He/she is personally known to me or produced _____ as identification.

My commission expires:

DENISE P. SORIANO
Notary Public - State of Florida
My Commission Expires Jun 25, 2009
Commission # DD 416499
Bonded By National Notary Assn.

Name: DENISE P. SORIANO

Notary Public, State of Florida
Commission No. DD 416499

## JOINDER TO SUPPLEMENTAL DECLARATION

The undersigned, **North Carillon, L.L.C., a Florida limited liability company,** as the owner of a portion of The Properties, hereby joins in and consents to the execution and recording of the foregoing Amendment and Supplemental Declaration to Declaration of Covenants, Restrictions and Easements For Carillon Hotel and Spa (the "Declaration") and agrees that The Properties shall be bound by the terms and provisions of the Declaration, as modified by the foregoing Amendment and Supplemental Declaration to the Declaration and as same may hereafter be modified, amended and/or supplemented.

EXECUTED as of the ___ day of August, 2008.

Witnessed by:

Name: GREG STAY

Name: EDDIE MARTINEZ

**North Carillon, L.L.C., a Florida limited liability company**

By: _____
Name: Eric D. Sheppard
Title: Authorized Representative

(Corporate Seal)

Address: 400 ARTHUR GODFREY RD
#200
MIAMI BEACH, FL 33140

STATE OF FLORIDA          )
                          ) ss:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me this ___ day of AUGUST , 2008 by ERIC D. SHEPPARD , as Authorized Representative of North Carillon, L.L.C., a Florida limited liability company, on behalf of said company. He is personally known to me or produced _____ as identification.

Name: DENISE P. SORIANO

Notary Public, State of FLORIDA
Commission No. DD 416499

My commission expires:

DENISE P. SORIANO
Notary Public - State of Florida
My Commission Expires Jun 25, 2009
Commission # DD 416499
Bonded By National Notary Assn.

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the _1_ day of _July_ , 2008, on behalf of **LB Carillon Construction LLC, a Delaware limited liablity company** ("Mortgagee"), being the owner and holder of a first and second mortgage (collectively, as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") on all or portions of The Properties (as defined in the Master Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of an Amendment and Supplement to the Declaration of Covenants, Restrictions and Easements for Carillon Hotel And Spa (the "Master Amendment").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Master Amendment and the recordation thereof and agrees that the lien and effect of the Mortgage shall be subject and subordinate to the terms of the Master Amendment.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Master Amendment, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of the Carillon Hotel and Spa Project (as defined in the Declaration of Covenants, Restrictions and Easements for Carillon Hotel And Spa), and does not assume and shall not be responsible for any of the obligations or liabilities of the Declarant contained in the Master Amendment or other documents issued in connection with the promotion of any portion of the Carillon Hotel and Spa Project. None of the representations contained in the Master Amendment, or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Master Amendment.

Made as of the day and year first above written.

Witnessed by:

LB CARILLON CONSTRUCTION LLC, a Delaware limited liablity company

Name: _Catrina Cassanova_

By: _Auoey Kosakowski_
Name: _Auoey B. Kosakowski_
Title: _AUTHORIZED SIGNATORY_

Name: _Nancy Sharperson_

STATE OF **New York** )
COUNTY OF **New York** ) SS:

The foregoing instrument was acknowledged before me this _1_ day of _July_ , 2008, by Auoey B. Kosakowski as AUTHORIZED SIGNATORY of LB Carillon Construction LLC, a Delaware limited liability company, on behalf of said **company**. He/she is personally known to me or has produced _____ as identification.

Name: _DEANNA EMILIO_

Notary Public, State of _____
Commission No. _____

My Commission Expires:

DEANNA EMILIO
Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the 25 day of August , 2008, on behalf of **Fortress Credit Corp., a Delaware corporation** ("Mortgagee"), as Agent, as collateral assignee under that certain Recorded Mortgage Collateral Security Documents by LB Construction LLC to Fortress Credit Corp., (as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") affecting all or portions of The Properties (as defined in the Master Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of an Amendment and Supplement to the Declaration of Covenants, Restrictions and Easements for Carillon Hotel And Spa (the "Master Amendment").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Master Amendment and the recordation thereof and agrees that the lien and effect of the Mortgage shall be subject and subordinate to the terms of the Master Amendment.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Master Amendment, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of the Carillon Hotel and Spa Project (as defined in the Declaration of Covenants, Restrictions and Easements for Carillon Hotel And Spa), and does not assume and shall not be responsible for any of the obligations or liabilities of the Declarant contained in the Master Amendment or other documents issued in connection with the promotion of any portion of the Carillon Hotel and Spa Project. None of the representations contained in the Master Amendment, or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Master Amendment.

