# <u>Exhibit "B"</u>

②

This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

CFN 2008R0701131
OR Bk 26542 Pgs 0015 - 158; (144pgs)
RECORDED 08/27/2008 15:11:49
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

(Reserved for Clerk of Court)

Exhibit "A"
## DECLARATION
### OF
### NORTH CARILLON BEACH, A CONDOMINIUM

North Carillon, L.L.C., a Florida limited liability company, hereby declares:

1. Introduction and Submission.

1.1 The Land. The Developer owns fee title to an interest in certain real property located in Miami-Dade County, Florida, as more particularly described in Exhibit "1" annexed hereto (the "Land").

1.2 Submission Statement. Except as set forth in this Subsection 1.2, the Developer hereby submits the Land and all improvements erected or to be erected thereon and all other property, real, personal or mixed, now or hereafter situated on or within the Land - but excluding (i) all public or private (e.g. cable television and/or other receiving or transmitting lines, fiber, antennae or equipment) utility installations therein or thereon, the Master Life Safety Systems (as hereinafter defined) and all leased property therein or thereon and (ii) the Shared Facilities (as defined in the Master Covenants, as hereinafter defined) or any portion of them - to the condominium form of ownership and use in the manner provided for in the Florida Condominium Act as it exists on the date hereof and as it may be hereafter renumbered. Without limiting any of the foregoing, no property, real, personal or mixed, not located within or upon the Land as aforesaid, and no portion of the Shared Facilities, shall for any purposes be deemed part of the Condominium or be subject to the jurisdiction of the Association, the operation and effect of the Florida Condominium Act or any rules or regulations promulgated pursuant thereto, unless expressly provided.

1.3 Name. The name by which this condominium is to be identified is NORTH CARILLON BEACH, A CONDOMINIUM (hereinafter called the "Condominium").

2. Definitions. The following terms when used in this Declaration and in its exhibits, and as it and they may hereafter be amended, shall have the respective meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

2.1 "Access Fee" shall have the meaning given in subsection 15.3 below.

2.2 "Act" means the Florida Condominium Act (Chapter 718 of the Florida Statutes) as it exists on the date hereof and as it may be hereafter renumbered.

2.3 "Administrative Agent" shall have the meaning given to it in the Master Covenants (as hereinafter defined), and shall include its successors and/or assigns.

2.4 "Allocated Interests" shall have the meaning ascribed to it in Section 5.1 below.

2.5 "Articles" or "Articles of Incorporation" mean the Articles of Incorporation of the Association, as amended from time to time.

2.6 "Assessment" means a share of the funds required for the payment of Common Expenses which from time to time is assessed against the Unit Owner.

Tax Certificate #2856

(Reserved for Clerk of Court)

2.7 "Association" or "Condominium Association" means NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., a Florida corporation not for profit, the sole entity responsible for the operation of the Common Elements of the Condominium.

2.8 "Association Property" means that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the Association for the use and benefit of its members.

2.9 "Board" or "Board of Directors" means the board of directors, from time to time, of the Association.

2.10 "Building" means the structure(s) in which the Units and the Common Elements are located, regardless of the number of such structures, which are located on the Condominium Property.

2.11 "By-Laws" mean the By-Laws of the Association, as amended from time to time.

2.12 "Charge" shall mean and refer to the imposition of any financial obligation by the Association which is not an Assessment as defined by Subsection 2.6 above. Accordingly, as to Charges, the Association will not have the enforcement remedies that the Act grants for the collection of Assessments.

2.13 "Committee" means a group of Board Members, Unit Owners or Board Members and Unit Owners appointed by the Board or a member of the Board to make recommendations to the Board regarding the proposed annual budget or to take action on behalf of the Board.

2.14 "Common Elements" mean and include:

(a) The portions of the Condominium Property which are not included within either the Units and/or the Association Property.

(b) An easement of support in every portion of a Unit which contributes to the support of the Building.

(c) Any other parts of the Condominium Property designated as Common Elements in this Declaration, which shall specifically include the surface water management system, if any, of the Condominium Property.

(d) any other parts of the Condominium Property designated as Common Elements in this Declaration, which shall specifically include the surface water management system, if any, of the Condominium to the extent not governed by the Hotel Lot or the Master Association.

The Condominium has been established in such a manner to minimize the Common Elements. Most components which are typical "common elements" of a condominium have instead been designated herein as part of the Shared Facilities of the Hotel Lot. No portion of the Shared Facilities shall be deemed Common Elements hereunder.

2.15 "Common Expenses" mean all expenses incurred by the Association for the operation, maintenance, repair, replacement, management or protection of the Common Elements and Association Property, the costs of carrying out the powers and duties of the Association, and any other expense, whether or not included in the foregoing, designated as a "Common Expense" by the Act, the Declaration, the Articles or the Bylaws. For all purposes of this Declaration, "Common Expenses" shall also include, without limitation: (a) all reserves required by the Act or otherwise established by the Association, regardless of when reserve funds are expended; (b) if applicable, costs relating to insurance for directors and officers, in-house and/or interactive communications and surveillance systems; (c) the cost of a master antenna television system or duly franchised cable television service obtained pursuant to a bulk contract; (d) the real property taxes, Assessments and other maintenance expenses attributable to any Units acquired by the Association or any Association Property and/or rental or other expenses owed in connection with any Units leased by the Association; (e) any lease payments required under leases for mechanical equipment, including without limitation, leases for recycling equipment, if same is leased by the Association rather than being owned by it; (f) to the extent that the Association enters into any

Declaration
-2-

agreement with the Hotel Lot Owner for use of the Spa (as defined in the Master Covenants) for the Condominium and/or its Unit Owners, any and all costs incurred in connection with same; (g) any unpaid share of Common Expenses or Assessments extinguished by foreclosure of a superior lien or by deed in lieu of foreclosure, and (h) any unpaid share of Common Expenses or Assessments extinguished by foreclosure of a superior lien or by deed in lieu of foreclosure. Common Expenses shall not include any separate obligations of individual Unit Owners.

In addition to the Common Expenses, the Association is obligated for the payment of Master Expenses (as hereinafter defined). While the Master Expenses are not deemed Common Expenses, for purposes of this Declaration, Master Expenses shall be assessed and collected in the same manner as Common Expenses, and the Association shall have such remedies for the failure of an Owner to pay its Allocated Interest of such Master Expenses as exist for the failure of an Owner to pay its proportionate share of Common Expenses.

2.16   "Common Surplus" means the amount of all receipts or revenues of the Association collected on behalf of the Association, including, but not limited to, Assessments, rents, profits and revenues on account of the Common Elements, over the amount of Common Expenses.

2.17   "Condominium Parcel" means a Unit together with the undivided share in the Common Elements which are appurtenant to said Unit.

2.18   "Condominium Property" means the Land, Improvements and other property described in Section 1.2 hereof, subject to the limitations thereof and exclusions therefrom.

2.19   "County" means the County of Miami-Dade, State of Florida.

2.20   "Declaration" or "Declaration of Condominium" means this instrument and all exhibits attached hereto, as same may be amended from time to time.

2.21   "Developer" means **North Carillon, L.L.C., a Florida limited liability company**, its successors, nominees, affiliates and such of its assigns as to which the rights of Developer hereunder are specifically assigned. Developer may assign all or a portion of its rights hereunder, or all or a portion of such rights in connection with specific portions of the Condominium. In the event of any partial assignment, the assignee shall not be deemed the Developer, but may exercise such rights of Developer as are specifically assigned to it. Any such assignment may be made on a nonexclusive basis. Notwithstanding any assignment of the Developer's rights hereunder (whether partially or in full), the assignee shall not be deemed to have assumed any of the obligations of the Developer unless, and only to the extent that, it expressly agrees to do so in writing. The rights of Developer under this Declaration are independent of the Developer's rights to control the Board of Directors of the Association, and, accordingly, shall not be deemed waived, transferred or assigned to the Unit Owners, the Board or the Association upon the transfer of control of the Association.

2.22   "Dispute", for purposes of Section 16.1, means any disagreement between two or more parties that involves: (a) the authority of the Board, under any law or under this Declaration, the Articles or By-Laws to: (i) require any Owner to take any action, or not to take any action, involving that Owner's Unit or the appurtenances thereto; or (ii) alter or add to a common area or Common Element; or (b) the failure of the Association, when required by law or this Declaration, the Articles or By-Laws to: (i) properly conduct elections; (ii) give adequate notice of meetings or other actions; (iii) properly conduct meetings; or (iv) allow inspection of books and records. "Dispute" shall not include any disagreement that primarily involves title to any Unit or Common Element; the interpretation or enforcement of any warranty; or the levy of a fee or Assessment or the collection of an Assessment levied against a party.

2.23   "Division" means the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation, State of Florida, or its successor.

2.24   "First Mortgagee" means any person or entity holding a first mortgage on a Unit or Units.

2.25   "Impositions" shall mean the share of the funds required for the payment of the Master Expenses which from time to time are assessed against the Unit Owner.

Declaration
-3-

2.26    "Improvements" mean all structures and artificial changes to the natural environment (exclusive of landscaping) located on the Condominium Property including, but not limited to, the Building.

2.27    "Institutional First Mortgagee" means a bank, savings and loan association, insurance company, mortgage company, real estate or mortgage investment trust, government sponsored entity, pension fund, an agency of the United States Government, mortgage banker, the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC") or any other lender generally recognized as an institutional lender, or the Developer, holding a first mortgage on a Unit or Units. A "Majority of Institutional First Mortgagees" shall mean and refer to Institutional First Mortgagees of Units to which at least fifty-one percent (51%) of the voting interests of Units subject to mortgages held by Institutional First Mortgagees are appurtenant.

2.28    "Land" shall have the meaning given to it in Section 1.1 above.

2.29    "Master Association" means Carillon Hotel and Spa Master Association, Inc., a Florida corporation not for profit, being the entity responsible for the administration of the Master Covenants.

2.30    "Master Covenants" mean the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa, recorded or to be recorded in the Public Records of the County, and when the context permits, shall also mean the Articles of Incorporation and By-Laws of the Master Association, all as now or hereafter amended, modified or supplemented.

2.31    "Master Expenses" shall mean and refer to any and all assessments, charges and/or sums payable by the Association to the Master Association and/or the Hotel Lot Owner (as defined in the Master Covenants) pursuant to, and in accordance with the Master Covenants. The Master Expenses are not Common Expenses.

2.32    "Occupancy Limits" shall have the meaning given to it in subsection 15.1 below.

2.33    "Permitted Occupants" shall have the meaning given to it in Section 15.1 below.

2.34    "Primary Institutional First Mortgagee" means the Administrative Agent (as defined in the Master Covenants) for as long as it holds a mortgage on any Unit in the Condominium, and thereafter shall mean the Institutional First Mortgage which owns, at the relevant time, Unit mortgages securing a greater aggregate indebtedness than is owed to any other Institutional First Mortgagee.

2.35    "Stairways" mean any flight of steps, fire corridors, elevators and/or escalators which are at some point located in, or directly accessible from, the Common Elements.

2.36    "Unit" means a part of the Condominium Property which is subject to exclusive ownership.

2.37    "Unit Owner" or "Owner of a Unit" or "Owner" means a record owner of legal title to a Condominium Parcel.

Unless the context otherwise requires, any capitalized term not defined but used herein which is defined in the Master Covenants shall have the meaning given to such word or words in the Master Covenants.

3.    Description of Condominium.

3.1    Identification of Units. The Land consists of one (1) Building containing a total of Two Hundred Nine (209) Units. Each such Unit is identified by a separate numerical or alpha-numerical designation. The designation of each of such Units is set forth on Exhibit "2" attached hereto. Exhibit "2" consists of a survey of the Land, a graphic description of the Improvements located thereon, including, but not limited to, the Building in which the Units are located, and a plot plan thereof. Said Exhibit "2", together with this Declaration, is sufficient in detail to identify the Common Elements and each Unit and their relative locations and dimensions. There shall pass with a Unit, as appurtenances thereto: (a) an undivided share in the Common Elements and Common Surplus; (b) the exclusive right to use such portion of the Common Elements as may be provided in this Declaration, including, without limitation, the right to transfer such right to other

```
                                    (Reserved for Clerk of Court)
```

Units or Unit Owners; (c) an exclusive easement for the use of the airspace occupied by the Unit as it exists at any particular time and as the Unit may lawfully be altered or reconstructed from time to time, provided that an easement in airspace which is vacated shall be terminated automatically; (d) membership in the Association with the full voting rights appurtenant thereto; and (e) other appurtenances as may be provided by this Declaration.

3.2 <u>Unit Boundaries</u>. Each Unit shall include that part of the Building containing the Unit that lies within the following boundaries:

(a) <u>Boundaries of Units</u>. The upper and lower boundaries of each Unit shall be the following boundaries extended to their planar intersections with the perimetrical boundaries:

  (i) <u>Upper Boundaries</u>. The horizontal plane of the unfinished lower surface of the ceiling (which will be deemed to be the ceiling of the upper story if the Unit is a multi-story Unit, provided that in multi-story Units where the lower boundary extends beyond the upper boundary, the upper boundary shall include that portion of the ceiling of the lower floor for which there is no corresponding ceiling on the upper floor directly above such bottom floor ceiling).

  (ii) <u>Lower Boundaries</u>. The horizontal plane of the unfinished upper surface of the floor of the Unit (which will be deemed to be the floor of the first story if the Unit is a multi-story Unit, provided that in multi-story Units where the upper boundary extends beyond the lower boundary, the lower boundary shall include that portion of the floor of the upper floor for which there is no corresponding floor on the bottom floor directly below the floor of such top floor).

  (iii) <u>Interior Divisions</u>. Except as provided in subsections 3.2(a)(i) and 3.2(a)(ii) above, no part of the floor of the top floor, ceiling of the bottom floor, stairwell adjoining the multi-floors, in all cases of a multi-story Unit, if any, or nonstructural interior walls shall be considered a boundary of the Unit.

  (iv) <u>Perimetrical Boundaries</u>. The perimetrical boundaries of the Unit shall be the vertical planes of the unfinished interior surfaces of the walls bounding the Unit extended to their planar intersections with each other and with the upper and lower boundaries (and to the extent that the walls are drywall and/or gypsum board, the Unit boundaries shall be deemed to be the area immediately behind the drywall and/or gypsum board, so that for all purposes hereunder the drywall and/or gypsum board shall be deemed part of the Unit and not part of the Common Elements or Hotel Lot).. Notwithstanding the foregoing, as to walls shared by a Unit and the Hotel Lot, the perimetrical boundary of the Hotel Lot at such shared wall shall be coextensive to the perimetrical boundary of the adjoining Unit (so that the shared wall and all installations therein shall be part of the Hotel Lot rather than the Common Elements) and therefore the perimetrical boundary of the Hotel Lot shall extend to the unfinished interior surface of any walls bounding a Unit.

(b) <u>Apertures</u>. Notwithstanding the boundaries set forth above, all exterior surfaces made of glass or other transparent materials shall be deemed part of the Hotel Lot and excluded from the boundaries of the Unit and the Condominium. Additionally, all floor, wall and ceiling coverings affixed to the Hotel Lot shall be deemed part of the Hotel Lot. NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, NO POST TENSION CABLES AND/OR RODS CONTAINED IN THE BUILDING SHALL BE CONSIDERED A PART OF A UNIT. AS SUCH POST TENSIONED CABLES AND/OR RODS ARE ESSENTIAL TO THE STRUCTURE AND SUPPORT OF THE BUILDING, ALL POST TENSIONED CABLES AND/OR RODS SHALL BE DEEMED PART OF THE HOTEL LOT AND MAY NOT BE DISTURBED OR ALTERED WITHOUT THE PRIOR WRITTEN CONSENT OF THE HOTEL LOT OWNER.

(c) <u>Exceptions</u>. In cases not specifically covered above, and/or in any case of conflict or ambiguity, the survey of the Units set forth as Exhibit "2" hereto shall control in

determining the boundaries of a Unit, except that the provisions of Section 3.2(b) above shall control unless specifically depicted and labeled otherwise on such survey.

3.3   Limited Common Elements.   Each Unit may have, to the extent applicable and subject to the provisions of this Declaration, as Limited Common Elements appurtenant thereto:

   (a)   Miscellaneous Areas, Equipment.   Any fixtures or equipment (e.g., an air conditioning compressor, other portions of any air conditioning systems, and/or heater, if any, or hot water heater) serving a Unit or Units exclusively and any area (e.g., a closet, roof space or ground slab) upon/within which such fixtures or equipment are located shall be Limited Common Elements of such Unit(s).   The maintenance of any such equipment and/or areas so assigned shall be the sole responsibility of the Owner of the Unit(s) to which the fixtures and/or equipment are appurtenant.

   (b)   Other.   If applicable, any other portion of the Common Elements which, by its nature, cannot serve all Units but serves one Unit or more than one Unit (i.e., any elevator landing and/or hallway serving a single Unit or more than one (1) Unit owned by the same Owner) shall be deemed a Limited Common Element of the Unit(s) served and shall be maintained by said Owner.   In the event of any doubt or dispute as to whether any portion of the Common Elements constitutes a Limited Common Element or in the event of any question as to which Units are served thereby, a decision shall be made by a majority vote of the Board of Directors of the Association and shall be binding and conclusive when so made.   To the extent of any area deemed a Limited Common Element hereunder, the Owner of the Unit(s) to which the Limited Common Element is appurtenant shall have the right to alter same as if the Limited Common Element were part of the Owner's Unit, rather than as required for alteration of Common Elements. Notwithstanding the foregoing, the designation of same as a Limited Common Element hereunder shall not allow the Owner of the Unit to which the Limited Common Element is appurtenant to preclude, or in any way interfere with the passage through such areas as may be needed from time to time for emergency ingress and egress, and for the maintenance, repair, replacement, alteration and/or operation of the elevators, Life Safety Systems, mechanical equipment and/or other Common Elements which are most conveniently serviced (in the sole determination of the Board) by accessing such areas (and an easement is hereby reserved for such purposes).

3.4   Easements.   The following easements are hereby created (in addition to any easements created under the Act and any easements affecting the Condominium Property and recorded in the Public Records of the County):

   (a)   Support.   Each Unit and any structure and/or improvement now or hereafter constructed within The Properties and/or the Future Development Property (each as defined in the Master Covenants) shall have an easement of support and of necessity and shall be subject to an easement of support and necessity in favor of all other Units, the Common Elements and such other improvements constructed upon The Properties.

   (b)   Utility and Other Services; Drainage.   Easements are reserved under, through and over the Condominium Property as may be required from time to time for utility, cable television, communications and monitoring systems, and other services and drainage in order to serve the Condominium and/or members of the Association and/or the Lots (as defined in the Master Covenants).   A Unit Owner shall do nothing within or outside his Unit that interferes with or impairs, or may interfere with or impair, the provision of such utility, cable television, communications and security systems, or other service or drainage facilities or the use of these easements.   The Association and the Hotel Lot Owner, as applicable, shall have a right of access to each Unit to maintain, repair or replace any Common Element or Shared Facilities pipes, wires, ducts, vents, cables, conduits and other utility, cable television, communications and similar systems, hot water heaters, service and drainage facilities, and Common Elements and/or Shared Facilities contained in the Unit or elsewhere in or around the Condominium Property, and to remove any improvements interfering with or impairing such facilities or easements herein reserved;

(Reserved for Clerk of Court)

provided such right of access, except in the event of an emergency, shall not unreasonably interfere with the Unit Owner's permitted use of the Unit, and except in the event of an emergency, entry shall be made on not less than one (1) days' notice (which notice shall not, however, be required if the Unit Owner is absent when the giving of notice is attempted).

(c)     Encroachments. If (i) any portion of the Common Elements and/or Shared Facilities encroaches upon any Unit; (ii) any Unit encroaches upon any other Unit or upon any portion of the Common Elements and/or Shared Facilities; (iii) any Improvements encroach upon any improvements constructed on The Properties (as defined in the Master Covenants); (iv) any "Improvements" of or upon The Properties encroach upon the Condominium Property; or (v) any encroachment shall hereafter occur as a result of (1) construction of the Improvements and/or any "Improvements" of or upon The Properties; (2) settling or shifting of the Improvements; (3) any alteration or repair to the Common Elements (or the Shared Facilities) made by or with the consent of the Association or Developer or the Hotel Lot Owner, as appropriate; or (4) any repair or restoration of the Improvements (or any portion thereof) or any Unit after damage by fire or other casualty or any taking by condemnation or eminent domain proceedings of all or any portion of any Unit or the Common Elements or the Shared Facilities, then, in any such event, a valid easement shall exist for such encroachment and for the maintenance of same so long as the Improvements or the relevant "Improvements upon The Properties, shall stand.

(d)     Ingress and Egress. A non-exclusive easement in favor of each Unit Owner and resident, their guests and invitees, for each member of the Association, the Master Association and the Hotel Lot Owner (and its and their guests, tenants and invitees) shall exist for pedestrian traffic over, through and across such portions of the Common Elements and the Shared Facilities as are intended to provide direct pedestrian access to and from the Shared Facilities to the applicable Unit. Additionally, easements are hereby reserved in favor of all Unit Owners, all Lot Owners and all residents of The Properties (and their guests, tenants and invitees) for emergency ingress and egress over, through and across all Stairways. None of the easements specified in this subparagraph 3.4(d) shall be encumbered by any leasehold or lien other than those on the Condominium Parcels. Any such lien encumbering such easements (other than those on Condominium Parcels) automatically shall be subordinate to the rights of Unit Owners and the Association with respect to such easements.

(e)     Construction; Maintenance. The Developer (including its designees, agents, contractors, successors and assigns) and the Hotel Lot Owner (including its designees, agents, contractors, successors and assigns) shall have the right, in its (and their) sole discretion from time to time, to enter the Condominium Property and take all other action necessary or convenient for the purpose of completing the construction of any and all improvements upon any portion of The Properties and/or the Future Development Property, or any part thereof, or any Improvements or Units located or to be located on the Condominium Property, and for repair, replacement and maintenance or warranty purposes or where the Developer and/or Hotel Lot Owner, in its or their sole discretion, determines that it is required or desires to do so. The Association and/or Hotel Lot Owner (and its and their designees, contractors, subcontractors, employees) shall have the right to have access to each Unit from time to time during reasonable hours as may be necessary for pest control purposes and for the maintenance, repair or replacement of any Common Elements or any portion of a Unit, if any, to be maintained by the Association, or at any time and by force, if necessary, to prevent damage to the Common Elements, the Association Property or to a Unit or Units, including, without limitation, (but without obligation or duty) to close exterior storm shutters in the event of the issuance of a storm watch or storm warning.

(f)     Sales Activity. For as long as the Developer offers Units for sale in the ordinary course of business, the Developer, its designees, successors and assigns, shall have the right to use any such Units and parts of the Common Elements or Association Property for guest accommodations, model apartments and sales, leasing and construction offices relating to

Declaration
-7-

(Reserved for Clerk of Court)

the Condominium or the Hotel Lot, to show model Units and the Common Elements to prospective purchasers and tenants of Units, and to erect on the Condominium Property and Association Property signs and other promotional material to advertise or otherwise market the Units, and/or any facilities built or to be constructed upon any portion of The Properties and/or the Future Development Property, for sale, lease or occupancy.

(g)     Master Association and Hotel Lot Owner's Easements. The Master Association, the Hotel Lot Owner and its and their agents, employees, contractors and assigns shall have an easement to enter onto the Condominium Property for the purpose of performing such functions as are permitted or required to be performed by such Association and/or the Hotel Lot Owner by the Master Covenants, including, but not limited to, maintenance, repair, replacement and alteration of Common Properties and/or Shared Facilities, safety and maintenance activities and enforcement of architectural restrictions. An easement for such purposes is hereby granted and reserved to the Master Association and the Hotel Lot Owner and its, and/or their, members (and their guests tenants and invitees), and each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to have agreed to the grant and reservation of easement herein described and the rights herein vested in the Master Association and the Hotel Lot Owner. Notwithstanding anything herein contained to the contrary, in order to provide for the orderly distribution and regulation of parking facilities within the Carillon Hotel and Spa, to the extent that any portion of the Condominium Property is necessary or desirable (in the sole determination of the Hotel Lot Owner) for maximizing and easing traffic flow through the parking areas adjacent to the Condominium Property, then, all such portions shall be maintained and operated by the Hotel Lot Owner as Shared Facilities of and under the Master Declaration, and the maintenance, operation and regulation of same shall be vested in the Hotel Lot Owner. An easement for such purposes is hereby granted and reserved to the Hotel Lot Owner and the Master Association and its, and their, members (and their guests tenants and invitees), and each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to have agreed to the grant and reservation of the easements herein described and the rights herein vested in the Master Association and the Hotel Lot Owner. All easements and rights provided for in the Master Covenants in favor of the Master Association and the Hotel Lot Owner, its respective members and/or the Declarant thereunder, are hereby granted to said Master Association and its members and Declarant, and its assignees, designees and nominees.

(h)     Support of Adjacent Structures. In the event that any structure(s) is constructed so as to be connected in any manner to the Buildings and/or any Improvements constructed upon The Properties, then there shall be (and there is hereby declared) an easement of support for such structure(s) as well as for the installation, maintenance, repair and replacement of all utility lines and equipment serving the adjoining structures which are necessarily or conveniently located within the Condominium Property, the Association Property and/or The Properties (provided that the use of this easement shall not unreasonably interfere with the structure, operation or use of the Condominium Property, the Association Property or the Buildings). All easements and rights provided for in the Master Covenants in favor of the Master Association, its respective members and/or the Hotel Lot Owner, and/or the Declarant thereunder, are hereby granted, respectively, to the Association, the Unit Owners, the Hotel Lot Owner and the Declarant, and its and their assignees, designees and nominees.

(i)     Warranty. For as long as Developer remains liable under any warranty, whether statutory, express or implied, for act or omission of Developer in the development, construction, sale and marketing of the Condominium, then Developer and its contractors, agents and designees shall have the right, in Developer's sole discretion and from time to time, and without requiring prior approval of the Association and/or any Unit Owner (provided, however, that absent an emergency situation, Developer shall provide reasonable advance notice), to enter the Common Elements and Units for the purpose of making any necessary inspections, tests, repairs, improvements and/or replacements required for the Developer to fulfill any of its warranty obligations. Each Unit Owner, by acceptance of a deed or otherwise accepting title to a Unit, recognizes and agrees that this is a reasonable

(Reserved for Clerk of Court)

reservation of rights which is necessary to afford Developer the ability to perform any of its warranty obligations. Failure of the Association or any Unit Owner to grant such access may result in the appropriate warranty being nullified and of no further force or effect. **Nothing herein shall be deemed or construed as the Developer making or offering any warranty, all of which are disclaimed (except to the extent same may not be) as set forth In Section 21 below.**

(j)  Additional Easements. The Association, through its Board, on the Association's behalf and on behalf of all Unit Owners (each of whom hereby appoints the Association as its attorney-in-fact for this purpose), shall have the right to grant such additional general ("blanket") and specific electric, gas or other utility, cable television, security systems, communications or service easements (and appropriate bills of sale for equipment, conduits, pipes, lines and similar installations pertaining thereto), or modify or relocate any such existing easements or drainage facilities, in any portion of the Condominium and/or Association Property, and to grant access easements or relocate any existing access easements in any portion of the Condominium and/or Association Property, as the Board shall deem necessary or desirable for the proper operation and maintenance of the Improvements, or any portion thereof, or any improvement located on Common Properties or within The Properties, or for the general health or welfare of the Unit Owners and/or members of the Association, or for the purpose of carrying out any provisions of this Declaration or the Master Covenants, provided that such easements or the relocation of existing easements will not prevent or unreasonably interfere with the reasonable use of the Units for their intended purposes.

4.  Restraint Upon Separation and Partition of Common Elements. The undivided share in the Common Elements and Common Surplus which is appurtenant to a Unit, shall not be separated therefrom and shall pass with the title to the Unit, whether or not separately described. The appurtenant share in the Common Elements and Common Surplus, except as elsewhere herein provided to the contrary, cannot be conveyed or encumbered except together with the Unit. The respective shares in the Common Elements appurtenant to Units shall remain undivided, and no action for partition of the Common Elements, the Condominium Property, or any part thereof, shall lie, except as provided herein with respect to termination of the Condominium.

5.  Ownership of Common Elements and Common Surplus and Share of Common Expenses and Master Expenses; Voting Rights

5.1  Percentage Ownership and Shares. The undivided percentage interest in the Common Elements and Common Surplus, and the percentage share of the Common Expenses and Master Expenses, appurtenant to each Unit is based upon the total square footage of each Unit in uniform relationship to the total square footage of each other Unit, and is as set forth on Exhibit "3" attached hereto (the "Allocated Interests").

5.2  Voting. Each Unit shall be entitled to one vote to be cast by its Owner in accordance with the provisions of the By-Laws and Articles of Incorporation of the Association. Each Unit Owner shall be a member of the Association.

6.  Amendments. Except as elsewhere provided herein, amendments to this Declaration may be effected as follows:

6.1  By The Association. Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is to be considered. A resolution for the adoption of a proposed amendment may be proposed either by a majority of the Board of Directors of the Association or by not less than one-third (1/3) of the Unit Owners. Except as elsewhere provided, approvals must be by an affirmative vote representing 80% or more of the voting interests of all Unit Owners. Directors and members not present in person or by proxy at the meeting considering the amendment may express their approval or disapproval in writing, provided that such approval or disapproval is delivered to the secretary at or prior to the meeting, however,

such approval or disapproval may not be used as a vote for or against the action taken and may not be used for the purpose of creating a quorum.

