# Exhibit "D"

CFN 2008R0840382
OR Bk 26610 Pgs 0735 - 8821 (148pgs)
RECORDED 10/15/2008 13:42:34
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131



(Reserved for Clerk of Court)

<div align="center">

DECLARATION
OF
CENTRAL CARILLON BEACH, A CONDOMINIUM

</div>

Carillon South Joint Venture, L.L.C., a Florida limited liability company, hereby declares:

1. **Introduction and Submission.**

    1.1 **The Land.** The Developer owns fee title to an interest in certain real property located in Miami-Dade County, Florida, as more particularly described in Exhibit "1" annexed hereto (the "Land").

    1.2 **Submission Statement.** The Developer hereby submits the Land and all improvements erected or to be erected thereon and all other property, real, personal or mixed, now or hereafter situated on or within the Land - but excluding (i) all public or private (e.g. cable television) utility installations the Master Life Safety Systems (as hereinafter defined) and all leased property therein or thereon and (ii) the Shared Facilities (as defined in the Master Covenants, as hereinafter defined) or any portion of them - to the condominium form of ownership and use in the manner provided for in the Florida Condominium Act as it exists on the date hereof and as it may be hereafter renumbered. Without limiting any of the foregoing, no property, real, personal or mixed, not located within or upon the Land as aforesaid, and no portion of the Shared Facilities, shall for any purpose be deemed part of the Condominium or be subject to the jurisdiction of the Association, the operation and effect of the Florida Condominium Act or any rules or regulations promulgated pursuant thereto, unless expressly provided.

    1.3 **Name.** The name by which this condominium is to be identified is CENTRAL CARILLON BEACH, A CONDOMINIUM (hereinafter called the "Condominium").

2. **Definitions.** The following terms when used in this Declaration and in its exhibits, and as it and they may hereafter be amended, shall have the respective meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

    2.1 "Access Fee" shall have the meaning given in subsection 16.3 below.

    2.2 "Act" means the Florida Condominium Act (Chapter 718 of the Florida Statutes) as it exists on the date hereof and as it may be hereafter renumbered.

    2.3 "Administrative Agent" shall have the meaning given to it in the Master Covenants (as hereinafter defined), and shall include its successors and/or assigns.

    2.4 "Administrative Fee" shall have the meaning given in subsection 16.10 below.

    2.5 "Allocated Interests" shall have the meaning ascribed to it in Section 5.1 below.

    2.6 "Articles" or "Articles of Incorporation" mean the Articles of Incorporation of the Association, as amended from time to time.

    2.7 "Assessment" means a share of the funds required for the payment of Common Expenses which from time to time is assessed against the Unit Owner.

Tax Payment Certification #2872

(Reserved for Clerk of Court)

2.8 "Association" or "Condominium Association" means CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., a Florida corporation not for profit, the sole entity responsible for the operation of the Common Elements of the Condominium.

2.9 "Association Property" means that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the Association for the use and benefit of its members.

2.10 "Board" or "Board of Directors" means the board of directors, from time to time, of the Association.

2.11 "Building" means the structure(s) in which the Units and the Common Elements are located, regardless of the number of such structures, which are located on the Condominium Property.

2.12 "By-Laws" mean the By-Laws of the Association, as amended from time to time.

2.13 "Charge" shall mean and refer to the imposition of any financial obligation by the Association which is not an Assessment as defined by Subsection 2.7 above. Accordingly, as to Charges, the Association will not have the enforcement remedies that the Act grants for the collection of Assessments.

2.14 "Committee" means a group of Board Members, Unit Owners or Board Members and Unit Owners appointed by the Board or a member of the Board to make recommendations to the Board regarding the proposed annual budget or to take action on behalf of the Board.

2.15 "Common Elements" mean and include:

    (a) The portions of the Condominium Property which are not included within either the Units and/or the Association Property.

    (b) An easement of support in every portion of a Unit which contributes to the support of the Building.

    (c) Any other parts of the Condominium Property designated as Common Elements in this Declaration, which shall specifically include the surface water management system, if any, of the Condominium Property.

The Condominium has been established in such a manner to minimize the Common Elements. Most components which are typical "common elements" of a condominium have instead been designated herein as part of the Shared Facilities of the Hotel Lot or the Shared Components of the Shared Components Unit. No portion of the Shared Facilities or the Shared Components shall be deemed Common Elements hereunder.

2.16 "Common Expenses" mean all expenses incurred by the Association for the operation, maintenance, repair, replacement, management or protection of the Common Elements and Association Property, the costs of carrying out the powers and duties of the Association, and any other expense, whether or not included in the foregoing, designated as a "Common Expense" by the Act, the Declaration, the Articles or the Bylaws. For all purposes of this Declaration, "Common Expenses" shall also include, without limitation: (a) all reserves required by the Act or otherwise established by the Association, regardless of when reserve funds are expended; (b) the cost of a master antenna television system or duly franchised cable television service obtained pursuant to a bulk contract; (c) if applicable, costs relating to insurance for directors and officers, in-house and/or interactive communications and surveillance systems; (d) the real property taxes, Assessments and other maintenance expenses attributable to any Units acquired by the Association or any Association Property and/or rental or other expenses owed in connection with any Units leased by the Association; (e) any lease payments required under leases for mechanical equipment, including without limitation, leases for recycling equipment, if same is leased by the Association rather than being owned by it; (f) to the extent that the Association enters into any agreement with the Hotel Lot Owner for the exclusive use of parking spaces therein for the Condominium and/or its Unit Owners, any and all costs incurred in connection with same, (g) to the extent that the Association enters into any agreement with the Hotel Lot Owner for use of the Spa (as defined in the Master Covenants) for the Condominium and/or its Unit Owners, any and all

(Reserved for Clerk of Court)

costs incurred in connection with same; and (h) any unpaid share of Common Expenses or Assessments extinguished by foreclosure of a superior lien or by deed in lieu of foreclosure. Common Expenses shall not include any separate obligations of individual Unit Owners or any Shared Components Costs.

In addition to the Common Expenses, the Association is obligated for the payment of Master Expenses (as hereinafter defined). While the Master Expenses are not deemed Common Expenses, for purposes of this Declaration, Master Expenses shall be assessed and collected in the same manner as Common Expenses, and the Association shall have such remedies for the failure of an Owner to pay its Allocated Interest of such Master Expenses as exist for the failure of an Owner to pay its proportionate share of Common Expenses.

2.17    "Common Surplus" means the excess of all receipts of the Association collected on behalf of the Association, including, but not limited to, Assessments, rents, profits and revenues on account of the Common Elements, over the amount of Common Expenses.

2.18    "Condominium Parcel" means a Unit together with the undivided share in the Common Elements which is appurtenant to said Unit; and when the context permits, the term includes all other appurtenances to the Unit.

2.19    "Condominium Property" means the Land, Improvements and other property described in Section 1.2 hereof, subject to the limitations thereof and exclusions therefrom.

2.20    "County" means the County of Miami-Dade, State of Florida.

2.21    "Declaration" or "Declaration of Condominium" means this instrument and all exhibits attached hereto, as same may be amended from time to time.

2.22    "Developer" means Carillon South Joint Venture, L.L.C., a Florida limited liability company, its successors and such of its assigns as to which the rights of Developer hereunder are specifically assigned. Developer may assign all or a portion of its rights hereunder, or all or a portion of such rights in connection with specific portions of the Condominium. In the event of any partial assignment, the assignee shall not be deemed the Developer, but may exercise such rights of Developer as are specifically assigned to it. Any such assignment may be made on a nonexclusive basis. Notwithstanding any assignment of the Developer's rights hereunder (whether partially or in full), the assignee shall not be deemed to have assumed any of the obligations of the Developer unless, and only to the extent that, it expressly agrees to do so in writing. The rights of Developer under this Declaration are independent of the Developer's rights to control the Board of Directors of the Association, and, accordingly, shall not be deemed waived, transferred or assigned to the Unit Owners, the Board or the Association upon the transfer of control of the Association.

2.23    "Dispute", for purposes of Section 18.1, means any disagreement between two or more parties that involves: (a) the authority of the Board, under any law or under this Declaration, the Articles or By-Laws to: (i) require any Owner to take any action, or not to take any action, involving that Owner's Unit or the appurtenances thereto; or (ii) alter or add to a common area or Common Element; or (b) the failure of the Association, when required by law or this Declaration, the Articles or By-Laws to: (i) properly conduct elections; (ii) give adequate notice of meetings or other actions; (iii) properly conduct meetings; or (iv) allow inspection of books and records. "Dispute" shall not include any disagreement that primarily involves title to any Unit or Common Element; the interpretation or enforcement of any warranty; or the levy of a fee or Assessment or the collection of an Assessment levied against a party.

2.24    "Division" means the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation, State of Florida, or its successor.

2.25    "First Mortgagee" means any person or entity holding a first mortgage on a Unit or Units.

2.26    "Impositions" shall mean the share of the funds required for the payment of the Master Expenses which from time to time are assessed against the Unit Owner.

(Reserved for Clerk of Court)

2.27 "Improvements" mean all structures and artificial changes to the natural environment (exclusive of landscaping) located on the Condominium Property including, but not limited to, the Building.

2.28 "Institutional First Mortgagee" means a bank, savings and loan association, insurance company, real estate or mortgage investment trust, pension fund, an agency of the United States Government, mortgage banker, the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC") or any other lender generally recognized as an institutional lender, or the Developer, holding a first mortgage on a Unit or Units. A "Majority of Institutional First Mortgagees" shall mean and refer to Institutional First Mortgagees of Units to which at least fifty-one percent (51%) of the voting interests of Units subject to mortgages held by Institutional First Mortgagees are appurtenant.

2.29 "Land" shall have the meaning given to it in Section 1.1 above.

2.30 "Master Association" means Carillon Hotel and Spa Master Association, Inc., a Florida corporation not for profit, being the entity responsible for the administration of the Master Covenants.

2.31 "Master Covenants" mean the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa, recorded or to be recorded in the Public Records of the County, and when the context permits, shall also mean the Articles of Incorporation and By-Laws of the Master Association, all as now or hereafter amended, modified or supplemented.

2.32 "Master Expenses" shall mean and refer to any and all assessments, charges and/or sums payable by the Association to the Master Association and/or the Hotel Lot Owner (as defined in the Master Covenants) pursuant to, and in accordance with the Master Covenants. The Master Expenses are not Common Expenses.

2.33 "Occupancy Limits" shall have the meaning given to it in subsection 16.1 below.

2.34 "Permitted Occupants" shall have the meaning given to it in Section 16.1 below.

2.35 "Primary Institutional First Mortgagee" means the Administrative Agent (as defined in the Master Covenants) for as long as it holds a mortgage on any Unit in the Condominium, and thereafter shall mean the Institutional First Mortgagee which owns, at the relevant time, Unit mortgages securing a greater aggregate indebtedness than is owed to any other Institutional First Mortgagee.

2.36 "Residential Unit" means and refers to each of the Units (either a Traditional Unit or a Transient Unit) other than the Shared Components Unit. References herein to "Units" or "Parcels" shall include Residential Units unless the context prohibits or it is otherwise expressly provided.

2.37 "Shared Components". Together, the improvements constituting the Common Elements, Residential Units and Shared Components Unit have been, or shall be, constructed as to contain, among other things, a single unified structure. Given the integration of the structure of those improvements, and notwithstanding anything to the contrary depicted on the survey/plot plan attached hereto as Exhibit "2", the following components of the improvements (the "Shared Components"), to the extent within the Condominium Property, shall be deemed part of the Shared Components Unit, whether or not graphically depicted as such on said survey/plot plan: any lobby and/or elevator landing, structural components of the improvements, including, without limitation, all exterior block walls, all corridors, hallways and stairways (as hereinafter defined) serving more than one Residential Unit; all finishes (paint, stucco, etc.) and balconies, terraces and/or facades attached or affixed thereto; the room; all roof trusses, roof support elements and roofing installations; all utility, mechanical, electrical, telephonic, telecommunications, plumbing and/or other systems, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services; all heating, ventilating and air conditioning systems, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services; all elevator shafts, elevator cabs, elevator cables and/or systems and/or equipment used in the operation of the elevators transversing the Condominium Property; and all trash rooms, trash chutes and any and all trash collection and/or disposal systems. Notwithstanding anything herein, or in any of the exhibits hereto, contained to

Declaration
-4-

(Reserved for Clerk of Court)

the contrary, the Shared Components shall be deemed part of the Shared Components Unit. The Shared Components Unit Owner shall have the right (but not the obligation), by Supplemental Declaration executed by the Shared Components Unit Owner alone, to designate additional portions of the Shared Components Unit as Shared Components hereunder. Notwithstanding the designation of the Shared Components, the Shared Components Unit Owner shall have the right, from time to time, to expand, alter, relocate and or eliminate the portions of the Shared Components Unit deemed Shared Components, without requiring the consent or approval of the Association or any Owner, provided that any portions withdrawn are not, in the reasonable opinion of the Shared Components Unit Owner essential to the structural integrity of the Residential Units, the provision of utilities and utility services to the Residential Units and/or the provision of pedestrian access to and from the Residential Units and the adjoining public street. In furtherance of the foregoing, the Shared Components Unit Owner also reserves the absolute right at any time, and from time to time, to construct additional facilities upon the Shared Components Unit and to determine whether same shall be deemed Shared Components.

It is expressly contemplated that persons other than Unit Owners shall be granted use rights in and to certain of the facilities of the Shared Components Unit (such determination to be made in the sole and absolute discretion of the Shared Components Unit Owner).

2.38    "Shared Components Costs" shall have the meaning given in Section 12.1 below. The Shared Components Costs are not Common Expenses.

2.39    "Shared Components Unit" means and refers to the "Shared Components Unit" as identified on Exhibit "2" attached hereto, which contains the Shared Components. References herein to "Units" or "Parcels" shall include the Shared Components Unit unless the context would prohibit or it is otherwise expressly provided.

2.40    "Shared Components Unit Owner" means and refers to the owner, from time to time, of the Shared Components Unit.

2.41    "Stairways" mean any flight of steps, fire corridors, elevators and/or escalators which are at some point located in, or directly accessible from, the Common Elements and/or the Shared Components Unit.

2.42    "Traditional Unit" means and refers to each of the Units, excluding only the Shared Components Unit and the Transient Units (as hereinafter defined). References herein to "Units" or "Parcels" shall include Traditional Units unless the context prohibits or it is otherwise expressly provided.

2.43    "Transient Unit" means and refers to each of the Units located on floors 2 through 10 of the Condominium Building (other than the Shared Components Unit). References herein to "Units" or "Parcels" shall include Transient Units unless the context prohibits or it is otherwise expressly provided.

2.44    "Unit" means a part of the Condominium Property which is subject to exclusive ownership, and except where specifically excluded, or the context otherwise requires, shall be deemed to include the Residential Units, Traditional Units, Transient Units and the Shared Components Unit.

2.45    "Unit Owner" or "Owner of a Unit" or "Owner" means a record owner of legal title to a Condominium Parcel.

Unless the context otherwise requires, any capitalized term not defined but used herein which is defined in the Master Covenants shall have the meaning given to such word or words in the Master Covenants.

3.    Description of Condominium.

3.1    Identification of Units. The Land consists of a portion of one (1) Building containing a total of two hundred thirty-one (231) Units; consisting of eighty (80) Traditional Units, one hundred fifty (150) Transient Units and one (1) Shared Components Unit. Each such Unit is identified by a separate numerical or alpha-numerical designation. The designation of each of such Units is set forth on

(Reserved for Clerk of Court)

Exhibit "2" attached hereto. Exhibit "2" consists of a survey of the Land, a graphic description of the Improvements located thereon, including, but not limited to, the Building in which the Units are located, and a plot plan thereof. Said Exhibit "2", together with this Declaration, is sufficient in detail to identify the Common Elements and each Unit and their relative locations and dimensions. There shall pass with a Unit, as appurtenances thereto: (a) an undivided share in the Common Elements and Common Surplus; (b) the exclusive right to use such portion of the Common Elements as may be provided in this Declaration, including, without limitation, the right to transfer such right to other Units or Unit Owners; (c) an exclusive easement for the use of the airspace occupied by the Unit as it exists at any particular time and as the Unit may lawfully be altered or reconstructed from time to time, provided that an easement in airspace which is vacated shall be terminated automatically; (d) membership in the Association with the full voting rights appurtenant thereto; and (e) other appurtenances as may be provided by this Declaration.

3.2     Unit Boundaries. Each Unit shall include that part of the Building containing the Unit that lies within the following boundaries:

    (a)     Boundaries of Residential Units. The upper and lower boundaries of each Residential Unit shall be the following boundaries extended to their planar intersections with the perimetrical boundaries:

        (i)     Upper Boundaries. The horizontal plane of the unfinished lower surface of the ceiling (which will be deemed to be the ceiling of the upper story if the Unit is a multi-story Residential Unit, provided that in multi-story Residential Units where the lower boundary extends beyond the upper boundary, the upper boundary shall include that portion of the ceiling of the lower floor for which there is no corresponding ceiling on the upper floor directly above such bottom floor ceiling).

        (ii)    Lower Boundaries. The horizontal plane of the unfinished upper surface of the floor of the Residential Unit (which will be deemed to be the floor of the first story if the Unit is a multi-story Residential Unit, provided that in multi-story Residential Units where the upper boundary extends beyond the lower boundary, the lower boundary shall include that portion of the floor of the upper floor for which there is no corresponding floor on the bottom floor directly below the floor of such top floor).

        (iii)   Interior Divisions. Except as provided in subsections 3.2(a)(i) and 3.2(a)(ii) above, no part of the floor of the top floor, ceiling of the bottom floor, stairwell adjoining the multi-floors, in all cases of a multi-story Unit, if any, or nonstructural interior walls shall be considered a boundary of the Residential Unit.

        (iv)    Perimetrical Boundaries. The perimetrical boundaries of the Residential Unit shall be the vertical planes of the unfinished interior surfaces of the walls bounding the Unit extended to their planar intersections with each other and with the upper and lower boundaries. Notwithstanding the foregoing, as to walls shared by a Residential Unit and the Shared Components Unit or the Hotel Lot, the perimetrical boundary of the Shared Components Unit or Hotel Lot, as applicable, at such shared wall shall be coextensive to the perimetrical boundary of the adjoining Residential Unit (so that the shared wall and all installations therein shall be part of the Shared Components Unit or Hotel Lot, as applicable, rather than the Common Elements) and therefore the perimetrical boundary of the Shared Components Unit and/or Hotel Lot, as applicable, shall extend to the unfinished interior surface of any walls bounding a Residential Unit.

    (b)     Boundaries of Shared Components Unit. The Shared Components Unit shall consist of all of the Condominium Property, including, without limitation, any and all improvements now or hereafter constructed thereon, less and except only the following: (i) the Residential Units, and (ii) the portion of the Condominium Property located above a horizontal plane which is ten feet (10') above the highest physical improvement constructed within the

Declaration
- 5 -

(Reserved for Clerk of Court)

Condominium Property. Said portion of the Condominium Property lying above that horizontal plane shall be deemed Common Elements hereunder.

(c) Apertures. Where there are apertures in any boundary which is a part of the Condominium Property, same shall be deemed part of the Shared Components, and as such, part of the Shared Components Unit. However, and notwithstanding the boundaries set forth above, all exterior surfaces made of glass or other transparent materials shall be deemed part of the Hotel Lot and excluded from the boundaries of the Unit and the Condominium. Additionally, all floor, wall and ceiling coverings affixed to the Hotel Lot shall be deemed part of the Hotel Lot. In the event of any conflict between the provisions hereof and the provisions of paragraph 3.2(b) above, the provisions of paragraph 3.2(b) shall prevail.

(d) Exceptions. In cases not specifically covered above, and/or in any case of conflict or ambiguity, the survey of the Units set forth as Exhibit "2" hereto shall control in determining the boundaries of a Unit, except that the provisions of Section 3.2(c) above shall control unless specifically depicted and labeled otherwise on such survey.

3.3 Easements. The following easements are hereby created (in addition to any easements created under the Act and any easements affecting the Condominium Property and recorded in the Public Records of the County):

(a) Support. Each Unit and any structure and/or improvement now or hereafter constructed within The Properties (as defined in the Master Covenants) shall have an easement of support and of necessity and shall be subject to an easement of support and necessity in favor of all other Units, the Common Elements and such other Improvements constructed upon The Properties and/or the Future Development Property (each as defined in the Master Covenants).

(b) Utility and Other Services; Drainage. Easements are reserved under, through and over the Condominium Property as may be required from time to time for utility, cable television, communications and monitoring systems, and other services and drainage in order to serve the Condominium and/or members of the Association and/or the Lots (as defined in the Master Covenants). A Unit Owner shall do nothing within or outside his Unit that interferes with or impairs, or may interfere with or impair, the provision of such utility, cable television, communications and security systems, or other service or drainage facilities or the use of these easements. The Association and the Shared Components Unit Owner, as applicable, shall have a right of access to each Unit to maintain, repair or replace any Common Element, Shared Components or Shared Facilities pipes, wires, ducts, vents, cables, conduits and other utility, cable television, communications and similar systems, hot water heaters, service and drainage facilities, and Common Elements and/or Shared Components and/or Shared Facilities contained in the Unit or elsewhere in or around the Condominium Property, and to remove any Improvements interfering with or impairing such facilities or easements herein reserved; provided such right of access, except in the event of an emergency, shall not unreasonably interfere with the Unit Owner's permitted use of the Unit, and except in the event of an emergency, entry shall be made on not less than one (1) days' notice (which notice shall not, however, be required if the Unit Owner is absent when the giving of notice is attempted).

(c) Encroachments. If (i) any portion of the Common Elements and/or Shared Facilities and/or Shared Components encroaches upon any Unit; (ii) any Unit encroaches upon any other Unit or upon any portion of the Common Elements and/or Shared Facilities and/or Shared Components; (iii) any Improvements encroach upon any Improvements constructed on The Properties; (iv) any "Improvements" of or upon The Properties encroach upon the Condominium Property; or (v) any encroachment shall hereafter occur as a result of (1) construction of the Improvements and/or any "Improvements" of or upon The Properties; (2) settling or shifting of the Improvements; (3) any alteration or repair to the Common Elements (or the Shared Facilities or Shared Components) made by or with the consent of the Association or Developer or the Hotel Lot Owner, as appropriate; or (4)

(Reserved for Clerk of Court)

any repair or restoration of the Improvements (or any portion thereof) or any Unit after damage by fire or other casualty or any taking by condemnation or eminent domain proceedings of all or any portion of any Unit or the Common Elements or the Shared Facilities, then, in any such event, a valid easement shall exist for such encroachment and for the maintenance of same so long as the Improvements or the relevant 'Improvements upon The Properties, shall stand.

(d)    Ingress and Egress. A non-exclusive easement in favor of each Unit Owner and resident, ·their guests and invitees, for each member of the Association; the Master Association, the Shared Components Unit Owner and the Hotel Lot Owner (and its and their guests, tenants and invitees) shall exist for (i) pedestrian traffic over, through and across such portions of the Shared Components Unit as are designated by the Shared Components Unit Owner and intended to provide direct pedestrian access to and from the Shared Facilities to the applicable Residential Unit and the public right of way adjacent to The 'Properties, and (ii) use and enjoyment of the Shared Components, subject to regulation as may be established from time to time by the Shared Components Unit Owner. Notwithstanding the foregoing, the aforesaid easement over the Shared Components Unit is limited and solely for use of the named beneficiaries' obtaining access to and from their Residential Unit and shall not be used for the provision of any services, including, without limitation, any third party related services, including, but not limited to solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, it being understood and agreed by all Unit Owners that any such service may only be provided by the Owner(s) of the Shared Components Unit. Additionally, easements are hereby reserved in favor of all Unit Owners, all Lot Owners and all residents of The Properties (and their guests, tenants and invitees) for emergency ingress and egress over, through and across all Stairways. None of the easements specified in this subparagraph 3.3(d) shall be encumbered by any leasehold or lien other than those on the Condominium Parcels. Any such lien encumbering such easements (other than those on Condominium Parcels) automatically shall be subordinate to the rights of Unit Owners and the Association with respect to such easements.

(e)    Construction; Maintenance. The Developer (including its designees, agents, contractors, successors and assigns) and the Hotel Lot Owner (including its designees, agents, contractors, successors and assigns) shall have the right, in its (and their) sole discretion from time to time, to enter the Condominium Property and take all other action necessary or convenient for the purpose of completing the construction of any and all improvements upon any portion of The Properties and/or the Future Development Property, or any part thereof, or any Improvements or Units located or to be located on the Condominium Property, and for repair, replacement and maintenance or warranty purposes or where the Developer and/or Hotel Lot Owner, in its or their sole discretion, determines that it is required or desires to do so. The Association, Shared Components Unit Owner, and/or Hotel Lot Owner (and its and their designees, contractors, subcontractors, employees) shall have the right to have access to each Unit from time to time during reasonable hours as may be necessary for pest control purposes and for the maintenance, repair or replacement of any Common Elements or any portion of a Unit, if any, to be maintained by the Association, or at any time and by force, if necessary, to prevent damage to the Common Elements, the Association Property or to a Unit or Units, including, without limitation, (but without obligation or duty) to close hurricane shutters in the event of the issuance of a storm watch or storm warning.

(f)    Sales Activity. For as long as the Developer offers Units for sale in the ordinary course of · business, the Developer, its designees, successors and assigns, shall have the right to use any such Units and parts of the Common Elements or Association Property for guest accommodations, model apartments and sales, leasing and construction offices relating to the Condominium or the Hotel Lot, to show model Units and the Common Elements to prospective purchasers and tenants of Units, and to erect on the Condominium Property and Association Property signs and other promotional material to advertise or otherwise

(Reserved for Clerk of Court)

market the Units, and/or any facilities built or to be constructed upon any portion of The Properties and/or the Future Development Property, for sale, lease or occupancy.

(g)     Master Association and Hotel Lot Owner's Easements. The Master Association, the Hotel Lot Owner and its and their agents, employees, contractors and assigns shall have an easement to enter onto the Condominium Property for the purpose of performing such functions as are permitted or required to be performed by such Association and/or the Hotel Lot Owner by the Master Covenants, including, but not limited to, maintenance, repair, replacement and alteration of Common Properties and/or Shared Facilities, safety and maintenance activities and enforcement of architectural restrictions. An easement for such purposes is hereby granted and reserved to the Master Association and the Hotel Lot Owner and its, and/or their, members (and their guests tenants and invitees), and each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to have agreed to the grant and reservation of easement herein described and the rights herein vested in the Master Association and the Hotel Lot Owner. Notwithstanding anything herein contained to the contrary, in order to provide for the orderly distribution and regulation of parking facilities within the Carlton Hotel and Spa, to the extent that any portion of the Condominium Property is necessary or desirable (in the sole determination of the Hotel Lot Owner) for maximizing and easing traffic flow through the parking areas adjacent to the Condominium Property, then, all such portions shall be maintained and operated by the Hotel Lot Owner as Shared Facilities of and under the Master Declaration, and the maintenance, operation and regulation of same shall be vested in the Hotel Lot Owner. An easement for such purposes is hereby granted and reserved to the Hotel Lot Owner and the Master Association and its, and their, members (and their guests tenants and invitees), and each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to have agreed to the grant and reservation of the easements herein described and the rights herein vested in the Master Association and the Hotel Lot Owner. All easements and rights provided for in the Master Covenants in favor of the Master Association and the Hotel Lot Owner, its respective members and/or the Declarant thereunder, are hereby granted to said Master Association and its members and Declarant, and its assignees, designees and nominees.

