**Hearing Date:  June 25, 2014 at 10:00 a.m. (ET)**
**Response Date:  June 19, 2014 at 4:00 p.m. (ET)[1]**

BROWN RUDNICK LLP
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4900

- and -

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 350-2414

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc., Central Carillon Beach Condominium*
*Association, Inc., and South Carillon Beach*
*Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
In re:                                                        :    Chapter 11
                                                              :
                                                              :    Case No. 14-11691 (SCC)
FL 6801 SPIRITS LLC, *et al.*,                                :
                                                              :    (Jointly Administered)
                                          Debtors.            :
---------------------------------------------------------------X

**OBJECTION TO DEBTORS' (I) *EX PARTE* APPLICATION**
**FOR AN ORDER SCHEDULING A HEARING TO CONSIDER,**
**AMONG OTHER THINGS, BIDDING PROCEDURES AND (II) MOTION**
**FOR (A) AN ORDER APPROVING, AMONG OTHER THINGS, (i) BIDDING**
**PROCEDURES REGARDING THE DEBTORS' SALE OF PROPERTY, SUBJECT**
**TO HIGHER OR BETTER OFFERS AND BANKRUPTCY COURT APPROVAL,**
**(ii) THE TIME, DATE, PLACE AND FORM OF NOTICE FOR THE AUCTION**
**AND SALE HEARING, AND (iii) A BREAK-UP FEE, (B) AN ORDER (i) APPROVING**
**THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER**
**INTERESTS, AND (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT**
<u>**OF CERTAIN EXECUTORY CONTRACTS AND (C) RELATED RELIEF**</u>

---

[1]    The Response Date was extended by agreement with the Debtors.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ....................................................................................................... 4

    A.    General Background. ........................................................................ 4

    B.    The Condominium Towers, Associations and Declarations ................................. 4

    C.    The State Court Actions ................................................................... 5

    D.    The Sale Motion................................................................................ 8

    E.    The Proposed Bidding Procedures.................................................... 9

    F.    Motion to Transfer Venue .............................................................. 11

OBJECTION ............................................................................................................ 11

    A.    The Debtors Failed to Provide Sufficient Notice to All of the Unit Owners in Violation of Due Process Requirements ........................................... 11

    B.    The Proposed Sale Cannot be Effectuated Under Bankruptcy Code Section 363(f)(4) ........................................................................................ 12

    C.    The Relief Requested in the Sale motion is Procedurally Improper.................... 14

    D.    The State Court Actions Are Non-Core Matters and the Court Should Abstain From Determining the Issues Raised in the State Court Actions ......................... 17

    E.    The Claims in the State Court Actions Fall Squarely within the Mandatory Abstention Provisions of 28 U.S.C. § 1334(c)(2) and Accordingly, Should Not Be Resolved by the Bankruptcy Court .................................................... 18

        i.    The Timeliness of the Abstention Request ............................... 19

        ii.    The Declaratory Judgement Actions Concern Only State Laws Claims... 19

        iii.    The Declaratory Judgment Actions are Non-Core Proceedings .............. 19

        iv.    The Only Basis for Jurisdiction over the State Court Actions is 28 U.S.C. § 1334 ................................................................................ 19

      v.     The State Court Actions were Commenced Pre-Petition .........................20

      vi.    The State Court Actions Can be Timely Adjudicated .............................20

F.     The Bankruptcy Court Should Abstain From Granting the Requested
Declaratory Relief Based on the Doctrines of Permissive Abstention
and Equitable Remand ...................................................................................22

G.    The Bid Protections and Proposed Bid Procedures are Unreasonable.................24

      i.     The Bid Procedures are Excessive ........................................................25

      ii.    The Proposed Bidding Procedures Provide an Unfair Advantages to the
Stalking Horse and Fail to Create a Competitive and Open Auction
Process .......................................................................................27

CONCLUSION...........................................................................................................29

# TABLE OF AUTHORITIES

CASES                                                                                      PAGE(S)

BGC Partners, Inc. v. Avison Young (Canada), Inc.,
   919 F. Supp. 2d 310 (S.D.N.Y. 2013) ................................................................20

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
   181 F.3d 527 (3d Cir. 1999) ..............................................................................27

Certain Underwriters at Lloyd's London v. ABB Lummus Global, Inc.,
   No. 03 Civ. 7248 (JGK), 2004 WL 224505 (S.D.N.Y. Feb. 5, 2004) ..................22

Cheslock-Bakker & Assocs., Inc. v. Kremer (In re Downtown Athletic Club of
   New York City, Inc.),
   No. M-47 (JSM), 2000 WL 744126 (S.D.N.Y. June 9, 2000).............................12

Cody Inc. v. Cnty. of Orange (In re Cody, Inc.),
   281 B.R. 182 (S.D.N.Y. 2002).............................................................................23

DPWN Holdings (USA), Inc. v. United Air Lines, Inc.,
   747 F.3d 145 (2d Cir. 2014) ...............................................................................11

E.S. Bankest, LLC v. United Beverage Fla., LLC (In re United Container LLC),
   284 B.R. 162 (Bankr. S.D. Fla. 2002) ................................................................23

Executive Benefits Ins. Agency v. Arkison,
   No. 12-1200, 2014 WL 2560461 (June 9, 2014) ................................................17

Fried v. Lehman Bros. Real Estate Assocs. III, L.P.,
   496 B.R. 706 (S.D.N.Y. 2013)....................................................18, 20, 22, 23, 24

Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.,
   No. 02 Civ. 0710 (SHS), 2002 WL 31426344 (S.D.N.Y. Oct. 29, 2002), aff'd
   346 F.3d 31 (2d Cir. 2003) .................................................................................24

GMAC Mortg. Corp. v. Salisbury (In re Loloee),
   241 B.R. 655 (B.A.P. 9th Cir. 1999) ..................................................................15

IIG Capital LLC v. Wollmuth Maher & Deutsh, LLP (In re AMANAT),
   338 B.R. 574 (Bankr. S.D.N.Y. 2005) ...............................................................17

In re 4 Front Petroleum, Inc.,,
   345 B.R. 744 (Bankr. N.D. Okla. 2006)..............................................................21

In re Daufuskie Island Prop., LLC,
    431 B.R. 626 (Bankr. D.S.C. 2010) ...................................................................13

In re Eastman Kodak Co.,
    No. 12-10202, 2012 WL 2255719 (Bankr. S.D.N.Y. June 15, 2012)............................ 15, 16

In re Jon J. Peterson, Inc.,
    411 B.R. 131 (Bankr. W.D.N.Y. 2009)...............................................................25

In re Metaldyne Corp.,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009) ................................................... 24, 25, 26

In re President Casinos, Inc.,
    314 B.R. 784 (Bankr. E.D. Mo. 2004) ................................................................25

In re Reader's Digest Ass'n,
    No. 09-23529 (Bankr. S.D.N.Y. Dec. 18, 2009) ...................................................25

In re RSL COM Primecall, Inc. & RSL COM USA, Inc.,
    No. 01-11457, 2002 Bankr. LEXIS 367 (Bankr. S.D.N.Y. Apr. 11, 2002) ..........................25

In re Silicon Graphics, Inc.,
    No. 09-11701. 2009 Bankr. LEXIS 5155 (Bankr. S.D.N.Y. Apr. 3, 2009) ..........................25

In re Young Broadcasting, Inc.,
    Case No. 09-10645 (Bankr. S.D.N.Y. Apr. 2, 2009) ..............................................25

Joremi Enters. Inc. v. Hershkowitz (In re New 118th LLC),
    396 B.R. 885 (Bankr. S.D.N.Y. 2008) ................................................................19

Langston Law Firm v. Mississippi,
    410 B.R. 150 (S.D.N.Y. 2008)..........................................................................24

Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Systems,Inc.),
    277 F.3d 1057 (9th Cir. 2002) .........................................................................13

Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus, Inc.),
    467 B.R. 694 (S.D.N.Y. 2012)..........................................................................11

Mullane v. Cent. Hanover Bank & Trust Co.,
    339 U.S. 306 (1950) .....................................................................................11

New York Commercial Bank v. Pullo,
    No. 12-02052 (BRL), 2013 WL 494050 (Bankr. S.D.N.Y. Feb. 7, 2013)..........................20

Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re
Integrated Resources, Inc.),
    147 B.R. 650 (S.D.N.Y. 1992) ................................................................... 24, 26

Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.,
    639 F.3d 572 (2d Cir. 2011) .................................................................20

Rimell v. Mark Twain Bank (In re Rimell),
    946 F.2d 1363 (8th Cir. 1991) ..............................................................13

Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.),
    459 B.R. 190 (Bankr. S.D.N.Y. 2011) ..................................................15

Silverman v. Ankari (In re Oyster Bay Cove, Ltd.),
    196 B.R. 251 (E.D.N.Y. 1996) ..............................................................12

Walker, Truesdall, Roth & Assoc. v. Blackstone Grp., L.P. (In re Extended Stay),
    466 B.R. 188 (S.D.N.Y. 2011)...............................................................18

Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.),
    157 B.R. 220 (S.D.N.Y. 1993)...............................................................11

Wood v. Wood (In re Wood),
    825 F.2d 90 (5th Cir. 1987) ...................................................................17

STATUTES

11 U.S.C. § 363(f)(4) ....................................................................3, 9, 12, 13, 14

11 U.S.C. § 1107(a) ......................................................................................4

11 U.S.C. § 1108............................................................................................4

28 U.S.C. § 157(c)(1).............................................................................. 17, 21

28 U.S.C. 157(e) ..........................................................................................18

28 U.S.C. § 1331 ...........................................................................................19

28 U.S.C. § 1332(a) ......................................................................................19

28 U.S.C. § 1334 .................................................................................. 19, 22, 23

28 U.S.C. § 1334(c)(1) ..................................................................................22

28 U.S.C. § 1334(c)(2) .................................................................. 18, 19, 20, 21

28 U.S.C. § 1408 ...........................................................................................11

28 U.S.C. § 1412 ...........................................................................................11

28 U.S.C. § 1452(b) ......................................................................................22

Fla. Stat. § 86 et seq. ............................................................................................5

Fla. Stat. § 718 et seq. .........................................................................................21

Fla. Stat. § 720 et seq. .........................................................................................21

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7001 .................................................................................15, 16

Fed. R. Bankr. P. 7001(2).............................................................................14, 16

Fed. R. Bankr. P. 7001(9).................................................................................14

Black's Law Dictionary (17th Ed. 1999) ..........................................................15

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

North Carillon Beach Condominium Association, Inc. ("North Association"), Central Carillon Beach Condominium Association, Inc. ("Central Association") and South Carillon Beach Condominium Association, Inc. ("South Association" and, together with North Association and Central Association, the "Associations"), by and through their undersigned co-counsel, hereby object (the "Objection") to the *Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-Up Fee, (B) an Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts and (C) Related Relief* [Docket No. 4] (the "Sale Motion"), filed by FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collin South LLC ("6801 South") and FL 6801 Collins Central LLC ("6801 Central" and collectively with 6801 North and 6801 South, the "Tower Owners"; 6801 Central, 6801 North, 6801 South and Spirits are collectively referred to as the "Debtors"), and in furtherance of this Objection, the Associations respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       The Associations are not-for-profit Florida corporations that operate and govern the Condo Towers (defined below) within the Canyon Ranch Miami Beach community. The Canyon Ranch community is comprised of the owners (the "Unit Owners") of approximately

570 condominium units on the Property.[2]  In February 2014, the Associations sued the Tower Owners (the "State Court Actions") in Florida state court (the "State Court") seeking, *inter alia*, declaratory relief as to the Unit Owners' rights under various condominium declarations, restrictions and easements which are expressly governed by Florida law.[3]  In addition, the Unit Owners may have claims (including, perhaps, class actions claims) for potentially false and misleading and fraudulent sale practices against the Debtors and their equity owner.[4]

2.    Prior to filing for bankruptcy, the Debtors entered into a Forbearance and Standstill Agreement (the "Standstill Agreement") with the Associations, whereby the Associations agreed to forbear prosecution of the State Court Actions for a period of time so that the Associations and the Debtors could negotiate a deal for the purchase of the Property by an entity controlled by the Associations.  However, instead of negotiating in good faith, the Debtors withheld information from the Associations and filed a Chapter 11 petition in New York on the day after the expiration of the Standstill Agreement.  Now the Debtors seek to sell the Property in a Bankruptcy Code Section 363 sale that would terminate the Canyon Ranch management and materially devalue the Unit Owners' interest in their condominium units.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

[3]    The State Court Actions are:  (i) *Central Carillon Beach Condominium Association, Inc., South Carillon Beach Condominium Association, Inc. v. FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc., North Carillon Beach Condominium Association, Inc.*, Case No. 2014-5408-CA (25), pending in the Circuit Court in and for Miami-Dade County, Florida; and (ii) *North Carillon Beach Condominium Association, Inc., vs. FL 6801 Collins North LLC, FL 6801 Collins South LLC, FL 6801 Collins Central LLC and W Capital Group, LLC*, Case No. 14-004356 CA (04), pending in the Circuit Court in and for Miami-Dade County, Florida.  Copies of the complaints (without exhibits) filed in the State Court Actions are attached hereto as **Exhibit A**.

[4]    Upon information and belief, the Debtors' ultimate equity owner was intimately involved in, or controlled, the sales process for the Units and potentially made false and misleading representations to Unit Owners, including, without limitation, that the Debtors were committed to Canyon Ranch managing the Property for no less than 20 years.

2

3.      The Associations are interested in submitting a higher or better bid for the Property or possibly acquiring the Property pursuant to the terms of a Chapter 11 plan. However, the Sale Motion is a continuation of the Debtors' callous campaign to disenfranchise the Unit Owners who invested in, and live on, the Property, and who, through the Associations, have repeatedly expressed to the Debtors their commitment and wherewithal to purchase the Property on better terms than the Stalking Horse.   Accordingly, the Associations file this Objection to contest the Debtors' unfair proposed sale procedures and seek an even playing field in these Chapter 11 cases.

4.      Specifically, the Sale Motion and Proposed Bidding Procedures must be denied or significantly modified as more fully set forth in this Objection, because:

- the Debtors violated the Unit Owners' fundamental rights to due process by failing to provide the Unit Owners sufficient notice of the Sale Motion;

- the Debtors cannot sell the Property free and clear of the claims raised in the State Court Actions under Bankruptcy Code Section 363(f)(4), because the Associations' interest in the Master Association is not in *bona fide* dispute;

- the relief requested in the Sale Motion is procedurally improper because the Debtors' request that the Sale Order contain findings of fact and conclusions of law interpreting the Master Declaration in favor of the Debtors (i.e., the "Favorable Resolution" requirement) must be brought by an adversary proceeding;

- the Court should abstain from determining property rights under the Declarations affecting the Property as such determinations are non-core matters appropriately made in the State Court Actions; and

- the proposed Bid Protections and Bid Procedures are unreasonable and provide anti-competitive advantages to the Stalking Horse that must be stricken.

3

# BACKGROUND

## A.      General Background.

5.      On June 1, 2014 (the "Petition Date"), the Debtors filed voluntary petitions under title 11 of the United States Code (the "Bankruptcy Code").

6.      Since the Petition Date, the Debtors have been operating their business as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

7.      As of the date of this filing, no committee of unsecured creditors has been appointed in the Chapter 11 cases.

## B.      The Condominium Towers, Associations and Declarations.

8.      The Property is a mixed-use project comprised of three condominium towers (the "North Tower," the "South Tower, and" the "Central Tower" and, collectively, the "Condo Towers") located in Miami Beach, Florida.   Canyon Ranch, the owner of luxury health spa resorts in the United States ("Canyon Ranch"), manages the hotel and retail segments of the Property pursuant to a management agreement with Spirits and/or the Tower Owners.

