BROWN RUDNICK LLP
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

- and -

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 350-2414

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc., Central Carillon Beach*
*Condominium Association, Inc., and South Carillon*
*Beach Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 14-11691 (SCC) |
| FL 6801 SPIRITS LLC, *et al*., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-----------------------------------------------------------------X

**ASSOCIATIONS' SUPPLEMENTAL**
**OBJECTION TO:  (I) CONDUCT OF AUCTION;**
**(II) SELECTION OF SUCCESSFUL BIDDER AND**
**SECOND HIGHEST BIDDER; AND (III) TERMS OF PROPOSED SALE**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

BACKGROUND ...............................................................................................................8

    I.     Lehman's Historical Disregard For
           The Rights Of The Associations And Unit Holders. .............................................8

         a.     The Misrepresentation Regarding Canyon Ranch. ...................................8

         b.     Lehman Causes Canyon Ranch to
              Change Expense Allocations and Limit Access.......................................8

         c.     The HOAs' Pending Claims. ..................................................................10

         d.     Lehman's Bogus Claims. .......................................................................10

         e.     Debtors' Discovery Abuses. ...................................................................11

    II.    6801 Collins' Initial Bid.....................................................................................12

         a.     Partnership With Capella. ......................................................................13

    III.   The 6801 Collins Bid Had The Support Of The HOAs. .....................................13

    IV.   The Tainted Auction Process...............................................................................14

OBJECTION....................................................................................................................21

    I.     The Auction Process Was Tainted And The Debtors' and Lehman's Conduct
           Violated The Bidding Procedures Order................................................................21

    II.    The Proposed Sale To Z Capital Does Not Represent The Best Bid And Greatest
           Overall Benefit For The Debtors' Estates. ..........................................................27

         a.     The Z Capital Bid Is Illusory. ...............................................................29

         b.     The 6801 Collins Bid Is Materially Better Than The Z Capital Bid.........31

RESERVATION OF RIGHTS ...........................................................................................33

CONCLUSION.................................................................................................................35

**Page(s)**

<small>**CASES**</small>

C& J Clark America Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),
    92 B.R. 87 (Bankr. S.D.N.Y. 1988) .................................................................... 20, 27

Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),
    926 F.2d 1458 (5th Cir. 1991) ....................................................................................11

G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place
    Investments, L.P.),
    994 F.2d 744 (10th Cir. 1993) ....................................................................................27

In re After Six, Inc.,
    154 B.R. 876 (Bankr. E.D. Pa. 1993) ...................................................................27

In re Bakalis,
    220 B.R. 525 (Bankr. E.D.N.Y. 1998) ......................................................... 26, 28

In re Blue Coal Corp.,
    168 B.R. 553 (Bankr. M.D. Pa. 1994) .................................................................21

In re Blue Coal Corp.,
    59 B.R. 157 (Bankr. M.D. Pa. 1986) ...................................................................26

In re Crowthers McCall Pattern, Inc.,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...............................................................27

In re Enron Corp.,
    335 B.R. 22 (S.D.N.Y. 2005)...................................................................................26

In re Fin. News Network, Inc.,
    980 F.2d 169 (2d Cir. 1992) ...................................................................................26

In re General Insecticide Co., Inc.,
    403 F.2d 629 (2d Cir. 1968) ...................................................................................20

In re GSC,
    453 B.R 132 (Bankr. S.D.N.Y. 2011) .................................................................26

In re Med. Software Solutions,
    286 B.R. 431 (Bankr. D. Utah 2002).....................................................................27

In re Metaldyne Corp.,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009) ......................................................... 26, 27

In re Scimeca Foundation, Inc.,
    497 B.R. 753 (Bankr. E.D. Pa. 2013) ....................................................................... 27

Kabro Assocs of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill
    Assocs.),
    111 F.3d 269 (2d Cir. 1997) ................................................................................... 20

Munro Drydock, Inc. v. M/V Heron,
    585 F.2d 13 (1st Cir.1978) ................................................................................ 20, 26

Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.),
    554 F.3d 382 (3d Cir. 2009) ............................................................................. 11, 15

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

North Carillon Beach Condominium Association, Inc., Central Carillon Beach Condominium Association, Inc., and South Carillon Beach Condominium Association, Inc. (collectively, the "HOAs" or the "Associations"), by and through their undersigned co-counsel, hereby file this supplemental objection (the "Supplemental Objection") to: (i) the conduct of the auction (the "Auction") by the Debtors/Lehman;[1] (ii) the selection of Z Capital Partners, L.L.C. ("Z Capital") as the Successful Bidder and North Beach Development, LLC ("North Beach") as the Second Highest Bidder; and (iii) the terms of the proposed sale of the Assets to Z Capital.[2] The Supplemental Objection fully adopts and incorporates by reference the Associations' pending objections to the Sale Motion.[3] In support of the Supplemental Objection, the Associations respectfully represent as follows:

---

[1] The Debtors are indirect, wholly-owned subsidiaries of Lehman Brothers Holdings, Inc. ("LBHI").Lehman Ali Inc. ("Lehman Ali") is the sole member of PAMI ALI LLC ("PAMI," and collectively with Lehman Ali and LBHI, "Lehman"), which in turn is the manager and sole member of Debtor FL 6801 Spirits LLC ("Spirits"), the manager and sole member of affiliated Debtors, FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries," and collectively with Spirits, the "Debtors"). The reference to Debtors/Lehman is used to convey the HOAs' contention that Lehman controls the conduct of the Debtors.

[2] Capitalized terms used in this Supplemental Objection but not otherwise defined shall have the meanings ascribed to them in the *Order (A) Approving (i) Bidding Procedures, (ii) Form and Manner of Notices, and (iii) Form of Asset Purchase Agreement, Including Bid Protections; (B) Scheduling the Time, Date and Place for the Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Bidding Procedures Order"). See Docket No. 77.

[3] See *Objection to Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, Among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, Among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-Up Fee, (B) An Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and (C) Related Relief*, dated June 19, 2014 [Docket No. 52] (the "Associations' Preliminary Objection"), attached hereto (without amendments) as **Exhibit A**; and *The Associations' Objection to the Sale Motion*, dated August 14, 2014 [Docket No. 106] (the "Associations' Sale Objection"), attached hereto (without amendments) as **Exhibit B**.

1.     The HOAs represent the interests of some 580 unit owners (the "Unit Holders") at the award winning Canyon Ranch Hotel & Spa Miami Beach ("Canyon Ranch Miami" or the "Property"), a condominium hotel and spa development that was marketed as the nation's first luxury boutique hotel and spa dedicated to wellness and providing its owners with a unique and valuable life-style experience.[4]  The Unit Holders paid a premium price for their homes based on the availability of various first-class amenities and services and with the realization that the market value of their units was directly tied into maintaining the Canyon Ranch nameplate and associated life-style.  However, after Lehman took over the property, the Unit Holders and the HOAs consistently have had their reasonable expectations thwarted as Lehman sought to exit and enhance the value of its investment.  For years, Lehman orchestrated material and improper changes in the assessments charged to the Unit Holders and sought to unilaterally change the terms and conditions of their use and enjoyment of the 70,000 square-foot Spa and Wellness facility.

