**SALE STATUS CONFERENCE**
**DATE AND TIME:**                    **September 12, 2014 at 10 a.m. (New York Time)**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Steven S. Flores
Lauren L. Peacock

Counsel to the
  Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                             :
In re:                                       :        Chapter 11
                                             :
FL 6801 SPIRITS LLC, *et al.*,               :        Case No. 14-11691
                                             :
                          Debtors.           :        (Jointly Administered)
                                             :
-------------------------------------------------------------x

# DEBTORS' REPLY TO THE ASSOCIATIONS'
# AND 6801 COLLINS HOTEL'S OBJECTIONS TO THE SALE

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................7

A.   The Debtors' Acquisition of the Property ....................................7

B.   Negotiations With the Associations End When They
     Cannot Provide Evidence of Authority ........................................8

C.   The Bankruptcy Filing and Sale Motion ....................................10

D.   The Associations Abandon Their
     First Set of Improper Discovery Requests ..................................11

E.   The Property is Widely Marketed and the Debtors
     Receive Multiple Competitive Bids That Exceed
     the Stalking Horse's Bid ..............................................................14

F.   The Auction Was Open and Fair and Conducted
     Pursuant to the Bidding Procedures Order..................................17

G.   The Successful Bidder..................................................................24

ARGUMENT........................................................................................................25

I.   The Objections Must Be Overruled Because the Auction
     Was Open and Fair and No Party Has or Can Overcome
     the Debtors' Sound Business Judgment.......................................25

A.   The Auction Was Open and Fair and Conducted in
     Accordance with the Court-Approved Bidding Procedures........25

B.   The Debtors' Sound Business Judgment is Accorded
     Great Deference ...........................................................................28

C.   There are Multiple Good Business Reasons for
     Selecting Z Capital's Bid As the Highest and Best Offer ...........31

D.   The Associations Have Not Met Their Burden
     to Overcome the Debtors' Business Judgment ............................36

II.  Collins Hotel Lacks Standing to Challenge the Sale Because the
     Process Was Conducted By the Fair, Court-Approved Bidding Procedures.........43

**Page**

III.   The Sale Order Findings are Core Issues Which are Necessary to
       Effectuate a Sale of the Debtors' Property and Do Not Warrant Abstention.........43

       A.     Mandatory Abstention is Inappropriate...........................................................44

       B.     Permissive Abstention is Unwarranted...........................................................46

       C.     The Court May Enter The Sale Findings at the Sale Hearing......................49

       D.     The Proposed Findings in the Sale Order Are Meritorious.........................49

       E.     This Court Should Reject the Associations' Request to Further
              Brief the Merits of the Proposed Findings in the Sale Order......................54

# TABLE OF AUTHORITIES

**Page**

**Cases**

*BGC Partners, Inc. v. Avison Young (Canada), Inc.,*
    919 F. Supp. 2d 310 (S.D.N.Y. 2013)....................................................... 45

*Bickerton v. Bozel S.A. (In re Bozel S.A.),* 434 B.R. 86 (Bankr. S.D.N.Y. 2010)...................... 46

*C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),*
    92 B.R. 87 (Bankr. S.D.N.Y. 1988) .................................................................... 30

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),*
    181 F.3d 527 (3d Cir. 1999) .............................................................................. 42

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
    722 F.2d 1063 (2d Cir. 1983) ...................................................................... *passim*

*Consumer News & Bus. Channel P'ship v. Fin. News Network Inc.*
    *(In re Fin. News Network),* 980 F.2d 165 (2d Cir. 1993) .............................. 43

*Exec. Benefits Ins. Agency v. Arkison,* 134 S.Ct. 2165 (2014).................................... 47

*G-K Dev. Co., Inc. v. Broadmoore Place Invs., L.P.*
    *(In re Broadmoore Place Inves., L.P.),* 994 F.2d 744 (10th Cir. 1993) ........................ 30

*In re After Six, Inc.,* 154 B.R. 876 (Bankr. E.D. Pa. 1993)................................... 30, 39

*In re Balco Equities Ltd., Inc.,* 323 B.R. 85 (Bankr. S.D.N.Y. 2005)................................... 44, 45

*In re Bigler, LP,* 443 B.R. 101 (Bankr. S.D. Tex. 2010) .............................................. 43

*In re Borders Grp., Inc.,* 453 B.R. 477 (Bankr. S.D.N.Y. 2011) .......................................... 29, 41

*In re Cenargo Int'l, PLC,* 294 B.R. 571 (Bankr. S.D.N.Y. 2003) ............................................. 40

*In re Central Ice Cream Co.,* 836 F.2d 1068 (7th Cir. 1987) ....................................... 40

*In re Coserv, L.L.C.,* 273 B.R. 487 (Bankr. N.D. Tex. 2002) .................................... 40

*In re Dewey & LeBoeuf LLP,* 478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................. 41

*In re Gen. Motors Corp.,* 407 B.R. 463 (Bankr. S.D.N.Y. 2009).................................. 34

*In re Grubb & Ellis Co.,* Ch. 11 Case No. 12-10685,
    2012 WL 1036071 (Bankr. S.D.N.Y. Mar. 27, 2012) ...................... 29, 36, 41

*In re GSC, Inc.,* 453 B.R. 132 (Bankr. S.D.N.Y. 2011) ........................................ 29, 40

*In re Med. Software Solutions,* 286 B.R. 431 (Bankr. D. Utah 2002)........................................ 30

*In re Metaldyne Corp.,* 409 B.R. 661 (Bankr. S.D.N.Y. 2009).................................................. 30

*In re Moritz,* 162 B.R. 618 (Bankr. M.D. Fla. 1994) ................................................................ 35

*In re Sheehan Mem. Hosp.*, 377 B.R. 63 (Bankr. W.D.N.Y. 2007) ............................................. 48

*In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637 (Bankr. W.D. Pa. 2010) ...................... 29, 39

*Ind. State Police Pension Trust v. Chrysler LLC*
    (*In re Chrysler LLC*), 576 F.3d 108 (2d Cir. 2009) ......................................................... 29

*Ind. State Police Pension Trust v. Chrysler LLC*
    (*In re Chrysler LLC*), 592 F.3d 370 (2d Cir. 2010) ......................................................... 29

*Jones v. State Farm Mut. Auto Ins. Co. (In re Jones)*,
    410 B.R. 632 (Bankr. D. Idaho 2009) ............................................................................ 48

*Krys v. Sugrue*, No. 08 Civ. 3065, 2008 WL 4700920 (S.D.N.Y. Oct. 23, 2008) .................... 47

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380 (2d Cir. 1997) ........................ 42

*N.Y.C. Employees' Ret. Sys. v. Ebbers*
    (*In re WorldCom, Inc. Secs. Litig.*), 293 B.R. 308 (S.D.N.Y. 2003) .............................. 46

*Nature's Prods., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307 (S.D. Fla. 2013) .......................... 48

*Ne. Indus. Dev. Corp. v. ParkStone Capital Partners, LLC*
    (*In re Ne. Indus. Dev. Corp.*), Ch. 11 Case No. 13-37619,
    Adv. No. 14-09005, 2014 WL 3720193 (Bankr. S.D.N.Y. July 29, 2014) .................. 45

*Norkin v. DLA Piper Rudnick Gray Cary, LLP*, No. 05 Civ. 9137,
    2006 WL 839079 (S.D.N.Y. Mar. 31, 2006) ............................................................ 46, 47

*Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp.*
    (*In re Enron Corp.*), 335 B.R. 22 (S.D.N.Y. 2005) .................................................. 30, 31

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011) ........................................................................................ 45

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ........................................................... 46

*Rahl v. Bande*, 316 B.R. 127 (S.D.N.Y. 2004) .................................................................... 46, 47

*Renaissance Cosmetics, Inc. v. Dev. Specialists, Inc.*, 277 B.R. 5 (S.D.N.Y. 2002) ................... 46

*S.G. Phillips Constructors, Inc. v. City of Burlington*
    (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702 (2d Cir. 1995) ............................. 45

*Shields v. Andros Isle Prop. Owners Ass'n, Inc.*,
    872 So. 2d 1003 (Fla. Dist. Ct. App. 2004) ................................................................ 48

*Winstar Holdings, LLC v. Blackstone Grp. L.P.*,
    No. 07 Civ. 4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ............................ 46, 47

*Zero Food Storage v. Henderson's Sea Food, Inc.*,
    121 So. 2d 462 (Fla. Dist. Ct. App. 1960) ................................................................... 48

**Page**

**Statutes**

11 U.S.C. § 364(f)(4) ....................................................................................... 29, 43

28 U.S.C. § 1334(c)(2) ..................................................................................... 44, 45

**Other Authorities**

1 *Collier on Bankruptcy* ¶ 3.05[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ......................................................................................................... 46

Fla. R. Jud. Admin. 2.250 ..................................................................................... 45

Fla. Stat. Ann. § 720.302 (West 2014) ................................................................. 35

Fla. Stat. Ann. § 720.309 (West 2014) ................................................................. 35

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),[1] in response to the objections (collectively, the "Objections")[2] to the Debtors' Sale Motion (defined below) of:

      (i)        the Associations[3] [Docket Nos. 52, 106 and 120]; and

      (ii)      6801 Collins Hotel LLC [Docket No. 121]

file this reply (the "Sale Reply"), in advance of the status conference on the Sale Motion, to address the Objections and, in particular, to correct certain misstatements made relating to the Auction, and respectfully state:

## PRELIMINARY STATEMENT

Prior to the commencement of these cases, the Collins Subsidiaries (for convenience hereafter, referred to as the Debtors) pursued a potential sale of the Property. An extensive marketing process was led by CBRE, Inc.,[4] a national real estate brokerage company having a comprehensive hospitality practice. A contract purchaser was found but exercised its right to terminate its written agreement with the Debtors after the commencement of meritless state court litigations filed by the Associations in February 2014. Subsequently, the Debtors negotiated with the Associations for their potential purchase of the Property but with no success.

---

[1]    The Debtors consist of the following entities: FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," and together with 6801 North and 6801 Central, the "Collins Subsidiaries").

[2]    The Debtors do not address the sale objections raised by the Associations on September 9, 2014 [Docket No. 132] herein as they are untimely. Should the Court entertain them, the Debtors reserve all rights with respect thereto.

[3]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Motion.

[4]    A Declaration of Christian Charre of CBRE, Inc. ("CBRE") in Support of the Sale and the Debtors' Reply (the "Charre Decl.") is annexed hereto as Exhibit "1."

In light of the Property's continuing losses, the Debtors, with CBRE's assistance, were fortunate to secure an offer from 360 Miami, an operator of award-winning luxury resort and spa facilities. 360 Miami made a $12 million "stalking horse" bid for the Debtors' interest in the luxury full-service, ocean front condominium hotel located at the site of the old Carillon Hotel in Miami Beach, Florida (the "Property"), subject to certain findings confirming the Debtors' rights under the Declarations that govern the Property. The Debtors subsequently sought to sell the Property to 360 Miami subject to higher *or* better offers by way of a Court-approved auction process designed to maximize value.

Pursuant to the consensual Bidding Procedures Order (defined below), which reflected substantial input from the Associations, the Debtors qualified seven bidders to participate in the Auction, including luxury hotel operators from Canada and Mexico, as well as the Associations' designated bidder, 6801 Collins Hotel, LLC ("Collins Hotel"), a limited liability company purportedly having two North Tower unit owners and an affiliate of Capella Hotel Group, LLC ("Capella") as its members, who the Associations call the "Interested Parties."

Contrary to the litany of misstatements in the Objections, the Auction was fair, transparent, competitive, and well attended by legitimate bidders, all of whom had conducted substantial diligence on the Property, including meetings and tours of the Property with CBRE; submitted sizeable deposits; and, in many cases, travelled long distances to participate in the Auction. Bidding by highly sophisticated parties was spirited and achieved final all-cash high bids of $21.6 million and $21.5 million from Z Capital Partners, LLC ("Z Capital") and North Beach Development, LLC ("North Beach"), respectively. In contrast, Collins Hotel offered only $19 million, subject to a

2

$4 million credit for obtaining the release and dismissal of the Associations' claims (later reduced to $2 million).[5]

After consulting with the Associations' counsel as well as their preferred bidder, Collins Hotel, throughout the proceedings and again before closing the record, the Debtors announced that Collins Hotel, Z Capital, and North Beach would meet with the Debtors and the Associations to further evaluate their respective bids by (i) identifying contracts to be assigned and (ii) finalizing the terms of each parties' purchase and sale agreements.  The Debtors engaged in subsequent negotiations with the Associations, Collins Hotel and their counsel over the course of the next 36 hours. Notwithstanding the Debtors' considerable efforts to negotiate with the Associations and their preferred bidder, Collins Hotel continued to raise new issues and refused to present a Qualified Bid that materially differed from the one submitted in advance of the Auction.

Accordingly, exercising their sound business judgment, the Debtors deemed the $21.6 million offer by Z Capital to be the highest and best offer, and Z Capital to be the "Successful Bidder."  Z Capital provides the highest likelihood for a successful closing because its bid contains only one contingency and that contingency can be resolved by this Court.  Z Capital is also well positioned to consummate the Sale and satisfy any concerns about its future performance.  In light of these benefits, Z Capital offers the best potential to maximize the return to the Debtors' estates and should satisfy the Associations' concerns regarding the Property's future operation.

---

[5]    Prior to becoming "Qualified," Collins Hotel's bid also included a $5,277,500 credit for obtaining the releases and dismissal of the Associations' claims, a $1,377,500 credit for delivery of releases from Canyon Ranch, a requirement that 91 participants in the rental program modify their existing agreements to be "acceptable" to Collins Hotel, and a demand that a WARN Act notice be sent to Canyon Ranch employees by October 1, 2014.

