Hearing Date:  October 15, 2014 at 10:00 a.m. (ET)
Response Date:  September 30, 2014 at 4:00 p.m. (ET)

BROWN RUDNICK LLP
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4900

- and -

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 350-2414

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc., Central Carillon Beach*
*Condominium Association, Inc., and South Carillon*
*Beach Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:                                               :        Chapter 11
                                                     :
                                                     :        Case No. 14-11691 (SCC)
                                                     :
FL 6801 SPIRITS LLC, *et al.*,                       :
                                                     :        (Jointly Administered)
                              Debtors.               :
-----------------------------------------------------------------X

**NOTICE OF MOTION FOR ENTRY OF**
**AN ORDER:  (I) APPOINTING A TRUSTEE**
**PURSUANT TO BANKRUPTCY CODE SECTION 1104(a), OR,**
**ALTERNATIVELY, (II) APPOINTING AN EXAMINER PURSUANT TO**
**BANKRUPTCY CODE SECTION 1104(c) AND TERMINATING THE DEBTORS'**
**EXCLUSIVITY PERIOD PURSUANT TO BANKRUPTCY CODE SECTION 1121(d)**

**PLEASE TAKE NOTICE** that a hearing on the *Motion for Entry of an Order: (I) Appointing a Trustee Pursuant to Bankruptcy Code Section 1104(a), or, Alternatively, (II) Appointing an Examiner Pursuant to Bankruptcy Code Section 1104(c) and Terminating the Debtors' Exclusivity Period Pursuant to Bankruptcy Code Section 1121(d)* (the "Motion") will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on **October 15, 2014 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Motion (the "Responses") must be made in writing, stating in detail the reasons therefore, and must be filed with the Clerk of the Bankruptcy Court, with paper copies delivered to Bankruptcy Judge Shelley C. Chapman's Chambers, and served upon: (i) Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn: Edward S. Weisfelner, Esq. and Howard S. Steel, Esq.; (ii) Togut, Segal & Segal, One Penn Plaza, Suite 3335, Attn: Frank A. Oswald, Esq. and Lara R. Sheikh, Esq., as counsel for the Debtors; (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq.; (iv) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, Attn: Jacqueline Marcus, Esq., as counsel for Lehman; and (v) any parties required to be served under any applicable Bankruptcy Rules or Local Rules, so that such Responses are actually received by the aforementioned parties not later than **September 30, 2014 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no Reponses are timely filed and served with respect to the Motion, the Associations may, on or before the Response Deadline,

submit to the Court a proposed order with respect to the relief requested in the Motion, which order may be entered with no further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that the hearing to consider the Motion may be adjourned from time to time, without further written notice to any party.

Dated: New York, New York
September 11, 2014

Respectfully submitted,

**NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC., AND SOUTH CARILLON CONDOMINIUM ASSOCIATION, INC.**

By their counsel,
BROWN RUDNICK LLP

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

-and-

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 374-7580
Facsimile:  (305) 351-2242

**Hearing Date:  October 15, 2014 at 10:00 a.m. (ET)**
**Response Date:  September 30, 2014 at 4:00 p.m. (ET)**

BROWN RUDNICK LLP
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4900

- and -

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone:  (305) 350-2414

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc., Central Carillon Beach*
*Condominium Association, Inc., and South Carillon*
*Beach Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:                                               :      Chapter 11
                                                     :
                                                     :      Case No. 14-11691 (SCC)
                                                     :
FL 6801 SPIRITS LLC, *et al*.,                       :      (Jointly Administered)
                                                     :
                              Debtors.               :
-----------------------------------------------------------------X

**MOTION FOR ENTRY OF AN**
**ORDER:  (I) APPOINTING A TRUSTEE**
**PURSUANT TO BANKRUPTCY CODE SECTION 1104(a), OR,**
**ALTERNATIVELY, (II) APPOINTING AN EXAMINER PURSUANT TO**
**BANKRUPTCY CODE SECTION 1104(c) AND TERMINATING THE DEBTORS'**
**EXCLUSIVITY PERIOD PURSUANT TO BANKRUPTCY CODE SECTION 1121(d)**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

JURISDICTION, VENUE, AND STATUTORY PREDICATES ................................10

BACKGROUND ...........................................................................10

A.      Pre-Petition Misconduct Of The Debtors And Lehman....................10

        i.      Fraudulent Marketing Of Units................................10

        ii.     The Florida Lawsuits. ........................................12

B.      Insider Transactions Between The Debtors And Lehman. .................13

C.      The Debtors/Lehman's Misconduct Related To The Auction...............16

        i.      Misconduct Prior To And During The Auction. ..................16

        ii.     Post-Auction Bad Faith........................................18

D.      The Debtors' Proposed Sale To Z Capital..............................19

        i.      Z Capital's Inferior Bid. ....................................19

        ii.     The Associations' Plan Alternative............................20

RELIEF REQUESTED .....................................................................21

ARGUMENT  .............................................................................21

A.      The Court Should Appoint A Trustee  Pursuant To Bankruptcy Code Section
        1104(a). ..............................................................21

        i.      Legal Standard. ..............................................21

        ii.     The Debtors' Misconduct And Derogation  Of Their Fiduciary Duties To
                Creditors Provides  Sufficient Cause To Justify The Appointment Of A
                Trustee. .....................................................22

        iii.    Appointment Of A Trustee Is In  The Best Interests Of The Debtors'
                Creditors.....................................................25

B.      Alternatively, The Court Should Appoint An Examiner In  These Chapter 11
        Cases Under Bankruptcy Code Section 1104(c). .........................26

        i.      Legal Standard. ..............................................27

ii.     Appointment Of An Examiner  Is Mandatory Under Bankruptcy Code
        Section 1104(c)(2). ...................................................................................27

iii.    Appointment Of An Examiner Is Necessary,  Appropriate, And In The
        Best Interest Of The Debtors' Creditors. .................................................28

iv.     The Proposed Scope Of The Examiner's  Investigation Is Reasonable And
        Appropriate. ........................................................................................29

C.      In Addition To Appointing An Examiner, The Court Should Terminate The
        Debtors' Exclusivity Pursuant To Bankruptcy Code Section 1121(d). ................31

        i.      Legal Standard. .......................................................................................31

        ii.     Abundant Cause Exists Under Bankruptcy Code Section 1121(d) To
                Terminate The Debtors' Exclusivity. .....................................................33

NO PRIOR REQUEST ............................................................................................37

NOTICE .................................................................................................................38

CONCLUSION........................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

CASES

Commodity Futures Trading Comm'n v. Weintraub,
   471 U.S. 343 (1985) ............................................................................................23

Euro-America Lodging Corp., 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) ..............................25

Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing
   Home, Inc.),
   187 B.R. 128 (D. N.J. 1995) ..............................................................................31

In re Adelphia Commc'ns Corp.,
   352 B.R. 578 ........................................................................... 32, 33, 36

In re All Seasons Indus.,
   121 B.R. (Bankr. N.D. Ind. 1990) ......................................................................36

In re Altman,
   230 B.R. 6 (Bankr. D. Conn. 1999), aff'd in part, vacated in part, 254 B.R. 509 (D.
   Conn. 2000) ........................................................................................22

In re Am. Fed'n of Television and Radio Artists,
   30 B.R. 772 (Bankr. S.D.N.Y. 1983) ..................................................................34

In re The Bible Speaks,
   74 B.R. 511 (Bankr. D. Mass. 1987) ..................................................................24

In re Big Rivers Elec. Corp.,
   284 B.R. 580 (W.D. Ky. 2002) ..........................................................................28

In re Borders Grp., Inc.,
   460 B.R. 818 (Bankr. S.D.N.Y. 2011) ................................................................32

In re Cajun Elec. Power Coop., Inc.,
   74 F.3d 599 (5th Cir. 1995) ..............................................................................23

In re Carnegie Int'l Corp.,
   51 B.R. 252 (Bankr. S.D. Ind. 1984)..................................................................30

In re Crescent Beach Inn, Inc.,
   22 B.R. 155 (Bankr. D. Me. 1982)......................................................................34

In re DBSI, Inc.,
   Case No. 08-12687 (PJW) (Bankr. D. Del. Mar. 25, 2009) ................................31

In re Dow Corning Corp.,
    208 B.R. 661 (Bankr. E.D. Mich. 1997)......................................................... 32, 33, 36

In re Dynegy Holdings, LLC,
    Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. Dec. 29, 2011)...............................30

In re Eurospark Indus., Inc.,
    424 B.R. 621 (Bankr. E.D.N.Y. 2010) ..................................................................24

In re FiberMark,
    339 B.R. 321 (Bankr. D. Vt. 2006) .......................................................................29

In re Fiesta Homes of Georgia,
    125 B.R. 321 (Bankr. S.D. Ga. 1990) ...................................................................23

In re Gilman Servs.,
    46 B.R. 322 .............................................................................................................30

In re Gitto Global Corp.,
    No. Civ. 05-10334, 2005 WL 1027348 (D. Mass May 2, 2005)...........................29

In re Grossinger's Associates, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ...................35

In re Henry Mayo Newhall Mem'l Hosp.,
    282 B.R. 444 (B.A.P. 9th Cir. 2002).....................................................................36

In re Int'l Distrib. Ctrs.,
    74 B.R. 221 (S.D.N.Y. 1987).................................................................................30

In re Ionosphere Clubs, Inc.,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ..................................................................25

In re Ira Haupt & Co.,
    361 F.2d 164 (2d Cir. 1966) ....................................................................................7

In re Lehigh Valley Prof'l Sports Club, Inc.,
    No. 00–11296, 2000 WL 290187 (Bankr. E.D. Pa. Mar. 14, 2000) ......................31

In re Nautilis of New Mexico, Inc.,
    83 B.R. 784 (Bankr. D.N.M. 1988).......................................................................23

In re R.G. Pharm., Inc.,
    374 B.R. 484 (Bankr. D. Conn. 2007)....................................................................36

In re Residential Capital, LLC,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 20, 2012).................................30

In re Revco D.S., Inc.,
    898 F.2d 498 ...........................................................................................................27

In re Schepps Food Stores,
    148 B.R. 27 (Bankr. S.D. Tex. 1992) ................................................................28

In re Sharon Steel Corp.,
    871 F.2d 1217 (3d Cir. 1989). Bankruptcy ........................................................25

In re Sharon Steel Corp.
    78 B.R. 762 (Bankr. W.D. Pa. 1987) .................................................................34

In re V. Savino Oil & Heating Co., Inc.,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ..........................................................22, 25

In re Washington Mutual, Inc.,
    Case No. 08-12229 (MFW) (Bankr. D. Del. July 22, 2010) ...............................31

Keene Corp. v. Coleman (In re Keene Corp.),
    164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..............................................................29

Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral
    Space Commc'ns Ltd.),
    No. 04-Civ-8645, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2014) .........................24

Marvel Entm't Grp., Inc., 140 F.3d 463, 473 (3d Cir.) ..............................................27

Morgenstein v. Revco D.S., Inc., In re Revco D.S., Inc.), 898 F.2d 498, 500-01 (6th Cir.
    1990) .................................................................................................................27

Oklahoma Refinancing Co. v. Blaik (In re Oklahoma Refinancing Co.),
    838 F.2d 1133 (10th Cir. 1988) .........................................................................22

Straub v. Muir-Villas Homeowners Ass'n, Inc.,
    No. 4D12-1335, District Court of Appeal of Florida, Fourth District (Dec. 18, 2013) ..........18

United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re
    Timbers of Inwood Forest Assocs., Ltd.),
    808 F.2d 363 (5th Cir. 1987), aff'd, United Sav. Ass'n of Tex. v. Timbers of Inwood
    Forest Assocs., Ltd., 484 U.S. 365 (1988) .........................................................32

STATUTES

11 U.S.C. § 105 ...................................................................................... 4, 12, 14

11 U.S.C. § 361 ............................................................................................4, 14

11 U.S.C. § 362 ....................................................................................4, 13, 14

11 U.S.C. § 363 ............................................................................... 4, 12, 13, 14

11 U.S.C. § 364 ............................................................................................4, 14

11 U.S.C. § 1104(a) ............................................................................................ 1, 10, 21, 22

11 U.S.C. § 1104(a)(1) ...................................................................................................... 22, 24

11 U.S.C. § 1104(a)(2) ...............................................................................................................25

11 U.S.C. § 1104(c) ....................................................................................1, 9, 21, 26, 27, 39

11 U.S.C. § 1104(c)(1) ................................................................................................... 8, 28

11 U.S.C. § 1104(c)(2) ............................................................................................. 8, 27, 28

11 U.S.C. § 1106(a) ......................................................................................................... 10, 30

11 U.S.C. § 1106(b) ................................................................................................... 10, 29, 30

11 U.S.C. § 1121 ..................................................................................................................32

11 U.S.C. § 1121(a) ..............................................................................................................10

11 U.S.C. § 1121(b) ..............................................................................................................31

11 U.S.C. § 1121(d) ....................................................................................................10,21, 33

11 U.S.C. § 1121(d)(1) ................................................................................................... 31, 32

28 U.S.C. § 157 ....................................................................................................................10

28 U.S.C. § 157(b) ................................................................................................................10

28 U.S.C. § 1334 ............................................................................................................ 10, 12

28 U.S.C. § 1408 ....................................................................................................................9

28 U.S.C. § 1409 ....................................................................................................................9

**RULES**

Federal Rules of Bankruptcy Procedure Rule 4001(b) ...............................................4

Federal Rules of Bankruptcy Procedure Rule 4001(c) ...............................................4

Local Rules of Bankruptcy Procedure Rule 1007-2 ...................................................1

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

North Carillon Beach Condominium Association, Inc., Central Carillon Beach Condominium Association, Inc., and South Carillon Beach Condominium Association, Inc. (collectively, the "Associations," or "HOAs"), by and through their undersigned co-counsel, hereby file this *Motion for Entry of an Order:  (I) Appointing a Trustee Pursuant to Bankruptcy Code Section 1104(a), or, Alternatively, (II) Appointing an Examiner Pursuant to Bankruptcy Code Section 1104(c) and Terminating the Debtors' Exclusivity Period Pursuant to Bankruptcy Code Section 1121(d)* (the "Motion").[1]  In support of the Motion, the Associations respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Associations, not-for-profit Florida corporations that represent the interests of 580 unit owners (the "Unit Holders") at the Canyon Ranch Hotel & Spa Miami Beach (the "Property"), have repeatedly tried to resolve their many issues with Lehman for months. Concerns about mounting and improper charges, Lehman's failure to address manifest construction defects and needed capital expenditures at the Property and Lehman's efforts to exit its investment by fundamentally altering the nature of the significant life-style investment that the Unit Holders were induced into making have consumed the HOAs.  During these many months of often acrimonious relationships, the Unit Holders have been forced to face disturbing

---

[1]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the *Declaration of Anthony Barsanti Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Motion* [Docket No. 2] (the "Barsanti Declaration").  The Debtors are indirect, wholly-owned subsidiaries of Lehman Brothers Holdings, Inc. ("LBHI").  Lehman Ali Inc. ("Lehman Ali") is the sole member of PAMI ALI LLC ("PAMI," and collectively with Lehman Ali and LBHI, "Lehman"), which in turn is the manager and sole member of Debtor FL 6801 Spirits LLC ("Spirits"), the manager and sole member of affiliated Debtors, FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), Fl 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries," and collectively with Spirits, the "Debtors").  The reference to Debtors/Lehman is used to convey the Associations' contention that Lehman controls the conduct of the Debtors.

uncertainty regarding the value of their investments, the costs of maintaining and enjoying the amenities they were promised, the adverse impact on their ability to sell their units and the potential change in the nature of the development they bought into. These ongoing disputes necessitated significant litigation in the state courts of Florida (the "Florida State Courts") and have cost the HOAs millions in professional fees.

2.      However, rather than simply draw and stand behind battle lines, the HOAs have repeatedly sought to consensually resolve their disputes with Lehman. Before these chapter 11 filings, the HOAs agreed to stay the Florida Lawsuits (defined below) so as to explore a purchase of the Property. Indeed, the parties had reached an agreement in principle regarding the economics of such a transaction (the "Pre-Petition Proposal") but, rather than continuing to negotiate in good faith to finalize the terms of that deal, Lehman secretly entered into an alternative deal with 360 Miami and, on the day the litigation stay expired, caused the Debtors to file their petitions and Sale Motion with 360 Miami as the stalking horse bidder.

3.      Attempting to lay the groundwork for a consensual plan, the HOAs, with the substantial assistance of Steven Roth ("Roth")[2] and Scott Prince[3] ("Prince," and together with Roth, the "Interested Parties"), began the process of identifying and interviewing numerous candidates who could operate the Property's hotel and who would consider allowing Canyon Ranch or a similarly qualified spa operator to run the Property's spa facilities. Simultaneously, the HOAs and the Interested Parties worked on raising the financing necessary to insure that a

---

[2]    Steven Roth is the Chairman of the Board and Chief Executive Officer of Vornado Realty Trust. Mr. Roth has been Chairman of the Board since May 1981. He was the Chief Executive Officer from May 1981 through May 2009 and was reappointed on April 15, 2013. Barron's Magazine, in its March 2005, 2006 and 2007 issues named Mr. Roth one of the World's Thirty Most Respected CEO's. In its January 2006 issue on the Best CEO's in America, Institutional Investor magazine designated Mr. Roth as the top CEO in the REIT industry.

[3]    Scott Prince is the Founding Member of Prince Partners, L.P. and previously served as a Co-Managing Partner at SkyBridge Capital II, LLC from 2007 to January 2012. Prior to joining SkyBridge, Mr. Prince served as a Partner at Eton Park Capital Management from 2004 to 2007 and Goldman Sachs & Company from 1998 to 2004.

2

consensual plan could satisfy all administrative, priority and general unsecured claims and result in a reasonable return to Lehman's equity position. These negotiations also centered on finding a new hotel and spa operator that could operate the facilities at the level envisioned by the Unit Holders at the time of their purchase and reverse years of operating losses while insuring that the Unit Holders' payments for ongoing services and amenities were consistent with other premier facilities.

4.    These considerable efforts ultimately bore fruit when Capella Hotel Group, LLC ("Capella") was identified as the best qualified partner to work with the HOAs and Interested Parties to resuscitate the Property. Prior to the Auction, the HOAs provided Lehman with a detailed plan term sheet and related purchase and sale agreement (the "Pre-Auction Proposal"). Unfortunately, after extensive discussions, Lehman rejected the Pre-Auction Proposal for two articulated reasons. First, Lehman demanded that the Florida Lawsuits be dismissed with prejudice and that Lehman and the Debtors receive numerous direct releases from the Associations whether or not the proposed plan was confirmed. Second, Lehman insisted on an economic return on its equity that substantially exceeded the amount it had agreed to accept as part of the Pre-Petition Proposal. As a consequence of this impasse, and over the objection of the HOAs, Lehman went forward with its plan for an auction.

5.    As detailed in their Supplemental Sale Objection,[4] the HOAs believe that the Auction (as defined below) was fundamentally tainted. Among other violations of this Court's approved bidding procedures, Lehman refused to consult with the Associations regarding the bona fides of the bidders it chose to qualify, structured the Auction to artificially drive up the

---

[4]    See *Associations' Supplemental Objection to: (I) Conduct of Auction; (II) Selection of Successful Bidder and Second Highest Bidder; and (III) Terms of Proposed Sale*, dated August 26, 2014 [Docket No. 120] (the "Supplemental Sale Objection").

cash portion of the bid, and ultimately anointed Z Capital Partners, L.L.C. ("Z Capital") as the successful bidder.

6.       Details of the Z Capital bid have only begun to emerge after the August 27, 2014 status hearing, which further supports the HOAs' contention that the anointed bid is nothing more than an illusory free option.  First, the HOAs were informed, after the August 27th hearing that the Z Capital bid has a $500,000 credit (over and above the $300,000 potential credit to be earned if the Favorable Resolution is not achieved in a timely fashion) for contracts it has agreed to assume.   More significantly, further details regarding historical overcharges of the Unit Holders, which serve to artificially depress the true extent of the losses being suffered at the Property, have been uncovered.  In addition, numerous construction defects and deferred capital expenditures have been identified that Lehman has refused to correct, despite the contrary allegations it made as part of its request for Court approval of its DIP Budget.[5]  The HOAs believe that Z Capital's otherwise illusory bid did not factor in these additional losses and potential additional costs, only further casting substantial doubt on its willingness to close a sale transaction at the price it bid at the tainted auction.

7.       During a meeting held on September 2, 2014, within days of the status conference with the Court on August 27th, the Associations presented a revised consensual chapter 11 plan

---

[5]    See *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Super-Priority Financing, and (B) Utilize Cash Collateral of Prepetition Lender; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* [Docket No. 5] (the "DIP Motion")  ("If the Debtors are unable to access Cash Collateral and the DIP Facility until entry of the Final Order, the repairs to the North Tower will be delayed, which could jeopardize the transaction, or consume a greater portion of the consideration that the Debtors receive from the Proposed Sale than would otherwise have been the case.")  DIP Motion ¶ 34; see also Barsanti DIP Declaration ¶16; ("Access to the DIP Facility and the use of Cash Collateral is essential to the success of the Proposed Sale and the administration of the Chapter 11 Cases.  As set forth in the Barsanti Declaration, portions of the Property, particularly the exterior of the North Tower, are deficient and must be repaired.  The expense attendant to completing these repairs is incorporated into the Proposed Sale and, to the extent that the Debtors are able to commence the repair process (including the assessment of the scope of such repairs) and control the related expenses in the time period leading up to the closing, they may be able to retain a larger portion of the sale price for the benefit of their estates."  DIP Motion ¶ 11 (citing Barsanti DIP Declaration ¶ 9).

4

proposal (the "September 2nd Plan Proposal") to the Debtors and Lehman in the Associations' ongoing efforts to resolve these cases.[6]  The contemplated plan would provide enough cash to pay what the Associations were led to believe were all of the budgeted costs of administration, the satisfaction of all of the projected general unsecured claims and a reasonable return to Lehman.[7]  Significantly, the Associations' September 2nd Plan Proposal also includes Lehman's demanded releases of the Associations' Florida Lawsuits (defined below) and would have expedited a harmonious transition of the Property from the Debtors to an entity comprised of several Unit Holders and their chosen new hotel operator.

