# PURCHASE AND SALE AGREEMENT

**by and among**

**FL 6801 COLLINS NORTH LLC**
**FL 6801 COLLINS SOUTH LLC**
**FL 6801 COLLINS CENTRAL LLC**

**"SELLERS"**

**and**

**Z CAPITAL PARTNERS, L.L.C. OR ITS AFFILIATED DESIGNEE(S)**

**"BUYER"**



Debtors'
Ex. 5

# TABLE OF CONTENTS

Page

1.  Definitions.....................................................................................................................2

2.  Purchase Price............................................................................................................12

3.  Deposit........................................................................................................................13

4.  Purchase of Assets.....................................................................................................13

5.  Allocation of Purchase Price.....................................................................................13

6.  Purchase Price............................................................................................................14

7.  Inspections; Diligence................................................................................................14

8.  Title.............................................................................................................................15

9.  Escrow Agent and Escrow.........................................................................................16

10. Closing........................................................................................................................18

11. Adjustments and Prorations at Closing.....................................................................26

12. Representations & Warranties of Sellers...................................................................30

13. Representations & Warranties of Buyer.....................................................................34

14. Operation of Assets Prior to and After Closing.........................................................35

15. Default.........................................................................................................................37

16. Purchase of Assets As-Is...........................................................................................39

17. Brokerage....................................................................................................................42

18. Notices.........................................................................................................................42

19. Assignability...............................................................................................................43

20. Property Information and Confidentiality..................................................................44

21. Condominium Units Disclosures...............................................................................45

22. Time is of the Essence................................................................................................51

23. Successor and Assigns................................................................................................51

24. Merger.........................................................................................................................51

25. Acceptance of Deeds..................................................................................................51

26. Limitation of Liability................................................................................................51

27. No Waiver...................................................................................................................52

28. No Recording..............................................................................................................52

29. No Offer......................................................................................................................52

30. Captions......................................................................................................................52

31. Severability.................................................................................................................52

32. Counterparts; Facsimile Execution............................................................................53

i

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|
| 33. | Governing Law | 53 |
| 34. | Attorneys' Fees and Costs | 53 |
| 35. | Modification | 53 |
| 36. | Exhibits and Schedules; Construction | 53 |
| 37. | WAIVER OF JURY TRIAL | 53 |
| 38. | Limitation of Liability to Seller Liability Cap Amount | 54 |
| 39. | Sales Tax Certificate of Compliance | 54 |
| 40. | Bankruptcy Court Approval | 54 |
| 41. | Consents | 54 |
| 42. | Further Assurances | 55 |
| 43. | Submission to Jurisdiction; Consent to Service of Process | 55 |

US_ACTIVE:\44547262\6\58399.0031

## EXHIBITS AND SCHEDULES

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A-1 | North Tower Condominium Units Legal Description |
| Exhibit A-2 | South Tower Condominium Units Legal Description |
| Exhibit A-3 | Central Tower Condominium Units Legal Description |
| Exhibit A-4 | Hotel Property Legal Description |
| Exhibit A-5 | Retail Property Legal Description |
| Exhibit A-6 | Shared Component Unit Legal Description |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Assignment and Assumption of Rental Program Agreements |
| Exhibit D | Form of Partial Assignment of Developer's Rights, Bulk Buyer |
| Exhibit E | Condominium Documents |
| Exhibit F | Form of Special Warranty Deed |
| Exhibit G | Form of Bill of Sale |
| Exhibit H | Form of Title Affidavit |
| Exhibit I-1 | Receipt for Condominium Documents – North Carillon Beach |
| Exhibit I-2 | Receipt for Condominium Documents – South Carillon Beach |
| Exhibit I-3 | Receipt for Condominium Documents – Central Carillon Beach |
| Exhibit J | Form of Non-Foreign Affidavit |
| Exhibit K | Title Commitment |
| Exhibit L | Department of Community Affairs Brochure |
| Exhibit M | Form of Association Estoppel Certificate |
| Exhibit N | Bidding Procedures Order |
| Exhibit O | Sale Order |
| Exhibit P | Construction Contract |

| SCHEDULE | DESCRIPTION |
| --- | --- |
| Schedule 1 | Assessments |
| Schedule 2 | Purchase Price Allocation |
| Schedule 3 | Rental Program Agreements |
| Schedule 4 | Previously Used Units |
| Schedule 5 | Assumed Leases and Contracts |
| Schedule 6 | Litigation |

## JOINDERS

Joinder of Confidentiality Party
Joinder of Guarantor

US_ACTIVE:\44547262\6\58399.0031

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF DEVELOPER.  FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made as of _____, 2014 (the "**Effective Date**") by and among FL 6801 COLLINS NORTH LLC, a Delaware limited liability ("**Collins North Owner**"), FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("**Collins South Owner**"), and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability company ("**Collins Central Owner**") (Collins North Owner, Collins South Owner and Collins Central Owner are hereinafter sometimes individually referred to as a "**Seller**" and collectively referred to as the "**Sellers**"), Z Capital Partners, L.L.C. or its affiliated designee(s) ("**Buyer**"), and OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, as escrow agent ("**Escrow Agent**").

## W I T N E S S E T H :

**WHEREAS**, Collins North Owner is the owner of those certain condominium units more particularly described on Exhibit A-1 (the "**North Tower Condominium Units**"), together with an undivided interest in the common elements appurtenant thereto, located within North Carillon Beach, a Condominium; Collins South Owner is the owner of (x) those certain condominium units more particularly described on Exhibit A-2 (the "**South Tower Condominium Units**"), together with an undivided interest in the common elements appurtenant thereto, located within South Carillon Beach, a Condominium, and (y) those certain condominium units more particularly described on Exhibit A-3 (the "**Central Tower Condominium Units**"), together with an undivided interest in the common appurtenant elements thereto, located within Central Carillon Beach, a Condominium; and Collins Central Owner is the owner of (x) the real property and improvements identified as the Hotel Lot (as such term is defined in the Master Declaration), more particularly described on Exhibit A-4 (the "**Hotel Property**", upon which Sellers own and operate a full-service hotel known as the "**Canyon Ranch Hotel & Spa**"), (y) the real property and improvements identified as the Retail Lot (as such term is defined in the Master Declaration), more particularly described on Exhibit A-5 (the "**Retail Property**"), and (z) that certain Shared Component Unit located within Central Carillon Beach, a Condominium, more particularly described on Exhibit A-6 (the "**Shared Component Unit**"), together with an undivided interest in the common elements appurtenant thereto (the North Tower Condominium Units, the South Tower Condominium Units, the Central Tower Condominium Units, the Hotel Property, the Retail Property and the Shared Component Unit are hereinafter sometimes collectively referred to as the "**Real Property**"); and

**WHEREAS**, on June 1, 2014, each Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which Bankruptcy Case is being jointly administered under Case No. 14-11691, to seek, among other things, the approval of the Bankruptcy Court to sell to Buyer, pursuant to Sections 363 and 365 of the

Bankruptcy Code, the Real Property and certain other assets of Sellers upon the terms and conditions set forth herein, subject to the receipt and acceptance by Sellers of higher and better offers.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Definitions.**

The following terms (in their singular and plural forms as appropriate) as used in this Agreement shall have the meanings set forth below:

"**A&A Agreements**" shall have the meaning set forth in Section 10(b)(i) hereof.

"**Accepted Bid Fees**" shall have the meaning set forth in Section 14(g)(iv)14(g)(i) hereof.

"**Affiliate**" shall mean, with respect to any Person, (i) any other Person who, either directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with that Person; (ii) any officer, director or partner (as relates to any partnership) of such Person; (iii) if such Person is an officer, director or partner of another Person, any company for which such Person acts in such capacity; and (iv) if such Person is a natural person, any relative of or trust for the benefit of such Person or any relative of such Person.

"**Agreement**" shall mean this Purchase and Sale Agreement, as the same may hereafter be amended in accordance with the terms hereof.

"**Assets**" shall mean, collectively, the Real Property, the Intellectual Property, the Rental Program Agreements, the Licenses, the Personal Property, the Developer Rights, the Software, the Construction Contract, the Assumed Leases and Contracts and the Property Books and Records and specifically excluding the Excluded Assets.

"**Assignment and Assumption Agreement**" shall have the meaning set forth in Section 10(b)(i)(A).

"**Associations**" shall mean the Carillon Hotel and Spa Master Association, Inc., the South Carillon Beach Condominium Association, Inc., the Central Carillon Beach Condominium Association, Inc., and the North Carillon Beach Condominium Association, Inc. (each, an "**Association**").

"**Assumed Leases and Contracts**" shall mean the leases and contracts set forth on Schedule 5 (a) to the extent such leases and contracts are executory contracts or leases capable of being assigned pursuant to section 365 of the Bankruptcy Code, and (b) the Bankruptcy Court authorizes the assumption and assignment of such leases and contracts to the Buyer; provided

2

that Buyer shall have the option to add other contracts and leases of the Sellers (including the CR Agreements) to Schedule 5 at any time prior to Closing.

"**Assumed Liabilities**" shall mean, collectively (i) the Permitted Encumbrances, and (ii) all Liabilities of Sellers that arise from and after the Closing under, pursuant to or otherwise arising from the Rental Program Agreements, the Licenses, the Assumed Leases and Contracts, the Construction Contract (if applicable), the Intellectual Property and/or the Developer Rights, solely to the extent assigned to and assumed by Buyer pursuant to the A&A Agreements; however, the Retained Lawsuit, the Excluded Leases and Contracts, and Taxes specifically allocated to a Seller pursuant to Section 11 are expressly excluded.

"**Auction**" means Auction, as defined in the Bidding Procedures.

"**Bankruptcy Case**" shall have the meaning set forth in the preamble.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §101 *et seq*.

"**Bankruptcy Court**" shall have the meaning set forth in the preamble.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall mean August 14, 2014 at 4:00 p.m. (prevailing Eastern time).

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court under Sections 105 and 363 of the Bankruptcy Code, approving the Bidding Procedures, dated July 1, 2014.

"**Bidding Procedures**" shall mean the bidding procedures and bid protections with respect to the sale of the Assets, attached to the Bidding Procedures Order.

"**Break-Up Fee**" shall have the meaning set forth in the Sale Motion.

"**Broker**" shall have the meaning set forth in Section 17.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which banks in the State of Florida are authorized or required by law or executive order to be closed.

"**Buyer**" shall have the meaning set forth in the preamble.

"**Buyer Knowledge Parties**" shall have the meaning set forth in Section 12(b) hereof.

"**Buyer Termination Event**" shall have the meaning set forth in Section 3 hereof.

"**Buyer's Representatives**" shall mean the directors, officers, employees, Affiliates, partners, agents or other representatives of Buyer including, without limitation, Buyer's attorneys, accountants, consultants, engineers, lenders and financial advisors.

3

"**Canyon Ranch Entities**" shall mean, collectively, CR Miami, LLC, CR Licensee, LLC and Spa Project Advisors.

"**Closing**" shall mean the consummation of the acquisition of the Assets by Buyer and the consummation of the other transactions contemplated by this Agreement.

"**Closing Condition**" or "**Closing Conditions**" shall have the meaning set forth in Section 10(d)(vi) hereof.

"**Closing Date**" shall mean the date which is two (2) Business Days following the Conditions Satisfaction Date.

"**Closing Documents**" shall mean, collectively, the A&A Agreements, the Deeds and each of the other documents required to be delivered by or on behalf of Sellers and/or Buyer under Section 10 hereof.

"**Closing Statement**" shall have the meaning set forth in Section 10(b)(iv) hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Conditions Satisfaction Date**" shall have the meaning set forth in Section 10(d) hereof.

"**Condo Deliverables**" shall have the meaning set forth in Section 21(a)(iv).

"**Condominium Project**" shall mean that certain hotel condominium project created pursuant to the Condominium Documents.

"**Condominium Documents**" shall mean the Master Declaration and each of the other documents described as "Condominium Documents" on Exhibit E attached hereto and made a part hereof.

"**Condominium Units**" shall mean those portions of the Real Property that constitute condominium units pursuant to recorded condominium formation documents for the Real Property.

"**Condominium Unit Owner**" shall mean an owner (other than any Seller) of any Condominium Unit.

"**Confidentiality Agreement**" shall have the meaning set forth in Section 20(e) hereof.

"**Confidentiality Party**" shall have the meaning set forth in Section 20(e) hereof.

"**Construction Contract**" shall have the meaning set forth in Section 14(g)(i) hereof.

"**CR Agreements**" shall mean, collectively, the Management Agreement and the other agreements identified in and amended by that certain Omnibus Agreement to Original Canyon

4

Ranch Agreements dated as of February ___, 2010, by and among Sellers and the Canyon Ranch Entities.

"**Current Accounts Receivable**" shall have the meaning set forth in Section11(b)(iii) hereof.

"**Current Ledger**" shall have the meaning set forth in Section 11(b) hereof.

"**Cut-Off Time**" shall mean 11:59 p.m. Eastern Time on the Closing Date.

"**Data Room**" shall have the meaning set forth in Section 16(b).

"**Developer Rights**" shall have the meaning set forth in Section 10(b)(i)(C)

"**Deeds**" shall have the meaning set forth in Section 10(b)(ii)(A) hereof.

"**Default**" shall mean a breach or default by Sellers (or any of them) or Buyer, as the case may be, of any of the terms, covenants, conditions or provisions of this Agreement or any of the representations or warranties made by such Party under this Agreement which breach or default has not otherwise been cured within five (5) days following written notice thereof to such Party by any other Party hereto; provided, that the foregoing notice and cure period shall not be applicable to any obligation of a Party which is required under the terms of this Agreement to be performed by a specified deadline or within a specified time period (including, without limitation, the obligation of the Parties to consummate the Closing on the applicable Closing Date) and under no circumstances shall any deadline or time period contained herein be extended or otherwise modified by the foregoing notice and cure period.

"**Deposit**" shall have the meaning set forth in Section 3 hereof.

"**Eastern Time**" shall mean Eastern Standard Time or Eastern Daylight Savings Time, as in effect in Miami, Florida.

"**EBL**" shall have the meaning set forth in Section 14(g)(i) hereof.

"**Effective Date**" shall have the meaning set forth in the preamble.

"**Engineer**" shall have the meaning set forth in Section 14(g)(iii) hereof.

"**Escrow Agent**" shall have the meaning set forth in the preamble.

"**Excluded Assets**" shall mean, collectively, any and all (i) reserves, escrows and deposits of any kind or nature, whether maintained by Sellers (or any of them) or on behalf of Sellers (or any of them) by any utility or otherwise (excluding, however, any reserves or escrows held by or on behalf of the Collins Central Owner or Manager under any Rental Program Agreement not otherwise transferred under this Agreement, (ii) house banks not transferred to Buyer under this Agreement, (iii) bank accounts, cash and cash equivalents and security of Sellers (whether held by or in the name of Sellers (or any of them), the Real Property or otherwise), (iv) uncollected credit card charges relating to the period prior to the Closing Date,

5

(v) income attributable to any period through the Cut-Off Time belonging to Sellers (or any of them) and constituting a receivable as of the Closing Date except as otherwise provided in Section 11(b); (vi) inventory, equipment and other personal property or other items owned by any employees, guests, members or patrons of the Real Property, any of the Condominium Unit Owners, or other third parties or any of such items owned by the Manager pursuant to the terms of the Management Agreement, (vii) all insurance policies and insurance contracts relating to any Assets or to any other Excluded Assets, and all of the rights, remedies, and options of Sellers thereunder including, without limitation, all rights and claims of Sellers with respect to the Retained Lawsuit; (viii) the Excluded Business Records; (ix) claims for refunds of taxes and other governmental charges of whatever nature for all periods prior to the Closing Date; (x) Excluded Leases and Contracts; and (x) rights and benefits arising or accruing under any leases and contracts and Rental Program Agreements prior to the Closing Date.  Further, Buyer acknowledges and agrees that the names "Canyon Ranch," "Canyon Ranch Spa," "Canyon Ranch Spa Club," and "Canyon Ranch Living" (collectively, the "**Trademarked Names**") are registered trademarks owned by the Canyon Ranch Entities, that any use of the Trademarked Names without proper licensing from the Canyon Ranch Entities is expressly prohibited, and that the Trademarked Names are Excluded Assets.

"**Excluded Business Records**" shall mean the respective corporate books and records of each Seller, any and all tax records and any Property Books and Records relating to the Excluded Assets, provided that the books and records related to Sales and Occupancy Taxes shall not be excluded.

"**Excluded Leases and Contracts**" shall mean the leases and contracts that are not Assumed Leases and Contracts.

"**Executive Order 13224**" shall have the meaning set forth in Section 12(a)(v).

"**Final Order**" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or on the docket of any other court of competent jurisdiction) which has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause such order not to be a Final Order.

"**FF&E and Inventory**" shall mean, collectively, all of the goods and materials held, owned, leased, used or possessed by Sellers in the ordinary course of operating the Hotel Property and the other Real Property and located at the Real Property including, but not limited to, all furniture, fixtures, equipment, appliances, furnishings, drapes, floor coverings, televisions,

6

clock-radios, saleable food and beverage inventory, food service equipment and supplies, flatware, china, glassware, cooking utensils and equipment, linens, cleaning equipment and supplies, computers used in the operation of the Real Property, heating, lighting, refrigeration, plumbing, ventilating, incinerating, communication, electrical, dish washing, laundry, and air conditioning equipment, storm shutters, pylon and other signs, spa, fitness and recreational equipment, sprinklers, hoses, tools and lawn and pool equipment, as the same may be depleted, replaced or otherwise disposed of in the ordinary course of business prior to the Closing Date (without any abatement of the Purchase Price or any credit or allowance on account thereof) other than any of the foregoing which have the "Canyon Ranch" logo affixed thereon (the "**CR Branded OS&E**").  Immediately following the Closing Date, all of the CR Branded OS&E shall be properly disposed of or removed by Buyer and made available to the Canyon Ranch Entities. Notwithstanding the foregoing, no property of Manager, the Associations, any Condominium Unit Owner, or any tenants, guests, members or patrons of the Real Property shall be included in the FF&E and Inventory.

"**Florida Condominium Act**" shall mean Chapter 718 of the Florida Statues and all regulations promulgated thereunder as they exist of the Effective Date hereof.

"**Front Desk Closing Hour**" shall have the meaning set forth in Section 11(b)(ii) hereof.

"**General Contractor**" shall have the meaning set forth in Section 14(g)(i) hereof.

"**Governmental Authority**" shall mean any federal, state, county, local, foreign or other governmental or public agency, instrumentality, commission, court authority, board or body.

"**Guarantor**" shall mean Lehman ALI Inc., a Delaware corporation.

"**Hotel Room Revenues**" shall have the meaning set forth in Section 11(b)(ii) hereof.

"**Inspections**" shall mean, collectively, all inspections, tests and studies conducted by Buyer.

"**Intellectual Property**" shall mean, collectively, any trademarks, trademark registration, trademark applications, service marks, business marks, trade names, brand names, or other names, logos and slogans embodying business or product good will (or both), copyright registrations and/or copyrights used in connection with the Real Property, including without limitation the name "Carillon Beach", to the extent the same are owned by Sellers and assignable or transferable, but specifically excluding the Trademarked Names.

"**IRS**" shall mean the Internal Revenue Service of the United States.

"**Leases and Contracts**" shall mean all of Sellers' right, title and interest under the contracts and leases in effect with respect to the Assets executed directly by any Seller or by an authorized person on behalf of any Seller and as set forth on Schedule 5.

"**Law**" shall mean any code, law, order, ordinance, regulation, rule, or statute of any Governmental Authority.

US_ACTIVE:\44547262\6\58399.0031

"**Legal Proceeding**" shall mean any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"**Liability**" shall mean any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, expense (including, without limitation, costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills and checks presented to banks for collection or deposit in the ordinary course of business) of any type, whether known or unknown, accrued or unaccrued, absolute or contingent, liquidated or unliquidated, matured or unmatured.

"**Licenses**" shall mean, collectively, any and all licenses, permits and approvals issued by governmental agencies and authorities, held by or on behalf of Sellers (or any of them) and exclusively relating to or otherwise used in connection with the operation of the Real Property, to the extent the same are assignable or transferable.

"**Lien**" shall mean any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"**Management Agreement**" shall mean that certain "Carillon Management Agreement" dated as of May 9, 2003, as amended, between North Carillon LLC and Carillon South Joint Venture LLC, as Owner, and CR Miami, LLC, as Manager.

"**Manager**" shall mean CR Miami, LLC, an Arizona limited liability company.

"**Master Declaration**" shall mean that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded in Official Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida, as amended.

"**North Tower Litigation**" shall mean *North Carillon Beach Condominium Association, Inc., Plaintiff, v. FL 6801 Collins North LLC, FL 6801 Collins South LLC and FL 6801 Collins Central LLC, Defendants*, Local Case No. 2014-4356-CA-01 (Judicial Section 04), pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

"**OFAC**" shall have the meaning set forth in Section12(a)(v) .

"**OFAC Lists**" shall have the meaning set forth in Section 12(a)(v).

"**Operating Facility**" shall have the meaning set forth in Section 11(b) hereof.

"**Other Litigation**" shall mean any claim, other than the North Tower Litigation and South Tower Litigation, that is made prior to, on, or after the Effective Date by North Carillon Beach Condominium Association, Inc., Central Carillon Beach Condominium Association, Inc. and/or South Carillon Beach Condominium Association, as Plaintiff(s), against any or all of Sellers, as Defendant(s), in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida or any other court, and that will materially and adversely (as defined below) affect the Buyer, the Property and/or the operation of the Property after Closing.  The

8

definition of "Other Litigation" specifically excludes any claims that can be resolved by any of Sellers by the payment of money.  The meaning of "materially and adversely" shall mean any claim or claims that are $100,000 or more in the aggregate.

"**Party**" and "**Parties**" shall mean and refer to each of the Sellers and Buyer.

"**Permitted Disclosure Parties**" shall have the meaning set forth in Section 20(a) hereof.

"**Permitted Encumbrances**" shall mean (i) all matters disclosed in Schedule B - Section II of the Title Commitment attached hereto as Exhibit K and any defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in any Title Updates and which the Sellers do not otherwise cure pursuant to Section 8 hereof, (ii) zoning, entitlement and other land use and environmental restrictions and prohibitions imposed by any Governmental Authority, (iii) [reserved], (iv) Liens imposed by law, incurred in good faith in the ordinary course of operating the Real Property, that secure obligations with respect to current taxes and assessments or other governmental charges which are not yet due, (v) [reserved], (vi) any notices of commencement (but not construction liens) for the Work to be performed pursuant to the Construction Contract, provided that the Work to be performed under the Construction Contract has not been completed as of five (5) Business Days prior to the Closing Date, and (vii) any matters of any kind or nature created by or through Buyer or any of its Affiliates.  Notwithstanding anything to the contrary contained herein, nothing contained herein shall be deemed to reimpose any encumbrance or exception that may be deleted or insured over by the Title Policy.

"**Person**" shall mean a natural person or any entity including, without limitation, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, firm, business association or other entity.

"**Personal Property**" shall mean, collectively, all FF&E and Inventory and all other tangible personal property of every kind and nature owned by Sellers as of the Closing Date and located in or upon the Real Property, together with all intangible and intangible property and property rights held by Sellers with respect to the Real Property, and which are not part of the Excluded Assets or CR Branded OS&E.

"**Property Books and Records**" shall mean, collectively, any and all correspondence files (hard copies only) of Sellers related to the operation of the Real Property and located at the Real Property, specifically excluding emails and other electronic communications, financial information, and information of a privileged or confidential nature.

"**Property Information**" shall have the meaning set forth in Section 16(b) hereof.

"**Prorated Items**" shall have the meaning set forth in Section 11(a) hereof.

"**Purchase Price**" shall have the meaning set forth in Section 2 hereof.

"**Real Property**" shall have the meaning set forth in the Recitals hereof. For the avoidance of doubt, the Real Property includes all of The Properties and the Future Development Property (i.e., the Retail Lot), both as defined in the Master Declaration, less the Condominium Units owned by Condominium Unit Owners.

9

"**Reimbursement**" shall have the meaning set forth in Section 14(g)(v) hereof.

"**Rental Program Agreements**" shall mean, collectively, the rental program agreements more particularly described on Schedule 3 attached hereto and made a part hereof (as any of such agreements may hereafter be modified or amended), together with any additional rental program agreements entered into after the Effective Date and prior to the Closing Date between a Condominium Unit Owner and the Collins Central Owner (or the Manager, on behalf of the Collins Central Owner) with respect to the offering of the Condominium Unit owned by such Condominium Unit Owner for rent as part of the rental program operated by the Manager, on behalf of the Collins Central Owner.

"**Required Cure Items**" shall have the meaning set forth in Section 8(b) hereof.

"**Retained Lawsuit**" shall mean *KM/PLAZA, a joint venture comprised of Katz Meltzer Construction Company, a Florida corporation, and Plaza Contracting Company, a Delaware limited liability company, Plaintiff, v. FL 6801 COLLINS NORTH, LLC, Defendant, KM/Plaza, Third Party Plaintiff, v. BCI, INCORPORATED, a Florida corporation; BAKER CONCRETE CONSTRUCTION, INC., an Ohio corporation; DELTA PAINTING, INC., a Florida corporation; J.D. WATERPROOFING, INC., a dissolved Florida corporation; DECKTIGHT ROOFING SERVICES, INC., a Florida corporation; and MIAMI DRYWALL & STUCCO, INC., a Florida corporation, Third Party Defendants*, Case No. 10-31272 CA 01 (25) (General Jurisdiction Division), pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

"**Sale Motion**" shall mean the motion filed in the Bankruptcy Case on June 1, 2014, seeking approval and entry of, among other things, orders under Bankruptcy Code sections 105 and 363, Bankruptcy Rule 6004 and 6006 (i) authorizing the Sellers' entry into this Agreement, (ii) authorizing and approving the Bidding Procedures and Break-Up Fee, (iii) approving the notice procedures, (iv) setting a date for a sale hearing, and (iv) authorizing and approving the Sale Order.

"**Sale Order**" shall mean an order of the Bankruptcy Court under Sections 105 and 363 of the Bankruptcy Code, approving the transactions contemplated by this Agreement, substantially in the form set forth in Exhibit O (it being understood that certain of the provisions of the Sale Order must constitute findings of fact or conclusions of law to be made by the Bankruptcy Court); which Sale Order shall not be modified to impair or adversely impact in any material respect the rights of the Buyer without the Buyer's prior consent. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens created by Buyer and Permitted Encumbrances) and claims; (ii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 43 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and are binding upon, and not subject to rejection or avoidance by, Sellers or any chapter 7 or chapter 11 trustee of Sellers. In addition,

with respect to any mortgages or security interests encumbering any Assets at Closing, the Sale Order shall provide that the Assets are being conveyed to Buyer free and clear of such mortgages and security interests pursuant to Section 363(f) of the Bankruptcy Code, and Sellers shall have no other obligation to deliver to the Title Company any satisfaction of mortgage, financing statement termination or other document terminating any such mortgages or security interests.

"**Sales and Occupancy Taxes**" shall have the meaning set forth in Section 12(a)(vii) hereof.

"**Seller Construction Cap**" shall have the meaning set forth in Section 14(g)(iv) hereof.

"**Seller Indemnified Parties**" shall have the meaning set forth in Section 7(a) hereof.

"**Seller Liability Cap Amount**" shall have the meaning set forth in Section 12(c)(ii) hereof.

"**Sellers**" shall have the meaning set forth in the preamble.

"**Sellers Knowledge Individual**" shall have the meaning set forth in Section 12(e) hereof.

"**Sellers' Documents**" shall mean all Closing Documents required to be executed and/or delivered by any of the Sellers to Buyer.

"**Sellers' Affiliates**" shall have the meaning set forth in Section 26 hereof.

"**Software**" shall mean, collectively, to the extent owned by Sellers or licensed and assignable by Sellers, any and all (i) computer programs (and all licenses to use related thereto), including software implementations of algorithms, models and methodologies, whether in source code or object code, used solely in the operation of the Real Property, (ii) databases and compilations, including any and all data relating to the other Assets, whether machine readable or otherwise, to the extent used solely in the operation of the Real Property, (iii) descriptions, flow charts and other work product used solely to design, plan, organize and develop any of the foregoing, and (iv) all documentation, including user manuals and training software, relating to any of the foregoing.

"**Sole Warranties**" shall have the meaning set forth in Section 21(a)(viii)(E) hereof.

"**South Tower Litigation**" shall mean *Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, v. FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc. and North Carillon Beach Condominium Association, Inc.*, Local Case No. 2014-5408-CA-01 (Judicial Section 25), pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

"**Successful Bidder(s)**" shall mean the bidder(s) selected by the Sellers at the Auction (unless no other "Qualified Bid" as defined in the Bidding Procedures is received, in which case

the Buyer shall be the Successful Bidder without an Auction being held) as having the highest and best bid for the Assets.

"**Taxes**" shall mean any and all taxes, fees, imposts, duties, levies or other assessments, imposed by any Governmental Authority, and such term shall include any interest, fines, penalties or additional amounts attributable to, or imposed upon, or with respect to, any such taxes, fees, imposts, duties, levies or other assessments.

"**Tax Return**" shall mean any return, declaration, report, statement, information statement and other document (including any schedules or attachments thereto) required to be filed with respect to Taxes, and including any amendments thereof.

"**Third Party**" shall mean, in respect of the Sellers or the Buyer, any Person who is not an Affiliate thereof or an officer, director, trustee, employee, shareholder, partner, principal, agent or representative thereof.

"**Title Commitment**" shall have the meaning set forth in Section 8(a) hereof.

"**Title Company**" shall mean Old Republic National Title Insurance Company.

"**Title Notice**" shall have the meaning set forth in Section 8(b) hereof.

"**Title Objections**" shall have the meaning set forth in Section 8(b) hereof.

"**Title Policy**" shall mean, collectively, one or more owner's title insurance policies issued by the Title Company pursuant to the Title Commitment.

"**Title Updates**" shall have the meaning set forth in Section 8(b) hereof.

"**Trade Payables**" shall have the meaning set forth in Section 11(b)(viii) hereof.

"**Transfer Taxes**" shall mean, collectively, any transfer, documentary, sales, use, registration and any real property sale and transfer or gains tax, stamp tax, equity transfer tax, excise tax or other similar tax (including any penalties or interest with respect thereto) on the Deeds.

"**WARN Act**" shall have the meaning set forth in Section 13(a)(vi) hereof.

"**Work**" shall have the meaning set forth in Section 14(g)(ii) hereof.

2.     **Purchase Price**.   On the terms and subject to the conditions set forth in this Agreement and the Sale Order, Sellers hereby agree to sell, transfer and convey, and Buyer hereby agrees to purchase from Sellers, the Assets for an aggregate purchase price equal to Twenty-One Million Six Hundred Thousand and No/100 Dollars ($21,600,000.00); provided, that Buyer shall receive a credit of Five Hundred Thousand Dollars ($500,000.00) on the Closing Date for assuming all of the Assumed Leases and Contracts (the "Purchase Price"), payable as provided in this Agreement.

3. **Deposit**. The Buyer has delivered to the Escrow Agent, by wire transfer of immediately available funds in accordance with wire transfer instructions to be furnished by Escrow Agent to Buyer, the sum of $1,254,000 (the "**Deposit**"). The Deposit shall be held by Escrow Agent in escrow. All funds held by Escrow Agent hereunder shall be invested in obligations of, or insured by, the federal government of the United States of America, as Seller and Buyer shall agree, and so long as Buyer provides Escrow Agent with all necessary forms and documents required by Escrow Agent to invest such funds in accordance with the foregoing. All interest or other investment earnings on the Deposit shall be included in and be deemed a part of the Deposit for all purposes hereunder. The Deposit shall be non-refundable to Buyer under all circumstances except upon the termination of this Agreement by Buyer pursuant to the terms hereof and solely by reason or as a result of (x) the Default of Sellers (or any of them), (y) Sellers' election not to cure or any other failure to cure any Title Objections (including any Required Cure Items) pursuant to Section 8(b) hereof, or (z) the exercise of Buyer's right to terminate this Agreement pursuant to Section 10(d) or 10(e) hereof (each of the foregoing events described in clauses (x), (y) and (z) referred to herein as a "**Buyer Termination Event**"). Upon the occurrence of any Buyer Termination Event, the Escrow Agent shall promptly return the Deposit to Buyer, Seller shall pay Buyer any third party costs and expenses actually incurred by Buyer and this Agreement shall automatically terminate and none of the Parties shall have any further obligation to the others, except for obligations which are expressly stated to survive the termination of this Agreement; provided, however, that if Buyer is entitled to a return of the Deposit pursuant to any provision of this Agreement, including, without limitation, this Section 3 and Sections 8(b), 10(d), 10(e), 15 and 31 hereof, and Sellers have notified Escrow Agent and Buyer that Sellers assert a claim that Buyer has caused physical damage to the Real Property or the Personal Property in breach of Buyer's obligations under this Agreement, the Escrow Agent shall retain a portion of the Deposit equal to the amount of such claim until such claim has been resolved by settlement or by court order. If the Closing occurs, the Deposit shall be paid to Sellers at Closing (and allocated among Sellers as they may determine in their sole and absolute discretion) by wire transfer of immediately available funds in accordance with wire transfer instructions to be provided by Sellers to Escrow Agent and shall be credited against and shall reduce the balance of the Purchase Price due and payable by Buyer at Closing.

4. **Purchase of Assets**. Sellers shall sell, transfer, assign, convey and deliver to Buyer or its assignee(s) in accordance with Section 19 and Buyer or such assignee(s) shall purchase and acquire from Sellers, on the Closing Date and upon satisfaction of all conditions to Closing provided for herein for the benefit of the applicable Party, all of each Seller's right, title and interest, if any and to the extent assignable by Sellers, in and to the Assets, subject to the Permitted Encumbrances. In addition, on the terms and subject to the conditions set forth herein, at Closing, Buyer shall assume and thereafter pay, perform or discharge in accordance with their terms, only the Assumed Liabilities.

5. **Allocation of Purchase Price**. The Purchase Price shall be allocated among the Assets and among the Sellers as provided on Schedule 2 attached hereto and made a part hereof. Subject to Sellers' rights set forth in Section 10(c), the Parties specifically agree to such allocation as final and binding (as between the Parties) and will consistently reflect such allocation in their respective Tax Returns (including IRS Form 8594) as well as any real estate transfer Tax Returns and filings required in connection with the execution and/or recording of the Deeds and any of the other Closing Documents. Neither Buyer nor any Seller shall take any

13

position inconsistent with the allocation set forth on <u>Schedule 2</u> in the course of any audit, examination or other proceeding unless required to do so by applicable Law.  The terms of this <u>Section 5</u> shall survive the Closing.

6.      **Purchase Price**.  The Purchase Price shall be payable by Buyer to Sellers on the Closing Date and shall be subject to the prorations and apportionments provided for in <u>Section 11</u> hereof.  At Closing, all payments to any Party hereunder shall be made to the Escrow Agent's account by wire transfer of immediately available funds pursuant to wire transfer instructions provided by Escrow Agent, or such other bank account as Escrow Agent shall have given notice to the Parties no later than one (1) Business Day prior to the Closing, and Escrow Agent shall thereupon immediately distribute such payments to the Party entitled thereto.

7.      **Inspections; Diligence.**

(a)      <u>Real Property Inspections</u>.  Buyer and Sellers acknowledge that (i) Sellers have and will continue to deliver to Buyer or make available to Buyer at the Real Property, Property Information in Sellers' possession for Buyer's inspection and as requested by Buyer, (ii) Buyer has conducted and will continue to conduct such Inspections as Buyer deems appropriate, and (iii) all Inspections conducted by Buyer or to be conducted by Buyer were and will be in full compliance with all applicable Laws. Notwithstanding any such Inspections or anything to the contrary contained herein, Buyer's obligations hereunder shall not be limited or otherwise affected as a result of any fact, circumstance or other matter of any kind discovered in connection with any Inspections or otherwise.  Buyer agrees that it shall not have the right to terminate this Agreement or obtain a reduction of the Purchase Price as a result of any such fact, circumstance or other matter so discovered, including, without limitation, relating to the physical condition of the Real Property, the operations of the Real Property or otherwise except as otherwise set forth in this Agreement. All costs and expenses of any kind incurred by Buyer in connection with such Inspections shall be at the sole expense of Buyer.  Buyer shall indemnify and hold Sellers and their respective Affiliates and any officers, directors, members, partners, owners, agents or representatives thereof (collectively, the "**Seller Indemnified Parties**") harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonably attorneys' fees and disbursements), suffered or incurred by any of the Seller Indemnified Parties and caused by (i) Buyer's or any Buyer's Representative's entry upon the Real Property for the purpose of conducting the Inspections, (ii) any of the Inspections, and/or (iii) any Liens filed or recorded against any portion of the Real Property as a consequence of the Inspections.  Unless otherwise approved by Sellers, Buyer shall maintain a policy of comprehensive general public liability insurance with a broad form contractual liability endorsement covering Buyer's indemnification obligations contained in this <u>Section 7</u> and <u>Section 20(c)</u>, and with a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, automobile liability coverage including owned and hired vehicles with a combined single limit of $1,000,000 per occurrence for bodily injury and property damage, and an excess umbrella liability policy for bodily injury and property damage in the amount of $4,000,000, insuring Sellers and Sellers' Affiliates, as additional insureds, against any injuries or damages to persons or property that may result from or are related to (i) Buyer's and/or Buyer's Representatives' entry upon the Real Property, (ii) any Inspections or other activities conducted thereon, and (iii) any and all other activities undertaken by Buyer and/or Buyer's Representatives, all of which insurance shall be on

14

an "occurrence form" and otherwise in such forms and with an insurance company acceptable to Sellers, and Buyer has delivered a copy of such insurance policy to Sellers.

(b)     <u>Management Agreement and Other CR Agreements</u>.  Buyer acknowledges that (i) Sellers have informed Manager that Sellers have the right to terminate the Management Agreement and the other CR Agreements, and (ii) at Buyer's request, at or prior to Closing, Sellers shall terminate such agreements.  Buyer acknowledges that Buyer has reviewed the provisions in the Management Agreement with regard to the transition of the Assets and agrees to cooperate with Manager, Sellers and/or one or more representatives of Sellers, from and after Closing, to effect a smooth transition of the Assets in compliance with the Management Agreement.  Sellers and/or one or more representatives of Sellers, from and after Closing, agree to reasonably cooperate with Buyer, at no material expense to Sellers, to (i) provide necessary information to Buyer's insurance provider so that Buyer may procure insurance, and (ii) transfer any other operational matters.  Sellers further agree to comply and to use commercially reasonable efforts to cause the Manager to comply with the "Transition Procedures" under the CR Agreements.

(c)     <u>Liquor License</u>.  Buyer understands and acknowledges that the existing liquor license applicable to the Hotel Property will not be transferred by Sellers or Manager to Buyer and that Buyer will be responsible for applying for any new liquor license it desires for the operation of the Hotel Property in advance of the Closing.

(d)     <u>Condominium Documents</u>.  Buyer acknowledges that Sellers have provided Buyer with copies of the Condominium Documents and that Buyer has executed receipts therefor in the forms of <u>Exhibits I-1</u>, <u>I-2</u> and <u>I-3</u> attached hereto.

(e)     <u>Environmental Conditions</u>.  Buyer acknowledges receipt of Quarterly Groundwater Monitoring Report (non-petroleum) dated April 24, 2014 and Quarterly Groundwater Sampling Report (Petroleum) dated December 17, 2013 for FDEP Facility ID No. 13/9810231 related to two separate environmental conditions at the Real Property.  Accordingly, Buyer acknowledges the existence of the environmental conditions, that these conditions are subject to the jurisdiction and oversight of the Miami-Dade County Department of Regulatory and Economic Resources Environmental Resources Management, that Sellers are seeking a conditional closure of one or both of the environmental conditions, and that the existence and potential conditional closure of these conditions may involve ongoing obligations for the Buyer, including but not limited to additional assessment and remediation as well as the recordation of declarations or restrictions as a condition of conditional closure.

(f)     The Buyer's obligations under this <u>Section 7</u> shall survive the termination of this Agreement.

8.     **<u>Title</u>.**

(a)     Sellers have ordered and provided to Buyer one or more commitments for the issuance of one or more owner's fee title insurance policies with respect to the Real Property (collectively, the "**Title Commitment**", including copies of all title exception documents thereunder) in an aggregate amount equal to the Purchase Price.  The Title Commitment and

15

Title Policy shall be issued and the cost and expense of the title insurance premium for the Title Policy and related search fees shall be equally split by Buyer and Seller; provided, however, Buyer shall be solely responsible for the costs associated with any extended title insurance coverage and any and all endorsements to the Title Policy requested or required by Buyer.  If Buyer obtains a survey of the Real Property the cost and expenses shall be borne by Buyer. Buyer has approved the Title Commitment attached hereto as <u>Exhibit K</u> and any survey of the Real Property obtained by Buyer.

(b)    Buyer shall be responsible for obtaining any updates to the Title Commitment attached hereto as <u>Exhibit K</u> (collectively, the "**Title Updates**") and shall provide Sellers with copies of any such Title Updates no later than five (5) days following Buyer's receipt thereof.  If any Title Update reveals additional encumbrances or other exceptions to title not otherwise reflected on the Title Commitment attached hereto as <u>Exhibit K</u> or on any previously delivered Title Update, Buyer shall notify Sellers in writing (each, a "**Title Notice**") of any such encumbrances or exceptions which have an adverse effect on the Real Property and which Buyer is unwilling to accept title subject to (the "**Title Objections**") within three (3) Business Days following Buyer's receipt of such Title Update.  Except as otherwise provided herein or in the Sale Motion, Sellers shall, on or prior to the Closing Date (i) remove or cause to be removed any Liens affecting the Real Property and securing any indebtedness created or assumed by Sellers (or any of them) (excluding Liens involuntarily imposed on Sellers), and (ii) remove or cause to be removed, any mechanics' liens or judgment liens affecting the Real Property or any portion thereof (the foregoing items being collectively referred to herein as the "**Required Cure Items**").  Sellers shall have the right, but not the obligation (except with respect to any Required Cure Items), to cure or cause to be cured, on or prior to the Closing Date, any Title Objections, in which case the Closing shall proceed in accordance with the terms of this Agreement.  If Sellers elect not to cure or otherwise fail to cure any Title Objections on or prior to the Closing Date, Buyer shall have the right to either (i) accept title to the Real Property subject to any such Title Objections (other than any Required Cure Items) which have not been cured (without any abatement to, diminution of or credit against the Purchase Price) and which Title Objections shall thereafter constitute and be deemed to be Permitted Encumbrances, and proceed to Closing, or (ii) terminate this Agreement by written notice to Sellers whereupon Escrow Agent shall promptly return the Deposit to Buyer provided that Buyer is not otherwise in Default hereunder, and none of the Parties shall have any further obligation to the others, except for those obligations which are expressly stated to survive the termination of this Agreement. Notwithstanding the foregoing or anything to the contrary contained herein, Buyer shall not be entitled to object to any matters of any kind or nature created by or through Buyer or any of its Affiliates and none of such matters may be Title Objections.  In the event Buyer does not deliver the Title Notice within three (3) Business Days following Buyer's receipt of any Title Update, then Buyer shall be deemed to have waived any right to object to any matters shown in the Title Updates and all such matters shall be deemed Permitted Encumbrances.  Within five (5) Business Days after Sellers receive Title Objections, Sellers will notify Buyer whether or not Sellers will cure the Title Objections (Sellers' failure to notify Buyer of Sellers' decision shall be deemed an election by Sellers not to cure the Title Objections).

9. **Escrow Agent and Escrow.**

(a)    (i)    Upon the execution of this Agreement by Buyer and Sellers, and the acceptance of this Agreement by Escrow Agent in writing, this Agreement shall constitute the joint escrow instructions of Buyer and Sellers to Escrow Agent to open an escrow ("**Escrow**") pursuant to the terms of this Agreement.  Upon Escrow Agent's written acceptance of this Agreement, Escrow Agent is authorized to act in accordance with the terms of this Agreement.

(ii)    Provided that all conditions to Closing set forth in this Agreement have been satisfied, or as to any condition not satisfied, waived by the party intended to be benefited thereby, on the Closing Date Escrow Agent shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(A)    record the Deed in the official records of the county in which the Real Property is located;

(B)    deliver to Buyer copies or originals of all documents that are required to be delivered by Sellers to Buyer pursuant to Section 10(b) hereof;

(C)    deliver to Sellers (A) copies or originals of all documents that are required to be delivered by Buyer to Sellers pursuant to Section 10(b) hereof, and (B) the Purchase Price and reflecting all closing adjustments, credits (including, the Deposit and all interest accrued thereon) and prorations required hereunder (the "**Proceeds**"); and

(D)    issue the Title Policy to Buyer.

(iii)    Sellers and Buyer agree to execute such reasonable additional and supplemental escrow instructions as may be appropriate to enable Escrow Agent to comply with the terms of this Agreement. In the event of a conflict between the provisions of this Agreement and any additional escrow instructions, the terms of this Agreement shall control.

(b)    Any funds (including, without limitation, the Deposit), documents or other property delivered to the Escrow Agent pursuant to this Agreement shall be held by the Escrow Agent in trust.  Buyer acknowledges that the sub-account into which funds are to be deposited cannot be established without Buyer furnishing the Escrow Agent with an executed original IRS Form W-9.  Buyer represents and warrants to Escrow Agent that its U.S. federal Taxpayer Identification Number is the number provided in the IRS Form W-9 delivered to the Escrow Agent.  References to the Deposit or any other funds delivered to Escrow Agent hereunder shall include any and all interest accrued thereon.  The Sellers and Buyer acknowledge that the Escrow Agent, as the escrow agent, has no duties or responsibilities hereunder other than to hold any funds, documents or other property deposited with it pursuant to this Agreement.  In the event of any dispute regarding any action taken, or proposed to be taken, by the Escrow Agent with respect to any funds, documents or other property held by the Escrow Agent pursuant to this Agreement, the Escrow Agent, in its sole discretion, may cause such funds, documents and other property to be placed into the registry of a court of competent jurisdiction pursuant to an action

17

of interpleader commenced by the Escrow Agent, and the Sellers and Buyer, jointly and severally, agree to pay directly or reimburse the Escrow Agent for, any reasonable expenses so incurred by the Escrow Agent, including, but not limited to, any reasonable attorneys' fees incurred by the Escrow Agent in any such action.  Sellers and Buyer acknowledge that the Escrow Agent is acting hereunder solely as a stakeholder and at the request of the Parties and as a convenience to the Parties and that the Escrow Agent shall not be deemed to be the agent of any of the Parties and that the Escrow Agent shall not be liable for (i) any loss, cost or damage which it may incur as a result of serving as Escrow Agent hereunder, except for any loss, cost or damage arising out of its willful misconduct or negligence or failure to comply with the terms of this Agreement, (ii) any action taken or omitted to be taken in reliance upon any document, including any written instructions provided for in this Agreement, which the Escrow Agent shall in good faith believe to be genuine, and (iii) any loss or impairment resulting from the failure, insolvency or suspension of the financial institution at which any funds have been deposited. Sellers and Buyer, jointly and severally, do hereby agree to indemnify and hold harmless the Escrow Agent of and from any and all liabilities, costs, expenses, and claims, of any nature whatsoever, by reason of or arising out of the acting as escrow agent hereunder by the named Escrow Agent. If for any reason the Closing does not occur and any Party makes a written or oral demand upon Escrow Agent for delivery to it of any funds being held by it, the Escrow Agent shall give written notice to the other Party of such demand, and if Buyer exercises a right to terminate this Agreement and demands the return of the Deposit, Escrow Agent shall give written notice of such demand to Sellers.  If Escrow Agent does not receive a written objection from the non-demanding Party or Parties to the proposed delivery of the funds within three (3) Business Days after the giving of such notice, Escrow Agent is authorized, instructed and directed to make such delivery.  If Escrow Agent does receive such written objection within such three (3) Business Day period, Escrow Agent shall continue to hold the funds until otherwise directed by written instructions from the Parties or a final judgment of a court of competent jurisdiction. Escrow Agent shall have the right at any time to deposit the funds with the clerk of the Circuit Court in and for Miami-Dade County, Florida or with such other court having appropriate jurisdiction over the subject matter of this Agreement.  Escrow Agent shall give written notice of any such deposit to the Parties.  Upon any such deposit, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

10.    **Closing**.    Following the Conditions Satisfaction Date and provided this Agreement has not otherwise been terminated pursuant to the terms of <u>Section 8</u>, the Parties shall proceed to Closing as follows:

(a)    <u>Closing Date</u>.  The Closing shall occur on the Closing Date and shall take place at a time and place in Miami-Dade County, Florida designated by Buyer and reasonably acceptable to Sellers and in accordance with <u>Section 9</u>.

(b)    <u>Deliveries at the Closing</u>.

(i)    At the Closing, Sellers (or any of them, as may be applicable) and Buyer shall each execute and deliver to each other the following documents (collectively, the "**A&A Agreements**"):

18

(A)     an assignment and assumption of the Intellectual Property, Licenses, Assumed Leases and Contracts, and, if applicable, the Construction Contract (which may be a separate agreement with respect to each Seller), substantially in the form(s) attached hereto as Exhibit B (the "**Assignment and Assumption Agreement**"), pursuant to which Sellers shall assign all Licenses, Assumed Leases and Contracts, Intellectual Property and, if applicable, the Construction Contract to Buyer and Buyer shall assume all obligations thereunder as provided in the Assignment and Assumption Agreement; provided, however, that such assignment shall not prejudice, impair or restrict Sellers' or their respective Affiliates' ability to assert any defenses, counterclaims or objections that Sellers may have with respect to any of the Licenses, Assumed Leases and Contracts, Construction Contract (if applicable) or Intellectual Property;

(B)     an assignment and assumption of the Rental Program Agreements, substantially in the form(s) attached hereto as Exhibit C, pursuant to which Collins Central Owner shall assign all Rental Program Agreements to Buyer and Buyer shall assume all obligations thereunder as provided in such assignment and assumption of the Rental Program Agreements; provided, however, that such assignment shall not prejudice, impair or restrict Collins Central Owner's or its Affiliates' ability to assert any defenses, counterclaims or objections that Collins Central Owner may have with respect to any of the Rental Program Agreements; and

(C)     a Partial Assignment of Developer's Rights, Bulk Buyer, substantially in the form attached hereto as Exhibit D, pursuant to which (A) Collins South Owner shall assign to Buyer certain rights, benefits and privileges of the "Developer" (the "**Central Condo Developer Rights**") as created by and set forth in that certain Declaration of Central Carillon Beach, a Condominium recorded October 15, 2008, in Official Records Book 26610, Page 0735, of the Public Records of Miami-Dade County, Florida and (B) Buyer may be recognized as a "Bulk Buyer" pursuant to  Section 718.703(2), Florida Statutes; and an Assignment of Declarant's Rights, substantially in the form attached hereto as Exhibit D, pursuant to which Collins South Owner shall assign to Buyer certain rights, benefits and privileges of the "Declarant" (the "**Master Declarant Rights**") as created by and set forth in the Master Declaration.  The Central Condo Developer Rights and the Master Declarant Rights are referred to herein collectively as the "**Developer Rights**."

(ii)     Sellers shall deliver, or shall cause to be delivered, to Buyer each of the following:

(A)     special warranty deeds, each substantially in the form attached hereto as Exhibit F (the "**Deeds**"), duly executed and in recordable form, conveying fee simple absolute title to the Real Property to Buyer, subject only to the Permitted Encumbrances;

19

(B)    title affidavits required by the Title Company in order to issue the Title Policy, in the form attached hereto as <u>Exhibit H</u>;

(C)    an affidavit substantially in the form attached hereto as <u>Exhibit J</u>, in accordance with the Foreign Investment in Real Property Tax Act, confirming that each Seller is a "United States Person" within the meaning of Section 1445 of the Code;

(D)    a Bill of Sale substantially in the form attached hereto as <u>Exhibit G</u>, conveying, transferring and selling to Buyer, without warranty or representation (other than ownership and authorization), the FF&E and Inventory and all other Personal Property, free and clear of all Liens except the Permitted Encumbrances;

(E)    the resignation of each designee of Sellers from the Boards of Directors of the Associations;

(F)    to the extent in the possession of Sellers, copies of all documents relating to the development, construction or operation of the Real Property and the creation of the Condominium Project;

(G)    evidence of the authority of the persons executing the Closing Documents being executed and delivered by Sellers; and

(H)    other documents that shall be reasonably required by the Title Company in order to issue the Title Policy including any documents or instruments or payments required to cure the Required Cure Items or the termination of any notice of commencement for Work that has been completed pursuant to the Construction Contract; <u>provided</u>, <u>however</u>, that no such documents shall materially and/or adversely increase Sellers' liabilities and obligations, or materially and/or adversely decrease Sellers' rights, under this Agreement and the other documents to be delivered at Closing.

(iii)    Buyer shall deliver, or shall cause to be delivered, to Sellers each of the following:

(A)    the balance of the Purchase Price (which shall be equal to the Purchase Price less the amount of the Deposit), subject to apportionments, credits and adjustments as provided in and as required to be made or given pursuant to this Agreement, by wire transfer of immediately available funds pursuant to wire transfer instructions provided by Sellers to Buyer and Escrow Agent;

(B)    evidence of the authority of the persons executing the Closing Documents being executed and delivered by Buyer; and

(C)    other documents that shall be reasonably required by the Title Company in order to issue the Title Policy.

US_ACTIVE:\44547262\6\58399.0031

(iv)    Sellers and Buyer shall prepare and execute and deliver to each other a closing statement (the "**Closing Statement**") setting forth the Purchase Price and reflecting all closing adjustments, credits and prorations required hereunder.

(v)    Sellers shall use reasonable efforts to obtain and deliver to Buyer, prior to or at Closing, an estoppel certificate from each Association substantially in the form attached hereto as Exhibit M, which shall identify the current amount of any assessments payable by Sellers to the Associations with respect to the Real Property for the current fiscal year of the Associations. Buyer acknowledges that in no event shall delivery of such estoppel certificate be a condition to Closing.

(c)    Closing Costs.  At Closing, Sellers shall pay the costs of (i) obtaining and recording any and all instruments required to cure any Required Cure Items and any Title Objections which Sellers have agreed to cure, (ii) their own attorneys and accountants incurred in connection with this Agreement and the transactions contemplated by this Agreement, (iii) ½ of all recording fees, (iv) any Taxes due in connection with the transfer of the Personal Property, (v) ½ of all title insurance premiums and related search fees with respect to the issuance of the Title Commitment and the Title Policy, except as provided in this Agreement, (vi) any capital or working fund contributions applicable to the conveyance of the Condominium Units, required by and payable to the Associations, if any, (vii) ½ all fees and expenses charged by the Escrow Agent for its services as escrow agent hereunder, and (viii) all amounts necessary to cure defaults under all Assumed Leases and Contracts and otherwise satisfy the requirements of section 365(b) of the Bankruptcy Code allowing Sellers to assume and assign the Assumed Leases and Contracts to Buyer.  Buyer shall pay for (i) the cost of its own attorneys and accountants incurred in connection with this Agreement and the transactions contemplated by this Agreement, (ii) ½ all fees and expenses charged by the Escrow Agent for its services as escrow agent hereunder, (iii) ½ of all title insurance premiums and related search fees with respect to the issuance of the Title Commitment and the Title Policy, (iv) the cost of any surveys of the Real Property ordered and obtained by Buyer, (v) the cost of any extended title insurance coverage and any and all endorsements to the Title Policy requested or required by Buyer and (vi) ½ of all recording fees. At Closing, Sellers shall pay all Transfer Taxes. Buyer and Sellers acknowledge and agree that, after Closing, Sellers have the right to appeal such Transfer Taxes and/or seek a refund of such Transfer Taxes, and Sellers shall have the right to file all necessary Tax Returns and other documentation with respect to a refund or appeal of all Transfer Taxes (and the costs of filing such Tax Returns and other documentation shall be borne by Sellers). All amounts received by Sellers in connection with a refund or an appeal of Transfer Taxes shall belong solely to Sellers. If Buyer receives any such amounts, Buyer shall promptly deliver same to Sellers. The provisions of this Section 10(c) shall survive the Closing and the termination of this Agreement.

(d)    Conditions Precedent to Closing.

(i)    Buyer's obligation under this Agreement to purchase the Assets as provided hereunder shall be subject to the fulfillment of each of the following conditions subject, however, to the provisions of subsection (d) below:

US_ACTIVE:\44547262\6\58399.0031

(A)      the representations and warranties of Sellers contained in Section 12 hereof shall be true, accurate and correct in all material respects as of the Closing Date;

(B)      Sellers shall have performed and complied in all material respects with the covenants and agreements to be performed and complied with by Sellers prior to the Closing;

(C)      title to the Real Property shall be in compliance with the terms of Section 8 hereof;

(D)      Sellers shall have terminated the Management Agreement, if requested by Buyer;

(E)      Property Taxes for any Tax year prior to the year of Closing shall be paid; and

(F)      Sellers shall have delivered, or caused to be delivered or be ready, willing and able to deliver, to Buyer or Escrow Agent each of the Closing Documents required to be delivered by Sellers pursuant to Section 10(a) hereof and shall have performed all other covenants, undertakings and obligations and complied with all conditions required by this Agreement to be performed or complied with by Sellers at or prior to the Closing.

(ii)      Sellers' obligations under this Agreement to sell the Assets as provided hereunder shall be subject to the fulfillment of each of the following conditions subject, however, to the provisions of subsection (iv) below:

(A)      the representations and warranties of Buyer contained in Section 13 hereof shall be true, accurate and correct in all material respects as of the Closing Date;

(B)      Buyer shall have performed and complied in all material respects with the covenants and agreements to be performed and complied with by Buyer prior to the Closing;

(C)      Buyer shall have delivered the funds required to be delivered by Buyer hereunder at Closing and shall have further delivered, or caused to be delivered, each of the Closing Documents required to be delivered by Buyer pursuant to Section 10(a) hereof and shall have performed all other covenants, undertakings and obligations and complied with all conditions required by this Agreement to be performed or complied with by Buyer, at or prior to the Closing, in order to consummate Buyer's purchase of all of the Assets in accordance with this Agreement (the purchase of less than all of the Assets by Buyer being expressly prohibited); and

22

(D)    no petition shall have been filed by or against Buyer under the Bankruptcy Code or any similar State or Federal Law, whether now or hereafter existing.

(iii)    This Agreement may be terminated prior to Closing by Buyer if (i) the Sale Order is not entered by the Bankruptcy Court within the later of (x) five (5) Business Days following the completion of the Auction and (y) a date that is no later than five (5) Business after a final non-appealable resolution of the last to be resolved of the North Tower Litigation, the South Tower Litigation and any Other Litigation, provided that such date is not later than one hundred and twenty (120) days following entry of the Bidding Procedures Order, subject to being extended for up to an additional one hundred and eighty (180) days upon exercise by Sellers of one or more Extension Options pursuant to Section 10(d) below; (ii) any law or any order of any court or other government entity in the United States shall be in effect and shall prohibit the transactions contemplated hereby; or (iii) any preliminary or permanent injunction or other order shall be in effect and shall declare this Agreement invalid or unenforceable in any material respect or shall otherwise prevent the consummation of the transactions contemplated hereby or thereby.

(iv)    Notwithstanding any other provision of this Agreement, the Buyer shall have the option of cancelling this Agreement prior to Closing if (a) the Sellers' Bankruptcy Cases are dismissed or converted to liquidation proceedings under Chapter 7 of the Bankruptcy Code, or if the Sellers shall have filed a pleading requesting any such relief, or (b) the Assets are sold pursuant to a Chapter 11 Plan, or if the Sellers shall have filed a pleading requesting such relief.

(v)    In the event that any condition contained in this Section 10(d)(i) or (ii) is not satisfied, the Party entitled to the satisfaction of such condition as a condition to its obligation to close hereunder, shall have as its sole remedy hereunder the right to elect to (i) waive such unsatisfied condition whereupon Closing shall proceed as provided in this Agreement without any abatement of the Purchase Price, or (ii) terminate this Agreement; provided, however, that if such failure of a condition is due to a Default by one of the Parties under this Agreement, the non-defaulting Party shall have the remedies for default provided in this Agreement.  In the event either Party elects to terminate this Agreement as provided in this Section 10(d)(i), (ii), (iii) or (iv), this Agreement shall be terminated and the Parties shall have no further rights, obligations or liabilities hereunder, except for those obligations which are expressly stated to survive the termination of this Agreement and except that if Buyer terminates this Agreement because a condition contained in Section 10(d)(i), Section 10(d)(iii), or Section 10(d)(iii) hereof is not satisfied, Escrow Agent shall return the Deposit to Buyer.  Nothing contained herein shall be construed so as to bestow any right of termination upon a Party for the failure of a condition to be satisfied unless such Party is expressly entitled to the satisfaction of such condition as provided in Section 10(d)(i), (ii), (iii) or (iv) hereof.

(vi)    Buyer's obligation under this Agreement to purchase the Assets and Seller's obligation under this Agreement to sell the Assets as provided hereunder

23

shall be subject to the fulfillment of each of the following conditions (each, individually, a "**Closing Condition**" and collectively, the "**Closing Conditions**"):

(A)    Intentionally Deleted;

(B)    the Bankruptcy Court entering the Sale Order and such Sale Order is a Final Order (which condition requiring the Sale Order be a Final Order can be waived by the Buyer in its sole discretion);

(C)    there shall not be in effect any Law or any order of any court or other government entity in the United States prohibiting the transactions contemplated hereby;

(D)    no preliminary or permanent injunction or other order that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect;

(E)    entry of an order by the Bankruptcy Court which denies, dismisses or otherwise disposes of the declaratory relief sought by Plaintiff(s) named therein, including the entry of (i) the Sale Order containing findings of fact and conclusions of law effectuating such relief, (ii) an order of dismissal, or (iii) other similar resolution that is favorable to the Defendant(s) named therein (a "**Favorable Resolution**") with respect to the South Tower Litigation (which condition requiring a Favorable Resolution can be waived by the Buyer in its sole discretion as more fully described below);

(F)    a Favorable Resolution of the North Tower Litigation (which condition requiring a Favorable Resolution can be waived by the Buyer in its sole discretion as more fully described below); and

(G)    a Favorable Resolution of any Other Litigation (which condition requiring a Favorable Resolution can be waived by the Buyer in its sole discretion as more fully described below).

Sellers (or any one of them) shall promptly notify Buyer in writing after each Closing Condition has been satisfied. The date on which the last of the Closing Conditions is (x) waived by Buyer or (y) satisfied and Sellers (or any one of them) have notified Buyer of same in writing shall be the "**Conditions Satisfaction Date**". If the Closing Conditions are not satisfied on or before November 24, 2014 (as may be extended pursuant to this paragraph, the "**Conditions Satisfaction Deadline**") by written notice to the other party whereupon Escrow Agent shall promptly return the Deposit to Buyer provided that Buyer is not otherwise in Default hereunder, and none of the Parties shall have any further obligation to the others, except for those obligations which are expressly stated to survive the termination of this Agreement; provided, however, notwithstanding the foregoing, upon five (5) Business Days' prior written notice to Buyer, Sellers shall have the option, in their sole discretion, to extend the Conditions Satisfaction Deadline for up to three (3) consecutive periods of sixty (60) days each (each such option, an

24

"**Extension Option**"); provided that, upon the exercise by Sellers of each Extension Option, if any, the Purchase Price shall be reduced by $100,000.00.

In the event a Favorable Resolution is not obtained on the South Tower Litigation, the North Tower Litigation and/or any Other Litigation (an "**Unfavorable Resolution**"), Sellers (or any one of them) shall promptly notify Buyer of same. No later than five (5) Business Days after receipt of such notice, Buyer shall provide written notice to Sellers of Buyer's election to waive the Closing Conditions to obtain a Favorable Resolution of the South Tower Litigation, the North Tower Litigation and/or any Other Litigation, as applicable, and proceed to Closing without such Favorable Resolution(s), subject to the other provisions of this Agreement, or Buyer's election to terminate this Agreement (the "**Resolution Notice**"). If Buyer does not so timely provide a Resolution Notice or if Buyer provides a Resolution Notice stating that Buyer has elected to terminate this Agreement, this Agreement shall terminate or be deemed terminated, as applicable, and Escrow Agent shall promptly return the Deposit to Buyer, and none of the Parties shall have any further obligation to the others, except for those obligations which are expressly stated to survive the termination of this Agreement.

(e)    Risk of Loss & Insurance Proceeds.

(i)    In the event any "material" portion (as hereinafter defined) of the Real Property is destroyed or damaged by fire or other casualty, Buyer shall have the option to terminate this Agreement upon notice to Sellers given not later than ten (10) days after receipt of the applicable Seller's notice of the occurrence of any such fire or other casualty, together with a description of the damage and copies of such Seller's insurance policies. If this Agreement is so terminated, the provisions of Section 10(e)(iv) hereof shall apply. If (i) Buyer does not elect to terminate this Agreement, or (ii) there is damage to or destruction of only an "immaterial" portion ("immaterial" being deemed to be any damage or destruction which is not "material", as such term is hereinafter defined) of the Real Property, Buyer shall be obligated to close hereunder as provided in this Agreement and, at the Closing, Sellers shall, unless Sellers have repaired such damage or destruction prior to the Closing, (x) pay over to Buyer the proceeds of any insurance collected by Sellers (including, without limitation, the proceeds of any business interruption insurance applicable to the period following the Closing), plus the amount of any uncovered damage, and any insurance deductible, less the amount of all costs incurred by Sellers in connection with the repair of such damage or destruction, and (y) assign and transfer to Buyer all right, title and interest of the applicable Seller in and to any uncollected insurance proceeds (including, without limitation, the proceeds of any business interruption insurance applicable to the period following the Closing) which such Seller may be entitled to receive from such damage or destruction. A "material" portion of the Real Property shall be deemed to have been damaged or destroyed (i) if the cost of repair or replacement shall be $1,000,000.00 or more as reasonably estimated by an insurance company adjuster reasonably acceptable to each of the Parties, or (ii) if, as a result of the damage or destruction, 10% or more of the Hotel Property has been or will be rendered unusable for more than sixty (60) days.

(ii)    If, prior to the Closing Date, all or any "significant" portion (as hereinafter defined) of the Real Property is taken by eminent domain or condemnation (or

25

is the subject of a pending taking which has not been consummated), the applicable Seller shall notify Buyer of such fact, and deliver all information in such Seller's possession or control regarding such fact to Buyer, whereupon the Buyer shall have the option to terminate this Agreement upon notice to the Sellers given not later than ten (10) days after receipt of the applicable Seller's notice.  If this Agreement is so terminated, the provisions of Section 10(e)(iv) hereof shall apply.  If Buyer does not elect to terminate this Agreement, or if only an "insignificant" portion ("insignificant" being deemed to be any taking which is not "significant", as such term is hereinafter defined) of the Real Property is taken by eminent domain or condemnation, at the Closing, the applicable Seller shall assign and turn over, and Buyer shall be entitled to receive and keep, all awards or other proceeds for such taking by eminent domain or condemnation.  A "significant" portion of the Real Property means 30% or more of the Hotel Property shall have been taken or otherwise rendered unusable as a result of the taking.

(iii)    Notwithstanding anything contained in Section 10(e)(i) and (ii) hereof to the contrary, if this Agreement is not terminated as provided in Section 10(e)(i) or (ii) hereof and the insurance, eminent domain or condemnation proceeds payable with respect to the Real Property as a result of any casualty or taking exceeds the Purchase Price, Sellers' obligation to pay over to Buyer those proceeds paid to the applicable Seller prior to the Closing shall be limited to the amount of the Purchase Price and the applicable Seller shall be entitled to retain the remainder of such proceeds.  To the extent that payment of all or any portion of such proceeds does not occur prior to the Closing, the Parties agree that the applicable Seller shall be entitled to that portion of the proceeds in excess of the Purchase Price, plus collection costs, which agreement shall survive the Closing.

(iv)    If Buyer elects to terminate this Agreement pursuant to Section 10(e)(i) or (ii) hereof, this Agreement shall be terminated and none of the Parties shall have any further rights, obligations or liabilities hereunder, except for those rights, obligations and/or liabilities which are expressly stated to survive the termination of this Agreement, and except that Escrow Agent shall return the Deposit to Buyer, provided that Buyer is not otherwise in Default hereunder.

11.    **Adjustments and Prorations at Closing.**

(a)    Cut-Off Time.  The following adjustments and prorations (collectively "**Prorated Items**") shall be made at Closing.  Except as otherwise expressly provided in this Agreement, all income and expenses of the Real Property shall be prorated between Sellers and Buyer as of the Cut-Off Time, so that all income and expenses of the Real Property with respect to the period prior to the Cut-Off Time shall be for the account of Sellers and all income and expenses of the Real Property with respect to the period after the Cut-Off Time shall be for the account of Buyer.  Any reference in this Section (a) to payments made or cash being received by Sellers shall also include any such items which are made or received by Manager on behalf of Sellers prior to Closing.  Moreover, any reference in this Section (a) to payments made or cash being received by Buyer shall also include any such items which are made or received by Manager on behalf of Buyer after Closing.  No items of income or expense are to be included more than once in determining the prorations and payments under this Section (a).  Sellers and

26

Buyer shall be responsible for computing all such prorations in the manner hereafter set forth. If the aggregate amount of the credit due to Sellers exceeds the aggregate amount of credit due to Buyer, Buyer shall pay such amount in excess of the amount of the credit to Buyer with the payment of the Purchase Price.

(b)    Hotel Adjustments and Prorations.

(i)    Sellers shall receive and be entitled to all rents and all other revenues of any kind attributable to any period prior to the Cut-Off Time (or, in the case of any facility at the Hotel Property (an "**Operating Facility**") which closes after the Cut-Off Time, the time that such Operating Facility closes on the Closing Date), including, without limitation, all food service, bar, beverage and liquor revenues and charges, all revenues and charges from restaurant operations, spa operations, parking garage operations, hotel banquet and conference facility operations, revenues from recreational services and amenities, and other revenue of any kind attributable to any of the same. Buyer shall be entitled to all rents and all other revenues of any kind attributable to any period after the Cut-Off Time (or, in the case of any Operating Facility which closes after the Cut-Off Time, after such time as such Operating Facility closes on the Closing Date), including, without limitation, all food service, bar, beverage and liquor revenues and charges, all revenues and charges from restaurant operations, spa operations, parking garage operations, hotel banquet and conference facility operations, all revenues from recreational services and amenities, and all other revenue of any kind attributable to any of the same.

(ii)    Sellers shall receive and be entitled to all room and other revenues, charges and receivables from the hotel rooms at the Hotel Property, including without limitation telephone, laundry, valet, mini-bar and other charges and revenues otherwise arising from guests and customers of the Hotel (collectively, "**Hotel Room Revenues**") attributable to any period prior to the Cut-Off Time. Buyer shall receive and be entitled to all Hotel Room Revenues from and after the Cut-Off Time, provided, however, that revenues received or "posted" in the normal course after the time Sellers normally closes front desk activity for the "night" audit for the Cut-Off Time (the "**Front Desk Closing Hour**") shall belong to Buyer. The accounts receivable of registered guests at the Hotel Property who have not checked out and are occupying rooms as of the Cut-Off Time are collectively called the "**Current Ledger**"; Buyer shall be entitled to the portion of the Current Ledger that relates to the night preceding the Closing Date and all nights thereafter; Seller shall be entitled to the portion of the Current Ledger that relates to all nights preceding the night preceding the Closing Date, provided, however, notwithstanding anything to the contrary contained herein, Buyer shall be responsible for all housekeeping costs related to the Closing Day (including all costs of morning housekeeping). Consistent with the preceding sentence, following Closing (if and to the extent such amounts are actually received by Buyer), Buyer shall pay over to Sellers the Sellers' share of the proceeds of the Current Ledger attributable to each such guest's account for the period ending on the Cut-Off Time, less an amount equal to the actual credit card and travel agent commissions allocable to such share, which commissions shall be paid by Buyer out of such proceeds when and as collected. Sellers shall receive a credit at Closing in an amount equal to the face value of all petty cash funds in the hands

27

of Sellers or Manager in connection with the hotel guest operations at the Hotel.  As provided in Section 14(c), the Hotel FF&E reserve account and the Hotel's shared facilities (and shared component unit, if any) reserve account shall be transferred to Buyer at Closing and Sellers shall not receive a credit at Closing for the amount of such funds so transferred to Buyer at Closing.

(iii)    Sellers shall retain all accounts receivable invoiced more than sixty (60) days prior to the Closing Date, and shall be entitled to collect the same.  Buyer shall purchase at Closing, and Sellers shall receive a credit for, all accounts receivable invoiced not more than sixty (60) days prior to the Closing Date ("**Current Accounts Receivable**") at ninety-eight percent (98%) of the face value of such Current Accounts Receivable as of the Closing Date.  After the Closing, Buyer shall be entitled to all collections of such Current Accounts Receivables.  The terms of this Section (iii) shall survive the Closing (and shall not be merged therein).

(iv)    At Closing, Sellers shall give Buyer a credit against the Purchase Price in the aggregate amount of any advance booking deposits actually received and held by Sellers with respect to the Hotel Property pursuant to the terms of any reservations of rooms or banquet or other facilities.  All advance booking deposits as of the Closing Date for the Hotel Property for which Buyer receives a credit shall be the obligation of Buyer after Closing.  There shall be no post-Closing Date adjustment based on the amounts actually earned or refunded by Buyer with respect to or on account of advance bookings, regardless of whether Buyer's obligations with respect thereto shall be greater or less than the amount credited to Buyer pursuant to this Section (iv).  With respect to the foregoing, Sellers shall provide Buyer with a list of all advance deposits received and held by Sellers and the details relating to each such deposit.  Sellers shall receive a credit for all non-refundable commissions paid in connection with any advance deposits; Buyer shall reimburse Sellers for any commission paid by Sellers (which could otherwise have been refunded if the event did not occur) when the subject event has occurred.

(v)    Sellers shall transfer to Buyer, and Buyer shall purchase from Sellers, at the cost of such supplies and consumables, all of the unopened reserve stocks of supplies and consumables consisting of food and beverage (including alcoholic and nonalcoholic) items to the extent permitted by applicable law.  Sellers shall transfer to Buyer at no cost to Buyer or credit to Sellers, all of the opened reserve stocks of supplies and consumables consisting of food and beverage (including alcoholic and nonalcoholic) items, to the extent permitted by applicable law.

(vi)    Sellers shall cause the applicable vending companies to service the vending machines at the Hotel Property on the morning of Closing.  All commissions due to Seller from such vending companies based on the amount of vending proceeds as of the Cut-Off Time shall be paid to and belong to Seller.

(vii)    To the extent that items (such as postage meter, marketing fees, advertising costs, fees for inclusion of the Hotel Property in travel agent reservation systems, travel guides or other items) have been paid prior to Closing for a period after

28

Closing Date, and are or have been reflected as a deduction from Sellers' income, Sellers shall receive a credit from Buyer on the Closing Statement for the portion of such prepaid items that relate to periods following Closing.

(viii)   For purposes of this Agreement, the term "**trade payables**" shall mean any open accounts payable to trade vendors or suppliers of the Hotel Property, restaurant, bar, spa or similar facilities at the Hotel Property selling goods, food, beverages or services to the general public for final use or consumption (*i.e.*, retail trade). Sellers agrees that they shall give a credit to Buyer at Closing for all trade payables from the Hotel Property for goods received at or services supplied to the Hotel Property on or prior to the Cut-Off Time. Buyer shall assume the obligation to pay such trade payables in the ordinary course after the Closing. In addition, Buyer agrees that it shall be charged with all trade payables from the Hotel Property for goods received at or services supplied to the Hotel Property after the Cut-Off Time and reasonably ordered by Sellers or Manager in the ordinary course of business prior to the Closing Date, and in any event for all such goods and services accepted by Buyer, and shall and hereby does indemnify and hold Sellers and Sellers' officers, directors, employees and agents harmless from payment of the same, which indemnity shall survive the Closing (and shall not be merged therein).

(ix)   All other costs and expenses (including Taxes other than the Taxes addressed in Section 11(c)) incurred in connection with the ownership, operation, use or maintenance of the Assets (including without limitation, pursuant to the Rental Program Agreements and any assessments due and payable to the Associations) will be prorated between Sellers and Buyer as of the Cut-Off Time.

(x)   Premiums on insurance policies will not be adjusted. As of the Closing Date, Sellers will terminate their blanket insurance policy and Buyer will obtain its own insurance coverage in compliance with the requirements for same under the Condominium Documents.

(c)   <u>Taxes</u>. Real and personal property taxes shall be prorated on the basis of the then current year's taxes, if known, or if the current year's taxes are not yet available, on the basis of the prior year's taxes (and assuming the full available discount has been obtained) subject to adjustment and reconciliation post-Closing to reflect the actual taxes for the current year when such actual taxes can be finally determined. Buyer acknowledges that Sellers shall have the right in their sole discretion to pursue real estate tax appeals relating to periods prior to the Closing and to retain all tax rebates resulting from such appeals relating to periods prior to Closing. Buyer covenants and agrees not to interfere with any of such tax appeals by Sellers and not to take any positions with taxation authorities adverse to Sellers' interest in such appeals. If any real property tax assessments affecting the Real Property or any portion thereof are or may become payable in installments, of which the first installment is, as of the Effective Date, a charge or lien or has been paid, then Sellers shall be obligated to pay all installments of any such assessments which are due and payable prior to the Closing Date and Buyer shall assume all unpaid installments of any such assessment which are to become due and payable on or after the Closing Date. If subsequent to the Closing Date, the Real Property or any portion thereof shall become affected by any real property tax assessment, the payment thereof shall be assumed by

29

Buyer without abatement of the Purchase Price and in the event any such assessment, whether payable in lump sum or in installments, is due and payable prior to the Closing, and has been paid by Sellers, Buyer shall reimburse Sellers for same at the Closing.

(d)    Post-Closing Adjustments.    No later than thirty (30) Business Days following the Closing, Buyer and Sellers shall recalculate the prorations set forth in Section 11(a)-(c) above to account for the incomplete information available prior to the Cut-Off Time and appropriate adjusting payments shall be made within five (5) days after such recalculation.  Except as otherwise provided in any other provision of Section 11, no later than ninety (90) days following the Closing, Buyer shall prepare and present to Sellers a recalculation of any and all amounts due or subject to proration under Section 11 to correct any errors or make changes necessary because of the lack of complete or accurate information as of the Closing Date, including, without limitation, information related to actual inventories, actual utility costs, and actual management fees.  Such recalculation shall include supporting documentation therefor.  The Parties shall make the appropriate adjusting payment between them within thirty (30) days after delivery of any such recalculation.  If there is a dispute among the Parties regarding the re-computation of the apportionment of any Prorated Items and the Parties are unable to resolve such dispute after good faith efforts to do so, then the Parties shall retain an independent accountant reasonably acceptable to each of the Parties (the cost of which shall be borne one-half by the Sellers and one-half by the Buyer) to recompute any such apportionment which is in dispute.  The foregoing obligation to reapportion estimated Prorated Items shall survive the Closing.

12.    **Representations & Warranties of Sellers.**

(a)    In order to induce Buyer to enter into this Agreement and to consummate the transactions contemplated herein, Sellers represent and warrant to, and covenant with, Buyer as follows as of the Effective Date and, with respect to Section 12(a)(i),(ii) and (iii) only, Closing:

(i)    Good Standing.    Sellers are each limited liability companies organized and validly existing under the laws of the State of Delaware and qualified to do business in the State of Florida.

(ii)    Due Authorization; Binding Obligation.    Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), the execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all requisite actions of Sellers (none of which actions have been modified or rescinded, and all of which actions are and will be at Closing in full force and effect).  This Agreement constitutes the valid and binding obligations of Sellers, enforceable against Sellers in accordance with its terms.

(iii)    Execution and Delivery.    Subject to the entry of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement by Sellers, and the consummation by Sellers of the transactions contemplated hereby, will not (a) violate or conflict with any law or any order of any court or

30

Governmental Authority applicable to Sellers or any provision of the organizational documents of Sellers; (b) result in a breach of or default under any contract, agreement or instrument to which any of the Sellers is a party or by which any of the Sellers or the Assets are bound; or (c) require any consent or approval or vote of any court or Governmental Authority or of any third person or entity that, as of the Closing Date, has not been given or taken and does not remain effective.

(iv)    FIRPTA.  Each Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(v)    OFAC.  To Sellers' knowledge, none of Sellers, nor any member, partner or shareholder of Sellers, nor any person or entity with actual authority to direct the actions of any member, partner or shareholder of Sellers, nor, to Sellers' knowledge, any other person or entity holding any legal or beneficial interest whatsoever in Sellers, (i) are named on any list of persons and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("**Executive Order 13224**"), as in effect on the Effective Date, or any similar list known to Sellers or publicly issued by OFAC or any other department or agency of the United States of America (collectively, the "**OFAC Lists**"),  (ii) are included in, owned by, controlled by, knowing acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person named on any of the OFAC Lists or any person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or, to Sellers' knowledge, otherwise associated with any of the persons referred to or described in the OFAC Lists.

(vi)    Rental Program Agreements.  To Sellers' knowledge and based solely on information provided to Sellers by Manager, Schedule 3 sets forth all Rental Program Agreements in effect as of the Effective Date.  To Sellers' knowledge, as of the Effective Date, Collins Central Owner has not received any written notice from a Condominium Unit Owner under any Rental Program Agreement in effect as of the Effective Date alleging a default by the Collins Central Owner or the Manager thereunder.  Sellers shall deliver, or caused to be delivered, copies of all Rental Program Agreements to Buyer within five (5) Business Days of the Effective Date.

(vii)    Sales and Occupancy Taxes.  All sales taxes and occupancy taxes arising from the operation of the Assets during the period prior to the Closing Date (collectively, the "**Sales and Occupancy Taxes**") and which have become due and payable have been or will be timely paid by or on behalf of the Sellers.

(viii)    Title to Assets.  Sellers owns the Assets, free and clear of all Liens, other than Permitted Encumbrances, and, to the fullest extent permissible under section

31

363(f) of the Bankruptcy Code, Buyer will be vested with good title to such Assets, free and clear of all Liens.

(ix)    <u>Litigation</u>.  Except for the Retained Lawsuit and as set forth on <u>Schedule 6</u>, there are no pending and, to the best of Sellers' knowledge, Seller has not received any written notice of any threatened litigation, proceedings or investigations (by any person, governmental or quasi-governmental agency or authority or otherwise against Sellers) which might materially adversely affect the ownership, use, occupancy, value, operation or title of the Real Property.

(x)    <u>Condemnation</u>.  There are no pending or, to the best of Sellers' knowledge, contemplated condemnation proceedings involving the Real Property.

(xi)    <u>Hazardous Materials</u>.  Except as may be identified in any environmental reports delivered by Sellers to Buyer, Sellers have not received any written notice of any previous or present generation, storage, disposal or existence of any hazardous waste on the Real Property in violation of any applicable environmental laws.  The term "hazardous waste" shall mean "hazardous waste", "toxic substances" or other similar or related terms as defined or used from time to time in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, <u>et</u> <u>seq</u>.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, <u>et</u> <u>seq</u>.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 6921, <u>et</u> <u>seq</u>.) and regulations adopted thereunder.

(xii)    <u>Assessments</u>.  Except as set forth on <u>Schedule 1</u>, to the best of Sellers' knowledge, there are no special or other assessments for public improvements or otherwise now affecting the Real Property, and Sellers have no actual knowledge of (1) any pending or threatened special assessments affecting the Real Property or (2) any contemplated improvements affecting the Real Property that may result in special assessments affecting the Real Property.  There are no tax abatements, phase-ins or exemptions affecting the Real Property.

(xiii)    <u>Leases and Contracts</u>.  The Assumed Leases and Contracts are the only leases and contracts being assigned to and assumed by Buyer.

(xiv)    <u>Employees</u>.  Sellers have no employees and shall not hire any employees during the term of this Agreement.

(b)    Wherever in this Agreement there is reference to "Buyer's knowledge", "Buyer becoming aware", or words of similar meaning, such phrase shall refer to the actual knowledge of Andrei Scrivens (the "**Buyer Knowledge Parties**"); <u>provided</u>, <u>however</u>, that the Buyer Knowledge Parties shall be deemed to have actual knowledge of all information, documents and material available in the Data Room (as hereinafter defined) and the contents of all reports furnished to Buyer by Buyer's third party inspectors, consultants and advisors.  The provisions of this <u>Section 12(b)</u> shall survive the Closing.

(c)    In the event the Closing occurs:

US_ACTIVE:\44547262\6\58399.0031

(i)     Notwithstanding anything contained in this <u>Section 12</u> or elsewhere in this Agreement to the contrary, Buyer hereby expressly waives, relinquishes and releases any right or remedy available to it at law, in equity or under this Agreement to make a claim against Sellers for damages that Buyer may incur, or to rescind this Agreement and the transactions contemplated hereby, as the result of any of Sellers' representations or warranties being untrue, inaccurate or incorrect if (1) Buyer had actual knowledge that such representation or warranty was untrue, inaccurate or incorrect at the time of the Closing and such breach did not result from the willful acts of the Sellers and Buyer nevertheless closes title hereunder, or (2) Buyer's damages as a result of such representation or warranty being untrue, inaccurate or incorrect are less than $50,000 in the aggregate.   For example, Buyer shall be deemed to have knowledge that a representation or warranty was untrue, inaccurate or incorrect at the time of the Closing to the extent that the Property Information furnished or made available to or otherwise obtained by Buyer contains information which is inconsistent with such representation or warranty.

(ii)     Notwithstanding anything contained herein to the contrary, if the Closing shall have occurred and Buyer shall not have waived, relinquished and released all rights or remedies available to it at law, in equity or otherwise as provided hereunder, the aggregate liability of Sellers arising pursuant to or in connection with the representations, warranties, covenants and other obligations (whether express or implied) of Sellers in this Agreement and/or the Sellers Documents (including, without limitation, the Deeds and the A & A Agreements) shall not exceed $1,200,000 in the aggregate (the "**Seller Liability Cap Amount**").   Sellers shall make arrangements reasonably acceptable to Buyer to ensure that funds constituting the Seller Liability Cap Amount are not distributed to creditors or other parties.

The provisions of this <u>Section 12(c)</u> shall survive the Closing.

(d)     The representations and warranties of Sellers set forth in <u>Section 12(a)</u> shall be true, accurate and correct in all material respects upon the execution of this Agreement and shall be deemed to be repeated on and as of the Closing Date (except as they relate only to an earlier date) and shall survive Closing for a period of six (6) months, except that Sellers' representations and warranties set forth in Subparagraph 12(a)(x) shall survive for the statutory liability period, and no action or claim based thereon shall be commenced after such period.

(e)     For purposes of this Agreement, the phrase "to Seller's knowledge" and similar expressions means the present, actual (as distinguished from implied, imputed or constructive) knowledge (without investigation or review of files or documents relating to the Real Property or Sellers) of Christopher Polanco ("**Sellers Knowledge Individual**").   In no event shall the Sellers Knowledge Individual have any personal liability hereunder.   The provisions of this <u>Section 12(e)</u> shall survive the Closing.

(f)     Buyer understands that any representation made in this Agreement is not being made by the Canyon Ranch Entities or by Sellers on behalf of the Canyon Ranch Entities. Further, except as otherwise specifically provided in this Agreement, Sellers have not made any

33

inquiry with the Canyon Ranch Entities regarding any of the representations made by Sellers herein.

13.    **Representations & Warranties of Buyer.**

(a)    In order to induce Sellers to enter into this Agreement and to consummate the transactions contemplated herein, Buyer represents and warrants to, and covenants with, Sellers as follows:

(i)    <u>Good Standing</u>.  Buyer is a _____ organized and validly existing and in good standing under the laws of the State of _____ and is qualified to do business in the State of Florida.

(ii)    <u>Due Authorization; Binding Obligation</u>.  The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate actions of Buyer (none of which actions have been modified or rescinded, and all of which actions are and will be at Closing in full force and effect).  This Agreement constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(iii)    <u>Execution and Delivery</u>.  The execution, delivery and performance of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated hereby, will not (a) violate or conflict with any law or any order of any court or Governmental Authority applicable to Buyer or any provisions of the organizational documents of Buyer; (b) result in a breach or default under any contract, agreement or instrument to which Buyer is a party or by which Buyer or any of its properties or assets are bound; or (c) acquire any consent or approval or vote of any court or Governmental Authority or of any person or entity that, as of the Closing Date, has not been taken or given and does not remain effective.

(iv)    <u>Litigation</u>.  There are no actions, suits, arbitrations, proceedings, governmental investigations or other proceedings that are pending against Buyer that adversely affect Buyer's ability to enter into or perform this Agreement.

(v)    <u>Prohibited Transaction</u>.  To Buyer's knowledge, neither Buyer, nor any member, partner or shareholder of Buyer, nor any person or entity with actual authority to direct the actions of any member, partner or shareholder of Buyer, nor, to Buyer's knowledge, any other person or entity holding any legal or beneficial interest whatsoever in Buyer , (i) are named on any list of persons and governments issued by OFAC pursuant to Executive Order 13224, as in effect on the Effective Date, or any OFAC Lists,  (ii) are included in, owned by, controlled by, knowing acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person named on any of the OFAC Lists or any person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support,

34

sponsorship, or services of any kind to, or, to Buyer's knowledge, otherwise associated with any of the persons referred to or described in the OFAC Lists.

(vi) <u>WARN Act</u>. Buyer acknowledges that all employees are employees of Manager. If the WARN Act is applicable, Buyer shall offer employment to a sufficient number of the employees of Manager on such terms and conditions so that Manager is not required to provide notice of a "plant closing" or "mass layoff" to any person or entity under the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101 et seq. or any other similar federal, state or local law or regulation (the "**WARN Act**") as a result of the termination of employment of the employees by Manager as of the Closing, and Buyer agrees not to terminate or permit its manager to terminate any such hired employees who accept such employment for a period of ninety (90) calendar days after Closing, or to take any other action, which will cause the application of the WARN Act. If the WARN Act is applicable, on or following the Closing, Buyer shall comply with all provisions of the WARN Act with respect to all employees to the extent failure to do so would impose liability on Sellers. The foregoing covenants shall survive Closing.

(vii) <u>Buyer</u>. Any Buyer designated by Z Capital Partners L.L.C. will be owned or controlled by Z Capital Partners L.L.C. or funds managed by it.

(b) The representations and warranties of Buyer set forth in <u>Section 13(a)</u> shall be true, accurate and correct in all material respects upon the execution of this Agreement and shall be deemed to be repeated on and as of the Closing Date (except as they relate only to an earlier date) and shall survive the Closing and the execution and delivery of the Deeds.

14. **Operation of Assets Prior to and After Closing.**

(a) <u>Operations</u>. Until the Closing Date, Sellers intend to continue to operate and maintain the Assets in a reasonably prudent fashion and in accordance with past practices. Notwithstanding the foregoing, Buyer understands that Sellers' ability to continue to operate and maintain the Assets in accordance with past practices may be affected by the Bankruptcy Case, and in such event, Sellers shall not be deemed in violation of the foregoing covenant. From and after the Effective Date, Sellers shall not enter into any leases and contracts or Rental Program Agreements, nor consent to the Manager entering into any leases and contracts or Rental Program Agreements on Sellers' behalf (to the extent that Sellers' consent thereto is otherwise required under the terms of the Management Agreement), without the prior written consent of Buyer, such consent not to be unreasonably withheld; <u>provided</u>, <u>however</u>, that Buyer's consent shall not be required in connection with any Lease and Contract and/or Rental Program Agreement which is a renewal of an existing Lease and Contract and/or Rental Program Agreement, or if the Sellers, or any of them, as applicable, (i) have no right to consent to the entering into of any such Lease and Contract and/or Rental Program Agreement by Manager either directly or on behalf of a Seller, or (ii) cannot unreasonably withhold their consent to the entering into of any such Lease and Contract and/or Rental Program Agreement by Manager. Buyer shall acquire the Assets subject to any Assumed Leases and Contracts and Rental Program Agreements entered into prior to the Closing Date in accordance with this <u>Section 14</u>. In no event shall Buyer be liable for any obligations arising under any Excluded Leases and Contracts.

35

If Sellers shall modify, extend, or renew any Lease and Contract and/or Rental Program Agreement or enter into any new Lease and Contract and/or Rental Program Agreement for which Buyer's approval is not required under this paragraph, Sellers shall promptly provide to Buyer a copy of same.

(b)    Sellers' Rights of First Refusal.    Buyer acknowledges that under the Condominium Documents Sellers have certain rights of first refusal to purchase units in the Condominium Project, and agrees that Sellers may exercise or decline to exercise such rights of first refusal in Sellers' sole and absolute discretion prior to the Closing Date; provided, however, that (i) from and after the Closing Date, Buyer shall have all rights of Sellers to exercise any such rights of first refusal to purchase units in the Condominium Project, and (ii) Sellers hereby irrevocably waive any rights of first refusal, rights of first offer and similar rights they may have with respect to the Real Property, or any portion thereof, to be conveyed to Buyer hereunder. The foregoing obligation shall survive the Closing (and shall not be merged therein).

(c)    Reserve Accounts.    At Closing, Sellers shall assign to Buyer and Buyer shall receive without a credit to Sellers the Hotel FF&E reserve account and the Hotel's shared facility (and shared component, if any) reserve account, any security deposits and any other reserves and deposits held by Seller.    Notwithstanding anything herein to the contrary, from the Effective Date through the Closing Sellers shall fund the amounts, if any, then currently required to be funded into the Hotel FF&E reserve account and the Hotel's portion of the shared facility reserve account (and shared component unit reserve account, if funded pursuant to the applicable budget), provided, however, that Sellers shall have no obligation whatsoever to fund the deficiency currently existing in any of such reserve accounts or to fund any current or future deficiency on behalf of any of the Condominium Unit Owners in the Condominium Project.

(d)    Bookings and Reservations.    Sellers shall cause Manager to continue to take all bookings and reservations for room rentals at the Hotel Property and for the use of other facilities at the Hotel Property for periods subsequent to the Effective Date, provided such bookings and reservations are upon substantially the same terms and rates which Manager would require and charge in the normal and customary operation of the Hotel Property.    Buyer shall honor all reservations for the Hotel Property, or for any related conference, banquet, or meeting space or any recreational facilities in connection with the Hotel Property, that are made by Sellers or Manager on or prior to the date hereof which pertain to periods on or after the Closing Date, provided that the party that made the reservation complies with its obligations with respect to such reservation.    The foregoing obligation shall survive the Closing (and shall not be merged therein).

(e)    Guest Baggage.    Any baggage or other property of departed guests held by Manager on behalf of Sellers at the Hotel Property shall be inventoried, sealed and tagged jointly by Manager and Buyer promptly after the Closing and may be left at the Property for a period not to exceed ninety (90) days following the Closing Date.    After such period, all such baggage or property will be deemed abandoned by Sellers and Buyer shall dispose of such baggage in any manner deemed appropriate by Buyer.    Buyer hereby indemnifies Sellers against all claims, losses and liabilities in connection with the holding such baggage or other property for such period and Buyer's disposal of baggage abandoned by Sellers.    All baggage of guests who are still guests of the Hotel Property on the Closing Date which has been checked with or left in the

36

care of Sellers shall be inventoried, sealed and tagged jointly by Manager and Buyer promptly after the Closing.  Buyer hereby agrees to indemnify Sellers against all claims, losses or liabilities with respect to such baggage arising out of the acts or omissions of Buyer after the Closing. The foregoing obligation shall survive the Closing (and shall not be merged therein).

(f)     Safe Deposits.  Not earlier than three (3) Business Days prior to Closing, Sellers shall cause Manager to notify Hotel guests or other persons who have safe deposit boxes (other than in-room safes), if any, advising them of the sale of the Property to Buyer, and requesting verification or removal of the contents prior to the Closing Date.  Sellers may, at their option, require such persons to execute new safe deposit agreements, in a form reasonably acceptable to Buyer and identifying Buyer as the owner of the Property, which shall be effective as of the Cut-Off Time.  The safe deposit boxes of persons not responding to said notification shall be opened only in the presence of representatives of both Sellers and Buyer.  The contents of all boxes opened as aforesaid shall be listed at the time such boxes are opened, each such list shall be signed by or on behalf of Sellers and Buyer, and Buyer shall not be liable or responsible for any items claimed to have been in said boxes unless such items are included in such list.  Buyer agrees to indemnify and hold harmless Sellers from and against any liability or responsibility for items claimed to have been in said boxes and included on such list.  The foregoing obligation shall survive the Closing (and shall not be merged therein).

(g)     Construction.

(i)     Buyer and Collins North Owner have approved a construction contract with EBL Partners, LLC ("EBL") in the form attached hereto as Exhibit P, with such modifications requested by Buyer in writing as of the Effective Date (the "Construction Contract").  Buyer and Collins North Owner acknowledge that the Construction Contract has not yet been approved by EBL. Subject to EBL's approval of the Construction Contract, which Sellers shall reasonably request, Collins North Owner shall execute the Construction Contract after the Sale Order has been entered and prior to Closing.  If EBL does not approve the Construction Contract, Collins North Owner and Buyer acting reasonably jointly shall select another general contractor (EBL or such other approved general contractor being "General Contractor").

(ii)     In addition, prior to entering into the Construction Contract:

(A)     Collins North Owner shall retain NV5 to conduct a Sounding Survey and to determine the full scope of the stucco remediation work to be completed on the North Tower Condominium (the "Work");

(B)     NV5 shall develop bidding drawings and specifications necessary to complete the Work and to be disseminated to two (2) or more bidding sub-contractors; and

(C)     the bids shall be compared on a line-by-line basis and both the Collins North Owner and the Buyer shall mutually and reasonably agree upon the sub-contractor.

37

(iii)    The parties agree that NV5 or another qualified architectural or engineering firm that is jointly selected by Collins North Owner and Buyer acting reasonably (NV5 or such other approved architectural or engineering firm being "Engineer")) shall serve as the designated architect/engineer for the administration of the Construction Contract following approval by both Buyer and Collins North Owner on the scope and estimate of the cost for the administration of the Construction Contract by Engineer.

(iv)    The parties agree that Collins North Owner's obligation to pay for the Work, including, without limitation, amounts payable to the Engineer, the accepted bid and any amounts payable to General Contractor (which shall be limited to a maximum of 10% of all charges made by General Contractor, which shall include, but shall not be limited to, all charges for General Contractor's mobilization, general conditions, profit and overhead) and any sub-contractors (collectively, the "Accepted Bid Fees"), shall not exceed $3,000,000.00 (the "Seller Construction Cap").  If the cost of the Work, including, without limitation, the Accepted Bid Fees, shall exceed the Seller Construction Cap, Buyer shall pay for all amounts over the Seller Construction Cap.

(v)    At Closing, if the Work has not been completed, (A) (1) Buyer shall receive a credit against the Purchase Price in an amount equal to 100% of the unpaid amount under the Construction Contract subject to the Seller Construction Cap, (2) Collins North Owner and Buyer shall cooperate and use commercially reasonable efforts to insure that the General Contractor completes the Work prior to and, to the extent required, subsequent to, Closing, (3) Buyer shall take primary responsibility for the supervision of the Work from and after Closing, and (4) Collins North Owner shall assign to Buyer, and Buyer shall assume, the Construction Contract pursuant to the Assignment and Assumption Agreement, and Buyer shall use commercially reasonable efforts to complete and deliver any applications and take such other actions as may be required as a condition to the assignment of the Construction Contract, and (B) in the event Buyer delivers to Collins North Owner from time to time after Closing notice of any change orders to the Construction Contract that are recommended as necessary by Engineer and/or any sub-contractors and approved by Buyer, then Collins North Owner shall pay to Buyer for the net increase, if any, in the cost due to General Contractor and any sub-contractors for the Work within five (5) Business Days after receipt of such notice so long as the payments under this subsection (E) plus the amounts previously paid by Collins North Owner under the Construction Contract do not exceed in the aggregate the Seller Construction Cap (the "Reimbursement").  Collins North Owner shall cause Guarantor to execute the Joinder of Guarantor attached to this Agreement for the sole purpose of evidencing Guarantor's agreement to pay the Reimbursement.  If the Work is completed prior to Closing, to the extent assignable, Collins North Owner will assign any warranties obtained for such Work to Buyer.  The parties further agree that if any portion of the Work may be payable from proceeds of Collins North Owner' Owner Controlled Insurance Program, then such funds shall be applied to the cost of such Work as a credit to Collins North Owner' obligation hereunder. For avoidance of doubt, it is the express intent that the Buyer be deemed to be and qualify as a "bulk buyer" (as set forth in the "Distressed Condominium Relief Act" which is Part VII of the Florida Condominium

38

Act); provided that, for the avoidance of doubt, Sellers make no representation as to whether the Buyer shall qualify as a "bulk buyer".

(vi)    The provisions of this Section shall survive the Closing.

(h)    The Sellers agree that, between the Effective Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms, the Buyer shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, employees, accountants, auditors, counsel and operations of the Sellers as the Buyer or the Buyer's Representatives may reasonably request.    Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including the Seller's right to have its Representatives accompany the Buyer and shall be subject to restrictions under applicable Law. The Sellers shall use commercially reasonable efforts to cause the Canyon Ranch Entities and their employees to reasonably cooperate with the Buyer and the Buyer's Representatives in connection with such investigations and examinations.    The Buyer agrees to use commercially reasonably efforts to minimize any disruption to the business in connection with such investigations and examinations.

15.    **Default**.  In the event of a Default hereunder by Sellers (or any of them), Buyer shall have the right, as its sole and exclusive remedy hereunder, either (a) to terminate this Agreement by written notice to Sellers and to receive a refund of the Deposit paid by Buyer under this Agreement; or (b) to institute an action for specific performance against Sellers.  As a condition precedent to Buyer exercising any right it may have to bring an action for specific performance as the result of Sellers' Default hereunder, Buyer must commence such an action within ninety (90) days after the occurrence of such Default.  Buyer agrees that its failure to timely commence such an action for specific performance within such ninety (90) day period shall be deemed a waiver by it of its right to commence such an action.  If Buyer elects to terminate this Agreement, then Buyer, as its sole remedies, shall be entitled to receive a refund of the Deposit paid by Buyer under this Agreement.  Buyer agrees that the foregoing remedies shall be the sole and exclusive remedies available to Buyer in the event of a Default by Sellers and Buyer hereby waives any and all other rights, in equity or at law, which it might otherwise have against Sellers (including, without limitation, the right to any consequential or other damages) in connection with any such Default.  In the event of a Default hereunder by Buyer, Sellers shall have the right to terminate this Agreement by written notice to Buyer and to retain the Deposit and to seek all available remedies and damages available at law, in equity or otherwise by reason of Buyer's Default hereunder or Buyer's failure or refusal to perform its obligations hereunder..

16.    **Purchase of Assets As-Is**.

(a)    Except as otherwise provided in this Agreement, Buyer acknowledges that Sellers acquired their interest in the Real Property and other Assets through foreclosure, deed-in-lieu of foreclosure or other arrangement involving the prior owner of the Real Property and an affiliate of Sellers which held a mortgage, deed of trust or other security interest encumbering the Real Property to secure an indebtedness owed by such prior owner to such affiliate.  Buyer

39

further acknowledges that, due to the circumstances surrounding Sellers' acquisition of the Real Property, such acquisition was subject to such facts, circumstances, defects and problems which existed with respect to the Real Property at the time of such acquisition and for which Seller is not responsible. Accordingly, Buyer agrees to accept the Assets, subject to any facts, circumstances, defects and problems that may exist, on an "**AS IS WHERE IS AND WITH ALL FAULTS**" basis and Buyer is not relying on any representations or warranties of Sellers or any other Person with respect to the Assets except those expressly set forth in this Agreement and in any estoppel, certificate or affidavit delivered by Sellers to Buyer at or prior to Closing. This Agreement, as written, contains all the terms of the agreement entered into among the Parties as of the Effective Date, and Buyer acknowledges that neither Sellers nor any of their respective Affiliates, nor any of the respective agents or representatives thereof, have made any representations or held out any inducements to Buyer, and Sellers hereby specifically disclaim any representation, oral or written, past, present or future, other than those specifically set forth in <u>Section 12</u> hereof. Without limiting the generality of the foregoing, Buyer has not relied on any representations or warranties, and neither Sellers nor any of their respective Affiliates, nor any of the respective agents or representatives thereof, have or are willing to make any representations or warranties, express or implied, other than as may be expressly set forth herein, as to: (i) the status of title to the Real Property; (ii) the Licenses; (iii) the Intellectual Property; (iv) the Rental Program Agreements; (v) the Condominium Documents; (vi) the current or future real estate Tax liability, assessment or valuation of the Real Property; (vii) the potential qualification of the Real Property for any and all benefits conferred by any Laws whether for subsidies, special real estate Tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated; (viii) the compliance of the Real Property in its current or any future state with applicable Laws or any violations thereof, including, without limitation, those relating to access for the handicapped, environmental or zoning matters, and the ability to obtain a change in the zoning or a variance in respect to the Real Property's non-compliance, if any, with zoning Laws; (ix) the nature and extent of any right of way, lease, possession, Lien, license, reservation, condition or otherwise; (x) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Real Property from any source, including, without limitation, any Government Authority or any lender; (xi) the current or future use of the Real Property, including, without limitation, the use thereof for commercial, manufacturing or general office purposes; (xii) the present and future condition and operating state of any FF&E and Inventory or other Personal Property and the present or future structural and physical condition of any buildings, structures or other improvements comprising any portion of the Real Property, their suitability for rehabilitation or renovation, or the need for expenditures for capital improvements, repairs or replacements thereto; (xiii) the viability or financial condition of the Manager, Condominium Unit Owner, the Associations or any tenant; (xiv) the status of the hotel industry in the market in which the Real Property is located; (xv) the Management Agreement; (xvii) the Construction Contract and the Work; (xviii) any leases and/or contracts; or (xiv) the actual or projected income or operating expenses of the Real Property or any of the other Assets.

(b)    Buyer acknowledges that prior to the Effective Date, Sellers have made available to Buyer, in an offering memorandum and in a due diligence website or data room (the "**Data Room**"), certain information with respect to the Assets, including, without limitation, financial statements, projections and analyses, environmental reports, information regarding the South Tower Litigation and the North Tower Litigation, and the Management Agreement (collectively, the "**Property Information**"), and Buyer has been afforded an opportunity to

40

review the Property Information and to investigate, examine and inspect the Assets. Buyer acknowledges and agrees that (i) the Property Information delivered or made available to Buyer and its representatives by Sellers or their respective Affiliates, or any of the agents or representatives thereof, may have been prepared by third parties and may not be the work product of Sellers and/or any of their respective Affiliates; (ii) neither Sellers nor any of their respective Affiliates has made any independent investigation or verification of, or has any knowledge of, the accuracy or completeness of, the Property Information; (iii) the Property Information delivered or made available to Buyer and to Buyer's Representatives is furnished to them at the request, and for the convenience of, Buyer; (iv) except as may be expressly set forth herein, Buyer is relying solely on its own investigations, examinations and Inspections of the Real Property and the other Assets and those of Buyer's Representatives and is not relying in any way on the Property Information furnished by Sellers or any of their respective Affiliates, or any of the respective agents or representatives thereof; (v) except as may be expressly set forth herein, Sellers expressly disclaim any representations or warranties with respect to the accuracy or completeness of the Property Information and Buyer releases Sellers and their respective Affiliates, and the respective agents and representatives thereof, from any and all liability with respect thereto; (vi) any further distribution of the Property Information is subject to <u>Section 20</u> hereof; and (vii) certain proprietary information of Manager has not been provided to Buyer because such information is subject to a confidentiality agreement.

(c)    Except as otherwise provided in this Agreement, Buyer or anyone claiming by, through or under Buyer, hereby fully and irrevocably releases Sellers and their respective Affiliates, and the respective agents and representatives thereof, from any and all claims that Buyer may now have or hereafter acquire against Sellers (or any of them) or any of their respective Affiliates, or any of the respective agents or representatives thereof for any cost, loss, liability, damage, expense, action or cause of action, whether foreseen or unforeseen, arising from or related to any construction defects, errors or omissions on or in the Assets, the presence of environmentally hazardous, toxic or dangerous substances, or any other conditions (whether patent, latent or otherwise) affecting the Assets. Buyer further acknowledges and agrees that this release shall be given full force and effect according to each of its expressed terms and provisions, including, but not limited to, those relating to unknown and suspected claims, damages and causes of action. As a material covenant and condition of this Agreement, Buyer agrees that in the event of any such construction defects, errors or omissions, the presence of environmentally hazardous, toxic or dangerous substances, or any other conditions affecting the Assets, Buyer shall look solely to any contractors or other third parties which may otherwise be liable with respect to any of the foregoing for any redress or relief. Except as expressly provided herein, to the fullest extent permitted by law, Buyer hereby waives any and all rights and benefits which it now has, or in the future may have, conferred upon it by virtue of any applicable state, federal, or local law, rule, or regulation as a result of any alleged inaccuracy or incompleteness of the information or the purchase of the Assets, including any environmental law, rule, or regulation whether federal, state or local, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§9601 et seq.) as amended by the Superfund Amendments and Reauthorization Act of 1986, and any analogous federal or state laws.

(d)    Buyer's election to execute this Agreement shall be deemed an acknowledgment by Buyer that Buyer has inspected the Assets, is thoroughly acquainted with

41

and accepts their condition, and has reviewed, to the extent necessary in its discretion, all the Property Information.  Sellers shall not be liable or bound in any manner by any oral or written "setups" or information pertaining to the Assets furnished by Sellers, any of their respective Affiliates or any of the respective agents or representatives thereof, any real estate broker or other Person.

(e)    The provisions of this Section 16 shall survive the termination of this Agreement and the Closing.

17.    **Brokerage**.    Sellers represent and warrant to Buyer that Sellers have not contacted, negotiated with or entered into any agreement with any real estate broker, agent, finder, or any party in connection with this Agreement and the transaction contemplated herein except for CBRE ("**Broker**"), whose fee shall be paid entirely by Sellers pursuant to a separate written agreement between Sellers and Broker.  Buyer hereby represents and warrants to Sellers that Buyer has not contacted, negotiated with or entered into any agreement with any real estate broker, agent, finder, or any party in connection with this Agreement and the transaction contemplated herein.    Each party shall indemnify and hold the other party harmless from any claim, demand, cause of action, loss, liability, damage, cost, or expense (including, without limitation, reasonable attorneys' fees) paid or incurred by the other party by reason of a breach of the representation and warranty made by such party under this Section 17.    Notwithstanding anything to the contrary contained in this Agreement, the indemnities set forth in this Section 17 shall survive the Closing or earlier termination of this Agreement.

18.    **Notices**.    All notices, elections, consents, approvals, demands, objections, requests or other communications hereunder shall be in writing and transmitted to the Parties and to the Escrow Agent as follows:

|  |  |
|---|---|
| As to Buyer: | Z Capital Partners, L.L.C. |
| | Two Conway Park |
| | 150 Field Dr. Suite 300 |
| | Lake Forest, IL 60045 |
| | Attn: Andrei Scrivens |
| | Tel: +1 847 235 8100 |
| | Email: ascrivens@zcap.net |
| | |
| With a copy to: | Latham & Watkins LLP |
| | 330 N. Wabash Ave., Suite 2800 |
| | Chicago, IL 60611 |
| | Attn:  James Ktsanes |
| | Tel:  312-876-7700 |
| | E-mail:  james.ktsanes@lw.com |
| | |
| As to Sellers: | FL 6801 COLLINS NORTH LLC, |
| | FL 6801 COLLINS SOUTH LLC and |
| | FL 6801 COLLINS CENTRAL LLC |
| | 1271 Avenue of the Americas, 39th Floor |
| | New York, New York  10020 |

42

|                              | Attn:   Joelle Halperin, Esq. and |
|                              | Christopher Polanco |
|                              | (646) 285-9066 |
|                              | E-mail:joelle.halperin@lehmanholdings.com |
|                              | and christopher.polanco@lehmanholdings.com |

With a copy to:                 Togut, Segal & Segal LLP
                                One Penn Plaza, Suite 3335
                                New York, NY  10119
                                Attention: Frank A. Oswald, Esq.
                                Tel. No.: (212) 594-5000
                                E-mail address: frankoswald@teamtogut.com

With a copy to counsel
for Lehman Brothers
Holdings Inc.:                  Weil, Gotshal & Manges LLP
                                1395 Brickell Avenue, Suite 1200
                                Miami, Florida 33131-2861
                                Attention:     Beatriz Azcuy-Diaz, Esq.
                                Tel. No.: (305) 577-3257
                                E-mail address: beatriz.azcuy-diaz@weil.com

As to Escrow Agent:             Old Republic National Title Insurance Company
                                600 W. Hillsboro Boulevard, Suite 450
                                Deerfield Beach, Florida  33441
                                Attn:  Sergio Osorio
                                Tel:  (954) 354-8371
                                E-mail:  SOsorio@oldrepublictitle.com

unless the address is changed by the Party by like notice given to the other Parties and/or Escrow Agent.  Notice shall be in writing, mailed certified mail, return receipt requested, postage prepaid and shall be deemed delivered three (3) Business Days after mailing or upon delivery to the addresses indicated by a nationally or internationally recognized firm of overnight couriers. Notwithstanding the foregoing notice, requests or demands or other communications referred to in this Agreement may be sent by confirmed email, but shall be deemed to have been given only when received by such means.

19.     **Assignability**.  This Agreement may not be assigned by Buyer in whole or in part and any assignment or attempted assignment by Buyer shall constitute a Default by Buyer hereunder and shall be null and void.  For the purposes of this Section 19, any transfer prior to the Closing shall be deemed to be an assignment and prohibited by the terms of this Section 19. No assignment of this Agreement by Buyer shall relieve the original Buyer from any of its obligations, liabilities or responsibilities under this Agreement.  Notwithstanding the foregoing, Buyer may assign this Agreement without the consent of Sellers to one or more entities wholly owned or controlled by Buyer, Z Capital Partners L.L.C. or funds managed by it, so long as Buyer notifies Sellers of such assignment or designation at least five (5) Business Days prior to

43

the Closing Date; provided, however, that Buyer may not assign this Agreement to any Affiliate in which Condominium Unit Owners have any direct ownership, direct control, or other direct interest.   In the event of any such permitted assignment, and provided the assignee(s) has assumed in writing the obligations of Buyer under this Agreement, Sellers and the assignee(s) shall proceed under the terms and conditions hereof.   Buyer shall not be released of liability under this Agreement by reason of any assignment of this Agreement.

20.    **Property Information and Confidentiality.**

(a)    Buyer agrees that, prior to the Closing, all Property Information shall be kept strictly confidential and shall not, without the prior consent of Sellers, be disclosed by Buyer or Buyer's Representatives, in any manner whatsoever, in whole or in part, to any Person other than Buyer's accountants, legal advisors and other professionals and to Buyer's current and/or prospective lenders and investors (collectively, "**Permitted Disclosure Parties**"), and will not be used by Buyer or Buyer's Representatives, directly or indirectly, for any purpose whatsoever other than evaluating the Assets and seeking to complete the Closing.   Moreover, Buyer agrees that, prior to the Closing, the Property Information will be transmitted only to Buyer's Representatives and to those other Permitted Disclosure Parties who need to know the Property Information for the purpose of evaluating the Assets, and who are informed by the Buyer of the confidential nature of the Property Information and who agree to be bound by the terms of this Section 20 and Section 16(c).   Prior to the delivery or disclosure of any Property Information to Buyer's Representatives (other than Buyer's professionals or lender) at any time prior to Closing, Buyer agrees to notify Sellers as to their identity and to furnish Sellers with their written assumption and adoption of the terms of this Section 20 and Section 16(c), all in a form reasonably acceptable to Sellers. The provisions of this Section 20(a) shall in no event apply to Property Information which is a matter of public record and shall not prevent Buyer from complying with Laws or the Bankruptcy Court, including, without limitation, governmental regulatory, disclosure, tax and reporting requirements.   Notwithstanding the foregoing, in addition to the restrictions and conditions set forth above with respect to the Property Information, Buyer shall also comply with the terms, restrictions and conditions relating to the use, dissemination and/or confidentiality of the Property Information as may be provided for in the Management Agreement.

(b)    Buyer and Sellers, for the benefit of each other, hereby agree that between the Effective Date and the Closing Date, they will not release or cause or permit to be released any press notices, publicity (oral or written) or advertising promotion relating to, or otherwise announce or disclose or cause or permit to be announced or disclosed, in any manner whatsoever, the terms, conditions or substance of this Agreement or the transactions contemplated herein, without first obtaining the written consent of the other Party hereto.   It is understood that the foregoing shall not preclude the Party from discussing the substance or any relevant details of the transactions contemplated in this Agreement, subject to the terms of Section 20(a), with any of its attorneys, accountants, professional consultants or potential lenders, as the case may be, or prevent the Parties from complying with Laws or the Bankruptcy Court, including, without limitation, governmental regulatory, disclosure, Tax and reporting requirements.

44

(c)    Buyer shall indemnify and hold Sellers and Sellers' Affiliates harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by Sellers or any of Seller's Affiliates and arising out of or in connection with a breach by Buyer or Buyer's Affiliates of the provisions of this Section 20.

(d)    In the event this Agreement is terminated, Buyer and Buyer's Representatives shall promptly deliver to Sellers all originals and copies of the Property Information in the possession of Buyer and Buyer's Representatives and, regardless of whether or not Buyer has done so, shall not be permitted to use any of the Property Information for any purpose thereafter.  Notwithstanding anything to the contrary contained herein, if Buyer is entitled to a return of the Deposit pursuant to the terms of this Agreement, a Default by Buyer solely under this Section 20 shall not preclude the return of the Deposit to Buyer.

(e)    Reference is hereby made to that certain Confidentiality Agreement, made by Z Capital Partners, L.L.C. ("**Confidentiality Party**") on June 18, 2014 in favor of FL GS Collins Avenue LLC and FL 6801 Spirits LLC on behalf of itself and its subsidiaries, the Sellers (the "**Confidentiality Agreement**").  The Parties agree that with regard to the Assets to be conveyed hereunder, if the Confidentiality Agreement is in any respect more restrictive against Confidentiality Party than the provisions of this Section 20, the provisions of this Section 20 shall apply. Confidentiality Party has joined in this Agreement solely for the purpose of agreeing to be bound by the provisions of this Section 20.

(f)    The provisions of this Section 20 shall survive the Closing or the termination of this Agreement for a period of one year.

21.    **Condominium Units Disclosures.**

(a)    Buyer acknowledges receipt of the Condominium Documents and all other documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement.   Executed copies of the Receipts for Condominium Documents, as to the Condominium Units, are attached hereto as Exhibits I-1, I-2 and I-3, and incorporated herein by this reference.

(i)    The Units identified on Schedule 4 attached hereto have been previously used by Sellers for general office purposes in connection with Sellers' ownership and sales of Condominium Units.

(ii)    Pursuant to Section 501.1375, Florida Statutes, Buyer is provided with the following notice:

THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED IN WRITING, BY THE BUYER.

Buyer hereby acknowledges and agrees that the foregoing notice has been provided by Sellers in the event same is applicable to the subject transaction and that the

45

provisions shall be null and void if the provisions of Section 501.1375, Florida Statutes, are in fact not applicable to this transaction.

           (iii)    <u>Insulation; Energy Efficiency</u>.  Sellers have advised Buyer, as required by the rules of the Federal Trade Commission, that the following insulation is installed in connection with the Condominium Units: (a) insulation on the exterior walls, having an R-Value of R-5 and varying thickness; and (b) insulation on the roof, having an average R-Value of R-19 and varying thickness. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Sellers are not responsible for the manufacturers' errors.  To the extent required by applicable Law, Buyer may have the Condominium Project building's energy efficiency rating determined; <u>provided</u>, <u>however</u>, that this Agreement is not contingent upon Buyer having the rating determined or approving the rating.  Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings, a copy of which is attached hereto as <u>Exhibit L</u> and incorporated herein by this reference.

           (iv)    Buyer's right to cancel under Section 718.503, Florida Statutes applies only to the North Tower Condominium Units, the South Tower Condominium Units and the Central Tower Condominium Units.

**THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE EFFECTIVE DATE, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO BUYER BY THE DEVELOPER UNDER SECTION 718.503 OF THE FLORIDA CONDOMINIUM ACT (THE "CONDO DELIVERABLES").  BUYER HEREBY ACKNOWLEDGES THAT BUYER HAS RECEIVED THE CONDO DELIVERABLES.  THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.  ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED.  BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.  FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER.  ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS.  SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.**

If Buyer does not cancel this Agreement during this 15-day period, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

46

(v)   **Substantial Completion**.   The Condominium Units are substantially complete and ready for immediate occupancy.

(vi)   Buyer understands and agrees that because the Associations are on-going entities, the budgets of, and assessments payable to, the Associations may increase (based upon actual operating expenses and projections thereof), both before and after the closing under this Agreement.

(vii)   **The Associations**.  This Agreement is also Buyer's application for membership in the Associations, which memberships shall automatically take effect at Closing.  At that time, Buyer agrees to accept all of the liabilities and obligations of membership.

(viii)   **Additional Disclosures**.  Buyer is hereby advised as follows:

(A)   RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.  The foregoing notice is provided in order to comply with state law and is for informational purposes only. Sellers do not conduct radon testing with respect to the Condominium Units or the Condominium Project, and specifically disclaim any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium Project.

(B)   ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

(C)   BUYER SHOULD NOT RELY ON THE SELLERS' CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE REAL PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(D)   FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS

47

MAY EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

(E)    Buyer acknowledges that at the time of execution of this Agreement, Sellers have no reason to know of any particular purpose of Buyer in purchasing the Condominium Units and items of personal property sold pursuant to this Agreement.  THE ORIGINAL DEVELOPER OF THE CONDOMINIUM (NOT SELLER), CONSTRUCTED THE CONDOMINIUM UNITS AND THE CONDOMINIUM PROJECT.  Accordingly, Buyer acknowledges and agrees that the only warranties applicable to the Condominium Project, if any, are those that may validly be imposed thereon by statutory law on the date hereof, as set forth in the Florida Condominium Act, as such section exists as of the date of this Agreement, if applicable ("**Sole Warranties**").  Buyer further acknowledges and agrees that, to the maximum extent allowed by Law, since Sellers did not construct the Condominium Project and did not create the condominiums located therein, Sellers disclaim all warranties and Sellers make no other express or implied warranties whatsoever in regard to the Condominium Units, the common elements, any fixtures or items of personal property sold pursuant to this Agreement or any other real or personal property whatsoever sold hereby, except as otherwise expressly set forth in this Agreement and only to the extent allowed by law.

**BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS THROUGH FORECLOSURE, DEED-IN-LIEU OF FORECLOSURE OR OTHER ARRANGEMENT INVOLVING THE PRIOR OWNER OF THE REAL PROPERTY AND AN AFFILIATE OF SELLERS WHICH HELD A MORTGAGE, DEED OF TRUST OR OTHER SECURITY INTEREST ENCUMBERING THE REAL PROPERTY TO SECURE AN INDEBTEDNESS OWED BY SUCH PRIOR OWNER TO SUCH AFFILIATE, HAVE LIMITED INFORMATION ABOUT THE ASSETS.  IN THAT REGARD, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE CONDOMINIUM DOCUMENTS AND OTHER DISCLOSURES MADE PURSUANT TO THE FLORIDA CONDOMINIUM ACT, DELIVERED BY SELLERS TO BUYER ARE BEING DELIVERED TO BUYER WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE.**

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS HEREBY DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AS TO DESIGN, CONSTRUCTION, FURNISHINGS AND EQUIPPING OF THE CONDOMINIUM UNITS AND THE CONDOMINIUM PROJECT, AND DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AS SET FORTH IN THE FLORIDA CONDOMINIUM ACT (TO THE EXTENT APPLICABLE) AND ANY OTHER STATUTORY WARRANTIES (TO THE EXTENT APPLICABLE) AS WELL AS ANY WARRANTIES WHICH MAY ARISE BY OPERATION OF LAW, UNDER COMMON LAW OR OTHERWISE.**

(F)    <u>Additional Disclosures as to the Central Tower Condominium Units</u>.  In the location where the Condominium Project has been

48

constructed, there were formerly other improvements. These prior improvements have been in part demolished by the creating developer, with the balance substantially renovated by the creating developer, to such an extent that all of the Central Tower Condominium Units obtained new certificates of occupancy. Except only for certain portions of the façade, and certain portions of the previous improvements' foundation, exterior shell and certain other structural components and interior architectural details, the Central Tower Condominium Units are new construction. Given the nature and breadth of reconstruction that occurred to the Condominium Project, the Central Tower Condominium Units required new certificates of occupancy prior to being lawfully habitable. Pursuant to the definitions set forth in the Florida Condominium Act, Central Carillon Beach, a Condominium may, however, be deemed to be a "**conversion condominium.**" In that regard, in accordance with Section 718.618 of the Florida Condominium Act,

**BUYER IS HEREBY ADVISED THAT TO THE EXTENT APPLICABLE AND NOT ABLE TO BE DISCLAIMED OR YET EXPIRED, SELLERS HAVE ELECTED TO PROVIDE THE BUYER OF EACH CENTRAL TOWER CONDOMINIUM UNIT AN IMPLIED WARRANTY OF FITNESS AND MERCHANTABILITY FOR THE PURPOSES OR USES INTENDED, ALL IN ACCORDANCE WITH SECTION 718.618(6) OF THE FLORIDA CONDOMINIUM ACT.**

(G)    Coastal Construction Control Line. Buyer is aware that the Condominium Units and/or portions of the Condominium Project may be located in coastal areas partially or totally seaward of the Coastal Construction Control Line as defined in Section 161.053, Florida Statutes. The property being purchased may be subject to coastal erosion and to federal, state, or local regulations that govern coastal properly, including the delineation of the Coastal Construction Control Line, rigid coastal protection structures, beach nourishment, and the protection of marine turtles. Additional information can be obtained from the Florida Department of Environmental Protection, including whether there are significant erosion conditions associated with the shoreline of the property being purchased. Buyer is fully apprised of the character of the regulation of property in such coastal areas and Buyer hereby waives and releases any right to receive at closing a survey delineating the location of the Coastal Construction Control Line with respect to the Condominium Units and the Condominium Project in accordance with Section 161.57, Florida Statutes.

(H)    Florida Homeowners' Construction Recovery Fund. Pursuant to Section 489.1425, Florida Statutes, Sellers are required to provide the following notice to Buyer:

**FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND PAYMENT MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA**

49

CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: 1940 NORTH MONROE STREET, TALLAHASSEE, FL 32399-0783, PHONE: 850-487-1395.

(I)     Subsequent Developer, Existing Improvements and Other Matters.  Buyer acknowledges that Sellers are not the creating developer of the Condominium Project and that Sellers did not construct the improvements constituting the Condominium Project, nor prepare the initial covenants and restrictions, including the Condominium Documents or exhibits thereto, governing same.  Buyer acknowledges and agrees that, during construction, the creating developer may have modified and adjusted plans and specifications for the improvements to the Condominium Project to reflect ongoing, "in the field" construction needs. Buyer further acknowledges and agrees that Sellers have made available to Buyer a conversion inspection report as to the Central Tower Condominium Units, which was prepared for the creating developer, and not by or for Sellers. Because certain changes made to the plans and specifications may not have to have been filed with the governmental authorities at all, Buyer acknowledges and agrees that the plans and specifications for the Condominium Units and the Condominium Project on file with applicable governmental authorities may not be identical to those current plans and specifications available for inspection in the offices of Sellers.  Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a condominium unit and depending upon the method of calculation, the quoted square footage of a condominium unit may vary in the Condominium Documents and advertising materials.  In that regard and during the course of Sellers' ownership of the Condominium Units, Sellers have identified that the square footage of the Condominiums Units shown in any advertising and promotional materials including, but not limited to, brochures, newspapers, models and floor plans may be inaccurate and the Condominium Units' assigned "Allocated Interests" (as such term is defined in the Condominium Documents) as reflected on exhibits attached to the Condominium Documents) may be inconsistent with the description and boundaries of the Condominium Units stated in the Condominium Documents.  In that regard, to Sellers' knowledge, stated dimensions of the Condominium Units in any advertising and promotional materials and/or as reflected on exhibits attached to the Condominium Documents may vary from the dimensions that would be determined by using the description and boundaries of the Condominium Units set forth in the Condominium Documents (which such definition only includes the interior airspace between the perimeter walls). Accordingly, Buyer acknowledges and agrees that, to Sellers' knowledge, the square footages stated in any advertising and promotional materials may be greater or lesser than those which would be derived by measuring only the interior area space for the Condominium Units as the Condominium Units are described and defined in the Condominium Documents and that the Condominium Unit's assigned Allocated Interests may be inconsistent with the description and boundaries of the Condominium Units set forth in the Condominium Documents. Buyer further acknowledges and agrees that Sellers do not make any representation or warranty whatsoever, and specifically disclaims same, as to area

50

or dimensions of the Condominium Units, the Condominium Units' assigned Allocated Interests or the square footage of the Condominium Units or any other unit in the Condominium Project, and Buyer hereby waives and expressly releases any such warranty.

(ix)    The provisions of this Section 21 shall survive the Closing.

22.    **Time is of the Essence**.  For all purposes herein, the Parties agree that time is and shall be of the essence of this Agreement.  If the date of the performance of any term, provision or condition of this Agreement shall happen to fall on a Saturday, Sunday or other non-Business Day, the date for the performance of such term, provision or condition shall be extended to the next succeeding Business Day immediately thereafter occurring.

23.    **Successor and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and to their respective heirs, executors, administrators, successors and permitted assigns.

24.    **Merger**.  All prior statements, understandings, representations and agreements between the Parties, oral or written, are superseded by and merged in this Agreement, which alone fully and completely expresses the agreement between them in connection with this transaction and which is entered into after full investigation, none of the Parties relying upon any statement, understanding, representation or agreement made by the others not embodied in this Agreement.  This Agreement shall be given a fair and reasonable construction in accordance with the intentions of the Parties, and without regard to or aid of canons requiring construction against Sellers or the Party drafting this Agreement.

25.    **Acceptance of Deeds**.  Except for those obligations, representations, warranties, covenants or agreements which are expressly stated to survive the Closing, Buyer's acceptance of the Deeds shall be deemed a discharge of all of the obligations of Sellers hereunder and all of each Seller's representations, warranties, covenants and agreements herein, shall merge in the documents and agreements executed at the Closing by such Seller and shall not survive the Closing.

26.    **Limitation of Liability**.  Buyer agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Sellers, including, without limitation, Lehman Brothers Holdings Inc., or any officer, director, employee, trustee, shareholder, partner or principal of any such parent, subsidiary or other affiliate (collectively, "**Sellers' Affiliates**"), arising out of or in connection with this Agreement or the transactions contemplated hereby, except for the express obligations of Guarantor set forth in Section 14(g) of this Agreement and as limited thereby.  Buyer agrees to look solely to Sellers and their respective assets for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Sellers' Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.  Without limiting the generality of the foregoing provisions of this <u>Section 26</u>, Buyer hereby

51

unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Sellers' Affiliates, and hereby unconditionally and irrevocably releases and discharges Sellers' Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Buyer against Sellers' Affiliates, in connection with or arising out of this Agreement or the transactions contemplated hereby.  The provisions of this <u>Section 26</u> shall survive the termination of this Agreement and the Closing.

27.     **No Waiver**.  No failure or delay of any Party in the exercise of any right or remedy given to such Party hereunder or the waiver by any Party of any condition hereunder for its benefit (unless the time specified herein for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy.  No waiver by any Party of any breach hereunder or failure or refusal by the other Parties to comply with their obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.  No waiver of any provision of this Agreement shall be effective unless it is in writing, signed by the Party against whom it is asserted and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

28.     **No Recording**.  Neither this Agreement nor any memorandum of this Agreement shall be recorded and any attempted recordation hereof shall be void and shall constitute a Default by the Party effecting such recording or attempt to record.

29.     **No Offer**.  Delivery of this Agreement shall not be deemed an offer and neither Sellers nor Buyer shall have any rights or obligations hereunder unless and until all Parties have signed and delivered an original of this Agreement and the Deposit shall have been paid to the Escrow Agent.

30.     **Captions**.  The caption headings in this Agreement are for convenience only and are not intended to be a part of this Agreement and shall not be construed to modify, explain or alter any of the terms, covenants or conditions herein contained.

31.     **Severability**.  If any provision of this Agreement shall be unenforceable or invalid, the same shall not affect the remaining provisions of this Agreement and to this end the provisions of this Agreement are intended to be and shall be severable.  Notwithstanding the foregoing sentence, if (i) any provision of this Agreement is finally determined by a court of competent jurisdiction to be unenforceable or invalid in whole or in part, (ii) the opportunity for all appeals of such determination have expired, and (iii) such unenforceability or invalidity alters the substance of this Agreement (taken as a whole) so as to deny any Party, in a material way, the realization of the intended benefit of its bargain, such Party may terminate this Agreement within thirty (30) days after the final determination by notice to the other Parties.  If such Party so elects to terminate this Agreement, then this Agreement shall be terminated and none of the Parties shall have any further rights, obligations or liabilities hereunder, except for those rights, obligations or liabilities which are expressly stated to survive the termination of this Agreement, and except that Buyer shall be entitled to a return of the Deposit provided Buyer is not otherwise in Default hereunder.

32. **Counterparts; Facsimile Execution**. This Agreement may be executed by facsimile and in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same Agreement.

33. **Governing Law**. This Agreement shall be construed and interpreted according to federal bankruptcy laws and the laws of the State of Florida (notwithstanding conflict of laws provisions of the State of Florida) and venue with respect to any litigation with respect to this Agreement or any of the Closing Documents shall be in the United States Bankruptcy Court hearing the Bankruptcy Case. This Section 33 shall survive the Closing or termination of this Agreement.

34. **Attorneys' Fees and Costs**. In the event of any litigation between the Parties to enforce, interpret, or arising out of this Agreement or pursuant to any of the Closing Documents, the prevailing Party in any such litigation shall be entitled to an award of its attorneys' fees. For the purposes of this Agreement, the Party who receives or is awarded a substantial portion of the damages or claims sought in any proceeding shall be deemed the "prevailing" Party and attorneys' fees shall mean the reasonable fees charged by an attorney or a law firm for legal services and the services of any legal assistants, and costs of litigation, including, but not limited to, fees and costs at trial and appellate levels. This Section 34 shall survive the Closing or termination of this Agreement.

35. **Modification**. This Agreement shall not be modified or amended (and no purported modification or amendment thereof shall be effective) unless in writing and signed by the Party to be charged.

36. **Exhibits and Schedules; Construction**. The Exhibits and Schedules referred to herein and attached hereto are hereby incorporated herein by this reference and made a part hereof for all purposes. All references to the singular or plural number or masculine, feminine or neuter gender shall, as the context requires, include all others. All references to sections, paragraphs, and exhibits are to this Agreement unless otherwise specifically noted. The use of the words "hereof", "hereunder", "herein" and words of similar import shall refer to this entire Agreement and not to any particular section, paragraph or portion of this Agreement unless otherwise specifically noted.

37. **WAIVER OF JURY TRIAL**. SELLERS AND BUYER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT EACH MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED BY ANY PARTY IN CONNECTION HEREWITH (INCLUDING ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS SECTION 37 SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

US_ACTIVE:\44547262\6\58399.0031

38.    **Limitation of Liability to Seller Liability Cap Amount**.    Notwithstanding anything to the contrary contained in this Agreement or in any other Closing Document, if the Closing occurs, the maximum aggregate liability of the Sellers hereunder and under the Closing Documents for any indemnification obligations, claims for damages resulting from any breach of representations, warranties or covenants and/or any other claims that the Buyer may be entitled to pursue under this Agreement or any Closing Document against the Sellers (excluding, however, any claims arising from a breach of the representation set forth in Section 12(a)(x)) shall not exceed the Seller Liability Cap Amount.  Each of the entities constituting Sellers shall be jointly and severally liable under this Agreement.  This Section 38 shall survive the Closing or termination of this Agreement.

39.    **Sales Tax Certificate of Compliance**.  At the request of Buyer, Sellers, without cost or expense to Sellers, shall cooperate with Buyer so that Buyer may apply for and obtain a Tax clearance certificate with respect to Sellers.

40.    **Bankruptcy Court Approval.**    To the extent the Buyer is selected as the Successful Bidder, Sellers shall use their reasonable efforts to obtain Bankruptcy Court approval of the Sale Order (including file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Sale Order).  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective reasonable efforts to defend such appeal.  Each of the Buyer and Sellers hereby agree to take all reasonable steps, and use their reasonable efforts, to obtain an expedited resolution of such appeal; *provided*, *however*, that, subject to the conditions set forth herein (including the condition precedent in Section 10(d)(v) requiring the Sale Order to become a Final Order unless such condition is waived by the Buyer), nothing contained in this Section 40 shall preclude the Buyer and Sellers from consummating the transactions contemplated hereby if the Sale Order shall have been entered, shall not be subject to any stay and shall not have been modified, revised or amended.  Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding modification or staying of the Bidding Procedures Order or the Sale Order.  Sellers shall use their commercially reasonable best efforts to provide such prior notice as may be reasonable under the circumstances before filing any papers in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Buyer, and shall consult in good faith with Buyer regarding the content of such materials prior to such filing.

41.    **Consents.**  Each Party shall use its commercially reasonable efforts to obtain and deliver to the other Party at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the Sale Order; provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval or to appeal a denied Sale Order.

54

42.   **Further Assurances.**   Each of Sellers and Buyer shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.   Sellers further covenant and agree to use all commercially reasonable efforts, sought in good faith, to have the Bankruptcy Court enter the Sale Order.

43.   **Submission to Jurisdiction; Consent to Service of Process.**

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and Sellers and Buyer consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 33 hereof; provided, however, that if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.   Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each Party consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 33.

[THE REMAINDER OF THIS PAGE IS LEFT BLANK]

55

IN WITNESS WHEREOF, the Parties have executed this Agreement on and as of the Effective Date.

**SELLERS:**

**<u>COLLINS NORTH OWNER</u>:**

**FL 6801 COLLINS NORTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

By: _____
Name:
Title:    Manager

**<u>COLLINS SOUTH OWNER</u>:**

**FL 6801 COLLINS SOUTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

By: _____
Name:
Title:    Manager

**<u>COLLINS CENTRAL OWNER</u>:**

**FL 6801 COLLINS CENTRAL LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

By: _____
Name:
Title:    Manager

**BUYER:**

**Z CAPITAL PARTNERS, L.L.C., on behalf of
itself or its affiliated designee(s)**

By:_____

Name: _JAMES  J.  ZENNI, JR._

Title: _PRESIDENT & CEO_

**ESCROW AGENT:**

OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY

By: _____
Name: _____
Title: _____

## JOINDER OF CONFIDENTIALITY PARTY

Confidentiality Party hereby joins in the foregoing Purchase and Sale Agreement by and among FL 6801 Collins North LLC, FL 6801 Collins South LLC, and FL 6801 Collins Central LLC, as Sellers, and _____, as Buyer (the "**PSA**"), for the sole purpose of agreeing to be bound by the provisions of Section 20 (Property Information and Confidentiality) of the PSA.

**CONFIDENTIALITY PARTY:**

By: _____

## JOINDER OF GUARANTOR

Guarantor hereby acknowledges the foregoing Purchase and Sale Agreement by and among FL 6801 Collins North LLC, FL 6801 Collins South LLC, and FL 6801 Collins Central LLC, as Sellers, and Z Capital Partners, L.L.C. or its affiliated designee(s), as Buyer (the "**PSA**"), for the sole purpose of agreeing to be bound by the provisions of Section 14(g) of the PSA as to the payment of the Reimbursement. In no event shall Guarantor be liable for the Reimbursement in an aggregate amount in excess of the amount Sellers would be liable under the PSA. For the avoidance of doubt, Guarantor's Reimbursement obligation shall not exceed the Seller Construction Cap and in no event shall Guarantor be responsible for reimbursing Buyer for any amounts incurred prior to Closing and/or not subject to a change order that is recommended as necessary by Engineer and/or any sub-contractors and approved by Buyer.

**GUARANTOR:**

**LEHMAN ALI INC.,** a Delaware
corporation

By: _____
Name:_____
Title: Vice President

**EXHIBIT A-1**
**NORTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Units 610, 204 and 205 of North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**EXHIBIT A-2**
**SOUTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Unit 109 of South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**EXHIBIT A-3**
**CENTRAL TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION**

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019 of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

## EXHIBIT A-4
## HOTEL PROPERTY LEGAL DESCRIPTION

**Parcel 1**:


Lots 1 through 6, inclusive, in Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, at Page 14, of the Public records of Miami-Dade County, Florida.

**Parcel 2**:


A PARCEL OF LAND LYING East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.

**Parcel 3**:


The North 25.00 feet of Lot 48, all Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

**Parcel 4**:


A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62 of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 1 and 2 ABOVE:**

North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded on August 27, 2008 in Official Records Book 26542, Pages 0015 through 158, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

The Retail Lot, described as follows:

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet; thence N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 3 and 4 ABOVE:**

Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26610, Pages 735 through 822, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26080, Pages 4764 through 4904, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto.

## EXHIBIT A-5
## RETAIL PROPERTY LEGAL DESCRIPTION

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet thence; N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

**EXHIBIT A-6**
**SHARED COMPONENT UNIT LEGAL DESCRIPTION**

Shared Component Unit of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**EXHIBIT B**
**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of _____ 2014 (this "Assignment"), by and among FL 6801 COLLINS NORTH LLC, a Delaware limited liability company ("Collins North Owner"), FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("Collins South Owner"), and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability company ("Collins Central Owner") (Collins North Owner, Collins South Owner and Collins Central Owner are hereinafter sometimes individually referred to as a "Seller" and collectively referred to as "Sellers") and [_____, a _____] ("Buyer").

W I T N E S S E T H :

WHEREAS, Sellers and Buyer[, by assignment,] are parties to that certain Purchase and Sale Agreement, dated as of _____ 2014 (the "Agreement"), providing for, among other things, the sale by Sellers to Buyer of the Assets and the assumption by Buyer of the Assumed Liabilities; and

WHEREAS, in accordance with the terms of the Agreement, Sellers and Buyer have agreed to enter into this Assignment, providing for (a) the assignment from Sellers to Buyer of all of Sellers' right, title and interest in, under and to the [Construction Contract,] Intellectual Property, Licenses and Assumed Leases and Contracts (collectively, the "Intangible Property") on and subject to the terms of the Agreement and (b) the acceptance by Buyer of such assignment and the assumption by Buyer of (i) all obligations to be performed by Sellers in connection with the Intangible Property accruing or arising from and after the date hereof and (ii) the other Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Assignment.   In accordance with and subject to the terms of the Agreement, each Seller hereby sells, assigns, transfers, conveys and delivers to Buyer, to the extent that such are legally assignable and any necessary consents to assignment have been obtained, all of such Seller's right, title and interest in, under and to the Intangible Property.

2.      Acceptance and Assumption.   In accordance with and subject to the terms of the Agreement, Buyer hereby (a) purchases and accepts the sale, assignment, transfer, conveyance and delivery to the extent that such are legally assignable and necessary consents to assignment have been obtained, of Sellers' right, title and interest in, under and to the Intangible Property;  (b) unconditionally and irrevocably assumes, undertakes and agrees to pay, satisfy, perform and discharge in full, as and when due, and release and discharge each Seller and its Affiliates, successors and assigns completely and forever from, all obligations and liabilities of any kind arising out of, or required to be performed under, the Intangible Property accruing or

arising from and after the date hereof; and (c) unconditionally and irrevocably assumes, undertakes and agrees to pay, satisfy, perform and discharge in full, as and when due, and release and discharge each Seller and its Affiliates, successors and assigns completely and forever from, all of the Assumed Liabilities and all obligations and liabilities of any kind arising out of Buyer's assumption of the Assumed Liabilities.

3.    <u>Waiver</u>.  Except as specifically set forth in the Agreement, Buyer hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Sellers or Sellers' Affiliates, and hereby unconditionally and irrevocably fully releases and discharges Sellers and Sellers' Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Buyer against Sellers or Sellers' Affiliates, in connection with or arising out of any of the Intangible Property.

4.    <u>No Warranty</u>.  Except as otherwise set forth in the Agreement, this Assignment is made without any covenant, warranty or representation by, or recourse against, Sellers or Sellers' Affiliates of any kind whatsoever.

5.    <u>Parties in Interest</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

6.    <u>Counterparts</u>.  This Assignment may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, and all of which together shall constitute one and the same instrument.  Any counterpart delivered by facsimile, PDF or other electronic means shall have the same import and effect as an original counterpart and shall be valid, enforceable and binding for the purposes of this Agreement.

7.    <u>Governing Law</u>.  This Assignment and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Florida as applied to contracts made and performed entirely in such state.

8.    <u>Conflicts with Agreement</u>.  In the event of any conflict between this Assignment and the Agreement, the terms of the Agreement shall control.

9.    <u>Definitions</u>.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Assignment as of the date first written above.

**SELLERS:**

**COLLINS NORTH OWNER:**

**FL 6801 COLLINS NORTH LLC**, a Delaware limited liability company

By: FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

   By: _____
   Name:
   Title: Manager

**COLLINS SOUTH OWNER:**

**FL 6801 COLLINS SOUTH LLC**, a Delaware limited liability company

By: FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

   By: _____
   Name:
   Title: Manager

**COLLINS CENTRAL OWNER:**

**FL 6801 COLLINS CENTRAL LLC**, a Delaware limited liability company

By: FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

   By: _____
   Name:
   Title: Manager

**BUYER:**


By: _____
Name:
Title:

**EXHIBIT C**
**FORM OF ASSIGNMENT AND ASSUMPTION OF RENTAL PROGRAM
AGREEMENTS**

**ASSIGNMENT AND ASSUMPTION OF RENTAL PROGRAM AGREEMENTS**

ASSIGNMENT AND ASSUMPTION OF RENTAL PROGRAM
AGREEMENTS, _____ 2014 (this "Agreement"), by and between FL 6801 COLLINS
CENTRAL LLC, a Delaware limited liability company ("Assignor"), and [_____, a
_____] (the "Assignee").

WITNESSETH:

WHEREAS, Assignor and Assignee[, by assignment,] are parties to that certain Purchase
and Sale Agreement, dated as of _____ 2014 (the "Purchase Agreement"), providing for,
among other things, the sale to Assignee of the Assets and the assumption by Assignee of the
Assumed Liabilities;

WHEREAS, Assignor, or CR Miami, LLC, on behalf of Assignor, has entered into those
certain rental program agreements more particularly described on Exhibit A attached hereto and
made a part hereof (collectively, the "Rental Program Agreements"); and

WHEREAS, in furtherance of the Purchase Agreement, Assignor desires to assign to
Assignee all of its right, title and interest in and to the Rental Program Agreements and Assignee
desires to accept such assignment and assume all of the obligations, liabilities and
responsibilities of Assignor arising out of, or required to be performed under, any of the Rental
Program Agreements accruing or arising from and after the date hereof.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto,
intending to be legally bound hereby, agree as follows:

1.    Effective as of the date hereof, Assignor does hereby unconditionally,
absolutely and irrevocably assign to Assignee all of its right, title and interest in and to the Rental
Program Agreements.

2.    Assignee hereby accepts such assignment and Assignee does hereby
unconditionally and irrevocably assume, undertake and agree, subject to valid claims and
defenses arising under the Rental Program Agreements or by law, to pay, satisfy, perform and
discharge in full, as and when due, and release and discharge Assignor and its successors and
assigns completely and forever from, all of the obligations, liabilities and responsibilities of
Assignor (including, without limitation, the obligation to pay, reimburse or otherwise refund any
amounts due and owing by Assignor pursuant to the terms of the Rental Program Agreements)
arising out of, or required to be performed under, any of the Rental Program Agreements from
and after the date hereof.

3.      Except as specifically set forth in the Purchase Agreement, Assignee hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Assignor or Assignor's Affiliates and hereby unconditionally and irrevocably fully releases and discharges Assignor and Assignor's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Assignee against Assignor or Assignor's Affiliates, in each case, in connection with or arising out of any of the Rental Program Agreements.

4.      Except as otherwise set forth in the Purchase Agreement, this Agreement is made without any covenant, warranty or representation by, or recourse against, Assignor or Assignor's Affiliates of any kind whatsoever.

5.      This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors-in-interest and permitted assigns.

6.      This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original and all of which together shall constitute one and the same instrument.  Any counterpart delivered by facsimile, PDF or other electronic means shall have the same import and effect as an original counterpart and shall be valid, enforceable and binding for the purposes of this Agreement.

7.      This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Florida as applied to contracts made and performed entirely in such state.

8.      In the event of any conflict between this Assignment and the Purchase Agreement, the terms of the Purchase Agreement shall control.

9.      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Assignment as of the date first written above.

**ASSIGNOR:**

**FL 6801 COLLINS CENTRAL LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

        By: _____
        Name:
        Title:    Manager

**ASSIGNEE:**

_____

By: _____
Name:
Title:

## <u>EXHIBIT A</u>

**Rental Program Agreements**


**[ALL RENTAL PROGRAM AGREEMENTS WILL BE LISTED]**

**EXHIBIT D**

**FORMS OF ASSIGNMENTS OF DEVELOPER RIGHTS**

**FORM OF ASSIGNMENT OF CENTRAL CONDO DEVELOPER RIGHTS**

This instrument prepared by, or under the supervision of
(and after recording, return to):

(Reserved for Clerk of Court)

**ASSIGNMENT OF CENTRAL CONDO DEVELOPER RIGHTS**

THIS ASSIGNMENT is made as of the ___ day of _____, 2014 by FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("Assignor") to _____ (including its successors and assigns, "Assignee").

**R E C I T A L S:**

A.    Assignor, pursuant to that certain Assignment of Declarant and Developer Rights recorded in Official Records Book 27124, Page 2053, of the Public Records of Miami-Dade County, Florida ("County") is the holder of the rights and privileges ("Rights") of the "Developer" under that certain Declaration of **Central Carillon Beach, a Condominium** recorded October 15, 2008, in Official Records Book 26610, Page 0735, of the Public Records of the County (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Declaration").

B.    Assignee acquired certain inventory units ("Units") located in Central Carillon Beach, a Condominium (the "Condominium") through a bulk acquisition from Assignor.

C.    Assignor desires to assign to Assignee, and Assignee desires to accept an assignment of some, but not all, of the Rights, as more particularly set forth in this Assignment.

**NOW, THEREFORE**, for Ten and No/100 Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree:

1.    The foregoing recitals are incorporated herein as if repeated at length.

2.      Assignor hereby assigns to Assignee, on an exclusive basis, and Assignee hereby accepts from Assignor, only the following rights, benefits and privileges of the "Developer" as created by, and set forth in, or which arise out of, the Declaration (collectively, the "Assigned Rights"):

(a)      The right to conduct sales, leasing, and marketing activities within the Condominium;

(b)      The right to be exempt from the payment, if any, of working capital contributions to Central Carillon Beach Condominium Association, Inc. (the "Association") arising out of, or in connection with, Assignee's acquisition of the Units; and

(c)      The right to be exempt from any rights of first refusal which may be held by the Association and would otherwise be applicable to the subsequent transfers of title from Assignee to a third party purchaser concerning one or more of the Units.

3.      It is understood that Assignee shall have the right to further assign, either in whole or in part, the Assigned Rights, or any of them.

4.      Assignor hereby represents and warrants to the Assignee that Assignor has not previously assigned the Assigned Rights to any other party, and has the right to enter into this Assignment.

5.      This Assignment is being given in accordance with the provisions of Section 718.703(2), Florida Statutes, with the intent that Assignee is a "Bulk Buyer" as defined therein. Notwithstanding anything to the contrary contained herein, in no event shall any provision of this Assignment operate or be construed to grant to Assignee any greater rights than those afforded to Assignee as a Bulk Buyer, waive or result in the loss of any rights afforded to Assignee as a Bulk Buyer or preclude Assignee from qualifying as a Bulk Buyer, and any provision, or portion hereof, which would have such effect shall be severed from this Assignment.

6.      This Assignment shall be construed according to the laws of the State of Florida. In the event legal action shall become necessary, venue shall be in the County.

7.      This Assignment may be executed in any number of counterparts, provided each of the parties hereto executes at least one counterpart; each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

8.      This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed as of the day and year first above written.

Signed in the presence of:

**ASSIGNOR:**

**FL 6801 COLLINS SOUTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

_____
Name: _____

    By:_____
    Name: _____
    Title:   Manager

_____
Name: _____

Address: _____
               _____


**ASSIGNEE:**

**Bulk Buyer**

_____

_____
Name: _____

By:    _____
Name:  _____
Title:   _____

_____
Name: _____

Address: _____
               _____

STATE OF _____)
                                              ) SS:
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as Manager of FL 6801 Spirits LLC, a Delaware limited liability company, as Managing Member of FL 6801 Collins South LLC, a Delaware limited liability company, on behalf of said company. He/she is personally known to me or produced _____ as identification.

_____
Name: _____

Notary Public, State of _____
My Commission Expires:                    Commission No.:        _____

(Notarial Seal)


STATE OF _____)
                                              ) SS:
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as _____ of _____, on behalf of said _____. He/she is personally known to me or produced _____ as identification.

_____
Name: _____

Notary Public, State of _____
My Commission Expires:                    Commission No.:        _____

(Notarial Seal)

**FORM OF ASSIGNMENT OF MASTER DECLARANT RIGHTS**

This instrument prepared by, or under the supervision of
(and after recording, return to):

(Reserved for Clerk of Court)

**ASSIGNMENT
OF
DECLARANT'S RIGHTS**

THIS ASSIGNMENT is made as of the ___ day of _____, 2014 by FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("Assignor") to _____ (including its successors and assigns, "Assignee").

**R E C I T A L S:**

A.    Assignor, pursuant to that certain Assignment of Declarant and Developer Rights recorded in Official Records Book 27124, Page 2053, of the Public Records of Miami-Dade County, Florida ("County") is the holder of the rights and privileges ("Rights") of the "Declarant" under that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded December 3, 2007, in Official Records Book 26080, Page 4905, of the Public Records of the County (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Declaration").

B.    Assignee acquired certain property which is encumbered by the Declaration through a bulk acquisition from Assignor.

C.    Assignor desires to assign to Assignee, and Assignee desires to accept an assignment of the Rights, as more particularly set forth in this Assignment.

NOW, THEREFORE, for Ten and No/100 Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree:

1.    The foregoing recitals are incorporated herein as if repeated at length.

US_ACTIVE:\44547264\2\58399.0031

2.      Assignor hereby assigns to Assignee, on an exclusive basis, and Assignee hereby accepts from Assignor, from and after the date of this Assignment, all of Assignor's right, title and interest in and to the Rights.

3.      It is understood that Assignee shall have the right to further assign, either in whole or in part, the Rights, or any of them.

4.      Assignor hereby represents and warrants to the Assignee that Assignor has not previously assigned the Rights to any other party, and has the right to enter into this Assignment.

5.      This Assignment shall be construed according to the laws of the State of Florida. In the event legal action shall become necessary, venue shall be in the County.

6.      This Assignment may be executed in any number of counterparts, provided each of the parties hereto executes at least one counterpart; each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

7.      This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed as of the day and year first above written.

Signed in the presence of:

**ASSIGNOR:**

**FL 6801 COLLINS SOUTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

_____
Name: _____

       By:_____
       Name:
       Title:  Manager

_____
Name: _____

Address: _____
         _____


**ASSIGNEE:**

[_____]

_____

_____
Name: _____

By:   _____
Name:  _____
Title:   _____

_____
Name: _____

Address: _____
         _____

STATE OF _____)
                                            ) SS:
COUNTY OF _____)

       The foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as Manager of FL 6801 Spirits LLC, a Delaware limited liability company, as Managing Member of FL 6801 Collins South LLC, a Delaware limited liability company, on behalf of said company. He/she is personally known to me or produced _____ as identification.

                                    _____

                                Name: _____

                                Notary Public, State of _____

My Commission Expires:       Commission No.:     _____

(Notarial Seal)

STATE OF _____)
                                            ) SS:
COUNTY OF _____)

       The foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as _____ of _____, on behalf of said _____. He/she is personally known to me or produced _____ as identification.

                                      _____

                                Name: _____

                                Notary Public, State of _____

My Commission Expires:       Commission No.:     _____

(Notarial Seal)

## EXHIBIT E
## CONDOMINIUM DOCUMENTS

1. Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded in Official Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida, as amended.

2. Declaration of Condominium of North Carillon Beach, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, as amended.

3. Declaration of Condominium of Central Carillon Beach, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, as amended.

4. Declaration of Condominium of South Carillon Beach, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, as amended.

**EXHIBIT F**
**FORM OF SPECIAL WARRANTY DEED**

**PREPARED BY AND WHEN RECORDED
RETURN TO:**

_____
_____
_____
_____

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED,** made as of _____ 2014, by [FL 6801 COLLINS NORTH LLC], a Delaware limited liability company, having an address at 1271 Avenue of the Americas, 38th Floor, New York, New York 10022 ("Grantor"), in favor of [_____, a _____, having an address at _____] ("Grantee").

## W I T N E S S E T H:

That Grantor, for and in consideration of the sum of Ten and no/100 Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt and sufficiency of which are hereby acknowledged and confessed, pursuant to that certain Order (i) Approving Sale of Debtors' Property; (ii) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief, pursuant to sections 105(a) and 363 of title 11 of the United States Code and Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, attached hereto as Exhibit A, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto Grantee, its successors and assigns, the following-described real property and rights and interests in real property situate, lying and being in Miami-Dade County, Florida to wit:

FOR LEGAL DESCRIPTION OF LAND SEE EXHIBIT B ATTACHED HERETO AND MADE A PART HEREOF.

Together with all and singular, the benefits, privileges, easements, rights-of-way, tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining and together with all improvements attached thereto or located thereon (collectively, the "Property").

**TO HAVE AND TO HOLD** the same in fee simple forever.

**AND** Grantor hereby warrants title to said Property and covenants with said Grantee that it will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to those matters set forth on Exhibit C attached hereto and made a part hereof, without intending to reimpose any such matters set forth on Exhibit C.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, Grantor has hereunto executed this Special Warranty Deed as of the day and year first above written.

**GRANTOR:**

Signed, sealed and delivered in the presence of:

**[FL 6801 COLLINS NORTH LLC]**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

Witness:_____
Printed Name:

By:_____
Name:
Title: Manager

Witness:_____
Printed Name:

STATE OF NEW YORK            )
                            ) ss:
COUNTY OF NEW YORK          )

The foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as Manager of FL 6801 Spirits LLC, a Delaware limited liability company, the Managing Member of **[FL 6801 Collins North LLC]**, a Delaware limited liability company, on behalf of said limited liability company. He/She is personally known to me or has produced a driver's license as identification.

_____
Notary Public
Commission Number: _____
My Commission Expires: _____

(NOTARY SEAL)

## **EXHIBIT A**

## **SALE ORDER**

SEE ATTACHED

## EXHIBIT B

## LEGAL DESCRIPTION

[Insert appropriate Legal Description from:

Exhibit A-1 – North Tower Condominium Units

Exhibit A-2 – South Tower Condominium Units

Exhibit A-3 – Central Tower Condominium Units

Exhibit A-4 – Hotel Property

Exhibit A-5 – Retail Property

Exhibit A-6 – Shared Component Unit]

<u>**EXHIBIT C**</u>

<u>**PERMITTED ENCUMBRANCES**</u>

1.      Real property taxes and assessments for the year 2014 and thereafter.

2.      Zoning and other regulatory laws and ordinances affecting the Property.

3.      [Permitted Encumbrances, as defined in the Purchase and Sale Agreement]

**EXHIBIT G**
**FORM OF BILL OF SALE**

**BILL OF SALE**

**THIS BILL OF SALE** (this "Bill of Sale") is made and delivered this __ day of _____, 2014, by FL 6801 COLLINS NORTH LLC, a Delaware limited liability company ("Collins North Owner"), FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("Collins South Owner"), and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability company ("Collins Central Owner") (Collins North Owner, Collins South Owner and Collins Central Owner each a "Seller" and, collectively, "Sellers") for the benefit of [_____, a _____] ("Buyer").  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement (as hereinafter defined).

**WHEREAS**, Sellers and Buyer have entered into that certain Purchase and Sale Agreement dated as of _____, 2014 (the "Agreement"), the terms of which are incorporated herein by reference, which provides for, among other things, the sale and assignment by Sellers to Buyer of the Assets.

**NOW, THEREFORE,** in consideration of the mutual promises contained in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Sellers, and subject to the terms and conditions of the Agreement:

1.    Sellers do hereby sell, assign, transfer, convey and deliver unto Buyer, and its successors and assigns, forever, all of Sellers' right, title and interest in and to the FF&E and Inventory and all other Personal Property **TO HAVE AND TO HOLD** with all appurtenances thereto, unto Buyer, and its successors and assigns, for its use forever, subject, however, to the Permitted Encumbrances.

2.    Except as set forth in the Agreement, Buyer hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Sellers or Sellers' Affiliates, and hereby unconditionally and irrevocably fully releases and discharges Sellers and Sellers' Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Buyer against Sellers or Sellers' Affiliates, in connection with or arising out of the Assets conveyed hereunder.

3.    Except as otherwise set forth in the Agreement, this Bill of Sale is made without any covenant, warranty or representation by, or recourse against, Sellers or Sellers' Affiliates of any kind whatsoever.

4.    This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

5.     Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Agreement.  To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the Agreement, the Agreement shall govern.

6.     This Bill of Sale is executed and delivered pursuant to the Agreement.

7.     This Bill of Sale may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, and all of which together shall constitute one and the same instrument.   Any counterpart delivered by facsimile, PDF or other electronic means shall have the same import and effect as an original counterpart and shall be valid, enforceable and binding for the purposes of this Bill of Sale.

8.     This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Florida, as applied to contracts made and performed entirely in such state.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, each Seller has caused this Bill of Sale to be executed and delivered as of the day and year first above written.

**SELLERS:**

**COLLINS NORTH OWNER:**

**FL 6801 COLLINS NORTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

        By: _____
        Name:
        Title:    Manager

**COLLINS SOUTH OWNER:**

**FL 6801 COLLINS SOUTH LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

        By: _____
        Name:
        Title:    Manager

**COLLINS CENTRAL OWNER:**

**FL 6801 COLLINS CENTRAL LLC**, a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited liability company, its Managing Member

        By: _____
        Name:
        Title:    Manager

# EXHIBIT H
# FORM OF TITLE AFFIDAVIT

SEE ATTACHED

### Form of TITLE STATEMENT

Dated: _____, 2014
Title Order No. _____

      The undersigned ("Affiant") hereby represents and warrants, in his/her capacity as a Manager of FL 6801 Spirits LLC, a Delaware limited liability company, the Managing Member of FL 6801 COLLINS NORTH LLC, a Delaware limited liability company ("Collins North Owner"), FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company ("Collins South Owner"), and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability company ("Collins Central Owner") (Collins North Owner, Collins South Owner and Collins Central Owner are hereinafter sometimes individually referred to as a "Owner" and collectively referred to as "Owners") and not personally, as follows to and for the benefit of OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY (the "Title Company"), with respect to that certain title commitment with an effective date of _____, 2014 (the "Title Report"):

      1.      To the knowledge of Affiant, there is no one in possession, or with a claim of possession, of any portion of the subject property described in Schedule A of the Title Report (the "Property"), except for guests of the hotel located on the Property (or a portion thereof) and as set forth on the attached Exhibit A.

      2.      To the knowledge of Affiant, there are no unrecorded easements affecting the Property, except as shown on a survey of the Property or any part thereof.

      3.      Within the last ninety (90) days, Owners have not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been paid for in full, (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full, and (iii) attached any fixtures to the Property which have not been paid for in full, except as follows: _____.

      4.      Each Owner is wholly owned by FL 6801 Spirits LLC, which is wholly owned by Pami ALI LLC, a Delaware limited liability company, which is wholly owned and managed by Lehman ALI Inc., which is wholly owned by Lehman Brothers Holdings Inc. ("LBHI") Other than LBHI [and _____], none of such entities have been a debtor in bankruptcy.

      This statement is made for the purpose of aiding the Title Company in determining the insurability of title to the Property, and to induce the Title Company to issue its owner's policy of title insurance. This affidavit may be relied upon by the Title Company but may not be relied upon by any other person or entity.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, Affiant has executed this affidavit as of the date first written above.

_____

_____, as Manager
of FL 6801 Spirits LLC, a Delaware limited
liability company, as Managing Member of
FL 6801 COLLINS NORTH LLC, a
Delaware limited liability company, FL
6801 COLLINS SOUTH LLC, a Delaware
limited liability company    and FL 6801
COLLINS CENTRAL LLC, a Delaware
limited liability company

STATE OF _____)
                                                    ) SS:
COUNTY OF _____)

        The    foregoing    instrument    was    acknowledged    before    me    this    ___    day    of
_____, 2014 by _____ as Manager of FL 6801 Spirits LLC, a
Delaware limited liability company, as Managing Member of FL 6801 COLLINS NORTH LLC,
a Delaware limited liability company, FL 6801 COLLINS SOUTH LLC, a Delaware limited
liability company and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability
company, on behalf of the companies.  Such individual is personally known to me or produced __
_____ as identification.

                                                            Name: _____
                                                            Notary Public, State of _____
My commission expires:                    Commission No. _____
                                                            [Notarial Seal]

## **EXHIBIT A**

## **Form of GAP INDEMNITY**

_____, 2014


Title Order No. _____
Title Commitment Effective Date: _____, 2014

     WHEREAS, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY (the "Title Company") has been asked to issue its owner's policy of title insurance in the aggregate amount of $[_____] in favor of _____, a _____ ("Buyer"), covering premises (the "Real Property") being acquired from [_____], a Delaware limited liability company ("Seller"), on or around the date hereof;

     AND WHEREAS, the Title Company is unwilling to give title insurance coverage to Buyer with respect to the Real Property until the instruments under which Buyer acquires title are filed for record in the appropriate registry;

     NOW, THEREFORE, it is agreed that in consideration of the Title Company issuing its title insurance policy to Buyer effective as of the date closing occurs without making exception therein to matters which may arise between the Title Commitment Effective Date referenced above (being the last effective date of the title insurance commitment issued by the Title Company in connection with Buyer's title insurance) and the date the documents creating the interest being insured have been filed for record and which matters may constitute an encumbrance on or affect said title, Seller agrees to promptly defend, remove, bond or otherwise dispose of any encumbrance, lien or objectionable matter to title caused by the acts of Seller, its agents or representatives which may arise or be filed, as the case may be, against the Real Property during the period of time between the Title Commitment Effective Date referenced above and the date on which the documents creating the interest being insured have been filed for record, and to hold harmless, and indemnify the Title Company against all actual expenses, costs, and reasonable attorneys' fees, which may arise out of Seller's failure to so remove, bond or otherwise dispose of any said liens, encumbrances or objectionable matters caused solely by the acts of Seller, its agents or representatives; provided, however, that the Title Company shall use good faith and diligent efforts to cause all documents to be recorded as soon as possible but, in any event, no later than five (5) business days after the date hereof and Seller shall have no obligations or liability hereunder with respect to any objections to title which may arise or be filed after such five (5) business day period nor shall Seller have any obligations or liability hereunder with respect to any objections to title which may arise or be filed as a result of the acts or by permission of Buyer, its agents or representatives.

IN WITNESS WHEREOF, Seller has executed this Gap Indemnity as of the date first written above.

**[FL 6801 COLLINS NORTH LLC]**,
a Delaware limited liability company

By:    FL 6801 Spirits LLC, a Delaware limited
       liability company, its Managing Member


By:_____
Name:
Title: Manager

**EXHIBIT I-1**
**RECEIPT FOR CONDOMINIUM DOCUMENTS – NORTH CARILLON BEACH**

SEE ATTACHED

## RECEIPT FOR CONDOMINIUM DOCUMENTS – NORTH CARILLON BEACH

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium        North Carillon Beach, a Condominium
Address of Condominium       6899 Collins Avenue, Miami Beach, Florida 33141

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents:  Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.


_____, a Delaware limited
liability company

By:     _____


By: _____
Name: _____
Title: _____


(Developer's Copy)

# RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium _____ North Carillon Beach, a Condominium _____
Address of Condominium _____ 6899 Collins Avenue, Miami Beach, Florida 33141 _____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents:  Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.

_____, a Delaware limited
liability company

By: _____

    By: _____
    Name: _____
    Title: _____

(Purchaser's Copy)

**EXHIBIT I-2**
**RECEIPT FOR CONDOMINIUM DOCUMENTS – SOUTH CARILLON BEACH**

SEE ATTACHED

## RECEIPT FOR CONDOMINIUM DOCUMENTS – SOUTH CARILLON BEACH

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium _____ South Carillon Beach, a Condominium _____
Address of Condominium _____ 6799 Collins Avenue, Miami Beach, Florida 33141 _____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents: Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.

_____, a Delaware limited
liability company

By:    _____

By: _____
Name: _____
Title: _____

(Developer's Copy)

# RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium _____ South Carillon Beach, a Condominium _____

Address of Condominium _____ 6799 Collins Avenue, Miami Beach, Florida 33141 _____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents: Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.


_____, a Delaware limited
liability company


By:    _____


    By: _____
    Name: _____
    Title: _____


(Purchaser's Copy)

**EXHIBIT I-3**
**RECEIPT FOR CONDOMINIUM DOCUMENTS – CENTRAL CARILLON BEACH**

SEE ATTACHED

## **RECEIPT FOR CONDOMINIUM DOCUMENTS – CENTRAL CARILLON BEACH**

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium _____ Central Carillon Beach, a Condominium _____
Address of Condominium _____ 6801 Collins Avenue, Miami Beach, Florida 33141 _____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | | |
| Conversion Termite Inspection Report | | |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents: Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.


_____, a Delaware limited
liability company

By:    _____


By: _____
Name: _____
Title: _____


(Developer's Copy)

# RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, have been made available for inspection.

Name of Condominium _____ Central Carillon Beach, a Condominium _____

Address of Condominium _____ 6801 Collins Avenue, Miami Beach, Florida 33141 _____

Place a check in the column by each document received or, for the plans and specifications, made available for inspection. If a document uses a different name, substitute the correct name or place in parenthesis. If an item does not apply, place "N/A" in the column.

| DOCUMENT | RECEIVED BY HARD COPY | RECEIVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | | |
| Declaration of Condominium | | |
| Articles of Incorporation | | |
| Bylaws | | |
| Estimated Operating Budget | | |
| Form of Agreement for Sale or Lease | | |
| Rules & Regulations | N/A | N/A |
| Covenants and Restrictions | | |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More Than One Year | | |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sales Brochures | | |
| Phase Development Description | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with Other Condominiums | N/A | N/A |
| Description of Management for Single Management of Multiple Condominiums | N/A | N/A |
| Conversion Inspection Report | | |
| Conversion Termite Inspection Report | | |
| Plot Plan | | |
| Floor Plan | | |
| Survey of Land and Graphic Description of Improvements | | |
| Executed Escrow Agreement | | |
| Frequently Asked Questions & Answers Sheet | | |
| Financial Information | N/A | N/A |
| State or Local Acceptance/Approval of Dock or Marina Facilities | N/A | N/A |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon Which the Condominium is to be Developed | | |
| Other Documents:  Form Special Condominium Warranty Deed | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | N/A | |

| DOCUMENT | RECEIVED | OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|---|
| Plans and Specifications | | | MADE AVAILABLE | N/A |

**THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OF MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.**

Executed this _____ day of _____, 2014.


_____, a Delaware limited
liability company


By:    _____


By: _____
Name: _____
Title: _____


(Purchaser's Copy)

## EXHIBIT J
## FORM OF NON-FOREIGN AFFIDAVIT

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform [_____, a _____] (the "Transferee"), that withholding of tax under Section 1445 of the Code will not be required upon the transfer of certain U.S. real property by FL 6801 COLLINS NORTH LLC, a Delaware limited liability company, FL 6801 COLLINS SOUTH LLC, a Delaware limited liability company and FL 6801 COLLINS CENTRAL LLC, a Delaware limited liability company (collectively, the "Titleholder") to Transferee, the undersigned hereby certifies the following, in his/her capacity as an officer of and not personally on behalf of Lehman ALI Inc., a Delaware corporation  (the "Transferor"), which is the managing member of Pami ALI LLC, a Delaware limited liability company (the "PAMI"), which is the sole member FL 6801 Spirits LLC, a Delaware limited liability company ("Spirits"), which is the managing member and the sole member of the Titleholder.

1.     Titleholder, Spirits and PAMI are disregarded entities for federal income tax purposes.

2.     The Transferor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust, foreign estate or foreign person (as those terms are defined in the Code and the regulations promulgated thereunder);

3.     The Transferor's U.S. Employer Identification Number is [_____]; and

4.     The Transferor's address is 1271 Avenue of the Americas, 38th Floor, New York, New York 10022.

5.   The Transferor is not a disregarded entity as defined in Treasury Regulations § 1.1445-2(b)(2)(iii).

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.  The Transferor understands that the Transferee is relying on this certification in determining whether withholding is required upon the above-described transfer.

The individual executing this certification on behalf of the Transferor declares, in his/ her capacity as an officer of the Transferor and not personally, that (i) he or she has examined this certification, (ii) to the best of his or her knowledge and belief, the certification is true and correct and (iii) he or she is authorized to sign this document on behalf of the Transferor.

Date: [_____, 2014].

[Remainder of page intentionally left blank]

**<u>TRANSFEROR:</u>**


LEHMAN ALI INC., a Delaware corporation


_____


By: _____
Name:
Title: Vice President

## EXHIBIT K   TITLE COMMITMENT

SEE ATTACHED

**Old Republic National Title Insurance Company**
**600 W. Hillsboro Blvd. Ste 450**
**Deerfield Beach, Florida 33441**

## SCHEDULE A

FILE NO.:    14023648 SC **Rev E**
Agent File # 58399.0031

County:        Miami-Dade

1.      Effective Date:  April 24, 2014 at 11:59pm

2.      Policies to be Issued:                        Proposed Amount of Insurance:

    (a)    ALTA 2006 OWNER'S POLICY              Amount:      To Be Determined
        (with Florida Modifications)
        Proposed Insured:                    Premium:  $

        To Be Determined

    (b)    ALTA 2006 LOAN POLICY                Amount:      To Be Determined
        (with Florida Modifications)
        Proposed Insured:                    Premium:  $

        To Be Determined

3.      The estate or interest in the land described or referred to in this Commitment is Fee Simple.

4.      Title to the Fee Simple estate or interest in the land is at the Effective Date vested in:

    FL 6801 Collins North LLC, a Delaware limited liability company (as to the North Tower Condominium
    Units), FL 6801 Collins South LLC, a Delaware limited liability company (as to the South Tower
    Condominium Units and Central Tower Condominium Units) and FL 6801 Collins Central LLC, a Delaware
    limited liability company (as to the Hotel Property, Retail Property and Shared Component Unit)

5.      The land referred to in this Commitment is described as follows:

    See Attached Legal Description

---

**ALTA COMMITMENT**                                                                                    **Page 1**

FILE NO.: 14023648

---

## SCHEDULE B - SECTION I
## REQUIREMENTS

Requirements:

1. Pay and/or disburse the agreed amounts for the interest in the land, which are due and payable.

2. Pay us the premiums, fees and charges for the policy.

3. Pay all taxes and/or assessments, levied and assessed against the land, which are due and payable.

4. The following documents, satisfactory to us, creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded:

   a. Special Warranty Deed from FL 6801 Collins North LLC, a Delaware limited liability company to To Be Determined, conveying the land described in Exhibit A herein; together with satisfactory evidence that FL 6801 Collins North LLC, a Delaware limited liability company is either authorized to transact business in the State of Florida, or is presently in existence in their State of origin.

   Provide the Company for review a copy of the Articles of Organization filed with its domicile state, and amendments thereto, if any, and a copy of the Operating Agreement for FL 6801 Collins North LLC, a Delaware limited liability company to verify who may sign on behalf of the limited liability company, as well as the procedure authorizing such signatory. Obtain a satisfactory affidavit from one of the signatory members or managers of FL 6801 Collins North LLC, a Delaware limited liability company, which states the limited liability company has not been dissolved and neither the limited liability company nor any of the members or managers are currently debtors in any bankruptcy proceedings, that affiant has the authority to execute deed/mortgage on behalf of the Company in conformity with the Articles of Organization and Operating Agreement and all necessary consents have been obtained. (as to North Tower Condominium Units)

   b. Special Warranty Deed from FL 6801 Collins South LLC, a Delaware limited liability company to To Be Determined, conveying the land described in Exhibit A herein; together with satisfactory evidence that FL 6801 Collins South LLC, a Delaware limited liability company is either authorized to transact business in the State of Florida, or is presently in existence in their State of origin.

   Provide the Company for review a copy of the Articles of Organization filed with its domicile state, and amendments thereto, if any, and a copy of the Operating Agreement for FL 6801 Collins South LLC, a Delaware limited liability company to verify who may sign on behalf of the limited liability company, as well as the procedure authorizing such signatory. Obtain a satisfactory affidavit from one of the signatory members or managers of FL 6801 Collins South LLC, a Delaware limited liability company, which states the limited liability company has not been dissolved and neither the limited liability company nor any of the members or managers are currently debtors in any bankruptcy proceedings, that affiant has the authority to execute deed/mortgage on behalf of the Company in conformity with the Articles of Organization and Operating Agreement and all necessary consents have been obtained. (as to South Tower Condominium Units and the Central Tower Condominium Units)

   c. Special Warranty Deed from FL 6801 Collins Central LLC, a Delaware limited liability company to To Be Determined, conveying the land described in Exhibit A herein; together with satisfactory evidence that FL 6801 Collins Central LLC, a Delaware limited liability company is either authorized to transact business in the State of Florida, or is presently in existence in their State of origin.

---

US_ACTIVE:\44547264\2\58399.0031

**FILE NO.: 14023648**

Provide the Company for review a copy of the Articles of Organization filed with its domicile state, and amendments thereto, if any, and a copy of the Operating Agreement for FL 6801 Collins Central LLC, a Delaware limited liability company to verify who may sign on behalf of the limited liability company, as well as the procedure authorizing such signatory. Obtain a satisfactory affidavit from one of the signatory members or managers of FL 6801 Collins Central LLC, a Delaware limited liability company, which states the limited liability company has not been dissolved and neither the limited liability company nor any of the members or managers are currently debtors in any bankruptcy proceedings, that affiant has the authority to execute deed/mortgage on behalf of the Company in conformity with the Articles of Organization and Operating Agreement and all necessary consents have been obtained. (as to the Hotel Property, Retail Property and Shared Component Unit)

d.   Bankruptcy:  Record in the Public Records an Order Authorizing the Sale of the Property of Debtor in Possession described on Exhibit A, Free and Clear of all Liens, Claims, and Encumbrances, with respect to Chapter 11 Bankruptcy Case No. _____, filed in the U.S. Bankruptcy Court for the Southern District of New York.

The Order must recite a) the legal description of the property; b) sufficient basis to establish service of Notice of the Motion to Approve Sale on all interested parties; c) the name of the party to whom the property will be conveyed together with the consideration to be paid; d) waive the 14 day stay provisions of Bankruptcy Rule 6004(h); e) findings of fact supporting the conveyance of the subject real property free and clear of liens and encumbrances under the provisions of Section 363(f) of the U.S. Bankruptcy Code (11 U.S.C. 101 et seq.) and stating that all liens, claims or encumbrances removed from the subject property by virtue of entry of said Order shall attach to the proceeds of sale; f) authorize and direct the debtor in possession to execute, deliver, receive, exchange and record any and all documents and instruments necessary to effectuate the sale of the Property, including the execution of releases of any liens or encumbrances of record against the Property that are removed pursuant to the terms of the Order; g) must recognize the Purchaser to be a good faith purchaser entitled to the benefits and protections of Section 363(m) of the Code.

e.   Mortgage from To Be Determined to To Be Determined encumbering the land described in Exhibit A herein in the principal amount of $To Be Determined. (as to all the Units)

5.   Record in the Public Records a release or satisfaction of the Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo Real Estate Capital Corporation, a Delaware corporation, dated April 21, 2004, recorded April 22, 2004 in Official Records Book 22234, Page 2688, as amended by First Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded March 4, 2005 in Official Records Book 23139, Page 1936, as re-recorded April 4, 2005 in Official Records Book 23233, Page 1997, and modified by Notice of Future Advance and Second Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded August 2, 2005 in Official Records Book 23633, Page 4123, as assigned to Lehman Brothers Holdings, Inc. by Assignment of Notes and Mortgages recorded July 5, 2006 in Official Records Book 24689, Page 864, and further modified by that certain Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded September 12, 2006 in Official Records Book 24901, Page 2262, as assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May 1, 2008 in Official Records Book 26355, Page 4533, and further assigned to Fortress Credit Corp. by Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded May 1, 2008 in Official Records Book 26355, Page 4587, and as affected by that certain Termination and Release of Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded July 7, 2009 in Official Records Book 26930, Page 559, as affected by Partial Release of Mortgages and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3163, Partial Release of Mortgage and Security Documents recorded August 5,

US_ACTIVE:\44547264\2\58399.0031

2009 in Official Records Book 26967, Page 3167, Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2925, Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2933, Partial Release of Mortgages and Security Documents recorded November 16, 2009 in Official Records Book 27084, Page 22, Partial Release of Mortgages and Security Documents recorded November 16, 2009 in Official Records Book 27084, Page 148, Partial Release of Mortgage recorded May 1, 2008 in Official Records Book 26355, Page 4529, Partial Release of Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page 1450, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4506, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4512, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 85, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 100, Partial Release of Mortgages and Security Documents recorded July 7, 2010 in Official Records Book 27343, Page 4986, Partial Release of Mortgages and Security Documents recorded July 7, 2010 in Official Records Book 27344, Page 94, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1656, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1664, Partial Release of Mortgages and Security Documents recorded December 9, 2011 in Official Records Book 27921, Page 4251, Partial Release of Mortgages and Security Documents recorded December 21, 2011 in Official Records Book 27935, Page 4658, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 8, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 16, and Partial Release of Mortgages and Security Documents recorded December 3, 2012 in Official Records Book 28381, Page 2543, all of the Public Records of Miami-Dade County, Florida; together with the following loan supporting documents: (as to South Tower Condominium Units, Central Tower Condominium Units and the Hotel Property) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

   a.  UCC-1 Financing Statement recorded April 22, 2004 in Official Records Book 22234, Page 2742, of the Public Records of Miami-Dade County, Florida, as amended by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 869, and further amended by UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1293, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4602, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4603, and further amended by UCC-3 Financing Statement Amendment recorded December 26, 2008 in Official Records Book 26699, Page 4186, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3988, all of the Public Records of Miami-Dade County, Florida. **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

   b.  UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23633, Page 4169, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3567, UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3568, all of the Public Records of Miami-Dade County, Florida. **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

   c.  Assignment of Leases, Rents and Revenues recorded September 12, 2006 in Official Records Book 24901, Page 2304, of the Public Records of Miami-Dade County, Florida. **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

6.  Record in the Public Records a release or satisfaction of the Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc., recorded May 1, 2008 in Official Records Book 26355, Page 4546, of the Public Records of Miami-Dade County, Florida; together with the following loan supporting documents:

FILE NO.: 14023648

(as to the Hotel Property and the South Tower Condominium Units) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

    a.    UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4608, of the Public Records of Miami-Dade County, Florida; as amended by UCC-3 Financing Statement Amendment recorded May 5, 2008 in Official Records Book 26360, Page 4190, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 563, all of the Public Records of Miami-Dade County, Florida. **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

7.    Record in the Public Records a release or satisfaction of the Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo Real Estate Capital Corporation, a Delaware corporation dated July 29, 2005 recorded August 2, 2005 in Official Records Book 23631, Page 2746, as modified by Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded September 13, 2006 in Official Records Book 24903, Page 3644, and as assigned to Lehman Brothers Holdings, Inc., a Delaware corporation by Assignment of Notes and Mortgages recorded July 5, 2006 in Official Records Book 24689, Page 864, and further assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May 1, 2008 in Official Records Book 26355, Page 4540, as affected by Partial Release of Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page 1456, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4518, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 110, Partial Release of Mortgages and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3159, Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2929, Partial Release of Mortgages and Security Documents recorded July 7, 2010 in Official Records Book 27344, Page 47, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1660, Partial Release of Mortgages and Security Documents recorded August 3, 2011 in Official Records Book 27778, Page 3179, Partial Release of Mortgages and Security Documents recorded December 9, 2011 in Official Records Book 27921, Page 4242, Partial Release of Mortgages and Security Documents recorded January 18, 2012 in Official Records Book 27964, Page 2631, Partial Release of Mortgages and Security Documents recorded February 10, 2012 in Official Records Book 27994, Page 1233, Partial Release of Mortgages and Security Documents recorded May 2, 2012 in Official Records Book 28094, Page 4599, Partial Release of Mortgages and Security Documents recorded May 4, 2012 in Official Records Book 28098, Page 2916, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 12, Partial Release of Mortgages and Security Documents recorded October 1, 2012 in Official Records Book 28294, Page 2404, Partial Release of Mortgages and Security Documents recorded December 3, 2012 in Official Records Book 28381, Page 2547, Partial Release of Mortgages and Security Documents recorded September 4, 2013 in Official Records Book 28803, Page 2919, Partial Release of Mortgages and Security Documents recorded November 15, 2013 in Official Records Book 28912, Page 3203, Partial Release of Mortgages and Security Documents recorded November 25, 2013 in Official Records Book 28925, Page 3937, all of the Public Records of Miami-Dade County, Florida; together with the following loan supporting documents: (as to the Hotel Property and the North Tower Condominium Units) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

    a.    UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2836, as assigned by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 870, and UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1292, as terminated by UCC-3 Financing Statement recorded October 11, 2006 in Official Records Book 24991, Page 1301, as assigned by UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4604, and assigned by UCC-3 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4605, and July 24,

**FILE NO.: 14023648**

---

2009 in Official Records Book 26953, Page 3987, all of the Public Records of Miami-Dade County, Florida. (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

b.  UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2844, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3566, and further amended by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 871, and further amended by UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1291, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4606, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4607, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3986, all of the Public Records of Miami-Dade County, Florida. (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

c.  Assignment of Leases, Rents and Revenues recorded September 13, 2006 in Official Records Book 24903, Page 3684, of the Public Records of Miami-Dade County, Florida. (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

8.  Release of Collateral Assignment of Recorded Mortgage Collateral Security Documents in favor of Fortress Credit Corp. recorded May 1, 2008 in Official Records Book 26355, Page 4595, of the Public Records of Miami-Dade County, Florida. (as to the Hotel Property and the North Tower Condominium Units)  (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

9.  Record in the Public Records a release or satisfaction of the Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc. recorded May 1, 2008 in Official Records Book 26355, Page 4567, of the Public Records of Miami-Dade County, Florida; together with the following loan supporting documents: (as to the Hotel Property and the South Tower Condominium Units) (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

a.  UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4616, as amended by UCC-3 Financing Statement Amendment recorded May 6, 2008 in Official Records Book 26364, Page 148, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3985, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 562, all of the Public Records of Miami-Dade County, Florida. (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

10.  Record in the Public Records a release or satisfaction of the Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in favor of PAMI ALI LLC, a Delaware limited liability company dated March 12, 2014, recorded March 18, 2014 in Official Records Book 29072, Page 1855, of the Public Records of Miami-Dade County, Florida. (as to all the Units) (**NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.**)

11.  In relation to the Notice of Commencement recorded June 19, 2013 in Official Records Book 28685, Page 3570, of the Public Records of Miami-Dade County, Florida; the Company requires completion of the following: (as to the Hotel Property, Retail Property and North Tower Condominium Units)

a.  Owner's Affidavit identifying all parties who gave notice to owner.
b.  Contractor's Final Affidavit, together with Final Waiver and Release of Liens from each of the subcontractors and materialmen who gave notice to owner or are listed as unpaid in the Contractor's Final Affidavit;
c.  Termination of Notice of Commencement in compliance with 713.132 F.S. (1993)

---

**FILE NO.: 14023648**

    d.   Final Lien waiver and release from the general contractor.

    The Company reserves the right to make additional requirements based upon its evaluation of lien exposure.

12.   In relation to the Notice of Commencement recorded March 5, 2014 in Official Records Book 29055, Page 1441, of the Public Records of Miami-Dade County, Florida; the Company requires completion of the following: (as to the Hotel Property, Retail Property and North Tower Condominium Units)

    a.   Owner's Affidavit identifying all parties who gave notice to owner.
    b.   Contractor's Final Affidavit, together with Final Waiver and Release of Liens from each of the subcontractors and materialmen who gave notice to owner or are listed as unpaid in the Contractor's Final Affidavit;
    c.   Termination of Notice of Commencement in compliance with 713.132 F.S. (1993)
    d.   Final Lien waiver and release from the general contractor.

    The Company reserves the right to make additional requirements based upon its evaluation of lien exposure.

13.   Furnish proof satisfactory to the Company from NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. that it has approved the sale to the proposed purchaser; that all condominium fees and assessments have been paid in full; and that there are no delinquencies. (as to the North Tower Condominium Units) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

14.   Furnish proof satisfactory to the Company from SOUTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. that it has approved the sale to the proposed purchaser; that all condominium fees and assessments have been paid in full; and that there are no delinquencies. (as to the SouthTower Condominium Units) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

15.   Furnish proof satisfactory to the Company from CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. that it has approved the sale to the proposed purchaser; that all condominium fees and assessments have been paid in full; and that there are no delinquencies. (as to the Central Tower Condominium Units) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

16.   Furnish proof satisfactory to the Company from CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC. that it has approved the sale to the proposed purchaser; that all condominium fees and assessments have been paid in full; and that there are no delinquencies. (as to the all the Parcels) **(NOTE: Upon recordation of the Order Authorizing Sale Free and Clear, this requirement can be deleted.)**

17.   The actual value of the estate or interest to be insured must be disclosed to the company and, subject to approval by the Company, entered as the amount of the Policy to be issued. Until the amount of the Policy to be issued shall be determined and entered as aforesaid, it is agreed by and between the Company, the applicant for this Commitment, and every person relying on this Commitment that the Company cannot be required to approve any such evaluation in excess of $1,000.00 and the total liability of the Company on account of this Commitment shall not exceed said amount.

18.   The name of the Proposed Insured under the Proposed Policy must be furnished in order that this Commitment may become effective. This Commitment is subject to further requirements as may then be deemed necessary.

US_ACTIVE:\44547264\2\58399.0031

**FILE NO.: 14023648**

19. Survey provided by TBD and prepared by a registered land surveyor dated no more than 90 days prior to the closing date of subject transaction and certified to the proposed insured(s), Old Republic National Title Insurance Company, and all other parties in interests, meeting the minimum standards for ALTA/ACSM surveys. The Company reserves the right to make such additional requirements as it may deem necessary. (as to the Hotel Property and Retail Property)

20. An Affidavit in form acceptable to Old Republic National Title Insurance Company and executed by or on behalf of the current record owner(s) of the subject property stating:

    (a) That there are no parties in possession of the subject property other than said current record owner(s);

    (b) That there are no encumbrances upon the subject property other than as may be set forth in this Commitment;

    (c) There are no unrecorded assessments which are due and payable and all sewer and water bills are paid through the date of this Affidavit; and

    (d) That there have been no improvements made to or upon the subject property within the ninety (90) day period last past (from the date of such affidavit) for which there remain any outstanding and unpaid bills for labor, materials or supplies for which a lien or liens may be claimed must be furnished to Old Republic National Title Insurance Company, or, in lieu thereof, an exception to those matters set forth in said Affidavit which are inconsistent with or deviate from the foregoing requirements will appear in the policy or policies to be issued pursuant to this Commitment. Said Affidavit must contain the legal description of the captioned property.

21. Proof of payment, satisfactory to the Company, of all special assessments, recorded or unrecorded, including but not limited to special assessments arising under Chapter 159 of the Florida Statutes.

22. Proof of payment of all pending or certified charges or special assessments by the appropriate authority, including but not limited to Sanitation, Utility, Road, Paving and Wastewater Assessments.

23. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-091-0720. (as to Unit 204 of the North Tower Condominium Units)

24. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-091-1000. (as to Unit 205 of the North Tower Condominium Units)

25. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-090-1270. (as to Unit 109 of the South Tower Condominium Units)

26. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-0850. (as to Unit 207 of the Central Tower Condominium Units)

27. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-0860. (as to Unit 307 of the Central Tower Condominium Units)

28. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2230. (as to Unit 319 of the Central Tower Condominium

US_ACTIVE:\44547264\2\58399.0031

**FILE NO.: 14023648**

Units)

29. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2250. (as to Unit 519 of the Central Tower Condominium Units)

30. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2260. (as to Unit 619 of the Central Tower Condominium Units)

31. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2270. (as to Unit 719 of the Central Tower Condominium Units)

32. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2280. (as to Unit 819 of the Central Tower Condominium Units)

33. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2290. (as to Unit 919 of the Central Tower Condominium Units)

34. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2300. (as to Unit 1019 of the Central Tower condominium Units)

35. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-007-0460. (as to the Hotel Property)

36. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-001-0060. (as to the Hotel Property)

37. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-092-2310. (as to the Shared Component Unit)

38. Proof satisfactory to the Company of payment of taxes for the year 2013 and all prior years, which are now DUE AND PAYABLE. (as to the Retail Property) (Tax Information not available at this time)

39. Proof satisfactory to the Company of payment of taxes for the year 2013, which are now DUE AND PAYABLE under Tax Folio No. 02-3211-091-1890. (as to Unit 610 of the North Tower Condominium Units)

**NOTE:** All recording references in this commitment/policy shall refer to the Public Records of Miami-Dade County, unless otherwise noted.

**SCHEDULE B SECTION II IS CONTINUED ON AN ADDED PAGE**

FILE NO.: 14023648

---

### SCHEDULE B - SECTION II

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

1.  Defects, liens, encumbrances, adverse claims or other matters, if any created, first appearing in the Public Records or attaching subsequent to the Effective Date but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.  The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments on the Land of existing improvements located on adjoining land.

3.  Rights or claims of parties in possession.

4.  Construction, Mechanic's, Contractors' or Materialmen's lien claims, if any, where no notice thereof appears of record.

5.  Easements or claims of easements not shown by the public records.

6.  General or special taxes and assessments required to be paid in the year 2014 and subsequent years.

7.  This Policy does not insure any lands waterward of the Erosion Coastal Lines as same is shown on the Erosion Control Line Plat as recorded in Plat Book 105, Pages 62, of the Public Records of Miami-Dade County, Florida. In addition, this Policy should not be construed as insuring the title to any land between the mean high water line on date of the recordation of the Erosion Control Plat and the Erosion Control Line as shown therein, which may have vested in the insured or its predecessors in title as a result of the implementation of Chapter 161 of the Florida Statutes. (as to all the Parcels)

8.  Certificate of Approval Establishment of Erosion Control Line recorded December 3, 1976 in Official Records Book 9517, Page 2028, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels).

9.  This Policy does not insure any lands waterward of the Erosion Coastal Lines as same is shown on the Erosion Control Line Plat recorded in Plat Book 74, Page 25, of the Public Records of Miami-Dade County, Florida. In addition, this Policy should not be construed as insuring the title to any land between the mean high water line on date of recordation of the Erosion Control Line Plat and the Erosion Control Line as shown therein, which may have bested in the insured or its predecessors in title as a result of the implementation of Chapter 161 of the Florida Statutes. (as to all the Parcels)

10. Easement as set forth in that certain Warranty Deed recorded December 3, 1976 in Official Records Book 9519, Page 261, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

11. Order of the Board of Adjustment of the City of Miami Beach, Florida recorded June 13, 1997 in Official Records Book 17675, Page 4904, as affected by Extension of Time recorded November 7, 1997 in Official Records Book 17860, Page 2447, Order recorded August 20, 1998 in Official Records Book 18242, Page 378, Modification Order recorded May 20, 2002 in Official Records Book 20406, Page 1219, Modification of Order recorded December 8, 2003 in Official Records Book 21880, Page 4267, Modification/Extension of Time Order recorded February 8, 2006 in Official Records Book 24218, Page 2862, Modification/Extension of Time Order recorded February 15, 2007 in Official Records Book 25369, Page 758, Modification Order recorded January 31, 2008 in Official Records Book 26191, Page 3363, Modification Order recorded November 5, 2008 in Official Records Book 26639, Page 1954, all of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

---

ALTA COMMITMENT                                                                                    Page 10

**FILE NO.: 14023648**

12.  Covenant in Lieu of Unity of Title recorded July 17, 2002 in Official Records Book 20534, Page 2395, of the Public Records of Miami-Dade County, Florida. (Hotel Property, South Tower Condominium Units, North Tower Condominium Units)

13.  Easement and Operating Agreement by and between Transnational Properties, Inc., a Florida corporation, and North Carillon, L.L.C., a Florida limited liability company, recorded July 17, 2002 in Official Records Book 20534, Page 2407, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

14.  Agreement concerning Development Agreement and Easement and Operating Agreement by and between Carillon South Joint Venture, L.L.C., a Florida limited liability company, North Carillon, L.L.C., a Florida limited liability company, Lehman Brothers Holdings Inc., a Delaware corporation, and Lehman Brothers Holdings Inc., a Delaware corporation, recorded September 13, 2006 in Official Records Book 24903, Page 3702, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

15.  Development Agreement by and between Carillon South Joint Venture, LLC, a Florida limited liability company, and North Carillon, LLC, a Florida limited liability company, recorded July 17, 2002 in Official Records Book 20534, Page 2440, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

16.  Easement in favor of Florida Power and Light Company recorded December 28, 2006 in Official Records Book 25230, Page 3243, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

17.  Easement in favor of Florida Power and Light Company recorded December 28, 2006 in Official Records Book 25230, Page 3247, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

18.  Easement in favor of Florida Power and Light Company recorded April 10, 2007 in Official Records Book 25522, Page 4896, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

19.  Easement in favor of Florida Power and Light Company recorded April 26, 2007 in Official Records Book 25566, Page 3372, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

20.  Order of the Board of Adjustment of the City of Miami Beach, Florida recorded July 18, 2007 in Official Records Book 25786, Page 994, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

21.  Easement and Memorandum of Agreement recorded October 19, 2007 in Official Records Book 25999, Page 4770, as modified by Modification and Amendment of Easement and Memorandum of Agreement recorded June 19, 2008 in Official Records Book 26439, Page 4562, both of the Public Records of Miami-Dade County, Florida. (as to the Hotel Property)

22.  Terms, conditions, restrictions, reservations, dedications, options, rights of first refusal and Easements as contained in the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded December 3, 2007 in Official Records Book 26080, Page 4905, together with Subordination Agreement recorded December 11, 2007 in Official Records Book 26100, Page 2310, as amended by Amendment and Supplemental Declaration to Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded August 27, 2008 in Official Records Book 26542, Page 1, Amendment and Supplemental Declaration to Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded October 15, 2008 in Official Records Book 26610, Page 728, Assignment of Declarant and Developer Rights recorded December 22, 2009 in Official Records Book 27124, Page 2053, as amended by Amendment to Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded October 3, 2011 in Official Records Book 27846, Page 2108, which provides for a private charge or assessment, all of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

23.  Perpetual Non-Exclusive Easement Agreement by and between North Carillon, L.L.C., a Florida limited

---

**ALTA COMMITMENT**                                                                                    **Page 11**

**FILE NO.: 14023648**

liability company, and the City of Miami Beach, recorded April 7, 2008 in Official Records Book 26310, Page 4281, as affected by Consent to Assignment and Amendment to Perpetual Non-Exclusive Easement Agreement recorded October 4, 2010 in Official Records Book 27442, Page 280, all of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

24.    Terms, covenants, conditions, restrictions, dedications, options, rights of first refusal and easements as shown on the Declaration of CENTRAL CARILLON BEACH, A CONDOMINIUM, according to the Declaration of Condominium thereof as recorded October 15, 2008 in Official Records Book 26610, Page 735, as amended by Amendment to Declaration of Condominium of Central Carillon Beach, A Condominium recorded February 8, 2010 in Official Records Book 27176, Page 1593, Second Amendment to Declaration of Condominium of Central Carillon Beach, A Condominium recorded June 29, 2011 in Official Records Book 27738, Page 1576, Third Amendment to Declaration of Condominium of Central Carillon Beach, A Condominium recorded June 15, 2012 in Official Records Book 28151, Page 2110, which provides for a private charge or assessment, of the Public Records of Miami-Dade County, Florida. (as to the Central Tower Condominium Units)

25.    Restrictions, dedications, conditions, reservations, easements and other matters shown on the Plat of AMENDED PLAT OF SECOND OCEAN FRONT SUBDIVISION, recorded in Plat Book 28, Page 28, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

26.    Restrictions, dedications, conditions, reservations, easements and other matters shown on the Plat of ATLANTIC HEIGHTS, recorded in Plat Book 4, Page 146, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

27.    Restrictions, dedications, conditions, reservations, easements and other matters as shown on the Plat of CORRECTED PLAT OF ATLANTIC HEIGHTS, recorded in Plat Book 9, Page 14, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

28.    Terms, covenants, conditions, restrictions, dedications, options, rights of first refusal and easements as shown on the Declaration of NORTH CARILLON BEACH, A CONDOMINIUM, according to the Declaration of Condominium thereof as recorded August 27, 2008 in Official Records Book 26542, Page 15, as amended by First Amendment to Declaration of Condominium of North Carillon Beach, A Condominium recorded October 9, 2009 in Official Records Book 27044, Page 308, Second Amendment to Declaration of Condominium of North Carillon Beach, A Condominium recorded September 13, 2012 in Official Records Book 28270, Page 3665, together with Assignment of Developer's Rights recorded December 22, 2009 in Official Records Book 27124, Page 2060, which provides for a private charge or assessment, all of the Public Records of Miami-Dade County, Florida. (as to the North Tower Condominium Units)

29.    Terms, covenants, conditions, restrictions, dedications, options, rights of first refusal and easements as shown on the Declaration of SOUTH CARILLON BEACH, A CONDOMINIUM, according to the Declaration thereof, as recorded December 3, 2007 in Official Records Book 26080, Page 4764, as amended by Amendment to Declaration of South Carillon Beach, A Condominium recorded January 30, 2008 in Official Records Book 26186, Page 4424, Certificate of Amendment to Declaration of South Carillon Beach, A Condominium recorded April 30, 2008 in Official Records Book 26353, Page 1890, as amended by Amendment to Declaration of South Carillon Beach, A Condominium recorded October 20, 2009 in Official Records Book 27054, Page 3792, all of the Public Records of Miami-Dade County, Florida. (as to the South Tower Condominium Units)

30.    Easement Mortgage recorded December 17, 2008 in Official Records Book 26689, Page 2168, of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

31.    Easement and Memorandum of Agreement recorded October 19, 2007 in Official Records Book 25999, Page 4770, and assigned by Assignment of Easement recorded October 30, 2012 in Official Records Book 28335, Page 2169, and Assignment of Easement recorded December 12, 2008 in Official Records Book 26683, Page

---

**ALTA COMMITMENT**                                                                                 **Page 12**

**FILE NO.: 14023648**

4188, all of the Public Records of Miami-Dade County, Florida. (as to all the Parcels)

32. Declaration of Restrictive Covenants recorded November 21, 2012 in Official Records Book 28367, Page 3038, of the Public Records of Miami-Dade County, Florida. (as to the Hotel Property)

33. Rights of tenants in possession under unrecorded leases.

34. Any adverse ownership claim by the State of Florida by right of sovereignty to any part of the land that is, as of the Date of Policy or was at any time previously, under water (submerged).

35. Rights of the United States Government to that part of the land, if any, being artificially filled in land in what was formerly navigable waters arising by reason of the United States Government control over navigable waters in the interest of navigation and commerce.

36. The right, title or interest, if any, of the public to use as a public beach or recreation area any part of the land lying between the water abutting the land and the most inland of any of the following (a) the natural line of vegetation; (b) the most extreme high water mark; (c) the bulkhead line, or (d) any other line which as been or which hereafter may be legally established as relating to such public use.

37. Riparian Rights and/or Littoral Rights are not insured.

38. The Policy does not insure against any appeal that may be brought within the 14 day appeal period with respect to the Order described in Schedule B, Section I, Item 4.d above.

FILE NO.: 14023648

---

# EXHIBIT A

**NORTH TOWER CONDOMINIUM UNITS**

**Units 204, 205 and 610, of NORTH CARILLON BEACH, a Condominium, according to the Declaration of Condominium thereof, recorded August 27, 2008, in Official Records Book 26542, Page 15, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in said Declaration.**

**SOUTH TOWER CONDOMINIUM UNITS**

**Unit 109, of SOUTH CARILLON BEACH, a Condominium, according to the Declaration of Condominium thereof, recorded December 3, 2007, in Official Records Book 26080, Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.**

**CENTRAL TOWER CONDOMINIUM UNITS**

**Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019, of CENTRAL CARILLON BEACH, a Condominium, according to the Declaration of Condominium thereof, recorded October 15, 2008, in Official Records Book 26610, Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.**

**HOTEL PROPERTY**

**Parcel 1:**

**Lots 1 through 6, inclusive, Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, Page 14, of the Public Records of Miami-Dade County, Florida.**

**Parcel 2:**

**A PARCEL OF LAND LYING East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.**

**Parcel 3:**

**The North 25.00 feet of Lot 48, all Lots 49 through 53, inclusive, Block 1, OF AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the Plat thereof, a subdivision recorded in Plat Book 28, Page 28, of the Public Records of Miami-Dade County, Florida.**

---

FILE NO.: 14023648

**Parcel 4:**

A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 1 and 2 ABOVE:**

North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded on August 27, 2008 in Official Records Book 26542, Pages 15 through 158, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto;

**and**

The Retail Lot, described as follows:

A portion of Lots 1, 2, 3, 4, 5 and 6, Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, Page 14, of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence North 02°27'29" West along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence North 87°32'31" East at right angles to the previously described course for 15.62 feet to the POINT OF BEGINNING; thence North 88°18'36" East for 15.52 feet; thence North 01°41'24" West for 123.25 feet; thence North 88°20'18" East for 17.15 feet; thence North 01°41'24" West for 124.26 feet; thence South 88°18'38" West for 32.67 feet; thence South 01°41'24" East for 247.50 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum 1929.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 3 and 4 ABOVE:**

Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26610, Pages 735 through 822, of the Public Records of Miami-Dade County, Florida, and any and all amendments;

**and**

South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26080, Pages 4764 through 4904, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto.

**RETAIL PROPERTY**

A portion of Lots 1, 2, 3, 4, 5 and 6, Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according the Plat thereof, as recorded in Plat Book 9, Page 14, of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence North 02°27'29" West along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence

ALTA COMMITMENT                                                                                     Page 15

FILE NO.: 14023648

North 87°32'31" East at right angles to the previously described course for 15.62 feet to the POINT OF BEGINNING; thence North 88°18'36" East for 15.52 feet; thence North 01°41'24" West for 123.25 feet; thence North 88°20'18" East for 17.15 feet; thence North 01°41'24" West for 124.26 feet; thence South 88°18'38" West for 32.67 feet; thence South 01°41'24" East for 247.50 feet to the POINT OF BEGINNING.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.


SHARED COMPONENT UNIT

Shared Component Unit, of CENTRAL CARILLON BEACH, a Condominium, according to the Declaration of Condominium thereof, recorded October 15, 2008, in Official Records Book 26610, Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.


EASEMENT PARCEL

Easements contained in that certain Easement and Operating Agreement, dated July 12, 2002, recorded July 17, 2002, in Official Records Book 20534, Page 2407; and as affected by that certain Agreement Concerning Development Agreement and Easement and Operating Agreement by and among Carillon South Joint Venture, L.L.C., North Carillon, L.L.C., and Lehman Brothers Holdings Inc., dated September 8, 2006 and recorded September 13, 2006 in Official Records Book 24903, Page 3702, of the Public Records of Miami-Dade County, Florida.


EASEMENT PARCEL

Easements contained in that certain Development Agreement, recorded July 17, 2002, in Official Records Book 20534, Page 2440; and as affected by that certain Agreement Concerning Development Agreement and Easement and Operating Agreement by and among Carillon South Joint Venture, L.L.C., North Carillon, L.L.C., and Lehman Brothers Holdings Inc., dated September 8, 2006 and recorded September 13, 2006 in Official Records Book 24903, Page 3702, of the Public Records of Miami-Dade County, Florida.


EASEMENT PARCEL

Easements contained in Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa, recorded December 2, 2007, in Official Records Book 26080, Page 4905, and as affected by Subordination Agreement recorded in Official Records Book 26100, Page 2310; and as amended and supplemented by Amendments recorded in Official Records Book 26542, Page 1, and Official Records Book 26610, Page 728, of the Public Records of Miami-Dade County, Florida.

US_ACTIVE:\44547264\2\58399.0031

**FILE NO.: 14023648**

# EXHIBIT L
## DEPARTMENT OF COMMUNITY AFFAIRS BROCHURE



# Thinking About Buying a Home?
## Get An EnergyGauge® Rating!

### Congratulations on your decision to purchase a home.

As you know, there are a lot of factors to consider before signing on the dotted line. By now, you've probably checked out the location of the home you like the best. You know how much the seller wants, how many bedrooms there are, whether your dining room table will fit, where you'll park your car and lots of other important things.

### But wait, there's still one more important thing you really ought to do.

You wouldn't buy a car without asking how many miles-per-gallon it gets, would you? So why would you even think of buying a house without knowing how much the power bills will be? That's why now is the perfect time to get an EnergyGauge® rating on the house.

Since 1994, there has been a voluntary, statewide energy-efficiency rating system for homes in Florida. Prospective homeowners just like you, all around the state, are getting their homes rated before they make their purchase.

### There are several very important reasons why:

▲ Energy ratings give homebuyers a market-place yardstick that measures the benefits of energy-efficiency. You get detailed estimates of how much your energy use will cost.

▲ Energy ratings give you clear and specific information that lets you compare similar homes on their energy use. Two homes might look similar, but one may be efficient and comfortable, and the other an energy-guzzler with a very uncomfortable interior.

## Consider the Benefits:

▲ More Home for Less Money
▲ Tested Quality Construction
▲ Enhanced Indoor Comfort
▲ Superior Energy Efficiency
▲ More Environmental Sustainability
▲ Improved Mortgage Options
▲ Greater Resale Value

▲ Maybe most important of all, the national Home Energy Rating System (HERS) Index on the energy rating can qualify you for a number of special mortgage programs that offer lower interest rates, lower closing costs, and other benefits. Some lenders may offer special financing.

### Before buying your next home, hire a Certified Energy Rater to do a rating.

Your builder or Realtor can help you find a Certified Rater in your area. After the rating, you'll get an easy-to-understand Energy Guide that estimates how much it will cost to pay for energy used in that home.

For many years, buyers have had home inspectors look over a home before making their purchase. This is a great way to find out about potential house problems before you make your purchase. Smart homebuyers around the country are now also asking for a home energy rating to look specifically at the energy-use in a home and determine efficiency. Because energy costs can equal house payments, the relatively small cost of a home energy rating can easily be offset by many years of lower energy payments.

You're already familiar with the miles-per-gallon stickers on new automobiles, and the yellow Energy Guide labels on home appliances. Shoppers use this information to figure out how much that car or appliance is really going to cost them. This information gives the buyer

a good estimate of what it will cost to operate that car or use that appliance, over and above the purchase price. A car or product that is cheaper to buy can often be more expensive to operate, so this information can be very important to assure that you make the best purchase decision.

### Here's how the EnergyGauge® program works.

After the rating, you'll get an easy-to-read form like the one on the next page. The Rating Guide has a scale that allows you to compare the specific home you're looking at with the most efficient and the least efficient homes of the same size, with the same number of bedrooms available in your part of the state today.

One of the keys to the success of this program is the uniformity of ratings, made possible by the use of the EnergyGauge® software developed by the Florida Solar Energy Center®. It has been specially designed to let Raters input the key data on the home and obtain accurate information for comparison purposes.



## Beyond a home energy rating, how can you reduce your energy use and save money?

That's easy. While the design and construction of your home, and the efficiency of its appliances and equipment, control the most significant portion of its energy use, occupant lifestyle will still have a big effect on exactly how much energy gets used. Your comfort preferences and personal habits - the level at which you set the thermostat, whether or not you turn off lights and fans when leaving a room, how much natural ventilation you use, and other factors - will all affect your home's actual monthly energy use.

## Florida's program parallels national activities.

The Residential Energy Services Network (RESNET) sets the national standards for the Home Energy Rating System (HERS), and the Florida Solar Energy Center's Energy Gauge system meets these standards. The Florida Building Energy Rating Guide provides a HERS Index for the home. This national score enables homes to qualify for national mortgage financing options requiring a HERS Index. This index is computed in accordance with national guidelines, considering the heating, cooling, water heating, lighting, appliance, and photovoltaic energy uses. HERS awards stars to the rating.

## Tell your Realtor or builder that you want to get the home rated before you buy it.

They can give you the names of Raters in your area. Additional information on the program is available from the Energy Gauge Program Office at 321-638-1422, or visit our Web site at www.floridaenergycenter.org.

## Who does Energy Ratings?

It is important to note that only Certified Raters are allowed to perform ratings. These Raters have undergone rigorous training programs and have passed the RESNET National Core exam and the required challenge exams. They are also required to undergo continuing education classes and additional exams to keep their



certifications current. An on-going quality control program also watches over their Ratings and their work. All their Ratings are submitted to a central registry that checks them for accuracy and compiles generic building data.

## Energy Ratings in Florida

The Florida Building Energy-Efficiency Rating Act (Florida Statute 553.990) was passed by the State Legislature in 1993 and amended in 1994. It established a voluntary state-wide energy-efficiency rating system for homes. The Rating System has been adopted by DCA Rule 9B-60. Modifications were made by the Legislature in 2013.



**The EnergyGauge®
Program Building Energy
Rating System**

1679 Clearlake Road
Cocoa, Florida 32922-5703
Phone: 321-638-1422
Fax: 321-638-1010
E-Mail: Info@energygauge.com
**www.floridaenergycenter.org**

## EXHIBIT M
## FORM OF ASSOCIATION ESTOPPEL CERTIFICATE

### Association Estoppel Certificate (North Carillon Beach)

FL 6801 Collins North LLC, a Delaware limited liability company ("Seller") has informed North Carillon Beach Condominium Association, Inc., a not-for-profit Florida corporation (the "Association"), that Seller intends to transfer its interest in certain condominium units in North Carillon Beach, a Condominium situated in the City of Miami Beach, Miami-Dade County, Florida, (the "Condominium") to [_____], a [_____] or its permitted assignee ("Buyer"). Such condominium units are more particularly described on Exhibit A hereto (the "Property"). The Property is subject to that certain Declaration of Condominium of North Carillon Beach, a Condominium (the "Declaration"), recorded August 27, 2008 in Official Records Book 26542, Page 0015, of the Public Records of Miami-Dade County, Florida (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Association Documents"; all capitalized terms not defined herein shall have the meaning set forth in the Association Documents).

The Association hereby certifies to the Buyer that:

1.    The Association is that association identified as the "Association" or "Condominium Association" in the Declaration.

2.    Seller is the holder of the rights of the "Developer" under and as defined in the Declaration.

3.    Seller has paid all monetary obligations due and owing of Seller as required by and pursuant to the Declaration and/or applicable law.

4.    The periodic Assessments are due on a monthly, quarterly, annual (circle one) basis, if applicable.

5.    The next due date for the payment of periodic Assessments for the Property is _____, 20___ (blank, if not applicable), in the amounts set forth on Exhibit B hereto.

6.    In addition to the periodic Assessments and/or other monetary obligations referred to above, Seller presently pays the following amounts to the Association pursuant to the Association Documents in connection with the Property:

- Amount of outstanding Special Assessments, if any:  $_____.

- Amount of outstanding Capital Improvement Assessments, if any:  $_____.

- Amount due on a monthly, quarterly, annual (circle one) basis for Reserves per unit, if any, $_____.

- Amount of outstanding Impositions, if any: $_____.

7.      The Association has not received from Seller, nor has the Association delivered to Seller, any notice of default under the Declaration, nor, to the Association's knowledge, is Seller in default under the Declaration.  The Association releases and waives any claims, whether known or unknown, that the Association may have against Seller relating to the Property, the Condominium, or the Association Documents.

8.      This Certificate shall be binding upon the Association and its successors and assigns and shall inure to the benefit of and be enforceable by Seller and its successors, assigns and designees, Buyer and its successors, assigns and designees, and any party providing financing to Buyer or Buyer's affiliates.


        IN WITNESS WHEREOF, the Association has duly executed, acknowledged and delivered this Certificate as of the date set forth below.


                                        **ASSOCIATION**:

                                        **NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**, a not-for-profit Florida corporation


                                        By:     _____
                                                Name:
                                                Title:


                                        Date:   _____

**Exhibit A**

**Legal Description - North Tower Condominium Units**

Units 610, 204 and 205 of North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration

**<u>Exhibit B</u>**

**Assessments**

**Association Estoppel Certificate (South Carillon Beach)**

FL 6801 Collins South LLC, a Delaware limited liability company ("Seller") has informed South Carillon Beach Condominium Association, Inc., a not-for-profit Florida corporation (the "Association"), that Seller intends to transfer its interest in certain condominium units in South Carillon Beach, a Condominium situated in the City of Miami Beach, Miami-Dade County, Florida, (the "Condominium") to [_____], a [_____] or its permitted assignee or designee ("Buyer"). Such condominium units are more particularly described on Exhibit A hereto (the "Property"). The Property is subject to that certain Declaration of Condominium of South Carillon Beach, a Condominium (the "Declaration"), recorded December 3, 2007 in Official Records Book 26080, Page 4764, of the Public Records of Miami-Dade County, Florida (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Association Documents"; all capitalized terms not defined herein shall have the meaning set forth in the Association Documents).

The Association hereby certifies to the Buyer that:

9.    The Association is that association identified as the "Association" or "Condominium Association" in the Declaration.

10.    Seller is the holder of the rights of the "Developer" under and as defined in the Declaration.

11.    Seller has paid all monetary obligations due and owing of Seller as required by and pursuant to the Declaration and/or applicable law.

12.    The periodic Assessments are due on a monthly, quarterly, annual (circle one) basis, if applicable.

13.    The next due date for the payment of periodic Assessments for the Property is _____, 20___ (blank, if not applicable), in the amounts set forth on Exhibit B hereto.

14.    In addition to the periodic Assessments and/or other monetary obligations referred to above, Seller presently pays the following amounts to the Association pursuant to the Association Documents in connection with the Property:

  • Amount of outstanding Special Assessments, if any:  $_____.

  • Amount of outstanding Capital Improvement Assessments, if any:  $_____.

  • Amount due on a monthly, quarterly, annual (circle one) basis for Reserves per unit, if any, $_____.

  • Amount of outstanding Impositions, if any: $_____.

15.    The Association has not received from Seller, nor has the Association delivered to Seller, any notice of default under the Declaration, nor, to the Association's knowledge, is Seller

in default under the Declaration.  The Association releases and waives any claims, whether known or unknown, that the Association may have against Seller relating to the Property, the Condominium, or the Association Documents.

16.     This Certificate shall be binding upon the Association and its successors and assigns and shall inure to the benefit of and be enforceable by Seller and its successors, assigns and designees, Buyer and its successors, assigns and designees, and any party providing financing to Buyer or Buyer's affiliates.


        IN WITNESS WHEREOF, the Association has duly executed, acknowledged and delivered this Certificate as of the date set forth below.


                                    **ASSOCIATION**:

                                    **NORTH CARILLON BEACH
                                    CONDOMINIUM ASSOCIATION, INC.**, a not-
                                    for-profit Florida corporation


                        By:     _____
                                Name:
                                Title:


                        Date:   _____

**Exhibit A**

**Legal Description – South Tower Condominium Units**

Unit 109 of South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**<u>Exhibit B</u>**

**Assessments**

## Association Estoppel Certificate (Central Carillon Beach)

FL 6801 Collins South LLC, a Delaware limited liability company ("Seller") has informed Central Carillon Beach Condominium Association, Inc., a not-for-profit Florida corporation (the "Association"), that Seller intends to transfer its interest in certain condominium units in Central Carillon Beach, a Condominium situated in the City of Miami Beach, Miami-Dade County, Florida, (the "Condominium") to [_____], a [_____] or its permitted assignee or designee ("Buyer"). Such condominium units are more particularly described on Exhibit A hereto (the "Property"). The Property is subject to that certain Declaration of Condominium of Central Carillon Beach, a Condominium (the "Declaration"), recorded October 15, 2008 in Official Records Book 26610, Page 735, of the Public Records of Miami-Dade County, Florida (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Association Documents"; all capitalized terms not defined herein shall have the meaning set forth in the Association Documents).

The Association hereby certifies to the Buyer that:

17. The Association is that association identified as the "Association" or "Condominium Association" in the Declaration.

18. Seller is the holder of the rights of the "Developer" under and as defined in the Declaration.

19. Seller has paid all monetary obligations due and owing of Seller as required by and pursuant to the Declaration and/or applicable law.

20. The periodic Assessments are due on a monthly, quarterly, annual (circle one) basis, if applicable.

21. The next due date for the payment of periodic Assessments for the Property is _____, 20___ (blank, if not applicable), in the amounts set forth on Exhibit B hereto.

22. In addition to the periodic Assessments and/or other monetary obligations referred to above, Seller presently pays the following amounts to the Association pursuant to the Association Documents in connection with the Property:

   • Amount of outstanding Special Assessments, if any:  $_____.

   • Amount of outstanding Capital Improvement Assessments, if any:  $_____.

   • Amount due on a monthly, quarterly, annual (circle one) basis for Reserves per unit, if any, $_____.

   • Amount of outstanding Impositions, if any: $_____.

US_ACTIVE:\44547264\2\58399.0031

23.     The Association has not received from Seller, nor has the Association delivered to Seller, any notice of default under the Declaration, nor, to the Association's knowledge, is Seller in default under the Declaration.  The Association releases and waives any claims, whether known or unknown, that the Association may have against Seller relating to the Property, the Condominium, or the Association Documents.

24.     This Certificate shall be binding upon the Association and its successors and assigns and shall inure to the benefit of and be enforceable by Seller and its successors, assigns and designees, Buyer and its successors, assigns and designees, and any party providing financing to Buyer or Buyer's affiliates.

        IN WITNESS WHEREOF, the Association has duly executed, acknowledged and delivered this Certificate as of the date set forth below.

                                **ASSOCIATION**:

                                **CENTRAL CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**, a not-for-profit Florida corporation

                        By:     _____
                                Name:
                                Title:


                        Date:   _____

## Exhibit A

## Legal Description – Central Tower Condominium Units

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019 of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

Shared Component Unit of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**<u>Exhibit B</u>**

**Assessments**

## Association Estoppel Certificate (Master Association)

FL 6801 Collins South LLC, a Delaware limited liability company ("Seller") has informed Carillon Hotel and Spa Master Association, Inc., a not-for-profit Florida corporation (the "Association"), that Seller intends to transfer its interest in certain real property units in the Carillon Hotel and Spa situated in the City of Miami Beach, Miami-Dade County, Florida, (the "Project") to [_____], a [_____] or its permitted assignee or designee ("Buyer"). Such property is more particularly described on Exhibit A hereto (the "Property"). The Property is subject to that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Declaration"), recorded December 3, 2007 in Official Records Book 26080, Page 4905, of the Public Records of Miami-Dade County, Florida (including all exhibits thereto, all as now or hereafter amended and/or supplemented, the "Association Documents"; all capitalized terms not defined herein shall have the meaning set forth in the Association Documents).

The Association hereby certifies to the Buyer that:

1.    The Association is that association identified as the "Association" in the Declaration.

2.    Seller is the holder of the rights of the "Declarant" under and as defined in the Declaration.

3.    Seller has paid all monetary obligations due and owing of Seller as required by and pursuant to the Declaration and/or applicable law.

4.    The periodic Assessments are due on a monthly, quarterly, annual (circle one) basis, if applicable.

5.    The next due date for the payment of periodic Assessments for the Property is _____, 20___ (blank, if not applicable), in the amounts set forth on Exhibit B hereto.

6.    In addition to the periodic Assessments and/or other monetary obligations referred to above, Seller presently pays the following amounts to the Association pursuant to the Association Documents in connection with the Property:

    • Amount of outstanding Special Assessments, if any: $_____.

    • Amount of outstanding Capital Improvement Assessments, if any: $_____.

    • Amount due on a monthly, quarterly, annual (circle one) basis for Reserves per unit, if any, $_____.

    • Amount of outstanding Impositions, if any: $_____.

7.    The Association has not received from Seller, nor has the Association delivered to Seller, any notice of default under the Declaration, nor, to the Association's knowledge, is Seller

in default under the Declaration.  The Association releases and waives any claims, whether known or unknown, that the Association may have against Seller relating to the Property, the Condominium, or the Association Documents.

8.    This Certificate shall be binding upon the Association and its successors and assigns and shall inure to the benefit of and be enforceable by Seller and its successors, assigns and designees, Buyer and its successors, assigns and designees, and any party providing financing to Buyer or Buyer's affiliates.


        IN WITNESS WHEREOF, the Association has duly executed, acknowledged and delivered this Certificate as of the date set forth below.


                              **ASSOCIATION**:

                              **CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC.**, a not-for-profit Florida corporation


                    By:    _____
                              Name:
                              Title:


                    Date:    _____

**Exhibit A**

**Legal Description**

North Tower Units:

Units 610, 204 and 205 of North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

South Tower Units:

Unit 109 of South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

Central Tower Units:

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019 of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

Shared Component Unit of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

Hotel Lot:

**Parcel 1**:

Lots 1 through 6, inclusive, in Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, at Page 14, of the Public records of Miami-Dade County, Florida.

**Parcel 2**:

A PARCEL OF LAND LYING East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.

**Parcel 3**:

The North 25.00 feet of Lot 48, all Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

**Parcel 4**:

A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62 of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 1 and 2 ABOVE:**

North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded on August 27, 2008 in Official Records Book 26542, Pages 0015 through 158, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

The Retail Lot, described as follows:

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet; thence N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 3 and 4 ABOVE:**

Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26610, Pages 735 through 822, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26080, Pages 4764 through 4904, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto.

## Exhibit B

## Assessments

**EXHIBIT N**
**BIDDING PROCEDURES ORDER**

SEE ATTACHED

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 11
                                                    :
                                                    :        Case No. 14-11691 (SCC)
FL 6801 SPIRITS LLC, *et al.*,                      :
                                                    :        (Jointly Administered)
                                    Debtors.        :
                                                    :
-------------------------------------------------------------x

**ORDER (A) APPROVING (i) BIDDING PROCEDURES, (ii) FORM AND MANNER
OF NOTICES, AND (iii) FORM OF ASSET PURCHASE AGREEMENT,
INCLUDING BID PROTECTIONS; (B) SCHEDULING THE TIME, DATE AND
PLACE FOR THE AUCTION AND HEARING TO CONSIDER FINAL APPROVAL
OF SALE, INCLUDING TREATMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF</u>**

Upon consideration of that portion of the motion (the "Procedures

Motion"), dated June 1, 2014, of FL 6801 Spirits LLC, *et al.* (collectively, the "Debtors")[1],

for entry of an order pursuant to sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rules 2002(a)(2) and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"):  (i) approving the proposed bidding

procedures (the "Bidding Procedures") to be used in connection with the proposed sale

(the "Sale") of the Assets[2] to 360 Miami Hotel & Spa LLC (the "Purchaser"), or to any

competing bidder (the "Successful Bidder") that submits a higher or better offer for the

---

[1]     The Debtors consist of the following entities:  FL 6801 Spirits LLC, FL 6801 Collins North LLC, FL
6801 Collins Central LLC, FL 6801 Collins South LLC.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the
        Bidding Procedures and/or the Purchase Agreement (defined below).

Assets, (ii) scheduling an auction (the "Auction") for the Assets and a hearing (the "Sale

Hearing") to consider approval of the Sale, and (iii) approving the form and manner of

notice of the Auction and the Sale Hearing; and this Court having held a hearing on the

Bidding Procedures on June 30, 2014 (the "Procedures Hearing"); and this Court having

reviewed, among other things the Procedures Motion, and objection (the "Objection")

to the Procedures Motion filed by North Carillon Beach Condominium Association,

Inc., Central Carillon Beach Condominium Association, Inc. and South Carillon Beach

Condominium Association, Inc. (collectively, the "Associations") [ECF No. 52] and the

Debtors' response to the Objection (the "Response") [ECF No. 71]; and based on the

Procedures Motion and the record of the Procedures Hearing, it now appearing that the

relief requested in the Procedures Motion is in the best interest of the Debtors' estates

and all parties in interest; and after due deliberation thereon and good cause appearing

therefor an no further notice being required, it is hereby:

### FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction over the Procedures Motion pursuant to

28 U.S.C. § 1334.  Consideration of the Procedures Motion is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact, when appropriate.  See Fed. R. Bankr. P. 7052.

B.      Good and sufficient notice of the Procedures Motion has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Procedures Motion has been afforded to all interested persons and entities, including (i) counsel for the Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn:  Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn: Kristian W. Gluck, Esq.; (ii) all applicable federal, state, and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Assets, are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the Debtors' ownership of the Assets or have any known interest in the relief requested by the Procedures Motion, including (a) the Internal Revenue Service, P.O. Box 21126, Philadelphia, Pennsylvania 19114, (b) the Florida Licensing Authorities, and (c) the City of Miami Beach, City Hall, 1700 Convention Center Drive, Miami Beach, Florida 33139; (iii) the Debtors' known secured creditors and lien holders, including all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Assets; (iv) the United States Attorney for the Southern District of New York; (v) the Office of the United States Trustee for Region 2, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq., U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014; (vi) the Debtors' Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline Marcus, Esq., 767 Fifth Avenue, New York, New York 10153; (vii) CR Miami,

LLC, Attn:  Jerry Cohen and Gary Milner, 8600 East Rockcliff Road, Tucson, Arizona

85750; W. James Harrison, Esq., W.J. Harrison & Associates, P.C., 3561 East Sunrise,

Suite 201, Tucson, Arizona 85718 (counsel to CR Miami, LLC); (viii) parties to executory

contracts and unexpired leases proposed to be assumed and assigned, or rejected as

part of the Proposed Sale; (ix) counsel to the North Tower Association; (x) counsel to the

Central and South Tower Associations; (xi) all owners of units at the Assets; (xii) the

creditors listed as holding the 20 largest unsecured claims against the Debtors' estates

(on a consolidated basis); (xiii) all entities that have expressed an interest to the Debtors'

or their advisors in purchasing the assets subject to this Order;  (xiv) all parties listed on

Schedule 6 to the Purchase Agreement;  and (xv) all other parties that filed notices of

appearance in the Chapter 11 cases ((i)-(xv) shall be collectively referred to herein as the

"Notice Parties").

C.    The proposed notice of the Sale and the Bidding Procedures is

good, appropriate, sufficient and is reasonably calculated to provide all interested

parties with timely and proper notice of the Sale and the Bidding Procedures, and no

other or further notice of the Sale of the Assets, the assumption and assignment of the

Assigned Contracts (as defined herein), or the Bidding Procedures, as set forth herein

and in the Procedures Motion, is required.

D.    The Cure Notice (as defined herein) attached hereto as **Exhibit C** is

reasonably calculated to provide all non-Debtor counterparties (the "Contract Parties")

to the Debtors' executory contracts and unexpired leases (each a "Contract or Lease"

and, collectively, the "Contracts and Leases") with proper notice of the potential

4

assumption and assignment of their Contract or Lease and any cure amounts relating thereto and will be served on such Contract Parties in accordance with paragraph 17 hereof; provided, however, that the mere listing of any Contract or Lease on the Cure Notice does not require or guarantee that such Contract or Lease will be assumed and assigned, and all rights of the Debtors with respect to such Contracts and Leases are reserved.

E.    The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Procedures Motion, including this Court's approval of (i) the Bidding Procedures, attached hereto as **Exhibit A**, (ii) the form and manner of service of the notice of the Auction and Sale Hearing, attached hereto as **Exhibit B** (the "Notice of Auction and Sale Hearing"), (iii) the procedures for the assumption and assignment of certain Contracts and Leases (collectively, the "Assigned Contracts"), including notice of the proposed cure amounts, and (iv) the Break-Up Fee.

F.    The Debtors have articulated good and sufficient reasons for, and the best interests of the Debtors' estates will be served by, this Court scheduling a subsequent hearing to consider whether to grant the relief requested in that portion of the Debtors' motion (the "Sale Motion"), dated June 1, 2014, for entry of an order (i) approving the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests, and (ii) authorizing the assumption and assignment of certain executory contracts, including approval of the proposed Sale in accordance with either (i) the Purchase Agreement, or (ii) such other agreement by and between the Debtors and the Successful Bidder, which may be consummated pursuant to a chapter 11 plan of

liquidation, in each case, free and clear of, among other things, all liens, claims,

encumbrances, and interests, other than permitted exceptions (collectively, "Liens,

Claims and/or Interests") (with the same to attach to the proceeds therefrom) pursuant

to section 363 of the Bankruptcy Code.

G.     The entry of this Order is in the best interests of the Debtors, their

estates, their creditors and other parties in interest.

H.     The Debtors have exercised sound business judgment and

presented sound business reasons for approval of the Bid Procedures and Break-Up

Fee.  The Bidding Procedures are reasonably designed to maximize the value to be

achieved for the Assets.

I.     The Break-Up Fee set forth in the Purchase Agreement, if triggered:

(i) shall be deemed an actual and necessary cost and super-priority administrative

expense of preserving the value of the Debtors' estates, within the meaning of sections

364(c)(1) and 503(b)(1) of the Bankruptcy Code, (ii) is reasonable and appropriate,

particularly in light of the size and nature of the sale and the efforts that have been or

will be expended by the Purchaser notwithstanding that the proposed sale is subject to

higher or otherwise better offers for the Assets, (iii) was negotiated by the parties at

arm's length and in good faith, (iv) is commensurate with the real and substantial post-

petition benefits conferred upon the Debtors' estates by the Purchase, and (v) is

necessary to ensure that the Purchaser will continue to pursue its proposed acquisition

of the Assets contemplated by the Purchase Agreement.

J.      The proposed sale of the Assets is consistent with section 363(b)(1)(A) of the Bankruptcy Code and the Debtors' existing privacy policy, and no consumer privacy ombudsman is necessary in connection with the sale of the Assets.

K.      The entry of this Order is without prejudice to the State Court Actions and all rights of the Associations and the Debtors relating thereto are expressly reserved.[4]

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Procedures Motion is GRANTED solely to the extent provided in this Order.

2.      Any and all objections to the relief requested in the Procedures Motion that have not been withdrawn, waived, resolved, or settled, are hereby denied and overruled.

3.      The Bidding Procedures, as set forth on **Exhibit A** and incorporated herein by reference as if fully set forth herein, are approved and shall apply with respect to the sale of the Assets.  Notwithstanding the above, any party in interest may object at the Sale Hearing to, *inter alia*, the criteria used by the Debtors (after consultation with any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee") or the Associations, provided that, the Associations are not a Qualified Bidder) to select the highest or otherwise best offer for the Assets.

---

[4]     Capitalized terms in Paragraph K shall have the meanings ascribed to them in the Objection.

4.      The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

## Important Dates and Deadlines

5.      **Bid Deadline.**  The deadline for submitting bids for the Assets (the "Bid Deadline") shall be August 14, 2014, at 4:00 p.m., or such later date to which the Debtors reasonably consent (after consultation with the Committee), but in no event later than three business days prior to the commencement of the Auction.  If the Debtors extend the Bid Deadline, the Debtors shall promptly notify all Potential Bidders of the extension.

6.      **Auction.** If Qualified Bids are timely received by the Debtors in accordance with the Bidding Procedures, the Auction shall commence at 11:00 a.m. New York Time on August 19, 2014, at a location to be determined in New York, New York, or such later date and time as the Debtors shall notify all Qualified Bidders and counsel for the Purchaser; provided, however, in the event that no Qualified Bids (other than that submitted by the Purchaser) are received by the Bid Deadline, the Debtors shall not be required to conduct an Auction, and in such event the Debtors shall proceed with the approval of the Purchase Agreement.   Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that it has not engaged in any collusion with respect to the bidding or the Sale.

7.      Sale Hearing.  The Sale Hearing shall be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, on August 27, 2014 at 10:00 a.m. at the United States Bankruptcy Court, Courtroom 623, One Bowling Green, New York,

8

New York 10004.  At the Sale Hearing, the Court shall:  (i) consider approval of the Sale

to the Purchaser or an Alternative Transaction with a Successful Bidder; (ii) consider the

entry of the proposed sale order, substantially in the form attached to the Procedures

Motion as **Exhibit 3** (the "Sale Order"); (iii) consider any issues or objections that are

timely interposed by any parties;  and (iv) grant such other or further relief as this Court

may deem just or proper.

8.      Without prejudice to the Purchaser's rights under the Purchase

Agreement, the Sale Hearing (or any portion thereof) may be adjourned by the Court or

the Debtors, after consultation with the Committee, and the Purchaser or other

Successful Bidder, as applicable, from time to time without further order of this Court,

by filing a notice with this Court and serving such notice on all Qualified Bidders and

counsel for the Purchaser.

9.      Sale Notice.  The Notice of Auction and Sale Hearing substantially

in the form attached hereto as **Exhibit B** is hereby approved.

10.      Within two (2) business days after the entry of this Order, the

Debtors shall cause a copy of the Bidding Procedures, the Notice of Auction and Sale

Hearing, and this Order to be served upon the Notice Parties as well as the parties that

toured and/or made offers for the Assets via first class mail if they could be located.

11.      As soon as practicable after entry of this Order, the Debtors shall

cause the Notice of Auction and Sale Hearing, substantially in the form attached hereto

as **Exhibit B**, to be published once in the New York Times pursuant to Bankruptcy Rule

2002(l).

9

12.    The notice and publication as set forth in the preceding paragraphs shall constitute good and sufficient notice of the Sale Motion, the Auction, the Sale Hearing and the proposed Sale Order, and no other or further notice of the Sale Motion, the Auction, the Sale Hearing and/or the proposed Sale Order shall be necessary or required.

13.    Sale Objections.  Objections, if any, to the sale of the Assets, the proposed form of Sale Order, or the relief requested in the Sale Motion, other than with respect to the relief granted herein, shall: (i) be in writing; (ii) comply with the Bankruptcy Rules; (iii) be filed with this Court and served so as to be **received** no later than 4:00 p.m. prevailing Eastern Time on August 14, 2014 (the "Objection Deadline"), provided, however, that supplemental objections relating to the conduct of the Auction, the selection of the Successful Bidder (other than the Purchaser) or the terms of the Successful Bid (other than the Purchase Agreement), may be filed with this Court and served so as to be **received** no later than 4:00 p.m. prevailing Eastern Time on August 22, 2014 (the "Supplemental Objection Deadline") by:  (a) Togut, Segal & Segal LLP, attorneys for the Debtors, One Penn Plaza, Suite 3335, New York, New York 10119, Attention:  Frank A. Oswald, Esq.; (b) the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq.; and (c) counsel for Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn: Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:  Kristian W. Gluck, Esq; and (d) Brown Rudnick LLP, 7

Times Square, New York, New York 10036:  Attn:  Edward S. Weisfelner, Esq. and

Howard S. Steel, Esq., as counsel to the Associations.  Only timely filed and served

responses, objections, and other pleadings will be considered by this Court at the Sale

Hearing.

14.    The failure of any person or entity to timely file an objection to the

Sale Motion shall, unless otherwise ordered by the Bankruptcy Court, forever bar any

objection to the Sale Motion or the relief requested therein, or to the consummation of

the Sale contemplated by the Purchase Agreement or an Alternative Transaction with

the Successful Bidder, if any (including the transfer of the Assets free and clear of Liens,

Claims and/or Interests).

## Assigned Contracts

15.    The notice of potential assumption and assignment of the Contracts

and Leases, substantially in the form attached hereto as **Exhibit C** (the "Cure Notice"), is

hereby approved.

16.    On or before ten (10) business days after the entry of this Order, the

Debtors shall file with the Bankruptcy Court and serve by first-class postage-prepaid

the Cure Notice on all Contract Parties and their counsel who have filed notices of

appearance in the Chapter 11 Cases.  The Cure Notice shall identify each of the

Contracts and Leases and provide the corresponding cure amounts that the Debtors

believe must be paid to cure all defaults under the Contracts and Leases to the extent

required by section 365 of the Bankruptcy Code (the "'Cure Amounts").  The Cure

Notice that the Debtors shall file with the Bankruptcy Court will include a comprehensive list of the Contracts and Leases with the corresponding Cure Amounts and the Cure Notice that the Debtors shall serve on Contract Parties shall be personalized.

17.     Unless the Contract Party to any Contract or Lease files an objection to its scheduled Cure Amount or to the assumption and assignment of a Contract or Lease, and serves a copy of the such objection so as to be actually received by the Notice Parties no later than the Objection Deadline , such Contract Party shall be forever barred, estopped, and enjoined from objecting (i) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (ii) that any conditions to assumption and assignment must be satisfied under such Contract or Lease before it can be assumed and assigned or that any required consent to assumption or assignment has not been given, or (iii) that the Successful Bidder (including the Purchaser) has not provided adequate assurance of future performance.

18.     In the event of a timely filed objection and dispute regarding: (a) any Cure Amount with respect to any of the Contracts and Leases; (b) the ability of the Successful Bidder (including the Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under any of the Contracts and Leases; or (c) any other matter pertaining to assumption or assignment of any of the Contracts and Leases, the Debtors may, in consultation with the Committee, hold an amount equal to the claimed cure amount in reserve pending further order of the Court or agreement between the Debtors and the objecting party;

provided, however, that the Debtors are authorized to consensually resolve with an applicable counterparty any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Purchaser), without any further notice to or action, order, or approval of the Bankruptcy Court.  If the Debtors hold the claimed cure amount in reserve, the Debtors may assume and assign the Contracts or Leases without further delay, unless such Contract(s) or Lease(s) may not be assumed or assigned for reasons other than or in addition to the adequacy or inadequacy of the cure amount.

19.     No later than five (5) business days after the Closing Date, the Debtors will file a complete list of the Contracts and Leases that were assumed and assigned as Assigned Contracts as of the Closing Date in connection with the sale of the Assets.

20.     The Successful Bidder may determine to exclude any Contracts and Leases from the list of Assets at any time prior to the Closing.  The non-debtor party or parties to any such excluded contract will be notified of such exclusion by written notice as soon as practicable after such determination, which may be after the Sale Hearing.

**Break-Up Fee**

21.     The Break-Up Fee is hereby approved, authorized and binding upon the Debtors and their estates as a super-priority administrative expense.  The Debtors' obligation to pay the Break-Up Fee shall survive termination of the Purchase Agreement and shall be payable as provided in the Purchase Agreement as an

13

administrative expense claim in accordance with sections 105(a) and 503 of the Bankruptcy Code. The Debtors are authorized and directed to pay the Break-Up Fee to the Purchaser in accordance with the terms of the Purchase Agreement without further order of the Bankruptcy Court.

22. Nothing in this Order shall prohibit any Qualified Bidder from requesting payment of any incurred reasonable fees and expenses arising in connection with the due diligence investigation of such Qualified Bidder relating to a potential bid for the Assets as an administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise.

23. The Debtors' obligations under this Order, the provision of this Order, and the portions of the Purchase Agreement pertaining to the obligations to pay the Break-Up Fee shall survive confirmation of any chapter 11 plan or discharge of claims thereunder and shall be binding upon the Debtors, and the reorganized or reconstituted Debtors, as the case may be, after the effective date of a confirmed plan or plans in the Chapter 11 Cases (including any order entered after any dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code).

24. The full amount of the Break-Up Fee may be included in each bid by the Purchaser for the purposes of comparison to any Overbid (as defined in the Bid Procedures) in connection with each round of bidding in the Auction.

## Additional Provisions

25.     The Debtors, in consultation with the Committee, shall determine, consistent with the Bidding Procedures:  (i) which bidders are Qualified Bidders; (ii) which bids are Qualified Bids; (iii) which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; and (iv) whether to waive terms and conditions set forth herein with respect to all potential bidders.

26.     Nothing in the Bidding Procedures or this Order shall prohibit, restrict, or otherwise limit the ability of a Qualified Bidder to propose an Alternative Transaction that contemplates acquiring the Assets pursuant to the terms of a chapter 11 plan of liquidation.

27.     The rights of the Associations to object to the Sale and the relief requested in the Sale Motion with respect to approval of the Sale are fully reserved and preserved pending the Sale Hearing and the entry of this Order is without prejudice to the State Court Actions and all rights of the Associations and the Debtors relating thereto are expressly reserved.

28. Any Committee member that is affiliated with a person or entity, including the Associations, that intends to submit or submits a Qualified Bid for the Assets, shall be prohibited from exercising any consultation rights under this Order or the Bidding Procedures except to the extent that such consultation rights are available to all Qualified Bidders.

15

29.     The Debtors are authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the notice requirements established by this Order.

30.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived, and this Order shall be effective immediately upon its entry.

31.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32.     This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: July 1, 2014
New York, New York

*/s/ Shelley C. Chapman*
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                    :
In re:                              :        Chapter 11
                                    :        Case No. 14-11691 (SCC)
FL 6801 SPIRITS LLC, *et al.*,      :        (Jointly Administered)
                                    :
                        Debtors.    :
                                    :
-----------------------------------------------------------------x

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures")[1] have been approved by an order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on [_____ __,] 2014 [Docket No. __] (the "Bidding Procedures Order") on the docket in the above-captioned jointly administered cases of FL 6801 Spirits LLC, *et al.*, (the "Debtors").[2] The Bidding Procedures set forth the process by which the Debtors are authorized to conduct the sale (the "Sale") by auction of the Assets, as defined in that certain Purchase and Sale Agreement (the "Purchase Agreement") by and between the Collins Subsidiaries as Sellers (the "Sellers") and 360 Miami Hotel & Spa LLC, as stalking horse purchaser (the "Purchaser").

## Notice

The Debtors shall provide notice of the Bidding Procedures and the date for a hearing to approve the sale of the Assets (the "Sale Hearing"), together with a copy of the Purchase Agreement, to all parties identified by the Debtors as potentially having an interest in acquiring the Assets.

## Due Diligence

Parties interested in conducting due diligence should contact the Debtors' real estate brokers, CBRE Inc. ("CBRE") attention Christian Charre at (305) 381-6427 or Christian.Charre@cbre.com. Prospective bidders that have executed an appropriate

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

[2] The Debtors consist of the following entities: FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries").

confidentiality agreement with CBRE will be afforded access to a virtual proprietary data room that contains information relating to the Assets. The Debtors and CBRE maintain the right to deny access to the proprietary data room to any party, in their discretion, including, without limitation, on the basis that such party might use such proprietary information in a competitive manner to the detriment of the Debtors, Canyon Ranch, the Purchaser or the Successful Bidder (as defined below), provided that such access shall not be denied to the North Carillon Beach Condominium Association, Inc., Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, Inc. and its affiliates and related entities (collectively, the "Associations"). The Debtors and CBRE shall not be obligated to furnish any due diligence information other than that information contained in the virtual data room or after the Bid Deadline (as defined below). The Debtors and CBRE shall use good faith efforts to provide all prospective bidders with substantially the same access and information.

Each party submitting a bid (each, a "Potential Bidder") and Qualified Bidder (as defined herein) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors in consultation with any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"). Failure by a Potential Bidder or Qualified Bidder (other than the Purchaser) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors in consultation with the Committee to determine that such bidder is not a Qualified Bidder or that a bid made by a Qualified Bidder is not a Qualified Bid.

## Qualified Bid Requirements

Unless otherwise ordered by the Bankruptcy Court, to participate in the Auction, each Potential Bidder must submit a bid that adheres to the requirements below. Nothing in these Bidding Procedures shall prohibit the Associations from submitting a Qualified Bid. Each bid must:

    a. state that the bid is irrevocable through the Auction, <u>provided</u>, <u>however</u>, that (a) if the Qualified Bid (defined below) becomes the Successful Bid, such bid shall be irrevocable through the Closing Date or such earlier date as the Purchase Agreement is terminated in accordance with its terms and (b) and in the case of the Second Highest Bid (defined below), such bid shall remain irrevocable through the closing of the sale of the Assets to the Successful Bidder, unless the Successful Bidder fails to close and the Debtors shall have given notice to the Second Highest Bidder that it has decided to consummate the transaction contemplated by the Second Highest Bid in which case the Second Highest Bid shall

remain open through the closing with such Second Highest Bidder or such earlier dates as the Purchase Agreement may be terminated in accordance with its terms;

b.  state that the Potential Bidder (i) has had an opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith with respect to its bid, except as expressly stated in these Bidding Procedures;

c.  stating that the Potential Bidder has obtained all necessary organizational approvals to make its competing bid and to enter into and consummate the transaction set forth in the Qualified Bid; and

d.  be submitted in writing to (a) counsel for the Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119 (Attn: Frank A. Oswald); and (b) CBRE, 777 Brickell Avenue, Suite 900, Miami, Florida 33131 (Attn: Christian Charre), real estate broker for Debtors, so as to be received no later than August 14, 2014 at 4 PM (Prevailing Eastern time) (the "Bid Deadline"). Upon receipt of a bid, the Debtors shall deliver a copy to counsel for the Purchaser: Fulbright & Jaworski LLP, 98 San Jacinto Boulevard, Suite 1100, Austin, Texas 78701 (Attn: Jane Snoddy Smith) and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201 (Attn: Kristian W. Gluck) and counsel for the Committee, should a Committee be formed.

In addition to the foregoing, a "Qualified Bidder" is a Potential Bidder that delivers a binding bid ("Qualified Bid") that satisfies the following:

1)    the bid must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "Modified Purchase Agreement"), which may be consummated pursuant to a chapter 11 plan of liquidation. The bid must also include a copy of the Purchase Agreement marked against the Modified Purchase

Agreement to show all changes requested by the Bidder.  The Debtors will promptly provide a Word document of the Purchase Agreement to all Potential Bidders;

    2)      the bid must offer to purchase all of the Assets;

    3)      the bid must be on the same (or better) terms and conditions as those set forth in the Purchase Agreement, including without limitation, with respect to timing and certainty of closing;

    4)      includes a bid under terms which the Debtors, and should a Committee be formed, in consultation with said Committee (or the Associations if the Associations are not a Qualified Bidder), believe to be higher or better than the Purchaser's bid without any financing conditions, the value of which is determined by the Debtors and, should a Committee be formed, in consultation with said Committee to be equal to or greater than the sum of: (a) the purchase price set forth in the stalking horse Purchase Agreement; the (b) the Break-Up Fee;[3] and (c) $100,000 (the sum of which shall be the incremental bid amount);

    5)      is accompanied by a deposit (the "Bid Deposit") in an amount equal to 10% of the cash purchase price proposed by the Potential Bidder, in the form of a certified check or cash deposit, provided that the Bid Deposit shall in no event be less than $1,200,000.00;

    6)      is accompanied by satisfactory evidence, in the opinion of the Debtors, in consultation with the Committee, of the Qualified Bidder's ability to (a) fund the purchase price proposed by the Qualified Bidder with cash on hand (or sources of immediately available funds) or other distributable forms of consideration or non-cash consideration, and (b) otherwise perform all transactions contemplated by the Qualified Bid;

    7)      is firm and unconditional and not subject to further due diligence review or financing and other contingencies;

    8)      contains a list of the Debtors' leases and executory contract that may be assumed and assigned in connection with the consummation of the Qualified Bid;

    9)      a Qualified Bid may provide for forms of consideration that include cash and non-cash consideration, including, without limitation, releases of claims, or a

---

[3]    Counsel for the Purchaser will, upon reasonable request of counsel for the Debtors prior to the Bid Deadline, provide counsel for the Debtors with a reasonable estimate of the expense reimbursement through and including the Auction, which amount shall be used by the Debtors to calculate the expense reimbursement for purposes of determining Qualified Bids.

combination of cash and other distributable form of non-cash consideration that may be distributed or used to satisfy claims under a plan of liquidation;

10)      a Qualified Bid may propose to consummate an Alternative Transaction pursuant to a chapter 11 plan of liquidation.  Any proposed chapter 11 plan of liquidation must be attached as an exhibit to the Modified Purchase Agreement.

The Debtors shall not consider any Bids received after the Bid Deadline. A Qualified Bid will be valued based upon factors such as:  (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' estates from any releases of claims and assumption of liabilities; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the length of time expected to close the proposed transaction and the cost to the Debtors of any delay in closing; (d) the ability to obtain all necessary approvals for the proposed transaction; (e) the confirmability of any proposed chapter 11 plan; (f) the number, type, and nature of any changes to the Purchase Agreement requested by the Bidder; and (g) any other factors that the Debtors and, should a Committee be formed, in consultation with said Committee may deem relevant.

The Debtors may, in their sole and absolute discretion, communicate prior to the Auction or Sale Hearing with any Potential Bidder and may request any additional information reasonably required by the Debtors in connection with the Debtors' evaluation of such Potential Bidder's bid.

Within three (3) business days after the Bid Deadline, the Debtors shall inform each Potential Bidder that has submitted a bid whether it is a Qualified Bidder and shall contemporaneously advise the Purchaser and the Committee of such determination(s).  As soon as reasonably practicable after the Bid Deadline, but in any case no later than two (2) days prior to the Auction (as defined below), the Debtors shall give all Qualified Bidders a copy of all Qualified Bid(s) received to date.

The Purchase Agreement executed by the Purchaser is a Qualified Bid and the Purchaser is a Qualified Bidder for all purposes.

## Sale to The Purchaser

The Successful Bid for the Assets will be presented to the Bankruptcy Court for approval at the Sale Hearing.  If no Qualified Bids have been submitted (other than that submitted by the Purchaser) by the Bid Deadline the Debtors shall report the same to the Bankruptcy Court and shall proceed to seek approval of the Purchase Agreement and the transaction contemplated thereby.

## Auction

If the Debtors receive a Qualified Bid for the Assets (other than that submitted by the Purchaser) by the Bid Deadline, the Debtors will hold an auction (the "Auction") on August 19, 2014 at 11:00 a.m. in New York, New York at a location to be determined or such later date and time as the Debtors shall notify all Qualified Bidders and counsel for the Purchaser. The Debtors may, after consultation with the Committee, extend the deadlines set forth in the Bidding Procedures Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing for any reason without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Potential Bidders.

Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. The Debtors will evaluate all Qualified Bids received and, after consultation with their professionals and the Committee, will select the Qualified Bid that reflects the highest or best offer for the Assets as the "Starting Auction Bid." In considering which Qualified Bid shall be the Starting Auction Bid, the Debtors will consider, among other things, the Qualified Bid, the changes to the Purchase Agreement required by the Qualified Bid, and the Qualified Bidder's ability to finance and timely consummate the purchase of Assets.

For the avoidance of doubt, the Purchaser shall be permitted to include the full amount of the Break-Up Fee in each bid by the Purchaser for the purposes of comparison to any overbid in connection with each round of bidding in the Auction.

The following rules shall apply at the Auction:

(i) only the Debtors and their representatives, the Committee (should a Committee be formed), the Debtors' post-petition lenders and any other Qualified Bidder that has timely submitted a Qualified Bid shall attend the Auction in person. Only the Purchaser and any other Qualified Bidders will be entitled to make any subsequent bids at the Auction and each of the Purchaser and any other Qualified Bidders must have a representative attend the Auction in person. Bidding at the Auction will be transcribed or videotaped.

(ii) each Qualified Bidder shall be required to confirm on the record at the Auction that it has not engaged in any impermissible collusion with respect to bidding or the sale by the Debtors of the Assets.

(iii) Bidding at the auction will begin with the Starting Auction Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid by at least $100,000 (a "Subsequent Bid"). The value of any Subsequent Bid may come in the form of: (i) cash; (ii) non-cash

consideration; and/or (iii) other forms of consideration that may be distributed under a plan of liquidation. Each Subsequent Bid shall provide net value to the estate over the Starting Auction Bid with respect to the Assets, which net value may be in the form of cash or non-cash consideration (any such non-cash consideration to be valued in the discretion of the Debtors, in consultation with the Committee). From time to time, the Debtors will, in an open forum, advise Qualified Bidders participating in the Auction of their determination as to the terms of the then highest or otherwise best bid for the Assets. The Debtors shall also consider the impact of the Break-Up Fee and the potential costs of satisfying the conditions of any bid.

(iv) A Subsequent Bid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Subsequent Bid must remain open and binding on the Bidder until and unless the Debtors accept a higher or otherwise better Subsequent Bid from such Bidder. To the extent not previously provided, a Bidder submitting a Subsequent Bid at the Auction must submit, as part of its Subsequent Bid, written evidence reasonably acceptable to the Debtors, after consultation with the Committee demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Subsequent Bid.

(v) The Debtors, after consultation with their professionals and the Committee, may adopt other rules for the Auction at the Auction that, in their reasonable judgment, will better promote the goals of the Auction. All such rules will provide that: (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder and (ii) all bids shall be made and received in one room, on an open basis, and all bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Qualified Bid shall be fully disclosed to all other bidders throughout the entire Auction. Nothing herein shall prohibit the Debtors from meeting privately with any Qualified Bidder to negotiate the terms of a bid or a Subsequent Bid.

(vi) During the Auction, the Debtors will review each bid or Subsequent Bid submitted by a Qualified Bidder in order to identify, in their sole and absolute discretion after consultation with their professionals and the Committee, the bid or Subsequent Bid that constitutes the highest or otherwise best bid for the Assets. The Debtors will consider, among other things, (i) the amount of consideration offered under the Qualified Bid; (ii) the changes to the Purchase Agreement required by the Qualified Bid; and (iii) the Qualified Bidder's ability to finance and timely consummate the purchase of the Assets. The Debtors will also consider the Qualified Bid's impact on the ability to minimize the Debtors' losses incurred before the Closing Date based on the terms and timing provided in the bid.

(vii) The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtors determine, in their reasonable business judgment, after

consultation with their advisors and the Committee, is the highest or otherwise best Qualified Bid at the Auction for the Assets. The bid that is selected by the Debtors as the highest or otherwise best bid for the Assets will be considered the "Successful Bid" and such bidder the "Successful Bidder."

(viii) Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction (and in no event later than one (1) business day after the close of the Auction), the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

Any bid submitted after the conclusion of the Auction shall not be considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be considered, and neither the Debtors nor any other person shall have any obligation to seek such an order from the Bankruptcy Court.

The second highest or otherwise best bid (the "Second Highest Bid" and such bidder, the "Second Highest Bidder"), as determined by the Debtors after consultation with the Committee, at the conclusion of the Auction and approved by the Bankruptcy Court at the Sale Hearing, shall remain open and irrevocable through the closing of the sale of the Assets to the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by its Successful Bid, the Debtors, in their sole and absolute discretion, after consultation with the Committee, may elect to regard the Second Highest Bid as the highest or best bid for the Assets, and the Debtors will be authorized to consummate the transaction contemplated by the Second Highest Bid without further order of the Bankruptcy Court. The Debtors may not compel the Purchaser to serve as the Second Highest Bidder without the Purchaser's express written consent.

Subject to the provisions of the Bidding Procedures Order, whenever these Bidding Procedures refer to a determination as to the highest or otherwise best offer, the Debtors, after consultation with the Committee, shall have the final authority to make such determinations, subject to approval of the Bankruptcy Court.

Nothing in these Bidding Procedures shall prohibit any Qualified Bidder from requesting payment of any incurred reasonable fees and expenses arising in connection with the due diligence investigation of such Qualified Bidder relating to a potential bid for the Assets as an administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise.

### The Sale Hearing and Return of Deposits

No offer shall be deemed accepted by the Debtors unless and until it is approved by the Bankruptcy Court. The Sale Hearing will be held at a date and time

established by the Bankruptcy Court in the Bidding Procedures Order.  At the Sale Hearing, the Debtors will seek entry of a Sale Order, among other things, authorizing and approving the sale of the Assets:  (i) if no Auction is held or if the Purchase Agreement is the Successful Bid, with the Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement, or (ii) if a Qualified Bid other than the Purchase Agreement is determined by the Debtors after the Auction to be the Successful Bid, with the Successful Bidder pursuant to the terms and conditions set forth in the Successful Bid.  Without prejudice to the Purchaser's rights under the Purchase Agreement, the Sale Hearing (or any portion thereof) may be adjourned by the Court or the Debtors, after consultation with the Committee, and the Purchaser or other Successful Bidder, as applicable, from time to time without further order of this Court, by filing a notice with this Court and serving such notice on all Qualified Bidders and counsel for the Purchaser.

In the event the Purchaser or any Successful Bidder fails to consummate the purchase of the Assets because of its own breach or failure to perform, the bidder's Bid Deposit shall be forfeited to the Debtors provided that the Debtors reserve the right to seek all available damages from the defaulting bidder, <u>provided</u>, <u>however</u>, that in the case of the Purchaser's Bid Deposit, the treatment thereof shall be governed by the terms of the Purchase Agreement and the Debtors' right to seek additional damages will be subject to the terms of the Purchase Agreement.

All Bid Deposits, other than the Bid Deposit of the Successful Bidder and the Second Highest Bidder, will be returned within three (3) business days following entry of the Sale Order.  The Bid Deposit of the Second Highest Bidder will be returned promptly following the closing of the sale with the Successful Bidder, unless the Debtors have elected to regard the Second Highest Bid as the highest or best bid for the Assets, as described above.  Except as otherwise provided for in the Purchase Agreement, the Debtors will not be required to maintain any Bid Deposit in an interest-bearing account, but any interest earned on any Bid Deposit will be remitted to the appropriate Qualified Bidder if the Bid Deposit is returned to the Qualified Bidder pursuant to the above.  Subject to the Purchase Agreement in the case of the Purchaser's Bid Deposit, Bid Deposits may only be used in accordance with the terms of these Bidding Procedures.  The Debtors may, in consultation with the Committee, credit the Deposit of the Successful Bidder toward the purchase price on the closing of the sale of the Assets.

## Break-Up Fee

Pursuant to the Bidding Procedures Order, the Purchaser is entitled to the Break-Up Fee in accordance with the terms of the Purchase Agreement and the Bidding Procedures Order.

## Personal Identifiable Information

The Sale may include the transfer of personally identifiable information, as defined in section 101(41)(A) of the Bankruptcy Code.  No consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy Code because the Purchaser (and the Successful Bidder to the extent not the Purchaser) agrees to use customer information only in accordance with the applicable privacy policies in effect on the date of the commencement of the case.

## Jurisdiction

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute arising from or relating to the implementation of the Bidding Procedures Order.

## Limitation on Committee Consultation Rights

Should a Committee be formed, any Committee member that is affiliated with a person or entity, including the Associations, that intends to submit or submits a Qualified Bid for the Assets, shall be prohibited from exercising any consultation rights under these Bidding Procedures except to the extent that such consultation rights are available to all Qualified Bidders.

## NOTICE OF AUCTION

| | |
|---|---|
| **AUCTION DATE AND TIME:** | **Aug. 19, 2014 at 11:00 a.m. (New York Time)** |
| **BID DEADLINE DATE AND TIME:** | **Aug. 14 2014 at 4:00 p.m. (New York Time)** |
| **SALE HEARING DATE AND TIME:** | **Aug. 27, 2014 at 10:00 a.m. (New York Time)** |
| **OBJECTION DEADLINE DATE AND TIME:** | **Aug. 14, 2014 at 4:00 p.m. (New York Time)** |
| **SUPPLEMENTAL OBJECTION DEADLINE:** | **Aug. 22, 2014 at 4:00 p.m. (New York Time)** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :   Case No. 14-11691
FL 6801 SPIRITS LLC, et al.,              :
                                          :   (Jointly Administered)
                          Debtors.        :
                                          :
-------------------------------------------------------------x
```

## NOTICE OF AUCTION AND HEARING TO CONSIDER
## APPROVAL OF SALE OF THE DEBTORS' PROPERTY

**NOTICE IS HEREBY GIVEN**, that:

1.      On June 1, 2014, FL 6801 Spirits LLC, *et al.*, (the "Debtors")[1] filed a

motion (the "Motion") with the United States Bankruptcy Court for the Southern

District of New York (the "Bankruptcy Court") requesting, among other things, (i) the

approval of bidding procedures (the "Bidding Procedures") in connection with the sale

of the Assets, as defined in the Purchase and Sale Agreement attached to the Motion as

Exhibit A, to 360 Miami Hotel & Spa LLC, as stalking horse purchaser (the "Purchaser")

and (ii) the scheduling of a bid deadline, auction date, and sale hearing (the "Bidding

---

[1]      The Debtors consist of the following entities:  FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries").

Schedule"). On _____ ___, 2014, the Bankruptcy Court entered an order (the

"Bidding Procedures Order") approving, among other things, the Bidding Procedures,

and establishing the Bidding Schedule.

2.    A copy of each of the Motion, the Bidding Procedures, and the

Bidding Procedures Order may be obtained by: (i) accessing the Bankruptcy Court's

website at www.nysb.uscourts.gov, (ii) accessing the website maintained by the

Debtors' claims and noticing agent at http://cases.primeclerk.com/flspirits/, or

(iii) contacting Frank A. Oswald, Esq. at Togut, Segal & Segal LLP, attorneys for the

Debtors, at (212) 594-5000. Note that a PACER password is needed to access documents

on the Court's website.

3.    The Debtors and the Purchaser have entered into the Purchase and

Sale Agreement (the "Purchase Agreement") for the sale of the Assets, but as set forth in

the Bidding Procedures, the sale of the Assets remains subject to higher or better offers

and Bankruptcy Court approval.

4.    All interested parties are invited to make competing offers for the

Assets in accordance with the terms of the Bidding Procedures and Bidding Procedures

Order. The deadline to submit competing offers (the "Bid Deadline") is August 14, 2014

at 4:00 p.m. New York time. Pursuant to the Bidding Procedures Order, the Debtors

may conduct an auction (the "Auction") for the sale of the Assets on August 19, 2014 at

11:00 a.m. New York time. The Auction may be adjourned from time to time.

5.    The Bidding Procedures Order further provides that a Sale Hearing

will be held on August 27, 2014, at 10:00 a.m. New York time before the Honorable

2

Shelley C. Chapman, United States Bankruptcy Judge, in Room 632 of the Bankruptcy

Court, One Bowling Green, New York, New York 10004.  The hearing may be

adjourned from time to time.

6.      At the Sale Hearing, the Debtors will request that the Bankruptcy

Court enter an order, among other things, approving the highest or best bid for the

Assets, or the Purchase Agreement (which will be determined as described in the

Bidding Procedures), pursuant to which the Debtors will transfer the Assets.  In

addition, the Debtors will request that the Bankruptcy Court provide that the transfer of

the Assets be free and clear of all liens, claims and interests, including possessory

leasehold interests (other than certain permitted exceptions as expressly set forth in the

Purchase Agreement).

7.      At the Sale Hearing, the Bankruptcy Court may enter such orders

as it deems appropriate under applicable law and as required by the circumstances and

equities of this Chapter 11 case.  Objections, if any, to the sale of the Assets pursuant to

the terms of the agreement reached between the Debtors and the successful bidder for

the Assets, the proposed form of Sale Order, or the Purchase Agreement, as applicable,

must be in writing and filed with the Bankruptcy Court and served so as to be **received**

no later than 4:00 p.m. prevailing Eastern Time on August 14, 2014, provided, however

that supplemental objections relating to the conduct of the Auction, the selection of the

Successful Bidder (other than the Purchaser) or the terms of the Successful Bid (other

than the Purchase Agreement), may be filed with this Court and served so as to be

**received** no later than 4:00 p.m. prevailing Eastern Time on August 22, 2014 (the

"Supplemental Objection Deadline").  Copies of Objections, if any, must be provided to the Chambers of the Honorable Shelley Chapman, United States Bankruptcy Judge, United States Bankruptcy Court, One Bowling Green, Room 610, New York, New York 10004-1408, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates, the basis for the objection and the specific grounds therefor, and must be served upon:  (i) Togut, Segal & Segal LLP, attorneys for the Debtors, One Penn Plaza, Suite 3335, New York, New York 10119, Attention:  Frank A. Oswald, Esq.; (ii) the Office of the United States Trustee for Region 2, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq., U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014; (iii) counsel for the Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn:  Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:  Kristian W. Gluck, Esq., and (vi) counsel for the Associations, Brown Rudnick LLP, 7 Times Square, New York, New York 10036:  Attn: Edward S. Weisfelner, Esq. and Howard S. Steel, Esq.

8.    All requests for information concerning the sale of the Assets should be directed by written request to counsel for the Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attention:  Frank A. Oswald, Esq. or by contacting CBRE, Inc., Attention:  Christian Charre at (305) 381-6427 or Christian.Charre@cbre.com, 777 Brickell Avenue, Suite 900, Miami, Florida 33131, real estate brokers to the Debtors' estates.

DATED:  New York, New York
_____, 2014

FL 6801 SPIRITS LLC, *ET AL.*,
Debtors and Debtors in Possession,
By their attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

_____
ALBERT TOGUT
FRANK A. OSWALD
LARA R. SHEIKH
One Penn Plaza, Suite 3335
New York, New York  10119
(212) 594-5000

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Lara R. Sheikh

*Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                 :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 14-11691 |
| FL 6801 SPIRITS LLC, *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------x

## NOTICE TO COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THE DEBTORS MAY ASSUME AND ASSIGN AS PART OF SALE OF SUBSTANTIALLY ALL OF THE PROPERTY

**PLEASE TAKE NOTICE THAT** on June 1, 2014, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors")[1] filed a motion [Docket No. 4] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which seeks, among other things, approval of key dates, times, and procedures related to the sale of the "Assets," as defined in the Purchase and Sale Agreement (the "Agreement"), to 360 Miami Hotel & Spa LLC (the "Purchaser") pursuant to the Agreement. On [_____], 2014, the Bankruptcy Court approved the Bidding Procedures. On August 27, 2014 at 10:00 a.m. prevailing Eastern time, the Debtors intend to seek approval of, among other things, the sale of the Assets, including the assumption and assignment of certain executory contracts and unexpired leases.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR**

---

[1] The Debtors consist of the following entities: FL 6801 Spirits LLC, FL 6801 Collins North LLC, FL 6801 Collins Central LLC and FL 6801 Collins South LLC.

**UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.[2]**

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Bidding Procedures, the Debtors may assume and assign to the Purchaser or other Successful Bidder the executory contract(s) or unexpired lease(s) listed on <u>Exhibit A</u> attached hereto (each, an "Assigned Contract") to which you are a counterparty. The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contract is as set forth on Exhibit A attached hereto (the "Cure Amount"). If you disagree with the proposed Cure Amount, object to the proposed assignment to the Purchaser or other Successful Bidder of the Assigned Contract(s) or object to the Purchaser's ability to provide adequate assurance of future performance with respect to any Assigned Contracts, you must file an objection with the Bankruptcy Court so as to be actually received no later than 4:00 p.m. (prevailing Eastern time) on August 14, 2014 (the "Objection Deadline"), provided, however that supplemental objections relating to the Successful Bidder's (if other than the Purchaser) ability to provide adequate assurance of future performance with respect to any Assigned Contracts, may be filed with this Court and served so as to be actually received no later than 4:00 p.m. prevailing Eastern Time on August 22, 2014 (the "Supplemental Objection Deadline"), and serve such objection(s) on (i) Togut, Segal & Segal LLP, attorneys for the Debtors, One Penn Plaza, Suite 3335, New York, New York 10119, Attention: Frank A. Oswald, Esq. and Lara R. Sheikh, Esq.; (ii) the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq. and Susan D. Golden, Esq.; and (iii) counsel for Purchaser, Fulbright & Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn: Jane Snoddy Smith, Esq. and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn: Kristian W. Gluck, Esq.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors propose that if no objection to (a) the Cure Amount(s), (b) the proposed assignment of the Assigned Contract(s) to the Purchaser or other Successful Bidder or (c) adequate assurance of the Purchaser's or other Successful Bidder's ability to perform is filed by the Objection Deadline or the Supplemental Objection Deadline, as applicable, (i) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtors is correct, (ii) you shall be forever barred, estopped, and enjoined from asserting any additional cure amount under the Assigned Contract(s), and (iii) you will be forever barred from objecting to the assumption or assignment of the Assigned Contract(s) to the Purchaser or other Successful Bidder or the Purchaser's or other Successful Bidder's adequate assurance of future performance.

---

[2] This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.

**PLEASE TAKE FURTHER NOTICE THAT** with respect to any Assigned Contract assumed and assigned to the Purchaser or other Successful Bidder, all Cure Amounts shall be satisfied by payment of the Cure Amounts as soon as reasonably practicable after closing of the sale to the Purchaser or other Successful Bidder or on such other terms as the parties to each such Assigned Contract and the Purchaser or other Successful Bidder may otherwise agree without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, the assumption or assignment of each such Assigned Contract may be conditioned upon the disposition of all issues with respect to such Assigned Contract.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Bidding Procedures, with respect to any Assigned Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Debtors to assume or assign to the Purchaser or other Successful Bidder such Assigned Contracts; (c) the ability of the Purchaser or other Successful Bidder to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under such Assigned Contract; or (d) any other matter pertaining to assumption or assignment, the Cure Amounts shall be paid as soon as reasonably practicable following the entry of a final order resolving the dispute and approving the assumption and assignment of such Assigned Contract; provided, however, that the Debtors may settle any such dispute without any further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE THAT FURTHER NOTICE THAT** notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection, or termination of any of the Assigned Contracts.  Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to seek to reject or assume or assume and assign any Assigned Contract pursuant to section 365(a) of the Bankruptcy Code, and nothing herein (a) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to an Assigned Contract against the Debtors that may arise under such Assigned Contract, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of any counterparty to an Assigned Contract against the Debtors that may arise under such Assigned Contract.

DATED:  New York, New York
_____, 2014

FL 6801 SPIRITS LLC, *ET AL.*,
Debtors and Debtors in Possession,
By their attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

3

_____

ALBERT TOGUT
FRANK A. OSWALD
LARA R. SHEIKH
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

**Exhibit A**

| Counterparty Name | Executory Contract or Unexpired Lease | Cure Amount |
|---|---|---|
|  |  |  |

**EXHIBIT O**
**SALE ORDER**

SEE ATTACHED

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Lara R. Sheikh

*Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re:                                                       :        Chapter 11
                                                             :        Case No.
FL 6801 SPIRITS  LLC, et al.,                                :
                                                             :
                                    Debtors.                 :
                                                             :
-------------------------------------------------------------x

## ORDER (I) APPROVING SALE OF DEBTORS' PROPERTY; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon that portion (the "Sale Motion") of the motion (the "Motion"), dated

[                    ], 2014 of FL 6801 Spirits LLC, et al. (collectively, the "Debtors"),[1]

wherein the Debtors moved for entry of an order pursuant to sections 105(a) and 363 of

title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2), 6004

and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

approving the sale (the "Sale") of the Assets to 360 Miami Hotel & Spa LLC (the

"Purchaser"), as defined and described in the Motion and the Purchase and Sale

Agreement attached to the Motion as Exhibit A (the "Purchase Agreement");[2]  and this

Court having reviewed the Sale Motion and the Purchase Agreement;  and upon this

---

[1]    The Debtors consist of the following entities:  FL 6801 Spirits LLC ("Spirits"), FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), FL 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries").

[2]    Unless otherwise defined in this Order, capitalized terms used herein shall have the meanings ascribed to such terms in the Motion or the Purchase Agreement, as applicable.

Court's prior order, dated _____ __, 2014 approving the Bidding

Procedures [Docket No. __] (the "Bidding Procedures Order");  and due notice of the

Sale Motion, the Bidding Procedures Order and the auction conducted in connection

therewith (the "Auction") having been given to all parties entitled thereto; and the

Auction having been held on _____ __, 2014;

       **NOW, THEREFORE**, upon the entire record of the Procedures Hearing,

the Sale Hearing (each as defined in the Bidding Procedures Order) and this case, and

after due deliberation thereon and good cause appearing therefor;

       **IT IS HEREBY FOUND AND DETERMINED THAT:**

       A.     This Court has jurisdiction over the Sale Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.), and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the

Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

       B.     The statutory predicates for the relief sought in the Sale Motion are

sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and

6006.

       C.     Proper, timely, adequate and sufficient notice of the Sale Motion

and the relief requested therein, the Auction, the Sale Hearing, the Sale, and the

transactions described in the Purchase Agreement, including, without limitation,

payment of the Break-Up Fee contained in the Purchase Agreement (all such

transactions being collectively referred to as the "Sale Transaction"), and the

assumption and assignment of each Assigned Contract, has been provided in

accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, 6006 and 9014 and in compliance with the Bidding Procedures Order

to all interested persons and entities, including:  (i) counsel for the Purchaser, Fulbright

& Jaworski LLP, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255, Attn:  Jane

Snoddy Smith, Esq., and 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201, Attn:

Kristian W. Gluck, Esq.; (ii) all applicable federal, state, and local taxing and regulatory

authorities of the Debtors or recording offices or any other governmental authorities

that, as a result of the sale of the Assets, are reasonably expected by the Debtors to have

claims, contingent or otherwise, in connection with the Debtors' ownership of the

Assets or have any known interest in the relief requested by the Motion, including (a)

the Internal Revenue Service, P.O. Box 21126, Philadelphia, Pennsylvania 19114, (b) the

Florida Licensing Authorities, and (c) the City of Miami Beach, City Hall, 1700

Convention Center Drive, Miami Beach, Florida 33139; (iii) the Debtors' known secured

creditors and lien holders, including all creditors or their counsel known to the Debtors

to assert a lien (including any security interest), claim, right, interest, or encumbrance of

record against all or any portion of the Assets; (iv) the United States Attorney for the

Southern District of New York; (v) the Office of the United States Trustee for Region 2,

Attn: William K. Harrington, Esq. and Susan D. Golden, Esq., U.S. Federal Office

Building, 201 Varick Street, Suite 1006, New York, New York 10014; (vi) the Debtors'

Secured Lender, PAMI ALI LLC, c/o Weil, Gotshal & Manges LLP, Attn: Jacqueline

Marcus, Esq., 767 Fifth Avenue, New York, New York 10153; (vii) CR Miami, LLC, Attn:

Jerry Cohen and Gary Milner, 8600 East Rockcliff Road, Tucson, Arizona 85750; W.

James Harrison, Esq., W.J. Harrison & Associates, P.C., 3561 East Sunrise, Suite 201,

Tucson, Arizona 85718 (counsel to CR Miami, LLC); (viii) parties to executory contracts

and unexpired leases proposed to be assumed and assigned, or rejected as part of the

Proposed Sale; (ix) counsel to the North Tower Association; (x) counsel to the Central

3

and South Tower Associations; (xi) all owners of units at the Assets; (xii) the creditors listed as holding the 20 largest unsecured claims against the Debtors' estates (on a consolidated basis); (xiii) all entities that have expressed an interest to the Debtors' or their advisors in purchasing the assets subject to this Order; (xiv) all parties listed on Schedule 6 to the Purchase Agreement;  and (xv) all other parties that filed notices of appearance in the Chapter 11 cases, ((i)-(xv) shall be collectively referred to herein as the "Notice Parties").  Notice of the Auction and Sale Hearing was published in the New York Times on _____, 2014.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice is required.

D.    The disclosures made by the Debtors concerning the Purchase Agreement, the Auction, the Sale contemplated by the Purchase Agreement, and the Sale Hearing were good, complete, and adequate.

E.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive and proposed and executed in good faith as a result of arm's-length negotiations between the Debtors and the Purchaser, and were substantively and procedurally fair to all entities.

F.    The Debtors conducted the sale and auction process in accordance, and have otherwise complied in all respects, with the Bidding Procedures Order.  The sale and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for all creditors, parties-in-interest and other entities to make a higher or otherwise better offer to purchase the Assets.

G.    A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

H.      The Debtors have full corporate power and authority to
consummate the Sale Transaction pursuant to the Purchase Agreement and all other
documents contemplated thereby, and no consents or approvals, other than those
expressly provided for in the Purchase Agreement, are required for the Debtors to
consummate the Sale Transaction.

I.      Approval of the Purchase Agreement and consummation of the
Sale Transaction are in the best interests of the Debtors' estates, their creditors, and
other parties-in-interest.

J.      The Debtors have demonstrated good, sufficient, and sound
business purpose and justification and compelling circumstances for the Sale pursuant
to section 363(b) of the Bankruptcy Code.  Such business reasons include, without
limitation, the following: (i) the Purchase Agreement constitutes the highest or
otherwise best offer for the Assets; (ii) the Purchase Agreement and the closing thereon
will present the best opportunity to realize the value of the Assets on a going concern
basis and avoid decline and devaluation of the Assets; and (iii) any other transaction,
including, without limitation, pursuant to a chapter 11 plan, would not have yielded as
favorable an economic result.

K.      The Purchase Agreement was negotiated, proposed and entered
into by and among the Debtors and the Purchaser, without collusion, in good faith, and
from arm's- length bargaining positions.  The Purchaser is not an "insider" or "affiliate"
of the Debtors as those terms are defined in the Bankruptcy Code.  Neither the Debtors
nor the Purchaser have engaged in any conduct that would cause or permit the
avoidance of the Purchase Agreement or the consummation of the Sale Transaction, or
the imposition of costs or damages under section 363(n) of the Bankruptcy Code.  The

5

aggregate price paid by the Purchaser for the Assets was not controlled by any

agreement among the bidders.

L.    The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in

that: (a) the Purchaser recognized that the Debtors were free to deal with any other

party interested in a transaction regarding the Sale; (b) the Purchaser complied in all

respects with the Bidding Procedures Order; (c) the Purchaser agreed to provisions in

the Purchase Agreement that would enable the Debtors to accept a higher or better offer

in respect of the Sale; (d) the Purchaser made the highest or best bid in respect of the

Sale; (e) all payments to be made by or to the Purchaser and other agreements or

arrangements entered into by the Purchaser in connection with the transactions have

been disclosed; (f) the Purchaser neither induced nor caused the Debtors' chapter 11

filings; (g) the negotiation and execution of the Purchase Agreement and any other

agreements or instruments related thereto was in good faith and an arm's-length

transaction between the Purchaser and the Debtors; and (h) the Purchaser has not

violated section 363(n) of the Bankruptcy Code by any action or inaction.  The

Purchaser has at all times acted in good faith and will continue to be acting in good

faith within the meaning of section 363(m) of the Bankruptcy Code in closing the

transactions contemplated by the Purchase Agreement.

M.    The Sale Transaction and the sale of the Assets is in furtherance of,

and a conveyance pursuant to, the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc., Chapter 11 Case No. 08-13555 [ECF No. 23023] (the

"Plan"), which provides that the Plan Administrator (as defined in the Plan) shall wind-

down, sell and otherwise liquidate assets of the Debtor-Controlled Entities (as defined

in the Plan) in accordance with Section 6.1(b)(iii) of the Plan.  The Debtors are Debtor-
Controlled Entities within the meaning of the Plan.

N.    The terms and conditions of the Purchase Agreement are fair and
reasonable.  The consideration of $12,000,000 provided by the Purchaser for the Assets
pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or best
offer for the Assets, (iii) will provide a greater recovery for the Debtors' creditors than
would be provided by any other practical available alternative, and (iv) constitutes
reasonably equivalent value (as those terms are defined in each of the Uniform
Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the
Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable
non-bankruptcy law.  No other entity or group of entities has offered to purchase the
Assets for greater economic value to the Debtors' estates than the Purchaser.  The
Debtors' determination that the Purchase Agreement constitutes the highest and best
offer for the Assets constitutes a valid and sound exercise of the Debtors' business
judgment.

O.    The Purchaser is not a mere continuation of any of the Debtors or
their estates and there is no continuity of enterprise between the Purchaser and any of
the Debtors.  The Purchaser is not holding itself out to the public as a continuation of
any of the Debtors.  The Purchaser is not a successor to any of the Debtors or their
estates and the Sale does not amount to a consolidation, merger or de facto merger of
Purchaser and any of the Debtors.

P.    The Sale of the Assets outside a chapter 11 plan pursuant to the
Purchase Agreement neither impermissibly restructures the rights of the Debtors'
creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtors.  The
Sale does not constitute a sub rosa plan.

7

Q.    The Purchaser has not agreed to assume and shall have no

obligations with respect to any liabilities of the Debtors or their subsidiaries or Affiliates

other than the Assumed Liabilities and Permitted Encumbrances as specifically

provided in the Purchase Agreement.

R.    The Purchaser is not and will not be liable to any agent, broker,

person or firm acting or purporting to act on behalf of either the Debtors or the

Purchaser for any commission, broker's fee or finder's fee respecting the Sale

Transaction.

S.    The Purchase Agreement was not entered into for the purpose of

hindering, delaying or defrauding creditors under the Bankruptcy Code or under the

laws of the United States, any state, territory, possession or the District of Columbia.

Neither the Debtors nor the Purchaser are fraudulently entering in the transaction

contemplated by the Purchase Agreement.

T.    The Assets constitute property of the Debtors' estates and the

Debtors are the sole and lawful owner of the Assets, and hold good title thereto (subject

to the Permitted Encumbrances).[3]  The transfer of the Assets to the Purchaser will be a

legal, valid, and effective transfer of the Assets, and will vest the Purchaser with all

right, title, and interest of the Debtors in and to the Assets free and clear of all liens,

claims, interests, obligations, rights, charges and encumbrances, except for Permitted

Encumbrances as specifically provided in the Purchase Agreement.  The Purchaser shall

have no liability for any claims against or liabilities of the Debtors or their estates.

U.    The Debtors have good marketable title to the Assets and are

lawful owners of the Assets.  The Debtors may sell the Assets free and clear of all, liens,

---

[3]    A Legal Description of the real property components of the Assets is contained on Exhibit B to this
Order.

interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security

interests, claims (including, any "claim" as defined in Section 101(5) of the Bankruptcy

Code), leases, possessory leasehold interests, charges, options, rights of first refusal or

option to purchase any real property, easements, servitudes, transfer restrictions under

any agreement, judgments, hypothecations, demands, licenses, sublicenses,

assignments, debts, obligations, guaranties, options, contractual commitments,

restrictions, environmental liabilities, options to purchase, and options, in each case of

whatever kind, nature, or description in, against or with respect to any of the Assets,

having arisen, existed or accrued prior to and through the Closing, whether direct or

indirect, absolute or contingent, choate or inchoate, fixed or contingent, matured or

unmatured, liquidated or unliquidated, arising or imposed by agreement,

understanding, law, equity, statute or otherwise and whether arising prior to, on or

after the Petition Date, including those liens, claims and/or encumbrances listed on

Exhibit A to this Order (collectively, "Liens, Claims and/or Interests"), except for

Permitted Encumbrances as expressly provided in the Purchase Agreement, because

one or more of the standards set forth in section 363(f)(1) – (5) has been satisfied with

regard to each such Lien, Claim and/or Interest.  Those non-debtor parties with Liens,

Claims and/or Interests in or with respect to the Assets who did not object, or who

withdrew their objections to the Sale Transaction or the Sale Motion are deemed to have

consented to the sale of the Assets free and clear of those non-debtor parties' Liens,

Claims and/or Interests in the Assets pursuant to section 363(f)(2) of the Bankruptcy

Code.  Those non-debtor parties with Liens, Claims and/or Interests in or with respect

to the Assets who objected to the Motion, but who did not withdraw any such objection,

can be compelled to accept a monetary satisfaction of their liens, claims or interests

within the meaning of Section 363(f)(5) of the Bankruptcy Code.

9

V.    Certain of the Assets are sold subject to: (i) the Declaration of
Covenants, Restrictions and Easements for Carillon Hotel and Spa recorded on
December 3, 2007 in OR Book 26080 on Pages 4905 – 5008 in the public records for
Miami-Dade County, FL, including all recorded amendments to same (collectively, the
"Master Declaration"); (ii) the Declaration of Central Carillon Beach, a Condominium
recorded on October 15, 2008 in OR Book 26610, Pages 0735 – 882 in the public records
for Miami-Dade County, FL, including all recorded amendments to same (collectively,
the "Central Tower Declaration");  (iii) the Declaration of South  Carillon Beach, a
Condominium recorded on December 3, 2007 in OR Book 26080 at page 4764 in the
public records for Miami-Dade County, FL, including all recorded amendments to same
(collectively, the "South Tower Declaration"), and (iv) the Declaration of North
Carillon Beach, a Condominium recorded on  August 27, 2008 in OR Book 26542 at page
15 in the public records for Miami-Dade County, FL, including all recorded
amendments to same (collectively, the "North Tower Declaration") (the "North Tower
Declaration," "South Tower Declaration" and "Central Tower Declaration" are
collectively referred to hereinafter as the "Tower Declarations" unless otherwise
specified, and the Master Declaration and Tower Declarations are hereinafter referred to
as the "Declarations," unless otherwise specified) which grant the owner of those Assets
certain rights pursuant thereto.  The North Carillon Beach Condominium Association
Inc., South Carillon Beach Condominium Association Inc., and Central Carillon Beach
Condominium Association, Inc. (collectively referred to hereinafter as the
"Associations" unless otherwise specified) dispute and have sought to impinge upon
and define those rights.  To facilitate the Sale, this Court makes the following findings
confirming the rights granted to the Debtors pursuant to the Declarations:

10

- The "Hotel Lot Owner" (as defined in the Master Declaration) (or any successor Hotel Lot Owner) has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa (as defined in the Master Declaration) and spa facilities shall be used, if at all, including, without limitation, the right to approve users, determine eligibility for use, establish hours or use and guest policies, restrictions and/or prohibitions, and to allow use of the Spa and spa facilities by persons other than the Unit Owners (as defined in the Declarations).

- Each Unit Owner's right to use the Shared Facilities (as defined in the Master Declaration), including his or her "Limited Spa Rights," as that term is defined in Article 1.1(dd)(iv)(d) of the Master Declaration, are subject to the Hotel Lot Owner's right to permit other persons to use such facilities as the Hotel Lot Owner (or any successor Hotel Lot Owner) may designate in its sole discretion. This includes without limitation persons who are not members of the Associations or who are not owners of any portion of the Properties (as defined in the Master Declaration) and may include members of the public generally.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) of the Future Development Property as defined by Article 1.1(x) of the Master Declaration has the right to "annex" or add Future Development Property to the jurisdiction of the Master Declaration, provided that a Supplemental Declaration is duly executed and recorded in the Public Records of Miami-Dade County, as provided in Article 2.2 of the Master Declaration.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration.

- The Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities, including, without limitation, (i) the right to limit

11

the availability of Unit Owners' use privileges, (ii) to change, eliminate or cease of any or all of the spa features and/or services, and (iii) to impose reasonable non-discriminatory rules and regulations, policies, restrictions and/or prohibitions to govern the orderly use of such facilities.

• The Hotel Lot Owner (or any successor Hotel Lot Owner) may institute reasonable rules and regulations to operate and manage the Shared Facilities, including limiting maximum daily users to comport with legal occupancy limits.

• The Hotel Lot Owner (or any successor Hotel Lot Owner) may include the expense of Valet Parking Services (as defined in the Sale Motion) in the Condominium Tower' Shared Facilities Assessments (as defined in the Sale Motion).

• The Hotel Lot Owner (or any successor Hotel Lot Owner) may assess utility costs based upon square footage rather than actual usage.

Nothing herein shall constitute an amendment of the Declarations.

W. If the above findings regarding the rights granted by the Master Declaration and Declarations were not entered, the Purchaser would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors.

X. If the Sale were not free and clear of all Liens, Claims and/or Interests, or if the Purchaser would, or in the future could, be liable for any of the Liens, Claims and/or Interests, the Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors.

Y. The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

Z.      The Debtors and Purchaser have, to the extent necessary, satisfied

the requirements of section 365 of the Bankruptcy Code, including, without limitation,

sections 365(b)(l)(A) and (B) and 365(f) of the Bankruptcy Code, in connection with the

Sale and the assumption and assignment of the Assigned Contracts to the extent

provided under the Purchase Agreement. The Purchaser is able to demonstrate

adequate assurance of future performance with respect to any Assigned Contracts in

accordance with section 365(b)(l)(C) of the Bankruptcy Code. Except as expressly

provided by the Purchase Agreement, the Assigned Contracts are assumable and

assignable notwithstanding any provisions contained therein to the contrary.

AA.    The transfer of the Assets to the Purchaser (i) does not constitute an

avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or

non-bankruptcy law and (ii) does not and will not subject the Purchaser to any liability

whatsoever with respect to the operation of the Debtors' business prior to the closing of

the Sale Transaction (the "Closing").

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND**

**DECREED THAT:**

**General Provisions**

1.      The Sale Motion is hereby granted and approved as set forth

herein.

2.      The findings of fact set forth above and conclusions of law stated

herein shall constitute this Court's findings of fact and conclusions of law pursuant to

Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule

9014.  To the extent any finding of fact later shall be determined to be a conclusion of

law, it shall be so deemed, and to the extent any conclusion of law later shall be

determined to be a finding of fact, it shall be so deemed.

13

3.      Any and all objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case, are enjoined from taking any action against the Purchaser or any purchaser of the Assets, his affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against the Debtors, or their estates.   Those parties who did not object or who withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Approval of the Purchase Agreement**

4.      The Purchasers' offer for the Assets, as embodied in the Purchase Agreement, is the highest or otherwise best offer for the Assets.

5.      The Sale Transaction, and all of the terms and conditions and transactions contemplated by the Purchase Agreement, including, without limitation, the obligations respecting the Break-Up Fee contained therein, are hereby authorized and approved pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale Transaction or pay the Break-Up Fee, as the case may be, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Debtors shall at all times act in accordance with the terms thereof.

7.      The Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient or desirable to implement the Purchase Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by the

14

Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

8.      The consideration provided by the Purchaser to the Debtors pursuant to the Purchase Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

9.      This Order shall be binding in all respects upon (a) the Debtors, (b) their estates, (c) all creditors, (d) all holders of Liens, Claims and/or Interests whether known or unknown (including, but not limited to those identified on Exhibit A to this Order) against or on all or any portion of the Assets, (d) the Purchaser and all successors and assigns of the Purchaser (e) the Assets, (f) any trustees, if any, subsequently appointed in the Debtors' chapter 11 cases or upon a dismissal or conversion of these cases under chapter 7 of the Bankruptcy Code.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets**

10.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Liens, Claims and/or  Interests in the Assets.

11.      Except for Permitted Encumbrances only as expressly provided in the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Assets (and good and marketable title to such Assets) and all of

the Debtors' rights, title and interest therein shall be transferred to the Purchaser free
and clear of all Liens, Claims and/or Interests (including, but not limited to those listed
on Exhibit A to this Order) with all such Liens, Claims and/or Interests to attach to the
net cash proceeds of the Sale Transaction in the order of their priority, with the same
validity, force and effect which they now have as against the Assets, subject to any
claims and defenses, setoffs or rights of recoupment the Debtors may possess with
respect thereto.

       12.     Pursuant to section 363(f) of the Bankruptcy Code, applicable
Florida law, the Declarations, and this Court's Guidelines for the Conduct of Asset
Sales, adopted by General Order No. M-383, dated as of November 18, 2009, the
Debtors have set forth the legal authority necessary to support this Court's findings
regarding the future conduct that may or will take place with respect to certain of the
Assets after the date of the Sale Order.

       13.     Except for Permitted Encumbrances, as expressly provided in the
Purchase Agreement, all persons and entities (and their respective successors and
assigns) including, but not limited to, all equity security holders, governmental, tax, and
regulatory authorities, lenders, trade and other creditors, holding Liens, Claims and/or
Interests (whether legal or equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated) against, in or with respect to the
Debtors and/or the Assets arising or accruing under or out of, in connection with, or in
any way relating to, the Debtor, the Assets, the operation of the Debtors' business prior
to the Closing, or the transfer of the Assets to the Purchaser, hereby are forever barred,
estopped, and permanently enjoined from asserting such persons' or entities' Liens,
Claims and/or Interests against the Assets or the Purchaser or any of the Purchaser's
successors or assigns.  Following the Closing Date, no holder of a Lien, Claim and/or

16

Interest shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to such Lien, Claim and/or Interest or any actions that the Debtors have taken or may take in this Chapter 11 case.  Effective upon the Closing, the Purchaser shall have no liability for any claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors or their estates.

14.    The Debtors may sell the Assets free and clear of all Liens, Claims and/or Interests whatsoever against the Debtors, their estates or any of the Assets (except the Assumed Liabilities or as otherwise provided in this Order) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens, Claims and/or Interests against the Debtors, their estates or any of the Assets who did not object, or who withdrew their objections to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to 363(f)(2) of the Bankruptcy Code.

15.    The transfer of the Assets to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets.

**Sale Proceeds**

16.    The proceeds of the Sale Transaction (including the amount of the Deposit) shall be distributed as follows:  first, to pay the costs and expenses incurred by the Debtors in connection with the Sale Transaction (excluding legal fees), including, without limitation, the commission owing to the Debtors' broker, CBRE in the amount of [ X ], all taxes and/or assessments levied and assessed against the land, which are due and payable, estoppel fees, survey costs, escrow fees, title costs, stamp taxes, transfer taxes, and property prorations due from the Debtors;  and second, to PAMI ALI, LLC, the Debtors' post-petition lender and the holder of a first priority senior lien

17

on the Assets.  Any and all valid and perfected Liens, Claims and/or Interests in the

Assets shall attach to the proceeds of such Assets immediately upon receipt of such

proceeds by the Debtors (or any party acting on any Debtor's behalf) in order of

priority, and with the same validity, force and effect which they now have against such

Assets, except to the extent modified by the immediately preceding sentence, subject to

any rights, claims and defenses the Debtors, the Debtors' estates or any trustee for any

Debtor, as applicable, may possess with respect thereto, in addition to any limitations

on the use of such proceeds pursuant to any provision of this Sale Order.

**No Successor Liability**

17.    Except for the Assumed Liabilities, the transfer of the Assets to

Purchaser shall not result in (i) the Purchaser or the Assets having any liability or

responsibility for any Liens, Claims and/or Interests against the Debtors or against an

insider of the Debtors, (ii) the Purchaser or the Assets having any liability whatsoever

with respect to or be required to satisfy in any manner, whether at law or in equity,

whether by payment, setoff or otherwise, directly or indirectly, any Liens, Claims

and/or Interests or [Excluded Assets], or (iii) the Purchaser or the Assets, having any

liability or responsibility to the Debtors except as is expressly set forth in the Purchase

Agreement.

18.    Without limiting the generality of the foregoing, and except as

otherwise specifically provided herein or in the Agreement, the Purchaser shall not be

liable for any claims (as defined in section 101(5) of the Bankruptcy Code) against any of

the Debtors or any of their respective predecessors or affiliates, and the Purchaser shall

have no successor or vicarious liabilities of any kind of character, including, but not

limited to, under any theory of antitrust, environmental, successor or transferee

liability, labor law, successor or successor employer liability, de facto merger or joint

venture, mere continuation or substantial continuity, whether known or unknown as of

the Closing, now existing or hereafter arising, whether fixed or contingent, whether

asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated,

including, but not limited to, liabilities on account of warranties, intercompany loans

and receivables between any of the Debtors and any non-debtor subsidiary, liabilities

relating to or arising from any environmental laws, and any taxes arising, accruing or

payable under, out of, in connection with, or in any way relating to the operation of any

of the Assets prior to Closing.

19.      All persons and entities are hereby forever prohibited and enjoined

from taking any action that would adversely affect or interfere with the ability of any of

the Debtors to sell and transfer the Assets to the Purchaser in accordance with the terms

of the Purchase Agreement and this Order.

20.      The Purchaser has given substantial consideration under the

Purchase Agreement for the benefit of the Debtors, their estates and creditors.  The

consideration given by the Purchaser shall constitute valid and valuable consideration

for the releases of any potential Liens, Claims and/or Interests pursuant to the Order,

which releases shall be deemed to have been given in favor of the Purchaser by all

holders of all Liens, Claims and/or Interests against any of the Debtors or any of the

Assets.  The consideration provided by the Purchaser for the Assets under the

Agreement is fair and reasonable and accordingly the purchase may not be avoided

under section 363(n) of the Bankruptcy Code.

**Assigned Contracts**

21.      (a)      **Authorization**.  Subject to the terms of this Section 20, the

Debtors are authorized to execute and deliver to the Purchaser such documents or other

instruments and to take such other actions as may be necessary to assume and assign

the Assigned Contracts to the Purchaser at Closing.  In addition, the Debtors shall, at or

prior to Closing, assign the Rental Program Agreements to the Purchaser.  The

foregoing assignment of the Rental Program Agreements to the Purchaser shall

constitute an "Assigned Contract" for all purposes hereunder, including, without

limitation, Section 20(c) of this Sale Order.

(b)     **Cure Amounts; Adequate Assurances**.  Except as may

otherwise be agreed to by the parties to an Assigned Contract, at the Closing, the

Debtors shall cure those defaults under the Assigned Contracts that need to be cured in

accordance with the Purchase Agreement and section 365(b) of the Bankruptcy Code,

by payment of (i) the undisputed Cure Amounts in the amounts listed in the Sale Notice

as "Cure Amounts," (ii) the amount agreed to by any party to an Assigned Contract and

the Debtors, or (iii) the amount ordered by this Court to constitute the Cure Amount for

any Assigned Contract after a hearing to consider the objection by a counterparty to an

Assigned Contract to the Cure Amount for such Assigned Contract.  The payment of

the applicable Cure Amounts (if any) by the Debtors will (a) effect a cure of all defaults

existing thereunder as of the date that such executory contracts or unexpired leases are

assumed and assigned within the meaning of section 365(b)(l)(A) of the Bankruptcy

Code or otherwise and (b) compensate for any actual pecuniary loss to such non-Debtor

party resulting from such default within the meaning of section 365(b)(l)(B) of the

Bankruptcy Code or otherwise, at which time the Purchasers shall then have taken

assignment of the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy

Code, the assignment by the Debtors of such Assigned Contracts shall not be a default

thereunder.  Since the Purchaser has sufficient assets to continue performance under the

Assigned Contracts, the Purchaser's promise to perform under the Assigned Contracts

is hereby deemed to constitute adequate assurance of future performance under the
Assigned Contracts and any other proposed assignments.

(c)    **Assignment Free and Clear of Liens, Claims and/or**

**Interests**.  The Assigned Contracts shall be assigned to the Purchaser upon the Closing,
free and clear of all Liens, Claims and/or Interests of any kind or nature whatsoever
(including, without limitation, any Liens, Claims and/or Interests arising under or
related to any of the Canyon Ranch Agreements) other than the Assumed Liabilities,
and shall remain in full force and effect for the benefit of the Purchaser and/or its
affiliates, as applicable, in accordance with their respective terms, notwithstanding any
provision in any such Assigned Contracts (including those of the type described in
sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions
any assignment, transfer or sublease.

(d)    **Good Faith**.  The assignments of each of the Assigned
Contracts are made in good faith under sections 363(b) and 363(m) of the Bankruptcy
Code.

(e)    **Effect of Assumption and Assignment**.  Upon the Closing
(or, if later, upon the assignment of such Assigned Contract to Purchaser) and the
payment of the relevant Cure Amounts by the Debtors, Purchaser shall be deemed to be
substituted for the Debtors, as applicable, as a party to the applicable Assigned
Contracts and the Debtors shall be released, pursuant to section 365(k) of the
Bankruptcy code, to the extent allowable under applicable law, from any liability under
the Assigned Contracts but only to the extent any such liability first accrues after the
Closing Date;  provided, however, that any default, claim, liability or obligation of any
kind arising from an event that occurs prior to the Closing that gives rise to a default,
claim, liability or obligation or any kind after Closing (e.g., any event that gives rise to

liability after lapse of an applicable cure period) shall be deemed to have accrued prior to Closing for all purposes hereunder); and, provided, further, that the foregoing release of the Debtors by the Purchaser shall apply only with respect to liabilities that are assumed by the Purchaser.  There shall be no rent accelerations, assignment fees, increases or any other fees or loss of rights or increase of liabilities under the Assigned Contracts charged to Purchaser solely as a result of the assumption and assignment of the Assigned Contracts.  Each counterparty to an Assigned Contract will be forever barred, estopped and permanently enjoined from (i) asserting against the Debtors or the Purchaser, or their respective affiliates, or the property of any of them, any default existing as of Closing; or, against the Purchaser or its affiliates, any counterclaim, defense, setoff or any other Lien, Claim and/or Interest asserted or assertable against the Debtors;  and (ii) imposing or charging against Purchaser or its affiliates any accelerations, assignment fees, increases or any other fees or asserting any loss of rights or increase of liabilities under the Assigned Contract solely as a result of the Debtors' assumption and assignment to Purchaser of the Assigned Contract.  No counterparty under any Assigned Contract may terminate any such contract, nor shall the Purchaser's rights and obligations under such Assigned Contracts be adversely affected in any way, by reason of any default under such Assigned Contract prior to Closing.  To the extent that any counterparty to an Assigned Contract failed to object to any notice of assumption and assignment or to the Cure Amount with respect to such Assigned Contract, such counterparty is deemed to have consented to such Cure Amount and the assignment of such contract to the Purchaser.

(f)    **Possible Covenants Attached to the Assets**.  The assumption of that certain Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration"), which is recorded in Official

22

Records Book 26080, Page 4905 of the Public Records of Miami-Dade County, Florida, is

without prejudice to any party's argument over whether such contract is an "executory

contract" subject to assumption or rejection.

**Rejected Contracts**

22.    This Sale Order shall operate as a permanent injunction prohibiting

any party to a contract that has been rejected by any of the Debtors (each a "Rejected

Party") that in any way relates to the Assets from taking any action against the

Purchaser in connection with the Sale Transaction, whether pursuant to the Bankruptcy

Code or any other statutory or non-statutory federal, state or local law.

**Ipso Facto Clauses Ineffective**

23.    Upon the Debtors' assignment of the Assigned Contracts to the

Purchaser under the provisions of this Sale Order and any additional order

contemplated by this Sale Order or the Purchase Agreement, and subject to the timely

payment by the Debtors of the applicable Cure Amount or such other amount as may

be agreed to in writing by the parties to an Assigned Contract (provided, however, that

the failure of the Debtors to cure any default under an Assigned Contract shall not

result in any liability to or obligation of the Purchaser), no default shall exist under any

Assigned Contract, and no counterparty to any Assigned Contract shall be permitted to

declare a default thereunder, or otherwise take action against the Purchaser, as a result

of any Debtor's financial condition, bankruptcy or failure of the Debtor to perform or

observe any of its obligations under the relevant Assigned Contract.  Any provision in

an Assigned Contract that prohibits or conditions an assignment or sublease of such

Assigned Contract (including, without limitation, the granting of a lien therein) or

allows the counterparty thereto to terminate, recapture, impose any penalty, condition

on renewal or extension, or modify any term or condition on account of such

assignment or sublease, constitutes an unenforceable anti-assignment provision in
connection with the Sale Transaction that is void and of no force and effect.  The failure
of the Debtors or the Purchaser to enforce at any time one or more terms or conditions
of any Assigned Contract shall not be a waiver of such terms or conditions, or the
Debtors' and Purchaser's rights to enforce every term and condition of the Assigned
Contract.

**No Stay of Order**

24.    Notwithstanding the provisions of Bankruptcy Rule 6004 and
Bankruptcy Rule 6006 or any applicable provisions of the Local Bankruptcy Rules, this
Sale Order shall not be stayed for 14 days after the entry hereof, but shall be effective
and enforceable immediately upon entry.  Time is of the essence in approving the Sale
Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as
soon as practicable.

**Additional Provisions**

25.    Without limiting the other terms of this Sale Order, prior to or upon
the Closing of the Sale Transaction, each of the Debtors' creditors is authorized and
directed to execute such documents and take all other actions as may be necessary to
release their Liens, Claims and/or Interests, if any, in the Assets as such Liens, Claims
and/or Interests may have been recorded or may otherwise exist.

26.    Except for Permitted Encumbrances, only as expressly provided in
the Purchase Agreement, this Sale Order (a) shall be effective as a determination that,
upon the Closing, all Liens, Claims and/or Interests existing with respect to the Assets
prior to the Closing (including, but not limited to those listed on Exhibit A to this Sale
Order) have been unconditionally released, discharged and terminated as to the
Purchaser and the Assets, and that the conveyances described herein have been

24

effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state,

and local officials, and all other persons and entities who may be required by operation

of law, the duties of their office, or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure

any title or state of title in or to any of the Assets.

27.    Each and every federal, state, and local governmental agency or

department or office is hereby directed to accept this Sale Order and any and all

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Purchase Agreement.

28.    Without limiting the other provisions of this Sale Order, if any

person or entity that has filed financing statements, mortgages, mechanic's liens, lis

pendens or other documents or agreements evidencing interests with respect to the

Debtors and/or the Assets shall not have delivered to the Debtors or their designee

prior to the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all Liens, Claims and/or

Interests which the person or entity has with respect to the Debtors, the Assets or

otherwise, then (a) the Debtors are hereby authorized and directed to execute and file

such statements, instruments, releases and other documents on behalf of the person or

entity with respect to the Assets and (b) the Purchaser and/or the Debtors are hereby

authorized to file, register, or otherwise record a certified copy of this Sale Order,

which, once filed, registered, or otherwise recorded, shall constitute conclusive

evidence of the release of all Liens, Claims and/or Interests in, against or with respect to

the Debtors and/or the Assets.  This Sale Order is deemed to be in recordable form

sufficient to be placed in the filing or recording system of each and every federal, state,

and local governmental agency, department, or office.

29.    From and after the date hereof, no creditor of the Debtors or other

party in interest shall take or cause to be taken any action that would interfere with the

transfer of the Assets to the Purchaser in accordance with the terms of this Sale Order.

30.    This Court hereby retains exclusive jurisdiction, regardless of

whether a chapter 11 plan has been confirmed and consummated and irrespective of the

provisions of any such plan or order confirming such plan, to enforce and implement

the terms and provisions of the Purchase Agreement, all amendments thereto, any

waivers and consents thereunder, and of each of the agreements executed in connection

therewith in all respects including, but not limited to, retaining jurisdiction to (a)

compel delivery of the Assets to the Purchaser in accordance with the terms of the

Purchase Agreement, (b) resolve any dispute, controversy or claim arising under or

related to the Purchase Agreement, or the breach thereof and (c) interpret, implement,

and enforce the provisions of this Sale Order and resolve any disputes related thereto.

31.    Nothing contained in any plan confirmed in this Chapter 11 case or

any order of this Court confirming such plan shall conflict with or derogate from the

provisions of the Purchase Agreement or the terms of this Sale Order.

32.    The transactions contemplated by the Purchase Agreement are

undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the

Bankruptcy Code.  The Purchaser is a purchaser in good faith of the Assets and is

entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

Accordingly, any reversal or modification on appeal of the authorization provided

herein to consummate the Sale Transaction shall not affect the validity of the Sale

Transaction to the Purchaser.

33.    The terms and provisions of the Purchase Agreement and this Sale

Order shall be binding in all respects upon, and shall inure to the benefit of, the

Debtors, their estates and their creditors, the Purchaser, and any of such parties'

respective affiliates, designees, successors, and assigns, and shall be binding in all

respects upon all of the Debtors' creditors, all prospective and actual bidders for some

or all of the Assets, and all persons and entities receiving notice of the Sale Motion, the

Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any

examiner(s) or receiver(s) under any Chapter of the Bankruptcy Code or any other law,

and all such provisions and terms shall likewise be binding on such trustee(s),

examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the

Debtors, their estates, their creditors, their members or any examiner(s) or receiver(s).

34.    The failure specifically to include any particular provision of the

Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of

such provision, it being the intent of this Court that the Purchase Agreement be

authorized and approved in its entirety.

35.    All time periods set forth in this Order shall be calculated in

accordance with Bankruptcy Rule 9006(a).

**[continued on the following page]**

27

36.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

DATED:    New York, New York
    _____, 2014


    _____
    HONORABLE SHELLEY C. CHAPMAN
    UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

1. The Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo Real Estate Capital Corporation, a Delaware corporation, dated April 21, 2004, recorded April 22. 2004 in Official Records Book 22234, Page 2688, as amended by First Amendment to Mortgage. Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded March 4, 2005 in Official Records Book 23139, Page 1936, as re-recorded April 4, 2005 in Official Records Book 23233, Page 1997. and modified by Notice of Future Advance and Second Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded August 2, 2005 in Official Records Book 23633. Page 4123, as assigned to Lehman Brothers Holdings, Inc., by Assignment of Notes and Mortgages recorded July 5, 2006 in Official Records Book 24689, Page 864, and further modified by that certain Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded September 12, 2006 in Official Records Book 24901, Page 2262, as assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May 1, 2008 in Official Records Book 26355, Page 4533, and further assigned to Fortress Credit Corp, by Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded May 1, 2008 in Official Records Book 26355, Page 4587, and as affected by that certain Termination and Release of Collateral Assignment of Recorded Mortgage Collateral Security Documents recorded July 7, 2009 in Official Records Book 26930, Page 559, as affected by Partial Release of Mortgages and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3163, Partial Release of Mortgage and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3 167, Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2925, Partial Release of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2933, Partial Release of Mortgages and Security Documents recorded November 16, 2009 in Official Records Book 27084, Page 22, Partial Release of Mortgages and Security Documents recorded November 16, 2009 in Official Records Book 27084, Page 148, Partial Release of Mortgage recorded May 1, 2008 in Official Records Book 26355, Page 4529, Partial Release of Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page 1450, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4506, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4512, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 85, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 100, Partial Release of Mortgages and Security Documents recorded July 7, 201 0 in Official Records Book 27343, Page 4986, Partial Release of Mortgages and Security Documents recorded July 7, 20 10 in Official Records Book 27344, Page 94, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1656, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1664 Partial Release of Mortgages and Security Documents recorded December 9, 2011 in Official Records Book 27921, Page 4251, Partial Release of Mortgages and Security Documents recorded December 21, 2011 in Official Records Book 27935, Page 4658, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 2826 t, Page 8, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 16, and Partial Release of Mortgages and Security Documents recorded December 3, 2012 in Official Records Book 28381, Page 2543, all of the Public Records of Miami-Dade County, Florida.

2. UCC-1 Financing Statement recorded April 22, 2004 in Official Records Book 22234, Page 2742, Of the Public Records of Miami-Dade County, Florida, as amended by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 869, and further amended by UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1293, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4602, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355,

29

Page 4603, and further amended by UCC-3 Financing Statement Amendment recorded December 26, 2008 in Official Records Book 26699, Page 4 186, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3988, all of the Public Records of Miami-Dade County, Florida.

3.    UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23633, Page 4169, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3567, UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3568, all of the Public Records of Miami-Dade County, Florida.

4.    Assignment of Leases, Rents and Revenues recorded September 12, 2006 in Official Records Book 24901, Page 2304, of the Public Records of Miami-Dade County. Florida.

5.    Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc., recorded May 1, 2008 in Official Records Book 26355, Page 4546, of the Public Records of Miami-Dade County, Florida.

6.    UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4608, of the Public Records of Miami-Dade County, Florida; as amended by UCC-3 Financing Statement Amendment recorded May 5, 2008 in Official Records Book 26360, Page 4190, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 563, all of the Public Records of Miami-Dade County, Florida.

7.    Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing in favor of Hypo Real Estate Capital Corporation, a Delaware corporation dated July 29, 2005 recorded August 2, 2005 in Official Records Book 23631, Page 2746, as modified by Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded September 1 3, 2006 in Official Records Book 24903, Page 3644, and as assigned to Lehman Brothers Holdings, Inc., a Delaware corporation by Assignment of Notes and Mortgages recorded July 5, 2006 in Official Records Book 24689, Page 864, and further assigned to LB Carillon Construction LLC by Assignment of Notice of Future Advance and Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded May 1, 2008 in Official Records Book 26355, Page 4540, as affected by Partial Release of Mortgages and Security Documents recorded October 24, 2008 in Official Records Book 26624, Page 1456, Partial Release of Mortgages and Security Documents recorded January 20, 2009 in Official Records Book 26722, Page 4518, Partial Release of Mortgages and Security Documents recorded May 19, 2009 in Official Records Book 26872, Page 110, Partial Release of Mortgages and Security Documents recorded August 5, 2009 in Official Records Book 26967, Page 3159, Partial Re lease of Mortgages and Security Documents recorded November 5, 2009 in Official Records Book 27074, Page 2929, Partial Release of Mortgages and Security Documents recorded July 7, 2010 in Official Records Book 27344, Page 47, Partial Release of Mortgages and Security Documents recorded June 8, 2011 in Official Records Book 27714, Page 1660, Partial Release of Mortgages and Security Documents recorded August 3, 2011 in Official Records Book 27778, Page 3179, Partial Release of Mortgages and Security Documents recorded December 9, 2011 in Official Records Book 27921, Page 4242, Partial Release of Mortgages and Security Documents recorded January 18, 2012 in Official Records Book 27964, Page 2631, Partial Release of Mortgages and Security Documents recorded February 10, 2012 in Official Records Book 27994, Page 1233, Partial Release of Mortgages and Security Documents recorded May 2, 2012 in Official Records Book 2809-L Page 4599, Partial Release of Mortgages and Security Documents recorded May 4, 2012 in Official Records Book 28098, Page 2916, Partial Release of Mortgages and Security Documents recorded September 6, 2012 in Official Records Book 28261, Page 12, Partial Release of Mortgages and Security Documents recorded October 1, 2012 in Official Records Book 28294, Page 2404, Partial Release of Mortgages and Security Documents recorded December 3, 2012 in Official Records Book 28381, Page 2547, Partial Release of Mortgages and Security Documents recorded September 4, 2013 in Official Records Book 28803, Page 2919, Partial Release of Mortgages and Security Documents recorded November 15, 2013 in Official Records Book 28912, Page 3203, Partial Release of Mortgages and Security Documents recorded November 25, 2013 in Official Records Book 28925, Page 3937, all of the Public Records of Miami-Dade County, Florida.

8.  UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2836, as assigned by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 870, and UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24 716, Page 1292, as terminated by UCC-3 Financing Statement recorded October 11, 2006 in Official Records Book 24991, Page 1301, as assigned by UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4604, and assigned by UCC-3 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4605, and July 24, 2009 in Official Records Book 26953, Page 3987, all of the Public Records of Miami-Dade County, Florida.

9.  UCC-1 Financing Statement recorded August 2, 2005 in Official Records Book 23631, Page 2844, as amended by UCC-3 Financing Statement Amendment recorded June 16, 2010 in Official Records Book 27321, Page 3566, and further amended by UCC-3 Financing Statement Amendment recorded July 5, 2006 in Official Records Book 24689, Page 871, and further amended by UCC-3 Financing Statement Amendment recorded July 13, 2006 in Official Records Book 24716, Page 1291, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4606, UCC-3 Financing Statement Amendment recorded May 1, 2008 in Official Records Book 26355, Page 4607, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3986, all of the Public Records of Miami-Dade County, Florida.

10. Assignment of Leases, Rents and Revenues recorded September 13, 2006 in Official Records Book 24903, Page 3684, of the Public Records of Miami-Dade County, Florida.

11. Collateral Assignment of Recorded Mortgage Collateral Security Documents in favor of Fortress Credit Corp, recorded May 1, 2008 in Official Records Book 26355, Page 4595, of the Public Records of Miami-Dade County, Florida.

12. Second Priority Guaranty Mortgage in favor of Lehman Brothers Holdings, Inc. recorded May 1, 2008 in Official Records Book 26355, Page 4567, of the Public Records of Miami-Dade County, Florida.

13. UCC-1 Financing Statement recorded May 1, 2008 in Official Records Book 26355, Page 4616, as amended by UCC-3 Financing Statement Amendment recorded May 6, 2008 in Official Records Book 26364, Page 148, UCC-3 Financing Statement Amendment recorded July 24, 2009 in Official Records Book 26953, Page 3985, UCC-3 Financing Statement Amendment recorded July 7, 2009 in Official Records Book 26930, Page 562, all of the Public Records of Miami-Dade County, Florida.

14. Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in favor of PAMI ALI LLC, a Delaware limited liability company dated March 12, 2014, recorded March 18, 20 14 in Official Records Book 29072, Page 1855, of the Public Records of Miami-Dade County, Florida.

15. [Notice of Commencement recorded June 19, 2013 in Official Records Book 28685, Page 3570, of the Public Records of Miami-Dade County, Florida.]

16. [Notice of Commencement recorded March 5, 2014 in Official Records Book 29055, Page 1441, of the Public Records of Miami-Dade County, Florida.]

17. Any and all claims in North Carillon Beach Condominium Association, Inc. Complaint for Declaratory Relief against FL 6801 COLLINS NORTH LLC, FL 6801 COLLINS SOUTH LLC and FL 6801 Collins Central dated February 19, 2014.

18. Any and all claims in Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, Inc., Complaint against FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc., and North Carillon Beach Condominium Association, Inc., dated, March 11, 2014.

19.     Any and all claims covered by the Broad and Cassel letter addressed to Carillon Hotel and Spa Master Association, Inc. regarding "Request for Records" dated December 27, 2013.

20.     Any and all claims covered by the Broad and Cassel letter addressed to FL6801 Collins Central, LLC c/o FL 6801 Spirits LLC regarding "Request for Records" dated December 27, 2013.

21.     Any and all claims covered by the Siegfried Rivera Hyman Lerner De La Torre Mars Sobel ("SRHL") letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated November 19, 2013.

22.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Certificate of Occupancy dated September 26, 2013.

23.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated September 25, 2013.

24.     Any and all claims covered by the SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Vibration and Noise from Hydraulic Elevator Pumps  dated September 27, 2013.

25.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated April 26, 2013.

26.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated May 3, 2013.

27.     Any and all claims covered by the HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated June 3, 2013.

28.     Any and all claims covered by the GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Building Records dated February 5, 2013.

29.     Any and all claims covered by the GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Request for Records dated January 21, 2013.

30.     Any and all claims covered by the Notice of Claim by South Carillon Beach Condominium Association, Inc. pursuant to Chapter 558 Florida Statues dated May 22, 2012.

31.     Any and all claims covered by the RUMBERGER KIRK & CALDWELL letter addressed to GURSKY & RAGAN PA regarding South Carillon Beach Condominium Association, Inc. 558 Notice dated May 29, 2013.

32.     Any and all claims covered by the Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 507 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010

33.     Any and all claims covered by the Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 508 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010.

## Exhibit B

### NORTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION

Units 610, 204 and 205 of North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed August 27, 2008, in Official Records Book 26542, at Page 0015 of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

### SOUTH TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION

Unit 109 of South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed December 3, 2007, in Official Records Book 26080, at Page 4764, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

### CENTRAL TOWER CONDOMINIUM UNITS LEGAL DESCRIPTION

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019 of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

### HOTEL PROPERTY LEGAL DESCRIPTION

**Parcel 1:**

Lots 1 through 6, inclusive, in Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the Plat thereof, as recorded in Plat Book 9, at Page 14, of the Public records of Miami-Dade County, Florida.

**Parcel 2:**

A PARCEL OF LAND LYING East of the Water Line of the Atlantic Ocean as shown on said CORRECTED PLAT OF ATLANTIC HEIGHTS and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the Plat thereof, as recorded in Plat Book 105, at Page 62, of said Public Records, and lying South of the Easterly extension of the North line of said Lot 1 in Block B and lying North of the Easterly extension of the South line of said Lot 6 in Block B of CORRECTED PLAT OF ATLANTIC HEIGHTS.

**Parcel 3:**

The North 25.00 feet of Lot 48, all Lots 49 through 53, inclusive, in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION, according to the plat thereof, a subdivision recorded in Plat Book 28, at Page 28, of the Public Records of Miami-Dade County, Florida.

**Parcel 4:**

A parcel of land lying East of the High Water Line of the Atlantic Ocean as shown on said AMENDED SECOND OCEAN FRONT SUBDIVISION, and lying West of the Erosion Control Line as shown on establishment of EROSION CONTROL LINE, according to the plat thereof, as recorded in Plat Book 105 at Page 62 of said Public Records, and lying South of the Easterly extension of the North line of said Lot 53 in Block 1, and lying North of the Easterly extension of the South line of said North 25.00 feet of Lot 48 in Block 1 of AMENDED SECOND OCEAN FRONT SUBDIVISION.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 1 and 2 ABOVE:**

North Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded on August 27, 2008 in Official Records Book 26542, Pages 0015 through 158, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

The Retail Lot, described as follows:

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet; thence N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

**LESS AND EXCEPT THE FOLLOWING FROM PARCELS 3 and 4 ABOVE:**

Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26610, Pages 735 through 822, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto; and

South Carillon Beach, a Condominium, according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 26080, Pages 4764 through 4904, of the Public Records of Miami-Dade County, Florida, and any and all amendments thereto.

## RETAIL PROPERTY LEGAL DESCRIPTION

A portion of Lots 1, 2, 3, 4, 5 and 6, of Block B, CORRECTED PLAT OF ATLANTIC HEIGHTS, according to the plat thereof, as recorded in Plat Book 9 at Page 14 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the Southwest corner of said Lot 6; thence N 02°27'29" W along the West line of said Block B, also being the East right of way line of Collins Avenue (State Road A-1-A) for 28.07 feet; thence N 87°32'31" E at right angles to the previously described course for 15.62 feet to the Point of Beginning; thence N 88°18'36" E for 15.52 feet; thence N 01°41'24" W for 123.25 feet; thence N 88°20'18" E for 17.15 feet thence; N 01°41'24" W for 124.26 feet; thence S 88°18'38" W for 32.67 feet; thence S 01°41'24" E for 247.50 feet to the Point of Beginning.

The above described perimetrical boundary lies between elevation +8.1 feet and elevation +21.4 feet relative to the National Geodetic Vertical Datum of 1929.

## SHARED COMPONENT UNIT LEGAL DESCRIPTION

Unit Shared Component Unit of Central Carillon Beach, a Condominium, according to the Declaration of Condominium thereof, filed October 15, 2008, in Official Records Book 26610, at Page 735, of the Public Records of Miami-Dade County, Florida, and all amendments thereto, together with an undivided interest in and to the common elements appurtenant thereto as specified in such Declaration.

**EXHIBIT P**
**CONSTRUCTION CONTRACT**

SEE ATTACHED

# AIA® Document A107™ – 2007

## Standard Form of Agreement Between Owner and Contractor *for a Project of Limited Scope*

AGREEMENT made as of the ▨ day of ▨ in the year 2014

BETWEEN the Owner:

FL 6801 Collins North LLC
c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 39th Floor
New York, New York 10020

and the Contractor:

EBL Construction
1482 Rail Head Boulevard
Naples, Florida 34110

for the following Project:

Stucco remediation, Canyon Ranch North Tower, 6900 Collins Avenue, Miami Beach, Florida

The Architect:*

NV5 Structures/Vertical V – Southeast, Inc.
200 South Park Road, Suite 350
Hollywood, Florida 33021

The Owner and the Contractor agree as follows.

*The term "Architect" herein shall mean NV5 Structures/Vertical V – Southeast, Inc., a professional and technical consulting firm.

THSH DRAFT 5/22/2014

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**ELECTRONIC COPYING** of any portion of this AIA® Document to another electronic file is prohibited and constitutes a violation of copyright laws as set forth in the footer of this document.

AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                    (1848792917)

1

TABLE OF ARTICLES

1    THE WORK OF THIS CONTRACT

2    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

3    CONTRACT SUM

4    PAYMENT

5    DISPUTE RESOLUTION

6    ENUMERATION OF CONTRACT DOCUMENTS

7    GENERAL PROVISIONS

8    OWNER

9    CONTRACTOR

10    ARCHITECT

11    SUBCONTRACTORS

12    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

13    CHANGES IN THE WORK

14    TIME

15    PAYMENTS AND COMPLETION

16    PROTECTION OF PERSONS AND PROPERTY

17    INSURANCE & BONDS

18    CORRECTION OF WORK

19    MISCELLANEOUS PROVISIONS

20    TERMINATION OF THE CONTRACT

21    CLAIMS AND DISPUTES

ARTICLE 1    THE WORK OF THIS CONTRACT
*(Paragraph deleted)*
§ 1.1 The Contractor shall execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

§ 1.2 The Contractor shall perform the work required by the Contract Documents, and all work which is reasonably inferable therefrom, and provide all labor, materials, equipment, tools, scaffolding and other facilities and services necessary for the proper execution and completion of the work for the Project (the "Work") and shall perform all related work made necessary by a visual inspection of the Project. The Contractor shall also be responsible to Owner for assuring that the Work is performed in strict accordance and as required by the Contract Documents. Materials which are not shown on the Drawings shall be suitable for the intended use, and shall be subject to review and approval by Owner and Architect for consistency with the intent of the Contract Documents. Where installation techniques are

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                          (1848792917)

not specified, they shall be in accordance with manufacturer's current instructions, industry standards and all applicable laws, rules and regulations.

§ **1.3** The documents comprising the Drawings and the other Contract Documents shall be deemed to be cumulative, and if there shall be a conflict or ambiguity between or among the Drawings or if a discrepancy shall arise between the Specifications and existing conditions at the Project, the Contractor shall immediately notify Architect of such fact when it becomes aware of same and, thereafter, the Owner, in consultation with the Architect and the Contractor, shall determine the appropriate course of action to follow and advise the Contractor accordingly. In the event any provision in this Agreement conflicts with or is inconsistent with any provision contained in the Contract Documents, the Contractor shall immediately notify Architect and Owner and the parties will endeavor to reach agreement as to the applicable provision. Any Work relating to such conflict, ambiguity or discrepancy which is knowingly performed by the Contractor prior to the Owner's resolution thereof shall be at the Contractor's sole risk and expense.

§ **1.4** The Contractor has carefully examined the Contract Documents and the premises and, from the Contractor's own investigations, is satisfied as to the nature and location of the Work, the character, quality and quantity of materials likely to be encountered, the character of equipment and other facilities needed for the performance of the Work, and all other conditions or items which may affect the Work. The Contractor accepts full responsibility for all conditions at the premises that may affect the Contractor's performance.

§ **1.5** The Contractor warrants and guarantees that the performance of the Work (i.e. means and methods) will be in conformance with all applicable codes and other applicable rules, regulations and ordinances of all governmental and administrative agencies having jurisdiction over the Project.

## ARTICLE 2    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION
§ **2.1** The date of commencement of the Work shall
*(Paragraphs deleted)*
be_____.

§ **2.2** The Contract Time shall be measured from the date of commencement.

§ **2.3** The Contractor shall achieve Substantial Completion of the entire Work not later than        (       ) days from the date of commencement,
*(Paragraphs deleted)*
subject to adjustments of this Contract Time as provided in the Contract Documents.

§ **2.4** The Contractor agrees to perform the Work or cause the performance of Work by others in a prompt and diligent manner so as to ensure the uninterrupted progress of the Project and in accordance with a project schedule approved by the Owner and the Architect and furnished by the Contractor upon the execution of this Agreement. The Contractor agrees to complete the Work as rapidly as field conditions permit, proceeding in a skillful and expeditious manner, with sufficient labor, materials, tools, equipment, supplies and all things necessary to ensure uniform and efficient progress, so that the Work will be completed by the Substantial Completion Date. THE SUBSTANTIAL COMPLETION DATE ESTABLISHED BY THIS AGREEMENT SHALL BE DEEMED OF THE ESSENCE OF THIS AGREEMENT. By executing the Agreement, the Contractor confirms that the Substantial Completion Date is a reasonable period for completing the Work.

§ **2.5** If the Work is not progressing timely and the delays are caused by the Contractor, the Contractor shall at its own cost and expense be responsible to work additional shifts and cause at its own cost and expense its Subcontractors involved in the Work to work additional shifts and to take other reasonable measures in order to bridge the gap between the delay and the time requirement, all at no additional cost to Owner. Nothing contained in this or any other provision of this Agreement shall limit Owner's right to seek other and further remedies which may be allowed by this Agreement or in law or equity.

## ARTICLE 3    CONTRACT SUM
§ **3.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be one of the following:

*(Paragraph deleted)*

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                      (1848792917)

[ **X** ] Cost of the Work based on Contractor's Proposal (Exhibit A) plus the Contractor's Fee, in accordance
with Section 3.3 below
*(Paragraphs deleted)*

*(Table deleted)*
*(Paragraphs deleted)*
*(Table deleted)*

### § 3.3 COST OF THE WORK PLUS CONTRACTOR'S FEE

§ 3.3.1 The Cost of the Work shall mean the Contractor costs identified in Exhibit A and as may be modified by
Changes in the Work (Article 13).

§ 3.3.2 The Contractor's Fee:
*(Paragraph deleted)*
Ten percent (10%) of the Cost of the Work. The Contractor's Fee shall be inclusive of mobilization costs, general
conditions costs, profit and overhead.

§ 3.3.3 Unit Prices, if any:

| Item | Units and Limitations | Price Per Unit ($0.00) |
|------|----------------------|------------------------|
| See Exhibit A. | | |

*(Paragraphs deleted)*
*(Table deleted)*
*(Paragraphs deleted)*
*(Table deleted)*
*(Paragraphs deleted)*

### ARTICLE 4   PAYMENTS

### § 4.1 PROGRESS PAYMENTS

§ 4.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for
Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the
Contractor as provided below and elsewhere in the Contract Documents.

§ 4.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the
month

§ 4.1.3 Payment to the Contractor shall be made by the Owner pursuant to Article 15.

§ 4.1.4 Retainage, if any, shall be withheld as follows:

Ten percent (10%) until Substantial Completion. (See Section 15.4.2.)

§ 4.1.5 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated
below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

Six percent (6%)     per annum

### § 4.2 FINAL PAYMENT

§ 4.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the
Contractor when
    .1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct
            Work as provided in Section 18.2, and to satisfy other requirements, if any, which extend beyond final
            payment;
    .2    the Contractor has submitted a final accounting for the Cost of the Work, where payment is on the basis
            of the Cost of the Work with or without a guaranteed maximum price;
    .3    all sign offs which are the responsibility of the Contractor or its Subcontractors are submitted to the
            Owner; and
    .4    a final Certificate for Payment has been issued by the Architect.

AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects.
All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or
distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent
possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is
not for resale.
User Notes: Canyon Ranch/EBL

**4**

(1848792917)

**§ 4.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment.

**§ 4.3** The Contractor shall without delay cause the discharge of any mechanics' liens filed against the Project by any of its laborers, Subcontractors or materialmen, and shall cause any such lien to be discharged of record within fifteen (15) days after the notice of filing thereof by bond, order or deposit provided the Owner has paid the Contractor for the Work in question. If the Contractor shall fail to cause such lien to be discharged of record within such period, the Owner may do so. Any amount paid by the Owner for such purpose, including all costs and expenses, including reasonable attorneys' fees shall be paid by the Contractor to the Owner on demand. The Owner may at any time also require the Contractor to furnish a bond or other security, in a form and amount satisfactory to Owner as security for the payment of any such liens. The filing of a lien by the Contractor, unless the Owner is in default of its payment obligations hereunder, shall be deemed a default under the terms of the Contract.

**§ 4.4** In the event payments are withheld as a result of the failure of the Contractor to make payments to a Subcontractor or materialman or by reason of other defaults of the Contractor, the Owner may, at its option, make payment directly to said Subcontractor or materialman, in lieu of making payment to the Contractor.

## ARTICLE 5    DISPUTE RESOLUTION
**§ 5.1 BINDING DISPUTE RESOLUTION**
For any claim subject to, but not resolved by, mediation pursuant to Section 21.3, the method of binding dispute resolution shall be
*(Paragraphs deleted)*
arbitration.

## ARTICLE 6    ENUMERATION OF CONTRACT DOCUMENTS
**§ 6.1** The Contract Documents are defined in Article 7 and, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

**§ 6.1.1** The Agreement is this executed AIA Document A107–2007, Standard Form of Agreement Between the Owner and the Contractor for a Project of Limited Scope.

*(Table deleted)*
*(Paragraph deleted)*
**§ 6.1.3** The Specifications:

*(Paragraphs deleted)*Title of Specifications exhibit:  See Drawings and Specifications (Exhibit C).
*(Table deleted)*
**§ 6.1.4** The Drawings:

*(Paragraphs deleted)*Title of Drawings exhibit:  See Drawings and Specifications (Exhibit C).
*(Table deleted)*
**§ 6.1.5** The Addenda, if any:

| Number | Date | Pages |
|--------|------|-------|
| N/A    |      |       |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are enumerated in this Article 6.

**§ 6.1.6** Additional documents, if any, forming part of the Contract Documents:
    .1    Exhibit A, Proposal

    .2    Other documents:

        Exhibit B, Indemnity and Insurance Requirements
        Exhibit C, Drawings and Specifications

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                                    (1848792917)

5

*(Paragraphs deleted)*

Exhibit D, Forms of Final and Progress Lien Waivers

## ARTICLE 7   GENERAL PROVISIONS
### § 7.1 THE CONTRACT DOCUMENTS
The Contract Documents are enumerated in Article 6 and consist of this Agreement (including, if applicable, Supplementary and other Conditions of the Contract), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### § 7.2 THE CONTRACT
The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind between any persons or entities other than the Owner and the Contractor.

### § 7.3 THE WORK
The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 7.4 INSTRUMENTS OF SERVICE
Instruments of Service are representations, in any medium of expression now known or later developed, of the tangible and intangible creative work performed by the Architect and the Architect's consultants under their respective professional services agreements. Instruments of Service may include, without limitation, studies, surveys, models, sketches, drawings, specifications, and other similar materials.

### § 7.5 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
#### § 7.5.1 The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and will retain all common law, statutory and other reserved rights, including copyrights. The Contractor, the Subcontractors, the Sub-subcontractors, and material or equipment suppliers shall not own or claim a copyright in the Instruments of Service. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' reserved rights.

#### § 7.5.2 Pursuant to Owner's exclusive license to use the Architect's Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, the Contractor, the Subcontractors, the Sub-subcontractors and material or equipment suppliers are authorized by the Owner to use and reproduce the Instruments of Service provided to them solely and exclusively for execution of the Work. All copies made under this authorization shall bear the copyright notice, if any, shown on the Instruments of Service. The Contractor, the Subcontractors, the Sub-subcontractors, and material or equipment suppliers may not use the Instruments of Service on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants.

### § 7.6 TRANSMISSION OF DATA IN DIGITAL FORM
If the parties intend to transmit Instruments of Service or any other information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmission, unless otherwise provided in the Agreement or in the Contract Documents.

AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                 (1848792917)

6

## ARTICLE 8   OWNER

### § 8.1 INFORMATION AND SERVICES REQUIRED OF THE OWNER

§ 8.1.1 The Owner shall furnish all necessary surveys and a legal description of the site.

§ 8.1.2 The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ 8.1.3 Except for permits and fees that are the responsibility of the Contractor under the Contract Documents, including those required under Section 9.6.1, the Owner shall secure and pay for other necessary approvals, easements, assessments and charges required for the construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

### § 8.2 OWNER'S RIGHT TO STOP THE WORK

If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents, or repeatedly fails to carry out the Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order is eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity.

### § 8.3 OWNER'S RIGHT TO CARRY OUT THE WORK

If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents, and fails within a ten-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner, without prejudice to any other remedy the Owner may have, may correct such deficiencies and may deduct the reasonable cost thereof, including Owner's expenses and compensation for the Architect's services made necessary thereby, from the payment then or thereafter due the Contractor.

## ARTICLE 9   CONTRACTOR

### § 9.1 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

§ 9.1.1 Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

§ 9.1.2 Because the Contract Documents are complementary, the Contractor shall, before starting each portion of the Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 8.1.1, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating coordination, and reviewing for constructability by the Contractor. The Contractor shall promptly report to the Architect any errors, inconsistencies, or omissions discovered by or made known to the Contractor as a request for information in such form as the Architect may require. It is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents.

§ 9.1.3 The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Contractor shall promptly report to the Architect any nonconformity discovered by or made known to the Contractor as a request for information in such form as the Architect may require.

### § 9.2 SUPERVISION AND CONSTRUCTION PROCEDURES

§ 9.2.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters.

§ 9.2.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, the Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects.
**All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                      (1848792917)

**§ 9.2.3** The Contractor shall employ a full-time construction supervisor at the Project for the coordination and supervision of the Work, and who shall not, while in the Contractor's employ, be replaced without the Owner's consent. The Contractor shall remove any employee from the Project upon reasonable objection from the Owner.

**§ 9.2.4** The Contractor shall hold regularly scheduled job meetings attended by the Contractor and its Subcontractors, the Owner and the Architect to discuss procedures, progress, problems, scheduling and open items.

## § 9.3 LABOR AND MATERIALS

**§ 9.3.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**§ 9.3.2** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them. The Contractor shall maintain labor peace and harmony on the Project and shall adopt and implement policies and practices designed to avoid work stoppages, slowdowns, disputes or strikes.

**§ 9.3.3** The Contractor may make a substitution only with the consent of the Owner, after evaluation by the Architect and in accordance with a Modification.

## § 9.4 WARRANTY

The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Contractor, improper or insufficient maintenance, improper operation or normal wear and tear under normal usage.

## § 9.5 TAXES

The Contractor shall pay sales, consumer, use and other similar taxes that are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 9.6 PERMITS, FEES, NOTICES, AND COMPLIANCE WITH LAWS

**§ 9.6.1** Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit as well as other permits, fees, licenses and inspections by government agencies necessary for proper execution and completion of the Work that are customarily secured after execution of the Contract and legally required at the time bids are received or negotiations concluded.

**§ 9.6.2** The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules, and regulations, and lawful orders of public authorities applicable to performance of the Work. If the Contractor performs Work knowing it to be contrary to applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 9.7 ALLOWANCES

The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. The Owner shall select materials and equipment under allowances with reasonable promptness. Allowance amounts shall include the costs to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts. Allowance amounts shall not include the Contractor's costs for unloading and handling at the site, labor, installation, overhead, and profit.

## § 9.8 CONTRACTOR'S CONSTRUCTION SCHEDULES

**§ 9.8.1** Upon execution, the Contractor shall submit for the Owner's and the Architect's approval a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents,

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL
(1848792917)

shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 9.8.2** The Contractor shall perform the Work in general accordance with the most recent schedule submitted to the Owner and Architect.

### § 9.9 SUBMITTALS
**§ 9.9.1** The Contractor shall review for compliance with the Contract Documents and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents in coordination with the Contractor's construction schedule and in such sequence as to allow the Architect reasonable time for review. By submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents to the Owner and Architect that the Contractor has (1) reviewed and approved them; (2) determined and verified materials, field measurements and field construction criteria related thereto, or will do so; and (3) checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents. The Work shall be in accordance with approved submittals.

**§ 9.9.2** Shop Drawings, Product Data, Samples and similar submittals, when approved by the Architect, are Contract Documents.

### § 9.10 USE OF SITE
The Contractor shall confine operations at the site to areas permitted by applicable laws, statutes, ordinances, codes, rules and regulations, lawful orders of public authorities, and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

### § 9.11 CUTTING AND PATCHING
The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

### § 9.12 CLEANING UP
The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus material from and about the Project.

### § 9.13 ROYALTIES, PATENTS AND COPYRIGHTS
The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

### § 9.14 ACCESS TO WORK
The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

### § 9.15 INDEMNIFICATION See Contractor's Indemnity and Insurance Requirements (Exhibit B).
*(Paragraph deleted)*
**§ 9.15.2** In claims against any person or entity indemnified under Exhibit B by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Exhibit B shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or the Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                    (1848792917)

## ARTICLE 10   ARCHITECT

§ 10.1 The Architect will provide administration of the Contract and will be an Owner's representative during construction, until the date the Architect issues the final Certificate for Payment. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

§ 10.2 The Architect will visit the site at intervals appropriate to the stage of the construction to become generally familiar with the progress and quality of the portion of the Work completed, and to determine in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not have control over, charge of, or responsibility for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

§ 10.3 On the basis of the site visits, the Architect will keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and report to the Owner (1) known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor, and (2) defects and deficiencies observed in the Work. The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, the Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 10.4 Based on the Architect's evaluations of the Work and of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

§ 10.5 The Architect has authority to reject Work that does not conform to the Contract Documents and to require inspection or testing of the Work.

§ 10.6 The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents.

§ 10.7 The Architect will interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or the Contractor. The Architect will make initial decisions on all claims, disputes and other matters in question between the Owner and the Contractor but will not be liable for results of any interpretations or decisions rendered in good faith.

*(Paragraph deleted)*
§ 10.9 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, the Contractor and the Architect. Consent shall not be unreasonably withheld.

## ARTICLE 11   SUBCONTRACTORS

§ 11.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site.

§ 11.2 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner all contracts ("Subcontracts") and purchase orders with Subcontractors or suppliers for each of the principal portions of the Work, together with names of all manufacturers proposed to be used. The Contractor shall not contract with any Subcontractor or supplier to whom the Owner or Architect has made reasonable written objection within ten days after receipt of the Subcontracts and purchase orders. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                              (1848792917)

**10**

§ **11.3** Contracts between the Contractor and the Subcontractors shall (1) require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by the Contract Documents, assumes toward the Owner and Architect, (2) allow the Subcontractor the benefit of all rights, remedies and redress against the Contractor that the Contractor, by these Contract Documents, has against the Owner, and (3) be conditionally assigned to the Owner.

§ **11.4** The Owner may communicate with the Subcontractors and suppliers for the purpose of verifying amounts due and paid for work performed. At the request of the Owner, the Contractor shall provide the Owner with evidence of payments made to the Subcontractors and suppliers.

## ARTICLE 12    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

§ **12.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under conditions of the contract identical or substantially similar to these, including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such claim as provided in Article 21.

§ **12.2** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's activities with theirs as required by the Contract Documents.

§ **12.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

## ARTICLE 13    CHANGES IN THE WORK

§ **13.1** By appropriate Modification, changes in the Work may be accomplished after execution of the Contract. The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, with the Contract Sum and Contract Time being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by the Owner, the Contractor and the Architect, or by written Construction Change Directive signed by the Owner and the Architect. NO WORK SHALL BE PERFORMED (INCLUDING OVERTIME WORK) AND THE CONTRACTOR SHALL MAKE NO CLAIM FOR ADDITIONAL COMPENSATION UNLESS A CHANGE ORDER OR CONSTRUCTION CHANGE DIRECTIVE, CONTAINING EITHER THE ACTUAL COST OF THE WORK OR THE METHOD FOR DETERMINING THE COST, IS SIGNED BY THE OWNER AND THE CONTRACTOR.

§ **13.2** Adjustments in the Contract Sum resulting from a change in the Work shall be determined in accordance with Exhibit A, inclusive of the Contractor's general conditions costs, overhead and profit. The Architect will make an interim determination of the amount of payment due for purposes of certifying the Contractor's monthly Application for Payment.

§ **13.3** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and the Contractor. The Contractor shall carry out such written orders promptly.

§ **13.4** If concealed or unknown physical conditions are encountered at the site that differ materially from those indicated in the Contract Documents or from those conditions ordinarily found to exist, the Contract Sum and Contract Time shall be equitably adjusted as mutually agreed between the Owner and the Contractor; provided that the Contractor provides notice to the Owner and the Architect promptly and before conditions are disturbed.

## ARTICLE 14    TIME

§ **14.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                      (1848792917)

**§ 14.2** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**§ 14.3** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

**§ 14.4** The date of Substantial Completion is the date certified by the Architect in accordance with Section 15.4.3.

**§ 14.5** If the Contractor is delayed at any time in the commencement or progress of the Work by changes ordered in the Work, by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoidable casualties or any causes beyond the Contractor's control, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine, subject to the provisions of Article 21. An extension of the Contract Time shall be the Contractor's sole remedy for delay.

## ARTICLE 15    PAYMENTS AND COMPLETION
### § 15.1 APPLICATIONS FOR PAYMENT
**§ 15.1.1** The Contractor shall submit to the Architect, before the first Application for Payment, a schedule of values, allocating the entire Contract Sum to the various portions of the Work, utilizing AIA forms G702 and G703, and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used in reviewing the Contractor's Applications for Payment.

**§ 15.1.2** With each Application for Payment the Contractor and its subcontractors shall submit progress lien waivers in the forms attached as Exhibit D.

**§ 15.1.3** Payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment stored, and protected from damage, off the site at a location agreed upon in writing.

**§ 15.1.4** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or other encumbrances adverse to the Owner's interests.

### § 15.2 CERTIFICATES FOR PAYMENT
**§ 15.2.1** The Architect will, with approval of the Owner, within ten (10) business days after receipt of the Contractor's Application for Payment, issue a Certificate for Payment, to the Contractor, for such amount as the Architect and Owner determines is properly due, based upon the quality and progress of the Work. The Architect will also notify the Contractor in writing of the Architect's and/or the Owner's reasons for withholding certification in whole or in part as provided in Section 15.2.3 and (a) set forth the amount to be paid to the Contractor, and (b) describe those items in the Application for Payment which are not approved. In determining the amount to be paid to the Contractor, the Owner may either withhold (a) sums that are sufficient to pay the costs and expense the Owner reasonably expects to incur in order to cure any items described in the Certificate for Payment or (b) an amount not to exceed the line item amount appearing in the agreed schedule of values, including change orders, relating to the disapproved Work (together with an amount sufficient to cover liquidated damages, if any and such other damages as the Owner may incur as a result of the items described in Subsection 15.2.3).

**§ 15.2.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluations of the Work and the data comprising the Application for Payment, that, to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated and that the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation by the Architect that the Contractor is entitled to payment in the amount certified. However, the

AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                            (1848792917)

issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from the Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

§ **15.2.3** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 15.2.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and the Owner as provided in Section 15.2.1. If the Contractor and the Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 9.2.2, because of

    .1    defective Work not remedied;
    .2    third party claims (including mechanic's liens) and municipal violations filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;
    .3    failure of the Contractor to make payments properly to the Subcontractors or for labor, materials or equipment;
    .4    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;
    .5    damage to the Owner or a separate contractor;
    .6    reasonable evidence that the Work will not be completed within the Contract Time and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or
    .7    repeated failure to carry out the Work in accordance with the Contract Documents.

The Owner may also disapprove payment on the foregoing grounds.

§ **15.2.4** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

§ **15.2.5** The Owner shall pay the Contractor the approved amount set forth in the Certificate for Payment within thirty (30) days after the issuance of the Certificate for Payment.

§ **15.3 PROGRESS PAYMENTS**
§ **15.3.1** The Contractor shall pay each Subcontractor, no later than seven days after receipt of payment, the amount to which the Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of the Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to sub-subcontractors in similar manner.

§ **15.3.2** Neither the Owner nor Architect shall have an obligation to pay or see to the payment of money to a Subcontractor except as may otherwise be required by law. In the event that Contractor fails to pay to any Subcontractor the amount to which such Subcontractor is entitled, Owner may elect to make payment to the Subcontractor to satisfy the Contractor's obligation and such payment by the Owner to the Subcontractor will not preclude Owner from any rights to obtain reimbursement from the Contractor for the amount paid.

§ **15.3.3** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

§ **15.4 SUBSTANTIAL COMPLETION**
§ **15.4.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL

13

(1848792917)

§ **15.4.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Architect shall prepare and submit to the Contractor a comprehensive list of items to be completed or corrected prior to final payment but in no event more than thirty (30) days after receipt of the list. Pending completion of the items, a sum equivalent to two hundred percent (200%) of the cost to complete the items, as determined by the Architect, shall be withheld from the Contractor in lieu of the retainage pursuant to Section 4.1.4. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ **15.4.3** Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. When the Architect determines that the Work or designated portion thereof is substantially complete, the Architect will issue a Certificate of Substantial Completion which shall establish the date of Substantial Completion, establish responsibilities of the Owner and the Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ **15.4.4** The Certificate of Substantial Completion shall be submitted to the Owner and the Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

§ **15.5 FINAL COMPLETION AND FINAL PAYMENT**
§ **15.5.1** Upon receipt of the Contractor's written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions stated in Section 15.5.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

§ **15.5.2** Final payment shall be made in accordance with Subsection 15.2.5. Neither final payment nor any remaining retained percentage shall become due until the Contractor complies with the provision of Subsection 4.2.1 and submits to the Owner (i) final lien waivers and releases in the forms attached as Exhibit D for itself and its Subcontractors; (ii) such other documentation specified by the Owner including, if applicable, a certificate of occupancy for the Project; and (iii) as-built drawings in CADD format prepared by the Contractor and, as applicable, the HVAC plumbing, sprinkler and electrical Subcontractors. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor shall furnish a bond satisfactory to the Owner. If such lien remains unsatisfied after payments are made, the Contractor shall indemnify and hold the Owner harmless from all claims and damages, and refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

*(Paragraphs deleted)*
§ **15.5.4** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment. In no event shall the Contractor commence an action against the Owner more than one year following Final Payment or the termination of this Agreement, whichever is earlier.

## ARTICLE 16   PROTECTION OF PERSONS AND PROPERTY
§ **16.1 SAFETY PRECAUTIONS AND PROGRAMS**
The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract. The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to
   .1     employees on the Work and other persons who may be affected thereby;

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL

14

(1848792917)

.2    the Work and materials and equipment to be incorporated therein (including the Contractors equipment), whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

.3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury or loss. The Contractor shall promptly remedy damage and loss to property caused in whole or in part by the Contractor, a Subcontractor, a sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 16.1.2 and 16.1.3, except for damage or loss attributable to acts or omissions of the Owner or Architect or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 9.15.

## § 16.2 HAZARDOUS MATERIALS

**§ 16.2.1** The Contractor is responsible for compliance with the requirements of the Contract Documents regarding hazardous materials. If the Contractor encounters a hazardous material or substance not addressed in the Contract Documents, and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and the Contractor. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shutdown, delay and start-up.

*(Paragraph deleted)*
**§ 16.2.3** If, without negligence on the part of the Contractor, the Contractor is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

**ARTICLE 17    INSURANCE AND BONDS** See Contractor's Indemnity and Insurance Requirements (Exhibit B).

*(Paragraph deleted)*
## § 17.2 OWNER'S LIABILITY INSURANCE
The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

## § 17.3 PROPERTY INSURANCE
**§ 17.3.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance comprising total value for the entire Project at the site on a replacement cost basis. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 15.5 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 17.3.1 to be covered, whichever is later. At the election of the Owner, this insurance shall include interests of the Owner, the Contractor, the Subcontractors and the sub-subcontractors in the Project.

*(Paragraph deleted)*
**§ 17.3.3** The Owner and the Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, the Architect's consultants, separate contractors described in Article 12, if any, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to Section 17.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or the Contractor, as appropriate, shall require of the Architect, the Architect's consultants, separate contractors described in Article 12, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                    (1848792917)

legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

§ 17.3.4 A loss insured under the Owner's property insurance shall be adjusted by the Owner on behalf of all insureds and made payable to the Owner on behalf of the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. Owner shall pay the Contractor the shares of insurance proceeds of the Contractor and all subcontractors. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their sub-subcontractors in similar manner.

*(Paragraphs deleted)*
## ARTICLE 18    CORRECTION OF WORK
§ 18.1 The Contractor shall correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed but in no event later than thirty (30) days after being notified of defective work. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

§ 18.2 In addition to the Contractor's obligations under Section 9.4, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 15.4.3, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty.

§ 18.3 If the Contractor fails to correct nonconforming Work within a reasonable time, the Owner may correct it in accordance with Section 8.3.

§ 18.4 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual completion of that portion of the Work.

§ 18.5 The one-year period for correction of Work shall be extended for a period of six (6) months from the completion of corrective Work performed by the Contractor pursuant to this Article 18, but only with respect to the particular items of corrective Work.

§ 18.6 Notwithstanding the one-year period for correction of Work, the Owner may commence an action under the terms of this Agreement against the Contractor in accordance with the applicable statute of limitations.

## ARTICLE 19    MISCELLANEOUS PROVISIONS
### § 19.1 ASSIGNMENT OF CONTRACT
The Contractor may not assign the Contract without written consent of the Owner.  Owner may assign the Contract at its sole discretion and such assignment shall relieve Owner of any and all obligations it may have under the Contract.

### § 19.2 GOVERNING LAW
The Contract shall be governed by the law of the state where the Project is located.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                                                   (1848792917)

## § 19.3 TESTS AND INSPECTIONS

Tests, inspections and approvals of portions of the Work required by the Contract Documents or by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public authorities shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and (2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating the costs to the Contractor.

*(Paragraphs deleted)*

## ARTICLE 20    TERMINATION OF THE CONTRACT
## § 20.1 TERMINATION BY THE CONTRACTOR

If the Owner fails to make payment of approved amounts in accordance with Article 15, the Contractor may, upon ten (10) additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner payment for Work executed, and demobilization costs incurred by reason of such termination. The Contractor's notice shall (a) inform the Owner that payment of approved amounts has not been received, and (b) state the intent of the Contractor to suspend performance for nonpayment. If, after the tenth (10th) calendar day following written notice, the Owner has not cured the deficiency, the Contractor may terminate the Contract. In the event the Contractor terminates the Contract, the Owner may hire another Contractor to complete the Work.

## § 20.2 TERMINATION BY THE OWNER FOR CAUSE
## § 20.2.1 The Owner may terminate the Contract if the Contractor

- .1    repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
- .2    fails to make payment to the Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;
- .3    repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of a public authority; or
- .4    otherwise is guilty of substantial breach of a provision of the Contract Documents.

**§ 20.2.2** When any of the above reasons exists, the Owner may, without prejudice to any other remedy the Owner may have and after giving the Contractor seven days' written notice, terminate the Contract and take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever reasonable method the Owner may deem expedient, and may accept assignment of those Subcontracts the Owner elects to assume. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**§ 20.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 20.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**§ 20.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or the Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

**§ 20.2.5** In the event it is judicially determined that the Owner was not entitled to terminate the Contract for cause, the Owner's termination shall be deemed a termination for convenience.

## § 20.3 TERMINATION BY THE OWNER FOR CONVENIENCE

In addition to the foregoing, the Owner, upon seven (7) days' written notice to the Contractor, may terminate the Contract for its convenience, in which event the Contractor shall be paid for all work performed (as calculated in accordance with Article 4) as of the effective date of termination, together with the retainage then due.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                                      (1848792917)

## ARTICLE 21   CLAIMS AND DISPUTES

§ **21.1** Claims, disputes and other matters in question arising out of or relating to this Contract, including those alleging an error or omission by the Architect but excluding those arising under Section 16.2, shall be subject to mediation as a condition precedent to binding dispute resolution.

§ **21.2** If a claim, dispute or other matter in question relates to or is the subject of a mechanic's lien, the party asserting such matter may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

§ **21.3** Any claim, subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association, in accordance with the Construction Industry Arbitration Rules in effect on the date of this Agreement. Demand for arbitration shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the arbitration. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

§ **21.4** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

§ **21.5** Any party to an arbitration may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described in the written Consent.

§ **21.6** The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

§ **21.7** If a dispute shall arise between the parties to this Agreement, or related thereto, the Contractor shall continue during the pendency of such dispute to perform its services hereunder as if no dispute shall have arisen. During the pendency of any such dispute the Contractor shall be entitled to payments from the Owner only for non-disputed items, and payments shall be deferred only for that portion of the items that are disputed, until final resolution of the dispute.

§ **21.8** Claims by the Contractor (including claims for Change Orders) must be initiated by written notice to the Owner. Claims must be initiated within ten (10) days after occurrence of the event giving rise to such claim or within ten (10) days after the Contractor first recognizes the condition giving rise to the claim, whichever is later.

### § 21.9 CLAIMS FOR CONSEQUENTIAL DAMAGES

The Contractor and the Owner waive claims against each other for consequential damages for delay arising out of or relating to this Contract. For the purposes hereof "consequential damages" shall only be

  .1    damages incurred by the Owner for occupancy expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

  .2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit or business opportunities.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 20. Nothing contained in this Section 21.9 shall be deemed to preclude an award of actual damages, incurred under the terms of this Agreement.

## ARTICLE 22   OTHER CONDITIONS OR PROVISIONS

§ **22.1.** All Applications for Payment and notices and communications hereunder shall be delivered electronically or by reputable overnight courier and shall be deemed effective on the date sent.

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects.
**All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL

**18**

(1848792917)

**§ 22.2** The failure of Owner to insist upon the strict performance of any provision of this Agreement, or the failure of Owner to exercise any right, option or remedy hereby reserved, shall not be construed as a waiver in the future of any such provision, right, option or remedy or as a waiver of a subsequent breach thereof. The consent or approval by Owner of any act by Contractor requiring Owner's consent or approval shall not be construed to waive or render unnecessary the requirement for Owner's consent or approval of any subsequent similar act by Contractor. The payment by Owner of any amount due hereunder with knowledge of a breach of any provision of this Agreement shall not be deemed a waiver of such breach. No provision of this Agreement shall be deemed to have been waived unless such waiver shall be in writing signed by the party to be charged.

This Agreement entered into as of the day and year first written above.

FL 6801 COLLINS NORTH LLC                    EBL CONSTRUCTION

By:  FL 6801 Spirits LLC, its Managing Member

By: _____                   By: _____
**OWNER** *(Signature)*                           **CONTRACTOR** *(Signature)*

_____                  _____
*(Printed name and title)*                        *(Printed name and title)*

**AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL                                                                (1848792917)

19

## Additions and Deletions Report for

AIA® Document A107™ – 2007

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 16:47:14 on 05/22/2014.

PAGE 1

AGREEMENT made as of the ▓▓▓ day of ▓▓▓ in the year
(In words, indicate day, month and year.)2014

...

(Name, legal status, address and other information)FL 6801 Collins North LLC
c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 39th Floor
New York, New York 10020

...

(Name, legal status, address and other information)
EBL Construction
1482 Rail Head Boulevard
Naples, Florida 34110

...

(Name, location and detailed description)
Stucco remediation, Canyon Ranch North Tower, 6900 Collins Avenue, Miami Beach, Florida

...

The Architect:Architect:*
(Name, legal status, address and other information)
NV5 Structures/Vertical V – Southeast, Inc.
200 South Park Road, Suite 350
Hollywood, Florida 33021

...

The Owner and the Contractor agree as follows.

*The term "Architect" herein shall mean NV5 Structures/Vertical V – Southeast, Inc., a professional and technical consulting firm.

THSH DRAFT 5/22/2014

PAGE 2

Additions and Deletions Report for AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL

1

(1848792917)

~~The Contractor shall execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.~~

§ 1.1 The Contractor shall execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

§ 1.2 The Contractor shall perform the work required by the Contract Documents, and all work which is reasonably inferable therefrom, and provide all labor, materials, equipment, tools, scaffolding and other facilities and services necessary for the proper execution and completion of the work for the Project (the "Work") and shall perform all related work made necessary by a visual inspection of the Project. The Contractor shall also be responsible to Owner for assuring that the Work is performed in strict accordance and as required by the Contract Documents. Materials which are not shown on the Drawings shall be suitable for the intended use, and shall be subject to review and approval by Owner and Architect for consistency with the intent of the Contract Documents. Where installation techniques are not specified, they shall be in accordance with manufacturer's current instructions, industry standards and all applicable laws, rules and regulations.

§ 1.3 The documents comprising the Drawings and the other Contract Documents shall be deemed to be cumulative, and if there shall be a conflict or ambiguity between or among the Drawings or if a discrepancy shall arise between the Specifications and existing conditions at the Project, the Contractor shall immediately notify Architect of such fact when it becomes aware of same and, thereafter, the Owner, in consultation with the Architect and the Contractor, shall determine the appropriate course of action to follow and advise the Contractor accordingly. In the event any provision in this Agreement conflicts with or is inconsistent with any provision contained in the Contract Documents, the Contractor shall immediately notify Architect and Owner and the parties will endeavor to reach agreement as to the applicable provision. Any Work relating to such conflict, ambiguity or discrepancy which is knowingly performed by the Contractor prior to the Owner's resolution thereof shall be at the Contractor's sole risk and expense.

§ 1.4 The Contractor has carefully examined the Contract Documents and the premises and, from the Contractor's own investigations, is satisfied as to the nature and location of the Work, the character, quality and quantity of materials likely to be encountered, the character of equipment and other facilities needed for the performance of the Work, and all other conditions or items which may affect the Work. The Contractor accepts full responsibility for all conditions at the premises that may affect the Contractor's performance.

§ 1.5 The Contractor warrants and guarantees that the performance of the Work (i.e. means and methods) will be in conformance with all applicable codes and other applicable rules, regulations and ordinances of all governmental and administrative agencies having jurisdiction over the Project.

§ 2.1 The date of commencement of the Work shall ~~be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.~~
*~~(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)~~*

be _____.

**PAGE 3**

§ 2.3 The Contractor shall achieve Substantial Completion of the entire Work not later than    (    ) days from the date of commencement, ~~or as follows:~~
*~~(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)~~*

| ~~Portion of Work~~ | ~~Substantial Completion Date~~ |
| --- | --- |

~~,~~ subject to adjustments of this Contract Time as provided in the Contract Documents.

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®** Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL
(1848792917)

2

~~(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus payments for early completion of the Work.)~~

**§ 2.4** The Contractor agrees to perform the Work or cause the performance of Work by others in a prompt and diligent manner so as to ensure the uninterrupted progress of the Project and in accordance with a project schedule approved by the Owner and the Architect and furnished by the Contractor upon the execution of this Agreement. The Contractor agrees to complete the Work as rapidly as field conditions permit, proceeding in a skillful and expeditious manner, with sufficient labor, materials, tools, equipment, supplies and all things necessary to ensure uniform and efficient progress, so that the Work will be completed by the Substantial Completion Date. THE SUBSTANTIAL COMPLETION DATE ESTABLISHED BY THIS AGREEMENT SHALL BE DEEMED OF THE ESSENCE OF THIS AGREEMENT. By executing the Agreement, the Contractor confirms that the Substantial Completion Date is a reasonable period for completing the Work.

**§ 2.5** If the Work is not progressing timely and the delays are caused by the Contractor, the Contractor shall at its own cost and expense be responsible to work additional shifts and cause at its own cost and expense its Subcontractors involved in the Work to work additional shifts and to take other reasonable measures in order to bridge the gap between the delay and the time requirement, all at no additional cost to Owner. Nothing contained in this or any other provision of this Agreement shall limit Owner's right to seek other and further remedies which may be allowed by this Agreement or in law or equity.

...

~~(Check the appropriate box.)~~

~~[   ]    Stipulated Sum, in accordance with Section 3.2 below~~

~~[   ]    Cost of the Work~~  [ X ]       Cost of the Work based on Contractor's Proposal (Exhibit A) plus the Contractor's Fee, in accordance with Section 3.3 below

~~[   ]    Cost of the Work plus the Contractor's Fee with a Guaranteed Maximum Price, in accordance with Section 3.4 below~~

~~(Based on the selection above, complete Section 3.2, 3.3 or 3.4 below.)~~

~~**§ 3.2** The Stipulated Sum shall be   ($   ), subject to additions and deductions as provided in the Contract Documents.~~

~~**§ 3.2.1** The Stipulated Sum is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:~~
~~*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*~~

~~**§ 3.2.2** Unit prices, if any:~~
~~*(Identify and state the unit price, and state the quantity limitations, if any, to which the unit price will be applicable.)*~~

| ~~Item~~ | ~~Units and Limitations~~ | ~~Price Per Unit ($0.00)~~ |
|---|---|---|
| | | |

~~**§ 3.2.3** Allowances included in the stipulated sum, if any:~~
~~*(Identify allowance and state exclusions, if any, from the allowance price.)*~~

| ~~Item~~ | ~~Allowance~~ |
|---|---|
| | |

**§ 3.3.1** The Cost of the Work ~~is as defined in Exhibit A, Determination of the Cost of the Work~~ shall mean the Contractor costs identified in Exhibit A and as may be modified by Changes in the Work (Article 13).

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                                                          (1848792917)

**PAGE 4**

*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee and the method of adjustment to the Fee for changes in the Work.)*

Ten percent (10%) of the Cost of the Work. The Contractor's Fee shall be inclusive of mobilization costs, general conditions costs, profit and overhead.

**§ 3.3.3** Unit Prices, if any:

| Item | Units and Limitations | Price Per Unit ($0.00) |
|------|----------------------|------------------------|
| See Exhibit A. | | |

**§ 3.4 COST OF THE WORK PLUS CONTRACTOR'S FEE WITH A GUARANTEED MAXIMUM PRICE**
**§ 3.4.1** The Cost of the Work is as defined in Exhibit A, Determination of the Cost of the Work.

**§ 3.4.2** The Contractor's Fee:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee and the method of adjustment to the Fee for changes in the Work.)*

**§ 3.4.3 GUARANTEED MAXIMUM PRICE**
**§ 3.4.3.1** The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed ($ ), subject to additions and deductions by changes in the Work as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner.
*(Insert specific provisions if the Contractor is to participate in any savings.)*

**§ 3.4.3.2** The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

**§ 3.4.3.3** Unit Prices, if any:
*(Identify and state the unit price, and state the quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($0.00) |
|------|----------------------|------------------------|

**§ 3.4.3.4** Allowances included in the Guaranteed Maximum Price, if any:
*(Identify and state the amounts of any allowances, and state whether they include labor, materials, or both.)*

| Item | Allowance |
|------|-----------|

**§ 3.4.3.5** Assumptions, if any, on which the Guaranteed Maximum Price is based:

...

**§ 4.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                                                                        (1848792917)

4

month

§ 4.1.3 ~~Provided that an Application for~~ Payment ~~is received by the Architect not later than the ___ day of a month, the Owner shall make payment of the certified amount~~ to the Contractor ~~not later than the ___ day of the ___ month. If an Application for Payment is received by the Architect after the date fixed above, payment~~ shall be made by the Owner ~~not later than ___ ( ___ ) days after the Architect receives the Application for Payment.~~
*(Federal, state or local laws may require payment within a certain period of time.)* pursuant to Article 15.

...

Ten percent (10%) until Substantial Completion. (See Section 15.4.2.)

...

~~(Insert rate of interest agreed upon, if any.)~~

~~___ %~~ Six percent (6%)   per annum

...

    .2   the ~~contractor~~ Contractor has submitted a final accounting for the Cost of the Work, where payment is on the basis of the Cost of the Work with or without a guaranteed maximum price;

    .3   all sign offs which are the responsibility of the Contractor or its Subcontractors are submitted to the Owner; and

    .3 .4   a final Certificate for Payment has been issued by the Architect.

§ 4.2.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for ~~Payment, or as follows:~~ Payment.

§ 4.3 The Contractor shall without delay cause the discharge of any mechanics' liens filed against the Project by any of its laborers, Subcontractors or materialmen, and shall cause any such lien to be discharged of record within fifteen (15) days after the notice of filing thereof by bond, order or deposit provided the Owner has paid the Contractor for the Work in question. If the Contractor shall fail to cause such lien to be discharged of record within such period, the Owner may do so. Any amount paid by the Owner for such purpose, including all costs and expenses, including reasonable attorneys' fees shall be paid by the Contractor to the Owner on demand. The Owner may at any time also require the Contractor to furnish a bond or other security, in a form and amount satisfactory to Owner as security for the payment of any such liens. The filing of a lien by the Contractor, unless the Owner is in default of its payment obligations hereunder, shall be deemed a default under the terms of the Contract.

§ 4.4 In the event payments are withheld as a result of the failure of the Contractor to make payments to a Subcontractor or materialman or by reason of other defaults of the Contractor, the Owner may, at its option, make payment directly to said Subcontractor or materialman, in lieu of making payment to the Contractor.

## PAGE 5

For any claim subject to, but not resolved by, mediation pursuant to Section 21.3, the method of binding dispute resolution shall be ~~as follows:~~
*~~(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, claims will be resolved in a court of competent jurisdiction.)~~*

    [ ~~X~~ ]   ~~Arbitration pursuant to Section 21.4 of this Agreement~~

    [ ~~X~~ ]   ~~Litigation in a court of competent jurisdiction~~

    [ ~~X~~ ]   ~~Other *(Specify)*~~

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL
(1848792917)

arbitration.

...

§ 6.1.1 The Agreement is this executed AIA Document A107–2007, Standard Form of Agreement Between the Owner and the Contractor for a Project of Limited Scope.

§ 6.1.2 The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|
| | | | |

*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

Title of Specifications exhibit:  See Drawings and Specifications (Exhibit C).

| Section | Title | Date | Pages |
|---|---|---|---|
| | | | |

...

*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

Title of Drawings exhibit:  See Drawings and Specifications (Exhibit C).

| Number | Title | Date |
|---|---|---|
| | | |

...

N/A

...

   .1   Exhibit A, ~~Determination of the Cost of the Work, if applicable.~~Proposal
   .2   ~~AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed, or the following:~~Other documents:

      Exhibit B, Indemnity and Insurance Requirements
      Exhibit C, Drawings and Specifications
   .3   ~~Other documents:~~
*(List here any additional documents that are intended to form part of the Contract Documents.)*

      Exhibit D, Forms of Final and Progress Lien Waivers

## PAGE 6

§ 7.5.1 The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and will retain all common law, statutory and other reserved rights, including copyrights. The Contractor, the Subcontractors, the Sub-subcontractors, and material or equipment suppliers shall not own or claim a copyright in the Instruments of Service. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' reserved rights.

§ 7.5.2 ~~The Contractor, Subcontractors,~~ Pursuant to Owner's exclusive license to use the Architect's Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, the

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL

6

(1848792917)

Contractor, the Subcontractors, the Sub-subcontractors and material or equipment suppliers are authorized by the
Owner to use and reproduce the Instruments of Service provided to them solely and exclusively for execution of the
Work. All copies made under this authorization shall bear the copyright notice, if any, shown on the Instruments of
Service. The Contractor, ~~Subcontractors, the Subcontractors, the~~ Sub-subcontractors, and material or equipment
suppliers may not use the Instruments of Service on other projects or for additions to this Project outside the scope of
the Work without the specific written consent of the Owner, Architect and the Architect's consultants.

**PAGE 7**

**§ 9.1.2** Because the Contract Documents are complementary, the Contractor shall, before starting each portion of the
Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the
information furnished by the Owner pursuant to Section 8.1.1, shall take field measurements of any existing
conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations
are for the purpose of facilitating ~~coordination and construction by the Contractor and are not for the purpose of
discovering errors, omissions, or inconsistencies in the Contract Documents; however, the~~ coordination, and
reviewing for constructability by the Contractor. The Contractor shall promptly report to the Architect any errors,
inconsistencies, or omissions discovered by or made known to the Contractor as a request for information in such form
as the Architect may require. It is recognized that the Contractor's review is made in the Contractor's capacity as a
contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents.

...

**§ 9.2.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, the
Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on
behalf of the Contractor or any of its Subcontractors.

**§ 9.2.3** The Contractor shall employ a full-time construction supervisor at the Project for the coordination and
supervision of the Work, and who shall not, while in the Contractor's employ, be replaced without the Owner's
consent. The Contractor shall remove any employee from the Project upon reasonable objection from the Owner.

**§ 9.2.4** The Contractor shall hold regularly scheduled job meetings attended by the Contractor and its Subcontractors,
the Owner and the Architect to discuss procedures, progress, problems, scheduling and open items.

**PAGE 8**

**§ 9.3.2** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other
persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not skilled in
tasks assigned to them. The Contractor shall maintain labor peace and harmony on the Project and shall adopt and
implement policies and practices designed to avoid work stoppages, slowdowns, disputes or strikes.

...

**§ 9.6.2** The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes,
~~rules~~ rules, and regulations, and lawful orders of public authorities applicable to performance of the Work. If the
Contractor performs Work knowing it to be contrary to applicable laws, statutes, ordinances, codes, rules and
regulations, or lawful orders of public authorities, the Contractor shall assume appropriate responsibility for such
Work and shall bear the costs attributable to correction.

...

**§ 9.8.1** ~~The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and
Architect's information~~ Upon execution, the Contractor shall submit for the Owner's and the Architect's approval a
Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract
Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be
related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and
practicable execution of the Work.

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007
by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.**
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1
which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL

(1848792917)

PAGE 9

§ **9.9.2** Shop Drawings, Product Data, Samples and similar ~~submittals are not~~ submittals, when approved by the Architect, are Contract Documents.

...

§ **9.15 INDEMNIFICATION** See Contractor's Indemnity and Insurance Requirements (Exhibit B).
~~§ 9.15.1 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 9.15.1.~~

§ **9.15.2** In claims against any person or entity indemnified under ~~this Section 9.15~~ Exhibit B by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under ~~Section 9.15.1~~ Exhibit B shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or the Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

PAGE 10

§ **10.3** On the basis of the site visits, the Architect will keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and report to the Owner (1) known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor, and (2) defects and deficiencies observed in the Work. The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, the Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

...

§ **10.7** The Architect will interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or the Contractor. The Architect will make initial decisions on all claims, disputes and other matters in question between the Owner and the Contractor but will not be liable for results of any interpretations or decisions rendered in good faith.

~~§ 10.8 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.~~

§ **10.9** Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, the Contractor and the Architect. Consent shall not be unreasonably withheld.

...

§ **11.2** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner ~~through the Architect the names of the~~ all contracts ("Subcontracts") and purchase orders with Subcontractors or suppliers for each of the principal portions of the ~~Work.~~ Work, together with names of all manufacturers proposed to be used. The Contractor shall not contract with any Subcontractor or supplier to whom the Owner or Architect has made reasonable written objection within ten days after receipt of the ~~Contractor's list of Subcontractors and suppliers.~~ Subcontracts and purchase orders. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL

(1848792917)

**8**

be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 11.3 Contracts between the Contractor and the Subcontractors shall (1) require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by the Contract Documents, assumes toward the Owner and Architect, ~~and~~ (2) allow the Subcontractor the benefit of all rights, remedies and redress against the Contractor that the Contractor, by these Contract Documents, has against the Owner, and (3) be conditionally assigned to the Owner.

§ 11.4 The Owner may communicate with the Subcontractors and suppliers for the purpose of verifying amounts due and paid for work performed. At the request of the Owner, the Contractor shall provide the Owner with evidence of payments made to the Subcontractors and suppliers.

## PAGE 11

§ 13.1 By appropriate Modification, changes in the Work may be accomplished after execution of the Contract. The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, with the Contract Sum and Contract Time being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by the Owner, the Contractor and the Architect, or by written Construction Change Directive signed by the Owner and the Architect. NO WORK SHALL BE PERFORMED (INCLUDING OVERTIME WORK) AND THE CONTRACTOR SHALL MAKE NO CLAIM FOR ADDITIONAL COMPENSATION UNLESS A CHANGE ORDER OR CONSTRUCTION CHANGE DIRECTIVE, CONTAINING EITHER THE ACTUAL COST OF THE WORK OR THE METHOD FOR DETERMINING THE COST, IS SIGNED BY THE OWNER AND THE CONTRACTOR.

§ 13.2 Adjustments in the Contract Sum ~~and Contract Time~~ resulting from a change in the Work shall be determined ~~by mutual agreement of the parties or, in the case of a Construction Change Directive signed only by the Owner and Architect, by the Contractor's cost of labor, material, equipment, and reasonable overhead and profit, unless the parties agree on another method for determining the cost or credit. Pending final determination of the total cost of a Construction Change Directive, the Contractor may request payment for Work completed pursuant to the Construction Change Directive.~~ in accordance with Exhibit A, inclusive of the Contractor's general conditions costs, overhead and profit. The Architect will make an interim determination of the amount of payment due for purposes of certifying the Contractor's monthly Application for Payment. ~~When the Owner and Contractor agree on adjustments to the Contract Sum and Contract Time arising from a Construction Change Directive, the Architect will prepare a Change Order.~~

§ 13.3 The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and the Contractor. The Contractor shall carry out such written orders promptly.

§ 13.4 If concealed or unknown physical conditions are encountered at the site that differ materially from those indicated in the Contract Documents or from those conditions ordinarily found to exist, the Contract Sum and Contract Time shall be equitably adjusted as mutually agreed between the Owner and the Contractor; provided that the Contractor provides notice to the Owner and the Architect promptly and before conditions are disturbed.

## PAGE 12

§ 14.5 If the Contractor is delayed at any time in the commencement or progress of the Work by changes ordered in the Work, by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoidable casualties or any causes beyond the Contractor's control, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine, subject to the provisions of Article 21. An extension of the Contract Time shall be the Contractor's sole remedy for delay.

...

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                                                    (1848792917)

**§ 15.1.1** ~~Where the Contract is based on a Stipulated Sum or the Cost of the Work with a Guaranteed Maximum Price, the~~ The Contractor shall submit to the Architect, before the first Application for Payment, a schedule of values, allocating the entire Contract Sum to the various portions of the Work, ~~prepared in such form~~ utilizing AIA forms G702 and G703, and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used in reviewing the Contractor's Applications for Payment.

**§ 15.1.2** With each Application for Payment ~~where the Contract Sum is based upon the Cost of the Work, or the Cost of the Work with a Guaranteed Maximum Price, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor, less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.~~ the Contractor and its subcontractors shall submit progress lien waivers in the forms attached as Exhibit D.

...

**§ 15.2.1** The Architect will, ~~within seven~~ with approval of the Owner, within ten (10) business days after receipt of the Contractor's Application for Payment, ~~either~~ issue ~~to the Owner~~ a Certificate for Payment, ~~with a copy~~ to the Contractor, for such amount as the Architect ~~determines is properly due, or notify the Contractor and Owner in writing of the Architect's~~ and Owner determines is properly due, based upon the quality and progress of the Work.  The Architect will also notify the Contractor in writing of the Architect's and/or the Owner's reasons for withholding certification in whole or in part as provided in Section ~~15.2.3.~~15.2.3 and (a) set forth the amount to be paid to the Contractor, and (b) describe those items in the Application for Payment which are not approved.  In determining the amount to be paid to the Contractor, the Owner may either withhold (a) sums that are sufficient to pay the costs and expense the Owner reasonably expects to incur in order to cure any items described in the Certificate for Payment or (b) an amount not to exceed the line item amount appearing in the agreed schedule of values, including change orders, relating to the disapproved Work (together with an amount sufficient to cover liquidated damages, if any and such other damages as the Owner may incur as a result of the items described in Subsection 15.2.3).

**§ 15.2.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluations of the Work and the data comprising the Application for Payment, that, to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated and that the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation by the Architect that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from the Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**§ 15.2.3** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 15.2.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and the Owner as provided in Section 15.2.1. If the Contractor and the Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 9.2.2, because of

**PAGE 13**

Additions and Deletions Report for AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                      (1848792917)

10

.2    third party claims (including mechanic's liens) and municipal violations filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3    failure of the Contractor to make payments properly to the Subcontractors or for labor, materials or equipment;

...

.7    repeated failure to carry out the Work in accordance with the Contract Documents.

The Owner may also disapprove payment on the foregoing grounds.

...

§ 15.2.5 The Owner shall pay the Contractor the approved amount set forth in the Certificate for Payment within thirty (30) days after the issuance of the Certificate for Payment.

...

§ 15.3.2 Neither the Owner nor Architect shall have an obligation to pay or see to the payment of money to a Subcontractor except as may otherwise be required by law.  In the event that Contractor fails to pay to any Subcontractor the amount to which such Subcontractor is entitled, Owner may elect to make payment to the Subcontractor to satisfy the Contractor's obligation and such payment by the Owner to the Subcontractor will not preclude Owner from any rights to obtain reimbursement from the Contractor for the amount paid.

**PAGE 14**

§ 15.4.2 When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the ~~Contractor~~ Architect shall prepare and submit to the ~~Architect~~ Contractor a comprehensive list of items to be completed or corrected prior to final ~~payment.~~ payment but in no event more than thirty (30) days after receipt of the list. Pending completion of the items, a sum equivalent to two hundred percent (200%) of the cost to complete the items, as determined by the Architect, shall be withheld from the Contractor in lieu of the retainage pursuant to Section 4.1.4. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ 15.4.3 Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. When the Architect determines that the Work or designated portion thereof is substantially complete, the Architect will issue a Certificate of Substantial Completion which shall establish the date of Substantial Completion, establish responsibilities of the Owner and the Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ 15.4.4 The Certificate of Substantial Completion shall be submitted to the Owner and the Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

...

§ 15.5.2 Final payment shall ~~not become due until the Contractor has delivered to the Owner a complete release of all liens arising out of this Contract or receipts in full covering all labor, materials and equipment for which a lien could be filed, or a bond satisfactory to the Owner to indemnify the Owner against such lien.~~ be made in accordance with Subsection 15.2.5.  Neither final payment nor any remaining retained percentage shall become due until the Contractor complies with the provision of Subsection 4.2.1 and submits to the Owner (i) final lien waivers and releases in the

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978. 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                                                                    (1848792917)

forms attached as Exhibit D for itself and its Subcontractors; (ii) such other documentation specified by the Owner including, if applicable, a certificate of occupancy for the Project; and (iii) as-built drawings in CADD format prepared by the Contractor and, as applicable, the HVAC plumbing, sprinkler and electrical Subcontractors. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor shall furnish a bond satisfactory to the Owner. If such lien remains unsatisfied after payments are made, the Contractor shall indemnify and hold the Owner harmless from all claims and damages, and refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

§ 15.5.3 The making of final payment shall constitute a waiver of claims by the Owner except those arising from
.1    liens, claims, security interests or encumbrances arising out of the Contract and unsettled;
.2    failure of the Work to comply with the requirements of the Contract Documents; or
.3    terms of special warranties required by the Contract Documents.

§ 15.5.4 Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment. In no event shall the Contractor commence an action against the Owner more than one year following Final Payment or the termination of this Agreement, whichever is earlier.

## PAGE 15

.2    the Work and materials and equipment to be incorporated therein, therein (including the Contractors equipment), whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

...

§ 16.2.1 The Contractor is responsible for compliance with the requirements of the Contract Documents regarding hazardous materials. If the Contractor encounters a hazardous material or substance not addressed in the Contract Documents, and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and the Contractor. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shutdown, delay and start-up.

§ 16.2.2 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area, if in fact, the material or substance presents the risk of bodily injury or death as described in Section 16.2.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.

## ARTICLE 17   INSURANCE AND BONDS See Contractor's Indemnity and Insurance Requirements (Exhibit B).
§ 17.1 The Contractor shall purchase from, and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, insurance for protection from claims under workers' compensation acts and other employee benefit acts which are applicable, claims for damages because of bodily injury, including death, and claims for damages, other than to the Work itself, to property which may arise out of or result from the Contractor's operations and completed operations under the Contract, whether such operations be by the Contractor or by a Subcontractor or anyone directly or indirectly employed by any of them. This insurance shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater, and shall include contractual liability insurance applicable to the Contractor's obligations under Section 9.15. Certificates of Insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.** Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL
(1848792917)

~~Work. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. The Contractor shall cause the commercial liability coverage required by the Contract Documents to include: (1) the Owner, the Architect and the Architect's Consultants as additional insureds for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's operations; and (2) the Owner as an additional insured for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's completed operations.~~

...

**§ 17.3.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance ~~on an "all-risk" or equivalent policy form, including builder's risk, in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied and installed by others,~~ comprising total value for the entire Project at the site on a replacement cost ~~basis without optional deductibles.~~ basis. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 15.5 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 17.3.1 to be covered, whichever is later. ~~This~~ At the election of the Owner, this insurance shall include interests of the Owner, the Contractor, the Subcontractors and the sub-subcontractors in the Project.

**§ 17.3.2** ~~The Owner shall file a copy of each policy with the Contractor before an exposure to loss may occur. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.~~

**§ 17.3.3** The Owner and the Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, the Architect's consultants, separate contractors described in Article 12, if any, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to Section 17.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or the Contractor, as appropriate, shall require of the Architect, the Architect's consultants, separate contractors described in Article 12, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**§ 17.3.4** A loss insured under the Owner's property insurance shall be adjusted by the Owner ~~as fiduciary~~ on behalf of all insureds and made payable to the Owner ~~as fiduciary for~~ on behalf of the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. Owner shall pay the Contractor the shares of insurance proceeds of the Contractor and all subcontractors. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their sub-subcontractors in similar manner.

**§ 17.4 ~~PERFORMANCE BOND AND PAYMENT BOND~~**
**§ 17.4.1** ~~The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.~~

**§ 17.4.2** ~~Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall authorize a copy to be furnished.~~

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL

(1848792917)

**13**

§ **18.1** The Contractor shall ~~promptly~~ correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or ~~completed.~~ completed but in no event later than thirty (30) days after being notified of defective work. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's ~~expense, unless compensable under Section A.2.7.3 in Exhibit A, Determination of the Cost of the Work.~~ expense.

**PAGE 16**

§ **18.5** The one-year period for correction of Work shall ~~not be extended by~~ be extended for a period of six (6) months from the completion of corrective Work performed by the Contractor pursuant to this Article ~~18.~~ 18, but only with respect to the particular items of corrective Work.

§ **18.6** Notwithstanding the one-year period for correction of Work, the Owner may commence an action under the terms of this Agreement against the Contractor in accordance with the applicable statute of limitations.

...

~~Neither party to the Contract shall~~ The Contractor may not assign the Contract without written consent of the ~~other, except that the Owner may, without consent of the Contractor, assign the Contract to a lender providing construction financing for the Project if the lender assumes the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.~~ Owner.  Owner may assign the Contract at its sole discretion and such assignment shall relieve Owner of any and all obligations it may have under the Contract.

...

The Contract shall be governed by the law of the ~~place where the Project is located, except, that if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 21.4.~~ state where the Project is located.

**PAGE 17**

§ ~~19.4 COMMENCEMENT OF STATUTORY LIMITATION PERIOD~~
~~The Owner and Contractor shall commence all claims and causes of action, whether in contract, tort, breach of warranty or otherwise, against the other arising out of or related to the Contract in accordance with the requirements of the final dispute resolution method selected in the Agreement within the period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Owner and Contractor waive all claims and causes of action not commenced in accordance with this Section 19.4.~~

...

 If the ~~Architect fails to certify payment as provided in Section 15.2.1 for a period of 30 days through no fault of the Contractor, or if the Owner fails to make payment as provided in Section 4.1.3 for a period of 30 days, the Contractor may, upon seven~~ Owner fails to make payment of approved amounts in accordance with Article 15, the Contractor may, upon ten (10) additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner payment for Work executed,  ~~including reasonable overhead and profit, and~~ demobilization costs incurred by reason of such ~~termination, and damages.~~ termination. The Contractor's notice shall (a) inform the Owner that payment of approved amounts has not been received, and (b) state the intent of the Contractor to suspend performance for nonpayment.  If, after the tenth (10th) calendar day following written notice, the Owner has not cured the deficiency, the Contractor may terminate the Contract.  In the event the Contractor terminates the Contract, the Owner may hire another Contractor to complete the Work.

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL                                                                                       (1848792917)

**14**

...

.2    fails to make payment to the Subcontractors for materials or labor in accordance with the respective
agreements between the Contractor and the Subcontractors;

...

**§ 20.2.2** When any of the above reasons exists, the ~~Owner, upon certification by the Architect that sufficient cause
exists to justify such action,~~ Owner may, without prejudice to any other remedy the Owner may have and after giving
the Contractor seven days' written notice, terminate the Contract and take possession of the site and of all materials,
equipment, tools, and construction equipment and machinery thereon owned by the Contractor and may finish the
Work by whatever reasonable method the Owner may deem ~~expedient.~~ expedient, and may accept assignment of those
Subcontracts the Owner elects to assume. Upon request of the Contractor, the Owner shall furnish to the Contractor a
detailed accounting of the costs incurred by the Owner in finishing the Work.

...

**§ 20.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for
the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not
expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance,
the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or the Owner, as the case
may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination
of the Contract.

**§ 20.2.5** In the event it is judicially determined that the Owner was not entitled to terminate the Contract for cause, the
Owner's termination shall be deemed a termination for convenience.

...

~~The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause. The Contractor
shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with
reasonable overhead and profit on the Work not executed.~~ In addition to the foregoing, the Owner, upon seven (7)
days' written notice to the Contractor, may terminate the Contract for its convenience, in which event the Contractor
shall be paid for all work performed (as calculated in accordance with Article 4) as of the effective date of termination,
together with the retainage then due.

**PAGE 18**

**§ 21.1** Claims, disputes and other matters in question arising out of or relating to this Contract, including those
alleging an error or omission by the Architect but excluding those arising under Section 16.2, shall be ~~referred initially
to the Architect for decision. Such matters, except those waived as provided for in Section 21.8 and Sections 15.5.3
and 15.5.4, shall, after initial decision by the Architect or 30 days after submission of the matter to the Architect, be~~
subject to mediation as a condition precedent to binding dispute resolution.

...

**§ 21.3** ~~The parties shall endeavor to resolve their disputes by mediation.~~ Any claim, subject to, but not resolved by,
mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by
the American Arbitration ~~Association~~ Association, in accordance with ~~their~~ the Construction Industry ~~Mediation
Procedures~~ Arbitration Rules in effect on the date of ~~the Agreement. A request for mediation~~ this Agreement. Demand
for arbitration shall be made in writing, delivered to the other party to ~~this Agreement,~~ the Contract, and filed with the
person or entity administering the ~~mediation. The request may be made concurrently with the binding dispute
resolution but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which
shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by
agreement of the parties or court order. If an arbitration is stayed pursuant to this Section, the parties may nonetheless
proceed to the selection of the arbitrator(s) and agree upon a schedule for later proceedings.~~ arbitration. The award

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007
by The American Institute of Architects. **All rights reserved. WARNING: This AIA**® **Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA**® **Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1
which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL**                                                                                                    (1848792917)

rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

§ 21.4 ~~If the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any claim, subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association, in accordance with the Construction Industry Arbitration Rules in effect on the date of this Agreement. Demand for arbitration shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the arbitration. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.~~Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

§ 21.5 ~~Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).~~Any party to an arbitration may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described in the written Consent.

§ 21.6 ~~Any party to an arbitration may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described in the written Consent.~~ The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

§ 21.7 ~~The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.~~If a dispute shall arise between the parties to this Agreement, or related thereto, the Contractor shall continue during the pendency of such dispute to perform its services hereunder as if no dispute shall have arisen. During the pendency of any such dispute the Contractor shall be entitled to payments from the Owner only for non-disputed items, and payments shall be deferred only for that portion of the items that are disputed, until final resolution of the dispute.

§ 21.8 ~~CLAIMS FOR CONSEQUENTIAL DAMAGES~~Claims by the Contractor (including claims for Change Orders) must be initiated by written notice to the Owner. Claims must be initiated within ten (10) days after occurrence of the event giving rise to such claim or within ten (10) days after the Contractor first recognizes the condition giving rise to the claim, whichever is later.

## § 21.9 CLAIMS FOR CONSEQUENTIAL DAMAGES

The Contractor and the Owner waive claims against each other for consequential damages for delay arising out of or relating to this Contract. ~~This mutual waiver includes~~For the purposes hereof "consequential damages" shall only be

   .1     damages incurred by the Owner for ~~rental~~occupancy expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity ~~or of the services of such persons~~; and

   .2     damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit ~~except anticipated profit arising directly from the Work.~~or business opportunities.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 20. Nothing contained in this Section ~~21.8~~21.9 shall be deemed to preclude an award of

Additions and Deletions Report for AIA Document A107™ – 2007. Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
**User Notes:** Canyon Ranch/EBL    (1848792917)

16

~~liquidated damages, when applicable, in accordance with the requirements of the Contract Documents.~~actual damages, incurred under the terms of this Agreement.

## ARTICLE 22    OTHER CONDITIONS OR PROVISIONS

**§ 22.1.** All Applications for Payment and notices and communications hereunder shall be delivered electronically or by reputable overnight courier and shall be deemed effective on the date sent.

**§ 22.2** The failure of Owner to insist upon the strict performance of any provision of this Agreement, or the failure of Owner to exercise any right, option or remedy hereby reserved, shall not be construed as a waiver in the future of any such provision, right, option or remedy or as a waiver of a subsequent breach thereof. The consent or approval by Owner of any act by Contractor requiring Owner's consent or approval shall not be construed to waive or render unnecessary the requirement for Owner's consent or approval of any subsequent similar act by Contractor. The payment by Owner of any amount due hereunder with knowledge of a breach of any provision of this Agreement shall not be deemed a waiver of such breach. No provision of this Agreement shall be deemed to have been waived unless such waiver shall be in writing signed by the party to be charged.

This Agreement entered into as of the day and year first written above.

FL 6801 COLLINS NORTH LLC                         EBL CONSTRUCTION

By:  FL 6801 Spirits LLC, its Managing Member

By: _____          By: _____

**Additions and Deletions Report for AIA Document A107™ – 2007.** Copyright © 1936, 1951, 1958, 1961, 1963, 1966, 1970, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This draft was produced by AIA software at 16:47:14 on 05/22/2014 under Order No.4438793819_1 which expires on 05/03/2015, and is not for resale.
User Notes: Canyon Ranch/EBL
(1848792917)

17

# EXHIBIT A

## CONTRACTOR'S PROPOSAL

| Item | Quantity | Units | Price Per Unit | Total |
|---|---|---|---|---|
| Mobilization* | 1 | Lump Sum | _____ | _____ |
| Crack Repair** | _____ | Linear Feet | _____ | _____ |
| Debonded Stucco Repairs*** | _____ | Square Feet | _____ | _____ |
| | _____ | Linear Feet | _____ | _____ |
| Waterproofing Repairs**** | _____ | Square Feet | _____ | _____ |
| Glazing Perimeter Repairs***** | _____ | Linear Feet | _____ | _____ |
| Painting****** | 1 | Lump Sum | _____ | _____ |
| Total | | | | _____ |

*Mobilization shall include General Conditions, Supervision, Staging, Protection, and any and all charges not otherwise included in this Exhibit.

**Create a separate line item entry for each type and area of crack repair such as "Crack repair on Supergrid; Crack repair < 1/16"; Crack repair 1/16" to 3/16"; Crack repair > 3/16"."

***Create a separate line item entry for each type and area of stucco repair such as "Square Feet of stucco repairs" and "Linear Feet of stucco repairs per detail at Supergrid 2.1a-2.1C)" and "Square Feet at Detail 2.2 @ Terrace."

****Create a separate line item entry for each type and area of Waterproofing Repair such as "Repair at Supergrid" and "Repair at Parapet."

*****Create a separate line item entry for each type and area of Glazing Perimeter repair such as "Remove and replace Perimeter Sealant (Details at Supergrid 2.1a–2.1c)" and "Remove and Replace Perimeter Sealant (at Slabs as necessary)."

******Painting costs shall include all repairs listed above as a lump sum.

[998578-1]

## EXHIBIT B

## CONTRACTOR'S INDEMNITY AND INSURANCE REQUIREMENTS

1.   <u>Indemnification and Hold Harmless</u>

(a)    To the fullest extent permitted by law Contractor agrees for itself, and to cause its subcontractors, to indemnify, defend and hold harmless FL 6801 Collins North LLC, FL 6801 Spirits LLC, their lenders (if applicable), and their respective affiliates, principals, partners, members, stockholders, officers, directors, agents, employees, servants, successors and assigns (hereinafter collectively referred to as "Owner Parties") from and against any and all claims of third parties resulting in liabilities, losses, obligations, fines, liens, penalties, actions, judgments, damages, costs (including, without limitation, reasonable attorneys' fees and expenses incurred in connection therewith and in the enforcement of this indemnification), charges, expenses and demands of whatever kind (collectively, "Claims") in connection with and/or arising from or out of the following ("Indemnified Matters"):

(i)    any negligent, willful or wrongful act resulting in bodily injury (including death), personal injury or property damage by Contractor, Contractor's sub-contractors, their respective officers, employees, servants, agents, suppliers, invitees, successors and assigns (hereinafter collectively referred to as "Contractor Parties");

(ii)    the Work or any breach of this Agreement or infringement of any patent right, by any Contractor Party; or

(iii)    any statutorily imposed liability for injury to employees or failure to comply with any laws or regulations affecting the Work.

(b)    The indemnity contained herein shall survive the termination of this Agreement. Contractor shall advise Owner promptly, in writing of any incident that might give rise to a Claim or the service upon any Contractor Party of any summons, notices, letters or other communications alleging any Claim against any Owner Party or with respect to the Building or its surrounding area, upon which any Contractor Party is supplying services.

(c)    In claims against any person or entity indemnified hereunder by an employee of Contractor, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation hereunder shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for  Contractor or its subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

[997725-1]

2.    <u>Insurance</u>

(a)    Contractor shall secure and keep in full force and effect and shall cause any subcontractor to secure and keep in full force and effect, until the Work is finally completed and Contractor and all subcontractors have left the premises and removed all of their property therefrom, the following insurance coverage at Contractor's sole cost and expense. Such insurance shall be primary and noncontributory, notwithstanding any other insurance that might be in effect for any Owner Party:

(i)    commercial general liability insurance, including contractual liability (to specifically include coverage for the indemnification clause in Section 1(a)(i) relating to bodily injury, death or property damage), independent subcontractors liability, products and completed operations liability personal and advertising injury liability, all written on an occurrence form, with combined bodily injury and property damage limits of liability of no less than $2,000,000 per occurrence, $4,000,000 per project general aggregate, $2,000,000 personal and advertising injury and $2,000,000 products and completed operations liability with a $4,000,000 aggregate limit applied on a per project basis;

(ii)    completed operations coverage under their liability insurance for ten (10) years after the Work is completed;

(iii)    worker's compensation insurance providing statutory benefits for employees and employer's liability coverage in an amount that is no less than $1,000,000 per employee/$1,000,000 each accident/$1,000,000 each disease;

(iv)    commercial automobile liability insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $1,000,000 per occurrence;

(v)    umbrella/excess liability insurance on an occurrence basis with limits of not less than $10,000,000 per occurrence in excess of the limits provided by the employer's liability, commercial general liability and automobile liability insurance. The coverage terms of the umbrella/excess insurance must be on a no less than follow form basis. Contractor and its subcontractors shall secure, pay for and maintain whatever insurance they may deem necessary for protection against loss of owned or rented capital equipment and tools. The requirement to secure and maintain such insurance is solely for the benefit of Contractor and its subcontractors. Failure of Contractor or its subcontractors to secure such insurance and maintain adequate levels of coverage shall not obligate Owner or its agents and employees for any losses of owned or rented equipment.

(b)    All required insurance policies shall be maintained with insurance companies licensed or permitted within the State of Florida and holding an AM Best Rating of no

less than A-, VIII.  Said policies shall contain a provision that coverage will not be canceled or non-renewed until at least thirty (30) days prior written notice has been provided to Contractor (or ten (10) days in the case of nonpayment of premium). Contractor shall provide Owner with a copy of such notice within one (1) business day of the receipt thereof and within five (5) business days thereafter cause the policy to be reinstated or a like-kind policy to be issued by an insurance company meeting the requirements of this exhibit. At any time during the term of this Agreement, when requested by Owner, Contractor and its subcontractors shall promptly produce complete copies of all insurance policies required herein and evidence of payment of premiums thereon unless Owner assumes responsibility for payment of such premium.  If not so produced, Owner shall have the immediate right to procure the required insurance on behalf of Contractor and to charge and deduct the cost thereof from the within price, but Owner shall not be under any obligation to do so.

(c)      In the event that any Contractor Party sustains a loss by fire or other casualty the Contractor agrees to waive all rights of recovery against the Owner Parties and no third party shall have any right of recovery against any Owner Party by way of subrogation or assignment or otherwise.

(d)      The Owner Parties, along with their subsidiaries and affiliated entities, now or hereafter formed, all as their interests may appear, and such other parties in interest as Owner may designate in writing from time to time (collectively, "Additional Insureds"), shall be named as Additional Insureds, including during the period that completed operations coverage is to be maintained, except with respect to workers compensation and Contractor's property insurance. The Additional Insureds are to be included as a loss payee with regard to any commercial crime insurance.

(e)      Certificates in the customary form, i.e., Acord 25, except Acord 28 for property and commercial crime insurance, evidencing all lines of coverage required hereunder shall be delivered to the Owner or Owner's managing agent, or their agent together with general liability additional insured endorsements CG 2010 (11/85) or its equivalent, or CG 2010 (10/01) and CG 2037 (07/04), or broader and to be attached to and referenced in the certificate of insurance, prior to commencement of any Work.  Similar certificates shall be delivered evidencing the renewal or replacement of such insurance, at least ten (10) days prior to the effective date of such renewal or change of insurer.

3.    <u>Work Safety/OSHA</u>

(a)      Contractor expressly agrees and understands, and will cause its subcontractors to expressly agree and understand, that Contractor is primarily and solely responsible for the safety conditions of the work areas.  Contractor agrees that it is fully responsible for the compliance with all current and hereinafter enacted requirements and provisions under the Occupational Safety and Health Act of 1970 ("OSHA") and/or any special standards and/or requirements promulgated by Owner with regard to the Work, work areas or any contractors.

(b)      Contractor is hereby notified and shall advise all subcontractors, that there may be a potential for exposure to asbestos containing material ("ACM") and/or presumed asbestos containing material ("PACM") as defined in the OSHA Regulations, in the building, especially when working behind columns, in chases, etc. and when work is in contact with floor tile.  Contractor and each subcontractor shall be required to perform such work with personnel who have been properly trained per OSHA regulations.  Each subcontractor shall promptly notify both the Contractor and the Owner in the event any asbestos, ACM, or PACM is encountered.  Any removal thereof shall be in accordance with all applicable laws, rules and regulations.

(c)      Contractor agrees to and shall indemnify, defend and hold harmless all Owner Parties from any and all Claims arising out of Contractor's failure to comply with the above subparagraphs (a) and (b) or imposed or sought to be imposed against Owner Parties without regard to fault and solely by reason of statute or operation of law.

# EXHIBIT C

## DRAWINGS AND SPECIFICATIONS

**(To be provided)**

## EXHIBIT D

### CONTRACTOR'S PROGRESS LIEN WAIVER AND RELEASE OF CLAIMS

Period Ending ("Payment Date"): _____, 20__

Owner: _____  Original Contract Sum:  $_____
Project/Premises: _____  Approved Change Orders:  $_____
Contractor: _____  Contract Sum to Date:  $_____
Total Completed to Date:  $_____
Retainage:  $_____
Total Earned Less Retainage:  $_____
Total Payments Received to Date:  $_____
Progress Payment:  $_____

Contractor hereby acknowledges that the Progress Payment, upon clearance by Contractor's bank, together with Total Payments Received To Date, represents payment in full for all work, labor, services, equipment and materials furnished on the Project by Contractor and its subcontractors, laborers and materialmen through the Payment Date and for which payment is now due (the "Work").

In consideration of the sums previously received, and the Progress Payment, Contractor hereby waives and releases Owner from any and all claims for payment for the Work and liens and rights of liens in connection with the Project, other than with respect to the Retainage, the pending claims (if any) listed on the attached schedule (the "Listed Claims"), notice of which has been timely provided in accordance with the provisions of the Contract, and any potential claims for which the time to provide notice in accordance with the provisions of the Contract has not expired. [_____ Initial here if schedule is attached.]

Contractor represents and warrants that it has paid for all labor, materials, equipment and services that it has used or supplied in the amounts set forth on Contractor's Applications for Payment or, upon clearance of the Progress Payment, will pay for same in accordance with applicable law.  Contractor further represents and warrants that it has no other outstanding and unpaid applications, invoices, or unbilled work or materials against Owner other than the Listed Claims and any potential claims for which the time to provide notice in accordance with the provisions of the Contract has not expired. Contractor agrees to defend, indemnify and hold harmless Owner for any losses or expenses (including without limitation reasonable attorneys' fees) should any claim, lien or right of lien be asserted against Owner by Contractor or any of its subcontractors, laborers or materialmen in connection with payment for the Work. Contractor acknowledges that (a) amounts received from Owner are trust funds under applicable law and (b) the making and delivery of this waiver is a substantial inducement to Owner in making payments to Contractor under the Contract.

_____

By:_____
    Name:
    Title:

Sworn to before me this
_____ day of _____, 20__

_____
Notary Public

[957596-1]

**CONTRACTOR'S FINAL LIEN WAIVER AND RELEASE OF CLAIMS**

Owner: _____     Original Contract Sum:          $_____
Project/Premises: _____     Approved Change Orders:        $_____
Contractor: _____     Contract Sum to Date:            $_____
                                     Total Completed to Date:         $_____
                                     Total Payments Received to Date: $_____
                                     Final Payment:                   $_____

Contractor hereby acknowledges that the Final Payment, upon clearance by Contractor's bank, together with Total Payments Received To Date, represents payment in full for all work, labor, services, equipment and materials furnished on the Project by Contractor and its subcontractors, laborers and materialmen (the "Work").

In consideration of the sums previously received, and the Final Payment, Contractor hereby waives and releases Owner from any and all claims for payment for the Work and liens and rights of liens in connection with the Project as well as any other claims, rights or causes of action in equity or law whatsoever arising out of, through or under the Contract for the Work on the Project or otherwise in connection with the Project.

Contractor represents and warrants that it has paid for all labor, materials, equipment and services that it has used or supplied in the amounts set forth on Contractor's Applications for Payment or, upon clearance of the Final Payment, will pay for same in accordance with applicable law. Contractor further represents and warrants that it has no other outstanding and unpaid applications, invoices, or unbilled work or materials against Owner. Contractor agrees to defend, indemnify and hold harmless Owner for any losses or expenses (including without limitation reasonable attorneys' fees) should any claim, lien or right of lien be asserted against Owner by Contractor or any of its subcontractors, laborers or materialmen in connection with payment for the Work. Contractor acknowledges (a) amounts received from Owner are trust funds under applicable law and (b) the making and delivery of this waiver is a substantial inducement to Owner in making payments to Contractor under the Contract.

                                _____

                        By: _____
                            Name:
                            Title:

Sworn to before me this
_____ day of _____, 20__


_____
Notary Public

2

[957596-1]

## SUBCONTRACTOR'S PROGRESS LIEN WAIVER AND RELEASE OF CLAIMS

Period Ending ("Payment Date"): _____, 20__

Owner: _____
Project/Premises: _____
Contractor: _____
Subcontractor: _____
Percentage of Work Completed: _____

Subcontractor hereby acknowledges that the payment for the Percentage of Work Completed (the "Progress Payment"), upon clearance by Subcontractor's bank, together with Total Payments Received To Date, represents payment in full for all work, labor, services, equipment and materials furnished on the Project by Subcontractor and its sub-subcontractors, laborers and materialmen through the Payment Date (the "Work") and for which payment is now due.

In consideration of the sums previously received, and the Progress Payment, Subcontractor hereby waives and releases Contractor and Owner from any and all claims for payment for the Work and liens and rights of liens in connection with the Project, other than with respect to Retainage, the Claims (if any) listed on the attached schedule (the "Listed Claims"), notice of which has been timely provided in accordance with the provisions of the Contract for the Project, and any potential claims for which the time to provide notice in accordance with the provisions of the Contract has not expired. [_____ Initial here if schedule is attached.]

Subcontractor represents and warrants that it has paid for all labor, materials, equipment and services that it has used or supplied in the amounts set forth on Subcontractor's Applications for Payment or, upon clearance of the Progress Payment, will pay for same in accordance with applicable law. Subcontractor further represents and warrants that it has no other outstanding and unpaid applications, invoices, or unbilled work or materials against Contractor other than the Listed Claims and any potential claims for which the time to provide notice in accordance with the provisions of the Contract has not expired. Subcontractor agrees to defend, indemnify and hold harmless Contractor and Owner for any losses or expenses (including without limitation reasonable attorneys' fees) should any claim, lien or right of lien be asserted against Contractor or Owner by Subcontractor or any of its sub-subcontractors, laborers or materialmen in connection with payment for the Work. Subcontractor acknowledges (a) amounts received from Contractor are trust funds under applicable law and (b) the making and delivery of this waiver is a substantial inducement to Contractor in making payments to Subcontractor.

_____

By:_____
    Name:
    Title:

Sworn to before me this
_____ day of _____, 20__

_____
Notary Public

[957596-1]

3

## SUBCONTRACTOR'S FINAL LIEN WAIVER AND RELEASE OF CLAIMS

Owner: _____

Project/Premises: _____

Contractor: _____

Subcontractor: _____

Percentage of Work Completed: _____

Subcontractor hereby acknowledges that the payment for the Percentage of Work Completed (the "Final Payment"), upon clearance by Subcontractor's bank, together with Total Payments Received To Date, represents payment in full for all work, labor, services, equipment and materials furnished on the Project by Subcontractor and its sub-subcontractors, laborers and materialmen.

In consideration of the sums previously received, and the Final Payment, Subcontractor hereby waives and releases Contractor and Owner from any and all claims for payment for the Work and liens and rights of liens in connection with the Project as well as any other claims, rights or causes of action in equity or law whatsoever arising out of, through or under the Subcontract for the Work on the Project or otherwise in connection with the Project.

Subcontractor represents and warrants that it has paid for all labor, materials, equipment and services that it has used or supplied in the amounts set forth on Subcontractor's Applications for Payment or, upon clearance of the Final Payment, will pay for same in accordance with applicable law.  Subcontractor further represents and warrants that it has no other outstanding and unpaid applications, invoices, or unbilled work or materials against Contractor.  Subcontractor agrees to defend, indemnify and hold harmless Contractor and Owner for any losses or expenses (including without limitation reasonable attorneys' fees) should any claim, lien or right of lien be asserted against Contractor or Owner by Subcontractor or any of its sub-subcontractors, laborers or materialmen in connection with payment for the Work.  Subcontractor acknowledges that (a) amounts received from Contractor are trust funds under applicable law and (b) the making and delivery of this waiver is a substantial inducement to Contractor in making payments to Subcontractor.

_____

By:_____

    Name:

    Title:

Sworn to before me this
_____ day of _____, 20__

_____

Notary Public

[957596-1]

4

**SCHEDULE 1**
**ASSESSMENTS**

1. City of Miami Beach North Shore Resolution Number 94-21437 dated, December 21, 1994

2. Perpetual Non-Exclusive Easement Agreement between NORTH CARILLON, L.L.C., and the CITY OF MIAMI BEACH dated, April 4, 2008

**SCHEDULE 2**
**PURCHASE PRICE ALLOCATION**


**[TO BE MUTUALLY AGREED PRIOR TO CLOSING ON AN ASSET BASIS]**

## SCHEDULE 3
## RENTAL PROGRAM AGREEMENTS

| Floor | Hotel Unit & Contract Unit | Owner Name | RPA PROGRAM / BENEFITS ACCEPTED | DATE OF AGREEMENT TERMINATION DATE |
|-------|------|------------|------|------|
| 2 | 210 C211 | JLE PROPERTIES LLC - ELLEN WINDHEIM&LEONARD ZACKON | B - NO | 7/6/2012 7/5/2014 |
| 2 | 212 C210 | DRM ASSETS CORP, RAFAEL LAURO | C - NO | 6-25-12 6-24-14 |
| 2 | 214 C209 | SCALITTI LLC - Carlos DiCarlo | B - NO | 12/16/2013 12/15/15 |
| 2 | 216 C208 | P&R PROPERTY LLC, DANIEL OZAN and CLAUDIA GOMEZ | A - YES | 3/5/2011 3/4/2016 |
| 2 | 217 C204 | DAVID HAMAMOTO | A - NO | 5/2/2012 5/1/2017 |
| 2 | 220 C206 | DAVID HAMAMOTO | A - NO | 5/2/2012 5/1/2017 |
| 2 | 222 C205 | SEASIDE CITY LLC, FRANCINE LEFRAK& RICK FRIEDBERG | C -YES | 2/25/2009 2/24/2015 |
| | | | | |
| 3 | 301 C316 | WILLIAM FRIEDBERG | C -YES | 9/26/2011 9/26/2014 |
| 3 | 310 C311 | LANCASHIRE GROUP LLC - DIEGO STERMAN | C - NO | 6/12/2012 6/11/2014 |
| 3 | 314 C309 | PETER FREY & CAROLINE SHAPIRO | C - NO | 2/1/2014 1/31/2015 |
| 3 | 315 C303 | LODEWIJK DE LAERE & PASCALE CLEMENT | C - YES | 11/4/2009 11/3/2014 |
| 3 | 316 C308 | OCCELLI INVESTMENTS LLC. OCCELLI, Dario | B - YES | 07/22/11 07/21/2015 |
| 3 | 317 C304 | TIPY FLORIDA INC. GLAUCIA RODRIGUES | C - NO | 02/20/2012 02/19/2015 |
| 3 | 320 C306 | YOUNG MEE KANG & IRVIN BRADY | C - YES | 1/29/2010 1/28/2015 |

| 3 | 322<br>C305 | SUSAN TAWIL | C - YES | 6/30/2009<br>6/29/2014 |
|---|---|---|---|---|
| 4 | 409<br>C401 | MD Real Property LLC, DANIELOZAN | A - YES | 10/29/2010<br>10/28/2015 |
| 4 | 410<br>C411 | RAIN CASTLE CANYON - LANA CALLEN | B - NO | 8/24/2012<br>8/23/2014 |
| 4 | 411<br>C402 | ERIC WALLBERG | D* - YES | 12/22/2008<br>12/21/2015 |
| 4 | 412<br>C410 | HELEN YARMAK | C - NO | 1/5/2009<br>1/4/2015 |
| 4 | 414<br>C409 | S & E HOTEL MANAGEMENT, LLC | B - YES | 10/26/2010<br>10/25/2014 |
| 4 | 415<br>C403 | IGNACIO G. PAKCIARZ & SUSANA HERNANDEZ | B - YES | 7/15/2010<br>7/14/2014 |
| 4 | 416<br>C408 | JANE COE STOKER | B - NO | 02/21/12<br>02/20/16 |
| 4 | 418<br>C407 | MARGARET ROSENFELD | A - YES | 8/10/2009<br>8/9/2014 |
| 4 | 420<br>C406 | PETER FREY & CARRIE SHAPIRO | C- NO | 5/19/2014<br>5/18/2015 |
| 4 | 422<br>C405 | SANDY MONTAG | A- YES | 12/12/2008<br>12/11/2018 |
| 5 | 501<br>C516 | EVAN MICHAELS | B - YES | 12/22/2008<br>12/21/2014 |

| 5 | 502 C515 | STIVELMAN , CLAUDIO JACQUES | B-NO | 11-29-11 11/28/2015 |
| 5 | 503 C517 | EMANUEL & CAROL FITZGERALD | B - YES | 4/29/2014 4/28/2016 |
| 5 | 509 C501 | LAS CONDES, LLC  - JUAN PABLO CAPPELLO | C - YES | 4/30/2010 4/29/2014 |
| 5 | 510 C511 | NAJM, JAMAL | B - NO | 6/13/2012 6/12/2014 |
| 5 | 515 C503 | OTELLO SORATO & FABIANA BERNARDI | B - NO | 12/10/2008 12/9/2015 |
| 5 | 516 C508 | DUBOURG, Julian | B-NO | 6/26/13 6/25/2015 |
| 5 | 518 C507 | SUKRU AND INCI CAKIRCA | C - YES | 7/20/2010 7/19/2014 |
| | | | | |
| 6 | 601 C616 | SOJAMA LLC - Gustavo Sterman | C-NO | 7/3/2013 7/2/2014 |
| 6 | 603 C617 | NEWBLATT FAMILY LLC, ROBERT NEWBLAT | B -YES | 10/31/2008 10/30/2014 |
| 6 | 604 C614 | JAMES WALESA | A -YES | 1/16/2009 1/15/2019 |
| 6 | 605 C618 | BHATIA VENTURES/Susan Bhatia | A-NO | 8/20/2013 8/19/2018 |
| 6 | 606 C613 | SAUDE INVESTMENTS, LLC - BETTINA CISNEROS | C-NO | 1/22/2014 1/21/2015 |
| 6 | 608 C612 | JANE COE STOKER | B -NO | 6/12/2013 6/12/2015 |
| 6 | 610 C611 | BRIAN GORDON, PAUL SILITSKY, ANDREA LUBELL | B -YES | 12/2/2009 12/1/2015 |
| 6 | 611 C602 | LLOYD HERSHMAN & ELIZABETH WELCH | A -YES | 1/8/2009 1/7/2019 |
| 6 | 612 C610 | CISNEROS, WILLIAM&BETTINA | C-NO | 12/17/13 12/16/2014 |
| 6 | 614 C609 | TIM OUELLETTE | B -YES | 6/17/2009 6/16/2015 |

| | | | | |
|---|---|---|---|---|
| 6 | 615 C603 | ARI RUBENSTEIN | A -YES | 6/17/2009 6/16/2018 |
| 6 | 616 C608 | BARRY AND DONNA ZUCKER | B -YES | 12/22/2008 12/21/15 |
| 6 | 617 C604 | SOJAMA LLC  - GUSTAVO STERMAN | C-NO | 11/30/2012 11/30/2014 |
| 6 | 620 C606 | JAY PARKER | B - NO | 5/1/2009 4/30/2015 |
| 6 | 622 C605 | YOEL & CAROL HALLER | B -YES | 10/30/2008 10/29/2014 |
| | | | | |
| 7 | 701 C716 | FIDEO LLC - ROBERTO STERMAN | C - NO | 5/29/2012 5/28/14 |
| 7 | 702 C715 | GLEICHER, ISAAC | B -NO | 11/21/2011 11/20/2015 |
| 7 | 704 C714 | CIPORA FRAIMAN | B -YES | 8/27/2009 8/26/2015 |
| 7 | 706 C713 | DRM ASSETS CORP, RAFAEL LAURO | C - NO | 6-25-12 6-24-14 |
| 7 | 708 C712 | ACBS Florida Investments LLC / Robert and Mary Ellen Fettig | B-NO | 3-1-13 3-1-15 |
| 7 | 710 C711 | ALEXEY VOLOKHOV | B- NO | 10/21/2013 10/20/2015 |
| 7 | 711 C702 | JENINE RENZULLI & JEFF ROSENBERG | B -YES | 4/3/2009 4/2/2015 |
| 7 | 714 C709 | LUIS SOUZA FIDELIX | C -YES | 9-20-11 9/20/14 |
| 7 | 715 C703 | PAUL BOGUTSKY | B -YES | 11/7/2008 11/6/2014 |
| 7 | 716 C708 | STEVEN STANLEY LEVY & MICHELLE DE LOS SANTOS | C -YES | 5/23/2011 5/22/2014 |

| 7 | 717 C704 | KOHANN YEE | B-NO | 3/12/2013 3/12/2015 |
|---|---|---|---|---|
| 8 | 801 C816 | PHILOMENA D LLC/ ANTHONY DELLA SALLA | C- YES | 10/10/2011 10/09/2014 |
| 8 | 802 C815 | MAXINE BASS | B - YES | 11/12/2008 11/11/2014 |
| 8 | 803 C817 | STUART LEVINE | A - YES | 11/12/2008 11/11/2018 |
| 8 | 804 C814 | BALLRIRSM & LEELA MAHARAJ | A - NO | 12/15/2008 12/14/2018 |
| 8 | 805 C818 | DOUGLAS SCHOEN | A - NO | 11/26/2008 11/25/2018 |
| 8 | 806 C813 | PJAS SUSAN KUNREUTHER & PETER SMITH | A - YES | 12/4/2008 12/03/2018 |
| 8 | 809 C801 | MARENGO INTERNATIONAL GROUP CORP | C - NO | 12/20/2011 12/19/2014 |
| 8 | 811 C802 | GEORGE LUFT | B -YES | 8/17/2009 8/16/2015 |
| 8 | 812 C810 | ROBERT WATMAN | C -YES | 6/23/2009 6/22/2014 |
| 8 | 816 C808 | PETROESTE - EDUARDO ESTIVIL | B - NO | 7/5/2012 7/4/2014 |
| 8 | 817 C804 | JAY PARKER  (REP) / GIOVANNI FIOCCHI ( OWNER) | B -YES | 5/18/2009 5/17/2015 |
| 8 | 820 C806 | SUGLIA REALTY MIAMI LLC | C -YES | 5/17/2010 5/16/2014 |
| 8 | 822 C805 | UNIT 822 PROPERTIES | B - NO | 11/06/2012 11/05/2014 |
| 9 | 901 C916 | CR901 LLC - Roberto Garcia & Francisco Gonzalez | A- NO | 6/12/2012 6/11/2017 |

| 9 | 902 C915 | FIDEO LLC - ROBERTO STERMAN | C- NO | 5/29/12 5/28/15 |
| 9 | 903 C917 | ZINA SHERMAN | B -YES | 11/6/2008 11/5/2014 |
| 9 | 905 C918 | HANK KATZEN | A -YES | 11/4/2008 11/03/2018 |
| 9 | 906 C913 | Montag Canyon LLC / RODNEY MONTAG | A-NO | 04/07/2013 04/07/2018 |
| 9 | 910 C911 | QING HUANG and JIA XIE | B -NO | 3/21/2012 3/20/14 |
| 9 | 914 C909 | NANCY FUSCO BALDWIN | B -YES | 11/26/2008 11/25/2014 |
| 9 | 915 C903 | STEPHEN & ROSALEE SIMENSKY TRUST | A - YES | 1/4/2010 1/3/2015 |
| 9 | 916 C908 | LANCASHIRE GROUP LLC - DIEGO STERMAN | C - NO | 6/29/2012 6/28/2014 |
| 9 | 917 C904 | Plate West, In., a Florida corporation | C -YES | 11/1/2010 10/31/2014 |
| 9 | 918 C907 | CR907 LLC. Caffarro, Mr. A and Mr. S | C -YES | 6/7/2011 6/6/2014 |
| 9 | 920 C906 | MARY KAY FALISE | B -YES | 12/4/2008 12/03/2014 |
| 9 | 922 C905 | BARRY AND DONNA ZUCKER | A - YES | 1/13/2009 1/12/2019 |
| | | | | |
| 10 | 1001 C1016 | BARBARA SILBER | C -NO | 12/21/2011 12/20/2014 |
| 10 | 1002 C1015 | DICCE, VINCENT | B -YES | 4/15/2010 4/14/2014 |
| 10 | 1003 C1017 | WINDSOR INVESTMENT CR LLC, RONALD DIGASBARRO | B -YES | 4/30/2010 4/29/2014 |
| 10 | 1004 C1014 | GUSTAVO, EDURADO, OSCAR RUBIO | C -YES | 6/1/2010 5/30/2014 |
| 10 | 1006 C1013 | BERNICE BARSTEIN | C -YES | 3/19/2009 3/18/2014 |

| 10 | 1008 C1012 | QING HUANG and JIA XIE | B - NO | 6/22/2012 6/21/2014 |
|----|------------|-------------------------|--------|----------------------|
| 10 | 1010 C1011 | ANA & JAMIE A. DAVIDSON | C - NO | 7/10/2012 7/9/2014 |
| 10 | 1011 C1002 | FEDERICO GREYEB | B -YES | 8/26/2009 8/25/2015 |
| 10 | 1012 C1010 | MR. MANBIR SINGH | B - NO | 5/22/2014 5/21/2016 |
| 10 | 1017 C1004 | SHAWYIN AND KWASI ARMAH | B -YES | 9/1/2011 8-31-15 |
| 10 | 1018 C1007 | CR 1018 LLC (MRS. PAOLA GARZONI) | B- NO | 12/10/2012 09/3/14 |
| 10 | 1020 C1006 | DR. BRIAN HOYLE | B -YES | 6/21/11 6/20/2015 |
| 10 | 1022 C1005 | HELEN YARMAK | A - NO | 1/25/2009 1/24/2019 |

## SCHEDULE 4
## PREVIOUSLY USED UNITS

Units 204 and 205, North Tower

Unit 109, South Tower

Units 207, 307, 319, 519, 619, 719, 819, 919, and 1019, Central Tower

**SCHEDULE 5
LEASES AND CONTRACTS**

1.  Construction Manager Agreement between FL 6801 SPIRITS, LLC and BENSON ENGINEERING & CONSTRUCTION COMPANY, CGC LIC #062411 and EBL PARTNERS, LLC dated January 4, 2010

2.  Amendment #1 of the Construction Management Agreement between FL 6801 SPIRITS, LLC AND BENSON ENGINEERING & CONSTRUCTION COMPANY, CGC LIC#062411 and EBL PARTNERS, LLC dated June 2, 2010

3.  Amendment #2 of the Construction Manager Agreement between FL 6801 SPRITS, LLC and BENSON ENGINEERING & CONSTRUCTION COMPANY, CGC LIC# 062411 and EBL PARTNERS, LLC LIC#1518857 dated March 18, 2011

4.  Amendment #3 of the Construction Manager Agreement between FL 6801 SPRITS, LLC and EBL PARTNERS, LLC LIC#1518857 dated November 21, 2011

5.  Amendment #4 of the Construction Manager Agreement between FL 6801 SPRITS, LLC and EBL PARTNERS, LLC LIC#1518857 dated June 21, 2012

6.  Amendment #5 of the Construction Manager Agreement between FL 6801 SPRITS, LLC and EBL PARTNERS, LLC LIC#1518857 dated September 7, 2012

7.  Amendment #6 of the Construction Manager Agreement between FL 6801 SPRITS, LLC and EBL PARTNERS, LLC LIC#1518857 dated January 16, 2013 (NOT EXECUTED)

8.  Association Management Agreement between CARILLON HOTEL AND SPA MASTER ASSOCIATION, INC. and ATLANTIC & PACIFIC ASSOCIATION MANAGEMENT, INC. dated December 10, 2010

9.  User License Agreement between LB CARILLON LLC and COTTON AND COMPANY, dated May, 2009 (NOT DATED)

10. Marketing Agreement between FL 6801 COLLINS SOUTH LLC and COTTON AND COMPANY, dated March 19, 2011

11. All of the additional contracts described on the following pages, numbered 1 through 53.

**[SEE ATTACHED]**

Canyon Ranch Contract and Agreements

| | VENDOR NAME | CONTRACT DESCRIPTION | CONTRACT START DATE | ADDRESS | CITY | STATE OR PROVINCE | ZIP | COUNTRY | CURE AMOUNT* |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ADP | Outsourcing for Payroll | 12/18/06 | One ADP Drive | Augusta | GA | 30909 | United States | $0 |
| 2 | Airstron | Air Conditioning Services | 3/23/11 | 1559 SW 21st Avenue | Ft. Lauderdale | FL | 33312 | United States | $0 |
| 3 | American Express Travel Related Services Company, Inc. | Credit Card Service | 1/1/08 | P.O. Box 35022 | Greensboro | NC | 27425 | United States | $0 |
| 4 | AT&T | Data, VoIP, Toll Free & Internet Provider | 6/4/10 | 13450 W Sunrise Blvd. | Sunrise | FL | 33323 | United States | $0 |
| 5 | Boucher Brothers | Concession Agreement | 4/15/13 | 1451 Ocean Drive, Suite 205 | Miami Beach | FL | 33139 | United States | $0 |
| 6 | Boucher Brothers | Concessionaire Bank Issue Contract | 4/17/13 | 1452 Ocean Drive, Suite 205 | Miami Beach | FL | 33139 | United States | $0 |
| 7 | Boucher Brothers | Service Agreement | 4/1/13 | 1451 Ocean Drive, Suite 205 | Miami Beach | FL | 33139 | United States | $0 |
| 8 | Cascade | Water Treatment Specialists | 4/1/13 | 2010 N.W. 29th Street, | Oakland Park | FL | 33311 | United States | $0 |
| 9 | Century Cleaning | Exhaust Kitchen Cleaning | 3/12/13 | 21432 SW 86 Place | Cutler Bay | FL | 33189 | United States | $0 |
| 10 | Coastal Car & Limousine | Car and Limousine Service | 8/9/08 | 1040 South West 10th Street | Pompano Beach | FL | 33069 | United States | $0 |
| 11 | Coletti Investments, LLC | Dry Cleaning Service Agreement | 11/27/12 | 3475 NE 163rd Street | North Miami Beach | FL | 33166 | United States | $0 |
| 12 | Computrition | Food Software | 1/18/08 | 8521 Fallbrook Ave, Suite 100 | West Hill | CA | 91304 | United States | $0 |
| 13 | Concept | Software Maintenance Service | 5/10/12 | 147 Avenida Eng. Duarte Pacheco | Almancil | | 8135-104 | Portugal | $0 |
| 14 | Commercial Energy Specialists | Pool Water Quality Control | 9/18/12 | 860 Jupiter Park Dr. | Jupiter | FL | 33458 | United States | $0 |
| 15 | Dunbar Armored | Security Services | 11/7/2008 | 50 Schilling Road | Hunt Valley | MD | 21031 | United States | $0 |

 * The Bankruptcy Court has previously authorized the Debtors to honor necessary expenses incurred in connection with Canyon Ranch's management of the Property, such as employees, vendors, service providers, utilities, insurance, tax obligations and reimbursement for operational costs (e.g., reservation systems).  Accordingly, the Cure Amounts for obligations arising under the contracts entered into by Canyon Ranch listed on this Schedule, are reflected at $0.  The Debtors anticipate that undisputed obligations under such agreements and contracts will be paid in the ordinary course of the Debtors' operations through consummation of the Sale.

Canyon Ranch Contract and Agreements

| | VENDOR NAME | CONTRACT DESCRIPTION | CONTRACT START DATE | ADDRESS | CITY | STATE OR PROVINCE | ZIP | COUNTRY | CURE AMOUNT* |
|---|---|---|---|---|---|---|---|---|---|
| 16 | Extenway Solutions | Interactive and Guest Media Services | 11/4/08 | 500 Morgan Road, Suite 100 | Baie d'Urfé | Quebec | H9X 3V1 | Canada | $0 |
| 17 | Fire Alarm Systems Security Inc. | Monitoring and Servicing of Fire Alarm Systems | 12/21/11 | 3901 S.W. 47th Ave., Suite 408 | Davie | FL | 33314 | United States | $0 |
| 18 | Garaventa Lift | Planned Lift Equipment Maintenance | 5/20/13 | 549 Sawgrass Corporate Parkway | Sunrise | FL | 33325 | United States | $0 |
| 19 | Gold Key Solutions | Concierge Assistant | 6/16/10 | 28118 Agoura Road, Suite 202 | Agoura Hills | CA | 91301 | United States | $0 |
| 20 | Great Waste | Great Waste & Recycling Services | 5/8/14 | 3051 NW 129th Street | Opa-Locka | FL | 33054 | United States | $0 |
| 21 | Hobart Services | Maintenance for Kitchen Equipment | 5/7/12 | 701 S. Ridge Ave. | Troy | OH | 45374-0001 | United States | $0 |
| 22 | Hot SOS | Software Provider | 11/2/07 | 9941 West Jessamine Street | Miami | FL | 33157 | United States | $0 |
| 23 | Infinite Energy | Natural Gas | 4/9/12 | 7001 SW 24th Ave. | Gainesville | FL | 32607-3704 | United States | $0 |
| 24 | KW Power | Generator Maintenance Agreement | 7/18/13 | 9820 NW 117 Way | Medley | FL | 33172 | United States | $0 |
| 25 | Labcorp | Laboratory Service Agreement | 4/10/07 | 69 First Avenue | Raritan | NJ | 08869 | United States | $0 |
| 26 | Living Color Entiprises | Aquarium Maintenance and Service | 12/3/08 | 6850 NW 12th Avenue | Ft. Lauderdale | FL | 33309 | United States | $0 |
| 27 | Leading Hotels Of The World | Hotel Membership | 12/1/11 | 485 Lexington Avenue | New York | NY | 10016 | United States | $0 |
| 28 | Metropolis Technologies | Call Accounting Software | 11/1/13 | 6278 N. Federal Highway, #413 | Ft. Lauderdale | FL | 33308 | United States | $0 |
| 29 | Micro Systems Inc. | Software Provider | 3/17/09 | 7031 Columbia Gateway Drive | Columbia | MD | 21046-2289 | United States | $0 |
| 30 | National Service Group | Professional Cleaning Service | 10/1/08 | 12535 Orange Drive, Suite 602 | Davie | FL | 33330 | United States | $0 |

 * The Bankruptcy Court has previously authorized the Debtors to honor necessary expenses incurred in connection with Canyon Ranch's management of the Property, such as employees, vendors, service providers, utilities, insurance, tax obligations and reimbursement for operational costs (e.g., reservation systems). Accordingly, the Cure Amounts for obligations arising under the contracts

Canyon Ranch Contract and Agreements

| | VENDOR NAME | CONTRACT DESCRIPTION | CONTRACT START DATE | ADDRESS | CITY | STATE OR PROVINCE | ZIP | COUNTRY | CURE AMOUNT* |
|---|---|---|---|---|---|---|---|---|---|

entered into by Canyon Ranch listed on this Schedule, are reflected at $0. The Debtors anticipate that undisputed obligations under such agreements and contracts will be paid in the ordinary course of the Debtors' operations through consummation of the Sale.

Canyon Ranch Contract and Agreements

| | VENDOR NAME | CONTRACT DESCRIPTION | CONTRACT START DATE | ADDRESS | CITY | STATE OR PROVINCE | ZIP | COUNTRY | CURE AMOUNT* |
|---|---|---|---|---|---|---|---|---|---|
| 31 | Natures Vending | Vending Equipment Placement  Agreement | 3/25/14 | 700 NE 25th St., Suite #1903 | Miami | FL | 33137 | United States | $0 |
| 32 | Open Table | System and Software Provider | 9/9/08 | 799 Market St., Suite 400 | San Francisco | CA | 94103 | United States | $0 |
| 33 | Otis Elevator | Elevator Company: North, Central and South | 10/6/09 | 16200 NW 59th Avenue, Suite 109 | Miami Lakes | FL | 33014 | United States | $0 |
| 34 | OSA Financial, Inc. | ATM Service | 3/3/09 | 12340 Montana Ave., Suite 303 | Los Angeles | CA | 90049 | United States | $0 |
| 35 | Park One | Parking Management | 12/31/2013 | 10800 Biscayne Blvd., Suite 950 | Miami | FL | 33161 | United States | $0 |
| 36 | Pitney Bowes | Postage Machine | 12/23/11 | P.O. Box 855942 | Louisville | KY | 40285-6042 | United States | $0 |
| 37 | Plant Care | Plant Maintenance and Provider | 8/25/11 | P.O. Box 50115 | Lighthouse Point | FL | 33074 | United States | $0 |
| 38 | Ricoh | Copiers Lease Agreement | 11/19/13 | 70 Valley Stream Parkway | Malvern | PA | 19355 | United States | $0 |
| 39 | R.N. Views, Inc. | Window Maintenance | 3/10/14 | 8851 NW 119th St., #341 | Hialeah Gardens | FL | 33018 | United States | $0 |
| 40 | Smartresort Co., LLC | Cable Services Agreement: North and Central | 1/1/09 | P.O. Box 643829 | Cincinnati | OH | 45264-3829 | United States | $0 |
| 41 | Shift 4 | Software for credit/debit transactions | 1/7/08 | 1491 Center Crossing Rd. | Las Vegas | NV | 89144-7047 | United States | $0 |
| 42 | Sno White | Dust Control Service | 3/4/11 | 2012 Grant St. | Hollywood | FL | 33020 | United States | $0 |
| 43 | Staffix | Employment Agency | 12/17/09 | 2164 Whisper Lakes Blvd. | Orlando | FL | 32837 | United States | $0 |
| 44 | Stericycle | Biomedical Waste Services | 12/1/08 | 2333 Waukegan Rd., Suite 200 | Bannockburn | IL | 60015 | United States | $0 |
| 45 | Sunshine State Management | Contract Labor Hotel Services | 5/27/14 | 18801 Collins Ave, Suite #102-403 | North Miami Beach | FL | 33160 | United States | $0 |

 * The Bankruptcy Court has previously authorized the Debtors to honor necessary expenses incurred in connection with Canyon Ranch's management of the Property, such as employees, vendors, service providers, utilities, insurance, tax obligations and reimbursement for operational costs (e.g., reservation systems).  Accordingly, the Cure Amounts for obligations arising under the contracts entered into by Canyon Ranch listed on this Schedule, are reflected at $0.  The Debtors anticipate that undisputed obligations under such agreements and contracts will be paid in the ordinary course of the Debtors' operations through consummation of the Sale.

Canyon Ranch Contract and Agreements

| | VENDOR NAME | CONTRACT DESCRIPTION | CONTRACT START DATE | ADDRESS | CITY | STATE OR PROVINCE | ZIP | COUNTRY | CURE AMOUNT* |
|---|---|---|---|---|---|---|---|---|---|
| 46 | Steritech | Brand Protection Services | 1/20/11 and 4/25/11 | 2250 Lucien Way, Suite 280 | Maitland | FL | 32751 | United States | $0 |
| 47 | Techno Gym | Fitness Equipment Technical Support and Services | 4/21/14 | 700 Route 46 East, 2nd Floor | Fairfield | NJ | 07004 | United States | $0 |
| 48 | Timesaver | Hospitality Time & Labor Management System | 6/23/08 | 300 N. Martingale Road, Suite 500 | Schaumburg | IL | 60173 | United States | $0 |
| 49 | Worldwide Pools | Pool Service and Maintenance | 1/1/13 | 15476 NW 77th Court, Suite 168 | Miami Lakes | FL | 33016 | United States | $0 |
| 50 | Yun Maintenance | Maintenance Service | 3/29/11 | 2132 SW 132nd Way | Davie | FL | 33325 | United States | $0 |
| 51 | YZ Studio, Inc. | Exercise and Products Services | 9/1/09 | 416 W 13th St, #7 | New York | NY | 10014 | United States | $0 |
| 52 | Zdirect, Inc. | Customer Relations Management | 1/10/10 | 1920 E. Hallandale Beach Blvd. | Hallandale Beach | FL | 33009 | United States | $0 |
| 53 | Waste Services of FL, Inc. | Solid Waste & Recycle | 1/10/14 | 3840 NW 37th Court | Miami | FL | 33142 | United States | $0 |

 * The Bankruptcy Court has previously authorized the Debtors to honor necessary expenses incurred in connection with Canyon Ranch's management of the Property, such as employees, vendors, service providers, utilities, insurance, tax obligations and reimbursement for operational costs (e.g., reservation systems).  Accordingly, the Cure Amounts for obligations arising under the contracts entered into by Canyon Ranch listed on this Schedule, are reflected at $0.  The Debtors anticipate that undisputed obligations under such agreements and contracts will be paid in the ordinary course of the Debtors' operations through consummation of the Sale.

## SCHEDULE 6
## LITIGATION

1. North Carillon Beach Condominium Association, Inc. Complaint for Declaratory Relief against FL 6801 COLLINS NORTH LLC, FL 6801 COLLINS SOUTH LLC and FL 6801 Collins Central dated February 19, 2014

2. Central Carillon Beach Condominium Association, Inc. and South Carillon Beach Condominium Association, Inc., Complaint against FL 6801 Collins Central LLC, Carillon Hotel and Spa Master Association, Inc., and North Carillon Beach Condominium Association, Inc., dated, March 11, 2014

3. Broad and Cassel letter addressed to Carillon Hotel and Spa Master Association, Inc. regarding "Request for Records" dated December 27, 2013

4. Broad and Cassel letter addressed to FL6801 Collins Central, LLC c/o FL 6801 Spirits LLC regarding "Request for Records" dated December 27, 2013

5. Siegfried Rivera Hyman Lerner De La Torre Mars Sobel ("SRHL") letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated November 19, 2013

6. SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Certificate of Occupancy dated September 26, 2013

7. SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Heat Exchange System dated September 25, 2013

8. SRHL letter addressed to SHUTTS & BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Vibration and Noise from Hydraulic Elevator Pumps dated September 27, 2013

9. HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated April 26, 2013

10. HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated May 3, 2013

11. HYMAN and MARS LLP letter addressed to SHUTTS AND BOWEN, LLP regarding South Carillon Beach Condominium Association, Inc. Units S-212 and Units S-312 dated June 3, 2013

12. GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Building Records dated February 5, 2013

13. GURSKEY RAGAN PA letter addressed to SHUTTS AND BOWEN, LLP regarding Request for Records dated January 21, 2013

14. Notice of Claim by South Carillon Beach Condominium Association, Inc. pursuant to Chapter 558 Florida Statues dated May 22, 2012

15. RUMBERGER KIRK & CALDWELL letter addressed to GURSKY & RAGAN PA regarding South Carillon Beach Condominium Association, Inc. 558 Notice dated May 29, 2013

16. Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 507 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010

17. Pardo & Gainsburg LLP letter to FL 6801 Collins South, LLC regarding NOTICE OF CLAIM FOR UNIT 508 PURSUANT TO SECTION 558.004, FLORIDA STATUTES dated November 4, 2010