BRACEWELL & GIULIANI LLP
Daniel S. Connolly
Jennifer Feldsher
Rachel B. Goldman
David J. Ball
1251 Avenue of the Americas
New York, New York 10020
Telephone (212) 508-6100
Facsimile (212) 508-6101

*Counsel to the North Carillon Beach*
*Condominium Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| FL 6801 SPIRITS, *et al.*, | Case No. 14-11691 (SCC) |
| Debtors. | (Jointly Administered) |

**RESPONSE OF NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**
**IN OPPOSITION TO DEBTORS' OBJECTIONS TO THE NORTH TOWER**
**PROOFS OF CLAIM**
**(CLAIM NOS. 17, 19, 24 AND 27)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................1

PRELIMINARY STATEMENT ........................................................................................2

STATEMENT OF RELEVANT FACTS .........................................................................7

      A.     The Property.......................................................................................7

      B.     Prepetition, The Debtors Levied Charges And Assessments Against The Unit Owners That Were Improper And Inconsistent With The Master Declaration ...................................8

      C.     The Florida Lawsuits .................................................................9

      D.     Sale Of The Property .................................................................9

      E.     The Proofs of Claim.................................................................12

ARGUMENT .................................................................................................................12

    I.     Applicable Standard.................................................................................12

    II.     The Sale Findings Do Not Preclude The North Association's Overcharge Claims .................................................................................14

      A.     The Debtors Have Not Met Their Burden to Establish Collateral Estoppel.................................................................15

            i.     The Issues Implicated In The Sale Findings And The Proofs Of Claims Are Distinct......................................16

            ii.     The Issues Raised By The Proofs Of Claim Were Never Litigated Nor Decided In The Debtors' Chapter 11 Cases............19

            iii.     No Full And Fair Opportunity To Litigate The Proofs Of Claim Has Been Provided To The North Association.................................................................20

            iv.     Whether The Sale Findings Were Necessary To The Sale Order Is Irrelevant – Resolution Of The North Association's Monetary Claims Was Not Necessary To Consummation Of The Sales Process ...........................23

    III.     Fairness Considerations Weigh Against Collateral Estoppel ...............................25

    IV.     The Sale Findings Did Not Resolve The Factual Issues In The Proofs Of Claim.................................................................................25

      A.      Improper Spa Charges.................................................................................26

      B.      Improper Valet Parking Assessments ........................................................31

      C.      Improper Utilities Assessments ................................................................30

V.      The Debtors' Objection To The North Association's
Construction Defect Claims Has No Merit.................................................30

      A.      The North Association Complied With Chapter 558's Notice
Requirements ..............................................................................................32

      B.      Failure To Provide Notice Under Chapter 558 Is Not A Basis For
Dismissal.....................................................................................................35

      C.      Unpaid Dues.................................................................................................36

VI.      Further Objections Raised By The Debtors ............................................36

VII.      Reservation Of Rights............................................................................37

CONCLUSION...................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Arizona v. California*,
530 U.S. 392 (2000)..................................................................................................19

*Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*,
409 F.3d 87 (2d Cir. 2005)........................................................................................14

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)......................................................................................14

*City Stores Co. v. Mall, Inc. (In re City Stores Co.)*,
42 B.R 685 (S.D.N.Y. 1984)......................................................................................18

*First Coast Excursions, LLC. v. Tadlock (In re Tadlock)*,
No. 09-ap-475, 2010 WL 8320065 (Bankr. M.D. Fla. Sept. 1, 2010)................30, 33

*Hebden v. Roy A. Kunnemann Constr. Inc.*,
3 So.3d 417 ..............................................................................................................33

*In re Aiolova*,
No. 11-10503 (BRL), 2013 WL 5818893 (Bankr. S.D.N.Y. Oct. 29, 2013)...........12

*In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*,
336 B.R. 866 (Bankr. S.D. Fla. 2006) .......................................................................6

*In re Birnbaum*,
513 B.R. 788 (Bankr. E.D.N.Y. 2014)................................................................17, 20

*In re Enron Corp.*,
300 B.R. 201 (Bankr. S.D.N.Y. 2003).......................................................................31

*In re Landrin*,
173 B.R. 307 (Bankr. S.D.N.Y. 1994).......................................................................15

*In re Minbatiwalla*,
424 B.R. 104 (Bankr. S.D.N.Y. 2010).................................................................12, 13

*In re Sabre Shipping Corp.*,
299 F. Supp. 97 (S.D.N.Y. 1969)..............................................................................12

*In re Saint Vincent's Catholic Medical Centers of New York*,
440 B.R. 587 (Bankr. S.D.N.Y. 2010).........................................................................5

*In re Smith*,
    463 B.R. 756 (Bankr. E.D. Pa. 2012) .................................................................................12

*In re South Side House, LLC*,
    451 B.R. 248 (Bankr. E.D.N.Y. 2011).................................................................................12

*In re Tucker*,
    No. 11-32756, 2012 WL 1918528 (Bankr. S.D. Ill. May 25, 2012).................................12, 31

*ITT Corp. v. United States*,
    963 F.2d 561 (2d Cir. 1992).................................................................................................15

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002).................................................................................................19

*May Ship Repair Contracting Corp. v. Barge Columbia New York*,
    160 F. Supp. 2d 594 (S.D.N.Y. 2001)................................................................................9, 14

*Mitchell v. Humana Hosp.-Shoals*,
    942 F.2d 1581 (11th Cir. 1991) ..........................................................................................19

*Neuman v. Grandview At Emerald Hills, Inc.*,
    861 So. 2d 494 (Fla. Dist. Ct. App. 2003) ...........................................................................7

*Olson v. Dep't of Treasury (In re Olson)*,
    170 B.R. 161 (Bankr. D.N.D. 1994) ..................................................................................18

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979)...........................................................................................................18

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004)................................................................................................22

*S.E.C. v. Credit Bancorp, Ltd.*,
    No. 99 CIV. 11395, 2011 WL 497775 (S.D.N.Y. Feb. 10, 2011) ...........................................18

*SCFB HOLT LLC v. Collins Stewart Ltd.*,
    No. 02-cv-3069 (LBS), 2004 WL 1794499 (S.D.N.Y. Aug. 10, 2004)..................................19

*SEC v. Monarch*,
    192 F.3d 295 (2d Cir. 1999)....................................................................................17, 18, 22

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
    549 U.S. 443 (2007)...........................................................................................................12

*United States v. Alfano*,
    34 F. Supp. 2d 827 (E.D.N.Y. 1999) ..................................................................................18

*United States v. U.S. Currency in Amount of $119,984.00, More or Less*,
   304 F.3d 165 (2d Cir. 2002)..................................................................................14, 18, 20, 22

*Zherka v. City of New York*,
   459 F. App'x 10 (2d Cir. 2012) ..........................................................................................15

**STATUTES**

*Federal*

11 U.S.C. § 105...........................................................................................................................21

11 U.S.C. § 362...........................................................................................................................21

11 U.S.C. § 363...........................................................................................................................

11 U.S.C. § 501...........................................................................................................................11

11 U.S.C. § 502...........................................................................................................................11

28 U.S.C. § 1334.........................................................................................................................21

*State*

FLA. STAT. ANN. § 558.003........................................................................................................32

FLA. STAT. ANN. § 558.004..........................................................................................5, 29, 30, 31, 32

FLA. STAT. ANN. § 720.301 *et seq.* ............................................................................................5

**RULES**

Fed. R. Bankr. P. 3001 ............................................................................................1, 11, 12, 31, 33

**FED. R. BANKR. P. 3007          1**

**TREATISES**

4 COLLIER ON BANKRUPTCY ¶ 501[1] (16th ed.) ........................................................................31

18 James W. Moore *et al.*, *Moore's Federal Practice*, § 132.03[2][g] (3d ed. 1998) ...................18

*Restatement (Second) of Judgments* § 27.....................................................................................19

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

The North Carillon Beach Condominium Association, Inc. (the "***North Association***"), by and through its undersigned counsel, respectfully submits this response (the "***Response***") in opposition to the Debtors' *Objection to Proofs of Claim of the North Tower, South Tower, and Central Tower Associations* [Dkt. No. 229] (the "***Objection***")[1] and in further support of its timely filed Proofs of Claim Nos. 17, 19, 24 and 27 (collectively, the "***Proofs of Claim***"), pursuant to section 502 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").  In support of this Response, the North Association respectfully states:[2]

## PRELIMINARY STATEMENT

1.      The North Association is a not-for-profit Florida corporation that is charged with representing the interests of the unit owners (the "***Unit Owners***") in the North Tower of what was previously known as Canyon Ranch Hotel and Spa, Miami Beach. Following the closing of the sale of the Property to Z Capital Partners, L.L.C. ("***Z Capital***") less than a week ago, the Property is now known as the Carillon Hotel & Spa.[3]

2.      Throughout these chapter 11 cases, the North Association has maintained that it,

---

[1] The Debtors are indirect, wholly-owned subsidiaries of Lehman Brothers Holdings Inc. ("LBHI").  Lehman Ali Inc. ("***Lehman Ali***") is the sole member of PAMI ALI LLC ("***PAMI***," and collectively with Lehman Ali and LBHI, "***Lehman***"), which in turn is the manager and sole member of Debtor FL 6801 Spirits LLC ("***Spirits***"), the manager and sole member of affiliated Debtors, FL 6801 Collins North LLC ("***6801 North***"), FL 6801  Collins Central LLC ("***6801 Central***"), FL 6801 Collins South LLC ("***6801 South***," together with 6801 North  and 6801 Central, the "***Collins Subsidiaries***," and collectively with Spirits, the "***Debtors***").

