| | |
|---|---|
| BROWN RUDNICK LLP | BOIES, SCHILLER & FLEXNER LLP |
| Edward S. Weisfelner | Sigrid S. McCawley |
| Bennett S. Silverberg | Carl Goldfarb |
| Seven Times Square | 401 East Las Olas Blvd., Suite 1200 |
| New York, NY 10036 | Fort Lauderdale, FL 33301 |
| Telephone: (212) 209-4900 | Telephone: (954) 356-0011 |

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 14-11691 (SCC) |
| FL 6801 SPIRITS LLC, *et al*., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-------------------------------------------------------------------X

**NOTICE OF MOTION OF NORTH CARILLON BEACH CONDOMINIUM
ASSOCIATION, INC. FOR ENTRY OF AN ORDER REOPENING
THESE CHAPTER 11 CASES PURSUANT TO BANKRUPTCY CODE
SECTION 350, RULE 5010 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE AND RULE 5010-1 OF THE LOCAL BANKRUPTCY RULES**

**PLEASE TAKE NOTICE** that a hearing on the *Motion of North Carillon Beach
Condominium Association, Inc. For Entry Of An Order Reopening These Chapter 11 Cases
Pursuant To Bankruptcy Code Section 350, Rule 5010 Of The Federal Rules Of Bankruptcy
Procedure And Rule 5010-1 Of The Local Bankruptcy Rules* (the "Motion") will be held before
the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Room 623 of the United
States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York,
New York 10004-1408, on **September 6, 2016 at 2:00 p.m. (prevailing Eastern Time)**, or as
soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Motion (the "Responses") must be made in writing, stating in detail the reasons therefore, and must be filed with the Clerk of the Bankruptcy Court, with paper copies delivered to Bankruptcy Judge Shelley C. Chapman's Chambers, and served upon: (i) Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: Edward S. Weisfelner, Esq. and Bennett S. Silverberg and Boies, Schiller & Flexner LLP, 401 East Las Olas Blvd., Suite 1200, Fort Lauderdale, FL 33301, Attn: Sigrid S. McCawley and Carl Goldfarb, co-counsel to North Carillon Beach Condominium Association, Inc. ("NCBCA"); (ii) Togut, Segal & Segal, One Penn Plaza, Suite 3335, New York, NY 10119, Attn: Frank A. Oswald, Esq., as former counsel for the Debtors; and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Susan D. Golden, Esq. so that such Responses are actually received by the aforementioned parties not later than **August 30, 2016 at 4:00 p.m.** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no Reponses are timely filed and served with respect to the Motion, NCBCA may, on or before the Response Deadline, submit to the Court a proposed order with respect to the relief requested in the Motion, which order may be entered with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider the Motion may be

adjourned from time to time, without further written notice to any party.

Dated: New York, New York
      August 11, 2016

           Respectfully submitted,

           **NORTH CARILLON BEACH**
           **CONDOMINIUM ASSOCIATION, INC.**

           By its counsel,
           BROWN RUDNICK LLP

           */s/ Edward S. Weisfelner*
           Edward S. Weisfelner
           Bennett S. Silverberg
           Seven Times Square
           New York, New York 10036
           Telephone: (212) 209-4800
           Facsimile: (212) 209-4801

                    - and –

           BOIES, SCHILLER & FLEXNER LLP
           Sigrid S. McCawley
           Carl Goldfarb
           401 East Las Olas Blvd., Suite 1200
           Fort Lauderdale, FL 33301
           Telephone:  (954) 356-0011
           Facsimile:  (954) 356-0022

BROWN RUDNICK LLP
Edward S. Weisfelner
Bennett S. Silverberg
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4900

BOIES, SCHILLER & FLEXNER LLP
Sigrid S. McCawley
Carl Goldfarb
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011

*Co-Counsel for North Carillon Beach Condominium*
*Association, Inc*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 14-11691 (SCC) |
| FL 6801 SPIRITS LLC, *et al*., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-------------------------------------------------------------------X

**MOTION OF NORTH CARILLON BEACH CONDOMINIUM**
**ASSOCIATION, INC. FOR ENTRY OF AN ORDER REOPENING**
**THESE CHAPTER 11 CASES PURSUANT TO BANKRUPTCY CODE**
**SECTION 350, RULE 5010 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE AND RULE 5010-1 OF THE LOCAL BANKRUPTCY RULES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION ................................................................................................3

RELIEF REQUESTED......................................................................................4

FACTUAL BACKGROUND ..............................................................................4

A.     The Property....................................................................................4

B.     Events Leading To The Sale Of The Property ....................................5

C.     Z Capital Contractually Binds Itself To Properly Manage The Property ...........8

D.     Approval Of Sale And Closing Of Bankruptcy Cases........................10

E.     Z Capital's Management Of The Property Post-Acquisition.............10

F.     Summary Of Claims And Causes Of Action Against Z Capital.......11

     a.     Z Capital Fraudulently Induced NCBCA To Consent To The Sale And Enter Into The North Tower Contract ................................................11

     b.     Breach Of Contract Claims................................................12

     c.     Z Capital Has Repeatedly and Egregiously Violated The Florida Condominium And Homeowners Association Laws And The Master Declaration ...........................................14

ARGUMENT..................................................................................................16

NO PRIOR REQUEST ..................................................................................19

NOTICE........................................................................................................19

CONCLUSION..............................................................................................20

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

<u>In re Arana</u>,
    456 B.R. 161 (Bankr. E.D.N.Y. 2011)......................................................................16

<u>Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC</u>,
    No. 2016-011172 CA 24 (Fla. Miami-Dade County Ct. July 29, 2016) ..................................2

