MILBANK, TWEED, HADLEY &
M<sup>c</sup>CLOY LLP
Andrew M. Leblanc
David S. Cohen
Erin M. Culbertson (*pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone:  (202) 835-7500

*Counsel to Defendants Z Capital
Partners, LLC and Z Capital Florida
Resort, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FL 6801 SPIRITS LLC, *et al.*, | ) | Case No. 14-11691 (SCC) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
| | ) | Ref. ECF No. 364 |

## <u>RESPONSE OF Z CAPITAL PARTNERS, LLC AND Z CAPITAL FLORIDA RESORT, LLC TO NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC.'S MOTION TO REOPEN THESE CHAPTER 11 CASES</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 2

FACTUAL BACKGROUND ................................................................................. 7

    The Property.................................................................................................... 7

    The Commencement of the Debtors' Bankruptcy Proceedings.......................... 8

    The Auction of the Property ............................................................................ 9

    Post-Auction Negotiations .............................................................................. 12

    The Sale Order ............................................................................................... 16

    Current Litigations ......................................................................................... 19

ARGUMENT ..................................................................................................... 21

I.     The Pre-Closing Claims and Declaration Claims Are Precluded by the Court's Sale Order, Making Reopening the Chapter 11 Cases to Litigate Such Claims Futile. ........... 24

    a.     The Sale Order is a Final Judgment by a Court of Competent Jurisdiction. ........ 25

    b.     The Bankruptcy Proceedings Involved the Same Parties that Would Be Involved in an Adversary Proceeding.................................................. 27

    c.     The Pre-Closing Claims Are Expressly Precluded by the Sale Order Because They Were Expressly Decided by this Court in the Sale Order. .......................... 27

    d.     The Declaration Claims Were or Should Have Been Litigated in the Bankruptcy Proceedings and Are Subject to the Doctrine of *Res Judicata*.......... 30

II.    The Court Should Abstain from Exercising its Jurisdiction To Litigate the Post-Closing Claims, Which Could Equally and Efficiently Be Decided by Another Court... 34

    a.     The Sale Order Was Entered Nearly Two Years Ago, and the Case Was Closed Nearly One Year Ago. .............................................................. 35

    b.     Reopening Would Not Benefit the Debtors' Estates. ........................................ 35

    c.     Reopening Would Be Futile Because the North Tower Association Has Not Asserted Claims For Which Relief Would Be Granted. ...................................... 36

    d.     A Non-Bankruptcy Court is an Alternative and Adequate Forum. ..................... 38

CONCLUSION ................................................................................................... 39

**Page(s)**

**Cases**

Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust),
    634 F.3d 678 (2d Cir. 2011)................................................................................25, 33

Bank of Lafayette v. Baudoin (In re Badouin),
    981 F.2d 736 (5th Cir. 1993) ...................................................................................26

Bronson v. CHC Indus. (In re CHC Indust.),
    389 B.R. 767 (Bankr. M.D. Fla. 2007) ...................................................................30

Cho v. Seventh Ave. Fine Foods Corp.,
    No. 11 Civ. 3436 (KPF), 2016 WL 1717214 (S.D.N.Y. Apr. 28, 2016)..................26

Corbett v. MacDonald Moving Servs., Inc.,
    124 F.3d 82 (2d Cir. 1997)................................................................................25, 26

Culp v. Stanzialie (In re Culp),
    550 B.R. 683 (D. Del. 2015)....................................................................................26

In re Easley-Brooks,
    487 B.R. 400 (Bankr. S.D.N.Y. 2013) ...............................................................22, 37

Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),
    15-2844-bk(L), 2016 WL 3766237 (2d Cir. July 13, 2016) ....................................25

In re Farmland Indust., Inc.,
    376 B.R. 718 (Bankr. W.D. Mo. 2007),
    aff'd, 639 F.3d 402 (8th Cir. 2011)....................................................................30, 36

Freedom, N.Y., Inc. v. United States,
    438 F. Supp. 2d 457 (S.D.N.Y. 2006)......................................................................27

In re HBLS, L.P.,
    468 B.R. 634 (Bankr. S.D.N.Y. 2012)................................................................22, 23

Lawrence v. Wink (In re Lawrence),
    293 F.3d 615 (2d Cir. 2002).....................................................................................26

In re Met-L-Wood Corp.,
    861 F.2d 1012 (7th Cir. 1988) ......................................................................27, 30, 36

In re Neil's Mazel, Inc.,
    492 B.R. 620 (Bankr. E.D.N.Y. 2013)......................................................................36

Prime Healthcare Servs. v. Hudson (In re Christ Hosp.),
    502 B.R. 158 (Bankr. D.N.J. 2013),
    aff'd sub nom. In re Christ Hosp., No. 14-472 (ES), 2014 WL 4613316
    (D.N.J. Sept. 12, 2014) .................................................................................................29, 30

State Bank of India v. Chalasani (In re Chalasani),
    92 F.3d 1300 (2d Cir. 1996).......................................................................................22

Stern v. Marshall,
    564 U.S. 462 (2011)....................................................................................................40

Sure-Snap Corp. v. State Street Bank & Trust Co.,
    948 F.2d 869 (2d Cir. 1991).................................................................................34, 35

In re Wilson,
    492 B.R. 691 (Bankr. S.D.N.Y. 2013) .......................................................................23

Winget v. JP Morgan Chase Bank, N.A.,
    537 F.3d 565 (6th Cir. 2008) ................................................................................26, 34

**Statutes and Rules**

11 U.S.C. § 105...............................................................................................12, 18, 19

11 U.S.C. § 350.........................................................................................5, 22, 23, 36

11 U.S.C. § 363.................................................................................................. passim

11 U.S.C. § 362.......................................................................................................12

28 U.S.C. § 1334......................................................................................................12

Fed. R. Bank. P. 9024 ..............................................................................................27

Fed. R. Bankr. P. 5010 .............................................................................................22

Fed. R. Civ. P. 60 .....................................................................................................27

Local Bankruptcy Rule 1007-2 ...................................................................................7

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Z Capital Partners, LLC and Z Capital Florida Resort, LLC (collectively, "Z Capital") submit this Response to the *Motion of North Carillon Beach Condominium Association, Inc. for Entry of an Order Reopening These Chapter 11 Cases Pursuant to Bankruptcy Code Section 350, Rule 5010 of the Federal Rules of Bankruptcy Procedure and Rule 5010-1 of the Local Bankruptcy Rules*, ECF No. 364, (the "Motion to Reopen" or the "Motion").

## PRELIMINARY STATEMENT

1.      Nearly two years ago, after Z Capital purchased a significant part of the Carillon Hotel & Spa (the "Carillon"), a luxury oceanfront condominium development formerly known as Canyon Ranch Hotel & Spa and located in Miami Beach, Florida, movant North Carillon Beach Condominium Association, Inc. (the "North Tower Association") now asks this Court to reopen these chapter 11 cases to effectively unwind the Sale.[1]  This Court should decline to reopen the chapter 11 cases, while, at the same time, affirming that re-litigation of issues already decided by this Court is both untimely and barred by *res judicata*.

2.      Z Capital purchased the Carillon for $21.4 million from the Debtors in an auction and sale that were both approved by this Court pursuant to section 363 of the Bankruptcy Code (the "Sale").  From the beginning of these cases, the North Tower Association, and the related Central Carillon Beach Condominium Association, Inc. (the "Central Tower Association") and the South Carillon Beach Condominium Association, Inc. (the "South Tower Association," and together, with the North Tower Association and the Central Tower Association, the

---

[1]      Undefined terms shall have the definitions ascribed to them in the Motion to Reopen or in the body of this Response.

"Associations"), were active participants in these proceedings, acting on behalf of the condominium owners (the "Unit Owners") in their respective towers at the Carillon. The Associations ultimately agreed to the Sale to Z Capital, and these cases were closed on October 23, 2015.

3.     Throughout the Sale process, from approval of the Bidding Procedures to the auction and final Sale Hearing, each specifically approved by this Court, the Associations were represented by sophisticated counsel (indeed, in large part the same counsel representing them today) and had ample opportunity to object or otherwise provide input with respect to the Sale. And the Associations took full advantage of this opportunity. In connection with the auction and sale of the Debtors' interests in the Carillon, the Associations' objections largely focused on two items. *First*, the Associations attempted, improperly, to redefine the scope of rights granted to the Property's owner and successors under the Property's governing documents. *Second*, the Associations also wanted to maintain the exclusive luxury status of the Carillon—a goal that was, and still is, shared by Z Capital.

4.     Thus, despite the fact that Z Capital was the Successful Bidder at the auction, the Debtors delayed the final Sale Hearing by three months to work with Z Capital and the Associations in an attempt to reach a consensus regarding the future of the Carillon among all interested parties. Although it required significant time and effort on behalf of all involved, that process proved to be a success. Specifically, after months of negotiations, Z Capital and the Associations finally reached agreements that were memorialized in the North Tower Term Sheet and the South/Central Term Sheet. Satisfied that Z Capital had significant financial and operational resources to improve the financial performance and elevate the level of service of the Carillon, the Associations ultimately withdrew their objections and consented to this Court's

entry on November 26, 2014 of the *Order (I) Approving Sale of Debtors' Property; (II) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [ECF No. 218] (the "Sale Order"). Among other things, the Sale Order approved the Term Sheets, confirmed the rights granted to the Property owner under the Carillon's governing documents, and authorized the Debtors' entry into a Purchase and Sale Agreement pursuant to which the Debtors sold the Property to Z Capital, a good faith purchaser. See id. at ¶¶ V, 8, 33. Thereafter, on May 20, 2015, the Court entered an order confirming the *Liquidating Plan of FL 6801 Spirits LLC and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* [ECF No. 330], and a final decree and order designating these chapter 11 cases closed as of September 30, 2015 [ECF No. 361].

5.      May 6, 2016—nearly two years after the entry of the Sale Order, one year after the Liquidating Plan was confirmed, and more than six months after the cases were formally closed—the Central Tower Association commenced an action against Z Capital in a Florida state court impermissibly attacking this Court's Sale Order and Z Capital's purchase of the Property by challenging, *inter alia*, Z Capital's rights under the Carillon's governing documents, the Purchase Agreement, and the Term Sheets. Though named only as a "nominal" defendant in that action, the North Tower Association has been an active participant.

6.      Z Capital filed a motion to dismiss the Central Tower Association's case because, among other things, this Court retained exclusive jurisdiction over the claims, most of which are certain to be barred by principles of collateral estoppel and *res judicata*. Subsequently, on August 11, 2016, the North Tower Association filed this Motion to Reopen (which motion the Central Tower Association has indicated it intends to join), seeking authority to file a proposed complaint against Z Capital "similar to" the Central Tower Association's complaint.

7.      Pursuant to section 350(b) of the Bankruptcy Code, the Court has broad discretion in determining whether to reopen a bankruptcy case.  In deciding whether and how to exercise that discretion, courts consider several elements in deciding whether to reopen, including the passage of time, whether a non-bankruptcy forum is appropriate and has jurisdiction, the corresponding benefit and harm of reopening, and whether it is clear that no relief would be forthcoming by granting the motion to reopen.

8.      Applying those considerations here, the Court should exercise the discretion afforded to it by section 350(b) of the Bankruptcy Code, and decline to reopen the chapter 11 cases.  At the same time, however, the Court should make clear that re-litigation of issues it has already decided is barred by *res judicata*, and that the period of time to challenge the Sale Order has long-since expired.

9.      ***First***, certain of the claims that the North Tower Association seeks to assert in an Adversary Proceeding—purported pre-closing actions (the "Pre-Closing Claims")[2] and claims relating to Z Capital's rights in the Property (the "Declaration Claims")[3]—are precluded by this Court's findings in the Sale Order because such claims already were or should have been heard during the bankruptcy proceedings.  Specifically, almost two years ago, this Court confirmed that Z Capital was a good faith purchaser.  See Sale Order at ¶ L.  Moreover, in approving the Sale free and clear to Z Capital, this Court confirmed Z Capital's delineated rights under the Carillon's governing documents to manage and operate the Property.  See Sale Order at ¶¶ U, V. Now, however, the Associations attempt to collaterally attack this Court's Sale Order.  Contrary

---

[2]      Claim 1 (Fraudulent Inducement), Claim 2 (Negligent Misrepresentation), Claim 6 (Florida Deceptive and Unfair Trade Practices Act), and Claim 13 (Declaratory Judgment as to Majority Members of the Board of Directors and Member Voting Rights on the Master Association).