Made as of the day and year first above written.

Witnessed by:

Name:

Name: Patrick Cally

Fortress Credit Corp., a Delaware corporation, as Agent

By:

Name:

Title: MARC K. FURSTEIN
CHIEF OPERATING OFFICER

STATE OF _New York_ )
) SS:
COUNTY OF _New York_ )

The foregoing instrument was acknowledged before me this 25th day of August , 2008, by Marc K. Furstein as Chief Operating Officer of Fortress Credit Corp., a Delaware corporation, on behalf of said _____. He/she is personally known to me or has produced _____ as identification.

Name: _____

Notary Public, State of _____
Commission No. _____

My Commission Expires:

VIOLETTA USTAYEV
NOTARY PUBLIC, State of New York
No. 01US6163257
Qualified in Kings County
Certificate on file in New York County
Commission Expires March 19, 2011

**Exhibit "A"**

*Added Property*

## LEGAL DESCRIPTION:

Lots 1 through 6 inclusive, in Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida.

AND ALSO

A parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B, and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.

TOGETHER WITH

The North 25.00 feet of Lot 48, all of Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

AND ALSO

A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62 of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

<u>**Exhibit "B"**</u>

*Future Development Property*

**LEGAL DESCRIPTION: Retail Lot**

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet; thence N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | |
|------|--------|-----------|
| LINE | LENGTH | BEARING |
| L1 | 15.52 | N88°18'36"E |
| L2 | 123.25 | N01°41'24"W |
| L3 | 17.15 | N88°20'18"E |
| L4 | 124.26 | N01°41'24"W |
| L5 | 32.67 | S88°18'38"W |
| L6 | 247.50 | S01°41'24"E |

**AMENDED SECOND**
**OCEAN FRONT SUBDIVISION**
**PLAT BOOK 28 PAGE 28**

GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

**EXHIBIT** *b* **SKETCH & LEGAL DESCRIPTION** **SHEET 1 OF 1**



# NORTH CARILLON BEACH,

## A CONDOMINIUM

LEGAL DESCRIPTION: 2nd & 3rd Level

A portion of Lots 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A–1–A) for 25.72 feet; thence N 87°32'31" E at right angles to the previously described course for 191.07 feet to the Point of Beginning; thence N 88°20'13" E for 65.45 feet; thence N 01°39'47" W for 18.08 feet; thence S 88°20'12" W for 4.00 feet; thence N 01°39'47" W for 13.16 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 17.96 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'47" W for 14.76 thence S 88°20'13" W for 28.95 feet; thence S 01°39'47" E for 0.87 feet; thence S 88°20'13" W for 19.68 feet; thence S 01°39'47" E for 17.92 feet; thence S 88°20'13" W for 11.50 feet; thence S 01°39'47" W for 6.52 feet; thence S 88°20'13" W for 10.33 feet; thence S 01°39'47" E for 18.18 feet; thence N 88°20'13" E for 9.00 feet; thence S 01°39'47" E for 20.47 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +23.0 feet and elevation +43.0 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | |
|---|---|---|
| LINE | LENGTH | BEARING |
| L1 | 65.45 | N88°20'13"E |
| L2 | 18.08 | N01°39'47"W |
| L3 | 4.00 | S88°20'12"W |
| L4 | 13.16 | N01°39'47"W |
| L5 | 4.00 | N88°20'13"E |
| L6 | 17.96 | N01°39'47"W |
| L7 | 4.00 | S88°20'13"W |
| L8 | 14.76 | N01°39'47"W |
| L9 | 28.95 | S88°20'13"W |
| L10 | 0.87 | S01°39'47"E |
| L11 | 19.68 | S88°20'13"W |
| L12 | 17.92 | S01°39'47"E |
| L13 | 11.50 | S88°20'13"W |
| L14 | 6.52 | S01°39'47"E |
| L15 | 10.33 | S88°20'13"W |
| L16 | 18.18 | S01°39'47"E |
| L17 | 9.00 | N88°20'13"E |
| L18 | 20.47 | S01°39'47"E |

LOT 1

APPROVED COASTAL
CONSTRUCTION CONTROL LINE
PLAT BOOK 74 PAGE 25
RECORDED 2/10/82

LOT 2

30.00'
RIGHT OF WAY

EAST RIGHT OF WAY LINE
(COLLINS AVENUE
(STATE ROAD A-1-A)