6.2     Material Amendments. Unless otherwise provided specifically to the contrary in this Declaration, no amendment shall change the configuration or size of any Unit in any material fashion, materially alter or modify the appurtenances to any Unit, permit timeshare estates or change the percentage by which the Owner of a Unit shares the Common Expenses and owns the Common Elements and Common Surplus (any such change or alteration being a "Material Amendment"), unless the record Owner(s) thereof, and all record owners of mortgages or other liens thereon, shall join in the execution of the amendment and the amendment is otherwise approved by 80% or more of the voting interests of Unit Owners. The acquisition of property by the Association, material alterations or substantial additions to such property or the Common Elements by the Association and installation, replacement and maintenance of approved exterior storm shutters, if in accordance with the provisions of this Declaration, shall not be deemed to constitute a material alteration or modification of the appurtenances of the Units, and accordingly, shall not constitute a Material Amendment.

6.3     Mortgagee's Consent. No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise materially and adversely affect any rights, benefits, privileges or priorities granted or reserved in this Declaration to mortgagees of Units without the consent of said mortgagees in each instance; nor shall an amendment make any change in the sections hereof entitled "Insurance", "Reconstruction or Repair after Casualty", or "Condemnation" unless the Primary Institutional First Mortgagee shall join in the amendment. Except as specifically provided herein or if required by FNMA or FHLMC, the consent and/or joinder of any lien or mortgage holder on a Unit shall not be required for the adoption of an amendment to this Declaration and, whenever the consent or joinder of a lien or mortgage holder is required, such consent or joinder shall not be unreasonably withheld.

6.4     South Florida Water Management District. No amendment may be adopted which would affect the surface water management system, including environmental conservation areas, without the consent of the South Florida Water Management District (the "District" or "SFWMD"). The District shall determine whether the amendment necessitates a modification of the current surface water management permit. If a modification is necessary, the District will advise the Association.

6.5     By or Affecting The Developer. Notwithstanding anything herein contained to the contrary, during the time the Developer has the right to elect a majority of the Board of Directors of the Association, the Declaration, the Articles of Incorporation or the By-Laws of the Association may be amended by the Developer alone (joined by the holder of any mortgages securing Units then owned by the Developer), without requiring the consent of any other party, to effect any change whatsoever, except for an amendment: (i) to permit time-share estates (which must be approved, if at all, in the manner provided in Section 6.2 above); or (ii) to effect a "Material Amendment", which must be approved, if at all, in the manner set forth in Section 6.2 above. The unilateral amendment right set forth herein shall include, without limitation, the right to correct scrivener's errors. No amendment may be adopted (whether to this Declaration or any of the exhibits hereto) which would eliminate, modify, prejudice, abridge or otherwise adversely affect any rights, benefits, privileges or priorities granted or reserved to the Developer, without the consent of the Developer in each instance.

6.6     Execution and Recording. An amendment, other than amendments made by the Developer alone pursuant to the Act or this Declaration, shall be evidenced by a certificate of the Association, executed either by the President of the Association or a majority of the members of the Board of Directors which shall include recording data identifying the Declaration and shall be executed with the same formalities required for the execution of a deed. An amendment of the Declaration is effective when the applicable amendment is properly recorded in the public records of the County. No provision of this Declaration shall be revised or amended by reference to its title or number only. Proposals to amend existing provisions of this Declaration shall contain the full text of the provision to be amended; new words shall be inserted in the text underlined; and words to be deleted shall be lined through with hyphens. However, if the proposed change is so extensive that this procedure would hinder, rather than assist, the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but,

(Reserved for Clerk of Court)

instead, a notation must be inserted immediately preceding the proposed amendment in substantially the following language: "Substantial rewording of Declaration. See provision . . . for present text." Nonmaterial errors or omissions in the amendment process shall not invalidate an otherwise properly adopted amendment.

7. Maintenance and Repairs.

7.1 Units. All maintenance, repairs and replacements of, in or to any Unit, whether structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen, including, without limitation, maintenance, repair and replacement of windows, window coverings, interior nonstructural walls, the interior side of the entrance door and all other doors within or affording access to a Unit, and the electrical (including wiring), plumbing (including fixtures and connections), heating and air-conditioning equipment, fixtures and outlets, appliances, carpets and other floor coverings, all interior surfaces and the entire interior of the Unit lying within the boundaries of the Unit or other property belonging to the Unit Owner, shall be performed by the Owner of such Unit at the Unit Owner's sole cost and expense, except as otherwise expressly provided to the contrary herein. Notwithstanding anything herein to the contrary, to the extent that any of the foregoing items are part of the Shared Facilities, then the maintenance of same shall be the obligation of the Hotel Lot Owner, with the costs thereof charged against the Unit Owners in accordance with the terms of the Master Covenants.

7.2 Common Elements and Association Property. Except to the extent (i) expressly provided to the contrary herein, or (ii) proceeds of insurance are made available therefor, all maintenance, repairs and replacements in or to the Common Elements and Association Property shall be performed by the Association and the cost and expense thereof shall be charged to all Unit Owners as a Common Expense, except to the extent arising from or necessitated by the negligence, misuse or neglect of specific Unit Owners, in which case such cost and expense shall be paid solely by such Unit Owners.

7.3 Hotel Lot. The Hotel Lot Owner(s), from time to time, shall be responsible for the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Facilities, which shall be performed in a commercially reasonable manner in the determination of the Hotel Lot Owner (which determination shall be binding). In consideration of the reservation and grant of easement over the Shared Facilities, as provided in Section 3.4(d) above, each Unit Owner shall be obligated for payment of the expenses incurred by the Hotel Lot Owner in connection with such maintenance, repair, replacement, improvement, management, operation, and insurance, all as more particularly provided in the Master Covenants.

7.4 Standards for Maintenance. Notwithstanding anything herein contained to the contrary, any and all maintenance obligations of either the Association or a Unit Owner must be undertaken in such a manner to assure that the portions being maintained by the Association and/or any Unit Owner are consistent with the high standards of any hotel operated from within the Hotel Lot (the "Hotel") and the other hotels and resorts owned or managed and operated by the operator of the Hotel, or its affiliates.

8. Additions, Alterations or Improvements by Unit Owner.

8.1 Consent of the Board of Directors. Subject to the provisions of Section 15.6 below, no Unit Owner (other than the Developer) shall make any addition, alteration or improvement in or to the Common Elements, the Association Property, any structural addition, alteration or improvement in or to his or her Unit (to the extent either (i) visible from any Lot, or the exterior of the Building, (ii) affecting the structural integrity of the Building, (iii) or affecting any electrical, mechanical, HVAC, plumbing, life safety, monitoring, information and/or other systems of the Building) without the prior written consent of the Hotel Lot Owner and the Board of Directors of the Association. The Board shall have the obligation to answer, in writing, any written request by a Unit Owner for approval of such an addition, alteration or improvement within thirty (30) days after such request and all additional information requested is received, and the failure to do so within the stipulated time shall constitute the Board's consent. The Board may condition the approval in any manner, including, without

(Reserved for Clerk of Court)

limitation, retaining approval rights of the contractor to perform the work, imposing conduct standards on all such workers, establishing permitted work hours and requiring the Unit Owner to obtain insurance naming the Developer, the Association and/or the Hotel Lot as additional insureds. The proposed additions, alterations and improvements by the Unit Owners shall be made in compliance with all laws, rules, ordinances and regulations of all governmental authorities having jurisdiction, and with any conditions imposed by the Association with respect to design, structural integrity, aesthetic appeal, construction details, lien protection or otherwise. Further, no alteration, addition or modification may in any manner affect any portion of any other Lot or any portion of the Shared Facilities, without the prior written consent of the applicable Lot Owner (which consent may be withheld in its or their sole discretion). Once approved by the Hotel Lot Owner and the Board of Directors, such approval may not be revoked. A Unit Owner making or causing to be made any such additions, alterations or improvements agrees, and shall be deemed to have agreed, for such Owner, and such Unit Owner's heirs, personal representatives, successors and assigns, as appropriate, to hold the Association, the Developer, the Hotel Lot Owner, and all other Unit Owners and their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys harmless from and to indemnify them for any liability or damage to the Condominium Property, Association Property, the Lots and/or the Shared Facilities and expenses arising therefrom, and shall be solely responsible for the maintenance, repair and insurance thereof from and after that date of installation or construction thereof as may be required by the Association. The Association's rights of review and approval of plans and other submissions under this Declaration are intended solely for the benefit of the Association. Neither the Developer, the Association, the Hotel Lot Owner, nor any of their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys shall be liable to any Owner or any other person by reason of mistake in judgment, failure to point out or correct deficiencies in any plans or other submissions, negligence, or any other misfeasance, malfeasance or non-feasance arising out of or in connection with the approval or disapproval of any plans or submissions. Anyone submitting plans hereunder, by the submission of same, and any Owner, by acquiring title to same, agrees not to seek damages from the Developer, the Association and/or the Hotel Lot Owner arising out of the Association's review of any plans hereunder. Without limiting the generality of the foregoing, the Association and Hotel Lot Owner shall not be responsible for reviewing, nor shall its review of any plans be deemed approval of, any plans from the standpoint of structural safety, soundness, workmanship, materials, usefulness, conformity with building or other codes or industry standards, or compliance with governmental requirements. Further, each Owner (including the successors and assigns) agrees to indemnify and hold the Developer, the Association and the Hotel Lot Owner and their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys harmless from and against any and all costs, claims (whether rightfully or wrongfully asserted), damages, expenses or liabilities whatsoever (including, without limitation, reasonable attorneys' fees and court costs at all trial and appellate levels), arising out of any review of plans hereunder. The provisions of this Section 8.1 shall not be applicable to the Hotel Lot and/or to any Unit owned by the Developer. The provisions of this Section 8.1 shall not be amended without an affirmative vote of 4/5ths of the total voting interests in the Condominium.

Without limiting the generality of the foregoing, to the extent that the Condominium has been constructed with post tensioned cables and/or rods, absolutely no penetration shall be made to any floor, roof or ceiling slabs without the prior written consent of the Hotel Lot Owner and review of the as-built plans and specifications for the Building to confirm the approximate location of the post tensioned cables and/or rods. The plans and specifications for the Building shall be maintained by the Association as part of its official records. To the extent that the Condominium has been constructed with post tensioned cables and/or rods, each Unit Owner, by accepting a deed or otherwise acquiring title to a Unit shall be deemed to: (i) have assumed the risks associated with post tension construction, and (ii) agree that the penetration of any post tensioned cables and/or rods may threaten the structural integrity of the Building. To the extent that the Condominium has been constructed with post tensioned cables and/or rods, each Owner hereby releases Developer and Declarant, and its or their members, contractors, architects, engineers and its and their officers, directors, shareholders, employees and agents from and against any and all liability that may result from penetration of any of the post tensioned cables and/or rods.

In addition to the foregoing, all additions, alterations and improvements proposed to be made by any Owner shall be subject to, and restricted by, the terms and conditions of the Master Covenants and may also require the prior approval of the Hotel Lot Owner.

8.2     Improvements, Additions or Alterations by Developer or Hotel Lot. Anything to the contrary notwithstanding, the foregoing restrictions of this Section 8 shall not apply to Developer-owned Units nor to the Hotel Lot. The Developer shall have the additional right, without the consent or approval of the Board of Directors or other Unit Owners, but without obligation, to (a) make alterations, additions or improvements, structural and non-structural, interior and exterior, ordinary and extraordinary, in, to and upon any Unit owned by it (including, without limitation, the removal of walls, floors, ceilings and other structural portions of the Improvements), and (b) expand, alter or add to all or any part of the recreational facilities. Any amendment to this Declaration required by a change made by the Developer pursuant to this Section 8.2 shall be adopted in accordance with Section 6, provided, however, that the exercise of any right by Developer pursuant to clause (b) above shall not be deemed a Material Amendment.

9.      Operation of the Condominium by the Association; Powers and Duties.

9.1     Powers and Duties. The Association shall be the entity responsible for the operation of the Common Elements and the Association Property. The powers and duties of the Association shall include those set forth in the By-Laws and Articles of Incorporation of the Association (which By-Laws and Articles are attached hereto as Exhibits "4" and "5", respectively) as amended from time to time. The affairs of the Association shall be governed by a Board of not less than three (3) nor more than nine (9) directors. Directors must be natural persons who are 18 years of age or older. Any person who has been convicted of any felony by any court of record in the United States and who has not had his or her right to vote restored pursuant to law in the jurisdiction of his or her residence is not eligible for Board membership (provided, however, that the validity of any Board action is not affected if it is later determined that a member of the Board is ineligible for Board membership due to having been convicted of a felony). In addition, the Association shall have all the powers and duties set forth in the Act, as well as all powers and duties granted to or imposed upon it by this Declaration, including, without limitation:

(a)     The irrevocable right to have access to each Unit from time to time during reasonable hours as may be necessary for pest control purposes and for the maintenance, repair or replacement of any Common Elements or any portion of a Unit, if any, to be maintained by the Association, or at any time and by force, if necessary, to prevent damage to the Common Elements, the Association Property or to a Unit or Units, including, without limitation, (but without obligation or duty) to close exterior storm shutters in the event of the issuance of a storm watch or storm warning.

(b)     The power to make and collect Assessments, impositions and other charges against Unit Owners and to lease, maintain, repair and replace the Common Elements and Association Property.

(c)     The duty to maintain accounting records of the Association according to good accounting practices, which shall be open to inspection by Unit Owners or their authorized representatives at reasonable times upon prior request.

(d)     The power to contract for the management and maintenance of the Condominium Property and to authorize a management agent (who may be an affiliate of the Developer) to assist the Association and/or Hotel Lot Owner, in carrying out its powers and duties by performing such functions as reviewing and evaluating the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair and replacement of Common Elements with such funds as shall be made available by the Association for such purposes. The Association and/or Hotel Lot Owner, and its, and their, officers shall, however, retain at all times the powers and duties granted in the Condominium documents and the Condominium Act, including, but not limited to, the making of Assessments, promulgation of rules, subject to the provisions of Section 9.1(g)

(Reserved for Clerk of Court)

below, and execution of contracts on behalf of the Association and/or Hotel Lot Owner.

(e)     Without creating any obligation to do so, the power and authority of the Board (by a majority vote, without requiring any vote of Unit Owners) to negotiate and enter into an agreement or agreements with the Hotel Lot Owner to obtain use rights in and to the Spa. Said power shall include, without limitation, the right to negotiate the specific terms and conditions of such agreement (or agreements), including, without limitation, the services to be provided, location of facilities and/or use and/or membership fees.

(f)     The power to borrow money, execute promissory notes and other evidences of indebtedness and to give as security therefor mortgages and security interests in property owned by the Association, if any, provided that such actions are approved by a majority of the entire membership of the Board of Directors and 80% or more of the Units represented at a meeting at which a quorum has been attained in accordance with the Articles and By-Laws, or by such greater percentage of the Board or Unit Owners as may be specified in the By-Laws with respect to certain borrowing. The foregoing restriction shall not apply if such indebtedness is entered into for the purpose of financing insurance premiums, which action may be undertaken solely by the Board of Directors, without requiring a vote of the Unit Owners.

(g)     The power to adopt and amend rules and regulations concerning the details of the operation and use of the Common Elements and Association Property. Notwithstanding anything herein contained to the contrary, no such rule may restrict, limit or otherwise impair the rights of the Hotel Lot Owner and/or the Developer without the prior written consent of the Hotel Lot Owner and/or the Developer, as applicable.

(h)     The power to acquire, convey, lease and encumber real and personal property. Personal property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors, unless the cost thereof exceeds $25,000.00 in which event the acquisition shall require an affirmative vote of not less than 80% of the voting interests in accordance with the Articles and By-Laws. Real property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors alone and an affirmative vote of not less than 80% of the voting interests; provided, however, that the acquisition of any Unit as a result of a foreclosure of the lien for Assessments and/or Impositions (or by deed in lieu of foreclosure) shall be made upon the majority vote of the Board, regardless of the price for same and the Association, through its Board, has the power to hold, lease, mortgage or convey the acquired Unit(s) without requiring the consent of Unit Owners. The expenses of acquisition, ownership (including the expense of making and carrying any mortgage related to such ownership), rental, membership fees, taxes, Assessments, operation, replacements and other expenses and undertakings in connection therewith shall be Common Expenses.

(i)     The obligation to (i) operate and maintain the surface water management system in accordance with the permit issued by the SFWMD, (ii) carry out, maintain, and monitor any required wetland mitigation tasks and (iii) maintain copies of all permitting actions with regard to the SFWMD.

(j)     The power to act as the collection agent on behalf, and at the request, of the Master Association and/or the Hotel Lot Owner for assessments due same from Unit Owners, provided, however, that any assessments so collected shall not be deemed Assessments or Common Expenses hereunder.

(k)     The power to execute all documents or consents, on behalf of all Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner, by acceptance of the deed to such Owner's Unit, and each mortgagee of a Unit Owner by acceptance of a lien on said Unit, appoints and designates the President of the

Association, as such Owner's agent and attorney-in-fact to execute any and all such documents or consents.

(l)     All of the powers which a corporation not for profit in the State of Florida may exercise pursuant to this Declaration, the Articles of Incorporation, the Bylaws, Chapters 607 and 617, Florida Statutes and the Act, in all cases except as expressly limited or restricted in the Act.

(m)     Subject to the limitations set forth in the Act, the power to enter into management agreements which may delegate any or all of the foregoing powers to a third party.

In the event of conflict among the powers and duties of the Association or the terms and provisions of this Declaration, exhibits attached hereto and the Master Covenants, or otherwise, the Master Covenants shall take precedence over this Declaration; this Declaration shall take precedence over the Articles of Incorporation, By-Laws and applicable rules and regulations; the Articles of Incorporation shall take precedence over the By-Laws and applicable rules and regulations; and the By-Laws shall take precedence over applicable rules and regulations, all as amended from time to time. Notwithstanding anything in this Declaration or its exhibits to the contrary, nothing in the Master Covenants shall conflict with the powers and duties of the Association or the rights of the Unit owners as provided in the Act.

9.2     Limitation Upon Liability of Association.  Notwithstanding the duty of the Association to maintain and repair parts of the Condominium Property, the Association shall not be liable to Unit Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the Condominium Property.  Further, the Association shall not be liable for any such injury or damage caused by defects in design or workmanship or any other reason connected with any additions, alterations or improvements or other activities done by or on behalf of any Unit Owners regardless of whether or not same shall have been approved by the Association pursuant to Section 8.1 hereof. The Association also shall not be liable to any Unit Owner or lessee or to any other person or entity for any property damage, personal injury, death or other liability on the grounds that the Association did not obtain or maintain insurance (or carried insurance with any particular deductible amount) for any particular matter where: (i) such insurance is not required hereby; or (ii) the Association could not obtain such insurance at reasonable costs or upon reasonable terms. Nothing herein shall be deemed to relieve the Association of its duty to exercise ordinary care in the carrying out the powers and duties set forth herein, nor to deprive the Unit Owners of their right to sue the Association if it negligently or willfully causes damage to the Unit Owners' property during the performance of its duties hereunder.  The limitations upon liability of the Association described in this Subsection are subject to the provisions of Section 718.111(3) F.S.

9.3     Restraint Upon Assignment of Shares in Assets.  The share of a Unit Owner in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to his Unit.

9.4     Approval or Disapproval of Matters.  Whenever the decision of a Unit Owner is required upon any matter, whether or not the subject of an Association meeting, that decision shall be expressed by the same person who would cast the vote for that Unit if at an Association meeting, unless the joinder of all record Owners of the Unit is specifically required by this Declaration or by law.

9.5     Acts of the Association.  Unless the approval or action of Unit Owners, and/or a certain specific percentage of the Board of Directors of the Association, is specifically required in this Declaration, the Articles of Incorporation or By-Laws of the Association, applicable rules and regulations or applicable law, all approvals or actions required or permitted to be given or taken by the Association shall be given or taken by the Board of Directors, without the consent of Unit Owners, and the Board may so approve and act through the proper officers of the Association without a specific resolution. When an approval or action of the Association is permitted to be given or taken hereunder or thereunder, such action or approval may be conditioned in any manner the Association deems appropriate or the Association may refuse to take or give such action or approval without the necessity of establishing the reasonableness of such conditions or refusal.

```
(Reserved for Clerk of Court)
```

9.6 Effect on Developer. If the Developer holds a Unit for sale in the ordinary course of business, none of the following actions may be taken by the Association, subsequent to the transfer of control of the Board to Unit Owners other than the Developer, without the prior written approval of the Developer:

(a) Assessment of the Developer as a Unit Owner for capital improvements;

(b) Any action by the Association that would be detrimental to the sales of Units by the Developer; provided, however, that an increase in Assessments for Common Expenses without discrimination against the Developer shall not be deemed to be detrimental to the sales of Units.

10. Determination of Common Expenses and Master Expenses and Fixing of Assessments Therefor. The Board of Directors shall from time to time, and at least annually, prepare, or cause to be prepared, a budget for the Condominium and the Association which are designed to adhere to the standards set forth in Section 7.4 above and determine, or cause to be determined, the amount of Assessments payable by the Unit Owners to meet the Common Expenses of the Condominium and allocate and assess such expenses and the Master Expenses among the Unit Owners in accordance with the provisions of this Declaration and the By-Laws. The Board of Directors shall advise all Unit Owners promptly in writing of the amount of the Assessments and Impositions payable by each of them as determined by the Board of Directors as aforesaid and shall furnish copies of the budget, on which such Assessments and Impositions are based, to all Unit Owners and (if requested in writing) to their respective mortgagees. The Common Expenses shall include the expenses and of reserves for (if required by, and not waived in accordance with, applicable law) the operation, maintenance, repair and replacement of the Common Elements and Association Property, costs of carrying out the powers and duties of the Association and any other expenses designated as Common Expenses by the Act, this Declaration, the Articles or By-Laws of the Association, applicable rules and regulations or by the Association. Incidental income to the Association, if any, may be used to pay regular or extraordinary Association expenses and liabilities, to fund reserve accounts, or otherwise as the Board shall determine from time to time, and need not be restricted or accumulated. Any Budget adopted shall be subject to change to cover actual expenses at any time. Any such change shall be adopted consistent with the provisions of this Declaration and the By-Laws.

11. Collection of Assessments.

11.1 Liability for Assessments. A Unit Owner, regardless of how title is acquired, including by purchase at a foreclosure sale or by deed in lieu of foreclosure shall be liable for all Assessments and Impositions coming due while he or she is the Unit Owner. Additionally, a Unit Owner shall be jointly and severally liable with the previous Owner for all unpaid Assessments and/or Impositions that came due up to the time of the conveyance, without prejudice to any right the Owner may have to recover from the previous Owner the amounts paid by the grantee Owner. The liability for Assessments and/or Impositions may not be avoided by waiver of the use or enjoyment of any Common Elements or by the abandonment of the Unit for which the Assessments and/or Impositions are made or otherwise.

11.2 Special and Capital Improvement Assessments. In addition to Assessments levied by the Association to meet the Common Expenses of the Condominium and the Association, the Board of Directors may levy "Special Assessments" and "Capital Improvement Assessments" upon the following terms and conditions:

(a) "Special Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for specific purposes of a nonrecurring nature which are not in the nature of capital improvements.

(b) "Capital Improvement Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for the acquisition, installation, construction or replacement (as distinguished from repairs and maintenance) of any capital improvements located or to be located within the Common Elements or Association Property.

(Reserved for Clerk of Court)

(c)     Special Assessments and Capital Improvement Assessments may be levied by the Board and shall be payable in lump sums or installments, in the discretion of the Board, provided that, if such Special Assessments or Capital Improvement Assessments, in the aggregate in any year, exceed $125,000.00 or cause the total Assessments levied to exceed 115% of Assessments for the preceding calendar year, the Board must obtain approval of a majority of the Units represented at a meeting at which a quorum is attained.

11.3    Default in Payment of Assessments for Common Expenses or Master Expenses. Assessments, Impositions and Installments of either not paid within ten (10) days from the date when they are due shall bear interest at fifteen percent (15%) per annum from the date due until paid and shall be subject to an administrative late fee in an amount not to exceed the greater of $25.00 or five percent (5%) of each delinquent installment. The Association has a lien on each Condominium Parcel to secure the payment of Assessments and Impositions. Except as set forth below, the lien is effective from, and shall relate back to, the date of the recording of this Declaration. However, as to first mortgages of record, the lien is effective from and after the date of the recording of a claim of lien in the Public Records of the County, stating the description of the Condominium Parcel, the name of the record Owner and the name and address of the Association. The lien shall be evidenced by the recording of a claim of lien in the Public Records of the County. To be valid, the claim of lien must state the description of the Condominium Parcel, the name of the record Owner, the name and address of the Association, the amount due and the due dates, and the claim of lien must be executed and acknowledged by an officer or authorized officer of the Association. The claim of lien shall not be released until all sums secured by it (or such other amount as to which the Association shall agree by way of settlement) have been fully paid or until it is barred by law. No such lien shall be effective longer than one (1) year after the claim of lien has been recorded unless, within that one (1) year period, an action to enforce the lien is commenced. The one (1) year period shall automatically be extended for any length of time during which the Association is prevented from filing a foreclosure action by an automatic stay resulting from a bankruptcy petition filed by the Owner or any other person claiming an interest in the Unit. The claim of lien shall secure (whether or not stated therein) all unpaid Assessments and/or Impositions, which are due and which may accrue subsequent to the recording of the claim of lien and prior to the entry of a certificate of title, as well as interest and all reasonable costs and attorneys' fees incurred by the Association incident to the collection process. Upon payment in full, the person making the payment is entitled to a satisfaction of the lien in recordable form. The Association may bring an action in its name to foreclose a lien for unpaid Assessments and/or Impositions in the manner a mortgage of real property is foreclosed and may also bring an action at law to recover a money judgment for the unpaid Assessments and/or Impositions without waiving any claim of lien. The Association is entitled to recover its reasonable attorneys' fees incurred either in a lien foreclosure action or an action to recover a money judgment for unpaid Assessments and/or Impositions.

Additionally, each Owner of any Unit by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in any such deed or other conveyance, shall be deemed to have assigned all rents, issues and profits (the "Collateral Assignment of Rents") on each such Unit to the Association, which Collateral Assignment of Rents shall become absolute upon default of such Unit Owner hereunder, but shall in any event be subject and subordinate to the lien of any first mortgage on such Unit and any assignment of leases in favor of the holder of such first mortgage.

As an additional right and remedy of the Association, upon default in the payment of Assessments and/or Impositions as aforesaid and after thirty (30) days' prior written notice to the applicable Unit Owner and the recording of a claim of lien, the Association may declare the Assessment Installments for the remainder of the budget year to be accelerated and immediately due and payable. In the event that the amount of such installments changes during the remainder of the budget year, the Unit Owner or the Association, as appropriate, shall be obligated to pay or reimburse to the other the amount of increase or decrease within ten (10) days of same taking effect.

11.4    Notice of Intention to Foreclose Lien. No foreclosure judgment may be entered until at least thirty (30) days after the Association gives written notice to the Unit Owner of its intention to foreclose its

                                                    1



                              (Reserved for Clerk of Court)

lien to collect the unpaid Assessments and/or Impositions. If this notice is not given at least thirty (30) days before the foreclosure action is filed, and if the unpaid Assessments and/or Impositions, including those coming due after the claim of lien is recorded, are paid before the entry of a final judgment of foreclosure, the Association shall not recover attorney's fees or costs. The notice must be given by delivery of a copy of it to the Unit Owner or by certified or registered mail, return receipt requested, addressed to the Unit Owner at the last known address, and upon such mailing, the notice shall be deemed to have been given. If after diligent search and inquiry the Association cannot find the Unit Owner or a mailing address at which the Unit Owner will receive the notice, the court may proceed with the foreclosure action and may award attorney's fees and costs as permitted by law. The notice requirements of this subsection are satisfied if the Unit Owner records a Notice of Contest of Lien as provided in the Act.

11.5    Appointment of Receiver to Collect Rental. If the Unit Owner remains in possession of the Unit after a foreclosure judgment has been entered, the court in its discretion may require the Unit Owner to pay a reasonable rental for the Unit. If the Unit is rented or leased during the pendency of the foreclosure action, the Association is entitled to the appointment of a receiver to collect the rent. The expenses of such receiver shall be paid by the party which does not prevail in the foreclosure action.

11.6    First Mortgagee. The liability of the holder of a first mortgage on a Unit (a "First Mortgagee"), or its successors or assigns, who acquires title to a Unit by foreclosure or by deed in lieu of foreclosure for the unpaid Assessments (or installments thereof) that became due prior to the First Mortgagee's acquisition of title is limited to the lesser of:

        (a)     The Unit's unpaid Common Expenses and regular periodic Assessments which accrued or came due during the six (6) months immediately preceding the acquisition of title and for which payment in full has not been received by the Association; or

        (b)     One percent (1%) of the original mortgage debt.

As to a Unit acquired by foreclosure, the limitations set forth in clause (a) and clause (b) above shall not apply unless the First Mortgagee joined the Association as a defendant in the foreclosure action. Joinder of the Association, however, is not required if, on the date the complaint is filed, the Association was dissolved or did not maintain an office or agent for service of process at a location which was known to or reasonably discoverable by the mortgagee.