(h)     Support of Adjacent Structures. In the event that any structure(s) is constructed so as to be connected in any manner to the Buildings and/or any improvements constructed upon The Properties, then there shall be (and there is hereby declared) an easement of support for such structure(s) as well as for the installation, maintenance, repair and replacement of all utility lines and equipment serving the adjoining structures which are necessarily or conveniently located within the Condominium Property, the Association Property and/or The Properties (provided that the use of this easement shall not unreasonably interfere with the structure, operation or use of the Condominium Property, the Association Property or the Buildings). All easements and rights provided for in the Master Covenants in favor of the Master Association, its respective members and/or the Hotel Lot Owner, and/or the Declarant thereunder, are hereby granted, respectively, to the Association, the Unit Owners, the Hotel Lot Owner and the Declarant, and its and their assignees, designees and nominees.

(i)     Warranty. For as long as Developer remains liable under any warranty, whether statutory, express or implied, for act or omission of Developer in the development, construction, sale and marketing of the Condominium, then Developer and its contractors, agents and designees shall have the right, in Developer's sole discretion and from time to time, and without requiring prior approval of the Association and/or any Unit Owner (provided, however, that absent an emergency situation, Developer shall provide reasonable advance notice), to enter the Common Elements and Units for the purpose of making any necessary inspections, tests, repairs, improvements and/or replacements required for the Developer to fulfill any of its warranty obligations. Each Unit Owner, by acceptance of a deed or otherwise accepting title to a Unit, recognizes and agrees that this is a reasonable reservation of rights which is necessary to afford Developer the ability to perform any of its warranty obligations. Failure of the Association or any Unit Owner to grant such access may result in the appropriate warranty being nullified and of no further force or effect.

Declaration
-9-

(Reserved for Clerk of Court)

Nothing herein shall be deemed or construed as the Developer making or offering any warranty, all of which are disclaimed (except to the extent same may not be) as set forth in Section 24 below.

(j)     Additional Easements. The Association, through its Board, on the Association's behalf and on behalf of all Unit Owners (each of whom hereby appoints the Association as its attorney-in-fact for this purpose), shall have the right to grant such additional general ("blanket") and specific electric, gas or other utility, cable television, security systems, communications or service easements (and appropriate bills of sale for equipment, conduits, pipes, lines and similar installations pertaining thereto), or modify or relocate any such existing easements or drainage facilities, in any portion of the Condominium and/or Association Property, and to grant access easements or relocate any existing access easements in any portion of the Condominium and/or Association Property, as the Board shall deem necessary or desirable for the proper operation and maintenance of the Improvements, or any portion thereof, or any Improvement located on Common Properties or within The Properties, or for the general health or welfare of the Unit Owners and/or members of the Association, or for the purpose of carrying out any provisions of this Declaration or the Master Covenants, provided that such easements or the relocation of existing easements will not prevent or unreasonably interfere with the reasonable use of the Units for their intended purposes and provided further that if any such easement is to traverse the Shared Components Unit, the joinder of the Shared Components Unit Owner must be obtained.

4.     Restraint Upon Separation and Partition of Common Elements. The undivided share in the Common Elements and Common Surplus which is appurtenant to a Unit, shall not be separated therefrom and shall pass with the title to the Unit, whether or not separately described. The appurtenant share in the Common Elements and Common Surplus, except as elsewhere herein provided to the contrary, cannot be conveyed or encumbered except together with the Unit. The respective shares in the Common Elements appurtenant to Units shall remain undivided, and no action for partition of the Common Elements, the Condominium Property, or any part thereof, shall lie, except as provided herein with respect to termination of the Condominium.

5.     Ownership of Common Elements and Common Surplus and Share of Common Expenses and Master Expenses; Voting Rights

5.1     Percentage Ownership and Shares. The undivided percentage interest in the Common Elements and Common Surplus, and the percentage share of the Common Expenses and Master Expenses, appurtenant to each Unit, is as set forth on Exhibit "3" attached hereto (the "Allocated Interests").

5.2     Voting. Each Residential Unit shall be entitled to one vote to be cast by its Owner in accordance with the provisions of the By-Laws and Articles of Incorporation of the Association. The Shared Components Unit shall be entitled to five (5) votes to be cast by its Owner in accordance with the provisions of the By-Laws and Articles of Incorporation of the Association. Each Unit Owner shall be a member of the Association.

6.     Amendments. Except as elsewhere provided herein, amendments to this Declaration may be effected as follows:

6.1     By The Association. Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is to be considered. A resolution for the adoption of a proposed amendment may be proposed either by a majority of the Board of Directors of the Association or by not less than one-third (1/3) of the Unit Owners. Except as elsewhere provided, approvals must be by an affirmative vote representing 80% or more of the voting interests of all Unit Owners. Directors and members not present in person or by proxy at the meeting considering the amendment may express their approval or disapproval in writing, provided that such approval or disapproval is delivered to the secretary at or prior to the meeting, however,

(Reserved for Clerk of Court)

such approval or disapproval may not be used as a vote for or against the action taken and may not be used for the purpose of creating a quorum.

6.2 Material Amendments. Unless otherwise provided specifically to the contrary in this Declaration, no amendment shall change the configuration or size of any Unit in any material fashion, materially alter or modify the appurtenances to any Unit, permit timeshares estates or change the percentage by which the Owner of a Unit shares the Common Expenses and owns the Common Elements and Common Surplus (any such change or alteration being a "Material Amendment"), unless the record Owner(s) thereof, and all record owners of mortgages or other liens thereon, shall join in the execution of the amendment and the amendment is otherwise approved by 80% or more of the voting interests of Unit Owners. The acquisition of property by the Association, material alterations or substantial additions to such property or the Common Elements by the Association and installation, replacement and maintenance of approved hurricane shutters, if in accordance with the provisions of this Declaration, shall not be deemed to constitute a material alteration or modification of the appurtenances of the Units, and accordingly, shall not constitute a Material Amendment.

6.3 Mortgagee's Consent. No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise materially and adversely affect any rights, benefits, privileges or priorities granted or reserved in this Declaration to mortgagees of Units without the consent of said mortgagees in each instance; nor shall an amendment make any change in the sections hereof entitled "Insurance", "Reconstruction or Repair after Casualty", or "Condemnation" unless the Primary Institutional First Mortgagee shall join in the amendment. Except as specifically provided herein or if required by FNMA or FHLMC, the consent and/or joinder of any lien or mortgage holder on a Unit shall not be required for the adoption of an amendment to this Declaration and, whenever the consent or joinder of a lien or mortgage holder is required, such consent or joinder shall not be unreasonably withheld.

6.4 South Florida Water Management District. No amendment may be adopted which would affect the surface water management system, including environmental conservation areas, without the consent of the South Florida Water Management District (the "District" or "SFWMD"). The District shall determine whether the amendment necessitates a modification of the current surface water management permit. If a modification is necessary, the District will advise the Association.

6.5 By The Developer. Notwithstanding anything herein contained to the contrary, during the time the Developer has the right to elect a majority of the Board of Directors of the Association, the Declaration, the Articles of Incorporation or the By-Laws of the Association may be amended by the Developer alone (joined by the holder of any mortgages securing Units then owned by the Developer), without requiring the consent of any other party, to effect any change whatsoever, except for an amendment: (i) to permit time-share estates (which must be approved, if at all, in the manner provided in Section 6.2 above); or (ii) to effect a "Material Amendment", which must be approved, if at all, in the manner set forth in Section 6.2 above. The unilateral amendment right set forth herein shall include, without limitation, the right to correct scrivener's errors. No amendment may be adopted which would eliminate, modify, prejudice, abridge or otherwise adversely affect any rights, benefits, privileges or priorities granted or reserved to the Developer, without the consent of the Developer in each instance.

6.6 Execution and Recording. An amendment, other than amendments made by the Developer alone pursuant to the Act or this Declaration, shall be evidenced by a certificate of the Association, executed either by the President of the Association or a majority of the members of the Board of Directors which shall include recording data identifying the Declaration and shall be executed with the same formalities required for the execution of a deed. An amendment of the Declaration is effective when the applicable amendment is properly recorded in the public records of the County. No provision of this Declaration shall be revised or amended by reference to its title or number only. Proposals to amend existing provisions of this Declaration shall contain the full text of the provision to be amended; new words shall be inserted in the text underlined; and words to be deleted shall be lined through with hyphens. However, if the proposed change is so extensive that this procedure would hinder, rather than assist, the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but, instead, a notation must be inserted immediately preceding the proposed amendment in

Declaration
- 11 -

[Reserved for Clerk of Court]

substantially the following language: "Substantial rewording of Declaration. See provision . . . for present text." Nonmaterial errors or omissions in the amendment process shall not invalidate an otherwise properly adopted amendment.

7. Maintenance and Repairs.

    7.1    Units. All maintenance, repairs and replacements of, in or to any Unit, whether structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen, including, without limitation, maintenance, repair and replacement of windows, window coverings, interior nonstructural walls, the interior side of the entrance door and all other doors within or affording access to a Unit, and the electrical (including wiring), plumbing (including fixtures and connections), heating and air-conditioning equipment, fixtures and outlets, appliances, carpets and other floor coverings, all interior surfaces and the entire interior of the Unit lying within the boundaries of the Unit or other property belonging to the Unit Owner, shall be performed by the Owner of such Unit at the Unit Owner's sole cost and expense, except as otherwise expressly provided to the contrary herein. Notwithstanding anything herein to the contrary, to the extent that any of the foregoing items are part of the Shared Facilities, then the maintenance of same shall be the obligation of the Hotel Lot Owner, with the costs thereof charged against the Unit Owners in accordance with the terms of the Master Covenants.

    7.2    Common Elements and Association Property. Except to the extent (i) expressly provided to the contrary herein, or (ii) proceeds of insurance are made available therefor, all maintenance, repairs and replacements in or to the Common Elements and Association Property shall be performed by the Association and the cost and expense thereof shall be charged to all Unit Owners as a Common Expense, except to the extent arising from or necessitated by the negligence, misuse or neglect of specific Unit Owners, in which case such cost and expense shall be paid solely by such Unit Owners.

    7.3    Hotel Lot. The Hotel Lot Owner(s), from time to time, shall be responsible for the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Facilities, which shall be performed in a commercially reasonable manner in the determination of the Hotel Lot Owner (which determination shall be binding). In consideration of the reservation and grant of easement over the Shared Facilities, as provided in Section 3.3(d) above, each Unit Owner shall be obligated for payment of the expenses incurred by the Hotel Lot Owner in connection with such maintenance, repair, replacement, improvement, management, operation, and insurance, all as more particularly provided in the Master Covenants.

    7.4    Shared Components Unit. The Shared Components Unit Owner(s), from time to time, shall be responsible for the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components Unit, which shall be performed in a commercially reasonable manner in the determination of the Shared Components Unit Owner(s) (which determination shall be binding). In consideration of the reservation and grant of easement over the Shared Components Unit, as provided in Section 3.3(d) above, each Residential Unit Owner shall be obligated for payment of the expenses incurred by the Shared Components Unit Owner(s) in connection with such maintenance, repair, replacement, improvement, management, operation, and insurance, all as more particularly provided in Section 12 below.

    7.5    Standards for Maintenance. Notwithstanding anything herein contained to the contrary, any and all maintenance obligations of either the Association, the Shared Components Unit Owner or a Unit Owner must be undertaken in such a manner to assure that the portions being maintained by the Association, the Shared Components Unit Owner and/or any Unit Owner are consistent with the high standards of any hotel operated from within the Hotel Lot (the "Hotel") and the other hotels and resorts owned or managed and operated by the operator of the Hotel, or its affiliates.

8. Additions, Alterations or Improvements by Unit Owner.

    8.1    Consent of the Board of Directors. Subject to the provisions of Section 16.6 below, no Residential Unit Owner (other than the Developer) shall make any addition, alteration or improvement in or to the Common Elements, the Association Property, or his Residential Unit (to the extent either (i)

(Reserved for Clerk of Court)

visible from the Shared Components Unit, any other Lot, or the exterior of the Building, (ii) affecting the structural integrity of the Building, (iii) or affecting any electrical, mechanical, HVAC, plumbing, life safety, monitoring, information and/or other systems of the Building) without the prior written consent of the Hotel Lot Owner and the Board of Directors of the Association. The Board shall have the obligation to answer, in writing, any written request by a Residential Unit Owner for approval of such an addition, alteration or improvement within thirty (30) days after such request and all additional information requested is received, and the failure to do so within the stipulated time shall constitute the Board's consent. The Board may condition the approval in any manner, including, without limitation, retaining approval rights of the contractor to perform the work and requiring the Unit Owner to obtain insurance naming the Developer, the Association, the Shared Components Unit Owner and/or the Hotel Lot as additional insureds. The proposed additions, alterations and improvements by the Residential Unit Owners shall be made in compliance with all laws, rules, ordinances and regulations of all governmental authorities having jurisdiction, and with any conditions imposed by the Association with respect to design, structural integrity, aesthetic appeal, construction details, lien protection or otherwise. Further, no alteration, addition or modification may in any manner affect the Shared Components Unit, any portion of the Shared Components, any portion of any other Lot or any portion of the Shared Facilities, without the prior written consent of the Shared Components Unit Owner or the applicable Lot Owner, as applicable (which consent may be withheld in its or their sole discretion). Once approved by the Hotel Lot Owner and the Board of Directors, such approval may not be revoked. A Residential Unit Owner making or causing to be made any such additions, alterations or improvements agrees, and shall be deemed to have agreed, for such Owner, and his heirs, personal representatives, successors and assigns, as appropriate, to hold the Association, the Developer, the Hotel Lot Owner, the Shared Components Unit Owner and all other Unit Owners and their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys harmless from and to indemnify them for any liability or damage to the Condominium Property, Association Property, the Lots, the Shared Components Unit, the Shared Components and/or the Shared Facilities and expenses arising therefrom, and shall be solely responsible for the maintenance, repair and insurance thereof from and after that date of installation or construction thereof as may be required by the Association. The Association's rights of review and approval of plans and other submissions under this Declaration are intended solely for the benefit of the Association. Neither the Developer, the Association, the Hotel Lot Owner, the Shared Components Unit Owner nor any of their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys shall be liable to any Owner or any other person by reason of mistake in judgment, failure to point out or correct deficiencies in any plans or other submissions, negligence, or any other misfeasance, malfeasance or non-feasance arising out of or in connection with the approval or disapproval of any plans or submissions. Anyone submitting plans hereunder, by the submission of same, and any Owner, by acquiring title to same, agrees not to seek damages from the Developer, the Association, the Shared Components Unit Owner and/or the Hotel Lot Owner arising out of the Association's review of any plans hereunder. Without limiting the generality of the foregoing, the Association, Shared Components Unit Owner and Hotel Lot Owner shall not be responsible for reviewing, nor shall its review of any plans be deemed approval of, any plans from the standpoint of structural safety, soundness, workmanship, materials, usefulness, conformity with building or other codes or industry standards, or compliance with governmental requirements. Further, each Owner (including the successors and assigns) agrees to indemnify and hold the Developer, the Association, the Shared Components Unit Owner and the Hotel Lot Owner and their respective officers, directors, employees, managers, agents, contractors, consultants or attorneys harmless from and against any and all costs, claims (whether rightfully or wrongfully asserted), damages, expenses or liabilities whatsoever (including, without limitation, reasonable attorneys' fees and court costs at all trial and appellate levels), arising out of any review of plans hereunder. The provisions of this Section 8.1 shall not be applicable to the Hotel Lot and/or to any Unit owned by the Developer. The provisions of this Section 8.1 shall not be amended without an affirmative vote of 4/5ths of the total voting interests in the Condominium.

In addition to the foregoing, all additions, alterations and improvements proposed to be made by any Owner shall be subject to, and restricted by, the terms and conditions of the Master Covenants and may also require the prior approval of the Hotel Lot Owner.

(Reserved for Clerk of Court)

8.2 <u>Improvements, Additions or Alterations by Developer or the Shared Components Unit or Hotel Lot.</u> Anything to the contrary notwithstanding, the foregoing restrictions of this Section 8 shall not apply to Developer-owned Units, the Shared Components Unit nor to the Hotel Lot. The Developer shall have the additional right, without the consent or approval of the Board of Directors or other Unit Owners, but without obligation, to (a) make alterations, additions or improvements, structural and non-structural, interior and exterior, ordinary and extraordinary, in, to and upon any Unit owned by it (including, without limitation, the removal of walls, floors, ceilings and other structural portions of the improvements), and (b) expand, alter or add to all or any part of the recreational facilities. Similarly, the Shared Components Unit Owner, together with the consent of the Hotel Lot Owner, shall have the additional right, without the consent or approval of the Board of Directors or other Unit Owners, but without obligation, to make alterations, additions or improvements, structural and non-structural, interior and exterior, ordinary and extraordinary, in, to and upon the Shared Components Unit and any portions thereof (including, without limitation, the removal of walls, floors, ceilings and other structural portions of the improvements), and to expand, alter or add to all or any part of the recreational facilities contained within the Shared Components Unit. Any amendment to this Declaration required by a change made by the Developer pursuant to this Section 8.2 shall be adopted in accordance with Section 6, provided, however, that the exercise of any right by Developer pursuant to clause (b) above shall not be deemed a Material Amendment. Notwithstanding anything to the contrary contained in this Declaration, each Unit Owner recognizes and agrees that the Shared Components Unit Owner shall be permitted to make the following alterations to each Unit (and shall be permitted access to each Unit for purposes of making the following described alterations): (i) installation of unit location/exiting maps on the interior portion of each Residential Unit's entry door and (ii) replacement of manually operated doors with doors containing automatic closing devices (i.e., spring hinges or door closers). To the extent that the Shared Components Unit Owner has installed unit location/exit maps and/or automatic doors, no Unit Owner shall be permitted to make any additions, alterations or improvements to such unit location/exit maps and/or automatic doors, and/or to any other portion of the Condominium Property which may impair such unit-location/exit maps and/or automatic doors, without first receiving the prior written approval of the Shared Components Unit Owner.

9. Operation of the Condominium by the Association; Powers and Duties.

9.1 <u>Powers and Duties.</u> The Association shall be the entity responsible for the operation of the Common Elements and the Association Property. The powers and duties of the Association shall include those set forth in the By-Laws and Articles of Incorporation of the Association (which By-Laws and Articles are attached hereto as Exhibits "4" and "5", respectively) as amended from time to time. The affairs of the Association shall be governed by a Board of not less than three (3) nor more than nine (9) directors. Directors must be natural persons who are 18 years of age or older. Any person who has been convicted of any felony by any court of record in the United States and who has not had his or her right to vote restored pursuant to law in the jurisdiction of his or her residence is not eligible for Board membership (provided, however, that the validity of any Board action is not affected if it is later determined that a member of the Board is ineligible for Board membership due to having been convicted of a felony). In addition, the Association shall have all the powers and duties set forth in the Act, as well as all powers and duties granted to or imposed upon it by this Declaration, including, without limitation:

(a) The irrevocable right to have access to each Unit from time to time during reasonable hours as may be necessary for pest control purposes and for the maintenance, repair or replacement of any Common Elements or any portion of a Unit, if any, to be maintained by the Association, or at any time and by force, if necessary, to prevent damage to the Common Elements, the Association Property or to a Unit or Units, including, without limitation, (but without obligation or duty) to close hurricane shutters in the event of the issuance of a storm watch or storm warning.

(b) The power to make and collect Assessments, impositions and other charges against Unit Owners and to lease, maintain, repair and replace the Common Elements and Association Property.

Declaration
-14-

(Reserved for Clerk of Court)

(c) The duty to maintain accounting records of the Association according to good accounting practices, which shall be open to inspection by Unit Owners or their authorized representatives at reasonable times upon prior request.

(d) The power to contract for the management and maintenance of the Condominium Property and to authorize a management agent (who may be an affiliate of the Developer) to assist the Association, Shared Components Unit Owner, and/or Hotel Lot Owner, in carrying out its powers and duties by performing such functions as the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair and replacement of Common Elements with such funds as shall be made available by the Association for such purposes. The Association, Shared Components Unit Owner, and/or Hotel Lot Owner, and its, and their, officers shall, however, retain at all times the powers and duties granted in the Condominium documents and the Condominium Act, including, but not limited to, the making of Assessments, promulgation of rules, subject to the provisions of Section 9.1(g) below, and execution of contracts on behalf of the Association, Shared Components Unit Owner, and/or Hotel Lot Owner.

(e) Without creating any obligation to do so, the power and authority of the Board (by a majority vote, without requiring any vote of Unit Owners) to negotiate and enter into an agreement or agreements with the Hotel Lot Owner to obtain use rights in and to the Spa. Said power shall include, without limitation, the right to negotiate the specific terms and conditions of such agreement (or agreements), including, without limitation, the services to be provided, location of facilities and/or use and/or membership fees.

(f) The power to borrow money, execute promissory notes and other evidences of indebtedness and to give as security therefor mortgages and security interests in property owned by the Association, if any, provided that such actions are approved by a majority of the entire membership of the Board of Directors and 60% or more of the Units represented at a meeting at which a quorum has been attained in accordance with the Articles and By-Laws, or by such greater percentage of the Board or Unit Owners as may be specified in the By-Laws with respect to certain borrowing. The foregoing restriction shall not apply if such indebtedness is entered into for the purpose of financing insurance premiums, which action may be undertaken solely by the Board of Directors, without requiring a vote of the Unit Owners.

(g) The power to adopt and amend rules and regulations concerning the details of the operation and use of the Common Elements and Association Property. Notwithstanding anything herein contained to the contrary, no such rule may restrict, limit or otherwise impair the rights of the Hotel Lot Owner and/or the Developer without the prior written consent of the Hotel Lot Owner and/or the Developer, as applicable.

(h) The power to acquire, convey, lease and encumber real and personal property. Personal property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors, unless the cost thereof exceeds $25,000.00 in which event the acquisition shall require an affirmative vote of not less than 60% of the voting interests in accordance with the Articles and By-Laws. Real property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors alone and an affirmative vote of not less than 60% of the voting interests; provided, however, that the acquisition of any Unit as a result of a foreclosure of the lien for Assessments and/or Impositions (or by deed in lieu of foreclosure) shall be made upon the majority vote of the Board, regardless of the price for same and the Association, through its Board, has the power to hold, lease, mortgage or convey the acquired Unit(s) without requiring the consent of Unit Owners. The expenses of acquisition, ownership (including the expense of making and carrying any mortgage related to such ownership), rental, membership fees, taxes, Assessments, operation, replacements and other expenses and undertakings in connection therewith shall be Common Expenses.

(i) The obligation to (i) operate and maintain the surface water management system in

(Reserved for Clerk of Court)

(c)     The duty to maintain accounting records of the Association according to good accounting practices, which shall be open to inspection by Unit Owners or their authorized representatives at reasonable times upon prior request.

(d)     The power to contract for the management and maintenance of the Condominium Property and to authorize a management agent (who may be an affiliate of the Developer) to assist the Association, Shared Components Unit Owner, and/or Hotel Lot Owner, in carrying out its powers and duties by performing such functions as the submission of proposals, collection of Assessments, preparation of records, enforcement of rules and maintenance, repair and replacement of Common Elements with such funds as shall be made available by the Association for such purposes. The Association, Shared Components Unit Owner, and/or Hotel Lot Owner, and its, and their, officers shall, however, retain at all times the powers and duties granted in the Condominium documents and the Condominium Act, including, but not limited to, the making of Assessments, promulgation of rules, subject to the provisions of Section 9.1(g) below, and execution of contracts on behalf of the Association, Shared Components Unit Owner, and/or Hotel Lot Owner.

(e)     Without creating any obligation to do so, the power and authority of the Board (by a majority vote, without requiring any vote of Unit Owners) to negotiate and enter into an agreement or agreements with the Hotel Lot Owner to obtain use rights in and to the Spa. Said power shall include, without limitation, the right to negotiate the specific terms and conditions of such agreement (or agreements), including, without limitation, the services to be provided, location of facilities and/or use and/or membership fees.

(f)     The power to borrow money, execute promissory notes and other evidences of indebtedness and to give as security therefor mortgages and security interests in property owned by the Association, if any, provided that such actions are approved by a majority of the entire membership of the Board of Directors and 80% or more of the Units represented at a meeting at which a quorum has been attained in accordance with the Articles and By-Laws, or by such greater percentage of the Board or Unit Owners as may be specified in the By-Laws with respect to certain borrowing. The foregoing restriction shall not apply if such indebtedness is entered into for the purpose of financing insurance premiums, which action may be undertaken solely by the Board of Directors, without requiring a vote of the Unit Owners.

(g)     The power to adopt and amend rules and regulations concerning the details of the operation and use of the Common Elements and Association Property. Notwithstanding anything herein contained to the contrary, no such rule may restrict, limit or otherwise impair the rights of the Hotel Lot Owner and/or the Developer without the prior written consent of the Hotel Lot Owner and/or the Developer, as applicable.

(h)     The power to acquire, convey, lease and encumber real and personal property. Personal property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors, unless the cost thereof exceeds $25,000.00 in which event the acquisition shall require an affirmative vote of not less than 80% of the voting interests in accordance with the Articles and By-Laws. Real property shall be acquired, conveyed, leased or encumbered upon a majority vote of the Board of Directors alone and an affirmative vote of not less than 80% of the voting interests; provided, however, that the acquisition of any Unit as a result of a foreclosure of the lien for Assessments and/or Impositions (or by deed in lieu of foreclosure) shall be made upon the majority vote of the Board, regardless of the price for same and the Association, through its Board, has the power to hold, lease, mortgage or convey the acquired Unit(s) without requiring the consent of Unit Owners. The expenses of acquisition, ownership (including the expense of making and carrying any mortgage related to such ownership), rental, membership fees, taxes, Assessments, operation, replacements and other expenses and undertakings in connection therewith shall be Common Expenses.

(i)     The obligation to (i) operate and maintain the surface water management system in

Declaration
-15-

accordance with the permit issued by the SFWMD, (ii) carry out, maintain, and monitor any required wetland mitigation tasks and (iii) maintain copies of all permitting actions with regard to the SFWMD.

(j) The power to act as the collection agent on behalf, and at the request, of the Master Association, the Shared Components Unit Owner and/or the Hotel Lot Owner for assessments due same from Unit Owners.

(k) The power to execute all documents or consents, on behalf of all Residential Unit Owners (and their mortgagees), required by all governmental and/or quasi-governmental agencies in connection with land use and development matters (including, without limitation, plats, waivers of plat, unities of title, covenants in lieu thereof, etc.), and in that regard, each Owner of a Residential Unit, by acceptance of the deed to such Owner's Unit, and each mortgagee of a Residential Unit Owner by acceptance of a lien on said Residential Unit, appoints and designates the President of the Association, as such Owner's agent and attorney-in-fact to execute any and all such documents or consents.

(l) All of the powers which a corporation not for profit in the State of Florida may exercise pursuant to this Declaration, the Articles of Incorporation, the Bylaws, Chapters 607 and 617, Florida Statutes and the Act, in all cases except as expressly limited or restricted in the Act.

(m) Subject to the limitations set forth in the Act, the power to enter into management agreements which may delegate any or all of the foregoing powers to a third party.

In the event of conflict among the powers and duties of the Association or the terms and provisions of this Declaration, exhibits attached hereto and the Master Covenants, or otherwise, the Master Covenants shall take precedence over this Declaration; this Declaration shall take precedence over the Articles of Incorporation, By-Laws and applicable rules and regulations; the Articles of Incorporation shall take precedence over the By-Laws and applicable rules and regulations; and the By-Laws shall take precedence over applicable rules and regulations, all as amended from time to time. Notwithstanding anything in this Declaration or its exhibits to the contrary, nothing in the Master Covenants shall conflict with the powers and duties of the Association or the rights of the Unit owners as provided in the Act.