9.      It appears that all of the Debtors were formed under Delaware law as special purpose entities to take title to their assets through deeds in lieu of foreclosure.   See *Declaration of Anthony Barsanti pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Motions* (hereafter, the "Barsanti Decl.") at 3.  Subsequent to taking title to the project, the Debtors sold all but thirteen of the units at Canyon Ranch Miami to Unit Owners whose interests are collectively represented by the Associations.

10.      Canyon Ranch Miami is governed by a recorded Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration").   The Master Declaration envisions five "Lots" as follows:

| Address | Lots |
|---|---|
| 6799 Collins Avenue | South Tower |
| 6801 Collins Avenue | Central Tower |
| 6801 Collins Avenue | Hotel Lot |
| 6899 Collins Avenue | North Tower |
| 6899 Collins Avenue | Retail Lot |

11.     The Master Declaration governs the relationships between and among the developer, the Master Association, the Condo Associations, the Unit Owners, the Hotel Lot Owner, and the Retail Lot Owner.  The Master Declaration, in essence, created a homeowners association, as described in Chapter 720, Florida Statutes, since the project is principally comprised of residential units.

C.     **The State Court Actions.**

12.     On February 19, 2014, North Tower Association filed an Amended Complaint in the State Court against 6801 North, 6801 South, 6801 Central and W Capital Group, LLC,[5] seeking declaratory relief under Chapter 86 of the Florida Statutes in connection with defendants' exercise of their rights under the Master Declaration and the North Tower Declaration (the "North Tower Litigation").

13.     On February 28, 2014, Central Tower Association and South Tower Association filed a Complaint in the State Court against the Master Association, North Tower Association and 6801 Central, seeking:  (i) declaratory and injunctive relief under the Master Declaration and the Rules relating to (a) expenses for the non-retail shared facilities budget, (b) assessments for valet parking services in the shared facilities budget, (c) assessments for utilities, and (d) a reduction in the number of permitted occupants in the spa facilities; (ii) damages for breach of

---

[5]     On March 21, 2014, North Tower Association filed a "Stipulated Notice of Dropping Defendant W Capital Group, LLC without Prejudice," thereby removing W Capital Group, LLC as a defendant in the litigation.

the Master Declaration by 6801 Central in an amount no less than $8.7 million; and (iii) specific

performance by 6801 Central for breach of Section 16.8 of the Master Declaration relating to the

turnover of certain financial records (the "Central/South Tower Litigation").   In their Complaint,

Central Tower Association and South Tower Association requested a jury trial.

14.    By their respective State Court Actions, the Associations seek, *inter alia*,

declaratory relief with respect to a number of issues arising from the Debtors' conduct that

impact the manner in which the Debtors, and any successor owner, will prospectively operate the

Master Association and the Non-Retail Shared Facilities, including the following:

A.    Whether, under the Master Declaration, 6801 Central, or any successor in interest, can include:  (i) Spa-related line items in the Non-Retail Shared Facilities assessments, including but not limited to (a) Spa Attendants, (b) Spa Expenses, (c) Fitness Instructors, (d) Office Expense Fitness, and (e) Spa Expense Supplies; and (ii) Hotel-related line items in the Non-Retail Shared Facilities Budget, including (a) IT Systems & Technology Share, (b) Concierge, and (c) Contingency;

B.    Whether, under the Master Declaration, 6801 Central, or any successor in interest, can assess Garage Costs by including Valet Parking Services as part of the Non-Retail Shared Facilities when Unit Owners are prohibited from self-parking their vehicles and, prior to 2012, such expenses were not included in the Shared Facilities assessments

C.    Whether, under the Master Declaration, 6801 Central, or any successor in interest, can assess costs for utilities based upon a purported square footage allocation methodology instead of based upon usage

D.    Whether 6801 Central, or any successor in interest, is prohibited from enacting rules and regulations relating to Spa usage which are in direct conflict with the rights of Unit Owners set forth in the Prospectus for each Condominium Tower, upon which the Unit Owners relied in purchasing their units; an

E.    Whether 6801 Central, 6801 North and 6801 South, or any successor "Declarant" under the Condominium Declarations for the three Condominium Towers, is entitled to exercise reserved rights, if any, in such a way that would fundamentally and adversely change or alter the character of the exclusive and private lifestyle that is the key ambient element of Canyon Ranch Miami.

15.    Resolution of the State Court Actions not only requires interpretation of the Master Declaration and the Rules, but also the review and application of fairly arcane Florida statutory and decisional law.

16.    Many of the Unit Owners were induced into purchasing their Units based, in substantial part, on written and oral representations regarding the continued operation of the Spa facilities by Canyon Ranch.   These potential claims, sounding in the nature of fraudulent inducement, may also be asserted against the Debtors' equity owners as there is information suggesting that the equity owners controlled the sales process and were responsible for the alleged misrepresentations.   In addition, there are concerns about whether the Debtors and/or their equity owners violated express and implied warranties with regard to the condition of the Property, which are still under investigation.

17.    On April 17, 2014, the Associations and the Tower Owners executed the Standstill Agreement pursuant to which they agreed, *inter alia*, that:   (i) the defendants in the State Court Actions would enter appearances in same; (ii) the defendants in the State Court Actions would not be required to file responses until twenty days after the Termination Date (as such term is defined in the Standstill Agreement); (iii) the material terms of a purchase and sale agreement between the Condo Associations and the Tower Owners would be as set forth in the Standstill Agreement; (iv) the Towers Owners would not dispose of the Property or make any alterations to the Master Declaration or the operation of the Property until the Termination Date; and (v) the State Court Actions would be stayed until the Termination Date.

18.    Thereafter, the Debtors withheld requested information from the Associations necessary for the Associations to fully formulate a purchase and sale agreement for the Property. For example, the PSA includes twenty-nine exhibits and schedules and collectively runs two

7

hundred and seventy-four pages.  The Debtors never provided the Associations with the form PSA or any of the exhibits or schedules.

19.    The Debtors filed their Chapter 11 petitions on the day after the expiration of the Standstill Agreement.

**D.    The Sale Motion.**

20.    On the Petition Date, the Debtors filed the Sale Motion.

21.    Pursuant to the Sale Motion, the Debtors seek approval to sell substantially all of their assets to 360 Miami Hotel and Spa LLC as the Stalking Horse in accordance with the terms of that certain Purchase and Sale Agreement, dated as of May 28, 2014 (the "PSA"), if the Debtors do not receive any Qualified Bids by the Bid Deadline, or do not select an alternate bid at the Auction.  The Debtors also request that the Court approve certain bidding procedures (the "Proposed Bidding Procedures") in connection with the Auction.  See Sale Motion ¶¶ 60-61, Exhibit B.

22.    The assets to be purchased by the Stalking Horse pursuant to the PSA include the Debtors' interests in the Property and certain related Assets.  See Sale Motion ¶ 5; PSA §§ 1, 4. The PSA provides that the Stalking Horse agrees to purchase substantially all of the Debtors' Assets, including the Property, in accordance with the terms of the PSA for an aggregate purchase price of $12 million, subject to potential material downward adjustments as set forth in the PSA.  See PSA §§ 2, 11 (e.g., pursuant to Sections 11(b)(iv) and (viii) of the PSA, the Stalking Horse would be entitled to a credit against the Purchase Price in the aggregate amount of:  (i) any advance booking deposits received and held by the Debtors with respect to the Hotel Property at Closing; and (ii) all trade payables from the Hotel Property for goods received at or services supplied to the Hotel Property on or prior to the Closing Date. )

23.    As part of the PSA, the Debtors seek the Court's approval of certain Stalking Horse protections, including:  (i) a break-up fee of $440,000 (the "Break-Up Fee"); and (ii) up to $120,000 in expense reimbursements (which would be included in the $440,000 Break-Up Fee should the Debtors consummate a sale to a party other than the Stalking Horse).  See Sale Motion ¶ 48; PSA § 40(a).

24.    In recognition of the significance of the State Court Actions to an owner of the Property, the Debtors make the extraordinary request that the Court include a series of findings in the Sale Order – the so-called Favorable Resolution requirement – that would deny, dismiss or otherwise dispose "of the declaratory relief sought by the [Associations], including [through] the entry of (i) the Sale Order containing findings of fact and conclusions of law effectuating such relief, (ii) an order of dismissal or (iii) other similar resolution that is favorable to the Debtors." See Sale Motion ¶ 17, n. 4.  Indeed, the Debtors have made the resolution of causes of action asserted in the State Court Actions an express condition precedent to the sale of the Property. See PSA § 10(d)(vi); see also Sale Motion ¶¶ 89-106.

25.    By the Sale Motion, the Debtors also request that the Court approve the sale of the Property free and clear of the claims raised by the Associations in the State Court Actions pursuant to Bankruptcy Code Section 363(f)(4).  See Sale Motion ¶ 113.  The stated basis for the requested relief is the alleged existence of a *bona fide* dispute between the Debtors and the Associations regarding the Associations' attempts to "encumber, define and limit the Debtors' rights to the Property under the Declarations."  Id. ¶ 114.

E.    **The Proposed Bidding Procedures.**

26.    Pursuant to the Sale Motion, the Debtors seek approval of the Proposed Bidding Procedures.  Among other things, the Proposed Bidding Procedures set forth:  (i) deadlines in connection with the bidding and Auction process; (ii) requirements that a potential bidder must

satisfy to be entitled to participate in the bidding and Auction process; and (iii) the procedures

for conducting the Auction and other matters relating to the sale of the Debtors' Assets.  See Sale

Motion ¶¶ 49-52.

27.    Under the Proposed Bidding Procedures, prospective bidders must submit a

"Qualified Bid" to be eligible to participate in the Auction.  In order to be considered a Qualified

Bid, a bid must include a purchase price for all of the Assets that provides net consideration to

the Debtors' estate of at least $540,000 more than the purchase price offered by the Stalking

Horse, consisting of the $440,000 Break-Up Fee, plus a $100,000 overbid (together, the

"Minimum Overbid," and, together with the Break-Up Fee, the "Bid Protections").

28.    The Proposed Bidding Procedures provide that the Debtors will select the

successful bid at the conclusion of the Auction, which the Debtors propose to hold within fifty

(50) days of entry of the Bidding Procedures Order, with bids due within forty-five (45) days of

entry of the Bidding Procedures Order.  See Sale Motion ¶ 45.  The Debtors may also deem a bid

that is the second highest and best bid as a back-up bid (the Second Highest Bid"), which the

Debtors may accept in the event that the sale to the Successful Bidder at the Auction is not

consummated.  See Sale Motion ¶ 50.  However, under no circumstances can the Stalking Horse

be required to be the Second Highest Bid without the Stalking Horse's express written consent.

29.    Additional requirements set forth in the Proposed Bidding Procedures are as

follows:

- The Debtors retain sole discretion to determine whether a potential bidder has the financial ability to timely consummate a sale; Proposed Bidding Procedures at 4;

- Qualified Bids must be in cash without any financing conditions; Id. at 3.

- The Debtors will consider only bids for all of the Assets and, therefore, will not consider bids for discrete portions of the Assets; Id.; and

10

- The Stalking Horse will be permitted to include the full amount of the Break-Up Fee in each round of bidding.  Id. at 5.

F.      **Motion to Transfer Venue.**

30.      On June 17, 2014, the Associations filed a Motion Pursuant to 28 U.S.C. §§ 1408 and 1412 and Bankruptcy Rule 1013 to transfer these Chapter 11 Cases to the United States District Court for the Southern District of Florida [Docket No. 46] (the "Venue Motion").  The Associations have requested that the Venue Motion be heard prior to or in conjunction with the Sale Motion at the June 25, 2014 hearing.

## OBJECTION

A.      **The Debtors Failed to Provide Sufficient Notice to All of the Unit Owners in Violation of Due Process Requirements.**

31.      To satisfy the requirements of due process, there must be "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  See Mullane v. Central Hanover Bank & Trust, Co., 339 U.S. 306, 314 (1950); Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Industries, Inc.), 467 B.R. 694, 706 (S.D.N.Y. 2012).  Whether a creditor was provided with notice sufficient to satisfy due process requirements "often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known."  DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145, 150 (2d Cir. Mar. 27, 2014).  Actual notice is required for known creditors or "creditors with reasonably ascertainable names and addresses. . . ."  See Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.), 157 B.R. 220, 221 (S.D.N.Y. 1993).

32.      Upon information and belief, at the time of this Objection, the Debtors have yet to provide notice of the Sale Motion to certain of the Unit Owners, despite the fact that the Unit

Owners are known creditors of the Debtors with reasonably ascertainable names and addresses from the Debtors' books and records. Accordingly, the Court should not consider the Sale Motion at this time as the Unit Owners have been deprived of their fundamental rights to due process.

**B.**    **The Proposed Sale Cannot Be Effectuated
          Effectuated Under Bankruptcy Code Section 363(f)(4).**

33.    The only basis that the Debtors offer for their request to sell the Property free and clear of the claims raised in the State Court Actions is Bankruptcy Code Section 363(f)(4). However, a sale "free and clear of liens or other interests" should not impact litigation concerning the interpretation of the Master Declaration, which is a covenant that runs with the land.

34.    As used in Bankruptcy Code Section 363(f)(4), "free and clear" refers to economic interests against the assets to be sold, such as liens and mortgages, which would then attach to the proceeds of the sale. See Silverman v. Ankari (In re Oyster Bay Cove, Ltd.), 196 B.R. 251, 255 (E.D.N.Y. 1996) (finding that an order to sell free and clear has no effect on easements that run with the land). As the District Court for the Eastern District of New York noted in Oyster Bay Cove, "[c]learly 11 U.S.C.A. § 363(f) and Bankruptcy Rule 6004, which refer to the sale of land 'free and clear' from these 'interests,' are not intended to sever

easements and other non-monetary property interests that are created by substantive State law."
Id. at 255.[6]

35.    In order to establish the existence of a *bona fide* dispute that would enable the
Court to authorize the sale of the Property free and clear under Bankruptcy Code
Section 363(f)(4), the Debtors must present the Court with objective evidence that a factual or
legal dispute exists as to the validity of the Master Declaration. See Liberty Tool, & Mfg. v.
Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1066-67 (9th Cir.
2002).   In other words, the Debtors would have to demonstrate that the Property ought not be
subject to the Master Declaration.   The mere fact that the State Court Actions were filed is not
enough to establish a *bona fide* dispute.   See id. at 1066 ("It is true that the mere existence of
pending litigation or the filing of an answer is insufficient to establish the existence of a *bona
fide* dispute.").