2.     In an effort to advance its own economic interests over the interests of the Unit Holders, prior to causing the filing herein, Lehman sought to terminate Canyon Ranch's management of the facility and bring in a new owner/operator over the objections of the HOAs. Lehman's improper and actionable conduct gave rise to the filing of two separate lawsuits currently pending in the State Courts in Florida (the "Florida Lawsuits").  According to Lehman, the Florida Lawsuits served to scuttle a deal that Lehman had pending for a sale of its interests. After commencement of the Florida Lawsuits, the HOAs were induced into entering into a

---

[4]     According to Canyon Ranch's promotional materials, *Travel & Leisure* readers consistently rate the Property on its list of Top 10 Destination Spas Overall in the "World's Best Awards" (2014, 2012, 2011, 2010) and American Airlines *Celebrated Living* magazine consistently recognizes the Property as both a Top 10 Spa and a Platinum Hotel in its annual Readers' Choice "Platinum List" – most recently, the Property ranked 3rd and 12th, respectively (2014).

standstill of the Florida Lawsuits so that the HOAs and Lehman could negotiate a deal for a purchase of the Property.

3.      The HOAs believe that Lehman conducted its negotiations for this contemplated out-of-court sale transaction in bad faith, and the day after the expiration of the standstill agreement, and without ever having filed an answer in the Florida Lawsuits, Lehman caused the Debtors to file their chapter 11 cases with a new "stalking horse" bidder for the Property.  As this Court is well aware, the stalking horse bid was premised, and made expressly conditioned upon, this Court's summary extinguishment of the Florida Lawsuits.

4.      What was always a two party dispute between the HOAs and Lehman is still a two party dispute, now cast in the guise of a chapter 11 process, albeit without any of the protections for creditors that chapter 11 contemplates.[5]  For example, no official creditors' committee was ever formed by the United States Trustee, despite the fact that any number of Unit Holders applied for a position on a committee in response to the solicitation notice.  Instead, the HOAs, not-for-profit Florida corporations, have been forced to bear their own significant expenses in attempting to prevent Lehman's self-serving and improper agenda.  Neither is there an independent debtor-in-possession in these cases looking out for the best interests of creditors. Instead, Lehman is in complete control and has dictated all of the Debtors' actions and positions.

5.      At the outset of these cases, the uneven playing field concocted and controlled by Lehman was, at least temporarily, evened out when two of the Unit Holders stepped up in an

---

[5]      The Unit Holders are the Debtors' single largest creditor body and their legitimate claims dwarf all other claims scheduled or likely to be filed in these cases.

effort to protect the interests of all of the other Unit Holders. Steven Roth ("Roth")[6] and Scott Prince[7] ("Prince" and, together with Roth, the "Interested Owners") determined to use their considerable resources and business acumen in an attempt to forge a consensus. A consensus was reached with the HOAs' support for maintaining the Canyon Ranch fitness and spa capabilities at the Property. At the same time the consensus called for a new hotel operator willing to participate in an acquisition of the "hotel lot" and manage the hotel and food and beverage operations alongside the Canyon Ranch spa. The Interested Owners arranged numerous meetings where qualified hotel operators were given the opportunity to present to the HOAs.

6. Furthermore, with the help of the Interested Owners, the HOAs made a concerted effort to avoid an ill-conceived and highly conditional auction by offering to sponsor a fully consensual plan of liquidation (the "Plan"). Toward that end, the HOAs provided the Debtors with a detailed plan term sheet and supporting Purchase and Sale Agreement. That proposed Plan would have resolved both pending and threatened litigation against the Debtors and Lehman, would have allowed the Unit Holders the ability to determine their own destiny with regard to the ownership and operation of the Hotel and Spa and would have provided a total or near-total recovery for all general unsecured creditors. Significantly, that Plan would have also

---

[6]     Steven Roth is the Chairman of the Board and Chief Executive Officer of Vornado Realty Trust. Mr. Roth has been Chairman of the Board since May 1981. He was the Chief Executive Officer from May 1981 through May 2009 and was reappointed on April 15, 2013. *Barron's Magazine*, in its March 2005, 2006 and 2007 issues named Mr. Roth one of the World's Thirty Most Respected CEO's. In its January 2006 issue on the Best CEO's in America, *Institutional Investor* magazine designated Mr. Roth as the top CEO in the REIT industry.

[7]     Scott Prince is the Founding Member of Prince Partners, L.P. and previously served as a Co-Managing Partner at SkyBridge Capital II, LLC from 2007 to January 2012. Prior to joining SkyBridge, Mr. Prince served as a Partner at Eton Park Capital Management from 2004 to 2007 and Goldman Sachs & Company from 1998 to 2004.

provided Lehman with a higher return on its equity than Lehman had demanded during the failed, pre-chapter 11 out-of-court resolution.

7.      Lehman rejected this Plan proposal, seeking both a higher equity return and, quite unreasonably, insisting that dismissal of the Florida Lawsuits with prejudice was a pre-condition to further discussions.  In light of Lehman's refusal to work with the HOAs and the Interested Owners toward a Plan, the Interested Owners partnered with a first class operator in the form of Capella Hotel Group, LLC ("Capella") and submitted what it believed was a fully Qualified Bid consistent with the Bidding Procedures Order.  That Qualified Bid was submitted by 6801 Collins Hotel LLC ("6801 Collins"), a Florida LLC consisting of its members, the Interested Owners and Asset Restructuring Group, LLC.[8]

8.      Lehman's domination and control of these cases, unchecked by an independent fiduciary representing creditor interests, has resulted in a rejection of a fully consensual Plan, as well as a tainted Auction process that cannot be approved by this Court.  The evidence to be elicited at a Sale Hearing will demonstrate that Lehman orchestrated an inappropriate Auction process in direct contravention of this Court's Bidding Procedures Order, and with complete disregard of the rights and legitimate interests of the participants at the Auction, to say nothing of the rights and interests of the Unit Holders.[9]  The Lehman anointed winning bid is nothing more than an artificially inflated free option that is extremely unlikely to close.  The illusory bid being promoted by Lehman was made by a self-styled distressed debt investor that has failed to identify a hotel or spa operator for the Property, let alone a first class operator that the Unit

---

[8]      The Qualified Bid of 6801 Collins contemplated that Capella – a world class hotel operator – would operate the hotel at the Property and was prepared to consider working with Canyon Ranch as the spa operator.

[9]      The HOAs have served certain discovery on Z Capital, North Beach, the Debtors, Lehman, CBRE and Canyon Ranch in anticipation of the Sale Hearing currently scheduled to be heard on September 12, 2014. The HOAs reserve all of their rights to supplement their objections following such discovery including the right to solicit assistance from this Court should the parties fail to comply with their discovery obligations.

Holders bargained for when they bought their homes.  The HOAs believe and intend to prove that Lehman caused the Auction to be conducted in direct violation of the Bidding Procedures Order in numerous respects so as to artificially increase the "cash only" aspect of the competing bids, including by:

- prohibiting potential bidders, under the threat of disqualification, from contacting the Associations;

- failing to disclose the basis for qualifying bids and failing to consult with the Associations about the requirements to qualify bids;

- failing to timely circulate Qualified Bids;

- inviting straw-man bidders to participate in the Auction, including a bidder who admitted to not having viewed the Property and a bidder who could not readily confirm that he did not collude prior to the Auction;

- failing to properly consult with the Associations with respect to the selection of the highest or best bid;

- prohibiting the Associations from making any statements at the Auction;

- failing to provide information about bidders' qualifications and prohibiting the Associations and Qualified Bidders from asking questions about other bidders at the Auction, including questions about the bidders' financial capacity and ability to operate a world-class condominium based hotel and spa facility;

- refusing to disclose various credits allocated only to certain bids at the Auction;

- refusing to consider improvements in bids based on non-cash considerations, thereby artificially boosting the cash component of the bids;

- closing the Auction as to cash bidding and then continuing to negotiate purchase price and terms with various bidders; and

- failing to timely announce the identity of or the terms and conditions of Successful Bidder so as to continue to negotiate and play bidders off one another.