Undeterred, the Associations seek to destroy what was a fair and open Court-approved sale process and override the Debtors' business judgment by their own self-interest because their preferred bid—submitted by a newly formed LLC formed by two North Tower unit owners without the backing of a larger corporate entity that can supply the necessary capital and other resources post-closing—is a "better offer."  The defect of this approach is that Collins Hotel did not make a "better offer."  Collins Hotel's purported "final" bid, which was never reduced to a writing and was first seen by the Debtors when attached to their sale objection, would have both resulted in substantially less cash proceeds to the Debtors' estates and included several conditions (including delivery of dismissals and releases it could not guarantee as well as the termination of the Canyon Ranch Agreements).[6]  These conditions made their bid inferior both in dollars and in terms.

The Associations' and Collins Hotel's coordinated objections should be seen for what they are—an effort by the officers of the Associations and two unit owners (including one who made an unsuccessful bid for the Property a year ago) to obtain the Property on their own terms (terms, which even they cannot agree to among themselves) without regard to costs, delays, and risks imposed on the Debtors' and other parties in interest.

Moreover, the Associations cannot come close to meeting their heavy burden to overcome the deference afforded the Debtors' sound business judgment, for a number of reasons.

---

[6]    The Associations perplexingly assert in their pending and threatened litigation that termination of the Canyon Ranch Agreements is objectionable to them.

First, the Debtors' sound business judgment is entitled great judicial weight. The Debtors need only establish "a" good business reason for selecting the highest or best bidder; here there are many. Once established, the Debtors' judgment should not be disturbed absent a showing of bad faith, self-dealing, or gross negligence. The Associations have not and cannot make such a showing. Further, it is undisputed that the Successful Bidder is not an insider of the Debtors such that no higher level of scrutiny is warranted. And contrary to the Associations' spurious allegations, the Debtors have done everything in their power to maximize value to the estates, including securing the $21.6 million bid from a financially viable purchaser that is eager to make the Property profitable, thereby making it a sustainable business operation for the benefit of the unit owners.

Second, the Debtors are well within their business judgment to reject the Collins Hotel bid. In addition to being $4.6 million less than the bid from Z Capital (by the Associations' own calculation), the bid submitted by Collins Hotel contained significantly less favorable non-monetary terms and their oral proposals were constantly in flux. These contingencies substantially devalued their bid. Further, while the Associations purport to object as creditors, the coordinated Objections clearly evidence an intent to advance the interests of Collins Hotel. To the extent the Associations improperly advocate for Collins Hotel's interests (as an unsuccessful bidder), the Associations' objection should be given less weight.

Third, there is no barrier to this Court including findings in the Sale Order confirming the Debtors' clear rights under the Declarations prior to closing on the Sale. Such findings are core matters arising from the plain language of the Declarations that must be confirmed in order to administer these estates.

The crux of the Associations' argument is that because of their state court litigations and their continuous threats to bring more vexatious litigation, no Sale will be consummated unless it is a sale of their choosing.  It is evident from their behavior since before these Chapter 11 Cases that the Associations and certain unit owners will not stop until they have secured the Property for themselves.  While today the Associations and Collins Hotel come before this Court as united, at the end of the Auction, Collins Hotel advised the Debtors that even they could not guarantee the delivery of the Associations' dismissals and releases at closing.  Of course, despite their empty promises in their Objections, nothing in Collins Hotel's proposed contract (which continues to change by the day) obligates the Associations to do so.  Indeed, since the last status conference before this Court, the Associations and Collins Hotel have informed the Debtors that they are rescinding their "final" offer as filed with this Court and have significantly reduced their offered price and tripled their request for the Associations' substantial contribution claim to $1.5 million.  It is clear that they have no interest in purchasing the Property for its value and are simply using this Court and their threats of additional litigation as a means to undermine the Debtors' efforts to sell their valuable Property.

Because the Objections are void of evidentiary and factual support,[7] and because the Debtors' are well within their sound business judgment in advocating the sale of the Property to the Successful Bidder, the Court should overrule the Objections and approve the Sale.  The Successful Bidder has reached out to the Associations with little success.  However, if permitted to proceed, the Debtors, with the assistance of the Successful Bidder, will make every effort to work to understand and satisfy the

---

[7]    As of September 2, 2014, this "final" offer has been withdrawn.  Barsanti Reply Decl. ¶ 62.

Associations' concerns.  To date, the Associations have been unwilling to speak with the Debtors or Z Capital about a purchase to anyone other than Collins Hotel.

## BACKGROUND

### A.    The Debtors' Acquisition of the Property

1.    The Debtors own interests in property commonly known as the "Canyon Ranch Hotel & Spa, Miami Beach," a luxury full-service, ocean front condominium hotel located at the site of the old Carillon Hotel in Miami Beach, Florida (the "Property").[8]  With a substantial majority of the units unsold and areas of the Property unfinished and in need of repair, the developer of the Property defaulted on its loan to an affiliate of the Debtors.  Barsanti Reply Decl. ¶ 6.  After thoughtful consideration of the impact a long judicial foreclosure would have on the value of the Property, in November 2009, the borrower agreed to deliver to the Debtors, newly formed subsidiaries of the lender, a deed in lieu of foreclosure to the Property subject to certain recorded declarations of covenants, restrictions and easements that run with the land, including the Master Declaration.  *Id.*

2.    In consideration of being permitted to remain as the manager of the Property, Canyon Ranch and the Debtors entered into an amendment of the existing management agreement.  *Id.* ¶ 7.  When the Debtors acquired the Property, the majority of the condominium units were unfinished and unsold and portions of Property were unfinished and in need of repair, including landscaping, pools, and other public and

---

[8]    The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the Declaration of Anthony Barsanti submitted in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in support of the Debtors' Chapter 11 petitions [Docket No. 2] (the "Barsanti Declaration") and the supplemental declaration of Anthony Barsanti in support of the Sale [Docket No. 72] (the "Supplemental Barsanti Declaration"), both of which are deemed fully incorporated herein by reference.  Additional facts in support of this Reply are in the declaration of Anthony Barsanti attached hereto as Exhibit "2" (the "Barsanti Reply Decl.").

shared areas. *Id.*[9] Over the course of a four-year period, the Debtors spent millions of dollars and substantial time enhancing the Property by making necessary repairs and installing extensive landscaping and other amenities and sought recourse against the Property's contractors, all in an effort to bring the Property to completion. *Id.* ¶ 8.

3.    While the unit owners accepted the Debtors' financial contributions made over the years to finish the luxury project, they now complain that the fees for services that they have been enjoying are too high assessments and fees to maintain the Property and their lifestyle are too high. *Id.* Clearly the adage that no good deed goes unpunished is proven here.

4.    Notwithstanding the Debtors' substantial contributions of money and time, under Canyon Ranch's management, the Property has operated at a loss each year. *Id.* ¶ 9.

### B.    Negotiations With the Associations End When They Cannot Provide Evidence of Authority

5.    The commencement of the Associations' litigations in February 2014 chilled a potential sale to a purchaser, Shamrock, who, at that time, was the only interested purchaser that would agree to retain Canyon Ranch as the manager of the Property. Even at this juncture, the Associations and their counsel made it clear that they objected to the sale to Shamrock and would continue to object to the sale of the Property to anyone other than themselves or someone that they select. However, during the extensive and public marketing process, both before and after the Petition

---

[9]    In light of the Hotel Lot's continuing operating losses and liquidity constraints, on or about March 12, 2014, the Debtors were required to borrow $2 million from PAMI ALI on a secured basis to pay the annual insurance premiums for the Property. Although not relevant to their Objection, the Associations question the legitimacy of this secured loan. *See* Sup. Obj'n ¶¶ 17-18. The Debtors reject the Associations' misstatements regarding the loan and reserve all rights with respect thereto.

Date, the Associations never submitted a bid and never expressed an interest in purchasing the Property.[10]

6.      Following the commencement of the Associations' litigations in February 2014, the Debtors negotiated with several of the unit owners (Steven Roth, Scott Prince and Peter Edelman—two of whom are now the designated representatives of Collins Hotel) on behalf of the Associations in the hopes of resolving their claims and moving forward with a successful sale of the Property.  Barsanti Reply Decl. ¶ 10.  In April 2014, the Debtors and Associations entered into a "stand-still" agreement to stay the litigation and permit the Associations to conduct due diligence in furtherance of submitting an offer, while the Debtors were expressly permitted to continue negotiating with other parties.  Barsanti Decl. ¶¶ 14, 54–55.  In that connection, the Debtors requested that the Associations' representatives provide evidence of their authority to negotiate and purchase the Property on the Associations' behalf.  *Id.*  But the Associations did not respond to the Debtors' requests, and as a result, the Debtors could not assess whether the Associations would be able to raise the necessary funds or achieve the required unit owner approval and votes, and deliver the necessary dismissals and releases.  *Id.*  As Associations' counsel explained to this Court, that was because they (Messrs. Roth, Prince and Edelman) could not guarantee that they could herd the "cats" to "get from here to there."  *See* Peacock Decl. Ex. 6 (Hr'g Tr. June 25, 2014 at 31:19–24).  The pre-petition negotiations failed, not because of the Debtors' "bad faith" and not because the Debtors did not try to accommodate the Associations' desire to own the Property, but because of the Associations' own failure to present the Debtors

---

[10]    In this regard, Scott Prince, one of the principals of Collins Hotel and a North Tower unit owner, submitted a bid during the pre-petition marketing process with another investor in partnership with a new operator, "Montage."  Barsanti Reply Decl. ¶ 10.

with a viable transaction and evidence that they could close—which they still cannot do today.

        **C.**      **The Bankruptcy Filing and Sale Motion**

       7.      On June 1, 2014 (the "Petition Date"), the Debtors filed a motion seeking approval of the sale of substantially all of their assets (the "Sale Motion") to 360 Miami Hotel and Spa LLC (the "Stalking Horse"), subject to higher or better offers (the "Sale") upon the terms set forth in that certain Purchase and Sale Agreement, dated May 28, 2014 [Docket No. 4] (the "Stalking Horse Purchase Agreement").  As a condition to closing, the Stalking Horse Purchase Agreement requires certain findings to be made in connection with the Debtors' rights under the Declarations that govern the Property.

       8.      On June 19, 2014, the Associations filed an objection to the Sale Motion [Docket No. 52] (the "Preliminary Objection" or "Prelim. Obj'n").  On June 26, 2014 the Debtors filed a response to the Preliminary Objection [Docket No. 71] (the "Preliminary Response" or "Prelim. Response") and the Supplemental Barsanti Declaration [Docket No. 72].

       9.      By Order dated July 1, 2014 this Court approved, *inter alia*, bidding procedures and bid protections in connection with the Sale and scheduled the date and time or the submission of higher or better offers, the sale objection deadlines, the Auction and the Sale Hearing [Docket No. 77] (the "Bidding Procedures Order").  This Order was ultimately consensual following substantial negotiations between the

Debtors, the Stalking Horse Bidder, and the Associations in response to the Preliminary

Objection, which resolved the Associations' concerns.[11]

10.     On August 26, 2014, the Associations filed their supplemental

objection to the Sale [Docket No. 120] (the "Supplemental Objection" or "Sup. Obj'n,"

together with the Preliminary Objection and Objection, the "Associations' Objection")

and Collins Hotel filed their objection to the Sale [Docket No. 121] (the "Collins Hotel

Objection" or "Collins Obj'n").

**D.      The Associations Abandon Their
          First Set of Improper Discovery Requests**

11.     Prior to filing the Preliminary Objection, on June 11, 2014, the

Associations served overbroad discovery requests (without any authority to do so)

seeking documents from the Debtors and a Rule 30(b)(6) deponent.  The overbroad

request contained 22 separate document requests and improperly "demanded" the

production of documents in a mere four days.  The improper deposition notice

contained 13 topics for examination and purported to set a deposition just 12 days later.

*See* Sup. Obj'n Ex. D.  Immediately after receiving the discovery, on June 12, 2014,

counsel for the Debtors and the Associations had an in person "meet and confer."

During that meeting (which primarily focused on possibilities for a global settlement),

counsel for the Associations unequivocally advised Debtors' counsel to ignore the

discovery requests and deposition notice—a fact that is inexcusably omitted from the

Associations' Supplemental Objection.

---

[11]   The Bidding Procedures Order provides, among other things, for parties to submit bids by August 14, 2014 (the "Bid Deadline"), objections to the Sale by August 14, 2014 (the "Objection Deadline"), for supplemental objections to be submitted by August 22, 2014 (the "Supplemental Objection Deadline").  Unless otherwise ordered by the Court, the Bidding Procedures Order provides that failure to file a timely objection to the Sale Motion shall "forever bar any objection to the Sale Motion or the relief requested therein."  Bidding Procedures Order ¶ 14.

12.     The Debtors also advised the Associations that much of the information they sought was available in a "data room" maintained by CBRE for all potential purchasers of the Property.  Counsel then sent instructions to Associations' counsel regarding how to gain access to that data room on June 12, 2014.  *See* Peacock Decl. Ex. 1.[12]

13.     Prior to gaining access, the Associations were required to sign the form of CBRE confidentiality agreement.  While 217 other interested parties signed these confidentiality agreements (some with negotiated changes) to access this information, including at least one unit owner and an individual who is a consultant to the Associations and Collins Hotel, *see* Barsanti Reply Decl. ¶ 14, the Associations refused to sign the CBRE confidentiality agreement or even send a markup of that agreement indicating their comments to Debtors' counsel despite requests to do so.  Importantly, the data room not only contains the Debtors' confidential information, but it also contains what the Debtors believe to be confidential information from Canyon Ranch.  So, even if the Debtors were inclined to grant the Associations access to the data room without the confidentiality protections that 217 others agreed to, the Debtors could not do so without possibly violating obligations to Canyon Ranch.

14.     At the same time, the Debtors and the Associations—at Debtors' counsels' suggestion—undertook to negotiate a separate confidentiality agreement to expedite the exchange of the Debtors' information in the event that the Associations wanted material that was ***not*** on the CBRE website.