8.      The September 2nd Plan Proposal had a number of other benefits for Lehman. Under its terms, the HOAs would agree to drop their objection to:  (i) Lehman's claim for a $1.7 million secured claim which the Associations would otherwise have every reason to contest; and (ii) Lehman's asserted $1.4 million general unsecured claim which showed up on the schedules and as to which, the HOAs have been provided no information, despite repeated requests.

9.      Unfortunately, the Associations' considerable efforts appear for naught.  Not only have the Debtors refused to respond to the Associations' latest plan proposal, newly discovered facts and circumstances evidence Lehman's continued efforts to change the economic goal posts for a deal and cling to an auction result that is more mirage than any sort of reflection of true market value.

10.     Since the September 2nd meeting, Lehman has admitted that it did not fund anywhere near the court-approved DIP budget and has failed to make any of the property repairs

---

[6]     Attached hereto as **Exhibit A** is an accurate reflection of the Associations' plan term sheet, as amended to reflect further clarifications made by the Associations subsequent to the September 2, 2014 meeting.

[7]     In fact, the projected return to the equity owners provides more value than what Lehman demanded the Associations deliver in connection with the Pre-Auction Proposal.

called for in that budget.[8]    Instead, Lehman now appears to want the plan proponents to undertake the costs of certain construction defects (estimated at almost $3 million) as an additional cost of funding a plan.    Furthermore, there are literally millions of dollars of other construction defects and/or deferred maintenance costs that Lehman has known about for years but has failed to address.[9]

11.    Despite the passage of time, and even further concessions to the September 2nd Plan Proposal offered by the Associations, there has still been no formal response to the economic terms proposed by the Associations.    Said another way, Lehman has yet to articulate its counter-demand for a return on its equity.

12.    The Associations agree with this Court's view that "[a] plan unlike a sale has the ability to tie off lots of issues," and regarded these cases as a textbook example that the most value accretive course would be a transfer of the Property under a consensual chapter 11 plan. See August 27, 2014 Hr'g Tr. 86:7-8.    To that end, the Associations have worked in good faith for months to negotiate a consensual plan with the Debtors, circulating several plan term sheets and revised purchase and sale agreements, and responding to countless inquiries from the Debtors/Lehman.    In exchange, the Debtors have completely failed to exercise their fiduciary duties to their creditors, opting instead to consider only the financial interests and directions of Lehman.    The Debtors have completely shunned their creditors' interests, refusing even to respond to the Associations' latest plan proposal.

---

[8]    Despite this recent admission, Lehman has still refused to provide a DIP financing Budget variance report.

[9]    It also appears that Lehman withheld these additional costs from the bidders as part of the due diligence process making the likelihood of Z Capital closing all the more speculative.  Lehman continues to want to rely on a long shot (who has not articulated a plan for the operation of the hotel or spa) and who has the option to drag out the uncertainty imposed on the Unit Holders through May 22, 2015, or simply walk away with a return of its deposit if it is not satisfied with the results of litigation over the Florida Lawsuits.

6

13.     Even efforts to streamline discovery and orderly prepare for a trial or trials on the many disputes between Lehman and the HOAs have been stymied by Lehman's puppet Debtors. Despite countless efforts at a meet and confer process, the Debtors have refused to produce documents deemed "irrelevant," provide a schedule as to when documents agreed to would be produced or work on a reasonable schedule for depositions.

14.     In order to preserve the integrity of the chapter 11 process in these cases, the time has come for the Court to appoint a trustee or an examiner.  The Debtors' creditors have lost faith that the Debtors can conduct these proceedings in a manner that is not only fair, but appears fair, the long standing honest-broker mantle the Second Circuit requires of Debtor-fiduciaries. See In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

15.     It is undisputed that the Debtors lack independent management.  They are operated by Lehman officers.   These same officers dominate and control the Debtors' professionals.  They are incentivized to utilize the Debtors as a platform to increase Lehman's bottom line.

16.     Lehman has taken full advantage of its insider status and control over the Debtors and stands to reap the benefit of numerous insider transactions, in addition to any recovery to equity from sale proceeds or under a plan.  Under Lehman's direction, the Debtors have brazenly violated the Bidding Procedures Order and continue to pursue a sale transaction that cannot close and lacks creditor support.[10]

---

[10]   See *Order (A) Approving (i) Bidding Procedures, (ii) Form and Manner of Notices, and (iii) Form of Asset Purchase Agreement, Including Bid Protections; (B) Scheduling the Time, Date and Place for the Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 77].

17.    Appointment of a trustee is now essential as the Debtors appear completely to have lost sight of their fiduciary responsibility to act in the best interests of all creditors of the estates. The Debtors have surrendered their impartiality and independence in favor of allowing the outcome and timing of these cases to be dictated by Lehman. If a trustee is appointed, the Associations stand ready to sponsor a chapter 11 plan substantially in the form set forth in the modified September 2nd Plan Proposal without delay. These cases could be consensually resolved by end of 2014.

18.    Alternatively, an independent examiner should be appointed. Not only is appointment of an examiner plainly mandated by Bankruptcy Code Section 1104(c)(2), it is also in the best interest of the Debtors' estates and thereby justified under Bankruptcy Code Section 1104(c)(1). An independent examiner would be able to conduct an investigation into Lehman's control over the Debtors and insider transactions and mitigate the lack of transparency that has infected these matters to date. Accordingly, if the Court is not prepared to appoint a trustee, the Associations request the appointment of an examiner for the limited purposes of investigating and reporting to the Court and parties-in-interest in these cases on the following:

- Whether the Debtors and Lehman violated the Bidding Procedures Order in connection with their marketing of the Property and conduct of the Auction, including threatening bidders with disqualification if they spoke with the Associations, failing to consult with the Associations, undertaking backroom negotiations with bidders and utilizing straw man bidders;

- Whether the Debtors' DIP financing loan from Lehman was incurred on appropriate terms and conditions, the current status of projects identified in the DIP financing budget, whether the Debtors and Lehman misrepresented DIP budget line items, and the cause for Lehman's failure to provide timely DIP financing variance reporting;

- Whether the Debtors' purportedly secured loan from Lehman was incurred on appropriate terms and conditions;

- Whether Lehman's scheduled general unsecured claim was incurred on appropriate terms and conditions;

- Whether Lehman's various claims against the Debtors should be equitably subordinated or disallowed or otherwise avoided or recharacterized, and any other potential estate causes of action relating to Lehman's insider control over and transactions with the Debtors.

19.    To ensure that the examiner can carry out this mandate, the Court should direct the Debtors and Lehman to cooperate fully with the examiner, including the ability to review communications subject to the Debtors' and Lehman's privileges and to retain outside counsel and any other advisors necessary to complete the investigation.

20.    While an examiner will go a long way to ensure transparency and mitigate substantial conflicts of interest that beset these proceedings, the unique and unfortunate circumstances of these cases also necessitate termination of the Debtors' exclusivity period at this stage of the proceedings, if an examiner rather than a trustee is appointed.

21.    The Debtors/Lehman have done nothing to demonstrate that they have a viable next move that will not lead to more cost, delay, and uncertain litigation risk.  They refuse to work constructively with the Associations, and the Associations have no faith that the Debtors/Lehman are focused on a value accretive plan for unsecured creditors.

22.    The September 2nd Plan Proposal reflects a light at the end of the tunnel – a fair and equitable case result for all parties-in-interest.  It is a better play than the Hail Mary that is the conditional proposed sale to Z Capital.  Accordingly, the Associations request that the Court terminate the Debtors' exclusive period in which to file a plan and solicit votes so that a viable, consensual plan can see the light of day, and these chapter 11 cases can move toward a resolution that benefits all parties-in-interest.  At a minimum, the Associations' plan proposal should be permitted to proceed on a parallel track with the Debtors' proposed sale process.

9

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

23.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for this Motion are sections 1104(a), 1104(c), 1106(a), 1106(b), 1121(a), and 1121(d) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

### A.    Pre-Petition Misconduct Of The Debtors And Lehman.

#### i.    Fraudulent Marketing Of Units.

24.    Lehman's wrongful acts and abuse of the Associations and Unit Holders dates back to when it first took over the Property in 2009 by deed in lieu of foreclosure and a substantial number of units were unfinished and unsold.[11]

25.    While Lehman was marketing units to prospective purchasers, annual budgets were prepared by Canyon Ranch[12] to allocate operational costs between the Hotel Lot Owner and the Unit Holders (via assessments on the Associations).  Lehman was asked by Canyon Ranch to ratify Canyon Ranch's proposed charges.  On at least one occasion for which the HOAs have documented evidence,[13] Lehman refused, and responded that Canyon Ranch's proposed charges

---

[11]    See *Objection to Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, Among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, Among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-Up Fee, (B) An Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and (C) Related Relief, dated June 19, 2014 [Docket No. 52] (*the "Preliminary Sale Objection"); The Associations' Objection to the Sale Motion, dated August 14, 2014* [Docket No. 106] (the "Sale Objection"); and (iii) Supplemental Sale Objection.

[12]    "Canyon Ranch" means, collectively, CR Miami LLC, CR License LLC and Spa Project Advisors.

[13]    The HOAs believe other similar evidence exists and have repeatedly requested documents to that effect for over three months and counting.  To date, the Debtors/Lehman have not produced any responsive documents and have not even agreed to search for such responsive documents.

10

were not reasonable and would violate the Declarations governing the Property.[14]    The annual budget was approved with Lehman's corrected charges.  Subsequent purchasers of units relied on the corrected budgets and charges in purchasing their units.

26.    However, once the majority of the units were sold, starting in late 2012, the Debtors/Lehman began approving the very same charges they previously found to be inappropriate and in violation of the Declarations.  Charges to Unit Holders skyrocketed and Unit Holders found that they were paying almost double the original charges.  The increase in charges on Unit Holders has been relentless and the charges levied now far surpass market assessments for comparable properties in violation of the controlling Declarations.

27.    The result is millions of dollars of improper and unsupported charges (now identified by the Associations' forensic accountants at approximately $32 million over the last six years).[15]    The Unit Holders' potential claims for fraudulent misrepresentation and fraudulent inducement in connection with the marketing of units by Lehman and related to the charges to Unit Holders may amount to hundreds of millions of dollars in damages.

28.    Lehman also marketed units to prospective purchasers with the express representation that Canyon Ranch had a fixed twenty-year contract to run the hotel and spa.[16]    However, in 2009, Lehman surreptitiously amended the management agreement with Canyon Ranch to enable the termination of the agreement in direct contravention of the representations made to purchasers of units.  The Unit Holders' potential claims for fraudulent misrepresentation

---

[14]    Attached hereto as **Exhibit B** is Lehman's communication to Canyon Ranch rejecting Canyon Ranch's proposed allocation.

[15]    Attached hereto as **Exhibit C** are substantially final forms of proofs of claims of the HOAs (without voluminous exhibits) that will be filed before the claims bar date.

[16]    Attached hereto as **Exhibit D** is a comfort letter issued to a Unit Holder by or on behalf of Lehman.

and fraudulent inducement related to Canyon Ranch's involvement at the Property may amount to hundreds of millions of dollars.

### ii.    The Florida Lawsuits.

29.    In response to Lehman's historical improper assessments and other violations of the Declarations, the Associations filed the Florida Lawsuits in the Circuit Court in and for Miami-Dade County, Florida.[17]  Typically, the relationship between a condominium developer and the resulting home owners association is premised on the fact that the parties will need to "live together" for the foreseeable future, coupled with the developers' knowledge that its reputation for dealing fairly with the home owners association will impact its future projects. Lehman, in the process of liquidating its remaining estate, has none of these concerns and its treatment of the HOAs in this case evidences its callous disregard for the need to get along with the Unit Holders and maintain its reputation in the condo-development space.

30.    The Florida Lawsuits seek monetary recovery of the improper historical assessments and declaratory relief with respect to the going forward interpretation of the Declarations.  The Florida Lawsuits are complex litigations, based on statutory and decisional Florida law and dense condominium documents.  The declaratory aspects of those Lawsuits will no doubt require expert testimony and comparative analysis of similar chargees by other condominium developers in the Debtors' market place.

31.    On September 9, 2014, the Associations filed a motion seeking entry of an order finding that the proposed sale cannot be consummated free and clear of the Florida Lawsuits under Bankruptcy Code Section 363, and requesting that the Court abstain from adjudicating the

---

[17]    The Florida Lawsuits are:  *(i) Central Carillon Beach Condominium Association, Inc., South Carillon Beach Condominium Association, Inc. v. FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc., North Carillon Beach Condominium Association, Inc.,* Case No. 2014-5408-CA (01); and *(ii) North Carillon Beach Condominium Association, Inc., vs. FL 6801 Collins North LLC, FL 6801 Collins South LLC, FL 6801 Collins Central LLC and W Capital Group, LLC,* Case No. 14-004356 CA (01).

12

declaratory relief requested in the Florida Lawsuits and lift the automatic stay so that the Florida

State Courts can adjudicate the declaratory relief requested.[18]

### B. Insider Transactions Between The Debtors And Lehman.

32.    On March 12, 2014, wholly-owned Lehman subsidiary PAMI provided the

Debtors with a $2 million secured loan allegedly to pay insurance premiums at the Property.  It is

believed that historically, Lehman paid these expenses as a cost of ownership of the Property and

there was no additional out of pocket expenditure by Lehman for such insurance coverage.

33.    The transaction was rolled under Lehman's umbrella policy for insuring their

substantial property holdings, and upon information and belief, costs of the insurance coverage

were allocated, after-the-fact, to the Debtors without market testing.   The premiums were

charged in amounts unilaterally determined by Lehman, having no basis in the actual cost of

insuring the Property and no precedent in Lehman's history with the Property.  To date, despite

the Associations' repeated requests, the Debtors have not provided any rationale or basis for the

purportedly secured claim, the insurance premiums allocated to the Debtors or the historical cost

of insurance coverage for the Property.

34.    Recognizing the Debtors' impending bankruptcy, it appears that Lehman sought

to exert its insider position to gain an undue advantage to the detriment of unsecured creditors in

connection with the creation of Lehman's secured claim.  The terms and conditions of Lehman's

secured claim are ripe for investigation.

35.    Likewise, Lehman's "mystery" general unsecured claim requires study.  While

the Barsanti Declaration details Lehman's secured claim, it makes no mention of any general

---

[18]    See *The Associations' Motion for Entry of an Order: (I) Abstaining from Adjudicating Declaratory Relief Requested in Florida Lawsuits Pursuant to 28 U.S.C, § 1334 and Lifting the Automatic Stay to Pursue the Declaratory Relief Sought in the Florida Lawsuits Pursuant to 11 U.S.C. § 362, or, in the Alternative, (II) Finding that the Proposed Sale Cannot Be Consummated Free and Clear of the Florida Lawsuits Pursuant to 11 U.S.C. §§ 105 and 363* [Docket No. 132].

unsecured claim of Lehman. Yet, on July 30, 2014, the Debtors filed their schedules and for the first time, publicized a purported unsecured claim in the amount of $1,369,635 owed to Lehman. See Docket No. 95 at 16. Upon inquiry by the Associations, the Debtors were flummoxed, admitting the claim is "not able to be allocated on an individual debtor basis," and providing the unhelpful color that they thought it related to "advances." Id. at 19.

36.    To date, despite repeated requests by the Associations, the Debtors have not produced any loan or other supporting documentation identifying the basis for or propriety of this Lehman claim. Additional independent examination is warranted.

37.    The commencement of these chapter 11 cases did not temper Lehman's appetite to gain advantage at the expense of the Debtors' creditors. On June 25, 2014, the Court approved up to $5 million in debtor in possession financing (the "DIP Financing") provided by PAMI pursuant to the terms of that certain Subordinate Mortgage, Loan and Security Agreement, dated as of June 4, 2014 (the "DIP Agreement").[19]

38.    The record is bereft of any attempts by the Debtors to test the market before agreeing to Lehman's terms for DIP Financing. Much of the DIP budget line items related to necessary repairs and capital expenditures for the Property. But to date, upon information and belief, the Debtors/Lehman have not undertaken any of those vital projects.

39.    Instead, upon information and belief, the DIP loan is being primarily utilized for the Debtors'/Lehman's professional fees in an effort to wear down the Associations' opposition to the proposed Z Capital sale (including the costs of drafting and serving burdensome and harassing discovery on Unit Holders).

---

[19]    See *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364(I) Authorizing the Debtors to (A) Obtain Postpetition Secured Super-Priority Financing, and (B) Utilize Cash Collateral of Prepetition Lender; and (II) Granting Related Relief* [Docket No. 69] (the "Final DIP Order").

40.    Despite repeated requests by the Associations, the Debtors have failed to provide the Associations with DIP variance reports or an updated DIP budget – saying Lehman is still reviewing it.

41.    The DIP Financing Budget projects $3 million in borrowings under the DIP Agreement through September 2014 with nearly two-thirds of projected borrowings for necessary repairs to the North Tower.  However, to date, essentially no work has been done with respect to such repairs.  The DIP Agreement and Budget require careful examination to ensure the Final DIP Order is not being abused by the Debtors/Lehman similar to their wanton breach of the Bidding Procedures Order.

42.    The Associations, as not-for-profit Florida corporations, have done what they can to investigate Lehman's claims, but are hamstrung by the absence of a Creditors' Committee in these cases and the need to assess Unit Holders to pay ever-increasing legal fees in these proceedings to counter-balance the Debtors'/Lehman's misconduct.

43.    The Debtors have also obstructed the Associations' investigation of Lehman's insider transactions.    The Associations' repeated requests for information from the Debtors/Lehman have been wrongfully ignored or responded to inadequately.  Like clock-work, the Associations have requested documents and deposition testimony on June 11th, July 14th and August 15th.  It was not until September 4th that the Debtors finally provided the Associations access to their broker's data room for marketing the Property.  Even that access came with onerous and unfair terms and conditions, including a drop dead date by which the Debtors will pull the plug on the Associations' access to all documents.

15

C.     **The Debtors'/Lehman's Misconduct Related To The Auction.**

    i.     **Misconduct Prior To And During The Auction.**

44.     On June 1, 2014, the Debtors filed the Sale Motion, pursuant to which the Debtors requested, *inter alia*, that the Court enter certain bidding procedures to govern the proposed auction of the Property (the "Auction").[20]

45.     The Associations, long familiar with the operating challenges and intricacies of the Property, freely offered the Debtors/Lehman their views that a sale process would not optimize value in these cases and that a chapter 11 plan was the best path forward.

46.     To that end, on June 17, 2014, the Associations provided the Debtors/Lehman with an initial plan term sheet for a chapter 11 plan that would satisfy all projected costs of administration, all projected priority and general unsecured claims and provide a reasonable distribution to equity.  Lehman responded with a litany of questions and demands.  Lehman's representatives signed off by saying they were heading out on vacation.  Suffice to say, meaningful engagement by Lehman did not follow.

47.     On July 1, 2014, the Court entered its Bidding Procedures Order.[21]

48.     On August 19, 2014, the Debtors conducted the Auction.  See Docket No. 108.

49.     The Debtors/Lehman made up the Auction rules on the fly and repeatedly violated the Bidding Procedures Order.  The Associations believe that Lehman caused the Auction to be

---

[20]     See *Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-Up Fee, (B) an Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts and (C) Related Relief* [Docket No. 4]

[21]     See Order (A) Approving (i) Bidding Procedures, (ii) Form and Manner of Notices, and (iii) Form of Asset Purchase Agreement, Including Bid Protections; (B) Scheduling the Time, Date and Place for the Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contract and Unexpired Leases; and (C) Granting Related Relief [Docket No. 77].

16

conducted in direct violation of the Bidding Procedures Order in numerous respects so as to artificially increase the "cash only" aspect of the competing bids, including by:

- prohibiting potential bidders, under the threat of disqualification, from contacting the Associations;

- failing to disclose the basis for qualifying bids and failing to consult with the Associations about the requirements to qualify bids;

- failing to timely circulate Qualified Bids;

- inviting straw-man bidders to participate in the Auction, including a bidder who admitted to not having viewed the Property and a bidder who could not readily confirm that he did not collude prior to the Auction;

- failing to properly consult with the Associations with respect to the selection of the highest or best bid;

- prohibiting the Associations from making any statements at the Auction;

- failing to provide information about bidders' qualifications and prohibiting the Associations and Qualified Bidders from asking questions about other bidders at the Auction, including questions about the bidders' financial capacity and ability to operate a world-class condominium-based hotel and spa facility;

- refusing to disclose various credits allocated only to certain bids at the Auction;

- refusing to consider improvements in bids based on non-cash considerations, thereby artificially boosting the cash component of the bids;

- closing the Auction as to cash bidding and then continuing to negotiate purchase price and terms with various bidders; and

- failing to timely announce the identity of or the terms and conditions of Successful Bidder so as to continue to negotiate and play bidders off one another.

50.     Additionally, the behavior of certain bidders at the Auction raises serious questions concerning their authenticity and role in the process.  For example, the representative for the purported Second Highest Bidder, North Beach Development, LLC ("North Beach"), admitted at the Auction that he had never even seen the Property prior to the Auction.  See August 19, 2014 Auction Tr. ("Auction Tr.") at 63:15 (North Beach: "I never saw the

17

property.").  The fact that North Beach may not have done any significant diligence prior to the Auction raises serious questions about the authenticity of their numerous, ever increasing bids. The representative for another bidder, Polo North Golf Club, Inc. ("Polo North"), initially refused to state whether he agreed to be bound by the Bidding Procedures Order, and was uncertain whether he had colluded in connection with the Auction.[22]  See Auction Tr. at 18:25-20:15; 21:8-22:7.

51.    An independent investigation of the Debtors'/Lehman's conduct in connection with the Auction is necessary to protect the integrity of this Court's Bidding Procedures Order.

ii.    **Post-Auction Bad Faith.**

52.    The Debtors/Lehman's misconduct continued after the Auction.  After closing the Auction, the Debtors/Lehman continued to negotiate behind closed doors with Z Capital and 6801 Collins Hotel LLC ("6801 Collins"), playing their bids off each other.

53.    In a frenzied and undignified pursuit to extract every last scrap of consideration for itself, the Debtors/Lehman informed the Associations that their preferred bidder, 6801 Collins, would only remain in contention if the Associations delivered not only additional cash consideration, but also:  (i) releases of all their claims and Florida Lawsuits up-front and with prejudice, come "hell or high water," unless a court found by final order a sellers' breach; and (ii) releases from each the Associations' Board members, certain Unit Holders deemed by the Debtors/Lehman to be "trouble-makers," and 6801 Collins' sponsors, from any claims they may have against not only the Debtors but Lehman as well.