[2] The response to the Objection filed by South Carillon Beach Condominium Association, Inc. (the "***South Association***") and Central Carillon Beach Condominium Association, Inc. (the "***Central Association***") (collectively, and together with the North Association, the "***Associations***"), is consistent with the arguments presented in this Response, and the three Associations jointly oppose the Objection.

[3] The "***Property***," for purposes herein, is defined as the Lots, condominium towers, hotel and all Shared Facilities, Common Properties and other joint and individual parts of the site of the Old Carillon Hotel in Miami Beach, Florida.

along with the South and Central Associations, are the Debtors' principal stakeholders, bearing the economic and lifestyle impact of the Debtors' actions concerning the Property, including the sale of the Property and the various incentives offered to prospective buyers. In the absence of a statutory creditors' committee, and as a result of the perceived disregard shown by the Debtors to the rights of the Associations and the Unit Owners, the North Association was forced to protect its interests, with expenses born by the Unit Owners.

3.      Despite the closing of the sale of the Property to Z Capital, with the support of the Associations, the Debtors' Objection accuses the Associations of trying to "exploit their final opportunity to improperly extract value from these Debtors." The Debtors' efforts to cast aspersions on the North Association, however, are belied by the facts. The North Association originally objected to the sale of the Property because the sale failed to address the primary problems experienced by the Unit Owners with previous owners of the Property – the lack of transparency on the division of costs for shared facilities between the condominium towers and the hotel lot and the preservation of the luxury, wellness lifestyle that formed a fundamental basis of the Property. When, after extensive negotiations with Z Capital, the North Association secured, among other things, (i) transparency on the types of charges that Z Capital could assess against the Unit Owners, (ii) a cap on the amount of assessment increases that could be passed through to the Unit Owners through 2017 and (iii) reasonable protections for the current lifestyle enjoyed by the Unit Owners, the North Association resolved its objections and supported the sale.

4.      The instant litigation on the Proofs of Claim is driven entirely by the Debtors' equity owners' attempts to extract value – not by the North Association. The North Association and Z Capital had negotiated a release of the Debtors in connection with the Florida lawsuits

and the Proofs of Claim if Z Capital received a purchase price reduction from the Debtors.[4]  The

Debtors elected not to participate in the settlement.

      5.      The Debtors also mischaracterize these proceedings by suggesting that the Proofs

of Claim should be denied now, without a trial on the merits, because the Debtors allegedly

raised and litigated, and this Court purportedly "rejected (or otherwise rendered moot)," the

Associations' *monetary* claims when approving the "Favorable Resolutions" in the Sale Order.[5]

In connection with seeking approval of the sale, the Debtors made clear that they were only

seeking the Court's determination on the Master Declaration (defined below) with respect to the

declaratory relief sought in the Associations' lawsuits that were pending in the Florida state

courts.  Specifically, in the Sale Motion,[6] in seeking extraordinary relief from the Court, the

Debtors described the Favorable Resolutions as follows:

> "Future Conduct."  The Sale Order provides for the Court to make certain
> determinations regarding the Debtors' property rights under the governing
> Declarations that will effect the Purchaser's conduct and actions taken after the
> date of the Sale Order. These determinations will dispose of the Associations'
> *non-monetary claims*, which the Debtors view as meritless on their face due to
> provisions of the Master Declaration, and satisfy the Favorable Resolution
> requirement. Sale Order, Finding V, ¶ 12.

Sale Motion ¶ 53 (emphasis added).  Accordingly, the Debtors represented to this Court that

---

[4] Pursuant to the settlement term sheets between Z Capital and the Associations, the purchase price reduction would have been applied as a reserve for needed capital improvements at the Property, which had been neglected by the Debtors and the remainder rebated to Unit Owners to offset expenses they had incurred, including for expenses associated with these chapter 11 cases.

[5] *See* Order (I) Approving Sale of Debtors' Property; (II) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief  (the "***Sale Order***"), issued November 26, 2014 [Dkt. No. 218].

[6] *See* Debtors' *(I) Ex Parte Application for an Order Scheduling a Hearing to Consider, Among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, Among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-Up Fee, (B) an Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (C) Related Relief* [Dkt. No. 4] (the "***Sale Motion***").

"the Associations' monetary damages will attach to the Sale proceeds, and can be resolved in the claim resolution process, as any other disputed pre-petition claim." *Id.* ¶ 7.

6.    In their Objection, the Debtors try to recast the actual relief sought by the Sale Motion in an attempt to summarily dispose of the Proofs of Claim through collateral estoppel without ever having to respond on the merits. However, the findings ("***Sale Findings***") in the Court's Sale Order were limited in scope to a determination by the Court, as a matter of contract interpretation, of the rights available to the Debtors and any future purchaser under certain provisions of the Master Declaration[7] that governs the Property.[8] *See* Sale Order at 12-13. The Debtors' application of those rights to the North Association and its Unit Owners was never addressed in connection with the sale.

7.    The Sale Findings did not, and were never intended to, determine the Associations' monetary claims for improper assessments and charges as set forth in the Proofs of Claim. As a result, the issues resolved in the Sale Order are not the same as the issues raised in the Proofs of Claim and collateral estoppel cannot apply.[9] Given the Debtors' failure to raise any other substantive objections to the North Association's improper/unsupported assessment claims, these claims should be deemed allowed in their entirety.

8.    The Debtors' objections to the other pending North Association claims similarly

---

[7] *See* Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "***Master Declaration***"), attached hereto, with amendments, as Exhibit A.

[8] Capitalized terms used but not otherwise defined herein shall be given the meanings ascribed to them in the Master Declaration.

[9] To be clear, the Sale Findings impact the North Association's claims but that impact is tangential at best and merely one step in the claims analysis. Various provisions of the Master Declaration are relevant to the claims, many of which were not considered in the Sale Findings. Moreover, whether the actual amount and type of charges imposed on the Unit Owners was proper, unreasonable or without basis is a factual dispute that cannot be decided on the face of the Master Declaration or by operation of the Sale Findings.

fail as a matter of law.[10]  With respect to the Association's construction defect claims under Chapter 558 of the Florida Statutes, the North Association filed a claim in the amount of over $900,000 that was supported by a 43-page report prepared by M2E, LLC, an outside engineering firm hired by the Associations.  Without substantively disputing the asserted defects or the damage caused therefrom, the Debtors object to the claims on the basis that the North Association allegedly did not properly serve notice pursuant to the statute.  The Debtors are wrong and their objections to these claims should be denied.

9.     The North Association could not serve notice directly upon the Debtors without violating the automatic stay.  However, failure to send the 558 notice has no bearing on the validity of the claims under applicable bankruptcy law.  *See*, *e.g., In re Saint Vincent's Catholic Medical Centers of New York*, 440 B.R. 587, 603 (Bankr. S.D.N.Y. 2010).  Moreover, the only statutory remedy that would be available to the Debtors for a failure to provide the 558 notice is not disallowance of the claim, but rather the ability to seek to delay any action to permit investigation and cure.  Here, the Debtors were on notice of the defects for months based upon the Proofs of Claim filed in September, which included an itemized list of 70 defects, and their receipt of a copy of the full engineering report through counsel on December 2, 2014. Accordingly, there can be little doubt the Debtors have had ample opportunity to investigate and cure any cited defects and to respond to the claims substantively.  Having failed to do so, these claims should also be allowed.

10.     The Debtors' objection to the Association's claim for stucco repairs actually concedes their validity.  *See* Objection at 4 & n.28.  However, the Debtors contend that Z

---

[10] In light of the North Association's support for the Z Capital transaction, the North Association does not intend to pursue its claims against the Debtors for fraudulent misrepresentation or fraudulently inducing unit owners to purchase condominiums at the Property or for violations of Chapter 720 of the Florida Statutes.

Capital has assumed the Debtors' obligations for the stucco repairs pursuant to the purchase and sale agreement[11] between the Debtors and Z Capital (the "***PSA***").  The PSA provides that the Debtors will assign any construction contract they have for repair of the stucco to Z Capital and will provide Z Capital with a purchase price adjustment of $3,000,000 if the repairs are not completed by the sale closing.  However, the North Tower has not been provided with evidence of the assignment of the stucco liability to Z Capital at closing.  Thus, until the stucco repairs are completed, its claim against the Debtors has yet to be resolved and should be allowed.

11.     Finally, the Debtors concede the North Association's claim for unpaid dues, *see* Objection at 4, and thus the claim, which remains unpaid as of the closing, should be allowed. *See infra*, ¶ 86.

12.     Based upon the foregoing, and as further described herein, the Debtors have failed to demonstrate a legal or factual basis to rebut the *prima facie* validity of the North Association's Proofs of Claim.  Accordingly, the Objection should be overruled or denied and the Proofs of Claim allowed.

## STATEMENT OF RELEVANT FACTS

### A.     The Property

13.     The Property is a mixed-use property that contains three condominium towers, a hotel, a spa and related fitness and wellness facilities, retail space, common areas, and parking facilities.