<u>Citizens Bank & Tr. Co. v. Case (In re Case)</u>,
    937 F.2d 1014 (5th Cir. 1991) ........................................................................16, 17

<u>In re Dimogerodakis</u>,
    No. 10-004, 20111 WL 1362342 (D. N.J. Apr. 11, 2011) ......................................................17

<u>In re Easley-Brooks</u>,
    487 B.R. 400 (Bankr. S.D.N.Y. 2013), *aff'd.* 505 B.R. 419 (S.D.N.Y. 2014),
    *vacated and remanded sub nom.* <u>In re PlusFunds Grp., Inc</u>., 589 F. App'x 41
    (2d Cir. 2015)......................................................................................................16

<u>Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)</u>,
    15-2844 (2d Cir. July 13, 2016)......................................................................................2

<u>In re HBLS, L.P.</u>,
    468 B.R. 634 (Bankr. S.D.N.Y. 2012) ...........................................................................17, 18

<u>In re Lowery</u>,
    398 B.R. 512 (Bankr. E.D.N.Y. 2008) ...........................................................................16, 17

<u>In re Palij</u>,
    202 B.R. 27 (Bankr. D.N.J. 1996) ...................................................................................17

<u>In re Phillips</u>,
    No. 09-28759/JHW, 2012 WL 1232008 (Bankr. D.N.J. Apr. 12, 2012)...............................17

<u>In re PlusFunds Grp., Inc.</u>,
    492 B.R. 202 (Bankr. S.D.N.Y. 2013)...........................................................................16

<u>Reid v. Richardson</u>,
    304 F.2d 351 (4th Cir. 1962) ......................................................................................17

**Statutes**

11 U.S.C. § 105(a) ...................................................................................................4

11 U.S.C. § 350..................................................................................................4, 16

ii

28 U.S.C. § 157 ...........................................................................................................3

28 U.S.C. § 1334 .........................................................................................................3

28 U.S.C. § 1408 .........................................................................................................4

28 U.S.C. § 1409 .........................................................................................................4

Bankruptcy Code section 363 ......................................................................................2

**Other Authorities**

Fed. R. Bankr. P. 5010 ...........................................................................................4, 16

LBR 5010-1 .................................................................................................................4

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

North Carillon Beach Condominium Association, Inc. ("NCBCA"), by and through its undersigned co-counsel, respectfully submits this *Motion Of North Carillon Beach Condominium Association, Inc. For Entry Of An Order Reopening These Chapter 11 Cases Pursuant To Bankruptcy Code Section 350, Rule 5010 Of The Federal Rules Of Bankruptcy Procedure and Rule 5010-1 Of The Local Bankruptcy Rules* (the "Motion").[1] In support of the Motion, NCBCA respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      NCBCA is a not-for-profit Florida corporation that represents the interests of the unit owners (the "Unit Owners") in the North Tower at the Carillon Condominium (formerly known as the Canyon Ranch Hotel & Spa Miami Beach; the "Property").

2.      NCBCA seeks to reopen the above-captioned chapter 11 cases in order to commence an adversary proceeding (the "Adversary Proceeding") against Z Capital Partners, LLC and Z Capital Florida Resort (together with certain of its affiliates, "Z Capital") seeking damages and equitable relief for their unlawful exploitation of NCBCA and the Unit Owners, which includes fraudulently inducing NCBCA and the Unit Owners to enter into the North Term Sheet (as defined below) as well as multiple breaches of the North Term Sheet. NCBCA intends to commence the Adversary Proceeding through the filing of the complaint (the "Adversary Complaint") substantially in the form attached hereto as Exhibit A.[2] The Adversary Complaint

---

[1]     The Debtors were formerly indirect, wholly-owned subsidiaries of Lehman Brothers Holdings, Inc. ("LBHI"). Lehman Ali Inc. ("Lehman Ali") was the sole member of PAMI ALI LLC ("PAMI," and collectively with Lehman Ali and LBHI, "Lehman"), which in turn was the manager and sole member of Debtor FL 6801 Spirits LLC ("Spirits"), the manager and sole member of affiliated Debtors, FL 6801 Collins North LLC ("6801 North"), FL 6801 Collins Central LLC ("6801 Central"), Fl 6801 Collins South LLC ("6801 South," together with 6801 North and 6801 Central, the "Collins Subsidiaries," and collectively with Spirits, the "Debtors").

[2]     In deference to this Court, NCBCA seeks to commence this Adversary Proceeding to provide a forum for this Court to interpret the scope of its reservation of exclusive jurisdiction over certain claims.

seeks damages and equitable relief against Z Capital on account of its wrongful conduct discussed in this Motion (the "Claims").

3.  At bottom, Z Capital lied to NCBCA and this Court in connection with obtaining the relief in the Sale Order (as defined below). Z Capital fraudulently induced NCBCA and its Unit Owners to support its purchase of the Property so that it could gain control of the Property, where, through breach of contract and exploitation of egregiously one-sided documents, it can rely on its experience in asset stripping, cost cutting, restructuring, and fiscal obfuscation to extract capital contributions and excessive maintenance payments from Unit Owners who have no control over their own condominium.

4.  Z Capital's wrongful conduct has caused a dramatic decrease in unit prices, a decrease that Z Capital has directly benefited from because it has embarked on a buying spree that has seen it acquire approximately 43 units since it acquired the Property. NCBCA, on behalf of the Unit Owners, intends to commence the Adversary Proceeding to stop these egregious breaches of law and this unconscionable, unfair, and unreasonable abuse of power, and thereby end this predatory exploitation.