[3]      Claim 9 (Declaratory Judgment as to Common Areas Belonging to the North Tower), Claim 10 (Unfairness and Unreasonableness under Chapter 718), Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association), Claim 12 (Unfairness and Unreasonableness under Chapter 720), and Claim 14 (Injunctive relief and Declaratory Judgment as to Planned Renovations and Improvements).

to this Court's express findings, they have alleged that Z Capital was not a good faith purchaser and that Z Capital's rights to manage and operate the Property as Hotel Lot Owner somehow violate Florida law. This Court specifically retained exclusive jurisdiction to determine the effect of its own orders, and need not reopen these chapter 11 cases to conclusively determine, as it should, that the Pre-Closing and Declaration Claims are collaterally estopped by the Sale Order. Z Capital does not, however, oppose reopening these cases, if this Court determines reopening necessary as a prerequisite to entering an order affirming the *res judicata* effect of its prior findings and decisions.

10. ***Second***, the North Tower Association has made numerous allegations in its proposed complaint concerning Z Capital's post-closing operation and management of the Carillon (the "Post-Closing Claims")[4]—claims that have nothing to do with the propriety of the Sale or enforcement of this Court's orders. This Court retained exclusive jurisdiction to address such claims, but, on balance, multiple 350(b) elements—such as the passage of time, the absence of any benefit to the Debtors, the futility of claims asserted in the Adversary Proceeding complaint, and the availability of an alternative forum—weigh against reopening these chapter 11 cases to litigate the Post-Closing Claims.

11. Z Capital respectfully requests that this Court (1) affirm the *res judicata* effect of its Sale Order in precluding the Pre-Closing Claims and Declaration Claims; (2) deny the Motion to Reopen; and (3) abstain from exercising its jurisdiction to hear the Post-Closing Claims.[5]

---

[4] Claim 3 (Breach of North Tower Term Sheet), Claim 4 (Breach of Implied Covenant of Good Faith and Fair Dealing – North Tower Term Sheet), Claim 5 (Unjust Enrichment), Claim 7 (Breach of Covenants – Master Declaration), Claim 8 (Breach of Implied Covenant of Good Faith and Fair Dealing – Master Declaration).

[5] The Court retained exclusive jurisdiction over the Post-Closing Claims, and Z Capital is prepared to defend itself in this Court if it decides to grant the Motion to Reopen. If, however, the Court exercises its discretion and denies the Motion to Reopen, Z Capital is prepared to defend its actions against the North Tower Association's allegations, in either the pending Central Tower Association action in Florida state court or whatever proper forum the North Tower Association selects.

## FACTUAL BACKGROUND

### *The Property*

12.     The Carillon was developed as a mixed-used project comprised of 580 condominium units,[6] spanning across three towers, with hotel and spa amenities and facilities, consisting of:  (a) a combination hotel (the "Hotel Lot"), retail component (the "Retail Lot"), residential condominium building and spa in the central portion of the property (the "Central Tower"); (b) a residential condominium building on the south portion of the property (the "South Tower"); and (c) the North Tower (together with the Central Tower and South Tower, the "Condo Towers").  See Barsanti Decl. at ¶ 26.  The Hotel Lot and Retail Lot were previously owned by Debtor FL 6801 Collins Central LLC ("6801 Central").   Debtors FL 6801 Collins North LLC ("6801 North") and FL 6801 Collins South LLC ("6801 South," and collectively with 6801 North and 6801 Central, the "Collins Subsidiaries")[7] owned thirteen residential units in the North, South, and Central Towers (together with the Hotel and Retail Lots, the "Property").  See id. at ¶ 34.

13.     The Carillon is governed by the Declaration of Covenants, Restrictions and Easements for Carillon Hotel and Spa (the "Master Declaration"), as well as the Declarations for each of the North Tower, the South Tower, and the Central Tower (collectively, the "Tower Declarations," and together with the Master Declaration, the "Declarations").[8]  See id. at ¶ 27. The Master Declaration, which has been in effect since December 3, 2007 (as amended from

---

[6]     Of the 580 total condominium units on the property, 150 units are "hotel units" and 430 units are standard "residential units."  See *Decl. of Anthony Barsanti Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Mots.* at ¶ 26, June 1, 2014 [ECF No. 2] (hereinafter "Barsanti Decl.").

[7]     The Debtors are various indirect, wholly-owned subsidiaries of Lehman Brothers Holdings Inc. ("Lehman"):  Lehman Ali Inc. was the sole member of PAMI ALI LLC ("PAMI"), the manager and sole member of Debtor FL 6801 Spirits LLC ("Spirits"), the manager and sole member of the Collins Subsidiaries.

[8]     Each Tower Declaration incorporates and is subordinated to the Master Declaration.

time to time and subject to this Court's findings in the Sale Order), governs the relationships between the Hotel Lot Owner, the Retail Lot Owner, the Associations, and the Unit Owners. The Master Declaration, among other things: (a) vests Z Capital, as the Hotel Lot Owner with broad control over all of the facilities necessary to operate, maintain and manage the hotel, common areas and operations, including services in the spa, the private health and wellness facilities, the salon, parking facilities and retail space; and (b) provides for the sharing of certain costs for shared Property components among the condominium unit owners with a cost sharing mechanism based upon applicable used and benefits. See id. at ¶¶ 28-29.

***The Commencement of the Debtors' Bankruptcy Proceedings***

14. From their acquisition of the Property in 2009, the Collins Subsidiaries consistently faced operating losses. In light of those losses, in 2013 they began pursuing a sale of the Property. See id. at ¶¶ 7-8. Shortly thereafter, in February 2014, the Associations each brought actions in Florida state court (the "Florida Lawsuits"), seeking declaratory judgments against the Collins Subsidiaries in an effort to encumber, define, and limit the rights afforded to the Hotel Lot Owner under the Declarations, including the right to control access to and assess charges for the spa and shared facilities. See id. at ¶¶ 10-11, 17. Because the Florida Lawsuits sought to limit the owner's rights in the Property, the Debtors believed that the Florida Lawsuits chilled a potential sale of the Property. See id. at ¶ 54.

15. In 2014, faced with the anticipation of continued, if not escalating, operating losses as the Property entered its slow summer season, the Collins Subsidiaries began contemplating filing a bankruptcy petition, including a potential sale of the Property under section 363 of the Bankruptcy Code. See id. at ¶¶ 14, 57. In May 2014, before the Collins Subsidiaries actually filed their chapter 11 petitions, they received an offer of $12 million for the

Property from 360 Miami Hotel and Spa LLC, free and clear of liens and encumbrances pursuant to section 363 of the Bankruptcy Code—including a favorable resolution of the Florida Lawsuits through express findings by this Court confirming the Debtors' rights under the Declarations— subject to higher or better offers and Bankruptcy Court approval (the "Stalking Horse Bid"). See id. at ¶ 15, 57.

16. On June 1, 2014, the Debtors also filed their Chapter 11 petitions. *Voluntary Petition for FL 6801 Sprits LLC (Chapter 11)*, June 1, 2014 [ECF No. 1]. The Debtors made clear in their first-day filings that they intended to pursue and consummate a sale of the Property through an expedited and streamlined process to minimize the incurrence of further losses and to maximize recoveries for the Debtors' estates. See Barsanti Decl. at ¶ 21.

***The Auction of the Property***

17. On June 1, 2014, the same day they filed their chapter 11 petitions, the Debtors filed a Motion for an Order approving, among other things, bidding procedures regarding the Debtors' Sale of the Property, and the Sale free and clear of liens, claims, encumbrances, and other interests (the "Sale Motion and Proposed Bidding Procedures"). *Debtors' (I) Ex Parte Application for an Order Scheduling a Hearing to Consider, Among Other Things, Bidding Procedures and (II) Motion for (A) an Order Approving, Among Other Things, (i) Bidding Procedures Regarding the Debtors' Sale of Property, Subject to Higher or Better Offers and Bankruptcy Court Approval, (ii) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (iii) a Break-up Fee, (B) an Order (i) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contrast, and (C) Related Relief*, June 1, 2014 [ECF No. 4]. In addition to approving procedures to govern the auction and sale process, the Debtors specifically

requested that the Court include findings in the sale order confirming the Debtors' broad rights under the Declarations.  See, e.g., id. at ¶ 89 ("[T]he Debtors submit that it is necessary for this Court to make findings in the Sale Order confirming the Debtors' rights under the Declarations—thereby nullifying the Associations' attempts to limit a Hotel Lot Owner's rights with respect to the Property—in order to maximize the value of the Property and to successfully facilitate the Proposed Sale.").  This express finding was needed to resolve the Florida Lawsuits and define precisely what the Debtors were selling.

18.     On June 19, 2014, the Associations objected to the Sale Motion and Proposed Bidding Procedures, arguing, among other things, that (1) the relief requested in the Sale Motion was procedurally improper, (2) the Court should abstain from determining property rights under the Declarations affecting the Property as such determinations were non-core matters, and (3) the proposed Bidding Procedures were unreasonable and provided anti-competitive advantages to the Stalking Horse Bid.  See *Associations' Obj. to Debtors' Sale Mot. and Proposed Bidding Procedures*, June 19, 2014 [ECF No. 52].

19.     On July 1, 2014, after considering and hearing the Associations' Objections, see id., and the Debtors' response thereto, see *Debtors' Resp. to Associations' Obj. to Debtors' Sale Mot. and Proposed Bidding Procedures*, June 26, 2014 [ECF No. 71], the Court approved the Debtors' proposed Bidding Procedures.  See *Order (A) Approving (i) Bidding Procedures, (ii) Form and Manner of Notices, and (iii) Form of Asset Purchase Agreement, Including Bid Protections; (B) Scheduling the Time, Date and Place for the Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*, July 1, 2014 [ECF No. 77] (the "Bidding Procedures Order"); see also *Tr. of Hr'g re: Debtors' Sale Mot. and Proposed Bidding Procedures*, June 30, 2014 [ECF

No. 139]. The Court agreed to schedule a subsequent hearing (the "<u>Final Sale Hearing</u>") to consider whether to grant an order approving the Sale of the Assets free and clear of liens, encumbrances, and other interests. <u>See</u> Bidding Procedures Order at ¶ F.

20. Pursuant to the Bidding Procedures Order, which was designed to ensure a substantively and procedurally fair Sale process, the Property was auctioned on August 19, 2014. <u>See</u> *Notice of Successful Bidder*, Aug. 21, 2014 [ECF No. 113]; <u>see</u> <u>also</u> Sale Order at ¶ E. In addition to participating in the discussion of the Bidding Procedures' approval, the Associations, as parties-in-interest and represented by counsel, also participated in the auction process as observers and consulted with the Debtors throughout. <u>See</u> *Auction Proceedings Tr.*, Aug. 19, 2014 at 29, 37:22-25, 42:3-10, 66:14-17 [ECF No. 134-12]. The auction, which was conducted according to the letter and spirit of the Bidding Procedures, was a success. Significantly, Debtors' counsel explained at the Sale Hearing,

> The auction process was as the Court would want it to be. Forty-five hundred parties were contacted; 193 signed confidentiality agreements. Thirty-one different groups went in to look at the property; fifty people attended the auction. Seven people bid, and it was, as Your Honor noted, an ordinary process.

<u>See</u> *Tr. of Mot. to Sell Property Free and Clear of Liens Under Section 363(f)*, Nov. 24, 2014 at 9:21-10:1 [ECF No. 227] (hereinafter, "<u>Sale Hr'g Tr.</u>").