CENTERLINE

LOT 3

# BLOCK B

## CORRECTED PLAT
## OF ATLANTIC HEIGHTS
## PLAT BOOK 9 PAGE 14

LOT 4

EAST LINE OF BLOCK B
PLAT BOOK 9 PAGE 14

EROSION CONTROL LINE
OF THE ATLANTIC OCEAN
PLAT BOOK 105 PAGE 62
O.R.B. 9517 PAGE 2028
RECORDED 12/30/78

WEST LINE OF BLOCK B

LOT 5

COLLINS AVENUE
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

N87°32'31"E

LOT 6

191.07'

POINT OF BEGINNING

N02°27'29"W
25.72'

SOUTH LINE OF LOT 6
PLAT BOOK 9 PAGE 14

NORTH LINE OF LOT 53
PLAT BOOK 28 PAGE 28

POINT OF COMMENCEMENT
S.W. CORNER OF LOT 6

30.00'
RIGHT OF WAY

# BLOCK 1

LOT 53

AMENDED SECOND
OCEAN FRONT SUBDIVISION
PLAT BOOK 28 PAGE 28

GRAPHIC SCALE

0   20   40        80

( IN FEET )
1 inch = 40  ft.

Date Printed: 8/8/08 4:12p
Drawn By: MAP
Cod No. 071900L

# SKETCH & LEGAL DESCRIPTION

Exhibit C

1

Book26542/Page12     CFN#20080701130                    Page 12 of 14



# NORTH CARILLON BEACH,

## A C O N D O M I N I U M

**LEGAL DESCRIPTION: 4th & 5th Level**

A portion of Lots 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 25.72 feet; thence N 87°32'31" E at right angles to the previously described course for 191.07 feet to the Point of Beginning; thence N 88°19'14" E for 65.45 feet; thence N 01°39'47" W for 18.06 feet; thence S 88°20'12" W for 4.00 feet; thence N 01°39'47" W for 13.16 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 17.96 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'52" W for 27.30 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 34.16 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'45" W for 27.04 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'54" W for 15.96 feet; thence S 88°20'13" W for 64.29 feet; thence S 01°27'03" E for 0.33 feet; thence S 88°20'13" W for 10.17 feet; thence S 01°39'47" E for 77.35 feet; thence N 88°20'13" E for 10.33 feet; thence S 01°39'47" E for 37.33 feet; thence S 88°20'13" W for 10.33 feet; thence S 01°39'47" E for 18.08 feet; thence N 88°20'13" E for 9.00 feet; thence S 01°39'47" E for 20.56 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +43.0 feet and elevation +63.0 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | | LINE TABLE | | |
|------|--------|-----------|------|--------|-----------|
| LINE | LENGTH | BEARING | LINE | LENGTH | BEARING |
| L1 | 65.45 | N88°19'14"E | L13 | 4.00 | N88°20'13"E |
| L2 | 18.06 | N01°39'47"W | L14 | 15.96 | N01°39'54"W |
| L3 | 4.00 | S88°20'12"W | L15 | 64.29 | S88°20'13"W |
| L4 | 13.16 | N01°39'47"W | L16 | 0.33 | S01°27'03"E |
| L5 | 4.00 | N88°20'13"E | L17 | 10.17 | S88°20'13"W |
| L6 | 17.96 | N01°39'47"W | L18 | 77.35 | S01°39'47"E |
| L7 | 4.00 | S88°20'13"W | L19 | 10.33 | N88°20'13"E |
| L8 | 27.30 | N01°39'52"W | L20 | 37.33 | S01°39'47"E |
| L9 | 4.00 | N88°20'13"E | L21 | 10.33 | S88°20'13"W |
| L10 | 34.16 | N01°39'47"W | L22 | 18.08 | S01°39'47"E |
| L11 | 4.00 | S88°20'13"W | L23 | 9.00 | N88°20'13"E |
| L12 | 27.04 | N01°39'45"W | L24 | 20.56 | S01°39'47"E |