A First Mortgagee acquiring title to a Unit as a result of foreclosure or deed in lieu thereof may not, during the period of its ownership of such Unit, whether or not such Unit is unoccupied, be excused from the payment of some or all of the Common Expenses and/or Master Expenses coming due during the period of such ownership.

11.7    Certificate of Unpaid Assessments and/or Impositions. Within fifteen (15) days after receiving a written request therefore from a purchaser, Unit Owner or mortgagee of a Unit, the Association shall provide a certificate, signed by an officer or agent of the Association, stating all Assessments and/or Impositions and other moneys owed to the Association by the Unit Owner with respect to his Unit. Any person other than the Unit Owner who relies upon such certificate shall be protected thereby. The Association or its authorized agent may charge a reasonable fee for the preparation of such certificate.

11.8    Installments. Regular Assessments and/or Impositions shall be collected monthly or quarterly, in advance, at the option of the Association. Initially, Assessments and/or Impositions will be collected monthly.

11.9    Application of Payments. Any payments received by the Association from a delinquent Unit Owner shall be applied first to any interest accrued on the delinquent installment(s) as aforesaid, then to any administrative late fees, then to any costs and reasonable attorneys' fees incurred in collection and then to the delinquent and any accelerated Assessments and/or Impositions. The foregoing shall be applicable notwithstanding any restrictive endorsement, designation or instruction placed on or accompanying a payment.

(Reserved for Clerk of Court)

12. Insurance. Insurance covering the Condominium Property and the Association Property shall be governed by the following provisions:

12.1 Purchase, Custody and Payment.

(a) Purchase. All insurance policies described herein covering portions of the Condominium and Association Property shall be purchased by the Association and shall be issued either by an insurance company authorized to do business in Florida or a reputable surplus lines carriers offering policies for properties in Florida.

(b) Approval. Each insurance policy, the agency and company issuing the policy and the Insurance Trustee (if appointed) hereinafter described shall be subject to the approval of the Primary Institutional First Mortgagee in the first instance, if requested thereby (which approval right has been requested by Administrative Agent).

(c) Named Insured. The named insured shall be the Association, individually, and as agent for the Association and the Owners of Units covered by the policy, without naming them, and as agent for the holders of any mortgage on a Unit (or any leasehold interest therein), without naming them. The Association, Unit Owners and the holders of any mortgage on a Unit shall be deemed additional insureds.

(d) Custody of Policies and Payment of Proceeds. All policies shall provide that payments for losses made by the insurer shall be paid to the Insurance Trustee (if appointed), and all policies and endorsements thereto shall be deposited with the Insurance Trustee (if appointed).

(e) Copies to Mortgagees. One copy of each insurance policy, or a certificate evidencing such policy, and all endorsements thereto, shall be furnished by the Association upon request to the holders of any mortgage on a Unit. Copies or certificates shall be furnished not less than ten (10) days prior to the beginning of the term of the policy, or not less than ten (10) days prior to the expiration of each preceding policy that is being renewed or replaced, as appropriate.

(f) Personal Property and Liability. Except as specifically provided herein or by the Act, the Association shall not be responsible to Unit Owners to obtain insurance coverage upon the property lying within the boundaries of their Unit, including, but not limited to, the Improvements, Owner's personal property, nor insurance for the Owner's personal liability and living expenses nor for any other risks not otherwise insured in accordance herewith. To the extent that a Unit Owner or other occupant of a Unit desires coverage for such excluded items, it shall be the sole responsibility of the Unit Owner and/or occupant to obtain.

12.2 Coverage. The Association shall maintain insurance covering the following, to the extent applicable (keeping in mind that, given the breadth of the Shared Facilities, much, if not all of same shall be carried by the Master Association or the Hotel Lot Owner, as applicable, all in accordance with the terms of the Master Covenants):

(a) Casualty. The Building (including all fixtures, installations or additions comprising that part of the Building within the boundaries of the Units and required by the Act to be insured under the Association's policies) and all improvements located on the Common Elements and the Association Property from time to time, together with all fixtures, building service equipment, personal property and supplies constituting the Common Elements or Association Property (collectively the "Insured Property"), shall be insured in amounts not less than may be required from time to time by the Administrative Agent, or after such time as the Administrative Agent no longer holds a mortgage encumbering the Condominium Property, in such amounts as are commercially reasonable. Notwithstanding the foregoing, the Insured Property shall not include, and shall specifically exclude, all furniture, furnishings, Unit floor coverings, wall coverings and ceiling coverings, other personal property owned, supplied or installed by Unit Owners or tenants of Unit Owners, and all electrical fixtures, appliances, air conditioner and heating

Declaration
-19-

(Reserved for Clerk of Court)

equipment, water heaters and built-in cabinets, to the extent that any of same are required to be repaired or replaced by the Unit Owners. Such policies may contain reasonable deductible provisions as determined by the Board of Directors of the Association. Such coverage shall afford protection against loss or damage by fire and other hazards covered by a standard "all-risks" form, and such other risks as from time to time are customarily covered with respect to buildings and improvements similar to the Insured Property in construction, location and use.

(b) Liability. Comprehensive general public liability and automobile liability insurance covering loss or damage resulting from accidents or occurrences on or about or in connection with the Insured Property or adjoining driveways and walkways, or any work, matters or things related to the Insured Property, with such coverage as shall be required by the Board of Directors of the Association, but with combined single limit liability of not less than $1,000,000 for each accident or occurrence, $100,000 per person and $50,000 property damage, and with a cross liability endorsement to cover liabilities of the Unit Owners as a group to any Unit Owner, and vice versa. The Association may also obtain and maintain liability insurance for its directors and officers and for the benefit of the Association's employees.

(c) Worker's Compensation and other mandatory insurance, when applicable.

(d) Flood Insurance covering the Common Elements, Association Property and Units if required by the Primary Institutional First Mortgagee or FNMA/FHLMC, or if the Association so elects.

(e) Errors and Omissions. The Association shall obtain and maintain adequate liability, errors and omission coverage on behalf of each of the officers and directors of the Association.

(f) Fidelity Insurance or Fidelity Bonds. The Association shall obtain and maintain adequate insurance or fidelity bonding of all persons who control or disburse Association funds, which shall include, without limitation, those individuals authorized to sign Association checks and the president, secretary and treasurer of the Association. The insurance policy or fidelity bond shall be in such amount as shall be determined by a majority of the Board, but must be sufficient to cover the maximum funds that will be in the custody of the Association or its management agent at any one time. The premiums on such bonds and/or insurance shall be paid by the Association as a Common Expense.

(g) Association Property. Appropriate additional policy provisions, policies or endorsements extending the applicable portions of the coverage described above to all Association Property, where such coverage is available.

(h) Such Other Insurance as the Board of Directors of the Association shall determine from time to time to be desirable.

When appropriate and obtainable, each of the foregoing policies shall waive the insurer's right to: (i) as to property insurance policies, subrogation against the Association and against the Unit Owners individually and as a group, (ii) to pay only a fraction of any loss in the event of coinsurance or if other insurance carriers have issued coverage upon the same risk, and (iii) avoid liability for a loss that is caused by an act of the Board of Directors of the Association (or any of its employees, contractors and/or agents), a member of the Board of Directors of the Association, one or more Unit Owners or as a result of contractual undertakings. Additionally, each policy shall provide that any insurance trust agreement will be recognized, that the insurance provided shall not be prejudiced by any act or omissions of individual Unit Owners that are not under the control of the Association, and that the policy shall be primary, even if a Unit Owner has other insurance that covers the same loss.

12.3 Additional Provisions. All policies of insurance shall provide that such policies may not be canceled or substantially modified, other than as a result of non-payment of premiums, without at least thirty (30) days' prior written notice to all of the named insureds, including all mortgagees of Units. Prior to obtaining any policy of casualty insurance or any renewal thereof, the Board of

Declaration
- 20 -

(Reserved for Clerk of Court)

Directors may obtain an appraisal from a fire insurance company, or other competent appraiser, of the full insurable replacement value of the Insured Property (exclusive of foundations), without deduction for depreciation, for the purpose of determining the amount of insurance to be effected pursuant to this Section.

12.4 Premiums. Premiums upon insurance policies purchased by the Association shall be paid by the Association as a Common Expense, except that the costs of fidelity bonding for any management company employee may be paid by such company pursuant to its contract with the Association. Premiums may be financed in such manner as the Board of Directors deems appropriate.

12.5 Insurance Trustee; Share of Proceeds. Subject to the terms of the Master Declaration, all insurance policies obtained by or on behalf of the Association shall be for the benefit of the Association, the Unit Owners and their mortgagees, as their respective interests may appear, and shall provide that all proceeds covering property losses shall be paid to the Insurance Trustee which may be designated by the Board of Directors as provided in Section 12.9 below, and which, if so appointed, shall be a bank or trust company in Florida with trust powers, with its principal place of business in the State of Florida. The Insurance Trustee shall not be liable for payment of premiums, nor for the renewal or the sufficiency of policies, nor for the failure to collect any insurance proceeds. The duty of the Insurance Trustee shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein, and for the benefit of the Unit Owners and their respective mortgagees in accordance with the Allocated Interest attributable thereto.

12.6 Distribution of Proceeds. Proceeds of insurance policies received by the Insurance Trustee shall be distributed to or for the benefit of the beneficial owners thereof in the following manner:

(a) Expenses of the Trust. All expenses of the Insurance Trustee shall be first paid or provision shall be made therefor.

(b) Reconstruction or Repair. If the damaged property for which the proceeds are paid is to be repaired or reconstructed, the remaining proceeds shall be paid to defray the cost thereof as elsewhere provided herein. Any proceeds remaining after defraying such costs shall be distributed to the beneficial owners thereof, remittances to Unit Owners and their mortgagees being payable jointly to them.

(c) Failure to Reconstruct or Repair. If it is determined in the manner elsewhere provided that the damaged property for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be allocated among the beneficial owners as provided in Section 12.5 above, and distributed first to all Institutional First Mortgagees in an amount sufficient to pay off their mortgages, and the balance, if any, to the beneficial owners.

(d) Certificate. In making distributions to Unit Owners and their mortgagees, the Insurance Trustee (if appointed) may rely upon a certificate of the Association made by its President and Secretary as to the names of the Unit Owners and their mortgagees and their respective shares of the distribution.

12.7 Association as Agent. The Association is hereby irrevocably appointed as agent and attorney-in-fact for each Unit Owner and for each owner of a mortgage or other lien upon a Unit and for each owner of any other interest in the Condominium Property to adjust all claims arising under insurance policies purchased by the Association and to execute and deliver releases upon the payment of claims.

12.8 Unit Owners' Personal Coverage. Unless the Association elects otherwise, the insurance purchased by the Association shall not cover claims against an Owner due to accidents occurring within his Unit, nor casualty or theft loss to the contents of an Owner's Unit. It shall be the obligation of the individual Unit Owner, if such Owner so desires, to purchase and pay for insurance as to all such and other risks not covered by insurance carried by the Association.

(Reserved for Clerk of Court)

12.9    Appointment of Insurance Trustee. The Board of Directors of the Association shall have the option in its discretion of appointing an Insurance Trustee hereunder. If the Association fails or elects not to appoint such Trustee, the Association will perform directly all obligations imposed upon such Trustee by this Declaration. Fees and expenses of any Insurance Trustee are Common Expenses. To the extent that Administrative Agent holds a mortgage on any Unit owned by Developer, Administrative Agent shall be deemed to be the appointed Insurance Trustee of the Association, unless it declines to act as such.

12.10   Presumption as to Damaged Property. In the event of a dispute or lack of certainty as to whether damaged property constitutes a Unit(s) or Common Elements, such property shall be presumed to be Common Elements.

12.11   "Blanket" Insurance. The requirements of this Article may be met by way of the Association being an insured party under any coverage carried by the Declarant, any Owner, the owner of any Lot, or the Master Association as long as such coverage is in accordance with the amounts and other standards stated in this Article.

12.12   Benefit of Mortgagees. Certain provisions in this Section 12 entitled "Insurance" are for the benefit of mortgagees of Units and may be enforced by such mortgagees.

13.    Reconstruction or Repair After Fire or Other Casualty.

13.1    Determination to Reconstruct or Repair. Subject to the terms of the Master Declaration, subject to the immediately following paragraph, in the event of damage to or destruction of the Insured Property (and the Optional Property, if insurance has been obtained by the Association with respect thereto) as a result of fire or other casualty, the Board of Directors shall arrange for the prompt repair and restoration of the Insured Property (and the Optional Property, if insurance has been obtained by the Association with respect thereto) and the Insurance Trustee (if appointed) shall disburse the proceeds of all insurance policies to the contractors engaged in such repair and restoration in appropriate progress payments.

If 75% or more of the Insured Property (and the Optional Property, if insurance has been obtained by the Association with respect thereto) is substantially damaged or destroyed and if Unit Owners owning 80% of the applicable interests in the Common Elements duly and promptly resolve not to proceed with the repair or restoration thereof and a Majority of Institutional First Mortgagees approve such resolution, the Condominium Property will not be repaired and shall be subject to an action for partition instituted by the Association, any Unit Owner, mortgagee or lienor, as if the Condominium Property were owned in common, in which event the net proceeds of insurance resulting from such damage or destruction shall be divided among all the Unit Owners in proportion to their respective interests in the Common Elements (with respect to proceeds held for damage to the Insured Property other than that portion of the Insured Property lying within the boundaries of the Unit), and among affected Unit Owners in proportion to the damage suffered by each such affected Unit Owner, as determined in the sole discretion of the Association (with respect to proceeds held for damage to the Optional Property, if any, and/or that portion of the Insured Property lying within the boundaries of the Unit); provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such fund all mortgages and liens on his Unit in the order of priority of such mortgages and liens.

Whenever in this Section the words "promptly repair" are used, it shall mean that repairs are to begin not more than sixty (60) days from the date the Insurance Trustee (if appointed) notifies the Board of Directors and Unit Owners that it holds proceeds of insurance on account of such damage or destruction sufficient to pay the estimated cost of such work, or not more than ninety (90) days after the Insurance Trustee (if appointed) notifies the Board of Directors and the Unit Owners that such proceeds of insurance are insufficient to pay the estimated costs of such work. The Insurance Trustee (if appointed) may rely upon a certificate of the Association made by its President and Secretary to determine whether or not the damaged property is to be reconstructed or repaired.

13.2    Plans and Specifications. Any reconstruction or repair must be made substantially in accordance with the plans and specifications for the original Improvements and then applicable building and

(Reserved for Clerk of Court)

other codes; or if not, then in accordance with the plans and specifications approved by the Board of Directors of the Association and then applicable building and other codes, and, if the damaged property which is to be altered is the Building or the Optional Property, by the Owners of not less than 80% of the applicable interests in the Common Elements, as well as the Owners of all Units and other portions of the Optional Property (and their respective mortgagees) the plans for which are to be altered.

13.3    Special Responsibility. If the damage is only to those parts of the Optional Property for which the responsibility of maintenance and repair is that of the respective Unit Owners, then the Unit Owners shall be responsible for all necessary reconstruction and repair, which shall be effected promptly and in accordance with guidelines established by the Board of Directors (unless insurance proceeds are held by the Association with respect thereto by reason of the purchase of optional insurance thereon, in which case the Association shall have the responsibility to reconstruct and repair the damaged Optional Property, provided the respective Unit Owners shall be individually responsible for any amount by which the cost of such repair or reconstruction exceeds the insurance proceeds held for such repair or reconstruction on a Unit by Unit basis, as determined in the sole discretion of the Association). In all other instances, the responsibility for all necessary reconstruction and repair shall be that of the Association.

(a)    Disbursement. The proceeds of insurance collected on account of a casualty, and the sums collected from Unit Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

(i)    Association - Lesser Damage. If the amount of the estimated costs of reconstruction and repair which are the responsibility of the Association is less than $100,000, then the construction fund shall be disbursed in payment of such costs upon the order of the Board of Directors of the Association; provided, however, that upon request to the Insurance Trustee (if appointed) by an institutional First Mortgagee which is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund, such fund shall be disbursed in the manner provided below for the reconstruction and repair of major damage.

(ii)    Association - Major Damage. If the amount of the estimated costs of reconstruction and repair which are the responsibility of the Association is more than $100,000, then the construction fund shall be disbursed in payment of such costs in the manner contemplated by subparagraph (i) above, but then only upon the further approval of a construction consultant, architect, contractor or engineer qualified to practice in Florida and employed by the Association to supervise the work. Disbursement of proceeds or other funds for the repair or restoration shall only be made in accordance with safeguards normally associated with construction loan disbursements, which shall include, without limitation, that the construction consultant, architect, contractor or engineer certify prior to any disbursement substantially the following:

(a)    that all of the work completed as of the date of such request for disbursement has been done substantially in accordance with the approved plans and specifications;

(b)    that such disbursement request represents monies which either have been paid by or on behalf of the construction consultant, architect, contractor or engineer and/or are justly due to contractors, subcontractors, materialmen, engineers or other persons who have rendered or furnished certain services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the respective amounts paid or due to each of said persons in respect thereof and stating the progress of the work up to the date of said certificate;

Declaration
-23-

(Reserved for Clerk of Court)

(c)    that the sum then requested to be disbursed plus all sums previously disbursed does not exceed the cost of the work in relation to what has actually been completed through the date of the certificate;

(d)    that no sums being requested to be disbursed have been the subject of any previous disbursement or any pending application for disbursement;

(e)    confirming receipt of all applicable lien waivers; and

(f)    that the amount remaining for disbursement after the pending disbursement will be sufficient to complete the necessary repair or restoration.

(iii)    <u>Unit Owners</u>. If there is a balance of insurance proceeds after payment of all costs of reconstruction and repair that are the responsibility of the Association, this balance may be used by the Association to effect repairs to the Optional Property (if not insured or if under-insured), or may be distributed to Owners of the Optional Property who have the responsibility for reconstruction and repair thereof. The distribution shall be in the proportion that the estimated cost of reconstruction and repair of such damage to each affected Unit Owner bears to the total of such estimated costs to all affected Unit Owners, as determined by the Board; provided, however, that no Unit Owner shall be paid an amount in excess of the estimated costs of repair for his portion of the Optional Property. All proceeds must be used to effect repairs to the Optional Property, and if insufficient to complete such repairs, the Owners shall pay the deficit with respect to their portion of the Optional Property and promptly effect the repairs. Any balance remaining after such repairs have been effected shall be distributed to the affected Unit Owners and their mortgagees jointly as elsewhere herein contemplated.

(iv)    <u>Surplus</u>. It shall be presumed that the first monies disbursed in payment of costs of reconstruction and repair shall be from insurance proceeds. If there is a balance in a construction fund after payment of all costs relating to the reconstruction and repair for which the fund is established, such balance shall be distributed to the beneficial owners of the fund in the manner elsewhere stated; except, however, that part of a distribution to an Owner which is not in excess of Assessments paid by such Owner into the construction fund shall not be made payable jointly to any mortgagee.

(v)    <u>Certificate</u>. Subject to the provisions of Section 13.3(a)(ii) above, notwithstanding the provisions herein, the Insurance Trustee shall not be required to determine whether or not sums paid by Unit Owners upon Assessments shall be deposited by the Association with the Insurance Trustee, nor to determine whether the disbursements from the construction fund are to be made upon the order of the Association alone or upon the additional approval of an architect, engineer or otherwise, nor whether a disbursement is to be made from the construction fund, nor to determine whether surplus funds to be distributed are less than the Assessments paid by Owners, nor to determine the payees nor the amounts to be paid. The Insurance Trustee may rely upon a certificate of the Association, made by its President and Secretary, as to any or all of such matters and stating that the sums to be paid are due and properly payable, and stating the names of the payees and the amounts to be paid.

13.4    <u>Assessments</u>. If the proceeds of the insurance are not sufficient to defray the estimated costs of reconstruction and repair to be effected by the Association, or if at any time during reconstruction and repair, or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, Assessments shall be made against the Unit Owners in sufficient amounts to provide funds for the payment of such costs. Such Assessments on account of damage to the Insured Property shall be in proportion to all of the Owners' respective

(Reserved for Clerk of Court)

shares in the Common Elements, and on account of damage to the Optional Property, the Association shall charge the Owner (but shall not levy an Assessment) in proportion to the cost of repairing the damage suffered by each Owner thereof, as determined by the Association.

13.5    Benefit of Mortgagees. Certain provisions in this Section 13 are for the benefit of mortgagees of Units and may be enforced by any of them.

14.    Condemnation.

14.1    Deposit of Awards with Insurance Trustee. The taking of portions of the Condominium Property or Association Property by the exercise of the power of eminent domain shall be deemed to be a casualty, and, subject to the terms of the Master Declaration, the awards for that taking shall be deemed to be proceeds from insurance on account of the casualty and shall be deposited with the Insurance Trustee. Even though the awards may be payable to Unit Owners, the Unit Owners shall deposit the awards with the Insurance Trustee; and in the event of failure to do so, in the discretion of the Board of Directors of the Association, a charge shall be made against a defaulting Unit Owner in the amount of his award, or the amount of that award shall be set off against the sums hereafter made payable to that Owner.

14.2    Determination Whether to Continue Condominium. Whether the Condominium will be continued after condemnation will be determined in the manner provided for determining whether damaged property will be reconstructed and repaired after casualty. For this purpose, the taking by eminent domain also shall be deemed to be a casualty.

14.3    Disbursement of Funds. If the Condominium is terminated after condemnation, the proceeds of the awards and special Assessments will be deemed to be insurance proceeds and shall be owned and distributed in the manner provided with respect to the ownership and distribution of insurance proceeds if the Condominium is terminated after a casualty. If the Condominium is not terminated after condemnation, the size of the Condominium will be reduced and the property damaged by the taking will be made usable in the manner provided below. The proceeds of the awards and special Assessments shall be used for these purposes and shall be disbursed in the manner provided for disbursement of funds by the Insurance Trustee (if appointed) after a casualty, or as elsewhere in this Section 14 specifically provided.

14.4    Unit Reduced but Habitable. If the taking reduces the size of a Unit and the remaining portion of the Unit can be made habitable (in the sole opinion of the Association), the award for the taking of a portion of the Unit shall be used for the following purposes in the order stated and the following changes shall be made to the Condominium:

(a)    Restoration of Unit. The Unit shall be made habitable. If the cost of the restoration exceeds the amount of the award, the additional funds required shall be charged to and paid by the Owner of the Unit.

(b)    Distribution of Surplus. The balance of the award in respect of the Unit, if any, shall be distributed to the Owner of the Unit and to each mortgagee of the Unit, the remittance being made payable jointly to the Owner and such mortgagees.

(c)    Adjustment of Shares in Common Elements. If the floor area of the Unit is reduced by the taking, the percentage representing the share in the Common Elements and of the Common Expenses and Common Surplus appurtenant to the Unit shall be reduced by multiplying the percentage of the applicable Unit prior to reduction by a fraction, the numerator of which shall be the area in square feet of the Unit after the taking and the denominator of which shall be the area in square feet of the Unit before the taking. The shares of all Unit Owners in the Common Elements, Common Expenses and Common Surplus shall then be restated as follows:

(i)    add the total of all percentages of all Units after reduction as aforesaid (the "Remaining Percentage Balance"); and

Declaration
- 25 -

(Reserved for Clerk of Court)

    (ii)    divide each percentage for each Unit after reduction as aforesaid by the Remaining Percentage Balance.

The result of such division for each Unit shall be the adjusted percentage for such Unit.

14.5    <u>Unit Made Uninhabitable.</u> If the taking is of the entire Unit or so reduces the size of a Unit that it cannot be made habitable (in the sole opinion of the Association), the award for the taking of the Unit shall be used for the following purposes in the order stated and the following changes shall be made to the Condominium:

(a)    <u>Payment of Award.</u> The awards shall be paid first to the applicable Institutional First Mortgagees in amounts sufficient to pay off their mortgages in connection with each Unit which is not so habitable; second, to the Association for any due and unpaid Assessments; third, jointly to the affected Unit Owners and other mortgagees of their Units. In no event shall the total of such distributions in respect of a specific Unit exceed the market value of such Unit immediately prior to the taking. The balance, if any, shall be applied to repairing and replacing the Common Elements.

(b)    <u>Addition to Common Elements.</u> The remaining portion of the Unit, if any, shall become part of the Common Elements and shall be placed in a condition allowing, to the extent possible, for use by all of the Unit Owners in the manner approved by the Board of Directors of the Association; provided that if the cost of the work therefor shall exceed the balance of the fund from the award for the taking, such work shall be approved in the manner elsewhere required for capital improvements to the Common Elements.

(c)    <u>Adjustment of Shares.</u> The shares in the Common Elements, Common Expenses and Common Surplus appurtenant to the Units that continue as part of the Condominium shall be adjusted to distribute the shares in the Common Elements, Common Expenses and Common Surplus among the reduced number of Unit Owners (and among reduced Units). This shall be effected by restating the shares of continuing Unit Owners as follows:

    (i)    add the total of all percentages of all Units of continuing Owners prior to this adjustment, but after any adjustments made necessary by subsection (c) hereof (the "Percentage Balance"); and

    (ii)    divide the percentage of each Unit of a continuing Owner prior to this adjustment, but after any adjustments made necessary by subsection (c) hereof, by the Percentage Balance.

The result of such division for each Unit shall be the adjusted percentage for such Unit.

(d)    <u>Assessments.</u> If the balance of the award (after payments to the Unit Owner and such Owner's mortgagees as above provided) for the taking is not sufficient to alter the remaining portion of the Unit for use as a part of the Common Elements, the additional funds required for such purposes shall be raised by Assessments against all of the Unit Owners who will continue as Owners of Units after the changes in the Condominium effected by the taking. The Assessments shall be made in proportion to the applicable percentage shares of those Owners after all adjustments to such shares effected pursuant hereto by reason of the taking.

(e)    <u>Arbitration.</u> If the market value of a Unit prior to the taking cannot be determined by agreement between the Unit Owner and mortgagees of the Unit and the Association within 30 days after notice of a dispute by any affected party, such value shall be determined by arbitration in accordance with the then existing rules of the American Arbitration Association, except that the arbitrators shall be two appraisers appointed by the American Arbitration Association who shall base their determination upon an average of their appraisals of the Unit. A judgment upon the decision rendered by the arbitrators may be entered in any court of competent jurisdiction in accordance with the Florida Arbitration Code. The cost of arbitration proceedings shall be assessed against all Units Owners, including Owners who will not continue after the taking, in proportion to the

applicable percentage shares of such Owners as they exist prior to the adjustments to such shares effected pursuant hereto by reason of the taking. Notwithstanding the foregoing, nothing contained herein shall limit or abridge the remedies of Unit Owners provided in Sections 718.303, F.S. and 718.506, F.S.

14.6    Taking of Common Elements. Awards for the taking of Common Elements shall be used to render the remaining portion of the Common Elements usable in the manner approved by the Board of Directors of the Association; provided, that if the cost of such work shall exceed the balance of the funds from the awards for the taking, the work shall be approved in the manner elsewhere required for capital improvements to the Common Elements. The balance of the awards for the taking of Common Elements, if any, shall be distributed to the Unit Owners in the shares in which they own the Common Elements after adjustments to these shares effected pursuant hereto by reason of the taking. If there is a mortgage on a Unit, the distribution shall be paid jointly to the Owner and the mortgagees of the Unit.

14.7    Amendment of Declaration. The changes in Units, in the Common Elements and in the ownership of the Common Elements and share in the Common Expenses and Common Surplus that are effected by the taking shall be evidenced by an amendment to this Declaration of Condominium that is only required to be approved by, and executed upon the direction of, a majority of all Directors of the Association.

15.    Occupancy and Use Restrictions. In order to provide for congenial occupancy of the Condominium and Association Property and for the protection of the values of the Units, the use of the Condominium Property shall be restricted to and shall be in accordance with the following provisions:

15.1    Occupancy. Each Unit shall be used as a residence only, whether for permanent, temporary or transient use, except as otherwise herein expressly provided, all in accordance with all applicable county and state codes, ordinances and regulations. Except as otherwise expressly provided herein, in no event shall occupancy (except for temporary occupancy by visiting guests) exceed more than one (1) person per bedroom or den (as defined by the Association for the purpose of excluding from such definition living rooms, dining rooms, family rooms, country kitchens and the like), plus one (1) additional person (the "Occupancy Limits"). Notwithstanding anything contained herein to the contrary, for purposes hereof, the Occupancy Limits stated above may be exceeded by the number of children under the age of 18 who are residing in the Unit with their parents, provided however, in no event shall the total number of occupants exceed the maximum number permitted by applicable law. By way of example only, occupancy of a two (2) bedroom Unit shall be limited to a total of three (3) persons (plus those children, if any, under 18 residing in the Unit with their parents) - one (1) per each bedroom, plus one (1) additional person (and any children as described above). Notwithstanding that the Unit may be owned by any number of individuals or by an entity, whether a corporation, partnership, limited liability company, trust or otherwise, the number of occupants shall in no event exceed the limits described in this subsection 15.1. The Hotel Lot Owner shall have the power to authorize occupancy of a Unit by persons in addition to those set forth above. The provisions of this subsection 15.1 shall not be applicable to Units used by the Developer for model apartments, sales or resales offices or management or administrative services.