9.2 Limitation Upon Liability of Association. Notwithstanding the duty of the Association to maintain and repair parts of the Condominium Property, the Association shall not be liable to Unit Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the Condominium Property. Further, the Association shall not be liable for any such injury or damage caused by defects in design or workmanship or any other reason connected with any additions, alterations or improvements or other activities done by or on behalf of any Unit Owners regardless of whether or not same shall have been approved by the Association pursuant to Section 8.1 hereof. The Association also shall not be liable to any Unit Owner or lessee or to any other person or entity for any property damage, personal injury, death or other liability on the grounds that the Association did not obtain or maintain insurance (or carried insurance with any particular deductible amount) for any particular matter where: (i) such insurance is not required hereby; or (ii) the Association could not obtain such insurance at reasonable costs or upon reasonable terms. Nothing herein shall be deemed to relieve the Association of its duty to exercise ordinary care in the carrying out of its responsibilities nor to deprive the Unit Owners of their right to sue the Association if it negligently or willfully causes damage to the Unit Owners' property during the performance of the Association's duties.

9.3 Restraint Upon Assignment of Shares in Assets. The share of a Unit Owner in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to his Unit.

9.4 Approval or Disapproval of Matters. Whenever the decision of a Unit Owner is required upon any matter, whether or not the subject of an Association meeting, that decision shall be expressed by

(Reserved for Clerk of Court)

the same person who would cast the vote for that Unit if at an Association meeting, unless the joinder of all record Owners of the Unit is specifically required by this Declaration or by law.

9.5    Acts of the Association. Unless the approval or action of Unit Owners, and/or a certain specific percentage of the Board of Directors of the Association, is specifically required in this Declaration, the Articles of Incorporation or By-Laws of the Association, applicable rules and regulations or applicable law, all approvals or actions required or permitted to be given or taken by the Association shall be given or taken by the Board of Directors, without the consent of Unit Owners, and the Board may so approve and act through the proper officers of the Association without a specific resolution. When an approval or action of the Association is permitted to be given or taken hereunder or thereunder, such action or approval may be conditioned in any manner the Association deems appropriate or the Association may refuse to take or give such action or approval without the necessity of establishing the reasonableness of such conditions or refusal.

9.6    Effect on Developer. If the Developer holds a Unit for sale in the ordinary course of business, none of the following actions may be taken by the Association, subsequent to the transfer of control of the Board to Unit Owners other than the Developer, without the prior written approval of the Developer:

    (a)    Assessment of the Developer as a Unit Owner for capital improvements;

    (b)    Any action by the Association that would be detrimental to the sales of Units by the Developer; provided, however, that an increase in Assessments for Common Expenses without discrimination against the Developer shall not be deemed to be detrimental to the sales of Units.

10.    Determination of Common Expenses and Master Expenses and Fixing of Assessments Therefor. The Board of Directors shall from time to time, and at least annually, prepare, or cause to be prepared, a budget for the Condominium and the Association which are designed to adhere to the standards set forth in Section 7.5 above and determine, or cause to be determined, the amount of Assessments payable by the Unit Owners to meet the Common Expenses of the Condominium and allocate and assess such expenses and the Master Expenses among the Unit Owners in accordance with the provisions of this Declaration and the By-Laws. The Board of Directors shall advise all Unit Owners promptly in writing of the amount of the Assessments and Impositions payable by each of them as determined by the Board of Directors as aforesaid and shall furnish copies of the budget, on which such Assessments and Impositions are based, to all Unit Owners and (if requested in writing) to their respective mortgagees. The Common Expenses shall include the expenses of and reserves for (if required by, and not waived in accordance with, applicable law) the operation, maintenance, repair and replacement of the Common Elements and Association Property, costs of carrying out the powers and duties of the Association and any other expenses designated as Common Expenses by the Act, this Declaration, the Articles or By-Laws of the Association, applicable rules and regulations or by the Association. Incidental income to the Association, if any, may be used to pay regular or extraordinary Association expenses and liabilities, to fund reserve accounts, or otherwise as the Board shall determine from time to time, and need not be restricted or accumulated. Any Budget adopted shall be subject to change to cover actual expenses at any time. Any such change shall be adopted consistent with the provisions of this Declaration and the By-Laws.

11.    Collection of Assessments.

    11.1    Liability for Assessments. A Unit Owner, regardless of how title is acquired, including by purchase at a foreclosure sale or by deed in lieu of foreclosure shall be liable for all Assessments and Impositions coming due while he or she is the Unit Owner. Additionally, a Unit Owner shall be jointly and severally liable with the previous Owner for all unpaid Assessments and/or Impositions that came due up to the time of the conveyance, without prejudice to any right the Owner may have to recover from the previous Owner the amounts paid by the grantee Owner. The liability for Assessments and/or Impositions may not be avoided by waiver of the use or enjoyment of any Common Elements or by the abandonment of the Unit for which the Assessments and/or Impositions are made or otherwise.

Declaration
- 17 -

[Reserved for Clerk of Court]

11.2 Special and Capital Improvement Assessments. In addition to Assessments levied by the Association to meet the Common Expenses of the Condominium and the Association, the Board of Directors may levy "Special Assessments" and "Capital Improvement Assessments" upon the following terms and conditions:

(a) "Special Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for specific purposes of a nonrecurring nature which are not in the nature of capital improvements.

(b) "Capital Improvement Assessments" shall mean and refer to a charge against each Owner and his Unit, representing a portion of the costs incurred by the Association for the acquisition, installation, construction or replacement (as distinguished from repairs and maintenance) of any capital improvements located or to be located within the Common Elements or Association Property.

(c) Special Assessments and Capital Improvement Assessments may be levied by the Board and shall be payable in lump sums or installments, in the discretion of the Board, provided that, if such Special Assessments or Capital Improvement Assessments, in the aggregate in any year, exceed $125,000.00 or cause the total Assessments levied to exceed 115% of Assessments for the preceding calendar year, the Board must obtain approval of a majority of the Units represented at a meeting at which a quorum is attained.

11.3 Default in Payment of Assessments for Common Expenses or Master Expenses. Assessments, Impositions and installments of either not paid within ten (10) days from the date when they are due shall bear interest at fifteen percent (15%) per annum from the date due until paid and shall be subject to an administrative late fee in an amount not to exceed the greater of $25.00 or five percent (5%) of each delinquent installment. The Association has a lien on each Condominium Parcel to secure the payment of Assessments and Impositions. Except as set forth below, the lien is effective from, and shall relate back to, the date of the recording of this Declaration. However, as to first mortgages of record, the lien is effective from and after the date of the recording of a claim of lien in the Public Records of the County, stating the description of the Condominium Parcel, the name of the record Owner and the name and address of the Association. The lien shall be evidenced by the recording of a claim of lien in the Public Records of the County. To be valid, the claim of lien must state the description of the Condominium Parcel, the name of the record Owner, the name and address of the Association, the amount due and the due dates, and the claim of lien must be executed and acknowledged by an officer or authorized officer of the Association. The claim of lien shall not be released until all sums secured by it (or such other amount as to which the Association shall agree by way of settlement) have been fully paid or until it is barred by law. No such lien shall be effective longer than one (1) year after the claim of lien has been recorded unless, within that one (1) year period, an action to enforce the lien is commenced. The one (1) year period shall automatically be extended for any length of time during which the Association is prevented from filing a foreclosure action by an automatic stay resulting from a bankruptcy petition filed by the Owner or any other person claiming an interest in the Unit. The claim of lien shall secure (whether or not stated therein) all unpaid Assessments and/or Impositions, which are due and which may accrue subsequent to the recording of the claim of lien and prior to the entry of a certificate of title, as well as interest and all reasonable costs and attorneys' fees incurred by the Association incident to the collection process. Upon payment in full, the person making the payment is entitled to a satisfaction of the lien in recordable form. The Association may bring an action in its name to foreclose a lien for unpaid Assessments and/or Impositions in the manner a mortgage of real property is foreclosed and may also bring an action at law to recover a money judgment for the unpaid Assessments and/or Impositions without waiving any claim of lien. The Association is entitled to recover its reasonable attorneys' fees incurred either in a lien foreclosure action or an action to recover a money judgment for unpaid Assessments and/or Impositions.

Additionally, each Owner of any Unit by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in any such deed or other conveyance, shall be deemed to have assigned all rents, issues and profits (the "Collateral Assignment of Rents") on each such Unit to the Association, which Collateral Assignment of Rents shall become absolute

Declaration
- 18 -

(Reserved for Clerk of Court)

upon default of such Unit Owner hereunder, but shall in any event be subject and subordinate to the lien of any first mortgage on such Unit and any assignment of leases in favor of the holder of such first mortgage.

As an additional right and remedy of the Association, upon default in the payment of Assessments and/or Impositions as aforesaid and after thirty (30) days' prior written notice to the applicable Unit Owner and the recording of a claim of lien, the Association may declare the Assessment installments for the remainder of the budget year to be accelerated and immediately due and payable. In the event that the amount of such installments changes during the remainder of the budget year, the Unit Owner or the Association, as appropriate, shall be obligated to pay or reimburse to the other the amount of increase or decrease within ten (10) days of same taking effect.

11.4    Notice of Intention to Foreclose Lien.  No foreclosure judgment may be entered until at least thirty (30) days after the Association gives written notice to the Unit Owner of its intention to foreclose its lien to collect the unpaid Assessments and/or Impositions.  If this notice is not given at least thirty (30) days before the foreclosure action is filed, and if the unpaid Assessments and/or Impositions, including those coming due after the claim of lien is recorded, are paid before the entry of a final judgment of foreclosure, the Association shall not recover attorney's fees or costs.  The notice must be given by delivery of a copy of it to the Unit Owner or by certified or registered mail, return receipt requested, addressed to the Unit Owner at the last known address, and upon such mailing, the notice shall be deemed to have been given. If after diligent search and inquiry the Association cannot find the Unit Owner or a mailing address at which the Unit Owner will receive the notice, the court may proceed with the foreclosure action and may award attorney's fees and costs as permitted by law.  The notice requirements of this subsection are satisfied if the Unit Owner records a Notice of Contest of Lien as provided in the Act.

11.5    Appointment of Receiver to Collect Rental.  If the Unit Owner remains in possession of the Unit after a foreclosure judgment has been entered, the court in its discretion may require the Unit Owner to pay a reasonable rental for the Unit.  If the Unit is rented or leased during the pendency of the foreclosure action, the Association is entitled to the appointment of a receiver to collect the rent.  The expenses of such receiver shall be paid by the party which does not prevail in the foreclosure action.

11.6    First Mortgages.  The liability of the holder of a first mortgage on a Unit (a "First Mortgagee"), or its successor or assignees, who acquire title to a Unit by foreclosure or by deed in lieu of foreclosure for the unpaid Assessments (or installments thereof) that became due prior to the First Mortgagee's acquisition of title is limited to the lesser of:

(a)    The Unit's unpaid Common Expenses and regular periodic Assessments which accrued or came due during the six (6) months immediately preceding the acquisition of title and for which payment in full has not been received by the Association; or

(b)    One percent (1%) of the original mortgage debt.

As to a Unit acquired by foreclosure, the limitations set forth in clause (b) above shall not apply unless the First Mortgagee joined the Association as a defendant in the foreclosure action. Joinder of the Association, however, is not required if, on the date the complaint is filed, the Association was dissolved or did not maintain an office or agent for service of process at a location which was known to or reasonably discoverable by the mortgagee.

A First Mortgagee acquiring title to a Unit as a result of foreclosure or deed in lieu thereof may not, during the period of its ownership of such Unit, whether or not such Unit is unoccupied, be excused from the payment of some or all of the Common Expenses and/or Master Expenses coming due during the period of such ownership.

11.7    Certificate of Unpaid Assessments and/or Impositions.  Within fifteen (15) days after receiving a written request therefore from a purchaser, Unit Owner or mortgagee of a Unit, the Association shall provide a certificate, signed by an officer or agent of the Association, stating all Assessments and/or Impositions and other moneys owed to the Association by the Unit Owner with respect to his

(Reserved for Clerk of Court)

Unit. Any person other than the Unit Owner who relies upon such certificate shall be protected thereby. The Association or its authorized agent may charge a reasonable fee for the preparation of such certificate.

11.8    Installments. Regular Assessments and/or Impositions shall be collected monthly or quarterly, in advance, at the option of the Association. Initially, Assessments and/or Impositions will be collected monthly.

11.9    Application of Payments. Any payments received by the Association from a delinquent Unit Owner shall be applied first to any interest accrued on the delinquent installment(s) as aforesaid, then to any administrative late fees, then to any costs and reasonable attorneys' fees incurred in collection and then to the delinquent and any accelerated Assessments and/or Impositions. The foregoing shall be applicable notwithstanding any restrictive endorsement, designation or instruction placed on or accompanying a payment.

12.    Obligation for Expenses Relating to Shared Components Unit.

12.1    Maintenance. As provided in Sections 3.3(d) and 7.4above, the Shared Components Unit Owner has granted easements with respect to certain portions of the Shared Components Unit and agreed to repair, replace, improve, maintain, manage, operate, and insure the Shared Components Unit, all to be done as determined and ordered by the Shared Components Unit Owner, or otherwise as provided in Section 7.4. In consideration of the foregoing, each Residential Unit Owner, by acceptance of a deed or other conveyance of a Residential Unit, and whether or not expressly stated, shall be deemed to agree that the costs incurred by the Shared Components Unit Owner in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components (including reasonable reserves if established by the Shared Components Unit Owner and any assessments payable by the Shared Components Unit Owner to the Association, collectively, the "Shared Components Costs") shall be paid for in part through charges (either general or special) imposed against the Residential Units in accordance with the terms hereof. No Owner may waive or otherwise escape liability for charges for the Shared Components Costs by non-use (whether voluntary or involuntary) of the Shared Components Unit or abandonment of the right to use same. Notwithstanding anything herein contained to the contrary, the Shared Components Unit Owner shall be excused and relieved from any and all maintenance, repair and/or replacement obligations with respect to the Shared Components Unit to the extent that the funds necessary to perform same, to the extent the obligation of the Residential Unit Owners, are not available through the charges imposed and actually collected. The Shared Components Unit Owners shall have no obligation to fund and/or advance any deficit or shortfall in funds which were the obligation of the Residential Unit Owners in order to properly perform the maintenance, repair and/or replacement obligations described herein.

12.2    Easement. An easement is hereby reserved and created in favor of the Shared Components Unit Owner, and its designees over the Condominium Property for the purpose of entering onto the Condominium Property for the performance of the maintenance, repair and replacement obligations herein described.

12.3    Charge to Residential Unit Owners; Lien. Developer, for all Units now or hereafter located within the Condominium Property, hereby covenants and agrees, and each Owner of any Residential Unit by acceptance of a deed therefor or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to covenant and agree, to pay to the Shared Components Unit Owner annual charges for the operation and insurance of the Shared Components; and for payment of 100% of the Shared Components Costs (the "Residential Units Allocated Share"), the establishment of reasonable reserves for the replacement of the Shared Components and the furnishings and finishings thereof, capital improvement charges, special charges and all other charges hereinafter referred to or lawfully imposed by the Shared Components Unit Owner in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components, all such charges to be fixed, established and collected from time to time as herein provided. The annual charge, capital

(Reserved for Clerk of Court)

improvement charge and special charge, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the Residential Units and shall be a continuing lien upon the Residential Unit against which each such charge is made and upon all improvements thereon, from time to time existing. Each such charge, together with such interest thereon and costs of collection thereof as hereinafter provided, shall also be the personal obligation of the person who is the Owner of such Residential Unit at the time when the charge fell due and all subsequent Owners of that Unit until paid, except as provided in Section 12.5 below. Reference herein to charges shall be understood to include reference to any and all of said charges whether or not specifically mentioned. Each Unit shall be charged the percentage share of the Shared Components Costs as is set forth on Exhibit "6" attached hereto, except only with respect to the portion of the Shared Components Costs attributable to consumption of electricity within the individual Units, which electricity charges shall be assessed to the Unit by the Shared Components Unit Owner based upon actual consumption to the extent that a reasonable means, in the opinion of the Shared Components Unit Owner, to determine actual consumption is available (e.g., submetering or other means of identifying consumption on a per Unit basis). In the event that the Shared Components Unit Owner does not reasonably believe that a reasonable means exists to determine actual consumption of electricity, the electricity charges shall be allocated among the Units in the same manner as the other Shared Components Costs, in accordance with the percentages set forth on Exhibit "6" hereof.

In addition to the regular and capital improvement charges which are or may be levied hereunder, the Shared Components Unit Owner shall have the right to collect reasonable reserves for the replacement of the Shared Components and the furnishings and finishings thereof and to levy special charges against an Owner(s) to the exclusion of other Owners for the repair or replacement of damage to any portion of the Shared Components Unit (including, without limitation, improvements, furnishings and finishings therein) caused by the misuse, negligence or other action or inaction of an Owner or his guests, tenants or invitees. Any such special charge shall be subject to all of the applicable provisions of this Section including, without limitation, lien filing and foreclosure procedures and late charges and interest. Any special charge levied hereunder shall be due within the time specified by the Shared Components Unit Owner in the action imposing such charge. The annual regular charges provided for in this Section shall commence on the first day of the month next following the recordation of this Declaration and shall be applicable through December 31 of such year. Each subsequent annual charge shall be imposed for the year beginning January 1 and ending December 31. The annual charges shall be payable in advance in monthly installments, or in annual, semi- or quarter-annual installments if so determined by the Shared Components Unit Owner (absent which determination they shall be payable monthly). The charge amount (and applicable installments) may be changed at any time by the Shared Components Unit Owner from that originally stipulated or from any other charge that is in the future adopted by the Shared Components Unit Owner. The original charge for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary, at any appropriate time during the year), but the amount of any revised charge to be levied during any period shorter than a full calendar year shall be in proportion to the number of months (or other appropriate installments) remaining in such calendar year. The Shared Components Unit Owner shall fix the date of commencement and the amount of the charge against the Residential Units for each charge period, to the extent practicable, at least thirty (30) days in advance of such date or period, and shall, at that time, prepare a roster of the Residential Units and charges applicable thereto which shall be kept in the office of the Shared Components Unit Owner and shall be open to inspection by any Owner. Written notice of the charge shall thereupon be sent to every Residential Unit Owner subject thereto twenty (20) days prior to payment of the first installment thereof, except as to special charges. In the event no such notice of the charges for a new charge period is given, the amount payable shall continue to be the same as the amount payable for the previous period, until changed in the manner provided for herein.

12.4   Effect of Non-Payment of Charge; the Personal Obligation; the Lien; Remedies of the Shared Components Unit Owners. If the charges (or installments) provided for herein are not paid on the date(s) when due (being the date(s) specified herein or pursuant hereto), then such charges (or installments) shall become delinquent and shall, together with late charges, interest and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Residential Unit and all improvements thereon which shall bind such Residential Unit in the hands of the then

(Reserved for Clerk of Court)

Owner, his heirs, personal representatives, successors and assigns. Except as provided in Section 12.5 to the contrary, the personal obligation of an Owner to pay such charge shall pass to his successors in title and recourse may be had against either or both. If any installment of a charge is not paid within fifteen (15) days after the due date, at the option of the Shared Components Unit Owner, a late charge not greater than the amount of such unpaid installment may be imposed (provided that only one late charge may be imposed on any one unpaid installment and if such installment is not paid thereafter, it and the late charge shall accrue interest as provided herein but shall not be subject to additional late charges; provided further, however, that each other installment thereafter coming due shall be subject to one late charge each as aforesaid) and the Shared Components Unit Owner may bring an action at law against the Owner(s) personally obligated to pay the same, may record a claim of lien (as evidence of its lien rights as hereinabove provided for) against the Residential Unit on which the charges and late charges are unpaid and all improvements thereon, may foreclose the lien against the applicable Residential Unit and all improvements thereon on which the charges and late charges are unpaid, or may pursue one or more of such remedies at the same time or successively, and attorneys' fees and costs actually incurred in preparing and filing the claim of lien and the complaint, if any, and prosecuting same, in such action shall be added to the amount of such charges, late charges and interest secured by the lien, and in the event a judgment is obtained, such judgment shall include all such sums as above provided and attorneys' fees actually incurred together with the costs of the action, through all applicable appellate levels. Failure of the Shared Components Unit Owner (or any collecting entity) to send or deliver bills or notices of charges shall not relieve Owners from their obligations hereunder. The Shared Components Unit Owner shall have such other remedies for collection and enforcement of charges as may be permitted by applicable law. All remedies are intended to be, and shall be, cumulative.

12.5    Subordination of the Shared Components Unit Owner's Lien. The lien of the charges provided for in this Article shall be subordinate to real property tax liens and the lien of any first mortgage; provided, however, that any such mortgage lender when in possession, and in the event of a foreclosure, any purchaser at a foreclosure sale, and any such mortgage lender acquiring a deed in lieu of foreclosure, and all persons claiming by, through or under such purchaser or mortgage lender, shall hold title subject to the liability and lien of any charge coming due after such foreclosure (or conveyance in lieu of foreclosure). Any unpaid charge which cannot be collected as a lien against any Residential Unit by reason of the provisions of this Section shall be deemed to be a charge divided equally among, payable by and a lien against all Residential Units, including the Residential Units as to which the foreclosure (or conveyance in lieu of foreclosure) took place.

12.6    Curative Right. In the event (and only in the event) that the Shared Components Unit Owner fails to maintain the Shared Components as required under this Declaration, the Association and the Hotel Lot Owner shall have the right to perform such duties; provided, however, that same may only occur after thirty (30) days' prior written notice to the Shared Components Unit Owner and the Hotel Lot Owner and provided that the Shared Components Unit Owner has not effected curative action within said thirty (30) day period (or if the curative action cannot reasonably be completed within said thirty (30) day period, provided only that the Shared Components Unit Owner has not commenced curative actions within said thirty (30) day period and thereafter diligently pursued same to completion). To the extent that the Association and/or Hotel Lot Owner must undertake maintenance responsibilities as a result of the Shared Components Unit Owners' failure to perform same, then in such event, but only for such remedial actions as may be necessary, the Association and Hotel Lot Owner shall be deemed vested with the Charge rights of the Shared Components Unit Owner hereunder for the limited purpose of obtaining reimbursement from the Shared Components Unit Owner for the costs of performing such remedial work.

12.7    Financial Records. The Shared Components Unit Owner shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and insurance of the Shared Components, including the then current budget and any then proposed budget (the "Shared Components Records"). The Shared Components Records need not be audited or reviewed by a Certified Public Accountant. The Shared Components Records shall at all times, during reasonable business hours, be subject to the inspection of any Member of the Association.

(Reserved for Clerk of Court)

12.8    Shared Components Unit Owners Consent; Conflict. The provisions of this Section 12 shall not be amended, modified or in any manner impaired and/or diminished, directly or indirectly, without the prior written consent of 4/5th of the Residential Unit Owners and the Shared Components Unit Owner. In the event of any conflict between the provisions of this Section 12, and the provisions of any other Section of this Declaration, the provisions of this Section 12 shall prevail and govern.

13.    Insurance. Insurance obtained by the Shared Components Unit Owner pursuant to the requirements of this Section 13 shall be governed by the following provisions:

13.1    Purchase, Custody and Payment.

   (a)    Purchase. All insurance policies required to be obtained by the Shared Components Unit Owner hereunder shall be issued by an insurance company authorized to do business in Florida or by surplus lines carriers offering policies for properties in Florida.

   (b)    Approval. Each insurance policy, the agency and company issuing the policy and the Insurance Trustee (if appointed) hereinafter described shall be subject to the approval of the Primary Institutional First Mortgagee in the first instance, if requested thereby (which approval right has been requested by Administrative Agent).

   (c)    Named Insured. The named insured shall be the Shared Components Unit Owner, individually, or such designee as may be designated by the Shared Components Unit Owner, and as agent for the Association and the Owners of Units covered by the policy, without naming them, and as agent for the holders of any mortgage on a Unit (or any leasehold interest therein), without naming them. The Association, Unit Owners and the holders of any mortgage on a Unit (or any leasehold interest therein) shall be deemed additional insureds.

   (d)    Custody of Policies and Payment of Proceeds. All policies shall provide that payments for losses made by the insurer shall be paid to the Shared Components Unit Owner and the holders of any mortgage on the Shared Components Unit, as their interests may appear.

   (e)    Copies to Mortgagees. One copy of each insurance policy, or a certificate evidencing such policy, and all endorsements thereto, shall be furnished by the Shared Components Unit Owner upon request to the holders of any mortgage on a Unit. Copies or certificates shall be furnished not less than ten (10) days prior to the beginning of the term of the policy, or not less than ten (10) days prior to the expiration of each preceding policy that is being renewed or replaced, as appropriate.

   (f)    Personal Property and Liability. Except as specifically provided herein, the Shared Components Unit Owner shall not be responsible to Residential Unit Owners to obtain insurance coverage upon the property lying within the boundaries of their Residential Unit, including, but not limited to, the Improvements, Owner's personal property, nor insurance for the Owners' personal liability and living expenses, nor for any other risks not otherwise insured in accordance herewith.

13.2    Coverage. The Shared Components Unit Owner shall maintain insurance covering the following, to the extent applicable (keeping in mind that, given the breadth of the Shared Facilities, much, if not all of same shall be carried by the Master Association or the Hotel Lot Owner, as applicable, all in accordance with the terms of the Master Covenants):

   (a)    Casualty. The Shared Components, together with all fixtures, building service equipment, personal property and supplies constituting the Shared Components (collectively the "Insured Property"), shall be insured in amounts not less than may be required from time to time by the Administrative Agent, or after such time as the Administrative Agent no longer holds a mortgage encumbering the Condominium Property, in such amounts as are commercially reasonable. Notwithstanding the foregoing, the Insured Property shall not include, and shall specifically exclude, the Residential Units, the portions of the Shared Components Unit which are not part of the Shared Components, and all furniture,

Declaration
- 23 -

(Reserved for Clerk of Court)

furnishings, Unit floor coverings, wall coverings and ceiling coverings, other personal property owned, supplied or installed by Residential Unit Owners or tenants of Residential Unit Owners, and all electrical fixtures, appliances, air conditioner and/or heating equipment, water heaters, water filters, built-in cabinets and countertops, and window treatments, including curtains, drapes, blinds, hardware and similar window treatment components, or replacements or any of the foregoing which are located within the boundaries of a Unit and serve only one Unit and all air conditioning compressors that service only an individual Unit, if any and to the extent not part of the Shared Components. Such policies may contain reasonable deductible provisions as determined by the Shared Components Unit Owner. Such coverage shall afford protection against loss or damage by fire and other hazards covered by a standard "all risks" form, and such other risks as from time to time are customarily covered with respect to buildings and improvements similar to the Insured Property in construction, location and use, including, but not limited to, vandalism and malicious mischief.

(b) Liability. Comprehensive general public liability and automobile liability insurance covering loss or damage resulting from accidents or occurrences on or about or in connection with the Insured Property or adjoining driveways and walkways, or any work, matters or things related to the Insured Property, with such coverage as shall be required by the Shared Components Unit Owner, and with a cross liability endorsement to cover liabilities of the Unit Owners as a group to any Unit Owner, and vice versa.

(c) Worker's Compensation and other mandatory insurance, when applicable, to the extent applicable to the maintenance, operation, repair or replacement of the Shared Components.

(d) Flood Insurance covering the Insured Property, if so determined by the Shared Components Unit Owner.

(e) Fidelity Insurance or Fidelity Bonds. The Association shall obtain and maintain adequate insurance or fidelity bonding of all persons who control or disburse Association funds, which shall include, without limitation, those individuals authorized to sign Association checks and the president, secretary and treasurer of the Association. The insurance policy or fidelity bond shall be in such amount as shall be determined by a majority of the Board, but must be sufficient to cover the maximum funds that will be in the custody of the Association or its management agent at any one time. The premiums on such bonds and/or insurance shall be paid by the Association as a Common Expense.

(f) Such Other Insurance as the Shared Components Unit Owner shall determine from time to time to be desirable in connection with the Shared Components.