36.    Because the standard to be employed requires an objective analysis, "neither
[D]ebtor's subjective intent nor [its] subjective belief is sufficient to meet [the] burden" of
establishing a *bona fide* dispute.   Rimell v. Mark Twain Bank (In re Rimell), 946 F.2d 1363,
1365 (8th Cir. 1991).   Accordingly, the subjective contentions of the Debtors regarding the

---

[6]    The Debtors misplace reliance on the opinions delivered in In re Daufuskie Island Properties, LLC, 431
B.R. 626, 635 (Bankr. D. S.C. 2010) and Cheslock-Bakker & Assocs., Inc. v. Kremer (In re Downtown
Athletic Club of New York City, Inc.), No. M-47 (JSM), 2000 WL 744126 (S.D.N.Y. June 9, 2000).  Both
decisions appear to be outliers in Bankruptcy Code Section 363(f)(4) jurisprudence. Daufuskie concerned a
contractual right to repurchase real property, which the court noted had not yet been triggered.   In
authorizing the sale free and clear of the contract right, the court based its decision, in part, on the fact that
the holder of the repurchase right could not exercise the right even if he wanted to do so.   See Daufuskie,
431 B.R. at 643-44 ("Since the repurchase right in Article 5 has not been triggered and is unlikely to be
triggered in the future, and because it is contingent…the repurchase right offers no real protection to MCI. .
. . ."). Accordingly, and contrary to the situation here, there was no real prejudice to the claimant.   The
Downtown Athletic Club appeal concerned leasehold interests in hotel units that the debtor sold pursuant to
Bankruptcy Code Section 363.   The court found that a *bona fide* dispute existed as to whether certain
members of the Downtown Athletic Club had leasehold interests in the hotel units that they occupied.   See
Downtown Athletic Club, 2000 WL at *4.   In other words, there was a dispute as to the existence of an
interest and not, as we have here, a dispute regarding the interpretation of a covenant that runs with the
land.   Neither case lends support to the Debtors' position that the Property can be sold free and clear of the
claims raised in the State Court Actions concerning the interpretation of the Master Declaration.

claims of the Associations are irrelevant to the Court's consideration of whether an objective *bona fide* dispute exists.

37.     A review of the Sale Motion confirms that the Debtors are unable to provide any objective evidence of a *bona fide* dispute over the validity of the Master Declaration.  While the Debtors and the Associations may not agree on the import of specific provisions of the Master Declaration, a disagreement over how to interpret a covenant that runs with the land does not give rise to a *bona fide* dispute over an interest in the Property.  Clearly, the Property is and shall remain subject to the Master Declaration, regardless of who ends up owning the Property.

38.     Indeed, the Sale Motion and PSA expressly contemplate that the Purchaser will acquire title subject to the Master Declaration upon the closing of the sale.  See Sale Motion ¶ 53; PSA § 4.  The only matters that are in "dispute" according to the Debtors are the appropriate allocation of certain assessments, accounting methods for shared costs, and resident and guest access to shared facilities.  It cannot be that these types of ordinary, ancillary disputes constitute a "*bona fide* dispute" of an interest against the Property as set forth in Bankruptcy Code Section 363(f)(4) sufficient to authorize the Debtors to sell the Property free and clear of the causes of action asserted in the State Court Actions.

**C.     The Relief Requested in the Sale Motion is Procedurally Improper.**

39.     Bankruptcy Rule 7001(2) provides that "a proceeding to determine the validity, priority or extent of a lien or other interest in property" must be commenced through an adversary proceeding.  Fed R. Bank. P. 7001(2).  Additionally, Bankruptcy Rule 7001(9) makes clear that "a proceeding to obtain a declaratory judgment relating to" a proceeding of the type described in Bankruptcy Rule 7001(2) also must be commenced through an adversary proceeding.  Fed. R. Bankr. P. 7001(9).

40.     The Debtors admit that the Condo Declarations constitute "interests" that are subject to the provisions of Bankruptcy Code Section 363(f).  See Sale Motion ¶ 119.  The Debtors then ask the Court to interpret those "interests" in a light most favorable to them under the Favorable Resolution requirement.  It cannot be gainsaid that the relief the Debtors are requesting is anything but an action for declaratory relief.[7]

41.     Given that the Favorable Resolution requirement relates to an action for declaratory judgment to resolve certain of the causes of action asserted in the State Court Actions, it should be sought by way of an adversary proceeding and not in the context of a contested Sale Motion.

42.     Courts have long-recognized that a party requesting a declaratory judgment in the context of a bankruptcy case must do so through the commencement of an adversary proceeding.  See In re Eastman Kodak Co., No. 12-10202, 2012 WL 2255719, at *2 (Bankr. S.D.N.Y. June 15, 2012) ("Since the relief Kodak seeks is … an action for a declaratory judgment to determine an interest in property …, the plain meaning of Rule 7001 indicates that it must be brought as an adversary proceeding, not as a contested Rule 9014 motion"); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 459 B.R. 190, 195 (Bankr. S.D.N.Y. 2011) ("A party seeking a declaratory judgment must do so by commencing an adversary proceeding."); see also GMAC Mortg. Corp. v. Salisbury (In re Loloee), 241 B.R. 655, 660 (B.A.P. 9th Cir. 1999) ("A motion procedure cannot be used to circumvent the requirement of an adversary proceeding.") (internal citation omitted).

43.     As Judge Gropper noted in the Eastman Kodak chapter 11 cases:

Although [debtor] proceeds on the premise it can obtain the relief it seeks based

---

[7]     See, e.g., Black's Law Dictionary (17th Ed. 1999) (defining a declaratory judgment as "a binding adjudication that establishes the rights and other legal relations of the parties without providing for or ordering enforcement").

> on this Court's ability to authorize sales under § 363, it has not cited any authority
> that a bankruptcy court can determine ownership of property in connection with a
> sale motion and the small amount of authority on point suggests the opposite.

Eastman Kodak Co., 2012 WL 2255719, at *2. Judge Gropper concluded that the proper vehicle for determining the validity and extent of an interest in property is an adversary proceeding. See id. Similarly, an adversary proceeding is the appropriate vehicle for determining the Associations' and Unit Owners' rights under the governing documents.

44.      Accordingly, the Debtors should not be permitted to circumvent Bankruptcy Rule 7001 and should be required to file an adversary proceeding. "The procedural requirement in Rule 7001(2) that [property interests] be resolved by adversary proceeding has implications for due process that become important when a Rule 9014 contested matter is asked to do an adversary proceeding's job." Loloee, 241 B.R. at 661 (holding that debtor's attempt to resolve a lien priority dispute through a sale order rather than an adversary proceeding violated the lienholder's due process rights). This is particularly true where, as here, the Associations have pending litigation against the Debtors and requested a jury trial. Without the benefits of the procedural protections afforded in adversary proceedings and the State Court Actions, the Associations will not have the opportunity to further develop their claims, engage in discovery and expert analysis and take advantage of their constitutional right to a trial by jury.

16

D.    **The State Court Actions Are Non-Core
Matters and the Court Should Abstain From
Determining the Issues Raised in the State Court Actions.**

45.    The Debtors' claims relating to the Favorable Resolution of the State Court Actions are non-core matters.[8]  As a consequence, this Court can do no more than submit proposed findings of fact and conclusions of law to the District Court, and any final order or judgment must be entered by a District Court Judge after considering this Court's proposed findings and conclusions and reviewing *de novo* those matters to which any party has timely and specifically objected.  See 28 U.S.C. § 157(c)(1); Executive Benefits Ins. Agency v. Arkison, No. 12-1200, 2014 WL 2560461, at *6 (June 9, 2014) (Thomas, J.) ("If a matter is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge must propose findings of fact and conclusions of law.  Then, the district court must review the proceeding *de novo* and enter final judgment.").  Thus, there is virtually no prospect that the Debtors can obtain the Favorable Resolution of the State Court Actions by the 30-day deadline specified in the PSA.

46.    Furthermore, the Debtors' self-imposed exigency does not permit the Debtors to ignore the limitations on this Court's jurisdiction and authority or illuminate a new path for the Debtors through the rigors of the core/non-core dichotomy.  Moreover, even if the Court were to

---

[8]    See IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re AMANAT), 338 B.R. 574, 580-581 (Bankr. S.D.N.Y. 2005) ("Related to jurisdiction is presumptively non-core jurisdiction." A proceeding is core if it is of "the type to overwhelm the rights of other creditors or dominate the case."); see also Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987), in which the Fifth Circuit instructed, as follows:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference.  If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.  If the proceeding does not involve a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

find the State Court Actions to be core matters, the Debtors cannot override the Associations'

request for a jury trial in the Central/South Tower Litigation, which the plaintiffs in that action

have not waived, and do not intend to waive; nor do the plaintiffs in that action consent to a jury

trial in the Bankruptcy Court.[9]

> ### E. The Claims in the State Court Actions Fall Squarely within the Mandatory Abstention Provisions of 28 U.S.C. § 1334(c)(2) and Accordingly, Should Not Be Resolved by the Bankruptcy Court.

47.    Mandatory abstention by a bankruptcy court is governed by 28 U.S.C.

§ 1334(c)(2), which provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

48.    In <u>Fried v. Lehman Bros. Real Estate Assocs. III, L.P.</u>, 496 B.R. 706, 711

(S.D.N.Y. 2013), District Judge Schofield identified the requirements for mandatory abstention,

as follows:

> There are six requirements for mandatory abstention: (1) the motion to abstain is timely; (2) the action is based on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section 1334 provides the sole basis for federal jurisdiction; (5) an action is commenced in state court; and (6) the action can be timely adjudicated in state court.

As shown below, the State Court Actions meet all of the requirements for mandatory abstention

---

[9]      <u>See</u> 28 U.S.C. § 157(e); <u>Walker, Truesdall, Roth & Assoc. v. Blackstone Grp., L.P. (In re Extended Stay)</u>, 466 B.R. 188, 197 (S.D.N.Y. 2011) ("Even if the proceeding is determined to be core in nature and a jury trial is demanded, a bankruptcy court may only conduct a jury trial if 'specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.'").

pursuant to 28 U.S.C. § 1334(c)(2).

i.     **The Timeliness of the Abstention Request.**

49.     Although 28 U.S.C. § 1334(c)(2) does not define "timely" and courts tend to apply a case-by-case approach, the "relevant considerations include … whether the movant moves as soon as possible after he or she should have learned the grounds for such a motion." Joremi Enters. Inc. v. Hershkowitz (In re New 118th LLC), 396 B.R. 885, 893 (Bankr. S.D.N.Y. 2008) (internal citation and quotation marks omitted).  There should be no disagreement that the Associations' abstention request is timely as the issue is joined by the Sale Motion and the Associations have timely filed this Objection.

ii.     **The Declaratory Judgment Actions Concern Only State Law Claims.**

50.     The State Court Actions are based wholly on state law and neither the Debtors nor the Associations assert any bankruptcy or other federal law claims.  Every cause of action pled in the State Court Actions must be analyzed pursuant to Florida law.

iii.     **The Declaratory Judgment Actions are Non-Core Proceedings.**

51.     The claims asserted in the State Court Actions and the request for the Favorable Resolution under the Sale Motion are non-core, related-to claims that could be asserted regardless of the commencement of the Chapter 11 Cases.

iv.     **The Only Basis for Jurisdiction over the State Court Actions is 28 U.S.C. § 1334.**

52.     28 U.S.C. § 1334 is the sole basis for federal jurisdiction over the State Court Actions.  The State Court Actions do not raise any claims that constitute federal questions under 28 U.S.C. § 1331.  Nor is there federal jurisdiction in respect of the State Court Actions based on 28 U.S.C. § 1332(a).  Accordingly, there is no other basis for federal jurisdiction over the claims asserted in the State Court Actions.

**v.**     **The State Court Actions Were Commenced Pre-Petition.**

53.     The State Court Actions were commenced in February 2014 in the State Court

and are pending in the State Court, subject to the automatic stay due to the subsequent filing of

these Chapter 11 Cases.

**vi.**     **The State Court Actions Can Be Timely Adjudicated.**

54.     "Whether a case can be timely adjudicated for purposes of mandatory abstention

analysis requires more than an analysis of the relative speed of the state and federal forums."

Fried, 496 B.R. at 711.   The Second Circuit has identified four factors to consider when

evaluating timeliness for purposes of 28 U.S.C. § 1334(c)(2), as follows:  "(1) the backlog of the

state court's calendar relative to the federal court's calendar; (2) the complexity of the issues

presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy

proceeding to which the state law claims are related;[10] and (4) whether the state court proceeding

would prolong the administration or liquidation of the estate."[11]   Parmalat Capital Fin. Ltd. v.

Bank of Am. Corp., 639 F.3d 572, 580 (2d Cir. 2011) (internal citation omitted).

55.     The burden of proving that the State Court cannot adjudicate the State Court

Actions in a timely manner is on the Debtors.   See BGC Partners, Inc. v. Avison Young

---

[10]     At least one bankruptcy court in this district has examined the weight this factor should be given where, as here, the principal purpose of the chapter 11 case is to effectuate an asset sale.  See New York Commercial Bank v. Pullo, No. 12-02052 (BRL) 2013 WL 494050, at *7 (Bankr. S.D.N.Y. Feb. 7, 2013) (in granting a motion to abstain under 28 U.S.C. § 1334(c)(2), noting that "[h]ere the Chapter 11 case does not involve a complex reorganization, as the Borrowers seek a sale of substantially all of their assets" and finding that this fact weighs in favor of abstention).

[11]     With respect to the fourth factor (prolonging administration of the estate), the Second Circuit has identified three additional factors to consider: (i) whether the district court is concurrently charged with administration of the bankruptcy estate, (ii) close connections between the defendants in the action and the debtor, and (iii) complexity of the litigation.  Parmalat, 639 F.3d at 581.  However, as the District Court noted in BGC Partners, Inc. v. Avison Young (Canada), Inc., 919 F. Supp. 2d 310, 320 (S.D.N.Y. 2013), "[w]here the district court…is not charged with administration of a bankruptcy estate…the possibility that remand of the state court claims will slow down the [bankruptcy] proceeding is insufficient to show that state court adjudication would be untimely." Id. (citing Parmalat in deciding that mandatory abstention of proceedings concerning state law causes of action is appropriate).

(Canada), Inc., 919 F. Supp. 2d  at 319 n. 66 (S.D.N.Y. 2013) ("I conclude that…the burden should be on defendants to prove that the state court *cannot* adjudicate the claims in a timely manner.") (emphasis in original).

56.    The Associations are specifically motivated to resolve the claims in the State Court Actions in an expedient manner.  Moreover, the Associations chose the State Court as the appropriate forum to determine the State Court Actions as it has significant experience analyzing condominium declarations in light of the statutory scheme set forth in chapters 718 and 720 of the Florida Statutes.  See, e.g., id., at 320 ("[T]here is no question that state courts are best positioned to interpret and apply state law.").  It was only the Debtors' hollow agreement to negotiate a sale of the Property to an entity controlled by the Associations that engendered a delay in the prosecution of the State Court Actions.

57.    Furthermore, the Associations do not consent to the entry of final orders by the Bankruptcy Court.  The exercise of this right may lead to further inefficiencies.  As observed by the bankruptcy court in In re 4 Front Petroleum, Inc., 345 B.R. 744 (Bankr. N.D. Okla. 2006):

> This procedure is inefficient, generates a multitude of repetitive pleadings, is expensive, doubles the judicial resources devoted to this matter, and substantially increases the duration of the litigation.  A trial in State Court before a judge and jury who are empowered to make binding findings of fact and final conclusions of law will almost always be more efficient that the multi-tiered procedure imposed by 28 U.S.C. § 157(c)(1).

Id. at 755.

58.    The requirements for mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) are clearly satisfied in this case, particularly taking into account the nascent stage of these Chapter 11 cases.  As a result, the Court should deny the relief requested in the Sale Motion in light of the legal and equitable impediments to this Court resolving the issues joined in the State Court Actions.