9.      Unfortunately, this overview of Lehman's bad faith in connection with the Auction process reflects a continuing pattern of historical abuse of the Unit Owners' interests as detailed in the Associations' Preliminary Objection, the Associations' Sale Objection and as will

be demonstrated at trial. Given Lehman's conduct, the results of the Auction cannot be approved.[10] The culmination of Lehman's self-serving campaign is its selection of Z Capital as the purportedly highest Qualified Bid. Amazingly, the Debtors have yet to publically disclose the terms and conditions of its so-called winning bid. Indeed, the HOAs have been informed and, on that basis, believe, that Lehman has secretly negotiated with Z Capital after the close of the Auction and that Lehman has agreed to material modifications of the Z Capital Bid, including a new six month extension of the time within which the Debtors would be required to obtain the Favorable Resolution.

10. If true, this last-minute undisclosed and material change, taken by itself, renders the entire Auction process a nullity. All of the other bidders at the Auction were required to bid off the Stalking Horse Bid which required a resolution of the Florida Lawsuits sometime within the next six weeks. At a minimum, this undisclosed change in the bidding rules provided only to Z Capital serves to underscore the illusory nature of the Z Capital Bid and serves as a tacit acknowledgement that obtaining the Favorable Resolution will be an expensive, time consuming and uncertain condition that is likely not to be satisfied.

11. As described in detail below and will be demonstrated at trial, the Z Capital bid, as it is presently understood, is an inferior and illusory bid, unsupported by the HOAs which continue to believe that the bid submitted by 6801 Collins is the best bid by far.

---

[10] The HOAs believe that Lehman's pre- and post-petition conduct will warrant the equitable subordination of its claims against the Debtors.

# BACKGROUND

## I. Lehman's Historical Disregard For The Rights Of The Associations And Unit Holders.

### a. The Misrepresentation Regarding Canyon Ranch.

12. The Associations' history with Lehman is both complex and nightmarish. For years, Lehman has taken an adversarial approach in dealings with the Associations and Unit Holders. Individual units at the Property were marketed to prospective owners on Lehman's behalf with the express representation that Canyon Ranch had a fixed twenty-year contract to run the hotel and spa.[11] The offering memorandum for the purchase and sale of units, likewise, contained reference to Canyon Ranch's twenty-year term and were relied on by Unit Holders in purchasing units. In 2009, Lehman, without notice to the Associations, amended the Management Agreement with Canyon Ranch to enable the termination of Canyon Ranch's Management Agreement in direct contravention of the representations made in connection with the purchase of units.[12] In the absence of a prompt and proper resolution of these cases, the HOAs are committed to seeking redress for these false representations.

### b. Lehman Causes Canyon Ranch to Change Expense Allocations and Limit Access.

13. In the offering materials for the units, Lehman included operating budgets as a basis for the level of assessments against Unit Holders. These budgets failed to indicate that Lehman was paying some of the expenses outside of the budgets. While they were marketing the units, Lehman directed Canyon Ranch to allocate expenses in such a way as to minimize

---

[11] Attached hereto as **Exhibit C** is a "comfort letter" given to a buyer with the representation that Canyon Ranch had an initial twenty year contract to run the hotel and spa.

[12] Unit Holders and/or the HOAs are considering their potential claims against the Debtors, Lehman and their principals relating to certain misrepresentations and claims of fraudulent inducement in connection with the marketing of the units. These claims may amount to hundreds of millions of dollars.

charges that would be borne by Unit Holders so as to further induce their purchases of unsold units. Maintenance charges and other assessments skyrocketed immediately after Lehman sold almost all of the units and the Unit Holders found themselves facing maintenance and assessment fees dramatically higher than residents in condominiums in the same market place. Additionally, new restrictions were imposed on the Unit Holders' ability to utilize the facilities – none of which are appropriate under the governing documents. Earlier this year, the Debtors attempted to sell the Assets, without any regard for the interests of the Unit Holders, to a third party whose development plans entailed radically altering the character of the Property in violation of the Unit Holders' rights under the Declarations. See North Tower Compl. ¶ 33.

14. As set forth in more detail in the Florida Lawsuits, these newly imposed charges and restrictions directly conflict with the assessment charges and access called for under the governing documents. The improper assessments require additional forensic accounting to identify their ultimate quantum, but are at a minimum, in the tens of millions of dollars.[13]

15. The Unit Holders filed the Florida Lawsuits in response to the improper assessments and restrictions. The Florida Lawsuits seek recovery of the improper historical assessments and, critically, a declaratory interpretation of the governing documents to preclude Lehman and any new purchaser from continuing to levy improper assessments and impose undue restrictions upon the Unit Holders. It is a complex litigation, based on interpretations of dense condominium documents under Florida law that cannot be disposed of in the summary fashion

---

[13] While the Florida Lawsuits estimated the historic overcharges at some $8.7 million, the results of a recent forensic audit undertaken on behalf of the HOAs indicate the overcharges to be closer to no less than $16 million. The uncertainty of the damages has been occasioned by Lehman's refusal to produce documentation regarding the full extent of these overcharges.

proposed by the Debtors.[14]  To date, the Debtors have not formally answered the Florida Lawsuits.  Furthermore, it is the position of the HOAs that this Court lacks jurisdiction over the declaratory aspects of the Florida Lawsuits and that resolution thereof is not the proper subject matter of the Sale Motion.

### c.    The HOAs' Pending Claims.

16.    For years, Lehman has been extracting millions of dollars in unauthorized assessments against the Unit Holders in violation of the Declarations.  See Central/South Tower Compl. ¶ 30.  As described in the Central/South Tower Litigation, the Central and South Towers had identified at least $8.7 million in improper assessments as of the time of filing the Florida Lawsuits in February 2014.  To date, the aggregate amount of improper assessments is no less than $16 million dollars.  Each of the Central, South and North Towers has identified numerous improper assessments that will be detailed in either an amendment to the Florida Lawsuits or in their proofs of claims.[15]

### d.    Lehman's Bogus Claims.

17.    On March 12, 2014, just before the filing of the petitions herein, PAMI allegedly provided the Debtors with a $2 million "secured" loan (with $1.66 million outstanding as of the Petition Date), purportedly to pay insurance premiums at the Property.  However, upon information and belief, the allegedly secured transaction was the first time that the annual insurance premiums were charged to the Debtors, and the first time they were financed through a

---

[14]    In addition, the HOAs intend to seek to amend the Florida Lawsuits, or as part of their proofs of claims, to assert their rights and remedies under Chapter 720 of Florida Statutes, known as the "Homeowners' Association Law," which affords the HOAs control over annual budgets for the Property, maintenance imposed on the Unit Holders and reforms of the Declarations.

[15]    The Debtors disclose that the Property is losing approximately $3 million a year but, in reality, the HOAs believe it is losing close to double that, if not more, because of the improper assessments that inappropriately shift certain costs to the Unit Holders that should be borne by the operator.  This level of losses, the HOAs believe, ultimately will cause Z Capital to refuse to close on its illusory bid.

secured loan between the Debtors and Lehman.[16]   The insider transaction was structured so as to provide insurance coverage under Lehman's umbrella policy, with a unilaterally determined cost allocation to the Property.  To date, the Debtors have not provided any rationale or basis for the premium allocated to the Property or the historical costs of insurance coverage for the Property. The Associations are investigating potential claims for avoidance, recharacterization or equitable subordination of Lehman's allegedly secured claim.  See Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."), (quoting Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1465 (5th Cir. 1991)).

       e.    **Debtors' Discovery Abuses.**

18.    The Debtors have obstructed the Associations' investigation of Lehman's purportedly secured claim and other key discovery requested by the Associations.  The Associations' repeated requests for information from Lehman and the Debtors have been wrongfully ignored or responded to inadequately.  In particular, Lehman has refused to provide detailed accounting records regarding historic overcharges.  By letter dated June 11, 2014, the Associations sent the Debtors their first set of documents requests and a Rule 30(b)(6) notice of deposition.[17]   The Debtors did not provide the Associations with any of the requested information or make any representative available for a deposition.