---

[12]    A Declaration of Lauren L. Peacock, Esq. in Support of the Sale and the Debtors' Reply (the "Peacock Decl.") is annexed as Exhibit "3."

15.    The Associations received an initial draft of that agreement on June 13, 2014. Peacock Decl. Ex. 2. Notably, it took the Associations more than a full month to provide initial comments to that draft. *Id.* Ex. 3.

16.    Moreover, even though that agreement was completed by July 23, 2014 (within 8 days of receiving the Associations' first round of comments to it, *id.* Ex. 4), the Associations did not sign the agreement until August 4, 2014 (the "Confidentiality Agreement"). *Id.* Ex. 5.

17.    Various exchanges of information have taken place pursuant to the Confidentiality Agreement (including access to property management and at least one production). But, as the Associations were aware (and the Confidentiality Agreement specifically notes, *see id.* Ex. 4 at p. 2) the Confidentiality Agreement did not permit or require the Debtors to violate confidentiality obligations to Canyon Ranch or others. Thus, access to the CBRE data room could not be granted without additional protections in place.[13]

18.    In any event, the Associations' counsel received same-day access to the CBRE website after the Associations agreed: (i) that all data room material will be treated as "confidential" under the Confidentiality Agreement (*i.e.*, it need not be printed and stamped "confidential" to receive such treatment); and (ii) that Canyon Ranch will be afforded the same confidentiality protections as the Debtors with respect to material in the data room (to address the concern about giving access to Canyon Ranch documents in the data room).

---

[13]    At least one of the three separate Brown Rudnick attorneys who negotiated the Confidentiality Agreement were informed of this concern no later than July 2014. Indeed, this is precisely why the Confidentiality Agreement states "[n]othing in this Agreement creates an obligation for the Debtors to . . . violate or alter confidentiality obligations that the Debtors may have with others." Peacock Decl. Ex. 4 at p. 5.

**E.    The Property is Widely Marketed and the Debtors Receive
Multiple Competitive Bids That Exceed the Stalking Horse's Bid**

19.    As part of its pre-petition efforts, CBRE marketed the Property

extensively.  They sent "teasers" to approximately 15,000 parties in CBRE's database of

real estate and hotel professionals, which resulted in approximately 4,500 parties

viewing the electronic offering and subsequently approximately 193 interested parties

executed confidentiality agreements.  Charre Decl. ¶ 6.  The parties that executed

confidentiality agreements were provided with additional property information.  *Id.*

CBRE arranged property tours, inspections and meetings with approximately 31 parties

who expressed interest after reviewing the property information.  *Id.*

20.    Following the commencement of these cases, CBRE assisted the

Debtors in their Sale efforts by providing the Debtors with a list of 319 individuals

which represented various investment groups that had expressed an interest in

purchasing the Property and signed confidential agreements pre-petition, so that they

could be served with the sale package.  *Id.* ¶ 16.  In addition, CBRE e-mailed

approximately 14,700 investors or interested parties from CBRE's targeted marketing

database with an electronic marketing teaser advising them of the Proposed Sale of

which approximately 3,500 viewed the electronic offering email.  *Id.*

21.    The Debtors provided notice of the Auction pursuant to the

Bidding Procedures Order, which was served on all known creditors, all unit owners,

and 319 parties that had expressed interest in purchasing the Property [Docket No. 77]**.**

Notice of the Auction was also published in the New York Times (National Edition)

[Docket No. 85].  A form of bidder contract and due diligence information was posted

on the CBRE bidder data site.  Charre Decl. ¶ 18.  Prior to the Auction, 217 parties

entered into confidentiality agreements to access CBRE's bidder data site;  22 interested

parties conducted substantial due diligence; and CBRE conducted approximately 70 tours of the Property. *Id.* ¶ 17.

22.     In response to the Debtors' solicitation for bids, eight bids were received by the Bid Deadline. Barsanti Reply Decl. ¶ 16. Several of the bidders submitted questions and draft bids to CBRE in advance of the deadline and in each of these situations, the Debtors reviewed the bids and through CBRE answered questions. *Id.*; Charre Decl. ¶ 22. The Debtors asked for additional information and, in certain cases, changes to purchase and sale contracts, from certain potential bidders whose initial bids did not adhere to the "Qualified Bid" requirements under the Bidding Procedures or who had not provided evidence of their ability to consummate the transaction. Barsanti Reply Decl. ¶ 17. In particular, several of the potential bidders had not identified whether they would assume obligations under approximately fifty contracts entered into by Canyon Ranch in connection with operating the Property (the "Canyon Ranch Contracts"), some of which could have triggered rejection damage claims. *Id.* ¶ 19.

23.     Ultimately, after several exchanges of e-mails and revisions to bids, seven bids were accepted as Qualified Bids, which included the Stalking Horse and Collins Hotel—the Associations' preferred purchaser. *Id.* ¶ 22. Marked copies of the purchase and sale agreements (each, a "Purchase Agreement") for each of the Qualified Bids were circulated to all Qualified Bidders before the Auction in accordance with the Bidding Procedures. *Id.* ¶ 23. Although not required, the Debtors also circulated the Qualified Bids to the Associations prior to the Auction. *Id.*; Bidding Procedures Order, Ex. A at 5 (requiring circulation of Qualified Bids to Qualified Bidders only). All but Collins Hotel's Purchase Agreement were in substantially the same form as the Stalking Horse Purchase Agreement. Barsanti Reply Decl. ¶ 24.

24. While the Debtors treated the Collins Hotel bid as a Qualified Bid, the Debtors informed Collins Hotel and their counsel that the Debtors had a number of issues that would need to be addressed before the Auction for the Debtors to consider their bid as a potential "best" offer. *Id.* Those included:

- The Purchase Agreement included as a condition to closing that amended Rental Program Agreements must be in place for not less than ninety-one (91) units with a minimum term of three (3) years from the closing date, with modifications approved by Collins Hotel.

- The Purchase Agreement provided for a $5,277,500 reduction in the $12.54 million purchase price upon Collins Hotel's delivery of dismissals of the Association Litigations with prejudice (the "Dismissals") and the delivery of releases from the Associations, to the Debtors (the "Releases") as a condition of closing.  The Purchase Agreement lacked any explanation as to the status or process for obtaining the Dismissals or Releases.  Further, the Associations were not parties to any agreement to deliver the Dismissals or Releases and would not agree to escrow the Dismissals, leaving the Debtors uncertain as to whether Collins Hotel could satisfy the condition by closing, particularly if the Associations failed to obtain a satisfactory resolution of each of their demands.  If the Association Releases and Dismissals were not obtained, Collins Hotel would be unable to close and the Debtors would be back to square one.

- The Purchase Agreement also provided for a $1,377,500 reduction in the purchase price upon Collins Hotel's delivery of a release of all claims that Canyon Ranch may have against the Debtors.

- The Purchase Agreement required the Debtors to deliver broad releases of the Associations and the unit owners, but the releases offered to the Debtors did not include releases by unit owners and were, therefore, not mutual.  The Debtors did not demand unreasonable releases from the Associations or their constituent unit owners but, rather, only that the releases be *mutual* to the broad releases in the Collins Hotel offer.

- The Purchase Agreement required the Debtors or Canyon Ranch to issue a WARN notice to all Canyon Ranch employees at the Property by October 1, 2014.

- Notwithstanding their protestations about the economic and personal loss if the Property was to be rebranded by the Stalking Horse, *the Purchase Agreement required the termination of the Canyon Ranch Agreement.*

*Id.*

### F.    The Auction Was Open and Fair and <u>Conducted Pursuant to the Bidding Procedures Order</u>

25.    The Auction occurred on August 19, 2014 at the offices of Weil, Gotshal & Manges LLP, counsel to the Debtors' parent and secured lender, PAMI ALI. Bidding at the Auction was spirited.

26.    Approximately fifty individuals attended the Auction, including two to eight representatives for each of the Qualified Bidders.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 2:3–8:9).  Additionally, the Debtors invited counsel to the Associations to attend the Auction as an observer and for the purpose of exercising their limited consultation rights.  *See id.* at 9:12–13; 50:10–11; Barsanti Reply Decl. ¶ 27.  Canyon Ranch was also permitted to attend the Auction so that it could provide real time responses in the event that questions arose with respect to a Qualified Bidder's proposal to continue with Canyon Ranch as operator.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 30:7–8); Barsanti Reply Decl. ¶ 26.

27.    Al Togut conducted the Auction for the Debtors.  At the commencement of the Auction, a summary of the Auction rules were read into the record, and each Qualified Bidder's representative was asked to confirm on the record that they had not engaged in any impermissible collusion with respect to bidding or the sale, and had read and agreed to be bound by the Bidding Procedures Order.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 9:2–33:17).

28.    Although he was to be an observer and there for consultation purposes only, the Associations' counsel seated himself at the center of the table and

asked if he could make certain comments about the bid submitted by the Associations'
preferred bidder and asked if the assembly would be provided with background
information on all of the bidders.  The Debtors' counsel denied the Associations'
counsel the right to commandeer the Auction and announced that the bidding would
begin.  *See id.* at 30:14–31:19.

29.   The opening bid of $13.05 million was announced, and three
bidders quickly raised the bid to $14.3 million before the Debtors took a break to confer.
Barsanti Reply Decl. ¶ 30.  During the break, Collins Hotel and their counsel entered the
Debtors' breakout room to discuss its Qualified Bid and potential modifications that
might make it more attractive.  *Id.* ¶ 31.

30.   Specifically, the Debtors addressed the status of Collins Hotel's
discussions with Canyon Ranch and their proposed hotel operator, Capella;  about the
Property's hotel and spa operations and allocations among them and the Associations;
the status and process for Collins Hotel to obtain their proposed Dismissals and
Releases;  whether they would waive the Favorable Resolution requirement;  and
whether Collins Hotel could deliver the Dismissals and/or Releases to be held in
escrow undelivered if Collins Hotel was unwilling or unable (absent a default by the
Debtors) to close.  *Id.*  Collins Hotel agreed to waive the Favorable Resolution
requirement but refused to deliver the Dismissals and Releases (to be held in escrow)
until closing.  *Id.*  Collins Hotel also indicated that it did not have a definitive agreement
with Capella or the Associations regarding allocations.  *Id.*

31.   After the break, Collins Hotel increased their initial bid from
$12,540,000 to $15 million.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 38:16).  Numerous
bidders then asked questions about how the Collins Hotel bid could be evaluated and
whether they were using the Association Litigations as a credit to make their bid appear

18

higher than other bids already made. *See id.* at 39:41–40:15.  Thereafter, the Debtors met

privately with Collins Hotel and the Associations to further analyze their bid. *See id.* at

40:19;  Barsanti Reply Decl. ¶ 32.  After the short break, Collins Hotel and the

Associations explained the terms of the Collins Hotel bid and the value that they placed

on the non-cash consideration (the Dismissals and Releases from the Associations), that

were also reflected in their Purchase Agreement. *See* Peacock Decl. Ex. 7 (Auction Tr. at

40:22–42:2).  The Debtors then announced that they would break for lunch and extend

the same opportunity to meet and confer privately with the Debtors to each of the other

Qualified Bidders. *See id.* at 42:3–13.  During the private meetings, the Debtors asked

each of the bidders the same four questions that they had asked Collins Hotel:

- Their intentions with respect to the Property should they be selected as the successful bidder, including their intention, if any, with respect to Canyon Ranch;

- Which, if any, of the Canyon Ranch Contracts they would take by assignment;

- Whether they would agree to extend the Debtors' time to obtain entry of the Sale Order and to close on the transaction beyond the November 26, 2014 deadline in the Stalking Horse Purchase Agreement;  and

- Whether they would agree to waive the Favorable Resolution requirement under the Purchase Agreement.

Barsanti Reply Decl. ¶ 34.  Only Collins Hotel agreed to waive the Favorable

Resolution, provided they received the "credit" of $5,277,500 contained in their

Purchase Agreement. *Id.* ¶ 35.  No other Qualified Bidder would agree to waive the

condition but several indicated that they would consider extending the outside closing

date (for a reasonable period) if more time was needed to satisfy the Favorable

Resolution condition. *Id.*

32.    After the break, the Debtors resumed the Auction and announced that they viewed the $14.3 million bid as "significantly higher" than the Collins Hotel's bid at $15 million due to their inclusion of conditions and price reductions.  *See id.* ¶ 36. The conditions included in Collins Hotel's bid added considerable risk to its ability to close and substantially lowered its value below $14.3 million.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 45:15).  The Debtors gave Collins Hotel the following instructions:

> [Collins Hotel], you have two choices: You can
> join the rest of us and bid the way we are bidding
> or if you want to keep raising the offer with your
> conditions, you can do that;  and we are going
> to run you simultaneous with the rest of us.

*Id*. at 45:18–23.

33.    At that point, Collins Hotel did not raise its offer.  The Debtors therefore announced that they would accept subsequent bids based solely on the cash purchase price basis of the Stalking Horse Purchase Agreement, assuming that none of the Canyon Ranch Contracts would be assigned.  *See id.* at 46:2–17.  The Debtors would then provide a credit based on any assigned Canyon Ranch Contracts after receiving the highest bids.  *Id.* at 53:3–7;  Barsanti Reply Decl. ¶ 38.  The purpose of this approach was to allow bidders to bid on the same basis and, at the same time, to afford Collins Hotel the option to continue to participating in the Auction (considering that it had stopped bidding based on its Qualified Bid, which included delivering the Dismissals and Releases, and the other non-conforming conditions described above).  *See* Peacock Decl. Ex. 7 (Auction Tr. at 64:25–65:3);  Barsanti Reply Decl. ¶ 39.  Importantly, the Debtors stated at the auction, that they reserved their rights to alter the terms of bidding.  *See* Peacock Decl. Ex. 7 (Auction Tr. at 15:11–20).  This was fully consistent with the Court-approved bidding procedures.  Bidding Procedures Order p. 7 ("The Debtors, after consultation with their professionals and the Committee, may adopt other rules for the

Auction at the Auction that, in their reasonable judgment, will better promote the goals of the Auction.").