---

[22]    The Associations have discovered that the owner of Polo North, who attended the Auction, has been involved in a number of litigations with homeowners' associations in Florida, including for allegedly bilking associations for millions of dollars in unauthorized assessments.  See, e.g., Straub v. Muir-Villas Homeowners Ass'n, Inc., No. 4D12-1335, District Court of Appeal of Florida, Fourth District (Dec. 18, 2013).

54.    The back-room dealing and last-minute demand for releases running to Lehman was never part of the Auction process or part of this Court's Bidding Procedures Order.

55.    Even the proposed Z Capital Purchase Agreement reflects the Debtors/Lehman's bad faith and abuse of process.  It contains material modifications to the form purchase agreement that every bidder was instructed to bid off of, including a new six-month extension of the time within which the Debtors would be required to obtain the Favorable Resolution (now providing an almost endless runway to May 22, 2015) and a potential $300,000 reduction in the purchase price to be paid by Z Capital for that additional time to litigate.  See Z Capital Purchase Agreement § 10(d)(vi).

56.    Besides serving as a tacit acknowledgement that any attempt at obtaining the Favorable Resolution will be expensive, time-consuming and uncertain, these modifications underscore how the Debtors'/Lehman's stewardship of these cases must end or their conduct investigated by an impartial fiduciary.

**D.    The Debtors' Proposed Sale To Z Capital.**

**i.    Z Capital's Inferior Bid.**

57.    On August 21, 2014, the Debtors announced that Z Capital was selected as the Successful Bidder [Docket No. 113], over the Associations' recommendation that the 6801 Collins bid was the best offer.

58.    While it requires independent examination, it appears that the only possible basis for the Debtors/Lehman to select the Z Capital bid over the 6801 Collins bid was the (illusory) potential for more cash consideration to Lehman.  That gambit quickly disintegrates if even a small portion of the Associations' claims for improper assessments are allowed.

59.    There is not a reasonable expectation that Z Capital can or will close and every reason to believe that it cannot or will choose not to close, given the Favorable Resolution

19

condition and the Associations' staunch opposition to Z Capital's hostile takeover of the Property.[23]

60.    Z Capital itself, has little or no experience owning or managing a lifestyle condominium hotel and spa, and has not disclosed any plan for the operation of the hotel or spa or any hotel manager for the project.

61.    Z Capital has not disclosed how it intends to stanch the millions of dollars in yearly operating losses (the true extent of which has been masked by the millions in improper assessments), an issue that this Court has described as "critical" to the resolution of theses chapter 11 cases.  See August 27, 2014 Status Conf. Tr. at 64:10-11; see also 28:6-13 (Court: "[$21.6 million] is a big number to commit to this project, particularly given the . . . financial stress that it has endured and continues to endure.  So one would think that before committing that much capital one would have an idea, one would have a game plan, a business plan and that that would include an operator.").

62.    In sum, the Z Capital Purchase Agreement offers no viable path for resolving the Florida Lawsuits or closing a transaction for the Property.  Why the Debtors/Lehman continue to promote it as a viable option speaks volumes for the need of a trustee or examiner in these cases.

### ii.    The Associations' Plan Alternative.

63.    The Associations have been working diligently to prepare a viable consensual plan that benefits the estates, creditors, equity and the residents whose daily lives are impacted by these cases.

64.    As set forth in the September 2nd Plan Proposal, the Associations' contemplated plan would provide up to $14 million in cash consideration, pay in full all legitimate costs of

---

[23]    Z Capital's only exposure is the potential loss of its $1.245 million deposit.  Even this exposure is limited given that the deposit will be returned to Z Capital if the transaction does not close because of the Debtors' failure to obtain a Favorable Resolution.

administration, pay all projected allowed priority and unsecured claims, and provide a reasonable distribution to Lehman.

65.    To top it off, the Associations' plan delivers the dismissal of the Florida Lawsuits and releases of the Associations' claims against the Debtors/Lehman and expedites a harmonious transition of the Property from the Debtors to an entity supported by the Associations.

## RELIEF REQUESTED

66.    The Associations respectfully request that the Court enter an order appointing a chapter 11 trustee pursuant to Bankruptcy Code Section 1104(a) or, alternatively, appointing an examiner pursuant to Bankruptcy Code Section 1104(c) and terminating the Debtors' exclusivity period pursuant to Bankruptcy Code Section 1121(d).

## ARGUMENT

**A.    The Court Should Appoint A Trustee
Pursuant To Bankruptcy Code Section 1104(a).**

**i.    Legal Standard.**

67.    Bankruptcy Code Section 1104(a) provides as follows:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee -

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

21

11 U.S.C. § 1104(a).

68.    Accordingly, under Bankruptcy Code Section 1104(a), a court is required to appoint a trustee:  (i) at the request of a party in interest; (ii) at any time prior to plan confirmation; and (iii) when *either* cause exists, including fraud, dishonesty, incompetence, or gross mismanagement, *or* such appointment is in the best interest of creditors.  See 11 U.S.C. § 1104(a).

69.    The requirements for the appointment of a trustee are satisfied.  The Associations are parties in interest and no plan has been confirmed.  Further, sufficient cause exists to appoint a trustee and such appointment is in the best interest of the Debtors' estates.

ii.    **The Debtors' Misconduct And Derogation
Of Their Fiduciary Duties To Creditors Provides
Sufficient Cause To Justify The Appointment Of A Trustee.**

70.    A finding of "cause" under Bankruptcy Code Section 1104(a)(1) mandates the appointment of a trustee.  See Oklahoma Refinancing Co. v. Blaik (In re Oklahoma Refinancing Co.), 838 F.2d 1133, 1136 (10th Cir. 1988); In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  Although the Bankruptcy Code does not define "cause," "[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; . . . various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." In re Altman, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), aff'd in part, vacated in part, 254 B.R. 509 (D. Conn. 2000).

71.    As set forth in this Motion, substantial "cause" exists to appoint a trustee under Bankruptcy Code Section 1104(a)(1).

72.    First, Lehman's complete domination and control over the Debtors' stewardship of these chapter 11 cases reflects a hopeless conflict of interest that necessitates appointment of a

trustee.  See In re Cajun Elec. Power Coop., Inc., 74 F.3d 599, 600 (5th Cir. 1995) (appointing trustee on rehearing because of conflict of interest of debtors' board members); In re Fiesta Homes of Georgia, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("[T]he presence of a conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); In re Nautilis of New Mexico, Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (holding that conflict of interest of debtors' controlling owner warranted appointment of trustee).

73.    Second, the Debtors' wanton disregard for their creditor' interests is in complete derogation of their fiduciary duties and cause for the appointment of a trustee.  Cf. August 27, 2014 Status Conf. Tr. 32:12-13 (Court: "[Y]our fiduciary duties are to the creditors of these debtors.").

74.    Congress has mandated that debtors-in-possession act as honest brokers in exercising their fiduciary duties to the estate and their creditors.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.").

75.    The Debtors are not acting as fiduciaries of the estates or their creditors. Lehman's control over the Debtors has already resulted in myriad insider transactions benefitting Lehman that must be investigated and may result in significant estate causes of action. Lehman's domination and control has also resulted in a tainted auction and the misguided selection of the Z Capital bid.  A trustee is essential to clear the air and move these cases forward.

76.    <u>Finally</u>, the Debtors'/Lehman's antipathy towards the Associations and Unit Holders has metastasized during these chapter 11 cases, constituting further "cause" for the appointment of a trustee.

77.    Courts have regularly found that acrimony between a debtor and its creditors is sufficient "cause" to appoint a trustee. See <u>Marvel Entm't Grp., Inc.</u>, 140 F.3d 463, 473 (3d Cir.) (holding that acrimony between debtor-in-possession and creditors is sufficient "cause" under Bankruptcy Code Section 1104(a)(1) to warrant appointment of a trustee); <u>In re Eurospark Indus., Inc.</u>, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) ("[A]crimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under 11 U.S.C. § 1104(a)(1).") (citing <u>Marvel Entm't Grp.</u>); <u>In re The Bible Speaks</u>, 74 B.R. 511, 513 (Bankr. D. Mass. 1987) ("[T]he need for a neutral party to mediate disputes between the debtor and its creditors are grounds for a trustee's appointment.").

78.    The appointment of a trustee is warranted by the fact that the Debtors/Lehman and the Associations are at loggerheads, solely on account of Lehman's actions and improper demands for more and more value for itself. The Debtors refuse to respond to the September 2nd Plan Proposal. Discovery has come in drips and drabs. For the past year, the Debtors/Lehman have given the Associations nothing but the runaround. Under the Debtors/Lehman's stewardship, nothing but litigation is on the horizon.

79.    The only path forward that adequately addresses the interests of all parties involved in these chapter 11 cases is the appointment of an independent trustee. See <u>Marvel Entm't Grp.</u>, 140 F.3d at 475 (supporting the district court's exercise of its discretion to appoint a trustee based on the fact that "the parties [were] sharply divided on many issues, and [were] incapable of resolving them [at that time.]").

24

### iii.    Appointment Of A Trustee Is In
### The Best Interests Of The Debtors' Creditors.

80.    Bankruptcy Code Section 1104(a)(2) provides that the Court may appoint a trustee if such appointment is "in the interests of creditors." See 11 U.S.C. § 1104(a)(2); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); In re Sharon Steel Corp., 871 F.2d 1217, 1227 (3d Cir. 1989).  Bankruptcy Code Section 1104(a)(2) recognizes the "practical reality that [in certain cases] a trustee is needed." See In re V. Savino Oil & Heating Co., 99 B.R. 518, 527 n. 11 (Bankr. E.D.N.Y. 1989).

81.    Courts have considered several factors when determining whether the appointment of a trustee is in the best interests of creditors, including:  (i) the debtor's trustworthiness; (ii) the lack of creditor confidence in the debtor's management; and (iii) the relative benefits of appointing a trustee versus the costs. See Euro-America Lodging Corp., 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (citing In re Ionosphere Clubs, Inc., 113 B.R. at 168). Each of these factors militates in favor of appointing a trustee.

82.    Put simply, the Debtors cannot be trusted to exercise their fiduciary duties in these chapter 11 cases given their historical unwillingness to even consult with the Associations when required by court order.  Their reflexive kowtowing to the interests of Lehman has tarnished these cases and their continued stewardship is not in the best interests of creditors.

83.    The Associations have completely lost confidence in the Debtors' ability to act as fiduciaries for the interests of the estates' creditors.  Meanwhile, the Associations have a viable, consensual plan ready that could advance these cases to conclusion in short order, despite the unrelenting efforts of the Debtors/Lehman to put these cases into a tailspin.

84.    All the Associations' need is a fair shot and a partner across the table willing to work with them in good faith.  With the Debtors/Lehman at the head of the table, there is no fair

25

shot.  A trustee should be appointed and could easily step right in and drive these cases to conclusion with minimal additional cost to the estates and great benefit to their creditors.

85.    Accordingly, the appointment of trustee is in the best interest of the Debtors' estates and creditors.

**B.    Alternatively, The Court Should Appoint An Examiner In These Chapter 11 Cases Under Bankruptcy Code Section 1104(c).**

86.    If the Court does not appoint a trustee, the Associations respectfully request that the Court enter an order appointing an examiner to investigate and report on: (i) the Debtors'/Lehman's conduct during the sale process and whether they violated the Bidding Procedures Order; (ii) the numerous insider transactions between the Debtors and Lehman, including the DIP Financing and budget, purported Lehman secured claim and the newly disclosed Lehman general unsecured claim; and (iii) any related estate claims against Lehman, including equitable subordination, disallowance or recharacterization.

87.    Investigating potentially improper transactions between a debtor and its affiliates, and evaluating potential claims arising from those transactions are quintessential duties of an examiner.  This Court can, and should, empower the examiner to access the Debtors'/Lehman's communications with their counsel and other advisors (including communications subject to the Debtors'/Lehman's privileges) – information that is not available to the Associations.  To facilitate the examiner's investigation, the Court should direct the Debtors/Lehman to cooperate in the investigation and permit the examiner to retain outside counsel and other advisors that are necessary for the examiner to complete the investigation.  To ensure the examination is conducted expeditiously, the Court should require the examiner to report to the Court within 60 - 90 days from the date of entry of an order approving the appointment of an examiner.  Moreover,

until the Court has had an opportunity to receive and consider the examiner's report, the Court

should defer consideration of the Sale Motion.

### i.    Legal Standard.

88.    Bankruptcy Code Section 1104(c) of the Bankruptcy Code provides as follows:

> If the court does not order the appointment of a trustee under this section,
> then at any time before confirmation of a plan, on request of a party in
> interest or the United States trustee, and after notice and a hearing, the
> court shall order the appointment of an examiner to conduct such an
> investigation of the debtor as is appropriate, including an investigation of
> any allegations of fraud, dishonesty, incompetence, misconduct,
> mismanagement, or irregularity in the management of the affairs of the
> debtors of or by current or former management of the debtor, if—
>
> > (1) such appointment is in the interests of creditors, any equity
> > security holders, and other interests of the estate; or
> >
> > (2) the debtor's fixed, liquidated, unsecured debts, other than debts
> > for goods, services, or taxes, or owing to an insider, exceed
> > $5,000,000.

89.    Accordingly, under Section 1104(c), a court is required to appoint an examiner:

(a) at the request of a party in interest; (b) at any time prior to plan confirmation; (c) when a

trustee has not been appointed; and (d) when *either* such appointment is in the best interest of

creditors *or* the debtor's fixed, liquidated, or unsecured debts other than debts for goods,

services, taxes, or insider debts exceed $5 million.  See 11 U.S.C. § 1104(c); Morgenstein v.

Revco D.S., Inc., In re Revco D.S., Inc.), 898 F.2d 498, 500-01 (6th Cir. 1990).

### ii.    Appointment Of An Examiner
### Is Mandatory Under Bankruptcy Code Section 1104(c)(2).

90.    "On its face, Section 1104(c)(2) mandates the appointment of an examiner where

a party in interest moves for an examiner and the debtor has $5,000,000 in qualifying debt."  See

Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral Space

Commc'ns Ltd.), No. 04-Civ-8645, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2014); In re

<u>Revco D.S., Inc.</u>, 898 F.2d 498 at 500-01 ("[Section 1104(c)(2) plainly means that the bankruptcy court 'shall' order appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if a [party in interest] requests one."); <u>In re Big Rivers Elec. Corp.</u>, 284 B.R. 580, 584 (W.D. Ky. 2002); <u>In re Schepps Food Stores</u>, 148 B.R. 27, 30 (Bankr. S.D. Tex. 1992).

91.    The elements of Bankruptcy Code Section 1104(c)(2) are satisfied here.    The Court has not appointed a trustee and no plan has been filed.  The Debtors unquestionably have more than $5 million in qualifying unsecured debt.  The Debtors' Schedules of Assets and Liabilities list claims, among others aggregating millions of dollars, of:  (i) $8,700,000 for the Associations (a recent forensic audit has put the value of these claims at no less than $32 million); (ii) $5,082,211 for Canyon Ranch; and (iii) $1,470,200 for K/M Plaza.  <u>See</u> Docket No. 95.  These are claims over and above Lehman's recently asserted general unsecured claim for some $1.4 million.  <u>See</u> <u>Id.</u>

92.    Accordingly, Bankruptcy Code Section 1104(c)(2) mandates the appointment of an examiner to conduct an investigation into the insider transactions and dealings between the Debtors and Lehman.  Given Lehman's unfettered control of the Debtors throughout these chapter 11 cases and the fact that there is no Creditors' Committee appointed in these cases, appointment of an examiner is particularly appropriate to investigate and report on any estate causes of action against the Debtors' controlling insider, Lehman.

### iii.    Appointment Of An Examiner Is Necessary, Appropriate, And In The Best Interest Of The Debtors' Creditors.

93.    Bankruptcy Code Section 1104(c)(1) provides that the Court "shall" appoint an examiner where such an appointment is in the "interests of creditors."  <u>See</u> 11 U.S.C. § 1104(c)(1).  Given the extent of the Debtors' abdication of their fiduciary duties to their creditors

and Lehman's insider control and self-dealing, appointment of an examiner is in the best interest of creditors in these cases.

94.     A thorough and independent investigation is needed into the numerous transactions between the Debtors and Lehman and whether Lehman's domination and control over the Debtors gives rise to estate claims for, *inter alia*, subordination or recharacterization. Case law is clear that appointing an examiner is warranted under these circumstances.  See Keene Corp. v. Coleman (In re Keene Corp.), 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (appointing examiner to review affiliate transfers) (citing M. Bienenstock, Bankruptcy Reorganization 200 (1987) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated.").

95.     An impartial investigation is particularly critical here given there is no Creditors' Committee.  An "examiner answers solely to the Court" and acts as an "objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights."  See In re FiberMark, 339 B.R. 321, 325 (Bankr. D. Vt. 2006); In re Gitto Global Corp., No. Civ. 05-10334, 2005 WL 1027348, at *2 (D. Mass May 2, 2005) (An examiner is "first and foremost disinterested and nonadversarial.").

### iv.     The Proposed Scope Of The Examiner's Investigation Is Reasonable And Appropriate.

96.     The Associations propose that the scope of the examiner's investigation include: (i) the Debtors'/Lehman's conduct during the sale process and whether they violated the Bidding Procedures Order; (ii) the numerous insider transactions between the Debtors and Lehman, including the DIP Loan and budget, purported Lehman secured claim and the Lehman general

29

unsecured claim; and (iii) any related estate claims against Lehman, including equitable subordination, disallowance or recharacterization.

97.    The scope of the proposed investigation falls well within the statutory authority provided under Bankruptcy Code Section 1106(b), which provides for an examiner to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor. . . " and "file a statement of any investigation conducted . . ., including any facts ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate. . . ." See 11 U.S.C. § 1106(b), (a)(3)-(4); see also In re Gilman Servs., 46 B.R. 322, 327 (Bankr. D. Mass. 1985 (the primary function of an examiner is to "investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former managers.").

98.    Additionally, courts have recognized the need to be flexible and provide examiners with sufficient powers as circumstances warrant. See In re Int'l Distrib. Ctrs., 74 B.R. 221, 224 (S.D.N.Y. 1987); In re Carnegie Int'l Corp., 51 B.R. 252, 255 (Bankr. S.D. Ind. 1984). The scope of the proposed investigation is warranted under the circumstances and falls well within this flexible standard.

99.    The scope of the proposed investigation is also consistent with orders appointing examiners in other recent chapter 11 cases. See In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 20, 2012) [Docket No. 454] (ordering appointment of examiner to investigate and report on debtors' prepetition transactions with non-debtor and claims that debtors may hold claims related to such transactions); In re Dynegy Holdings, LLC,

30

Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. Dec. 29, 2011) [Docket No. 276] (ordering appointment of examiner to conduct investigation and report on conduct of debtors and non-debtor affiliates in connection with prepetition transfers); In re Washington Mutual, Inc., Case No. 08-12229 (MFW) (Bankr. D. Del. July 22, 2010) [Docket No. 5120] (ordering appointment of examiner to investigate and report on potential causes of action belonging to estates); In re DBSI, Inc., Case No. 08-12687 (PJW) (Bankr. D. Del. Mar. 25, 2009) [Docket No. 2974] (ordering appointment of examiner to investigate and report on debtors' inter-company transactions and transfers).

**C.    In Addition To Appointing An Examiner, The Court Should Terminate The Debtors' Exclusivity Pursuant To Bankruptcy Code Section 1121(d).**

100.    These cases cry out for direction and a prompt resolution under a consensual chapter 11 plan. Cf. August 27, 2014 Hr'g Tr. 86:7-8 (Court: "A plan unlike a sale has the ability to tie off lots of issues"). Despite the numerous benefits that a consensual chapter 11 plan offers, the Debtors/Lehman have shown no inclination to advance any chapter 11 plan. Instead, with blinders on, they propound the merits of an uncertain and highly conditional proposed sale transaction. It is a recipe for protracted litigation, not progress.

101.    Conversely, the Associations stand ready with a viable, consensual plan for the Property. The Court should terminate the Debtors' exclusivity and allow the Associations to sponsor a plan consistent with the September 2nd Plan Proposal. It will advance these cases. At a minimum, the Associations' plan proposal should proceed on a parallel track to the Debtors' proposed sale transaction.

**i.    Legal Standard.**

102.    Although Bankruptcy Code Section 1121(b) grants a debtor the exclusive right to file a plan during the first 120 days following the petition date, Bankruptcy Code Section

31

1121(d)(1) provides that "the court may for cause reduce or increase" the debtor's exclusivity period.  See 11 U.S.C. §§ 1121(d)(1) and 1121(b).

103.    Bankruptcy Code Section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of 'cause.'"  Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home, Inc.), 187 B.R. 128, 132 (D. N.J. 1995) (citations omitted); see also In re Lehigh Valley Prof'l Sports Club, Inc., No. 00–11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under §1121(d) is committed to the sound discretion of the bankruptcy judge); Adelphia, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.").

104.    Congress intended Bankruptcy Code Section 1121 to strike a balance between: (i) the presumption that the debtor should be given control, initially, over the plan process; and (ii) the rights of creditors to "limit the delay that makes [them] the hostages of Chapter 11 debtors."  See United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 372 (5th Cir. 1987), aff'd, United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988).

105.    Although Bankruptcy Code Section 1121(d)(1) does not define "cause," courts have identified the following multi-factor, balancing test in determining whether to terminate exclusivity:  (i) the size and complexity of the case; (ii) the necessity of sufficient time to negotiate and prepare adequate information; (iii) the existence of good faith progress toward reorganization; (iv) whether the debtor is paying its debts as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress negotiating with creditors; (vii) the length of time the case has been pending;

32

(viii) whether the debtor is seeking an extension to pressure creditors; and (ix) whether or not unresolved contingencies exist.  See, e.g., In re Borders Grp., Inc., 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (considering the foregoing factors); In re Adelphia Commc'ns Corp., 352 B.R. at 587 (same). In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997) (same).

106.    The same courts have cautioned, however, that in "determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate ***moving the case forward***.  And that is a practical call that can override a mere toting up of the factors."  See Dow Corning, 208 B.R. at 670 (emphasis added); see also Adelphia Commc'ns, 352 B.R. at 590 ("practical considerations, or other considerations in the interests of justice, could override . . . the result after analysis of the nine factors").  It is critical "to draw back from the narrow focus on individual factors and scan the big picture."  See Dow Corning, 208 B.R. at 669.