14.     The Property is controlled by the Master Declaration, which serves as the condominium's "constitution."  *In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*, 336

---

[11] *Purchase and Sale Agreement By And Among FL 6801 Collins North LLC, FL 6801 Collins South LLC, FL 6801 Collins Central LLC ("Sellers") and Z Capital Partners, L.L.C. Or Its Affiliated Designee(s) ("Buyer")*, filed August 26, 2014 [Dkt. No. 118-1].

B.R. 866, 874 (Bankr. S.D. Fla. 2006) (declaration "'is the condominium's 'constitution,' creates the condominium and strictly governs the relationships among the condominium units owners and the condominium association.'") (quoting *Neuman v. Grandview At Emerald Hills, Inc.*, 861 So. 2d 494, 496-97 (Fla. Dist. Ct. App. 2003)).

      **B.**     **Prepetition, The Debtors Levied Charges And Assessments Against The Unit Owners That Were Improper And Inconsistent With The Master Declaration**

      15.     The gravamen of the Associations' claims for improper assessments stems from the steep and rapid increase in expenses charged to the Associations after the Debtors took ownership of the Property in 2009 by deed in lieu of foreclosure.

      16.     The Associations maintain that while the Debtors were marketing unsold condominium units to prospective purchasers, the Debtors directed Canyon Ranch,[12] the then-manager of the Hotel and Spa, to divide shared facility expenses between the condominium towers and the Hotel in a more reasonable and equitable fashion to attract buyers to the Property. Indeed, on at least one occasion for which the Associations have documented evidence, the Debtors negated Canyon Ranch's attempts to impose a greater share of the expenses on the Associations as unreasonable and in violation of the Master Declaration.[13]

      17.     Once the majority of the condominium units at the Property were sold, however, the Debtors began increasing the charges attributable to the Associations and approving the same charges they previously found to be inappropriate and in violation of the Master Declaration. As a result, charges to all unit holders skyrocketed until the Unit Holders were paying nearly double

---

[12] "Canyon Ranch" means, collectively, CR Miami LLC, CR License LLC and Spa Project Advisors, and any of their affiliates at the Property.

[13] The North Association submits that other similar evidence exists and has previously requested such documents from the Debtors. In connection with these contested proceedings, the North Association intends to revive its document requests.

the historic charges.

18.     The increases in assessments against the Unit Holders resulted in millions of dollars of improper and unsupported charges.  All in, the Debtors demanded that the Associations pay approximately 81% of the Property's operating costs.  *See* Canyon Ranch 2013 Budgets, attached hereto as Exhibit B at 3-5 (allocating costs per square footage and determining that the Associations are responsible for 81% of cost of operating the Property).[14]

### C.     The Florida Lawsuits

19.     In response to the Debtors' improper assessments and other violations of the Master Declaration, the Associations each filed a lawsuit against the Debtors in the Circuit Court for Miami-Dade County, Florida (the "***Florida Lawsuits***").  The North Association's lawsuit sought declaratory relief regarding the interpretation and application of the Master Declaration. The South and Central lawsuit sought monetary damages for the improper historical assessments and declaratory relief with respect to the interpretation of the Master Declaration.  The Florida Lawsuits were stayed upon the Debtors' bankruptcy filing.

### D.     Sale Of The Property

20.     On June 1, 2014, the Debtors filed the Sale Motion, pursuant to which the Debtors requested, among other things, approval to sell substantially all of their interests in the Property to the Successful Bidder (as defined therein) pursuant to section 363 of the Bankruptcy Code. The Sale Motion also sought certain findings with respect to the Master Declaration, known as the Favorable Resolutions.  *See* Sale Motion, ¶¶ 7, 33, 40-41, 45 & n.4, 53 (4th bullet), 89, 95, 105, 119.

21.     By the Favorable Resolutions, the Debtors requested a determination that the

---

[14] Notably, because of the overcharges to the Associations, the Associations, and not the Debtors, have borne the majority of the operating costs at the Property resulting from any delays in these chapter 11 cases.  *See* Exhibit B.

Hotel Lot owner possesses certain rights to regulate use of the Property and levy assessments in accordance with the limitations of the Master Declaration. *See* Sale Order ¶ V; *see also* Debtors' Supplemental Reply [Dkt. No. 203] ¶ 18 ("As explained in detail in the Sale Motion and Sale Reply, the findings in the Sale Order merely confirm the Debtors' (and any successor owner's) rights in the Property under the language of the recorded Declarations."); Objection at 2.

22.     More specifically, the Favorable Resolutions, or Sale Findings, confirmed that: (1) the Hotel Lot Owner has the *right* to determine Spa use; (2) the Hotel Lot Owner has the *right* to allow other persons to use the Shared Facilities; (3) the Hotel Lot Owner has the *right* to grant easements with respect to the Shared Facilities; (4) the Hotel Lot Owner has the *right* to annex Future Development Property; (5) the Hotel Lot Owner has the *right* to levy assessments for the Shared Facilities; (6) the Hotel Lot Owner has the *right* to regulate use of the Shared Facilities; (7) the Hotel Lot Owner has the *right* to institute reasonable rules and regulations to operate and manage the Shared Facilities; (8) the Hotel Lot Owner *may* include the expenses for valet parking services in Condominium Tower Shared Facilities Assessments; and (9) the Hotel Lot Owner *may* assess utility costs based on square footage.[15]

23.     The avowed purpose of the Favorable Resolution was to dispose of the non-monetary declaratory relief claims asserted in the Florida Lawsuits. *See* Sale Motion ¶ 53 (4th bullet) ("These determinations will dispose of the Associations' non-monetary claims, which the Debtors view as meritless on their face due to provisions of the Master Declaration, and satisfy the Favorable Resolution requirement."); First Response[16] [Dkt. No. 71] ¶ 32; Sale Motion ¶ 40.

---

[15] Only Sale Findings (5), (8) and (9) relate to the monetary claims at issue. The remaining six relate to the Associations' declaratory claims, which the Debtors do not address. In light of the sale of the Property, the claims for declaratory or injunctive relief unrelated to the monetary relief sought are not an issue at this time.

[16] *See Debtors' Response to Objection of Associations to Debtors' Motion for (A) an Order Approving, Among other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and*

24.     Following a highly contentious bidding process, the Debtors selected Z Capital as the Successful Bidder.  *See* PSA.  The PSA between the Debtors and Z Capital conditioned Z Capital's purchase of the Property on the Court approving the Favorable Resolutions.  Pursuant to the PSA, the Favorable Resolution was described by the Debtors, in pertinent part, as follows:

> entry of an order by the Bankruptcy Court which denies, dismisses or otherwise disposes of the *declaratory relief* sought by Plaintiff(s) named therein [the Associations], including the entry of (i) the Sale Order containing findings of fact and conclusions of law effectuating such relief, (ii) an order of dismissal, or (iii) other similar resolution that is favorable to the Defendant(s) named therein.

Sale Motion ¶ 45 n.4 (emphasis added).

25.     Notably, the Favorable Resolution has never been described as resolving the Associations' monetary claims.  *See* PSA § 10(d)(vi)(E), (F), & (G); First Response  ¶ 42; *see also* Sale Motion ¶¶ 7, 33, 40-41, 45, 89, 95, 105, 119; Omnibus Reply[17] [Dkt. No. 134] ¶ 57; Objection ¶ 3.  To the contrary, the Associations' monetary claims were consistently preserved for resolution through the claims allowance process.  *See* Sale Motion ¶ 7 ("*To the extent there are any, the Associations' monetary damages will attach to the Sale proceeds, and can be resolved in the claim resolution process, as any other disputed pre-petition claim.*") (emphasis added).

26.     The sale to Z Capital was approved by the Court by order dated November 26, 2014.  The North Association consented to entry of the Sale Order with the Sale Findings.  In addition, in the absence of a settlement with the Debtors on an appropriate purchase price adjustment, the North Association also expressly reserved its claims against the Debtors in its

---

*(iii) a Break-Up Fee, (B) an Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and other Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (C) Related Relief*, filed on June 26, 2014 [Dkt. No. 71] (the Debtors' "***First Response***").

[17] *See Debtors' Reply to the Associations' and 6801 Collins Hotel's Objections to the Sale*, filed on September 10, 2014 [Dkt. No. 134 ] (the Debtors' "***Omnibus Reply***").

Florida Lawsuit and the Proofs of Claim. *See* Nov. 24, 2014 Hr'g Tr. at 81:5-10, 85:20-86:2, 87:23-89:13.

27.     The sale of the Property to Z Capital closed on January 15, 2015. *See* Notice of Sale Closing, filed on January 15, 2015 [Dkt. No. 246].

**E.     The Proofs of Claim**

28.     On September 12, 2014, the North Association filed its Proofs of Claim against the Debtors asserting, among other things: (i) approximately $15,446,502.00 in damages resulting from the improper and unsupported charges levied by the Debtors for, among other things, spa and valet parking charges, building maintenance and services, utilities, concierge services, property taxes, contingency fees, hotel administration and allocation of other expenses (the "***Overcharge Claims***"); (ii) approximately $916,430.00 for breach of statutory implied warranties and related construction defects (the "***Construction Claims***"); (iii) approximately $3,000,000.00 for repair of the North Tower stucco (the "***Stucco Claim***"); and (iv) approximately $509.00 in unpaid Association dues.

29.     On December 19, 2014, the Debtors objected to the Proofs of Claim, contending for the first time in these cases, that the Favorable Resolutions/Sale Findings resolved the Associations' monetary claims on the merits, without notice or a hearing. *See* Objection.