5.  There are three basic components (any one of which justifies the requested relief) to Z Capital's unlawful conduct which has caused serious economic damage to NCBCA and the Unit Owners.[3] First are the blatant misrepresentations made by Z Capital to NCBCA and the

---

[3]  In an action (the "CCBCA Action") commenced by the Central Carillon Beach Condominium Association, Inc. (the "CCBCA") – which seeks redress for claims and causes of action similar to those detailed in the Adversary Complaint – Z Capital moved to dismiss the CCBCA Action asserting that the Sale Order provided for a release of all claims that CCBCA may possibly assert in the future against Z Capital . See Defendant Z Capital Florida Resort, LLC's Motion to Dismiss Complaint And Supporting Memorandum of Law at 24-25, Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172 CA 24 (Fla. Miami-Dade County Ct. July 29, 2016) [Filing No. 44623327] (the "Z Motion to Dismiss"). NCBCA expressly reserves the right to argue that post-Sale Order independent claims held by NCBCA against Z Capital for its post-sale wrongful conduct are not immunized by any release or injunction typically contained in Bankruptcy Code section 363 sale orders as the Second Circuit recently held in Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.), 15-2844 (2d Cir. July 13, 2016).

fraudulent inducement of NCBCA's consent to Z Capital's purchase of the Property from the Debtors pursuant to the sale order.[4]  Second, Z Capital has repeatedly breached its contractual commitments under the North Tower Contract (as defined below) relating to the manner in which Z Capital agreed to manage the Property post-acquisition as a luxury property.  Third, Z Capital has violated several provisions of the Florida Condominium Act, Homeowners' Association Act and the Master Declaration itself, all of which have caused significant injury and damage to NCBCA and the Unit Owners.

6.        NCBCA is anxious to pursue relief from multiple forms of breach of contract and predatory deceit and exploitation of Unit Owners by Z Capital .  While NCBCA believes that many, if not all, of its claims against Z Capital may more properly be brought before a state court in Florida, where related actions are already pending, NCBCA acknowledges and respects the fact that some or all of these claims may fall within this Court's retained exclusive jurisdiction.[5]  Consequently, NCBCA respectfully submits that the Debtors' chapter 11 cases should be reopened so that the Adversary Complaint may be filed and for a subsequent determination as to whether this Court should adjudicate the claims outlined herein or, alternatively, whether this Court should abstain, in whole or in part, in favor of the Florida state courts.

## **JURISDICTION**

7.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Sale Order.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[4]   See Order (I) Approving Sale of Debtors' Property; (II) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 218] (the "Sale Order").

[5]   Notably, in the CCBCA Action, Z Capital moved to dismiss the CCBCA Action asserting that this Court has exclusive jurisdiction over such claims and causes of action citing the retention of jurisdiction provision contained in paragraph 31 of the Sale Order.  See Z Motion to Dismiss at 21-23.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested herein are sections 105(a) and 350(b) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rule 5010 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 5010-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**RELIEF REQUESTED**

10.     By this Motion, NCBCA seeks entry of an order reopening the cases of the above-captioned Debtors pursuant to Bankruptcy Code section 350, Bankruptcy Rule 5010 and Local Rule 5010-1 to permit NCBCA to commence the Adversary Proceeding and to grant such other and further relief to NCBCA as the Court may deem just and proper.

**FACTUAL BACKGROUND**

**A.      The Property**

11.     The Property is a condominium hotel and spa development that was marketed as the nation's first luxury boutique hotel and spa dedicated to wellness and providing its owners with a unique and valuable life-style experience.  The Property is comprised of three towers: (i) the "North Tower"; (ii) the "Central Tower"; and (iii) the "South Tower" (collectively, the "Condo Towers").

12.     Each of the Condo Towers is governed by a Declaration of Condominium (collectively, the "Tower Declarations").  In addition to the Tower Declarations, the Property is governed by a Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration" and together with the Tower Declarations, the "Declarations").

13.     The Master Declaration governs the relationships between and among the Condo Tower condominium associations (the "Condo Tower Associations"), the Unit Owners and the Hotel Lot Owner (as defined in the Master Declaration).  The Master Declaration identifies

certain shared facilities of the five Lots (the "Shared Facilities"), as well as certain non-retail shared facilities (the "Non-Retail Shared Facilities"). Every year, the Hotel Lot Owner is charged under the Declarations to establish an annual budget for the Shared Facilities (the "Shared Facilities Budget") and the Non-Retail Shared Facilities (the "Non-Retail Shared Facilities Budget"). The Master Declaration provides that the Condo Tower Associations, via assessments on Unit Owners, must pay the Hotel Lot Owner periodic charges relating to the Shared Facilities and the Non-Retail Shared Facilities. The Master Declaration also sets forth the methodology by which the Hotel Lot Owner shall allocate the assessments to the Condo Tower Associations. See Master Declaration Art. 16.3.

**B.    Events Leading To The Sale Of The Property**

14.    On or around June 1, 2014, the Debtors, entities that previously owned and/or operated the Property, filed a voluntary petition under chapter 11 before this Court for the primary purpose of selling the Property to the highest bidder.

15.    Ms. Joelle Halperin, an individual employed by Lehman Brothers Holdings Inc. ("LBHI") as a managing director, was identified as the chief decision maker for the Debtors.[6] The Debtors, over the objections of the three Condo Tower Associations, determined on August 21, 2014 that Z Capital submitted the "highest Qualified Bid" for the Debtors' assets. That determination was endorsed by Ms. Halperin in her capacity as the chief decision maker for the Debtors.