21. On August 21, 2014, Z Capital was selected as the Successful Bidder and entered into a Purchase and Sale Agreement with the Debtors to purchase the Property for $21.6 million—nearly twice the Stalking Horse Bid. <u>See</u> *Notice of Successful Bidder and Second Highest Bidder*, Aug. 21, 2014 [ECF No. 113]; *Notice of Filing of Purchase and Sale Agreement*, Aug. 26, 2014 [ECF No. 118]. In addition to providing the highest and best offer, the Debtors also determined that Z Capital was well-suited and able to consummate the Sale and fulfill Z

Capital's plans to continue operation of the Property as a luxury hotel and spa. See *Debtors'*
*Reply to the Associations' and 6801 Collins Hotel's Objections to the Sale*, Nov. 10, 2014 at ¶ 58
[ECF No. 134].

***Post-Auction Negotiations***

22.     In the days and weeks following the auction, the Associations (and related
bidders) filed objections challenging certain aspects of the auction, the selection of Z Capital as
the Successful Bidder, and the terms of the proposed sale (collectively, the "Sale Objections").[9]
Specifically, the Associations attempted to challenge Z Capital's ability and commitment to
maintaining the distinctive and exclusive lifestyle of the Carillon. The Associations also took
issue with the fact that the Sale was conditioned on a favorable resolution of the Florida
Lawsuits, which hinged, in the Associations' view, on interpretation of the Declarations and
Florida law best decided by a Florida court. In other words, despite the fact that the bankruptcy
cases were proceeding in this Court, and the auction and ultimate sale were unquestionably
before this Court, the Associations wanted some other court to consider their arguments.[10]

23.     In light of these objections and notwithstanding the fact that Z Capital was the
Successful Bidder, the Debtors, in exercising their fiduciary duty to act in the best interests of
their estates and creditors, continued negotiations with the Associations and the Associations'

---

[9]     See *Associations' Suppl. Obj. To: (I) Conduct Of Auction; (II) Selection Of Successful Bidder And Second*
*Highest Bidder; And (III) Terms of Proposed Sale*, Aug. 26, 2014 [ECF No. 120]; *Obj. of 6801 Collins Hotel LLC to*
*the Debtors' Sale Mot. and Auction*, Aug. 26, 2014 [ECF No. 121]; *Notice of Associations' Mot. For Entry Of An*
*Order: (I) Finding That The Proposed Sale Cannot Be Consummated Free And Clear of the Florida Lawsuits*
*Pursuant To 11 U.S.C. §§ 105 and 363, Or In The Alternative, (II) Abstaining From Adjudicating Declaratory Relief*
*Requested In Florida Lawsuits Pursuant To 28 U.S.C. § 1334 And To Lift the Automatic Stay To Pursue The*
*Declaratory Relief Sought In the Florida Lawsuits Pursuant To 11 U.S.C. § 362*, Sept. 9, 2014 [ECF No. 132].

[10]     This is precisely what is happening yet again in the New Florida Lawsuit (as defined below). The Central
Tower Association commenced its action with the express intent of gaining leverage to compel Z Capital to agree to
significant changes to the governing Declarations. The North Tower Association is a party to and an active
participant in that very action. It was only after Z Capital filed its motion to dismiss and argued that this Court,
which retained exclusive jurisdiction over the claims, had already entered a final, binding judgment precluding most
of the claims, that the North Tower Association saw fit to address its claims in this forum by filing the Motion and
voluminous adversary proceeding complaint. See infra at ¶¶ 36-39.

preferred bidder, which proposed to acquire the Debtors' Property through a plan of reorganization (as an alternative to a 363 sale). See, e.g., *Z Capital's Motion to Compel Debtors to Comply with Bidding Procedures Order*, Oct. 14, 2014 [ECF No. 158]. Because the Associations had differing interests and priorities, however, the "sand kept shifting under [the Debtors] feet." See *Tr. of Status Teleconference*, Oct. 23, 2014 [ECF No. 195] (hereinafter "Oct. 23 Status Conference Tr.") at 6:22.[11] Tellingly, even the North Tower Association's own counsel recognized that getting such a disparate group to agree was like "herding cats." See Sale Hr'g Tr. at 34:3-10, Nov. 24, 2014 [ECF No. 227].

24.     Z Capital attempted to mollify the Associations' concerns, making concessions, and providing additional information regarding how they intended to manage and operate the Property. See, e.g., Oct. 23 Status Conference Tr. at 10:9-14 (MS. MARCUS (Lehman's counsel): "[W]e have no complaints about Z Capital. They have been extraordinarily patient, have made themselves available for meetings with everyone and have demonstrated a willingness to make concessions to reach a consensual deal."); see also *Tr. of Status Teleconference*, Oct. 28, 2014 [ECF No. 340] (hereinafter "Oct. 28, 2014 Hr'g Tr.") at 5:15-21 (MS. MARCUS: "Z Capital has continued to be constructive and we have learned that Z Capital has reached out to unit owners to provide them with more details regarding Z Capital's plan for the properties."); see also Sale Hr'g Tr. at 28:18-23 (THE COURT: "And, by the way, [Z Capital] sat by for weeks, for weeks, while the debtor in the exercise of its fiduciary [duty]

---

[11]     See also Oct 23 Status Conference Tr. at 6:7-22 (MR. TOGUT (Debtors' counsel): "We have given [the Associations] some more time to try to get this done but frankly, from our perspective, we're running out of time because this whole process is extremely costly to the debtor's estate. . . . So far as we can tell, [the Associations are] not in a position to sign documents because there are disagreements within factions of the association. . . . And the sand just keeps shifting under our feet."); see also id. at 9:3-10:2 (MS. MARCUS (Lehman's counsel): "The associations which have repeatedly stated to the Court that they want to control their own destiny have been unable to get to a deal here. . . . So there's no real business reason why we don't have a deal with the associations. The associations—not for lack of trying I might add, simply haven't been able to make it happen.").

conducted those plan discussions with 6801 . . . [a]nd the homeowners. They were good sports").

25. Both Z Capital and the Debtors expended "extraordinary efforts" to try to unify all three Associations, resulting in a three-month delay of the final Sale Hearing. <u>See</u> Sale Hr'g Tr. at 10:15-18; <u>see</u> <u>also</u> *Decl. of Andrei Scrivens In Support of the Debtors' Mot. for an Order (I) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (III) Granting Related Relief* at ¶ 12, Nov. 17, 2014 [ECF No. 199] ("Since being announced the Successful Bidder on August 21, 2014, Z Capital has engaged in good faith negotiations with the Debtors and Associations in an effort to resolve actual and potential objections to the Sale Motion"). During this delay, the Court considered the Objections, as well as responses filed by the Debtors and Z Capital, at multiple hearings.[12] As the Court recognized, it was "frankly offensive" that another bidder would complain about the sale process. <u>See</u> Sale Hr'g Tr. at 3:21-22, 3:23-4:6.

26. Finally, on October 28, 2014, after "extensive deliberation at an hours-long meeting," the South and Central Tower Associations made the "business judgment" to enter into a term sheet with Z Capital (the "<u>South/Central Tower Term Sheet</u>"). <u>See</u> *Letter to Judge Chapman on Behalf of South and Central Associations*, Nov. 4, 2014 [ECF No. 179]. The South/Central Tower Term Sheet memorialized Z Capital's commitment to provide spa services, health and wellness programs, and fitness classes consistent with the current offerings; to negotiate in good faith with Canyon Ranch to remain as spa operator; to cap future assessments; to limit the number of spa memberships; and to agree to a temporary parking arrangement. <u>See</u>

---

[12]     <u>See, e.g.</u>, *Hr'g Tr. re: Status Conference re: Sale Hr'g*, Aug. 27, 2014 [ECF No. 141]; *Debtors' Reply to the Associations' and 6801 Collins Hotel's Objs. to the Sale*, Sept. 10, 2014 [ECF No. 134]; *Tr. of Hr'g re: Status Conference*, Sept. 12, 2014 [ECF No. 147]; *Z Capital's Prelim. Resp. in Support of the Proposed Sale to Successful Bidder in Accordance with Bidding Procedures*, Sept. 16, 2014 [ECF No. 142]; *Tr. of Status Conference*, Oct. 16, 2014 [ECF No. 194]; *Tr. of Status Conference*, Oct. 23, 2016 [ECF No. 195]; and Oct. 28 Hr'g Tr. [ECF No. 340].

*South/Central Term Sheet (Exhibit B to Sale Order)*, Nov. 26, 2014 [ECF No. 218-2]. In exchange for these commitments, and in particular the commitment to attempt to negotiate for Canyon Ranch to remain affiliated with the Property for a period of time, the Central and South Associations agreed to dismiss with prejudice the Florida Lawsuits. See id. On November 6, 2014, the Central and South Tower Associations withdrew their Sale Objections. See *Withdrawal of Support for Pending Motions*, Nov. 6, 2014 [ECF Nos. 184, 186, 187, 188, 189].

27.    Z Capital also continued negotiations with the North Tower Association. Despite the ongoing negotiations, the North Tower Association filed a Supplemental Objection to the Sale Motion three days before the final Sale Hearing. See *Supp. Obj. to the Sale Mot.*, Nov. 21, 2014 [ECF No. 210]. The Sale Hearing was finally held on November 24, 2014, nearly three months to the day after Z Capital was named the Successful Bidder at the auction.

28.    During a recess at the Sale Hearing, Z Capital and the North Tower Association finally reached an agreement (the "North Tower Term Sheet") pursuant to which the North Tower Association joined the Central/South Term Sheet (together with the North Tower Term Sheet, the "Term Sheets"), adding minimal provisions (described below) and one exception (the North Tower Association did not agree to be bound by any provisions requiring dismissal of any lawsuits or claims by the North Tower Association against the Debtors). See *Letter Agreement*, Nov. 24, 2014 at ¶ 7 [ECF No. 218-3]. For example, pursuant to the North Tower Term Sheet, Z Capital agreed to use its reasonable best efforts to provide a "destination restaurant," provide services (at it sole discretion) that would result in a "5-star product," implement various security measures, limit spa memberships, review valet parking usage and cost allocation, and permit the re-naming of the North Tower. See id. at ¶¶ 1-6. With the Term Sheets memorializing the

parties' settlements and incorporated into the final Sale Order (discussed below), the Sale Hearing continued.

***The Sale Order***

29. Upon consideration of the full record before it, on November 26, 2014, the Court determined that "[a]pproval of the Purchase Agreement and consummation of the Sale Transaction [were] in the best interests of the Debtors' estates, their creditors, and other parties-in-interest." <u>See</u> Sale Order at ¶ I.  This Court also found that the Debtors had demonstrated "good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code." <u>See</u> <u>id.</u> at ¶ J.  Specifically, this Court found that the Debtors validly and soundly exercised good business judgment in determining that:

- (i) the Purchase Agreement constituted the "highest or otherwise best offer for the Assets;"

- (ii) the Purchase Agreement and the closing of the Sale presented the "best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets;" and

- (iii) any other transaction "would not have yielded as favorable an economic result."

<u>See</u> <u>id.</u> at ¶¶ J, N, Z.

30. In approving the Sale, this Court, as requested by the Debtors, confirmed the Debtors' rights under the Declarations, and therefore, the rights that were granted to Z Capital as the incoming Hotel Lot Owner.  <u>See</u> Sale Order at ¶¶ V, Y.  These judicial findings, which were necessary to define the asset the Debtors were conveying to the Property's purchaser, were included in every iteration of the Sale Order, <u>see</u> *Proposed Sale Order* at ¶ V, June 1, 2014 [ECF No. 4-4], including the final Sale Order to which the Associations consented.  These rights, which the North Tower Association now challenges, are:

- "the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa and spa facilities shall be used;"

- "the right to permit other persons to use [the Shared Facilities] as the Hotel Lot Owner may designate in its sole discretion;"

- The right to "grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses;"

- The right to "levy assessments for, without limitation, the maintenance, repair, management, replacement and operation of the Shared Facilities;"

- "broad rights under the Master Declaration to regulate the use of the Shared Facilities;"

- the right to "institute reasonable rules and regulations to operate and manage the Shared Facilities;"

- the right to "include the expense of Valet Parking Services in the Condominium Tower' Shared Facilities Assessments;"

- the right to "assess utility costs based upon square footage rather than actual usage;" and

- certain rights, benefits, and privileges under the Declarations, as well as recognition under Florida law that Z Capital was a "Bulk Buyer."