## SKETCH & LEGAL DESCRIPTION

Exhibit C

# NORTH CARILLON BEACH,
## A CONDOMINIUM

**LEGAL DESCRIPTION: 6th thru Roof Level**

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 39.42 feet; thence N 87°32'31" E at right angles to the previously described course for 148.03 feet to the Point of Beginning; thence N 88°20'13" E for 67.92 feet; thence N 03°19'21" E for 14.72 feet; thence N 88°20'13" E for 7.34 feet; thence N 01°39'47" W for 36.25 feet; thence S 88°20'13" W for 5.69 feet; thence N 08°56'28" W for 31.11 feet; thence N 05°16'52" E for 28.96 feet;thence N 08°36'26" W for 28.96 feet; thence N 03°36'54" E for 31.11 feet; thence N 88°20'15" E for 5.69 feet; thence N 01°39'47" W for 36.25 feet; thence S 88°20'14" W for 7.34 feet; thence N 06°38'54" W for 14.72 feet; thence S 88°20'13" W for 67.92 feet; thence S 03°19'18" W for 14.12 feet; thence S 88°20'13" W for 4.69 feet; thence S 01°39'47" W for 42.25 feet; thence N 88°20'13" E for 5.44 feet; thence S 06°52'04" E for 25.69 feet; thence S 02°47'44" W for 28.84 feet; thence S 06°07'18" E for 28.84 feet; thence S 03°32'30" W for 25.69 feet; thence S 88°20'13" W for 5.44 feet; thence S 01°39'47" E for 42.25 feet; thence N 88°20'13" E for 4.69 feet; thence S 06°38'52" E for 14.12 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +63.0 feet and elevation +380.2 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE | LINE TABLE LENGTH | BEARING | LINE | LINE TABLE LENGTH | BEARING |
|------|--------|---------|------|--------|---------|
| L1 | 67.92 | N88°20'13"E | L14 | 67.92 | S88°20'13"W |
| L2 | 14.72 | N03°19'21"E | L15 | 14.12 | S03°19'18"W |
| L3 | 7.34 | N88°20'13"E | L16 | 4.69 | S88°20'13"W |
| L4 | 36.25 | N01°39'47"W | L17 | 42.25 | S01°39'47"W |
| L5 | 5.69 | S88°20'13"W | L18 | 5.44 | N88°20'13"E |
| L6 | 31.11 | N08°56'28"W | L19 | 25.69 | S06°52'04"E |
| L7 | 28.96 | N05°16'52"E | L20 | 28.84 | S02°47'44"W |
| L8 | 28.96 | N08°36'26"W | L21 | 28.84 | S06°07'18"E |
| L9 | 31.11 | N03°36'54"E | L22 | 25.69 | S03°32'30"W |
| L10 | 5.69 | N88°20'15"E | L23 | 5.44 | S88°20'13"W |
| L11 | 36.25 | N01°39'47"W | L24 | 42.25 | S01°39'47"E |
| L12 | 7.34 | S88°20'14"W | L25 | 4.69 | N88°20'13"E |
| L13 | 14.72 | N06°38'54"W | L26 | 14.12 | S06°38'52"E |

30.00'
RIGHT OF WAY

LOT 1
LOT 2
LOT 3

BLOCK B

CORRECTED PLAT
OF ATLANTIC HEIGHTS
PLAT BOOK 9 PAGE 14

LOT 4

EAST RIGHT OF WAY LINE
OF COLLINS AVENUE
(STATE ROAD A-1-A)

WEST LINE OF BLOCK B

LOT 5

APPROVED COASTAL
CONSTRUCTION CONTROL LINE
PLAT BOOK 74 PAGE 25
RECORDED 2/10/82

N87°32'31"E        148.03'

POINT OF BEGINNING

LOT 6

N02°27'29"W
39.42'

SOUTH LINE OF LOT 6
PLAT BOOK 9 PAGE 14

NORTH LINE OF LOT 53
PLAT BOOK 28 PAGE 28

POINT OF COMMENCEMENT
S.W. CORNER OF LOT 6

BLOCK 1

LOT 53

EROSION CONTROL LINE
OF THE ATLANTIC OCEAN
PLAT BOOK 105 PAGE 62
O.R.B. 9517 PAGE 2028
RECORDED 12/30/76

AMENDED SECOND
OCEAN FRONT SUBDIVISION
PLAT BOOK 28 PAGE 28

COLLINS AVENUE
(STATE ROAD A-1-A)
(PUBLIC RIGHT OF WAY)

Date Printed: 8/8/08 4:12p
Drawn By: MAP
Cad No. 071190ZL

GRAPHIC SCALE
0   20   40   80

( IN FEET )
1 inch = 40 ft.