The rights of Unit Owners to use the Shared Facilities shall be limited to the extent granted in, and subject to the restrictions of, Section 3.4(d). It is contemplated (but without creating an obligation whatsoever) that portions of the Hotel Lot may be utilized in such a manner as to provide, or cause to be provided, certain hotel-related services to Unit Owners, all of which shall be subject to rules, regulations and/or conditions as may be established by the Hotel Lot Owner from time to time in its sole and absolute discretion, including, without limitation, the right to require any person requesting such services to sign such agreements and pay such fees as may be required from time to time by the Hotel Lot Owner. Each Unit Owner, by acceptance of a deed or other conveyance of a Unit, recognizes and agrees that the Hotel Lot Owner is not required to provide any hotel related services, but if it determines to do so, in its sole discretion, it may condition the provisions of such services in any manner it so desires.

Declaration
- 27 -

(Reserved for Clerk of Court)

The provisions of this subsection 15.1 shall not be amended without the affirmative vote of not less than four-fifths (4/5ths) of the total voting interests of all Unit Owners.

15.2    <u>Children</u>. Children shall be permitted to be occupants of Units.

15.3    <u>Access Fees</u>. In furtherance of the rights of the Hotel Lot Owner to establish and implement rules, regulations and procedures for the orderly use of the Spa (as defined in the Master Covenants), each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to agree to pay a daily "Access Fee", which shall be imposed, and paid to the Hotel Lot Owner, any time a Unit is occupied by persons desiring use of the Spa who are not "Permitted Occupants" (as hereinafter defined). The payment of the Access Fee shall be a precondition to permitted use of the Spa by persons who are not Permitted Occupants. The initial Access Fee for each occupant of a Unit who is not otherwise deemed to be a Permitted Occupant shall be Sixty-Five and/No 100 Dollars ($65.00) per day. The Access Fee amounts shall remain fixed through the last day of the calendar year following the year in which this Declaration is recorded. Effective on January 1 of the following year and on every 2nd anniversary thereafter (i.e., January 1, 2009, January 1, 2011 etc.) the applicable Access Fee shall be increased by an amount to be determined by the Hotel Lot Owner in its sole discretion, provided, however, that no single increase shall be more than ten percent (10%) greater than the immediately previous applicable Access Fee charged.

For purposes of this Section 15.3, each Unit Owner shall submit in writing to the Hotel Lot Owner a list of not more than eight (8) individuals, who shall be deemed the Permitted Occupants of the Unit. If the Unit Owner intends to utilize the Unit and have access to the Spa without being required to pay an Access Fee, the Owner must include itself on the list. The list of Permitted Occupants may not be changed more frequently than once in any twelve (12) month period, absent a change in ownership of the Unit. Each Owner understands and agrees that while the number of Permitted Occupants may exceed the Occupancy Limits, nothing herein shall permit occupancy of a Unit at a singe time by a number of persons in excess of the Occupancy Limits.

The Hotel Lot Owner shall be permitted to exercise any and all rights available at law and/or in equity to enforce payment of, and to collect, the Access Fees and, to the extent that any such Access Fees are outstanding, shall be permitted to deny access to the Spa by any one who is not a Permitted Occupant.

15.4    <u>Pet Restrictions</u>. Subject to the other provisions of this Declaration, each Unit Owner may maintain within his or her Unit not more than two (2) domesticated pets, provided that any and all pets permitted shall only be allowed to remain in the Unit and on the Condominium Property if such pet is (i) permitted to be so kept by applicable laws and regulations, (ii) not left unattended on balconies or in lanai areas, (iii) not kept or maintained for commercial purposes or breeding, (iii) generally, not a nuisance or disturbance (whether by barking, scratching, lunging etc.) to residents of other Units or of other portions of The Properties and (iv) such pet is not a pit bull, rotweiller, chow, Doberman or other breed considered to be dangerous by the Board of Directors. The following provisions shall also govern any pets on the Condominium Property or The Properties:

(a)    All pets must be on a leash not more than six (6) feet long or carried when outside of the Unit.

(b)    Pets shall only be walked or taken upon those portions of The Properties designated by the applicable association or entity governing same from time to time for such purposes, if any.

(c)    Unit Owners shall pick up all solid wastes from their pets and dispose of same appropriately.

(d)    Each Owner shall be responsible for all damage caused by his/her pet.

(e)    The maintenance, keeping, boarding and/or raising of pot belly pigs, reptiles, rodents (i.e., mice, gerbils, hamsters) and any other animals, livestock, or poultry of any kind, regardless of number, is expressly prohibited.

(f)     Upon request of any resident, each Owner shall be deemed to agree to leave any elevator with its pet or wait for another elevator.

(g)     Pets may not play or exercise in the corridors, stairwells, roof, laundry rooms or other portions of the Condominium Property or The Properties, other than the Owner's Unit.

(h)     Each Owner agrees to underwrite the cost of necessary exterminator measures in the Owner's apartment or others if Owner's pet is responsible for the infestation of the building or portions thereof.

(i)     Each Owner agrees to restrain its pet in an appropriate manner should it be requested either for cause or the result of a justifiable request from the applicable association or governing entity (i.e., muzzled when going through public areas).

(j)     All cats must be spayed and declawed.

Any Owner who keeps or maintains a pet within The Properties shall indemnify and hold harmless all other Unit Owners, the Developer, the Declarant, the Master Association and all Lot Owners together with their respective directors, officers, agents, employees, managers, contractors or attorneys, from and against any loss, claim or liability of any kind or character whatsoever, whether to property or person, arising by reason of keeping or maintaining such pet within The Properties. The Association and/or any applicable governing entity may require registration of all pets and may establish reasonable fees in connection with same and/or may require pet owners to place with the Association a reasonable security deposit. Without limiting the generality of the other provisions hereof, a violation of the provisions of this paragraph shall entitle the Association to all of its rights and remedies, including, but not limited to, the right to fine Unit Owners (as provided in the By-Laws and any applicable rules and regulations) and/or to require any pet to be permanently removed from the Condominium Property.

15.5     Third Party Service Providers.  The Hotel Lot shall have the right, in its sole and absolute discretion, to establish reasonable regulations from time to time with respect to the provision of hotel and/or transient rental services by third party providers, including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, to the Condominium, the Unit Owners and their guests, tenants and invitees. No amendment to this Declaration or rule of the Association shall be adopted to impair or abridge the rights herein granted without an affirmative vote of not less than 80% of the voting interests of the Unit Owners.

15.6     Alterations.  Without limiting the generality of Section 8.1 hereof, but subject to Section 8.2 hereof, no Unit Owner shall cause or allow improvements or changes to any Unit which (i) are visible from any other Lot, or the exterior of the Building, or (ii) affect the structural integrity of the Building, or (iii) affect any electrical wiring, or mechanical, HVAC, plumbing systems, life safety, monitoring, information and/or other systems of the Building), or to the Common Elements or Association Property, without obtaining the prior written consent of the Association (in the manner specified in section 8.1 hereof) and the Hotel Lot Owner. Notwithstanding the foregoing, in no event shall any changes and/or tampering be permitted to any of the following, without the prior written consent of the Hotel Lot Owner: (i) any windows, operable or otherwise, accessible from any Unit or the Common Elements, and/or (ii) any bathroom or kitchen exhaust vents. Curtains or drapes (or linings thereof) which face the exterior windows or glass doors of Units shall be white or off-white in color and shall be subject to disapproval by the Hotel Lot Owner, in which case they shall be removed and replaced with acceptable items.

Notwithstanding the provisions of Section 8.1 above, any Unit Owner may display one portable, removable United States flag in a respectful way, and, on Armed Forces Day, Memorial Day, Flag Day, Independence Day and Veterans day, may display in a respectful way portable, removable official flags, not larger than 4½ feet by 6 feet, that represent the United States Army, Navy, Air Force, Marine Corps or Coast Guard.

In addition to any requirements which may established under the Master Covenants, the Hotel Lot Owner shall have the right to establish non-discriminatory restrictions on any and all persons

performing work within the Condominium Property, including, without limitation, by (a) restricting the hours during which work may be performed and restricting access of contractors to certain areas, (b) requiring that all persons performing any work have all necessary licenses and permits to perform the work, (c) requiring that all persons performing any work have adequate insurance coverage and that the Association be a named additional insured on such policy(ies), and (d) requiring a security deposit or other collateral to protect against damage that may be caused during such work.

15.7    Use of Common Elements and Association Property.    The Common Elements and Association Property shall be used only for furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of Units. In that regard, each Unit Owner, by acceptance of a deed for a Unit, thereby covenants and agrees that it is the intention of the Developer that the stairwells of the Building are intended for ingress and egress in the event of emergency only, and as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. The foregoing is not intended to prohibit the use of the stairwells for any other proper purpose.

15.8    Nuisances.    No nuisances (as defined by the Association) shall be allowed on the Condominium or Association Property, nor shall any use or practice be allowed which is a source of annoyance to occupants of Units or which interferes with the peaceful possession or proper use of the Condominium and/or Association Property by its residents, occupants or members. No activity specifically permitted by this Declaration, nor any actions, activities or businesses conducted from the Hotel Lot shall be deemed a nuisance regardless of any noises and/or odors emanating therefrom (except, however, to the extent that such odors and/or noises exceed limits permitted by applicable law). Each Unit Owner, by acceptance of a deed or other conveyance of a Unit shall be deemed to understand and agree that in close proximity to the Condominium Property is the Hotel Lot, from which noise, odors and/or other disruptions may occur. By acquiring a Unit, each Unit Owner, for such Unit Owner and its guests, tenants and invitees, and its and their successors and/or assigns, agrees not to object to the operations from the Hotel Lot which may include, noise, disruption and the playing of music outdoors, and hereby agrees to release Developer and the Hotel Lot Owner from any and all claims for damages, liabilities and/or losses suffered as a result of the existence of the Hotel Lot and the operations from same, and the noises and disruption resulting therefrom.

15.9    No Improper Uses.    No improper, offensive, hazardous or unlawful use shall be made of the Condominium or Association Property or any part thereof, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereover shall be observed. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereover, relating to any portion of the Condominium and/or Association Property, shall be corrected by, and at the sole expense of, the party obligated to maintain or repair such portion of the Condominium Property, as elsewhere herein set forth. Notwithstanding the foregoing and any provisions of this Declaration, the Articles of Incorporation or By-Laws, the Association shall not be liable to any person(s) for its failure to enforce the provisions of this Section 15.9. No activity specifically permitted by this Declaration or from the Hotel Lot shall be deemed to be a violation of this Section.

15.10    Leases.    No portion of a Unit, other than an entire Unit, may be leased or rented. Leasing or renting of Units shall be permitted, subject, however, to the prior written approval of the Association, and each lease shall be in writing and shall specifically provide (or, if it does not, shall be automatically deemed to provide) that a material condition of the lease shall be the tenant's full compliance with the covenants, terms, conditions and restrictions of this Declaration (and all Exhibits hereto), the Master Covenants and with any and all rules and regulations adopted by the Master Association and/or the Hotel Lot Owner from time to time. No lease of a Unit shall be for a term of less than six (6) months nor shall any Unit be leased in excess of two (2) times per year. The Unit Owner will be jointly and severally liable with the tenant to the Association for any amount which is required by the Association, to repair any damage to the Common Elements and/or the Shared Facilities resulting from acts or omissions of tenants (as determined in the sole discretion of the Association) and to pay any claim for injury or damage to property caused by the negligence of the tenant and special charges may be levied against the Unit therefor. All tenancies are hereby

made subordinate to any lien filed by the Condominium Association, whether prior or subsequent to such lease. There shall be no amendment to this Section 15.10, or to any other provision of this Declaration which shall impair the rights established in this Section 15.10, without the prior approval of eighty percent (80%) of the entire voting interests of the Unit Owners. The Association may charge a fee in connection with the approval of any lease, sublease, or other transfer of a Unit requiring approval, provided, however that such fee may not exceed $100 per applicant other than husband/wife or parent/dependent child, which are considered one applicant, and provided further, that if the lease or sublease is a renewal of a lease or sublease with the same lessee or sublessee, no charge shall be made. If so required by the Association, a tenant wishing to lease a Unit shall be required to place in escrow with the Association, a reasonable sum, not to exceed the equivalent of one month's rental, which may be used by the Association to repair any damage to the any portion of the Condominium Property and/or the Hotel Lot resulting from acts or omissions of tenants (as determined in the sole discretion of the Association). Nothing herein shall interfere with the access rights of the Unit Owner as a landlord pursuant to Chapter 83, Florida Statutes.

The lease of a Unit for a term of six (6) months or less is subject to a tourist development tax assessed pursuant to Section 125.0104, Florida Statutes. A Unit Owner leasing his or her Unit for a term of six (6) months or less agrees, and shall be deemed to have agreed, for such Owner, and his or her heirs, personal representatives, successors and assigns, as appropriate, to hold the Association, the Developer and all other Unit Owners harmless from and to indemnify them for any and all costs, claims, damages, expenses or liabilities whatsoever, arising out of the failure of such Unit Owner to pay the tourist development tax and/or any other tax or surcharge imposed by the State of Florida with respect to rental payments or other charges under the lease, and such Unit Owner shall be solely responsible for and shall pay to the applicable taxing authority, prior to delinquency, the tourist development tax and/or any other tax or surcharge due with respect to rental payments or other charges under the lease.

15.11  Weight and Sound Restriction. No hard and/or heavy surface floor coverings, such as tile, marble, wood, terrazzo and the like shall be permitted unless: (i) installed by, or at the direction of, the Developer, or (ii) first approved in writing by the Association. The Association shall not approve the installation of any hard and/or heavy surface floor coverings (for which approval is required) unless the flooring, or combination of flooring and underlayment product, as fastened, shall be sound rated for a minimum: (i) installed Impact Isolation Class (IIC) rating of fifty-two (52), (ii) Sound Impact Class (STC) rating of fifty (50) or (iii) Impact Noise Rating of zero (0). All persons seeking to install hard surface floor coverings must provide the Association with product data from flooring or floor underlayment manufacturers that demonstrates (i) laboratory tested sound ratings in accordance with testing standard ASTM C627, in similar cross-section floor/ceiling assemblies to that used in the Building, meeting or exceeding the standards set forth above, and (ii) that the fastener systems utilized does not impair the effectiveness of the sound absorption qualities of the flooring or underlayment. Each Unit Owner is solely responsible for floor leveling due to minor inconsistencies of the concrete slab construction and leveling, feathering and patching required to meet the requirements of the applicable South Florida Building Code. The maximum allowable thickness of any flooring (and any flooring underlayment or insulation product) installed in the Unit shall not exceed 2", however, it must be tapered to a maximum of 1" at the entrance threshold to the Unit. Undercutting of Unit entry doors is expressly prohibited, as is any alteration to the saddle at the entry doors to the Unit. Additionally, chipping, grinding and/or bushing of the concrete slab is expressly prohibited, due to the post-tension design of the Building. The installation of the foregoing insulation materials shall be performed in a manner that provides proper mechanical isolation of the flooring materials from any rigid part of the building structure, whether of the concrete subfloor (vertical transmission) or adjacent walls and fittings (horizontal transmission) and must be installed prior to the Unit being occupied. Owners will be held strictly liable for violations of these restrictions and for all damages resulting therefrom and the Association has the right to require immediate removal of violations. Applicable warranties of the Developer, if any, shall be voided by violations of these restrictions and requirements. Each Owner, by acceptance of a deed or other conveyance of their Unit, hereby acknowledges and agrees that sound transmission in a high-rise building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units and or mechanical equipment can often be heard in another Unit. The Developer does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and each Unit

(Reserved for Clerk of Court)

Owner hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound transmission.

15.12 Mitigation of Dampness and Humidity. No Unit Owner shall install, within his or her Unit, or upon the Common Elements or Association Property, non-breathable wall-coverings or low-permeance paints. Additionally, any and all built-in casework, furniture, and or shelving in a Unit must be installed over floor coverings to allow air space and air movement and shall not be installed with backboards flush against any gypsum board, masonry block or concrete wall. Additionally, all Unit Owners, whether or not occupying the Unit, shall periodically run the air conditioning system to maintain the Unit temperature, whether or not occupied, at 78°F or less, to minimize humidity in the Unit. Leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores. Each Unit Owner, by acceptance of a deed, or otherwise acquiring title to a Unit, shall be deemed to have agreed that neither the Declarant nor the Developer is responsible, and hereby disclaims any responsibility for any illness, personal injury, death or allergic reactions which may be experienced by the Unit Owner, its family members and/or its or their guests, tenants and invitees and/or the pets of all of the aforementioned persons, as a result of mold, mildew, fungus or spores. It is the Unit Owner's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination. While the foregoing are intended to minimize the potential development of molds, fungi, mildew and other mycotoxins, each Owner understands and agrees that there is no method for completely eliminating the development of molds or mycotoxins. The Developer does not make any representations or warranties regarding the existence or development of molds or mycotoxins and each Owner shall be deemed to waive and expressly release any such warranty and claim for loss or damages resulting from the existence and/or development of same. In furtherance of the rights of the Association as set forth in Section 9.1(a) above, in the event that the Association reasonably believes that the provisions of this Section 15.12 are not being complied with, then, the Association, or its designee, shall have the right (but not the obligation) to enter the Unit (without requiring the consent of the Owner or any other party) to turn on the air conditioning in an effort to cause the temperature of the Unit to be maintained as required hereby (with all utility consumption costs to be paid and assumed by the Unit Owner). To the extent that electric service is not then available to the Unit, the Association shall have the further right, but not the obligation (without requiring the consent of the Owner or any other party) to connect electric service to the Unit (with the costs thereof to be borne by the Unit Owner, or if advanced by the Association, to be promptly reimbursed by the Owner to the Association, with all such costs to be deemed Charges hereunder). Each Unit Owner, by acceptance of a deed or other conveyance of a Unit, holds the Declarant and the Developer harmless and agrees to indemnify the Declarant and the Developer from and against any and all claims made by the Unit Owner and the Unit Owner's guests, tenants and invitees on account of any illness, allergic reactions, personal injury and death to such persons and to any pets of such persons, including all expenses and costs associated with such claims including, without limitation, inconvenience, relocation and moving expenses, lost time, lost earning power, hotel and other accommodation expenses for room and board, all attorneys fees and other legal and associated expenses through and including all appellate proceedings with respect to all matters mentioned in this Subsection 15.12.

15.13 Exterior Improvements. Without limiting the generality of Sections 8.1 or 15.6 hereof, but subject to any provision of this Declaration specifically permitting same, no Unit Owner shall cause anything to be affixed or attached to, hung, displayed or placed on the exterior walls, doors, balconies or windows of the Building (including, but not limited to, awnings, signs, storm shutters, screens, window tinting, furniture, fixtures and equipment), without the prior written consent of the Hotel Lot Owner.

15.14 Association Access to Units. In order to facilitate access to Units by the Association for the purposes enumerated in Section 9.1 hereof, it shall be the responsibility of all Unit Owners to deliver a set of keys (or access card or code, as may be applicable) to their respective Units to the Association to use in the performance of its functions. No Owner shall change the locks to his Unit without so notifying the Association and delivering to the Association a new set of keys (or access card or code, as may be applicable) to such Unit.

(Reserved for Clerk of Court)

15.15 <u>Storage on Balconies/Terraces</u>. No equipment, materials or other items shall be kept or stored on any balcony or terrace area of the Condominium, including but not limited to towels, clothing, bicycles. The foregoing shall not prevent, however, placing and using patio-type furniture, planters and other items in such areas if same are normally and customarily used for a balcony or terrace area. In the event of any doubt or dispute as to whether a particular item is permitted hereunder, the decision of the Hotel Lot Owner shall be final and dispositive.

15.16 <u>Antennas, Satellite Dishes</u>. No Owner may install any antenna, satellite dish or other transmitting or receiving apparatus in or upon his or her Unit (and/or areas appurtenant thereto), without the prior written consent of the Hotel Lot Owner, and then only to the extent permitted by applicable law.

15.17 <u>Cumulative with Restrictions of Master Covenants</u>. The foregoing restrictions shall be in addition to, cumulative with, and not in derogation of those set forth in the Master Covenants.

15.18 <u>Relief by Association</u>. The Association shall have the power (but not the obligation) to grant relief in particular circumstances from the provisions of specific restrictions contained in this Section 15 for good cause shown to the extent that granting such relief does not in any manner effect the right, privileges or authority of the Hotel Lot Owner. To the extent that such relief would effect the Hotel Lot Owner, same shall not be valid without the written approval of the Hotel Lot Owner.

15.19 <u>Effect on Developer</u>. Subject to the following exceptions, the restrictions and limitations set forth in this Section 15 shall not apply to the Developer nor to Units owned by the Developer. The Developer shall not be exempt from the restrictions, if any, relating to requirements that leases or lessees be approved by the Association, pet restrictions, occupancy of Units based on age and vehicular restrictions, except as such vehicular restrictions relate to the Developer's construction, maintenance sales, re-sales, leasing and other marketing and financing activities, which activities the Developer can perform without the prior consent of the Unit Owners. Further, notwithstanding anything herein contained to the contrary, the provisions of this Section 15 shall not be amended, altered or modified in any manner affecting the Hotel Lot, without the consent of all of the Hotel Lot Owner from time to time.

15.20 <u>Cumulative with Restrictions of Master Covenants</u>. The foregoing restrictions shall be in addition to, cumulative with, and not in derogation of those set forth in the Master Covenants.

16. <u>Compliance and Default</u>. The Association, each Unit Owner, occupant of a Unit, tenant and other invitee of a Unit Owner shall be governed by and shall comply with the terms of this Declaration and all exhibits annexed hereto, the Master Covenants and the rules and regulations adopted pursuant thereto, as the same may be amended from time to time and the provisions of all of such documents shall be deemed incorporated into any lease of a Unit whether or not expressly stated in such lease. The Association (and Unit Owners, if appropriate) shall be entitled to the following relief in addition to the remedies provided by the Act:

16.1 <u>Mandatory Nonbinding Arbitration of Disputes</u>. Prior to the institution of court litigation, the parties to a Dispute shall petition the Division for nonbinding arbitration. The arbitration shall be conducted according to rules promulgated by the Division and before arbitrators employed by the Division. The filing of a petition for arbitration shall toll the applicable statute of limitation for the applicable Dispute, until the arbitration proceedings are completed. Any arbitration decision shall be presented to the parties in writing, and shall be deemed final if a complaint for trial <u>de novo</u> is not filed in a court of competent jurisdiction in which the Condominium is located within thirty (30) days following the issuance of the arbitration decision. The prevailing party in the arbitration proceeding shall be awarded the costs of the arbitration, and attorneys' fees and costs incurred in connection with the proceedings. The party who files a complaint for a trial <u>de novo</u> shall be assessed the other party's arbitration costs, courts costs and other reasonable costs, including, without limitation, attorneys' fees, investigation expenses and expenses for expert or other testimony or evidence incurred after the arbitration decision, if the judgment upon the trial <u>de novo</u> is not more favorable than the arbitration decision. If the judgment is more favorable, the party who filed a complaint for trial <u>de novo</u> shall be awarded reasonable court costs and attorneys' fees. Any party to an arbitration proceeding may enforce an arbitration award by filing a petition in a court of competent

jurisdiction in which the Condominium is located. A petition may not be granted unless the time for appeal by the filing of a complaint for a trial de novo has expired. If a complaint for a trial de novo has been filed, a petition may not be granted with respect to an arbitration award that has been stayed. If the petition is granted, the petitioner may recover reasonable attorneys' fees and costs incurred in enforcing the arbitration award.

16.2    Negligence and Compliance. A Unit Owner and/or tenant of a Unit shall be liable for the expense of any maintenance, repair or replacement made necessary by his negligence or by that of any member of his family or his or their guests, employees, agents or lessees, but only to the extent such expense is not met by the proceeds of insurance actually collected in respect of such negligence by the Association. In the event a Unit Owner, tenant or occupant fails to maintain a Unit or fails to cause such Unit to be maintained, or fails to observe and perform all of the provisions of the Declaration, the By-Laws, the Articles of Incorporation of the Association, applicable rules and regulations, or any other agreement, document or instrument affecting the Condominium Property or administered by the Association, in the manner required, the Association shall have the right to proceed in equity to require performance and/or compliance, to impose any applicable fines (in accordance with the provisions of Subsection 16.3 below), to sue at law for damages, and to charge the Unit Owner for the sums necessary to do whatever work is required to put the Unit Owner or Unit in compliance, provided, however, that nothing contained in this Section 16.2 shall authorize the Association to enter a Unit to enforce compliance. In any proceeding arising because of an alleged failure of a Unit Owner, a tenant or the Association to comply with the requirements of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, the prevailing party shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (including appellate attorneys' fees). A Unit Owner prevailing in an action with the Association, in addition to recovering his reasonable attorneys' fees, may recover additional amounts as determined by the court to be necessary to reimburse the Unit Owner for his share of Assessments levied by the Association to fund its expenses of the litigation.

16.3    Fines. In addition to any and all other remedies available to the Association, a fine or fines may be imposed upon an Owner for failure of an Owner, his family, guests, invitees, lessees or employees, to comply with any covenant, restriction, rule or regulation herein or Articles of Incorporation, By-Laws or Rules and Regulations of the Association, provided the following procedures are adhered to:

(a)    Notice: The party against whom the fine is sought to be levied shall be afforded an opportunity for hearing after reasonable notice of not less than fourteen (14) days and said notice shall include: (i) a statement of the date, time and place of the hearing; (ii) a statement of the provisions of the Declaration, By-Laws, Articles or rules which have allegedly been violated; and (iii) a short and plain statement of the matters asserted by the Association.

(b)    Hearing: The non-compliance shall be presented to a committee of other Unit Owners, who shall hear reasons why penalties should not be imposed. The party against whom the fine may be levied shall have an opportunity to respond, to present evidence, and to provide written and oral argument on all issues involved and shall have an opportunity at the hearing to review, challenge, and respond to any material considered by the committee. A written decision of the committee shall be submitted to the Owner or occupant by not later than twenty-one (21) days after the meeting. If the committee does not agree with the fine, the fine may not be levied.

(c)    Fines: The Board of Directors may impose fines against the applicable Unit up to the maximum amount permitted by law from time to time. At the time of the recordation of this Declaration, the Act provides that no fine may exceed $100.00 per violation, or $1,000.00 in the aggregate.

(d)    Violations: Each separate incident which is grounds for a fine shall be the basis of one separate fine. In the case of continuing violations, each continuation of same after a

(Reserved for Clerk of Court)

notice thereof is given shall be deemed a separate incident.

    (e)    Payment of Fines: Fines shall be paid not later than thirty (30) days after notice of the imposition thereof.

    (f)    Application of Fines: All monies received from fines shall be allocated as directed by the Board of Directors.

    (g)    Non-exclusive Remedy: These fines shall not be construed to be exclusive and shall exist in addition to all other rights and remedies to which the Association may be otherwise legally entitled; however, any penalty paid by the offending Owner or occupant shall be deducted from or offset against any damages which the Association may otherwise be entitled to recover by law from such Owner or occupant.

17.    Termination of Condominium. The Condominium shall continue until (i) terminated by casualty loss, condemnation or eminent domain, as more particularly provided in this Declaration, or (ii) such time as withdrawal of the Condominium Property from the provisions of the Act is authorized by a vote of Owners owning at least 80% of the applicable interests in the Common Elements and by the Primary Institutional First Mortgagee. In the event such withdrawal is authorized as aforesaid, the Condominium Property shall be subject to an action for partition by any Unit Owner, mortgagee or lienor as if owned in common in which event the net proceeds of the partition sale shall be divided among all Unit Owners in proportion to their respective interests in the Common Elements, provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such net proceeds all mortgages and liens on his Unit in the order of their priority. The termination of the Condominium, as aforesaid, shall be evidenced by a certificate of the Association executed by its President and Secretary, certifying as to the basis of the termination and said certificate shall be recorded among the public records of the County. The Association shall, within thirty (30) business days following such recordation, provide the Division with a copy of such recorded certificate.

This Section may not be amended without the consent of the Developer as long as it owns any Unit.

18.    Additional Rights of Mortgagees and Others.

    18.1    Availability of Association Documents. The Association shall have current and updated copies of the following available for inspection by Institutional First Mortgagees during normal business hours or under other reasonable circumstances as determined by the Board: (a) this Declaration; (b) the Articles; (c) the By-Laws; (d) the rules and regulations of the Association; and (e) the books, records and financial statements of the Association.

    18.2    Notices. Any holder, insurer or guarantor of a mortgage on a Unit shall have, if first requested in writing (which request shall be deemed made by Administrative Agent for so long as it holds a mortgage on a Unit), the right to timely written notice of:

    (a)    any condemnation or casualty loss affecting a material portion of the Condominium and/or Association Property or the affected mortgaged Unit;

    (b)    a sixty (60) day delinquency in the payment of the Assessments and/or Impositions on a mortgaged Unit;

    (c)    the occurrence of a lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

    (d)    any proposed action which requires the consent of a specified number of mortgage holders.

    18.3    Additional Rights. Institutional First Mortgagees shall have the right, upon written request to the Association (which request shall be deemed made by Administrative Agent for so long as it holds a mortgage on a Unit), to: (a) receive a copy of an audited financial statement of the Association for

(Reserved for Clerk of Court)

the immediately preceding fiscal year if such statements were prepared; and (b) receive notices of and attend Association meetings.