When appropriate and obtainable, each of the foregoing policies shall waive the insurer's right to: (i) as to property insurance policies, subrogation against the Association and against the Unit Owners individually and as a group, (ii) to pay only a fraction of any loss in the event of coinsurance or if other insurance carriers have issued coverage upon the same risk, and (iii) avoid liability for a loss that is caused by an act of the Shared Components Unit Owner (or any of its employees, contractors and/or agents), one or more Unit Owners or as a result of contractual undertakings. Additionally, and each policy shall provide that the insurance provided shall not be prejudiced by any act or omissions of individual Unit Owners that are not under the control of the Shared Components Unit Owner.

Every casualty insurance policy obtained by the Association, if required by FNMA/FHLMC, shall have the following endorsements: (i) agreed amount and inflation guard and (ii) steam boiler coverage (providing at least $50,000 coverage for each accident at each location), if applicable.

13.3 Additional Provisions. All policies of insurance shall provide that such policies may not be canceled or substantially modified, other than as a result of non-payment of premiums, without at least thirty (30) days' prior written notice to all of the named insureds, including all mortgagees of Units. Prior to obtaining any policy of casualty insurance or any renewal thereof, the Shared

Declaration
- 24 -

(Reserved for Clerk of Court)

Components Unit Owner may obtain an appraisal from a fire insurance company, or other competent appraiser, of the full insurable replacement value of the insured Property (exclusive of foundations), without deduction for depreciation, for the purpose of determining the amount of insurance to be effected pursuant to this Section.

13.4 **Premiums.** Premiums upon insurance policies purchased by the Shared Components Unit Owner pursuant to this Section 13 shall be among the costs assessed against the Unit Owners in accordance with the provisions of Section 12. Premiums may be financed in such manner as the Shared Components Unit Owner deems appropriate.

13.5 **Insurance Trustee; Share of Proceeds.** Subject to the terms of the Master Declaration, all insurance policies obtained by or on behalf of the Shared Components Unit Owner pursuant to this Section 13 shall be for the benefit of the Shared Components Unit Owner, the Association, the Unit Owners and their mortgagees, as their respective interests may appear, and shall provide that all proceeds covering property losses shall be paid to the Insurance Trustee which may be designated by the Shared Components Unit Owner as provided in Section 13.9 below, and which, if so appointed, shall be a bank or trust company in Florida with trust powers, with its principal place of business in the State of Florida. The Insurance Trustee shall not be liable for payment of premiums, nor for the renewal or the sufficiency of policies, nor for the failure to collect any insurance proceeds. The duty of the Insurance Trustee shall be to receive such proceeds as are paid and to hold the same in trust for the purposes elsewhere stated herein, and for the benefit of the Unit Owners and their respective mortgagees in accordance with the Allocated Interest attributable thereto.

13.6 **Distribution of Proceeds.** Proceeds of insurance policies received by the Insurance Trustee shall be distributed to or for the benefit of the beneficial owners thereof in the following manner:

(a) **Expenses of the Trust.** All expenses of the Insurance Trustee shall be first paid or provision shall be made therefor.

(b) **Reconstruction or Repair.** If the damaged property for which the proceeds are paid is to be repaired or reconstructed, the remaining proceeds shall be paid to defray the cost thereof as elsewhere provided herein. Any proceeds remaining after defraying such costs shall be distributed to the beneficial owners thereof, remittances to Unit Owners and their mortgagees being payable jointly to them.

(c) **Failure to Reconstruct or Repair.** If it is determined in the manner elsewhere provided that the damaged property for which the proceeds are paid shall not be reconstructed or repaired, the remaining proceeds shall be allocated among the beneficial owners as provided in Section 13.5 above, and distributed first to all Institutional First Mortgagees in an amount sufficient to pay off their mortgages, and the balance, if any, to the beneficial owners.

(d) **Certificate.** In making distributions to Unit Owners and their mortgagees, the Insurance Trustee (if appointed) may rely upon a certificate of the Shared Components Unit Owner as to the names of the Unit Owners and their mortgagees and their respective shares of the distribution.

13.7 **Shared Components Unit Owner as Agent.** The Shared Components Unit Owner is hereby irrevocably appointed as agent and attorney-in-fact for the Association and each Unit Owner and for each owner of a mortgage or other lien upon a Unit and for each owner of any other interest in the Condominium Property to adjust all claims arising under insurance policies purchased by the Shared Components Unit Owner and to execute and deliver releases upon the payment of claims.

13.8 **Unit Owners' Personal Coverage.** The insurance required to be purchased by the Shared Components Unit Owner pursuant to this Section 13 shall not cover claims against an Owner due to accidents occurring within his Unit, nor casualty or theft loss to the contents of an Owner's Unit. It shall be the obligation of the individual Unit Owner, if such Owner so desires, to purchase and pay for insurance, with limits of not less than $1,000,000.00 per occurrence, as to all such and

Declaration
- 26 -

---
(Reserved for Clerk of Court)
---

other risks not covered by insurance required to be carried by the Shared Components Unit Owner hereunder.

13.9    Appointment of Insurance Trustee. The Shared Components Unit Owner shall have the option in its discretion of appointing an Insurance Trustee hereunder for any losses estimated to exceed $1,000,000.00. If the loss does not exceed the foregoing threshold, or if the Shared Components Unit Owner fails or elects not to appoint such Trustee when the threshold is met, the Shared Components Unit Owner will perform directly all obligations imposed upon such Trustee by this Declaration. Fees and expenses of any Insurance Trustee are Common Expenses. To the extent that Administrative Agent holds a mortgage on any Unit owned by Developer, Administrative Agent shall be deemed to be the appointed Insurance Trustee (regardless of whether the threshold is expected to be met), unless it declines to act as such.

13.10   Presumption as to Damaged Property. In the event of a dispute or lack of certainty as to whether damaged property constitutes a Unit(s) or Shared Components, such property shall be presumed to be Shared Components.

13.11   Effect on Association. The Association shall only maintain such insurance as is expressly required to be maintained by the Association pursuant to the Act, it being the express intent of the Developer, as the Owner of each and every of the Units upon the recordation hereof, for itself and its successors and assigns, that the Association not be required to maintain insurance hereunder. To the extent that the Association is required to maintain insurance pursuant to the express requirements of the Act, then (a) as to any insurance required to be maintained by the Association, the Shared Components Unit Owner shall be relieved and released of its obligation hereunder to maintain same, and (b) all of the provisions hereof regarding said insurance, any claims thereunder and the distribution and application of proceeds thereunder shall be governed in accordance with the terms of this Declaration governing the insurance required to be maintained by the Shared Components Unit Owner as if the references herein to the Shared Components Unit Owner were references to the Association. Similarly, to the extent that there are any physical improvements now or hereafter contained within the Common Elements, the Association shall maintain insurance coverage with respect to same (in such amounts as are required of the Shared Components Unit Owner with respect to the insurance it is to maintain on the Shared Components, and all of the provisions hereof regarding said insurance, any claims thereunder and the distribution and application of proceeds thereunder shall be governed in accordance with the terms of this Declaration governing the insurance required to be maintained by the Shared Components Unit Owner as if the references herein to the Shared Components Unit Owner were references to the Association.

13.12   Benefit of Mortgagees. Certain provisions in this Section 13 entitled "Insurance" are for the benefit of mortgagees of Units and may be enforced by such mortgagees.

14.   Reconstruction or Repair After Fire or Other Casualty.

14.1    Determination to Reconstruct or Repair. Subject to the terms of the Master Declaration, subject to the immediately following paragraph, in the event of damage to or destruction of the Insured Property as a result of fire or other casualty, the Shared Components Unit Owner shall determine whether or not to repair and restore of the Insured Property and, if a determination is made to effect restoration, the Insurance Trustee (if appointed) shall disburse the proceeds of all insurance policies required to be maintained by it pursuant to Section 13 to the contractors engaged in such repair and restoration in appropriate progress payments.

In the event the Shared Components Unit Owner determines not to effect restoration to the Shared Components, the net proceeds of insurance resulting from such damage or destruction shall be divided among all the Unit Owners in proportion to their Allocated Interests; provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such fund all mortgages and liens on his Unit in the order of priority of such mortgages and liens.

14.2    Plans and Specifications. Any reconstruction or repair must be made substantially in accordance with the plans and specifications for the original improvements and then applicable building and

Declaration
-28-

(Reserved for Clerk of Court)

other codes; or if not, then in accordance with the plans and specifications approved by the Shared Components Unit Owner, provided, however, that if any reconstruction is undertaken, same shall be undertaken in such a manner to restore the Residential Units to substantially the same condition they were in prior to the occurrence of the casualty.

14.3    Special Responsibility.  In the event the Shared Components Unit Owner determines to effect restoration to the Shared Components, the procedures set forth below shall be observed.

    (a)    Disbursement.  The proceeds of insurance collected on account of a casualty, and the sums collected from Unit Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner and order:

        (i)    Lesser Damage.  If the amount of the estimated costs of reconstruction and repair is less than $100,000, then the construction fund shall be disbursed in payment of such costs upon the order of the Shared Components Unit Owner; provided, however, that upon request to the Insurance Trustee (if appointed) by an Institutional First Mortgagee which is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund, such fund shall be disbursed in the manner provided below for the reconstruction and repair of major damage.

        (ii)    Major Damage.  If the amount of the estimated costs of reconstruction and repair is more than $100,000, then the construction fund shall be disbursed in payment of such costs in the manner contemplated by subparagraph (i) above, but then only upon the further approval of a construction consultant, architect, contractor or engineer qualified to practice in Florida and employed by the Shared Components Unit Owner to supervise the work.  Disbursement of proceeds or other funds for the repair or restoration shall only be made in accordance with safeguards normally associated with construction loan disbursements, which shall include, without limitation, that the construction consultant, architect, contractor or engineer certify prior to any disbursement substantially the following:

            (a)    that all of the work completed as of the date of such request for disbursement has been done substantially in accordance with the approved plans and specifications;

            (b)    that such disbursement request represents monies which either have been paid by or on behalf of the construction consultant, architect, contractor or engineer and/or are justly due to contractors, subcontractors, materialmen, engineers or other persons who have rendered or furnished certain services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the respective amounts paid or due to each of said persons in respect thereof and stating the progress of the work up to the date of said certificate;

            (c)    that the sum then requested to be disbursed plus all sums previously disbursed does not exceed the cost of the work in relation to what has actually been completed through the date of the certificate;

            (d)    that no sums being requested to be disbursed have been the subject of any previous disbursement or any pending application for disbursement;

            (e)    confirming receipt of all applicable lien waivers; and

            (f)    that the amount remaining for disbursement after the pending disbursement will be sufficient to complete the necessary repair or restoration.

(Reserved for Clerk of Court)

(iii)     Unit Owners. If there is a balance of insurance proceeds after payment of all costs of reconstruction and repair as set forth above, this balance shall be divided among all the Unit Owners in proportion to their Allocated Interests; provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such fund all mortgages and liens on his Unit in the order of priority of such mortgages and liens.

(iv)     Certificate. Subject to the provisions of Section 14.3(a)(ii) above, notwithstanding the provisions herein, the Insurance Trustee shall not be required to determine whether or not sums paid by Unit Owners upon Assessments shall be deposited by the Shared Components Unit Owner with the Insurance Trustee, nor to determine whether the disbursements from the construction fund are to be made upon the order of the Shared Components Unit Owner alone or upon the additional approval of an architect, engineer or otherwise, nor whether a disbursement is to be made from the construction fund, nor to determine whether surplus funds to be distributed are less than the Assessments paid by Owners, nor to determine the payees nor the amounts to be paid. The Insurance Trustee may rely upon a certificate of the Shared Components Unit Owner, as to any or all of such matters and stating that the sums to be paid are due and properly payable, and stating the names of the payees and the amounts to be paid.

14.4     Assessments. If the proceeds of the insurance are not sufficient to defray the estimated costs of reconstruction and repair to be effected by the Shared Components Unit Owner, or if at any time during reconstruction and repair, or upon completion of reconstruction and repair, the funds for the payment of the costs of reconstruction and repair are insufficient, Assessments shall be made against the Unit Owners in sufficient amounts to provide funds for the payment of such costs. Such Assessments on account of damage to the Insured Property shall be in proportion to all of the Owners' respective shares in the Common Elements.

14.5     Benefit of Mortgagees. Certain provisions in this Section 14 are for the benefit of mortgagees of Units and may be enforced by any of them.

15.     Condemnation.

15.1     Deposit of Awards with Insurance Trustee. The taking of portions of the Shared Components by the exercise of the power of eminent domain shall be deemed to be a casualty, and, subject to the terms of the Master Declaration, the awards for that taking shall be deemed to be proceeds from insurance on account of the casualty and shall be deposited with the Insurance Trustee. Even though the awards may be payable to Unit Owners, the Unit Owners shall deposit the awards with the Insurance Trustee; and in the event of failure to do so, in the discretion of the Shared Components Unit Owner, a charge shall be made against a defaulting Unit Owner in the amount of his award, or the amount of that award shall be set off against the sums hereafter made payable to that Owner.

15.2     Determination Whether to Continue Condominium. Whether the Condominium will be continued after condemnation will be determined in the manner provided for determining whether damaged property will be reconstructed and repaired after casualty. For this purpose, the taking by eminent domain also shall be deemed to be a casualty.

15.3     Disbursement of Funds. If the Condominium is terminated after condemnation, the proceeds of the awards and special Assessments will be deemed to be insurance proceeds and shall be owned and distributed in the manner provided with respect to the ownership and distribution of insurance proceeds if the Condominium is terminated after a casualty.

15.4     Taking of Shared Components. Awards for the taking of Shared Components shall be used to render the remaining portion of the Shared Components usable in the manner approved by the Shared Components Unit Owner; provided, that if the cost of such work shall exceed the balance of the funds from the awards for the taking, the work shall be approved in the manner elsewhere

(Reserved for Clerk of Court)

required for capital improvements to the Shared Components. The balance of the awards for the taking of Shared Components, if any, shall be distributed to the Unit Owners in accordance with their Allocated Interests. Notwithstanding the foregoing, in the event that the costs of restoration resulting from any taking exceed $1,000,000.00, then the Shared Components Unit Owner shall have the sole right to determine whether or not to repair and/or restore in the same manner as is provided in Section 13.10 above with respect to a casualty loss. If there is a mortgage on a Unit, the distribution shall be paid jointly to the Owner and the said mortgagees.

16. Occupancy and Use Restrictions. In order to provide for congenial occupancy of the Condominium and Association Property and for the protection of the values of the Units, the use of the Condominium Property shall be restricted to and shall be in accordance with the following provisions:

16.1 Occupancy. Each Unit shall be used as a residence only, whether for permanent, temporary or transient use, except as otherwise herein expressly provided, all in accordance with all applicable county and state codes, ordinances and regulations. Except as otherwise expressly provided herein, in no event shall occupancy (except for temporary occupancy by visiting guests) exceed more than one (1) person per bedroom or den (as defined by the Association for the purpose of excluding from such definition living rooms, dining rooms, family rooms, country kitchens and the like), plus one (1) additional person (the "Occupancy Limits"). Notwithstanding anything contained herein to the contrary, for purposes hereof, the Occupancy Limits stated above may be exceeded by the number of children under the age of 18 who are residing in the Unit with their parents, provided however, in no event shall the total number of occupants exceed the maximum number permitted by applicable law. By way of example only, occupancy of a two (2) bedroom Unit shall be limited to a total of three (3) persons (plus those children, if any, under 18 residing in the Unit with their parents) - one (1) per each bedroom, plus one (1) additional person (and any children as described above). Notwithstanding that the Unit may be owned by any number of individuals or by an entity, whether a corporation, partnership, limited liability company, trust or otherwise, the number of occupants shall in no event exceed the limits described in this subsection 16.1. The Hotel Lot Owner shall have the power to authorize occupancy of a Unit by persons in addition to those set forth above. The provisions of this subsection 16.1 shall not be applicable to Units used by the Developer for model apartments, sales or resales offices or management or administrative services.

The rights of Unit Owners to use the Shared Components Unit and/or the Shared Facilities shall be limited to the extent granted in, and subject to the restrictions of, Section 3.3(d). It is contemplated (but without creating an obligation whatsoever) that in addition to use as a typical pedestrian passage, portions of the Shared Components Unit and/or the Hotel Lot may be utilized in such a manner as to provide, or cause to be provided, certain hotel-related services to Unit Owners, all of which shall be subject to rules, regulations and/or conditions as may be established by the Shared Components Unit Owner and/or Hotel Lot Owner, as applicable, from time to time in its and/or their sole and absolute discretion, including, without limitation, the right to require any person requesting such services to sign such agreements and pay such fees as may be required from time to time by the Hotel Lot Owner. Each Unit Owner, by acceptance of a deed or other conveyance of a Unit, recognizes and agrees that the Hotel Lot Owner is not required to provide any hotel related services, but if it determines to do so, in its sole discretion, it may condition the provisions of such services in any manner it so desires.

The provisions of this subsection 16.1 shall not be amended without the affirmative vote of not less than four-fifths (4/5ths) of the total voting interests of all Unit Owners.

16.2 Children. Children shall be permitted to be occupants of Units.

16.3 Access Fees. In furtherance of the rights of the Hotel Lot Owner to establish and implement rules, regulations and procedures for the orderly use of the Spa (as defined in the Master Covenants), each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to agree to pay a daily "Access Fee", which shall be imposed, and paid to the Hotel Lot Owner, any time a Unit is occupied by persons desiring use of the Spa who are not "Permitted Occupants" (as hereinafter defined). The payment of the Access Fee shall be a precondition to permitted use of the Spa by persons desiring use of the Spa who are not Permitted Occupants. The initial Access Fee for each

(Reserved for Clerk of Court)

occupant of a Residential Unit who is not otherwise deemed to be a Permitted Occupant shall be Forty-Five and No 100 Dollars ($45.00) per day for Traditional Units and Sixty and/No 100 Dollars ($60.00) per day for Transient Units. The Access Fee amounts shall remain fixed through the last day of the calendar year following the year in which this Declaration is recorded. Effective on January 1 of the following year and on every 2nd anniversary thereafter (i.e., January 1, 2008, January 1, 2010 etc.) the applicable Access Fee shall be increased by an amount to be determined by the Hotel Lot Owner in its sole discretion, provided, however, that no single increase shall be more than ten percent (10%) greater than the immediately previous applicable Access Fee charged.

For purposes of this Section 16.3, each Unit Owner shall submit in writing to the Hotel Lot Owner a list of not more than eight (8) individuals, who shall be deemed the Permitted Occupants of the Unit. If the Unit Owner intends to utilize the Unit and have access to the Spa without being required to pay an Access Fee, the Owner must include itself on the list. The list of Permitted Occupants may not be changed more frequently than once in any twelve (12) month period, absent a change in ownership of the Unit. Each Owner understands and agrees that while the number of Permitted Occupants may exceed the Occupancy Limits, nothing herein shall permit occupancy of a Unit at a singe time by a number of persons in excess of the Occupancy Limits.

The Hotel Lot Owner shall be permitted to exercise any and all rights available at law and/or in equity to enforce payment of, and to collect, the Access Fees and, to the extent that any such Access Fees are outstanding, shall be permitted to deny access to the Spa by any one who is not a Permitted Occupant

16.4    Pet Restrictions.  Except for Units 209, 211 and 215, as depicted on Exhibit "2" attached hereto, and as more particularly described below, no pets may be kept or maintained in any Unit located within the Condominium Property. Without limiting the generality of the other provisions hereof, a violation of the provisions of this paragraph shall entitle the Association to all of its rights and remedies, including, but not limited to, the right to fine Unit Owners (as provided in the By-Laws and any applicable rules and regulations) and/or to require any pet to be permanently removed from the Condominium Property.

Notwithstanding the foregoing, the Owner(s) of Units 209, 211 and 215 only, as depicted on Exhibit "2" attached hereto, shall be permitted to maintain not more than two (2) domesticated animals (i.e., dog, cat, aquarium fish), provided that any pet permitted shall only be allowed to remain in the Unit and on the Condominium Property if such pet is (i) permitted to be so kept by applicable laws and regulations, (ii) not left unattended for extended periods of time (or overnight) or on balconies or in lanai areas, (iii) not kept or maintained for commercial purposes or breeding, (iii) generally, not a nuisance or disturbance (whether by barking, scratching, lunging etc.) to residents of other Units or of other portions of The Properties and (iv) such pet is not a pit bull, rottweiler, chow, Doberman or other breed considered to be dangerous by the Board of Directors. The following provisions shall also govern any pets on the Condominium Property or The Properties:

(a)     All pets must be on a leash not more than six (6) feet long or carried when outside of the Unit.

(b)     Pets shall only be walked or taken upon those portions of The Properties designated by the applicable association or entity governing same from time to time for such purposes, if any.

(c)     Unit Owners shall pick up all solid wastes from their pets and dispose of same appropriately.

(d)     Each Owner shall be responsible for all damage caused by his/her pet.

(e)     The maintenance, keeping, boarding and/or raising of pot belly pigs, reptiles, rodents (i.e., mice, gerbils, hamsters) and any other animals, livestock, or poultry of any kind, regardless of number, is expressly prohibited.

(Reserved for Clerk of Court)

(f)     Upon request of any resident, each Owner shall be deemed to agree to leave any elevator with its pet or wait for another elevator.

(g)     Pets may not play or exercise in the corridors, stairwells, roof, laundry rooms or other portions of the Condominium Property or The Properties, other than the Owner's Unit.

(h)     Each Owner agrees to underwrite the cost of necessary exterminator measures in the Owner's apartment or others if Owner's pet is responsible for the infestation of the building or portions thereof.

(i)     Each Owner agrees to restrain its pet in an appropriate manner should it be requested either for cause or the result of a justifiable request from the applicable association or governing entity (i.e., muzzled when going through public areas).

Any Owner who keeps or maintains a pet within The Properties shall indemnify and hold harmless all other Unit Owners, the Developer, the Declarant, the Master Association and all Lot Owners together with their respective directors, officers, agents, employees, managers, contractors or attorneys, from and against any loss, claim or liability of any kind or character whatsoever, whether to property or person, arising by reason of keeping or maintaining such pet within The Properties. The Association and/or any applicable governing entity may require registration of all pets and may establish reasonable fees in connection with same and/or may require pet owners to place with the Association a reasonable security deposit. Without limiting the generality of the other provisions hereof, a violation of the provisions of this paragraph shall entitle the Association to all of its rights and remedies, including, but not limited to, the right to fine Unit Owners (as provided in the By-Laws and any applicable rules and regulations) and/or to require any pet to be permanently removed from the Condominium Property.

16.5     Third Party Service Providers. The Shared Components Unit Owner shall have the right, in its sole and absolute discretion, to establish reasonable regulations from time to time with respect to the provision of hotel and/or transient rental services by third party providers, including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, to the Condominium, the Unit Owners and their guests, tenants and invitees. No amendment to this Declaration or rule of the Association shall be adopted to impair or abridge the rights herein granted without an affirmative vote of not less than 80% of the voting interests of the Unit Owners.

16.6     Alterations. Without limiting the generality of Section 8.1 hereof, but subject to Section 8.2 hereof, no Residential Unit Owner shall cause or allow improvements or changes to any Residential Unit which (i) are visible from the Shared Components Unit, any other Lot, or the exterior of the Building, or (ii) affect the structural integrity of the Building, or (iii) affect any electrical, mechanical, HVAC, plumbing, life safety, monitoring, information and/or other systems of the Building), or to the Common Elements or Association Property, without obtaining the prior written consent of the Association and/or Shared Components Unit Owner (in the manner specified in section 8.1 hereof) and the Hotel Lot Owner. Notwithstanding the provisions of Section 8.1 above, any Unit Owner may display one portable, removable United States flag in a respectful way, and, on Armed Forces Day, Memorial Day, Flag Day, Independence Day and Veterans day, may display in a respectful way portable, removable official flags, not larger than 4½ feet by 6 feet, that represent the United States Army, Navy, Air Force, Marine Corps or Coast Guard. Notwithstanding the foregoing, in no event shall any changes and/or tampering be permitted to any of the following, without the prior written consent of the Hotel Lot Owner: (i) any windows, operable or otherwise, accessible from any Unit or the Common Elements, and/or (ii) any bathroom or kitchen exhaust vents. Curtains or drapes (or linings thereof) which face the exterior windows or glass doors of Units shall be off-white in color and shall be subject to disapproval by the Hotel Lot Owner, in which case they shall be removed and replaced with acceptable items.

In addition to any requirements which may established under the Master Covenants, the Shared Components Unit Owner shall have the right to establish non-discriminatory restrictions on any and all persons performing work within the Condominium Property, including, without limitation, by (a)

                                                    1

|                           |
|---------------------------|
| (Reserved for Clerk of Court) |

restricting the hours during which work may be performed and restricting access of contractors to certain areas, (b) requiring that all persons performing any work have all necessary licenses and permits to perform the work, (c) requiring that all persons performing any work have adequate insurance coverage and that the Association be a named additional insured on such policy(ies), and (d) requiring a security deposit or other collateral to protect against damage that may be caused during such work.

16.7    Use of Common Elements and Association Property. The Common Elements and Association Property shall be used only for furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of Units. In that regard, each Unit Owner, by acceptance of a deed for a Unit, thereby covenants and agrees that it is the intention of the Developer that the stairwells of the Building are intended for ingress and egress in the event of emergency only, and as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. The foregoing is not intended to prohibit the use of the stairwells for any other proper purpose.

16.8    Nuisances. No nuisances (as defined by the Association) shall be allowed on the Condominium or Association Property, nor shall any use or practice be allowed which is a source of annoyance to occupants of Units or which interferes with the peaceful possession or proper use of the Condominium and/or Association Property by its residents, occupants or members. No activity specifically permitted by this Declaration, nor any actions, activities or businesses conducted from the Hotel Lot or the Shared Components Unit shall be deemed a nuisance.

16.9    No Improper Uses. No improper, offensive, hazardous or unlawful use shall be made of the Condominium or Association Property or any part thereof, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereover shall be observed. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereover, relating to any portion of the Condominium and/or Association Property, shall be corrected by, and at the sole expense of, the party obligated to maintain or repair such portion of the Condominium Property, as elsewhere herein set forth. Notwithstanding the foregoing and any provisions of this Declaration, the Articles of Incorporation or By-Laws, the Association shall not be liable to any person(s) for its failure to enforce the provisions of this Section 16.9. No activity specifically permitted by this Declaration or from the Hotel Lot or the Shared Components Unit shall be deemed to be a violation of this Section.

16.10   Leasing of Transient Units. No portion of a Unit, other than an entire Unit, may be leased or rented. It is intended that the Transient Units may be used for transient and/or hotel rentals. As such, leasing of Transient Units shall not be subject to the approval of the Association and/or any other limitations, other than as expressly provided herein. Accordingly, there shall be no minimum lease term, nor any maximum number of times that a Transient Unit may be leased. The Unit Owner will be jointly and severally liable with the tenant to the Association for any amount which is required by the Association and/or the Hotel Lot Owner and/or the Shared Components Unit Owner, as applicable, to repair any damage to the Common Elements and/or the Shared Facilities and/or Shared Components resulting from acts or omissions of tenants (as determined in the sole discretion of the Association) and to pay any claim for injury or damage to property caused by the negligence of the tenant and special charges may be levied against the Unit therefor. All tenancies are hereby made subordinate to any lien filed by the Condominium Association, whether prior or subsequent to such lease. By this provision, it is expressly understood and agreed that transient rental of Units is expressly authorized and permitted. There shall be no amendment to this Section 16.10, or to any other provision of this Declaration which shall impair the rights established in this Section 16.10, without the prior approval of eighty percent (80%) of the entire voting interests of the Unit Owners.

Each tenant or occupant shall comply with the covenants, terms, conditions and restrictions of this Declaration (and all Exhibits hereto), the Master Covenants and with any and all rules and regulations adopted by the Master Association and/or the Hotel Lot Owner and/or the Shared Components Unit Owner from time to time, including, without limitation, any and all regulations and/or procedures adopted regarding mandatory check-in for Owners and residents, coordination of any charging privileges which the Hotel Lot Owner may elect to afford Unit Owners, their guests,

(Reserved for Clerk of Court)

invitees or tenants and other matters reasonably necessary to allow Owners and hotel guests to be well integrated into a unified structure and operation and to ensure that the Units and the Hotel Lot and related systems and the use and occupancy of Unit Owners and their guests, invitees and tenants and the guests of the Hotel of their respective facilities are integrated to the extent contemplated by this Declaration and the Master Covenants and to ensure that all operations may be conducted in an efficient manner.