**F.      The Bankruptcy Court Should Abstain from Granting the Requested
Declaratory Relief Based on the Doctrines of Permissive Abstention and
Equitable Remand.**

59.      Permissive abstention is governed by 28 U.S.C. § 1334(c)(1), which provides:

[N]othing in this section prevents a district court in the interests of justice, or in
the interests of comity with State courts, or respect for State law, from abstaining
from hearing a particular proceeding arising under title 11 or arising in or related
to a case under title 11.

28 U.S.C. § 1334(c)(1).

60.      Additionally, the Bankruptcy Court is permitted to equitably remand litigation

pursuant to 28 U.S.C. § 1452(b), which provides that "[t]he court to which such claim or cause

of action is removed may remand such claim or cause of action on any equitable ground."  28

U.S.C. § 1452(b).

61.      "The factors for equitable remand are virtually identical to the factors for

discretionary abstention."  Certain Underwriters at Lloyd's London v. ABB Lummus Global,

Inc., No. 03 Civ. 7248 (JGK), 2004 WL 224505, at *8 (S.D.N.Y. Feb. 5, 2004) (internal citations

omitted).  Such factors are, as follows:

(1) the effect or lack thereof on the efficient administration of the estate if Court
recommends abstention is exercised, (2) the extent to which state law issues
predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the
applicable state law, (4) the presence of a related proceedings commenced in state
court or other non-bankruptcy courts, (5) the jurisdictional basis, if any, other than
28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceedings
to the main bankruptcy case, (7) the substance rather than the form of an asserted
"core" proceeding, (8) the feasibility of severing state law claims from core
bankruptcy matters to allow judgments to be entered in state court with
enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy
court's] docket, (10) the likelihood that the commencement of the proceedings in
bankruptcy court involves forum shopping by one of the parties, (11) the
existence of a right to a jury trial, and (12) the presence in the proceeding of non-
debtor parties.

Fried, 496 B.R. at 712-13 (internal citations omitted).

62.      "In determining whether to exercise permissive abstention . . . courts have considered one or more (not necessarily all) of twelve factors. . . ." Cody Inc. v. Cnty. of Orange (In re Cody, Inc.), 281 B.R. 182, 190 (S.D.N.Y. 2002).  "The factors largely ask the Court to balance the federal interest in efficient bankruptcy administration against the interest of comity between the state and federal courts." Fried, 496 B.R. at 713.

63.      Most, if not all, of the above-enumerated factors support permissive abstention and equitable remand in this case.  First, a demand has been made by the Associations in the State Court Actions for a jury trial.  Thus "the trial would not be conducted by the bankruptcy judge administering the . . . case." E.S. Bankest, LLC v. United Beverage Fla., LLC (In re United Container LLC), 284 B.R. 162, 177 (Bankr. S.D. Fla. 2002).  Second, as shown above, there is no sound basis for federal jurisdiction over the Associations' claims asserted in the State Court Actions, other than, perhaps, potential "related to" jurisdiction under 28 U.S.C. § 1334. Third, "state law issues predominate" in the proceedings.  Indeed, all of the issues in the State Court Actions are governed by state law.  Fourth, even the Debtors concede that the issues raised in the State Court Actions must be resolved to effectuate a sale of the Property.  Thus, it certainly appears that the Debtors may have employed bankruptcy solely to avert the resolution of those issues by the State Court.

64.      In considering a request for permissive abstention under facts similar to the ones at issue here, the District Court in Fried ultimately determined it was appropriate to abstain, finding that:

> [M]ost of the factors relevant to permissive abstention weigh in favor of the state forum.  The Amended Complaint is based entirely on state law, and there are no bankruptcy or other federal issues (factors 2, 6, 7, 8); the Plaintiffs commenced this action in state court (factor 4); the parties are entitled to a jury trial, which would be unavailable in the bankruptcy court (factor 11); the sole basis for federal jurisdiction is "related to" jurisdiction under 28 U.S.C. § 1334 (factor 5); [and]

23

state adjudication will not impede the efficient administration of the bankruptcy estate (factor 1)….

Fried, 496 B.R. at 713; see also The Langston Law Firm v. Mississippi, 410 B.R. 150, 157 (S.D.N.Y. 2008) ("[T]he issues raised … are remote from the bankruptcy case and will likely hinge on Mississippi state law …, which is best handled by the Mississippi state court. The State has commenced an action in Mississippi state court, which will be able to resolve this dispute. Accordingly, the Bankruptcy Court did not abuse its discretion in abstaining.…"). Thus, even assuming *arguendo* that mandatory abstention is inappropriate, permissive abstention would be appropriate.

### G.    The Bid Protections and Proposed Bid Procedures are Unreasonable.

65.    The paramount goal in any proposed sale of property of the estate under Bankruptcy Code Section 363 is to maximize the proceeds received by the estate. See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 658 (S.D.N.Y. 1992); In re Metaldyne Corp., 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate.") (internal citation omitted).

66.    Accordingly, bid protections that have the potential to "chill" the bidding process should be denied. See Integrated Resources, at 660 (when determining whether bid protections are reasonable, "a court should determine whether the dollar amount … is so substantial that it has a 'chilling effect' on other prospective bidders.").

67.    Bankruptcy Code Section 363 requires that bid procedures be designed to encourage bidding, not suppress it. See Gey Assocs. Gen. P'Ship v. 310 Assocs., L.P., No. 02-Civ.-0710 (SHS), 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002), aff'd 346 F.3d 31 (2d Cir. 2003). Courts must safeguard the bidding and sale process by approving procedures that will not

chill bidder participation in the sale process.  See In re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests.").  Accordingly, courts should not approve bidding procedures that "undermine the principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value."  See In re Jon J. Peterson, Inc., 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

68.    Both the Bid Protections and the Proposed Bidding Procedures are designed not to encourage participation from prospective bidders, but rather to benefit the Stalking Horse and suppress competitive bids.  Accordingly, the Bid Protections and Proposed Bidding Procedures should be rejected or, in the alternative, amended as set forth below, to ensure an open, fair, and competitive Auction.

### i.    The Bid Protections Are Excessive.

69.    The Break-Up Fee, which represents approximately 3.7% of the Stalking Horse Bid, is higher than customary break-up fees approved in this jurisdiction.  See e.g., In re Reader's Digest Ass'n, No. 09-23529 (Bankr. S.D.N.Y. Dec. 18, 2009) [Docket No. 384] (approving 2.5% break-up fee); In re Silicon Graphics, Inc., No. 09-11701 2009, Bankr. LEXIS 5155 (Bankr. S.D.N.Y. Apr. 3, 2009) (approving 2.7% break-up fee); In re Young Broadcasting, Inc., Case No. 09-10645 (Bankr. S.D.N.Y. Apr. 2, 2009) [Docket No. 207] (approving 3% break-up fee); In re RSL COM Primecall, Inc. & RSL COM USA, Inc., No. 01-11457, 2002 Bankr. LEXIS 367, at *29 (Bankr. S.D.N.Y. Apr. 11, 2002) (finding that a break-up fee of 3.1% of the purchase price was "reasonable and customary"); Metaldyne, 409 B.R. at 670 (finding that bid protections of less than 3% fall within the range of acceptability in this jurisdiction).

70.    The Debtors have failed to show that the Break-Up Fee is reasonable or necessary under the circumstances.  Courts in this district typically consider three factors when determining whether a break-up fee is reasonable:  (1) whether the relationship of the parties who negotiated the break-up fee is tainted or manipulated; (2) whether the fee encourages, rather than hinders, alternative bids; and (3) whether the amount of the proposed fee is unreasonable considering the proposed purchase price.  See Integrated Resources, 147 B.R. at 657; Metaldyne Corp. 409 B.R. at 670.

71.    All of these factors weigh against approval of the Break-Up Fee.  First, because the Debtors failed to disclose critical information with respect to the Property to the Associations, the Stalking Horse was unduly favored and the Bid Protections represent an unwarranted advantage to the Stalking Horse.  Second, the $440,000 Break-Up Fee and the $540,000 Minimum Overbid will seriously discourage alternative bidders from submitting a bid for the Property and must be eliminated or reduced.  As a result of the proposed Bid Protections, an interested party would need to submit a bid of at least $12,540,000 – or 4.5% higher than the Stalking Horse Bid – to be even considered by the Debtors at the Auction.  The Proposed Bid Protections may end up being an even higher percentage of the proposed $12 million purchase price as the PSA explicitly provides that the final purchase price is subject to potential material adjustments.  See PSA § 11. Finally, according to the Proposed Bid Procedures any competing bid must be solely in cash and with no financing conditions.  This requirement must be stricken as it prevents consideration of bids including non-cash consideration, including without limitation, releases of claims and assumed liabilities, which may have more value to the Debtors' estate than additional cash consideration.

26

ii.   **The Proposed Bidding Procedures Provide an Unfair Advantage to the Stalking Horse and Fail to Create a Competitive and Open Auction Process.**

72.    The Proposed Bidding Procedures contain numerous provisions that will chill bidding, limit participation by prospective bidders, and result in a sale process that is unfairly skewed in favor of the Stalking Horse.  The Court must examine each and every Proposed Bidding Procedure to ensure that the process does not discourage potential bidders from participating in the process.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).

73.    First, the Proposed Bid Procedures provide the Debtors with unfettered discretion to decide whether or not to reject a bid or consider a bid a "Qualified Bid."  For example, the Proposed Bidding Procedures provide seven (7) conditions that must be met for a bid to be considered a "Qualified Bid."  However, even assuming that all of these conditions are met, such a bid will not constitute a "Qualified Bid" if the Debtors, "in their sole and absolute discretion, conclude [that the bidder] does not have the financial ability to consummate the transaction or fulfill financial commitments under their proposal."  The Debtors should not be afforded unfettered discretion to determine if an otherwise qualifying bid may be consummated.

74.    Second, the Proposed Bidding Procedures require that all bids be solely in cash and not subject to any financing conditions.  The Proposed Bidding Procedures should permit Qualified Bids to include non-cash consideration, including the release of claims and operating enhancements.

75.    Third, the proposed purchase price of $12 million is subject to potential material downward adjustments, many of which will not be known by either the Debtors or the Stalking

27

Horse until after closing.  See PSA § 11.  Consequently, the true value of the Stalking Horse bid cannot be determined at this time.

76.    Fourth, the Stalking Horse will benefit from the Break-Up Fee in each round of bidding, which is unusual, and in light of the excessive amount of the Break-Up Fee, unfairly tips the sale process in favor of the Stalking Horse.

77.    Finally, the Stalking Horse is explicitly exempted from the requirement of having to serve as the Second Highest Bid absent the Stalking Horse's express written consent, notwithstanding the fact that all other bids are subject to selection as the Second Highest Bid. This inconsistency in treatment of bidders is inappropriate, particularly in light of the Bid Protections being proposed for the benefit of the Stalking Horse.

## CONCLUSION

**WHEREFORE**, the Associations respectfully request that the Court (i) deny the Sale

Motion for the reasons set forth above, (ii) abstain from determining property rights under the

Declarations affecting the Property as such determinations are appropriately made in the State

Court Actions in the State Court; and, (iii) grant such other and further relief to the Condo

Associations as the Court may deem just and proper.

Dated: New York, New York
      June 19, 2014

Respectfully submitted,

**NORTH CARILLON BEACH
CONDOMINIUM ASSOCIATION, INC.,
CENTRAL CARILLON BEACH
CONDOMINIUM ASSOCIATION, INC., AND
SOUTH CARILLON CONDOMINIUM
ASSOCIATION, INC.**
By their counsel,
BROWN RUDNICK LLP
By:

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

-and-

BILZIN SUMBERG BAENA PRICE &
AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 374-7580
Facsimile:  (305) 351-2242

# **EXHIBIT A**

**State Court Actions**

**North Tower Action**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 14-004356 CA01

NORTH CARILLON BEACH
CONDOMINIUM ASSOCIATION, INC., a
Florida not-for-profit corporation,

      Plaintiff,

vs.

FL 6801 COLLINS NORTH LLC, a Delaware
limited liability company; FL 6801 COLLINS
SOUTH LLC, a Delaware limited liability
company; FL 6801 COLLINS CENTRAL
LLC, a Delaware limited liability company;
and W CAPITAL GROUP, LLC, a Florida
limited liability company,

      Defendants.

_____/

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiff North Carillon Beach Condominium Association, Inc. ("Association" or

"Plaintiff"), by and through undersigned counsel, sues defendants, FL 6801 Collins North LLC

("FL 6801 North"), FL 6801 Collins South LLC ("FL 6801 South"), FL 6801 Collins Central

LLC ("FL 6801 Central") (collectively, "Declarant" or "Defendants"), and defendant W Capital

Group, LLC ("W Capital Group"), and states as follows:

## INTRODUCTION

1.    This action for declaratory relief seeks to preserve and protect the rights of certain

condominium residents within the exclusive Canyon Ranch Miami Beach community whose

rights and interests are at risk of being adversely affected by the Declarant's imminent actions.

**ShubinBass** ✈

In particular, this action is brought by residents of the North Tower Condominium, through their Association, and seeks the Court's intervention to protect the exclusive and spa-based wellness lifestyle within the Canyon Ranch Miami Beach community that North Tower condominium residents bargained for and are entitled to enjoy. This exclusive community consists of three luxury condominium towers (including the North Tower) surrounded and serviced by the luxury "Canyon Ranch Hotel & Spa in Miami Beach" (located at 6801 Collins Avenue) with associated restaurants, shared facilities (such as pools, gardens and garages), and an extensive Canyon Ranch-style spa and fitness center used by condominium residents and hotel guests. North Tower condominium residents acquired their units in reliance on the quality and exclusivity of the Canyon Ranch lifestyle that was promised to them by the Declarant (including its predecessor).

2.     Defendants are individually and/or collectively the successors in interest to the original Declarant/Developer of this community (including the North Tower Condominium), and also own the hotel lot containing the "Canyon Ranch Hotel & Spa in Miami Beach" (including shared facilities). Defendants, however, have recently marketed and are currently in the process of selling this hotel property (along with any Declarant rights), and are packaging such hotel property with adjacent property that they also own and/or control (the former Golden Sands hotel located outside of this community).

3.     Based on representations made by Defendants as part of this marketing and sale process, the exclusive Canyon Ranch lifestyle within this community is at risk. In particular, as a result of this imminent sale, there are plans to exercise asserted rights of the Declarant to somehow: (i) "annex" the Golden Sands hotel to this exclusive Canyon Ranch community; (ii) create a 1,000-member beach club whose members (and guests) will have use of the Canyon

2

ShubinBass

Ranch shared facilities and the spa (which would overburden facilities currently used by condominium residents and hotel guests); and (iii) to account for this 1,000-member club, reduce the number of "permitted occupants" with access to the Canyon Ranch spa that condominium unit owners are currently entitled to designate (from eight (8) "permitted occupants" to six (6) occupants per unit owner).    Not coincidentally, based on the approximately 600 total condominium units in this community, a reduction of two (2) "permitted occupants" per unit would result in an overall reduction of approximately 1,200 "permitted occupants," which would be replaced by the planned 1,000 beach club members (and their guests).

4.    These actions would dramatically and fundamentally change the character of the exclusive Canyon Ranch community and overburden the "shared facilities" (including the parking garage at the North Tower) beyond what was represented by the Declarant to residents, and are otherwise beyond what is permitted under Florida decisional and statutory law.  North Tower residents thus have a well-founded concern that their spa-based exclusive "Canyon Ranch" lifestyle is about to be fundamentally and irreversibly undermined by the marketing and imminent sale of the Declarant's interest in the project to W Capital Group and/or others, which includes the sale of the existing Canyon Ranch hotel property.