19.    By letter dated July 14, 2014, the Associations requested "all insurance policy documents and other documents concerning the current and historical insurance premiums of the

---

[16]      Upon information and belief, Lehman had routinely paid these expenses out-of-pocket in each prior year, but changed course in 2014 with knowledge of the Debtors' impending bankruptcy.

[17]      A copy of the Associations' letter and first set of document requests is attached hereto as **Exhibit D**.

property and the payments thereof, including documents related to the insurance premium due in March 2014 that was paid for with the secured loan proceeds, as set forth in the first day declaration."[18]

20.     On August 15, 2014, the Associations sent Debtors' counsel an email reiterating its request for the information initially requested in the July 14, 2014 letter, as well as limited information from the June 11, 2014 document request pertaining to the allegedly secured Lehman claim.  Additionally, on August 15, 2014, the Associations sent a second Rule 30(b)(6) notice of deposition.[19]  To date, the Debtors have refused to make any representative available and have provided very limited responsive documents.[20]

## II.     6801 Collins' Initial Bid.

21.     Having failed to garner Lehman's support for a fully consensual Plan that would have satisfied all allowed claims in full and returned value to Lehman's equity interests, the Interested Owners, together with Cappella, submitted their Bid.  That Bid conformed to the Bidding Procedures Order and its terms were identical to the Stalking Horse Bid with the following essential differences:

    i.     *A Favorable Resolution of the Florida Lawsuits was not a condition to closing.* In other words, and confident in its ability to resolve all open issues with the HOAs, 6801 Collins committed to closing its bid without requiring the Florida Lawsuits to be extinguished;

    ii.     *Having a minimum number of hotel units committed to the Rental Management Program.* Since successful operation of the hotel requires a minimum number of Unit Holders committed to the Rental Management Program, the 6801 Collins

---

[18]     A copy of the Associations' letter to the Debtors is attached hereto as **Exhibit E**.

[19]     Copies of the Associations' August 15, 2014 email and discovery request are attached hereto as **Exhibit F**.

[20]      In connection with this Supplemental Objection, the Associations seek discovery and depositions from parties-in-interest, including, but not limited to Z Capital, North Beach, the Debtors, Lehman, CBRE and Canyon Ranch.

Bid was conditioned on having a threshold number of units committed to staying in the Rental Management Program;[21] and

iii. *A Purchase Price Adjustment*. The 6801 Collins Bid provided for two separate purchase price adjustments to be afforded if, and only if, they delivered to the Debtors a release of the Florida Lawsuits and a release of all claims from Canyon Ranch.

a. **Partnership With A World-Class Hotel Operator Willing To Keep Canyon Ranch On As Operator Of The Spa.**

22. The 6801 Collins Bid contemplates a partnership with a renowned, world-class hotel and spa operator, Capella Hotel Group, LLC. This going-forward operating strategy has the Associations' support and may include maintaining Canyon Ranch in the spa. By contrast, neither Z Capital nor North Beach has identified any potential hotel or spa operator and the Unit Holders are suffering the effects of the uncertainty both economically and as part of their quality of life.

23. Under these circumstances, any Unit Holder seeking to sell their units likely would be unable to find a buyer willing to undergo the uncertainty of who would operate the Spa, the Hotel or the common elements of the Property, and under what terms. If reported changes in the Z Capital Bid are true, this period of uncertainty is now scheduled to last as much as another six months, through and beyond the upcoming high season.

III. **The 6801 Collins Bid Had The Support Of The HOAs.**

24. The 6801 Collins Bid had the full support of the HOAs for numerous reasons. First, the Bid obviated the need for any litigation before this Court or the Florida State Courts to resolve the Florida Lawsuits. Releases with prejudice would be delivered at the closing of the anticipated sale. As reflected in the initial 6801 Collins Bid, such a dismissal would entitle 6801

---

[21] The HOAs have been inundated with comments from participants in the Rental Management Program to the effect that if a winning bidder did not meet their approval, they intended to remove their units from the Rental Management Program. Because Z Capital has not presented their plan for participation in the Rental Management Program that they would control, the HOAs believe that Z Capital will refuse to close should they fail to induce a critical mass of Unit Holderes to participate in their new Rental Management Program.

Collins to a credit of $5,277,500. Likewise, the Bid anticipated a settlement of the claims asserted by Canyon Ranch, although such settlement was likewise not a condition to closing. As reflected in the initial 6801 Collins Bid, if such releases were delivered at closing, an accomplishment that 6801 Collins and the HOAs were confident of achieving, there would be another purchase price credit in the amount of $1,377,500. Lehman improperly negotiated, in private, for a substantial reduction in these purchase price reductions.

25. The initial 6801 Collins Bid did contain a necessary condition to closing (since removed at Lehman's insistence) that all other bids did not contain related to the Rental Management Program. The Rental Management Program condition was necessitated because of the realization that, without a critical mass of hotel units, the hotel could not operate. 6801 Collins and the Associations are confident that the requisite number of Unit Holders would participate in a program sponsored by Capella.

## IV. The Tainted Auction Process.

26. On July 1, 2014, the Court entered its Bidding Procedures Order setting forth certain bidding procedures governing the sale of the Assets and the Auction.[22] Bids were due to the Debtors by August 14, 2014 at 4:00 p.m. (Eastern Time).

27. Despite being required to consult with the Associations on the highest or best bid in accordance with the Bidding Procedures Order and to distribute Qualified Bids no later than 11:00 a.m. on August 17, 2014, the Debtors did not consult with the Associations on the bid qualification process and did not provide the Associations copies of the purported Qualified Bids until late in the morning on August 18, 2014. The Debtors simply refused to provide the HOAs or any other bidder with even the most basic information regarding the purported Qualified Bids.

---

[22] The Bidding Procedures are attached as Exhibit A to the Bidding Procedures Order.

For example, no information regarding the identity or track record of the contemplated hotel or spa operator affiliated with the bids was ever provided. As a consequence, bidders were required to bid "cash only" without any basis on which to determine whether any of the other bidders were for real or just there to artificially jack up the cash portion of the bids.

28.     According to the Debtors, there were a total of seven purportedly Qualified Bids (including the Stalking Horse Bid). See August 19, 2014 Auction Tr. (the "Auction Tr.") at 12:7-17.[23] Among the purportedly Qualified Bids were the 6801 Collins Bid, the Z Capital Bid, and the North Beach Bid. See id.

29.     Beginning at 11:00 a.m. on August 19, 2014, at the offices of Lehman's counsel, Weil, Gotshal & Manges LLP, the Debtors commenced the Auction, under the complete domination and direction of Lehman. At the outset, only increases in the cash portion of the bids were accepted. Bidders were not permitted to offer changes in the conditions of their bids. As the HOAs will demonstrate at trial, most, if not all of the competing bids were illusory and the increase in the cash portion of the bids did not represent guaranteed cash available to the Debtors' estates but instead, in the view of the HOAs, represented puffed up numbers that would become meaningless if the bidder were either unable to close (entitling them to a return of their deposits)[24] or a refused to close (subjecting them to no worse a result than the loss of their deposit).[25]

---

[23]     The transcript of the Auction is attached hereto as **Exhibit G**.

[24]     For example, if the Favorable Resolution is not obtained by a date certain, Z Capital can refuse to close and would be entitled to a return of its deposit.