34.    Based on this modification to the Auction rules, extensive and spirited bidding ensued, including several bids by Collins Hotel (which now conformed to the Stalking Horse Purchase Agreement while reserving their claim rights). *See* Peacock Decl. Ex. 7 (Auction Tr. at 53:24–54:6). After Collins Hotel dropped out at $19 million, bidding continued with highest bid of $21.6 million by Z Capital and a second highest bid of $21.5 million by North Beach. *Id.* at 65:2–18.

35.    Before the bidding and the record of the Auction was closed, the Debtors met with the Associations to consult about the selection of highest or best offers. *Id.* at 66:13; Barsanti Reply Decl. ¶ 43. After this consultation, the Debtors announced that Collins Hotel, Z Capital, and North Beach would meet with the Debtors and the Associations to further evaluate their respective bids by (i) identifying contracts to be assigned and (ii) finalizing the terms of each parties' purchase and sale agreements. *See* Peacock Decl. Ex. 7 (Auction Tr. at 66:14–25). Collins Hotel, North Beach, and Z Capital each agreed to take all of the Canyon Ranch Contracts in exchange for a $500,000 credit on the purchase price. Barsanti Reply Decl. ¶ 45.

36.    Late into the night of the Auction and the following day, the Debtors and their counsel engaged in substantial discussions with Collins Hotel, the Associations, and their respective counsel, regarding Collins Hotel's bid. *Id.* at ¶ 46. During these discussions, the Debtors appreciated and considered the potential benefits of a deal with Collins Hotel, supported by the Associations, which even if not economically better, could avoid pending and threatened litigation with the Associations. *Id.* at ¶ 47. The Debtors, in close consultation with local Florida real

21

estate counsel and bankruptcy counsel, also considered the merits of such threats and litigation, and the associated costs and potential delay in the Chapter 11 cases. *Id.*

37.     Despite these continued negotiations, several problems could not be resolved:

- Collins Hotel would not agree to deliver the Releases and Dismissals upon signing a purchase agreement so that they could be held in escrow and delivered if Collins Hotel was unwilling or unable (absent a default by the Debtors) to close, creating the risk that on the scheduled closing date of December 1, the Debtors would be left to restart litigation with the Associations with no buyer for the Property, *id.* ¶ 48;

- Collins Hotel demanded a $4 million (later reduced to $2 million) credit against the purchase price for the delivery of the Association Releases and Dismissals and despite their protestations about the importance of Canyon Ranch, refused to accept any obligation to retain Canyon Ranch, thereby increasing the Debtors' risk of litigation or large claims from Canyon Ranch or the individual Unit Owners, *id.*;

- at the eleventh hour, Collins Hotel demanded that the Debtors agree to a $500,000 substantial contribution claim for the Associations' fees and expenses—further reducing the value of Collins Hotel's bid, *id.*;

- although Collins Hotel and the Associations have previously vehemently objected to anyone replacing Canyon Ranch, Collins Hotel's revised bid required termination of Canyon Ranch and had no plan for who would operate the hotel or spa, *id.*;

- unlike the other high bidders, Collins Hotel's bid required the Debtors to cause WARN Act notices to be issued to all Canyon Ranch employees at the Property by October 1, 2014 which would likely jeopardize hotel operations during the high season, *id.*;

- The Collins Hotel Purchase Agreement contained a forward indemnity of the Collins Hotel by the Debtors with respect to any claims for personal injury or property damage, *id.*; and

- Collins Hotel sought broad rights to assign the purchase and sale agreement leaving the Debtors unsure as to who was actually purchasing the Property. *Id.*

38.    The Debtors also learned at the end of the Auction that Collins Hotel still did not have agreement among themselves regarding: (i) how they would fund their bid; (ii) how they would secure the Releases and Dismissals; (iii) how they would secure the amendments to the Declaration that the Associations requested in return for the Releases and Dismissals (and whether they had authority for the same); (iv) what role Capella would play at the Property; and (v) whether they had reached an agreement with Canyon Ranch to operate the spa. Barsanti Reply Decl. ¶ 50; *see also* Peacock Decl. Ex. 8 (Hr'g Tr. Aug. 27, 2014 at 64:3–68:13 (confirming no "crisp" plan)). This uncertainty and vagueness rendered the bid unreliable.

39.    Considering these significant deficiencies and the lack of clear authority or a leader of Collins Hotel, the Debtors were unable to view the their bid as "better" than the higher Z Capital and North Beach bids. Barsanti Reply Decl. ¶ 51. Thus, after nearly 36 hours of deliberating and consulting with the Associations and Collins Hotel, on August 21, 2014, the Debtors announced Z Capital as the Successful Bidder and North Beach, as the second highest bidder, and filed a Notice with the Bankruptcy Court, as required by the Bidding Procedures Order.

40.    Both the Z Capital and North Beach Purchase Agreements are substantially in the form of Stalking Horse Purchase Agreement with the following added provisions: (a) an agreement to assume the Canyon Ranch Contracts in exchange for a $500,000 credit; and (b) if necessary, an agreement to extend the date of closing, for up to 180 days to obtain the Favorable Resolution provided the Debtors pay $100,000 for each 60-day extension. Barsanti Reply Decl. ¶ 54. The Debtors notified the Associations of the material terms of the Z Capital and North Beach Purchase Agreements when the successful bid was announced. *See id*. ¶ 53.

G.    **The Successful Bidder**

41.    As will be detailed in a declaration submitted by Z Capital (the "Successful Bidder"), the Successful Bidder is a leading private equity firm that the Debtors are informed makes opportunistic, long-term investments in companies that require growth capital, operational turnaround or restructuring.  The Successful Bidder has indicated that it is fully committed to maintaining the Property as a luxury hotel and spa, and will work to uphold the high standards that guests have come to expect.  While under no contractual obligation, Z Capital and Canyon Ranch have advised that they will consider negotiating with one another with respect to the Property.  The Debtors understand that the Associations, however, have refused meetings with both.  Capella has similarly refused to meet based on their exclusive agreement with the Associations.  Barsanti Reply Decl. ¶ 55.  Despite the Associations' and Collins Hotel's attempts to thwart all of the Debtors' efforts to resolve open issues, Z Capital has further indicated that it recognizes its responsibilities to all stakeholders and is confident that its team will successfully work alongside existing constituents, including the unit owners, to further enhance the Debtors' world-class Property.

42.    Z Capital's team includes Thomas Wicky, who has global expertise in hotel operations, with forty years of experience managing premier resorts and luxury hotels, including with The Boca Raton Hotel & Club, The Breakers Palm Beach, The Cloister at Sea Island, Georgia, The Spas & Grand Hotels Bad Ragaz and Fisher Island in Miami.  Z Capital is confident that it will be able to successfully leverage Mr. Wicky's award-winning experience in ways that are beneficial to the Property (and its residents).[14]

---

[14]    This information will be supplemented by Z Capital prior to the Sale Hearing.

43.    For the forgoing reasons, this Court is well within its authority to overrule the Objections and approve the Sale.

## ARGUMENT

## I.    The Objections Must Be Overruled Because the Auction Was Open and Fair and No Party Has or Can Overcome the Debtors' Sound Business Judgment

44.    The gravamen of the Objections is that the Auction was "tainted" and Z Capital's bid is inferior to Collins Hotel's bid.  Neither is correct.  The Associations grossly contort the facts in an attempt to sully what was a fair and open process.  In addition to their revisionist history of the Auction (and the Debtors' extensive good faith negotiations with them since before the Petition Date), the Associations seek to foist their view of the "better" bid upon the Debtors and this Court. This subverts the well-settled rule that it is a debtor, and not its creditors, who is tasked with exercising its business judgment to evaluate and determine the "best or highest" offer in a section 363 sale and that a debtor's determination is entitled to great deference.  Nor does a heightened level of scrutiny apply here because the Sale is not to an insider of the Debtors.  But, even if the Court were to apply a heightened level of scrutiny, the Debtors have clearly established that the sale process was conducted fairly and in good faith.  The Associations' misstatements of fact and law cannot overcome the obvious insufficiencies of their preferred (and ever-changing) bid, submitted by an undercapitalized, newly formed LLC composed of two wealthy unit owners.  For these reasons, the Objections should be rejected.

## A.    The Auction Was Open and Fair and Conducted in Accordance with the Court-Approved Bidding Procedures

45.    Every aspect of the Sale process—from bidding, to the Auction, to the announcement of the Successful Bidder—was fair, transparent and conducted in accordance with the Bidding Procedures Order approved by this Court.

46.     The Bidding Procedures provide, among other things, that the "[t]he Debtors may, in their sole and absolute discretion, communicate prior to the Auction or Sale Hearing with any Potential Bidder and may request any additional information reasonably required by the Debtors in connection with the Debtors' evaluation of such Potential Bidder's bid[,]" Bidding Procedures Order Ex. A, at 5, may "meet privately with any Qualified Bidder [at the Auction] to negotiate the terms of a bid or Subsequent Bid," *id.* at 7, and "may adopt other rules for the Auction at the Auction that, in their reasonable judgment, will better promote the goals of the Auction[.]" *Id.* At the beginning of the Auction, the Debtors announced that there would be breaks and that there were breakout rooms for meetings during the day. Although the Bidding Procedures provides the Associations certain limited "consultation" rights, *id.* at 4, all discretion to choose the highest and best bid remains squarely with the Debtors. *Id.* at 7–8. The Debtors complied with all these requirements. The Associations' and Collins Hotel's assertions to the contrary, Sup. Obj. ¶¶ 42–52, Collins Obj'n ¶¶ 4–11, are untrue, unsubstantiated and inconsistent with the terms of the Bidding Procedures Order.

47.     It is not at all true that the Debtors failed to "properly consult with the Associations with respect to the highest or best bid," Sup. Obj. ¶ 8;  the Debtors consulted with the Associations at length, including on the three highest bids, as the record clearly reflects, *see* Peacock Decl. Ex. 7 (Auction Tr. at 37:22–25, 42:3–10, 66:14–17).[15] Despite not being a qualified participant during the bidding, counsel to the

---

[15]   Contrary to the Associations' complaints, *see* Sup. Obj'n ¶¶ 8, 27, 30, the Debtors had no obligation to consult with them on the bid qualification process or to check in between every bid at the Auction. *See* Bidding Procedures Order.  The Bidding Procedures Order merely references the Associations' limited rights to consult in connection with the Debtors' selection of the highest or otherwise best bid provided that the Associations are not a "Qualified Bidder."  *See* Bidding Procedures Order, Ex. A at 4.  It would have disrupted the process and depressed bidding to have consulted after every bid.

Associations spoke 29 times on the record, including asking several questions of Debtors' counsel, *see id.* at 29:2–32:11, answering questions on behalf of Collins Hotel, *id.* at 41:19–23, and even purporting to "speak[] for everybody in the room." *Id.* 51:16–17.[16] It is particularly egregious that the Associations assert without any basis that the Debtors invited "straw-man bidders" to participate in the Auction to "artificially increase" the price, Sup. Obj'n ¶ 8, and competing bids were far from "illusory," *id.* ¶ 29, Collins Obj'n ¶ 8. Before participating, each of the seven Qualified Bidders provided a sizable deposit and evidence of their ability to consummate the Sale after conducting due diligence on the Property. *See* Barsanti Reply Decl. ¶ 21.

48.     It is not true that the Debtors prohibited bidders from contacting the Associations, Sup. Obj'n ¶ 8; instead, the Debtors encouraged this, even if the Associations refused. *See* Peacock Decl. Ex. 8 (Hr'g Tr. Aug. 27, 2014 at 38:10–18).[17]

49.     It is not true that the Debtors had "secret consultations" or forbidden meetings with the bidders, Sup. Obj'n ¶ 31, Collins Obj'n ¶ 8; the Debtors announced on the record that they would meet with each Qualified Bidder privately, which was expressly allowed by the Bidding Procedures. Bidding Procedures at 5, 8; Peacock Decl. Ex. 8 (Auction Tr. at 37:22–25, 42:3–10). Nor did the Debtors "fundamentally change" the Auction conditions for all participants other than Collins Hotel, Sup. Obj'n ¶ 31; instead, the Debtors changed the rules for all participants, as was their right under the ***consensual*** Bidding Procedures Order. *See* Peacock Decl. Ex. 8

---

[16]    Counsel for the Associations also spoke directly to the Qualified Bidders off the record. The Debtors' counsel did, however, question **Collins Hotel** when it attempted to meet privately with ***other Qualified Bidders*** due to the rules prohibiting collusion.

[17]    Tellingly, the Associations conclude that Z Capital "cannot or will choose not to close," Sup. Obj'n ¶ 60, simply because they will not agree to negotiate with anyone not of their choosing.

(Auction Tr. at 46:2–17);  Bidding Procedures Order Ex. A, at 7.[18]  It is also not true that

the Debtors failed to "timely circulate Qualified Bids," Sup. Obj'n ¶ 8;  bids were

circulated to each Qualified Bidder after being qualified and to the Associations prior to

the Auction.  Barsanti Reply Decl. ¶ 23.[19]

50.    It is patently untrue that the Debtors are Lehman's "puppet[s],"

Sup. Obj'n ¶ 44;  the Debtors are separate corporate entities, distinct and apart from

their indirect parent, are managed by their own officers and directors, and have

retained independent counsel in these Chapter 11 Cases.[20]  *See* Barsanti Reply Decl. ¶ 1.

51.    The other complaints in the Objections as to the purported

impropriety of the Auction process and to the quality of the bidders is a distortion by a

group who decided they simply did not want to pay what the Property has been

determined to be worth in the open market.  Counsel for the Associations' revisionist

version of what happened should be rejected.