### ii.    Abundant Cause Exists Under Bankruptcy Code Section 1121(d) To Terminate The Debtors' Exclusivity.

107.    The time is right to terminate the Debtors' exclusivity.  The Associations have worked tirelessly on behalf of the Unit Holders, who will continue to live with the aftermath of these cases long after the Debtors/Lehman divest themselves of the Property.  The efforts have borne fruit and can quickly blossom into a viable, consensual plan and harmonious transition of the Property from the Debtors to an entity comprised of several Unit Holders and their chosen new hotel operator.

108.    Because the Debtors have failed to engage with the Associations (their largest creditors by far) in good faith plan negotiations, exclusivity should be terminated to permit the Associations to attempt to resolve these cases in a prompt, equitable and fair manner.

1.    _The Issues In This Case Are Straightforward._

109.    The Debtors' capital structure is simple and, aside from the claims of the Associations and Unit Holders (which comprise the substantial majority of the Debtors' liabilities), their liabilities are modest.  The Debtors have no operations, employees, and are not reorganizing.  They are completely beholden to Lehman.  As demonstrated by the record and hearings to date, these cases are a two-party dispute between the Debtors and the Associations.

110.    There is no reason why the Debtors should be permitted to run these cases into the ground.  See In re Am. Fed'n of Television and Radio Artists, 30 B.R. 772, 774 (Bankr. S.D.N.Y. 1983) (declining to extend the exclusivity period in a "not . . . unusually large case," where two creditors held approximately 98% of the debtor's total liabilities).   Rather, the Associations should be granted the opportunity to marshal these cases to a successful conclusion for all parties-in-interest under the Associations' plan proposal.

2.    _The Debtors' Negotiations_
_With The Associations Have Been Unsuccessful._

111.    From the outset of these cases, the Associations have sought to jointly sponsor a consensual chapter 11 plan that would pay all projected costs of administration, satisfy projected allowed unsecured claims in full, and provide a reasonable return to equity.  As early as June 20, 2014, counsel for the Associations sent a letter to Lehman outlining a proposed plan that offered these terms and a clear path to resolve the Florida Lawsuits.  The Debtors/Lehman demanded more cash and other concessions solely for the benefit of Lehman.  These events have occurred time and time again in these cases.

112.    The Debtors have failed to make good faith progress on a consensual plan and have shown no inclination or ability to resolve these cases.  See e.g., In re Sharon Steel Corp. 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987) (declining to extend the exclusivity period because, _inter_

34

*alia*, there was no indication that the debtor was progressing in negotiating towards a plan); In re Crescent Beach Inn, Inc., 22 B.R. 155, 160 (Bankr. D. Me. 1982) (shortening the exclusivity period where "bitter feuding" between the principal parties was deemed to be a major obstacle to confirmation of chapter 11 plan).  The Associations stand ready with a viable, consensual plan. The Court should provide the Associations an opportunity to advance these cases.

3.    *The Debtors Have Failed To Demonstrate*
*Reasonable Prospects of Filing a Viable Plan.*

113.    There is no evidence that the Debtors can demonstrate reasonable prospects of filing a viable plan.  There is no guarantee that Z Capital can or will close the transaction contemplated in the Z Capital Purchase Agreement and every reason to believe they cannot or will choose not to close.  Z Capital has not disclosed any plan for the operation of the hotel or the spa or how they will maintain sufficient participation in the rental management program to quell ongoing operating losses in an amount of no less than $5 million a year.    Given the Debtors'/Lehman's lack of transparency, Z Capital may not even have known there are several millions of dollars of necessary repairs and deferred maintenance requiring additional investment.

114.    Z Capital was afforded a low-risk opportunity to bid up at the Auction, knowing that the risk attendant to its failure to close would amount to, at most, the loss of its deposit.  The Z Capital plan is nothing more than a wish, a hope and a prayer that "something" will come together.

115.    Meanwhile, the Unit Holders are prejudiced.  No Unit Holder will be able to sell their units absent there being a known operator for the hotel and spa.  The Debtors/Lehman have put 580 units in limbo to gamble on an unlikely outcome, which, if it miraculously comes through, would still lead to litigation and losses at the Property.

116.    The facts are analogous to those in <u>In re Grossinger's Associates</u>, 116 B.R. 34, 36

(Bankr. S.D.N.Y. 1990) where the Court terminated a debtor's exclusivity because

reorganization was premised on a "visionary concept" in which the refinancing of the debtor was

contingent upon the revival of a non-Debtor entity.  .   The Court opined that "[a]fter more than

six months of delay and no progress, the creditors in this cases should not be required to await

the outcome of an attempted restructuring of a nondebtor entity before the debtor may expect to

make efforts to fund a plan of reorganization."  <u>Id.</u>  Similarly here, unsecured creditors should

not have to wait until the end of the 120-day exclusivity period for the Debtor to realize that the

Z Capital pipe dream will not materialize.

<div align="center">

*4.    Terminating Exclusivity Will*
<u>*Move These Chapter 11 Cases Forward.*</u>

</div>

117.    In assessing whether "cause" exists to terminate exclusivity, "the primary

consideration should be whether or not doing so would facilitate moving the case forward."

<u>Dow Corning</u>, 208 B.R. at 670; <u>see also</u> <u>In re Henry Mayo Newhall Mem'l Hosp.</u>, 282 B.R. 444,

453 (B.A.P. 9th Cir. 2002) ("a transcendent consideration is whether adjustment of exclusivity

will facilitate moving the case forward toward a fair and equitable resolution."); <u>Adelphia</u>, 352

B.R. at 590 (the court should look at "whether terminating exclusivity would move the case

forward materially, to a degree that wouldn't otherwise be the case.").

118.    Terminating exclusivity will move these cases forward as the Associations have a

plan proposal ready that contemplates a consensual and highly confirmable plan that can yield a

transaction in a short period of time and benefits all parties-in-interest, including Lehman.

<div align="center">

*5.    <u>Terminating Exclusivity Will Not Prejudice The Debtors.</u>*

</div>

119.    Terminating the Debtors' exclusivity does not prejudice the Debtors because it

does not prevent them from proposing a plan or pursuing the Z Capital sale; instead, it simply

<div align="center">36</div>

opens up the process for the Associations' plan proposal and levels the playing field.  See In re R.G. Pharm., Inc., 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("[t]he fact that the debtor no longer has the exclusive right to file a plan does not affect its concurrent right to file a plan."); In re All Seasons Indus., 121 B.R. at 1002, 1005 (Bankr. N.D. Ind. 1990) (denial of request for extension is not the "death knell" for a debtor's reorganization; "debtor remains free to take as long as it wishes or feels appropriate to develop and propose its own plan.").

120.    There is no utility in maintaining the Debtors' exclusivity.  At a minimum, exclusivity should be terminated and the Associations' plan proposal should proceed on a parallel track as the Debtors' proposed sale to Z Capital.  Creditors could then evaluate the merits of both potential paths and choose which direction to support.

6.    *Creditors Have Lost Confidence In The Debtors'*
      *Ability To Manage The Property And Guide These Cases.*

121.    The Associations, as the Debtors' largest unsecured creditors, have lost faith in the Debtors/Lehman's ability to guide these cases to a consensual resolution.  As set forth in this Motion, appointment of a trustee is necessary to instill an appropriate honest broker to move these cases forward.  Alternatively, an examiner is warranted to investigate the insider control and transactions that benefit Lehman and whether there are related estate causes of action.

122.    In short, the Associations do not believe that the Debtors/Lehman are capable of abiding by their fiduciary duties to their creditors.  This tension has been exacerbated over time and after a reflective "stop, look, and listen" – the best next step in these cases is to terminate exclusivity to permit the Associations' plan proposal.

## NO PRIOR REQUEST

123.    No prior motion for the relief requested herein has been made to this Court or any other court.

37

## NOTICE

124.    Notice of this Motion has been given to:  (i) counsel to the Debtors; (ii) counsel to Lehman; (iii) the Office of the United States Trustee; (iv) counsel to Z Capital; (v) counsel to North Beach; (vi) creditors on the Debtors' schedule of the holders of the twenty largest unsecured claims; and (vii) parties who have filed notices of appearance.  The Associations respectfully submit that no other or further notice need be given.

*[The remainder of this page is intentionally left blank.]*

## CONCLUSION

**WHEREFORE**, the Associations respectfully request entry of an order: (i) appointing a chapter 11 trustee pursuant to Bankruptcy Code Section 1104(a): or, alternatively, (ii) an examiner pursuant to Bankruptcy Code Section 1104(c) and terminating the Debtors' exclusivity period pursuant to Bankruptcy Code Section 1121(d); and (iii) such other relief as the Court may deem appropriate.

Dated: New York, New York
        September 11, 2014

Respectfully submitted,

**NORTH CARILLON BEACH
CONDOMINIUM ASSOCIATION, INC.,
CENTRAL CARILLON BEACH
CONDOMINIUM ASSOCIATION, INC., AND
SOUTH CARILLON CONDOMINIUM
ASSOCIATION, INC.**

By their counsel,
BROWN RUDNICK LLP
By:

/s/ *Edward S. Weisfelner*
Edward S. Weisfelner
Howard S. Steel
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

-and-

BILZIN SUMBERG BAENA PRICE &
AXELROD, LLP
Scott L. Baena (admitted *pro hac vice*)
Mindy A. Mora
Martin A. Schwartz
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 351-2242

39

# EXHIBIT A

### HOAs' September 2nd Consensual Plan Proposal (As Revised)

**Admin[1]:**

| | |
|---|---|
| 1.5 mm | DIP[2] |
| 1.7 mm | Secured Claim[2] |
| 440K | Break-Up Fee |
| 240K | Taxes |
| 1.5 mm | 503(b)[3] |
| **5.38 mm** | |

**GUC[1]:**

| | |
|---|---|
| 1.4 mm | PAMI unsecured claim[2] |
| 1.4 mm | Canyon Ranch |
| 500K | Miscellaneous GUCs |
| ? | HOAs |
| **3.3 mm** | |

Admin + GUC = 8.68 mm

Plus 5.32 mm to Lehman = $14 mm (less deposit)

---

\*      HOAs' releases of Debtors effective at closing except for seller breach.

\*      HOAs' releases of Lehman and Canyon Ranch effective at closing except for seller breach.

\*      Lehman to receive assignment of estates' claims against K/M with full indemnity.[4]

\*      Lehman to pay up to first $3 mm for stucco repairs and the first $500K for any other construction defects.  In a consensual plan, Lehman to obtain proceeds of litigation against K/M and/or insurance proceeds to offset these costs.

\*      Close on or before 12/15.  No financing contingency.

---

[1]      Amounts are caps.  Savings accrue to sponsor.

[2]      Amount subject to challenge in non-consensual plan context.

[3]      Amount subject to reduction by $500K in consensual plan context.

[4]      Assignment not applicable to non-consensual plan.

# **<u>EXHIBIT B</u>**

FL 6801 COLLINS CENTRAL LLC
FL 6801 COLLINS NORTH LLC
FL 6801 COLLINS SOUTH LLC
c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 39th Floor
New York, New York 10020


June 24, 2010

**FEDERAL EXPRESS AND EMAIL**

CR Miami, LLC
8600 East Rockcliff Road
Tucson, Arizona 85750
Attention: Jerry Cohen

## NOTICE OBJECTING TO: Canyon Ranch Hotel & Spa Miami Beach, Proposed Budget 2010

Ladies and Gentlemen,

Over the course of the past five months there's been a series of conversations, emails and memos between yourselves, us and our asset managers in regard to certain items within the proposed 2010 budget (the "Proposed Budget") that you delivered to us for approval. This letter is delivered to confirm our position with respect to certain items contained in the Proposed Budget.

Based upon our review of the budget materials we confirm that the Proposed Budget is not approved. It is our view that portions of the Proposed Budget either do not conform to the agreements reached in that certain Omnibus Amendment to Canyon Ranch Agreements made as of February 4, 2010 or in accordance with GAAP as clarified for hotels by the Uniform System of Accounts. We have attached a summary of our specific areas of objection and analysis concerning same. Please make it clear to your personnel that they should not implement any projects or take any action that is inconsistent with the nature of our objections without our approval or resolution in accordance with the terms of the Management Agreement.

We hope to work expeditiously with you to review and resolve areas of dispute within the Proposed Budget in a prompt and businesslike manner. All rights and remedies reserved, without prejudice in law or equity.


HF 5836223v.1 #13157/0035

Jun 23 2010 4:01PM                                    0000000000            ....      P.2

Sincerely,

**FL 6801 COLLINS CENTRAL LLC,** a Delaware
limited liability company

By:   FL 6801 Spirits LLC, a Delaware limited liability
      company, its Managing Member

By:
Name:   Jeffrey Fins
Title:   Manager

**FL 6801 COLLINS NORTH LLC,** a Delaware limited
liability company

By:   FL 6801 Spirits LLC, a Delaware limited liability
      company, its Managing Member

By:
Name:   Jeffrey Fins
Title:   Manager

**FL 6801 COLLINS SOUTH LLC,** a Delaware limited
liability company

By:   FL 6801 Spirits LLC, a Delaware limited liability
      company, its Managing Member

By:
Name:   Jeffrey Fins
Title:   Manager

Cc:

W. James Harrison, Esq.
W.J. Harrison & Associates, P.C.
3561 East Sunrise, Suite 201
Tucson, Arizona   85718

## PROPOSED 2010 BUDGET V7 – REJECTED ITEMS

### Departures from Generally Accepted Accounting Principles ("GAAP")

The classification and presentation of certain accounts in the 2010 Proposed Budget depart materially from GAAP, as clarified for hotels through the Uniform System. Ownership rejects the following items on the basis that these accounts contain items that would either not be recorded or would be recorded elsewhere under GAAP:

- Gross Revenue – Revenues budgeted/recorded in excess of sales billed to and collectible from the customer in cash or credit are inappropriate and not in accordance with GAAP. The Uniform System defines Gross Revenue as "the gross amount billed to a customer". Items that are not collectible from the customer should be excluded from Gross Revenues. This includes discounts, allowances, complimentary services, gifts, and packages as well as uncollectible homeowner charges such as additional access fees.

- Package/Promotion Revenue – According to the Uniform System, "package revenues are lodging accommodations sold in conjunction with other services provided by either the property or third parties as part of a single transaction with the customer." The guidelines detail how the revenues should be allocated to the various departments providing services but in no instance should the total amount of the revenue recorded exceed the actual cash consideration paid by the customer. The Proposed 2010 Budget V7 includes revenue at a theoretical market/retail value with an offsetting expense to reach the net cash value. This treatment is inappropriate and overstates revenues.

- Guest Recovery/Promo Expense – These accounts consists primarily of allowances for service issues and unavailability of facilities, promotional events in F&B such as buy one, get one free in conjunction with wine tastings, and other complimentary services and concessions provided in response to service complaints and to sell other products and services. These accounts are not proper and contrary to GAAP guidelines. Revenue should be recorded at the net amount received by the property and not grossed-up with a corresponding offset to this line item.

- Discounts – According to the Uniform System, sales should be recorded at the net rate received by the property, exclusive of taxes. It is not appropriate to record a sale on a grossed up basis and then record an artificial discount expense to reconcile to the net cash collected. This treatment overstates revenues and is not in accordance with GAAP.

- Promotions Expense (Sales & Marketing) – As cited in the Uniform System, this line item should include the "cost of goods and services to provide to any individual or organization to promote the property in the community and the industry other than media advertising". If food and beverage is involved, it is recorded at the cost of the

1

food and beverage items provided.  In the 2010 Proposed Budget V7, this account includes (1) the retail value of extra services provided at no charge or a discount in conjunction with rooms sales, and (2) the retail cost of hosting any events to promote the property.  As mentioned above, revenues are to be recorded at the net realizable amounts and not grossed-up to retail.  The recording of the adjustments from retail/market as expenses is not appropriate and these expenses should be reclassified as an offset to revenues.  Regarding the cost of hosting events, the expense recorded should represent the actual cost of hosting the promotion including both internal (F&B, retail, etc) and external costs.  Any internal departments contributing to such promotional event should receive the benefit of the cost reduction/reallocation of actual expenses, but no revenue should be recognized in any department for promotional events.  This account needs to be adjusted to conform to GAAP.

- Sales Taxes – Sales taxes should be paid only on Gross Revenues booked at the net realizable amounts in accordance with GAAP as clarified by Uniform System and described above.  Adjustments made to Gross Revenues pursuant to the provisions herein should be reflected in the amount of Sales Taxes budgeted and paid.  Any overpayments for 2009 need to be reconsidered and re-filed and 2010 estimates should be adjusted accordingly.  A full analysis needs to be performed for all years.

- Commissions Expense – Incentive pay for employees should be reclassified under Salaries and Wages.  Per Uniform System, "bonus and incentives includes bonuses, incentive pay, and other types of performance pay designed to drive revenue through sales, profit or guest satisfaction measures."

- Management Fee – Management fee should be adjusted and applied only to revenues realizable and in accordance with Uniform System as outlined above.  It would be unreasonable and inconsistent with industry practice for the management fee to be calculated from an inflated revenue figure that includes amounts where no cash collections from the customer are expected.

- Cap on Chain Services and Additional Corporate Allocations – The caps outlined in the Omnibus Amendment are further described below.  All such caps are to be adjusted and applied only to revenues realizable and in accordance with Uniform System.  It would be unreasonable and inconsistent with industry practice for the cost allocations to be calculated from an inflated revenue figure that includes amounts where no cash collections from the customer are expected.

## Chain Services and Other Corporate Allocations

The Omnibus Amendment to the Management Agreement describes what Chain Services and other corporate charges are allowable as pass-through property expenses and which are to be subsumed within the Manager's fees.

The Amendment first defines Chain Services ("CSSA") as "central or regional sales and marketing services, training, common advertising and promotion (including direct and

2

image media and advertising administration) and reservations". It states that the Chain Services may vary from time to time but "will at all times be those services furnished for the benefit of all Canyon Ranch properties and in no case less than the level of services provided to the owned Canyon Ranch properties." The Amendment then dictates that such CSSA pass-through costs be limited to a cap of 3% of Gross Revenues. This cap is subject to reasonable and ratable reductions resulting from the property obtaining any services directly in lieu of Chain Services.

Additional costs such as "common data processing, software systems, human resources, accounting and internal audit services shall not be a component of Chain Services pass through costs" per the Omnibus Amendment and "instead shall be provided by Manager as a part of its regular management services and shall be subsumed within the management fees."

During Amendment negotiations, it was discussed that there will be additional costs that the Manager incurs in providing services not billed as Chain Services pass-through expenses that are directly attributable to the property and incremental in nature. Although it was understood that these non-CSSA incremental costs may actually exceed 0.5% of Gross Revenues, it was agreed that such incremental costs be capped at 0.5% of gross revenues ("Incremental CSSA"). This results in a total possible CSSA and corporate allocation of 3.5% of Gross Revenues which is consistent with industry standards for such charges and reasonable in light of the overall economics of the renegotiated terms.

The attached *Exhibit 1* was reviewed and discussed with the Manager during the Amendment negotiations. It was circulated for illustrative purposes so that there would be no confusion in implementation. This schedule clearly demonstrates which costs would be capped, which would be allowable incrementally, and which would be subsumed within the management fees (based on earlier budget drafts). The exhibit illustrates that the current budget is not in accordance with what was negotiated.

The Owner rejects all CSSA and other corporate charges and allocations in excess of the cap provisions described above. We estimate the amounts to be approximately as follows based on the data provided by Manager (and attached hereto as *Exhibit 2*); however all amounts are subject to recalculation based on Gross Revenue as revised in accordance with the other provisions herein:

| Description | 2010 Budget V7 Proposed Amount | % Budgeted GR | (Prelim) Amt not in Accordance with MA |
|---|---|---|---|
| Reservations | $188,056 | 0.99% | $0 |
| Data Processing/A&G | $240,633 | 1.27% | $146,038 |
| System Charges | $33,352 | 0.18% | $33,352 |
| HRIS/Phone Tech | $57,361 | 0.30% | $57,361 |
| Sales, Marketing, and PR | $282,993 | 1.50% | $4,736 |

3

| | | | |
|---|---|---|---|
| Sales – Labor | $100,123 | 0.53% | $100,123 |
| Corporate Marketing | $100,273 | 0.53% | $0 |
| Total | $1,002,641 | 5.30% | $341,760 |

In addition, the Omnibus Amendment provides that at least 1% of the total Chain Services charges to the Owner be spent on marketing specifically for the Miami Beach Hotel & Spa.   Approval of 1% ($104,859 based on above numbers) of total CSSA currently budgeted for sales and marketing is not approved pending demonstration by Manager that such amount is being spent for the specific marketing of Miami Beach.

All CSSA costs and other corporate charges are ultimately subject to audit by Owner prior to approval and payment.  Nothing herein waives the rights to audit these amounts on an annual basis.  Such audit will be performed for 2010 with and will review the following:

- Allocation charges conform to the contractual agreement;
- Allocation of Chain Services, Incremental CSSA and other charges, if any, to the Subject Property is based on fair and equitable methodology as defined in Management Agreement;
- Whether the Subject Property actually receives the benefits, Chain Services and Incremental CSSA, and other charges, if any, allocated to it by Management;
- Expense allocations to the Subject Property are allocated at Management's cost and do not include any mark-up.

**Additional Spa Revenue - Fixed Charges**

Section 16.3 of the Master Declaration provides for a Fixed Charge to be charged to all unit owners in addition to the other assessments they are obligated to pay on a monthly basis for HOA dues and shared service charges.  The Master Declaration set the initial Fixed Charge at $250/month for units within the South and Central Condominiums and $350/month for units within the North Condominium, plus an additional $50 for each additional allowable occupant.

To date, unit owners have been charged approximately $100/month less than specified in the Master Declaration.  This decision was made by the previous Hotel Lot Owner in conjunction with Manager at the opening of the Hotel & Spa.  Based on the assertion that Hotel Lot Owner has rights to charge the additional $100 Fixed Charge, Manager has included approximately $100/month per unit ($252,500) of Spa Access Fee Revenue that is not being billed to unit owners.