**ARGUMENT**

**I.     Applicable Standard**

30.     Pursuant to Bankruptcy Rule 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). Accordingly, a proof of claim filed pursuant to section 501 of the Bankruptcy Code is deemed allowed unless a party in interest objects. 11 U.S.C. §

502(a).  Where a party objects to the proof of claim, the court must determine the amount of the claim after notice and a hearing.  11 U.S.C. § 502(b).  "[I]f a claim arises from a prepetition right to payment under applicable nonbankruptcy law, then there is a presumption that the claim will be allowed…."  *In re South Side House, LLC*, 451 B.R. 248, 260 (Bankr. E.D.N.Y. 2011) (citing *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007)).

31.     A party objecting to a properly filed claim has the burden of coming forward with evidence that is sufficient to overcome the claim's *prima facie* validity.  *Id.* at 261.  "In other words, the objecting party must come forward with evidence of equal or greater value than that provided by the creditor in conjunction with the proof of claim."  *In re Aiolova*, No. 11-10503 (BRL), 2013 WL 5818893, at *2 (Bankr. S.D.N.Y. Oct. 29, 2013).  "[A] proof of claim in a bankruptcy proceeding 'cannot be defeated by mere formal objection….'"  *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010) (quoting *In re Sabre Shipping Corp.*, 299 F. Supp. 97, 99 (S.D.N.Y. 1969)).  "If the objector does not 'introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the validity and the amount of the claim.'"  *Id.* (quoting 4 COLLIER ON BANKRUPTCY ¶ 502.03[3][f] (rev. ed. 2007)).[18]

32.     Here, the Debtors have not come forward with any evidence disputing, on substantive grounds, the Proofs of Claim.  Instead, the Debtors object as a matter of law and do

---

[18] A claim "based on a writing," *see* Rule 3001(c)(1), does not impose upon creditors a burden of attaching "all of the relevant documents that might be produced in discovery in ordinary civil litigation to support the claimant's entitlement to [the] claim, but is limited to the documents that generally give rise to the claimant's right to payment ([*e.g.*,] the note and mortgage).").  *In re Smith*, 463 B.R. 756, 767 (Bankr. E.D. Pa. 2012).  If the claim is not based on a writing – for example, a claim based on a statute – Rule 3001(c)(1)'s documentation requirement does not apply.  *See In re Tucker*, No. 11-32756, 2012 WL 1918528, at *3 n.6 (Bankr. S.D. Ill. May 25, 2012) (concluding that because the IRS's claim was "based on a statute…Rule 3001(c)(1) does not apply").  In such cases, the claim need only conform to Official Form 10 pursuant to Rule 3001(a) and be executed by the creditor or its authorized agent under Rule 3001(b).  Fed. R. Bankr. P. 3001(a), (b). The failure to attach documentation called for by Rule 3001 will only result in the loss of the claim's *prima facie* validity.  *In re Minbatiwalla*, 424 B.R. at 112.  "[F]ailure to attach the required documentation does not automatically render the claim invalid."  *Id.*

not present any evidence that challenges, or even addresses, the validity of the underlying claims or the amounts asserted therein.  Thus, as the Debtors' legal arguments fail, the Associations "need offer no further proof of the merits of the validity and the amount of the claim" for the claims to be allowed.

**II.      The Sale Findings Do Not Preclude The North Association's Overcharge Claims**

33.      The Debtors mistakenly assert that the North Association's Overcharge Claims are barred by the doctrine of collateral estoppel.  *See* Objection ¶ 13.  The Debtors' argument is premised on the faulty assertion that the Overcharge Claims are "precisely the *same claims* described by the Associations in numerous sale-related objections and abstention filings" and "were squarely at issue during the Sale Hearing and clearly decided by the Sale Order, which is now final."  *Id.* (emphasis in original).  Simply put, the Debtors are wrong.

34.      While the Sale Findings determined the scope of certain rights available to the Hotel Lot Owner under the Master Declaration, it did not resolve how those rights are to be applied to specific shared charges under the Master Declaration.  Other than in the Objection, the Debtors have always taken the position that the merits of the North Association's monetary claims were not being decided by the Sale Order and were to be decided through the claims allowance process (presumably through an evidentiary hearing).  *See, e.g.*, Supplemental Reply [Dkt. No. 203] ¶¶ 17 n.11 & 18-21; Sale Motion ¶ 7 ("[A]ffirming the Debtors' property rights under the governing Declarations will dispose of the Associations' meritless non-monetary claims, which is a condition to closing under the Purchase Agreement.  *To the extent there are any, the Associations' monetary damages will attach to the Sale proceeds, and can be resolved in the claim resolution process, as any other disputed pre-petition claim.*") (emphasis added); Omnibus Reply [Dkt. No. 134] ¶ 61 n.31 ("[T]he actual value of the Associations' claims are irrelevant to the Sale Motion….For the clarity of the record, however, the Debtors deny the

Associations' assertions that the Debtors have overcharged the unit owners and reserve all rights to object to the Associations' claim for damages at the appropriate time."); Sept. 12, 2014 Hr'g Tr. [Dkt. No. 147] at 21:11-22:1 ("The Court: [Y]ou are proposing [to] now go forward with the Z Capital bid, correct? Mr. Togut: Yes….The Court: That would include a determination on the meaning and scope of the declarations, among other issues. Mr. Togut: Yes….The Court: Okay. *And that the claims of the association would remain disputed claims, yes?* Mr. Togut: Yes.").

35.     Although limited aspects of the Sale Findings bear on the Overcharge Claims, the factual issues and additional legal issues raised in the Proofs of Claim were not at issue during the Sale Hearing, were not litigated, and were not actually decided by the Sale Order. Therefore, the Debtors cannot use the Sale Order to now prevent the Proofs of Claim from seeing the light of day.[19]

### A.     The Debtors Have Not Met Their Burden to Establish Collateral Estoppel

36.     "Generally, for collateral estoppel to apply, four prerequisites must be satisfied: (1) the issues in both proceedings must be identical; (2) the issue must have been actually litigated and actually decided in the prior proceeding; (3) there must have been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue must have been necessary to support a valid and final judgment on the merits." *United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002) (citing *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

37.     "The party asserting collateral estoppel bears the burden of demonstrating that it is entitled to this relief." *See Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario,*

---

[19] The North Association is not challenging the Sale Findings, which are law of the case. However, the North Association maintains that the Sale Findings do not constitute a final adjudication of the Proofs of Claim.

*Inc.*, 409 F.3d 87, 93 (2d Cir. 2005) (quoting *May Ship Repair Contracting Corp. v. Barge Columbia New York*, 160 F. Supp. 2d 594, 599 (S.D.N.Y. 2001)).  Specifically, "[t]he party invoking collateral estoppel has the burden of identifying the precise issues litigated in the prior action and establishing a record sufficient to reveal the controlling facts." *In re Landrin*, 173 B.R. 307, 312 n.5. (Bankr. S.D.N.Y. 1994).

38.     Despite the Debtors' broad conclusions, not a single element of the collateral estoppel standard is met.  As a result, the Debtors' efforts to jettison the Proofs of Claim in their entirety and without a single hearing on the merits necessarily fails.

### i.     The Issues Implicated In The Sale Findings And The Proofs Of Claims Are Distinct

39.     The Debtors contend that the first element of collateral estoppel is met because the issues raised by the Proofs of Claim are identical to those decided by the Court in connection with the Sale Findings.  *See* Objection ¶¶ 13, 15 n.14.  In doing so, the Debtors ignore a distinction they themselves created and maintained throughout these chapter 11 cases – the difference between the Associations' monetary and non-monetary claims.

40.     The Sale Findings and the Overcharge Claims are not identical or even substantially the same.[20]  Pursuant to the Favorable Resolution, the Court was asked to determine the scope of certain rights granted to the Hotel Lot Owner under the plain language of the Master Declaration.  *See* Supplemental Reply [Dkt. No. 203] ¶¶ 18-21, Exhibit 1 (Chart comparing Sale Findings to Master Declaration provisions).  The Sale Findings did no more.  In fact, the Sale Order states: "Nothing herein, including the Court's approval of the North Tower Term Sheet

---

[20] *See* Objection ¶ 15 n.14; *Zherka v. City of New York*, 459 F. App'x 10, 13 (2d Cir. 2012) ("[I]t is not necessary that the issues be exactly identical; it is sufficient that 'the issues presented in [the earlier litigation] are substantially the same as those presented by [the later] action.'") (quoting *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir. 1992)).

and the South/Central Tower Term Sheet, shall constitute an amendment or modification of the Declarations."  Sale Order ¶ V.

41.     The Proofs of Claim do not challenge the rights available to the Hotel Lot Owner under the Master Declaration.  They challenge the Debtors' historical application of those rights to a variety of expenses shared between the Hotel and the condominium towers.  Various provisions of the Master Declaration, including but not limited to the provisions addressed in the Sale Findings, impact that determination, as does the Debtors' prior interpretations of the applicable Master Declaration provisions and their proper apportionment among the distinct uses at the Property.  The Sale Order neither addressed these issues nor decided them.  A more detailed explanation of the Overcharge Claims is set forth in Part IV below.

42.     Moreover, only three of the nine Sale Findings even arguably relate to the monetary claims raised in the Proofs of Claim, Findings (5), (8) and (9).  Even a cursory glance at these three findings, however, demonstrates that the North Associations' monetary claims could not have been decided by the Sale Order.  For example, Sale Finding (5) merely restates the terms of the Master Declaration with respect to expenses that generally may be assessed for the Shared Facilities:

> The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration.  Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration.