16.    This Court will no doubt recall that when Z Capital first sought to acquire the Property, it faced significant hurdles: the Unit Owners were vehemently opposed to a sale of this high-end luxury condominium complex to a hedge fund known for, and indeed priding itself on,

---

[6]    Particularly disturbing is the fact that, shortly after entry of the Sale Order, Ms. Halperin left LBHI's employ and took an executive position with Z Capital. From May 2015 through December 2015, she served as Z Capital's managing director and operating partner.

its "opportunistic approach" to investing and financial value extraction, and without any relevant experience managing or operating a property of the Property's caliber. Unit Owners consistently voiced their concerns that Z Capital's purchase would be disastrous for Unit Owners' property values, not to mention the unique lifestyle they contracted and paid for.

17.     During the chapter 11 cases, this Court acknowledged and sympathized with the Unit Owners' concerns about ensuring that the Property would maintain its unique characteristics as an exclusive Property focused on health and wellness. For example, this Court acknowledged as follows:

> THE COURT: Well, the unhappiness of the homeowners has been clear from the very beginning of this case…The happiness of the homeowners as far as I was concerned has always been a factor and they've been unhappy with the debtors, they were unhappy with Z Capital. They've just been unhappy, and I think that they – I'm not sure anybody is proposing and its certainly not in the record that there are going to be wild parties, you know, until four o'clock in the morning every night and we have seen the homeowners are highly sensitive to what they view as a degradation of their – of the lifestyle that they believe that they're entitled to being unit owners."

Nov. 6, 2014 Hr'g Tr., 39:5-17 [Docket No. 194].

18.     To overcome the resistance expressed by NCBCA and the Unit Owners, Z Capital made numerous promises and representations to them and to this Court that, if its acquisition were approved, Z Capital would either retain the existing brand (the exclusive "Canyon Ranch" name, synonymous with top-notch health and wellness lifestyles) or bring on an equally exclusive, luxurious, and renowned five-star brand to the Property, all while maintaining the integral focus on healthy living, serenity and general wellness. Z Capital explained that it "underst[oo]d that many, if not all of you, bought into the health and wellness

lifestyle and amenities that the property provides, and you likely paid a premium for it," and that if Z Capital were the successful bidder, "[t]his fundamental character will **not** change. Period."[7]

19.      To this end, Z Capital represented to Unit Owners and this Court that it had "executed an agreement" to "create a joint venture with Adrian Zecha, founder of Amanresorts and GHM Ltd, and Jonathan Breene, developer and creator of one of the premier properties in Miami, to launch a new luxury hotel flag, with the Property as its flagship property."[8] Z Capital emphasized the importance of these participants, explaining: "Mr. Breene was responsible for the development and creation of The Setai, South Beach, where his efforts drove unprecedented value for homeowners"[9], and that "[e]ach of Mr. Zecha's 5-star properties has a unique design, finish and feel with an individualized brand name to match. … Rest assured [the new brand at the Property] will be tasteful, classy, and will convey the sense of luxury for which Mr. Zecha is known. Everyone will know this is a 'Zecha' property."[10]

20.      Z Capital proudly announced "the unveiling of the new brand Adrian Zecha developed with you in mind – Talai – which will embody the ethos of service, health and wellness at luxury properties around the world."[11] Z Capital represented that if its purchase was approved, the Property would become the "first project of the joint venture, which is expected to create a premier, luxury flag with exclusive, unique locations around the world."[12]

21.      Indeed, Z Capital entered into binding and enforceable contracts with the three objecting Condo Tower Associations, including NCBCA, making numerous promises that it

---

[7]  See E-mail from Z Capital to Unit Owners (Oct. 3, 2014, 6:11 p.m.) (the "Oct. 3 email") at 2, attached hereto as Exhibit B.

[8]  See Letter to Court filed by James J. Ktsanes on behalf of Z Capital [Docket No. 149] (the "Sept. 29 Letter") at 1.

[9]  See Talai by Adrian Zecha pamphlet at 26, attached hereto as Exhibit C.

[10]  Oct. 3 email at 2.

[11]  See E-mail from Z Capital to Unit Owners (Oct. 26, 2014, 5:05 p.m.) (the "Oct. 26 email") at 1, attached hereto as Exhibit D.

[12]  See Sept. 29 Letter at 3.

would operate the Property at the highest level of quality with Zecha and Breene at the helm in order to secure the Condo Tower Associations' support of Z Capital's bid to buy the property. All the while, Z Capital explained that it had "every intention of preserving (and protecting!) the sanctuary that you have enjoyed at Canyon Ranch."[13] Only after receiving these representations and contractual promises were the Condo Tower Associations and Unit Owners persuaded to support Z Capital's acquisition of the property. Unfortunately, Z Capital's representations were simply false; it never intended to make good on its promises or contractual commitments.

**C.     Z Capital Contractually Binds Itself To Properly Manage The Property**

22.     On November 24, 2014, in connection with resolution of NCBCA's objections to the Debtors' proposed sale of the Property to Z Capital, NCBCA and Z Capital entered into a binding term sheet (the "North Tower Contract") which addressed specific material items of concern to the North Tower Unit Owners and incorporated by reference the term sheet Z Capital had already entered into with the condominium associations for the Central Tower and South Tower (the "South/Central Tower Contracts"). Pursuant to the North Tower Contract, Z Capital agreed to preserve the distinctive and exclusive lifestyle previously associated with the North Tower and to undertake the following specific obligations:[14]

- The Hotel Operator would be "[a] joint venture created among Adrian Zecha, Jonathan Breene and Z Capital, to be led by Tom Wicky."

- Z Capital would "make good faith efforts to negotiate with Canyon Ranch to remain in the spa only and further provided that Z Capital can reach agreement on economic and operational terms, Z Capital will agree to have Canyon Ranch remain the spa operator for an initial period of 2 years …" In the alternative, "the Zecha/Breene/Z Capital joint venture will operate the spa, or choose a third party operator at its sole discretion, and continue to provide spa services, health and wellness offerings, and fitness classes consistent with previous offerings."