See Sale Order at ¶ V; see also Purchase Agreement at § 10(b)(i)(C), Ex. D [ECF No. 218-1].

31.     As part of its Sale Order, the Court also determined that:

- The sale and auction process afforded a "full, fair, and reasonable opportunity for all creditors, parties-in-interest and other entities to make a higher or otherwise better offer to purchase the Assets;"

- A "reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein [was] afforded to all interested persons and entities;" and

- Z Capital was a good faith purchaser.

See Sale Order at ¶¶ F, G, L, 33.

32.     Following entry of the Term Sheets, the Associations withdrew their various Sale Objections and consented to the Sale of the Property, free and clear of all Liens, Claims, and/or Interests (as defined in the Sale Order).  See Sale Order at 1, and ¶¶ U, 4, 15.

33.     In entering the Sale Order, the Court retained exclusive jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement and of each of the agreements executed in connection therewith, including jurisdiction to: (a) compel delivery of the Assets to the Purchaser in accordance with the terms of the Purchase Agreement; (b) resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of the Sale Order and resolve any dispute related thereto.  See id. at ¶ 31.

34.     Pursuant to its commitments in the Term Sheets, Z Capital continued to negotiate in good faith with Canyon Ranch to remain affiliated with the Property.  On January 6, 2015, the Debtors notified the Court that although Z Capital and Canyon Ranch had not been able to achieve a consensual agreement to manage the Property, Canyon Ranch would assist in the transition to new management.  *Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtors' Termination of Canyon Ranch Management and Related Agreements on Shortened Notice*, Jan. 6, 2015 [ECF No. 240].  The Court granted the termination of the Canyon Ranch agreements and confirmed Canyon Ranch's obligations to assist in the transition of the Property's management.  *Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtors' Termination of Canyon Ranch Management and Related Agreements*, Jan. 15, 2015 [ECF No. 247].  On January 14, 2015, the Debtors and Z Capital closed on the Sale of the Property.  See *Notice of Sale Closing*, Jan. 15, 2015 [ECF No. 246].

35. Following the Sale, the Debtors filed a Liquidating Plan, which was confirmed on May 20, 2015.  See supra at ¶ 4.  The Debtors' chapter 11 cases were closed as of September 30, 2015, after final administrative actions were completed, such as the payment of professional fees. See supra at ¶ 4.  No motions were made within the time allotted by the Federal Rules of Civil Procedure or Bankruptcy Procedure to appeal or seek relief from the Sale Order.

***Current Litigations***

36. On May 6, 2016, the Central Tower Association commenced an action against Z Capital in the Circuit Court of the Eleventh Judicial Circuit in and for Miami Dade County (the "Florida Court").  See Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172 CA-01 (Fla. Miami-Dade County Ct. May 6, 2016) (the "New Florida Lawsuit").  In the New Florida Lawsuit, the Associations attempt to resuscitate claims previously raised before this Court that were adjudicated, waived, and/or released in connection with Z Capital's purchase of the Property.  For example, the complaint seeks declaratory judgments that (i) certain provisions of the Master Declaration and the Central Tower Declaration violate Florida law; (ii) contrary to the Purchase Agreement, Z Capital is a "Developer," not a "Bulk Buyer," and (iii) contrary to the Central/South Tower Term Sheet, the Central Tower Association, not Z Capital, has the power to determine assessments.  See, e.g., id. at Counts I, II, III, VI, VII, VIII.

37. Z Capital filed a motion to dismiss the New Florida Lawsuit on the basis that, *inter alia,* the Sale Order provides that this Court retained exclusive jurisdiction over claims arising thereunder.  See *Defendant Z Capital Florida Resort, LLC's Motion to Dismiss Complaint and Supporting Memorandum of Law,* Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172 CA-01 (Fla. Miami-Dade County Ct. July 29,

2016).[13]  Moreover, as Z Capital argued in the Motion to Dismiss, many, if not most, of the claims in the New Florida Lawsuit are barred by principles of collateral estoppel and *res judicata* from this Court's prior orders.  Id. at 16-20.[14]

38.    The North Tower Association has been an active participant in the New Florida Lawsuit: taking the lead in opposing Z Capital's motion to transfer the New Florida Lawsuit to the Complex Business Litigation Section, cross-moving to transfer the New Florida Lawsuit to the docket of the judge presiding over another lawsuit commenced by the South Tower Association against Z Capital, and moving to stay the New Florida Lawsuit.[15]

39.    On August 11, 2016, the North Tower Association filed this Motion to Reopen, seeking leave to commence an Adversary Proceeding alleging claims and causes of action "similar to" those detailed in the New Florida Lawsuit.  See Mot. at ¶ 5 n.3.  The Central Tower Association, whose interests are admittedly "generally aligned" with the North Tower Association's interests, has announced its intention to address its claims before this Court as

---

[13]    In light of the plain language of the Sale Order and the Court's retention of exclusive jurisdiction, it was inappropriate for the Central Tower Association to commence litigation without first requesting leave of this Court. Despite actively participating in that action for months, the North Tower Association apparently agrees.  See, e.g., Exhibit B (North Tower Tutorial) ("By our legal analysis, any judgement [*sic*] against Z that NT might obtain by going directly to Florida State Court, could be struck down as invalid—even years into the future, and even by Z itself—on the legal argument that the New York Bankruptcy Court's exclusive jurisdiction had been improperly bypassed.").

[14]    As discussed below, many of the claims in the New Florida Lawsuit are similar to the North Tower Association's Pre-Closing Claims or Declaration Claims, which are precluded by the Sale Order.  Although this Court retained exclusive jurisdiction, any Post-Closing Claims may be more appropriately heard by the Florida court, if this Court chooses to abstain from exercising its jurisdiction.  See infra at ¶¶ 39, 45-47, 66.

[15]    See *Joint Opp. of Central Carillon and North Carillon to Z Capital's Motion to Transfer Case to Complex Litigation Division, and Joint Cross Motion to Transfer Central Carillon Lawsuit to Judge Assigned to South Carillon Lawsuit*, Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172-CA-24 (Fla. Miami-Dade County Ct. July 27, 2016) [Filing No. 44487853]; see also *Tr. for Hr'g on Transfer Calendar for Complex Business Division*, Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172-CA-24 (Fla. Miami-Dade County Ct. Aug. 2, 2016); see also *Joint Mot. by North Carillon Beach Condo. Ass'n, Inc. and Central Carillon Beach Condo. Ass'n, Inc. to Stay Proceedings in this Action Pending Bankruptcy Court's Ruling on its Retained Exclusive Jurisdiction* (the "Joint Motion to Stay"), Cent. Carillon Beach Condo. Ass'n, Inc. v. Z Capital Fla. Resort, LLC, No. 2016-011172-CA-01 (Fla. Miami-Dade County Ct. Aug. 12, 2016). The Joint Motion to Stay was improperly submitted *ex parte* and has since been vacated.  The Florida Court has stayed discovery until mid-October and deferred ruling on the Joint Motion to Stay, pending this Court's decision on the Motion to Reopen.  The next status conference is scheduled for October 18.

well.  See *Central Carillon Beach Condominium Association, Inc.'s Emergency Motion to Enlarge Time to Respond to Motion to Reopen Chapter 11 Cases*, Aug. 30, 2016 [ECF No. 374].

40.       In a "tutorial" it provided to all Unit Owners in the North Tower (including Z Capital), the North Tower Association described its proposed Adversary Proceeding and Motion to Reopen as "a legal extension" of these long-since closed bankruptcy proceedings. See Email from H. Cadiz, Aug. 23, 2016 re: NT vs Z Litigation Tutorials 1, 2, 3 (A) (the "North Tower Tutorial," attached hereto as Exhibit B).  Subsequently, a Unit Owner in the North Tower acknowledged that this Court approved the Sale to Z Capital almost two years ago, but urged this Court to help the Unit Owners "regain control of [their] own destiny."  See *Letter to Judge Chapman from F. Rich*, Sept. 14, 2016 [ECF No. 383].

## ARGUMENT

41.       In the Sale Order, the Bankruptcy Court expressly retained jurisdiction over disputes arising from and relating to the Purchase Agreement and the Sale Order.  See Sale Order at ¶ 31; see also Mot. at ¶¶ 42-44 ("[T]his Court expressly reserved exclusive jurisdiction to adjudicate claims similar to those to be asserted in the Adversary Complaint."); see also Exhibit B (North Tower Tutorial) ("In approving that sale, the New York Bankruptcy Court explicitly asserted its 'exclusive' and widest possible jurisdiction over any possible subsequent disputes between the participating parties.").  That this Court retained jurisdiction, however, is not alone sufficient cause to reopen the bankruptcy cases.  Rather, it is simply the starting point of the analysis.

42.       The Court has broad discretion in deciding whether to grant the Motion to Reopen.  Pursuant to section 350(b) of the Bankruptcy Code, a bankruptcy court may reopen a case (1) to administer assets, (2) to accord relief to the debtor, or (3) for other cause.  11 U.S.C. §

350(b);[16] see, e.g., State Bank of India v. Chalasani (In re Chalasani), 92 F.3d 1300, 1307 (2d Cir. 1996); In re HBLS, L.P., 468 B.R. 634, 638 (Bankr. S.D.N.Y. 2012).  Here, the North Tower Association's Motion to Reopen is premised entirely on the undefined "for other cause" prong of Section 350(b).

43.     In deciding whether to reopen a closed bankruptcy case "for other cause," courts consider a number of factors, including: (1) the length of time that the case was closed, (2) whether a non-bankruptcy forum has jurisdiction to determine the issue that purports to be the basis for reopening the case, (3) whether the prior litigation in the bankruptcy court determined that a state court would be the appropriate forum, (4) whether any parties would suffer prejudice should the court grant or deny the motion to reopen, (5) the extent of the benefit by reopening, and (6) whether it is clear at the outset that no relief would be forthcoming by granting the motion to reopen.  In re Easley-Brooks, 487 B.R. 400, 407 (Bankr. S.D.N.Y. 2013).  In particular, if claims are "certain to fail" upon reopening of the case the Court should deny the Motion to Reopen.  In re HBLS, L.P., 468 B.R. at 639 (quoting In re Kassover, 448 B.R. 625, 631 (S.D.N.Y. 2011)).  These considerations require a case-by-case determination as to whether relief is appropriate.  See In re HBLS, L.P., 468 B.R. at 638.  Movant the North Tower Association bears the burden of demonstrating that "cause" exists to reopen these chapter 11 cases.  See In re Wilson, 492 B.R. 691, 695 (Bankr. S.D.N.Y. 2013).

44.     The section 350(b) elements strongly suggest that reopening these chapter 11 cases is unwarranted and unnecessary here.  The North Tower Association's claims in the draft Adversary Proceeding complaint can be grouped into three categories:  (1) Pre-Closing Claims arising from Z Capital's alleged bad faith in negotiating and entering into the Purchase

---

[16]     Bankruptcy Rule 5010, which implements section 350(b), states that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code."  Fed. R. Bankr. P. 5010.

Agreement and Sale Order; (2) Declaration Claims relating to the scope of Z Capital's rights under the Declarations; and (3) Post-Closing Claims relating to management and operations of the Property. The claims and their related categories are depicted in the chart below:

| Category | Claims Asserted in Plaintiff's Draft Adversary Proceeding Complaint |
|---|---|
| 1) *Pre-Closing Claims*: **Expressly precluded by the Sale Order** | Claim 1 (Fraudulent Inducement) |
| | Claim 2 (Negligent Misrepresentation) |
| | Claim 6 (Florida Deceptive and Unfair Trade Practices Act)[17] |
| | Claim 13 (Declaratory Judgment as to Majority Members of the Board of Directors and Member Voting Rights on the Master Association) |
| 2) *Declaration Claims*: **Expressly precluded by the Sale Order** | Claim 9 (Declaratory Judgment as to Common Areas Belonging to the North Tower) |
| | Claim 10 (Unfairness and Unreasonableness under Chapter 718) |
| | Claim 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association) |
| | Claim 12 (Unfairness and Unreasonableness under Chapter 720) |
| | Claim 14 (Injunctive Relief and Declaratory Judgment as to Planned Renovations and Improvements) |
| 3) *Post-Closing Claims*: **In light of the passage of time, the burden on the Debtors' estates, the futility of the claims, and the availability of an alternative forum, the Post-Closing Claims are more appropriately addressed (if addressed at all) by another court.** | Claim 3 (Breach of North Tower Term Sheet) |
| | Claim 4 (Breach of Implied Covenant of Good Faith and Fair Dealing - North Tower Term Sheet) |
| | Claim 5 (Unjust Enrichment) |
| | Claim 7 (Breach of Covenants - Master Declaration) |
| | Claim 8 (Breach of Implied Covenant of Good Faith and Fair Dealing-Master Declaration) |

[17] To the extent the North Tower Association alleges that Z Capital has engaged in "deceptive overcharging and concealment" of financial books and records, such allegations would qualify as Post-Closing Claims.