N

## SKETCH & LEGAL DESCRIPTION

Exhibit C



This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

CFN 2008R0840381
OR Bk 26610 Pss 0728 - 734; (7pss)
RECORDED 10/15/2008 13:42:54
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

(Reserved for Clerk of Court)

## AMENDMENT AND SUPPLEMENTAL DECLARATION
## TO
## DECLARATION OF COVENANTS,
## RESTRICTIONS AND EASEMENTS
## FOR
## CARILLON HOTEL AND SPA

**THIS AMENDMENT AND SUPPLEMENTAL DECLARATION** is made as of the 2̲8̲ day of August, 2008, to that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded December 3, 2007 in Official Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida (as amended from time to time, the "Declaration"). Unless the context otherwise requires, any capitalized term not defined but used herein shall have the meaning given to such word or words in the Declaration.

### R E C I T A L S

A.    **Carillon South Joint Venture, L.L.C., a Florida limited liability company** (the "Company") is the "Declarant" under the Declaration and is the sole Class B Voting Member of the Master Association.

B.    Pursuant to Section 2.2 of the Declaration, the Declarant, alone may from time to time subject other land to the provisions of the Declaration by execution and recordation of a Supplemental Declaration, and the Declarant may designate such added land as Lots and supplement the existing Properties.

C.    Pursuant to Section 19.8 of the Declaration, the Declaration may be amended, changed or added to at any time and from time to time upon the execution and recordation of an instrument executed by Declarant and Declarant's Mortgagee, for so long as it or its affiliate holds title to any Lot or Structure affected by the Declaration.

D.    Declarant is the owner of Lots affected by the Declaration.

E.    The undersigned now desires to amend the Declaration and now desires to amend the Declaration in the manner hereinafter set forth to correct a scrivener's error in the legal description of the Condominium Central Lot, in the manner set forth below.

**NOW, THEREFORE,** in consideration of the premises and by virtue of the authority as hereinabove set forth, the Declaration is hereby amended and supplemented as follows:

1.    From and after the recordation hereof, the Condominium Central Lot which is presently subject to the Declaration shall be that which is legally described on **Exhibit "A"** attached hereto (in lieu of the Condominium Central Lot as legally described through the recordation of any prior amendment and/or supplement to the Declaration).

2.    From and after the recordation hereof, the legal description of the Hotel Lot, which is presently subject to the Declaration shall hereby be amended and replaced in its entirety with the following:

"Hotel Lot" is legally described as The Properties (as supplemented hereby), LESS: (i) the Condominium Central Lot, as legally described on **Exhibit "A"** attached hereto, (ii) the Condominium South Lot and (iii) the Condominium North Lot"

Except as specifically modified hereby, the Declaration shall remain in full force and effect in accordance with its terms.

***\*\*\*Signatures are contained on the following page\*\*\****

**IN WITNESS WHEREOF**, Developer has executed this Supplemental Declaration as of the day and year first above written.

Witnessed by:

Name: MARK A. BURGIN

Magda Gobeli
Name: MAGDA GOBELI

**Carillon South Joint Venture, L.L.C., a Florida limited liability company**

By: _____

Eric Sheppard

Title: Manager

(Corporate Seal)

Address: 400 ARTHUR GODFREY RD.
SUITE 200
MIAMI BEACH, FL 33140

STATE OF FLORIDA )
) ss:
COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me this 28 day of August, 2008 by Eric Sheppard, as _____ of **Carillon South Joint Venture, L.L.C., a Florida limited liability company**, on behalf of said company. He/she is personally known to me or produced _____ as identification.

Name: Jessica A. Hernandez

Notary Public, State of Florida
Commission No. _____

My commission expires:

_____

Notary Public State of Florida
Jessica A Hernandez
My Commission DD781677
Expires 04/22/2012

**LEGAL DESCRIPTION: (CENTRAL TOWER)-SECOND LEVEL FLOOR PLAN**

A portion of lot 53, Block 1 OF AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami-Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A-1-A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 78.27 feet; thence N01°50'54"W for 27.92 feet; thence N88°09'06"E for 52.67 feet; thence N01°50'54"W for 14.00 feet; thence S88°09'06"W for 13.50 feet; thence N01°50'54"W for 19.20 feet; thence N88°09'06"E for 91.83 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"E for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +29.9 feet and elevation +41.0 feet relative to the National Geodetic Vertical Datum of 1929.



**NOTE:**
The legal description as shown hereon is the limit of each floor, less all "Hotel Lot" (or any part thereof) as depicted within Exhibit 2 to the Declaration of Condominium, which Hotel Lot is not part of the condominium property.

**Condominium Central Lot**

EXHIBIT "A"                                    SHEET 1