19. <u>Covenant Running With the Land</u>. All provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations of the Association, as well as those of the Master Covenants, shall, to the extent applicable and unless otherwise expressly herein or therein provided to the contrary, be perpetual and be construed to be covenants running with the Land and with every part thereof and interest therein, and all of the provisions hereof and thereof shall be binding upon and inure to the benefit of the Developer and subsequent owner(s) of the Land or any part thereof, or interest therein, and their respective heirs, personal representatives, successors and assigns, but the same are not intended to create nor shall they be construed as creating any rights in or for the benefit of the general public. All present and future Unit Owners, tenants and occupants of Units shall be subject to and shall comply with the provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations, as well as those of the Master Covenants, all as they may be amended from time to time. The acceptance of a deed or conveyance, or the entering into of a lease, or the entering into occupancy of any Unit, shall constitute an adoption and ratification of the provisions of this Declaration, and the Articles, By-Laws and applicable rules and regulations of the Association and the Master Covenants, all as they may be amended from time to time, including, but not limited to, a ratification of any appointments of attorneys-in-fact contained herein.

20. <u>The Master Association</u>. The Condominium is part of a Community known as Carillon Hotel and Spa (the "Community"). The Common Properties of the Community are governed by the Master Association pursuant to the Master Covenants. The Master Covenants also contain certain rules, regulations and restrictions relating to the use of such Common Properties as well as the Condominium Property (including Units). The Association will be a member of the Master Association and each Owner will be subject to all of the terms and conditions of the Master Covenants, as amended and supplemented from time to time. Among the powers of the Master Association are the power to assess Unit Owners (and other members of the Master Association) for a pro-rata share of the expenses of the operation and maintenance (including the management fees relating to) of such Common Properties and to impose and foreclose liens in the event such assessments are not paid when due. Except for those instances where the use is limited pursuant to the Master Covenants, the Unit Owners shall be entitled to use all of said Common Properties in accordance with and subject to the terms of the Master Covenants. The Master Association may impose certain obligations on the Association including, but not limited to, obligating the Association to collect Assessments due the Master Association despite the fact that such Assessments are not Common Expenses of the Condominium.

21. <u>Disclaimer of Warranties</u>. Except only for those warranties provided in Section 718.203, Florida Statutes (and then only to the extent applicable and not yet expired), to the maximum extent lawful Developer hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common, case law or otherwise, as to the design, construction, sound and/or odor transmission, existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Condominium Property and/or The Properties, including, without limitation, any implied warranties of habitability, fitness for a particular purpose or merchantability, compliance with plans, all warranties imposed by statute (other than those imposed by Section 718.203, Florida Statutes, and then only to the extent applicable and not yet expired) and all other express and implied warranties of any kind or character. Developer has not given and the Unit Owner has not relied on or bargained for any such warranties. Each Unit Owner, by accepting a deed to a Unit, or other conveyance thereof, shall be deemed to represent and warrant to Developer and Declarant that in deciding to acquire the Unit, the Unit Owner relied solely on such Unit Owner's independent inspection of the Unit, the Condominium and The Properties. The Unit Owner has not received nor relied on any warranties and/or representations from Developer of any kind, other than as expressly provided herein.

All Unit Owners, by virtue of their acceptance of title to their respective Units (whether from the Developer or another party) shall be deemed to have automatically waived all of the aforesaid disclaimed warranties and incidental and consequential damages. The foregoing shall also apply to any party claiming by, through or under a Unit Owner, including a tenant thereof.

(Reserved for Clerk of Court)

Further, given the climate and humid conditions in South Florida, molds, mildew, toxins and fungi may exist and/or develop within the Unit, the Condominium Property and/or The Properties. Each Owner is hereby advised that certain molds, mildew, toxins and/or fungi may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By acquiring title to a Unit, each Owner shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released the Developer and Declarant from any and all liability resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury). Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores. Each Unit Owner, by acceptance of a deed, or otherwise acquiring title to a Unit, shall be deemed to have agreed that neither the Developer nor the Declarant is responsible, and hereby disclaims any responsibility for any illness or allergic reactions, personal injury or death which may be experienced by the Unit Owner, its family members and/or its or their guests, tenants and invitees and to any pets of persons aforementioned in this sentence, as a result of mold, mildew, fungus or spores. It is the Unit Owner's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

Each Owner understands and agrees that for some time in the future, it, and its guests, tenants and invitees may be disturbed by the noise, commotion and other unpleasant effects of nearby construction activity and as a result Owner and its guests, tenants and invitees may be impeded in using portions of the Condominium Property by that activity. Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium. Additionally, Views may be blocked at any time and from time to time, due to vegetation and/or landscaping, whether installed by the Developer, or any other person or entity in accordance with applicable law, code or ordinance. Therefore, each Owner, for itself, its successors and assigns, agrees to release Declarant, Developer, its and their partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Developer's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Declarant, Developer or Developer's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction. As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter. Additionally, inasmuch as the Commercial Lots may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Common Elements, and in or around the Condominium Property, shall not be deemed a nuisance.

Lastly, each Owner, by acceptance of a deed or other conveyance of a Unit, understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Additionally, as a result of in the field construction, other permitted changes to the Unit, and settling and shifting of improvements, actual square footage of a Unit may also be affected. By accepting title to a Unit, the applicable Owner(s) shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed at any time prior to closing, whether included as part of Developer's promotional materials or otherwise. Without limiting the generality of this Section 21, Developer does not make any representation or warranty as to the actual size, dimensions (including ceiling heights) or square footage of any Unit, and each Owner shall be deemed to have fully waived and released any such warranty and claims for losses or damages resulting from any variances

(Reserved for Clerk of Court)

22.  Additional Provisions.

22.1  Notices. All notices to the Association required or desired hereunder or under the By-Laws of the Association shall be sent by certified mail (return receipt requested) to the Association in care of its office at the Condominium, or to such other address as the Association may hereafter designate from time to time by notice in writing to all Unit Owners. Except as provided specifically in the Act, all notices to any Unit Owner shall be sent by first class mail to the Condominium address of such Unit Owner, or such other address as may have been designated by him from time to time, in writing, to the Association. All notices to mortgagees of Units shall be sent by certified mail (return receipt requested) to their respective addresses, or such other address as may be designated by them from time to time, in writing to the Association. All notices shall be deemed to have been given when mailed in a postage prepaid sealed wrapper, except notices of a change of address, which shall be deemed to have been given when received, or 5 business days after proper mailing, whichever shall first occur.

22.2  Interpretation. The Board of Directors of the Association shall be responsible for interpreting the provisions hereof and of any of the Exhibits attached hereto. Such interpretation shall be binding upon all parties unless wholly unreasonable. An opinion of legal counsel that any interpretation adopted by the Association is not unreasonable shall conclusively establish the validity of such interpretation.

22.3  Mortgagees. Anything herein to the contrary notwithstanding, except with respect to the Administrative Agent, the Association shall not be responsible to any mortgagee or lienor of any Unit hereunder, and may assume the Unit is free of any such mortgages or liens, unless written notice of the existence of such mortgage or lien is received by the Association.

22.4  Exhibits. There is hereby incorporated in this Declaration all materials contained in the Exhibits annexed hereto, except that as to such Exhibits, any conflicting provisions set forth therein as to their amendment, modification, enforcement and other matters shall control over those hereof.

22.5  Signature of President and Secretary. Wherever the signature of the President of the Association is required hereunder, the signature of a vice-president may be substituted therefor, and wherever the signature of the Secretary of the Association is required hereunder, the signature of an assistant secretary may be substituted therefor, provided that the same person may not execute any single instrument on behalf of the Association in two separate capacities.

22.6  Governing Law. Should any dispute or litigation arise between any of the parties whose rights or duties are affected or determined by this Declaration, the Exhibits annexed hereto or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, said dispute or litigation shall be governed by the laws of the State of Florida.

22.7  Severability. The invalidity in whole or in part of any covenant or restriction, or any section, subsection, sentence, paragraph, clause, phrase or word, or other provision of this Declaration, the Exhibits annexed hereto, or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, shall not affect the validity of the remaining portions thereof which shall remain in full force and effect.

22.8  Waiver. The failure of the Association or any Unit Owner to enforce any covenant, restriction or other provision of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, shall not constitute a waiver of their right to do so thereafter.

22.9  Ratification. Each Unit Owner, by reason of having acquired ownership (whether by purchase, gift, operation of law or otherwise), and each occupant of a Unit, by reason of his occupancy, shall be deemed to have acknowledged and agreed that all of the provisions of this Declaration, and the Articles and By-Laws of the Association, and applicable rules and regulations, are fair and reasonable in all material respects.

22.10  Execution of Documents; Attorney-in-Fact. Without limiting the generality of other Sections of this Declaration and without such other Sections limiting the generality hereof, each Owner, by reason

of the acceptance of a deed to such Owner's Unit, hereby agrees to execute, at the request of the Developer, all documents or consents which may be required by all governmental agencies to allow the Developer and its affiliates to complete the plan of development of the Condominium as such plan may be hereafter amended, and each such Owner further appoints hereby and thereby the Developer as such Owner's agent and attorney-in-fact to execute, on behalf and in the name of such Owners, any and all of such documents or consents. This Power of attorney is irrevocable and coupled with an interest. The provisions of this Section may not be amended without the consent of the Developer.

22.11   Gender; Plurality. Wherever the context so permits, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be deemed to include all or no genders.

22.12   Captions. The captions herein and in the Exhibits annexed hereto are inserted only as a matter of convenience and for ease of reference and in no way define or limit the scope of the particular document or any provision thereof.

22.13   Liability. Notwithstanding anything contained herein or in the Articles of Incorporation, By-laws, any rules or regulations of the Association or any other document governing or binding the association (collectively, the "Association Documents"), the Association, except to the extent specifically provided to the contrary herein, shall not be liable or responsible for, or in any manner a guarantor or insurer of, the health, safety or welfare of any Owner, occupant or user of any portion of the Condominium and/or Association Property including, without limitation, Owners and their guests, invitees, agents, servants, contractors or subcontractors or for any property of any such persons. Without limiting the generality of the foregoing:

    (a)    it is the express intent of the Association Documents that the various provisions thereof which are enforceable by the Association and which govern or regulate the uses of the properties have been written, and are to be interpreted and enforced, for the sole purpose of enhancing and maintaining the enjoyment of the properties and the value thereof;

    (b)    the Association is not empowered, and has not been created, to act as an entity which enforces or ensures the compliance with the laws of the United States, State of Florida, County and/or any other jurisdiction or the prevention of tortious activities; and

    (c)    the provisions of the Association Documents setting forth the uses of assessments which relate to health, safety and/or welfare shall be interpreted and applied only as limitations on the uses of assessment funds and not as creating a duty of the Association to protect or further the health, safety or welfare of any person(s), even if assessment funds are chosen to be used for any such reason.

Each Owner (by virtue of his acceptance of title to his Unit) and each other person having an interest in or lien upon, or making use of, any portion of the properties (by virtue of accepting such interest or lien or making such use) shall be bound by this provision and shall be deemed to have automatically waived any and all rights, claims, demands and causes of action against the Association arising from or connected with any matter for which the liability of the Association has been disclaimed hereby. As used herein, "Association" shall include within its meaning all of Association's directors, officers, committee and board members, employees, agents, contractors (including management companies), subcontractors, successors and assigns. The provisions hereof shall also inure to the benefit of Developer, which shall be fully protected hereby.

(Reserved for Clerk of Court)

IN WITNESS WHEREOF, the Developer has caused this Declaration to be duly executed and its corporate seal to be hereunto affixed as of the _5_ day of _August_ 2008.

Witnessed by:

Name: _Joanne Hurley_

Name: _D. P. Soriano_

Carillon South Joint Venture, L.L.C., a Florida limited liability company

By: _____

Name: Eric D. Sheppard

Title: Manager

(Corporate Seal)

Address: _____
_____
_____

STATE OF FLORIDA )
 ) ss:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me this _5_ day of _August_, 2008 by Eric D. Sheppard, as Manager of Carillon South Joint Venture, L.L.C., a Florida limited liability company, on behalf of said partnership. He/she is personally known to me or produced _____ as identification.

Name: _____

Notary Public, State of _____

My commission expires: Commission No. _____

DENISE P. SORIANO
Notary Public - State of Florida
My Commission Expires Jun 25, 2009
Commission # DD 416499
Bonded By National Notary Assn.

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the __7__ day of __July__ , 2008, on behalf of **LB Carillon Construction LLC, a Delaware limited liability company** ("Mortgagee"), being the owner and holder of a first and second mortgage (collectively, as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") on all or portions of the Condominium Property (as defined in the Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of the Declaration of North Carillon Beach, a Condominium (the "Declaration").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Declaration and the recordation thereof.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Declaration, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of North Carillon Beach, a Condominium (the Condominium"), and does not assume and shall not be responsible for any of the obligations or liabilities of the Developer contained in the Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of the Condominium. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Declaration.

Made as of the day and year first above written.

Witnessed by:

LB CARILLON CONSTRUCTION LLC, a Delaware
limited liablity company

Name: Catrina Cassanova

By: _____
Name: Avvey B. Kosakowski
Title: AUTHORIZED SIGNATORY

Name: Nancy Sharperson

STATE OF __New York__ )
                                        ) SS:
COUNTY OF __New York__ )

The foregoing instrument was acknowledged before me this __7__ day of __July__ , 2008, by Avvey B. Kosakowski, as AUTHORIZED SIGNATORY of LB Carillon Construction LLC, a Delaware limited liability company, on behalf of said company. He/she is personally known to me or has produced _____ as identification.

Name: DEANNA EMILIO
Notary Public, State of _____
Commission No. _____

My Commission Expires:

DEANNA EMILIO
Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the ___ day of _____, 2008, on behalf of <u>Fortress Credit Corp., a Delaware corporation</u> ("Mortgagee"), as Agent, as collateral assignee under that certain Recorded Mortgage Collateral Security Documents by LB Construction LLC to Fortress Credit Corp., (as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") affecting all or portions of the Condominium Property (as defined in the Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of the Declaration of North Carillon Beach, a Condominium (the "Declaration").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Declaration and the recordation thereof.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Declaration, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of North Carillon Beach, a Condominium (the Condominium"), and does not assume and shall not be responsible for any of the obligations or liabilities of the Developer contained in the Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of the Condominium. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Declaration.

Made as of the day and year first above written.

Witnessed by:

Name: _____

Name: _____

Fortress Credit Corp., a Delaware corporation, as Agent

By: _____
Name: ~~MARC K. FURSTEIN~~
Title: ~~CHIEF OPERATING OFFICER~~

STATE OF _New York_ )
                                              ) SS:
COUNTY OF _New York_ )

The foregoing instrument was acknowledged before me this 25th day of _August_, 2008, by _Marc K. Furstein_ as _Chief Operating Officer_ of Fortress Credit Corp., a Delaware corporation, on behalf of said _____. He/she is personally known to me or has produced _____ as identification.

Name: _____

Notary Public, State of _____
My Commission Expires:                     Commission No. _____



VIOLETTA USTAYEVA
NOTARY PUBLIC, State of New York
No. 01US6193577
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 19, 2011

## Exhibit "1"'

North Carillon Beach, a Condominium

*Legal Description*

The legal description of the Condominium Property is set forth on Sheets 2, 3 and 4
of Exhibit "2" to the Declaration

# NORTH CARILLON BEACH,

## A CONDOMINIUM

STATE OF FLORIDA

SS

COUNTY OF MIAMI-DADE

BEFORE ME, the undersigned authority duly authorized to administer oaths and take acknowledgements, personally appeared DANIEL C. FORTIN, by me well known and known to me to be the person hereinafter described, who being by me first duly cautioned and sworn, deposes and says on oath as follows, to wit:

1. That he is a duly registered and duly licensed Surveyor and Mapper authorized to practice under the laws of the State of Florida.

2. Affiant hereby certifies that the CONSTRUCTION OF THE IMPROVEMENTS shown within this Exhibit 2, is substantially complete, so that this Exhibit 2, together with the provisions of the Declaration of Condominium describing the Condominium Property, is an accurate representation of the location and dimensions of the improvements and so that the identification, location, and dimensions of the common elements and of each unit can be determined from these materials.

3. And further, that all planned improvements, including, but not limited to landscaping, utility services and access to the units identified herein and common element facilities serving the herein identified units have been substantially completed in accordance with the provisions of Florida Statute 718.104.

4. That the Elevations shown hereon are relative to the National Geodetic Vertical Datum of 1929, based on project datum.

5. That all areas labeled NOT A PART or HOTEL LOT are graphically depicted by said architectural plans and were not field verified as part of this exhibit.

FURTHER AFFIANT SAYETH NAUGHT.

FORTIN, LEAVY, SKILES, INC., LB3653

By

Daniel C. Fortin, For The Firm
PROFESSIONAL SURVEYOR AND MAPPER LS2853
State of Florida

STATE OF FLORIDA

SS

COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this August 8, 2008 by DANIEL C. FORTIN, who is personally known to me and who did not take an oath.

NOTARY PUBLIC— State of Florida

Notary Public State of Florida
Susan P Kay
My Commission DD767544
Expires 04/06/2012

Date Printed: 8/8/08 2:36p

Cod No. 071902-N   Drawn By: RJM

# FORTIN, LEAVY, SKILES, INC.

## CONSULTING ENGINEERS, SURVEYORS & MAPPERS

FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER: 00003653
180 Northeast 168th. Street / North Miami Beach, Florida. 33162
Phone: 305-653-4493 / Fax 305-651-7152 / Email fls@flssurvey.com

| Date August 8, 2008 | Dwg. No. 6008-011 | Job. No. 071902 |
|---|---|---|

**EXHIBIT 2**                                        **SHEET 1 OF 65**

# NORTH CARILLON BEACH,

## A CONDOMINIUM

**LEGAL DESCRIPTION: 2nd & 3rd Level**

A portion of Lots 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A–1–A) for 25.72 feet; thence N 87°32'31" E at right angles to the previously described course for 191.07 feet to the Point of Beginning; thence N 88°20'13" E for 65.45 feet; thence N 01°39'47" W for 18.06 feet; thence S 88°20'12" W for 4.00 feet; thence N 01°39'47" W for 13.16 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 17.96 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'47" W for 14.76 feet; thence S 88°20'13" W for 28.95 feet; thence S 01°39'47" E for 0.87 feet; thence S 88°20'13" W for 19.68 feet; thence S 01°39'47" E for 17.92 feet; thence S 88°20'13" W for 11.50 feet; thence S 01°39'47" E for 6.52 feet; thence S 88°20'13" W for 10.33 feet; thence S 01°39'47" E for 18.18 feet; thence S 88°20'13" E for 9.00 feet; thence S 01°39'47" E for 20.47 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +23.0 feet and elevation +43.0 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | |
|---|---|---|
| LINE | LENGTH | BEARING |
| L1 | 65.45 | N88°20'13"E |
| L2 | 18.06 | N01°39'47"W |
| L3 | 4.00 | S88°20'12"W |
| L4 | 13.16 | N01°39'47"W |
| L5 | 4.00 | N88°20'13"E |
| L6 | 17.96 | N01°39'47"W |
| L7 | 4.00 | S88°20'13"W |
| L8 | 14.76 | N01°39'47"W |
| L9 | 28.95 | S88°20'13"W |
| L10 | 0.87 | S01°39'47"E |
| L11 | 19.68 | S88°20'13"W |
| L12 | 17.92 | S01°39'47"E |
| L13 | 11.50 | S88°20'13"W |
| L14 | 6.52 | S01°39'47"E |
| L15 | 10.33 | S88°20'13"W |
| L16 | 18.18 | S01°39'47"E |
| L17 | 9.00 | N88°20'13"E |
| L18 | 20.47 | S01°39'47"E |

LOT 1

APPROVED COASTAL
CONSTRUCTION CONTROL LINE
PLAT BOOK 74 PAGE 25
RECORDED 2/10/82

LOT 2

30.00'
RIGHT OF WAY

CENTERLINE

EAST RIGHT OF WAY LINE
OF COLLINS AVENUE
(STATE ROAD A–1–A)

LOT 3

# BLOCK B

CORRECTED PLAT
OF ATLANTIC HEIGHTS
PLAT BOOK 9 PAGE 14

LOT 4

EAST LINE OF BLOCK B
PLAT BOOK 9 PAGE 14

EROSION CONTROL LINE
OF THE ATLANTIC OCEAN
PLAT BOOK 105 PAGE 62
O.R.B. 9517 PAGE 2028
RECORDED 12/30/76

WEST LINE OF BLOCK B

COLLINS AVENUE
(STATE ROAD A–1–A)
(PUBLIC RIGHT OF WAY)

Date Printed: 8/8/08 4:12p

Cad No. 0716002L    Drawn By: MAP

LOT 5

90°    N87°32'31"E    191.07'
LOT 6

N02°27'29"W
25.72'

SOUTH LINE OF LOT 6
PLAT BOOK 9 PAGE 14

NORTH LINE OF LOT 53
PLAT BOOK 28 PAGE 28

**POINT OF COMMENCEMENT**
S.W. CORNER OF LOT 6

30.00'
RIGHT OF WAY

# BLOCK 1

LOT 53

**POINT OF BEGINNING**

AMENDED SECOND
OCEAN FRONT SUBDIVISION
PLAT BOOK 28 PAGE 28

GRAPHIC SCALE

0    20    40    80

( IN FEET )
1 inch = 40 ft.

# EXHIBIT 2 SKETCH & LEGAL DESCRIPTION SHEET 2 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM

**LEGAL DESCRIPTION: 4th & 5th Level**

A portion of Lots 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A–1–A) for 25.72 feet; thence N 87°32'31" E at right angles to the previously described course for 191.07 feet to the Point of Beginning; thence N 88°19'14" E for 65.45 feet; thence N 01°39'47" W for 18.06 feet; thence S 88°20'12" W for 4.00 feet; thence N 01°39'47" W for 13.16 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 17.96 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'52" W for 27.30 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'47" W for 34.16 feet; thence S 88°20'13" W for 4.00 feet; thence N 01°39'45" W for 27.04 feet; thence N 88°20'13" E for 4.00 feet; thence N 01°39'54" W for 15.96 feet; thence S 88°20'13" W for 64.29 feet; thence S 01°27'03" E for 0.33 feet; thence S 88°20'13" W for 10.17 feet; thence S 01°39'47" E for 77.35 feet; thence N 88°20'13" E for 10.33 feet; thence S 01°39'47" E for 37.33 feet; thence S 88°20'13" W for 10.33 feet; thence N 88°20'13" E for 18.08 feet; thence N 88°20'13" E for 9.00 feet; thence S 01°39'47" E for 20.56 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +43.0 feet and elevation +63.0 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | | LINE TABLE | | |
|---|---|---|---|---|---|
| LINE | LENGTH | BEARING | LINE | LENGTH | BEARING |
| L1 | 65.45 | N88°19'14"E | L13 | 4.00 | N88°20'13"E |
| L2 | 18.06 | N01°39'47"W | L14 | 15.96 | N01°39'54"W |
| L3 | 4.00 | S88°20'12"W | L15 | 64.29 | S88°20'13"W |
| L4 | 13.16 | N01°39'47"W | L16 | 0.33 | S01°27'03"E |
| L5 | 4.00 | N88°20'13"E | L17 | 10.17 | S88°20'13"W |
| L6 | 17.96 | N01°39'47"W | L18 | 77.35 | S01°39'47"E |
| L7 | 4.00 | S88°20'13"W | L19 | 10.33 | N88°20'13"E |
| L8 | 27.30 | N01°39'52"W | L20 | 37.33 | S01°39'47"E |
| L9 | 4.00 | N88°20'13"E | L21 | 10.33 | S88°20'13"W |
| L10 | 34.16 | S88°20'13"W | L22 | 18.08 | N88°20'13"E |
| L11 | 4.00 | S88°20'13"W | L23 | 9.00 | N88°20'13"E |
| L12 | 27.04 | N01°39'45"W | L24 | 20.56 | S01°39'47"E |

LOT 1

APPROVED COASTAL CONSTRUCTION CONTROL LINE PLAT BOOK 74 PAGE 25 RECORDED 2/10/82

LOT 2

30.00' RIGHT OF WAY

EAST LINE OF BLOCK B PLAT BOOK 9 PAGE 14

EROSION CONTROL LINE OF THE ATLANTIC OCEAN PLAT BOOK 105 PAGE 62 O.R.B. 9517 PAGE 2028 RECORDED 12/30/76

EAST RIGHT OF WAY LINE OF COLLINS AVENUE (STATE ROAD A–1–A)

LOT 3

L17  L16    L15

## BLOCK B

**CORRECTED PLAT OF ATLANTIC HEIGHTS PLAT BOOK 9 PAGE 14**

LOT 4

COLLINS AVENUE (STATE ROAD A–1–A) (PUBLIC RIGHT OF WAY)

WEST LINE OF BLOCK B

LOT 5

Date Printed: 8/8/08 4:12p

L18

L20

L14
L13
L12
L11
L10
L9
L8
L7
L6
L5
L4
L3
L2

L22  L23
L24

N87°32'31"E          191.07'

L1

POINT OF BEGINNING

N02°27'29"W 25.72'

SOUTH LINE OF LOT 6 PLAT BOOK 9 PAGE 14

NORTH LINE OF LOT 53 PLAT BOOK 28 PAGE 28

LOT 6

POINT OF COMMENCEMENT S.W. CORNER OF LOT 6

## BLOCK 1

LOT 53

**AMENDED SECOND OCEAN FRONT SUBDIVISION PLAT BOOK 28 PAGE 28**

GRAPHIC SCALE

0    20    40    80

( IN FEET )
1 inch = 40 ft.

Cod No. 0719001L    Drawn By: MAP

# EXHIBIT 2 SKETCH & LEGAL DESCRIPTION  SHEET 3 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM

**LEGAL DESCRIPTION: 6th thru Roof Level**

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A–1–A) for 39.42 feet; thence N 87°32'31" E at right angles to the previously described course for 148.03 feet to the Point of Beginning; thence N 88°20'13" E for 67.92 feet; thence N 03°19'21" E for 14.72 feet; thence N 88°20'13" E for 7.34 feet; thence N 01°39'47" W for 36.25 feet; thence S 88°20'13" W for 5.69 feet; thence N 06°56'28" W for 31.11 feet; thence N 05°16'52" E for 28.96 feet; thence N 88°36'26" W for 28.96 feet; thence N 03°36'54" E for 31.11 feet; thence N 88°20'15" E for 5.69 feet; thence N 01°39'47" W for 36.25 feet; thence S 88°20'14" W for 7.34 feet; thence N 06°38'54" W for 14.72 feet; thence S 88°20'13" W for 67.92 feet; thence S 03°19'18" W for 14.12 feet; thence S 88°20'13" W for 4.69 feet; thence S 01°39'47" E for 42.25 feet; thence N 88°20'13" E for 5.44 feet; thence S 06°52'04" E for 25.69 feet; thence S 02°47'44" W for 28.84 feet; thence S 06°07'18" E for 28.84 feet; thence S 03°32'30" W for 25.69 feet; thence S 88°20'13" W for 5.44 feet; thence S 01°39'47" E for 42.25 feet; thence N 88°20'13" E for 4.69 feet; thence S 06°38'52" E for 14.12 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +63.0 feet and elevation +380.2 feet relative to the National Geodetic Vertical Datum of 1929.



| LINE TABLE | | | LINE TABLE | | |
|---|---|---|---|---|---|
| LINE | LENGTH | BEARING | LINE | LENGTH | BEARING |
| L1 | 67.92 | N88°20'13"E | L14 | 67.92 | S88°20'13"W |
| L2 | 14.72 | N03°19'21"E | L15 | 14.12 | S03°19'18"W |
| L3 | 7.34 | N88°20'13"E | L16 | 4.69 | S88°20'13"W |
| L4 | 36.25 | N01°39'47"W | L17 | 42.25 | S01°39'47"E |
| L5 | 5.69 | S88°20'13"W | L18 | 5.44 | N88°20'13"E |
| L6 | 31.11 | N06°56'28"W | L19 | 25.69 | S06°52'04"E |
| L7 | 28.96 | N05°16'52"E | L20 | 28.84 | S02°47'44"W |
| L8 | 28.96 | N88°36'28"W | L21 | 28.84 | S05°07'18"E |
| L9 | 31.11 | N03°36'54"E | L22 | 25.69 | S03°32'30"W |
| L10 | 5.69 | N88°20'15"E | L23 | 5.44 | S88°20'13"W |
| L11 | 36.25 | N01°39'47"W | L24 | 42.25 | S01°39'47"E |
| L12 | 7.34 | S88°20'14"W | L25 | 4.69 | N88°20'13"E |
| L13 | 14.72 | N06°38'54"W | L26 | 14.12 | S06°38'52"E |

EXHIBIT 2 SKETCH & LEGAL DESCRIPTION SHEET 4 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM

### SURVEYOR'S NOTES:

— This site lies in Section 11, Township 53 South, Range 42 East, City of Miami Beach, Miami—Dade County, Florida.

— Bearings hereon are referred to an assumed value of N 02°27'29" W for the West line of Block B, corrected plat of Atlantic Heights, Plat Book 9, Page 14.

— Lands shown hereon were not abstracted for easements and/or rights—of—way of records.

— Elevations shown hereon are relative to the National Geodetic Vertical Datum of 1929, based on Department of Natural Resources Monument R—42 (1974), Elevation +12.39.