In furtherance of the rights of the Hotel Lot Owner to establish and implement rules, regulations and procedures for the orderly use of the Shared Facilities, each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to agree to pay a daily "Administrative Fee which shall be imposed, and paid to the Hotel Lot Owner, any time a Transient Unit is occupied by persons who are not deemed to be Permitted Occupants, as set forth in Section 16.3 above. The initial Administrative Fee shall be Fifty and No/100 Dollars ($50.00) per day. The Administrative Fee amount shall be subject to change annually by the Hotel Lot Owner in its sole and absolute discretion.

16.11    Leasing of Traditional Units. No portion of a Unit, other than an entire Unit, may be leased or rented. Leasing or renting of Traditional Units shall be permitted, subject, however, to the prior written approval of the Association, and each lease shall be in writing and shall specifically provide (or, if it does not, shall be automatically deemed to provide) that a material condition of the lease shall be the tenant's full compliance with the covenants, terms, conditions and restrictions of this Declaration (and all Exhibits hereto), the Master Covenants and with any and all rules and regulations adopted by the Master Association and/or the Hotel Lot Owner and/or the Shared Components Unit Owner from time to time, including, without limitation, any and all regulations and/or procedures adopted regarding mandatory check-in for Owners and residents, coordination of any charging privileges which the Hotel Lot Owner may elect to afford Unit Owners, their guests, invitees or tenants and other matters reasonably necessary to allow Owners and hotel guests to be well integrated into a unified structure and operation and to ensure that the Units and the Hotel Lot and related systems and the use and occupancy of Unit Owners and their guests, invitees and tenants and the guests of the Hotel of their respective facilities are integrated to the extent contemplated by this Declaration and the Master Covenants and to ensure that all operations may be conducted in an efficient manner. No lease of a Traditional Unit shall be for a term of less than six (6) months nor shall any Traditional Unit be leased in excess of two (2) times per year. The Unit Owner will be jointly and severally liable with the tenant to the Association for any amount which is required by the Association and/or the Hotel Lot Owner and/or the Shared Components Unit Owner, as applicable, to repair any damage to the Common Elements and/or the Shared Facilities and/or Shared Components resulting from acts or omissions of tenants (as determined in the sole discretion of the Association) and to pay any claim for injury or damage to property caused by the negligence of the tenant and special charges may be levied against the Unit therefor. All tenancies are hereby made subordinate to any lien filed by the Condominium Association, whether prior or subsequent to such lease. There shall be no amendment to this Section 16.11, or to any other provision of this Declaration which shall impair the rights established in this Section 16.11, without the prior approval of eighty percent (80%) of the entire voting interests of the Unit Owners. The Association, Hotel Lot Owner or the Shared Components Unit Owner may charge a fee in connection with the approval of any lease, sublease, or other transfer of a Unit requiring approval, provided, however that such fee may not exceed $100 per applicant other than husband/wife or parent/dependent child, which are considered one applicant, and provided further, that if the lease or sublease is a renewal of a lease or sublease with the same lessee or sublessee, no charge shall be made. If so required by the Association, Hotel Lot Owner or the Shared Components Unit Owner, a tenant wishing to lease a Unit shall be required to place in escrow with the Association, Hotel Lot Owner or the Shared Components Unit Owner, as applicable, a reasonable sum, not to exceed the equivalent of one month's rental, which may be used by the Association, Hotel Lot Owner or the Shared Components Unit Owner to repair any damage to the any portion of the Condominium Property, the Hotel Lot and/or the Shared Components Unit resulting from acts or omissions of tenants (as determined in the sole discretion of the Association). Nothing herein shall interfere with the access rights of the Unit Owner as a landlord pursuant to Chapter 83, Florida Statutes.

Declaration
-33-

```
                                    (Reserved for Clerk of Court)
```

16.12    Weight and Sound Restriction.  No hard and/or heavy surface floor coverings, such as tile, marble, wood, terrazzo and the like shall be permitted unless: (i) installed by, or at the direction of, the Developer, or (ii) first approved in writing by the Shared Components Unit Owner.  The Shared Components Unit Owner shall not approve the installation of any hard and/or heavy surface floor coverings (for which approval is required) unless the flooring, or combination of flooring and underlayment product, as fastened, shall be sound rated for a minimum: (i) Installed Impact Isolation Class (IIC) rating of fifty-two (52), (ii) Sound Impact Class (STC) rating of fifty (50) or (iii) Impact Noise Rating of zero (0).  All persons seeking to install hard surface floor coverings must provide the Shared Components Unit Owner with product data from flooring or floor underlayment manufacturers that demonstrates (i) laboratory tested sound ratings in accordance with testing standard ASTM C827, in similar cross-section floor/ceiling assemblies to that used in the Building, meeting or exceeding the standards set forth above, and (ii) that the fastener systems utilized does not impair the effectiveness of the sound absorption qualities of the flooring or underlayment.  Each Unit Owner is solely responsible for floor leveling due to minor inconsistencies of the concrete slab construction and leveling, feathering and patching required to meet the requirements of the applicable South Florida Building Code.  The maximum allowable thickness of any flooring (and any flooring underlayment or insulation product) installed in the Unit shall not exceed 2", however, it must be tapered to a maximum of 1" at the entrance threshold to the Unit.  Undercutting of Unit entry doors is expressly prohibited, as is any alteration to the saddle at the entry doors to the Unit.  Additionally, chipping, grinding and/or bushing of the concrete slab is expressly prohibited, due to the post-tension design of the Building.  The installation of the foregoing insulation materials shall be performed in a manner that provides proper mechanical isolation of the flooring materials from any rigid part of the building structure, whether of the concrete subfloor (vertical transmission) or adjacent walls and fittings (horizontal transmission) and must be installed prior to the Unit being occupied.  Owners will be held strictly liable for violations of these restrictions and for all damages resulting therefrom and the Shared Components Unit Owner has the right to require immediate removal of violations.  Applicable warranties of the Developer, if any, shall be voided by violations of these restrictions and requirements.  Each Owner, by acceptance of a deed or other conveyance of their Unit, hereby acknowledges and agrees that sound transmission in a high-rise building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units and or mechanical equipment can often be heard in another Unit.  The Developer does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and each Unit Owner hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound transmission.

16.13    Mitigation of Dampness and Humidity.  No Unit Owner shall install, within his or her Unit, or upon the Common Elements or Association Property, non-breathable wall-coverings or low-permeance paints.  Additionally, any and all built-in casework, furniture, and or shelving in a Unit must be installed over floor coverings to allow air space and air movement and shall not be installed with backboards flush against any gypsum board wall.  Additionally, all Unit Owners, whether or not occupying the Unit, shall continuously run the air conditioning system to maintain the Unit temperature, whether or not occupied to minimize humidity in the Unit.  While the foregoing are intended to minimize the potential development of molds, fungi, mildew and other mycotoxins, each Owner understands and agrees that there is no method for completely eliminating the development of molds or mycotoxins. The Developer does not make any representations or warranties regarding the existence or development of molds or mycotoxins and each Owner shall be deemed to waive and expressly release any such warranty and claim for loss or damages resulting from the existence and/or development of same.  In furtherance of the rights of the Association as set forth in Section 9.1(a) above, in the event that the Association reasonably believes that the provisions of this Section 16.13 are not being complied with, then, the Association, or its designee, shall have the right (but not the obligation) to enter the Unit (without requiring the consent of the Owner or any other party) to turn on the air conditioning in an effort to cause the temperature of the Unit to be maintained as required hereby (with all utility consumption costs to be paid and assumed by the Unit Owner).  To the extent that electric service is not then available to the Unit, the Association shall have the further right, but not the obligation (without requiring the consent of the Owner or any other party) to connect electric service to the Unit (with the costs thereof to be borne by the Unit Owner, or if advanced by the Association, to be promptly reimbursed by the Owner to the Association, with all such costs to be deemed Charges hereunder).

(Reserved for Clerk of Court)

16.14   <u>Exterior Improvements</u>. Without limiting the generality of Sections 8.1 or 16.5 hereof, but subject to any provision of this Declaration specifically permitting same, no Unit Owner shall cause anything to be affixed or attached to, hung, displayed or placed on the exterior walls, doors, balconies or windows of the Building (including, but not limited to, awnings, signs, storm shutters, screens, window tinting, furniture, fixtures and equipment), without the prior written consent of the Hotel Lot Owner.

16.15   <u>Association and Shared Components Unit Owner Access to Units</u>. In order to facilitate access to Units by the Association and the Shared Components Unit Owner for the purposes enumerated in Section 9.1 hereof, it shall be the responsibility of all Unit Owners to deliver a set of keys (or access card or code, as may be applicable) to their respective Units to the Association and to the Shared Components Unit Owner to use in the performance of its functions. No Owner shall change the locks to his Unit without so notifying the Association and the Shared Components Unit Owner and delivering to the Association and the Shared Components Unit Owner a new set of keys (or access card or code, as may be applicable) to such Unit. The Shared Components Unit Owner shall have the right to adopt reasonable regulations from time to time regarding access control and check-in, check-out procedures which shall be applicable to both hotel guests and Unit Owners.

16.16   <u>Antennas, Satellite Dishes</u>. No Owner may install any antenna, satellite dish or other transmitting or receiving apparatus in or upon his or her Unit (and/or areas appurtenant thereto), without the prior written consent of the Hotel Lot Owner, and then only to the extent permitted by applicable law.

16.17   <u>Cumulative with Restrictions of Master Covenants</u>. The foregoing restrictions shall be in addition to, cumulative with, and not in derogation of those set forth in the Master Covenants.

16.18   <u>Relief by Association</u>. The Association shall have the power (but not the obligation) to grant relief in particular circumstances from the provisions of specific restrictions contained in this Section 16 for good cause shown to the extent that granting such relief does not in any manner effect the right, privileges or authority of the Shared Components Unit Owner and/or the Hotel Lot Owner. To the extent that such relief would effect the Shared Components Unit Owner and/or the Hotel Lot Owner, same shall not be valid without the written approval of the Shared Components Unit Owner and/or Hotel Lot Owner, as applicable.

16.19   <u>Effect on Developer</u>. Subject to the following exceptions, the restrictions and limitations set forth in this Section 16 shall not apply to the Developer nor to Units owned by the Developer. The Developer shall not be exempt from the restrictions, if any, relating to requirements that leases or lessees be approved by the Association, pet restrictions, occupancy of Units based on age and vehicular restrictions, except as such vehicular restrictions relate to the Developer's construction, maintenance and marketing activities.

16.20   <u>Cumulative with Restrictions of Master Covenants</u>. The foregoing restrictions shall be in addition to, cumulative with, and not in derogation of those set forth in the Master Covenants.

17.   <u>Selling and Mortgaging of Transient Units</u>. No Transient Unit Owner other than the Developer may sell his or her Transient Unit except by complying with the following provisions:

17.1   <u>Right of First Refusal</u>. Any Unit Owner who receives a bona fide offer to purchase his or her Unit (such offer to purchase a Unit is called an "Outside Offer," the party making any such Outside Offer is called an "Outside Offeror," and the Unit Owner to whom the Outside Offer is made is called an "Offeree Unit Owner"), which he or she intends to accept shall give notice by certified and/or registered mail to the Hotel Lot Owner of the receipt of such Outside Offer. Said notice shall also state the name and address of the Outside Offeror, the terms of the proposed transaction and such other information as the Hotel Lot Owner may reasonably require and shall be accompanied by a check in the amount of $100.00 (or such greater amount as may be permitted by the Act) representing a screening fee. The giving of such notice to the Hotel Lot Owner shall constitute an offer by such Unit Owner to sell his or her Unit to the Hotel Lot Owner or its designee upon the

same terms and conditions as contained in such Outside Offer and shall also constitute a warranty and representation by the Unit Owner who has received such Outside Offer to the Hotel Lot Owner that such Unit Owner believes the Outside Offer to be bona fide in all respects. The Offeree Unit Owner shall submit in writing such further information with respect thereto as the Hotel Lot Owner may reasonably request. Not later than fifteen (15) days after receipt of such notice, together with such further information as may have been requested, the Hotel Lot Owner or its designee may elect, by sending written notice to such Offeree Unit Owner before the expiration of said fifteen (15) day period, by certified and/or registered mail, to purchase such Unit upon the same terms and conditions as contained in the Outside Offer and as stated in the notice from the Offeree Unit Owner. In the event the Hotel Lot Owner shall timely elect to purchase such Unit or to cause the same to be purchased by its designee, title shall close at the office of the attorneys for the Hotel Lot Owner, in accordance with the terms of the Outside Offer, within forty five (45) days after the giving of notice by the Hotel Lot Owner of its election to accept such offer. If, pursuant to such Outside Offer, the Outside Offeror was to assume or take title to the Unit subject to the Offeree Unit Owner's existing mortgage or mortgages, the Hotel Lot Owner may purchase the Unit and assume or take title to the Unit subject to said existing mortgage or mortgages, as the case may be. At the closing, the Offeree Unit Owner shall convey the same to the Hotel Lot Owner, or to its designee, by statutory warranty deed, with all tax and/or documentary stamps affixed at the expense of such Unit Owner, who shall also pay all other taxes arising out of such sale. Title shall be good and marketable and insurable and the Offeree Unit Owner shall deliver an abstract or provide a title binder (and subsequently, title insurance) at its expense at least thirty (30) days prior to such closing. Real estate taxes, mortgage interest, if any, and Common Expenses shall be apportioned between the Offeree Unit Owner and the Hotel Lot Owner, or its designee, as of the closing date.

In the event the Hotel Lot Owner or its designee shall fail to accept such offer within fifteen (15) days after receipt of notice and all additional information requested, as aforesaid, the Offeree Unit Owner shall be free to accept the Outside Offer within thirty (30) days after (i) notice of refusal is given by the Hotel Lot Owner, or (ii) the expiration of the period in which the Hotel Lot Owner or its designee might have accepted such offer, as the case may be. In the event the Offeree Unit Owner shall not, within such thirty (30) day period, accept, in writing, the Outside Offer or if the Offeree Unit Owner shall accept the Outside Offer within such thirty (30) day period, but such sale shall not be consummated in accordance with the terms of such Outside Offer or within a reasonable time after the date set for closing thereunder, then, should such Offeree Unit Owner thereafter elect to sell such Unit the Offeree Unit Owner shall be required to again comply with all of the terms and provisions of this Section.

Any deed to an Outside Offeror shall automatically be deemed to provide that the acceptance thereof by the grantee or tenant shall constitute an assumption of the provisions of the Declaration, the By-Laws, the Articles of Incorporation, applicable rules and regulations, the Master Covenants and all other agreements, documents or instruments affecting the Condominium Property or administered by the Master Association, as the same may be amended from time to time.

Any purported sale of a Unit in violation of this Section shall be voidable at any time at the election of the Hotel Lot Owner and if the Hotel Lot Owner shall so elect, the Unit Owner shall be deemed to have authorized and empowered the Hotel Lot Owner to institute legal proceedings to void the conveyance. Said Unit Owner shall reimburse the Hotel Lot Owner for all expenses (including attorneys' fees and disbursements) incurred in connection with such proceedings.

The foregoing restrictions regarding sales of Units shall not apply to Units sold by or to the Developer or by or to any Institutional First Mortgagee acquiring title by foreclosure or by a deed in lieu of foreclosure or in satisfaction of debt. The Developer and such Institutional First Mortgagees shall have the right to sell Units they own, without having to first offer the same for sale to the Hotel Lot Owner.

Notwithstanding anything herein contained to the contrary, the Hotel Lot Owner, in exercising its rights as provided in this Section 17.1, shall not make any decision in a discriminatory manner, and no decision shall be made on the basis of race, gender, religion, national origin or physical or mental handicap.

```
                                              (Reserved for Clerk of Court)
```

17.2    Release by the Hotel Lot Owner of the Right of First Refusal. The right of first refusal contained in Section 17.1 may be released or waived by the Hotel Lot Owner only in the manner provided in Section 17.3. In the event the Hotel Lot Owner shall release or waive its right of first refusal as to any Unit, such Unit may be sold and conveyed free and clear of the provisions of said Section 17.1 as to the transaction presented to the Hotel Lot Owner in accordance with Section 17.1 above. A subsequent conveyance of the Unit or any conveyance of the Unit other than pursuant to the transaction presented to the Hotel Lot Owner, shall requires compliance wit the procedures set forth in Section 17.1 above.

17.3    Certificate of Termination of Right of First Refusal. A certificate executed and acknowledged by an authorized representative of the Hotel Lot Owner stating that the provisions of Section 17.1 have been satisfied by a Unit Owner, or stating that the right of first refusal contained therein has been duly released or waived by the Hotel Lot Owner and that, as a result thereof, the rights of the Hotel Lot Owner thereunder have terminated with respect to the particular transaction, shall be conclusive with respect to all persons who rely on such certificate in good faith. The Hotel Lot Owner shall furnish such certificate upon request to any Unit Owner in respect to whom the provisions of such Section have, in fact, terminated or been waived. No fee shall be charged by the Hotel Lot Owner in connection with the furnishing of such certificate in excess of the charges reasonably required for same, and such charges shall not exceed the maximum amount allowed under the Act (as it is amended from time to time).

17.4    Exceptions. The provisions of Section 17.1 shall not apply with respect to any sale or conveyance of any Unit by: (a) the Unit Owner thereof to his or her spouse, adult children, parents, parents-in-law, adult siblings or a trust, corporation or other entity where the Unit Owner or the aforementioned related persons are and continue to be the sole beneficiary or equity owner of such trust, corporation or other entity, or to any one or more of the above; (b) the Developer; (c) the Association; (d) any proper officer conducting the sale of a Unit in connection with the foreclosure of a mortgage or other lien covering such Unit or delivering a deed in lieu of foreclosure; or (e) an Institutional First Mortgagee (or its designee) deriving title by virtue of foreclosure of its mortgage or acceptance of a deed in lieu of foreclosure or in satisfaction of debt; provided, however, that each succeeding Unit Owner shall be bound by, and his Unit subject to, the provisions of this Section 17.

17.5    Gifts and Devises, etc. Any Unit Owner shall be free to convey or transfer his or her Unit by gift, to devise his or her Unit by will, or to have his or her Unit pass by intestacy, without restriction; provided, however, that each succeeding Unit Owner shall be bound by, and his or her Unit subject to, the provisions of this Section 17.5.

17.6    Mortgage of Units. Each Unit Owner shall have the right to mortgage his or her Unit without restriction.

18.    Compliance and Default. The Association, each Unit Owner, occupant of a Unit, tenant and other invitee of a Unit Owner shall be governed by and shall comply with the terms of this Declaration and all exhibits annexed hereto, the Master Covenants and the rules and regulations adopted pursuant thereto, as the same may be amended from time to time and the provisions of all of such documents shall be deemed incorporated into any lease of a Unit whether or not expressly stated in such lease. The Association (and Unit Owners, if appropriate) shall be entitled to the following relief in addition to the remedies provided by the Act:

18.1    Mandatory Nonbinding Arbitration of Disputes. Prior to the institution of court litigation, the parties to a Dispute shall petition the Division for nonbinding arbitration. The arbitration shall be conducted according to rules promulgated by the Division and before arbitrators employed by the Division. The filing of a petition for arbitration shall toll the applicable statute of limitation for the applicable Dispute, until the arbitration proceedings are completed. Any arbitration decision shall be presented to the parties in writing, and shall be deemed final if a complaint for trial de novo is not filed in a court of competent jurisdiction in which the Condominium is located within thirty (30) days following the issuance of the arbitration decision. The prevailing party in the arbitration proceeding shall be awarded the costs of the arbitration, and attorneys' fees and costs incurred in connection with the proceedings. The party who files a complaint for a trial de novo shall be assessed the other party's arbitration costs, courts costs and other reasonable costs, including, without limitation,

(Reserved for Clerk of Court)

attorneys' fees, investigation expenses and expenses for expert or other testimony or evidence incurred after the arbitration decision, if the judgment upon the trial de novo is not more favorable than the arbitration decision. If the judgment is more favorable, the party who filed a complaint for trial de novo shall be awarded reasonable court costs and attorneys' fees. Any party to an arbitration proceeding may enforce an arbitration award by filing a petition in a court of competent jurisdiction in which the Condominium is located. A petition may not be granted unless the time for appeal by the filing of a complaint for a trial de novo has expired. If a complaint for a trial de novo has been filed, a petition may not be granted with respect to an arbitration award that has been stayed. If the petition is granted, the petitioner may recover reasonable attorneys' fees and costs incurred in enforcing the arbitration award.

18.2 Negligence and Compliance. A Unit Owner and/or tenant of a Unit shall be liable for the expense of any maintenance, repair or replacement made necessary by his negligence or by that of any member of his family or his or their guests, employees, agents or lessees, but only to the extent such expense is not met by the proceeds of insurance actually collected in respect of such negligence by the Association. In the event a Unit Owner, tenant or occupant fails to maintain a Unit or fails to cause such Unit to be maintained, or fails to observe and perform all of the provisions of the Declaration, the By-Laws, the Articles of Incorporation of the Association, applicable rules and regulations, or any other agreement, document or instrument affecting the Condominium Property or administered by the Association, in the manner required, the Association shall have the right to proceed in equity to require performance and/or compliance, to impose any applicable fines, to sue at law for damages, and to charge the Unit Owner for the sums necessary to do whatever work is required to put the Unit Owner or Unit in compliance, provided, however, that nothing contained in this Section 18.2 shall authorize the Association to enter a Unit to enforce compliance. In any proceeding arising because of an alleged failure of a Unit Owner, a tenant or the Association to comply with the requirements of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, the prevailing party shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (including appellate attorneys' fees). A Unit Owner prevailing in an action with the Association, in addition to recovering his reasonable attorneys' fees, may recover additional amounts as determined by the court to be necessary to reimburse the Unit Owner for his share of Assessments levied by the Association to fund its expenses of the litigation.

18.3 Fines. In addition to any and all other remedies available to the Association, in the sole discretion of the Board of Directors of the Association, a fine or fines may be imposed upon an Owner for failure of an Owner, his family, guests, invitees, lessees or employees, to comply with any covenant, restriction, rule or regulation herein or Articles of Incorporation, By-Laws or Rules and Regulations of the Association, provided the following procedures are adhered to:

(a) Notice: The party against whom the fine is sought to be levied shall be afforded an opportunity for hearing after reasonable notice of not less than fourteen (14) days and said notice shall include: (i) a statement of the date, time and place of the hearing; (ii) a statement of the provisions of the Declaration, By-Laws, Articles or rules which have allegedly been violated; and (iii) a short and plain statement of the matters asserted by the Association.

(b) Hearing: The non-compliance shall be presented to a committee of other Unit Owners, who shall hear reasons why penalties should not be imposed. The party against whom the fine may be levied shall have an opportunity to respond, to present evidence, and to provide written and oral argument on all issues involved and shall have an opportunity at the hearing to review, challenge, and respond to any material considered by the committee. A written decision of the committee shall be submitted to the Owner or occupant by not later than twenty-one (21) days after the meeting.

(c) Fines: The Board of Directors may impose fines against the applicable Unit up to the maximum amount permitted by law from time to time.

[Reserved for Clerk of Court]

(d) <u>Violations</u>: Each separate incident which is grounds for a fine shall be the basis of one separate fine. In the case of continuing violations, each continuation of same after a notice thereof is given shall be deemed a separate incident.

(e) <u>Payment of Fines</u>: Fines shall be paid not later than thirty (30) days after notice of the imposition thereof.

(f) <u>Application of Fines</u>: All monies received from fines shall be allocated as directed by the Board of Directors.

(g) <u>Non-exclusive Remedy</u>: These fines shall not be construed to be exclusive and shall exist in addition to all other rights and remedies to which the Association may be otherwise legally entitled; however, any penalty paid by the offending Owner or occupant shall be deducted from or offset against any damages which the Association may otherwise be entitled to recover by law from such Owner or occupant.

19. <u>Termination of Condominium</u>. The Condominium shall continue until (i) terminated by casualty loss, condemnation or eminent domain, as more particularly provided in this Declaration, or (ii) such time as withdrawal of the Condominium Property from the provisions of the Act is authorized by a vote of Owners owning at least 100% of the applicable interests in the Common Elements and by the Primary Institutional First Mortgagee. In the event such withdrawal is authorized as aforesaid, the Condominium Property shall be subject to an action for partition by any Unit Owner, mortgagee or lienor as if owned in common in which event the net proceeds of the partition sale shall be divided among all Unit Owners in proportion to their respective interests in the Common Elements, provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of his share of such net proceeds all mortgages and liens on his Unit in the order of their priority. The termination of the Condominium, as aforesaid, shall be evidenced by a certificate of the Association executed by its President and Secretary, certifying as to the basis of the termination and said certificate shall be recorded among the public records of the County.

This Section may not be amended without the consent of the Developer as long as it owns any Unit.

20. <u>Additional Rights of Mortgagees and Others</u>.

20.1 <u>Availability of Association Documents</u>. The Association shall have current and updated copies of the following available for inspection by Institutional First Mortgagees during normal business hours or under other reasonable circumstances as determined by the Board: (a) this Declaration; (b) the Articles; (c) the By-Laws; (d) the rules and regulations of the Association; and (e) the books, records and financial statements of the Association.

20.2 <u>Notices</u>. Any holder, insurer or guarantor of a mortgage on a Unit shall have, if first requested in writing (which request shall be deemed made by Administrative Agent for so long as it holds a mortgage on a Unit), the right to timely written notice of:

(a) any condemnation or casualty loss affecting a material portion of the Condominium and/or Association Property or the affected mortgaged Unit;

(b) a sixty (60) day delinquency in the payment of the Assessments and/or impositions on a mortgaged Unit;

(c) the occurrence of a lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

(d) any proposed action which requires the consent of a specified number of mortgage holders.

20.3 <u>Additional Rights</u>. Institutional First Mortgagees shall have the right, upon written request to the Association (which request shall be deemed made by Administrative Agent for so long as it holds a mortgage on a Unit), to: (a) receive a copy of an audited financial statement of the Association for

(Reserved for Clerk of Court)

the immediately preceding fiscal year if such statements were prepared; and (b) receive notices of and attend Association meetings.

21. <u>Covenant Running With the Land.</u> All provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations of the Association, as well as those of the Master Covenants, shall, to the extent applicable and unless otherwise expressly herein or therein provided to the contrary, be perpetual and be construed to be covenants running with the Land and with every part thereof and interest therein, and all of the provisions hereof and thereof shall be binding upon and inure to the benefit of the Developer and subsequent owner(s) of the Land or any part thereof, or interest therein, and their respective heirs, personal representatives, successors and assigns, but the same are not intended to create nor shall they be construed as creating any rights in or for the benefit of the general public. All present and future Unit Owners, tenants and occupants of Units shall be subject to and shall comply with the provisions of this Declaration, the Articles, By-Laws and applicable rules and regulations, as well as those of the Master Covenants, all as they may be amended from time to time. The acceptance of a deed or conveyance, or the entering into of a lease, or the entering into occupancy of any Unit, shall constitute an adoption and ratification of the provisions of this Declaration, and the Articles, By-Laws and applicable rules and regulations of the Association and the Master Covenants, all as they may be amended from time to time, including, but not limited to, a ratification of any appointments of attorneys-in-fact contained herein.