5.    Because the North Tower residents believe that the Declarant's sale is imminent, and that the future development of the properties will replicate the suggested business model of the Declarant/seller, they seek expedited guidance from this Court that confirms their position – a position not shared by the Defendants (or defendant W Capital Group) – that this re-development proposal would fundamentally alter the character of their community and thus be improper under existing decisional law and statutory authority.

ShubinBass ✈

## PARTIES, JURISDICTION, AND VENUE

### Plaintiff Association

6.      Plaintiff Association is the condominium association that operates and governs the North Tower Condominium within the Canyon Ranch Miami Beach community.   The Association is a not-for-profit corporation, organized and existing under the laws of the State of Florida, whose principal place of business is in Miami-Dade County, Florida.

7.      The Association brings this action in its own right and, pursuant to Rule 1.221 of the Florida Rules of Civil Procedure, on behalf of its members (*i.e.*, 207 unit owners in the North Tower Condominium within the Canyon Ranch Miami Beach community), inasmuch as the action concerns matters of common interest to its members.  The Declarant turned over control of the Association in February 7, 2013.

### Defendant FL 6801 North

8.      Defendant FL 6801 North is a limited liability company that is organized and existing under the laws of the State of Delaware, and it is qualified to and does conduct business in the State of Florida.  As more particularly alleged below, FL 6801 North is also the successor "Developer" of the North Tower Condominium.

9.       One of the governing documents of the North Tower Condominium is the "Declaration of Condominium of North Carillon Beach, a Condominium" that was executed by the original "Developer" thereunder (North Carillon, L.L.C.) as of August 25, 2008 (and recorded on August 27, 2008 in OR Book 26542 at Page 15 of the Miami-Dade County public records) (the "North Condominium Declaration").   (A true and correct copy of the North Condominium Declaration is attached hereto as Exhibit 1.)

4

ShubinBass

10.    Pursuant to an "Assignment of Developer's Rights" dated as of November 17, 2009 (and recorded on December 22, 2009 in OR Book 27124, Page 2060 of the Miami-Dade County public records), the original "Developer" under the North Condominium Declaration assigned to defendant FL 6801 Collins North "all of its rights and obligations as Developer under the North Condominium Declaration" and other governing documents of the North Tower Condominium.  (A true and correct copy of this "Assignment of Developer's Rights" is attached hereto as Exhibit 2.)

**Defendant FL 6801 South**

11.    Defendant FL 6801 South is a limited liability company that is organized and existing under the laws of the State of Delaware, and it is qualified to and does conduct business in the State of Florida.  As more particularly alleged below, FL 6801 South is also the successor "Declarant" under the Master Declaration (as defined below).

12.    Another one of the governing documents of the Canyon Ranch Miami Beach community is the "Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa" that was executed by the original "Declarant" thereunder (Carillon South Joint Venture, L.L.C.) as of December 2, 2007 (and recorded on December 3, 2007 in OR Book 26080, Page 4905 of the Miami-Dade County public records) (the "Master Declaration").  (A true and correct copy of the Master Declaration is attached hereto as Exhibit 3.)

13.    Pursuant to an "Assignment of Declarant and Developer Rights" dated as of November 17, 2009 (and recorded on December 22, 2009 in OR Book 27124, Page 2053 of the Miami-Dade County public records), the original "Declarant" under the Master Declaration assigned to defendant FL 6801 Collins South "all of its rights and obligations as Declarant under

5

ShubinBass

the Master Declaration" and other governing documents of the community.  (A true and correct copy of this "Assignment of Declarant and Developer Rights" is attached hereto as Exhibit 4.)

### Defendant FL 6801 Central

14.     Defendant FL 6801 Central is a limited liability company that is organized and existing under the laws of the State of Delaware, and it is qualified to and does conduct business in the State of Florida.  FL 6801 Central owns the Hotel Lot (and the Retail Lot) within the Canyon Ranch Miami Beach community.  As the "Hotel Lot Owner," FL 6801 Central is also the "Declarant" under the Master Declaration.

### Defendant W Capital Group

15.     Defendant W Capital Group is a limited liability company that is organized and existing under the laws of the State of Florida.  Upon information and belief, W Capital Group may have an interest in (or is in the process of acquiring an interest in) the Hotel Lot and Declarant's rights and obligations under the Master Declaration.

16.     This Court has jurisdiction over this matter pursuant to Chapter 86 of the Florida Statutes and pursuant to Section 26.012 of the Florida Statutes.

17.     This Court has personal jurisdiction over Defendants (and defendant W Capital Group) because they conduct business in Miami-Dade County, Florida, including but not limited to, through the Canyon Ranch hotel property that they own, and through the Master Declaration and the North Condominium Declaration.  This action arises from such business and other activity by Defendants (and defendant W Capital Group) in the State of Florida.

18.     Venue is appropriate in Miami-Dade County pursuant to Chapter 47 of the Florida Statutes because the property that is the subject of this litigation (including the Hotel Property owned by the Declarant) is located in Miami-Dade County.

6



## FACTUAL BACKGROUND

19.     The Canyon Ranch Miami Beach community was originally conceived and developed as an integrated and unified condominium-hotel project anchored by the exclusive and serene Canyon Ranch luxury, spa-based lifestyle.  In addition to the Canyon Ranch Hotel & Spa, there are three condominium towers in this community: the North Tower, the South Tower, and the Central Tower.  Significantly, all three of these condominium towers have "shared facilities" with the Canyon Ranch Hotel & Spa.

20.     Under the Master Declaration, the plan of development consists only of the following five (5) Lots: (i) Condominium North Lot; (ii) Condominium Central Lot; (iii) Condominium South Lot; (iv) Hotel Lot; and (v) Retail Lot.   The Retail Lot is the only property defined as "Future Development Property" under the Master Declaration.  No other property can be added to this community.

21.     The Declarant (including through its predecessor) marketed and promoted this project as a Canyon Ranch-based community that had certain defined boundaries.  As evidenced in promotional materials offered to potential condominium unit owners, the Declarant (including through its predecessor) sold, and the unit owners purchased, an exclusive "Canyon Ranch" lifestyle that would allow for the use of state-of-the-art spa and other wellness facilities consistent with the "Canyon Ranch" brand.  Thus, condominium units within this exclusive community were uniquely attractive and valuable because of this exclusive and spa-based Canyon Ranch lifestyle.

22.     The North Tower Condominium prospectus and other governing documents also contemplate that there are limits to the capacity of the "shared facilities" within this community. For example, the North Tower condominium prospectus confirms that the total number of

ShubinBass

condominium units in the community would not exceed 620 units. (A true and correct copy of this condominium prospectus is attached hereto as Exhibit 5.) This contemplates that the capacity of the "shared facilities" is limited and cannot be overburdened.

23.    While the Hotel Lot Owner may have the right to allow the use of the Wellness Spa (and/or "shared facilities") by persons other than unit owners (*i.e.*, by hotel guests and their invitees), such use by third parties cannot overburden the facilities in such a way that fundamentally changes the Canyon Ranch lifestyle.

24.    Nothing in the Declaration contemplates annexing any additional property to the community beyond the defined boundaries (along with creating a 1,000-member beach club and reducing the number of "permitted occupant" per unit) in such a way that would fundamentally change the character of the exclusive Canyon Ranch Miami Beach community and otherwise overburden the "shared facilities" at the Hotel property that are currently enjoyed by residents within the community.

25.    The North Condominium residents purchased their condominium units in reliance upon the nature of the plan of development as an exclusive and luxurious community defined by the wellness-based Canyon Ranch lifestyle. Thus, when residents purchased properties within the Canyon Ranch community, they relied upon representations made by the Declarant (in the governing documents and otherwise) about the exclusive nature of the wellness-based Canyon Ranch lifestyle.

26.    Through its logo, signage, branding, and the plan and design of the "Canyon Ranch" community, the Declarant inextricably linked itself to maintaining exclusivity and spa-based and wellness lifestyle that is part of the "Canyon Ranch" brand.

ShubinBass

27.     The Declarant's imminent sale of the Hotel property, together with the contemporaneous sale of the adjoining Golden Sands property, and the resulting and planned "annexation" of the Golden Sands property, would unreasonably impair the fundamental plan of development of this exclusive Canyon Ranch community, and cause damage to the North Tower residents.   To make matters worse, according to proposed plans (announced as recently as January 2014), the imminent sale of the Declarant's interests would also result in the annexation of the Golden Sands to the community along with the establishment of a 1,000-member beach club where members (and their guests) would somehow be entitled to use the "shared facilities" and other facilities within the exclusive Canyon Ranch community.   This would severely overburden the capacity of the "shared facilities" at the Hotel that North Tower residents (and residents from the other two condominium towers) currently use and in which they share in the expense of such facilities.   It would also overburden the capacity of the North Tower parking garage.   Such high-intensity uses, such as a 1,000-member beach club (coupled with the corresponding reduction of "permitted occupants" per unit), were never contemplated by the governing documents.

28.     The proposed plan thus unreasonably and fundamentally impairs the character of the exclusive Canyon Ranch community.   Florida law, however, prevents the Declarant (and any successor "Declarant") from exercising purported powers of amendment and annexation, if any, reserved to the Declarant under the Master Declaration or other governing documents – whether or not such powers are exercised prior to or after turnover by the Declarant.

29.     All conditions precedent to the filing of this action have occurred, have been performed by the Association or have otherwise been fulfilled, or their performance has been excused or waived by the acts and/or omissions of the Declarant.

9

ShubinBass ✈

30.     The Association has retained the services of undersigned counsel for the purpose of bringing and maintaining this action, and has obligated itself to pay a reasonable fee for legal services and the costs of bringing this action.  To the extent the Association prevails in this action, it is entitled to an award of reasonable attorneys' fees and costs pursuant to applicable law, the Master Declaration, and/or the North Condominium Declaration.

## COUNT I
## (DECLARATORY RELIEF)

31.     Plaintiff incorporates and re-alleges the allegations set forth in paragraphs 1 through 30 as though fully stated herein.

32.     This is an action for declaratory relief pursuant to Chapter 86 of the Florida Statutes.  Under Section 86.021 of the Florida Statutes, any person whose rights, status, or other equitable or legal relations are affected by a contract, may have determined any question of construction or validity arising under such contract, and obtain a declaration of rights, status, or other equitable or legal relations thereunder.

33.     Plaintiff seeks a judicial declaration that the Declarant (or any successor) cannot unreasonably exercise its Declarant's rights in such a way that will fundamentally change the character of the exclusive Canyon Ranch lifestyle within the community.  The exclusive Canyon Ranch lifestyle currently enjoyed by residents/unit owners at the North Tower is at risk of being adversely affected based on the Declarant's imminent sale of the Hotel Lot (and "Declarant's" rights) and the Golden Sands property to an entity/group that plans to expand the community by "annexing" the Golden Sands property to the Canyon Ranch community and also creating a 1,000-member beach club that will use the shared facilities within the community (and the planned reduction of "permitted occupants" per unit to use the spa).

10

ShubinBass

34.    Florida decisional law, as well as statutory authority (Fla. Stat. §720.3075), uniformly prohibits a developer/declarant or their successor – either pre-turnover or post-turnover – from: (i) acting in a manner which is arbitrary, capricious, or in bad faith; (ii) destroying the general plan of development of a planned residential community; (iii) prejudicing the rights of existing nondeveloper members to use and enjoy the benefits of common property; or (iv) materially shifting economic burdens from the developer/declarant to the existing nondeveloper members.   As such, any actions undertaken by the Declarant (or their successors) must be "reasonable" and not cause an alteration of either the relationships of lot owners to each other or of an individual's control of his/her property.    Similarly, any asserted rights of the Declarant, if any, must be exercised in a reasonable manner so as not to destroy the general plan of development.

35.    Plaintiff Association thus maintains that a developer (or successor developer), such as the Declarant may not exercise post-development and post-turnover rights, to the extent these rights were reserved or even exist, so as to fundamentally alter the character of the community that was promised to them.  Accordingly, the Association seeks a judicial declaration that the exercise of these rights, as anticipated, is unreasonable and conflicts with both Florida decisional law and statutory authority.  The issuance of a declaration in favor of the Association is both necessary, to protect the North Tower residents from the imminent destruction of their lifestyle, and proper, under well settled legal principles.

36.    Plaintiff is legally entitled to seek declaratory relief through this action.  Plaintiff has a *bona fide*, actual, and present practical need for a declaration by this Court that the Declarant (or any successor "declarant") is not entitled to exercise reserved rights, if any, in such a way that would fundamentally and adversely change the character of the exclusive Canyon

11

Ranch Miami Beach community, including, but not limited, through the imminent plan to "annex" the Golden Sands property to the Canyon Ranch community, create a 1,000-member beach club to use the "shared facilities" within this community, and correspondingly reduce the number of "permitted occupants" that residents are entitled to have to use the spa (*i.e.*, from 8 to 6 per unit).

37.     Plaintiff is in doubt as to whether the Declarant (or any "successor" declarant) is entitled to exercise "reserved" rights in such a way as is being proposed, which would fundamentally and adversely change the character of this exclusive community, and Plaintiff is seeking declaratory relief to have such doubt removed.

38.     There is a presently ascertainable set of facts and present controversy for this Court to resolve.

39.     Plaintiff and the Declarant (and W Capital Group) have antagonistic and adverse interests in the subject matter of this controversy.

40.     The antagonistic and adverse interests relative to this controversy are all before this Court.

41.     The declaration is sought by Plaintiff from this Court not to obtain legal advice, but to obtain a declaration of the Association's (and its members) rights under the Declaration and applicable law.

42.     Plaintiff seeks declaratory relief to determine disputed issues, including the following: whether the Declarant (or any "successor" declarant) is precluded from exercising "Declarant" rights under the Declaration in such a way that would fundamentally change or alter the character of the exclusive and private lifestyle that is the cornerstone of the Canyon Ranch Miami Beach community and that North Tower unit owners are entitled to under the Declaration

ShubinBass

and applicable law, by somehow (i) "annexing" the Golden Sands hotel to this exclusive Canyon

Ranch community; (ii) creating a 1,000-member beach club whose members (and guests) will

have use of the Canyon Ranch shared facilities and the spa (which would overburden facilities

currently used by condominium residents and hotel guests); (iii) to account for this 1,000-

member club, reducing the number of "permitted occupants" with access to the Canyon Ranch

spa that condominium unit owners are currently entitled to designate (from eight (8) "permitted

occupants" to six (6) occupants per unit owner); and (iv) otherwise overburdening the facilities

currently used by condominium residents and hotel guests.

43.    Plaintiff seeks a declaratory judgment declaring that the Declarant (or any

successor "declarant," including, but not limited to, defendant W Capital Group) is not entitled to

exercise any of its rights under the Declaration in such a way that would fundamentally change

or alter the character of the exclusive lifestyle at the Canyon Ranch community, particularly as it

affects the Association and the North Tower unit owners.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor

and declare that the Declarant (or any successor "declarant," including, but not limited to,

defendant W Capital Group) is not entitled to exercise reserved rights, if any, in such a way that

would fundamentally and adversely change the character of this exclusive Canyon Ranch Miami

Beach, including, but not limited, through the imminent plan to (i) "annex" the Golden Sands

property to the Canyon Ranch community, (ii) create a 1,000-member beach club whose

members (and guests) will have use of the Canyon Ranch shared facilities and the spa (which

would overburden facilities currently used by condominium residents and hotel guests), and (iii)

to account for this 1,000-member club, reduce the number of "permitted occupants" with access

to the Canyon Ranch spa that condominium unit owners are currently entitled to designate (from

ShubinBass

eight (8) "permitted occupants" to six (6) occupants per unit owner); and enter all such further and supplemental relief (consistent with the judicial declaration) that this Court deems equitable and just, including but not limited to, Plaintiff's reasonable attorneys' fees and costs pursuant to applicable law and/or the Declaration.