[25]     For example, if Z Capital were to determine that it could not obtain a critical number of units as part of its Rental Management Program and decided the hotel, therefor, would not be capable of turning a profit, it might refuse to close but forfeit its deposit.

30. Following the first round of the cash portion of the bidding process, the 6801 Collins Bid stood at $15 million in cash with its initial closing conditions and credits. The Z Capital Bid stood at $14 million and the North Beach Bid stood at $12.62 million. At that point there was a break, following which Lehman, through its Debtors' counsel, announced its conclusion that the $14.3 million bid by JJN Real Estate 3, LLC (the bid prior to the 6801 Collins' $15 million bid) was highest and best. It made this announcement without any consultation with the Associations, in complete derogation of the Bidding Procedures Order.

31. Then another break in the Auction ensued while all bidders, other than 6801 Collins were invited into a room marked "Lehman" for secret consultations with Lehman and the Debtors. During those consultations, the HOAs believe that Lehman fundamentally changed the conditions of the Auction for all participants other than 6801 Collins. Following the break, Debtors' counsel made the following statement:

> **Debtors' Counsel**: In our discussions with the other bidders, everyone is willing to let us litigate the pre-petition action claims, and so we will do that in the event you, [6801 Collins], are not the high bidder; and for everyone else, we were asked questions about how you are valuing, some of us are taking some contracts and other of us are not taking some contracts.
>
> The way we are going to do that is bid as though there were no contracts at all being assumed. None. Okay? None.
>
> And then whoever turns out to have the high numbers, we will give you an adjustment off that number based on any contracts you may be receiving.

See Auction Tr. 46:2-17.

32. Counsel for the HOAs and counsel for 6801 Collins asked about the changes but were denied answers. At this point, the proverbial uneven playing field was set in place by Lehman, as every bidder, other than 6801 Collins, presumably understood the implications of

bidding "as though there were no contracts at all being assumed" or what the value of "adjustments off that number" would be.

33.     Thereafter, a second round of cash only bids was solicited. During this second round of bidding, 6801 Collins made several bids reserving rights and credits on each bid, with its last bid at $19 million on terms substantially conforming to the Stalking Horse Purchase Agreement.

34.     Thereafter, the Debtors closed the auction with only three remaining bidders: Z Capital, North Beach and 6801 Collins. At this point, Lehman engaged in significant discussions with 6801 Collins in an attempt to extract further economic concessions as well as changes to their deal terms. Despite having purported to close the record on the Auction, negotiations continued with 6801 Collins through the following day and into the next. At this point, both the HOAs and 6801 Collins believed that the Debtors/Lehman had acknowledged the 6801 Collins Bid as the winning bid, subject only to certain clarifications. However, on August 21, 2014, contrary to the Associations recommendation that 6801 Collins had the best bid, the Debtors selected Z Capital as the Successful Bidder and North Beach as the Second Highest Bidder. See Docket No. 113.

35.     The Debtors did not disclose the terms of Z Capital's Successful Bid or North Beach's Second Highest Bid until 12:06 p.m. on August 26, 2014, less than four hours prior to the Supplemental Objection Deadline. This Supplemental Objection is based on the Z Capital and North Beach Purchase Agreements provided by the Debtors to the Associations on August 18, 2014 and the Purchase Agreement of 6801 Collins submitted to the Debtors and the Associations on August 20, 2014. The Associations expressly reserve all rights to supplement

this Objection upon a complete review of the proposed Z Capital and North Beach Purchase Agreements.

36.     The below chart summarizes the material differences between the Purchase Agreements for 6801 Collins, Z Capital, and North Beach

| | **6801 Collins** | **Z Capital** | **North Beach** |
|---|---|---|---|
| *Purchase Price* | $19 million (subject to certain purchase price credits at closing for obtaining releases from the Associations (approx. $2 million)). | $21.6 million (subject to undisclosed credits). | $21.5 million (subject to undisclosed credits). |
| *Favorable Resolution Closing Condition* | None. | Debtors must obtain Favorable Resolution of Associations' Litigations as a condition precedent to closing.  See Purchase Agreement § 10(d)(vi). | Debtors must obtain Favorable Resolution of Associations' Litigations as a condition precedent to closing.  See Purchase Agreement § 10(d)(vi). |
| *Association Releases* | Contemplates releases from Associations upon closing. | None. | None. |
| *State Court Actions* | Contemplates dismissal of State Court Actions upon closing. | Does not contemplate dismissal of State Court Actions. | Does not contemplate dismissal of State Court Actions. |
| *Proposed Hotel and Spa Operator* | Capella Hotel Group LLC | None. | None. |
| *Canyon Ranch* | Contemplates maintaining Canyon Ranch as manager of the spa facilities. | Assumption or rejection of Canyon Ranch Agreements subject to determination by Z Capital. | Rejection of Canyon Ranch Agreements. |
| *Contract Assumption* | $500,000 credit for assumed contracts. | Undisclosed credit for assumed contracts. | Undisclosed credit for assumed contracts. |
| *Closing Date* | No later than December 1, 2014. | No later than November 24, 2014; | No later than November 24, 2014; provided, |

18

| | 6801 Collins | Z Capital | North Beach |
|---|---|---|---|
| | | provided, however, that Z Capital has ability to terminate agreement if Favorable Resolution condition is not satisfied by October 28, 2014.[26] | however, that North Beach has ability to terminate agreement if Favorable Resolution condition is not satisfied by October 28, 2014. |

37. Post-Auction, Lehman continued to play Z Capital's Bid off of 6801 Collins' Bid and solicited additional cash consideration and other concessions from 6801 Collins. These demands included, not only additional cash consideration for the benefit of Lehman's equity interests, and the dismissal with prejudice of the Florida Lawsuits, but brand new demands for up-front releases from each of the HOAs of any and all other claims it and each of the Associations individual Board Members could have against the Debtors and Lehman.

38. At Lehman's request, late in the night on August 20, 2014, 6801 Collins delivered a revised purchase agreement. The terms included a $19 million purchase price, less a revised $2 million closing adjustment for delivery at closing of the releases of the Associations' claims and dismissal of the Florida Lawsuits. The 6801 Collins' purchase agreement substantially conformed to the Stalking Horse Purchase Agreement, did not contain a Favorable Resolution closing condition, and also removed any closing condition related to a minimum number of units participating in the Rental Management Program.

39. Lehman responded by demanding a lesser closing credit for the releases, cost sharing with respect to any allowed Canyon Ranch claim, an indemnity for any substantial contribution claims asserted by the HOAs, and the immediate "hell or high water" releases from the Associations unless the Sellers were found by a final court order to have breached the

---

[26] As indicated above, the HOAs have been informed that Lehman secretly negotiated a substantial increase for Z Capital's benefit extending the time for satisfaction of this closing condition.

purchase agreement. In addition to these post-Auction demands, Lehman then heaped on a request that 6801 Collins deliver releases of the Debtors **and Lehman** from the Interested Owners in their individual capacity and releases by individual Board Members of the Associations and residents that Lehman characterized as "trouble-makers." While 6801 Collins again attempted to improve its offer, Lehman would not agree to move forward with 6801 Collins on the basis that the releases would be delivered and effective as of closing. Instead, once again, Lehman turned its back on the Debtors' creditors and Unit Holders in pursuit of its own pecuniary interests.

40. Lehman's last-minute demand for releases running to itself was never part of the Auction process or part of this Court's Bidding Procedures Order and these demanded insider releases are just further evidence that the Auction was conducted in an improper fashion.