### B.    The Debtors' Sound Business Judgment is Accorded Great Deference

52.    It is well established that "the sale of an asset of the estate

under § 363(b) is permissible if the judge determining [the] § 363(b) application

---

[18]    The Debtors' decision to consider the cash component of certain bids during the Auction was
permissible under the Bidding Procedures Order and promoted competitive bidding by giving the
Qualified Bidders an even playing field.  By allowing parties to compete on the cash component of
their bids and identifying the highest valued bid, the Debtors used their "reasonable judgment" "to
promote the goals of the Auction," which was explained on the record.  *See* Bidding Procedures
Order Ex. A, at 7;  Auction Tr. 45:24–46:6 ("MR. TOGUT: [Y]our bid is viewed as not as favorable as
the 14.3.  In our discussions with the other bidders, everyone is willing to let us litigate the pre-
petition action claims, and so we will do that in the event you are not the high bidder").

[19]    Collins Hotel did not receive their package of Qualified Bids until the Monday morning before the
Auction because they did not submit a Qualified Bid until late on Sunday evening (despite having
been notified of the deficiencies in their bid on Friday morning).  *See* Barsanti Reply Decl. ¶ 23.

[20]    The Debtors object to the Associations' failure to separate the Debtors from their corporately distinct
parent.  *See, e.g.*, Sup. Obj'n ¶ 3 ("Lehman conducted its negotiations . . . in bad faith"), *id.* ¶ 7
("Lehman rejected this Plan[.]").  And, as explained below, there is nothing improper in the Debtors'
consideration of the interest of its equity holders.  To fail to do so would breach the Debtors' fiduciary
obligations.

expressly find[s] from the evidence presented before [him or her] at the hearing [that

there is] a good business reason to grant such an application." *Ind. State Police Pension

Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 117–18 (2d Cir. 2009) (citations

and internal quotation omitted), *vacated on other grounds per curiam*, 592 F.3d 370 (2d Cir.

2010).[21]

53.      A debtor's discretion in selecting the highest or best bid in a

section 363 sale is entitled to "great judicial deference." *See In re Grubb & Ellis Co.*,

Ch. 11 Case No. 12-10685, 2012 WL 1036071, at *4 (Bankr. S.D.N.Y. Mar. 27, 2012)

("[Debtor-in-possession] is entitled to great judicial deference in deciding which bid to

accept as the best and highest bid . . . the Court should not step in and assume a role

and responsibility properly placed by the Code in [the debtor's] hands." (internal

citation and quotation marks omitted)); *see also In re GSC, Inc.*, 453 B.R. 132, 156 (Bankr.

S.D.N.Y. 2011).  In that vein, courts will generally not interfere with a debtor's business

decisions absent an evidentiary "showing of 'bad faith, self-interest, or gross-

negligence.'" *See In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011)

(internal citation and quotation marks omitted); *Grubb & Ellis Co.*, 2012 WL 1036071,

at *4.  To overcome the great deference given a debtor's business judgment, an objector

"is required to produce some evidence" in support of its objection. *See Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re

Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 646 (Bankr. W.D. Pa. 2010) ("[A]n objector to

---

[21]      The Debtors have also demonstrated that the Sale shall be free and clear of all disputed claims and interests under section 363(f)(4) of the Bankruptcy Code.  The Debtors do not seek to sell the Property free and clear of the Master Declaration or of any restrictive covenants.  The Associations themselves concede that this is simply "a dispute regarding the interpretation of a covenant that runs with the land."  Prelim. Obj'n, n.6.  To the extent the Associations assert a monetary claim arising from the Property's restrictive covenants, this monetary interest is clearly in dispute.  The Sale otherwise preserves the Associations' rights as beneficiaries to covenants running with the land.

the proposed transaction is also required to produce some evidence supporting its objection as mere argument or conclusory allegation is not enough.").

54.    Faced with this deferential standard, the Associations reach for this Court to apply a heightened level of scrutiny because the "winning bid [is] based on benefits to controlling insiders." *See* Sup. Obj'n ¶ 55.  But in support of a higher standard, the Associations rely on cases where the ***insider was a bidder*** to the sale, *see* Sup. Obj'n ¶ 55 (citing *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002), *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87 (Bankr. S.D.N.Y. 1988)), or where no higher scrutiny was applied, *see* Sup. Obj'n ¶ 55 (citing *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp.* (*In re Enron Corp.*), 335 B.R. 22, 28 (S.D.N.Y. 2005),[22] *G-K Dev. Co., Inc. v. Broadmoore Place Invs., L.P. (In re Broadmoore Place Inves., L.P.)*, 994 F.2d 744, 746–47 (10th Cir. 1993), and *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009)).  Because there is no dispute that Z Capital is not an insider, no heightened scrutiny is appropriate.  *See, e.g., In re After Six, Inc.,* 154 B.R. 876, 883–84 (Bankr. E.D. Pa. 1993) (applying business judgment rule where objector failed to present evidence of any lack of good faith or any connection with insiders).  In other words, the parties representing the Debtors have no connection to the Successful Bidder, accordingly the proposed Sale will not benefit "controlling insiders" any more than any sale with the potential to satisfy unsecured claims.  To find otherwise would require the Debtors to ignore their fiduciary duties to equity holders.  Accordingly, the Sale is to be judged under the business judgment standard, but, even if

---

[22]    The *Enron* court held that the objecting party, the committee, ***failed to meet its burden*** to produce evidence that the retention of a law firm to assist in ongoing SEC investigations was a transaction subject to heightened scrutiny.  335 B.R. at 28 (stating that the committee "did not produce any evidence at the hearing that insiders who made the decision to retain [the firm] benefitted from the representation").

the Court were to apply heightened scrutiny, the result would be the same.  The

Debtors have clearly established that the Sale process was conducted fairly and in good

faith.  *See infra* Section I(a); *Enron*, 335 B.R. at 28.

**C.    There are Multiple Good Business Reasons for
Selecting Z Capital's Bid As the Highest and Best Offer**

55.    The Debtors have shown multiple valid business reasons for

accepting Z Capital's bid and rejecting the Collins Hotel bid.

56.    <u>First</u>, the $21.6 million cash purchase price far exceeds Collins

Hotel's $19 million offer (which, based on the contract submitted with their objection

but never delivered to the Debtors, is subject to a $2 million credit) and all other offers

that the Debtors received.  It is also fair and reasonable in light of CBRE's extensive

marketing of the Property and the Bidding Procedures, which yielded an offer from

Z Capital which is nearly double the Stalking Horse.

57.    <u>Second</u>, Z Capital provides the best possibility for a successful

closing because its bid contains only one contingency that can be resolved by this Court:

that the Debtors obtain a "Favorable Resolution" of the non-monetary relief sought by

the Associations as a condition of closing.  Notably, no bidder at the Auction other than

Collins Hotel would agree to forego this condition.  As explained in detail in prior

filings and below, this Court has the power to enter the findings in the Sale Order to

effectuate the closing.

58.    <u>Third</u>, in addition to providing the highest and best offer, Z Capital

is well suited and amply able to consummate the Sale and fulfill its plans to continue

operation of the Property as a luxury hotel and spa.  Although the Associations

complain that Z Capital has "little or no experience owning or managing luxury hotels

or spas," Sup. Obj'n ¶ 58, Thomas Wicky, an operating partner of Z Capital has global

31

expertise in hotel operations, with forty years of experience managing premier resorts and luxury hotels, including with The Boca Raton Hotel & Club, The Breakers Palm Beach, The Cloister at Sea Island, Georgia, The Spas & Grand Hotels Bad Ragaz and Fisher Island in Miami.  Further, Z Capital has committed to take assignment of the Canyon Ranch Contracts subject to satisfaction of the cure costs and Court approval. Additionally, while under no contractual obligation, Z Capital and Canyon Ranch have each indicated that they will negotiate with each other with an eye toward retaining Canyon Ranch in some capacity at the Property.[23]

59.     In stark contrast, the Collins Hotel bid lacks credibility, certainty, and value.  The Associations conveniently conclude that their preferred bid "is the only transaction available to the Debtors that has the ability to close," Sup. Obj'n ¶ 64,[24] yet Collins Hotel's bid requires[25] Collins Hotel to obtain and deliver dismissals of the South and Central Tower Litigation, dismissals of the North Tower Litigation (collectively, the "Dismissals"), and the Associations' releases of the Debtors (the "Releases") by

---

[23]   The Associations claim to prefer Collins Hotel's bid, in part, because they "may" maintain Canyon Ranch as the spa operator, Obj'n ¶ 5, but Collins Hotel does not have a contract with Canyon Ranch and instead has aligned themselves with a *different* hotel operator, an affiliate of Capella Hotel Group.  *Id.* ¶ 4; Sup. Obj'n ¶ 66 ("The [Collins Hotel] Purchase Agreement contemplates that Capella . . . will take the reigns as hotel operator (with Canyon Ranch possibly remaining as operator of the spa).").

[24]   *See also* Obj'n ¶ 24 (asserting that Collins Hotel's opening bid "provide[d] the Debtors and their creditors greater certainty of closing than the [Stalking Horse] bid"); Collins Obj'n ¶ 3 (stating their bid "is the only offer that is likely to close").  The Associations also initially argued that a sale to the Stalking Horse "cannot close" based on the Favorable Resolution condition; yet admitted that Collins Hotel's bid then "also contain[ed] the Favorable Resolution condition."  *See* Obj'n ¶ 30.  It is thus evident that the Associations will prefer their chosen bidder irrespective of the bid's actual terms.

[25]   The "final" Purchase Agreement the Debtors received during their negotiations is not the "final" Purchase Agreement attached to Collins Hotel's Objection.  Barsanti Reply Decl. ¶ 62.  The Debtors could not choose a bid they never received.  Nor could they accept it now as it has been taken off the table.  *Id.*

December 1, 2014.  Barsanti Reply Decl. ¶ 48;  Obj'n ¶ 7;  Collins Obj'n Ex. A.[26]  Yet

neither Collins Hotel nor the Associations have provided any explanation as to what

demands have and are being made for such Dismissals or Releases or the status or

process for obtaining them.  *See* Collins Obj'n ¶¶ 17, 21, Ex. A.  Moreover, despite the

Associations' promise that they are "prepared to deliver" the Releases and Dismissals

upon closing, Sup. Obj'n ¶ 65, nothing in the proposed contract obligates them to do

so.[27]  This is particularly troubling due to the admittedly "nightmarish," *see* Sup. Obj'n

¶ 12, history with the Associations including their inability to get the necessary unit

owner approval to finalize a deal.[28]  As counsel for the Associations stated to this Court,

securing a guarantee from his constituency may be akin to herding cats.  *See* Peacock

Decl. Ex. 6 (Hr'g Tr. June 25, 2014 at 31:22–24 ("MR. WEISFELNER:  I don't own cats so

I'm not sure I understand what it's really like to herd [sic] them, but I'm starting to get a

flavor for it.")).

      60.     Based on the Collins Hotel proposal, if the unit owner approvals

cannot be collected in order to deliver the Dismissals and Releases, the Sale will not

close and the Debtors will find themselves back to the drawing board to solicit new

buyers *and* to begin litigating with the Associations in December.  The risk of losing

---

[26]  Contrary to the Associations' unfounded assertions, Sup. Obj'n ¶¶ 39–41, the Debtors did not
demand unreasonable releases from the Associations or their constituents but, rather, only that the
releases be *mutual* to the broad releases in Collins Hotel's offer.  *See* Barsanti Reply Decl. ¶ 24.

[27]  The same is true as to the "detailed plan term sheet" that the Associations provided, *see* Sup. Obj'n
¶ 6, which also did not guarantee to resolve the Association Litigations.

[28]  After the Associations' meritless litigations succeeded in chilling a pre-petition sale, the Debtors
negotiated with the Associations regarding their potential purchase of the Property.  Barsanti Decl.
¶¶ 46, 48, 52–57.  But the Associations did not respond to the Debtors' requests for evidence of their
authority to negotiate and purchase the Property on the Associations' behalf.  *Id.* ¶¶ 50–51, 56.  As a
result, the Debtors could not be sure whether they would be able to raise the funds or achieve the
required unit owner approvals to deliver the Dismissals and Releases.  *Id.* ¶ 56–57.  The same
uncertainty exists today.

months, being forced to start again at year-end (and the associated costs of continued operations and potential loss of other interested buyers) is one that the Debtors are unwilling to take when they have a better and higher offer in hand. Barsanti Reply Declaration ¶¶ 56–59. The Associations have already cost the Debtors a $15 million pre-petition contract from a well-capitalized buyer who was ready to close, had hotel experience, and had reached an agreement with Canyon Ranch to operate the Property. Faced with the prospect of now losing a $21.6 million offer based on Collins Hotel's speculative bid is too much to risk. Put simply, the Debtors cannot be expected to pass up a successful sale to Z Capital in hopes that the Associations will finally herd its cats for a price that is significantly less than the Property's market value. *See* Peacock Decl. Ex. 6 (Hr'g Tr. June 25, 2014 at 31:22–24).[29] This alone is a sufficiently "good business reason" to reject Collins Hotel's bid. *See Lionel*, 722 F.2d at 1071; *see also, e.g., In re Gen. Motors Corp.*, 407 B.R. 463, 493 (Bankr. S.D.N.Y. 2009) (rejecting committee preference that debtors "gamble" and "risk doomsday consequences to increase their incremental recoveries").

61.    The Associations also overvalue Collins Hotel's bid. Prior to the Auction, Collins Hotel attributed a $5,277,000 value (which was reduced to $2 million at the end of the Auction) to their purported ability to deliver the Releases and Dismissals.