According to Owner's legal counsel, the Fixed Charge cannot be increased for any given year more than 10% of the prior year's actual charge.  Furthermore, the Fixed Charge is to be established on January 1st of each calendar year and remain at such rate for the

4

entire year. As such, Owner counsel does not recommend increasing any Fixed Charge until January 1st, 2011 at the earliest and then in that case by no more than 10% of the actual current charges. Finally, the recognition of additional revenue that will not be realizable is not in accordance with GAAP and the Uniform System of Accounts.

Based on the above, the budgeting and recording of the additional $100/month of Fixed Charges is not approved by the Owner. Management fees are not payable on these amounts and CSSA and other corporate allocation caps are not inclusive of this revenue.

**Additional Shared Service Allocations – Spa Expenses**

The Proposed 2010 Budget allocates $794,293 of spa expenses ("Additional Spa Costs") off of the hotel operating statement and onto the Non-Retail Shared Facilities (NRSF) budget for billing to the homeowners. The Additional Spa Costs are then booked as a sales concession on the NRSF budgets and established as a receivable from Owner.

Based on conversations with legal counsel, hospitality and property accounting experts, and the current cost of hotel lot operations, the allocation of Additional Spa Costs is not appropriate and therefore the accounting treatment proposed by the Manager is not approved. More specifically:

- The Manager needs to review and document all allocations to the NRSF against the standard of "reasonableness" required in the governing documents prior to any additional costs being allocated. Recent condominium hotel court filings demonstrate that unit owners are aware of the potential pitfalls of allocations and before any changes are made, the Manager must ensure the support and methodology is consistent with the standards in the documents.

  Although the Master Declaration gives the Hotel Lot Owner latitude for the types of costs that may be charged to the NRSF budgets, it does not provide specific guidance on the allocations of such costs between the NRSF budgets and the hotel operating budgets. Instead, it requires that all such allocations are reasonable.

  In discussions with local counsel "reasonableness" was suggested to mean a fair and reasonable allocation, made in good faith and supportable – i.e., explained with proper back-up, including, where available, invoices, etc. The analysis should be performed within each category (or cost type) of expense separately to determine what is appropriate rather than applying a "one size fits all" methodology.

  While utilization of relative square footage for the allocation of NRSF expenses is defensible when no better methods are available, allocation based on actual (measurable) usage or a combination of actual usage with the contemplation of usage availability is preferable and reasonably expected after the initial year of operations.

5

- Fixed Charge payments by unit owners need to be reviewed for offset against any Additional Spa Allocations that may ultimately be proposed. Manager must be able to substantiate and document a defensible position.

  Although the Master Declaration does not require that costs and expenses attributable to the Limited Spa Rights be reduced or offset against the Fixed Charge, to accept these payments and then charge unit owners for expenses related to these facilities could be seen as a "double charge" and therefore could be challenged as "unreasonable". A challenge could also potentially prompt a larger and more troubling question about whether these areas actually constitute a profit center and whether it is "reasonable" to expect unit owners to offset expenses related to a profit center.

- Appropriate Usage Data needs to be tracked and utilized to allocate Additional Spa Costs. Assuming the concept of charging additional expenses can be justified in light of the aforementioned issues, counsel advises us that the proper method for allocating gym and spa charges is through the measurement of use. Manager has suggested allocation based on square footage. This greatly favors the hotel operations. Whether intended or not, we believe it could be perceived as unreasonable and unfair if challenged. Usage tracking data needs to be reviewed and analyzed to the extent it is being captured. To the extent such measurements are not being performed, we request that Manager begin tracking usage where commercially reasonable so that they can be utilized for next year's calculations.

- A review of the treatment of such allocations at competitive properties should be performed prior to making a determination to change or add any allocations. Our hospitality accounting group performed a preliminary analysis of allocation methodologies on other condo hotel projects and identified various areas where CRLMB was out of line.

- The efficiency of Hotel Lot operations needs to be improved. These operations are a derivative of the Hotel & Spa operations which are consistently underperforming the competitive set and whose expenses are out of line with the HOST comparisons. The cost of the overall operations and implications on the NRSF budgets should be considered fully before any additional allocations are made.

- Hotel Lot Owner has ultimate approval over what gets charged and ultimately included in the Non-Retailed Shared Facilities budgets. Supported by all of the aforementioned reasons, Owner is not approving the Additional Spa Cost allocations to the NRSF budgets. As such, recording these items as a deduction from hotel operations in spite of this decision is not in accordance with GAAP and an artificial inflation of hotel profits. Incentive fees will not be paid on NOI generated from this treatment.

**Other Miscellaneous Items**

6

- Salary Increases – Manager has included salary increases for all personnel effective June 1, 2010. These increases are not currently approved. Owner will reconsider these increases upon evidence provided by Manager that such amounts are necessary to remain competitive in the marketplace. In the meantime, in light of the current state of the market and the high current labor costs relative to the subject's competitive properties, this increase is not approved.

- G&A Corporate Travel – Owner does not approve these expenses subject to Manager providing expected travel schedule and demonstration that expenditures are reasonable and in accordance with the provisions of the Management Agreement. No first class travel accommodations will be approved for anyone except for Mel Zuckerman.

- Base and Incentive Management Fees – These fees are not approved pending the following:

    o Adjustment for the budget items and accounting treatments rejected above as well as any other audit findings from 2009 applicable to 2010
    o Exclusion of revenue booked from house accounts
    o Incentive fee calculated on an annual basis and subject to audit (including resolution of 2009 audit adjustments and application to 2010 practices).
    o Incentive fee calculation adjusted for (1) material changes in accounting methodologies from 2009, (2) imputation of the base fee to 4.5% and of FFE reserves to 4%.

- Pursuant to the Omnibus Amendment, variable expenses are to be defined each year in conjunction with the budget approval process in order to facilitate automatic budget adjustments as actual occupancy and revenues deviate from the budget. The Proposed Budget V7 is not approved pending designation of fixed versus variable expenses.

- Capital budget was received on June 4, 2010. It is currently under review and has not yet been approved.

- G&A Guest Recovery/Promo – This account consists primarily of costs associated with community involvement, ownership meetings, and meetings with executive committee members. This account should only consist of the costs of providing such meetings and services and no corresponding revenue should be recognized anywhere within the financial statements. This account needs to be more fully analyzed and adjusted accordingly.

- G&A Guest Recovery/Promo – This account also consists of $6,536 in charges related to time spent by Dawn Moriarty on site in Miami. Ms. Moriarty is the assistant to the CEO of Canyon Ranch and based in Tucson. Dawn was assigned by Tucson to assist with establishing property protocols. Owner rejects this charge as it was not requested and not approved in advance.

7

- G&A – Professional Fees only include $85,000 for the Eisner audit. Owner requires $150,000 to be incorporated based on projected annual recurring cost on a normalized basis. The actual total expected cost for 2009 is in excess of $500,000.

**PROPOSED 2010 BUDGET V7 – OTHER OPERATIONAL CONCERNS**

In addition to the items rejected outright above, Owner has noted various operational concerns that warrant monitoring and/or additional investigation.

The hotel has generated substantial losses since opening in November 2008 and it is critical that the Manager make all efforts to drive real revenue and efficiencies and to minimize the losses. Accounting entries that record revenue/reduce expenses but do not generate cash are not adding value to the Owner and are deemed unproductive.

The following are a few areas of particular concern that Ownership has noted and requests monitoring and additional investigation/analysis by the Manager:

- Revenue Variances from Budget – Manager has missed its original revenue projections (budget v5) for the first five months of the year by 16% and has continued to miss each subsequent reforecast by a material amount.

  The original v5 budget presented to Ownership on November 1, 2009 projected Gross Revenue of $22.2MM. The v6 budget presented on April 30 projected $19.9MM and the most recent v7 budget presented on May 28 projects $18.9MM and incorporates actual revenue through April. Manager appears to have also missed the v7 projections for May by $0.2MM (14%) in spite of that budget being submitted during late May.

  Ownership remains concerned about the variances and Manager's ability to budget reasonably. This has important implications on the approval of operational decisions, costs, and overall project strategy for the Owner. It is critical the Manager can budget effectively and be able to provide information to Owner upon which it can rely.

- Complimentary Rooms Expense/Number of Comp Rooms – Ownership deems the projected remaining amount of complimentary rooms (1,115) to be high and requests that Manager review its policy for providing complimentary rooms. To the extent that the $50/night comp room expense is not modified with the upcoming rental program changes, we further request that Manger explore the opportunities for directing comp rooms first to developer owned units.

- F&B Payroll Expense – Payroll and benefits represents 79% of departmental revenue and is significantly higher than that of the Competitive Lodging Set average (46%). Ownership acknowledges Management's recent efforts to reduce labor costs; however, this is still an area of concern and further review is requested.

8

- **F&B Contract Services (Night Cleaning)** – The Proposed Budget estimates 8% of departmental revenue for this line item. Ownership requests further analysis by Manager to ascertain if costs savings may be achieved by bringing this function in-house or restructuring the current contract. Preliminary reviews have indicated a potential for significant cost savings.

- **Telecommunications Payroll and Benefits Expense** - The expense for this line item represents 546% of revenue and dramatically exceeds the results achieved by the Competitive Lodging Set at 62%. Ownership requests additional analysis and review of this line item.

- **Retail Management Salary** – Management salary at $71K is 48% of wages; Ownership requests management review alternatives.

- **Garage Contract Labor** - The 2010 Proposed Budget V7 estimates $667,395 for this line item. Ownership requests further analysis by Manager to ascertain if costs savings may be achieved by bringing this function in-house or restructuring the current contract.

- **Recreation Contract Labor** - Contract Labor (Beach Attendant) Expense is forecasted at $130,566. Ownership requests further analysis by Manager to ascertain if costs savings may be achieved by bringing this function in-house or restructuring the current contract.

- **G&A Payroll and Benefits Expense** - Payroll Expense is in line with the Competitive Lodging Set average as a percent of departmental revenue but is higher on a per available room and per occupied room basis. Further review is requested.

- **Employee Meals Expense** - Ownership requests that Management provide detail on how it recognizes the cost of employee meals, both for hourly and salaried employees and review this category for any potential reductions. Ownership also requests detailed support for the procedures used for managerial employees charging entertainment expenses to the property and the manner in which these expenses are allocated.

- **Shared Services Allocation Methodologies** - Ownership will be looking to Manager to perform a comprehensive review of the Property's shared expense allocations based on a fair and equitable methodology that can be supported and presented to all parties involved, including homeowners.

Refer to the attached *Exhibits 3 and 4* for additional information and benchmarking of our property against the 2009 HOST report and Comparable Properties.

9

**Canyon Ranch Miami Beach**
**Example of 2010 CSSA Calculations**

*NOTE: Calculations assume all CSSA provided by CR, appropriate support provided, and caps appropriately reached*

| Chain Service | Original Budgeted 2010 Cost | 22,248,000 % projected gross revenues | 2010 as Proposed | | | | |
|---|---|---|---|---|---|---|---|
| | | | CSSA | Non-Pass Thru Costs | Incremental (0.5%) * | Total to LB | Remaining |
| Reservations | 358,155 | 1.6% | 358,155 | | | 358,155 | 0 |
| Executive | 5,635 | 0.0% | | 5,635 | | 0 | 5,635 |
| Accounting | 23,281 | 0.1% | | 23,281 | | 0 | 23,281 |
| Audit | 28,216 | 0.1% | | 28,216 | | 0 | 28,216 |
| IT | 272,463 | 1.2% | | 272,463 | 111,240 | 111,240 | 161,223 |
| HR | 57,499 | 0.3% | | 57,499 | | 0 | 57,499 |
| Sales | 317,994 | 1.4% | 317,994 | | | 317,994 | 0 |
| Marketing | 228,411 | 1.0% | 228,411 | | | 228,411 | 0 |
| PR | 86,511 | 0.4% | 86,511 | | | 86,511 | 0 |
| Total | 1,378,165 | 6.2% | 991,071 | 387,094 | 111,240 | 1,102,311 | 275,854 |
| Less: reduction from cap | | | (323,631) | 0 | 0 | (323,631) | 323,631 |
| Adjusted Total | | | 667,440 | 387,094 | 111,240 | 778,680 | 599,485 |

* Incremental nature of costs must be proven by CR

Exhibit 1 (CSSA analysis for CR)

Canyon Ranch Hotel and Spa, Miami Beach
CSSA Charges - 2010 Operating Budget
Data prepared by: Brian Nesbitt, Director of Finance Canyon Ranch Hotel & Spa Miami Beach
Comments added by: TriMont Real Estate Advisors, Inc.

Proposed Budget Y7 - Total Gross Revenues   28,839,000

| | | | Actual Jan | Actual Feb | Actual Mar | Actual Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total | % GR | $$ to %$ of NA | Owner Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reservation Expense - CSSA | CSSA 1% of Revenue | Rooms | 17,774 | 18,945 | 20,682 | 14,470 | 13,935 | 11,973 | 12,542 | 12,566 | 10,557 | 16,529 | 16,892 | 20,682 | 186,598 | 0.99% | 0.000 | (A) |
| Data Processing (CSSA) | CSSA 0.5% of Revenue | A&G | 7,166 | 28,555 | 7,038 | 8,652 | 6,968 | 5,986 | 6,271 | 6,482 | 5,378 | 8,344 | 8,446 | 10,346 | 102,873 | 0.54% | 8,328 | (B) |
| | CSSA Charges, $9,710 Monthly | | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 4,710 | 56,520 | 0.30% | 56,520 | (C) |
| | Service Agreements, $6,770 Monthly | | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 6,770 | 81,240 | 0.43% | 61,240 | (D) |
| Systems Charges | New Hire DVD, $3,455 Monthly | HR | 2,699 | 3,062 | 3,288 | 6,503 | 2,175 | 2,175 | 2,175 | 2,175 | 2,175 | 2,175 | 2,175 | 2,175 | 29,352 | 0.18% | 29,352 | (E) |
| | HR Operating Expense, $720 Monthly | | | | | | | | | | | | | | | | | |
| HR&S | Wages and Salaries | HR | 0.002 | 4,404 | 6,327 | 0,560 | 3,231 | 3,231 | 3,231 | 3,231 | 3,231 | 3,231 | 3,231 | 3,231 | 37,024 | 0.20% | 37,024 | (F) |
| Phone Tech | Wages and Salaries | A&G | 0.002 | 23,540 | (11,770) | (0,174) | 1,091 | 1,091 | 1,091 | 1,091 | 1,091 | 1,091 | 1,091 | 1,091 | 20,327 | 0.11% | 20,327 | (G) |
| Sales, Marketing and PR | CSSA 2% of Revenue | Sales | 42,553 | 37,890 | 43,363 | 28,940 | 27,871 | 33,946 | 26,083 | 26,932 | 23,114 | 33,266 | 33,784 | 41,394 | 383,116 | 2.03% | 4,736 | (H) |
| Corp Marketing | | Sales | | | | | | | | | | | | | | | | |
| | A&I Projection | | 75,676 | 127,974 | 78,174 | 88,031 | 77,063 | 78,835 | 72,186 | 73,671 | 65,298 | 85,488 | 87,412 | 100,722 | 1,000,791 | 5.30% | 341,760 | |

Owner Notes: All amounts will fluctuate as Gross Revenues are adjusted to reflect truly collectible amounts in accordance with Uniform System/GAAP
All incremental cost and defined CSSA charges are subject to audit and verification

(A) 1% of CSSA cap for Reservations
(B) Incremental costs are to be capped at 0.5% of gross revenues. 0.5% assumed here but incremental nature needs to be demonstrated.
(C) Subsumed within management fee as common data processing and software systems
(D) Subsumed within management fee as common data processing and software systems
(E) Thinking is subject to cap. Remaining are to be subsumed within management fee as software system and HR
(F) Subsumed within management fee as HR and data processing
(G) Subsumed within management fee as HR and data processing
(H) In total, these data, marketing and PR costs are 5.26%. This is in excess of the remaining 2% available after reservation allocations.

Exhibit 2 (CSSA)

Privileged and Confidential
Attorney Work Product
Work-in-Progress

### Variance Analysis – 2010 Proposed Budget vs. 2009 Custom HOST Report

| Canyon Ranch Miami Beach 2010 Budget versus 2009 Custom HOST Report Comparable Operating Statement | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Canyon Ranch - 2010 Budget** | | | **2009 Custom HOST Report** | | | **Variance** | |
| Rooms Available | 121 | | | 294 | | | -173 | |
| Available Room Nights | 44,145 | | | 107,195 | | | -63,050 | |
| Occupied Rooms | 22,716 | | | 66,782 | | | -44,066 | |
| Occupancy | 51.5% | | | 62.3% | | | -10.8% | |
| Average Daily Rate | $285.61 | | | $307.52 | | | -$21.91 | |
| RevPAR | $146.97 | | | $191.63 | | | -$44.66 | |
| | % Rev | $ PAR | $ POR | % Rev | $ PAR | $ POR | % Rev | $ PAR | $ POR |
| **Revenues** | | | | | | | | | |
| Rooms | 34.3 | 53,643 | 285.61 | 55.0 | 69,901 | 307.52 | (21.4) | (16,258) | (21.91) |
| Food & Beverage | 18.0 | 28,092 | 149.57 | 24.7 | 31,552 | 138.81 | (7.2) | (3,460) | 10.76 |
| Telecommunications | 0.1 | 221 | 1.18 | 0.7 | 829 | 3.65 | (0.5) | (608) | (2.47) |
| Other Operated Departments | 47.6 | 74,468 | 396.48 | 12.1 | 15,126 | 66.55 | 35.6 | 59,342 | 329.93 |
| Rental & Other Income | 0.0 | 0 | 0.00 | 6.4 | 8,072 | 35.51 | (6.4) | (8,072) | (35.51) |
| Total | 100.0 | 156,424 | 832.83 | 100.0 | 125,480 | 552.04 | 0.0 | 30,944 | 280.79 |
| **Departmental Expenses** | | | | | | | | | |
| Rooms | 45.9 | 24,605 | 131.00 | 28.8 | 20,145 | 88.63 | 17.0 | 4,460 | 42.37 |
| Food & Beverage | 128.5 | 36,097 | 192.19 | 80.2 | 25,320 | 111.40 | 48.3 | 10,777 | 80.79 |
| Telecommunications | 1008.0 | 2,229 | 11.87 | 815.5 | 734 | 3.23 | 192.5 | 1,495 | 8.64 |
| Other Operated Departments | 30.4 | 42,886 | 252.83 | 95.2 | 11,697 | 52.34 | 20.9 | 35,589 | 200.49 |
| Total | 70.6 | 110,417 | 587.89 | 46.2 | 58,096 | 255.60 | 24.3 | 52,321 | 332.29 |
| **Gross Operating Income** | 29.4 | 46,007 | 244.95 | 53.7 | 67,384 | 296.44 | (24.3) | (21,377) | (51.49) |
| **Undistributed Operating Expenses** | | | | | | | | | |
| Administrative & General | 14.9 | 23,311 | 124.14 | 11.5 | 14,431 | 63.51 | 3.4 | 8,880 | 60.63 |
| Marketing | 14.5 | 22,668 | 120.69 | 6.6 | 8,294 | 36.49 | 7.9 | 14,374 | 84.20 |
| Franchise Fee | 0.0 | 0 | 0.00 | 0.0 | 0 | 0.00 | 0.0 | 0 | 0.00 |
| Management Fee | 5.1 | 7,911 | 42.13 | 3.7 | 4,700 | 20.68 | 1.3 | 3,211 | 21.44 |
| Property Operation & Maintenance | 0.8 | 1,228 | 6.54 | 5.2 | 6,578 | 28.94 | (4.5) | (5,350) | (22.40) |
| Utilities | 1.2 | 1,901 | 10.12 | 4.0 | 4,994 | 21.97 | (2.8) | (3,093) | (11.85) |
| Total | 36.5 | 57,024 | 303.61 | 31.1 | 39,003 | 171.59 | 5.4 | 18,021 | 132.02 |
| **Fixed Charges** | | | | | | | | | |
| Real Estate Taxes (A) | 2.0 | 3,166 | 16.86 | 6.5 | 8,173 | 35.95 | (4.5) | (5,007) | (19.09) |
| Reserve for Replacement | 2.0 | 3,122 | 16.62 | 2.8 | 3,539 | 15.57 | (0.8) | (417) | 1.05 |
| Total | 4.0 | 6,289 | 33.48 | 9.3 | 11,712 | 51.52 | (5.3) | (5,423) | (18.04) |
| **Revenue Share** | 11.1 | 17,302 | 92.12 | 0.0 | 0 | 0.00 | 11.1 | 17,302 | 92.12 |
| **Amount Available for Debt Service and Other Fixed Charges** | (22.1) | (34,609) | (184.27) | 13.3 | 16,669 | 73.33 | (35.4) | (51,278) | (257.60) |

**Notes:**
The Competitive Lodging Set includes Fairmont Turnberry Isle Resort, Delano Hotel, Ritz-Carlton South Beach, Four Seasons Hotel Miami and Mondrian South Beach.
Highlighted numbers indicate basis for analysis for each line item.
Rooms, F&B, and Telecommunications expense ratios (% sales) for departmental expenses and profits are based on their respective departmental revenues. All other expenses are based on total revenue.
Other Fixed Charges include Depreciation and Amortization, Interest, Rent, and Equipment Leases.
Totals might not add due to rounding.