Sale Order ¶ V (5th bullet).  Nothing in Sale Finding (5) bears on the proper allocation of the enumerated expenses between the Associations and the Hotel Lot.

43.     Sale Findings (8) and (9) suffer the same fate.  Sale Finding # (8) provides:

> The Hotel Lot Owner (or any successor Hotel Lot Owner) may include the expense of Valet Parking Services (as defined in the Sale Motion) in the Condominium Tower' Shared Facilities Assessments (as defined in the Sale Motion).

*Id.* (8th bullet). But the finding is silent on whether, under applicable law, the valet parking charges should be apportioned by usage or by some other metric. While Sale Finding (9) permits the Hotel Lot owner to "assess utility costs based upon square footage rather than actual usage," *id.* (9th bullet), it similarly falls short of resolving whether the actual utility costs assessed by the Debtors properly apportioned the charges or calculated the square footage fairly.

44. The Debtors' misleading chart comparing excerpts of arguments made by the Associations in a prior pleading to excerpts from the Overcharge Claims bears no weight. *See* Objection ¶ 16. The relevant inquiry is between the Sale Findings – the issue decided – and the Overcharge Claims – the issue the Debtors seek to preclude.[21] Additionally, the mere inclusion of an ancillary argument in a pleading does not suffice for collateral estoppel purposes. See *In re Birnbaum*, 513 B.R. 788, 802 (Bankr. E.D.N.Y. 2014) ("[M]atters that were ancillary to the first determination, and matters that were not finally determined, will not be invoked to bar the consideration of a disputed issue by the second court."); *SEC v. Monarch*, 192 F.3d 295, 305, 306, 309 (2d Cir. 1999).

45. Accordingly, as there is no identity of issues, the first element of the standard is not satisfied and collateral estoppel cannot apply. Thus, the Court should deny the Objection and need not even reach the remaining elements.

---

[21] The misleading nature of the Debtors' chart also is apparent because the excerpts are taken out of context – they are partial quotations from descriptions of the South and Central Associations' state court claims in the context of a larger argument. *See Associations' Objection to the Sale Motion*, filed on August 14, 2014 [Dkt. No. 106] ¶¶ 13, 37-44.

### ii. The Issues Raised By The Proofs Of Claim Were Never Litigated Nor Decided In The Debtors' Chapter 11 Cases

46.     The Debtors baldly assert that the second element of collateral estoppel is met because "the same issues raised by the Claims were addressed, actually litigated, and decided by this Court in the Sale Order." Objection ¶ 15. The Debtors' contention defies logic.

47.     First, as discussed above, the issues resolved by the Sale Findings fall well short of the monetary claims asserted in the Proofs of Claim. Therefore, the claims were neither "actually litigated" nor "actually decided in the prior proceeding." *U.S. Currency*, 304 F.3d at 172.

48.     Second, in the instant case, it is beyond dispute that no contested factual issues were ever presented to or determined by the Court. Indeed, even the limited discovery propounded by the Associations' previous counsel was stayed pending further action. The Court has never heard any evidence on the Proofs of Claim nor the fair and appropriate allocation of expenses between the Associations and the Hotel. Nor has the Court had an opportunity to apply the various relevant provisions of the Master Declaration or applicable law to the facts.

49.     "The fundamental purpose of collateral estoppel is not to foreclose a party from putting forth contested factual issues before the court, but rather is intended to bar their submission twice." *Olson v. Dep't of Treasury (In re Olson)*, 170 B.R. 161 (Bankr. D.N.D. 1994) (citing *City Stores Co. v. Mall, Inc. (In re City Stores Co.)*, 42 B.R 685, 688 (S.D.N.Y. 1984)). "The United States Supreme Court has noted that 'the whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further fact finding function to be performed.'" *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 n.23, (1979); *see also United States v. Alfano*, 34 F. Supp. 2d 827, 834 (E.D.N.Y. 1999) (quoting *Parklane*, 439 U.S. at 336 n.23); *S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395,

2011 WL 497775, at *4 (S.D.N.Y. Feb. 10, 2011). "[T]he actual litigation and actual decision prerequisites help ensure that a finding was carefully considered in the first action, and that it therefore may serve as a fair basis for estoppel." *Monarch*, 192 F.3d at 309.[22]

50.     Here, the North Association expressly reserved its rights at the Sale Hearing to pursue both its Florida Lawsuit and the Proofs of Claim. As the Debtors did not object then, they cannot now to try to summarily eliminate the rights of the North Association. *See, e.g.*, Nov. 24, 2014 Hr'g Tr. at 81:7-17 ("Ms. Feldsher:… the North Tower isn't granting any releases to the debtors of their lawsuit or the proofs of claim or anything else which were at some point being discussed by the parties….The Court: All right. And the debtors are aware of that position? Mr. Togut: We are now."); *id.* at 88:22-89:12 ("Mr. Ktsanes:…the [North Association] lawsuit remain[s] against the Debtors, the proof of claim against the debtors, but...the property is being sold free and clear of that lawsuit to [Z Capital]. Ms. Feldsher: That's correct.").[23]

### iii.     No Full And Fair Opportunity To Litigate he Proofs Of Claim Has Been Provided To The Associations

51.     The Debtors claim that the Associations had a full and fair opportunity to litigate the issues in a prior proceeding because they "disputed the Debtors' reading of the Declarations for months leading up to entry of the Sale Order…and they briefed this dispute several times prior to entry of the Sale Order." Objection ¶ 18.

---

[22] "A corollary of the actual litigation and decision requirements is that '[w]hen a court cannot ascertain what was litigated and decided, issue preclusion cannot operate.'" *Monarch*, 192 F.3d at 309 (citing 18 James W. Moore *et al.*, *Moore's Federal Practice*, § 132.03[2][g] (3d ed. 1998) (citing *Mitchell v. Humana Hosp.-Shoals*, 942 F.2d 1581, 1583–84 (11th Cir. 1991).

[23] Alternatively, if this Court were to conclude that the Overcharge Claims had been subsumed in the Sale Order, they would still not have been actually litigated or decided and collateral estoppel would not apply. *See Restatement (Second) of Judgments* § 27, cmt. e (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, ...[collateral estoppel] does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention"); *SCFB HOLT LLC v. Collins Stewart Ltd.*, No. 02-cv-3069 (LBS), 2004 WL 1794499, at *4 (S.D.N.Y. Aug. 10, 2004) ("Issues decided by consent judgments do not normally have collateral estoppel effect because they do not meet the requirement that the issue be actually litigated.") (internal quotations and citation omitted); *see also Arizona v. California*, 530 U.S. 392, 414 (2000).

52.     The third prong of the collateral estoppel inquiry requires, prior to preclusion, that a party be "fully able to raise the same factual or legal issues" in the earlier litigation. *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002).

53.     It is axiomatic that the North Association has not had a full and fair opportunity to litigate the Overcharge Claims. The Proofs of Claim had no bearing on the sales process and were, therefore, outside the scope of those proceedings. Having consistently maintained that the Sale Findings were intended only to address the declaratory, non-monetary claims in the Florida Lawsuits, the Debtors cannot credibly assert otherwise. *See, e.g.*, Sale Motion ¶¶ 7, 53; Supplemental Reply [Dkt. No. 203] ¶¶ 17 n.11, 18-21.

### iv.     Whether The Sale Findings Were Necessary To The Sale Order Is Irrelevant – Resolution Of The North Association's Monetary Claims Was Not Necessary To Consummation Of The Sales Process

54.     The Debtors further contend that the Sale Findings, "which provided a 'Favorable Resolution' necessary for the consummation of the Z Capital Purchase Agreement, were integral to the Sale and have been granted by a final order of this Court." Objection ¶ 19. Thus, in their view, the fourth and final element of collateral estoppel, which requires that "the resolution of the issue must have been necessary to support a valid and final judgment on the merits," *U.S. Currency*, 304 F.3d at 172, is satisfied.[24]

55.     The Debtors' argument entirely misses the mark. Even if the Sale Findings were theoretically necessary for consummation of the sale of the Property to Z Capital, adjudication of

---

[24] The fourth element of collateral estoppel "requires the court to consider the elements of the prior claim and whether a final judgment was entered. This assures that matters that were *ancillary* to the first determination, and matters that were not finally determined, will not be invoked to bar the consideration of a disputed issue by the second court." *In re Birnbaum*, 513 B.R. at 802 (emphasis added).

the North Association's monetary claims was not.[25]  Indeed, all of the principal participants, including Z Capital, at the Sale Hearing confirmed that the North Associations' Proofs of Claim would be reserved for later determination.  *See, e.g.*, Nov. 24 Tr. at 88:23-89:2 ("Mr. Ktsanes:…the [North Association] lawsuit remain[s] against the debtors, the proof of claim against the debtors, but...the property is being sold free and clear of that lawsuit to [Z Capital].").  Given the Property could have been, and in fact was, sold to Z Capital free and clear of the Florida Lawsuits and the Proofs of Claim, which attached to the sale proceeds, resolution of the merits of the Proofs of Claim could not be have been integral to the sale.