---

13  See E-mail from Z Capital to Unit Owners (Oct. 8, 2014, 5:26 p.m.) (the "Oct. 8 email") at 2, attached hereto as Exhibit E.

14  See North Tower Contract, Sale Order at Ex. C [Docket No. 218] (incorporating South/Central Tower Contracts, Sale Order at Ex. B), attached hereto as Exhibits F and G, respectively.

- Z Capital's would "use commercially reasonable efforts to have a Capital Reserve study performed by an engineering firm reasonably acceptable to the Associations…. [and that] Z Capital will use commercially reasonable efforts to segregate Capital Reserves that are to be fully funded by Z Capital from those Capital Reserves that are to be jointly funded by Z Capital and the Associations."

- "The Hotel Lot and the exteriors and interiors of the North Tower and the South Tower will be operated to a level of service equivalent or comparable to the A[c]qualina in Sunny Isles Beach, St. Regis in Bal Harbour and the Ritz-Carlton in Ft. Lauderdale, all in Florida."

- Z Capital would "to the extent practicable, review actual valet parking usage and the current cost allocation for such services within a commercially reasonable period of time after Closing, and, as necessary in Z Capital's discretion, adjust such allocation taking into account usage."

- Z Capital would "not, without consulting the Associations, remove any facilities from the use of the unit owners, and will not limit use of any facilities or charge any additional amounts for use of any facility unless, within one-year of the Closing, Z Capital reasonably determines (and notifies the Associations) that continuation of the status quo is unreasonable and impracticable."

- Z Capital would establish a "Unit Owner Selection Committee" to "invite, review and extend offers for prospective spa members."

- Z Capital's commitment that if it purchased the Property "in a manner which provides for a reduction in total consideration paid to Lehman Brothers . . . relative to the current . . . agreement" Z Capital would "apply the first $3.5 million of the difference in total consideration to a reserve for capital improvements to the [P]roperty."

- Z Capital would "use its reasonable best efforts to provide a destination restaurant on the Property."

- Z Capital would "include a cardio gym (or such other amenity to be mutually agreed by Z Capital and the Associations), for the exclusive use of the residents of those towers whose Associations elect to participate in such amenity" in the Ocean Studio.

- Z Capital would "evaluate guest daily and overnight parking rates and discounts relative to comparable properties and adjust accordingly."

- Z Capital would rename the North Tower.

23.    As described more fully below and in the Adversary Complaint, Z Capital has breached each and every one of these contractual commitments.

## D. Approval Of Sale And Closing Of Bankruptcy Cases

24.     On November 26, 2014, two days after NCBCA executed the North Tower Contract with Z Capital, this Court entered the Sale Order.  The Sale Order noted that "Approval of the North Tower [contract] … as part of the Court's approval of the Sale is a condition of the North Tower [contract] …."[15]  The Sale Order expressly approved both the North Tower and South/Central Tower Contracts.[16]

25.     On January 14, 2015, Z Capital closed on the sale of the Debtors' assets.[17]  Less than 4 months later, Ms. Halperin joined Z Capital as a managing director.

## E. Z Capital's Management Of The Property Post-Acquisition

26.     Today, instead of being run as a "premier, luxury flag" led by Breene and Zecha — and indeed instead of even being run by the original operator, Canyon Ranch, whom Z Capital promised to retain if feasible — the hotel and spa facilities at the Property are being operated by Z Capital alone.  There is no promised joint venture involving Zecha or Breene and, apparently, there never was.

27.     This unilaterally imposed arrangement provides none of the "talents, experience and resources of the owners and operators of some of the finest resorts and residences" that Z Capital promised,[18] but confers significant savings on Z Capital, at a major loss of branding and quality to Unit Owners.  Meanwhile, Z Capital has breached numerous other promises that it made when it needed the Unit Owners' support, at the expense of the Property's once-exclusive brand.  Most importantly, Z Capital has breached their promise to maintain the Property as the "ethos of health and wellness" at a level similar to that of the Acqualina Resort & Spa on the

---

[15]  See Sale Order at ¶ Y.
[16]  See Sale Order at ¶ 2.
[17]  See Notice of Sale Closing [Docket No. 246].
[18]  See Sept. 29 Letter at 2.

Beach in Sunny Isles Beach, St. Regis Bal Harbour Resort and the Ritz-Carlton in Fort Lauderdale. As a result, in a Miami Beach market that is otherwise booming, Unit Owners have seen their property values fall precipitously as the exclusive lifestyle for which they purchased their units has been eroded away, while hotel rates plummeted to the point that hotel room promotions, along with spa treatments and food and beverage deals, were offered on deep-discount websites.

28. Moreover, Z Capital has directly benefited from the reduced value of units at the Property having itself purchased no less than 43 units at depressed prices in the Central Tower.

**F. Summary Of Claims And Causes Of Action Against Z Capital**

### a. Z Capital Fraudulently Induced NCBCA To Consent To The Sale And Enter Into The North Tower Contract

29. As set forth in the Adversary Complaint, Z Capital implemented a fraudulent scheme by which it intentionally defrauded NCBCA and its Unit Owners by making certain false and misleading representations which induced NCBCA and its Unit Owners (and, induced the other condominium associations as well) to enter into a North Tower Contract and to support Z Capital's bid to purchase the property. These representations included, but were not limited to:

- That on September 29, 2014, Z Capital had "***executed an agreement*** … that will create a joint venture with Adrian Zecha, founder of Amanresorts and GHM Ltd, and Jonathan Breene, developer and creator of The Setai, South Beach, to launch a new luxury hotel flag, with the Property as its flagship property." (emphasis added). According to Z Capital, "[t]he Carillon Hotel and Spa will be the first project of the joint venture, which is expected to create a premier, luxury flag with exclusive, unique locations around the world." Z Capital even made these representations in a letter submitted to the Bankruptcy Court submitted through its restructuring counsel.