I.   **The Pre-Closing Claims and Declaration Claims Are Precluded by this Court's Sale Order, Making Reopening the Chapter 11 Cases to Litigate Such Claims Futile.**

45.      The Pre-Closing Claims and Declaration Claims are rife with specious allegations and frivolous claims that are unsupported by the record (to say nothing of any well-pleaded facts) and are expressly precluded by this Court's findings in the Sale Order.  The Pre-Closing Claims generally contend that the North Tower Association, notwithstanding its representation by two sets of sophisticated bankruptcy counsel, somehow was tricked into entering the North Tower Term Sheet by Z Capital's allegedly false and misleading statements, negligent misrepresentations, and/or deceptive conduct.  The Declaration Claims are challenges, purportedly under Florida law, to the rights afforded to Z Capital under the Declarations that this Court has already addressed (or had the opportunity to address) and determined.

46.      As this Court may itself recall, the Bidding Procedures, auction, and eventual sale to Z Capital were all the product of an extensive and transparent marketing process, open court proceedings, and comprehensive negotiations that led to an agreement being reached between the parties in the back of the courtroom (even later than the proverbial courtroom steps).  The Court should not revisit the long history of these cases because there is no reason to do so.

47.      Because the Pre-Closing and Declaration Claims were freely, fully, and fairly litigated and resolved in this Court almost two years ago, this Court should not hesitate to reaffirm the *res judicata* effect of its findings and decisions in the Sale Order.[18]  That re-litigating this Court's findings and conclusions in the Sale Order are barred by *res judicata* cannot be seriously debated.

_____

[18]      This Court plainly has jurisdiction to interpret and enforce its own prior orders.  See, e.g., Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.), 15-2844-bk(L), 2016 WL 3766237, at *10 (2d Cir. July 13, 2016).

48.     *Res judicata* applies when four factors are present:  (1) a final judgment on the merits (2) by a court of competent jurisdiction; (3) a subsequent action between the same parties; and (4) identity of causes of action.  Corbett v. MacDonald Moving Servs., Inc., 124 F.3d 82, 87-88 (2d Cir. 1997) (citing In re Teltronics Servs., Inc., 762 F.2d 185, 190 (2d Cir. 1985).[19]  A court also must consider whether "an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate, the enforceability or effectiveness' of the reorganization plan."  Corbett, 124 F.3d at 88.  Here, each of the *res judicata* factors is present.

### a.  The Sale Order is a Final Judgment by a Court of Competent Jurisdiction.

49.     The Court's Sale Order, and the findings and conclusions included therein, is a binding order with *res judicata* effect.  See Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust), 634 F.3d 678, 695 (2d Cir. 2011) ("A bankruptcy court order confirming an asset sale is a final judgment capable of having *res judicata* effect.").[20]  When it entered the Sale Order, this Court made clear that *res judicata* would apply:  "I'm going to enter an order that turns that into a binding order of this Court that's going to have collateral estoppel effect."  See Nov. 24, 2014 Hr'g Tr. at 82:10-18.[21]

---

[19]     For ease of reference in this Response, the first two factors are combined into one:  a final judgment on the merits by a court of competent jurisdiction.

[20]     See also Cho v. Seventh Ave. Fine Foods Corp., No. 11 Civ. 3436 (KPF), 2016 WL 1717214, at *3 (S.D.N.Y. Apr. 28, 2016) (bankruptcy court order approving a settlement agreement "constitute[d] a final judgment on the merits" for res judicata purposes); Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565 (6th Cir. 2008) (holding that a bankruptcy court's sale order is a final order for re judicata purposes); Bank of Lafayette v. Baudoin (In re Badouin), 981 F.2d 736, 742 (5th Cir. 1993) ("[B]ankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes"); Culp v. Stanzialie (In re Culp), 550 B.R. 683, 691 (D. Del. 2015) ("The majority of courts to consider the issue have concluded that an order authorizing the sale of assets of an estate is a final, appealable order.") (citing In re Adelphia Recovery Trust, 634 F.3d at 694-95 and collecting cases from other circuits).

[21]     As the Court acknowledged at the Sale hearing, "a decision on the meaning of the [D]eclarations . . . will have whatever effect it has and at least in my view although I'm not that court [the Florida court], my order will have collateral estoppel res judicata effect."  See Sale Hr'g Tr. at 82: 12-18; see also id. at 120:4-6 (THE COURT: "It is what it is.  I don't have the ability to tell some court down the road what effect they're going to give to my order").  The North Tower Association, which participated fully in the Sale process, seeks to file an Adversary Proceeding in this Court challenging the Sale Order—which, as this Court has already noted and should re-affirm, has *res judicata* effect.

50.     The interests of finality, which *res judicata* serves, "are particularly important in the bankruptcy context."  Corbett, 124 F.3d at 91; Lawrence v. Wink (In re Lawrence), 293 F.3d 615, 621 (2d Cir. 2002) (identifying the bankruptcy court proceeding as "a forum where finality of court orders is particularly important").  As the Sixth Circuit explained in Winget:

> A sale order signals an end to litigation in a bankruptcy proceeding; with the execution of the sale order the debtor's assets are judicially sold ***and no further litigation can be brought regarding those assets*** without forcing the court to undo the sale, an action of the very kind res judicata seeks to prohibit.  If sale orders were not final, parties could continue to litigate issues regarding the assets long after their sale, which is certainly an outcome worth prohibiting.  As such, we hold that a sale order is a final order for res judicata purposes.

Winget, 537 F.3d at 579 (emphasis added).

51.     The relief the North Tower Association seeks cannot be granted without overruling numerous and significant findings in the Sale Order.  As such, the Motion to Reopen is an improper and untimely motion for reconsideration and relief from the Sale Order.  Yet the time to seek relief from judgment or an order based on, among other things, newly discovered evidence or fraud, misrepresentation, or misconduct, expires within ***one year*** of the entry of the judgment or order.  See Fed. R. Civ. P. 60(c);[22] Fed. R. Bank. P. 9024 (applying Fed. R. 60).[23]  Even if the Sale Order did not have *res judicata* effect (which it does), any challenges to or appeal of the Sale Order and this Court's findings and conclusions therein are time-barred.[24]  Movant never sought to appeal or challenge the Sale order until now.

---

[22]     The plain language of Rule 60 creates no exception for evidence or fraud discovered more than one year after judgment.  See, e.g., Freedom, N.Y., Inc. v. United States, 438 F. Supp. 2d 457, 465 (S.D.N.Y. 2006).  Adherence to this deadline is not a sign of a "Prussian soul;" rather, it merely underscores the importance of finality in bankruptcy sales.  See In re Met-L-Wood Corp., 861 F.2d 1012, 1019 (7th Cir. 1988).

[23]     A motion to reopen a case is not subject to the one year limitation prescribed in Rule 60.  See Fed. R. Bank. P. 9024.

[24]     The North Tower Association has not alleged any facts supporting the "fraud on the court" exception to Rule 60's one year time limitation.  Fed. R. Civ. P. 60(d).

52.     For example, the North Tower Association acknowledges that it was informed in January 2015—more than eighteen months ago—that Canyon Ranch's agreements were being terminated, and yet, it is only now, long after the Sale Order was entered and these chapter 11 cases closed, that the North Tower Association alleges (without any support) that Z Capital failed to negotiate in good faith with Canyon Ranch.  See, e.g., Mot., Ex. A at ¶¶ 52, 156.  These claims are barred, as the Sale Order now poses an insuperable barrier to the North Tower Association's claims.

**b. The Bankruptcy Proceedings Involved the Same Parties that Would Be Involved in an Adversary Proceeding.**

53.     Throughout this case, the Associations, as creditors of the Debtors, were represented by sophisticated counsel, including the same lawyer at the Brown Rudnick law firm representing Movant now.  The Associations' counsel observed the Auction, filed numerous Sale Objections, participated at multiple court hearings, and negotiated with the Debtors and Z Capital for months.  See discussion supra at ¶¶ 3, 18, 20, 27.

**c. The Pre-Closing Claims Are Expressly Precluded by the Sale Order Because They Were Expressly Decided by this Court in the Sale Order.**

54.     This Court's specific findings and conclusions in the Sale Order clearly address the Pre-Closing Claims.  As such, re-litigation of those issues is barred by the doctrine of *res judicata*.  This Court found that the Debtors conducted the sale and auction process in compliance with the Bidding Procedures Order, which afforded a "full, fair, and reasonable opportunity" for all creditors, parties-in-interest and other entities.  See Sale Order at ¶ F.  This Court determined that the Bidding Procedures were "non-collusive and proposed and executed in good faith as a result of arm's-length negotiations," and were "substantively and procedurally fair to all entities."  See id. at ¶ E.  This Court acknowledged that all persons and entities

interested in the Sale were provided a "reasonable opportunity to object or be heard." See id. at ¶ G. As this Court recognized, it was—and still is—"frankly offensive" that someone would complain about the Sale process—particularly someone who participated in that process. See Nov. 24, 2014 Tr. at 3:21-22. This Motion is nothing more than another—and belated—attempt to attack the Sale process.

55.     Moreover, the Court expressly found that Z Capital was a "good faith purchaser" that (i) complied in all respects with the Bidding Procedures Order; (ii) agreed to certain provisions in the Purchase Agreement that would enable the Debtors to accept a higher or better offer in respect of the Sale; (iii) made the highest or best bid in respect of the Sale; (iv) engaged in good faith negotiations and execution of the Purchase Agreement. See Sale Order at ¶ L; see also id. at ¶ 33.

56.     This Court has already determined that the terms and conditions of, as well as the consideration for, the Purchase Agreement were "fair and reasonable," and the $21.4 million Z Capital provided for the Assets provided a greater recovery for the Debtors' creditors than "any other practical available alternative." See Sale Order at N. Notably, and expressly at odds with the North Tower Association's present allegations that Z Capital fraudulently induced its consent to the Sale, ***the Court found that Z Capital was not fraudulently entering in the transaction contemplated by the Purchase Agreement***. See Sale Order at ¶ S (emphasis added). Each of the Associations withdrew their objections and agreed to the entry of the Sale Order. See Sale Order at ¶¶ U, 4, 15; see also Exhibit B (North Tower Tutorial) ("[I]n the end we all did give the approval required for the sale to proceed."). Such "consent-based bankruptcy sale orders . . . are not subject to collateral attack." See, e.g., Prime Healthcare Servs. v. Hudson (In re Christ

Hosp.), 502 B.R. 158, 175 (Bankr. D.N.J. 2013), aff'd sub nom. In re Christ Hosp., No. 14-472 (ES), 2014 WL 4613316 (D.N.J. Sept. 12, 2014).

57.     The North Tower Associations' Pre-Closing Claims seek to re-litigate Z Capital's purchase of the Property. The North Tower Association's blunderbuss of contentions regarding Z Capital's purported fraudulent and negligent misrepresentations does not change this analysis. Almost two years ago, this Court expressly found—and the North Tower Association agreed—that Z Capital was a good faith purchaser. None of the Associations appealed or sought relief from the Sale Order. Simply, these new collateral and conclusory attacks—none of which are plausible[25]—on the Sale Order are barred. See, e.g., In re Farmland Indus., Inc., 376 B.R. 718, 728 (Bankr. W.D. Mo. 2007), aff'd, 639 F.3d 402 (8th Cir. 2011) (dismissing impermissible attack on validity of sale order and court's findings that defendant was a good faith purchaser, notwithstanding plaintiff's claims of newly discovered evidence that defendant allegedly misrepresented value of the assets); In re Met-L-Wood Corp., 861 F.2d 1012, 1019 (7th Cir. 1988) (affirming finality of sale order and finding that allegations of fraud were barred by res judicata); Bronson v. CHC Indus. (In re CHC Indust.), 389 B.R. 767 (Bankr. M.D. Fla. 2007) (finding that claims based on fraud and negligent misrepresentation were barred by the doctrine of *res judicata* and were impermissible collateral attacks on sale order); see, e.g., In re Christ Hosp., 502 B.R. at 178-179 (finding that purchaser acted in good faith was sufficient to rebut collateral attack of an economic tort claimant alleging purchaser acted maliciously).