— This is not a "Boundary Survey" but only a graphic depiction of the description shown hereon.

— Dimensions shown hereon are based on F.L.S. sketch #2005—062N.

— Legal descriptions represent the limit of each floor at its elevation as reflected hereon in this Exhibit, less all (units and balconies) and (hotel lot) as depicted in graphics unless otherwise noted and are not included in this condominium.

## SURVEYOR'S NOTES

EXHIBIT 2                    SHEET 5 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM



GRAPHIC SCALE



( IN FEET )
1 inch = 80 ft.



NOT A PART

NOTE:
THIS IS NOT A BOUNDARY SURVEY.

## RECORD SURVEY

EXHIBIT 2

SHEET 6 OF 65



# NORTH CARILLON BEACH,
## A CONDOMINIUM

ATLANTIC

OCEAN

STATE ROAD A-1-A

69th Street

Harding Avenue

Collins Avenue

CORRECTED PLAT OF ATLANTIC HEIGHTS
Plat Book 9, Page 14

AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION
Plat Book 28, Page 28

P.B. 09, PG. 14

P.B. 28, PG. 28

SOUTH LINE GOV'T LOT 1
SECTION 11-53-42

NORTH CARILLON BEACH,
A CONDOMINIUM

(D) 3 10 / 4 9 / 5 8 / 6 7

(A) 3 / 6

(C) 1 12 / 2 11 / 3 10 / 4 9 / 5 8 / 6 7

(B) 1 / 6

(6) 19 16 / 20 15 / 21 14 / 22 13 / 23 12 / 24 11 / 25 10 / 26 9 / 27 8 / 28 7 / 29 6 / 30 5

(1) 53 / 52 / 51 / 50 / 49 / 48 / 47 / 46 / 45

NORTH 25'
LOT 43

Cad No. 03010HL    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## LOCATION SKETCH
### NOT TO SCALE

N

EXHIBIT 2                SHEET 7 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





(HOTEL LOT)
NOT A PART
ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

GRAPHIC SCALE

0    20    40         80

( IN FEET )
1 inch = 40 ft.

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

NOTE:

For a complete description of the Unit boundaries
as shown hereon, refer to the Declaration of
Condominium.

Except as otherwise designated herein, all areas of
the properties located outside of the Condominium
Boundary Line are part of the Hotel Lot.

Cad No. 041920PK   Drawn By: RJM   Date Plotted: 8/8/08 4:12p

## BASEMENT LEVEL GARAGE PLAN
### ALL NOT A PART

EXHIBIT 2

SHEET 8 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





**(HOTEL LOT)**

**NOT A PART**

ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

(RETAIL LOT)
NOT A PART

GRAPHIC SCALE

0    20    40         80

( IN FEET )
1 inch = 40 ft.

LEGEND:

—————  CONDOMINIUM UNIT
BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

(RETAIL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

NOTE:

For a complete description of the Unit boundaries
as shown hereon, refer to the Declaration of
Condominium.

Except as otherwise designated herein, all areas of
the properties located outside of the Condominium
Boundary Line are part of the Hotel Lot.

Cad No. D41920PK   Drawn By: RJM   Date Printed: 8/8/08 4:12p

## 1st LEVEL GARAGE PLAN
ALL NOT A PART

EXHIBIT 2                    SHEET 9 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





**(HOTEL LOT)**
## NOT A PART

ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

TYPE "TH2"
#204

TYPE "TH1"
#205

BALCONY

BALCONY

BALCONY

BALCONY

**LEGEND:**

—————— CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

**HOTEL LOT:**

1. ALL BALCONIES AND/OR TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE



( IN FEET )
1 inch = 40 ft.

**NOTE:**

For a complete description of the Unit boundaries
as shown hereon, refer to the Declaration of
Condominium.

Except as otherwise designated herein, all areas of
the properties located outside of the Condominium
Boundary Line are part of the Hotel Lot.

FIRST LEVEL OF TOWNHOMES
## 2nd LEVEL GARAGE PLAN

Date Printed: 8/8/08 4:12p

Drawn By: RJM

Cad No. 041922SPK

## EXHIBIT 2

## SHEET 10 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





CONCRETE CANOPY

**(HOTEL LOT)**
## NOT A PART

ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART



TYPE "TH2" #204

TYPE "TH1" #205

BALCONY

BALCONY

BALCONY

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**HOTEL LOT:**

1. ALL BALCONIES AND/OR TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    20    40         60

( IN FEET )
1 inch = 40 ft.

**NOTE:**

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041920PK    Drawn By: RJM    Date Printed: 8/8/08 4:12p

SECOND LEVEL OF TOWNHOMES
## 3rd LEVEL GARAGE PLAN

EXHIBIT 2

# NORTH CARILLON BEACH,
## A CONDOMINIUM





ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

(HOTEL LOT)
N O T   A   P A R T

TYPE "TH7" #401 — BALCONY
TYPE "TH6" #402 — BALCONY
TYPE "TH5" #403 — BALCONY
TYPE "TH4" #404 — BALCONY
TYPE "TH3" #405 — BALCONY

LEGEND:

———————— CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

HOTEL LOT:

1. ALL BALCONIES AND/OR TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    20    40    60

( IN FEET )
1 inch = 40 ft.

NOTE:

For a complete description of the Unit boundaries
as shown hereon, refer to the Declaration of
Condominium.

Except as otherwise designated herein, all areas of
the properties located outside of the Condominium
Boundary Line are part of the Hotel Lot.

FIRST LEVEL OF TOWNHOMES
## 4th LEVEL GARAGE PLAN

## EXHIBIT 2                    SHEET 12 OF 65

Cad No. 041920PK    Drawn By: RJM    Date Printed 8/8/08 4:17p

# NORTH CARILLON BEACH,
## A CONDOMINIUM





ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

**(HOTEL LOT)**
NOT A PART

TYPE "TH7" #401
TYPE "TH6" #402
TYPE "TH5" #403
TYPE "TH4" #404
TYPE "TH3" #405

BALCONY

LEGEND:

——————— CONDOMINIUM UNIT BOUNDARY

////// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

HOTEL LOT:

1. ALL BALCONIES AND/OR TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.



GRAPHIC SCALE

20    40         60

( IN FEET )
1 inch = 40 ft.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041920PK   Drawn By: RJM   Date Printed: 8/8/08 4:12p

SECOND LEVEL OF TOWNHOMES
## 5th LEVEL GARAGE PLAN

# EXHIBIT 2                    SHEET 13 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**(HOTEL LOT)**
NOT A PART

WOMEN'S WASHROOM   MEN'S WASHROOM   POOL DECK STORAGE ROOM

**(HOTEL LOT)**
NOT A PART

TYPE "B1" UNIT #603

TYPE "B2" UNIT #601

PRIVATE GARDEN TERRACE

C.E.

TYPE "B3" UNIT #602

PRIVATE GARDEN TERRACE

TYPE "B3" UNIT #606

PRIVATE GARDEN TERRACE

TYPE "B1" UNIT #610

TYPE "B2" UNIT #607

PRIVATE GARDEN TERRACE

C.E.

**(HOTEL LOT)**
NOT A PART

LEGEND:

—— CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

N

GRAPHIC SCALE
0   15   30        60

( IN FEET )
1 inch = 30 ft.

HOTEL LOT:

1. ALL BALCONIES, TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041926F   Drawn By: RLU   Date Printed: 8/8/08 4:12p

## SIXTH LEVEL FLOOR PLAN

**EXHIBIT 2**                    **SHEET 14 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



TYPE "B1"
UNITS #703 and #803

TYPE "B2"
UNITS #701 and #801

C.E.

BALCONY

TYPE "B3"
UNITS #702 and #802

TYPE "B3"
UNITS #706 and #806

C.E.

TYPE "B1"
UNITS #710 and #810

TYPE "B2"
UNITS #707 and #807

TYPE "C1"
UNITS #709 and #809

TYPE "B4"
UNITS #708 and #808

BALCONY

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

GRAPHIC SCALE

0   15   30        60

( IN FEET )
1 inch = 30 ft.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041920F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# SEVENTH AND EIGHTH LEVEL
# FLOOR PLAN

EXHIBIT 2          SHEET 15 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**TYPE "C1"**
UNITS #904 thru #2004

**TYPE "B1"**
UNITS #903 thru #2003

**TYPE "B4"**
UNITS #905 thru #2005

**TYPE "B2"**
UNITS #901 thru #2001

**TYPE "B3"**
UNITS #902 thru #2002

**TYPE "B3"**
UNITS #906 thru #2006

**TYPE "B1"**
UNITS #910 thru #2010

**TYPE "B2"**
UNITS #907 thru #2007

**TYPE "C1"**
UNITS #909 thru #2009

**TYPE "B4"**
UNITS #908 thru #2008

BALCONY (repeated labels around perimeter)

C.E.

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

⬚ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**GRAPHIC SCALE**

0   15   30   60

( IN FEET )
1 inch = 50 ft.

**NOTE:**

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

*(NOTE: THERE IS NO 13th LEVEL)*

## NINTH THRU TWENTIETH LEVEL FLOOR PLAN

Cad No. 0419205F    Drawn By: RJM    Date Printed: 8/8/08 4:13p

EXHIBIT 2                    SHEET 16 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**TYPE "A1"**
UNITS #2104 and #2204

**TYPE "B1"**
UNITS #2103 and #2203

**TYPE "B2"**
UNITS #2101 and #2201

C.E.

BALCONY

**TYPE "B3"**
UNITS #2102 and #2202

**TYPE "B3"**
UNITS #2106 and #2206

**TYPE "B1"**
UNITS #2110 and #2210

**TYPE "B2"**
UNITS #2107 and #2207

C.E.

**TYPE "C1"**
UNITS #2109 and #2209

**TYPE "B4"**
UNITS #2108 and #2208

LEGEND:

───── CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

GRAPHIC SCALE

0   15   30                60

( IN FEET )
1 inch = 30 ft.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONES AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041920F   Drawn By: RJM   Date Printed: 8/8/08 4:12p

# TWENTYONE AND TWENTYTWO LEVEL
# FLOOR PLAN
## SHEET 17 OF 65

# NORTH CARILLON BEACH,

### A CONDOMINIUM



TYPE "A1"
UNIT #2304

TYPE "B5"
UNIT #2303

TYPE "B2"
UNIT #2301

BALCONY

PRIVATE TERRACE

PRIVATE POOL

PRIVATE POOL

PRIVATE POOL

PRIVATE POOL

PRIVATE TERRACE

TYPE "B5"
UNIT #2310

TYPE "B2"
UNIT #2307

TYPE "A1"
UNIT #2308

BALCONY

**LEGEND:**

—————— CONDOMINIUM UNIT
BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

**GRAPHIC SCALE**

0      15     30                60

( IN FEET )
1 inch = 30  ft.

**NOTE:**

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

The Hotel Lot Owner may assign and/or license the
Private Pools to a Unit and/or Units, at which time
same shall become an appurtenance to such Unit or
Units and shall be for the exclusive use of the Owner
of such Unit or Units.



Cad No. 0416206F   Drawn By: RJM   Date Printed: 8/13/98 8:46a

## TWENTYTHIRD LEVEL
## FLOOR PLAN

EXHIBIT 2

SHEET 18 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**TYPE "A1"**
UNITS #2404 and #2504

**TYPE "B5"**
UNITS #2403 and #2503

**TYPE "B2"**
UNITS #2401 and #2501

C.E.

BALCONY



**TYPE "B5"**
UNITS #2410 and #2510

**TYPE "B2"**
UNITS #2407 and #2507

**TYPE "A1"**
UNIT #2408 and #2508

C.E.

BALCONY

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

⬚ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES, TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

GRAPHIC SCALE

0    15    30    60

( IN FEET )
1 inch = 30 ft.

Cod No. 0419205F    Drawn By: RAM    Date Printed: 8/8/08 4:12p

## TWENTYFOURTH AND TWENTYFIFTH LEVEL FLOOR PLAN

EXHIBIT 2

SHEET 19 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

**TYPE "A1"**
UNITS #2604

**TYPE "B5"**
UNITS #2603

**TYPE "B2"**
UNITS #2601

C.E.

BALCONY

BALCONY

BALCONY



BALCONY

**TYPE "B6"**
UNITS #2607

C.E.

**TYPE "A2"**
UNITS #2608

BALCONY

BALCONY

BALCONY

LEGEND:

———————— CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    15    30              60

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

*(left margin, rotated)* Cod No. 0419205   Drawn By: RJM   Date Printed: 8/9/08 4:12p

## TWENTYSIXTH LEVEL FLOOR PLAN

**EXHIBIT 2**                          **SHEET 20 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



TYPE "A1-MOD"
UNITS #2704

TYPE "B5"
UNITS #2703

BALCONY

TYPE "B2-MOD"
UNITS #2701

C.E.



TYPE "B6"
UNITS #2707

BALCONY

C.E.

TYPE "A2"
UNITS #2708

LEGEND:

―――――  CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

GRAPHIC SCALE



( IN FEET )
1 inch = 30 ft.

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTE:**

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cod No. 041920F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## TWENTYSEVENTH LEVEL FLOOR PLAN

EXHIBIT 2

SHEET 21 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



TYPE "A1"
UNIT #2804

TYPE "B5"
UNIT #2803

TYPE "B2"
UNIT #2801

C.E.

BALCONY



TYPE "B6"
UNIT #2807

C.E.

TYPE "A2"
UNIT #2808

BALCONY

LEGEND:

——————— CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E.    COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    15    30        60

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

Cad No. 041920F    Drawn By: RJM    Date Printed: 8/6/08 4:12p

# TWENTYEIGHTH LEVEL FLOOR PLAN

EXHIBIT 2                    SHEET 22 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



TYPE "A1"
UNIT #2904

TYPE "B5"
UNIT #2903

TYPE "B2"
UNIT #2901

BALCONY

C.E.



TYPE "B6"
UNIT #2907

TYPE "A2"
UNIT #2908

BALCONY

C.E.

LEGEND:

——————  CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

GRAPHIC SCALE



0      15      30                60

( IN FEET )
1 inch = 30 ft.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 041923F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# TWENTYNINETH LEVEL FLOOR PLAN

EXHIBIT 2                    SHEET 23 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



TYPE "A2"
UNIT #3004

BALCONY

BALCONY

C.E.

BALCONY

BALCONY

TYPE "B6"
UNITS #3001



COOLING
TOWERS

LADDER

Hotel Lot

NOT A PART

LEGEND:

——————— CONDOMINIUM UNIT
BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E.    COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    15    30         60

( IN FEET )
1 inch = 30  ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

Cad No. 0419209F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## THIRTIETH LEVEL FLOOR PLAN

EXHIBIT 2

SHEET 24 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





LEGEND:

─────── CONDOMINIUM UNIT
          BOUNDARY

▨ (HOTEL LOT)
   NOT A PART OF THE
   CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

Cod No. 041920F    Drawn By: RJU    Date Printed: 8/8/08 4:12p

## LEVEL 31 AND MECHANICAL LEVEL 31 FLOOR PLAN

EXHIBIT 2                    SHEET 25 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**TYPE "A2"**
UNITS #3204 thru #3404

C.E.

**TYPE "B6"**
UNITS #3201 thru #3401

BALCONY (×4)



(HOTEL LOT)
NOT A PART

LEGEND:

| | |
|---|---|
| ———— | CONDOMINIUM UNIT BOUNDARY |
|  | (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY |
| C.E. | COMMON ELEMENT |

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.
2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.
3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    15    30    60

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Cad No. 0419220F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## LEVELS 32-34 AND LOWER ROOF PLAN
## EXHIBIT 2                    SHEET 26 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



Date Printed: 8/8/08 4:12p

Drawn By: RJM

Cad No. 041920F

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E.    COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0     15     30          60

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

## LEVEL 35 + LOWER ROOF PLAN

EXHIBIT 2                    SHEET 27 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM



LEGEND:

―――――― CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E. COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

GRAPHIC SCALE

0    15    30              60

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

ROOF PLAN LEVEL 36

EXHIBIT 2

SHEET 28 OF 65

Cad No. 04192DF    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,

## A CONDOMINIUM



LEGEND:

—————— CONDOMINIUM UNIT
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

C.E.   COMMON ELEMENT

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

NOTE:

For a complete description of the Unit boundaries as
shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the
properties located outside of the Condominium Boundary
Line are part of the Hotel Lot.

Cod No. 041920F    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## MECHANICAL PLAN LEVEL 37

EXHIBIT 2                     SHEET 29 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



Cod No. 0419205F    Drawn By: RAM    Date Printed: 8/8/08 4:12p

GRAPHIC SCALE



( IN FEET )
1 inch = 30 ft.

LEGEND:

 (HOTEL LOT)
NOT A PART OF
CONDOMINIUM PROPERTY

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

## ROOF

**EXHIBIT 2**

# NORTH CARILLON BEACH,

## A CONDOMINIUM

TOP OF SUPERGRID
+390.2' N.G.V.D.

ROOF LEVEL
+355.1' N.G.V.D.

LEVEL 35
+342.9' N.G.V.D.

LEVEL 34
+333.0' N.G.V.D.

LEVEL 33
+323.0' N.G.V.D.

LEVEL 32
+313.0' N.G.V.D.

LEVEL 31
+302.9' N.G.V.D.

LEVEL 30
+292.9' N.G.V.D.

LEVEL 29
+282.9' N.G.V.D.

LEVEL 28
+272.9' N.G.V.D.

LEVEL 27
+262.9' N.G.V.D.

LEVEL 26
+252.9' N.G.V.D.

LEVEL 25
+242.9' N.G.V.D.

LEVEL 24
+232.9' N.G.V.D.

LEVEL 23 / ROOF TERRACE
+222.9' N.G.V.D.

LEVEL 22
+212.9' N.G.V.D.

LEVEL 21
+202.9' N.G.V.D.

LEVEL 20
+192.9' N.G.V.D.

LEVEL 19
+182.9' N.G.V.D.

LEVEL 18
+172.9' N.G.V.D.

LEVEL 17
+162.9' N.G.V.D.

LEVEL 16
+152.9' N.G.V.D.

LEVEL 15
+143.0' N.G.V.D.

LEVEL 14
+132.9' N.G.V.D.

LEVEL 12        (NOTE: THERE IS NO 13th LEVEL)
+122.9' N.G.V.D.

LEVEL 11
+112.9' N.G.V.D.

LEVEL 10
+102.9' N.G.V.D.

LEVEL 9
+92.9' N.G.V.D.

LEVEL 8
+83.0' N.G.V.D.

LEVEL 7
+73.0' N.G.V.D.
LEVEL 6
+63.0' N.G.V.D.

TOP OF SUPERGRID
+320.1' N.G.V.D.

ROOF LEVEL
+298.2' N.G.V.D.

LEVEL 5 - TOWNHOUSES/PARKING
+53.0' N.G.V.D.

LEVEL 4 - TOWNHOUSES/PARKING
+43.0' N.G.V.D.

LEVEL 3 - TOWNHOUSES/PARKING
+33.0' N.G.V.D.

LEVEL 2 - TOWNHOUSES/PARKING
+28.3' N.G.V.D.        T.O.S. RETAIL ROOF
                       +21.4' N.G.V.D.

LEVEL 1 - LOBBY/AMENITIES/PARKING
+13.1' N.G.V.D.

RETAIL LEVEL
+8.1' N.G.V.D.

BASEMENT LEVEL PARKING
+3.0' N.G.V.D.

NOTE:
ELEVATIONS REFER TO (N.G.V.D.) NATIONAL GEODETIC VERTICAL DATUM OF 1929

Cod No. 04192020L    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# ELEVATION (WEST)

EXHIBIT 2                    SHEET 31 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

OPEN TO ABOVE

UP

BALCONY



GRAPHIC SCALE

0    5    10         20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

———— CONDOMINIUM UNIT BOUNDARY

▨ (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNIT
#205

(FIRST LEVEL)

Cad No. 0419200U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## TYPE "TH1"

EXHIBIT 2

SHEET 32 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM





GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

———— CONDOMINIUM UNIT BOUNDARY

▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT
#205

(SECOND LEVEL)

Cad No. 0419200   Drawn By: RJM   Date Printed: 6/9/08 4:12p

## TYPE "TH1"

EXHIBIT 2                    SHEET 33 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

OPEN TO ABOVE

OPEN TO ABOVE



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

— CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT
#204

(FIRST LEVEL)

Cad No. 04192003   Drawn By: RJM   Date Printed: 8/7/08 4:12p

## TYPE "TH2"

EXHIBIT 2

SHEET 34 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY
OPEN TO BELOW
OPEN TO BELOW



### GRAPHIC SCALE

0    5    10    20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

—————— CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

## UNIT #204
### (SECOND LEVEL)

Cod No. 04192DU    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## TYPE "TH2"

**EXHIBIT 2**            **SHEET 35 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

OPEN TO ABOVE

UP

BALCONY



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:
—————  CONDOMINIUM UNIT BOUNDARY
////////  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT
#405
(FIRST LEVEL)

Cad No. 0419120U   Drawn By: R.RM   Date Printed: 8/8/08 4:12p

TYPE "TH3"

EXHIBIT 2

SHEET 36 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

17.1'

1.1'
1.3'
0.5'
13.0'
3.5'
0.9'
0.5'
8.4'
3.5'
1.5'

OPEN TO BELOW

14.7'

47.3'

0.6'
1.3
0.6'
1.6'
1.4

30.6'

9.5'

1.5'
2.0

3.5'
0.3'

2.5'
2.0'
DN

60.0'
17.6'

BALCONY

0.3'

1.1'
4.9'
11.5'
15.4'

0.3'
2.4'
10.8'

18.0'

0.2'
1.3'



### GRAPHIC SCALE

0    5    10        20

( IN FEET )
1 inch = 10  ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

———————   CONDOMINIUM UNIT BOUNDARY

   (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #405
(SECOND LEVEL)

## TYPE "TH3"

EXHIBIT 2

SHEET 37 OF 65

Cad No. 0419200J    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM





GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

——————  CONDOMINIUM UNIT
BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNIT
#404

(FIRST LEVEL)

## TYPE 'TH4'

EXHIBIT 2

SHEET 38 OF 65

Ccd No. 0419220U   Date Printed: 8/8/08 4:12p   Drawn By: RJM

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

OPEN TO BELOW

OPEN TO BELOW

OPEN TO BELOW

DN



### GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT
#404

(SECOND LEVEL)

## TYPE "TH4"

**EXHIBIT 2**

**SHEET 39 OF 65**

Dod No. 0419200U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM





**GRAPHIC SCALE**

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

―――― CONDOMINIUM UNIT BOUNDARY

////// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

Cad No. 041920U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

**UNIT #403**

(FIRST LEVEL)

## TYPE 'TH5'

**EXHIBIT 2**

**SHEET 40 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM





GRAPHIC SCALE

0   5   10        20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**



———————  CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #403

(SECOND LEVEL)

TYPE "TH5"

EXHIBIT 2

SHEET 41 OF 65

Cad No. 0419200J   Drawn By: RJM   Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,

## A CONDOMINIUM



BALCONY

OPEN TO ABOVE

28.7'

OPEN TO ABOVE

UP

OPEN TO ABOVE

28.4'

TENANT STORAGE

28.5'



GRAPHIC SCALE

0  5  10        20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

———  CONDOMINIUM UNIT BOUNDARY

▨  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #402

(FIRST LEVEL)

## TYPE "TH6"

Cad No. 041920U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

EXHIBIT 2

SHEET 42 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM



BALCONY

OPEN TO BELOW

OPEN TO BELOW

OPEN TO BELOW

DN


NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

HOTEL LOT:

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #402

(SECOND LEVEL)

Cad No. 0419200  Drawn By: RJM  Date Printed: 8/8/08 4:12p

## TYPE "TH6"

EXHIBIT 2

SHEET 43 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

OPEN TO ABOVE

2.7'  0.3'  11.8'  0.6'
8.3'  13.0'
1.9'
3.6'  4.3'
2.6'  0.6'

28.6'

39.5'  25.2'

2.0'  1.5'  0.8'

3.0'
3.0'

0.5'
3.7'
0.5'

1.0'  38.6'
3.0'

UP
OPEN TO ABOVE

19.7'

OPEN TO ABOVE

73.2'

27.9'

0.3'
4.5'

TENANT STORAGE

2.7'
0.4'

28.1'



GRAPHIC SCALE

0   5   10        20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**
1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

———————  CONDOMINIUM UNIT BOUNDARY

///////  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #401

(FIRST LEVEL)

TYPE 'TH7'

EXHIBIT 2                    SHEET 44 OF 65

Ord No. 0419/20U      Drawn By: RvM      Date Printed: 8/8/08 4:13p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**BALCONY**

OPEN TO BELOW

28.7'

57.0'

46.7'

OPEN TO BELOW

DN

OPEN TO BELOW

11.5'

OPEN TO BELOW

13.6'



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

HOTEL LOT:

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

——————— CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #401

(SECOND LEVEL)

## TYPE 'TH7'

EXHIBIT 2

SHEET 45 OF 65

Cad No. 041920U   Drawn By: RJM   Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM





GRAPHIC SCALE

0    5    10         20

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

—————— CONDOMINIUM UNIT BOUNDARY

▨▨▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS #2104 THRU 2604, #2804 & #2904**

## TYPE 'A1'

Cad No. 04192OU    Drawn By: RJM    Date Printed: 8/8/08 4:12p

**EXHIBIT 2**

**SHEET 46 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

14.7'

31.3'

21.3'

81.4'

0.3'
2.1'
2.1'
4.0'
2.4'

18.2'

0.3'
2.1'
2.0'
4.0'
2.4'

15.3'

28.3'

14.0'

BALCONY

12.9'

7.3'

16.1'
1.5'
5.3'
1.4'
1.8'
3.8'
16.0'
5.5'
1.7'

18.6'

2.1'
2.7'
11.5'
1.0'
1.9'
9.6'
7.2'

8.3'
15.6'
1.0'
2.2'

26.8'

3.1'

7.0'

0.2'

9.0'

1.5'
5.1'

4.6'

2"DIA

2"DIA

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

UNIT #2704

Date Printed: 8/8/08 4:12p

**LEGEND:**

CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE CONDOMINIUM PROPERTY

## TYPE 'A1-MOD'

EXHIBIT 2

SHEET 47

# NORTH CARILLON BEACH,

## A CONDOMINIUM



BALCONY

BALCONY



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

———— CONDOMINIUM UNIT BOUNDARY

▨ (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNITS
#2308 THRU #2508

Cad No. 041920U     Drawn By: RJM     Date Printed: 8/8/06 4:12p

## TYPE 'A1'

EXHIBIT 2                    SHEET 48 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

BALCONY

OCCURS AT UNIT #3507 ONLY

COMMON CORNER

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

BALCONY

**LEGEND:**

―――――― CONDOMINIUM UNIT BOUNDARY

▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS #3004 THRU #3504

## TYPE 'A2'

EXHIBIT 2

SHEET 49 OF 65

Cod No. 041920U   Drwdat/By/Pdt/kd: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10  ft.

BALCONY

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

**HOTEL LOT:**
1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

BALCONY

**LEGEND:**

—— CONDOMINIUM UNIT
     BOUNDARY

////  (HOTEL LOT)
      NOT A PART OF THE
      CONDOMINIUM PROPERTY

UNITS
#2608 THRU #2908

Cad. No. 041920U    Drawn By: RLM    Date Printed: 8/8/08 4:12p

## TYPE 'A2'

**EXHIBIT 2**

**SHEET 50 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 10 ft.



**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO
INDIVIDUAL UNIT DEPICTION FOR BALCONY
VARIATION.

**LEGEND:**

———————— CONDOMINIUM UNIT
BOUNDARY

///// (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNITS
#603 THRU #2203

(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B1'

EXHIBIT 2

SHEET 51 OF 65

Cod No. 0419202J  Drawn By: RJM  Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

0    5    10         20

( IN FEET )
1 inch = 10 ft.



**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO
INDIVIDUAL UNIT DEPICTION FOR BALCONY
VARIATION.

**LEGEND:**

—————  CONDOMINIUM UNIT
         BOUNDARY

▨  (HOTEL LOT)
    NOT A PART OF THE
    CONDOMINIUM PROPERTY

**UNITS**
**#610 THRU #2210**

(NOTE: THERE IS NO 13th LEVEL)
## TYPE 'B1'

**EXHIBIT 2**                    **SHEET 52 OF 65**

Cad No. 041920U    Drown By: RLM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



**GRAPHIC SCALE**

( IN FEET )
1 inch = 10 ft.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

BALCONY

COMMON CORNER

OCCURS AT UNITS #601 THRU #2301 ONLY

OCCURS AT UNITS #2401 THRU #2901 ONLY

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO INDIVIDUAL UNIT DEPICTION FOR BALCONY VARIATION.

**LEGEND:**

——————  CONDOMINIUM UNIT BOUNDARY

/////////  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS #601 THRU #2601, 2801 & #2901**

(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B2'

EXHIBIT 2

SHEET 53 OF 65

Cod No. 041920U     Drawn By: RJM     Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.