22. <u>The Master Association.</u> The Condominium is part of a Community known as Carillon Hotel and Spa (the "Community"). The Common Properties of the Community are governed by the Master Association pursuant to the Master Covenants. The Master Covenants also contain certain rules, regulations and restrictions relating to the use of such Common Properties as well as the Condominium Property (including Units). The Association will be a member of the Master Association and each Owner will be subject to all of the terms and conditions of the Master Covenants, as amended and supplemented from time to time. Among the powers of the Master Association are the power to assess Unit Owners (and other members of the Master Association) for a pro-rata share of the expenses of the operation and maintenance (including the management fees relating to) of such Common Properties and to impose and foreclose liens in the event such assessments are not paid when due. Except for those instances where the use is limited pursuant to the Master Covenants, the Unit Owners shall be entitled to use all of said Common Properties in accordance with and subject to the terms of the Master Covenants. The Master Association may impose certain obligations on the Association including, but not limited to, obligating the Association to collect Assessments due the Master Association despite the fact that such Assessments are not Common Expenses of the Condominium.

23. <u>Nature of Improvements.</u> In the location where the Condominium has been constructed, there were formerly other improvements. Those prior improvements have been in part demolished, with the balance substantially renovated, to such an extent that all of the Units were required to obtain new certificates of occupancy. Except only for certain portions of the façade, and certain portions of the previous improvements' foundation, exterior shell and certain other structural components and interior architectural details, the Units are new construction.] Technically, however, the Condominium may be deemed to be a conversion of previously occupied premises. To the extent that the Condominium is deemed to be a conversion of previously occupied premises, the following provisions shall be applicable:

23.1 Developer has elected not to fund conversion reserves, but instead to warrant the improvements in accordance with the provisions of Section 718.618, Florida Statutes, to the extent applicable.

23.2 Subject to the provisions of Section 24 below, except only for those warranties provided in Section 718.618, Florida Statutes (and then only to the extent applicable and not yet expired), to the maximum extent lawful Developer hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common, case law or otherwise, as to the design, construction, sound and/or odor transmission, existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Condominium Property, including, without limitation, any implied warranties of habitability, fitness for a particular purpose or merchantability, compliance with plans, all warranties imposed by statute (other than those imposed by Section 718.618, Florida Statutes, and then only to the extent applicable and not yet expired) and all other

(Reserved for Clerk of Court)

express and implied warranties of any kind or character. Developer has not given and the Unit Owner has not relied on or bargained for any such warranties.

23.3    All of the disclaimers set forth in Section 24 below, as well as in other locations throughout the Declaration, shall nonetheless be applicable and binding upon each Unit Owner.

24.    Disclaimer of Warranties.  Except only for those warranties provided in Section 718.203, Florida Statutes (and then only to the extent applicable and not yet expired), to the maximum extent lawful Developer hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common, case law or otherwise, as to the design, construction, sound and/or odor transmission, existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Condominium Property, including, without limitation, any implied warranties of habitability, fitness for a particular purpose or merchantability, compliance with plans, all warranties imposed by statute (other than those imposed by Section 718.203, Florida Statutes, and then only to the extent applicable and not yet expired) and all other express and implied warranties of any kind or character. Developer has not given and the Unit Owner has not relied on or bargained for any such warranties. Each Unit Owner, by accepting a deed to a Unit, or other conveyance thereof, shall be deemed to represent and warrant to Developer that in deciding to acquire the Unit, the Unit Owner relied solely on such Unit Owner's independent inspection of the Unit and the Condominium. The Unit Owner has not received nor relied on any warranties and/or representations from Developer of any kind, other than as expressly provided herein.

All Unit Owners, by virtue of their acceptance of title to their respective Units (whether from the Developer or another party) shall be deemed to have automatically waived all of the aforesaid disclaimed warranties and incidental and consequential damages. The foregoing shall also apply to any party claiming by, through or under a Unit Owner, including a tenant thereof.

Further, given the climate and humid conditions in South Florida, molds, mildew, toxins and fungi may exist and/or develop within the Unit and/or the Condominium Property. Each Owner is hereby advised that certain molds, mildew, toxins and/or fungi may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By acquiring title to a Unit, each Owner shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released the Developer from any and liability resulting from same.

Lastly, each Owner, by acceptance of a deed or other conveyance of a Unit, understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of a Unit may vary by more than a nominal amount. Additionally, as a result of in the field construction, other permitted changes to the Unit, and settling and shifting of improvements, actual square footage of a Unit may also be affected. By accepting title to a Unit, the applicable Owner(s) shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed at any time prior to closing, whether included as part of Developer's promotional materials or otherwise. Without limiting the generality of this Section 24, Developer does not make any representation or warranty as to the actual size, dimensions or square footage of any Unit, and each Owner shall be deemed to have fully waived and released any such warranty and claims for losses or damages resulting from any variances

25.    Additional Provisions.

25.1    Notices.  All notices to the Association required or desired hereunder or under the By-Laws of the Association shall be sent by certified mail (return receipt requested) to the Association in care of its office at the Condominium, or to such other address as the Association may hereafter designate from time to time by notice in writing to all Unit Owners. Except as provided specifically in the Act, all notices to any Unit Owner shall be sent by first class mail to the Condominium address of such Unit Owner, or such other address as may have been designated by him from time to time, in writing, to the Association. All notices to mortgagees of Units shall be sent by certified mail (return receipt requested) to their respective addresses, or such other address as may be designated by them from time to time, in writing to the Association. All notices shall be deemed to have been given when mailed in a postage prepaid sealed wrapper, except notices of a change of address,

(Reserved for Clerk of Court)

which shall be deemed to have been given when received, or 5 business days after proper mailing, whichever shall first occur.

25.2   <u>Interpretation</u>. The Board of Directors of the Association shall be responsible for interpreting the provisions hereof and of any of the Exhibits attached hereto. Such interpretation shall be binding upon all parties unless wholly unreasonable. An opinion of legal counsel that any interpretation adopted by the Association is not unreasonable shall conclusively establish the validity of such interpretation.

25.3   <u>Mortgagees</u>. Anything herein to the contrary notwithstanding, except with respect to the Administrative Agent, the Association shall not be responsible to any mortgagee or lienor of any Unit hereunder, and may assume the Unit is free of any such mortgages or liens, unless written notice of the existence of such mortgage or lien is received by the Association.

25.4   <u>Exhibits</u>. There is hereby incorporated in this Declaration all materials contained in the Exhibits annexed hereto, except that as to such Exhibits, any conflicting provisions set forth therein as to their amendment, modification, enforcement and other matters shall control over those hereof.

25.5   <u>Signature of President and Secretary</u>. Wherever the signature of the President of the Association is required hereunder, the signature of a vice-president may be substituted therefor, and wherever the signature of the Secretary of the Association is required hereunder, the signature of an assistant secretary may be substituted therefor, provided that the same person may not execute any single instrument on behalf of the Association in two separate capacities.

25.6   <u>Governing Law</u>. Should any dispute or litigation arise between any of the parties whose rights or duties are affected or determined by this Declaration, the Exhibits annexed hereto or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, said dispute or litigation shall be governed by the laws of the State of Florida.

25.7   <u>Severability</u>. The invalidity in whole or in part of any covenant or restriction, or any section, subsection, sentence, paragraph, clause, phrase or word, or other provision of this Declaration, the Exhibits annexed hereto, or applicable rules and regulations adopted pursuant to such documents, as the same may be amended from time to time, shall not affect the validity of the remaining portions thereof which shall remain in full force and effect.

25.8   <u>Waiver</u>. The failure of the Association or any Unit Owner to enforce any covenant, restriction or other provision of the Act, this Declaration, the exhibits annexed hereto, or the rules and regulations adopted pursuant to said documents, as the same may be amended from time to time, shall not constitute a waiver of their right to do so thereafter.

25.9   <u>Ratification</u>. Each Unit Owner, by reason of having acquired ownership (whether by purchase, gift, operation of law or otherwise), and each occupant of a Unit, by reason of his occupancy, shall be deemed to have acknowledged and agreed that all of the provisions of this Declaration, and the Articles and By-Laws of the Association, and applicable rules and regulations, are fair and reasonable in all material respects.

25.10   <u>Execution of Documents; Attorney-In-Fact</u>. Without limiting the generality of other Sections of this Declaration and without such other Sections limiting the generality hereof, each Owner, by reason of the acceptance of a deed to such Owner's Unit, hereby agrees to execute, at the request of the Developer, all documents or consents which may be required by all governmental agencies to allow the Developer and its affiliates to complete the plan of development of the Condominium as such plan may be hereafter amended, and each such Owner further appoints hereby and thereby the Developer as such Owner's agent and attorney-in-fact to execute, on behalf and in the name of such Owners, any-and all of such documents or consents. This Power of attorney is irrevocable and coupled with an interest. The provisions of this Section may not be amended without the consent of the Developer.

25.11   <u>Gender; Plurality</u>. Wherever the context so permits, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be deemed to include all or no genders.

1

(Reserved for Clerk of Court)

25.12 **Captions.** The captions herein and in the Exhibits annexed hereto are inserted only as a matter of convenience and for ease of reference and in no way define or limit the scope of the particular document or any provision thereof.

25.13 **Liability.** Notwithstanding anything contained herein or in the Articles of Incorporation, By-laws, any rules or regulations of the Association or any other document governing or binding the association (collectively, the "Association Documents"), the Association, except to the extent specifically provided to the contrary herein, shall not be liable or responsible for, or in any manner a guarantor or insurer of, the health, safety or welfare of any Owner, occupant or user of any portion of the Condominium and/or Association Property including, without limitation, Owners and their guests, invitees, agents, servants, contractors or subcontractors or for any property of any such persons. Without limiting the generality of the foregoing:

(a) it is the express intent of the Association Documents that the various provisions thereof which are enforceable by the Association and which govern or regulate the uses of the properties have been written, and are to be interpreted and enforced, for the sole purpose of enhancing and maintaining the enjoyment of the properties and the value thereof;

(b) the Association is not empowered, and has not been created, to act as an entity which enforces or ensures the compliance with the laws of the United States, State of Florida, County and/or any other jurisdiction or the prevention of tortious activities; and

(c) the provisions of the Association Documents setting forth the uses of assessments which relate to health, safety and/or welfare shall be interpreted and applied only as limitations on the uses of assessment funds and not as creating a duty of the Association to protect or further the health, safety or welfare of any person(s), even if assessment funds are chosen to be used for any such reason.

Each Owner (by virtue of his acceptance of title to his Unit) and each other person having an interest in or lien upon, or making use of, any portion of the properties (by virtue of accepting such interest or lien or making such use) shall be bound by this provision and shall be deemed to have automatically waived any and all rights, claims, demands and causes of action against the Association arising from or connected with any matter for which the liability of the Association has been disclaimed hereby. As used herein, "Association" shall include within its meaning all of Association's directors, officers, committee and board members, employees, agents, contractors (including management companies), subcontractors, successors and assigns. The provisions hereof shall also inure to the benefit of Developer, which shall be fully protected hereby.

*** Signatures appear on the following pages ***

1

(Reserved for Clerk of Court)

IN WITNESS WHEREOF, the Developer has caused this Declaration to be duly executed and its corporate seal to be hereunto affixed as of the 25th day of September, 2008.

Witnessed by:

Carillon South Joint Venture, L.L.C., a Florida limited liability company

Names: Hugh A. Boscal

By: _____
Name: Eric D. Sheppard
Title: Manager

(Corporate Seal)

Name: Jessica A. Hernandez

Address: _____
_____
_____

STATE OF FLORIDA        )
                        ) ss:
COUNTY OF MIAMI-DADE    )

The foregoing instrument was acknowledged before me this 25th day of September, 2008 by Eric D. Sheppard, as Manager of Carillon South Joint Venture, L.L.C., a Florida limited liability company, on behalf of said partnership. He/she is personally known to me or produced _____ as identification.

Name: Jessica A. Hernandez

Notary Public, State of Florida
Commission No. DD781677

My commission expires: _____

Notary Public State of Florida
Jessica A Hernandez
My Commission DD781677
Expires 04/22/2012

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the 2⁹ᵗʰ day of _September_____, 2008, on behalf of LB Carillon Construction LLC, a Delaware limited liability company ("Mortgagee"), being the owner and holder of a mortgage (as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") on all or portions of the Condominium Property (as defined in the Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of the Declaration of Central Carillon Beach, a Condominium (the "Declaration").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Declaration and the recordation thereof.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Declaration, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of Central Carillon Beach, a Condominium (the "Condominium"), and does not assume and shall not be responsible for any of the obligations or liabilities of the Developer contained in the Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of the Condominium. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Declaration.

Made as of the day and year first above written.

Witnessed by:

Name: RONNIE BAPTISTE

Name: Nancy Sharperson

LB CARILLON CONSTRUCTION LLC, a Delaware limited liability company

By: _____
Name: Andre B. Kosakowski
Title: AUTHORIZED SIGNATORY

STATE OF   New York
                        } SS:
COUNTY OF   New York

The foregoing instrument was acknowledged before me this 22 day of September 2008, by Andre B. Kosakowski, as AUTHORIZED SIGNATORY of LB Carillon Construction LLC, a Delaware limited liability company, on behalf of said company. He/she is personally known to me or has produced _____ as identification.

_____
Name: DEANNA EMILIO

My Commission Expires:

Notary Public, State of _____
Commission No. _____

DEANNA EMILIO
Notary Public, State of New York
No. 01EM6171082
Qualified in Richmond County
Term Expires July 23, 2011

## CONSENT OF MORTGAGEE

THIS CONSENT is given as of the 22nd day of _September_, 2008, on behalf of Fortress Credit Corp., a Delaware corporation ("Mortgagee"), as agent, being the collateral assignee of a mortgage (as same may be amended or modified from time to time, and including any and all other documents securing the indebtedness referenced in the mortgage, the "Mortgage") on all or portions of the Condominium Property (as defined in the Declaration, as hereinafter defined).

WHEREAS, Mortgagee has been requested to consent to the recording of the Declaration of Central Carillon Beach, a Condominium (the "Declaration").

NOW, THEREFORE, Mortgagee consents to the terms, conditions, easements and provisions of the Declaration and the recordation thereof.

Mortgagee makes no warranty or any representation of any kind or nature concerning the Declaration, any of its terms or provisions, or the legal sufficiency thereof, and disavows any such warranty or representation as well as any participation in the development of Central Carillon Beach, a Condominium (the "Condominium"), and does not assume and shall not be responsible for any of the obligations or liabilities of the Developer contained in the Declaration or the prospectus, (if any) or other documents issued in connection with the promotion of the Condominium. None of the representations contained in the prospectus, (if any) or other documents shall be deemed to have been made by Mortgagee, nor shall they be construed to create any obligation on Mortgagee to any person relying thereon. Except only as expressly provided herein, this consent does not affect or impair the rights and remedies of Mortgagee as set forth in the Mortgage or in the Declaration.

Made as of the day and year first above written.

Witnessed by:

Name:

Name: _Colette Sible_

FORTRESS CREDIT CORP., a Delaware corporation, as agent

By: _____
Name: _____
Title: ~~CONSTANTINE M. DAKOLIAS~~
       PRESIDENT

STATE OF _New York_ }
                    } SS:
COUNTY OF _New York_ }

The foregoing instrument was acknowledged before me this 22nd day of _Sept._, 2008, by _Constantine Dakolias, as President_ of Fortress Credit Corp., a Delaware corporation, as agent, on behalf of said company. He/she is personally known to me or has produced _____ as identification.

Name: _____

Notary Public, State of _____
Commission No. _____

My Commission Expires: _____

VIOLETTA USTAYEV
NOTARY PUBLIC, State of New York
No. 01U86163257
Qualified in Kings County
Certificate on file in New York County
Commission Expires March 19, 2011

MIA 180,287,020v1 9-17-08

## Exhibit "1"

Central Carillon Beach, a Condominium

*Legal Description*

The legal description of the Condominium Property is set forth on Sheets 2, 3, 4, 5 and 6 of Exhibit "2" to the Declaration

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

STATE OF FLORIDA
          SS
COUNTY OF MIAMI-DADE
    BEFORE ME, the undersigned authority duly authorized to administer oaths and take acknowledgements, personally appeared DANIEL C. FORTIN, by me well known and known to me to be the person hereinafter described, who being by me first duly cautioned and sworn, deposes and says on oath as follows, to wit:

    1.    That he is a duly registered and duly licensed Surveyor and Mapper authorized to practice under the laws of the State of Florida.

    2.    Affiant hereby certifies that the CONSTRUCTION OF THE IMPROVEMENTS shown within this Exhibit 2, is substantially complete, so that this Exhibit 2, together with the provisions of the Declaration of Condominium describing the Condominium Property, is an accurate representation of the location and dimensions of the improvements and the identification, location, and dimensions of the common elements and of each unit can be determined from these materials.

    3.    And further, that all planned improvements, including, but not limited to landscaping, utility services and access to the units identified herein and common element facilities serving the herein identified units have been substantially completed in accordance with the provisions of Florida Statute 718.104.

    4.    That the Elevations shown hereon are relative to the National Geodetic Vertical Datum of 1929, based on project datum.

    5.    That all areas labeled NOT A PART or HOTEL LOT are graphically depicted by said architectural plans and were not field verified.

    6.    This site lies in Section 11, Township 53 South, Range 42 East, City of Miami Beach, Miami-Dade County, Florida.

    7.    Bearings hereon are referred to an assumed value of N 87°32'31" E for the North line of Lot 1, and evidenced by one (1) reset nail & disk and one (1) found 1/2" pipe & cap (10.50' offset).

    8.    Lands shown hereon were not abstracted for easements and/or rights-of-way of records.

    9.    Elevations shown hereon are relative to the North Geodetic Vertical Datum of 1929, based on Department of Natural Resources Monument R-42 (1974), Elevation +12.39, Located by found brass disk in parking deck.

    10.    Dimensions indicated hereon are field measured by electronic measurement, unless otherwise noted.

    11.    Dimensions shown hereon are based on F.L.S. sketch #2005-062N.

    12.    Legal description describes the entire limit of external floor plate at its proper elevation, LESS any portion of the Hotel Lot and/or Shared Facilities, as each is defined in the Declaration of Covenant, Restrictions and Easements for Carillon Hotel and Spa recorded 12/03/2007 in Official Record Book 26080, Page 4905, of the Public Records of Miami-Dade County, Florida, as amended from time to time.

FURTHER AFFIANT SAYETH NAUGHT.
FORTIN, LEAVY, SKILES, INC., LB3653

By: _____
Daniel C. Fortin, For The Firm
PROFESSIONAL SURVEYOR AND MAPPER LS2853
State of Florida

STATE OF FLORIDA
          SS
COUNTY OF MIAMI-DADE
    The foregoing instrument was acknowledged before me this October 13, 2008 by DANIEL C. FORTIN, who is personally known to me and who did not take an oath.

_____
NOTARY PUBLIC- State of Florida

Notary Public State of Florida
Susan P Key
My Commission DD767544
Expires 04/09/2012

# FORTIN, LEAVY, SKILES, INC.
## CONSULTING ENGINEERS, SURVEYORS & MAPPERS
FLORIDA CERTIFICATE OF AUTHORIZATION NUMBER: 00003653
180 Northeast 168th. Street / North Miami Beach, Florida. 33162
Phone: 305-653-4493 / Fax 305-651-7152 / Email fls@flssurvey.com

| Date  October 14, 2008 | Dwg. No.  6008-012 | Job. No.  070640 |
|---|---|---|

**EXHIBIT 2**          **SHEET 1 OF 62**

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM

**LEGAL DESCRIPTION: (CENTRAL TOWER)-SECOND LEVEL FLOOR PLAN**

A portion of lot 53, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A–1–A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 78.27 feet; thence N01°50'54"W for 27.92 feet; thence N88°09'06"E for 52.67 feet; thence N01°50'54"W for 14.00 feet; thence S88°09'06"W for 13.50 feet; thence N01°50'54"W for 19.20 feet; thence N88°09'06"E for 91.83 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence N88°09'06"E for 18.42 feet; thence N82°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +29.9 feet and elevation +41.0 feet relative to the National Geodetic Vertical Datum of 1929.



NOT TO SCALE

POINT OF BEGINNING

POINT OF COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

COLLINS AVENUE

BLOCK 1
AMENDED SECOND
OCEAN FRONT SUBDIVISION
PLAT BOOK 28 PAGE 28

LOT 53

**NOTE:**
The legal description as shown hereon is the limit of each floor, less all "Hotel Lot" (or any part thereof) as depicted within this Exhibit 2, which Hotel Lot is not part of the condominium property.

## SECOND LEVEL FLOOR PLAN
### CENTRAL TOWER
### LEGAL DESCRIPTION, SKETCH AND DESCRIPTION

EXHIBIT 2                          SHEET 2 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

**LEGAL DESCRIPTION: (CENTRAL TOWER)-THIRD AND FOURTH LEVEL FLOOR PLAN**

A portion of lot 53, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right-of-way line of Collins Avenue (State Road A–1–A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 77.94 feet; thence N01°50'54"W for 27.98 feet; thence S88°09'06"W for 59.17 feet; thence S01°50'54"E for 3.25 feet; thence S88°09'06"W for 4.92 feet; thence N01°50'54"W for 3.25 feet; thence S88°09'06"W for 27.08 feet; thence S01°50'54"E for 27.08 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'05"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 77.99 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 143.84 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +41.0 feet and elevation +59.0 feet relative to the National Geodetic Vertical Datum of 1929.

POINT OF BEGINNING

LOT 53

BLOCK 1
AMENDED SECOND
OCEAN FRONT SUBDIVISION
PLAT BOOK 28 PAGE 28

COLLINS AVENUE

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

SOUTH LINE LOT 49
PLAT BOOK 28, PAGE 28

N

NOT TO SCALE

**NOTE:**
The legal description as shown hereon is the limit of each floor, less all "Hotel Lot" (or any part thereof) as depicted within this Exhibit 2, which Hotel Lot is not part of the condominium property.

# THIRD AND FOURTH LEVEL FLOOR PLAN
## CENTRAL TOWER
## LEGAL DESCRIPTION, SKETCH AND DESCRIPTION

EXHIBIT 2                    SHEET 3 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

LEGAL DESCRIPTION: (CENTRAL TOWER)-FIFTH LEVEL FLOOR PLAN

A portion of lot 53, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right–of–way line of Collins Avenue (State Road A–1–A) for 314.84 feet; thence N88°18'31"E at right angles to the aforementioned course for 218.61 feet to the POINT OF BEGINNING; thence N01°50'54"W for 4.55 feet; thence S 88°09'06" W for 77.94 feet; thence N01°50'54"W for 27.98 feet; thence S88°09'06"W for 91.17 feet; thence S01°50'54"E for 27.08 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'05"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'08"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'08"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +59.0 feet and elevation +68.0 feet relative to the National Geodetic Vertical Datum of 1929.



NOT TO SCALE

NOTE:
The legal description as shown hereon is the limit of each floor, less all "Hotel Lot" (or any part thereof) as depicted within this Exhibit 2, which Hotel Lot is not part of the condominium property.

## FIFTH LEVEL FLOOR PLAN
## CENTRAL TOWER
## LEGAL DESCRIPTION, SKETCH AND DESCRIPTION
EXHIBIT 2                                    SHEET 4 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM

LEGAL DESCRIPTION: (CENTRAL TOWER)-SIXTH LEVEL FLOOR PLAN

A portion of lot 53, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida, and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right–of–way line of Collins Avenue (State Road A–1–A) for 314.44 feet; thence N88°18'31"E at right angles to the aforementioned course for 49.51 feet to the POINT OF BEGINNING; thence N01°50'54"W for 5.38 feet; thence S 88°09'06" W for 35.00 feet; thence N01°50'54"W for 54.83 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N88°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 90.27 feet; thence S01°50'54"E for 4.49 feet; thence S88°09'06"W for 52.67 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 12.50 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 13.67 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +86.0 feet and elevation +77.1 feet relative to the National Geodetic Vertical Datum of 1929.

NOTE:
The legal description as shown hereon is the limit of each floor, less all "Hotel Lot" (or any part thereof) as depicted within this Exhibit 2, which Hotel Lot is not part of the condominium property.

NOT TO SCALE

POINT OF BEGINNING

SEE DETAIL "A" BELOW

POINT OF COMMENCEMENT
SOUTHWEST CORNER OF LOT 49

DETAIL "A"
NOT TO SCALE

# SIXTH LEVEL FLOOR PLAN
# CENTRAL TOWER
# LEGAL DESCRIPTION, SKETCH AND DESCRIPTION

EXHIBIT 2                                    SHEET 5 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM

### LEGAL DESCRIPTION: (CENTRAL TOWER)-SEVENTH THRU SIXTEENTH LEVEL FLOOR PLAN

A portion of lot 53, Block 1 of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, recorded in Plat Book 28 at page 28 of the Public Records of Miami–Dade County, Florida and that parcel of land lying East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown an establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, being more particularly described as follows:

Commence at the Southwest corner of lot 49; thence N01°41'29"W along the East right–of–way line of Collins Avenue, (State Road A–1–A) for 314.51 feet; thence N88°18'31"E at right angles to the aforementioned course for 75.67 feet to the POINT OF BEGINNING; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 26.17 feet; thence N01°50'54"W for 0.83 feet; thence S88°09'06"W for 35.00 feet; thence N01°50'54"W for 54.63 feet; thence N88°09'06"E for 35.00 feet; thence S01°50'54"E for 22.75 feet; thence N88°09'06"E for 13.67 feet; thence N01°50'54"W for 28.13 feet; thence N88°09'06"E for 208.17 feet; thence S01°50'54"E for 9.78 feet; then thence N88°09'06"E for 4.67 feet; thence S01°50'54"E for 18.42 feet; thence N68°09'06"E for 21.50 feet; thence N01°50'54"W for 28.20 feet; thence N88°09'06"E for 30.55 feet; thence S01°50'54"E for 12.88 feet; thence N88°09'06"E for 4.45 feet; thence S01°50'54"E for 39.94 feet; thence S88°09'06"W for 4.39 feet; thence S01°50'54"E for 12.90 feet; thence S88°09'06"W for 31.68 feet; thence N01°50'54"W for 4.61 feet; thence S88°09'06"W for 25.04 feet; thence S01°50'54"E for 4.55 feet; thence S88°09'06"W for 52.79 feet; thence N01°50'54"W for 4.55 feet; thence S88°09'06"W for 90.27 feet; thence S01°50'54"E for 4.49 feet; thence S88°09'06"W for 52.67 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +77.1 feet and elevation +160.0 feet relative to the National Geodetic Vertical Datum of 1929.



(NOTE: THERE IS NO 13th LEVEL)

**NOTE:**
The legal description as shown hereon is the limit of each floor, less all 'Hotel Lot' (or any part thereof) as depicted within this Exhibit 2, which Hotel Lot is not part of the condominium property.

POINT OF
COMMENCEMENT
SOUTHWEST CORNER
OF LOT 49

NOT TO SCALE

## SEVENTH THRU SIXTEENTH LEVEL FLOOR PLAN
### CENTRAL TOWER
### LEGAL DESCRIPTION, SKETCH AND DESCRIPTION

EXHIBIT 2                                SHEET 6 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



**BLOCK 1**

CENTRAL CARILLON BEACH, A CONDOMINIUM — 16 STORY BUILDING — LIMITS OF TOWER

NOT A PART

NOT A PART

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

N

SURVEY

GRAPHIC SCALE

0    30    60                120

( IN FEET )
1 inch = 60 ft.

EXHIBIT 2                    SHEET 7 OF 62



# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

### LOCATION SKETCH
#### NOT TO SCALE

CENTRAL CARILLON BEACH,
A CONDOMINIUM

SOUTH LINE GOV'T LOT 1
SECTION 11-53-42

EXHIBIT 2

SHEET 8 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

**(HOTEL LOT)**
NOT A PART

ALL GRAPHIC IMPROVEMENTS SHOWN HEREON
WERE NOT SURVEYED AND ARE NOT A PART

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

NOTES:
All improvements shown here on are part
of the Hotel Lot, and not a part of the
Condominium Property.