Dated: February 19, 2014                              Respectfully Submitted,

                                                      SHUBIN & BASS, P.A.
                                                      46 S.W. First Street
                                                      Third Floor
                                                      Miami, Florida 33130
                                                      Tel.: (305) 381-6060
                                                      Fax: (305) 381-9457
                                                      jshubin@shubinbass.com
                                                      jfarach@shubinbass.com
                                                      eservice@shubinbass.com

                                                      By: /s/ John K. Shubin
                                                              John K. Shubin
                                                              Fla. Bar No. 771899
                                                              Juan J. Farach
                                                              Fla. Bar No. 957704

                                                      *Counsel for Plaintiff North Carillon Beach
                                                      Condominium Association, Inc.*

ShubinBass

**Central and South Tower Action**

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

**CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.,** a Florida not-for-profit corporation, and **SOUTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.,** a Florida not-for-profit corporation,

CASE NO.

     Plaintiffs,

v.

**JURY TRIAL DEMANDED**

**FL 6801 COLLINS CENTRAL LLC,** a Delaware limited liability company, **CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.,** a Florida not-for-profit corporation, and **NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.,** a Florida not-for-profit corporation,

     Defendants.

_____/

## **COMPLAINT**

    Plaintiffs, Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, Inc. (collectively, "Plaintiffs" or the "Condominium Associations"), by and through their undersigned counsel, sue Defendants, FL 6801 Collins Central, LLC, Carillon Hotel and Spa Master Association, Inc., and North Carillon Beach Condominium Association, Inc. (collectively, "Defendants"), and state as follows:

## THE PARTIES

1.      Plaintiff Central Carillon Beach Condominium Association, Inc. is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business in Miami Beach, Miami-Dade County, Florida.  The Central Carillon Beach Condominium Association, Inc. is a condominium association that operates and governs the Central Carillon Beach, a Condominium (the "Central Tower") within the property located at 6801 Collins Avenue, Miami Beach, Florida (comprising a portion of the hotel and condominium project known as "Canyon Ranch Living - Miami Beach").  The Central Tower's Declaration of Condominium was recorded on October 15, 2008 in OR Book 26610 at Page 735 of the Miami-Dade County public records (the "Central Tower Declaration").  Amendments to the Central Tower Declaration were recorded on February 8, 2010 in OR Book 27176 at Page 1593, on June 29, 2011 in OR Book 27738 at Page 1576, and on June 15, 2012 at OR Book 28151 at Page 2110 of the Miami-Dade County public records.

2.      Plaintiff South Carillon Beach Condominium Association, Inc. is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business in Miami Beach, Miami-Dade County, Florida.  The South Carillon Beach Condominium Association, Inc. is a condominium association that operates and governs the South Carillon Beach, a Condominium (the "South Tower") located at 6799 Collins Avenue, Miami Beach, Florida, within the Canyon Ranch Living - Miami Beach community.  The South Tower's Declaration of Condominium was recorded on December 3, 2007 in OR Book 26080 at Page 4764 of the Miami-Dade County public records (the "South Tower Declaration).  Amendments to the South Tower Declaration were recorded on January 30, 2008 in OR Book 26186 at Page

4424 and on April 30, 2008 in OR Book 26353 at Page 1890 of the Miami-Dade County public records.

3.      Defendant FL 6801 Collins Central LLC ("FL 6801 Collins Central" or the "Hotel Lot Owner") is a limited liability company organized under the laws of the State of Delaware and authorized to transact business in Florida, with its principal place of business in New York, New York.    FL 6801 Collins Central owns the Hotel Lot and Retail Lot within the Canyon Ranch Living - Miami Beach community.

4.      Defendant North Carillon Beach Condominium Association, Inc. is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business in Miami Beach, Miami-Dade County, Florida.    The North Carillon Beach Condominium Association, Inc. is a condominium association that operates and governs the North Carillon Beach, a Condominium (the "North Tower") located at 6899 Collins Avenue, Miami Beach, Florida, and is also within the Canyon Ranch Living - Miami Beach community. The North Tower's Declaration of Condominium was recorded on August 27, 2008 in OR Book 26542 at Page 15 of the Miami-Dade County public records (the "North Tower Declaration"). Amendments to the North Tower Declaration were recorded on October 9, 2009 in OR Book 27044 at Page 0308, and on September 13, 2012 in OR Book 28270 at Page 3665 of the Miami-Dade County public records.

5.      Defendant Carillon Hotel and Spa Master Association, Inc. (the "Master Association") is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business in New York, New York.    The members of the Master Association are the North, Central, and South Towers (collectively, and sometimes referred to

3

herein as the "Condominium Towers"), the Hotel Lot, and the Retail Lot located within the

Canyon Ranch Living - Miami Beach community.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter because Plaintiffs seek declaratory

and injunctive relief and because the amount in controversy exceeds $15,000 exclusive of

interest, costs and attorneys' fees. *See* Florida Statutes, Sections 26.01(2)(a) and (3) and 86.011.

7.      This Court has personal jurisdiction over Defendants because they reside in or

conduct business in Miami-Dade County, Florida, and this action arises from such business.

8.      Venue is proper in this Court pursuant to Chapter 47, Florida Statutes, because the

property that is the subject of this litigation is located in Miami-Dade County, Florida.

## BACKGROUND

**A.      The Canyon Ranch Property and the Condominium Towers.**

9.      Plaintiffs are condominium associations within the Canyon Ranch Living - Miami

Beach community, a beachfront hotel-condominium community comprised of five "Lots"

located at 6799 Collins Avenue (the South Tower), 6801 Collins Avenue (the Central Tower and

the Hotel Lot), and 6899 Collins Avenue (the North Tower and the Retail Lot), Miami Beach,

Florida.  All three Condominium Towers have "shared facilities" with the Hotel Lot (altogether,

the "Property").  The five Lots are all members of the Master Association.

10.     On December 2, 2007, the original developer of the Property, Carillon South Joint

Venture, LLC, executed the Declaration of Covenants, Restrictions and Easements for Carillon

Hotel and Spa (the "Master Declaration") which was recorded on December 3, 2007 in OR Book

26080, Page 4905 of the Miami-Dade County public records.  A copy of the Master Declaration

4

is attached hereto as **Exhibit 1**. An Amendment to the Master Declaration was recorded on October 20, 2009 in OR Book 27054 at Page 3792 of the Miami-Dade County public records.

11.     The Master Association was incorporated on September 25, 2007 for "those objects and purposes as are authorized by the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded (or to be recorded) in the Public Records of the County, as hereafter amended and/or supplemented from time to time (the "Declaration") … [and] to preserve the values and amenities in The Properties (as defined in the Declaration) and to maintain the Common Properties thereof for the benefit of the Members of the Association." *See* Master Declaration, Exhibit A, Articles of Incorporation, Article III.

12.     The Articles of Incorporation and the By-Laws of the Master Association are attached to the Master Declaration as Exhibits A and B. The Articles and By-Laws are incorporated by reference into the Master Declaration. *See* Declaration, Article 1(c) and (g).

13.     The Master Declaration governs the relationships between and among the developer, the Master Association, the Condominium Associations, the condominium unit owners (the "Unit Owners"), the Hotel Lot Owner, and the Retail Lot Owner.

14.     The Master Declaration, the Articles of Incorporation, and the By-Laws of the Master Association create a Community Association, as that term is defined in Chapter 720, Florida Statutes, by, *inter alia*, affording membership and voting rights in the Master Association based on the ownership of lots or units within the Property.

15.     The Hotel Lot Owner, the Retail Lot Owner, and the Condominium Associations are Members of the Master Association, as that term is defined in the Master Declaration. *See* Declaration, Articles 1.1(gg), 1.1(jj), 3.1, and 18.2(f).

16.     The Central Tower and the South Tower bring this action seeking declaratory and injunctive relief and damages.

**B.     The Master Declaration Limits the Plaintiffs' Share of the Hotel Lot Owner's Expenses and Provides a Methodology for the Hotel Lot Owner's Allocation of Expenses for the Shared Facilities.**

17.     Under the Master Declaration, the plan of development for the Property consists of five lots developed as a 'unified resort project': (1) the Condominium Central Lot; (2) the Condominium South Lot; (3) the Retail Lot; (4) the Condominium North Lot; and (5) the Hotel Lot. *See* Declaration, Section 1.1(i) (the Condominium Central Lot, the Condominium South Lot, and the Condominium North Lot are sometimes referred to herein collectively as the "Condominium Lots").

18.     The Master Declaration also identifies the shared components of the five lots as follows: (1) the "Condominium South Shared Facilities"; (2) the "Condominium Central Shared Facilities"; (3) the "Condominium North Shared Facilities"; (4) the "Non-Retail Shared Facilities"; and (5) the "Hotel Lot". *See* Declaration, Section 1.1(dd).

19.     The "Non-Retail Shared Facilities" are defined by the Master Declaration to be the following components of the Property, which serve the Condominium Lots or the Hotel Lot, but not the Retail Lot:

> (a) all utility, mechanical, electrical, telephonic, telecommunications, plumbing and other systems serving either the Condominium Central Lot, Condominium North Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot and Condominium North Lot and Condominium South Lot only, but not the Retail Lot, including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic, telecommunications, electrical, plumbing and/or other services;
>
> (b) all heating, ventilating and air conditioning systems serving either the Condominium Central Lot, Condominium North Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail

6

Lot, including, without limitation, compressors, air handlers, ducts, chillers, water towers and other apparatus used in the delivery of HVAC services;

(c) all trash rooms, trash chutes and any and all trash collection and/or disposal systems serving either the Condominium Central Lot, Condominium North Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot, Condominium North Lot and Condominium South Lot only, but not the Retail Lot;

(d) the Limited Spa Rights (as defined in Section 4.4 below), including, access to the Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/ Sauna/ Steam, Women's Wet Lounge /Sauna /Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi, Central Tower Lobby and Reception

*See* Declaration, Section 1.1(dd)(iv).

20.    The Master Declaration defines "Spa" as:

[T]hat portion of the Hotel Lot consisting of a health and fitness center, treatment rooms, medical offices and examination rooms, private fitness studios and labs, pilates room, rock climbing wall, treatment area relaxation lounges, cardio/weight room, men's locker room, women's locker room, men's wet lounge/sauna/steam, women's wet lounge/sauna/steam, south tower lobby, south tower beach pool and central tower lobby and reception, retail store and display areas. **The Spa is not a part of the Shared Facilities, and except only as provided in Section 4.4 below, Owners (other than the Hotel Lot Owner) shall not be entitled to use of, or access to, the Spa.**

*See* Declaration, Section 1.1(oo) (emphasis added).

21.    The "General Shared Facilities" for the Hotel Lot which are deemed to be included with the Non-Retail Shared Facilities are set forth in Section 1.1(dd)(v) of the Master Declaration.

22.    Collectively, the Condominium South Shared Facilities, the Condominium Central Shared Facilities, the Condominium North Shared Facilities, the Non-Retail Shared Facilities, and the General Shared Facilities are referred to as the "Shared Facilities". *Id.*

7

23.    Each year, the Hotel Lot Owner establishes the annual budgets for the Shared Facilities within each Condominium Tower (collectively, the "Shared Facilities Budgets"), as well as for the Non-Retail Shared Facilities (the "Non-Retail Shared Facilities Budget").

24.    Section 16.3 of the Master Declaration provides that Unit Owners must:

> [P]ay to the Hotel Lot Owner annual assessments and charges for the operation and insurance of, and for payment of expenses (and real estate and personal property taxes and/or governmental assessments and/or impositions) allocated or assessed to or through the Hotel Lot Owner, of and/or for the maintenance, management, operation and insurance of the Shared Facilities, the establishment of reasonable reserves for the replacement of same (if same are established in the sole discretion of the Hotel Lot Owner), capital improvement assessments, special assessments and all other charges and assessments hereinafter referred to or imposed by the Hotel Lot Owner in connection with the repair, replacement, improvement, maintenance, management, operation and insurance of, and taxes on, the Shared Facilities, all such assessments to be fixed, established and collected from time to time as herein provided.

*See* Declaration, Section 16.3.

25.    Section 16.3 also provides the methodology for the Hotel Lot Owner to allocate the assessments set forth in the Master Declaration, as well as limitations on what assessments may be charged to the Unit Owners. *See* Declaration, Section 16.3.

26.    The Property is also governed by the "Carillon Hotel and Spa a/k/a Canyon Ranch Miami Beach Rules and Regulations Adopted by the Hotel Lot Owner" (the "Rules"). The 2011 and 2014 Rules are attached as **Exhibits 2 and 3**.

27.    The Rules are made by the Hotel Lot Owner, as the owner of the Shared Facilities, with the intent "to govern the use of the Shared Facilities by Owners, Permitted Occupants and their families, guests, tenants and invitees". *See* Rules, p. 1.

28.    In the event of any conflict between the Rules and the Master Declaration or the Condominium Declarations, the Rules provide that the Master Declaration or the Condominium Declarations, as applicable, shall control. *See* Rules, Article 1 ¶ 1.

8

**C.    The Hotel Lot Owner Has Been Assessing Unauthorized Charges Against the Unit Owners in Violation of the Master Declaration.**

29.    The Hotel Lot Owner imposed on the Condominium Towers, and thereby their Unit Owners, a dramatic increase in assessment rates based on the 2013 budgets for the Shared Facilities.  In response, Plaintiffs, together with the North Tower, formed a committee to investigate the steep increase in the individual Condominium Towers' Shared Facilities Budgets and the Non-Retail Shared Facilities Budget.

30.    Plaintiffs discovered that the expenses for the Non-Retail Shared Facilities and the Shared Facilities for each of the Condominium Towers for the five (5) year period beginning in 2009 through and including 2013, as well as the projected expenses in the 2014 budgets, contained unauthorized charges in excess of $8.7 million.

31.    The Hotel Lot Owner has been including millions of dollars for certain Spa and Hotel-related charges in the Non-Retail Shared Facilities Budget, despite the fact that such charges are excluded from the Shared Facilities by the Master Declaration. *See* Declaration, Section 1.1(oo).  As only one example, the 2013 Non-Retail Shared Facilities assessments contained a substantial increase in the fitness program category because of the first-time inclusion of the cost of 'Fitness Instructors' at an annual cost of $1,149,629, or $3,150 per day. This cost was not included in the assessments for prior years.

32.    The Master Declaration expressly excludes the Spa from the Shared Facilities and, thus, such Spa-related charges are not authorized.

33.    The Master Declaration affords the Unit Owners of the Central, South and North Towers limited access rights to the Spa and the right to use certain designated areas, which rights are referred to as the "Limited Spa Rights".  In all other respects, per the Declaration, the "Spa" is expressly a private portion of the Hotel Lot:

9

34.    Section 4.4 of the Master Declaration provides:

Spa. The Spa shall be operated by the owner from time to time of the Hotel Lot. Only the following limited rights shall be included as part of the Non-Retail Shared Facilities (the "Limited Spa Rights"): access to, and use of, Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi and Central Tower Lobby and Reception. In all other respects, the Spa shall be deemed part of the private portions of the Hotel Lot and same shall not be included within the Common Properties or the Shared Facilities.... Use of the Spa by a Lot Owner to any extent greater than provided by the Limited Spa Rights shall be governed solely by separate agreement entered into by and between such Lot Owner and the Hotel Lot Owner. All fees collected by the Hotel Lot Owner for use of the Spa, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association or any other Lot Owner.