41. The gambit to benefit the Debtors' equity owners through ever increasing economic demands and demands for insider releases has a direct negative impact on the current value of the units and the Unit Holders' ability to sell their units at fair market value. The critical high season is fast approaching and the Unit Holders require and deserve to influence the outcome of these cases. The optimum case result is to close a sale transaction that benefits the Debtors, their creditors and the Unit Holders. The best bid for such a transaction is the 6801 Collins Bid. Ultimately, the last minute demand for immediately effective releases in favor of insiders was a final breaking point for 6801 Collins and negotiations ended.

## OBJECTION

I. **The Auction Process Was Tainted And The Debtors' and Lehman's Conduct Violated The Bidding Procedures Order.**

42. Protecting the sanctity and fairness of the auction process is of critical importance in bankruptcy. See Kabro Assocs of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 273-74, 30 (2d Cir. 1997). Courts should not approve a proposed sale if the integrity of the auction process was tainted by misconduct and inequity. See C& J Clark America Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988) ("The federal courts have long been concerned with the integrity of the bankruptcy sale process. Mindful of the need to engender stability and integrity of the sale process, the bankruptcy courts will uphold regularly conducted sales unless they are tinged with fraud, error or similar defects which would in equity affect the validity of any private transactions.") (citing In re General Insecticide Co., Inc., 403 F.2d 629, 630-31 (2d Cir. 1968)); see also Munro Drydock, Inc. v. M/V Heron, 585 F.2d 13, 14 (1st Cir.1978) ("It is important, in the ordinary case, to honor the expectations of those bidding at the sale.").

43. "Objections sufficient to defeat confirmation of a 363 Sale include unfairness toward bidders, stifling of competition, . . . sham bidding or 'puffing,' . . . and interference with the orderly conduct of the sale. See In re Blue Coal Corp., 168 B.R. 553, 561 (Bankr. M.D. Pa. 1994) (quoting 4B Collier on Bankruptcy (14th Ed.), ¶ 70.98, page 1183-1193)).

44. Lehman, through its puppet Debtors, conducted an Auction process plagued by impropriety and a reckless disregard for the interests of the Associations and Unit Holders. Specifically, the Bidding Procedures Order required the Debtors to:

- fully disclose all material terms of each Qualified Bid to all other bidders through the entire Auction;

- circulate all Qualified Bids no later than two days prior to the Auction;

- consult with the Associations in the evaluation of all Qualified Bids and the highest or best bidder;

- obtain information with respect to all Qualified Bidders' capacity to close;

- consider bids that included cash as well as non-cash consideration, such as releases of claims; and

- announce the Successful Bidder and Second Highest Bidder no later than the day immediately following the Auction.

See Bidding Procedures at 4-8. The Debtors failed on each of these requirements in violation of the Bidding Procedures Order.

45. The Debtors refused to disclose critical information about each Qualified Bidders' experience operating a world-class hotel or spa, or their financial wherewithal to close the transaction contemplated in their bid, despite being required to do so under the Bidding Procedures Order:[27]

> **6801 Collins' Counsel**: While we are going around to all bidders, I think it would be helpful as a bidder to have a little bit of background for each bidder to know who they are and the buildings they manage.

> **Debtors' Counsel**: No. We are here to hear numbers, dollars. Okay. We are not here to have speeches about everybody's background.

See Auction Tr. 18:10-17.

> **Associations' Counsel**: It's the debtor's position that the remaining bidders . . . are not entitled to . . . ask questions about the bidders' qualifications. . . . So, for example, questions about whether they have run a hotel property before; whether they have run a spa before; whether they are properly capitalized; whether they have done any due diligence, all of these questions that one bidder may have for another are not fair game today? Is that my understanding?

---

[27] Pursuant to the Bidding Procedures, the Debtors required all Qualified Bidders to provide "satisfactory evidence, in the opinion of the Debtors, in consultation with the [Associations], of the Qualified Bidder's ability to (a) fund the purchase price proposed by the Qualified Bidder with cash on hand (or sources of immediately available funds) . . ., and (b) otherwise perform all transactions contemplated by the Qualified Bid." See Bidding Procedures at 4.

**Debtors' Counsel**:  That's right.

See Auction Tr. 30:19-31:11.

46.     Further, throughout the Auction, the Debtors refused to allow the Associations to

make any statements and limited the Associations' questions.

> **Associations' Counsel**:  I have a question of counsel.  The contract assumption [credits], is there a maximum amount that you are aware of, of purchase price reductions with regard to the contracts?
>
> **Debtors' Counsel**:  [Y]ou are here as an observer.
>
> **Associations' Counsel**:  I am here as a party in interest.  Do you know the answer . . .?
>
> **Debtors' Counsel**:  I am not answering that.

See Auction Tr. 50:5-19.

> **Debtors' Counsel**:  [The Associations] are here to observe, not to speak.
>
> **Associations' Counsel**:  No, I was supposed to be here to coordinate with you.  I don't understand . . . the bidding.  I don't understand what the credit is that people are to get on the contracts.
>
> **Debtors' Counsel**:  You know what?  You are not a bidder.

 See Auction Tr. 51:5-13.

47.     Throughout the Auction, the Debtors repeatedly refused to disclose material terms

of the bids, despite numerous requests for clarification at the Auction.

> **Associations' Counsel**:  You indicated the [Purchase Agreements] for five of the six bidders were substantially identical. . . . To what extent, if any, was the sixth bid not essentially identical?
>
> **Debtors' Counsel**:  Everybody saw it.  Everybody read it.  It's not for me to describe it.

See Auction Tr. 32:2-11.

> **Counsel for Bidder**:  What's the better bid in terms of cash?
>
> **Debtors' Counsel**:  That's not for us to say. . . . [Y]ou know how to read their agreement.  We did.

See Auction Tr. 39:13-18.

> **6801 Collins' Counsel**:  You are not telling us how our bid [with potential releases] compares to the [high bid].
>
> **Debtors' Counsel**:  We absolutely are.  You're less favorable.
>
> **6801 Collins' Counsel**:  By how much?
>
> **Debtors' Counsel**:  It doesn't matter.

See Auction Tr. 46:24-47:8.

> **Counsel for Bidder**:  [M]y understanding was that [the 6801 Collins Bid] was a combination of credit and cash.  So in order to properly determine what the next bid should be, I am just trying to understand:  Does the debtor valuate their bid as being worth 15 million or is it something less than 15 million?
>
> **Debtors' Counsel**:  I tell you what, the debtor now will take a ten-minute break.

See Auction Tr. 40:8-16.

48.     Under the Bidding Procedures, the Associations were guaranteed consultation rights with respect to the evaluation of bids at the Auction.  The Debtors' refusal to allow the Associations to fully participate in the Auction process effectively deprived the Associations of their consultation rights to evaluate Qualified Bids in contravention of the clear terms of the

Bidding Procedures Order and the Debtors' representations on the record at prior hearings in these cases.[28]

49.     Under the Bidding Procedures Order, the Debtors were required to consider "forms of consideration that include cash and non-cash consideration, including, without limitation, releases of claims, or a combination of cash and other distributable forms of non-cash consideration . . . ."[29]  However, the Debtors refused, during the "cash only" portion of the Auction to consider bids in a form other than cash and then negotiated the purchase price and other terms behind closed doors and without any consultation with the Associations.

> **Associations' Counsel**:  [Y]ou indicated that bidding is going to proceed in $100,000 increments.  Will the debtor[s] also consider as an alternative to the price, changes in conditions?
>
> **Debtors' Counsel**:  Not at this time.

See Auction Tr. 29: 3-7.

> **Counsel for Bidder**:  Has the debtor given any credit with respect to any terminations of contracts or acceptance of contracts . . . ?
>
> **Debtors' Counsel**:  No.  This is cash.

See Auction Tr. 35:15-19.