---

[29]    Accepting this contingency would also give the Associations an incentive to withhold their releases without affording them any risk. Put differently, if the Debtors accepted the Collins Hotel bid, the Debtors could do nothing to keep the Associations from holding the Releases and Dismissals over the Debtors' and Collins Hotel's heads—holding up the closing until they get the money or modifications to the Declarations they seek, irrespective of the merits of their claims. The Debtors would also be powerless to stop the Associations from withholding their Releases and Dismissals so that the deal explodes and their preferred bidder swoops in to buy at a fire sale price. And the only contractual remedy against Collins Hotel under their proposed Purchase Agreement if they participated would be the loss of their $1,254,000.00 deposit. *See* Collins Obj'n n.9.

Barsanti Reply Decl. ¶ 24; Sup. Obj'n ¶ 38; Collins Obj'n ¶ 15.[30]  Even a $2 million

value is vastly inflated.  Although the Debtors would attribute some value to a

guaranteed dismissal and release of contingent litigation-based claims (which Collins

Hotel *does not* do, *see* Collins Obj'n Ex. A), as explained in detail in the Sale Motion and

below, in consultation with local condominium counsel, the Debtors have determined

that the claims in the Association Litigations are without merit and do not provide a

basis for challenging the Debtors' judgment now.[31]  *See* Barsanti Reply Decl. ¶¶ 47–55.[32]

As a result, the value of their dismissal is significantly less than $5,277,000 (or even

$2 million).  To the extent that Collins Hotel's bid includes "value" of the releases of yet-

to-be-filed frivolous fraud and misrepresentation claims, *see* Obj'n n.4, ¶ 15, these claims

also have no merit.  *See* Barsanti Reply Decl. Ex. A.[33]  Collins Hotel's attempt to use the

Associations' unsecured, unliquidated claims as a face-value bargaining chip in the

Auction is wholly improper.  *See In re Moritz*, 162 B.R. 618, 619 (Bankr. M.D. Fla. 1994)

(allowed secured claim may be set off against the purchase price of property of the

---

[30]    At that time, Collins Hotel also attributed a $1,377,500 reduction in purchase price upon their
delivery of the release of all claims that Canyon Ranch may have against the Debtors.  This condition
was later removed.

[31]    Because the Debtors have used their sound business judgment to consider this intangible condition,
the actual value of the Associations' claims are irrelevant to the Sale Motion.  For the clarity of the
record, however, the Debtors deny the Associations' assertions that the Debtors have overcharged the
unit owners and reserve all rights to object to the Associations' claim for damages at the appropriate
time.  Similarly, if the Associations should seek to make new arguments to assert rights and remedies
under Chapter 720 of the Florida Statues, Sup. Obj'n ¶ 15 n.15, the Debtors reserve their rights to
object to any such claim, including to show why the Property, which is a mixed use and primarily
commercial project is not subject to the jurisdiction of Chapter 720 and even if it were, Chapter 720
does not afford the Associations the power to control the Debtors' annual budgets or reform the
recorded declarations that run with the land.  *See* Fla. Stat. Ann. §§ 720.302, 720.309 (West 2014).

[32]    It is notable that Collins Hotel have reduced the "credit" for the Releases and Dismissals to
$2 million, but while the Associations note the $2 million credit, they at the same time imply that it
was improperly bargained down.  *Compare* Sup. Obj'n ¶¶ 24, 37-38 *with* Collins Hotel Obj'n ¶ 15. This
is further evidence of the moving target that the Debtors are negotiating with.

[33]    The weakness of this claim is also evidenced by the Associations' preference for a bid that only
"may" retain Canyon Ranch as spa operator and would terminate the Canyon Ranch Agreements.

estate but "there is no comparable provision which would permit unsecured creditors to offset their claims"). These disputed, unliquidated unsecured claim cannot be credit bid by Collins Hotel.

62.     In addition to offering an improper and inflated credit against the purchase price, Collins Hotel insisted on retaining the Associations' right to seek a substantial contribution claim for the Associations' counsel's fees and expenses— further reducing the value of Collins Hotel's bid. Barsanti Reply Decl. ¶ 48.

63.     Finally, at the close of the bidding at the Auction, the Debtors learned that Collins Hotel did not have a "crisp" agreement among themselves as to how they would fund their bid, how they would secure the Releases and Dismissals, and what role, if any, Capella would serve at the Property. Barsanti Reply Decl. ¶ 50; *see also* Peacock Decl. Ex. 8 (Hr'g Tr. Aug. 27, 2014 at 34:3–11)**.**

64.     Considering the facts at hand, the Debtors have shown that they are well within their sound business discretion to choose the Z Capital's offer over that of Collins Hotel (and all others). This Court should thus afford the Debtors the judicial deference they are due. *See Grubb & Ellis,* 2012 WL 1036071, at *4.

### D.    The Associations Have Not Met Their Burden to Overcome the Debtors' Business Judgment

65.     As a preliminary matter, the Associations fail to overcome the Debtors' sound business judgment because their Objection lacks evidentiary support. The Associations rely on conjecture and unfounded assertions of counsel as to a litany of doomsday "facts" that will occur should they not get their way. *See* Obj'n ¶¶ 3–4, 22–24, Sup. Obj'n ¶¶ 12, 60, 66. For instance, if their preferred bidder does not prevail, the Associations allege that unit owners may have an excess of $100 million in claims for fraud and misrepresentation based upon a so-called "pledge" to keep Canyon Ranch

36

as operator for 20 years, Obj'n n.4, ¶ 15, Sup. Obj'n ¶ 12, and decry that no unit owner "will be able to sell their units absent there being a known operator for the hotel and spa[.]" *Id*. ¶ 61.[34] On the other hand, should *their* bidder prevail (with Capella, not Canyon Ranch), all will be well—"the Property will be maintained at a world-class level, with minimal or no disruption" and the unit owners will be protected. *See id.* ¶ 66.[35]

66.    But neither of the Associations' parade of horribles has any support in the record. The Court may reject the Objection on this basis alone. *See Lionel*, 722 F.2d at 1071 ("[A]n objectant . . . is required to produce some evidence respecting its objections.").

67.    The Associations' failure to support their purported fraud claim is particularly troubling considering that, as the self-proclaimed spokespersons for the unit owners, they should be in possession of the relevant documents (or at the very least well-positioned to request them). For example, the Associations should have known *prior to filing their initial Objection* that each unit owner signed a purchase contract expressly acknowledging and agreeing that the contract was made "without reliance on any hotel affiliation" and that only those representations made by the Debtors in the written contract and the condominium documents delivered to each and every unit owner pursuant to Florida Condominium law could be relied upon. *See* Barsanti Reply

---

[34]    The Associations' first Objection was riddled with the same baseless assertions if the Stalking Horse purchased the Property. *See, e.g.*, Obj'n ¶ 3 (stating that a "majority" of the participants in the Rental Management Program will give notice that they will withdraw from the "lifeblood of the hotel operation" and that the unit owners' property values will decline by "at least twenty percent").

[35]    The Associations themselves have admitted on the record of these proceedings that they do not believe that Canyon Ranch should operate the hotel, *see* Hr'g Tr. Aug. 27, 2014 at 64:25–65:4, (in direct contravention of their pending and threatened litigation claims that they will suffer significant damages if Canyon Ranch is terminated), and the Collin Hotel bid requires termination of the Canyon Ranch Agreements or management of the hotel and spa.

Decl. *Ex.* A (sample set of executed purchase agreements); *id.* ¶¶ 64–65 (each purchase

agreement was based on same form).

68.     These purchase and sale documents pursuant to which each unit

owner bought their units clearly state that the unit owners are not relying on any

representation as to who will operate the spa and hotel.  *See* Barsanti Reply Decl., Ex. A

¶ 34(a) ("Buyer acknowledges, warrants, represents, and agrees that this Agreement is

being entered into by Buyer without reliance upon any representations concerning any

potential for future profit, or rental income, investment potential tax advantages, or

depreciation and without reliance upon any hotel affiliation or any monetary or

financial advantage.").[36]  The Debtors can only surmise that the Associations were not in

possession of these contracts before representing to this Court—and the public prior to

the Auction—that the unit owners are investigating millions of dollars of purported

fraud and misrepresentation claims.

69.     Their production of a vague "comfort" letter delivered to a unit

owner by Canyon Ranch does not entitle them to hold the Debtors responsible for

something that is contrary to their written purchase and sale agreements and the

Declaration.  The letter they produced predates the Debtors' ownership of the Property

and, to the Debtors' knowledge, is based on Canyon Ranch statements given only to a

handful of unit owners.  Accordingly, this letter cannot possibly serve as a basis for

claims against the Debtors.[37]

---

[36]   These claims also cannot be taken seriously because, as this Court has acknowledged, the
      Associations' preferred bidder has partnered with a ***different*** hotel operator, Capella, who only
      "may" maintain Canyon Ranch as the spa operator.  *See* Obj'n ¶ 5; Sup. Obj'n ¶ 66; Hr'g Tr. Aug. 27,
      2014 at 37:20–24.  The Associations cannot have it both ways.

[37]   In any event, the letter merely states that the Hotel Management Agreement between Canyon Ranch
      and the Debtors provides an initial 20-year term, which is subject to the "terms and conditions set
                                                              ***(footnote continued on the following page)***

70.    Accordingly, the Associations have not established any viable reason for this Court to interfere with the Debtors' business judgment. While, in a perfect world, the Associations would cooperate and work with the Debtors, the Associations' refusal to consider any option other than their own, *see* Obj'n ¶¶ 23, 25, does not override the Debtors' sound business judgment. *See, e.g., Lionel*, 722 F.2d at 1071 (deferring to debtors' business judgment over the creditor committee's objection in rejecting sale); *After Six*, 154 B.R. at 883 (approving debtor's selection of the highest dollar bid despite committee's preference for a lower bid that included a promise to employ debtor's former employees);[38] *see also, e.g., Shubh Hotels*, 439 B.R. at 646 n.7 (finding entrance into franchise agreement to be valid exercise of debtor's business judgment notwithstanding lender's objection "as to why it preferred Hilton over Wyndham as the franchisor of the [d]ebtor's hotel").

71.    As the Second Circuit advised in deferring to the debtors' business judgment over the creditors' committee's objection in *Lionel*:

---

forth therein." Sup. Obj'n Ex. C. Such agreement included rights of termination by both parties. This does not a fraud claim make.

[38]    The Associations misstate the holding in *After Six*. *See* Sup. Obj'n ¶ 56 (citing *After Six* as "approving sale to lower numeric bidder because lower bid contained no material contingencies and allowed for expeditious closing"). In *After Six*, the court ***approved the debtor's selection of the highest dollar amount bid*** despite the committee's preference for a lower bid that included a promise to employ debtor's former employees. While the committee's preference was "socially responsible" the court held that "***[i]t is only in the context of a strong and unusual case to the contrary*** in which a bankruptcy court should approve a sale to a party which the DIP does not deem the highest and/or best bidder in an auction sale." 154 B.R. at 882 (emphasis added). In approving the debtor in possession's bid selection, the court acknowledged the subjective value of intangible consideration, explaining that "[t]he difference between the position of the Committee and that of the Debtor was that the Committee's members were simply collectively inclined to place a value on Genesco's somewhat vague commitment to hire the Debtor's former employees, and the Debtor was not." *Id.* at 884. In conclusion, the Court held that "it is difficult to argue that preferring a $7.1 million bid to a $5.0 million bid constitutes a failure to accept an adequate price of the Debtor's assets. The piecemeal and inconclusive evidence at the hearing [] to the value of the Genesco offer failed to convince us that the $2.1 million gap was closed by the conditions offered by Genesco." *Id.* at 883. Similarly, the Objectors have failed to demonstrate how the monetary gap between their bid and Z Capital's is "closed" due to the possibility that they may deliver the Releases and Dismissals.

> [i]n fashioning its findings, a bankruptcy judge must
> not blindly follow the hue and cry of the most vocal
> special interest groups; rather, he should consider all
> salient factors pertaining to the proceeding and,
> accordingly, act to further the diverse interests of the
> debtor, creditors and *equity holders*, alike.

722 F.2d at 1071 (emphasis added). This includes the interests of the equity holders. *See id*.; Sup. Obj'n ¶ 54 (citing *GSC*, 453 B.R. at 169–70 ("a debtor has 'an obligation to the estate *as a whole*'" (emphasis added)); *In re Cenargo Int'l, PLC,* 294 B.R. 571, 600 n.32 (Bankr. S.D.N.Y. 2003) ("There is no question that a debtor in possession is a fiduciary, like a chapter 11 trustee, for the estate, creditors and shareholders.").

72. It would be particularly improper to elevate the "hue and cry" of the Associations when their voices seek to drown out equity. And, where, as here, the estate assets may be sufficient to pay all creditors, *shareholders are residual claimants and are entitled to collect each additional dollar*. *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987); *see also In re Coserv, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("A debtor in possession . . . is a fiduciary holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners.").

73. Further, as the Associations' claims are merely assertions that have not been proven, they are at best contingent and they should not be allowed to drive this process. The Associations' recently-created claims are a further attempt to obtain the Property for less than market price and to make the Property unsalable to anyone but themselves. *See* Barsanti Reply Decl. ¶ 65 (noting that, other than the Associations' litigations, the Associations have not brought any other such "claims" against the Debtors).

74.     The Associations have failed to put forth any evidence that the Debtors have acted in bad-faith, self-interest, or gross negligence such that interference with the Debtors' sound business decision would be appropriate. *Cf. Borders*, 453 B.R. at 483; *Grubb & Ellis*, 2012 WL 1036071, at *4.  While the Objections throw around words like "bad faith" and "tainted" and "sham," Sup. Obj'n ¶¶ 3, 8, 42, 69–70, Collins Obj'n ¶¶ 1, 4–11, there is not a scintilla of evidence to support these inflammatory and spurious statements and thus they shall be disregarded.  *See Lionel*, 722 F.2d at 1071; *see also In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012).