*Source: Subject Property 2010 Budget and Custom Host Report*



**GoldinAssociates, LLC**

2

Exhibit 3

Privileged and Confidential
Attorney Work Product
Work-in-Progress

## Variance Analysis – 2010 Proposed Budget vs. 2010 Comparable Properties

DRAFT

**FINANCIAL COMPARISON**
**Canyon Ranch**
**Miami Beach, FL**

| | Canyon Ranch | | | Comparable #1 | | | Comparable #2 | | | Comparable #3 | | | Comparable #4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Daily Room Count | 121 | | | 250-300 | | | 150-200 | | | 150-200 | | | 100-150 | | |
| Annual Available Rooms | 44,145 | | | 100,000-[illegible] | | | 70,000-80,000 | | | 60,000-70,000 | | | 40,000-50,000 | | |
| Occupied Rooms | 22,716 | | | 60,000-[illegible] | | | 45,000-50,000 | | | 45,000-50,000 | | | 35,000-40,000 | | |
| Occupancy | 51.5% | | | [illegible] | | | 70%-75% | | | 75%-80% | | | 65%-70% | | |
| Average Daily Room Rate | $285.61 | | | $300-$350 | | | $400-$450 | | | $500-$550 | | | $350-$400 | | |
| RevPAR | $346.97 | | | $200-$250 | | | $250-$300 | | | $400-$450 | | | $250-$300 | | |
| | Percent of Total | Per Available Room | Per Occupied Room | Percent of Total | Per Available Room | Per Occupied Room | Percent of Total | Per Available Room | Per Occupied Room | Percent of Total | Per Available Room | Per Occupied Room | Percent of Total | Per Available Room | Per Occupied Room |
| **Revenues** | | | | | | | | | | | | | | | |
| rooms | [illegible] | $53,643 | [illegible] | [illegible] | [illegible] | $347.09 | 67.3% | $104,239 | $404.47 | 48.2% | $127,841 | $525.03 | 94.1% | $113,606 | $375.32 |
| food & beverage | 18.0% | $28,092 | [illegible] | [illegible] | [illegible] | $0.00 | 28.4% | $45,945 | $170.51 | 44.2% | $117,352 | $481.95 | 0.9% | $1,093 | $3.62 |
| telecommunications | 0.1% | $221 | $1.18 | [illegible] | $1,123 | $5.31 | 1.1% | [illegible] | $6.46 | 0.6% | $1,489 | $6.11 | 1.3% | $1,552 | $5.13 |
| other operated departments | 47.6% | $74,46[illegible] | $396.48 | 0.0% | $0 | $0.00 | [illegible] | $4,922 | $19.10 | 7.1% | $18,759 | $77.04 | 3.7% | $4,432 | $14.64 |
| rental and other income, net | 0.0% | [illegible] | $0.00 | [illegible] | $4,594 | $21.70 | [illegible] | $0 | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| Total revenues | 100.0% | [illegible] | $832.53 | 100.0% | $79,196 | $374.09 | 100.0% | $154,777 | $600.56 | 100.0% | $265,441 | $1,090.14 | 100.0% | $120,685 | $398.71 |
| **Departmental expenses** | | | | | | | | | | | | | | | |
| rooms | 45.9% | $24,605 | [illegible] | 28.9% | [illegible] | $100.19 | [illegible] | $33,428 | [illegible] | 21.1% | $26,944 | $110.66 | 27.8% | $31,559 | $104.26 |
| food & beverage | 128.5% | $36,097 | [illegible] | 0.0% | [illegible] | $0.00 | [illegible] | $39,902 | [illegible] | [illegible] | $80,052 | $328.77 | 60.1% | $658 | $2.17 |
| telecommunications | 1008.0% | $2,229 | [illegible] | [illegible] | [illegible] | $5.02 | [illegible] | $1,951 | [illegible] | [illegible] | $1,147 | $4.71 | 54.5% | $346 | $2.80 |
| other operated departments | 30.4% | $47,486 | [illegible] | [illegible] | $0 | $0.00 | [illegible] | $4,949 | [illegible] | [illegible] | $9,150 | $37.58 | 0.0% | $0 | $0.00 |
| Total departmental expenses | 70.6% | $110,417 | $587.85 | [illegible] | $22,273 | [illegible] | 51.3% | $80,229 | $311.30 | [illegible] | $117,293 | $481.71 | 27.4% | $33,063 | $109.23 |
| Departmental profit | 29.4% | $46,007 | $244.95 | 71.9% | $56,923 | [illegible] | 48.2% | [illegible] | $289.26 | 55.8% | [illegible] | $608.43 | 72.6% | $87,622 | $289.48 |
| **Undistributed operating expenses** | | | | | | | | | | | | | | | |
| administrative and general | 14.9% | $23,317 | $124.14 | 13.1% | $10,357 | [illegible] | [illegible] | [illegible] | $73.59 | 12.1% | [illegible] | [illegible] | 11.0% | $13,304 | $43.95 |
| management fee | 5.1% | $7,911 | $42.12 | 1.3% | $1,007 | $4.76 | [illegible] | [illegible] | $23.59 | 4.0% | [illegible] | [illegible] | 4.0% | $4,829 | $15.95 |
| franchise fee | 0.0% | $0 | $0.00 | 0.0% | [illegible] | $0.00 | [illegible] | [illegible] | $0.00 | 0.0% | [illegible] | [illegible] | 0.0% | $0 | $0.00 |
| marketing | 14.5% | $22,668 | $120.69 | 11.0% | [illegible] | $41.10 | [illegible] | $12,409 | $48.15 | 4.9% | [illegible] | [illegible] | 4.2% | $5,009 | $16.55 |
| property operation and maintenance | 0.8% | $1,228 | $6.54 | 7.6% | $5,985 | [illegible] | 5.1% | $7,957 | $30.87 | 3.5% | [illegible] | [illegible] | 4.2% | $5,126 | $16.93 |
| utilities | 1.2% | $1,901 | $10.12 | 6.1% | $4,797 | [illegible] | 4.8% | $7,423 | $28.80 | [illegible] | [illegible] | $17.03 | 2.5% | $2,973 | $9.82 |
| Total undistributed operating expenses | 36.5% | $57,024 | $303.61 | 39.0% | $30,848 | [illegible] | 34.1% | $52,834 | $205.01 | [illegible] | $69,045 | $283.56 | 25.9% | $31,241 | $103.21 |
| Income before fixed charges | -7.0% | ($11,018) | ($58.66) | 32.9% | $26,075 | $123.17 | 14.0% | $21,714 | $84.25 | [illegible] | $79,102 | $324.87 | 46.7% | $56,381 | $186.27 |
| **Fixed charges** | | | | | | | | | | | | | | | |
| real estate & property taxes / insurance | 2.0% | $3,166 | $16.86 | 13.7% | $10,824 | $51.13 | 5.8% | $8,992 | [illegible] | 3.6% | $9,545 | $39.20 | 8.8% | $10,562 | $34.89 |
| leases | 0.3% | $518 | $2.76 | 0.0% | $0 | $0.00 | 2.4% | $3,698 | [illegible] | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| reserve for replacement | 3.0% | $3,122 | $16.62 | 5.0% | $3,960 | $18.70 | 4.0% | $6,188 | $24.01 | 4.0% | $10,617 | $43.60 | 4.0% | $4,827 | $15.95 |
| Total fixed charges | 4.4% | $6,807 | $36.24 | 18.7% | $14,784 | $69.83 | 12.2% | [illegible] | $73.25 | 7.6% | $20,162 | $82.81 | 12.8% | $15,389 | $50.84 |
| Revenue share | 11.1% | $17,302 | $92.12 | 0.0% | $0 | $0.00 | 0.0% | [illegible] | $0.00 | 0.0% | $0 | $0.00 | 0.0% | $0 | $0.00 |
| Pretax net income (loss) before DS | -22.5% | ($35,122) | ($187.02) | 14.3% | $11,291 | $53.33 | 1.8% | $2,835 | $11.00 | 22.2% | $58,940 | $242.06 | 34.0% | $40,992 | $135.42 |

Notes:
Individual comparable properties show 2010 dollars. Comparable 1 through 4 have been adjusted to reflect 2010 dollars by increasing revenues and expenses by CPI (2%) annually.
Highlighted numbers indicate basis for analysis for each line item.
ADR excluding complimentary rooms is $309.39.

*Source: Subject Property 2010 Budget and Goldin Associates, LLC*

GoldinAssociates, LLC

Exhibit 4

# EXHIBIT C

# **NORTH HOA PROOF OF CLAIM**

B 10 Modified (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

List the **name** and **case number** of the Debtor against whom you assert a claim below. (**List only one Debtor per claim form.**)

FL 6801 Collins North LLC
Case No. 14-11692 (SCC)

**Note:** *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after commencement of the case. A request for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

North Carillon Beach Condominium Association, Inc.

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Edward S. Weisfelner
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Telephone number: 212-209-4800       email: eweisfelner@brownrudnick.com

**Court Claim Number:** _____
(*If known*)
Filed on: _____

Name and address where payment should be sent (if different from above):

North Carillon Beach Condominium Association, Inc.
6899 Collins Avenue
Miami Beach, Florida 33141

Telephone number:  305-514-7458       email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ No less than $119,363,441.90, plus unliquidated amounts.

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim.  Attach a statement that itemizes interest or charges.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).  If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

**2. Basis for Claim:**  Please see Addendum attached hereto as Exhibit A.
   (See instruction #2)

| **3.  Last four digits of any number by which creditor identifies debtor:** __9__ __1__ __0__ __8__ | **3a. Debtor may have scheduled account as:** (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❏ Real Estate  ❏ Motor Vehicle  ❏ Other
**Describe:**

**Value of Property:** $_____   **Annual Interest Rate**_____% ❏ Fixed ❏ Variable
                            **(when case was filed)**

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
**if any:** $_____                     **Basis for perfection:** _____

**Amount of Secured Claim:** $_____       **Amount Unsecured:** $_____

❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❏ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):** Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
                                                 $_____       (See instruction #6)

❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

❏ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, mortgages, or security agreements. (See instruction #8, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**Amount entitled to priority:**
$_____

**9. Signature: (See instruction #9)**
Check the appropriate box.

☒ I am the creditor.  ❏ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)   ❏ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ❏ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

* *Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name:  Jason Stone
Title:           Authorized Representative
Company:    North Carillon Beach Condominium Assoc., Inc.
Address and telephone number (if different from notice address above):
6899 Collins Avenue
Miami Beach, Florida 33141

_Jason Stone_ (Signature)      9/10/14 (Date)

Telephone number:                     Email:

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

### ADDENDUM TO PROOF OF CLAIM OF
### NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.

1.      North Carillon Beach Condominium Association, Inc. ("North HOA") is a not-for-profit Florida corporation that represents 207 unit owners (the "Unit Holders") in the North Tower at Canyon Ranch Hotel & Spa, Miami Beach (the "Property"). The Property is governed by that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (as amended, the "Master Declaration"). The North Tower is also governed by its own separate declaration (the "North Tower Declaration," and together with the Master Declaration, the "Declarations"). The Declarations are attached hereto as **Exhibit 1**.

2.      The North HOA has claims against FL 6801 Collins North LLC ("Collins North") for: (i) historical and ongoing improper and/or unsupported charges, and other violations of the Declarations; (ii) fraudulent misrepresentation and fraudulent inducement; (iii) violations of Chapter 720, Florida Statutes; (iv) breach of statutory implied warranties and related relief relating to the construction and fitness of units; and (v) unpaid North HOA dues.

### A.      Improper And/Or Unsupported Charges.

3.      Attached hereto as **Exhibit 2** is a schedule of historical improper and/or unsupported charges discovered by the North HOA to date, which was compiled by the North HOA's certified public accountants from information provided to them by Canyon Ranch personnel. The aggregate amount of improper and/or unsupported charges on the North HOA is no less than $15,446,502, and such wrongful charges are ongoing.

4.      The improper and/or unsupported charges, include, but are not limited to the following charges on the North HOA:

i.    **Improper Spa Charges.**

5.    In violation of Sections 1.1(oo), 16.1, and 16.3 of the Master Declaration, the North HOA has been wrongfully charged, to date, charges for the spa and other Non-Retail Shared Facilities – including charges for "fitness instructors," in an aggregate amount of no less than $3,023,026.

ii.    **Improper And/Or Unsupported Valet Parking Charges.**

6.    In violation of Sections 1.1(z), 16.3, and 17 of the Master Declaration, the North HOA has been wrongfully charged, to date, the cost of valet parking services, in an aggregate amount of no less than $739,892.

iii.    **Additional Improper And/Or Unsupported Charges.**

7.    In violation of Sections 1.1, 16.1, and 16.3 of the Master Declaration, the North HOA has been wrongfully charged, to date, certain costs with respect to building maintenance, concierge services, contingency, finance services, IT systems and technology shared expenses, light bulbs, office expenses, pool/beach attendants, pool/beach expenses, waste removal, building superintendent, superintendent supplies & living expense, electricity, natural gas/fuel, and water/sewer costs, in an aggregate amount of no less than approximately $6,499,031.

iv.    **Improper And/Or Unsupported Shared Facilities Charges.**

8.    In violation of Sections 1.1 and 16.3 of the Master Declaration, the North HOA has been wrongly charged, to date, certain North Tower shared facilities costs with respect to real estate and property taxes, valet parking services, office expenses, property coverage and waste removal, in an aggregate amount of no less than approximately $5,184,553.

v.    **Additional Violations Of The Declarations.**

9.    The North HOA also has claims in amounts unknown at this time for Collins

2

North's violation of the Declarations by: (i) improperly limiting the number of people the Unit Holders may designate to use the spa facilities in violation of the rights provided to the Unit Holders as set forth within the Prospectus for the North Tower, upon which Unit Holders relief in purchasing their units[1]; (ii) improperly allocating utility expenses based on square footage of the units rather than usage in violation of Section 16.3 of the Master Declaration; and (iii) attempting to fundamentally alter the character of the Property in violation of Section 2.2 of the Master Declaration.

**B.      Fraudulent Misrepresentation And Fraudulent Inducement.**

10.      Pursuant to Section 718.111 of the Florida Statutes, the North HOA may "institute actions in its name or on behalf of all unit owners concerning matters of common interest to most or all unit owners . . . ." See Section 718.111(3), *Fla. Stat.*

11.      The North HOA asserts fraudulent misrepresentation and fraudulent inducement claims against Collins North in its own name and on behalf of all Unit Holders, as such claims are matters of common interest to most, if not all, of the Unit Holders. The aggregate amount of damages with respect to this claim cannot be fully determined at this time, but is believed to be no less than $100 million and the North HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

12.      While Collins North was marketing units to prospective purchasers, Canyon Ranch[2] presented Collins North with a budget allocating costs among the Hotel Lot Owner and the Unit Holders via assessments on the North HOA. Collins North responded to Canyon Ranch that its proposed allocations were unreasonable and inappropriate and would violate the

---

[1]      A copy of the Prospectus for the North Tower is attached hereto as **Exhibit 3**.

[2]      "Canyon Ranch" means, collectively, CR Miami LLC, CR License LLC and Spa Project Advisors.

3

Declarations.  Collins North directed Canyon Ranch to allocate expenses in such a way as to minimize charges that would be borne by Unit Holders so as to induce purchases of unsold units, and subsequent purchasers relied on such misrepresented budgets and allocations and were fraudulently induced into purchasing their units.  Once the majority of the units were sold, Collins North approved the very same allocation scheme that Collins North had previously found to be inappropriate and in violation of the Declarations.

13.    Additionally, individual units at the Property were marketed to prospective owners by Collins North or its agents with the express representation that Canyon Ranch had a fixed twenty-year contract to run the hotel and spa at the Property.  In 2009, the Canyon Ranch Management Agreement was amended to enable the termination of the Agreement in direct contravention of the representations made to the Unit Holders in connection with the purchase of units.  To that end, section 10(d)(i) of the purchase agreement governing the proposed sale of certain assets of Collins North contemplates the termination of the Canyon Ranch Management Agreement.

### C.    Claims Under Chapter 720, Florida Statutes.

14.    The North HOA, on behalf of itself and the Unit Holders, asserts all the rights and remedies afforded to them under Chapter 720 of the Florida Statutes, including, without limitation, the right to control:  (i) annual budgets for the Property; (ii) maintenance imposed on the Unit Holders; and (iii) reform of the Declarations.  The aggregate amount of damages with respect to these claims cannot be fully determined at this time and the North HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

15.    Chapter 720 of the Florida Statutes, known as the "Homeowners' Association Law," applies to communities composed of property "primarily intended" for residential use.  See

4

Section 720.302(3), *Fla. Stat.* The substantial majority of the units at the Property are used for residential purposes. Accordingly, Chapter 720 applies to the Property.

16.      Pursuant to Chapter 720, Collins North was required to have transferred control of the community to the Unit Holders once more than 90% of the units at the Property were sold. See Section 720.307, *Fla. Stat.* Despite the fact that more than 90% of the units have been sold, control of the Property has not been transferred to the Unit Holders in violation of Chapter 720 of the Florida Statutes.

**D.    Breach Of Statutory Implied Warranties And Related Relief.**

17.      In constructing the Property, Collins North made available to prospective purchasers the Declarations, which contained certain representations regarding the construction and fitness of the condominium units. Unit Holders relied on these representations in purchasing their units. Subsequently, Unit Holders observed certain defects in their units and retained RAS Engineers ("RAS") to conduct an inspection of the Property. RAS prepared a report (the "RAS Report") identifying numerous defects proximately caused by improper design and/or construction, including, without limitation, the following: (i) failure to comply with the requirements of applicable national, state and local building codes; (ii) failure to comply with the filed and approved construction plans and specifications; (iii) failure to comply with the standards of good workmanship; (iv) failure to use proper materials; and (v) that the improvements at the Property were un-merchantable and/or unfit for their intended purpose or use.[3]

18.      As a result, the North HOA has certain claims against Collins North, including, without limitation, for: (i) breach of statutory implied warranties of fitness and merchantability; and (ii) breach of the Declarations and related injunctive relief. The precise amount of the North

---

[3]        A copy of the RAS Report is attached hereto as **Exhibit 4**.

HOA's damages in respect of these claims is unknown at this time, but is no less than $916,430. Please see attached hereto as **Exhibit 5** a schedule setting forth necessary repairs to the North Tower (excluding the stucco repairs detailed below) discovered to date.

### i.    Breach Of Implied Warranties Of Fitness And Merchantability.

19.    Pursuant to Section 718.203(1), Florida Statutes, Collins North owed to Unit Holders implied warranties of fitness and merchantability with respect to: (i) their units; (ii) all property transferred with, or appurtenant to, each unit; (iii) all improvements for the use of the Unit Holders and personal property for the use of the Unit Holders; (iv) the roof and structural components of the Property or other improvements for the use of the Unit Holders; and (v) the mechanical, electrical and plumbing equipment elements serving the Property or serving improvements for the use of the Unit Holders.

20.    Collins North breached the implied warranties of fitness and merchantability provided under Section 718.203(1), Florida Statutes, by: (i) constructing and delivering the Property with defects and deficiencies, including, without limitation, those defects identified in the RAS Report; (ii) failing to construct and deliver the Property in compliance with all applicable national, state and local building codes; (iii) failing to construct and deliver the Property in accordance with the filed, approved, signed and sealed construction plans and specifications; (iv) failing to construct and deliver the Property in accordance with industry standards; and (v) constructing and delivering the Property with defects and deficiencies caused by faulty workmanship and/or defective work performed that has caused damage to other property located within, on and/or about the Property and resulted in loss of use of that property. Accordingly, the North HOA has suffered and continues to suffer damages, including, without limitation, for: (i) costs incurred and costs that will be incurred to repair and replace defects and deficiencies at

the Property; and (ii) costs incurred and costs that will be incurred to construct, repair, and replace other property located at the Property.

### ii.     Breach Of Declarations And Injunctive Relief.

21.     The North HOA has claims against Collins North for breach of the Declarations, specifically Section 16.2 of the Master Declaration, for its failure to maintain, repair and/or replace defects and deficiencies at the Property, including, without limitation, those defects identified in the RAS Report. Additionally, the North HOA has claims for injunctive relief against Collins North to repair the defects and deficiencies at the Property at no cost to the North HOA, and claims to recover all costs associated with the enforcement of Collins North's obligations under the Declarations, including, without limitation, attorneys' fees and court costs.

### iii.     Stucco Repair.

22.     The North HOA also has claims against Collins North with respect to defects in the North Tower stucco, necessitating extensive repair work as described in the *Declaration of Anthony Barsanti Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 petitions and First Day Motions*. See Docket No. 2, ¶ 16. The precise amount of the North HOA's damages in respect of the North Tower stucco is unknown at this time, but is no less than $3,000,000, and includes amounts necessary to: (i) repair the stucco (including consulting fees); and (ii) test the repaired stucco to ensure that the defects are adequately repaired.

### E.     Unpaid Association Dues.

23.     The North HOA has a claim in an amount of no less than $509.90 with respect to North HOA dues that are due and owing from Collins North as of the commencement of these Chapter 11 cases.

7

## RESERVATION OF RIGHTS

24.    As certain of the damages described in this Proof of Claim require additional discovery and forensic accounting, and are contingent, unliquidated and likely to continue, the exact amount of the North HOA's total claim is unknown at this time.  The North HOA reserves the right to amend or supplement this Proof of Claim in all respects.

25.    The North HOA reserves the right to file additional proofs of claim for additional claims, which may be based on the same or additional facts and/or allegations.  The North HOA reserves the right to file claims for the payment of interest (subject to applicable law) and for the reimbursement of all reasonable expenses (including attorneys' fees and collection fees) incurred by the North HOA in connection with the claims described herein.

26.    The North HOA reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against it by Collins North, including, without limitation, any rights of setoff and/or recoupment.  The North HOA reserves the right to amend and/or supplement this Proof of Claim and any Exhibit attached hereto at any time and in any manner.

27.    The filing of this Proof of Claim shall not constitute:  (i) a waiver, release, or limitation of the North HOA's rights against any person, entity or property in which the North HOA has a security interest or lien; (ii) a consent by the North HOA to the jurisdiction or venue of this Court or any other court with respect to the proceedings, if any, commenced in any case against or otherwise involving the North HOA with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the North HOA; (iii) a waiver, release, or limitation of the right of the North HOA to trial by jury in this Court or

8

any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related thereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by the North HOA to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the North HOA's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this claim, any objection thereto or other proceeding which may be commenced in these cases against or otherwise involving the North HOA; (vii) a consent to the termination of any liability to the North HOA by any particular court, including, without limitation, this Court; (viii) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c); or (ix) an election of remedies.