56.     Finally, the Debtors' assertion that the "Associations recognized in several filings that entry of the Sale Order would effectively decide their fee-related claims," Objection ¶ 20, is not a sufficient basis to grant collateral estoppel or even a fair representation of the paragraphs cited.  A review of the citations in context demonstrates that the Associations' counsel was responding to the Debtors' position that the Favorable Resolutions would dispose of the Florida Lawsuits.  *See* Abstention Motion ¶ 10.[26]  That is not akin to conceding the Sale Order estopps the Associations from pursuing their monetary claims through the claims resolution process.  In

---

[25] Notably, the Debtors themselves did not consider the Sale Findings integral to the sale, previously arguing that Z Capital should drop the Sale Findings.  *See* Debtors' Supplemental Reply [Dkt. No. 203] ¶ 16 ("The Debtors believe Z Capital should waive [the Sale Findings] requirement in light of its executed term sheet with the South and Central Tower Associations to further streamline the issues in the Sale Hearing.").  Z Capital shared the Debtors' willingness to drop the Sale Findings.  *See Motion of Z Capital Partners to Compel Debtors to Comply With Bidding Procedures Order*, filed on October 14, 2014 [Dkt. No. 158] ¶ 50 ("Z Capital is now willing to drop the Favorable Resolution condition, meaning that the sale to Z Capital can be approved and closed without any further delay.  In others words, Z Capital will assume the risk of the state court litigation.").

[26] "The Debtors have improperly sought to have this Court dispose of the Florida Lawsuits in summary fashion as part of the Sale Motion.  Specifically, by the Sale Motion, the Debtors have asked this Court to either enter findings of fact and conclusions of law that would *effectively adjudicate the claims for declaratory relief* asserted by the Associations in the Florida Lawsuits, or simply order their dismissal." *Associations' Motion for Entry of an Order: (I) Finding that the Proposed Sale Cannot Be Consummated Free and Clear of the Florida Lawsuits Pursuant to 11 U.S.C. §§ 105 and 363, or in the Alternative, (II) Abstaining from Adjudicating Declaratory Relief Requested in Florida Lawsuits Pursuant to 28 U.S.C. § 1334 and to Lift the Automatic Stay to Pursue the Declaratory Relief Sought in the Florida Lawsuits Pursuant to 11 U.S.C. § 362*, filed on September 9, 2014 [Dkt. No. 132] (the "**Abstention Motion**") ¶ 10 (emphasis added).

fact, in one of the same pleadings cited, counsel clarifies that the Associations' monetary claims would not be implicated by the Sale Findings:

> To be clear, the Associations acknowledge that this Court may be the appropriate forum for adjudicating the allowed amount of their contested general unsecured claims, an adjudication that would be settled under their plan construct. Rather, this Motion is addressed only to that portion of the Florida Lawsuits that seek declaratory relief.

*Id.* ¶ 9 n.5. [27]

## III.    Fairness Considerations Weigh Against Collateral Estoppel

57.     Even if the Court were to conclude that the Overcharge Claims were somehow determined on the merits by the Sale Findings and the four elements of collateral estoppel satisfied, collateral estoppel should still not be applied on fairness grounds. "[C]ollateral estoppel is an equitable doctrine – not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004). The doctrine "involves a balancing of fairness and efficiency: the fairness of ensuring a correct result, weighed against the efficiency of preventing relitigation of a single issue." *U.S. Currency*, 304 F.3d at 172 (citing *Monarch*, 192 F.3d at 304).

58.     In the instant case, it would be the height of unfairness to expand the equitable doctrine and use the sales process to preclude the North Association from ever litigating its timely-filed and otherwise valid Proofs of Claim. To decide the Overcharge Claims without putting the Debtors to their proof, considering and interpreting all of the applicable provisions of the Master Declaration, applying applicable nonbankruptcy law, and without providing the

---

[27] At the Sale Hearing, the Debtors insisted on creating a record with respect to the Sale Findings. *See* Nov. 24, 2014 Hr'g Tr. at 91:4-12 ("The Court: So, in the interest of time, unless anybody wants to challenge any of these, I'm not sure it's necessary to go through them all. I consider this to be part of the record….Mr. Flores: If I could take two minutes and just create a record."). The Debtors proceeded to discuss each of the nine Sale Findings for the record, describing only the owner's "ability to" regulate, institute rules, and charge fees. *See id.* at 90:20-94:8. There was no assertion, however, that the charges previously levied against the North Association were proper, even though the Debtors created this record after the Association expressly reserved its rights on these issues.

Associations an opportunity for discovery would be patently inequitable and would turn Bankruptcy Code § 502 on its head.

**IV.      The Sale Findings Did Not Resolve The Factual Issues In The Proofs Of Claim**

59.      As outlined above, the sale of the Property to Z Capital did not resolve whether the Debtors wrongfully charged the Associations for improper and invalid assessments. Specifically, the Proofs of Claim detail over $15 million in excessive, unreasonable and/or unjustified assessments for shared costs and services, as well as for improperly calculated and unsubstantiated allocations.  *See* Proofs of Claim ¶¶ 5-9 (describing improper spa charges, valet parking charges, maintenance, concierge, technology, waste removal, Shared Facilities charges, and additional misallocations).  These are factual issues and their determination requires an evidentiary review.  The Proofs of Claim do not challenge the Debtors' right to levy charges, they challenge *how* and *why* the Debtors levied certain charges and whether the historical assessments charged to the Unit Owners were, in fact, consistent with the Master Declaration or accurate and reasonable in light of the costs and use of the Property by the private residential units and hotel facilities open to the public.  Absent objection to the claims on substantive grounds, the Proofs of Claim can and should be allowed.

60.      By way of example, each of the assessments must be divided fairly between the Hotel and Unit Holders.  There is no dispute that the Master Declaration bars the Hotel Lot Owner from charging Unit Owners for the costs attributable solely to the operation of the hotel portion of the Hotel Lot.  *Compare* Master Decl. § 16.3 (permitting assessments only for Shared Facilities), *with* § 1.1(dd)(v) (limiting aspects of Hotel Lot portion of Shared Facilities) *and* § 1.1(dd)(5) (defining Hotel Lot with reference to Ex. 5 to Ex. E, which legal descriptions and schematics state and illustrate that various sections are "LESS…graphically depicted" sections of the Hotel Lot).  The Court must decide in connection with the Proofs of Claim whether the

Debtors properly complied with the provisions of the Master Declaration.

## A.    Improper Spa Charges

61.    Under the Master Declaration, the Spa is defined as part of the Hotel Lot, but the Spa is not considered part of the Shared Facilities, with one important caveat. *See id.* § 1.1(oo). The Limited Spa Rights of the Unit Owners are made part of the Non-Retail Shared Facilities; however, "[i]n all other respects, the Spa shall be deemed part of the private portions of the Hotel Lot and same shall not be included within the Common Properties or the Shared Facilities."[28] *Id.* § 4.4.

62.    The Limited Spa Rights afforded Unit Owners are defined within § 4.4 of the Master Declaration, which contains the substantive provisions governing the Spa. The Limited Spa Rights give "access to, and use of," the following Spa components to United Holders:

> Cardio/Weight Room, Exercise Studio, Spa Reception Lobby, Men's Locker Room, Women's Locker Room, Men's Wet Lounge/Sauna/Steam, Women's Wet Lounge/Sauna/Steam, Exercise Pool Deck, Jacuzzi, Exercise Pool, Exercise Studio, South Tower Lobby, South Tower Beach Pool and Jacuzzi and Central Tower Lobby and Reception.

*Id.*

63.    Section 4.3 grants each condominium unit owner "limited rights to use, benefit from and enjoy" the Shared Facilities, including the Limited Spa Rights as part of the Non-Retail Shared Facilities, in a "manner as may be reasonably regulated by the Hotel Lot Owner from time to time" and subject to the payment of assessments levied by the Hotel Lot Owner. *See id.* §§ 4.3 and 4.3(a); *see also id.* § 16.3.

---

[28] The Common Properties consist of certain common areas that are not otherwise part of the Shared Facilities. *See* Master Decl. § 1.1(i).

64.     The Associations do not contest that they can be assessed reasonable fees for Spa use.  Indeed, imposition of fees is consistent with the fifth Sale Finding, which provides, in pertinent part:

> The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities.  Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration.

Sale Order ¶ V (5th bullet).

65.     The Proofs of Claim dispute the fairness of those charges and increases by the Debtors over time.  The Associations, therefore, have challenged the mounting charges, the basis and method of calculating the assessments, and whether the assessments can ignore the amount paid pursuant to the Fixed Charge in calculating the assessments applied to the "operation and management" of the Limited Spa Rights.[29]  The Sale Findings are silent on these issues.

66.     In addition, Section 16.3 of the Master Declaration provides that the Hotel Lot Owner shall be paid

> annual assessments and charges for the operation and insurance of, and for payment of expenses (and real estate and personal property taxes and/or governmental assessments and/or impositions) allocated or assessed to or through the Hotel Lot Owner, of and/or for the maintenance, management, operation and insurance of the Shared Facilities….

---

[29] Crucially, the Debtors previously acknowledged the inability to "double charge" Unit Owners for the Limited Spa Rights by assessing for those rights under the Non-Retail Shared Facility budget without discounting the Fixed Charge:  "Although the Master Declaration does not require the costs and expenses attributable to the Limited Spa Rights be reduced or offset against the Fixed Charge, to accept these payments and then charge unit owners for the expense related to these facilities could be seen as a 'double charge' and therefore could be challenged as 'unreasonable.'"   Notice Objection To: Canyon Ranch Hotel & Spa Miami Beach, Proposed Budget 2010, attached hereto as Exhibit C at 6.