- The residences, Spa, restaurant, and bar would be run by a joint venture agreement between Z Capital and Jonathan Breene and Adrian Zecha, and Breene and Zecha would have substantial participation in the running, developing, and re-branding of the Property.

- The Property would be rebranded as the *Talai*, "a new brand Adrian Zecha developed with you in mind … which will embody the ethos of service, health, and wellness at luxury properties around the world. Your property will be the flagship to showcase all that we have in mind."

- The Property would continue to be run with the integral focus on health, wellness and a luxurious lifestyle.

- Z Capital would "make good faith efforts to negotiate with Canyon Ranch to remain in the spa" or, in the alternative, operate the spa as a joint venture or have the joint venture with Breene and Zecha choose an appropriate third-party operator and re-brand the Spa accordingly.

- The joint venture with Breene and Zecha would ensure that "spa services, health and wellness offerings, and fitness classes consistent with previous offerings" would be provided.

- Z Capital would ensure that "[t]he Hotel Lot and the exteriors and interiors of the North Tower … would be operated to a level of service equivalent or comparable to the A[c]qualina in Sunny Isles Beach, St. Regis in Bal Harbour and the Ritz-Carlton in Ft. Lauderdale."

- Z Capital would operate the Property as a "true 5-star property."

30.     These and other related representations were outright lies. As a direct and proximate result of its reliance upon the false representations and omissions of Z Capital, NCBCA (and the Unit Owners) have been damaged and have suffered losses, and continue to be damaged and are entitled to recover their losses. Because of the outrageous nature of Z Capital's willful and wanton conduct, NCBCA (and the Unit Owners) intend to seek punitive damages.

### b.    Breach Of Contract Claims

31.     As set forth in the Adversary Complaint, Z Capital has repeatedly and knowingly breached numerous of its obligations under the North Tower Contract. Z Capital has directly profited from the decline in quality, value, and reputation of the Property by purchasing a large number of condominium units at prices depressed by Z Capital's own wrongdoing. Z Capital purchased 43 units in just 15 months between January 2015 and March 2016—a rate of almost three units per month. These units would have been much more expensive to acquire had Z

Capital brought in the Breene/Zecha flag as promised or otherwise lived up to the high standards that it represented and promised to deliver upon acquiring the Property in bankruptcy.

32.    Z Capital breached the North Tower Contract by grossly failing to meet its obligations, including in the following ways:

- The Property was never operated or re-branded by a joint venture between Z Capital and Adrian Zecha and Jonathan Breene. Even if Z Capital entered into such a joint venture, it never operated the residences, hotel, restaurant, spa, and bar, and—after Canyon Ranch's departure—never chose a third-party operator to do so.

- Z Capital never negotiated in good faith with Canyon Ranch. On January 14, 2015, Canyon Ranch ceased to manage the residences, hotel, spa, and restaurant.

- Z Capital failed to take reasonable efforts to review actual valet parking usage and the current cost allocation for such services and adjust such allocation taking into account usage. Z Capital's only "adjustment" was to begin charging Unit Owners for valet parking more than one vehicle and charging for guest parking.

- Z Capital failed to use commercially reasonable efforts to have a Capital Reserve study performed.

- Z Capital failed to operate the exteriors and interiors of the North Tower to a level of service equivalent or comparable to the A[c]qualina in Sunny Isles Beach, St. Regis in Bal Harbour and the Ritz-Carlton in Ft. Lauderdale, all in Florida. While extensive renovations are planned for the restaurant, bar and other portions of the Central Tower, the interiors and exteriors of the North Tower have been almost completely neglected. For example, temporary signage for the North Tower, installed when Canyon Ranch was terminated, still has not been replaced. Moreover, the Z Capital have not embarked on any work to respond to NCBCA's request for drastically needed flooring replacement in the North Tower lobby— which NCBCA and the North Tower Unit Owners proposed at their own expense. Meanwhile Z Capital is assessing the North Tower Unit Owners for 46% of the cost of extensive renovations to the Central Tower's lobby and hotel reception area improvements, whose primary purpose is the expansion of Z Capital's retail revenues for the hotel bar and restaurant.

- Z Capital has either (a) removed facilities from the use of the unit owners, (b) limited the use of certain facilities or (c) charged any additional amounts for use of certain facilities without having notified NCBCA within one-year of the closing on the acquisition of the Property that continuation of the *status quo* was "unreasonable and impracticable." For instance, (1) Z Capital unilaterally removed parking spaces that were previously dedicated to use by the North Tower and dedicated them instead to the exclusive use by the new Retail Lot Owner and

(2) Z Capital recently announced plans to convert an area that is currently part of the Shared Facilities for use in a bar, entertainment area, and related retail operations for the Hotel Lot Owner.

- Z Capital failed to establish a Unit Owner Selection Committee to invite, review and extend offers for prospective spa members. Although such a committee was proposed, Z Capital explained that any such committee would not be entitled approve prospective members, and Z Capital failed to provide membership applications prior to approving prospective members.

- Although Z Capital was able to structure the sale in a way that reduced the purchase price by $3 million in exchange for agreeing to perform stucco repairs, although Z Capital plans to repair the stucco for substantially less than $3 million. Z Capital has not applied the savings from the stucco repair project (savings that will be realized because Z Capital intends to undertake low-quality repairs) to a reserve for additional capital improvements to the property despite its obligation to apply the first $3.5 million of any purchase price reduction to capital improvements to the Property.