---

[25]     The draft Adversary Proceeding Complaint is rife with speculation and unsupported by evidence. For example, in Claim 1 (Fraudulent Inducement), the North Tower Association makes a formulaic recitation of the elements of fraudulent inducement. See, e.g., Mot., Ex. A ¶ 135. The complaint does not satisfy relevant pleading standards. Cf. In re Farmland Indust., Inc., 376 B.R. at 729 (applying the plausibility standard for evaluating a complaint on a motion to dismiss and holding that it was not persuaded that the fraud allegedly perpetrated by defendants plausibly called into doubt the court's findings that the sale was negotiated at arm's length, without collusion, and in good faith.).

58.     Finality has always been and remains to be especially critical with respect to the

Property.  The Court's findings with respect to the Sale process and Z Capital's good faith are

clear; yet, without finality, the Associations could attempt—as they now are in at least two

venues—to challenge such findings each time a new board is appointed.  The Court's findings

were crucial to providing clarity with respect to the Sale and the resolution of the Florida

Lawsuits, as well as protecting the economic integrity of the Sale.[26]  The Motion to Reopen

should be denied, and the *res judicata* effect of the Sale Order should be enforced.

### d.   The Declaration Claims Were or Should Have Been Litigated in the Bankruptcy Proceedings and Are Subject to the Doctrine of *Res Judicata*.

59.     Prior to and during the bankruptcy proceedings, the Associations disputed and

sought to impinge upon and define the rights granted by the Declarations to the owner of the

Property.  See Sale Order at ¶ V.  Specifically, the Associations sought entry of an order finding

that the proposed sale to Z Capital could not be consummated free and clear of the claims for

declaratory relief asserted by the Associations in the Florida Lawsuits.  See, e.g., *Associations'*

*Obj. to the Debtors' Sale Mot. and Bidding Procedures* at ¶ 4; see also *Notice of Associations'*

*Mot. for Entry of an Order* at ¶ 10-11.

60.     In response, the Debtors, at the outset of the Sale process, asked this Court to

include in the Sale Order certain findings with respect to the Declarations so that the Debtors

could define for potential purchasers what they were selling.  See *Sale Motion and Bidding*

*Procedures Order.*  As the Debtors' emphasized, resolution of the parties' disputes with respect

to the Declarations was critical for the Sale, as the Declarations are unambiguously "'covenants

---

[26]     By seeking damages, possibly heavy damages from Z Capital, the North Tower Association's draft
Complaint is a "thinly disguised collateral attack" on the Sale Order, even if it does not expressly seek to rescind the
Sale Order.  See, e.g., In re Met-L-Wood Corp., 861 F.2d at 1018 (finding that plaintiffs who had notice of and/or
appeared at trial were barred by *res judicata* from bringing a lawsuit to nullify a sale of debtors' assets); see also In
re Farmland Indus., Inc., 376 B.R. 718, 726 (Bankr. W.D. Mo. 2007), aff'd, 639 F.3d 402 (8th Cir. 2011)
(dismissing complaint as an impermissible collateral attack on sale order, because plaintiff was "seeking to undo the
economics of the sale by seeking damages").

that run with the land.'"  <u>See</u> *Notice of Associations' Mot. for Entry of an Order* at ¶¶ 19-20

(citing Master Declaration, Arts. 19.1, 19.7; Tower Declarations, Art. 19).  The Declarations

were binding on the Debtors, and would continue to bind the Debtors' successor to the Property,

such as Z Capital.  <u>See id.</u> (citing Master Declaration, Art. 1.1(r)).  Consequently, the Debtors

had to have the ability to define exactly what it was selling and what the buyer was getting.  <u>See,</u>

<u>e.g.</u>, Sale Hr'g Tr. at 8:11-17 (THE COURT:  "The debtor has never for one moment suggested

that it's going to sell the property free and clear of the declarations but the debtor has every right

to sell the property and to seek an order of this Court describing exactly what the property is and

that's governed by the [D]eclarations.  There's nothing lawless about that, and there's [*sic*]

inconsistent with what bankruptcy courts do all the time.");  <u>see also id.</u> at 84:24-85:3 (THE

COURT:  "I think that when the debtor made its motion to sell the property it going out needed

clarity on the meaning of the declarations in order to have a bidder know what it was buying.  So

it's not a Z Capital thing.  It's a debtor trying to sell an asset thing.");  <u>see also</u> *Debtors' Reply to*

*the Associations' and 6801 Collins Hotel's Objections to the Sale*, Nov. 9, 2014 at ¶ 79 [ECF

No. 134] ("Because the Association Litigations attempt to limit the Debtors' (and any successor

owner's) rights under the Declarations that govern the Property and because the Property is the

lifeblood of the Debtors' business, the Bankruptcy Court must confirm these rights under the

Declarations in order to facilitate the sale of the Property.").[27]

---

[27]  <u>See also</u> Sept. 12, 2014 Hr'g Tr. at 22:19-23:10 (THE COURT:  "Well, the determination of—the determination of what it is that the estate is selling is definitely core—is the centerpiece of the sale.  The fact that it may—and I'm hesitating around the word—you say will, I say may—necessarily be dispositive of the existing claims is what it is.  In my view, subject to Mr. Weisfelner's rights to be heard, that doesn't change the core nature of the determination that's incumbent upon me [to] make in connection with the disposition of the property either pursuant to 363 or under a plan. . . That's core—in the truest sense of core.");  <u>see also id.</u> at 154:14-16 (THE COURT:  "I mean, the centerpiece of this dispute is what it says in those declarations, how they—and how they're going to be interpreted going forward.").

61.     In the Sale Order—to which the Associations agreed—the Court confirmed that, with respect to elements of the Declarations that were the subject of prior dispute, the Debtors' interpretation of the Declarations was correct.  Specifically, the Court found that the Declarations provided that the Hotel Owner (now Z Capital) had broad discretion and rights under the Declarations to, *inter alia*, regulate the use of Shared Facilities, institute reasonable rules and regulations, and levy assessments for the maintenance, repair, management, replacement and operation of the Shared Facilities.  See Sale Order at ¶ V.  Thus, the Court fully considered and decided the scope of Z Capital's rights under the Declarations with respect to the issues that are the subject of the Declaration Claims.[28]

62.     In making these express findings, the Court conclusively determined the proper interpretation of the disputed elements of the Declaration.  Importantly, the Court did not modify the Declarations, instead holding that "[n]othing herein, including the Court's approval of the North Tower Term Sheet and the South/Central Tower Sheet, shall constitute an amendment or modification of the Declarations.  See Sale Order at ¶ V; see also *Letter Agreement* at ¶ 12 ("Other than as set forth herein, the terms of the Master Declaration shall remain in full force and effect.").  And the Court was well within its authority and jurisdiction to interpret and enforce the Declarations in accordance with the law.  See, e.g., Sept. 12, 2014 Hr'g Tr. at 45:15-18 (THE COURT:  "There are—there's declarations that govern the operation and the conduct of the property.  They have to be complied with.  I'm going to enforce them in accordance with the law and we're going to be done"); see also id. at 125:19-21 (THE COURT:  "At the end of the day, my view is that I decide, as a matter of law, what the declarations mean.  Period.").[29]

---

[28]     Attached hereto as Exhibit C is a chart listing the Declaration Claims and the corresponding findings in the Sale Order precluding such claims.

[29]     The Court also reminded the parties that it could "read Florida law the same way" it "can read any other law."  See Sept. 12, 2014 Hr'g Tr. at 57:7-8.

63. The Court's Sale Order, and the findings therein, is a binding order with *res judicata* effect.  See supra at ¶ 49.  To the extent the North Tower Association now seeks declaratory relief that the Declarations themselves violate various Florida statutes, see, e.g., Mot., Exhibit A at ¶¶ 211-212, 218, 223, 231, 234, 237, 240-241 [ECF No. 364-1], such claims also are barred by *res judicata*.  See, e.g., In re Adelphia Recovery Trust, 634 F.3d at 694 ("[a] final judgment on the merits . . . precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.") (alteration in original) (emphasis added) (quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000)).  The Associations had the opportunity to challenge—and did challenge—the requested findings with respect to the Declarations during the bankruptcy proceedings.  See supra at ¶¶ 18-19, 22; see also Sale Hr'g Tr. at 39:16-20 (THE COURT:  "Now, the fact that you did a very lawyerly job of identifying some of the denseness of the language doesn't change the fact that the opportunity to deal with the declaration issues on the merits has been extant for months and months and months."); see also id. at 62:19-24 (THE COURT:  "I believe without question that there's been more [than] adequate due process afforded to everybody that at the sale hearing there was going to be a merits consideration of the issues surrounding the declaration . . . .").

64. Remarkably, and despite all of the litigation that has come before, the Associations now contend that the Declarations, which have been in place since 2007, somehow violate Florida law.  If such claims ever had any merit, they should have been brought during the bankruptcy proceeding.  See, e.g., Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 873-74 (2d Cir. 1991) ("[Res judicata] bars re-litigation not just of those claims which were brought in a prior proceeding, but of 'any other admissible matter' which could have been brought, but wasn't"); Winget v. JP Morgan Chase Bank, N.A., 537 F.3d at 579 (holding that

claims were barred by res judicata because plaintiff "could have, and indeed should have, brought its action during the Bankruptcy Proceeding."). The Associations do not get a "do over." Cf. Sure-Snap, 948 F.2d at 870 ("Restraining litigious plaintiffs from taking more than 'one bite of the apple' has been our avowed purpose since the common law doctrine of *res judicata* first evolved").

65. The declaratory relief sought by the Associations would not only materially change the long-standing Declarations, but it also would impair the value of the Property and Z Capital's rights under the Sale Order. See, e.g., Sure-Snap, 948 F.2d at 874 ("Also dispositive to a finding of preclusive effect, is whether an independent judgment [entered] in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'") (citing Herendeen v. Champion Int'l Corp., 525 F.2d 130, 133 (2d Cir. 1975)). Significantly, the Court recognized that if its findings regarding the rights granted by the Declarations were not entered, Z Capital would not consummate the Sale, thereby adversely affecting the Debtors, their estates and their creditors. See Sale Order at ¶ W. This Court also enjoined the Associations from asserting claims and/or interests against the Property or Z Capital. See id. at ¶ 14. The North Tower Association and the Central Tower Association's attempts to rewrite the Declarations, which govern Z Capital's rights to the Property and were directly at issue during the bankruptcy proceeding, should not be permitted. The Court should enforce the *res judicata* effect of its Sale Order.

**II.      The Court Should Abstain from Exercising its Jurisdiction To Litigate the Post-Closing Claims, Which Could Equally and Efficiently Be Decided by Another Court.**

66. The North Tower Association also seeks to assert the Post-Closing Claims, which are a number of claims arising from Z Capital's purported post-closing conduct. By the terms of

the Sale Order, the Court retained exclusive jurisdiction over the Post-Closing Claims. <u>See</u> Mot. at ¶¶ 42-44; <u>see</u> <u>also</u> Sale Order at ¶ 31. And Z Capital is prepared to defend itself in this Court if the Court decides to grant the Motion to Reopen. Notwithstanding its retention of jurisdiction, however, this Court must first decide if there is cause to reopen the bankruptcy case. As discussed above, it would be futile to reopen the case to litigate the Pre-Closing Claims and the Declaration Claims, which are squarely precluded by the Court's Sale Order. In addition, the section 350(b) elements are not met with respect to the Post-Closing Claims, and thus the Motion to Reopen should be denied.