Date Printed: 8/8/08 4:12p

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**LEGEND:**

——— CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNIT #2701

## TYPE 'B2-MOD'

EXHIBIT 2            SHEET 54 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



OCCURS AT UNITS
#2407 AND #2507
ONLY

4.6'
1.8'
5.8'
1.8'
13.6'
0.2'
9.3'
2.0'
33.0'

33.2'

COMMON CORNER

OCCURS AT UNITS
#607 THRU #2307
ONLY

4.6'
5.0'
5.8'
0.3'
1.8'
20.0'
1.9'
2.7'
0.4'
10.1'

13.6'

10.1'

BALCONY

0.3'

14.5'

49.3'

0.3'

14.2'

1.8'
5.3'
0.4'
1.2'

0.3'

41.0'

16.0'

14.5'

9.5'
0.4'
2.7'
1.5'
14.0'
0.7'
3.9'
1.3'

GRAPHIC SCALE

0    5    10         20

( IN FEET )
1 inch = 10 ft.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO INDIVIDUAL UNIT DEPICTION FOR BALCONY VARIATION.

**LEGEND:**

———— CONDOMINIUM UNIT BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS
#607 THRU #2507**

Cad No. 0419200J    Drawn By: RJM    Date Printed: 8/8/08 4:12p

(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B2'

**EXHIBIT 2**

**SHEET 55 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM





GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**BALCONY CONFIGURATION MAY VARY, REFER TO INDIVIDUAL UNIT DEPICTION FOR BALCONY VARIATION.**

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

——— CONDOMINIUM UNIT BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#602 THRU #2202

(NOTE: THERE IS NO 13th LEVEL)
## TYPE 'B3'

**EXHIBIT 2**

**SHEET 56 OF 65**

Cad No. 041920U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



BALCONY

GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

26.1'

1.4' 0.3'

28.6

39.9'

33.9'

0.3'

16.2'

12.5'

.5'

12.5'

1.4'
2.0'
1.7'

26.0'

22.5'

28.3'

0.5'

28.4'

0.6'

BALCONY

70.4'

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**BALCONY CONFIGURATION MAY VARY, REFER TO INDIVIDUAL UNIT DEPICTION FOR BALCONY VARIATION.**

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

——————  CONDOMINIUM UNIT BOUNDARY

///////  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#606 THRU #2206

(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B3'

EXHIBIT 2

SHEET 57 OF 65

Cat No. 0419020U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.



40.1'

BALCONY

COMMON CORNER

OCCURS AT UNITS
#1205 THRU #2005
ONLY

31.2'

48.4'

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

**LEGEND:**

—————  CONDOMINIUM UNIT
        BOUNDARY

////////  (HOTEL LOT)
          NOT A PART OF THE
          CONDOMINIUM PROPERTY

Cod No. 041920U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

## UNITS
## #905 THRU #2005

(NOTE: THERE IS NO 13th LEVEL)
## TYPE "B4"

**EXHIBIT 2**

**SHEET 58 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10   ft.



**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**LEGEND:**

───────── CONDOMINIUM UNIT BOUNDARY

▨▨▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#708 THRU #2208

(NOTE: THERE IS NO 13th LEVEL)
## TYPE 'B4'

Cad No. 0419200    Drawn By: RJM    Date Printed: 8/8/08 4:12p

EXHIBIT 2                                          SHEET 59 OF 65

# NORTH CARILLON BEACH,

## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

OCCURS AT UNITS
#2403 THRU #2903
ONLY

OCCURS AT UNIT
#2303 ONLY

OCCURS AT UNIT
#2903 ONLY

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO
INDIVIDUAL UNIT DEPICTION FOR BALCONY
VARIATION.

**LEGEND:**

 CONDOMINIUM UNIT
BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNITS
#2303 THRU #2903

Cad No. 04192000    Drawn By: RJM    Date Printed: 8/8/08 4:17p

## TYPE 'B5'

**EXHIBIT 2**

**SHEET 60 OF 65**

# NORTH CARILLON BEACH,
## A CONDOMINIUM



OCCURS AT UNIT #2310 ONLY

GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

BALCONY CONFIGURATION MAY VARY, REFER TO INDIVIDUAL UNIT DEPICTION FOR BALCONY VARIATION.

**LEGEND:**

—————— CONDOMINIUM UNIT BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS**
**#2310 THRU #2510**

## TYPE 'B5'

EXHIBIT 2

SHEET 61 OF 65

Cad No. 0419200    Drawn By: RJM    Date Printed: 8/8/08 4:12p



# NORTH CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.

BALCONY

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown herein, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

BALCONY

**LEGEND:**

———— CONDOMINIUM UNIT BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#3001 THRU #3501

## TYPE 'B6'

EXHIBIT 2                    SHEET 62 OF 65

Cad No. 0419220U    Drawn By: RLM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,

## A CONDOMINIUM



BALCONY

17.3' 3.0' 3.3' 2.5' 11.0' 1.1'

2.0'A

18.1'

15.7'

32.7' 0.1'

0.2' 9.9'

4.4'

1.8'

6.7' 13.8'

0.9' 1.8'

0.2'

12.0' 2.0'B

0.2'

0.0' 2.5'

8.7'

1.9' 75.9'

8.5'

0.6'

2.0'A 25.4'

4.4'

2.0'

1.4' 2.3' 0.5' 3.9'

1.4' 4.9'

0.2'

26.0' 1.8'

4.4'

BALCONY 22.6' 17.0'

10.8' 0.3' 1.9' 3.0'

1.1' 0.3' 0.3'

1.7' 10.5'

**GRAPHIC SCALE**

0  5  10  20

( IN FEET )
1 inch = 10 ft.

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**LEGEND:**

―――――  CONDOMINIUM UNIT BOUNDARY

▨  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS**
**#2607 THRU #2907**

Cad No. 041920U    Drawn By: RJM    Date Printed: 8/8/08 4:12p

# NORTH CARILLON BEACH,

## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.



COMMON CORNER

BALCONY

OCCURS AT UNITS
#904 THRU
#1104 ONLY

**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**

For a complete description of the unit
boundaries shown hereon, refer to the
Declaration of Condominium.

Except as otherwise designated herein, all
areas of the properties located outside of the
Condominium Boundary Line are part of the
Hotel Lot.

**LEGEND:**

———— CONDOMINIUM UNIT
      BOUNDARY

▨ (HOTEL LOT)
  NOT A PART OF THE
  CONDOMINIUM PROPERTY

UNITS
#904 THRU #2004

*(NOTE: THERE IS NO 13th LEVEL)*

## TYPE 'C1'



Cad No. 041920U    Drawn By: RLM    Date Printed: 8/8/08 4:12p



































EXHIBIT 2                    SHEET 64 OF 65

# NORTH CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 10 ft.



**HOTEL LOT:**

1. ALL BALCONIES ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

**LEGEND:**

———— CONDOMINIUM UNIT BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#709 THRU #2209

(NOTE: THERE IS NO 13th LEVEL)
## TYPE 'C1'

EXHIBIT 2     SHEET 65 OF 65

Cod No. 041920U   Drawn By: RJM   Date Printed: 8/8/08 4:12p

Exhibit "3"

NORTH CARILLON BEACH, A CONDOMINIUM

*PERCENTAGE OF OWNERSHIP OF COMMON ELEMENTS AND MASTER EXPENSES*
"ALLOCATED INTERESTS"

| Type | Unit # | % Shares |
|------|--------|----------|
| TH1 | 205 | 0.9975% |
| TH2 | 204 | 0.7221% |
| TH7 | 401 | 0.9018% |
| TH6 | 402 | 0.8901% |
| TH5 | 403 | 0.8856% |
| TH4 | 404 | 0.9151% |
| TH3 | 405 | 1.0477% |
| B2 | 601 | 0.4612% |
| B3 | 602 | 0.6041% |
| B1 | 603 | 0.3772% |
| B3 | 606 | 0.6041% |
| B2 | 607 | 0.4612% |
| B1 | 610 | 0.3772% |
| B2 | 701 | 0.4612% |
| B3 | 702 | 0.6041% |
| B1 | 703 | 0.3772% |
| B3 | 706 | 0.6041% |
| B2 | 707 | 0.4612% |
| B4 | 708 | 0.3801% |
| C1 | 709 | 0.2416% |
| B1 | 710 | 0.3772% |
| B2 | 801 | 0.4612% |
| B3 | 802 | 0.6041% |
| B1 | 803 | 0.3772% |
| B3 | 806 | 0.6041% |
| B2 | 807 | 0.4612% |
| B4 | 808 | 0.3801% |
| C1 | 809 | 0.2416% |
| B1 | 810 | 0.3772% |
| B2 | 901 | 0.4612% |
| B3 | 902 | 0.6041% |
| B1 | 903 | 0.3772% |
| C1 | 904 | 0.2416% |
| B4 | 905 | 0.3801% |
| B3 | 906 | 0.6041% |
| B2 | 907 | 0.4612% |
| B4 | 908 | 0.3801% |
| C1 | 909 | 0.2416% |
| B1 | 910 | 0.3772% |
| B2 | 1001 | 0.4612% |
| B3 | 1002 | 0.6041% |
| B1 | 1003 | 0.3772% |
| C1 | 1004 | 0.2416% |
| B4 | 1005 | 0.3801% |
| B3 | 1006 | 0.6041% |
| B2 | 1007 | 0.4612% |
| B4 | 1008 | 0.3801% |
| C1 | 1009 | 0.2416% |
| B1 | 1010 | 0.3772% |
| B2 | 1101 | 0.4612% |
| B3 | 1102 | 0.6041% |
| B1 | 1103 | 0.3772% |
| C1 | 1104 | 0.2416% |
| B4 | 1105 | 0.3801% |
| B3 | 1106 | 0.6041% |
| B2 | 1107 | 0.4612% |
| B4 | 1108 | 0.3801% |
| C1 | 1109 | 0.2416% |
| B1 | 1110 | 0.3772% |
| B2 | 1201 | 0.4612% |
| B3 | 1202 | 0.6041% |

| | | |
|---|---|---|
| B1 | 1203 | 0.3772% |
| C1 | 1204 | 0.2416% |
| B4 | 1205 | 0.3801% |
| B3 | 1206 | 0.6041% |
| B2 | 1207 | 0.4612% |
| B4 | 1208 | 0.3801% |
| C1 | 1209 | 0.2416% |
| B1 | 1210 | 0.3772% |
| B2 | 1401 | 0.4612% |
| B3 | 1402 | 0.6041% |
| B1 | 1403 | 0.3772% |
| C1 | 1404 | 0.2416% |
| B4 | 1405 | 0.3801% |
| B3 | 1406 | 0.6041% |
| B2 | 1407 | 0.4612% |
| B4 | 1408 | 0.3801% |
| C1 | 1409 | 0.2416% |
| B1 | 1410 | 0.3772% |
| B2 | 1501 | 0.4612% |
| B3 | 1502 | 0.6041% |
| B1 | 1503 | 0.3772% |
| C1 | 1504 | 0.2416% |
| B4 | 1505 | 0.3801% |
| B3 | 1506 | 0.6041% |
| B2 | 1507 | 0.4612% |
| B4 | 1508 | 0.3801% |
| C1 | 1509 | 0.2416% |
| B1 | 1510 | 0.3772% |
| B2 | 1601 | 0.4612% |
| B3 | 1602 | 0.6041% |
| B1 | 1603 | 0.3772% |
| C1 | 1604 | 0.2416% |
| B4 | 1605 | 0.3801% |
| B3 | 1606 | 0.6041% |
| B2 | 1607 | 0.4612% |
| B4 | 1608 | 0.3801% |
| C1 | 1609 | 0.2416% |
| B1 | 1610 | 0.3772% |
| B2 | 1701 | 0.4612% |
| B3 | 1702 | 0.6041% |
| B1 | 1703 | 0.3772% |
| C1 | 1704 | 0.2416% |
| B4 | 1705 | 0.3801% |
| B3 | 1706 | 0.6041% |
| B2 | 1707 | 0.4612% |
| B4 | 1708 | 0.3801% |
| C1 | 1709 | 0.2416% |
| B1 | 1710 | 0.3772% |
| B2 | 1801 | 0.4612% |
| B3 | 1802 | 0.6041% |
| B1 | 1803 | 0.3772% |
| C1 | 1804 | 0.2416% |
| B4 | 1805 | 0.3801% |
| B3 | 1806 | 0.6041% |
| B2 | 1807 | 0.4612% |
| B4 | 1808 | 0.3801% |
| C1 | 1809 | 0.2416% |
| B1 | 1810 | 0.3772% |
| B2 | 1901 | 0.4612% |
| B3 | 1902 | 0.6041% |
| B1 | 1903 | 0.3772% |
| C1 | 1904 | 0.2416% |
| B4 | 1905 | 0.3801% |
| B3 | 1906 | 0.6041% |
| B2 | 1907 | 0.4612% |
| B4 | 1908 | 0.3801% |
| C1 | 1909 | 0.2416% |
| B1 | 1910 | 0.3772% |
| B2 | 2001 | 0.4612% |
| B3 | 2002 | 0.6041% |

| | | |
|---|---|---|
| B1 | 2003 | 0.3772% |
| C1 | 2004 | 0.2416% |
| B4 | 2005 | 0.3801% |
| B3 | 2006 | 0.6041% |
| B2 | 2007 | 0.4612% |
| B4 | 2008 | 0.3801% |
| C1 | 2009 | 0.2416% |
| B1 | 2010 | 0.3772% |
| B2 | 2101 | 0.4612% |
| B3 | 2102 | 0.6041% |
| B1 | 2103 | 0.3772% |
| A1 | 2104 | 0.6336% |
| B3 | 2106 | 0.6041% |
| B2 | 2107 | 0.4612% |
| B4 | 2108 | 0.3801% |
| C1 | 2109 | 0.2416% |
| B1 | 2110 | 0.3772% |
| B2 | 2201 | 0.4612% |
| B3 | 2202 | 0.6041% |
| B1 | 2203 | 0.3772% |
| A1 | 2204 | 0.6336% |
| B3 | 2206 | 0.6041% |
| B2 | 2207 | 0.4612% |
| B4 | 2208 | 0.3801% |
| C1 | 2209 | 0.2416% |
| B1 | 2210 | 0.3772% |
| B2 | 2301 | 0.4612% |
| B5 | 2303 | 0.4052% |
| A1 | 2304 | 0.6336% |
| B2 | 2307 | 0.4612% |
| A1 | 2308 | 0.6336% |
| B5 | 2310 | 0.4052% |
| B2 | 2401 | 0.4612% |
| B5 | 2403 | 0.4052% |
| A1 | 2404 | 0.6336% |
| B2 | 2407 | 0.4612% |
| A1 | 2408 | 0.6336% |
| B5 | 2410 | 0.4052% |
| B2 | 2501 | 0.4612% |
| B5 | 2503 | 0.4052% |
| A1 | 2504 | 0.6336% |
| B2 | 2507 | 0.4612% |
| A1 | 2508 | 0.6336% |
| B5 | 2510 | 0.4052% |
| B2 | 2601 | 0.4612% |
| B5 | 2603 | 0.4052% |
| A1 | 2604 | 0.6336% |
| B6 | 2607 | 0.7176% |
| A2 | 2608 | 0.7869% |
| B2-MOD | 2701 | 0.2871% |
| B5 | 2703 | 0.4052% |
| A1-MOD | 2704 | 0.8114% |
| B6 | 2707 | 0.7176% |
| A2 | 2708 | 0.7869% |
| B2 | 2801 | 0.4612% |
| B5 | 2803 | 0.4052% |
| A1 | 2804 | 0.6336% |
| B6 | 2807 | 0.7176% |
| A2 | 2808 | 0.7869% |
| B2 | 2901 | 0.4612% |
| B5 | 2903 | 0.4052% |
| A1 | 2904 | 0.6336% |
| B6 | 2907 | 0.7176% |
| A2 | 2908 | 0.7869% |
| B6 | 3001 | 0.7176% |
| A2 | 3004 | 0.7869% |
| B6 | 3101 | 0.7176% |
| A2 | 3104 | 0.7869% |
| B6 | 3201 | 0.7176% |
| A2 | 3204 | 0.7869% |

| | | |
|---|---|---|
| B6 | 3301 | 0.7176% |
| A2 | 3304 | 0.7869% |
| B6 | 3401 | 0.7176% |
| A2 | 3404 | 0.7869% |
| B6 | 3501 | 0.7176% |
| A2 | 3504 | 0.7869% |
| | | 100% |

NOTE: FOR A DESCRIPTION OF UNITS BY UNIT TYPE, SEE EXHIBIT "2" TO THE DECLARATION OF CONDOMINIUM.

4

<u>Exhibit "4"</u>

BY-LAWS
OF
NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.

*A corporation not for profit organized
under the laws of the State of Florida*

1.  <u>Identity</u>. These are the By-Laws of NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. (the "Association"), a corporation not for profit incorporated under the laws of the State of Florida, and organized for the purposes set forth in its Articles of Incorporation.

    1.1  <u>Fiscal Year</u>. The fiscal year of the Association shall be the twelve month period commencing January 1st and terminating December 31st of each year.

    1.2  <u>Seal</u>. The seal of the Association shall bear the name of the corporation, the word "Florida", the words "Corporation Not for Profit", and the year of incorporation.

2.  <u>Definitions</u>. For convenience, these By-Laws shall be referred to as the "By-Laws" and the Articles of Incorporation of the Association as the "Articles". The other terms used in these By-Laws shall have the same definitions and meanings as those set forth in the Declaration for NORTH CARILLON BEACH, A CONDOMINIUM, unless herein provided to the contrary, or unless the context otherwise requires.

3.  <u>Members</u>.

    3.1  <u>Annual Meeting</u>. The annual members' meeting shall be held on the date, at the place and at the time determined by the Board of Directors from time to time, provided that there shall be an annual meeting every calendar year and, to the extent possible, no later than thirteen (13) months after the last preceding annual meeting. The purpose of the meeting shall be, except as provided herein to the contrary, to elect Directors, and to transact any other business authorized to be transacted by the members, or as stated in the notice of the meeting sent to Unit Owners in advance thereof. Unless changed by the Board of Directors, the first annual meeting shall be held in the month of October following the year in which the Declaration is filed.

    3.2  <u>Special Meetings</u>. Special members' meetings shall be held at such places as provided herein for annual meetings, and may be called by the President or by a majority of the Board of Directors of the Association, and must be called by the President or Secretary upon receipt of a written request from a majority of the members of the Association. The business conducted at a special meeting shall be limited to that stated in the notice of the meeting. Special meetings may also be called by Unit Owners in the manner provided for in the Act. Notwithstanding the foregoing: (i) as to special meetings regarding the adoption of the Condominium's estimated operating budget, reference should be made to Section 10.1 of these By-Laws; and (ii) as to special meetings regarding recall of Board members, reference should be made to Section 4.3 of these By-Laws.

    3.3  <u>Participation by Unit Owners</u>. Subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board, Unit Owners shall have the right to speak at the annual and special meetings of the Unit Owners, committee meetings and Board meetings with reference to all designated agenda items. A Unit Owner does not have the right to speak with respect to items not specifically designated on the agenda, provided, however, that the Board may permit an Unit Owner to speak on such items in its discretion. Every Unit Owner who desires to speak at a meeting, may do so, provided that the Unit Owner has filed a written request with the Secretary of the Association not less than 24 hours prior to the scheduled time for commencement of the meeting. Unless waived by the chairman of the meeting (which may be done in the chairman's sole and absolute discretion and without being deemed to constitute a waiver as to any other subsequent speakers), all Unit Owners speaking at a meeting shall be limited to a maximum of three (3) minutes per speaker. Any Unit Owner may tape record or videotape a meeting, subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board:

        (a)  The only audio and video equipment and devices which Unit Owners are authorized to utilize at any such meeting is equipment which does not produce distracting sound or light emissions;

        (b)  Audio and video equipment shall be assembled and placed in position in advance of the commencement of the meeting.

        (c)  Anyone videotaping or recording a meeting shall not be permitted to move about the meeting room in order to facilitate the recording; and

(d)    At least 48 hours (or 24 hours with respect to a Board meeting) prior written notice shall be given to the Secretary of the Association by any Unit Owner desiring to make an audio or video taping of the meeting.

3.4    Notice of Meeting; Waiver of Notice. Notice of a meeting of members (annual or special), stating the time and place and the purpose(s) for which the meeting is called, shall be given by the President or Secretary. A copy of the notice shall be posted at a conspicuous place on the Condominium Property. The notice of an annual or special meeting shall be hand delivered, electronically transmitted or sent by regular mail to each Unit Owner, unless the Unit Owner waives in writing the right to receive notice of the annual meeting by mail. The delivery or mailing shall be to the address of the member as last furnished to the Association by the Unit Owner. However, if a Unit is owned by more than one person, the Association shall provide notice, for meetings and all other purposes, to that one address initially identified for that purpose by the Developer and thereafter as one or more of the Owners of the Unit shall so advise the Association in writing, or if no address is given or if the Owners disagree, notice shall be sent to the address for the Owner as set forth on the deed of the Unit. The posting and mailing of the notice for either special or annual meetings, which notice shall incorporate an identification of agenda items, shall be effected not less than fourteen (14) continuous days, nor more than sixty (60) days, prior to the date of the meeting. The Board shall adopt by rule, and give notice to Unit Owners of, a specific location on the Condominium Property upon which all notices of members' meetings shall be posted. In lieu of or in addition to the physical posting of notice of any meeting of the Unit Owners on the Condominium Property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed-circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on the Condominium Property, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda.

Notice of specific meetings may be waived before or after the meeting and the attendance of any member (or person authorized to vote for such member), either in person or by proxy, shall constitute such member's waiver of notice of such meeting, and waiver of any and all objections to the place of the meeting, the time of the meeting or the manner in which it has been called or convened, except when his (or his authorized representative's) attendance is for the express purpose of objecting at the beginning of the meeting to the transaction of business because the meeting is not lawfully called.

An officer of the Association, or the manager or other person providing notice of the meeting shall provide an affidavit or United States Postal Service certificate of mailing, to be included in the official records of the Association, affirming that notices of meetings were posted and mailed or hand delivered in accordance with this Section and Section 718.112(2)(d) of the Act, to each Unit Owner at the appropriate address for such Unit Owner. No other proof of notice of a meeting shall be required.

3.5    Quorum. A quorum at members' meetings shall be attained by the presence, either in person or by proxy (limited or general), of persons entitled to cast in excess of 33 1/3% of the votes of members entitled to vote at the subject meeting.

3.6    Voting.

(a)    Number of Votes. Except as provided in Section 3.11 hereof, in any meeting of members, the Owners of each Unit shall be entitled to cast the number of votes designated for their Unit as set forth in the Articles. The vote of a Unit shall not be divisible.

(b)    Majority Vote. The acts approved by a majority of the votes present in person or by proxy at a meeting at which a quorum shall have been attained shall be binding upon all Unit Owners for all purposes, except where otherwise provided by law, the Declaration, the Articles or these By-Laws. As used in these By-Laws, the Articles or the Declaration, the terms "majority of the Unit Owners" and "majority of the members" shall mean a majority of the votes entitled to be cast by the members and not a majority of the members themselves and shall further mean more than 50% of the then total authorized votes present in person or by proxy and voting at any meeting of the Unit Owners at which a quorum shall have been attained. Similarly, if some greater percentage of members is required herein or in the Declaration or Articles, it shall mean such greater percentage of the votes of members and not of the members themselves.

(c)    Voting Member. If a Unit is owned by one person, that person's right to vote shall be established by the roster of members. If a Unit is owned by more than one person, those persons (including husbands and wives) shall decide among themselves as to who shall

cast the vote of the Unit. In the event that those persons cannot so decide, no vote shall be cast. A person casting a vote for a Unit shall be presumed to have the authority to do so unless the President or the Board of Directors is otherwise notified. If a Unit is owned by a corporation, the person entitled to cast the vote for the Unit shall be designated by a certificate signed by an appropriate officer of the corporation and filed with the Secretary of the Association. Such person need not be a Unit Owner. Those certificates shall be valid until revoked or until superseded by a subsequent certificate or until a change in the ownership of the Unit concerned. A certificate designating the person entitled to cast the vote for a Unit may be revoked by any record owner of an undivided interest in the Unit. If a certificate designating the person entitled to cast the vote for a Unit for which such certificate is required is not on file or has been revoked, the vote attributable to such Unit shall not be considered in determining whether a quorum is present, nor for any other purpose, and the total number of authorized votes in the Association shall be reduced accordingly until such certificate is filed.

3.7 <u>Proxies</u>. Votes to be cast at meetings of the Association membership may be cast in person or by proxy. Except as specifically provided herein, Unit Owners may not vote by general proxy, but may vote by limited proxies substantially conforming to the limited proxy form approved by the Division. Limited proxies shall be permitted to the extent permitted by the Act. No proxy, limited or general, shall be used in the election of Board members. General proxies may be used for other matters for which limited proxies are not required and may also be used in voting for nonsubstantive changes to items for which a limited proxy is required and given. A proxy may be made by any person entitled to vote, but shall only be valid for the specific meeting for which originally given and any lawful adjourned meetings thereof. In no event shall any proxy be valid for a period longer than 90 days after the date of the first meeting for which it was given. Every proxy shall be revocable at any time at the pleasure of the person executing it. A proxy must be in writing, signed by the person authorized to cast the vote for the Unit (as above described), name the person(s) voting by proxy and the person authorized to vote for such person(s) and filed with the Secretary before the appointed time of the meeting, or before the time to which the meeting is adjourned. Each proxy shall contain the date, time and place of the meeting for which it is given and, if a limited proxy, shall set forth the matters on which the proxy holder may vote and the manner in which the vote is to be cast. There shall be no limitation on the number of proxies which may be held by any person (including a designee of the Developer). If a proxy expressly provides, any proxy holder may appoint, in writing, a substitute to act in its place. If such provision is not made, substitution is not permitted.

3.8 <u>Adjourned Meetings</u>. If any proposed meeting cannot be organized because a quorum has not been attained, the members who are present, either in person or by proxy, may adjourn the meeting from time to time until a quorum is present, provided notice of the newly scheduled meeting is given in the manner required for the giving of notice of a meeting. Except as required above, proxies given for the adjourned meeting shall be valid for the newly scheduled meeting unless revoked for reasons other than the new date of the meeting.

3.9 <u>Order of Business</u>. If a quorum has been attained, the order of business at annual members' meetings, and, if applicable, at other members' meetings, shall be:

(a)  Collect any ballots not yet cast;

(b)  Call to order by President;

(c)  Appointment by the President of a chairman of the meeting (who need not be a member or a director);

(d)  Appointment of inspectors of election;

(e)  Counting of Ballots for Election of Directors;

(f)  Proof of notice of the meeting or waiver of notice;

(g)  Reading of minutes;

(h)  Reports of officers;

(i)  Reports of committees;

(j)  Unfinished business;

(k)  New business;

(l)  Adjournment.

Such order may be waived in whole or in part by direction of the chairman.

3.10 <u>Minutes of Meeting</u>. The minutes of all meetings of Unit Owners shall be kept in a book available for inspection by Unit Owners or their authorized representatives and Board members at any reasonable time. The Association shall retain these minutes for a period of not less than seven (7) years.

3.11 <u>Action Without A Meeting</u>. Anything to the contrary herein notwithstanding, to the extent lawful, any action required or which may be taken at any annual or special meeting of members, may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action so taken, shall be signed by the members (or persons authorized to cast the vote of any such members as elsewhere herein set forth) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting of members at which all members (or authorized persons) entitled to vote thereon were present and voted. In order to be effective, the action must be evidenced by one or more written consents describing the action taken, dated and signed by approving members having the requisite number of votes and entitled to vote on such action, and delivered to the Secretary of the Association, or other authorized agent of the Association. Written consent shall not be effective to take the corporate action referred to in the consent unless signed by members having the requisite number of votes necessary to authorize the action within sixty (60) days of the date of the earliest dated consent and delivered to the Association as aforesaid. Any written consent may be revoked prior to the date the Association receives the required number of consents to authorize the proposed action. A revocation is not effective unless in writing and until received by the Secretary of the Association, or other authorized agent of the Association. Within ten (10) days after obtaining such authorization by written consent, notice must be given to members who have not consented in writing. The notice shall fairly summarize the material features of the authorized action. A consent signed in accordance with the foregoing has the effect of a meeting vote and may be described as such in any document.

4. <u>Directors</u>.

4.1 <u>Membership</u>. The affairs of the Association shall be governed by a Board of not less than three (3) nor more than nine (9) directors, the exact number to be determined in the first instance in the Articles, and, thereafter, except as provided herein, from time to time upon majority vote of the membership. Directors must be natural persons who are 18 years of age or older. Any person who has been convicted of any felony by any court of record in the United States and who has not had his or her right to vote restored pursuant to law in the jurisdiction of his or her residence is not eligible for Board membership (provided, however, that the validity of any Board action is not affected if it is later determined that a member of the Board is ineligible for Board membership due to having been convicted of a felony). Directors may not vote at Board meetings by proxy or by secret ballot.

4.2 <u>Election of Directors</u>. Election of Directors shall be held at the annual members' meeting, except as herein provided to the contrary. Not less than sixty (60) days prior to a scheduled election, the Association shall mail, deliver or electronically transmit to each Unit Owner entitled to vote, a first notice of the date of election. Any Unit Owner or other eligible person desiring to be a candidate for the Board shall give written notice to the Secretary of the Association not less than forty (40) days prior to the scheduled election. Together with the notice of meeting and agenda sent in accordance with Section 3.4 above, the Association shall then, mail, deliver or electronically transmit a second notice of the meeting, not less than fourteen (14) days prior to the date of the meeting, to all Unit Owners entitled to vote therein, together with a ballot which shall list all candidates. Upon request of a candidate, the Association shall include an information sheet, no larger than 8-1/2 inches by 11 inches furnished by the candidate, which must be furnished by the candidate to the Association not less than thirty five (35) days before the election, to be included with the mailing of the ballot, with the costs of mailing or delivery and copying to be borne by the Association. The Association is not liable for the contents of the information sheets prepared by the candidates. In order to reduce costs, the Association may print or duplicate the information sheets on both sides of the paper.