## GARAGE LEVEL FLOOR PLAN
ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT 2                                  SHEET 9 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

NOTES:
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:



(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY



HOTEL LOT)
NOT A PART

STATE ROAD A-1-A
Collins Avenue

# (GROUND) FIRST LEVEL FLOOR PLAN

ALL (HOTEL) UNLESS OTHERWISE NOTED.

EXHIBIT 2

SHEET 10 OF 62



# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|--------|
| UNIT #201 | (CR-209) |
| UNIT #202 | (CR-211) |
| UNIT #203 | (CR-215) |
| UNIT #204 | (CR-217) |
| UNIT #205 | (CR-222) |
| UNIT #206 | (CR-220) |
| UNIT #207 | (CR-218) |
| UNIT #208 | (CR-216) |
| UNIT #209 | (CR-214) |
| UNIT #210 | (CR-212) |
| UNIT #211 | (CR-210) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS OR FOR PURPOSES OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

NOTES:
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.    COMMON ELEMENT

———    CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

BALCONY                BALCONY

TYPE "CR-L"            TYPE "CR-K"
UNIT #204             UNIT #205

TYPE "CR-J"
UNIT #206

TYPE "CR-M"          TYPE "CR-I"
UNIT #203            UNIT #207

TYPE "CR-N"          TYPE "CR-H"
UNIT #202            UNIT #208

TYPE "CR-O"          TYPE "CR-G"
UNIT #201            UNIT #209

TYPE "CR-F"
UNIT #210

TYPE "CR-E"
UNIT #211

NOT A PART

LINE OF WALL BELOW

(HOTEL LOT)

## SECOND LEVEL FLOOR PLAN

EXHIBIT 2                    SHEET 11 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|--------|
| UNIT #301 | (CR-309) |
| UNIT #302 | (CR-311) |
| UNIT #303 | (CR-315) |
| UNIT #304 | (CR-317) |
| UNIT #305 | (CR-322) |
| UNIT #306 | (CR-320) |
| UNIT #307 | (CR-318) |
| UNIT #308 | (CR-316) |
| UNIT #309 | (CR-314) |
| UNIT #310 | (CR-312) |
| UNIT #311 | (CR-310) |
| UNIT #319 | (CR-307) |
| UNIT #315 | (CR-302) |
| UNIT #316 | (CR-301) |

THE UNIT NUMBERING ON THE LEFT-HAND
COLUMN REFLECTS THE UNIT NUMBERS USED
TO LEGALLY IDENTIFY THE UNITS IN THE
CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED
ON THE RIGHT-HAND COLUMN MAY BE USED
TO PHYSICALLY IDENTIFY THE UNITS OR FOR
PURPOSES OTHER THAN TO LEGALLY IDENTIFY
THE UNITS.

NOTES:
For a complete description of the Unit
boundaries as shown hereon, refer to
the Declaration of Condominium.

Except as otherwise designated herein,
all areas of the properties located
outside of the Condominium Boundary
Line are part of the Hotel Lot.

HOTEL LOT:

1. ALL BALCONIES, TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.    COMMON ELEMENT

———    CONDOMINIUM
        BOUNDARY

////    (HOTEL LOT)
        NOT A PART OF THE
        CONDOMINIUM PROPERTY

## THIRD LEVEL FLOOR PLAN

EXHIBIT 2                    SHEET 12 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



### GRAPHIC SCALE

( IN FEET )
1 inch = 30 FT.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|--------|
| UNIT #401 | (CR-409) |
| UNIT #402 | (CR-411) |
| UNIT #403 | (CR-415) |
| UNIT #404 | (CR-417) |
| UNIT #405 | (CR-422) |
| UNIT #406 | (CR-420) |
| UNIT #407 | (CR-418) |
| UNIT #408 | (CR-416) |
| UNIT #409 | (CR-414) |
| UNIT #410 | (CR-412) |
| UNIT #411 | (CR-410) |
| UNIT #419 | (CR-407) |
| UNIT #415 | (CR-402) |
| UNIT #416 | (CR-401) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS OR FOR PURPOSES OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

### NOTES:

For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

### HOTEL LOT:

1. ALL BALCONIES, TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.
2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.
3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

### LEGEND:

C.E.    COMMON ELEMENT

———    CONDOMINIUM BOUNDARY

    (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY





### FOURTH LEVEL FLOOR PLAN

EXHIBIT 2

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



**GRAPHIC SCALE**

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|--------|
| UNIT #501 | (CR-509) |
| UNIT #502 | (CR-511) |
| UNIT #503 | (CR-515) |
| UNIT #504 | (CR-517) |
| UNIT #505 | (CR-522) |
| UNIT #506 | (CR-520) |
| UNIT #507 | (CR-518) |
| UNIT #508 | (CR-516) |
| UNIT #509 | (CR-514) |
| UNIT #510 | (CR-512) |
| UNIT #511 | (CR-510) |
| UNIT #515 | (CR-502) |
| UNIT #516 | (CR-501) |
| UNIT #517 | (CR-503) |
| UNIT #518 | (CR-505) |
| UNIT #519 | (CR-507) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS IN THE PURPOSES, OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

HOTEL LOT:
1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.
2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.
3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:
C.E.   COMMON ELEMENT
——   CONDOMINIUM BOUNDARY
▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY.

NOTES:
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Date Printed: 10/14/08 12:01a
Drawn By: BLM
Cad No. 6206511F

## FIFTH LEVEL FLOOR PLAN

EXHIBIT 2            SHEET 14 OF 62



# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

15    30             60

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| UNIT #601 | (CR-609) |
| UNIT #602 | (CR-611) |
| UNIT #603 | (CR-615) |
| UNIT #604 | (CR-617) |
| UNIT #605 | (CR-622) |
| UNIT #606 | (CR-620) |
| UNIT #607 | (CR-618) |
| UNIT #608 | (CR-616) |
| UNIT #609 | (CR-614) |
| UNIT #610 | (CR-612) |
| UNIT #611 | (CR-610) |
| UNIT #612 | (CR-608) |
| UNIT #613 | (CR-606) |
| UNIT #614 | (CR-604) |
| UNIT #615 | (CR-602) |
| UNIT #616 | (CR-601) |
| UNIT #617 | (CR-603) |
| UNIT #618 | (CR-605) |
| UNIT #619 | (CR-607) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS OR FOR PURPOSES OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

HOTEL LOT:
1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS ONBOARD EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.    COMMON ELEMENT

———    CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

NOTES:
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

BALCONY     BALCONY

TYPE "CR-L"     TYPE "CR-K"
UNIT #604        UNIT #605

TYPE "CR-J"
UNIT #606

TYPE "CR-M"     TYPE "CR-I"
UNIT #603        UNIT #607

TYPE "CR-N"     TYPE "CR-H"
UNIT #602        UNIT #608

TYPE "CR-O"     TYPE "CR-G"
UNIT #601        UNIT #609

TYPE "CR-F"
UNIT #610

TYPE "CR-P"

TYPE "CR-E"
UNIT #611

TYPE "CR-D"
UNIT #612

TYPE "CR-Q"     TYPE "CR-C"
UNIT #618        UNIT #613

TYPE "CR-R"     TYPE "CR-B"
UNIT #617        UNIT #614

SHARED COMPONENT UNIT

TYPE "CR-S"     TYPE "CR-A"
UNIT #616        UNIT #615

## SIXTH LEVEL FLOOR PLAN

EXHIBIT 2               SHEET 15 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 Inch = 30  ft

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| #701 AND #801 | (CR-709 AND CR-809) |
| #702 AND #802 | (CR-711 AND CR-811) |
| #703 AND #803 | (CR-715 AND CR-815) |
| #704 AND #804 | (CR-717 AND CR-817) |
| #705 AND #805 | (CR-722 AND CR-822) |
| #706 AND #806 | (CR-720 AND CR-820) |
| #707 AND #807 | (CR-718 AND CR-818) |
| #708 AND #808 | (CR-716 AND CR-816) |
| #709 AND #809 | (CR-714 AND CR-814) |
| #710 AND #810 | (CR-712 AND CR-812) |
| #711 AND #811 | (CR-710 AND CR-810) |
| #712 AND #812 | (CR-708 AND CR-808) |
| #713 AND #813 | (CR-705 AND CR-806) |
| #714 AND #814 | (CR-704 AND CR-504) |
| #715 AND #815 | (CR-702 AND CR-802) |
| #716 AND #816 | (CR-701 AND CR-801) |
| #717 AND #817 | (CR-703 AND CR-803) |
| #718 AND #818 | (CR-705 AND CR-805) |
| #719 AND #819 | (CR-707 AND CR-807) |

THE UNIT NUMBERING ON THE LEFT-HAND
COLUMN REFLECTS THE UNIT NUMBERS USED
TO LEGALLY IDENTIFY THE UNITS IN THE
CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED
ON THE RIGHT-HAND COLUMN MAY BE USED
TO PHYSICALLY IDENTIFY THE UNITS ON THE
PURPOSES, OTHER THAN TO LEGALLY IDENTIFY
THE UNITS.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
   PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
   EACH UNIT, ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.    COMMON ELEMENT

———    CONDOMINIUM
        BOUNDARY

▨▨▨    (HOTEL LOT)
        NOT A PART OF THE
        CONDOMINIUM PROPERTY

NOTES:
For a complete description of the Unit
boundaries as shown hereon, refer to
the Declaration of Condominium.

Except as otherwise designated herein,
all areas of the properties located
outside of the Condominium Boundary
Line are part of the Hotel Lot.

Dwn By: RJM    Date Printed: 10/14/08 12:01a    Oct No. 030611F

## SEVENTH AND EIGHTH LEVEL
## FLOOR PLAN

EXHIBIT 2                    SHEET 16 OF 62



# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

**GRAPHIC SCALE**

( IN FEET )
1 Inch = 30 ft.

**UNIT ADDRESS LEGEND:**
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| #901 AND #1001 | (CR-909 AND CR-1009) |
| #902 AND #1002 | (CR-911 AND CR-1011) |
| #903 AND #1003 | (CR-915 AND CR-1015) |
| #904 AND #1004 | (CR-917 AND CR-1017) |
| #905 AND #1005 | (CR-922 AND CR-1022) |
| #906 AND #1006 | (CR-920 AND CR-1020) |
| #907 AND #1007 | (CR-918 AND CR-1018) |
| #908 AND #1008 | (CR-916 AND CR-1016) |
| #909 AND #1009 | (CR-914 AND CR-1014) |
| #910 AND #1010 | (CR-912 AND CR-1012) |
| #911 AND #1011 | (CR-910 AND CR-1010) |
| #912 AND #1012 | (CR-908 AND CR-1008) |
| #913 AND #1013 | (CR-906 AND CR-1006) |
| #914 AND #1014 | (CR-904 AND CR-1004) |
| #915 AND #1015 | (CR-902 AND CR-1002) |
| #916 AND #1016 | (CR-901 AND CR-1001) |
| #917 AND #1017 | (CR-903 AND CR-1003) |
| #918 AND #1018 | (CR-905 AND CR-1005) |
| #919 AND #1019 | (CR-907 AND CR-1007) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS FOR THE PURPOSES OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

**HOTEL LOT:**

1. ALL BALCONIES, TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

**LEGEND:**

C.E.    COMMON ELEMENT

———   CONDOMINIUM BOUNDARY

▨   (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**TYPE "CR-L"** UNITS #904 AND #1004

**TYPE "CR-K"** UNITS #905 AND #1005

**TYPE "CR-J"** UNITS #906 AND #1006

**TYPE "CR-M"** UNITS #903 AND #1003

**TYPE "CR-I"** UNITS #907 AND #1007

**TYPE "CR-N"** UNITS #902 AND #1002

**TYPE "CR-H"** UNITS #908 AND #1008

**TYPE "CR-O"** UNITS #901 AND #1001

**TYPE "CR-G"** UNITS #909 AND #1009

**TYPE "CR-P"** UNITS #910 AND #1010

**TYPE "CR-E"** UNITS #911 AND #1011

**TYPE "CR-D"** UNITS #912 AND #1012

**TYPE "CR-Q"** UNITS #918 AND #1018

**TYPE "CR-C"** UNITS #913 AND #1013

**TYPE "CR-R"** UNITS #917 AND #1017

**TYPE "CR-B"** UNITS #914 AND #1014

**TYPE "CR-S"** UNITS #916 AND #1016

**TYPE "CR-A"** UNITS #915 AND #1015

BALCONY

**NOTES:**
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

## NINETH AND TENTH LEVEL FLOOR PLAN

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 50 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|---|---|
| #1101 THRU #1401 | (CR-1109 THRU CR-1409) |
| #1102 THRU #1402 | (CR-1111 THRU CR-1411) |
| #1103 THRU #1403 | (CR-1115 THRU CR-1415) |
| #1104 THRU #1404 | (CR-1117 THRU CR-1417) |
| #1105 THRU #1405 | (CR-1116 THRU CR-1416) |
| #1106 THRU #1406 | (CR-1114 THRU CR-1414) |
| #1107 THRU #1407 | (CR-1112 THRU CR-1412) |
| #1108 THRU #1408 | (CR-1110 THRU CR-1410) |
| #1109 THRU #1409 | (CR-1108 THRU CR-1408) |
| #1110 THRU #1410 | (CR-1106 THRU CR-1406) |
| #1111 THRU #1411 | (CR-1104 THRU CR-1404) |
| #1112 THRU #1412 | (CR-1102 THRU CR-1402) |
| #1113 THRU #1413 | (CR-1101 THRU CR-1401) |
| #1114 THRU #1414 | (CR-1103 THRU CR-1403) |
| #1115 THRU #1415 | (CR-1105 THRU CR-1405) |
| #1116 THRU #1416 | (CR-1107 THRU CR-1407) |

THE UNIT NUMBERING ON THE LEFT-HAND COLUMN REFLECTS THE UNIT NUMBERS USED TO LEGALLY IDENTIFY THE UNITS IN THE CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED ON THE RIGHT-HAND COLUMN MAY BE USED TO PHYSICALLY IDENTIFY THE UNITS ON THE PROPERTIES, OTHER THAN TO LEGALLY IDENTIFY THE UNITS.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.    COMMON ELEMENT

———  CONDOMINIUM BOUNDARY

////  (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

NOTES:
For a complete description of the Unit boundaries as shown hereon, refer to the Declaration of Condominium.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary Line are part of the Hotel Lot.

Date Printed: 10/A/06 12:0ba
Drawn By: BM
Cad No. 0308616

(NOTE: THERE IS NO 13th LEVEL)

# ELEVENTH THRU FOURTEENTH LEVEL FLOOR PLAN

EXHIBIT 2                    SHEET 18 OF 62



# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

UNIT ADDRESS LEGEND:
UNIT # = CARILLON
CR # = CANYON RANCH NUMBER

| UNIT # | CR # |
|--------|------|
| #LPH01 AND #PH01 | (CR-LPH09 AND CR-PH09) |
| #LPH02 AND #PH02 | (CR-LPH11 AND CR-PH11) |
| #LPH03 AND #PH03 | (CR-LPH15 AND CR-PH15) |
| #LPH04 AND #PH04 | (CR-LPH17 AND CR-PH17) |
| #LPH05 AND #PH05 | (CR-LPH16 AND CR-PH16) |
| #LPH06 AND #PH06 | (CR-LPH14 AND CR-PH14) |
| #LPH07 AND #PH07 | (CR-LPH12 AND CR-PH12) |
| #LPH08 AND #PH08 | (CR-LPH10 AND CR-PH10) |
| #LPH09 AND #PH09 | (CR-LPH08 AND CR-PH08) |
| #LPH10 AND #PH10 | (CR-LPH06 AND CR-PH06) |
| #LPH11 AND #PH11 | (CR-LPH04 AND CR-PH04) |
| #LPH12 AND #PH12 | (CR-LPH02 AND CR-PH02) |
| #LPH13 AND #PH13 | (CR-LPH01 AND CR-PH01) |
| #LPH14 AND #PH14 | (CR-LPH03 AND CR-PH03) |
| #LPH15 AND #PH15 | (CR-LPH05 AND CR-PH05) |
| #LPH16 AND #PH16 | (CR-LPH07 AND CR-PH07) |

THE UNIT NUMBERS ON THE LEFT-HAND
COLUMN REFLECTS THE UNIT NUMBERS USED
TO LEGALLY IDENTIFY THE UNITS IN THE
CONDOMINIUM.

THE CANYON RANCH UNIT NUMBERS LISTED
ON THE RIGHT-HAND COLUMN MAY BE USED
TO PHYSICALLY IDENTIFY THE UNITS OR THE
PURPOSES; OTHER THAN TO LEGALLY IDENTIFY
THE UNITS.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND
PATIOS ARE PART OF THE HOTEL LOT.

2. CHASES, COLUMNS AND WALLS DIVIDING
EACH UNIT ARE PART OF THE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
TERRACES AND THE TOP PARTITIONS OF BALCONIES
AND TERRACES ARE PART OF THE HOTEL LOT.

LEGEND:

C.E.     COMMON ELEMENT

———     CONDOMINIUM
BOUNDARY

▨     (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

NOTES:
For a complete description of the Unit
boundaries as shown hereon, refer to
the Declaration of Condominium.

Except as otherwise designated hereon,
all areas of the properties located
outside of the Condominium Boundary
Line are part of the Hotel Lot.

## LPH AND PH LEVEL
## FLOOR PLAN

EXHIBIT 2

SHEET 19 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

**HOTEL LOT]**
NOT A PART

**HOTEL LOT]**
NOT A PART

NOTES:
All improvements shown here on are
part of the Hotel Lot, and not a part
of the Condominium Property.

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

## MAIN ROOF PLAN

EXHIBIT 2

SHEET 20 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

BELOW

(HOTEL LOT)
NOT A PART

COOLING TOWER

BELOW

COOLING TOWER

(HOTEL LOT)
NOT A PART

NOTES:
All improvements shown here on are
part of the Hotel Lot, and not a part
of the Condominium Property.

BELOW

COOLING TOWER

(HOTEL LOT)
NOT A PART

BELOW

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

**MECHANICAL LEVEL 1**

EXHIBIT 2       SHEET 21 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

(HOTEL LOT) NOT A PART

BELOW

BELOW

(HOTEL LOT) NOT A PART

**NOTES:**
All improvements shown here on are
part of the Hotel Lot, and not a part
of the Condominium Property.

BELOW

Drawn By: RJM    Date Printed: 10/14/08 12:01a

Cad No. 0206117

**LEGEND:**

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

## MECHANICAL LEVEL 2

EXHIBIT 2

SHEET 22 OF 62

# CENTRAL CARILLON BEACH,
## A C O N D O M I N I U M

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

ROOF

HOTEL
LOT
NOT A PART

TRELLIS

HOTEL
LOT
NOT A PART

TRELLIS

NOTES:
All improvements shown here on are
part of the Hotel Lot, and not a part
of the Condominium Property.

LEGEND:

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

**ROOF**

Date Plotted: 10/14/08 12:49m
Drawn By: RJH
Cad No. 0306517

EXHIBIT 2

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



ROOF MECH. LEVEL 2 (WEST)
+193.8' (N.G.V.D. 29)

ROOF MECH. LEVEL 2 (EAST)
+187.5' (N.G.V.D. 29)

MECH. LEVEL 2
+177.9' (N.G.V.D. 29)

MECH. LEVEL 1
+171.9' (N.G.V.D. 29)

MAIN ROOF
+159.5' (N.G.V.D. 29)

LEVEL PH
+149.2' (N.G.V.D. 29)

LEVEL LPH
+140.1' (N.G.V.D. 29)

LEVEL 14
+131.2' (N.G.V.D. 29)

LEVEL 12
+122.0' (N.G.V.D. 29)

LEVEL 11
+113.1' (N.G.V.D. 29)

LEVEL 10
+104.2' (N.G.V.D. 29)

LEVEL 9
+95.1' (N.G.V.D. 29)

LEVEL 8
+86.1' (N.G.V.D. 29)

LEVEL 7
+77.1' (N.G.V.D. 29)

LEVEL 6
+68.0' (N.G.V.D. 29)

LEVEL 5
+59.0' (N.G.V.D. 29)

LEVEL 4
+48.9' (N.G.V.D. 29)

LEVEL 3
+41.0' (N.G.V.D. 29)

LEVEL 2
+29.9' (N.G.V.D. 29)

GROUND LEVEL
+15.3' (N.G.V.D. 29)

GRADE LEVEL
+5.9' (N.G.V.D. 29)

GARAGE LEVEL
+4.2' (N.G.V.D. 29)

HIGHEST POINT OF BUILDING
+201.1' (N.G.V.D. 29)

TOP OF SCREEN WALL
+199.8' (N.G.V.D. 29)

TOP OF BEAM
+199.4' (N.G.V.D. 29)

TOP OF PARAPET
+160.4' (N.G.V.D. 29)

(NOTE: THERE IS NO 13th LEVEL)

NOTES:
ELEVATIONS SHOWN HEREON ARE RELATIVE TO THE NATIONAL
GEODETIC VERTICAL DATUM OF 1929 (N.G.V.D. 29)

## ELEVATION (WEST)

EXHIBIT 2

SHEET 24 OF 62

Cat. No. 030811G. Drawn By: RJM    Date Printed: 10/24/08 12:00a

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 5 ft.



17.4'

11.9'

34.5'

2.3'
1.3'
2.3'

3.7'
1.9'
3.7'
1.9'

10.2'

8.2'

0.4'

15.0'

26.0'

17.2'

2.3'
1.3'
2.0'

1.3'
5.8'
5.8'

3.4'
6.0'
3.4'
3.3'
6.1'
3.3'

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

——————  CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#316 THRU #1016

## TYPE 'CR-S'

EXHIBIT 2

SHEET 25 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( OF FEET )
1 inch = 8 ft.



SEE DETAIL "A"





DETAIL "A"

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——————— CONDOMINIUM BOUNDARY

///////// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

## UNITS
### #315 THRU #1015

## TYPE 'CR-A'

EXHIBIT 2

SHEET 26 OF 62

Data Printed: 10/14/08 12:01a   Drawn By: D.R.   Cad No. 0709K4U

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



SEE DETAIL "A"



DETAIL "A"

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS #614

TYPE 'CR-B2'

EXHIBIT 2

SHEET 27 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



SEE DETAIL "A"



DETAIL "A"

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

—————  CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#714 THRU #1014

Dwn No. 0706AGU   Drawn By: GJD   Date Printed: 10/19/06 12:01a

## TYPE "CR-B"

EXHIBIT 2

SHEET 28 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



SEE DETAIL "A"





DETAIL "A"

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——— CONDOMINIUM BOUNDARY

///// (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#613 THRU #1013

## TYPE "CR-C"

EXHIBIT 2

SHEET 29 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#208 THRU #1008

## TYPE 'CR-H'

EXHIBIT 2          SHEET 30 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 5 ft.



12.7    0.2'    17.6'

5.6'
0.5'

5.8'

30.7'

0.5'    4.0'    1.7'    24.8'    

7.1'
7.1'

11.0'    31.1'

1.2'    8.9'    0.2'    30.1'

12.3'

1.3'
0.3'
0.5'
1.3'

12.4'

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS. IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——— CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#207 AND #407

Cad No. B70640U    Drawn By: DLD    Date Printed: 10/14/08 12:00a

**TYPE 'CR-I'**

EXHIBIT 2                    SHEET 31 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——————— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#507 THRU #1007

## TYPE 'CR-I'

EXHIBIT 2

SHEET 32 OF 62

Dwn By: DJG   Date Printed: 10/14/03 12.04a   Dwg No. 97064DV

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

—————  CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS**
**#612 THRU #1012**

**TYPE 'CR-D'**

EXHIBIT 2       SHEET 33 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



SEE DETAIL "A"



12.4'  0.4  11.7'  0.2  2.7'
5.7'  0.5'  11.8'
8.2'  3.8'  1.7'
0.5'  25.1'
26.7'
12.7'  12.0'
1.5'
1.7'  2.0'
9.7'  14.7'



2.4'  0.2'  1.2'
2.4'  0.2'  1.2'

DETAIL "A"

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

——————— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#210 THRU #1010

## TYPE "CR-F"

EXHIBIT 2

SHEET 34 OF 62

Date Printed: 10/14/08 12:00a   Drawn By: DJG   Ctd. No. 07/06/00

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.




HOTEL LOT:

1. ALL BALCONIES, TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES, SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#209 THRU #1009

TYPE 'CR-G'

EXHIBIT 2

SHEET 35 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 8 ft.



12.3'
5.9'
5.9'
6.1'
11.7'
38.4'
16.2'
34.5'
29.3'
0.2'
2.0'
0.3'
1.4'
3.9
1.7'
3.8
10.1
10.5'
13.7'
13.6'
10.4'

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

———————— CONDOMINIUM BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

## UNITS
## #205 THRU #1005

### TYPE 'CR-K'

EXHIBIT 2                          SHEET 37 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.





HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#206 THRU #1006

Date Printed: 10/14/08 12:04s    Drawn By: DJD    Cad No. 0705400.

## TYPE "CR-J"

EXHIBIT 2

SHEET 36 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



SEE DETAIL "A"

13.2'  0.2'  2.4'  8.6'  0.5'

1.4'

11.0'

24.9'

4.4'

1.6'  0.5'

6.2'

27.0'

0.5'

5.7'

6.0'

3.0'  0.2'  14.8'  0.3'  10.4'  0.2'  2.0'



0.2'
1.2'
2.4'
1.3'
2.4'
0.2'
0.2'

DETAIL "A"

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

—————— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#517 THRU #1017

Date Printed: 10/1/08 12:01s

Drawn By: 6dB

Cad No. 0200460

## TYPE "CR-R"

EXHIBIT 2

SHEET 39 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 6 ft.



Det No. 07084CH    Drawn By: GAD    Date Printed: 10/14/08 12:01a

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

——————— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#202 THRU #1002

TYPE 'CR-N'

EXHIBIT 2

SHEET 40 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 6 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS
   ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE
   HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES, AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries
shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the
architectural drawings and the improvements as
constructed.

Except as otherwise designated herin, all areas of the
properties located outside of the Condominium
Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM
BOUNDARY

 (HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNITS
#203 THRU #1003

Cad. No. 0705461/   Drawn By: DJG   Date Printed: 10/14/08 12:01a

## TYPE 'CR-M'

EXHIBIT 2            SHEET 41 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

——————— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#201 THRU #1001

TYPE "CR-O"

EXHIBIT 2                    SHEET 42 OF 62

Dwg No. 07000400  Drawn By: GAD  Date Printed: 10/14/08 12:01a

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

Date Printed: 10/14/08 12:01a

Drawn By: 0J0

Dwf No. 0205660

**LEGEND:**

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS**
**#518 THRU #1018**

## TYPE 'CR-Q'

**EXHIBIT 2**                    **SHEET 43 OF 62**

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.

UNABLE TO LOCATE
OR MEASURE INTERIOR COLUMNS.

**HOTEL LOT:**

1. ALL BALCONIES, TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**

For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.



**LEGEND:**

——————— CONDOMINIUM BOUNDARY

(HOTEL LOT)
NOT A PART OF THE
CONDOMINIUM PROPERTY

UNITS
#319 THRU #819

## TYPE "CR-P"

EXHIBIT 2

SHEET 44 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.

UNABLE TO LOCATE
OR MEASURE INTERIOR COLUMNS.

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——————— CONDOMINIUM BOUNDARY

▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS #919 AND #1019

TYPE 'CR-P'

EXHIBIT 2

SHEET 45 OF 62

Cad No. 0708(4N)  Drawn By: OJD  Date Printed: 10/14/08 12:03a

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 6 ft.





HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1101 THRU #PH01
(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B1'

EXHIBIT 2

SHEET 46 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

## UNITS
## #1115 THRU #PH15
(NOTE: THERE IS NO 13th LEVEL)

## TYPE "B1"

EXHIBIT 2

SHEET 47 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



HOTEL LOT:

1. ALL BALCONIES, TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1108 THRU #PH08
(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'B1'

EXHIBIT 2

SHEET 48 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

———— CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

**UNITS**
**#1112 THRU #PH12**
(NOTE: THERE IS NO 13th LEVEL)

**TYPE 'B2'**

EXHIBIT 2          SHEET 49 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



NOTE:
Units LPH06 and PH06 were under construction at the time of survey (9/20/2008).

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

——————  CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1106 THRU #PH06
(NOTE: THERE IS NO 13th LEVEL)

**TYPE 'B3'**

EXHIBIT 2

SHEET 50 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herein, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

Cad No. GF034401    Drawn By: DJG    Date Printed: 10/16/06 12.01a

**LEGEND:-**

———— CONDOMINIUM BOUNDARY

▨▨▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1107 THRU #PH07
(NOTE: THERE IS NO 13th LEVEL)

## TYPE "B3"

EXHIBIT 2

SHEET 51 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



## HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

## LEGEND:

—————  CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1110 THRU #PH10

(NOTE: THERE IS NO 13th LEVEL)

## TYPE "B3"

EXHIBIT 2                    SHEET 52 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( DI FEET )
i inch = 8 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1111 THRU #PH11
(NOTE: THERE IS NO 13th LEVEL)

TYPE 'B3'

EXHIBIT 2

SHEET 53 OF 62

Cad No. 0706600   Drawn By: DJD   Date Printed: 10/14/08 12:01a

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



NOTE:
Units LPH04 and PH04 were under construction at the time of survey (9/20/2008).

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

—— CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1104 THRU #PH04
(NOTE: THERE IS NO 13th LEVEL)

## TYPE "B4"

EXHIBIT 2                    SHEET 54 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



NOTE:
Units LPH05 and PH05 were
under construction at the
time of survey (9/20/2008).

**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS
   ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE
   HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries
shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the
architectural drawings and the improvements as
constructed.

Except as otherwise designated herin, all areas of the
properties located outside of the Condominium
Boundary line are part of the Hotel Lot.

**LEGEND:**

⎯⎯⎯⎯  CONDOMINIUM
       BOUNDARY

  (HOTEL LOT)
       NOT A PART OF THE
       CONDOMINIUM PROPERTY

UNITS
#1105 THRU #PH05
(NOTE: THERE IS NO 13th LEVEL)

**TYPE "B5"**

EXHIBIT 2                    SHEET 55 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 6 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**

For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#211  THRU  #1011

## TYPE 'CR-E'

EXHIBIT 2

SHEET 56 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 6 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

——— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1109 THRU #PH09
(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'C1'

EXHIBIT 2                    SHEET 57 OF 62

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM







HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.
2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.
3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

Cad No. 070560U Drawn By: OJO Date Printed: 10/14/08 12:01e

LEGEND:

CONDOMINIUM BOUNDARY

(HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1114 THRU #PH14
(NOTE: THERE IS NO 13th LEVEL)

TYPE "C3"

EXHIBIT 2

# CENTRAL CARILLON BEACH,

## A CONDOMINIUM

GRAPHIC SCALE



( IN FEET )
1 inch = 8 ft.



**HOTEL LOT:**

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

**NOTES:**
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

**LEGEND:**

———— CONDOMINIUM BOUNDARY

▨ (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1102 THRU #PH02

(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'C3'

**EXHIBIT 2**

**SHEET 59 OF 62**

Cad No. 0705400  Drawn By: D.G.  Date Printed: 10/14/03 12:04a

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

UNITS
#1103 THRU #PH03
(NOTE: THERE IS NO 13th LEVEL)

TYPE 'C3'

EXHIBIT 2

SHEET 60 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM



GRAPHIC SCALE

( IN FEET )
1 inch = 8  ft.

UNABLE TO LOCATE
OR MEASURE INTERIOR COLUMNS.

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS
   ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE
   HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR
   TERRACES AND THE TOP PARTITIONS OF BALCONIES
   AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries
shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the
architectural drawings and the improvements as
constructed.

Except as otherwise designated herin, all areas of the
properties located outside of the Condominium
Boundary line are part of the Hotel Lot.

LEGEND:

——————— CONDOMINIUM
         BOUNDARY

 (HOTEL LOT)
         NOT A PART OF THE
         CONDOMINIUM PROPERTY

UNITS
#1116  THRU  #PH16
(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'C4'

EXHIBIT 2

SHEET 61 OF 62

# CENTRAL CARILLON BEACH,
## A CONDOMINIUM

GRAPHIC SCALE

( IN FEET )
1 inch = 8 ft.



13.4'    0.2'   7.4'
4.8'
4.8'
3.6'
11.1'
1.6'
2.3'    0.2'  0.8'
1.6'    3.2'  3.6'
2.3'    1.3'
9.3'
34.2'
0.4'
26.0'
15.0'
16.3'
2.3'    1.1'
1.2'    3.5'  3.5'
2.7'    0.2'  0.2'
4.3'    3.6'  3.6'   0.2'
13.1'           12.8'   2.8'

HOTEL LOT:

1. ALL BALCONIES TERRACES AND PATIOS ARE LIMITED COMMON AREAS, IN THE HOTEL LOT.

2. CHASES AND COLUMNS WITHIN EACH UNIT ARE HOTEL LOT.

3. ALL RAILINGS AFFIXED TO THE BALCONIES OR TERRACES AND THE TOP PARTITIONS OF BALCONIES AND TERRACES SHALL BE HOTEL LOT.

NOTES:
For a complete description of the unit boundaries shown hereon, refer to the Declaration of Condominium.

There may exist some variation between the architectural drawings and the improvements as constructed.

Except as otherwise designated herin, all areas of the properties located outside of the Condominium Boundary line are part of the Hotel Lot.

LEGEND:

———— CONDOMINIUM BOUNDARY

 (HOTEL LOT) NOT A PART OF THE CONDOMINIUM PROPERTY

Date Printed: 10/14/08 12:00z    Drawn By: GJG    Cad No. 070060J

## UNITS
### #1113 THRU #PH13
(NOTE: THERE IS NO 13th LEVEL)

## TYPE 'C5'

EXHIBIT 2    SHEET 62 OF 62



EXHIBIT "3"

CENTRAL CARILLON BEACH, A CONDOMINIUM

*PERCENTAGE OF OWNERSHIP OF COMMON ELEMENTS AND MASTER EXPENSES*
"ALLOCATED INTERESTS"

| Type | Unit # | % Shares |
|------|--------|----------|
| CR-O | C 201 | 0.414841% |
| CR-N | C 202 | 0.309519% |
| CR-M | C 203 | 0.309519% |
| CR-L | C 204 | 0.374003% |
| CR-K | C 205 | 0.552405% |
| CR-J | C 206 | 0.309519% |
| CR-I | C 207 | 0.361105% |
| CR-H | C 208 | 0.361105% |
| CR-G | C 209 | 0.309519% |
| CR-F | C 210 | 0.309519% |
| CR-E | C 211 | 0.309519% |
| CR-O | C 301 | 0.414841% |
| CR-N | C 302 | 0.309519% |
| CR-M | C 303 | 0.309519% |
| CR-L | C 304 | 0.374003% |
| CR-K | C 305 | 0.552405% |
| CR-J | C 306 | 0.309519% |
| CR-I | C 307 | 0.361105% |
| CR-H | C 308 | 0.361105% |
| CR-G | C 309 | 0.309519% |
| CR-F | C 310 | 0.309519% |
| CR-E | C 311 | 0.309519% |
| CR-A | C 315 | 0.408394% |
| CR-S | C 316 | 0.408394% |
| CR-P | C 319 | 0.395497% |
| CR-O | C 401 | 0.414841% |
| CR-N | C 402 | 0.309519% |
| CR-M | C 403 | 0.309519% |
| CR-L | C 404 | 0.374003% |
| CR-K | C 405 | 0.552405% |
| CR-J | C 406 | 0.309519% |
| CR-I | C 407 | 0.361105% |
| CR-H | C 408 | 0.361105% |
| CR-G | C 409 | 0.309519% |
| CR-F | C 410 | 0.309519% |
| CR-E | C 411 | 0.309519% |
| Cr-A | C 415 | 0.408394% |
| CR-S | C 416 | 0.408394% |
| CR-P | C 419 | 0.395497% |
| CR-O | C 501 | 0.414841% |
| CR-N | C 502 | 0.309519% |
| CR-M | C 503 | 0.309519% |
| CR-L | C 504 | 0.374003% |
| CR-K | C 505 | 0.552405% |
| CR-J | C 506 | 0.309519% |
| CR-I | C 507 | 0.361105% |
| CR-H | C 508 | 0.361105% |
| CR-G | C 509 | 0.309519% |
| CR-F | C 510 | 0.309519% |
| CR-E | C 511 | 0.309519% |
| Cr-A | C 515 | 0.408394% |
| CR-S | C 516 | 0.408394% |
| CR-R | C 517 | 0.309519% |
| CR-Q | C 518 | 0.414841% |
| CR-P | C 519 | 0.395497% |
| CR-O | C 601 | 0.414841% |
| CR-N | C 602 | 0.309519% |
| CR-M | C 603 | 0.309519% |
| CR-L | C 604 | 0.374003% |
| CR-K | C 605 | 0.552405% |
| CR-J | C 606 | 0.309519% |
| CR-I | C 607 | 0.361105% |

| | | |
|---|---|---|
| CR-H | C 608 | 0.361105% |
| CR-G | C 609 | 0.309519% |
| CR-F | C 610 | 0.309519% |
| CR-E | C 611 | 0.309519% |
| CR-D | C 612 | 0.335312% |
| CR-C | C 613 | 0.361105% |
| CR-B2 | C 614 | 0.335312% |
| Cr-A | C 615 | 0.408394% |
| CR-S | C 616 | 0.408394% |
| CR-R | C 617 | 0.309519% |
| CR-Q | C 618 | 0.414841% |
| CR-P | C 619 | 0.395497% |
| CR-O | C 701 | 0.414841% |
| CR-N | C 702 | 0.309519% |
| CR-M | C 703 | 0.309519% |
| CR-L | C 704 | 0.374003% |
| CR-K | C 705 | 0.552405% |
| CR-J | C 706 | 0.309519% |
| CR-I | C 707 | 0.361105% |
| CR-H | C 708 | 0.361105% |
| CR-G | C 709 | 0.309519% |
| CR-F | C 710 | 0.309519% |
| CR-E | C 711 | 0.309519% |
| CR-D | C 712 | 0.335312% |
| CR-C | C 713 | 0.361105% |
| CR-B | C 714 | 0.490072% |
| Cr-A | C 715 | 0.408394% |
| CR-S | C 716 | 0.408394% |
| CR-R | C 717 | 0.309519% |
| CR-Q | C 718 | 0.414841% |
| CR-P | C 719 | 0.395497% |
| CR-O | C 801 | 0.414841% |
| CR-N | C 802 | 0.309519% |
| CR-M | C 803 | 0.309519% |
| CR-L | C 804 | 0.374003% |
| CR-K | C 805 | 0.552405% |
| CR-J | C 806 | 0.309519% |
| CR-I | C 807 | 0.361105% |
| CR-H | C 808 | 0.361105% |
| CR-G | C 809 | 0.309519% |
| CR-F | C 810 | 0.309519% |
| CR-E | C 811 | 0.309519% |
| CR-D | C 812 | 0.335312% |
| CR-C | C 813 | 0.361105% |
| CR-B | C 814 | 0.490072% |
| Cr-A | C 815 | 0.408394% |
| CR-S | C 816 | 0.408394% |
| CR-R | C 817 | 0.309519% |
| CR-Q | C 818 | 0.414841% |
| CR-P | C 819 | 0.395497% |
| CR-O | C 901 | 0.414841% |
| CR-N | C 902 | 0.309519% |
| CR-M | C 903 | 0.309519% |
| CR-L | C 904 | 0.374003% |
| CR-K | C 905 | 0.552405% |
| CR-J | C 906 | 0.309519% |
| CR-I | C 907 | 0.361105% |
| CR-H | C 908 | 0.361105% |
| CR-G | C 909 | 0.309519% |
| CR-F | C 910 | 0.309519% |
| CR-E | C 911 | 0.309519% |
| CR-D | C 912 | 0.335312% |
| CR-C | C 913 | 0.361105% |
| CR-B | C 914 | 0.490072% |
| Cr-A | C 915 | 0.408394% |
| CR-S | C 916 | 0.408394% |
| CR-R | C 917 | 0.309519% |
| CR-Q | C 918 | 0.414841% |
| CR-P | C 919 | 0.395497% |
| CR-O | C 1001 | 0.414841% |

| | | |
|---|---|---|
| CR-N | C 1002 | 0.309519% |
| CR-M | C 1003 | 0.309519% |
| CR-L | C 1004 | 0.374003% |
| CR-K | C 1005 | 0.552405% |
| CR-J | C 1006 | 0.309519% |
| CR-I | C 1007 | 0.361105% |
| CR-H | C 1008 | 0.361105% |
| CR-G | C 1009 | 0.309519% |
| CR-F | C 1010 | 0.309519% |
| CR-E | C 1011 | 0.309519% |
| CR-D | C 1012 | 0.335312% |
| CR-C | C 1013 | 0.361105% |
| CR-B | C 1014 | 0.490072% |
| Cr-A | C 1015 | 0.408394% |
| CR-S | C 1016 | 0.408394% |
| CR-R | C 1017 | 0.309519% |
| CR-Q | C 1018 | 0.414841% |
| CR-P | C 1019 | 0.395497% |
| B1 | C 1101 | 0.464278% |
| C3 | C 1102 | 0.309519% |
| C3 | C 1103 | 0.309519% |
| B4 | C 1104 | 0.522313% |
| B5 | C 1105 | 0.569601% |
| B3 | C 1106 | 0.515865% |
| B3 | C 1107 | 0.515865% |
| B1 | C 1108 | 0.464278% |
| C1 | C 1109 | 0.309519% |
| B3 | C 1110 | 0.515865% |
| B5 | C 1111 | 0.515865% |
| B2 | C 1112 | 0.571750% |
| C5 | C 1113 | 0.408394% |
| C3 | C 1114 | 0.309519% |
| B1 | C 1115 | 0.464278% |
| C4 | C 1116 | 0.395497% |
| B1 | C 1201 | 0.464278% |
| C3 | C 1202 | 0.309519% |
| C3 | C 1203 | 0.309519% |
| B4 | C 1204 | 0.522313% |
| B5 | C 1205 | 0.569601% |
| B3 | C 1206 | 0.515865% |
| B3 | C 1207 | 0.515865% |
| B1 | C 1208 | 0.464278% |
| C1 | C 1209 | 0.309519% |
| B3 | C 1210 | 0.515865% |
| B3 | C 1211 | 0.515865% |
| B2 | C 1212 | 0.571750% |
| C5 | C 1213 | 0.408394% |
| C3 | C 1214 | 0.309519% |
| B1 | C 1215 | 0.464278% |
| C4 | C 1216 | 0.395497% |
| B1 | C 1401 | 0.464278% |
| C3 | C 1402 | 0.309519% |
| C3 | C 1403 | 0.309519% |
| B4 | C 1404 | 0.522313% |
| B5 | C 1405 | 0.569601% |
| B3 | C 1406 | 0.515865% |
| B3 | C 1407 | 0.515865% |
| B1 | C 1408 | 0.464278% |
| C1 | C 1409 | 0.309519% |
| B3 | C 1410 | 0.515865% |
| B3 | C 1411 | 0.515865% |
| B2 | C 1412 | 0.571750% |
| C5 | C 1413 | 0.408394% |
| C3 | C 1414 | 0.309519% |
| B1 | C 1415 | 0.464278% |
| C4 | C 1416 | 0.395497% |
| B1 | C LPH01 | 0.464278% |
| C3 | C LPH02 | 0.309519% |
| C3 | C LPH03 | 0.309519% |
| B4 | C LPH04 | 0.522313% |

| | | |
|---|---|---|
| B5 | C LPH05 | 0.589601% |
| B3 | C LPH06 | 0.515865% |
| B3 | C LPH07 | 0.515865% |
| B1 | C LPH08 | 0.464278% |
| C1 | C LPH09 | 0.309519% |
| B3 | C LPH10 | 0.515865% |
| B3 | C LPH11 | 0.515865% |
| B2 | C LPH12 | 0.571750% |
| C5 | C LPH13 | 0.408394% |
| C3 | C LPH14 | 0.309519% |
| B1 | C LPH15 | 0.464278% |
| C4 | C LPH16 | 0.395497% |
| B1 | C PH01 | 0.464278% |
| C3 | C PH02 | 0.309519% |
| C3 | C PH03 | 0.309519% |
| B4 | C PH04 | 0.522313% |
| B5 | C PH05 | 0.589601% |
| B3 | C PH06 | 0.515865% |
| B3 | C PH07 | 0.515865% |
| B1 | C PH08 | 0.464278% |
| C1 | C PH09 | 0.309519% |
| B3 | C PH10 | 0.515865% |
| B3 | C PH11 | 0.515865% |
| B2 | C PH12 | 0.571750% |
| C5 | C PH13 | 0.408394% |
| C3 | C PH14 | 0.309519% |
| B1 | C PH15 | 0.464278% |
| C4 | C PH16 | 0.395497% |
| SCUO | Shared Component Unit | 9.0830093% |
| | | 100% |

NOTE: FOR A DESCRIPTION OF UNITS BY UNIT TYPE, SEE EXHIBIT "2" TO THE DECLARATION OF CONDOMINIUM.

#### Exhibit "4"

#### BY-LAWS
#### OF
#### CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.

*A corporation not for profit organized
under the laws of the State of Florida*

1. Identity. These are the By-Laws of CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. (the "Association"), a corporation not for profit incorporated under the laws of the State of Florida, and organized for the purposes set forth in its Articles of Incorporation.

   1.1 Fiscal Year. The fiscal year of the Association shall be the twelve month period commencing January 1st and terminating December 31st of each year.

   1.2 Seal. The seal of the Association shall bear the name of the corporation, the word "Florida", the words "Corporation Not for Profit", and the year of incorporation.

2. Definitions. For convenience, these By-Laws shall be referred to as the "By-Laws" and the Articles of Incorporation of the Association as the "Articles". The other terms used in these By-Laws shall have the same definitions and meanings as those set forth in the Declaration for CENTRAL CARILLON BEACH, A CONDOMINIUM, unless herein provided to the contrary, or unless the context otherwise requires.

3. Members.

   3.1 Annual Meeting. The annual members' meeting shall be held on the date, at the place and at the time determined by the Board of Directors from time to time, provided that there shall be an annual meeting every calendar year and, to the extent possible, no later than thirteen (13) months after the last preceding annual meeting. The purpose of the meeting shall be, except as provided herein to the contrary, to elect Directors, and to transact any other business authorized to be transacted by the members, or as stated in the notice of the meeting sent to Unit Owners in advance thereof. Unless changed by the Board of Directors, the first annual meeting shall be held in the month of October following the year in which the Declaration is filed.

   3.2 Special Meetings. Special members' meetings shall be held at such places as provided herein for annual meetings, and may be called by the President or by a majority of the Board of Directors of the Association, and must be called by the President or Secretary upon receipt of a written request from a majority of the members of the Association. The business conducted at a special meeting shall be limited to that stated in the notice of the meeting. Special meetings may also be called by Unit Owners in the manner provided for in the Act. Notwithstanding the foregoing: (i) as to special meetings regarding the adoption of the Condominium's estimated operating budget, reference should be made to Section 10.1 of these By-Laws; and (ii) as to special meetings regarding recall of Board members, reference should be made to Section 4.3 of these By-Laws.

   3.3 Participation by Unit Owners. Subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board, Unit Owners shall have the right to speak at the annual and special meetings of the Unit Owners, committee meetings and Board meetings with reference to all designated agenda items. A Unit Owner does not have the right to speak with respect to items not specifically designated on the agenda, provided, however, that the Board may permit an Unit Owner to speak on such items in its discretion. Every Unit Owner who desires to speak at a meeting, may do so, provided that the Unit Owner has filed a written request with the Secretary of the Association not less than 24 hours prior to the scheduled time for commencement of the meeting. Unless waived by the chairman of the meeting (which may be done in the chairman's sole and absolute discretion and without being deemed to constitute a waiver as to any other subsequent speakers), all Unit Owners speaking at a meeting shall be limited to a maximum of three (3) minutes per speaker. Any Unit Owner may tape record or videotape a meeting, subject to the following and such further reasonable restrictions as may be adopted from time to time by the Board:

   (a) The only audio and video equipment and devices which Unit Owners are authorized to utilize at any such meeting is equipment which does not produce distracting sound or light emissions;

   (b) Audio and video equipment shall be assembled and placed in position in advance of the commencement of the meeting;

   (c) Anyone videotaping or recording a meeting shall not be permitted to move about the meeting room in order to facilitate the recording; and

(d)     At least 48 hours (or 24 hours with respect to a Board meeting) prior written notice shall be given to the Secretary of the Association by any Unit Owner desiring to make an audio or video taping of the meeting.

3.4     Notice of Meeting; Waiver of Notice. Notice of a meeting of members (annual or special), stating the time and place and the purpose(s) for which the meeting is called, shall be given by the President or Secretary. A copy of the notice shall be posted at a conspicuous place on the Condominium Property. The notice of an annual or special meeting shall be hand delivered, electronically transmitted or sent by regular mail to each Unit Owner, unless the Unit Owner waives in writing the right to receive notice of the annual meeting by mail. The delivery or mailing shall be to the address of the member as last furnished to the Association by the Unit Owner. However, if a Unit is owned by more than one person, the Association shall provide notice, for meetings and all other purposes, to that one address initially identified for that purpose by the Developer and thereafter as one or more of the Owners of the Unit shall so advise the Association in writing, or if no address is given or if the Owners disagree, notice shall be sent to the address for the Owner as set forth on the deed of the Unit. The posting and mailing of the notice for either special or annual meetings, which notice shall incorporate an identification of agenda items, shall be effected not less than fourteen (14) continuous days, nor more than sixty (60) days, prior to the date of the meeting. The Board shall adopt by rule, and give notice to Unit Owners of, a specific location on the Condominium Property on which all notices of members' meetings shall be posted. In lieu of or in addition to the physical posting of notice of any meeting of the Unit Owners on the Condominium Property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed-circuit cable television system serving the Association, if any. However, if broadcast notice is used in lieu of a notice posted physically on the Condominium Property, the notice and agenda must be broadcast at least four times every broadcast hour of each day that a posted notice is otherwise required. When broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda.

Notice of specific meetings may be waived before or after the meeting and the attendance of any member (or person authorized to vote for such member), either in person or by proxy, shall constitute such member's waiver of notice of such meeting, and waiver of any and all objections to the place of the meeting, the time of the meeting or the manner in which it has been called or convened, except when his (or his authorized representative's) attendance is for the express purpose of objecting at the beginning of the meeting to the transaction of business because the meeting is not lawfully called.

An officer of the Association, or the manager or other person providing notice of the meeting shall provide an affidavit or United States Postal Service certificate of mailing, to be included in the official records of the Association, affirming that notices of meetings were posted and mailed or hand delivered in accordance with this Section and Section 718.112(2)(d) of the Act, to each Unit Owner at the appropriate address for such Unit Owner. No other proof of notice of a meeting shall be required.

3.5     Quorum. A quorum at members' meetings shall be attained by the presence, either in person or by proxy (limited or general), of persons entitled to cast in excess of 33 1/3% of the votes of members entitled to vote at the subject meeting.

3.6     Voting.

(a)     Number of Votes. Except as provided in Section 3.11 hereof, in any meeting of members, the Owners of each Unit shall be entitled to cast the number of votes designated for their Unit as set forth in the Articles. The vote of a Unit shall not be divisible.

(b)     Majority Vote. The acts approved by a majority of the votes present in person or by proxy at a meeting at which a quorum shall have been attained shall be binding upon all Unit Owners for all purposes, except where otherwise provided by law, the Declaration, the Articles or these By-Laws. As used in these By-Laws, the Articles or the Declaration, the terms "majority of the Unit Owners" and "majority of the members" shall mean a majority of the votes entitled to be cast by the members and not a majority of the members themselves and shall further mean more than 50% of the then total authorized votes present in person or by proxy and voting at any meeting of the Unit Owners at which a quorum shall have been attained. Similarly, if some greater percentage of members is required herein or in the Declaration or Articles, it shall mean such greater percentage of the votes of members and not of the members themselves.

(c)     Voting Member. If a Unit is owned by one person, that person's right to vote shall be established by the roster of members. If a Unit is owned by more than one person, those persons (including husbands and wives) shall decide among themselves as to who shall

cast the vote of the Unit. In the event that those persons cannot so decide, no vote shall be cast. A person casting a vote for a Unit shall be presumed to have the authority to do so unless the President or the Board of Directors is otherwise notified. If a Unit is owned by a corporation, the person entitled to cast the vote for the Unit shall be designated by a certificate signed by an appropriate officer of the corporation and filed with the Secretary of the Association. Such person need not be a Unit Owner. Those certificates shall be valid until revoked or until superseded by a subsequent certificate or until a change in the ownership of the Unit concerned. A certificate designating the person entitled to cast the vote for a Unit may be revoked by any record owner of an undivided interest in the Unit. If a certificate designating the person entitled to cast the vote for a Unit for which such certificate is required is not on file or has been revoked, the vote attributable to such Unit shall not be considered in determining whether a quorum is present, nor for any other purpose, and the total number of authorized votes in the Association shall be reduced accordingly until such certificate is filed.

3.7 <u>Proxies</u>. Votes to be cast at meetings of the Association membership may be cast in person or by proxy. Except as specifically provided herein, Unit Owners may not vote by general proxy, but may vote by limited proxies substantially conforming to the limited proxy form approved by the Division. Limited proxies shall be permitted to the extent permitted by the Act. No proxy, limited or general, shall be used in the election of Board members. General proxies may be used for other matters for which limited proxies are not required and may also be used in voting for nonsubstantive changes to items for which a limited proxy is required and given. A proxy may be made by any person entitled to vote, but shall only be valid for the specific meeting for which originally given and any lawful adjourned meetings thereof. In no event shall any proxy be valid for a period longer than 90 days after the date of the first meeting for which it was given. Every proxy shall be revocable at any time at the pleasure of the person executing it. A proxy must be in writing, signed by the person authorized to cast the vote for the Unit (as above described), name the person(s) voting by proxy and the person authorized to vote for such person(s) and filed with the Secretary before the appointed time of the meeting, or before the time to which the meeting is adjourned. Each proxy shall contain the date, time and place of the meeting for which it is given and, if a limited proxy, shall set forth the matters on which the proxy holder may vote and the manner in which the vote is to be cast. There shall be no limitation on the number of proxies which may be held by any person (including a designee of the Developer). If a proxy expressly provides, any proxy holder may appoint, in writing, a substitute to act in its place. If such provision is not made, substitution is not permitted.

3.8 <u>Adjourned Meetings</u>. If any proposed meeting cannot be organized because a quorum has not been attained, the members who are present, either in person or by proxy, may adjourn the meeting from time to time until a quorum is present, provided notice of the newly scheduled meeting is given in the manner required for the giving of notice of a meeting. Except as required above, proxies given for the adjourned meeting shall be valid for the newly scheduled meeting unless revoked for reasons other than the new date of the meeting.

3.9 <u>Order of Business</u>. If a quorum has been attained, the order of business at annual members' meetings; and, if applicable, at other members' meetings, shall be:

(a) Collect any ballots not yet cast;

(b) Call to order by President;

(c) Appointment by the President of a chairman of the meeting (who need not be a member or a director);

(d) Appointment of inspectors of election;

(e) Counting of Ballots for Election of Directors;

(f) Proof of notice of the meeting or waiver of notice;

(g) Reading of minutes;

(h) Reports of officers;

(i) Reports of committees;

(j) Unfinished business;

(k) New business;

(l) Adjournment.