*See* Declaration, Section 4.4 (emphasis added).

35.    Unit Owners are required to pay a fixed monthly charge (the "Fixed Charge" as defined in the Declaration) for their "Limited Spa Rights", according to the Master Declaration. *See* Declaration, Section 16.3. Plaintiffs' position is that the Fixed Charge is the **only** permissible Spa-related expense chargeable to Plaintiffs. *See* Declaration, Section 16.1.

36.    In 2012 and 2013, the Hotel Lot Owner also charged substantially all of the cost of valet parking services as contract expenses in each Condominium Tower's Shared Facilities assessments, despite the Master Declaration requirement that such "Garage Costs" shall be included within the Non-Retail Shared Facilities Budget, and allocated according to a prescribed formula. *See* Declaration, Sections 1.1(z), 16.3, and 17. The Hotel Lot Owner also included such Garage Costs as contract expenses in the 2014 Shared Facilities budgets.

37.    The Hotel Lot Owner has also been applying an improper methodology to allocate expenses for utilities purportedly based upon some measure of square footage, when the Master Declaration requires that the expenses for utilities be allocated based upon actual usage. *See* Declaration, Section 16.3.

10

38.    Additionally, in the Rules, the Hotel Lot Owner has impermissibly reduced the number of Permitted Occupants that Unit Owners may designate to use the Spa facilities from eight (8) Permitted Occupants to two (2) Permitted Occupants per day for one bedroom units, with an additional Permitted Occupant entitled to use the Spa facilities for each additional bedroom, in violation of the Prospectus for each Condominium Tower which provides for no such restriction or limitation.

39.    The Hotel Lot Owner's unauthorized assessments and elimination of rights afforded to Unit Owners by the condominium governing documents is an elimination of the property rights conveyed to Unit Owners at purchase.

40.    All conditions precedent to the filing of this action have occurred, have been performed by Plaintiffs or have otherwise been fulfilled, or their performance has been excused or waived by the acts or omissions of the Hotel Lot Owner.

41.    Plaintiffs have retained the services of Broad and Cassel for the purpose of bringing and maintaining this action, and have obligated themselves to pay a reasonable fee for legal services and costs.  To the extent Plaintiffs prevail in this action, they are entitled to an award of reasonable attorneys' fees and costs pursuant to Section 720.305, Florida Statutes.

## COUNT I

### CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF
### RELATING TO EXPENSES FOR THE NON-RETAIL SHARED FACILITIES BUDGET

#### Plaintiffs v. All Defendants

42.    Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set forth.

43.    This Count seeks declaratory relief pursuant to Section 86.011, *Fla. Stat.*, and injunctive relief as authorized by Section 26.012(3), *Fla. Stat.*

11

44.    The Master Declaration provides that each Unit Owner in the Condominium

Towers is assessed a share of the expenses relating to the operation, maintenance, upkeep and

repair of the "Common Properties" and the "Shared Facilities", as such terms are defined in the

Master Declaration. *See* Declaration, Section 16.3.

45.    The Declaration lists the various "Non-Retail Shared Facilities," which are

defined by the Master Declaration to be the following components of the Property, which serve

the Condominium Lots or the Hotel Lot, but not the Retail Lot:

> (a) all utility, mechanical, electrical, telephonic, telecommunications, plumbing
> and other systems serving either the Condominium Central Lot, Condominium
> North Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot,
> Condominium Central Lot, Condominium North Lot and Condominium South
> Lot only, but not the Retail Lot, including, without limitation, all wires,
> conduits, pipes, ducts, transformers, cables and other apparatus used in the
> delivery of the utility, mechanical, telephonic, telecommunications, electrical,
> plumbing and/or other services;

> (b) all heating, ventilating and air conditioning systems serving either the
> Condominium Central Lot, Condominium North Lot and the Condominium
> South Lot, exclusively, and/or the Hotel Lot, Condominium Central Lot,
> Condominium North Lot and Condominium South Lot only, but not the Retail
> Lot, including, without limitation, compressors, air handlers, ducts, chillers,
> water towers and other apparatus used in the delivery of HVAC services;

> (c) all trash rooms, trash chutes and any and all trash collection and/or disposal
> systems serving either the Condominium Central Lot, Condominium North
> Lot and the Condominium South Lot, exclusively, and/or the Hotel Lot,
> Condominium Central Lot, Condominium North Lot and Condominium South
> Lot only, but not the Retail Lot;

> (d) the Limited Spa Rights (as defined in Section 4.4 below), including, access to
> the Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's
> Locker Room, Women's Locker Room, Men's Wet Lounge/ Sauna/ Steam,
> Women's Wet Lounge /Sauna /Steam, Exercise Pool Deck, Jacuzzi, Exercise
> Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and
> Jacuzzi, Central Tower Lobby and Reception….

*See* Declaration, Section 1.1(dd)(iv).

46.    Section 4.4 of the Master Declaration provides:

12

Spa.  The Spa shall be operated by the owner from time to time of the Hotel Lot.  **Only the following limited rights shall be included as part of the Non-Retail Shared Facilities (the "Limited Spa Rights"): access to, and use of, Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi and Central Tower Lobby and Reception. In all other respects, the Spa shall be deemed part of the private portions of the Hotel Lot and same shall not be included within the Common Properties or the Shared Facilities....** Use of the Spa by a Lot Owner to any extent greater than provided by the Limited Spa Rights shall be governed solely by separate agreement entered into by and between such Lot Owner and the Hotel Lot Owner. All fees collected by the Hotel Lot Owner for use of the Spa, if any, shall be retained by the Hotel Lot Owner and shall not constitute income or revenue of the Association or any other Lot Owner.

*See* Declaration, Section 4.4 (emphasis added).

      47.    The Master Declaration defines "Spa" as:

[T]hat portion of the Hotel Lot consisting of a health and fitness center, treatment rooms, medical offices and examination rooms, private fitness studios and labs, pilates room, rock climbing wall, treatment area relaxation lounges, cardio/weight room, men's locker room, women's locker room, men's wet lounge/sauna/steam, women's wet lounge/sauna/steam, south tower lobby, south tower beach pool and central tower lobby and reception, retail store and display areas. **The Spa is not a part of the Shared Facilities, and except only as provided in Section 4.4 below, Owners (other than the Hotel Lot Owner) shall not be entitled to use of, or access to, the Spa.**

*See* Declaration, Section 1.1(oo) (emphasis added).

      48.    The Hotel Lot Owner contends that it is entitled to assess certain Spa-related charges against Plaintiffs in the Non-Retail Shared Facilities Budget, despite that the Master Declaration excludes the "Spa" from the Shared Facilities.  *See* Declaration, Section 1.1(oo).

      49.    The Hotel Lot Owner may not include Spa-related expenses as part of the Non-Retail Shared Facilities assessments.  *See* Declaration, Sections 1.1(dd)(iv) and (oo) and 4.4.

      50.    The Master Declaration provides instead that the **only** assessment which Unit Owners are required to pay in connection with their use of the Spa facilities is a monthly fixed charge for their use of the Spa facilities.  *See* Declaration, Section 16.3.

13

51.    Section 16.3 of the Master Declaration provides:

In addition to the assessments described in the foregoing paragraphs, **each fee owner of a unit within a Condominium Lot (a "Unit Owner") agrees to pay, on a monthly basis, a fixed charge for use of the spa facilities contained within the Non-Retail Shared Facilities (the "Fixed Charge"), which shall be assessed by the Hotel Lot Owner against each Unit....** The Fixed Charge amount shall remain fixed through the last day of the calendar year following the year in which this Declaration is recorded. Effective on January 1 of the following year and on every anniversary thereafter, the Fixed Charge shall be increased by an amount to be determined by the Hotel Lot Owner in its sole discretion, provided, however, that no single increase shall be more than ten percent (10%) greater than the immediately previous Fixed Charge charged....

*See* Declaration, Section 16.3 (emphasis added).

52.    Section 16.1 of the Master Declaration confirms that the Hotel Lot Owner may

not charge Unit Owners a use or membership fee for the Limited Spa Rights:

The Hotel Lot Owner shall have … the right to charge reasonable use fees for use of the General and/or Non- Retail Shared Facilities and/or for services offered from the General Shared Facilities and/or Non-Retail Shared Facilities (provided, however, that, except only through the maintenance assessments described in Section 16, and any applicable Access Fee, Administrative Fee and/or Fixed Charge, no Condominium Unit Owner shall be charged a use or membership fee for access to any of the Non- Retail, Condominium South, Condominium Central and/or Condominium North Shared Facilities and/or for the Limited Spa Rights (as distinguished from fees for items purchased at, or services provided from, the Non Retail, Condominium South, Condominium Central and/or Condominium North Shared Facilities, for which a Condominium Unit Owner shall be charged and/or guest fees established from time to time by the Hotel Lot Owner pursuant to a non-discriminatory policies)].

*See* Declaration, Section 16.1(c).

53.    The Hotel Lot Owner has included Spa-related line items in the Non-Retail

Shared Facilities assessments from 2009-2013, as well as in the 2014 Non-Retail Shared

Facilities Budget, which Plaintiffs contend are unauthorized and inappropriate, including, but not

limited to: (a) Spa Attendant (totaling $4,899,968); (b) Spa expenses (totaling $166,589); (c)

Fitness Instructors (totaling $2,188,829); (d) Office Expense Fitness (totaling $203,027); and (e)

Spa Expense Supplies (totaling $411,585).  In addition, the Hotel Lot Owner has included Hotel-

related line items in the Non-Retail Shared Facilities Budget, which Plaintiffs also contend are

14

unauthorized and inappropriate: (a) IT Systems & Technology Share (totaling $302,101); (b) Concierge (totaling $487,896); and (c) Contingency (totaling $36,000). None of these expenses are included in the Master Declaration as Non-Retail Shared Facilities expenses and therefore they are unauthorized by the Master Declaration. *See* Declaration, Section 1.1(dd)(iv).

54.    The Hotel Lot Owner's inclusion of these charges as part of the Non-Retail Shared Facilities expenses and the assessment of these unauthorized expenses against the Unit Owners violate the Unit Owners' rights as created by the Master Declaration.

55.    A controversy exists sufficient for this Court to construe the Master Declaration to declare whether the Hotel Lot Owner may include these expenses as part of the Non-Retail Shared Facilities assessments.

56.    Plaintiffs are in doubt as to their rights under the Master Declaration and are entitled to have that doubt removed by a declaratory judgment of this Court.

57.    The Hotel Lot Owner's continued assessment of unauthorized expenses against Plaintiffs would cause irreparable harm and violate the Master Declaration.

58.    Plaintiffs have no adequate remedy at law to prevent the continuation of the unauthorized assessments discussed above or to prevent the Hotel Lot Owner from its continuing violations of the Master Declaration.

59.    Plaintiffs join the Master Association and the North Tower as nominal Defendants because they will be affected by any ruling relating to the Master Declaration.

WHEREFORE, Plaintiffs respectfully request that the Court declare that the actions taken by FL 6801 Collins Central from 2009 through the present, including but not limited to, the inclusion of expenses such as (a) Spa Attendant; (b) Spa expenses; (c) Fitness Instructors; (d) Office Expense Fitness; (e) Spa Expense Supplies; (f) IT Systems & Technology Share; (g)

Concierge; and (h) Contingency in the Non-Retail Shared Facilities assessments and current 2014 budget violate the Master Declaration. Plaintiffs also request that this Court enjoin FL 6801 Collins Central from including these expenses as part of the 2014 Non-Retail Shared Facilities Budget. Plaintiffs also request an order for payment of their costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT II

### CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF
### TO ENJOIN ASSESSMENTS FOR VALET PARKING SERVICES
### IN THE SHARED FACILITIES BUDGETS

#### Plaintiffs v. All Defendants

60.     Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set forth.

61.     This Count seeks declaratory relief pursuant to Section 86.011, *Fla. Stat.*, and injunctive relief as authorized by Section 26.012(3), *Fla. Stat.*

62.     The Master Declaration provides that the three Condominium Towers will share in the assessment of costs of maintenance and repair of the Non-Retail Shared Facilities. *See* Declaration, Section 16.3.

63.     Section 16.3 of the Master Declaration provides:

With respect to the Non-Retail Shared Facilities, upon submission of the Condominium South Lot, Condominium Central Lot and Condominium North Lot to this Declaration, and otherwise as set forth below, the Condominium South Lot shall be assessed 25%, the Condominium Central Lot shall be assessed 29% and the Condominium North Lot shall be assessed 46% of the total estimated charges and expenses for the repair, replacement, improvement, maintenance, management, operation, alteration, relocation and/or insurance of, reserves (if determined to be maintained in the sole discretion of the Hotel Lot Owner) for, and taxes on, the Non-Retail Shared Facilities. **For purposes hereof, the following shall be deemed part of the expenses attributable to the Non-Retail Shared Facilities**: (1) the costs and expenses of maintaining, repairing and/or replacing as necessary the seawall located upon or adjacent to (even If beyond the legal boundaries of) the Hotel Lot; (2) the costs and expenses of installing, maintaining, repairing, restoring,

16

renourishing and/or replacing of the beach/dune systems, and any crosswalk or crossover structures to and from the beach located upon or adjacent to (even if beyond the legal boundaries of) the Hotel Lot; (3) the costs and expenses of providing services to Owners (and their guests, tenants and invitees) on the beach located upon or adjacent to (even if beyond the legal boundaries of) the Hotel Lot (without imposing any obligation on the Hotel Lot Owner to provide such services) and **(4) the Garage Costs**.

*See* Declaration, Section 16.3 (emphasis added).

64.   Section 1.1(z) of the Master Declaration defines "Garage Costs" as:

"Garage Costs" shall mean and refer to a portion of the expenses incurred by, or on behalf of, the Hotel Lot Owner for the operation, maintenance, repair, replacement, insurance and/or alteration of the parking structures and/or facilities located within the Hotel Lot, said portion to be equal to a fraction, the numerator of which is the number of Condominium Units then located within The Properties, and the denominator of which shall be equal to total number of parking spaces then located within the parking structures and/or facilities located within the Hotel Lot.

*See* Declaration, Section 1.1(z).

65.   Article 17 of the Master Declaration further provides, with respect to parking:

All of the parking areas for the use of the Hotel, Retail, Condominium North, Condominium South and Condominium Central Lots are located within the Hotel Lot…. it is initially intended that **all parking shall be by valet only and that there shall be no self-parking permitted within the parking facilities at any time. The Declarant, as the initial owner of the Hotel Lot, agrees that at no additional charge, it shall provide the non-exclusive use of one parking space for each Unit within the Condominium South Lot and the Condominium North Lot and for each Traditional Unit within the Condominium Central Lot**….

The Hotel Lot Owner shall maintain in good repair, and shall replace as often as necessary, the parking garage portion of the Hotel Lot, all such work to be done as determined and ordered by the Hotel Lot Owner.

*See* Declaration, Sections 17(1) and (3) (emphasis added).

66.   Valet service, has been at all times, and currently is, the only method of parking provided for the Property. *See* Rules, Article III ¶ 1.