50.     Finally, under the Bidding Procedures, the Debtors were required to announce the Successful Bidder and Second Highest Bidder "in no event later than one (1) business day after

---

[28]     See Bidding Procedures at 4 ("A 'Qualified Bid' is a Potential Bidder that delivers a binding bid that . . . includes a bid under terms which the Debtors, and should a Committee be formed, **in consultation with said Committee (or the Associations if the Associations are not a Qualified Bidder)**, believe to be higher or better than the [360 Miami Bid]") (emphasis added); see also June 30, 2014 Hr'g Tr. 13:23-14:3 ("[The Debtors have] also agreed that . . . to the extent that the [A]ssociations do not make a qualified bid then **we've granted the [A]ssociations consultation rights with respect to the evaluation of qualified bids**.") (emphasis added).

[29]     See Bidding Procedures at 4.

the close of the Auction."[30]  The Debtors did not announce the Successful Bidder and Second Highest Bidder until August 21, 2014, two days after the close of the Auction, and did not disclose the proposed Purchase Agreements until less than four hours prior to the Supplemental Objection Deadline.[31]  The Debtors violated this provision of the Bidding Procedures Order to allow Lehman to shop offers post-Auction and attempt to squeeze additional cash and other beneficial terms out of 6801 Collins, and against the recommendations of the Associations that the 6801 Collins Bid was the best bid on the table and ready to move forward.

51.    Perhaps most egregiously:  (i) Lehman provided Z Capital a material extension of the time period in which to obtain satisfaction of the Favorable Resolution condition, an extension not provided to any other bidder at the Auction; (ii) Lehman conditioned the 6801 Collins Bid on the provision of immediately effective releases for itself (an insider), again a condition not required of any other bidder during the Auction; and (iii) continuously sought a greater return for its equity interests beyond the point of obtaining enough value to pay or otherwise satisfy creditors in full.

52.    Based on the Debtor/Lehman's improper conduct throughout the Auction process, the Court should deny the Sale Motion, equitably subordinate all of Lehman's claims and instruct the Debtors to proceed with the sale to 6801 Collins or to continue to negotiate a fair transaction and equitable case outcome.

---

[30]      See Bidding Procedures at 8.

[31]      See *Notice of: (I) Successful Bidder and Second Highest Bidder at Auction for Sale of Debtors' Assets; (II) Status Conference on August 27, 2014; and (III) Adjournment of Sale Hearing to September 12, 2014*, dated August 21, 2014 [Docket No. 113].

## II. The Proposed Sale To Z Capital Does Not Represent The Best Bid And Greatest Overall Benefit For The Debtors' Estates.

53.     The Bidding Procedures Order explicitly requires the Debtors (after consultation with the Associations) to select, as the Successful Bidder, the bidder that offered "the highest or otherwise best Qualified Bid at the Auction for the Assets."[32]

54.     "[A] bankruptcy court's principal responsibility" in the context of a 363 sale "is to secure for the benefit of creditors the best possible bid." See In re Fin. News Network, Inc., 980 F.2d 169, 170 (2d Cir. 1992); In re Metaldyne Corp., 409 B.R. 661, 669 (Bankr. S.D.N.Y. 2009). When determining the "best" bid in the context of a 363 sale, a debtor has "an obligation to the estate as a whole," including the interests of its creditors. See In re GSC, 453 B.R 132, 169-70 (Bankr. S.D.N.Y. 2011); Munro Drydock, 585 F.2d at 14 (noting that the purpose of a sale in bankruptcy "is to benefit the creditors and debtor."). Although courts typically show deference to a debtor's business judgment in the context of a 363 sale, "in appropriate circumstances it is proper for a court to interfere with the [debtor's] judgment 'for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders.'" See In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998), (quoting In re Blue Coal Corp., 59 B.R. 157, 163 (Bankr. M.D. Pa. 1986)).

55.     This is especially true when the debtor selects a winning bid based on benefits to controlling insiders, as is the case here. In considering benefits to insiders, a higher burden of proof is required. See In re Enron Corp., 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved."); (citing In re Wingspread Corp., 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)); In re Med. Software Solutions, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (holding that when 363 transaction

---

[32]     See id.

benefits insiders, "the purchaser [of the asset] has a heightened responsibility to show that the sale is proposed in good faith and for fair value."); see also G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Investments, L.P.), 994 F.2d 744 (10th Cir. 1993) ("[A] Bankruptcy Court . . . [has] the power to disapprove a proposed sale recommended by a . . . debtor-in-possession if it has awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable."); In re Metaldyne, 409 B.R. at 669 n.13 (same).

56.     Courts often approve bids with lower cash consideration where such bids provide better overall value for the debtor's estate, by, for example, containing fewer contingencies, a more certain ability to close, and a lower likelihood of business disruption.  See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990) ("[T]he conditional nature of the [higher] bid more than justifies the Committee's and Debtor's acceptance of the [alternative] bid in a slightly lower amount that is not so conditioned.  A bid for higher monetary consideration is not necessarily higher and better[.]"); In re Broadmoor Place Investments, L.P., 994 F.2d at 745-46 (approving sale to lower numeric bid because higher numeric bid contained various contingencies that the court found risky, while the lower numeric bid had no material contingencies, facilitating a more expeditious closing); In re Scimeca Foundation, Inc., 497 B.R. 753, 770 (Bankr. E.D. Pa. 2013) (approving sale to lower numeric bid because of lack of contingencies and ability to close); In re After Six, Inc., 154 B.R. 876, 883-84 (Bankr. E.D. Pa. 1993) (approving sale to lower numeric bidder because lower bid contained no material contingencies and allowed for expeditious closing); In re Bakalis, 220 B.R. at 536 (approving sale to lower numeric bid because higher numeric bid involved contingencies that allowed bidder to avoid closing transaction, while lower numeric bid offered greater total value to debtor's

estate in form of fewer contingencies, more certain ability to close, and little disruption to business).

     **a.**     <u>**The Z Capital Bid Is Illusory.**</u>

57.    For purposes of this Supplemental Objection, the Associations focus on the proposed sale to Z Capital.[33] The Debtors are offering a private equity/hedge fund an option on the Property that is either free or, at best, subject to a forfeitable $1.245 million deposit. The Debtors have not taken into account Z Capital's ability to close, successfully operate a world class hotel and spa and obtain a sufficient number of units to participate in the Rental Management Program. This is of critical concern since a number of participants have already expressed concern that Z Capital has not identified a hotel operator or the going forward terms and conditions of the Rental Management Program, and, therefore, there is no guarantee the participants will remain in the Program.

58.    Z Capital is a private equity firm with little or no experience owning or managing luxury hotels or spas. Its business model specializes in acquiring distressed assets cheaply, stripping them down, and siphoning them off piecemeal for a profit or on a market up-swing. The Associations' preliminary diligence (to be supplemented by discovery requests recently served upon Z Capital) reveals that Z Capital has no portfolio companies even remotely similar to the Property and, upon information and belief, no hotel operator lined up to manage the hotel and spa.

59.    The Z Capital Purchase Agreement provides that the Canyon Ranch Management Agreement may be rejected in Z Capital's discretion. The Unit Holders paid substantial amounts

---

[33]     Upon information and belief, the terms of a proposed sale to North Beach or any other Qualified Bidder other than 6801 Collins, would be on the same terms except for a lower price. In sum, other than 6801 Collins, they are all illusory bids.

for the Canyon Ranch flag and experience.  Having Canyon Ranch removed from the Property and without an equivalent replacement lined up reflects an extreme indifference to the views of the Associations or the Unit Holders on the part of the Debtors/Lehman and does not represent sound business judgment for the going forward prospects of the Property.