75.     While they purport to object as creditors, the Associations have made clear their intent to advance the interests of the "Interested Parties" as **bidders**.  *See* Obj'n ¶ 4.  These so-called "Interested Parties" are comprised of at least one unit owner whom attempted to purchase the Property when it was first put on the market.  Barsanti Reply Decl. ¶ 10.  The Associations' counsel even complain to this Court that the Debtors should not be allowed to sell at the highest price because months ago they may have agreed (in settlement negotiations that may not be used against the Debtors) to accept less.  That is both without merit and ridiculous.  While bringing up the earlier negotiations is inappropriate, now that it has been done, the Court can take note that it was the Associations and the individuals that are now operating as Collins Hotel that walked away from earlier negotiations and failed to present the Debtors with a "crisp" deal or evidence they could close.  The Debtors had an obligation to test the market and they did.  Collins Hotel and the Associations could have elected to pay a higher price, but they did not.  It is not clear what the quid pro quo is for the "Associations'" support

of their preferred bid or who is the top "cat" leading the "Associations" as they have hidden behind their counsel and Collins Hotel.[39]

76.    As the Associations are, in effect, objecting on behalf of a disgruntled bidder, their Objection should be given less weight.  They have sought to chill competitive bidding by trumpeting their intention to quash all interest in the Property.  This exhibits their obvious conflict of interest, as the Associations are motivated to minimize (rather than maximize) the value of competing bids.  Where, as here, an auction was conducted fairly, failed bidders lack standing to object to the Sale. *See generally Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 388 (2d Cir. 1997) ("[U]nsuccessful bidders usually lack standing to challenge a bankruptcy court's approval of a sale.");  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 531 (3d Cir. 1999) (same).[40]

77.    In sum, because there are a myriad of "good business reasons" for the Sale here and because the Associations have shown that they are not objective and are using their claims to promote their preferred bidder at the estates' expense, the Court should overrule the Objections.[41]

---

[39]    The Debtors have sought to clarify the Associations' authority through discovery served in response to the Associations' discovery requests.

[40]    Considering the Associations' alignment with Collins Hotel, the fact that the Associations have wielded their litigations as a club to beat away other bidders comes dangerously close to collusion.  It is also suspect because the Associations themselves are incapable of purchasing the Property without first obtaining the approval of 80% of the unit owners, respectively, in each of the three Towers.  *See* Declaration of Lara Sheikh in support of Sale Motion (the "Sale Declaration") [Docket No. 12] Exs. A–C (Central Tower Declaration, at Section 9.1(h), North Tower Declaration, at Section 9.1(h), South Tower Declaration, at Section 9.1(h)).

[41]    The Court should reject the Associations' reservation of "all rights to supplement" their Objections.  Sup. Obj'n ¶ 35.  The Debtors disclosed all material terms of the Successful Bid, including purchase price, the $500,000 credit, and the ability to extend the closing when the Successful Bidder was announced.  *See* Barsanti Reply Decl. ¶ 54.

## II.  Collins Hotel Lacks Standing to Challenge the Sale Because the Process Was Conducted By the Fair, Court-Approved Bidding Procedures

78.    Collins Hotel lacks standing to object to the Sale.  This Court held that the Bidding Procedures were "reasonably designed to maximize the value to be achieved for the Assets." Bidding Procedures Order ¶ H.  The terms of the Bidding Procedures Order are clear.  *See id.*  Where, as here, the Auction was conducted in accordance with fair, unambiguous Bidding Procedures, the Court's Order should be binding.  *See In re Bigler, LP*, 443 B.R. 101, 111 (Bankr. S.D. Tex. 2010) ("[Because] the [b]id [p]rocedures and the [b]id [p]rocedures [o]rder are unambiguous, this Court will not consider the parties' expectations.").  To suggest otherwise would render the Court's so-ordered Bidding Procedures meaningless and improper.  Accordingly, because the process was fair and because Collins Hotel is not a creditor of the estates, Collins Hotel does not have standing to object to the Sale.[42]

## III.  The Sale Order Findings are Core Issues Which are Necessary to Effectuate a Sale of the Debtors' Property and Do Not Warrant Abstention

79.    The Associations incorporate by reference their "Preliminary Objection,"[43] which asserts that this Court should abstain, in large part, because the

---

[42]    Collins Hotel relies on *Consumer News & Business Channel Partnership v. Financial News Network Inc. (In re Financial News Network),* 980 F.2d 165 (2d Cir. 1993) for the proposition that the Sale and Auction was not properly conducted because it was overly "complicated."  *See* Collins Obj'n ¶ 23.  *Financial News* dealt with multiple auctions and does not address a debtor's business judgment.  Accordingly, it has no application to the case at hand.

[43]    In the Preliminary Objection, the Associations also argue that the Debtors cannot sell the Property "free and clear" of the claims raised in the Associations' litigations pursuant to section 363(f)(4) of the Bankruptcy Code.  *Id.* at ¶¶ 33–38.  However, the Debtors do not seek to sell the Property free and clear of the Master Declaration or of any restrictive covenants.  The Associations themselves concede that this is simply "a dispute regarding the interpretation of a covenant that runs with the land."  Prelim. Obj'n, n.6.  To the extent the Associations assert a monetary claim arising from the Property's restrictive covenants, this monetary interest is clearly in dispute.  The Sale otherwise preserves the Associations' rights as beneficiaries to covenants running with the land.

Association Litigations are non-core matters. *See* Obj'n ¶¶ 45–46.[44] But, as explained in the Preliminary Response, the Bankruptcy Court has core jurisdiction to issue the findings in the Sale Order. *See* Preliminary Response ¶¶ 31–36. In summary, the Sale is a core proceeding within this Court's authority. Because the Association Litigations attempt to limit the Debtors' (and any successor owner's) rights under the Declarations that govern the Property and because the Property is the lifeblood of the Debtors' business, the Bankruptcy Court must confirm these rights under the Declarations in order to facilitate the sale of the Property. This fact was made evident at the Auction because no bidder, except Collins Hotel, agreed to waive this closing condition. The Sale Order findings are thus necessary to achieve a successful outcome in these Chapter 11 cases and, as such, are within the Court's core jurisdiction.[45]

### A.    <u>Mandatory Abstention is Inappropriate</u>

80.    Mandatory abstention under 28 U.S.C. § 1334(c)(2) only applies where, among other things, the proceeding in question is related to a case under title 11 rather than arising under title 11; that is, in non-core matters, and where the proceeding is commenced and can be timely adjudicated in a state forum. *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 93 (Bankr. S.D.N.Y. 2005).[46] Neither is requirement is met here.

---

[44]    The Associations argue that the Court has already indicated it does not intend to enter findings to satisfy the Favorable Resolution component of the Successful Bidder's bid. *See* Sale Obj'n ¶ 31. Rather, as the Court is aware, the Court merely stated that "by definition" it will not enter findings in violation of the Bankruptcy Code and Florida state and constitutional law. *See* Hr'g Tr. June 25, 2014 at 26:6–20. The Associations have not articulated any law that will be violated by entry of the findings.

[45]    For the reasons explained in the Preliminary Response, the Sale Order findings are also procedurally proper as they seek confirmation of rights under the Declarations and do not require an adversary proceeding for the reasons discussed therein. *See* Prelim. Response ¶¶ 38–42.

[46]    Mandatory abstention is required if: (i) a motion is timely made; (ii) the action is based on a state law claim; (iii) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (iv) § 1334 provides the sole basis for federal jurisdiction; (v) an action was commenced in state court; and (vi) the action can be "timely adjudicated" in state court.

*(footnote continued on the following page)*

44

81.    <u>First</u>, as explained above, because the issues underlying the Associations' claims and the findings in the Sale Order are "core" matters that must be adjudicated to accomplish a sale of the Property, mandatory abstention is inapplicable. *See id.* ("[W]here a matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable." (citation and quotation marks omitted)); *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 708 (2d Cir. 1995).

82.    <u>Second</u>, even if the Sale Order findings were not "core" mandatory abstention would be unwarranted because the Associations have not shown that these issues can be timely adjudicated in a state forum and, indeed, they cannot.[47]

83.    In support of their argument that the Florida state court would be able to timely adjudicate these issues, the Associations argue that they are "specifically motivated" to resolve the claims in an "expedient matter" and that the Florida state court is best suited to adjudicate these issues. *See* Prelim. Obj'n ¶ 56. Despite these vague assertions, pursuant to Rule 2.250 of the Florida Rules of Judicial Administration, a "presumptively reasonable time period" for the completion of a jury civil case is 18 months from filing to final disposition, and 12 months for a non-jury civil case from filing to final disposition. *See* Fla. R. Jud. Admin. 2.250. A one-year delay in resolving

---

*See* 28 U.S.C. § 1334(c)(2); *Ne. Indus. Dev. Corp. v. ParkStone Capital Partners, LLC (In re Ne. Indus. Dev. Corp.)*, Ch. 11 Case No. 13-37619, Adv. No. 14-09005, 2014 WL 3720193, at *7 (Bankr. S.D.N.Y. July 29, 2014) (citing cases).

[47]    The Associations incorrectly assert that the Debtors have the burden to establish that the Florida state court cannot adjudicate the Associations' claims in a timely manner. Prelim. Obj'n ¶ 55. But the Second Circuit has left this decision open. *BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 919 F. Supp. 2d 310, 319, n.66 (S.D.N.Y. 2013) ("The Second Circuit left open the issue of who bears the burden on the question of whether a case may be timely adjudicated in state court . . . Thus, I conclude that, ***particularly in the context of removal,*** where any doubts are to be resolved against removability, the burden should be on defendants to prove that the state court *cannot* adjudicate the claims in a timely manner." (first emphasis added)); *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 582 (2d Cir. 2011). In any event, the Debtors have satisfied this burden.

the Sale Order findings would unquestionably drain the estates' resources and inhibit

any sale of the Property. *See* 1 *Collier on Bankruptcy* ¶ 3.05[2] (Alan N. Resnick & Henry

J. Sommer eds., 16th ed. 2014) ("[T]imeliness must be referenced against the needs of the

title 11 case, rather than against an absolute time guideline"); *see also, e.g.*, *Renaissance*

*Cosmetics, Inc. v. Dev. Specialists, Inc.*, 277 B.R. 5, 13–14 (S.D.N.Y. 2002) (refusing to

abstain when average time to trial in state court was 550 days and bankruptcy

proceedings were "relatively advanced"). Thus, mandatory abstention does not apply.

### B.    Permissive Abstention is Unwarranted

84.    Although discretionary, courts in this Circuit apply a presumption

against exercising permissive abstention, which is an "'extraordinary and narrow'"

exception to the "'virtually unflagging obligation . . . to exercise the jurisdiction given

them.'" *Rahl v. Bande*, 316 B.R. 127, 235 (S.D.N.Y. 2004) (quoting *N.Y.C. Employees' Ret.*

*Sys. v. Ebbers (In re WorldCom, Inc. Secs. Litig.)*, 293 B.R. 308, 332 (S.D.N.Y. 2003)); *see*

*Norkin v. DLA Piper Rudnick Gray Cary, LLP*, No. 05 Civ. 9137, 2006 WL 839079, at *5

(S.D.N.Y. Mar. 31, 2006); *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 102 (Bankr.

S.D.N.Y. 2010) (noting permissive abstention "should only be exercised in narrow

circumstances"); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–17 (1996) ("[F]ederal

courts have a strict duty to exercise the jurisdiction that is conferred upon them by

Congress."). Courts therefore are "sparing" in their exercise of permissive abstention.

*See Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 Civ. 4634, 2007 WL 4323003,

at *5 (S.D.N.Y. Dec. 10, 2007). The burden to prove that this narrow exception applies

falls squarely on the party requesting abstention—here, the Associations. *See Bozel,* 434

B.R. at 102.

85.    The Associations have failed to meet their evidentiary burden to

overcome the presumption in favor of maintaining federal jurisdiction because the

factors weigh heavily against abstention in this case.  Most importantly, the claims

underlying the Association Litigations and the findings in the Sale Order are "core"

such that the bankruptcy court may adjudicate these claims to final judgment.  *See Exec.*

*Benefits Ins. Agency v. Arkison,* 134 S.Ct. 2165, 2174–75 (2014).  This weighs heavily

against abstention.  *See, e.g., Winstar Holdings*, 2007 WL 4323003, at *5 (finding

permissive abstention not appropriate over matter closely tied to the bankruptcy case

since it arose out of the sale of assets that was a "central aspect and basic function of the

bankruptcy proceedings");  *see also Norkin*, 2006 WL 839079, at *5 (finding permissive

abstention not warranted where matter was core and state law claims were intertwined

with bankruptcies and were in "well settled areas of law").[48]  Abstention is also likely to

cause inefficiency and unnecessary expense.  *See Krys v. Sugrue*, No. 08 Civ. 3065, 2008

WL 4700920, at *10 (S.D.N.Y. Oct. 23, 2008).

86.    The application of Florida state law does not warrant a different

result.  The Associations have not identified a single unsettled issue of Florida state law

and concede that the Association Litigations require nothing more than straightforward

contract interpretation.  *See* Obj'n ¶ 35 ("Under Florida law, the Declarations are a form

of contract and are interpreted according to their plain meaning," citing cases).  This

Court is well equipped to confirm these rights and abstention is unwarranted.  *See*

*Winstar Holdings*, 2007 WL 4323003, at *5;  *Rahl*, 316 B.R. at 135 ("The existence of state

law claims does not automatically dictate remand or abstention especially where, as is

the case here, the state law claims are not particularly novel or complex.");  *see also In re*

---

[48]    As explained above, because these are core matters, the Associations are mistaken that "there is no
sound basis for federal jurisdiction" here.  *See* Obj'n ¶ 63.  Similarly, the Associations' failure to
consent to the bankruptcy court's jurisdiction, Prelim. Obj'n ¶ 57, is irrelevant.