*[The remainder of this page is intentionally left blank.]*

28.    All notices with respect to the North HOA's Proof of Claim are to be sent to:

Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Phone: (212) 209-4800
Fax:     (212) 209-4801
Email: eweisfelner@brownrudnick.com
          hsteel@brownrudnick.com

-and-

Scott L. Baena
Mindy A. Mora
Martin A. Schwartz
BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Phone: (305) 374-7580
Fax:     (305) 374-7593
Email: sbaena@bilzin.com
          mmora@bilzin.com
          mschwartz@bilzin.com

**North Carillon Beach Condominium Association, Inc.**

### NORTH SHARED FACILITIES

| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total |
|---|---|---|---|---|---|---|---|
| Real Estate and Property Taxes | $ 88,362 | $ 91,013 | $ 76,955 | $ 54,314 | $ 55,944 | $ 24,500 | $ 391,088 |
| Valet Parking Services | | | | 237,780 | 275,722 | 113,728 | 627,230 |
| Office Expenses | | | | | 85,866 | 40,000 | 125,866 |
| Property Coverage | 673,243 | 786,252 | 759,326 | 681,239 | 747,728 | 348,652 | 3,996,440 |
| Waste Removal | | 18,765 | 18,147 | (11,508) | 5,742 | 12,782 | 43,929 |
| | $ 761,605 | $ 896,030 | $ 854,428 | $ 961,826 | $ 1,171,002 | $ 539,662 | $ 5,184,553 |

| Non-Retail Shared Facilities | | | | | | | | 25% | 29% | 46% |
|---|---|---|---|---|---|---|---|---|---|---|
| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total | South Tower | Central Tower | North Tower |
| Spa Attendant | $ 694,783 | $ 829,875 | $ 915,600 | $ 777,156 | $ 833,560 | $ 353,748 | $ 4,404,722 | $ 1,101,180 | $ 1,277,369 | $ 2,026,172 |
| Fitness instructors | | | | | 1,067,654 | 467,156 | 1,534,810 | 383,703 | 445,095 | 706,013 |
| Office Expense Fitness | | | | | 97,922 | 43,794 | 141,716 | 35,429 | 41,098 | 65,189 |
| Spa expense supplies | | | | 137,994 | 123,442 | 62,562 | 323,998 | 81,000 | 93,959 | 149,039 |
| Spa expenses | | | 166,549 | | - | - | 166,549 | 41,637 | 48,299 | 76,613 |
| **Spa overcharges** | $ 694,783 | $ 829,875 | $ 1,082,149 | $ 915,150 | $ 2,122,578 | $ 927,260 | $ 6,571,795 | $ 1,642,949 | $ 1,905,820 | $ 3,023,026 |
| Contingency | | | | $ 12,000 | $ 12,000 | $ 5,000 | $ 29,000 | $ 7,250 | $ 8,410 | 13,340 |
| IT Systems & Tech Share | | | | 136,812 | 74,764 | 37,719 | 249,295 | 62,324 | 72,295 | 114,676 |
| Concierge | | 27,720 | 78,446 | 85,670 | 108,354 | 78,211 | 378,401 | 94,600 | 109,736 | 174,064 |
| Pool/Beach Attendants | 265,143 | 396,093 | 430,403 | 313,940 | 255,482 | 117,703 | 1,334,534 | 333,634 | 387,015 | 613,886 |
| Building | 414 | 283,129 | 266,755 | 350,709 | 616,502 | 329,909 | 1,237,423 | 309,356 | 358,853 | 569,215 |
| Pool/Beach Expenses | | | | 16,555 | 18,554 | 7,999 | 1,297,120 | 324,280 | 376,165 | 596,675 |
| Light Bulbs | | | | | | | 43,108 | 10,777 | 12,501 | 19,830 |
| Waste removal | | 75,153 | 94,559 | 187,095 | 121,784 | 42,535 | 521,126 | 130,281 | 151,126 | 239,718 |
| Electricity | 981,278 | 985,553 | 910,474 | 840,376 | 790,216 | 351,675 | 4,859,572 | 1,214,893 | 1,409,276 | 2,235,403 |
| Natural Gas/Fuel | 254,381 | 184,082 | 196,758 | 167,316 | 145,592 | 54,675 | 1,002,804 | 250,701 | 290,813 | 461,290 |
| Water/Sewer | 326,570 | 361,867 | 362,033 | 397,432 | 444,164 | 216,675 | 2,108,741 | 527,185 | 611,535 | 970,021 |
| Building Superintendent | | 35,000 | 105,367 | 109,103 | 192,000 | 113,750 | 520,220 | | | |
| Superintendent supplies & living expenses | | | | 99,797 | 30,000 | 12,500 | 142,297 | | | |
| Allowable amount ($100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (41,667) | (341,667) | | | |
| Building superintendent - claimed | - | - | 5,367 | 108,900 | 122,000 | 84,583 | 320,850 | 80,213 | 93,047 | 147,591 |
| Finance | 66,300 | 66,300 | 107,628 | 257,368 | 548,840 | 242,230 | 1,048,438 | | | |
| Allowable amount ($125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (52,083) | (302,083) | | | |
| Finance - claimed | - | - | - | 132,368 | 423,840 | 190,147 | 746,355 | 186,589 | 216,443 | 343,323 |
| | | | | | | Additional overcharges | $ | $ 3,532,082 | $ 4,097,215 | $ 6,499,031 |
| **Valet Parking services** | 485,525 | 524,882 | 598,054 | - | - | - | 1,608,461 | $ 402,115 | $ 466,454 | $ 739,892 |
| | | | | | | Total amount | | $ 15,446,502 | | |

# SOUTH HOA PROOF OF CLAIM

B 10 Modified (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

List the **name** and **case number** of the Debtor against which you assert a claim below. (**List only one Debtor per claim form.**)

FL 6801 Collins South LLC
Case No. 14-11693 (SCC)

*Note: This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after commencement of the case. A request for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

South Carillon Beach Condominium Association, Inc.

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Edward S. Weisfelner
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Telephone number: 212-209-4800       email: eweisfelner@brownrudnick.com

**Court Claim Number:** _____
*(If known)*
Filed on:_____

Name and address where payment should be sent (if different from above):

South Carillon Beach Condominium Association, Inc.
6799 Collins Avenue
Miami Beach, Florida 33141

Telephone number:  305-514-7458         email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ No less than $111,821,869.50, plus unliquidated amounts.
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**  Please see Addendum attached hereto as Exhibit A.
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
9 1 0 8

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
**Nature of property or right of setoff:** ❏ Real Estate  ❏ Motor Vehicle  ❏ Other
**Describe:**
Value of Property: $_____  Annual Interest Rate_____% ❏ Fixed ❏ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ _____  Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):** Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____   (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, mortgages, or security agreements. (See instruction #8, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9)
Check the appropriate box.

[X] I am the creditor.   ❏ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)

❏ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)

❏ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name:  David H. Pensky
Title:  Authorized Representative
Company:  South Carillon Beach Condominium Assoc., Inc.   (Signature)   Sept 8, 2014 (Date)
Address and telephone number (if different from notice address above):
6799 Collins Avenue
Miami Beach, Florida 33141
Telephone number: 301-641-4243     Email:

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❏ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**
$_____

* Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**COURT USE ONLY**

## EXHIBIT A

### ADDENDUM TO PROOF OF CLAIM OF
### SOUTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.

1.      South Carillon Beach Condominium Association, Inc. ("South HOA") is a not-for-profit Florida corporation that represents 143 unit owners (the "Unit Holders") in the South Tower at Canyon Ranch Hotel & Spa, Miami Beach (the "Property"). The Property is governed by that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (as amended, the "Master Declaration"). The South Tower is also governed by its own separate declaration (the "South Tower Declaration," and together with the Master Declaration, the "Declarations"). The Declarations are attached hereto as **Exhibit 1**.

2.      The South HOA has claims against FL 6801 Collins South LLC ("Collins South") for: (i) historical and ongoing improper and/or unsupported charges, and other violations of the Declarations; (ii) fraudulent misrepresentation and fraudulent inducement; (iii) violations of Chapter 720, Florida Statutes; (iv) breach of statutory implied warranties and related relief relating to the construction and fitness of units; and (v) unpaid South HOA dues.

      **A.**      **Improper And/Or Unsupported Charges.**

3.      Attached hereto as **Exhibit 2** is a schedule of historical improper and/or unsupported charges discovered by the South HOA to date, which was compiled by the South HOA's certified public accountants from information provided to them by Canyon Ranch personnel. The aggregate amount of improper and/or unsupported charges on the South HOA is no less than $8,855,764, and such wrongful charges are ongoing.

4.      The improper and/or unsupported charges, include, but are not limited to the following charges on the South HOA:

i.       **Improper Spa Charges.**

5.       In violation of Sections 1.1(oo), 16.1, and 16.3 of the Master Declaration, the South HOA has been wrongfully charged, to date, charges for the spa and other Non-Retail Shared Facilities – including charges for "fitness instructors," in an aggregate amount of no less than $1,642,949.

ii.      **Improper And/Or Unsupported Valet Parking Charges.**

6.       In violation of Sections 1.1(z), 16.3, and 17 of the Master Declaration, the South HOA has been wrongfully charged, to date, the cost of valet parking services, in an aggregate amount of no less than $402,115.

iii.     **Additional Improper And/Or Unsupported Charges.**

7.       In violation of Sections 1.1, 16.1, and 16.3 of the Master Declaration, the South HOA has been wrongfully charged, to date, certain costs with respect to building maintenance, concierge services, contingency, finance services, IT systems and technology shared expenses, light bulbs, office expenses, pool/beach attendants, pool/beach expenses, waste removal, building superintendent, superintendent supplies & living expense, electricity, natural gas/fuel, and water/sewer costs, in an aggregate amount of no less than approximately $3,532,082.

iv.      **Improper And/Or Unsupported Shared Facilities Charges.**

8.       In violation of Sections 1.1 and 16.3 of the Master Declaration, the South HOA has been wrongly charged, to date, certain South Tower shared facilities costs with respect to real estate and property taxes, valet parking services, office expenses, property coverage and waste removal, in an aggregate amount of no less than approximately $3,278,618.

v.       **Additional Violations Of The Declarations.**

9.       The South HOA also has claims in amounts unknown at this time for Collins

2

South's violation of the Declarations by: (i) improperly limiting the number of people the Unit Holders may designate to use the spa facilities in violation of the rights provided to the Unit Holders as set forth within the Prospectus for the South Tower, upon which Unit Holders relief in purchasing their units[1]; (ii) improperly allocating utility expenses based on square footage of the units rather than usage in violation of Section 16.3 of the Master Declaration; and (iii) attempting to fundamentally alter the character of the Property in violation of Section 2.2 of the Master Declaration.

### B.    Fraudulent Misrepresentation And Fraudulent Inducement.

10.    Pursuant to Section 718.111 of the Florida Statutes, the South HOA may "institute actions in its name or on behalf of all unit owners concerning matters of common interest to most or all unit owners . . . ." See Section 718.111(3), *Fla. Stat.*

11.    The South HOA asserts fraudulent misrepresentation and fraudulent inducement claims against Collins South in its own name and on behalf of all Unit Holders, as such claims are matters of common interest to most, if not all, of the Unit Holders. The aggregate amount of damages with respect to this claim cannot be fully determined at this time, but is believed to be no less than $100 million and the South HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

12.    While Collins South was marketing units to prospective purchasers, Canyon Ranch[2] presented Collins South with a budget allocating costs among the Hotel Lot Owner and the Unit Holders via assessments on the South HOA. Collins South responded to Canyon Ranch that its proposed allocations were unreasonable and inappropriate and would violate the

---

[1]        A copy of the Prospectus for the South Tower is attached hereto as **Exhibit 3**.

[2]        "Canyon Ranch" means, collectively, CR Miami LLC, CR License LLC and Spa Project Advisors.

Declarations.  Collins South directed Canyon Ranch to allocate expenses in such a way as to minimize charges that would be borne by Unit Holders so as to induce purchases of unsold units, and subsequent purchasers relied on such misrepresented budgets and allocations and were fraudulently induced into purchasing their units.  Once the majority of the units were sold, Collins South approved the very same allocation scheme that Collins South had previously found to be inappropriate and in violation of the Declarations.

13.    Additionally, individual units at the Property were marketed to prospective owners by Collins South or its agents with the express representation that Canyon Ranch had a fixed twenty-year contract to run the hotel and spa at the Property.  In 2009, the Canyon Ranch Management Agreement was amended to enable the termination of the Agreement in direct contravention of the representations made to the Unit Holders in connection with the purchase of units.  To that end, section 10(d)(i) of the purchase agreement governing the proposed sale of certain assets of Collins South contemplates the termination of the Canyon Ranch Management Agreement.

### C.    Claims Under Chapter 720, Florida Statutes.

14.    The South HOA, on behalf of itself and the Unit Holders, asserts all the rights and remedies afforded to them under Chapter 720 of the Florida Statutes, including, without limitation, the right to control:  (i) annual budgets for the Property; (ii) maintenance imposed on the Unit Holders; and (iii) reform of the Declarations.  The aggregate amount of damages with respect to these claims cannot be fully determined at this time and the South HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

15.    Chapter 720 of the Florida Statutes, known as the "Homeowners' Association Law," applies to communities composed of property "primarily intended" for residential use.  See

4

Section 720.302(3), *Fla. Stat.* The substantial majority of the units at the Property are used for residential purposes. Accordingly, Chapter 720 applies to the Property.

16.    Pursuant to Chapter 720, Collins South was required to have transferred control of the community to the Unit Holders once more than 90% of the units at the Property were sold. See Section 720.307, *Fla. Stat.* Despite the fact that more than 90% of the units have been sold, control of the Property has not been transferred to the Unit Holders in violation of Chapter 720 of the Florida Statutes.

**D.    Breach Of Statutory Implied Warranties And Related Relief.**

17.    In constructing the Property, Collins South made available to prospective purchasers the Declarations, which contained certain representations regarding the construction and fitness of the condominium units. Unit Holders relied on these representations in purchasing their units. Subsequently, Unit Holders observed certain defects in their units and retained RAS Engineers ("RAS") to conduct an inspection of the Property. RAS prepared a report  (the "RAS Report") identifying numerous defects proximately caused by improper design and/or construction, including, without limitation, the following:  (i) failure to comply with the requirements of applicable national, state and local building codes; (ii) failure to comply with the filed and approved construction plans and specifications; (iii) failure to comply with the standards of good workmanship; (iv) failure to use proper materials; and (v) that the improvements at the Property were un-merchantable and/or unfit for their intended purpose or use.[3]

18.    As a result, the South HOA has certain claims against Collins South, including, without limitation, for:  (i) breach of statutory implied warranties of fitness and merchantability; and (ii) breach of the Declarations and related injunctive relief. The precise amount of the South

---

[3]    A copy of the RAS Report is attached hereto as **Exhibit 4**.

5

HOA's damages in respect of these claims is unknown at this time, but is no less than $3,700,000. Please see attached hereto as **Exhibit 5** a schedule setting forth necessary repairs to the South Tower discovered to date.

### i.    Breach Of Implied Warranties Of Fitness And Merchantability.

19.    Pursuant to Section 718.203(1), Florida Statutes, Collins South owed to Unit Holders implied warranties of fitness and merchantability with respect to: (i) their units; (ii) all property transferred with, or appurtenant to, each unit; (iii) all improvements for the use of the Unit Holders and personal property for the use of the Unit Holders; (iv) the roof and structural components of the Property or other improvements for the use of the Unit Holders; and (v) the mechanical, electrical and plumbing equipment elements serving the Property or serving improvements for the use of the Unit Holders.

20.    Collins South breached the implied warranties of fitness and merchantability provided under Section 718.203(1), Florida Statutes, by: (i) constructing and delivering the Property with defects and deficiencies, including, without limitation, those defects identified in the RAS Report; (ii) failing to construct and deliver the Property in compliance with all applicable national, state and local building codes; (iii) failing to construct and deliver the Property in accordance with the filed, approved, signed and sealed construction plans and specifications; (iv) failing to construct and deliver the Property in accordance with industry standards; and (v) constructing and delivering the Property with defects and deficiencies caused by faulty workmanship and/or defective work performed that has caused damage to other property located within, on and/or about the Property and resulted in loss of use of that property. Accordingly, the South HOA has suffered and continues to suffer damages, including, without limitation, for: (i) costs incurred and costs that will be incurred to repair and replace defects and deficiencies at

the Property; and (ii) costs incurred and costs that will be incurred to construct, repair, and replace other property located at the Property.

### ii.   Breach Of Declarations And Injunctive Relief.

21.     The South HOA has claims against Collins South for breach of the Declarations, specifically Section 16.2 of the Master Declaration, for its failure to maintain, repair and/or replace defects and deficiencies at the Property, including, without limitation, those defects identified in the RAS Report.   Additionally, the South HOA has claims for injunctive relief against Collins South to repair the defects and deficiencies at the Property at no cost to the South HOA, and claims to recover all costs associated with the enforcement of Collins South's obligations under the Declarations, including, without limitation, attorneys' fees and court costs.

### E.     Unpaid Association Dues.

22.     The South HOA has a claim in an amount of no less than $105.50 with respect to South HOA dues that are due and owing from Collins South as of the commencement of these Chapter 11 cases.

### RESERVATION OF RIGHTS

23.     As certain of the damages described in this Proof of Claim require additional discovery and forensic accounting, and are contingent, unliquidated and likely to continue, the exact amount of the South HOA's total claim is unknown at this time.   The South HOA reserves the right to amend or supplement this Proof of Claim in all respects.

24.     The South HOA reserves the right to file additional proofs of claim for additional claims, which may be based on the same or additional facts and/or allegations.   The South HOA reserves the right to file claims for the payment of interest (subject to applicable law) and for the reimbursement of all reasonable expenses (including attorneys' fees and collection fees) incurred

7

by the South HOA in connection with the claims described herein.

25.    The South HOA reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against it by Collins South, including, without limitation, any rights of setoff and/or recoupment.  The South HOA reserves the right to amend and/or supplement this Proof of Claim and any Exhibit attached hereto at any time and in any manner.

26.    The filing of this Proof of Claim shall not constitute:  (i) a waiver, release, or limitation of the South HOA's rights against any person, entity or property in which the South HOA has a security interest or lien; (ii) a consent by the South HOA to the jurisdiction or venue of this Court or any other court with respect to the proceedings, if any, commenced in any case against or otherwise involving the South HOA with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the South HOA; (iii) a waiver, release, or limitation of the right of the South HOA to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related thereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by the South HOA to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the South HOA's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (vi) a

waiver of the right to move to withdraw the reference with respect to the subject matter of this

claim, any objection thereto or other proceeding which may be commenced in these cases against

or otherwise involving the South HOA; (vii) a consent to the termination of any liability to the

South HOA by any particular court, including, without limitation, this Court; (viii) a consent to the

final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c); or (ix) an

election of remedies.

     27.    All notices with respect to the South HOA's Proof of Claim are to be sent to:

> Edward S. Weisfelner
> Howard S. Steel
> BROWN RUDNICK LLP
> Seven Times Square
> New York, New York 10036
> Phone: (212) 209-4800
> Fax:    (212) 209-4801
> Email:  eweisfelner@brownrudnick.com
>        hsteel@brownrudnick.com
>
> -and-
>
> Scott L. Baena
> Mindy A. Mora
> Martin A. Schwartz
> BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
> 1450 Brickell Avenue, Suite 2300
> Miami, Florida 33131
> Phone: (305) 374-7580
> Fax:    (305) 374-7593
> Email:  sbaena@bilzin.com
>        mmora@bilzin.com
>        mschwartz@bilzin.com

**South Carillon Beach Condominium Association, Inc.**

### South Shared Facilities

| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total |
|---|---|---|---|---|---|---|---|
| Real Estate and Property Taxes | $ 48,023 | $ 49,463 | $ 41,823 | $ 29,519 | $ 30,404 | $ 14,368 | $ 213,600 |
| Valet parking Services | | | | 297,431 | 267,990 | 111,118 | 676,539 |
| Office expenses | | | | | 46,666 | 21,167 | 67,833 |
| Property Coverage | 365,893 | 427,311 | 412,677 | 370,239 | 406,374 | 235,228 | 2,217,722 |
| Waste Removal | 8,248 | 7,472 | 23,261 | 31,536 | 26,018 | 6,391 | 102,926 |
| | $ 422,164 | $ 484,246 | $ 477,761 | $ 728,725 | $ 777,452 | $ 388,270 | $ 3,278,618 |

### Non-Retail Shared Facilities

| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total | 25% South Tower | 29% Central Tower | 46% North Tower |
|---|---|---|---|---|---|---|---|---|---|---|
| Spa Attendant | $ 694,783 | $ 829,875 | $ 915,600 | $ 777,156 | $ 833,560 | $ 353,748 | $ 4,404,722 | $ 1,101,180 | $ 1,277,369 | $ 2,026,172 |
| Fitness instructors | | | | | 1,067,654 | 467,156 | 1,534,810 | 383,703 | 445,095 | 706,013 |
| Office Expense Fitness | | | | | 97,922 | 43,794 | 141,716 | 35,429 | 41,098 | 65,189 |
| Spa expense supplies | | | | 137,994 | 123,442 | 62,562 | 323,998 | 81,000 | 93,959 | 149,039 |
| Spa expenses | | | 166,549 | | - | - | 166,549 | 41,637 | 48,299 | 76,613 |
| **Spa overcharges** | $ 694,783 | $ 829,875 | $ 1,082,149 | $ 915,150 | $ 2,122,578 | $ 927,260 | $ 6,571,795 | $ 1,642,949 | $ 1,905,820 | $ 3,023,026 |
| Contingency | | | | $ 12,000 | $ 12,000 | $ 5,000 | $ 29,000 | $ 7,250 | $ 8,410 | $ 13,340 |
| IT Systems & Tech Share | | | | 136,812 | 74,764 | 37,719 | 249,295 | 62,324 | 72,295 | 114,676 |
| Concierge | | 27,720 | 78,446 | 85,670 | 108,354 | 78,211 | 378,401 | 94,600 | 109,736 | 174,064 |
| Pool/Beach Attendants | 265,143 | 396,093 | 430,403 | 160,161 | 82,734 | - | 1,334,534 | 333,634 | 387,015 | 613,886 |
| Building | 414 | 283,129 | 266,755 | 313,940 | 255,482 | 117,703 | 1,237,423 | 309,356 | 358,853 | 569,215 |
| Pool/Beach Expenses | | | | 350,709 | 616,502 | 329,909 | 1,297,120 | 324,280 | 376,165 | 596,675 |
| Light Bulbs | | | | 16,555 | 18,554 | 7,999 | 43,108 | 10,777 | 12,501 | 19,830 |
| Waste removal | | 75,153 | 94,559 | 187,095 | 121,784 | 42,535 | 521,126 | 130,281 | 151,126 | 239,718 |
| Electricity | 981,278 | 985,553 | 910,474 | 840,376 | 790,216 | 351,675 | 4,859,572 | 1,214,893 | 1,409,276 | 2,235,403 |
| Natural Gas/Fuel | 254,381 | 184,082 | 196,758 | 167,316 | 145,592 | 54,675 | 1,002,804 | 250,701 | 290,813 | 461,290 |
| Water/Sewer | 326,570 | 361,867 | 362,033 | 397,432 | 444,164 | 216,675 | 2,108,741 | 527,185 | 611,535 | 970,021 |
| Building Superintendent | | 35,000 | 105,367 | 109,103 | 192,000 | 113,750 | 520,220 | | | |
| Superintendent supplies & living expenses | | | | 99,797 | 30,000 | 12,500 | 142,297 | | | |
| Allowable amount ($100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (41,667) | (341,667) | | | |
| Building superintendent - claimed | - | - | 5,367 | 108,900 | 122,000 | 84,583 | 320,850 | 80,213 | 93,047 | 147,591 |
| Finance | 66,300 | 66,300 | 107,628 | 257,368 | 548,840 | 242,230 | 1,048,438 | | | |
| Allowable amount ($125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (52,083) | (302,083) | | | |
| Finance - claimed | - | - | - | 132,368 | 423,840 | 190,147 | 746,355 | 186,589 | 216,443 | 343,323 |
| | | | | | | Additional overcharges | $ 3,532,082 | $ 4,097,215 | $ 6,499,031 |
| **Valet Parking services** | 485,525 | 524,882 | 598,054 | - | - | | 1,608,461 | 402,115 | 466,454 | 739,892 |
| | | | | | | Total amount | $ 8,855,764 | | | |

# CENTRAL HOA PROOF OF CLAIM

| UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

List the **name** and **case number** of the Debtor against whom you assert a claim below. **(List only one Debtor per claim form.)**

FL 6801 Collins Central LLC
Case No. 14-11694 (SCC)

*Note: This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after commencement of the case. A request for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Central Carillon Beach Condominium Association, Inc.