*Id.* § 16.3.  Section 16.3 does not, however, address what specific operational and managerial costs and expenses can and cannot be assessed or in what proportion to the use by the Hotel and its guests and the Spa and its non-Unit Owner clients.  Rather, § 16.3 provides only that the Hotel Lot Owner must "budget and adopt assessments" for its

> general expenses for repair, operation, maintenance, improvement, replacement, insurance, alteration or relocation of, and taxes on, the applicable Shared Facilities (and the establishment of reserves therefor at the election of the Hotel Lot Owner) based, in part, upon the Hotel Lot Owner's *reasonable projections of the intensity of use* of the applicable Shared Facilities for the period subject to the budget.

*Id.* (emphasis added).  There is no metric explaining how the Hotel Lot Owner is to determine the "reasonable projection of the intensity of use."  *See also* § 16.1.

67.     According to the Debtors' own documents, any assessments and allocations against the Associations had to be "reasonable" and "defensible."   The Debtors have acknowledged that, "[a]lthough the Master Declaration gives the Hotel Lot Owner latitude for the types of costs that may be charged to the [Non-Retail Shared Facilities] budgets, it does not provide specific guidance on the allocations of such costs between the [Non-Retail Shared Facilities] budgets and the hotel operating budgets.  Instead, *it requires that all such allocations are reasonable*."  Exhibit C at 5 (emphasis added).  Specifically, the Debtors have stated:

> In discussions with local counsel  'reasonableness' was suggested to mean *a fair and reasonable allocation, made in good faith and supportable* – i.e., explained with proper back-up, including, where available, invoices, etc.  The analysis should be performed within each category (or cost type) of expense separately *to determine what is appropriate rather than applying a 'one size fits all' methodology*.

*Id.* (emphasis added).

68.     Moreover, notwithstanding the Debtors' rejection of a "one size fits all" allocation methodology when they were marketing unsold condominium units, the Proofs of Claim

demonstrate that the Debtors later applied that same methodology to expenses at the Property, thereby making all Non-Retail Shared Facility assessments according to an unsupported square footage calculation. As a result, shared expenses were allocated under an arbitrary 79/21 initial ratio between the Associations and the Hotel Lot, which later increased to an even greater 82/19 split. *See* Exhibit B at 2, 5. Not only is this approach at odds with the Debtors' own opinion (as informed by counsel), but it also conflicts with the Master Declaration, which states that the budget must, among other things, be based on "reasonable projections of intensity of use." Master Decl. § 16.3. The Overcharge Claims are not at odds with either the Sale Findings or the Sale Order in this respect.

69. The questionable nature of the assessments is also apparent from the sea change in assessments since the Debtors took control of the Property. Since 2009, the Non-Retail Shared Facility Budget doubled, from $4.2 million with reserves in 2009 to $8.3 million in 2013. *Compare* Non-Retail Shared Facilities Estimated Operating Budget (January 1, 2009 to December 31, 2009), attached hereto as Exhibit D at 4 *with* Non-Retail Shared Facilities Estimated Operating Budget (January 1, 2013 to December 31, 2013), attached hereto as Exhibit E. Regrettably, services at the Property did not increase concomitantly.

70. The allocation and legitimacy of the charges levied is clearly subject to further examination via the Proofs of Claim under the Sale Order.[30] Moreover, during the four-year period of the Debtors' operation of the Property, assessments for Spa Attendants has increased

---

[30] Section 16.8 of the Master Declaration, entitled "Financial Records," provides that the Hotel Lot Owner "shall maintain financial books and records showing its actual receipts and expenditures with respect to the maintenance, operation, repair, replacement, alteration and relocation of the General, Non-Retail, Condominium North, Condominium Central and Condominium South Shared Facilities, including the then current budget and any proposed budget (the 'Facilities Records')....The Facilities Records shall at all times, during reasonable business hours, be subject to the inspection and audit of any Member of the Association."

from $694,783 to $833,560 and, starting in 2013, assessments were levied for Fitness Instructors ($1 million) and Office Expense Fitness ($97,922). *See* Proofs of Claim Ex. 1, attached hereto as Exhibit F.[31]  In addition, 2011 had a $166,549 assessment for Spa Expenses, a category which had never been assessed prior and has not been assessed since, and 2012 and 2013 saw the addition of $137,994 and $123,442 in Spa Expense Supplies.  In total, these unsupported Spa assessments alone have cost the Associations over $6.5 million since 2009, of which $3,023,026 is claimed by the North Association. *See id.*

71.     Rather than a fair, reasonable and supportable allocation and assessment of costs, it appears that the Associations subsidized, in ever-increasing amounts, the money-losing Hotel Lot in contravention of the Master Declaration.[32]  Their only recourse now is the Proofs of Claim.

### B.     Improper Valet Parking Assessments

72.     Pre-2013 assessments for valet parking, which were assessed as part of the Non-Retail Share Facilities budget are also suspect.  Starting in 2013, the Hotel Lot Owner moved the valet parking assessments out of the Non-Retail Shared Facility budget and into each of the three Condominium Shared Facilities budgets because it purportedly offered greater accuracy.  The eighth Sale Finding addresses the propriety of that move, but did not in any way decide the validity of the assessments under the old methodology or the proper method for assessing the costs attributable to each Shared Facility segment. *See* Sale Order ¶ V (8th bullet).

---

[31] Cites to exhibits to the Proofs of Claim refer to exhibits to Proofs of Claim Nos. 17, 19, and 24.  Proof of Claim No. 27 contains the exhibits cited herein but numbered differently.

[32] For the same reasons, numerous other assessed charges are improper, including IT charges, pool and beach attendant expense, concierge cost and nearly $600,000 in A&G Allocation that was first assessed in 2013 and allocates between 20% and 40% of the cost of certain Hotel employees and service contracts to the Unit Owners even though little to no service is actually provided to the Unit Owners. *See* Exhibit B at 11.

73.     Although Section 17.1 of the Master Declaration places all parking areas for the Property within the Hotel Lot, the costs of parking were routinely assessed to the Unit Owners. Although the Master Declaration permits costs to be apportioned pro rata, it appears that, at least for some portion of time, the cost for valet services was improperly assessed based upon the Debtors' same "one size fits all" square footage methodology in violation of the Master Declaration. Clearly, the Associations deserve an opportunity to investigate the scope of these improper charges.

### C.     Improper Utilities Assessments

74.     Finally, a similar claim applies to the utility assessments. The North Association does not dispute its obligation to pay for some portion of the Non-Retail Shared Facilities utility expense, but the amount the Debtors allocated to the North Tower is questionable. The ninth Sale Finding confirmed the ability of the Hotel Lot Owner to assess utility costs by square footage, *see* Sale Order ¶ V (9th bullet), but did not address the method by which square footage should be reasonably determined or how the square footage of mixed-use and/or common areas shared by the Hotel and the other Lots impacts past assessments.

### V.     The Debtors' Objection To The North Association's Construction Defect Claims Has No Merit

75.     The Debtors argue that the North Association's claim under Chapter 558 of the Florida Statutes ("***Chapter 558***") allegedly fails because (i) the North Association did not serve a Chapter 558 notice on the Debtors, and (ii) the notice the Debtors did receive via the Proofs of Claim lacked sufficient detail under the Florida Statutes. *See* Objection ¶¶ 45-46. The Debtors are wrong on both counts. Not only did the North Association serve proper notice, but its notice met the statutory requirements and provided the Debtors with a sufficient opportunity to

investigate the claims and cure the defects.

76.     Contrary to the Debtors' assertions, even if there had been some defect in the service or substance of the requisite Chapter 558 notice, it would not be grounds for dismissal under Florida law.  Instead, the statute expressly provides that a lack of notice simply entitles the defendant, upon a proper motion, to a stay of the proceedings so that notice and an opportunity to cure may be provided.

**A.     <u>The North Association Complied With Chapter 558's Notice Requirements</u>**

77.     Section 558.004 of the Florida Statutes provides, "In actions brought alleging a construction defect, the claimant shall…serve written notice of claim on the contractor, subcontractor, supplier, or design professional, as applicable, which notice shall refer to this chapter."  FLA. STAT. ANN. § 558.004(1) (2015).  The section also requires the notice to describe in "reasonable detail" the "general nature" of the alleged defects and provide a description of the damage resulting from the defect, if known.  *Id.*[33]  The North Association has complied with both requirements.

78.     On September 8, 2014, construction counsel for the North Association served on eleven entities, including the general contractor, subcontractors and architects, a notice of construction defects under Chapter 558 and applicable statutory provisions (the "***Chapter 558 Notice***").  *See* Notice of Claim, attached hereto as Exhibit G.  The Chapter 558 Notice included a 43-page report prepared by M2E, LLC, an engineering firm, documenting in detail and with photographs, the damage resulting from the defects.  *Id.*  Also pursuant to the statute, on November 19, 2014, the North Association served on the contractors and design professionals a

---

[33] Section 558.004(1) provides:  "The notice of claim must describe the claim in reasonable detail sufficient to determine the general nature of each alleged construction defect and a description of the damage or loss resulting from the defect, if known."  FLA. STAT. ANN. § 558.004(1) (2015). The statute also mandates that the person served with notice have an opportunity to inspect the property.  *Id.* at § 558.004(2).

notice of inspection, which was scheduled for December 4, 2014.  *See* Notice of Inspection, attached hereto as Exhibit H.