- Z Capital did not use its reasonable best efforts to provide a destination restaurant on the Property.

- No exclusive cardio gym for the Ocean Studio was ever provided or even offered.

- Z Capital did not evaluate guest daily and overnight parking rates and discounts relative to comparable properties and adjust accordingly.

- Z Capital did not rename the North Tower.

33.     The Unit Owners have suffered and continue to suffer substantial damages due to Z Capital's actions. These damages are described more fully in the Adversary Complaint, but include significantly diminished property values, and expensive assessments and fees related to services Z Capital promised, but failed, to deliver.

### c.     Z Capital Has Repeatedly and Egregiously Violated The Florida Condominium And Homeowners Association Laws And The Master Declaration

34.     NCBCA seeks relief from Z Capital's attempt to wield exclusive and unrestricted control over essentially every part of the Property not physically encompassed within an individual Unit Owner's unit, including the lobbies for getting in and out of each condominium

building, the valet used for parking by North Tower Unit Owners and their guests, and the pools within the various condominium buildings.

35.     Despite the protections afforded to unit owners under Florida law, since acquiring the property, Z Capital has continually deprived NCBCA and the Unit Owners of any vote, input, and other rights whatsoever relating to the operation, management, or maintenance of most of the property that makes up the community where they live.  In fact, Z Capital has failed to relinquish control of the Master Association to the non-developer members as expressly required under both the Master Declaration and the Florida Homeowners' Association Act.  Z Capital has also failed to dedicate and convey what are or should be the common areas of their community, or to provide any financial transparency or accountability for the budgets related to this property as required.

36.     Yet while Z Capital has deprived NCBCA and the Unit Owners of the control that would ordinarily be part of a condominium governance structure, they have been charging Unit Owners the full costs of maintaining the facilities that Z Capital purports to own exclusively, including areas that largely serve hotel guests. Z Capital has imposed these unlawful assessments repeatedly, on a continual basis, since acquiring the Property.  These egregious abuses are exemplified by Z Capital's current plan to renovate portions of the Property, in an attempt to dramatically change the nature of the Carillon—and charge the Unit Owners for much of the costs—without holding any vote or even making available the financial books and records supporting the assessments.

37.     Z Capital's abuses violate the Florida Condominium Act and Homeowners' Association Act, under which NCBCA and the Unit Owners are entitled to a form of democratic control over their common facilities and common expenses.

<u>**ARGUMENT**</u>

38.     Section 350(b) of the Bankruptcy Code provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b).  Bankruptcy Rule 5010, which implements section 350(b) of the Bankruptcy Code, further provides that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the [Bankruptcy] Code."  Fed. R. Bankr. P. 5010.

39.     While the Bankruptcy Code does not define "other cause" or specify the type of "relief" sufficient to justify reopening a case, courts in the Southern District of New York ordinarily consider: (1) the length of time that the case was closed (the longer the time period, the less likely reopening a case is justified),[19] (2) whether a nonbankruptcy forum has jurisdiction to determine the issue which is the basis for reopening the case, (3) whether prior litigation in the bankruptcy court determined that a state court would be the appropriate forum, (4) whether any parties would suffer prejudice should the court grant or deny the motion to reopen, (5) the extent of the benefit by reopening, and (6) whether it is clear at the outset that no relief would be forthcoming by granting the motion to reopen. <u>See</u> <u>In re PlusFunds Grp., Inc.</u>, 492 B.R. 202, 209-10 (Bankr. S.D.N.Y. 2013) (<u>citing</u> <u>In re Easley-Brooks</u>, 487 B.R. 400, 407 (Bankr. S.D.N.Y. 2013)) <u>aff'd.</u> 505 B.R. 419 (S.D.N.Y. 2014) <u>vacated and remanded sub nom</u>. <u>In re PlusFunds Grp., Inc.</u>, 589 F. App'x 41 (2d Cir. 2015).

---

[19] <u>See, e.g.</u>, <u>Citizens Bank & Tr. Co. v. Case (In re Case)</u>, 937 F.2d 1014, 1018 (5th Cir. 1991) ("The longer the time between closing of the estate and the motion to reopen . . . the more compelling the reason for reopening should be."); <u>In re Arana</u>, 456 B.R. 161, 175 (Bankr. E.D.N.Y. 2011) (finding the concern of the difficulty of locating creditors to be outweighed by the potential benefit to thirty creditors with a total of $112,862.83 in claims); <u>In re Lowery</u>, 398 B.R. 512, 516 (Bankr. E.D.N.Y. 2008) (finding the potential benefit to creditors insufficient to reopen when there were four creditors with aggregate claims of $13,249.90 and ten to fourteen years had passed from the time the claims was incurred).

40. Applying the above six factors, cause exists to justify reopening the chapter 11 cases.[20]

41. ***First*** *(Length of Time Between Case Closure and Motion to Reopen)*, less than ten months have passed since the Court's entry of the Final Decree. Those instances where courts have rejected petitions to reopen cases on timeliness grounds have involved delays of multiple years.[21]

42. ***Second*** *(Jurisdiction)* and **third** *(State Court as More Appropriate Forum)*, this Court expressly reserved exclusive jurisdiction to adjudicate claims similar to those to be asserted in the Adversary Complaint.