**a. The Sale Order Was Entered Nearly Two Years Ago, and the Case Was Closed Nearly One Year Ago.**

67. The Court entered its Sale Order—to which the Associations agreed—nearly two years ago. <u>See</u> Sale Order at U, 4, 15. The Sale of the Property to Z Capital closed on January 15, 2015, more than 18 months ago. Since then, none of the Associations sought reconsideration of the Sale Order or any other form of relief. It is only now, after a concerted and successful effort to depose the leadership of the Associations with whom Z Capital negotiated during the Sale process and worked constructively for more than a year that the North and Central Tower Associations are asking this Court to essentially unwind the Sale. The passage of time alone militates against the reopening of these cases.

**b. Reopening Would Not Benefit the Debtors' Estates.**

68. Reopening these chapter 11 cases nearly two years after entry of the Sale Order to permit the North Tower Association to pursue the claims threatened against Z Capital would impose a burden on the Debtors' Estates, Z Capital, and this Court. The Debtors' estates have been fully administered, and the draft Adversary Proceeding (to which the Debtors are not named as defendants) will not benefit the Debtors' estates. <u>See</u> <u>In re Neil's Mazel, Inc.</u>, 492

B.R. 620, 628-29 (Bankr. E.D.N.Y. 2013) (denying motion to reopen where, *inter alia*, the disputes at issue were "almost entirely between [movant] and other entities, none of whom is a debtor in any open bankruptcy case" where "much of the force of [movant's] arguments is directed against . . . non-debtors," and where "the estate herein has already been fully administered").

     **c.    Reopening Would Be Futile Because the North Tower Association Has Not Asserted Claims For Which Relief Would Be Granted.**

     69.     Although it is not necessary for the Court to adjudicate the merits of the Post-Closing Claims for the purposes of this Motion, the Court should be cognizant of the fact that Z Capital vigorously disputes the allegations of the North Tower Association set forth in the draft Complaint. One of the 350(b) factors this Court should consider is whether it is clear at the outset that no relief would be forthcoming by granting the motion to reopen. See, e.g., In re Easley-Brooks, 487 B.R. at 407. In assessing this factor, it is appropriate for the Court to examine the merits of the underlying claims. See, e.g., In re Easley-Brooks, 487 B.R. at 409 (noting that a bankruptcy court, in determining whether to reopen a case or not, may examine the underlying complaint to see if it is "completely lacking in merit"). If the underlying claims are certain to fail, as the claims are here, then this Court should deny the Motion to Reopen.

     70.     Z Capital has worked diligently and cooperatively with the prior iteration of the North Tower Association Board, to maintain and improve these facilities. To that end, when the Associations' claims are ultimately adjudicated, Z Capital will establish that, among other commitments it made, it:

- Negotiated in good faith for months to retain Canyon Ranch as the spa operator and reached substantial agreement on terms, only to have the deal thwarted at the eleventh hour by the failure of the Central and South Tower Associations to

release claims against Canyon Ranch—in breach of the Central/South Tower Term Sheet;[30]

- Operated and continues to operate the Property at a superior level of service, evidenced by its 5-star rating on Expedia.com, TripAdvisor, and other leading travel websites, its continued membership in the Leading Hotels of the World, its achievement of a number one ranking on TripAdvisor for Miami Beach, and its inclusion as one of the top ten resorts in Florida by Travel & Leisure;

- Planned and is in the process of executing a renovation to upgrade the lobby, restaurant, and other spaces utilized and enjoyed by Unit Owners, with the vast majority of the cost to be borne by Z Capital;

- Reduced Unit Owners' monthly base assessments;

- Performed a study and developed a capital reserve (none existed previously) to maintain the longevity of the property and avoid unnecessary special assessments;

- Increased financial transparency by distributing to all Unit Owners an annual report containing the next year's budget and the prior year's actual performance versus budget, despite having no obligation to do so;

- Made the books and records available for review pursuant to the terms prescribed in the Master Declaration;

- Created a destination restaurant operated by the former Executive Chef from Amanyara (AmanResorts), an elite, ultra-luxury resort operator;

- Proceeded with ongoing stucco repairs at the North Tower, which repairs Z Capital fully expects will utilize the full amount of the purchase price adjustment when they are concluded; and

- Reviewed security systems on the property, implemented an entirely new security and lock system requiring photo-identification, and installed/replaced more than 100 security cameras.

71.     In whatever forum the North Tower Association's claims and Z Capital's defenses, as well as any potential counterclaims, are ultimately adjudicated, Z Capital will establish, as it is not in reasonable dispute, that it has acted in compliance with its obligations under the North Tower Term Sheet and the South/Central Tower Term Sheet.  The Court need

---

[30]     Z Capital understands that the Central and South Tower Associations wished to preserve their pending litigation against the Debtors in an effort to have their substantial legal fees paid by the Debtors' estates.

not, however, reopen these cases to litigate the Post-Closing Claims, for which relief is unlikely to be granted.

### d. A Non-Bankruptcy Court is an Alternative and Adequate Forum.

72.     With respect to the Post-Closing Claims, although this Court retained exclusive jurisdiction to adjudicate any alleged breaches of the Sale Order, the specific Post-Closing Claims at issue here, in which the North Tower Association alleges Z Capital has committed post-Closing breaches of the Term Sheets, are more appropriately considered by a court of general jurisdiction, such as the Florida state court.[31]  In particular, the Central Tower Association and the South Tower Association already have commenced separate lawsuits, in which the North Tower Association is actively participating, involving allegations similar to the Post-Closing Claims.  See supra at ¶ 39.  Thus, if this Court concludes that it should not reopen these cases, the existence of an alternative and more appropriate forum—of which the Associations have already availed themselves—for the Post-Closing Claims also weighs against the relief sought in the Motion.

73.     In deciding whether to grant the Motion to Reopen, this Court does not have to decide the merit (or lack thereof) of these allegations arising from post-closing conduct in the management and operation of the Carillon.  Rather, this Court's exercise of discretion should be guided by the 350(b) factors.  As discussed above, these factors—such as the length of time that has passed since the entry of the Sale Order, the lack of benefit to the Debtors' estates, the futility of the Associations' Post-Closing Claims, and the availability of an appropriate, alternate forum—weigh against reopening these bankruptcy proceedings.  Under these circumstances, the

---

[31]     As noted above, in light of the plain language of the Sale Order and the Court's retention of exclusive jurisdiction, it was inappropriate for the Central Tower Association to commence litigation in Florida without first requesting leave of this Court.  See supra at ¶¶ 37 n.13, 41.

Court should abstain from exercising its jurisdiction over the Post-Closing Claims in favor of a state court.[32]

## **CONCLUSION**

Defendant Z Capital respectfully requests that the Court enter an order granting the relief requested in the Proposed Order:

(1)     With respect to the Pre-Closing Claims and Declaration Claims, enforcing the *res judicata* effect of the Sale Order and conclusively determining that the Associations are collaterally estopped from pursuing these claims;

(2)     With respect to the Post-Closing Claims, determining the scope of its jurisdiction and deciding whether to (i) reopen the chapter 11 cases solely to litigate the Post-Closing Claims, or (ii) decline to reopen the chapter 11 cases, because appropriate and alternate fora exist; and

(3)     Such other and further relief as the Court may deem appropriate.

Dated: September 15, 2016           MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Washington, DC                   /s/ *Andrew M. Leblanc*
                                    Andrew M. Leblanc
                                    David S. Cohen
                                    Erin M. Culbertson (*pro hac vice*)
                                    1850 K Street NW, Suite 1100
                                    Washington, DC 20006
                                    Telephone:  (202) 835-7500
                                    Facsimile:  (202) 263-7586

                                    *Counsel to Defendants Z Capital Partners, LLC and*
                                    *Z Capital Florida Resort, LLC*

---

[32]     See, e.g., Stern v. Marshall, 564 U.S. 462, 499 (2011) (Article III prevents bankruptcy courts from entering final judgment on claims that would otherwise "exis[t] without regard to any bankruptcy proceeding"); cf. Wellness Int'l Network, Ltd., 135 S. Ct. 1932, 1939 (2015) ("Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge").

## Exhibit A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|                                        |     |                            |
| In re:                                 | )   | Chapter 11                 |
|                                        | )   |                            |
| FL 6801 SPIRITS LLC, *et al.*,         | )   | Case No. 14-11691 (SCC)    |
|                                        | )   |                            |
|      Debtors.  | )   | Jointly Administered       |
|                                        | )   |                            |

_____

## ORDER ON MOTION OF NORTH CARILLON BEACH CONDOMINIUM ASSOCIATION, INC. TO REOPEN THESE CHAPTER 11 CASES

Upon the *Motion of North Carillon Beach Condominium Association, Inc. for Entry of an Order Reopening these Chapter 11 Cases Pursuant to Bankruptcy Code Section 350, Rule 5010 of the Federal Rules of Bankruptcy Procedure and Rule 5010-1 of the Local Bankruptcy Rules* [Docket No. 364] (the "Motion to Reopen") and the Response of Defendant Z Capital Partners, LLC and Z Capital Florida Resort, LLC (together, "Z Capital") to such Motion;[33] and the Court having found that the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having retained exclusive jurisdiction to resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof; and the Court having retained exclusive jurisdiction to interpret, implement, and enforce the provisions of the Sale Order and resolve any dispute related thereto; and due and proper notice of the Motion having been provided under the circumstances, and it appearing that no other or further notice need be provided; and any objections to the Motion having been withdrawn, resolved, or overruled on the

---

[33] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion to Reopen or the Response.

merits; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED** that:

    1.  The Motion to Reopen is denied.

    2.  Claims 1, 2, 6, 9, 10, 11, 12, 13, and 14 are precluded and collaterally estopped by the Sale Order, which has *res judicata* effect.

    3.  The Court will abstain from exercising its jurisdiction over Claims 3, 4, 5, 6, 7, and 8 in light of (a) the length of time that has passed since the entry of the Sale Order, (b) the lack of benefit to the Debtors' estates, (c) the futility of the claims asserted in the draft Adversary Proceeding Complaint, and (d) the availability of an appropriate, alternate forum in state court.

    4.  The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

    5.  This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Date: _____, 2016
New York, New York

          _____
          HONORABLE SHELLEY C. CHAPMAN
          UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

Dear NT Neighbors,

after your board took Z Capital to court yesterday, as announced we want to acquaint you today with some more detail on the suit, in three very brief "tutorials" below, the last two of which relate also to the two attachments above.

**Tutorial 1 - Jurisdiction**

The board and the legal committee recognised from the very start, that any HOA suit against Z would be seen by the courts NOT as a self-standing 2016 conflict, but as a legal extension of the bankruptcy proceedings, through which Z bought the Carillon hotel lot from Lehman Brothers in November 2014. In approving that sale, the New York Bankruptcy Court explicitly asserted its "exclusive" and widest possible jurisdiction over any possible subsequent disputes between the participating parties. In legal terms, NT and the two other HOAs have been such participating parties, because our approval to the sale had been required, given that we each had had active law suits pending against the seller (Lehman Brothers) at that time, and in the end we all did give the approval required for the sale to proceed.

Our motion to re-open is not only an act of deference to the New York Bankruptcy Court's authority, however, but also an act of forward looking self preservation. By our legal analysis, any judgement against Z that NT might obtain by going directly to Florida State Court, could be struck down as invalid - even years into the future, and even by Z itself – on the legal argument that the New York Bankruptcy Court's exclusive jurisdiction had been improperly bypassed.

This is why yesterday's first step in NT's litigating against Z, has been to motion the New York Bankruptcy Court to re-open the 2014 bankruptcy proceeding. That motion will be negotiated in court on September 6. Assuming the re-opening is approved, we will then ask that court to determine, to what degree it elects to exercise its 2014 exclusive jurisdiction over NT's 2016 claims against Z, or to what degree it will abstain from jurisdiction, and instead allow Florida State Court to proceed with hearing some or all NT's claims.