The election of directors shall be by written ballot or voting machine. Proxies shall in no event be used in electing the Board at general elections or to fill vacancies caused by resignation or otherwise, provided, however, that limited proxies may be used to fill a vacancy resulting from the recall of a director, in the manner provided by the rules of the Division. Elections shall be decided by a plurality of those ballots and votes cast. There shall be no quorum requirement, however at least 20 percent of the eligible voters must cast a ballot in order to have a valid election of members of the Board. There shall be no cumulative voting.

Notwithstanding the provisions of this Section 4.2, an election is not required unless more candidates file notices of intent to run or are nominated than vacancies exist on the Board.

4.3 Vacancies and Removal.

(a) Except as to vacancies resulting from removal of Directors by members (as addressed in subsection (b) below), vacancies in the Board of Directors occurring between annual meetings of members shall be filled by a majority vote of the remaining Directors at any Board meeting (even if the remaining Directors constitute less than a quorum), provided that all vacancies in directorships to which Directors were appointed by the Developer pursuant to the provisions of paragraph 4.15 hereof shall be filled by the Developer without the necessity of any meeting.

(b) Any Director elected by the members (other than the Developer) may be removed by concurrence of a majority of the voting interests of the members at a special meeting of members called for that purpose or by written agreement signed by a majority of all voting interests. The vacancy in the Board of Directors so created shall be filled by the members at a special meeting of the members called for such purpose, or by the Board of Directors, in the case of removal by a written agreement unless said agreement also designates a new Director to take the place of the one removed. The conveyance of all Units owned by a Director in the Condominium (other than appointees of the Developer or Directors who were not Unit Owners) shall constitute the resignation of such Director.

(c) Anything to the contrary herein notwithstanding, until a majority of the Directors are elected by members other than the Developer of the Condominium, neither the first Directors of the Association, nor any Directors replacing them, nor any Directors named by the Developer, shall be subject to removal by members other than the Developer. The first Directors and Directors replacing them may be removed and replaced by the Developer without the necessity of any meeting.

(d) If a vacancy on the Board of Directors results in the inability to obtain a quorum of directors in accordance with these By-Laws, any Owner may apply to the Circuit Court within whose jurisdiction the Condominium lies for the appointment of a receiver to manage the affairs of the Association. At least thirty (30) days prior to applying to the Circuit Court, the Unit Owner shall mail to the Association and post in a conspicuous place on the Condominium Property a notice describing the intended action and giving the Association an opportunity to fill the vacancy(ies) in accordance with these By-Laws. If, during such time, the Association fails to fill the vacancy(ies), the Unit Owner may proceed with the petition. If a receiver is appointed, the Association shall be responsible for the salary of the receiver, court costs and attorneys' fees. The receiver shall have all powers and duties of a duly constituted Board of Directors, and shall serve until the Association fills the vacancy(ies) on the Board sufficient to constitute a quorum in accordance with these By-Laws.

4.4 Term. Except as provided herein to the contrary, the term of each Director's service shall extend until the next annual meeting of the members and subsequently until his successor is duly elected and has taken office, or until he is removed in the manner elsewhere provided. Notwithstanding the foregoing, any Director designated by the Developer shall serve at the pleasure of the Developer and may be removed and replaced by the Developer at any time.

4.5 Organizational Meeting. The organizational meeting of newly-elected or appointed Directors shall be held within ten (10) days of their election or appointment. The directors calling the organizational meeting shall give at least three (3) days advance notice thereof, stating the time and place of the meeting.

4.6 Meetings. Meetings of the Board of Directors may be held at such time and place as shall be determined, from time to time, by a majority of the Directors. Meetings of the Board of Directors may be held by telephone conference, with those Directors attending by telephone counted toward the quorum requirement, provided that a telephone speaker must be used so that the conversation of those Directors attending by telephone may be heard by the Directors and any Unit Owners attending such meeting in person. Notice of meetings shall be given to each Director, personally or by mail, telephone or telegraph, and shall be transmitted at least three (3) days prior to the meeting. Meetings of the Board of Directors and any Committee thereof at which a quorum of the members of that Committee are present shall be open to all Unit Owners. Any Unit Owner may tape record or videotape meetings of the Board, in accordance with the rules of the Division. The right to attend such meetings includes the right to speak at such meetings with respect to all designated agenda items. The Association may adopt reasonable rules governing the frequency, duration and manner of Unit Owner statements. Adequate notice of such meetings, which notice shall specifically incorporate an identification of agenda items, shall be posted conspicuously on the Condominium Property at least forty-eight (48) continuous hours preceding the meeting, except in the event of an emergency. Any item not included on the notice may be taken up on an emergency basis by at least a majority plus one of the members of the Board. Such emergency action shall be noticed and ratified at the next regular meeting of the Board. Notwithstanding the

foregoing, written notice of any meeting of the Board at which nonemergency special assessments, or at which amendment to rules regarding unit use will be proposed, discussed or approved, shall be mailed, delivered or electronically transmitted to all Unit Owners and posted conspicuously on the Condominium property not less than fourteen (14) continuous days prior to the meeting. Evidence of compliance with this fourteen (14) continuous day notice shall be made by an affidavit executed by the Secretary of the Association and filed among the official records of the Association. The Board shall adopt by rule, and give notice to Unit Owners of, a specific location on the Condominium Property upon which all notices of Board and/or Committee meetings shall be posted. In lieu of or in addition to the physical posting of notice of any meeting of the Board on the Condominium Property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed-circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on the Condominium Property, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda. Special meetings of the Directors may be called by the President, and must be called by the President or Secretary at the written request of one-third (1/3) of the Directors or where required by the Act. A Director or member of a Committee of the Board of Directors may submit in writing his/her agreement or disagreement with any action taken at a meeting that such individual did not attend. This agreement or disagreement may not be used for the purposes of creating a quorum.

4.7     Waiver of Notice. Any Director may waive notice of a meeting before or after the meeting and that waiver shall be deemed equivalent to the due receipt by said Director of notice. Attendance by any Director at a meeting shall constitute a waiver of notice of such meeting, and a waiver of any and all objections to the place of the meeting, to the time of the meeting or the manner in which it has been called or convened, except when a Director states at the beginning of the meeting, or promptly upon arrival at the meeting, any objection to the transaction of affairs because the meeting is not lawfully called or convened.

4.8     Quorum. A quorum at Directors' meetings shall consist of a majority of the entire Board of Directors. The acts approved by a majority of those present at a meeting at which a quorum is present shall constitute the acts of the Board of Directors, except when approval by a greater number of Directors is specifically required by the Declaration, the Articles or these By-Laws.

4.9     Adjourned Meetings. If, at any proposed meeting of the Board of Directors, there is less than a quorum present, the majority of those present may adjourn the meeting from time to time until a quorum is present, provided notice of such newly scheduled meeting is given as required hereunder. At any newly scheduled meeting, any business that might have been transacted at the meeting as originally called may be transacted as long as notice of such business to be conducted at the rescheduled meeting is given, if required (e.g., with respect to budget adoption).

4.10    Joinder in Meeting by Approval of Minutes. The joinder of a Director in the action of a meeting by signing and concurring in the minutes of that meeting shall constitute the approval of that Director of the business conducted at the meeting, but such joinder shall not be used as a vote for or against any particular action taken and shall not allow the applicable Director to be counted as being present for purposes of quorum.

4.11    Presiding Officer. The presiding officer at the Directors' meetings shall be the President (who may, however, designate any other Unit Owner to preside).

4.12    Order of Business. If a quorum has been attained, the order of business at Directors' meetings shall be:

   (a)     Proof of due notice of meeting;

   (b)     Reading and disposal of any unapproved minutes;

   (c)     Reports of officers and committees; .

   (d)     Election of officers;

   (e)     Unfinished business;

   (f)     New business;

   (g)     Adjournment.

Such order may be waived in whole or in part by direction of the presiding officer.

4.13     <u>Minutes of Meetings</u>. The minutes of all meetings of the Board of Directors shall be kept in a book available for inspection by Unit Owners, or their authorized representatives, and Board members at any reasonable time. The Association shall retain these minutes for a period of not less than seven years.

4.14     <u>Committees</u>. The Board may by resolution also create Committees and appoint persons to such Committees and vest in such Committees such powers and responsibilities as the Board shall deem advisable.

4.15     <u>Proviso</u>. Notwithstanding anything to the contrary contained in this Section 4 or otherwise, the Board shall consist of three directors during the period that the Developer is entitled to appoint a majority of the Directors, as hereinafter provided. The Developer shall have the right to appoint all of the members of the Board of Directors until Unit Owners other than the Developer own fifteen (15%) percent or more of the Units in the Condominium. When Unit Owners other than the Developer own fifteen percent (15%) or more of the Units in the Condominium that will be operated ultimately by the Association, the Unit Owners other than the Developer shall be entitled to elect not less than one-third (1/3) of the members of the Board of Directors. Upon the election of such director(s), the Developer shall forward to the Division of Florida Land Sales, Condominiums and Mobile Homes the name and mailing address of the director(s) elected. Unit Owners other than the Developer are entitled to elect not less than a majority of the members of the Board of Directors: (a) three years after fifty (50%) percent of the Units that will be operated ultimately by the Association have been conveyed to purchasers; (b) three months after ninety (90%) percent of the Units that will be operated ultimately by the Association have been conveyed to purchasers; (c) when all of the Units that will be operated ultimately by the Association have been completed, some of them have been conveyed to purchasers, and none of the others are being offered for sale by the Developer in the ordinary course of business; (d) when some of the Units have been conveyed to purchasers, and none of the others are being constructed or offered for sale by the Developer in the ordinary course of business; or (e) seven (7) years after recordation of the Declaration, whichever occurs first. The Developer is entitled (but not obligated) to elect at least one (1) member of the Board of Directors as long as the Developer holds for sale in the ordinary course of business five percent (5%) of the Units that will be operated ultimately by the Association.

The Developer may transfer control of the Association to Unit Owners other than the Developer prior to such dates in its sole discretion by causing enough of its appointed Directors to resign, whereupon it shall be the affirmative obligation of Unit Owners other than the Developer to elect Directors and assume control of the Association. Provided at least sixty (60) days' notice of Developer's decision to cause its appointees to resign is given to Unit Owners, neither the Developer, nor such appointees, shall be liable in any manner in connection with such resignations even if the Unit Owners other than the Developer refuse or fail to assume control.

Within seventy-five (75) days after the Unit Owners other than the Developer are entitled to elect a member or members of the Board of Directors, or sooner if the Developer has elected to accelerate such event as aforesaid, the Association shall call, and give not less than sixty (60) days' notice of an election for the member or members of the Board of Directors. The notice may be given by any Unit Owner if the Association fails to do so.

At the time the Unit Owners other than the Developer elect a majority of the members of the Board of Directors of the Association, the Developer shall relinquish control of the Association and such Unit Owners shall accept control. At that time (except as to subparagraph (g), which may be ninety (90) days thereafter) Developer shall deliver to the Association, at Developer's expense, all property of the Unit Owners and of the Association held or controlled by the Developer, including, but not limited to, the following items, if applicable to the Condominium:

(a)     The original or a photocopy of the recorded Declaration of Condominium, and all amendments thereto. If a photocopy is provided, the Developer must certify by affidavit that it is a complete copy of the actual recorded Declaration.

(b)     A certified copy of the Articles of Incorporation of the Association.

(c)     A copy of the By-Laws of the Association.

(d)     The minute book, including all minutes, and other books and records of the Association.

(e)     Any rules and regulations which have been adopted.

(f)     Resignations of resigning officers and Board members who were appointed by the Developer.

(g)      The financial records, including financial statements of the association, and source documents from the incorporation of the Association through the date of the turnover. The records shall be audited for the period from the incorporation of the Association or from the period covered by the last audit, if applicable, by an independent certified public accountant. All financial statements shall be prepared in accordance with generally accepted accounting principles and shall be audited in accordance with generally accepted auditing standards as prescribed by the Florida Board of Accountancy. The accountant performing the audit shall examine to the extent necessary supporting documents and records, including the cash disbursements and related paid invoices to determine if expenditures were for Association purposes, and billings, cash receipts and related records to determine that the Developer was charged and paid the proper amounts of Assessments.

(h)      Association funds or the control thereof.

(i)      All tangible personal property that is the property of the Association or is or was represented by the Developer to be part of the Common Elements or is ostensibly part of the Common Elements, and an inventory of such property.

(j)      A copy of the plans and specifications utilized in the construction or remodeling of Improvements and the supplying of equipment, and for the construction and installation of all mechanical components serving the Improvements and the Condominium Property, with a certificate, in affidavit form, of an officer of the Developer or an architect or engineer authorized to practice in Florida, that such plans and specifications represent, to the best of their knowledge and belief, the actual plans and specifications utilized in the construction and improvement of the Condominium Property and the construction and installation of the mechanical components serving the Improvements and the Condominium Property.

(k)      A list of the names and addresses of all contractors, subcontractors and suppliers, of which Developer had knowledge at any time in the development of the Condominium, utilized in the construction or remodeling of the Improvements and the landscaping of the Condominium and/or Association Property.

(l)      Insurance policies.

(m)      Copies of any Certificates of Occupancy which may have been issued for the Condominium Property.

(n)      Any other permits issued by governmental bodies applicable to the Condominium Property in force or issued within one (1) year prior to the date the Unit Owners take control of the Association.

(o)      All written warranties of contractors, subcontractors, suppliers and manufacturers, if any, that are still effective.

(p)      A roster of Unit Owners and their addresses and telephone numbers, if known, as shown on the Developer's records.

(q)      Leases of the Common Elements and other leases to which the Association is a party, if applicable.

(r)      Employment contracts or service contracts in which the Association is one of the contracting parties, or service contracts in which the Association or Unit Owners have an obligation or responsibility, directly or indirectly, to pay some or all of the fee or charge of the person or persons performing the service.

(s)      All other contracts to which the Association is a party.

5.      **Authority of the Board.**

      5.1      **Powers and Duties.** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may take all acts, through the proper officers of the Association, in executing such powers, except such acts which by law, the Declaration, the Articles or these By-Laws may not be delegated to the Board of Directors by the Unit Owners. Such powers and duties of the Board of Directors shall include, without limitation (except as limited elsewhere herein), the following:

            (a)      Operating and maintaining all Common Elements and the Association Property.

(b) Determining the expenses required for the operation of the Association and the Condominium.

(c) Employing and dismissing the personnel necessary for the maintenance and operation of the Common Elements and the Association Property.

(d) Adopting and amending rules and regulations concerning the details of the operation and use of the Condominium and Association Property, subject to a right of the Unit Owners to overrule the Board as provided in Section 14 hereof.

(e) Maintaining bank accounts on behalf of the Association and designating the signatories required therefor.

(f) Purchasing, leasing or otherwise acquiring title to, or an interest in, property in the name of the Association, or its designee, for the use and benefit of its members. The power to acquire personal property shall be exercised by the Board and the power to acquire real property shall be exercised as described herein and in the Declaration.

(g) Purchasing, leasing or otherwise acquiring Units or other property, including, without limitation, Units at foreclosure or other judicial sales, all in the name of the Association, or its designee.

(h) Selling, leasing, mortgaging or otherwise dealing with Units acquired, and subleasing Units leased, by the Association, or its designee.

(i) Organizing corporations and appointing persons to act as designees of the Association in acquiring title to or leasing Units or other property.

(j) Obtaining and reviewing insurance for the Condominium and Association Property.

(k) Making repairs, additions and improvements to, or alterations of, Condominium Property and Association Property, and repairs to and restoration of Condominium and Association Property, in accordance with the provisions of the Declaration after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings or otherwise.

(l) Enforcing obligations of the Unit Owners, allocating profits and expenses and taking such other actions as shall be deemed necessary and proper for the sound management of the Condominium.

(m) Levying fines against appropriate Unit Owners for violations of the rules and regulations established by the Association to govern the conduct of such Unit Owners. No fine shall be levied except after giving reasonable notice and opportunity for a hearing to the affected Unit Owner and, if applicable, his tenant, licensee or invitee. The hearing must be held before a committee of other Unit Owners. If the committee does not agree with the fine, the fine may not be levied. No fine may exceed $100.00 per violation, however, a fine may be levied on the basis of each day of a continuing violation with a single notice and opportunity for hearing, provided however, that no such fine shall in the aggregate exceed $1,000.00. No fine shall become a lien upon a Unit.

(n) Purchasing or leasing Units for use by resident superintendents and other similar persons or for the general use and enjoyment of the Unit Owners.

(o) Borrowing money on behalf of the Association or the Condominium when required in connection with the operation, care, upkeep and maintenance of Common Elements (if the need for the funds is unanticipated) or the acquisition of real property, and granting mortgages on and/or security interests in Association owned property; provided, however, that the consent of the Owners of at least two-thirds (2/3rds) of the Units represented at a meeting at which a quorum has been attained in accordance with the provisions of these By-Laws shall be required for the borrowing of any sum which would cause the total outstanding indebtedness of the Association to exceed $250,000.00. If any sum borrowed by the Board of Directors on behalf of the Condominium pursuant to the authority contained in this subparagraph (o) is not repaid by the Association, a Unit Owner who pays to the creditor such portion thereof as his interest in his Common Elements bears to the interest of all the Unit Owners in the Common Elements shall be entitled to obtain from the creditor a release of any judgment or other lien which said creditor shall have filed or shall have the right to file against, or which will affect, such Owner's Unit.

(p) Subject to the provisions of Section 5.2 below, contracting for the management and maintenance of the Condominium and Association Property and authorizing a

management agent (who may be an affiliate of the Developer) to assist the Association in carrying out its powers and duties by performing such functions as the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair, and replacement of the Common Elements and Association Property with such funds as shall be made available by the Association for such purposes. The Association and its officers shall, however, retain at all times the powers and duties granted by the Declaration, the Articles, these By-Laws and the Act, including, but not limited to, the making of Assessments, promulgation of rules and execution of contracts on behalf of the Association.

(q) At its discretion, but within the parameters of the Act, authorizing Unit Owners or other persons to use portions of the Common Elements or Association Property for private parties and gatherings and imposing reasonable charges for such private use.

(r) Executing all documents or consents, on behalf of all Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner, by acceptance of the deed to such Owner's Unit, and each mortgagee of a Unit Owner by acceptance of a lien on said Unit, appoints and designates the President of the Association as such Owner's agent and attorney-in-fact to execute any and all such documents or consents.

(s) Exercising (i) all powers specifically set forth in the Declaration, the Articles, these By-Laws and in the Act, (ii) all powers incidental thereto, and (iii) all other powers of a Florida corporation not for profit.

5.2 Contracts. Any contract which is not to be fully performed within one (1) year from the making thereof, for the purchase, lease or renting of materials or equipment to be used by the Association in accomplishing its purposes, and all contracts for the provision of services, shall be in writing. Where a contract for purchase, lease or renting materials or equipment, or for the provision of services, requires payment by the Association on behalf of the Condominium in the aggregate exceeding $5,000.00, the Association shall obtain competitive bids for the materials, equipment or services. Nothing contained herein shall be construed to require the Association to accept the lowest bid. Notwithstanding the foregoing, contracts with employees of the Association and contracts for attorney, accountant, architect, community association manager, engineering and landscape architect services shall not be subject to the provisions hereof. Further, nothing contained herein is intended to limit the ability of the Association to obtain needed products and services in an emergency; nor shall the provisions hereof apply if the business entity with which the Association desires to contract is the only source of supply within the County.

6. Officers.

6.1 Executive Officers. The executive officers of the Association shall be a President, a Vice-President, a Treasurer and a Secretary (none of whom need be Directors), all of whom shall be elected by the Board of Directors and who may be peremptorily removed at any meeting by concurrence of a majority of all of the Directors. A person may hold more than one office, except that the President may not also be the Secretary. No person shall sign an instrument or perform an act in the capacity of more than one office. The Board of Directors from time to time shall elect such other officers and designate their powers and duties as the Board shall deem necessary or appropriate to manage the affairs of the Association. Officers, other than designees of the Developer, must be Unit Owners (or authorized representatives of corporate/partnership/trust Unit Owners).

6.2 President. The President shall be the chief executive officer of the Association. He shall have all of the powers and duties that are usually vested in the office of president of an association. The President shall also serve as the Voting Member on behalf of the Condominium Hotel Lot and as a Director of the Master Association.

6.3 Vice-President. The Vice-President shall exercise the powers and perform the duties of the President in the absence or disability of the President. He also shall assist the President and exercise such other powers and perform such other duties as are incident to the office of the vice president of an association and as may be required by the Directors or the President.

6.4 Secretary. The Secretary shall keep the minutes of all proceedings of the Directors and the members. The Secretary shall attend to the giving of all notices to the members and Directors and other notices required by law. The Secretary shall have custody of the seal of the Association and shall affix it to instruments requiring the seal when duly signed. The Secretary shall keep the records of the Association, except those of the Treasurer, and shall perform all other duties incident to the office of the secretary of an association and as may be required by the Directors or the President.

6.5     <u>Treasurer</u>. The Treasurer shall have custody of all property of the Association, including funds, securities and evidences of indebtedness. The Treasurer shall keep books of account for the Association in accordance with good accounting practices, which, together with substantiating papers, shall be made available to the Board of Directors for examination at reasonable times. The Treasurer shall submit a treasurer's report to the Board of Directors at reasonable intervals and shall perform all other duties incident to the office of treasurer and as may be required by the Directors or the President. All monies and other valuable effects shall be kept for the benefit of the Association in such depositories as may be designated by a majority of the Board of Directors.

6.6     <u>Developer Appointees</u>. No officer appointed by the Developer may be removed except as provided in Section 4.15 hereof and by law.

7.     <u>Fiduciary Duty</u>. The officers and directors of the Association, as well as any manager employed by the Association, have a fiduciary relationship to the Unit Owners. No officer, director or manager shall solicit, offer to accept, or accept any thing or service of value for which consideration has not been provided for his own benefit or that of his immediate family, from any person providing or proposing to provide goods or services to the Association. Any such officer, director or manager who knowingly so solicits, offers to accept or accepts any thing or service of value shall, in addition to all other rights and remedies of the Association and Unit Owners, be subject to a civil penalty in accordance with the Act. Notwithstanding the foregoing, this paragraph shall not prohibit an officer, director or manager from accepting services or items received in connection with trade fairs or education programs.

8.     <u>Compensation</u>. Neither Directors nor officers shall receive compensation for their services as such, but this provision shall not preclude the Board of Directors from employing a Director or officer as an employee of the Association, nor preclude contracting with a Director or officer for the management of the Condominium or for any other service to be supplied by such Director or officer. Directors and officers shall be compensated for all actual and proper out of pocket expenses relating to the proper discharge of their respective duties.

9.     <u>Resignations</u>. Any Director or officer may resign his post at any time by written resignation, delivered to the President or Secretary, which shall take effect upon its receipt unless a later date is specified in the resignation, in which event the resignation shall be effective from such date unless withdrawn. The acceptance of a resignation shall not be required to make it effective. The conveyance of all Units owned by any Director or officer (other than appointees of the Developer or officers who were not Unit Owners) shall constitute a written resignation of such Director or officer.

10.     <u>Fiscal Management</u>. The provisions for fiscal management of the Association set forth in the Declaration and Articles shall be supplemented by the following provisions:

    10.1     <u>Budget</u>.

        (a)     <u>Adoption by Board; Items</u>. The Board of Directors shall from time to time, and at least annually, prepare a budget for all Condominiums governed and operated by the Association (which shall detail all accounts and items of expense and contain at least all items set forth in Section 718.504(21) of the Act, if applicable), determine the amount of Assessments payable by the Unit Owners to meet the expenses of such Condominium(s) and allocate and assess such expenses among the Unit Owners in accordance with the provisions of the Declaration. In addition, if the Association maintains limited common elements with the cost to be shared only by those entitled to use the limited common elements, the budget or a schedule attached thereto shall show amounts budgeted therefor. In addition to annual operating expenses, the budget shall include reserve accounts for capital expenditures and deferred maintenance (to the extent required by law). These accounts shall include, but not be limited to, roof replacement, building painting and pavement resurfacing regardless of the amount of deferred maintenance expense or replacement cost, and for any other item for which the deferred maintenance expense or replacement cost exceeds $10,000.00. The amount of reserves shall be computed by means of a formula which is based upon the estimated remaining useful life and the estimated replacement cost of each reserve item. The Association may adjust replacement and reserve assessments annually to take into account any changes in estimates or extension of the useful life of a reserve item caused by deferred maintenance. Reserves shall not be required if the members of the Association have, by a majority vote at a duly called meeting of members, determined for a specific fiscal year to provide no reserves or reserves less adequate than required hereby. Prior to transfer of control of the Association to Unit Owners other than the Developer, the Developer may vote to waive reserves or reduce the funding of reserves for the first two (2) fiscal years of operation of the Association, beginning with the fiscal year in which the Declaration is recorded, after which time and until transfer of control of the Association to Unit Owners other than the Developer, reserves may only be waived or reduced upon the vote of a majority of all non-Developer voting interests voting in person or by limited proxy at a duly called meeting of the Association. Following transfer of control of the Association to Unit Owners other than the Developer, the Developer may vote its voting interest to waive or reduce the funding of reserves. If a meeting of Unit Owners has been called to determine to provide no reserves or reserves less adequate than required, and such result is not attained or a quorum is not attained, the reserves, as included in the budget, shall go into effect. Reserve funds and any interest accruing thereon shall remain in the reserve account or accounts, and shall be used only for authorized reserve expenditures, unless their use for any other

purposes is approved in advance by a majority vote at a duly called meeting of the Association. Prior to transfer of control of the Association to Unit Owners other than the Developer, the Association shall not vote to use reserves for purposes other than that for which they were intended without the approval of a majority of all non-Developer voting interests, voting in person or by limited proxy at a duly called meeting of the Association.

The adoption of a budget for the Condominium shall comply with the requirements hereinafter set forth:

(i)     Notice of Meeting. A copy of the proposed budget of Common Expenses shall be hand delivered, mailed or electronically transmitted to each Unit Owner (at the address last furnished to the Association) not less than fourteen (14) days prior to the meeting of the Board of Directors at which the budget will be considered, together with a notice of that meeting indicating the time and place of such meeting. An officer or manager of the Association, or other person providing notice of such meeting, shall execute an affidavit evidencing compliance with such notice requirement and such affidavit shall be filed among the official records of the Association.

(ii)     Special Membership Meeting. If the Board of Directors adopts in any fiscal year an annual budget which requires assessments against Unit Owners which exceed one hundred fifteen percent (115%) of such Assessments for the preceding fiscal year, the Board of Directors shall conduct a special meeting of the Unit Owners to consider a substitute budget if the Board of Directors receives, within twenty-one (21) days following the adoption of the annual budget, a written request for a special meeting from at least ten percent (10%) of all voting interests. The special meeting shall be conducted within sixty (60) days following the adoption of the annual budget. At least fourteen (14) days prior to such special meeting, the Board of Directors shall hand deliver to each Unit Owner, or mail to each Unit Owner at the address last furnished to the Association, a notice of the meeting. An officer or manager of the Association, or other person providing notice of such meeting, shall execute an affidavit evidencing compliance with this notice requirement and such affidavit shall be filed among the official records of the Association. Unit Owners may consider and adopt a substitute budget at the special meeting. A substitute budget is adopted if approved by a majority of all voting interests. If there is not a quorum at the special meeting or a substitute budget is not adopted, the annual budget previously adopted by the Board of Directors shall take effect as scheduled.

(iii)     Determination of Budget Amount. Any determination of whether assessments exceed one hundred fifteen percent (115%) of assessments for the preceding fiscal year shall exclude any authorized provision for reasonable reserves for repair or replacement of the Condominium Property, anticipated expenses of the Association which the Board of Directors does not expect to be incurred on a regular or annual basis, or assessments for betterments to the Condominium Property.

(iv)     Proviso. As long as the Developer is in control of the Board of Directors of the Association, the Board shall not impose Assessments for a year greater than one hundred fifteen percent (115%) of the prior fiscal year's Assessments, as herein defined, without the approval of a majority of all voting interests.

(b)     Adoption by Membership. In the event that the Board of Directors shall be unable to adopt a budget for a fiscal year in accordance with the requirements of Subsection 10.1(a) above, the Board of Directors may call a special meeting of Unit Owners for the purpose of considering and adopting such budget, which meeting shall be called and held in the manner provided for such special meetings in said subsection, or propose a budget in writing to the members, and if such budget is adopted by the members, upon ratification by a majority of the Board of Directors, it shall become the budget for such year.

10.2     Assessments. Assessments against Unit Owners for their share of the items of the budget shall be made for the applicable fiscal year annually at least twenty (20) days preceding the year for which the Assessments are made. Such Assessments shall be due in equal installments, payable in advance on the first day of each month (or each quarter at the election of the Board) of the year for which the Assessments are made. If annual Assessments are not made as required, Assessments shall be presumed to have been made in the amount of the last prior