67.   According to the terms of the Master Declaration, the Garage Costs are assessed against the three Condominium Towers according to the methodology set forth in Section 16.3, as part of the Non-Retail Shared Facilities assessments. *See* Declaration, Section 16.3.

68.    In 2009, 2010, and 2011, the expenses for "Valet Parking Services" were included in the Non-Retail Shared Facilities assessments.

69.    Beginning in 2012, however, the cost of Valet Parking Services was included as part of the "contract expenses" in the Shared Facilities assessments for each of the three Condominium Towers.

70.    The Hotel Lot Owner's inclusion of Valet Parking Services as a contract expense in the Plaintiffs' Shared Facilities assessed charges is improper and violates the Unit Owners' rights as created by Section 16.3 of the Master Declaration.

71.    A controversy exists sufficient for this Court to construe the Master Declaration to declare whether the Hotel Lot Owner may permissibly include valet parking costs as Shared Facilities assessments, or whether the Valet Parking Services are Garage Costs which should be assessed as part of the Non-Retail Shared Facilities.

72.    The Hotel Lot Owner's continued assessment of unauthorized parking costs against Plaintiffs would cause irreparable harm and would violate the Master Declaration.

73.    Plaintiffs are in doubt as to their rights under the Master Declaration and are entitled to have that doubt removed by a declaratory judgment of this Court.

74.    Plaintiffs have no adequate remedy at law to prevent the continued, improper assessments of the valet parking costs as a contract expense for the Shared Facilities or to prevent the Hotel Lot Owner from its continuing violation of the Master Declaration.

75.    Plaintiffs join the Master Association and the North Tower as nominal Defendants because they will be affected by any ruling relating to the Master Declaration.

WHEREFORE, Plaintiffs respectfully request that the Court declare that the actions taken by FL 6801 Collins Central in assessing the Valet Parking Services costs as part of the Shared

18

Facilities expenses, and not as part of the Non-Retail Shared Facilities expenses, violates the

Master Declaration.  Plaintiffs also request that the Court enjoin FL 6801 Collins Central from

assessing the Valet Parking Services costs as part of the Plaintiffs' 2014 Shared Facilities

budgets. Plaintiffs also request an order for payment of their costs, expenses, attorneys' fees, and

such other relief as the Court deems just and proper.

**COUNT III**

**CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF
RELATING TO ASSESSMENTS FOR UTILITIES**

**Plaintiffs v. All Defendants**

76.    Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set

forth.

77.    This Count seeks declaratory relief pursuant to Section 86.011, *Fla. Stat.*, and

injunctive relief as authorized by Section 26.012(3), *Fla. Stat.*

78.    Section 16.3 of the Master Declaration provides, in relevant part:

> Notwithstanding the allocations set forth above, to the extent that any utility consumption
> charges are part of the costs attributable to the Shared Facilities and those charges can
> reasonably be allocated to the particular Lots based upon actual consumption, then in
> such event, the utility consumption charges shall be allocated based upon actual
> consumption, rather than by the percentage allocations described above.

*See* Declaration, Section 16.3.

79.    Despite the language of Section 16.3 requiring that utility costs be reasonably

allocated based on actual usage, the Hotel Lot Owner has been assessing utilities expenses

against the Unit Owners purportedly based upon square footage.

80.    Specifically, the assessments charged to the Unit Owners for electricity, natural

gas, fuel, water, sewer, and solid waste disposal have been purportedly based upon a percentage

19

allocation between the total amount of residential condominium square footage (81%) and the amount of square footage of the revenue-generating areas of the Property (19%) ("81/19").

81.     This purported square-footage allocation of utilities, rather than an allocation based upon usage, violates the Plaintiffs' rights as created by Section 16.3 of the Master Declaration, because the charges can be reasonably allocated to the particular lots based upon consumption.

82.     A controversy exists sufficient for this Court to construe the Master Declaration to declare whether the Hotel Lot Owner may assess the utility costs against the Unit Owners based upon a square-footage methodology of allocation, rather than according to usage based on actual consumption, as required by the Master Declaration. *See* Declaration, Section 16.3.

83.     The Hotel Lot Owner's continued assessment of utility costs based upon a purported square-footage allocation methodology would cause irreparable harm to Plaintiffs and would violate the Master Declaration.

84.     Plaintiffs are in doubt as to their rights under the Master Declaration and are entitled to have that doubt removed by a declaratory judgment of this Court.

85.     Plaintiffs have no adequate remedy at law to prevent the continued, improper mis-allocation of utilities assessments or to prevent the Hotel Lot Owner from its continuing violation of the Master Declaration.

86.     Plaintiffs join the Master Association and the North Tower as nominal Defendants because they will be affected by any ruling relating to the Master Declaration.

WHEREFORE, Plaintiffs respectfully request that the Court declare that the actions of FL 6801 Collins Central in assessing costs for utilities based upon a purported square-footage allocation methodology instead of based upon usage violate the Master Declaration. Plaintiffs

also request that the Court enjoin the Hotel Lot Owner from implementing the assessments for utilities based upon square footage as set forth in the 2014 Shared Facilities Budgets. Plaintiffs also request an order for payment of their costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

**COUNT IV**

**CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF RELATING TO THE REDUCTION OF PERMITTED OCCUPANTS PROVIDED SPA ACCESS**

**Plaintiffs vs. All Defendants**

87.     Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set forth.

88.     This Count seeks declaratory relief pursuant to Section 86.011, *Fla. Stat.*, and injunctive relief as authorized by Section 26.012(3), *Fla. Stat.*

89.     In connection with the purchase of their units, the Unit Owners in each of the Condominium Towers were given a Prospectus by the developer which sets forth certain features that the condominiums will possess, along with the applicable rules for use of the properties. The Prospectus also provides limits to the assessments that the Hotel Lot Owner may charge Unit Owners for the Shared Facilities within the Hotel and Spa community.

90.     The Central Tower Condominium prospectus, a copy of which is attached as **Exhibit 4**, and the South Tower Condominium prospectus, a copy of which is attached as **Exhibit 5** (collectively, the "Prospectus"), provide that, in addition to the assessments to the Condominium Association and the Master Association, each Unit Owner shall be obligated for payment of sums to the Hotel Lot Owner for use and enjoyment of the Shared Facilities which fees are described in the Prospectus. *See* Prospectus, at p. 1.

21

91.    The Prospectus also states that an Access Fee may be required for persons who are not "Permitted Occupants" in order to be able to use the Spa facilities. *See* Prospectus, at p. 7.

92.    The Prospectus provides for the following payment of Access Fees in connection with the use of the Spa facilities:

Access Fees:  In furtherance of the rights of the Hotel Lot Owner to establish and implement rules, regulations and procedures for the orderly use of the Spa (as defined in the Master Covenants), each Owner, by acceptance of a deed or other conveyance of a Unit, shall be deemed to agree to pay a daily "Access Fee," which shall be imposed, and paid to the Hotel Lot Owner, any time a Unit is occupied by persons who are not "Permitted Occupants" (as hereinafter defined). **The payment of the Access Fee shall be a precondition to permitted use of the Spa by persons desiring use of the Spa who are not Permitted Occupants....**

**For the purposes of this Section, each Unit Owner shall submit in writing to the Hotel Lot Owner, a list of not more than eight (8) individuals, who shall be deemed the Permitted Occupants of the Unit. If the Unit Owner intends to utilize the Unit and have access to the Spa without being required to pay an Access Fee, the Owner must include itself on the list....**

*See* Prospectus, p. 7 (emphasis added).

93.    The Prospectus thus provides that Unit Owners may submit a list of eight (8) Permitted Occupants for each unit who are not required to pay an Access Fee for access to the Spa. *See* Prospectus, p. 7.

94.    However, the Rules limit the number of Permitted Occupants allowed to use the Spa on a daily basis to two (2) Permitted Occupants for one-bedroom units, with an additional Permitted Occupant allowed Spa usage for each additional bedroom in the unit, which limitation and restriction is not included in the Prospectus and therefore is unauthorized by the governing documents. *See* Rules, Article V ¶ 2.

95.    The Rules provide, in Article V:

Usage of Spa facilities by Permitted Occupants of a Condominium Unit cannot exceed Legal Occupancy Limits within any one (1) calendar day.  Accordingly, **although the Permitted Occupant List may include eight (8) persons, if the Condominium Unit**

22

**contains only 1-bedroom, only two (2) Permitted Occupants of the Condominium Unit can use the Spa facilities within any one (1) calendar day.**

*See* 2014 Rules, Article V ¶ 2 (emphasis added).

96.    This reduction in the number of Permitted Occupants allowed to access the Spa facilities on a daily basis is in direct conflict with the rights of Unit Owners set forth within the Prospectus for each Condominium, upon which the Unit Owners relied in purchasing their units. *See* Prospectus, p. 7.

97.    A controversy exists sufficient for this Court to construe the Rules to declare whether the Hotel Lot Owner may limit the number of Permitted Occupants allowed daily access to the Spa below the eight (8) Permitted Occupants provided for in the Prospectus.

98.    The Hotel Lot Owner's limitation of the number of Permitted Occupants permitted access to the Spa on a daily basis without incurring additional and unjustified daily Access Fees causes irreparable harm and violates the Prospectus.

99.    Plaintiffs are in doubt as to their rights under the Rules and Prospectus and are entitled to have that doubt removed by a declaratory judgment of this Court.

100.    Plaintiffs have no adequate remedy at law to prevent the Hotel Lot Owner from implementing Article V, Paragraph 2 of the Rules to limit or restrict the number of persons on the Unit Owner's Permitted Occupants List which are allowed access to the Spa on any one calendar day or to prevent the Hotel Lot Owner from its continuing violation of the Prospectus.

101.    Plaintiffs join the Master Association and the North Tower as nominal Defendants because they will be affected by any ruling relating to the Rules, Declaration or Prospectus.

WHEREFORE, Plaintiffs request that the Court declare that Article V, Paragraph 2 of the Rules violates the Prospectus. Plaintiffs also request that the Court enjoin FL 6801 Collins Central from implementing Article V, Paragraph 2 of the Rules. Plaintiffs also request an order

for payment of their costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT V

### CLAIM FOR DAMAGES FOR BREACHES OF THE MASTER DECLARATION

#### Plaintiffs vs. FL 6801 Collins Central

102.   Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set forth.

103.   Since 2009, the Hotel Lot Owner has assessed unauthorized charges against the Unit Owners, in violation of Section 16 of the Master Declaration.

104.   First, the Hotel Lot Owner has included certain Spa and Hotel-related unauthorized expenses in the Non-Retail Shared Facilities assessments including, but not limited to, the following: (a) Spa Attendant; (b) Spa expenses; (c) Fitness Instructors; (d) Office Expense Fitness; (e) Spa Expense Supplies; (f) IT Systems & Technology Share; (g) Concierge; and (h) Contingency.  None of these charges are included in the Non-Retail Shared Facilities, as defined by the Master Declaration, and therefore these charges are unauthorized and violate the Master Declaration. See Declaration, Section 16.

105.   Next, the Hotel Lot Owner has violated Section 16.3 of the Master Declaration by charging "Garage Costs," such as for Valet Parking Services, as contract expenses in the Shared Facilities assessments, instead of including such costs in the Non-Retail Shared Facilities Budget.  *See* Declaration, Section 16.3.

106.   In addition, the Hotel Lot Owner has breached Section 16.3 of the Master Declaration by assessing utility expenses against the Unit Owners purportedly based upon a

24

square-footage methodology of allocation, rather than by allocating such expenses based upon usage, as required by Section 16.3 of the Master Declaration. *See* Declaration, Section 16.3.

107.    These violations of the Master Declaration have directly caused Plaintiffs to sustain damages in an amount in excess of $8.7 million, through and including 2014, and such damages are continuing to accrue with the implementation of the 2014 Budgets which became effective on January 1, 2014.

108.    In addition, the Non-Retail Shared Facilities assessments and the Central and South Shared Facilities assessments for the years 2009 through 2013, and the 2014 budgets for the Non-Retail Shared Facilities and the Central and South Shared Facilities, reflect questionable charges of approximately $20.3 million which are not supported by sufficient information to verify the accuracy of the expenses or the methodology used to allocate the expenses.

WHEREFORE, Plaintiffs request a judgment against FL 6801 Collins Central in an amount in excess of $8.7 million dollars or a greater amount to be proven at trial.  Plaintiffs also request an order for payment of their costs, interest, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

**COUNT VI**

**CLAIM FOR SPECIFIC PERFORMANCE FOR BREACH OF
SECTION 16.8 OF THE MASTER DECLARATION**

**Plaintiffs vs. FL 6801 Collins Central**

109.    Plaintiffs incorporate the allegations in Paragraphs 1 through 41 as if fully set forth.

110.    Section 16.8 of the Master Declaration provides:

Financial Records.  The Hotel Lot Owner shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration, and relocation of the

General, Non-Retail, Condominium North, Condominium Central and Condominium South Shared Facilities, including the then current budget and any then proposed budget (the "Facilities Records"). The Facilities Records need not be audited or reviewed by a Certified Public Accountant. The Facilities Records shall at all times, during reasonable business hours, be subject to the inspection and audit of any Member of the Association.

*See* Declaration, Section 16(8).

111.   On December 27, 2013, Plaintiffs, through the undersigned counsel, sent a letter to FL 6801 Collins Central, a copy of which is attached hereto as **Exhibit 6**, requesting to inspect certain of the Facilities Records. *See id.*

112.   In response, FL 6801 Collins Central's counsel sent a letter dated January 13, 2014, a copy of which is attached hereto as **Exhibit 7**. The letter contends that Plaintiffs had already been provided with "most of the documents" itemized in Plaintiffs' December 27, 2013 letter and asks Plaintiffs to identify with specificity which additional records Plaintiffs are seeking. *See id.*

113.   However, the records provided by FL 6801 Collins Central in response to Plaintiffs' demands did not include balance sheets, records of revenue and receipts, evidence of payment of invoices, or information as to which cash accounts payments made to or from, and thus they failed to meet the requirements of Section 16.8. *See* Letter from Plaintiff's counsel dated February 7, 2014, a copy of which is attached hereto as **Exhibit 8**.

114.   By failing to produce the requested records, FL 6801 Collins Central has violated Section 16.8 of the Master Declaration.

115.   Plaintiffs have been damaged as a direct result of FL 6801 Collins Central's violation of Section 16.8 of the Master Declaration, but have no adequate remedy at law. Money damages will not replace the information within the requested Financial Records.

26

116.   Plaintiffs are thus entitled to specific performance of FL 6801 Collins Central's duties under the Section 16.8 of the Master Declaration.

WHEREFORE, Plaintiffs request that that the Court enter judgment against FL 6801 Collins Central for breach of Section 16.8 of the Master Declaration and order FL 6801 Collins Central to provide the Facilities Records to Plaintiffs.   Plaintiffs also request an order for payment of their costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

**BROAD AND CASSEL**

By:   _/s/ George G. Mahfood_
     George G. Mahfood
     Florida Bar No.:  0077356
     Amanda Star Frazer
     Florida Bar No.:  0043921

     One Biscayne Tower, 21st Floor
     2 South Biscayne Boulevard
     Miami, Florida 33131
     Telephone No.:  305.373.9427
     Facsimile No.:  305.995.6437
     Email: GMahfood@BroadandCassel.com

     *Counsel for Plaintiffs Central Carillon*
     *Beach Condominium Association, Inc. and*
     *South Carillon Beach Condominium*
     *Association, Inc.*