60.     There is no guarantee that Z Capital can or will close the transaction contemplated in their Bid and every reason to believe that they cannot or will choose not to close.  Z Capital's only exposure is the potential loss of its deposit.  Z Capital has not disclosed any plan for the operation of the hotel or the spa or how they will maintain sufficient participation in the Rental Management Program to quell ongoing operating losses in an amount of no less than $5 million a year.

61.     Z Capital was afforded a low-risk opportunity to bid up at the Auction, knowing that the risk attendant to its failure to close would amount to, at most, the loss of its deposit. The Z Capital Bid is nothing more than a wish, a hope, and a prayer that "something" will come together.  Meanwhile, the Unit Holders are stuck.  No Unit Holders will be able to sell their units absent there being a known operator for the hotel and spa.  The Debtors/Lehman have put 580 units in limbo to gamble on an unlikely outcome, which, if it miraculously comes through, would still lead to litigation and losses at the Property.

62.     The Z Capital Bid includes the Favorable Resolution closing condition.  For the reasons set forth in the Associations' Preliminary Objection and the Associations' Sale Objection, the Favorable Resolution condition cannot be met.  See Associations' Preliminary Objection ¶¶ 33-64; Associations' Sale Objection ¶¶ 20-43.  There are only two ways that the Favorable Resolution condition can be met:  (i) through entry of the proposed Sale Order with findings of fact and conclusions of law that would, in essence, dispose of the Florida Lawsuits;

or (ii) entry of an order of this Court that denies, dismisses or otherwise disposes of the declaratory relief sought in the Florida Lawsuits. Neither condition can be met. This Court has already stated that it has "no intention" of violating the Associations' constitutional and Florida state law rights through entry of the proposed Sale Order. See June 25, 2014 Hr'g Tr. 26:8-16. And once the Florida Lawsuits are fully briefed and the Associations are allowed their day in court, the Debtors/Lehman's flawed interpretation of the Declarations will fail on the merits. Thus, the Z Capital Bid offers no viable path for resolving the Florida Lawsuits. Absent resolution of the Florida Lawsuits, the Debtors/Lehman will likely be mired in protracted and costly litigation to the detriment of the Debtors' creditors and all parties-in-interest.

63.     The proposed sale to Z Capital is a proverbial lose-lose for the Associations and the Unit Holders. Either the proposed sale does not close, and the Associations and Unit Holders are left in the tenuous position of not having a new owner and operator in place for the hotel and spa as the high season approaches, or the proposed sale closes, and the Unit Holders are forced to live under the umbrella of a vulture investor without a clearly-defined game plan for the operation of the hotel and spa, and the improper assessments and restrictions on access to the facilities continue unabated and likely substantially increased to defray the inflated purchase price. Accordingly, the illusory Z Capital Bid is sub-optimal and when compared to the 6801 Collins Bid, is clearly inferior. Thus, the Sale Motion should be denied.

**b.      The 6801 Collins Bid Is Materially Better Than The Z Capital Bid.**

64.     The 6801 Collins Bid is better than the Z Capital Bid in several respects. First, the transaction contemplated by the 6801 Collins Bid is the only transaction available to the Debtors that has the ability to close. The 6801 Collins Purchase Agreement does not contain a

Favorable Resolution condition to closing. In fact, the 6801 Collins Bid contemplates a release of the Associations' claims and a dismissal of the State Court Actions at closing.

65.     The Associations support the 6801 Collins Bid and are prepared to deliver releases of the Associations' claims and dismissal of the State Court Actions upon closing of the 6801 Collins Hotel transaction. 6801 Collins is the *only* potential purchaser that the Associations support (and, upon information and belief, the only potential purchaser who can close and generate sufficient Unit Holder participation in the Rental Management Program to turnaround the Property and its $5 million plus a year operating losses). The potential release of the Associations' claims (worth tens of millions of dollars) provides a considerable economic benefit to the Debtors' estate and ensures that the Debtors' estates will not be mired in years of protracted and expensive litigation.

66.     The 6801 Collins Purchase Agreement contemplates that Capella, a world-class operator, will take the reigns as hotel operator (with Canyon Ranch possibly remaining as operator of the spa). This plan ensures that the Property will be maintained at a world-class level, with minimal or no disruption, and protects the interests of the Unit Holders. It should be given great deference.

67.     Finally, the 6801 Collins Purchase Agreement contemplates sufficient cash consideration to satisfy the costs of administration in these chapter 11 cases and all projected allowed claims.

68.     In sum, the 6801 Collins Bid is the best offer for the Assets. It is the only bid that: (i) has the ability to close; (ii) offers a clear path to resolve the Florida Lawsuits and secure releases of the Associations' claims worth tens of millions of dollars and which represent the largest unsecured claims in the Debtors' Chapter 11 cases; (iii) enjoys the support of the

Associations; (iv) protects the bargained-for rights of the approximately 580 Unit Holders; (v) provides sufficient cash consideration to pay in full all allowed claims in the Debtors' Chapter 11 cases and a substantial distribution to equity; and (vi) provides a viable going forward plan to turnaround the Property. Because the Z Capital Bid clearly does not provide better overall value than the 6801 Collins Bid, the Court should deny the proposed sale to Z Capital.

69.     The conduct of the Auction and the selections of Z Capital and North Beach as the Successful Bidder and Second Highest Bidder, respectively, are tainted and this Court should deny the proposed sale to Z Capital and instruct the Debtors to proceed with a transaction with 6801 Collins or at a minimum, to continue negotiations in good faith and in consultation with the Associations on the best bid for the Property. Accordingly, the Sale Motion should be denied.

## RESERVATION OF RIGHTS

70.     The Associations reserve the right to revise, amend or supplement this Supplemental Objection at any time, including, with the Court's consent at the hearing to approve the Sale Motion or any subsequent hearing. The Associations seek a full evidentiary hearing with respect to the Sale Motion.

71.     The Associations are particularly concerned that the schedule suggested by the Debtors for a final hearing is inappropriate. In particular, the HOAs require certain critical and tailored discovery before a full evidentiary hearing can go forward. At the status conference, the HOAs currently intend to request an amendment to the proposed hearing date of September 12, 2014, so as to allow them to take their necessary discovery and be in a position to create an appropriate record.

72.     The Associations respectfully request that the Court abstain from determining the Florida Lawsuits and, if appropriate, remand the Florida Lawsuits to Florida State Court and

separate moving papers will shortly be filed seeking such relief.[34]  The HOAs believe that determination of the proper forum for determining the merits of the declaratory aspects of the Florida Lawsuits is a threshold issue that should be determined before consideration of the Sale Motion.  If the Court were nevertheless inclined to adjudicate the Florida Lawsuits in the context of the Sale Motion, the Associations respectfully request an appropriate discovery and briefing schedule.  The Associations intend to seek to introduce expert witness testimony regarding Florida State condominium law and the Declarations.

[The remainder of the page left intentionally blank]

---

[34]     The HOAs believe that this Court may not have jurisdiction to determine the declaratory aspects of the Florida Lawsuits in the context of the Sale Motion and reserves all of their rights in that regard.

## CONCLUSION

**WHEREFORE**, for the reasons set forth in the Associations' Preliminary Objection, the Associations' Sale Objection and the Associations' Supplemental Sale Objection, the Associations respectfully request that the Court deny the Sale Motion and grant such other and further relief to the Associations as the Court may deem just and proper.

Dated: New York, New York
   August 26, 2014

Respectfully submitted,

**NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., AND SOUTH CARILLON CONDOMINIUM ASSOCIATION, INC.**

By their counsel,
BROWN RUDNICK LLP
By:

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

-and-

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 374-7580
Facsimile:  (305) 351-2242