*Sheehan Mem. Hosp.*, 377 B.R. 63, 69 (Bankr. W.D.N.Y. 2007) (declining to permissively abstain where claim involves no unsettled or unusual issues of state law).

87. Similarly, although the Associations demand jury trials in their complaints, *see* Prelim. Obj'n ¶ 63, the Associations maintain that the Declarations are to be interpreted according to their plain meaning. *See* Obj'n ¶ 35. Any dispute over their interpretation is thus a question of law, not fact, such that it is unlikely that open issues would ever be submitted to a jury. *See Nature's Prods., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1319 (S.D. Fla. 2013) (holding that under Florida law, a decision construing an unambiguous contract presents an issue of law for the court to decide); *Shields v. Andros Isle Prop. Owners Ass'n, Inc.*, 872 So. 2d 1003, 1006 (Fla. Dist. Ct. App. 2004) (interpreting declaration of covenants according to the ordinary and obvious meaning of the words used); *see also Zero Food Storage v. Henderson's Sea Food, Inc.*, 121 So. 2d 462, 464–65 (Fla. Dist. Ct. App. 1960) ("The main question was one of construction of the contract and was primarily a question of law to be ruled upon by the court."). Accordingly, the jury trial factor weighs against permissive abstention. *See, e.g., Jones v. State Farm Mut. Auto Ins. Co. (In re Jones)*, 410 B.R. 632, 641 (Bankr. D. Idaho 2009) (abstention not appropriate where "the remaining issues in this action appear to be questions of law, not fact . . . . What Plaintiff did in this regard, and when she did it, are not in dispute . . . . In this sense, the Court doubts the need for a jury trial.").

88. Finally, the Associations' assertion that abstention is appropriate "solely to avert the resolution of the [Association Litigations] by the State Court," Prelim. Obj'n ¶ 8, is absurd. There is no dispute that the Property has been operating at a loss and that the Debtors must sell the Property. It is the Associations, not the Debtors, who are exploiting the bankruptcy process to their benefit. The Court should

see the Associations' unwarranted abstention request for what it is—a tactic for Collins Hotel's advantage.

### C.    The Court May Enter The Sale Findings at the Sale Hearing

89.    The Associations also object to the entry of the proposed findings in the Sale Order because they "fail on the merits" and because—over two months from the filing of the Proposed Sale Order and over six-weeks from entry of the consensual Bidding Procedures Order—they purport to require a briefing schedule. *See* Obj'n ¶¶ 29–51, Sup. Obj'n ¶ 62.  For the foregoing reasons, neither objection has any basis.

### D.    The Proposed Findings in the Sale Order Are Meritorious

90.    The Associations argue that the Sale should not be approved because the proposed findings in the Sale Order lack merit. *See* Obj'n ¶¶ 27–32.  As explained in detail in the Sale Motion, the findings in the Sale Order merely confirm the Debtor's (and any successor owner's) broad rights under the plain language of the recorded Declarations to (i) impose regulations and restrictions in order to manage and operate the Property, (ii) determine who may have access to the Property, and (iii) levy assessments and fees on the unit owners for their use of the Property, including use of the spa and shared facilities. *See* Sale Motion ¶¶ 89–106.

91.    In their Objection, the Associations agree that their claims rise or fall on the plain language of the Declarations. *See* Obj'n ¶ 35.  As the Debtors made clear in the Sale Motion, the Declarations—filed with the Sale Motion on the Petition Date—plainly support the proposed findings in the Sale Order. *See* Sale Motion ¶¶ 89–106.  The Debtors briefly address the Associations' flawed merits arguments below.

92.    <u>The Hotel Lot Owner may levy assessments for the Shared Facilities *and* charge a fixed charge for the use of the spa facilities.</u>  The Associations argue "that no additional spa-related expenses are chargeable, other than the fixed

charge set forth in the Master Declaration." *See* Obj'n. ¶ 39.  As explained in the Sale

Motion at ¶¶ 98–99, the Associations' reading ignores that the Master Declaration

clearly provides that the Hotel Lot Owner may levy assessments for the "repair,

operation, maintenance, improvement, replacement, insurance, alternation or relation

of, and taxes on" the Shared Facilities—including the unit owners' "Limited Spa

Rights." Sale Decl. Ex. A (Master Decl. at Art. 16.3).  "***In addition to the assessments***

***described [above],***" Article 16.3 of the Master Declaration expressly provides that each

unit owner "agrees to pay, on a monthly basis, a fixed charged for the use of the spa

facilities" (defined in the Master Declaration as the "Fixed Charge"). *See id.* (*emphasis*

*added*).  The Associations are thus wrong that "no additional spa-related" expenses

beyond the Fixed Charge, including for example for fitness instructors, are chargeable.

*See* Obj'n ¶ 39.  Moreover, where the Hotel Lot Owner may levy assessments for the

"repair, operation, maintenance, improvement, replacement, insurance, alternation or

relation of, and taxes on" the Shared Facilities, including the unit owners' "Limited Spa

Rights," Sale Decl. Ex. A (Master Decl. at Art. 16.3), and where the Limited Spa Rights

include access to and use of exercise rooms and facilities, *id.* at Art. 4.4, it is perfectly

obvious that their "operation" may include charges for fitness instructors.[49]

93.     Article 16.1 of the Master Declaration—which states that "except

only through the maintenance assessments described in Section 16 ***and*** any applicable

Access Fee, Administrative Fee and/or Fixed Charge," unit owners shall be charged no

further membership fee for access—is not to the contrary.  Sale Decl. Ex. A (Master Decl.

---

[49]    The Associations have alluded to a demand by their preferred bidders to "amend" the Declaration to
provide that the costs and allocations to which they object are hereafter assessed in accordance with
their desires.  If the Declarations are as clear in their favor as they assert, any such amendments
would be unnecessary.  The Debtors are seeking to clarify what "amendments," if any, have been
agreed to by their preferred bidder and Capella through discovery served on the Associations.

at Art. 16.1). By its terms, Article 16.1 only prohibits additional assessments or fees beyond those allowed in Article 16. To illustrate, under Article 16.1 a $1,000 "Tuesday" fee would not be permitted; where assessments for fitness instructors and the Fixed Charge are permitted since both of these charges are expressly contemplated and authorized by Article 16 of the Master Declaration. The Debtors' reading has not, as the Associations assert, rendered Article 16.1 a nullity. *See* Obj'n ¶ 40.

94.    The Hotel Lot Owner (and any successor owner) may limit the number of "Permitted Occupants" that may enter the spa on a given day. Similarly, as explained in the Sale Motion, while the Declarations provide that eight individuals may be deemed "Permitted Occupants" of a particular unit, the Associations fail to point to a single provision in the Declarations that entitle the Central and South Tower unit owners to enable all eight individuals to use the spa facilities on a single day. *See* Obj'n ¶¶ 41–42. Moreover, contrary to the Associations' allegations, *see id.* ¶ 42, the Debtors *have* pointed to a provision that allows the Hotel Lot Owner to limit the number of spa users—specifically, the Master Declaration, which is superior to the Tower Declarations, affords the Hotel Lot Owner broad authority to issue reasonable rules and restrictions over the unit owners aptly named "Limited" Spa Rights. *See* Sale Decl. Ex. A (Master Decl. at Art. 4.4). A daily limit that is consistent with each unit's legal occupancy limits is a reasonable restriction to regulate the orderly use of the spa facilities within the Property.

95.    The Hotel Lot Owner (and any successor owner) may include the expense of valet parking services in each individual Condominium Tower's Shared Facilities assessments. The Associations contend that valet parking services are included in "Garage Costs" and therefore shall be charged in the Non-Retail Shared Facilities Assessment. *See* Obj'n. ¶ 37. It remains that nothing within the Master

Declaration requires this.  *See* Sale Mot. ¶¶ 100–101.  The Associations argue that the

Debtors' interpretation fails to give meaning to the term "operation" in the definition of

"Garage Costs" in Article 1.1(z) of the Master Declaration.  Obj'n ¶¶ 37–38.  But even

the "operation . . . of the parking structures and/or facilities" cannot be read to include

the cost for Valet Parking Services.  Valet parking attendants operate cars.  They do not

operate the "parking structures" or "parking facilities" as would, for example, a

manager or operator.  Further, the Associations' reading of the Master Declaration is

illogical because it would prohibit the Hotel Lot Owner from assessing costs to unit

owners through each individual Tower so that the charge for these services is borne by

the applicable unit owners in accordance with their particular use and benefit.  It is also

contrary to the overall purpose of the Master Declaration, which is to enable the Hotel

Lot Owner to manage the Property.  *See, e.g.*, Sale Decl. Ex. A (Master Declaration at

Arts. 1.2, 4.3, 4.4, 16).[50]

      96.    <u>The Hotel Lot Owner (and any successor owner) may assess utility</u>

<u>costs based upon square footage rather than actual usage.</u>  There is no dispute that the

Hotel Lot Owner must only assess utility charges based upon actual usage and not

square footage if it "can reasonably be allocated to the Particular Lots based upon actual

consumption."  *See* Sale Decl. Ex. A (Master Declaration, at Art. 16.3); Obj'n 43.  This

cannot be done, however, because the Property's utility lines are not individually

metered in such a manner such that it is possible to bill on actual consumption by Lot.

Barsanti Reply Decl. ¶ 66.  Considering how the Lots are divided, this is only logical.

---

[50]    It should be noted that the Associations do not argue in their litigations or in objecting to the
proposed findings in the Sale Order that they should not be assessed for Valet Parking Services at all,
but only that these costs were allocated incorrectly among the three Towers.

For instance, by definition, the "Hotel Lot" includes portions of the "Shared Facilities" in each of the three of the Towers.  Sale Decl. Ex. A (Master Decl. at Art.  1.1(dd)(5)).

97.    The North Tower Litigation is moot and meritless.  The Associations argue that the North Tower Litigation is not moot because, while the sale to Shamrock was terminated, the North Tower Complaint seeks to prevent the Debtors from "fundamentally altering the character of the Property."  Obj'n ¶¶ 45–47.  This argument ignores the reality under which the complaint was filed.  The North Tower Complaint was asserted to stop the purported business plan of a long-gone purchaser. Further, this litigation is still moot because neither the Debtors nor the Successful Bidder is seeking to "fundamentally alter[] the character of the Property."  Nor is there a proposed finding in the Sale Order to that effect.

98.    When viewed correctly, it is clear that the proposed findings confirm the rights in the Declarations.  First, the Debtors do not, as the Associations argue, assert an "unqualified right" to annex additional property.  *See* Obj'n ¶ 48. Rather, the relevant proposed finding merely states that the Hotel Lot Owner may annex Future Development Property "as provided by Article 2.2 of the Master Declaration."

99.    Second, the Debtors do not, as the Associations argue, Obj'n ¶ 50, seek to erase the Hotel Lot Owner's rights to "reasonably" regulate the Shared Facilities or to adopt "reasonable" rules to the extent that those terms are used in Articles 4.3 and 4.4.  The Debtors merely request findings to address the North Tower Litigation that confirm the rights expressly afforded by the Master Declaration.  That is, the Hotel Lot Owner has the right to permit such persons as the Hotel Lot Owner shall designate to use the [Shared Facilities] and all recreational facilities located thereon . . . which may include persons who are not members of the Associations or owners of any portion of"

53

the Property, including the general pubic per Article 4.3(d); and the Hotel Lot Owner

has the right "to have, grant and use general ("blanket") and specific easements over,

under, and through the Shared Facilities per Art. 4.3(d). Moreover, Article 4.4 clearly

provides that the Spa and spa facilities "shall be developed and provided at the

discretion of the Hotel Lot Owner and the Hotel Lot Owner has the exclusive right to

determine from time to time in its sole discretion and without notice or approval of any

change, how and by whom" they shall be used. The Associations' assertion that the

broad relief sought by the Debtors "far exceeds" the Master Declaration, Obj'n ¶ 50, is

thus incorrect.

### E.     This Court Should Reject the Associations' Request to Further Brief the Merits of the Proposed Findings in the Sale Order

100.    Finally, this Court should reject the Associations' purported

"reservation of rights" to assert further arguments on the merits. *See* Obj'n ¶ 32. In

approving the Bidding Procedures Order on July 1, 2014, this Court set out a schedule

for objections to the Sale, which provided all interested parties with "good, appropriate,

sufficient" notice of the Sale. Bidding Procedures Order ¶ C. Per that Order, the

Associations have been afforded an opportunity to object to the Sale.

101.    If the Associations believed that further briefing was necessary to

address the Favorable Resolution condition (of which they were made aware of when

the Sale Motion was filed on the Petition Date), they should have raised these issues

with the Court much earlier. At the very least, the Associations should have made a

request shortly after the July 1, 2014 Bidding Procedures Order and well before the

Auction. Further, the Associations have not articulated a single valid reason for either

their delay or their request for more time. The Associations have continually illustrated

their intention to disrupt the Debtors' reorganization efforts to their own advantage.

Prior to these bankruptcy cases, the Associations caused the termination of a signed pre-petition purchase and sale agreement.  *See* Barsanti Decl. ¶¶ 12, 54.  Following the commencement of these cases, the Associations unsuccessfully attempted to disrupt the Sale with their since-withdrawn Motion to Transfer.  The Associations now seek to further delay.  Such a negotiating tactic is improper.  The Court should stop them in their tracks.

       **WHEREFORE**, the Debtors respectfully request that the Objections be overruled, and that the Sale Motion be granted in its entirety.

DATED:  New York, New York
         September 10, 2014

                                       FL 6801 SPIRITS LLC, *ET AL.*,
                                       Debtors and Debtors in Possession,
                                       By their Counsel,
                                       TOGUT, SEGAL & SEGAL LLP
                                     By:

                                     /s/ Albert Togut
                                     ALBERT TOGUT
                                     FRANK A. OSWALD
                                     One Penn Plaza, Suite 3335
                                     New York, New York  10119
                                     (212) 594-5000