❒ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Edward S. Weisfelner
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Telephone number: 212-209-4800      email: eweisfelner@brownrudnick.com

**Court Claim Number:** _____
*(If known)*
Filed on:_____

Name and address where payment should be sent (if different from above):

Central Carillon Beach Condominium Association, Inc.
6801 Collins Avenue
Miami Beach, Florida 33141

Telephone number: 305-514-7458      email:

❒ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ No less than $110,719,597.01, plus unliquidated amounts.

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

**2. Basis for Claim:** Please see Addendum attached hereto as Exhibit A.
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** 9 1 0 8 | **3a. Debtor may have scheduled account as:** (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❒Real Estate ❒Motor Vehicle ❒Other
**Describe:**
**Value of Property:** $_____ **Annual Interest Rate**_____% ❒Fixed ❒Variable
**(when case was filed)**
**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
if any: $_____      **Basis for perfection:**_____
**Amount of Secured Claim:** $_____      **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):** Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, mortgages, or security agreements. (See instruction #8, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9)
Check the appropriate box.

[X] I am the creditor.   ❒ I am the creditor's authorized agent.   ❒ I am the trustee, or the debtor, or   ❒ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
(See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief

Print Name:   Jeri Klemme-Zaiac
Title:   Authorized Representative
Company:   Central Carillon Beach Condominium Assoc.,Inc. (Signature)      (Date)
Address and telephone number (if different from notice address above):
6801Collins Avenue
Miami Beach, Florida 33141

Telephone number:      Email:

**Priority categories:**
❒ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).
❒ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).
❒ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).
❒ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).
❒ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).
❒ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**
$_____

* *Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**ADDENDUM TO PROOF OF CLAIM OF**
**CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**

1.      Central Carillon Beach Condominium Association, Inc. ("Central HOA") is a not-
for-profit Florida corporation that represents 230 unit owners (the "Unit Holders") in the Central
Tower at Canyon Ranch Hotel & Spa, Miami Beach (the "Property").  The Property is governed
by that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa
(as amended, the "Master Declaration").  The Central Tower is also governed by its own separate
declaration (the "Central Tower Declaration," and together with the Master Declaration, the
"Declarations").  The Declarations are attached hereto as **Exhibit 1**.

2.      The Central HOA has claims against FL 6801 Collins Central LLC ("Collins
Central") for: (i) historical and ongoing improper and/or unsupported charges, and other
violations of the Declarations; (ii) fraudulent misrepresentation and fraudulent inducement; (iii)
violations of Chapter 720, Florida Statutes; (iv) breach of statutory implied warranties and
related relief relating to the construction and fitness of units; and (v) unpaid Central HOA dues.

        **A.      Improper And/Or Unsupported Charges.**

3.      Attached hereto as **Exhibit 2** is a schedule of historical improper and/or
unsupported charges discovered by the Central HOA to date, which was compiled by the Central
HOA's certified public accountants from information provided to them by Canyon Ranch
personnel.  The aggregate amount of improper and/or unsupported charges on the Central HOA is
no less than $10,028,276, and such wrongful charges are ongoing.

4.      The improper and/or unsupported charges, include, but are not limited to the
following charges on the Central HOA:

### i.    Improper Spa Charges.

5.    In violation of Sections 1.1(oo), 16.1, and 16.3 of the Master Declaration, the Central HOA has been wrongfully charged, to date, charges for the spa and other Non-Retail Shared Facilities – including charges for "fitness instructors," in an aggregate amount of no less than $1,905,820.

### ii.    Improper And/Or Unsupported Valet Parking Charges.

6.    In violation of Sections 1.1(z), 16.3, and 17 of the Master Declaration, the Central HOA has been wrongfully charged, to date, the cost of valet parking services, in an aggregate amount of no less than $466,454.

### iii.    Additional Improper And/Or Unsupported Charges.

7.    In violation of Sections 1.1, 16.1, and 16.3 of the Master Declaration, the Central HOA has been wrongfully charged, to date, certain costs with respect to building maintenance, concierge services, contingency, finance services, IT systems and technology shared expenses, light bulbs, office expenses, pool/beach attendants, pool/beach expenses, waste removal, building superintendent, superintendent supplies & living expense, electricity, natural gas/fuel, and water/sewer costs, in an aggregate amount of no less than approximately $4,097,215.

### iv.    Improper And/Or Unauthorized Shared Facilities Charges.

8.    In violation of Sections 1.1 and 16.3 of the Master Declaration, the Central HOA has been wrongly charged, to date, certain Central Tower shared facilities costs with respect to real estate and property taxes, valet parking services, office expenses, property coverage and waste removal, in an aggregate amount of no less than approximately $3,558,787.

### v.    Additional Violations Of The Declarations.

9.    The Central HOA also has claims in amounts unknown at this time for Collins

2

Central's violation of the Declarations by: (i) improperly limiting the number of people the Unit Holders may designate to use the spa facilities in violation of the rights provided to the Unit Holders as set forth within the Prospectus for the Central Tower, upon which Unit Holders relief in purchasing their units[1]; (ii) improperly allocating utility expenses based on square footage of the units rather than usage in violation of Section 16.3 of the Master Declaration; and (iii) attempting to fundamentally alter the character of the Property in violation of Section 2.2 of the Master Declaration.

**B.    Fraudulent Misrepresentation And Fraudulent Inducement.**

10.    Pursuant to Section 718.111 of the Florida Statutes, the Central HOA may "institute actions in its name or on behalf of all unit owners concerning matters of common interest to most or all unit owners . . . ." See Section 718.111(3), *Fla. Stat.*

11.    The Central HOA asserts fraudulent misrepresentation and fraudulent inducement claims against Collins Central in its own name and on behalf of all Unit Holders, as such claims are matters of common interest to most, if not all, of the Unit Holders. The aggregate amount of damages with respect to this claim cannot be fully determined at this time, but is believed to be no less than $100 million and the Central HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

12.    While Collins Central was marketing units to prospective purchasers, Canyon Ranch[2] presented Collins Central with a budget allocating costs among the Hotel Lot Owner and the Unit Holders via assessments on the Central HOA. Collins Central responded to Canyon Ranch that its proposed allocations were unreasonable and inappropriate and would violate the

---

[1]    A copy of the Prospectus for the Central Tower is attached hereto as **Exhibit 3**.

[2]    "Canyon Ranch" means, collectively, CR Miami LLC, CR License LLC and Spa Project Advisors.

3

Declarations.  Collins Central directed Canyon Ranch to allocate expenses in such a way as to minimize charges that would be borne by Unit Holders so as to induce purchases of unsold units, and subsequent purchasers relied on such misrepresented budgets and allocations and were fraudulently induced into purchasing their units.  Once the majority of the units were sold, Collins Central approved the very same allocation scheme that Collins Central had previously found to be inappropriate and in violation of the Declarations.

13.    Additionally, individual units at the Property were marketed to prospective owners by Collins Central or its agents with the express representation that Canyon Ranch had a fixed twenty-year contract to run the hotel and spa at the Property.  In 2009, the Canyon Ranch Management Agreement was amended to enable the termination of the Agreement in direct contravention of the representations made to the Unit Holders in connection with the purchase of units.  To that end, section 10(d)(i) of the purchase agreement governing the proposed sale of certain assets of Collins Central contemplates the termination of the Canyon Ranch Management Agreement.

C.    **Claims Under Chapter 720, Florida Statutes.**

14.    The Central HOA, on behalf of itself and the Unit Holders, asserts all the rights and remedies afforded to them under Chapter 720 of the Florida Statutes, including, without limitation, the right to control:  (i) annual budgets for the Property; (ii) maintenance imposed on the Unit Holders; and (iii) reform of the Declarations.  The aggregate amount of damages with respect to these claims cannot be fully determined at this time and the Central HOA reserves all rights to amend this Proof of Claim to liquidate such damages.

15.    Chapter 720 of the Florida Statutes, known as the "Homeowners' Association Law," applies to communities composed of property "primarily intended" for residential use.  <u>See</u>

4

Section 720.302(3), *Fla. Stat.*  The substantial majority of the units at the Property are used for residential purposes.  Accordingly, Chapter 720 applies to the Property.

16.     Pursuant to Chapter 720, Collins Central was required to have transferred control of the community to the Unit Holders once more than 90% of the units at the Property were sold.  See Section 720.307, *Fla. Stat.*  Despite the fact that more than 90% of the units have been sold, control of the Property has not been transferred to the Unit Holders in violation of Chapter 720 of the Florida Statutes.

### D.    Breach Of Statutory Implied Warranties And Related Relief.

17.     In constructing the Property, Collins Central made available to prospective purchasers the Declarations, which contained certain representations regarding the construction and fitness of the condominium units.  Unit Holders relied on these representations in purchasing their units.  Subsequently, Unit Holders observed certain defects in their units and retained RAS Engineers ("RAS") to conduct an inspection of the Property.  RAS prepared a report  (the "RAS Report") identifying numerous defects proximately caused by improper design and/or construction, including, without limitation, the following:   (i) failure to comply with the requirements of applicable national, state and local building codes; (ii) failure to comply with the filed and approved construction plans and specifications; (iii) failure to comply with the standards of good workmanship; (iv) failure to use proper materials; and (v) that the improvements at the Property were un-merchantable and/or unfit for their intended purpose or use.[3]

18.     As a result, the Central HOA has certain claims against Collins Central, including, without limitation, for:  (i) breach of statutory implied warranties of fitness and merchantability; and (ii) breach of the Declarations and related injunctive relief.  The precise amount of the Central

---

[3]     A copy of the RAS Report is attached hereto as **Exhibit 4**.

HOA's damages in respect of these claims is unknown at this time, but is no less than $688,206. Please see attached hereto as **Exhibit 5** a schedule setting forth necessary repairs to the Central Tower discovered to date.

### i. Breach Of Implied Warranties Of Fitness And Merchantability.

19.     Pursuant to Section 718.203(1), Florida Statutes, Collins Central owed to Unit Holders implied warranties of fitness and merchantability with respect to: (i) their units; (ii) all property transferred with, or appurtenant to, each unit; (iii) all improvements for the use of the Unit Holders and personal property for the use of the Unit Holders; (iv) the roof and structural components of the Property or other improvements for the use of the Unit Holders; and (v) the mechanical, electrical and plumbing equipment elements serving the Property or serving improvements for the use of the Unit Holders.

20.     Collins Central breached the implied warranties of fitness and merchantability provided under Section 718.203(1), Florida Statutes, by: (i) constructing and delivering the Property with defects and deficiencies, including, without limitation, those defects identified in the RAS Report; (ii) failing to construct and deliver the Property in compliance with all applicable national, state and local building codes; (iii) failing to construct and deliver the Property in accordance with the filed, approved, signed and sealed construction plans and specifications; (iv) failing to construct and deliver the Property in accordance with industry standards; and (v) constructing and delivering the Property with defects and deficiencies caused by faulty workmanship and/or defective work performed that has caused damage to other property located within, on and/or about the Property and resulted in loss of use of that property. Accordingly, the Central HOA has suffered and continues to suffer damages, including, without limitation, for: (i) costs incurred and costs that will be incurred to repair and replace defects and deficiencies at

6

the Property; and (ii) costs incurred and costs that will be incurred to construct, repair, and replace

other property located at the Property.

### ii. Breach Of Declarations And Injunctive Relief.

21.    The Central HOA has claims against Collins Central for breach of the

Declarations, specifically Section 16.2 of the Master Declaration, for its failure to maintain, repair

and/or replace defects and deficiencies at the Property, including, without limitation, those defects

identified in the RAS Report.    Additionally, the Central HOA has claims for injunctive relief

against Collins Central to repair the defects and deficiencies at the Property at no cost to the

Central HOA, and claims to recover all costs associated with the enforcement of Collins Central's

obligations under the Declarations, including, without limitation, attorneys' fees and court costs.

### E.    Unpaid Association Dues.

22.    The Central HOA has a claim in an amount of no less than $3,115.01 with respect

to Central HOA dues that are due and owing from Collins Central as of the commencement of

these Chapter 11 cases.

### RESERVATION OF RIGHTS

23.    As certain of the damages described in this Proof of Claim require additional

discovery and forensic accounting, and are contingent, unliquidated and likely to continue, the

exact amount of the Central HOA's total claim is unknown at this time.    The Central HOA

reserves the right to amend or supplement this Proof of Claim in all respects.

24.    The Central HOA reserves the right to file additional proofs of claim for

additional claims, which may be based on the same or additional facts and/or allegations.    The

Central HOA reserves the right to file claims for the payment of interest (subject to applicable

law) and for the reimbursement of all reasonable expenses (including attorneys' fees and

7

collection fees) incurred by the Central HOA in connection with the claims described herein.

25.    The Central HOA reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against it by Collins Central, including, without limitation, any rights of setoff and/or recoupment.  The Central HOA reserves the right to amend and/or supplement this Proof of Claim and any Exhibit attached hereto at any time and in any manner.

26.    The filing of this Proof of Claim shall not constitute:  (i) a waiver, release, or limitation of the Central HOA's rights against any person, entity or property in which the Central HOA has a security interest or lien; (ii) a consent by the Central HOA to the jurisdiction or venue of this Court or any other court with respect to the proceedings, if any, commenced in any case against or otherwise involving the Central HOA with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Central HOA; (iii) a waiver, release, or limitation of the right of the Central HOA to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related thereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by the Central HOA to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the Central HOA's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge;

8

(vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this claim, any objection thereto or other proceeding which may be commenced in these cases against or otherwise involving the Central HOA; (vii) a consent to the termination of any liability to the Central HOA by any particular court, including, without limitation, this Court; (viii) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c); or (ix) an election of remedies.

27.     All notices with respect to the Central HOA's Proof of Claim are to be sent to:

> Edward S. Weisfelner
> Howard S. Steel
> BROWN RUDNICK LLP
> Seven Times Square
> New York, New York 10036
> Phone: (212) 209-4800
> Fax:    (212) 209-4801
> Email:  eweisfelner@brownrudnick.com
>         hsteel@brownrudnick.com
>
> -and-
>
> Scott L. Baena
> Mindy A. Mora
> Martin A. Schwartz
> BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
> 1450 Brickell Avenue, Suite 2300
> Miami, Florida 33131
> Phone: (305) 374-7580
> Fax:    (305) 374-7593
> Email:  sbaena@bilzin.com
>         mmora@bilzin.com
>         mschwartz@bilzin.com

**Central Carillon Beach Condominium Association, Inc.**

### Central Shared Facilities

| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total |
|---|---|---|---|---|---|---|---|
| Real Estate and Property Taxes | 55,706 | 57,378 | 48,515 | 30,908 | 35,268 | 16,667 | 244,442 |
| Valet parking Services | | | | 216,127 | 229,860 | 96,223 | 542,210 |
| Office expenses | | | | | 54,134 | 25,167 | 79,301 |
| Property Coverage | 424,436 | 495,681 | 478,705 | 429,477 | 521,916 | 272,865 | 2,623,080 |
| Waste Removal | | | | (8,285) | 17,296 | - | 9,011 |
| Waste Removal | 2,340 | 17,343 | 32,061 | | - | 9,000 | 60,744 |
| | 482,482 | 570,402 | 559,281 | 668,227 | 858,474 | 419,921 | 3,558,787 |

### Non-Retail Shared Facilities

| | Actuals YTD December 2009 | Actuals YTD December 2010 | Actuals YTD December 2011 | Actuals YTD December 2012 | Total Annualized 2013 | Budget Jan -May 2014 | Total | 25% South Tower | 29% Central Tower | 46% North Tower |
|---|---|---|---|---|---|---|---|---|---|---|
| Spa Attendant | 694,783 | 829,875 | 915,600 | 777,156 | 833,560 | 353,748 | 4,404,722 | 1,101,180 | 1,277,369 | 2,026,172 |
| Fitness instructors | | | | | 1,067,654 | 467,156 | 1,534,810 | 383,703 | 445,095 | 706,013 |
| Office Expense Fitness | | | | | 97,922 | 43,794 | 141,716 | 35,429 | 41,098 | 65,189 |
| Spa expense supplies | | | | 137,994 | 123,442 | 62,562 | 323,998 | 81,000 | 93,959 | 149,039 |
| Spa expenses | | | 166,549 | | - | - | 166,549 | 41,637 | 48,299 | 76,613 |
| **Spa overcharges** | 694,783 | 829,875 | 1,082,149 | 915,150 | 2,122,578 | 927,260 | 6,571,795 | 1,642,949 | **1,905,820** | 3,023,026 |
| | | | | | | | | | | |
| Contingency | | | | 12,000 | 12,000 | 5,000 | 29,000 | 7,250 | 8,410 | 13,340 |
| IT Systems & Tech Share | | | | 136,812 | 74,764 | 37,719 | 249,295 | 62,324 | 72,295 | 114,676 |
| Concierge | | 27,720 | 78,446 | 85,670 | 108,354 | 78,211 | 378,401 | 94,600 | 109,736 | 174,064 |
| Pool/Beach Attendants | 265,143 | 396,093 | 430,403 | 160,161 | 82,734 | - | 1,334,534 | 333,634 | 387,015 | 613,886 |
| Building | 414 | 283,129 | 266,755 | 313,940 | 255,482 | 117,703 | 1,237,423 | 309,356 | 358,853 | 569,215 |
| Pool/Beach Expenses | | | | 350,709 | 616,502 | 329,909 | 1,297,120 | 324,280 | 376,165 | 596,675 |
| Light Bulbs | | | | 16,555 | 18,554 | 7,999 | 43,108 | 10,777 | 12,501 | 19,830 |
| Waste removal | | 75,153 | 94,559 | 187,095 | 121,784 | 42,535 | 521,126 | 130,281 | 151,126 | 239,718 |
| Electricity | 981,278 | 985,553 | 910,474 | 840,376 | 790,216 | 351,675 | 4,859,572 | 1,214,893 | 1,409,276 | 2,235,403 |
| Natural Gas/Fuel | 254,381 | 184,082 | 196,758 | 167,316 | 145,592 | 54,675 | 1,002,804 | 250,701 | 290,813 | 461,290 |
| Water/Sewer | 326,570 | 361,867 | 362,033 | 397,432 | 444,164 | 216,675 | 2,108,741 | 527,185 | 611,535 | 970,021 |
| | | | | | | | | | | |
| Building Superintendent | | 35,000 | 105,367 | 109,103 | 192,000 | 113,750 | 520,220 | | | |
| Superintendent supplies & living expenses | | | | 99,797 | 30,000 | 12,500 | 142,297 | | | |
| Allowable amount ($100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (41,667) | (341,667) | | | |
| Building superintendent - claimed | - | - | 5,367 | 108,900 | 122,000 | 84,583 | 320,850 | 80,213 | 93,047 | 147,591 |
| | | | | | | | | | | |
| Finance | 66,300 | 66,300 | 107,628 | 257,368 | 548,840 | 242,230 | 1,048,438 | | | |
| Allowable amount ($125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (125,000) | (52,083) | (302,083) | | | |
| Finance - claimed | - | - | - | 132,368 | 423,840 | 190,147 | 746,355 | 186,589 | 216,443 | 343,323 |
| Additional overcharges | | | | | | | | 3,532,082 | **4,097,215** | 6,499,031 |
| | | | | | | | | | | |
| **Valet Parking services** | 485,525 | 524,882 | 598,054 | - | - | - | 1,608,461 | 402,115 | **466,454** | 739,892 |

Total amount   **$ 10,028,276** (rounded)

# <u>EXHIBIT D</u>



# CANYONRANCH®

### *The Power of Possibility*™

March 22, 2011

[redacted]

RE:  CR Miami Beach – Carillon [redacted]

Dear [redacted]

Please be advised that CR Miami, LLC (a Canyon Ranch wholly owned affiliate) the manager under a hotel management agreement among CR Miami, LLC, FL 6801 Collins North LLC, FL 6801 Collins South LLC and FL 6801 Collins Central LLC (the "Hotel Management Agreement").

The Hotel Management Agreement provides for CR Miami, LLC to operate and manage the facilities described therein (generally, the entire "Hotel Parcel", which includes the hotel and spa, as well as the other resort facilities and resort parcel areas located within all three tower buildings on the Carillon property), according to the terms and conditions set forth therein.

The initial 20-year term of the Hotel Management Agreement commenced when the hotel/spa facility opened in November 2008, and CR Miami, LLC has two options to further extend the term thereof upon the conditions stated therein.

Thank you for your courtesy.

Sincerely,

CR Miami, LLC

By:        Gary Milner
Its:        Vice President Legal & Development
           8600 East Rockcliff Road
           Tucson, AZ 85750
           (520) 749-9655 Ext. 4387
           gmilner@canyonranch.com