79.     In light of the Debtors' commencement of these bankruptcy cases, and the concomitant protections of the automatic stay, the North Association was barred from serving the Chapter 558 Notice directly on the Debtors.  *See* Bankruptcy Code § 362(a); *see also First Coast Excursions, LLC. v. Tadlock (In re Tadlock)*, No. 09-ap-475, 2010 WL 8320065, at *5-6 (Bankr. M.D. Fla. Sept. 1, 2010) (recognizing that automatic stay applied to post-petition service of notice and demand required by statute's pre-suit notice provision); *In re Enron Corp.*, 300 B.R. 201, 210, 212 (Bankr. S.D.N.Y. 2003) (finding automatic stay violation where, post-petition, claimant sent pre-suit notice of material breach to debtor required by contract).  However, the North Association asserted the construction defect claims in its Proofs of Claim.  *See* 4 COLLIER ON BANKRUPTCY ¶ 501[1] (16th ed.) ("The primary purpose [of filing a proof of claim] is, of course, to share in any distribution."); *see also In re Saint Vincent's Catholic Medical Centers of New York*, 440 B.R. 587, 603 (Bankr. S.D.N.Y. 2010).

80.     Additionally, on December 2, 2014, in response to the Debtors' request, counsel for the North Association provided the Debtors with a copy of the same Chapter 558 Notice served on the contractors and design professionals.[34]  *See* Email from M. Smiley to S. Krumbein dated December 2, 2014, attached hereto as Exhibit I.

81.     Accordingly, the Debtors received ample notice of the construction defects and have had a sufficient opportunity to investigate and cure them.  The Debtors do not contend otherwise.

---

[34] In addition, the Debtors were notified on November 21, 2014 that an inspection of the property pursuant Chapter 558 was planned.  *See* email from H. Cadiz to P. Edelman dated January 6, 2015, attached hereto as Exhibit J.  The North Association asked the Debtors for consent to inspect the Hotel Lot-owned area in the North Tower.  The Debtors' denied the request by return email on November 24, 2014.  *See id.*

82.     The Debtors choose to dispute the sufficiency of the detail provided by the Associations with respect to these claims.[35]  Objection ¶ 45.  This objection is puzzling in light of Exhibit 3 to the Proofs of Claim, which contains an itemized list, based on the engineering report, of 70 identified construction defects and the estimated costs for repair, as well as the fact that the Debtors received a copy of the full engineering report.  Proofs of Claim Ex. 3, attached hereto as Exhibit K.  More than the "reasonable detail sufficient to determine the general nature" of the defects at the property as required under the statute was clearly provided.

83.     Despite the Debtors' contentions, Chapter 558 does not require a notice to identify the "precise 'defects'" to be repaired, nor does the statute require that the notice specifically state whether the defects "arose due to building code violations, deviation from plans and specifications, failing to adhere to industry standards" or "why and how it is they even rise to the level of a construction defect."  Objection ¶ 45.  Chapter 558 requires only that reasonable notice of the claim be given so that a potential defendant can investigate, and possibly cure, the defects; Exhibit 3 to the Proofs of Claim does so.  Certainly the level of specificity was sufficient for a property manager to understand the claims.  Moreover, any purported lack of detail in the Proofs of Claim was conclusively addressed when the Debtors' subsequently received the full engineers' report on December 2nd.  *See* Exhibit K.[36]

**B.     Failure To Provide Notice Under Chapter 558 Is Not A Basis For Dismissal**

84.     Even if the North Association had not provided sufficient notice under Chapter

---

[35] The Debtors incorrectly posit that Bankruptcy Rule 3001(c) applies to the construction defect claims. *See* Objection at 26 n.30.  Since the construction defect claims are statutory and are not "based on a writing," the documentation requirements of Bankruptcy Rule 3001(c)(1) do not apply; instead, only subparagraphs (a) and (b) of the rule do. *See In re Tucker*, 2012 WL 1918528, at *3 n.6 (Bankr. S.D. Ill. May 25, 2012) (concluding that because the IRS's claim was "based on a statute….Rule 3001(c)(1) does not apply").  There is no dispute that the proofs of claim comply with Bankruptcy Rules 3001(a) and (b), which address conformity with the Official Forms and proper execution.  However, the North Association has attached the Chapter 558 Notice to this Response and, if necessary, can attach the same to an amended proof of claim.

[36] Notably, the Debtors have not identified any prejudice caused by the alleged defective notice.

558, dismissal of the construction claims is not warranted. Section 558.003 of the Florida Statutes states: "If a claimant files an action alleging a construction defect without first complying with the requirements of this chapter, on timely motion by a party to the action *the court shall stay the action, without prejudice,* and the action may not proceed until the claimant has complied with such requirements." FLA. STAT. ANN. § 558.003 (2015) (emphasis added). Chapter 558 therefore requires the party against whom the claim was filed to seek relief in the form of a stay pending compliance with the notice requirement. It does not, contrary to the Debtors' assertions, authorize dismissal of the claim due to a notice violation – and certainly not with prejudice.

85.     As a Florida appellate court has explained, "[t]he statute does not forfeit substantive rights as a penalty for noncompliance; it is expressly limited in scope," and thus "a claimant does not lose a right of recovery…." *Hebden v. Roy A. Kunnemann Constr. Inc.*, 3 So.3d 417, 419 (Fla. Dist. Ct. App. 2009); *cf. In re Tadlock*, 2010 WL 8320065, at *4-5 (citing case law staying, rather than dismissing, claims of civil theft with analogous pre-suit notice requirement where plaintiff failed to abide by it).[37]

86.     For the reasons stated above, the Debtors' Objection to the North Association's construction defect claims must be denied.[38] Further, as the Debtors do not object to the construction defect claims on any other grounds and do not offer any evidence to dispute the validity of the claim, the claim should be allowed. *See* Bankruptcy Rule 3001(f) & Bankruptcy Code § 502.

---

[37] The cases the Debtors cite are consistent with the statute's instruction that a failure to serve proper notice under § 558.004 does not merit dismissal of the claim. The Debtors simply mischaracterize those cases. *See* Objection ¶ 46.

[38] The Debtors' suggestion that its insurance policy may cover the construction defects provides no basis to release the Debtors from liability for these claims. The Debtors have not conceded liability and the North Association would likely have no standing to assert a claim against the Debtors' insurance carrier absent such a concession.

### C.     Unpaid Dues

87.     The Proofs of Claim also allege that certain dues are owed to the North Association by the Debtors as of the commencement of the Chapter 11 cases. The Debtors concede that any outstanding dues owed to the North Association will be paid at the closing of the Sale. *See* Objection at 4 (3rd bullet) ("To the extent dues remain unpaid, they will be adjusted and paid at the closing of the Sale in the ordinary course."). Given the claims remain pending despite the closing, the claims should now be allowed.

### VI.     Further Objections Raised By The Debtors

88.     The Debtors also assert that the Proofs of Claim are duplicative of claims filed by the other Associations and their allowance "would permit the Associations to receive multiple recoveries on a single injury." Objection ¶ 47. The Debtors objection is premature and lacks factual support. To the extent the Debtors believe that any of the North Association's claims are duplicative or lack basis, the onus is on the Debtors to demonstrate which ones and which portion of the asserted claim should be disallowed. Otherwise, as indicated above, the Debtors' Objection fails and the Proofs of Claim should be allowed.

89.     The Debtors also object to the North Association's claims against the Spirits Debtor, arguing that entity only holds the liquor license for the Property. The North Association acknowledges that it can only collect one recovery in satisfaction of its Proofs of Claim and that the Spirits Debtor, to the extent it holds only the liquor license, may not be liable under the Proofs of Claim. Nevertheless, because of the centralized nature of the Debtors' operations, and the Debtors' refusal to provide any discovery to the North Association thus far, it has been virtually impossible for the North Association to identify which Debtors should not be held jointly and severally liable. Thus, out of an abundance of caution, the North Association filed claims against all of the Debtors. Notably, even Lehman, which presumably understands well

the Debtors' corporate structure, also filed duplicative claims against each of the Debtors on account of its unsecured claims.

90.    In addition, as the proceeds from the Sale have yet to be separately apportioned or allocated between the Debtors' estates, assertion of the Proofs of Claim against each of the Debtors is wholly appropriate.

## VII.    Reservation Of Rights

91.    The North Association hereby incorporates all prior Reservations of Rights from its Proofs of Claim, including the right to amend or supplement the Proofs of Claim in all respects and file additional proofs of claim for additional claims.  The North Association also reserves the right to revise, amend, or supplement this Response and any Exhibits attached hereto at any time, including with the Court's consent at the hearing on the claims or any subsequent hearing, or to take any other appropriate actions, including to respond to the Debtors' objections, any additional objections or replies, and to seek discovery.

## CONCLUSION

WHEREFORE, the North Association respectfully requests that the Court enter an order (a) denying the Debtors' Objection, (b) allowing the claims set forth in the Proofs of Claim, and (c) granting such further and other relief as the Court deems just and proper.

Dated: January 20, 2015
New York, New York

Respectfully submitted,

**NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**

BRACEWELL & GIULIANI LLP

*/s/ Daniel S. Connolly*
Daniel S. Connolly

Jennifer Feldsher
Rachel B. Goldman
David J. Ball
1251 Avenue of the Americas
New York, New York 10020
Telephone (212) 508-6100
Facsimile (212) 508-6101