43. Paragraph 31 of the Sale Order provides as follows:

> This Court hereby retains exclusive jurisdiction, regardless of whether a chapter 11 plan has been confirmed and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Purchaser in accordance with the terms of the Purchase Agreement, (b) resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof and (c) interpret, implement, and

---

[20] The Court's power to re-open the chapter 11 cases is within its broad discretion. <u>See, e.g.</u>, <u>In re HBLS, L.P.</u>, 468 B.R. 634, 638 (Bankr. S.D.N.Y. 2012) ("Ultimately, the decision to reopen a case is at the broad discretion of the bankruptcy court."); <u>In re Phillips</u>, No. 09-28759/JHW, 2012 WL 1232008, at *3 (Bankr. D.N.J. Apr. 12, 2012) (quoting <u>In re Dimogerodakis</u>, No. 10-004, 20111 WL 1362342, at *4 (D. N.J. Apr. 11, 2011) ("A bankruptcy court exercises broad discretion in deciding whether to reopen a case"); <u>In re Palij</u>, 202 B.R. 27, 30 (Bankr. D.N.J. 1996) (quoting <u>In re Shondel</u>, 950 F.2d 1301, 1304 (7th Cir. 1991) ("In exercising its discretion to reopen a case, the bankruptcy court should exercise its equitable powers with respect to substance and not technical considerations that will prevent substantial injustice.").

[21] <u>Compare</u> <u>Lowery</u>, 398 B.R. at 516 (ten to fourteen years); <u>with</u> <u>Case</u>. 937 F.2d at 1018 (granting motion to re-open where two months had passed), <u>and</u> <u>Reid v. Richardson</u>, 304 F.2d 351, 355 (4th Cir. 1962) (granting motion to re- open where ten months had passed noting that the "lapse of time [wa]s . . . short"). <u>See also</u> <u>Order Reopening Cases, Amending Trust Agreement and Closing Cases, In re eLot, Inc. and eLotery, Inc.</u>, Case Nos. 01-15327, 01-15328 (ALG) (Bankr. S.D.N.Y. Dec. 17, 2009) [Docket No. 245] (granting a fourth order to re-open cases that successively had been closed and re-opened in one-year or more intervals between 2004 and 2009).

enforce the provisions of this Sale Order and resolve any disputes related thereto.

44. Accordingly, in the event the Court has exclusive jurisdiction over the Claims asserted in the Adversary Complaint, any non-bankruptcy forum may lack jurisdiction unless the Court decides to abstain. Cf. In re HBLS, L.P., 468 B.R. 634, 640 (Bankr. S.D.N.Y. 2012) (denying motion to reopen where alternative state court forum existed to pursue relief).

45. **Fourth** *(Prejudice to Parties from Granting Motion)* and **fifth** *(Benefits Gained from Granting Motion)*, no parties will suffer prejudice by virtue of the Court granting NCBCA's Motion to reopen the chapter 11 cases. The Sale Order arguably vests this Court with exclusive jurisdiction to hear disputes arising out of the Purchase Agreement and the North Tower Contract, a factor already relied upon by Z Capital in the Z Capital Motion to Dismiss. Consequently, NCBCA would be prejudiced by a failure to reopen the Debtors' chapter 11 cases, because it may then lack access to a forum with the jurisdiction to hear its claims.

46. **Finally** *(Availability of Relief)*, NCBCA would obviously benefit from reopening these chapter 11 cases so as to have its claims heard and adjudicated, either by this Court or by the Florida state court. Finally, for the reasons stated in the attached Adversary Complaint and outlined above, it seems apparent that some form of relief would be forthcoming to NCBCA if these chapter 11 cases are reopened. Thus, an order reopening the chapter 11 cases is necessary in order for the Court either to hear the claims or, ultimately, to abstain from hearing them and permit the parties to move forward in a Florida state court.

47. Also, as noted earlier, NCBCA believes that many, if not all, of its claims against Z Capital may more properly be brought before a state court in Florida, where related actions are already pending. Accordingly, upon reopening these chapter 11 cases and the commencement of the Adversary Proceeding, NCBCA intends seek a determination as to whether this Court should

adjudicate the claims outlined herein or, alternatively, whether this Court should abstain, in whole or in part, in favor of the Florida state courts.

48.　　For all these reasons, NCBCA therefore respectfully requests that this Court reopen the chapter 11 cases in order to either hear the claims asserted in the Adversary Complaint or abstain from doing so with regard to some or all of the counts outlined therein.

## NO PRIOR REQUEST

49.　　No prior motion for the relief requested herein has been made to this Court or any other court.

## NOTICE

50.　　Notice of this Motion has been given to: (a) Togut, Segal & Segal, One Penn Plaza, Suite 3335, New York, NY 10119, Attn: Frank A. Oswald, Esq., as former counsel for the Debtors; (b) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Susan D. Golden, Esq.; (c) Akerman LLP, Attn: Scott W. Rostock, Esq., Three Brickell City Centre, 98 SE 7th Street, Suite 1100, Miami, FL 33131 and Colson Hicks Eidson Gonzalez Martinez Kalbac & Kane, Attn: Ervin A. Gonzalez, Esq., 255 Alhambra Circle, PH, Coral Gables, FL 33134, counsel to Z Capital, and (d) the parties on the service list attached hereto as <u>Exhibit H</u>.  NCBCA respectfully submits that no other or further notice need be given under the circumstances.

## CONCLUSION

**WHEREFORE**, NCBCA respectfully requests that the Court enter an Order (i) reopening these chapter 11 cases to permit NCBCA to commence the Adversary Proceeding, and (ii) granting such other and further relief to NCBCA as the Court may deem just and proper.

Dated: New York, New York
      August 11, 2016

Respectfully submitted,

**NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.**

By its counsel,
BROWN RUDNICK LLP

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner
Bennett S. Silverberg
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and –

BOIES, SCHILLER & FLEXNER LLP
Sigrid S. McCawley
Carl Goldfarb
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

62532062