**Tutorial 2 – DRAFT of NT Claims Against Z**

To select its desired extent of adjudicating our complaints against Z, the New York Bankruptcy Court needs to know what those complaints are. Yet we have not filed our complaint, since we need a decision on jurisdiction first. To enable the Court to form a view, our Motion To Reopen has been appended with a copy of our fully considered and structured complaint, marked DRAFT.

By virtue of being attached to our Motion To Reopen, the Draft Complaint is already today an official document and public record, even though it does not yet constitute a filing, neither in New York Bankruptcy Court nor in Florida. If the New Your Bankruptcy Court elects to exercise full jurisdiction, however, our DRAFT could immediately morph into a filing, simply by removing the DRAFT stamp. On the other hand, the DRAFT

label is real: if the Bankruptcy Court decides to hear some parts but let other parts go to Florida State Court, we would dismantle and re-assemble our writ in two autonomous suits.

The attachment entitled "Tutorial 2" contains our complete NT Complaint against Z, marked DRAFT. You need not read all its 100 pages, but we do recommend you read pages 1 to 7, Preliminary Statement. This outlines our three main allegations against Z, namely that they (1) fraudulently induced us to consent to the 2014 Carillon sale from Lehman to Z; in order to (2) practice systematic fraud on us post sale, and in order to (3) exploit us through systematic breach of Florida Condo Law. Each of these three basic complaints is then detailed in Factual Background (subdivided into three chapters entitled Part 1, Part 2, and Part 3 respectively) between pages 9 and 57. Then all this is converted into thirteen Counts, from I to XIII, on pages 57 to 106.

**Tutorial 3 – Motion To Reopen**

Although Motion To Reopen is the current spearhead of our legal actions, it and the related attachment entitled "Tutorial 3" will probably be of the lower interest to most residents. Its twenty pages re-state the arguments of "Tutorial 2", but in the language and patterns of bankruptcy jurisprudence, culminating in why we believe the 2014 case must be re-opened in New York Bankruptcy Court.

**Next Board Meeting, September 30, 11 a.m. EST**

The North Tower board prides itself on a tradition of high transparency and communicativeness to our residents. Recently, under counsel's guidance and to protect attorney client privilege, we have been more restrained in our communication with you. In our pre-scheduled board meeting at 11:00 a.m on the last Friday of September (as pre-announced, there will be no board meeting in August) we plan to explain to you our route via the New York Bankruptcy Court, and other differences but also commonalities between our suit and the suits of ST and CT, as well as our expectations going forward.

Best wishes to you and your families for a wonderful holiday, yours sincerely

Karl Dannenbaum, President
Sam Mandel, Vice President
Betsie Piussan, Treasurer & Secretary

# EXHIBIT C

# DECLARATION CLAIMS

The Master Declaration and North Tower Declaration set forth Z Capital's rights, which were confirmed by this Court in its Sale Order:

- The Master Declaration was recorded on December 3, 2007 in the public records for Miami-Dade County, FL., including all recorded amendments. Sale Order at ¶ V.

- The North Tower Declaration was recorded on August 27, 2008 in the public records for Miami-Dade County, FL, including all recorded amendments. Sale Order at ¶ V.

- The Court recognized that the Associations "dispute and have sought to impinge upon and define those rights [granted to the owner of the Assets under the Declarations]." Sale Order at V.

- Thus, "[t]o facilitate the Sale," this Court made "findings confirming the rights granted to the Debtors pursuant to the Declarations." Sale Order at ¶ V.

  - "The Hotel Lot Owner (or any successor Hotel Lot Owner) has broad rights under the Master Declaration to regulate the use of the Shared Facilities . . ." Sale Order at ¶ V.

  - "The Hotel Lot Owner (or any successor Hotel Lot Owner) may institute reasonable rules and regulations to operate and manage the Shared Facilities . . ." Sale Order at ¶ V.

  - "The Hotel Lot Owner (or any successor Hotel Lot Owner) may grant and use general and specific easements over, under, and through the Shared Facilities at its sole discretion to whomever it so chooses." Sale Order at ¶ V.

  - "The Hotel Lot Owner (or any successor Hotel Lot Owner) may levy assessments for, without limitation, the maintenance, repair, management, replacement and operations of the Shared Facilities. Included in the Shared Facilities are the Unit Owner's Limited Spa Rights, only as expressly set forth in Articles 1.1(dd)(iv)(d), 1.1(oo), and 4.4 of the Master Declaration. Such assessments for the Shared Facilities are separate from and in addition to the monthly Fixed Charge that Unit Owners are obligated to pay the Hotel Lot Owner (or any successor Hotel Lot Owner) in accordance with Article 16.3 of the Master Declaration." Sale Order at ¶ V.

# DECLARATION CLAIMS

- "The 'Hotel Lot Owner' (or any successor Hotel Lot Owner) has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Spa and spa facilities shall be used, if at all . . ." Sale Order at ¶ V.

- "Each Unit Owner's right to use the Shared Facilities, including his or her "Limited Spa Rights" . . .are subject to the Hotel Lot Owner's right to permit other persons to use such facilities as the Hotel Lot Owner (or any successor Hotel Lot Owner) may designate in its sole discretion."  Sale Order at ¶ V.

- "Nothing herein, including the Court's approval of the North Tower Term Sheet and the South/Central Tower Term Sheet, shall constitute an amendment or modification of the Declarations."  Sale Order at ¶ V.

- "If the above findings regarding the rights granted by the Master Declaration and Declarations were not entered, the Purchaser would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors."  Sale Order at ¶ W.

- "If the Sale were not free and clear of all Liens, Claims and/or Interests, or if the Purchaser would, or in the future could, be liable for any of the Liens, Claims and/or Interests, the Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates and their creditors."  Sale Order at ¶ X.

# DECLARATION CLAIMS

The North Tower Association's allegations regarding these Declarations, summarized in the chart below, are barred by this Court's express findings:

| Adv. Pro. Claim | Allegations |
|---|---|
| **Claim 9 (Declaratory Judgment as to Common Elements Belonging to the North Tower)** | "[T]he North Tower Declaration and the Master Declaration contain various provisions, such as Sections 2.14, 3.4(g), and 7.4 of the North Tower Declaration and Sections 1.1(dd) and 16.3 of the Master Declaration, which violate the above listed rights [under Fla. Stat. § 718] of the North Tower condominium Unit Owners to control through their elected board their common elements." Mot., Ex. A at ¶ 211.

"Currently, those common elements of the North Tower are listed as part of the Shared Facilities of the Hotel Lot, and Z Capital is exercising unrestricted and unregulated authority over them, including the right to set the assessment levied against the North Tower Unit Owners for the maintenance of these common elements." Mot., Ex. A at ¶ 212. |
| **Claim 10 (Unfairness and Unreasonableness Under Chapter 718)** | "[T]he North Tower Declaration and the Master Declaration contain various provisions, such as Sections 2.14, 3.4(g), and 7.4 of the North Tower Declaration and Sections 1.1(dd)(i)-(v) and 16.3 of the Master Declaration, which unfairly and unreasonably deprive the North Tower condominium Unit Owners of their common elements . . . all for the benefit of Z Capital. These provisions strip the ability of the North Tower condominium Unit Owners to operate, maintain, or control their common elements, including leaving them without the ability to control or even have a say regarding the amount of assessments." Mot., Ex. A at ¶ 218. |

**DECLARATION CLAIMS**

| Adv. Pro. Claim | Allegations |
|---|---|
| | "Plaintiffs seek a declaration that the following aspects of the North Tower and Master Declarations violate Chapter 718's requirement that "[a]ny grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, ***shall be fair and reasonable***:" |
| |    -   Section 2.14 of the North Tower Declaration |
| |    -   Section 3.4(g) of the North Tower Declaration |
| |    -   Section 7.3 of the North Tower Declaration |
| |    -   Section 7.4 of the North Tower Declaration |
| |    -   Section 8.2 of the North Tower Declaration |
| |    -   Section 1.1(dd)(i)-(v) of the Master Declaration |
| |    -   Section 2.3 of the Master Declaration |
| |    -   Section 4.3 of the Master Declaration |
| |    -   Section 5.1 of the Master Declaration |
| |    -   Section 5.2 of the Master Declaration |
| |    -   Section 16.1 of the Master Declaration |
| |    -   Section 16.2 of the Master Declaration |
| |    -   Section 16.3 of the Master Declaration |
| | Mot., Ex. A at ¶ 223(a)-e). |

| **Adv. Pro. Claim** | **Allegations** |
|---|---|
| **Count 11 (Declaratory Judgment as to Common Areas Belonging to the Master Association)** | "[T]he Master Declaration contains provisions such as Sections 1.1(dd), 1.1(i), and 16.3, which violated the above listed rights [under Fla. Stat. § 720] of the North Tower Condominium Association as a member of the Master Association to control, through the Master Association, the common areas of the Master Association."  Mot., Ex. A at ¶ 231.

"Plaintiff seeks . . . a declaration that the Master Declaration, or Sections 1.1(dd), 1.1(i), 2.3, 4.3, 5.1, 16.1, 16.2, and 16.3 thereof, violate Chapter 720 of the Florida Statues, in that the Shared Facilities serving the several lots at the Carillon should be common areas of the Master Association and not Shared Facilities of the Hotel Lot under Fla. Stat. 720.301(2) and 720.303(1), and that the common areas should be under the control of the Master Association, not Z Capital . . ." Mot., Ex. A at ¶ 234. |
| **Claim 12 (Unfairness and Unreasonableness under Chapter 720)** | "[T]he Master Declaration purports to grant Z Capital exclusive possession and control over what should be the common areas of the Master Association, and gives Z Capital plenary power over the operation, maintenance, and management of these common areas—which are instead called "Shared Facilities" in the Master Declaration."  Mot., Ex. A at ¶ 237.

"[T]he Master Declaration requires Unit Owners to pay an escalating "Fixed Charge" to Z Capital for limited access rights to the Spa. . . . "Unit Owners have no input in how the Spa is operated, what services are provided, or who is allowed to use the Spa." Mot., Ex. A at ¶ 240. |

| Adv. Pro. Claim | Allegations |
|---|---|
| | "Plaintiff seeks a declaration that the following aspects of the Master Declaration violate Chapter 720's [fair and reasonable] requirement:<br>- Section 1.1(dd)(i)-(v) of the Master Declaration<br>- Section 1.2 of the Master Declaration<br>- Section 2.3 of the Master Declaration<br>- Section 4.3 of the Master Declaration<br>- Section 5.1 of the Master Declaration<br>- Section 5.2 of the Master Declaration<br>- Section 16.1 of the Master Declaration<br>- Section 16.2 of the Master Declaration<br>- Section 16.3 of the Master Declaration<br><br>Mot., Ex. A at ¶ 241(a)-(g). |
| **Claim 14 (Injunctive Relief and Declaratory Judgment as to Planned Renovations and Improvements)** | "Z Capital has announced . . . its plans to make material and unilateral alterations to the nature of the Property which are unreasonable, arbitrary and capricious, in bad faith and which destroy the general plan of development in violation of Section 720.3075." Mot., Ex. A at ¶ 258.<br><br>"Z Capital is undertaking significant and expensive renovations that primarily benefit Z Capital, including taking space from the Shared Facilities and converting it into exclusive property of Z Capital." Mot., Ex. A at ¶ 259.<br><br>"By converting space that was part of the Shared Facilities and converting it into exclusive property of Z Capital, Z Capital's planned renovation will, on information and belief, violate the contractually binding promise in Section 10 of the North Tower |

| <u>Adv. Pro. Claim</u> | <u>Allegations</u> |
|---|---|
| | Contract . . ." Mot., Ex. A at ¶ 260.<br><br>"Although the planned renovations will benefit Plaintiff very little, if at all, Z Capital has indicated [ ] that Plaintiff will be assessed to pay a significant portion of the cost of these renovations to facilities that are part of the Spa, and not part of the Shared Facilities (other than for limited access purposes)."  Mot., Ex. A at ¶ 263.<br><br>"Plaintiff seeks a declaration that the planned renovations and assessments are unlawful under the Florida Condominium Act," and "a preliminary injunction prohibiting the defendant, Z Capital, from altering the Shared Facilities until and unless there is a final determination of the merits of the claims in this case." Mot., Ex. A at ¶ 272. |